## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SHIRLEY TABB, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 06-00789 (PLF) |
| v. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, <u>et. al</u>., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendants District of Columbia, Brenda Donald Walker, and Mindy L. Good, by and through undersigned counsel, move to dismiss Plaintiff Shirley L. Tabb's Complaint. The individual defendants specifically seek summary judgment on the basis of qualified immunity. The District seek dismissal or, in the alternative, summary judgment as to the counts of Tabb's Complaint against it. A memorandum of points and authority in support and a proposed Order accompany this motion.

Because this is a dispositive motion, LCvR 7.1(m) does not require counsel to seek consent to the entry of the relief requested herein.

Dated: July 21, 2006                    Respectfully submitted,

ROBERT J. SPAGNOLETTI
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

/s/ Kimberly Johnson
KIMBERLY MATTHEWS JOHNSON
Chief, General Litigation I
D.C. Bar No. 435163


/s/ Wendel Hall
WENDEL V. HALL
Assistant Attorney General
D.C. Bar No. 439344
Suite 6S012
441 4th Street, N.W.
Washington, D.C.  20001
(202) 724-6608
(202) 727-0431 (fax)
E-mail: wendel.hall@dc.gov

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SHIRLEY TABB, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 06-00789 (PLF) |
| v. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, <u>et. al</u>., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

This case arises from the termination of Shirley Tabb's employment as a Public Affairs Specialist in the District of Columbia's Child and Family Services Administration ("CFSA"). Tabb's employment was terminated because her performance consistently failed to meet expectations even after receiving a Corrective Action Plan, an Official Reprimand, and a written admonition over a seven-month span. She was removed from her position summarily when it became clear that her behavior threatened the integrity of government operations. In all respects, the termination of Ms. Tabb's employment was legal. Her Complaint should be dismissed.

### II.    STATEMENT OF FACTS

Tabb worked as a Public Affairs Specialist in the CFSA's Office of Public Information ("OPI"). Complaint, ¶ 12. Tabb was working for the OPI when Mindy Good came to head the OPI in 2003. During Good's tenure, the demand for OPI's services increased rapidly as its

clients saw that it was capable of providing excellent communications support in a timely manner. Exhibit 1. This success carried a downside: the demand soon exceeded the ability of one person to provide the service required. Id. By 2005, it was time for Tabb to pull her weight.

Good conducted weekly staff meetings with Tabb and Derek Stewart, the other Public Affairs Specialist, and routinely discussed the increasing workload and what was necessary to meet it. Good summarized her expectations in a memorandum to Tabb and Stewart dated February 10, 2005. Exhibit 1. These expectations were clearly stated and very specific:

- Providing sound communication counsel and timely, quality products to clients.

- Taking initiative and responsibility to plan project/campaign steps, prepare and implement plans, and gain necessary approvals at each step.

- Involving Good in planning meetings with clients and ensuring Good had at least one day to review/approve drafts and final products before they were submitted to clients.

- Solving issues/problems that arise and scheduling time with Good to obtain guidance whenever needed.

- Keeping projects/campaigns moving and meeting deadlines.

- Using good judgment, managing time effectively, and producing quality work that meets communication objectives.

- Providing progress updates at weekly OPI staff meetings.

Good believed that the continued success of OPI required that both Tabb and Stewart meet these standards.

Tabb, however, almost immediately failed to perform according to these standards. Exhibit 2. As a result, Good worked out a Corrective Action Plan for Tabb and documented Tabb's unacceptable performance in light of those standards. For example, Tabb was asked to devise a communications plan for the launch of FACES.net, a laptop-based information system. Id.. Tabb missed every deadline associated with the project. She did not apply the

communication project steps OPI had discussed and used for two years, such as developing a communications plan before launching into implementation. Id. Tabb presented her work product to Good with much less than one day to review (even though Tabb knew that 24 hours was the minimum time for review) and, more seriously, did not allow enough time for the client to review the final product. Id. Nor did Tabb use her time productively to plan or implement the campaign, including catching up from a four-day absence. Id.

But Tabb continued to fall seriously behind on her projects often without explanation or communication with her supervisors. On July 1, 2005, Tabb and Good met with a representative of CFSA's Quality Improvement Administration. Exhibit 3. Good asked Tabb to develop a communication plan, update an existing all-staff memorandum, prepare a fact sheet, and contact supervisors. Id. She did not fulfill that assignment or communicate with Good about any unusual challenges. Id.

The problems continued. Tabb failed to respond to a FOIA request for almost a month and a half, even though the law provided a maximum of 15 days. On July 13, 2005, Ms. Tabb called in unexpectedly and, without explanation, stated that she would not be coming into work for the next five days. Id. She did not, however, arrange for coverage for a presentation scheduled for July 13, 2005. Id. Another example occurred on August 2, 2005, Ms. Tabb sent Good a draft of the CFSA Reporter due for distribution on August 3rd. Id. This submission was very late and in violation of Good's repeated direction that she be given 24 hours to edit. As a result of the late submission and the extreme number of errors, that edition of the CFSA Reporter did not go out. Id.

Rather than focusing on her performance deficiencies, Tabb focused on obtaining a promotion. In early July 2005, Tabb alleges that she met with Director Brenda Donald Walker.

Complaint, ¶ 14. Tabb used this meeting to suggest that she should be given "senior level responsibility" over two units involved in the emergency placement of children. Id. Director Donald Walker declined. Id.

By focusing her energies on obtaining a promotion rather than on doing her job, Tabb allowed her work performance to slip even further. On August 5, 2005, Good provided Tabb with an Advance Notice of Proposed Official Reprimand. Exhibit 3. The notice provided specific details about Tabb's deficient performance and explained how she could challenge it. Id. The Official Reprimand was sustained on August 22, 2005. Exhibit 4.

