UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Shirley Tabb, <br><br>        Plaintiff, <br>    v. <br><br> District of Columbia; <br> Brenda Donald Walker; <br> Mindy Good, <br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)      Civil Action No. 06-00789 (PLF) |

**DECLARATION OF SHIRLEY TABB**

I, Shirley Linda Tabb, depose and state the following:

1.    I am an adult and resident of Washington, District of Columbia. I am the

Plaintiff in the above-captioned matter.

2.    I was hired in August 1992 to recruit foster and adoptive parents for
District foster children.

3.    During my tenure, I have made significant contributions to the District's
mission to provide permanent and nurturing homes for foster children, and
raised thousands of dollars in fund-raising events when there was no money for
foster and adoptive home recruitment during the time the government was
under the guidance of a control board.

4.    I have worked for almost 14 years at DC Child and Family Services Agency
(CFSA) as a Licensed Independent Clinical Social Worker (LICSW).

5.  Like all District Government employees with proven and documented
acceptable work performance, I achieved progressive step increases and
incremental raises based upon the District of Columbia's Personnel Policy and
the collective bargaining agreement.

6.  As a result of my accomplishments, good evaluations, progressive step
increases, and 2 promotions, I became a grade 14 – step 6 with an annual salary

of approximately $92,848 per year.

7.      Most significant among my accomplishments as an adoptions and foster home recruitment social worker and supervisor include creating public private partnerships with major local radio stations where I profiled children waiting for adoption and recruited parents for a sibling group of 4 little boys over the age of 6 with emotional problems and another sibling group of 7 children during one of my weekly Adopt-a-Child Spotlight features.

8.      I remained in my role as a recruitment unit social work supervisor until promoted to the *Office of Public Information as Acting Public Information Officer* (*OPI*) during the receivership under Ernestine Jones in 2000.

9.      CFSA continued to utilize my special skills as a social worker with marketing expertise and I continued to work with the adoptions and foster home recruitment unit.  My sales and marketing skills were also used by human resource management to recruit much needed social workers nationally.

10.    During my tenure at CFSA and through my last evaluation signed in June 2005, my overall annual performance was never rated as "unsatisfactory" by any supervisor.

11.    In 2004, after a period of illness, I was diagnosed with Type II diabetes.

12.    I have struggled some with my diabetes and have had to take leave periodically for doctors visits and to properly regulate my symptoms.

13.    In early March 2005, I requested family leave so that I could properly care for my Mother.  I received family leave for the period March through July 2005.

14.    In mid-March 2005, my Mother suffered a stroke.  My Mother lived in my home. She was seriously ill and her care was very difficult and stressful.

15.    Unfortunately, in mid-April 2005, my Mother died.   It took me a few weeks to settle her affairs and tend to my grief.   I did not use all of my family and medical leave and I returned to work on or about May 9, 2006.

16.     I have reviewed the "statement of facts" presented to the Court by the

Defendants in section II of their Memorandum of Points and Authorities (Def.

Memo at 1 - 5). Reviewing the "statement of facts" I am unable to determine who

is making the statements, and there is no sworn affidavit(s) submitted in support

of the "facts" alleged in the "statement of facts."


17.     Defendants' "statement of facts" alleges that I "almost immediately failed

to perform to the[ ] standards" set out by Defendant Mindy Good. Def. Memo at

2 (and Exhibit 1). This statement is incorrect as I worked on the tasks assigned

and competed work as promptly as possible given the timing of the assignments,

resources provided, and my family and medical leave status. It was well known

to Defendant Good and other CFSA managers and staff that I was very involved

in the care of my elderly Mother during 2005 until her death in mid-April. As

noted previously, I was specifically given family medical leave for the period

March through mid-July 2005.   Attached as Exhibit A is a true and correct copy

of the authorization I received for family and medical leave.


18.     However, I am unable to fully address the suggestion that I may have

failed to compete any particular assignments (or phases of any assignment)

because I do not have all the records and communications relating to my work activities. I would be able to more specifically address the allegations about my work performance if I were able obtain these records and corresponding testimony through discovery.

19.    On March 2, 2005, Ms. Good issued a Notification of Unacceptable Performance and Corrective Action Plan (Def.s' Exhibit 2 at 1 - 7). This memo is unfairly and inaccurately critical of my performance on the FACES.net project and the *CFSA Reporter*. Moreover, this memo ignored my other work and contributions to CFSA. Complicating matters, at the time this memo was issued I was seeking family medical leave to further assist my eighty-nine year old Mother who I moved from Arkansas to live with me in 2004 after my Father died.