Tabb persisted in her efforts to obtain a new position running a program of her choosing. Tabb alleges that she then took her request to Susan Newman, Senior Advisor, Religious Affairs, Executive Office of the Mayor on August 15, 2005. Complaint, ¶ 16. Although the topic was out of her purview as a Public Affairs Specialist, Tabb suggested that children were routinely sleeping in the CFSA building and that she should be given "the opportunity to do something about it." Complaint, ¶ 16. Around this time, it was discovered that Tabb had approached the Department of Human Services at the time of her Corrective Action Plan (March 2005) about "developing a campaign to increase awareness around (*sic*) child abuse and neglect, reviving the Back to Sleep campaign and other projects . . . ." See Exhibit 5.[1] Tabb admitted that this effort was not "intended to be an OPI project," id., even though she took time away from her work to advance it. Id. Additionally, Tabb announced at an Executive Staff meeting, without prior notice to Good, that she was taking on a new project for CFSA Procurements and Contracts. This behavior led to a written admonition dated August 18, 2005.

---

[1] The Court may consider this document and all other documents referenced by and integral to the Complaint under Fed. R. Civ. P. 10(c). EEOC v. St. Francis Xavier Parochial

Tabb, however, continued her efforts to find a higher profile position. "In September 2005, having failed to get any positive response from CFSA management, [Tabb] contacted then-Deputy Mayor Neil Albert." Complaint, ¶ 20. She "shared her desire to transfer from CFSA to DHS and develop a faith-based recruitment and community awareness project." Complaint, ¶ 21. However, according to Tabb, Deputy Mayor Albert did not "provide further assistance to [Tabb] with her faith-based recruitment and community awareness project." Complaint, ¶ 22.

Tabb's next step occurred in mid-September. Sometime thereafter, Tabb took photographs of a child that she claims was under CFSA's care. One photograph was an un-obscured, full-face pose. She shared this photograph and others of this child with the media. She also shared alleged details of the circumstances under which he or she allegedly came into the care of CFSA with the media. The media published the story.

Tabb's performance over the previous year had been unacceptable. She had been given a Corrective Action Plan in March. She had been officially reprimanded. She had been admonished. Yet, she continued to pursue her own ambitions instead of doing what she was hired to do. With her behavior in mid-September, Tabb showed that she was willing even to breach the confidentiality accorded to children under the care of CFSA for her own ends. It was concluded that her continued employment threatened the integrity of government operations. On October 3, 2005, Tabb was served a Notice of Summary Removal in accordance with 16 D.P.M. § 1616. Exhibit 6. Tabb acknowledged that she received the notice on October 6, 2005 and requested a hearing. CFSA scheduled a hearing for October 27, 2005. Tabb, however, did not appear for the hearing and the action was sustained on November 3, 2005. Exhibit 7.

---

Sch., 117 F.3d 621, 625 (D.C. Cir. 1997); see also Phillips v. LCI Int'l, Inc., 190 F.3d 609 (4th

### III.    ARGUMENT

This case involves an employee with serious performance deficiencies who decided to put her energy into convincing high public officials to create a new job for her rather than focusing on doing a better job.  As the various officials declined to promote her personal agenda, Tabb then used a child that she alleges was in the care of CFSA to generate media stories.   Her willingness to violate the privacy of a child allegedly within the CFSA system to further her career ambitions – when it was her job to protect that child – and to misrepresent CFSA practice – when it was her job to correctly inform others of that practice – as well as a year's worth of uncorrected performance deficiencies led to the termination of her employment.  That decision was both justified and legal.

A.    Standards Of Review.

This motion seeks entry of summary judgment in favor of Defendants Brenda Donald Walker and Mindy L. Good on the basis of qualified immunity and on the basis of the fatal defects in Tabb's causes of action against them.  The District seeks dismissal under Fed. R. Civ. P. 12(b)(6) or, in the alternative, under Fed. R. Civ. P. 56(c).  The standards governing these requests for relief follow.

Summary judgment is proper when there is no genuine issue of material fact and judgment in favor of the movant is proper as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  No class of cases, including employment discrimination claims, is exempt from this rule, Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000); Evans v. New York Botanical Garden, 253 F. Supp. 2d 650, 657 (S.D.N.Y. 2003) ("The salutary purposes of summary judgment . . . apply no less to discrimination cases than to commercial or other areas of

Cir. 1999).

litigation."). The Supreme Court has expressly authorized early summary judgment when public officials face insubstantial claims such as those now before the Court. Harlow v. Fitzgerald, 457 U.S. 800, 814 (1982) ("In identifying qualified immunity as the best attainable accommodation of competing values . . . we relied on the assumption that this standard would permit '[insubstantial] lawsuits [to] be quickly terminated.'") (internal citations omitted). As the non-movant, Tabb must make a showing with "specific facts showing that there is a genuine issue[.]" Celotex, 477 U.S. at 324, in opposition to the qualified immunity defense. These facts must have "significant probative" force "tending to support the complaint." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

This Court recently stated the governing standard for Rule 12(b)(6) motions in Hoyte v. Am. Nat'l Red Cross, 2006 U.S. Dist. LEXIS 47491, 7-8 (D.D.C. 2006) (internal citations omitted):

> A motion to dismiss for failure to state a claim may not be granted, unless it appears beyond doubt that the plaintiff can demonstrate no set of facts that supports a claim entitling the plaintiff to relief. In evaluating the motion to dismiss, the Court must accept the plaintiff's factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. While the Court must construe the complaint liberally, the Court need not accept the plaintiff's factual inferences if the complaint's factual allegations do not support those inferences, nor must the Court accept the plaintiff's legal conclusions.

The limitation noted by this Court in the last sentence is highly significant in this case. The Court need not accept legal conclusions nor need it strain to find inferences to support Tabb's Complaint.

B.    Tabb's Claims Against Defendant Donald Walker And Mindy Good Under The Whistleblower Act Should Be Dismissed.

Tabb's claims against Donald Walker and Good under the WPA should be dismissed as a matter of law because the WPA does not provide a cause of action against individual supervisors.