20.    Despite my concerns with the accuracy and fairness of Defendant Good's corrective action plan, I responded constructively. See, Def. Memo at 2 - 3 (and Def.s' Exhibit 2). Attached as Exhibit B is a true and correct copy of the comments I submitted on March 17, 2005 in response to Defendant Good's corrective action concerns. Def.s' Exhibit 2).

21.    Defendant Good states that I missed every dead line the FACES.net

assignment. Def. Memo at 2 (and Exhibit 2). This statement is incorrect and

unsupported by the facts for several reasons:

▸    The FACES.net Project was given to me with only 2 weeks before the final

    product was due.

▸    Defendant Good initially assigned the project to Derek Stewart and had

    met with FACES staff several times before the day she took me to the

    meeting with her and involved me in the project.

▸    It was obvious at this meeting that every one in the room knew what they

    were talking about except me. This was the first time I knew any thing

    about the deadline and expectations.

▸    She assured me that I should give it my best shot and that more time

    would be allotted if needed.

▸    Defendant Good was out of the office on sick leave during this critical

    period following this impromptu assignment and I was left to work with

    FACES staff on my own.

▸    Documents were emailed to one of two home email addresses she

    provided me. She did not get the documents because she gave me the

    incorrect email address.

22.    Defendant Good claimed she emailed assignments and deadlines to Derek

Stewart and me on February 10, 2005 (Def.s' Exhibit 1), but this information

never made it to my District government email box.  Instead, I was working in

the office that weekend on February 12, 2005 and found a copy in Derek

Stewart's office when I went into his office to use his color printer.


23.    In addition, I never received the March 2005 unit calendar that Ms. Good

said she emailed and had to request that she send it to me again.   Attached as

Exhibit C is a true and correct copy of my March 3, 2005 Email to Mindy Good

Re: March Schedule.


24.    I was also out sick a couple of days during these final 2 weeks of the

FACES.net project dealing with complications of diabetes – but maintained

constant contact with Defendant Good and the FACES client.


25.    I worked directly with the FACES client who wrote me and Defendant

Good an email expressing her gratitude and praising me for my work and

support.

26.     Defendant Good emailed the client back and told her that she should not
have been satisfied because OPI did not provide adequate customer service. See
Def.s' Exhibit 2 at 24 - 25 ( February 25 and 26, 2005 Email exchanges between
Ms. Sharmaine Allen (FACES client) Ms. Good and me).

27.     On or about March 18, 2005, my Mother had a stroke. I took family and
medical leave to care for her until her death. As mentioned earlier, I returned
from leave on or about May 9, 2005. When I returned to work in May, I met with
Defendant Good and proceeded to resume my duties. During the period May -
July 2005, I carried out my duties and received no comments from the
Defendants indicating that my work or conduct was deficient in any manner.

28.     Earlier in the year and after I returned from leave, I heard from other CFSA
staff that children who were being brought in for intake and investigations were
sometimes sleeping overnight in the CFSA office building. I had also been
informed that CFSA did not have adequate facilities and supplies to try and
make children comfortable while awaiting placement. I knew this was a serious
problem because CFSA had declared in 2003 that it had ended the practice of
children sleeping overnight in the CFSA office building.

29.    I mentioned my concern about this issue to Defendant Good. She replied that the agency should consider using me to help with recruitment of foster homes. Defendant Good encouraged me to meet with Defendant Walker to discuss the issue and suggest a plan to resolve the problem.

30.    On July 6, 2005, I met with Defendant Walker and discussed the lack of emergency foster home resources that had resulted in children sleeping in the CFSA office building.

31.    During the meeting, I asked Defendant Walker if I could use my social work and marketing skills to recruit emergency homes in the faith-based community.   In addition, I suggested that I could assume senior level responsibility over two poorly performing recruitment units that the agency depends upon for placement resources. Defendant Walker rejected my suggestions.

32.    Following the July 2005 meeting with Defendant Walker, children continued to sleep in the CFSA office building.

33.    In early August 2005, I was home on sick leave when I received a letter

from Defendant Good proposing that I receive a reprimand for allegedly failing

to sustain satisfactory performance. Def.s' Exhibit 3. I was shocked and

surprised to receive this document as Defendant Good had not raised any

concerns regarding my performance upon my return from family and medical

leave following my Mother's death.