Winder v. Erste, 2005 U.S. Dist. Lexis 5190, *20-*27 (Mar. 31, 2005 D.D.C.).  The WPA expressly provides a cause of action in the Superior Court of the District of Columbia against the District of Columbia Government,  D.C. Official Code § 1-615.53; Winder, 2005 U.S. Dist. Lexis at *20-*21.  It does not, however, provide such an express cause of action against a supervisor.  Winder, 2005 U.S. Dist. Lexis at *23.  The question is whether the WPA can be construed to imply such a cause of action.  It cannot.

As the Winder court noted, "the ultimate issue is one of legislative intent[.]" Id. at *23.  To resolve this question, the courts look to the "language of the statute, the statutory structure" and to other sources such as legislative history.  Id.   As the plaintiff, Tabb bears the burden of showing that the D.C. Council intended to authorize WPA suits against individual supervisors.  Id.

> Tabb cannot carry that burden.  As the Winder Court reasoned:
>
> The structure of the statute strongly indicates that the right of action set forth in § 1-615.54 was intended to run only against the District – the pre-suit notice provision and evidentiary standards . . . apply only to the District.  Moreover, the provisions governing disciplinary proceedings against supervisors indicate that the D.C. Council gave consideration to the remedies that should be available against supervisors, and resolved the issue as set forth in D.C. Official Code § 1-615.58(10) and (11).

Winder, 2005 U.S. Dist. Lexis at *24-25.  The only provision suggesting the possibility of a cause of action against supervisors – D.C. Official Code § 1-615.55(b) – provides little support and, in fact, strengthens the case against supervisory liability.  "However, the more reasonable reading of this provision is that it authorizes fines as part of the judicial relief available to the District in a judicial appeal from an OEA decision on a disciplinary action." Winder, 2005 U.S. Dist. Lexis at *25.  The Winder court also noted that "the little legislative history that has been cited to the Court is consistent with the rejection of an implied cause of action.  The District

quotes an excerpt from the legislative history as stating: 'the Committee rejects, however, the provision in the bill as introduced that would have made supervisors personally liable for damages, including punitive damages, flowing from their violation of whistleblower protections.'" Id. at *26. The language of the WPA, its statutory structure, and legislative history all point in the same direction: individual supervisors cannot be personally liable for damages in a WPA action. The Court should reach the same conclusion as the Winder court and rule that the WPA does not authorize an individual cause of action against individual supervisors.

Even if the Court should decide that the WPA authorizes actions against individual supervisors, the Court should still dismiss the WPA counts against Defendants Donald Walker and Good. Tabb cannot demonstrate that a protected disclosure directly caused the termination of her employment. Crawford v. District of Columbia, 891 A.2d 216, 221 (D.C. 2006) ("While an employee makes a *prima facie* case by showing that the 'protected disclosure' was a "contributing factor" to the disciplinary action, a jury must find a direct causal link in order for there to be liability under § 1-615.53.") Because this issue is being considered under Fed. R. Civ. P. 56, the "direct causal link" standard applies here.

"To make a prima facie showing of a WPA violation, the plaintiff must establish by a preponderance of the evidence that he was the subject of a 'prohibited personnel action' because of his refusal to comply with an 'illegal order' or because he has made a 'protected disclosure.'" Zirkle v. District of Columbia, 830 A.2d 1250, 1258 (D.C. 2003). Tabb alleges that her statement to the media "about children sleeping in the CFSA office building" was a protected disclosure and was a contributing factor "in the personnel actions taken against her, including her summary termination." Complaint, ¶ 68. She does not allege that there is a direct causal link

between the statements and the termination of her employment. Specifically, Tabb asserts that it was her September 19, 2005 statement to the media that constituted the protected disclosure, id., that led to the termination of her employment.

Tabb's statements to the media were not protected disclosures for two reasons. First, the WPA defines the term "protected disclosure" as "any disclosure of information, not specifically prohibited by statute, by an employee to a supervisor or a public body that the employee reasonably believes evidences [specific kinds of alleged wrongdoing]." D.C. Official Code § 1-615.52(6). Tabb's statement to the media does not qualify as a protected disclosure because it was not made to "a supervisor or public body" and involved disclosure of information that, if the child was in fact under the care of CFSA, was "specifically prohibited by statute." D.C. Official Code §§ 4-103.06-07. As such, her statements to the media were not protected disclosures. Since the specific 'disclosure' upon which she bases her claim was not protected under the WPA,[2] Tabb fails to state a claim against Defendant Brenda Donald Walker.

Nor can Tabb state a claim against Defendant Mindy Good. First, Tabb makes the same allegations with respect to Good as she does against Donald Walker. Cf. Complaint, ¶ 68 with Complaint, ¶ 76. The statements to the media disclosing confidential information about someone that Tabb claims was a child in the care of CFSA were not protected disclosures. Nor did they directly cause the termination of Tabb's employment – Tabb's employment was terminated because of her willingness to violate the privacy of a child allegedly under the care of CFSA and to misrepresent CFSA practice to the media as well as a year's worth of uncorrected performance deficiencies.

---

[2]      Tabb's other alleged statements appear to be those in which she was attempting to persuade various officials to move her to a high profile position on a project of her own design.

C.    Tabb's Claims Against The District Under The Whistleblower Act Should Be Dismissed.

Tabb also alleges that the District violated the WPA.  This claim should also be dismissed for the substantive reasons discussed immediately above in connection with the claims against Donald Walker and Good.

D.    Defendants Donald Walker And Good Are Entitled To Dismissal Of The Remaining Counts Based On Qualified Immunity And The Fatal Substantive Defects In Each Count.