34.    The issues raised by Defendant Good are not supported by the facts. If I

were permitted discovery, I could more fully address these issues through

documents and witness testimony. However, I can respond, at least in part, to

several issues raised in the notice.

▸    Work with Tori Russell regarding the Quality Service Review. This project

      was not given to me until July 5 or 6, 2005. On Thursday, July 7, I still did

      not have the information I needed from Defendant Good. In addition, I

      was unable to reach the two supervisors who had to be interviewed. My

      recollection is that they may have worked off-site and were very difficult to

      reach. These factors made it impossible for me to prepare draft materials

      by Monday, July 11.

▸ Complicating matters further, problems associated with my diabetes required me to take leave July 11 - 22, July 26, and July 29 - August 8, 2005. All of the leave was authorized by my doctors and approved by CFSA management.

▸ Children's Law Center FOIA request. This project was being handled by Defendant Good for two or three months before she gave it to me. That is why CFSA's response was, in Defendant Good's words, "extremely late." The timeliness of the FOIA response had nothing to do with my work on the project.

▸ Fifteen minute OPI presentation at Employee Orientation. I missed the orientation because I was out sick. I had not arranged for a substitute because the date for the orientation had changed a few times and I was unaware of the final date that was selected.

▸ *CFSA Reporter.* Defendant Good was out sick on August 1, so she was unable to meet with her to discuss the *CFSA Reporter* before August 2, 2005. Attached as Exhibit D is a true and correct copy of an email I received from Defendant Good stating that she would be out sick on August 1. I made the corrections to the draft immediately after I received Defendant Good's comments. Attached as Exhibit E is a true and correct

copy of the version of the *CFSA Reporter* with my corrections.

▸ On August 15, 2005, I briefly responded in writing to the notice of reprimand. Attached as Exhibit F is a true and correct copy of my letter to Dr. Heather Stowe. Dr. Stowe was the CFSA official charged with reviewing the reprimand issue. She was also the Administrator of the Intake and Investigations Administration, which was responsible for addressing the problem of children sleeping overnight at CFSA. Consequently, I was not surprised when Dr. Stowe sustained the reprimand.

▸ The reprimand was contrived by the Defendants and Dr. Stowe in retaliation for my raising the issue of children sleeping overnight at CFSA. It was issued less than a month after my meeting with Defendant Walker.

35.    On August 15, 2005, I communicated with Susan Newman, senior advisor, Religious Affairs, Executive Office of the Mayor. I advised Ms. Newman that (a) CFSA had children sleeping in the building for lack of foster home resources; (b) I wanted the opportunity to do something about it, and ( c ) I recommended to Defendant Walker and/or Deputy Mayor Neil Albert emergency placement of

children at the Holiday Inn a few blocks from the CFSA office building. I also discussed the recruitment of emergency foster homes in the faith-based community with Ms. Newman.

36.    On August 18, 2005, I received an official admonition from Defendant Mindy Good (Def.s' Exhibit 5). Defendant Good admonished me for speaking to Susan Newman about children sleeping in the CFSA office building and my desire to implement some emergency plan to address the problem. In support of her admonishment, Defendant Good also referenced that I had contacted a public information officer at the D.C. Department of Human Services (DHS) in March 2005 about developing a campaign to increase awareness around child abuse and neglect, reviving the Back to Sleep Campaign and other projects.

36.    In response, on August 18, 2005, the I submitted a ten-page, written rebuttal to Defendant Good's admonition. My rebuttal stated, in part, "[w]e are breaking the law when children sleep in the agency." I also stated that "[w]e remove children from neglectful and abusive situations, only to bring them into another neglectful, abusive and degrading situation (in our custody)." Attached as Exhibit G is a true and correct copy of my rebuttal to management's

admonition.

37.    Despite my detailed responses to Defendant Good's admonition, to the best of my knowledge, the admonition was not retracted.   In fact, reference to the admonition was made in support of the decision to summarily remove me from my position.

38.    Unfortunately, complications associated with my diabetes was still causing troublesome symptoms such as blurry or dim vision and tingling in my hands, legs, and feet.  On August 18, 2005, I received a disability certificate from my doctor indicating that I needed to take leave from August 18 through September 16, 2005.   Following an appointment with my doctor on September 14, my disability was extended through October 3, 2005.  Then on September 27th, my doctor again extended medical authorization for leave through October 24, 2005. Attached as Exhibit H is a true and correct copy of my authorized family medical leave and subsequent extensions by my doctor.