"Government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established . . . rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The rationale for this defense is that the substantial social costs of such lawsuits – in terms of official diversion of energy from the public's business and timidity in protecting the public interest – must be balanced against the social interest in enforcing civil rights.  The social costs are well-documented.  As the United States Court of Appeals for the Eleventh Circuit explained:

'These social costs include the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office.  Finally, there is the danger that fear of being sued will 'dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching exercise of their duties.'

Foy v. Holston, 94 F.3d 1528, 1532 (11th Cir. 1996)(internal citations omitted).  The costs that qualified immunity seeks to avoid are primarily *social*.  Each public official has a job to do and that job has been determined by the government's elected officials to be in the public interest. As Foy noted:  "When public officials do their jobs, it is a good thing.  Qualified immunity is a real

---

Job seeking is not protected by the WPA.  See D.C. Official Code § 1-615.52); Complaint, ¶¶ 14,

world doctrine designed to allow local officials to act (without always erring on the side of caution) when action is required to discharge the duties of public office." Foy, 94 F.3d at 1534 (internal citation omitted).

When deciding a qualified immunity motion, the court first considers whether the defendant public official violated the plaintiff's constitutional or statutory rights. This issue is judged in light of current law. If so, the court next asks whether the constitutional right at issue was so clearly established in light of the law at the time of the act in question that is was objectively unreasonable to act as the public official did. Wilson v. Layne, 526 U.S. 603, 609 (1999). "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation that he confronted." Saucier v. Katz, 533 U.S. 194, 202 (2001). Whether a right was clearly established that an official's conduct violated the Constitution is judged in light of the case law in the official's jurisdiction or, failing controlling law, in light of the existence (or not) of a strong consensus of persuasive authority. Saucier, 533 U.S. at 202; Wilson, 526 U.S. at 617. Thus, "if the law did not clearly put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." Saucier, 533 U.S. at 202.

> E.    Defendant Donald Walker And Good Are Entitled To Dismissal Of Tabb's Claims Under 42 U.S.C. § 1985(2) Based On Qualified Immunity And Its Substantive Defects.

Tabb asserts that Donald Walker and Good conspired to prevent her from testifying in the LaShawn A. litigation. See Count IX. The first question for the Court is whether Tabb has

16, 18, 20-23.

established a violation of her rights under this statute.  <u>Wilson v. Layne</u>, 526 U.S. 603, 609 (1999).  She has not.

"The first clause of § 1985(2) prohibits conspiracies to interfere with judicial proceedings in federal court. See 42 U.S.C. § 1985(2). Thus, to state a claim under this section, Plaintiff must allege "(1) a conspiracy between two or more persons, (2) to deter a party, witness or juror from attending or testifying in any  matter pending in any court of the United States, which (3) results in injury to the plaintiff." <u>Lerner v. District of Columbia</u>, 362 F. Supp. 2d 149, 163-64 (D.D.C. 2005).

However, two employees of the same employer cannot conspire with each other or their employer under what is known as the "intracorporate conspiracy doctrine."  As the court in <u>Williams v. Fannie Mae</u>, 2006 U.S. Dist. LEXIS 42911 (D.D.C. 2006):

> "[U]nder the 'intracorporate conspiracy doctrine,' because a company cannot conspire with itself, the officers and directors of a corporation generally cannot be held liable under § 1985(3) for actions taken in concert with one another . . . . Instead, the relevant inquiry is whether the acts of the defendants were in fact taken on behalf of the corporation, each acting within the scope of their employment, or instead were taken solely for personal, nonbusiness motivations."

The <u>Lerner</u> decision was more succinct.  "[A] corporation cannot conspire with its employees, and its employees, when acting within the scope of their employment, cannot conspire among themselves." <u>Lerner</u>, 362 F. Supp 2d at 165, <u>quoting</u>, <u>McAndrew v. Lockheed Martin Corp.</u>, 206 F.3d 1031, 1035-36 (11th Cir. 2000).  This Court noted that the purpose of the doctrine is "to shield corporations and their employees from conspiracy liability from routine, collaborative decisions that are later alleged to be discriminatory[.]"  <u>Kivanc v. Ramsey</u>, 407 F. Supp 2d 270, 275-76 (D.D.C. 2006) (Friedman, J.).

The intracorporate conspiracy doctrine defeats Tabb's cause of action as a matter of law. Tabb alleges that Defendant Donald Walker and Defendant Good and certain unspecified others

entered into a conspiracy.  Complaint, ¶ 92.  Tabb, however, makes only makes allegations concerning the conduct of D.C. employees acting within the scope of their employment – people who cannot conspire as a matter of law.  Moreover, she does not allege that any of these decisions was outside of the participants' scope of employment.  Both defects lead to the dismissal of Count IX as a matter of law.

Nor is it clearly established that the routine actions of a supervisor in disciplining and taking corrective action concerning an underperforming employee can amount to a violation of § 1985(2).  First, as this Court noted in 2006, routine business decisions and interactions are precisely the kind of activities that are not covered by the statute.  Kivanc v. Ramsey, 407 F. Supp 2d 270, 275-76 (D.D.C. 2006) (Friedman, J.).  Second, the mere allegation that unnamed "others"[3] were part of the conspiracy does not render the doctrine inapplicable because the application of the doctrine would not change if these others were D.C. employees acting within the scope of their employment and the application of these laws is not clearly established if these others were not District employees.  Tripp v. Department of Defense, 173 F. Supp 2d 58, 62 (D.D.C. 2001) (dismissing § 1985(2) claim on immunity grounds because law was not clearly established even though rejecting defendant's substantive contention).  The law remains undeveloped.  Only one decision appears to address this issue.  Lerner v. District of Columbia, 362 F. Supp. 2d 149, 163-64 (D.D.C. 2005) (relying on Tripp, holding that intracorporate conspiracy doctrine does not apply when non-employees are part of the alleged conspiracy).  There is also the decision of this case recognizing the broad purpose served by the doctrine.  Kivanc v. Ramsey, 407 F. Supp 2d 270, 275-76 (D.D.C. 2006) (Friedman, J.).  There does not

---

[3]     Defendants would respectfully submit that this is an example of the kind of pleading as to which an order to provide more specifics would be appropriate under Crawford-El v. Britton, 523 U.S. 574, 597 (1998), if Tabb overcomes the other hurdles.

appear, however, to be any controlling authority from the D.C. Circuit or the Supreme Court. The law remains essentially in the same state as it was in 2001. This Court should follow the Tripp analysis and its own articulation of the purpose of the intracorporate conspiracy doctrine and decide that Defendants Donald Walker and Good are immune from liability under 42 U.S.C. § 1985(2).