39.    In September 2005, having failed to get any positive response from CFSA management, I contacted then-Deputy Mayor Neil Albert.  Deputy Mayor Albert

was responsible for the performance of CFSA and other social service agencies.

40.    In my communications with Deputy Mayor Albert, I stated my desire to transfer from CFSA to DHS and develop a faith-based recruitment and community awareness project.

41.    I also communicated to Deputy Mayor Albert that children were sleeping in the CFSA office building. I shared pictures of children sleeping in the building with the Deputy Mayor. I also advised the Deputy Mayor Albert that a placement worker had advised me that intake social workers were not calling potential foster families after 12 midnight or 1 a.m. to secure placements for children because it was too late.

42.    In mid-September 2005, while on medical leave, I received a telephone message from a social worker colleague who reported that she had six children in the office one night and only one blanket. The social worker asked if I could provide some comforters.

43.    CFSA management's failure to address the problem of children sleeping in the CFSA office building prompted me to take action to bring further attention to the issue. I contacted the media to alert them to the problem. The media reported that children were sleeping in the CFSA office building.

44.    On September 19 and 20, 2005, WUSA-TV did three news stories on the issue. Each story included interviews of the Plaintiff. Two of the stories played the voice mail of my colleague asking for comforters for children at CFSA. WJLA-TV also carried the story.

45.    In response to the WUSA-TV reports, Defendant Mindy Good stated that children sleeping in the CFSA office building was "totally unacceptable." CFSA's Principal Deputy Director Uma Ahlualia was also filmed providing a response to the news stories.

46.    On October 3, 2005, while I was still on medical leave, Defendant Walker issued a "Notice of Summary Removal." The Notice stated, in part, that "effective October 3, 2005 . . . [the Plaintiff was] summarily removed from . . . [her] position of Public Relations Specialist in the Child and Family Services

Agency, Office of Public Information (CFSA OPI)."

47.    Defendant Walker's Notice cited, in part, (a) my use of the CFSA e-mail
system to "approach another government agency about an unauthorized
campaign to raise awareness about child abuse and neglect . . ." in March 2005;
and (b) that on or about September 19, 2005 I allegedly "misrepresented agency
practice to the media; violated CFSA confidentiality laws in showing the image of
a child in CFSA's custody." However, no identifying characteristics of the child
in the photograph were shown.

48.    I was given no advance notice of my removal and no opportunity to
contest the allegations raised against me pre-removal.  At the time of my
removal, my pay grade was DS-14, step 6, which earned me an annual salary of
$92,848.00.

49.    On October 10, 2005, I filed a written response to my summary removal
contesting the claims raised by the Defendants.  Attached as Exhibit I is a true
and accurate copy of the written response I filed with CFSA.  In my response, I
again detailed the problems within the Office of Public Information and how

CFSA had been violating the rights of children by failing to provide timely and appropriate placements. I noted that at least ten children slept in the CFSA office building during the week of September 5, 2005. In addition, I refuted the specific allegations made against me regarding my work performance.

50.    On October 21, 2005, my attorney hand delivered a letter to Defendant Walker. Attached as Exhibit J is a true and accurate copy of the letter my attorney delivered to CFSA. The letter objected to the claims made against me in the removal letter. In addition, through this letter, I notified the Defendants that I had elected to file a civil action under the D.C. Whistleblower Protection Act in order to contest the removal and other prohibited personnel actions being taken against me. See, D.C. Code §§ 1-615.53, 1-615.54 and 1-615.56.

51.    On November 17, 2005, CFSA admitted in the *CFSA Reporter,* an internal agency newsletter, that the *LaShawn A.* Court Monitor had reported that "CFSA has experienced a crisis in placement services." The Monitor's November 3, 2005 assessment of progress through June 30, 2005 makes note of the placement crisis (Monitor's report at 4) and the fact that children had been sleeping overnight in the CFSA building (Monitor's report at 88). In addition, based upon employee

exit surveys, the Monitor reported that a suggestion for improvement offered by some departing CFSA employees was "[c]reate an environment that fosters open communication without retaliation" (Monitor's report at 58).  Attached as Exhibit K is a true and accurate copy of the *LaShawn A.* Court Monitor's report dated November 3, 2005 (highlighting on the referenced pages was added).


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Shirley L. Tabb, LICSW

Executed on: September 4, 2006