        F.       Defendant Donald Walker Is Entitled To Qualified Immunity As To Tabb's Claims Under The Fifth Amendment.

Tabb alleges that Defendant Donald Walker violated her rights under the Fifth Amendment. Assuming for the sake of argument that Tabb had a protected property interest in continued employment, Tabb received all the process due. The Supreme Court established the controlling standard in Cleveland Bd. of Education v. Loudermill, 470 U.S. 532, 546 (1985) (internal citations omitted):

> The foregoing considerations indicate that the pretermination "hearing," though necessary, need not be elaborate. We have pointed out that "[the] formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." In general, "something less" than a full evidentiary hearing is sufficient prior to adverse administrative action. Under state law, respondents were later entitled to a full administrative hearing and judicial review. The only question is what steps were required before the termination took effect.

> . . . .

> The essential requirements of due process, and all that respondents seek or the Court of Appeals required, are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement. The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee.

The termination of Tabb's employment met this standard. A summary removal under the DPM does not sever the employment relationship between the affected employee and the government until final agency action is taken.  The effect of the summary removal is to remove the employee from the workplace immediately.   The removal becomes permanent, i.e., the employment relationship is terminated if either the decision is sustained after a hearing or the employee chooses not to seek a hearing.  Decl. of Babara Bailey, ¶ 2.

Tabb received all of the process due.  The Notice identified the grounds for the action. See Exhibit 6.  It informed her that she had the right to review the materials upon which the action was based.  It informed her of her right to be represented by an attorney or other representation.  It informed her that any response could raise "every defense, fact or supporting matter in extenuation, exculpation, or mitigation of which you have knowledge or reasonably should have knowledge."  It informed her of who the hearing officer would be.  Id.

Tabb exercised her right to have a hearing.  It was scheduled for October 27, 2005.  Tabb did not appear.   On November 3, 2005, the agency issued its final decision upholding the summary removal. See Exhibit 7. Tabb was then removed from the workforce by personnel action dated November 8, 2005. See Exhibit 8.

This procedure meets the standard set forth in Loudermill because the whole process is pre-termination.  As for the effective date of a sustained summary removal, that is specified by 16 D.P.M. § 1616.12 – a regulation that helps define the scope of any property interest that Tabb might be able to claim.[4]   Board of Regents v. Roth, 408 U.S. 564, 577 (1972) ("Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source

such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.") Because the regulations were followed, Tabb received all the process that was due.  Neither Defendant Donald Walker nor the District of Columbia violated Tabb's rights under the Fifth Amendment.

The second inquiry in the qualified immunity analysis is whether the law clearly notified the public official involved that the alleged conduct was unlawful.  Wilson v. Layne, 526 U.S. 603, 609 (1999).  "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation that he confronted."  Saucier v. Katz, 533 U.S. 194, 202 (2001).  It appears that no decisions in this jurisdiction have held that the District's summary removal procedure is unconstitutional.  Given that the employment relationship is not terminated until either the employee declines a hearing (by not asking for one) or the hearing is concluded, the clearly established law leads to the opposite conclusion – the procedure is lawful.

Defendant Donald Walker is entitled to entry of summary judgment in her favor as to Tabb's claim under the Fifth Amendment.  She received all the process that was due and her employment was not terminated until after she had the opportunity for a hearing, an opportunity that she declined.

G.    The Court Should Dismiss Tabb's Claims Against The District Under Fifth Amendment.

---

[4]    Defendants reiterate that they have assumed that Tabb has such an interest only for the purposes of this argument and reserve any arguments with respect to this issue.

Tabb has also pled a count against the District for violating her Fifth Amendment rights. This claim is without merit for the reasons articulated in connection with the analysis of the substantive portion of Defendant Donald Walker's claim for qualified immunity.

>    H.    Defendant Donald Walker Is Entitled To Qualified Immunity As To Tabb's First Amendment Claim.

In addition to her Fifth Amendment claim, Tabb asserts that Defendant Donald Walker violated her rights under the First Amendment. Tabb's rights were not violated. She did not speak out on a matter of public concern; instead, she used the special access to the media that was an incident of her job as a Public Affairs Specialist to further a personal agenda by misrepresenting agency practice and disclosing confidential information about a child who Tabb claimed was in the care of CFSA. Even if it could be said that she spoke out on a matter of public concern, the statements are unprotected because the governmental interest in promoting the efficient delivery of services through its employees outweighs Tabb's interest in speaking out. See O'Donnell v. Barry, 148 F.3d 1126 (D.C. Cir. 1998).

The standard for analyzing claims of First Amendment retaliation is well established. First, Tabb must show that he or she was "speaking on a matter of public concern." O'Donnell v. Barry, 148 F.3d 1126, 1133 (D.C. Cir. 1998). This is a threshold inquiry: "If the speech is not of public concern, it is unnecessary to scrutinize the basis for the adverse action absent the most unusual circumstances." Id.

If so, the court must conduct a "fact sensitive and deferential weighing of the government's legitimate interests," Bd. of County Comm'rs v. Umbehr, 518 U.S. 668, 677 (1996), and decide whether the government's significant "interest in achieving its goals as effectively as possible", Waters v. Churchill, 518 U.S. 668, 676 (1996), is outweighed by the employee's contrary interest. O'Donnell, 148 F.3d at 1133.

18

Next, Tabb must prove causation. Id. A plaintiff does not prove causation by attacking the wisdom or correctness of his or her supervisor's decision. Fischbach v. District of Columbia, 86 F.3d 1180, 1183 (D.C. Cir. 1996). Tabb must show that specific instances of protected speech were "a substantial or motivating factor in prompting the retaliatory or punitive act of which she complains." O'Donnell, 148 F.3d at 1133.

Finally, the government must be given an opportunity to show that the same allegedly retaliatory action would have been taken regardless of the specific protected speech at issue. O'Donnell, 148 F.3d at 1133. The First Amendment does not allow an employee to place himself or herself "in a better position as a result of protected conduct than he would have occupied had he done nothing." Mt. Healthy School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 278 (1977).

Tabb did not speak out on a matter of public concern and her speech is therefore unprotected. Whether an employee is speaking on a matter of public concern "must be determined by the content, form, and context of a given statement, as revealed by the whole record." O'Donnell, 148 F.3d at 1134, quoting Connick v. Myers, 461 U.S. 138 (1983). While content is an important factor, Connick and O'Donnell make clear that it is not the only factor. In this case, the form and context of Tabb's statement, "as revealed by the whole record," shows that the statement was personally motivated and was an attempt to provide herself job security as her work performance failed to improve.

The Complaint and the other documents in the record reveal that Tabb's statement was not on a matter of public concern. Tabb received a Corrective Action Plan in March 2005. From that time forward, Tabb began seeking a new position using an issue that the agency knew about and was working to solve as her vehicle. In early July 2005, Tabb alleges that she met with

Director Brenda Donald Walker.  Complaint, ¶ 14. Tabb used this meeting to suggest that she should be given "senior level responsibility" over two units involved in the emergency placement of children.  Id.  Director Donald Walker declined.  Id.

Tabb then took her request to Susan Newman, Senior Advisor, Religious Affairs, Executive Office of the Mayor on August 15, 2005. Complaint, ¶ 16.  Although the topic was out of her purview as a Public Affairs Specialist, Tabb suggested that children were routinely sleeping in the CFSA building and that she should be given "the opportunity to do something about it."  Complaint, ¶ 16.  Around this time, it was discovered that Tabb had approached the Department of Human Services at the time of her Corrective Action Plan (March 2005) about "developing a campaign to increase awareness around (*sic*) child abuse and neglect, reviving the Back to Sleep campaign and other projects . . . ."  Tabb admitted that this effort was not "intended to be an OPI project," see Exhibit 5, even though she took time away from her assigned work to advance it.  Id.

Not receiving satisfaction from Ms. Newman, Tabb alleges that she then went to former Deputy Mayor Neil Albert to alert him to the problem of children sleeping in the CFSA office building and that she should be given senior-level responsibility to fix it.  As Tabb alleges, "In September 2005, having failed to get any positive response from CFSA management, [Tabb] contacted then-Deputy Mayor Neil Albert." Complaint, ¶ 20.  She "shared her desire to transfer from CFSA to DHS and develop a faith-based recruitment and community awareness project." Complaint, ¶ 21.  However, according to Tabb, Deputy Mayor Albert did not "provide further assistance to [Tabb] with her faith-based recruitment and community awareness project." Complaint, ¶ 22. Tabb's next step was to go to the media.  Thus, on the face of the Complaint,

the context of the statements is clearly one involving the pursuit of a personal employment agenda and speaking out not in her capacity as a citizen, but as a practitioner of office politics.

It is true that Tabb's pursuit of her self-interest does not per se render the statements not of public concern.  O'Donnell, 148 F.3d at 1134.  But it is a significant factor tending to show that she was not acting as a disinterested citizen seeking to participate in the political process. Cf. Connick v. Myers, 461 U.S. 138 (1983) (employee sent questionnaire seeking performance information about her public employer; *held* only one question was potentially of public concern, although all related to performance of a public office) with  Pickering v. Board of Educ., 391 U.S. 563 (1968) (teacher's contribution to debate about a school bond issue).  This case is more like Connick than like Pickering.  Both the plaintiff in Connick and Tabb made statements with the primary motivation of avoiding undesired job action.  Just because a public employee gathers information that others might find relevant or interesting does not automatically render it a matter of public concern.  Tabb's statements made in the course of leveraging a new position are not matters of public concern.[5]  The "content, context, and form" of Tabb's statements made during her job hunting are not matters of public concern even if she, as a result of the job that she was seeking to leave, was able to disseminate them more widely than most.

Moreover, Tabb's statements are not a matter of public concern under Garcetti v. Ceballos, 126 S. Ct. 1951 (2006).  In Garcetti, an attorney, Richard Ceballos, in the Los Angeles County Attorney's Office, wrote a memorandum criticizing Los Angeles County detectives and

---

[5]       Part of the reason for this result is that the greater the self-interest, the less reliable the information is.  The First Amendment analysis under Pickering is not indifferent to the truthfulness and reliability of the information.  Pickering v. Board of Educ., 391 U.S. 563 (1968) (public employees may be perceived to have better information than others regarding public issues.)  Naked self-interest is not conducive to reliability and unreliable information from a public official may cause greater harm than from others not perceived to have 'inside' information.

refused to revise it as his supervisors directed.  In doing so, he used his public position to advance his personal views rather than performing the job he was hired to do.  The County disciplined him for his statements.  When the matter was presented to the Supreme Court, the Court ruled that his statements were not "as a citizen speaking on a matter of public concern" because they were required by his job duties, even though they were inappropriate and subject to discipline.  Garcetti leads to the same result here.

The essence of Tabb's job was speaking authoritatively with the media and others about CFSA's programs and policies.  Tabb's conduct here was certainly a part of her job duties generally, even though the statements at a minimum misrepresented agency practice and breached her basic duty of confidentiality to a child that she asserted was in the care of CFSA. Just as Ceballos engaged in misconduct so, too, did Tabb and her statements are no more "as a citizen" than were his.  The same result therefore follows:  her statements were unprotected by the First Amendment because she was not speaking as a citizen.

The next inquiry is "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of a speaker's duties or interferes with the regular operation of the enterprise." O'Donnell, 148 F.3d at 1135.

Tabb's statements destroyed her ability to work with her superiors.  First, she disclosed confidential information, including at least one photograph, of a child who she claimed was under the care of the CFSA.  Few breaches of trust are more serious.  Second, she misrepresented agency practice as a result of making statements well outside of her administrative purview as a Public Affairs Specialist.  Third, she made a series of media contacts, apparently gathered information, and ran a media event at the same time that she was representing to her supervisors

that she was unable to do her job, a representation that her supervisors credited unhesitatingly. In short, Tabb could no longer be relied upon to do her job – being an authoritative voice for CFSA both internally and with the media. Nothing could be more harmful to "close working relationships" or impede the performance of Tabb's duties more seriously. The government's interest in having its Public Affairs Specialists perform their job strongly outweighs any residual interest Tabb may have had in making statements to the media in the context of this case.

Finally, it is clear from the record that Tabb's employment was in serious danger before the September 19th stories as a result of her failure to improve. Her deficiencies were well-documented, had not improved over the course of a year, and the level of discipline was increasing steadily. In short, without improvement in her performance – improvement that Tabb showed no sign of making, the decision that was made on November 3, 2005 appeared to be inevitable without significant and rapid improvement, improvement that Tabb showed no sign of making. The First Amendment does not allow an employee to place himself or herself "in a better position as a result of protected conduct than he would have occupied had he done nothing." Mt. Healthy School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 278 (1977).

In the final analysis, then, Tabb's First Amendment rights were not violated. She did not speak out as a citizen on a matter of public concern. Her statements substantially impaired the government's legitimate interest in operating an authoritative and accurate public information office. Tabb's choice to seek a new and better position rather than improving in the one she had meant that her ultimate removal on November 3, 2005 was inevitable. Defendant Donald Walker is entitled to dismissal of the First Amendment count on the ground of qualified immunity and the District is entitled to dismissal based on the lack of a substantive violation.

The second inquiry in the qualified immunity analysis is whether the law clearly notified the public official involved that the alleged conduct was unlawful.  Wilson v. Layne, 526 U.S. 603, 609 (1999).  Whether Tabb's speech was protected – and it was not – is determined on a case-by-case basis using a balancing test under Pickering v. Board of Educ., 391 U.S. 563 (1968).  Numerous courts, however, have recognized that when a balancing test is involved – and in particular balancing under Pickering – it is extremely difficult to show that a right was clearly established in the particularized sense needed for qualified immunity purposes.  DiMeglio v. Haines, 45 F.3d 790 (4th Cir. 1995) ("Only infrequently will it be 'clearly established' that a public employee's speech on a matter of public concern is constitutionally protected, because the relevant inquiry requires a 'particularized balancing' that is subtle, difficult to apply, and not yet well-defined.");  Medina v. Denver, 960 F.2d 1493 (10th Cir. 1992) ("In determining whether the law was clearly established, we bear in mind that allegations of constitutional violations that require courts to balance competing interest may make it more difficult to find the law 'clearly established' when assessing claims of qualified immunity.");  Borucki v. Ryan, 827 F.2d 836, 848 (1st Cir. 1987) ("When the law requires a balancing of competing interest, . . . it may be unfair to charge an official with knowledge of the law in absence of a previously decided case with clearly analogous facts.");  Benson v. Allophin, 786 F.2d 268, 276 (7th Cir.), cert. denied Benson v. Allphin, 479 U.S. 848 (1986).

It will not do to argue in conclusory terms that "retaliation" generally is unlawful and therefore "clearly established."  Such an argument begs the question – *what* constitutes 'retaliation' and whether the speech was protected in this *particular* circumstance.  Brosseau v. Haugen, 543 U.S. 194, 198 (2004) ("It is important to emphasize that this inquiry must be

undertaken in light of the specific context of the case, not as a broad general proposition.")  As

the Supreme Court explained:

> [W]e emphasized in Anderson [v Creighton,] 'that the right the official is alleged
> to have violated must have been "clearly established" in a more particularized,
> and hence more relevant, sense: The contours of the right must be sufficiently
> clear that a reasonable official would understand that what he is doing violates
> that right.' The relevant, dispositive inquiry in determining whether a right is
> clearly established is whether it would be clear to a reasonable officer that his
> conduct was unlawful in the situation he confronted."

Brosseau, 543 U.S. at 198, quoting Saucier v. Katz, 533 U.S. 194, 201 (2001) (internal citations

omitted).  Broad propositions embodying legal conclusions do not establish law in the sense

required by the Supreme Court.

In short, the need for balancing is fatal to any claim that the law clearly established that

the conduct described by Tabb violated the Constitution; in fact, as shown above, the law

actually would hold that the alleged conduct was not only lawful, but affirmatively protected by

the First Amendment.  It cannot be said that the law clearly put Defendant Donald Walker on

notice that the alleged conduct was unlawful.

I.      The First Amendment Retaliation Claim Against The District Should Be
        Dismissed.

Tabb also alleges that the District violated her First Amendment rights.  The District joins

in the substantive analysis concerning whether her statements to the media were protected.  In

addition, the District respectfully requests that the Court dismiss this claim against the District

because Tabb has not alleged a basis for municipal liability.

To prevail under 42 U.S.C. § 1983, Plaintiff must show "a violation of a right secured by

the Constitution or by federal law, and (2) that the deprivation was committed by a person acting

under the color of state law."  Brown v. District of Columbia, 2003 U.S. Dist. Lexis 3570, *31-

*32 (D.D.C. March 11, 2003)(Robinson, M.J.), citing Gabriel v. Corrections Corp. of America,

211 F. Supp. 2d 132 (D.D.C. 2002).  When a municipality is the named defendant, a plaintiff must show that the deprivation occurred because of a municipal policy or custom so that the municipality is the moving force behind the violation.  Baker v. District of Columbia, 2003 U.S. App. LEXIS 8452, *12 (D.C. Cir. May 2, 2003).  As the Supreme Court recently explained:

> Locating a policy ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality.

Bd. of County Commrs. v. Brown, 520 U.S. 397, 403-04 (1997).  Unless Plaintiff clearly shows that the alleged constitutional deprivation occurred pursuant to a Government policy, she can obtain none of the relief she seeks.  Monell v. Dep't of Social Servs., 436 U.S. 658, 690 (1978)("Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted by that body's officers.").

Tabb must show that a person with final policymaking authority caused the alleged constitutional violation, and St. Louis v. Praprotnik, 485 U.S. 112, 126-27, 130 (1988)(plurality)[6];  Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 694 (1978).  A municipal government cannot be held liable simply because its employees misused discretionary authority, i.e., there is no respondeat superior liability.  Monell, 436 U.S. at 694; see also Praprotnik, 485 U.S. at 130 (1988).  Municipal governments are to "be held responsible when, and only when, their official policies cause their employees to violate another person's

---

[6]    Praprotnik was a plurality decision.  Four members of the Court joined the lead opinion authored by Justice OConnor.  It is this opinion to which this brief refers.  Three members of the Court joined an opinion authored by Justice Brennan.  Justice Stevens authored a dissenting opinion.  No other justices joined this opinion.  When this brief refers to the

constitutional rights." <u>Praprotnik</u>, 485 U.S. at 122. Because only official policies lead to municipal liability, "[o]nly those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability," <u>Praprotnik</u>, 485 U.S. at 123. "[W]hen an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality." <u>Praprotnik</u>, 485 U.S. at 127.

Tabb alleges that Defendant Donald Walker was a policymaker. Complaint, ¶ 37. However, she also alleges that Defendant Donald Walker was constrained by laws not of her making, Complaint, ¶ 34, and that Defendant Donald Walker violated those policies (as demonstrated above, she did not). Two conclusions follow from these allegations. First, municipal policy protected Tabb's interest in speaking out where appropriate and authorized by law. Second, reading the Complaint on its own terms shows that Tabb is seeking to recover on a respondeat superior theory, a basis precluded by <u>Monell</u> and progeny. The Court should therefore dismiss Tabb's claim under 42 U.S.C. § 1983 for a violation of the First Amendment.

      J.      **Defendant District Of Columbia Did Not Violate The Federal Or Local Family And Medical Leave Act.**

Tabb alleges that the District violated her right to reinstatement under the FMLA when she was summarily removed by final agency action on November 3, 2005. The FMLA, however, gives an employee no greater rights to reinstatement than she would have if she were continuously employed. The Department of Labor regulations provide:

825.216 Are there any limitations on an employer's obligation to reinstate an employee?

(a)      An employee has no greater right to reinstatement or to other benefits and

---

<u>Praprotnik</u> "Court" or to the opinion, it is referring exclusively to the lead opinion authored by Justice O'Connor.

> conditions of employment than if the employee had been continuously employed during the FMLA leave period. An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment[.]

29 C.F.R. § 825.216.  In this case, the FMLA did not insulate Tabb from the consequences of the misconduct that led to the termination of her employment of November 3, 2005 because she would be subject to the same penalty if she had been continuously working.   Moreover, Tabb was properly restored to employment subject to the pending summary removal action. See Complaint, ¶ 86. As that was resolved well after she returned to the government, the District complied with both the federal FMLA and the DC FMLA.

## IV.    CONCLUSION

Tabb's employment was terminated because her performance consistently failed to meet expectations even after receiving a Corrective Action Plan, an Official Reprimand, and a written admonition over a seven-month span.  She was removed from her position summarily when it became clear that her behavior threatened the integrity of government operations by disclosing confidential information to the media.  In all respects, the termination of Ms. Tabb's employment was legal.  Her Complaint should be dismissed.

Dated: July 21, 2006                              Respectfully submitted,

                                                ROBERT J. SPAGNOLETTI
                                                Attorney General for the District of Columbia

                                                GEORGE  C. VALENTINE
                                                Deputy Attorney General
                                                Civil Litigation Division


                                                /s/ Kimberly Johnson
                                                KIMBERLY MATTHEWS JOHNSON
                                                Chief, General Litigation I
                                                D.C. Bar No. 435163

/s/ Wendel Hall
WENDEL V. HALL
Assistant Attorney General
D.C. Bar No. 439344
Suite 6S012
441 4th Street, N.W.
Washington, D.C.  20001
(202) 724-6608
(202) 727-0431 (fax)
E-mail: wendel.hall@dc.gov

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SHIRLEY TABB, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 06-00789 (PLF) |
| v. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| DISTRICT OF COLUMBIA, <u>et. al</u>., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## ORDER

Having considered Defendants' Motion to Dismiss or, in the alternative, for Summary Judgment, the memorandum of points and authorities in support, Plaintiff's Opposition, Defendants Reply, and the entire record herein, it is, this _____ day of _____, 2006:

ORDERED: that Defendants' Motion to Dismiss or, in the alternative, for Summary Judgment shall be, and hereby is, GRANTED; and it is

FURTHER ORDERED: that Plaintiff's Complaint shall be, and hereby is, DISMISSED.

_____
Paul L. Friedman
United States District Judge

cc:

Wendel V. Hall, Esq.
Assistant Attorney General
441 4th Street, N.W.
Sixth Floor South
Washington, D.C.   20001


Richard Condit, Esq.
Public Employees For Environmental Responsibility
2000 P Street, NW
Suite 240
Washington, DC 20036