# _LaShawn A. v. Williams_

## An Assessment of
## The District of Columbia's
## Progress as of June 30, 2005

Center for the Study of Social Policy
1575 Eye Street, NW, Suite 500
Washington, DC 20005

November 3, 2005

## _LaShawn A. v. Williams_

## An Assessment of the District of Columbia's
## Progress as of June 30, 2005

---

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................. 1

II.    OVERVIEW ....................................................................................... 2

III.   WHAT'S WORKING WELL AND WHAT'S NOT WORKING WELL ................. 3

IV.    PERFORMANCE IN KEY SUBSTANTIVE AREAS
       AS OF JUNE 30, 2005.................................................................... 6

       A.  Protective Services.................................................................6

       B.  Services to Families and Children in Their Own Homes ...................18

       C.  Placement of Children..........................................................23

       D.  Planning ...........................................................................35

       E.  Adoption and Post Adoption...................................................41

       F.  Supervision of Placement ....................................................46

       G.  Case Review System...........................................................49

       H.  Special Corrective Action ....................................................53

       I.   Staffing and Caseloads........................................................54

       J.   Training ...........................................................................62

       K.  Resource Development ........................................................69

       L.  Contract...........................................................................76

       M.  Information Systems ...........................................................80

       N.  Financial Development ........................................................81

V.     SUMMARY OF PERFORMANCE ON
       IMPLEMENTATION PLAN BENCHMARKS.............................................. 84

---

# LIST OF TABLES

Table

1.    Children Involved with CFSA at any Point Between 1999 and 2004
      Who Died in Calendar Year 2004 as of July 7, 2005 ...........................................15

2.    CFSA Referrals to the Healthy Families Thriving Communities
      Collaboratives between October 1, 2004 and February 28, 2005.......................20

3.    Selected Demographics for Children in Foster Care
      as of July 31, 2005 ...................................................................................................25

4.    Permanency Goals for Children in Foster Care as of July 31, 2005....................26

5.    Performance in Meeting MFO Placement Standards............................................31

6.    Finalized Foster Care Adoptions at CFSA...........................................................41
      January – July 2005

7.    Social Work Staffing as of July 31, 2004 and July 31, 2005...............................55

8.    Caseloads for CFSA Social Workers as of December 31, 2004..........................60

9.    Summary of FY06 Mandatory
      Training for Staff and Other Training...................................................................64

10.   Resource Parent Recruitment – 2003 and 2004....................................................70

11.   CFSA FY 2006 Budget ...........................................................................................82

# LIST OF FIGURES

Figure

1.     Calls to the CFSA Child Abuse and Neglect Hotline Reports of
Child Maltreatment (CPS) and Information and Referral (I&R).........................6

2.     Disposition of Hotline Reports of Abuse or Neglect
July 2004 – July 2005 .........................................................................................7

3.     Percentage of Investigations Initiated Within 24 and 48
Hours as of July 31, 2005 ...................................................................................8

4.     Percentage of Al Open Investigations Completed Within
30 Days as of July 31, 2005................................................................................9

5.     Backlog of Investigations Incomplete After 30 Days .........................................10

6.     Completion of Institutional Investigations as of July 31, 2005 ..........................11

7.     Medical Evaluations for Substantiated Investigations
as of June 30, 2005..........................................................................................13

8.     Social Worker Visits to Children Receiving In-Home Services
as of July 31, 2005 ...........................................................................................19

9.     Sibling Visitation for Children Placed Apart as of July 31, 2005 ......................27

10.    Children Under 6 in Congregate Care and Children
Under 12 in Children Care (January 2004 – January 2005) ...............................28

11.    Number of Children in Foster Care with Three or More
Placements in the Previous 12 Months as of July 31, 2005.................................30

12.    Current Case Plans for Foster Care Cases and Family Cases
as of July 31, 2005 ...........................................................................................36

13.    Visits Between Children and Parents in July 2005
When the Goal is Reunification..........................................................................38

14.    Placement of Children with a Goal of Adoption
as of July 31, 2005 ...........................................................................................42

15.    Social Worker Visitation to Children in Foster Care...........................................47

16.     Administrative Reviews for Children in Foster Care ...........................................50

17.     Permanency Hearings in Court for Children in
        Foster Care 14 Months or More..........................................................................51

### _LaShawn A. v. Williams_

### An Assessment of the District of Columbia's Progress as of June 30, 2005

## I.    INTRODUCTION

This report was prepared by the Center for the Study of Social Policy (the _LaShawn_ Court-appointed Monitor) to assess the progress of the District of Columbia in meeting the outcome and implementation benchmarks established in the Court-ordered _LaShawn A. v. Williams_ Implementation Plan.[1]

To assess progress on outcomes, the Monitor analyzes administrative data provided by the District's Child and Family Services Agency (CFSA or the "Agency") on a daily or monthly basis and also independently collects data through periodic case record reviews and other quantitative and qualitative review methodologies. To assess progress on implementation strategies, the Monitor reviews Agency policy and procedure, consults with the leadership and staff of CFSA, independently verifies and reviews actions the Agency has committed to undertake, and gathers information through observation and consultation with a wide range of public and private stakeholders. Taken together, all of this information enables the Monitor to make judgments about the Agency's activities and progress.

The following report looks at Agency progress as of June 30, 2005 against all of the outcome benchmarks in the Implementation Plan.[2]  The report also includes summary information on the key functions of the child welfare system and the children and families it serves as well as the Monitor's overall assessment of the District of Columbia's progress to date (i.e., what is working well, what is improving and those areas that require additional attention and better results).

This information allows the Monitor to determine the direction of progress and provide objective information to the Court, the plaintiffs in the _LaShawn_ litigation, key stakeholders, the Mayor, the Council of the District of Columbia, the Child and Family Services Agency and the general public.

Section V provides a summary table of the Agency's performance against the June 30, 2005 benchmarks.

---

[1] The _LaShawn_ Implementation Plan was approved on May 15, 2003 by U.S. District Court Judge Thomas F. Hogan. The Implementation Plan sets the outcomes to be met by and the strategies that the District of Columbia will implement to achieve compliance with the child welfare reforms required under the _LaShawn A. v. Williams_ Modified Final Order. The Implementation Plan covers outcomes and activities through December 31, 2006 and sets interim performance benchmarks to assess improvements at six month intervals.

[2] In order to best assess progress as of June 30, 2005, the Monitor uses administrative data and case record review information from the period between July 1, 2005 and July 31, 2005.

## II.  OVERVIEW

CFSA has made significant progress in many areas. The direction of progress has accelerated from six months ago and, in many areas, there has been progressive and measurable improvement towards the benchmarks in the Implementation Plan. Overall, our assessment of the Agency's progress is positive. At the same time, the Agency's performance and practice with individual children, families and contract providers in some areas is still not consistently at the level that is required by the Court Order, expected from the community or meeting the needs of some children and families. Additionally, the Agency's achievements are overshadowed by the serious and continuing problems in placement and timely payment to contract providers.

Several benchmarks have been substantively achieved during this reporting period including placing children in the least restrictive placement; adhering to capacity limits for foster homes; establishing appropriate permanency goals for several categories of children; conducting administrative reviews and permanency hearings; ensuring supervisory responsibility for cases, and providing foster parent pre-service training. However, compliance with the majority of performance benchmarks in the _LaShawn_ Implementation Plan, while mostly moving in the right direction, is not meeting established targets in most key areas. Furthermore, performance in some outcome areas has regressed or cannot be measured due to insufficient data.

Strong leadership is needed to propel CFSA forward to full compliance with the Implementation Plan. The current CFSA Director, Brenda Donald Walker, is transitioning to the position of Deputy Mayor for the District's Office of Children, Youth, Families and Elders. This transition was effective October 28, 2005.  Uma Ahluwalia, the current Principal Deputy Director, will assume the Director's position, and both Ms. Walker and Ms. Ahluwalia are working towards a smooth transition.  Recruitment to replace Ms. Ahluwalia is underway and an interim leadership team of the Deputies for Clinical Practice, Policy, Planning and Program Support and Licensing and Monitoring will fill that role until a replacement is recruited.

Leadership changes in any system have the potential to derail progress and this is a crucial time for the District as it enters the final year of the Implementation Plan, with the expectation that all requirements will be met by December 31, 2006. Although CFSA has achieved some benchmarks, significant additional progress is needed to meet the remaining benchmarks. CFSA must identify those areas that require intensive additional attention while sustaining the accomplishments of the past several years.

We are now less than 18 months from the expected compliance timeline for all _LaShawn_ requirements.  With this report as context, CFSA, the Plaintiffs and the Monitor must soon discuss additional strategies that may be needed over the next year to address those areas that have to date experienced slower progress or inadequate performance.  This need for forward thinking to ensure CFSA has the best chance at success should not obscure the overall finding that CFSA continues to make incremental progress toward improving results for the District's children and families. Notwithstanding the District's accomplishments to date, it is our concern that the current rate of progress may not be sufficient to meet a significant portion of Court-ordered benchmarks by December 31, 2006.

## III.   What's Working Well and What's Not Working Well

*What's Working Well*

- **Benchmarks have been met in several areas.** As noted above, CFSA has met the benchmarks for placing children in the least restrictive placement, capacity limits for foster homes, appropriate permanency goals for several categories of children, administrative reviews, permanency hearings, supervisory responsibility for cases, and foster parent pre-service training.

- **CFSA is developing and beginning to use a "practice model"** that focuses on engaging families, assessing their strengths and needs, developing and nurturing a family team for decision making and planning, tracking progress and making necessary adjustments in a timely fashion. Tools that will be used to support the practice model include Structured Decision-Making™ to assess risk and safety in families, Family Team Meetings to involve family members in decision-making and Quality Service Reviews to evaluate case practice. The CFSA leadership team supports this practice model as a way to instill uniform standards and practice expectations and continues to provide staff training to reinforce best practice.

- **Quality Service Reviews are being used regularly.** CFSA is building the capacity for and conducting a Quality Service Review to continually evaluate the status of children and families and to assess CFSA frontline practice and system performance. Resources have been dedicated to this effort and practice improvements, although not uniform, are being seen.

- **Supportive resources for families and children have been expanded** to include additional services for substance abusing parents and a partnership with the Department of Mental Health to provide crisis stabilization, multi-systemic therapy, in-home supports, and other mental health services.

- **CFSA and the Office of the Attorney General (OAG) have worked together to provide appropriate legal action to free children for adoption.** Termination of Parental Rights petitions are now regularly being filed and tried. OAG attorneys and CFSA staff have been jointly trained and there is ongoing work to make sure that legal actions and social worker decisions are coordinated on behalf of children whose permanency goal is adoption.

- **CFSA is moving children more quickly to permanency through adoption and guardianship.** During fiscal year 2004, there were 337 adoptions finalized and 248 children exited the foster care system through guardianship. Between October 2004 and July 2005, 278 adoptions were finalized and 198 children exited the foster care system through guardianship. Performance so far this year suggests that the number of adoption finalizations for FY 2005 may surpass FY 2004 performance.

- **There is a more intense focus on supporting older youth in foster care and helping them transition to independence**. CFSA's *Revamping Youth Services: Preparing Young People in Foster Care for Independence* represents the District's first formal attempt to engage a wide group of stakeholders to establish best practices and services for the more than 800 District youngsters, ages 16 to 21, growing up in foster care. The plan considers how best to prepare foster youth for adulthood and lays out a comprehensive plan, to be completed by March 2006, to coordinate and deliver services to older youth.

- **There is evidence CFSA's administrators, managers and supervisors regularly have access to data reports and are more frequently using data in decision making and strategic planning.** This is partially due to the Agency's enhanced ability to collect, analyze and use data.

- **CFSA's information system, known as FACES, was certified as a SACWIS (State Automated Child Welfare Information System) system by the Federal government in January, 2005**. The District of Columbia is only the 10th jurisdiction to achieve this status and it reflects the improvement in the quality and use of data.

- **The quality and comprehensiveness of CFSA planning and data analysis has improved dramatically.** CFSA submitted higher quality analytic reports during the past year. These include the *Child Fatality Annual Report, Resource Development Plan, Revamping Youth Services,* and the *Training Plan.*

*What's Not Working Well*

- **The number of child abuse and neglect investigations incomplete after 30 days remains too high.** Since peaking in July 2004, the number of incomplete investigations trended downward until the end of May 2005; however, this trend has not been maintained over the past several months. Management vigilance and additional investigations staff are needed to reduce this persistent problem.

- **CFSA has experienced a crisis in placement services.** Lapsed licenses of Maryland foster homes, decreased placement slots, increased placement disruptions for children in care, and insufficient support to foster parents have each contributed to the pressures on scarce placement resources. CFSA has begun to develop additional strategies, including contracting for more foster home resources and improving supports for existing foster parents. Longer term solutions are still needed.

- **CFSA's efforts to reach an agreement with Maryland on emergency placement of children with relatives, within the constraints of the Interstate Compact on the Placement of Children (ICPC), have stalled due to Maryland's refusal to license kin on an emergency basis.** This standstill is preventing District children from being promptly placed with viable kin in Maryland. The Monitor, Plaintiffs, CFSA and the Mayor's office are pulling together a work team to quickly address these and other urgent issues about placement of children in Maryland.

- **CFSA has not resolved problems in paying contract providers in a timely and accurate fashion.** Despite on-going and high-level attention, the District's payment processes do not work to ensure timely payment to placement and non-placement providers. The payment system is extremely complex involving multiple staff at CFSA and the Office of the Chief Financial Officer and requires multiple levels of data entry and review, none of which are sufficiently coordinated to produce a quick and accurate payment. While the District has hired an outside consultant to assess its systems and has recently agreed to hire a senior project manager to oversee reforms, more must be done to bring this issue to resolution.

- **CFSA's capacity to issue Requests for Proposals and sign contracts on a timely basis remains severely limited. Additionally, performance based contracts that provide monetary incentives and disincentives for performance are behind schedule.** The current DCKids contract continues to be extended instead of completing work to competitively procure and issue a new contract that better meets the needs of children in foster care. While CFSA has been making incremental progress towards performance based contracting, it was expected that the Agency would be further along at this juncture. In general, the Monitor believes CFSA's contracting capacity remains limited.

- **Visitation services are lagging far behind expectations.** Making sure that social workers visit families and children is a primary function for any child welfare agency. Safety and risk to children cannot be assessed without regular visitation. Additionally, data on visits between parents and their children in foster care and visits between siblings who are not placed together are unacceptably low. The Quality Service Review, which was held in September and October of 2005, also measured how well CFSA is maintaining family ties. The Agency performed relatively well in this area during the Quality Service Review, which could indicate the administrative data at CFSA under represent how often children in foster care are in contact with their families. This conflicting data bear additional analysis.

- **Post-adoptive services are not sufficient to meet the needs.** As CFSA moves forward aggressively to provide adoptive homes for children with the goal of adoption, adequate services must be readily available to support adoptive parents and children to remain together safely and permanently. The lack of sufficient post-adoptive services has led some lawyers and other advocates to advise potential adoptive parents against adoption because of fear of service reduction. The same issues apply regarding the need for services post-guardianship.

## IV.   PERFORMANCE IN KEY SUBSTANTIVE AREAS AS OF JUNE 30, 2005

### A.   <u>Protective Services</u>

#### *Calls to the Hotline*

The District of Columbia's child welfare agency is responsible for accepting all calls from mandated and community reporters related to allegations of child abuse and neglect. In responding to these calls, CFSA must conduct timely and high quality investigations and assessments and make sound decisions regarding the safety of children. CFSA and the Metropolitan Police Department conduct joint investigations when there are concerns of abuse or severe neglect.

Figure 1 shows the number of calls the Child Abuse and Neglect Hotline received between July 2004 and July 2005.  In July 2005, the Agency received 392 calls of alleged abuse or neglect (CPS) and 200 calls for information and referral (I&R).  Calls alleging abuse and neglect are typically lower in July when children are not in school; total calls in July 2005 are roughly similar to July 2004.

**Figure 1:**
**Calls to the CFSA Child Abuse and Neglect Hotline**
**Reports of Child Maltreatment (CPS) and Information & Referral (I&R)**
**July 2004 – July 2005**



Source: CFSA monthly administrative data.

Figure 2 below provides monthly data on the percentage of calls that are accepted for investigation and those screened out at the Hotline, as well as the percentage of investigations that are supported for abuse or neglect following an investigation. As Figure 2 illustrates, approximately 30% of District child abuse and neglect investigations are substantiated, a pattern that is consistent with national data regarding substantiation of child maltreatment. In December 2004 and March 2005, the Agency experienced an uncharacteristic spike in the percentage of investigations that were substantiated.

Beginning in February 2005, there has also been a slight increase in the number of cases that have been screened out at the Hotline. This increase is due in part to a new policy that was instituted in June 2005 but has since been repealed at the Monitor's request. The Agency began referring new reports of neglect regarding families with open cases to the on-going case manager for assessment and ceased doing investigations with these families. The Monitor will continue to track these increases over time to determine if there are specific practices in investigations or environmental conditions in the District that are contributing to the increases in both screened out and substantiated cases.

Of the 392 CPS calls to the Hotline in July 2005, 329 (84%) were accepted for investigation. One hundred and seventy-six (54%) of the calls accepted for investigation alleged neglect, 149 (45%) alleged physical or sexual abuse, and 4 (1%) were related to child fatalities.

**Figure 2:**
**Disposition of Hotline Reports of Abuse or Neglect\***
**July 2004 – July 2005**



Source: CFSA monthly administrative data.
\*Does not include information and referral calls. Investigations are required to be completed within 30 days. All calls to the Hotline during a particular month may or may not be completed by the end of that calendar month.

### *Initiation and Completion of Investigations*

The *LaShawn* Implementation Plan requires by June 30, 2005, CFSA will initiate 90% of all investigations within 48 hours. Of the 329 investigations accepted in July 2005, 236 (72%) were initiated within 48 hours. Ten investigations (3%) were initiated after 48 hours. Fourteen cases (4%) had no documented start date in FACES by the end of the reporting period. CFSA indicates it made good faith efforts (as allowed in the Modified Final Order) to initiate the investigation in 64 (19%) of the cases. The Monitor is currently conducting a case record review of cases closed in investigations in June 2005, which assesses, in part, the Agency's good faith efforts during an investigation. (See Figure 3)

While CFSA did not meet the benchmark for timely initiation of investigation, it has made significant improvement in this area since the last report. In June 2004, only 54% of investigations were initiated within 48 hours.

**Figure 3:**
**Percentage of Investigations Initiated Within 24 and 48 Hours**
**as of July 31, 2005**
**(N=329\*)**



Source: CFSA administrative data
\*Reports of abuse and neglect initiated during the month of July 2005

The *LaShawn* Implementation Plan requires that as of June 30, 2005, 80% of investigations are to be completed within 30 days. CFSA completed 391 investigations in July 2005. Of these 391 investigations, 174 (45%) were completed within 30 days, 145 (37%) were completed between 31 and 60 days and 72 (18%) took more than 60 days to complete or were not yet complete as of July 31, 2005. (See Figure 4)

**Figure 4:**
**Percentage of All Open Investigations Completed Within 30 Days**
**as of July 31, 2005**
**(N=391)**



Source: CFSA administrative data.

### *Investigations Backlog*

Figure 5 shows trend data for the number of incomplete investigations each month that are considered in a backlog because they are more than 30 days old. In July 2004, this number had risen to 685 cases. Since then, it has been on a downward path with 188 cases in May 2005. In the last few months, the number has fluctuated between 200 and 240 cases, and was 239 cases at the highest point during the month of September 2005. Given the recent fluctuations in the backlog and no specific additional downward trend, CFSA must continue to seek additional solutions to reduce this on-going and serious problem. At the present time, there remain eight staff vacancies in investigations, a resource shortage that is contributing to the backlog and must be promptly resolved. (See Figure 5)

**Figure 5:**
**Backlog of Investigations Incomplete After 30 Days***



Source: CFSA administrative data
* Data represents the "high point" of investigations in the backlog each month.


### Institutional Investigations

CFSA is required to investigate allegations of institutional abuse (those investigations occurring in congregate care or in foster homes) in accordance with investigations timeframes and policies. The Implementation Plan requires that as of December 31, 2004, 85% of institutional investigations be completed within 30 days. In July 2005, 21 cases of alleged institutional abuse were closed during the month. Fourteen (67%) of these investigations had been completed within 30 days and the remaining seven (33%) had been completed within 31 to 60 days. (See Figure 6)

**Figure 6:**
**Completion of Institutional Investigations**
**as of July 31, 2005**
**(N=25)**



Source: CFSA administrative data

### Checks for Prior Reports of Abuse or Neglect

As previously reported, CFSA's data management system, FACES, performs a 100% check of prior history of child abuse or neglect every time an individual's identifying information is added to the database. The Monitor is currently completing a case record review of investigations completed during June 2005. Through the case record review, the Monitor is assessing if Hotline workers and Intake workers are documenting their review of the automatic check and to what degree they are incorporating information about concerns contained in the previous reports into their current work. The Monitor's analysis of the case record review will be completed by December 2005.

### Medical, Psychological and Psychiatric Evaluations in Investigations

The Implementation Plan requires that by June 30, 2005, CFSA will provide appropriate medical, psychological or psychiatric evaluations of children as part of its investigation of alleged child abuse or neglect if it determines that such evaluations are necessary. CFSA is

working to develop a management information report to assess how often these exams are occurring.  While CFSA is currently able to report some data, the most recent report does not provide complete information on current practices in investigations. CFSA must develop a usable information report to track whether appropriate and needed medical and other evaluations occur during an investigation. CFSA reports it is working to refine the logic in the FACES report to ensure it reflects the number of referrals made for these evaluations and the number of evaluations completed.

In order to more definitively determine how often medical, psychological and psychiatric evaluations are needed during investigations and how often they are being provided, the Monitor is looking at this issue in a case record review of investigations that were closed in June 2005. It is anticipated that information from the case record review in conjunction with findings from the October 2005 Quality Service Review will be available in December 2005.

### *Medical Evaluations for Substantiated Investigations*
CFSA is required to provide medical evaluations within 48 hours for all children who are the subject of a substantiated investigation, regardless of whether or not they are removed from their homes. Children who have had a medical evaluation as part of the investigation or have had a recent exam within the time period recommended by the Early and Periodic Screening, Diagnostic, and Treatment (EPSDT) schedule are not required to have a second exam. The Implementation Plan requires that as of December 31, 2004, 50% of children who are the subject of a substantiated investigation will have a medical exam within 48 hours of the substantiation. In June 2005, there were 265 children included in substantiated cases. Of these 265 children, 80 children (30%) had a medical exam prior to the substantiation or within 48 hours. Of the remaining 185 children, fifteen (6%) had an exam after 48 hours and 170 (64%) had no documented medical evaluation. (See Figure 7)

It is possible that CFSA data over counts the number of children who are required to have this evaluation as some children may have had a medical exam from their own provider within the recommended EPSDT schedule. Additionally, when CFSA substantiates an allegation but does not open a case, it has no legal authority to enforce a medical exam and obtaining information from parents regarding exams that have been completed has proven difficult. As part of the case record review of completed investigations, the Monitor is attempting to ascertain how often this is the case.  Preliminary results from the case record review suggest that the level of social worker inquiry regarding when the most recent physical exam occurred and the documentation regarding the findings of this inquiry are not sufficient for CFSA to determine if children should receive a medical evaluation.

**Figure 7:**
**Medical Evaluations for Substantiated Investigations**
**as of June 30, 2005**



Source: CFSA administrative data

### *Quality of Investigations*

CFSA is responsible for conducting investigations of alleged child abuse and neglect that are comprehensive and of high quality. The Implementation Plan and CFSA policy require that quality investigations minimally include a) evidence of the use of a risk assessment protocol, b) a full and systematic analysis of the family's situation and factors placing the child at risk, and c) appropriate interviews with all children in the household outside the presence of the caretakers, parents, caregivers and needed collateral contacts.

The Monitor has taken a two-pronged approach to determine the quality of investigations at CFSA. As previously noted, a case record review of investigations closed in June 2005 is near completion. A statistically valid sample of 134 cases was chosen for the case record review. Of these 134 cases, 13 cases that were supported for abuse or neglect and were opened for in-home or out-of-home services were then chosen for more in-depth assessment through inclusion in the October 2005 Quality Service Review. It is intended that these evaluation methodologies will provide comprehensive information about the current status of investigation practice at CFSA. Information from both the case record review and the Quality Service Review will be available in December 2005.

***Child Fatality Reviews***

CFSA is expected to comprehensively review, within 45 days of the child's death, child fatality cases of children known to the agency within four years of their death. In some cases, CFSA and the City-Wide Child Fatality Review Committee are not notified until months after the child's death and the Agency, therefore, is not able to meet the 45-day requirement. As of September 1, 2005 there were 39 child deaths from 2002, 2003, and 2004 that had not yet been reviewed and 16 child deaths from 2005 that were beyond the 45 day review period and not yet reviewed. The Agency has created a plan, agreed to by the Monitor, to review each of those children's cases by the end of the calendar year. The Agency has recently made a number of decisions to strengthen the internal child fatality review process including increasing participation from internal and external stakeholders; developing long and short-term strategies to ensure that fatality reviews occur in a timely manner; and ensuring internal review meetings are more focused on practice, policy, training, and systemic issues.

CFSA released an annual Child Fatality Report in July 2005 that is well done and provides information needed to identify systemic issues in cases involving child fatalities.[3] It takes an in-depth look at the children who died in calendar year 2004 who had been involved with CFSA between 1999 and 2004. The table below provides data on the 2004 child fatalities.

---

[3] The *CFSA Child Fatalities Annual Report* (June 2005) can be obtained by contacting the Quality Improvement Administration at 202-442-6100 or by contacting the Monitor at 202-371-1565.

**Table 1:**
**Children Involved with CFSA at Any Point Between 1999 and 2004**
**Who Died in Calendar Year 2004 as of July 7, 2005**

| Manner of death*: | Violent Homicide (not abuse) | Natural Cause | Pending | Accident | Abuse Homicide | Not determined[4] | Total |
|---|---|---|---|---|---|---|---|
| **Age** | | | | | | | |
| <24 months | 0 | 10 | 2 | 1 | 2 | 4 | 19 |
| 2-6 yrs. | 0 | 0 | 0 | 2 | 1 | 0 | 3 |
| 7-12 yrs. | 0 | 3 | 0 | 3 | 1 | 0 | 7 |
| 13-16 yrs. | 9 | 3 | 0 | 1 | 0 | 0 | 13 |
| 17+ yrs. | 12 | 3 | 1 | 1 | 0 | 0 | 17 |
| **Gender** | | | | | | | |
| Male | 18 | 11 | 2 | 5 | 1 | 0 | 37 |
| Female | 3 | 8 | 1 | 3 | 3 | 4 | 22 |
| **Race** | | | | | | | |
| African-American | 21 | 19 | 3 | 8 | 2 | 4 | 57 |
| Hispanic/Latino | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| Caucasian | 0 | 0 | 0 | 0 | 1 | 0 | 1 |
| **Status with CFSA at Time of Death** | | | | | | | |
| Closed case | 12 | 7 | 0 | 4 | 3 | 0 | 26 |
| Active case | 3 | 10 | 2 | 2 | 1 | 3 | 21 |
| Prior/referral (closed at hotline) | 6 | 2 | 1 | 2 | 0 | 1 | 12 |
| **Placement Status at Time of Death** | | | | | | | |
| Not applicable | 18 | 9 | 1 | 5 | 3 | 1 | 37 |
| In home | 0 | 8 | 1 | 1 | 0 | 3 | 13 |
| Foster home | 3 | 2 | 1 | 2 | 1 | 0 | 9 |
| Total (Manner of death) | **21** (36%) | **19** (32%) | **3** (5%) | **8** (14%) | **4** (7%) | **4** (7%) | **59** |

Source: CFSA Child Fatalities Annual Report (June 2005)

*What's Working Well*

- **Use of Family Team Meetings during investigations.** A Family Team Meeting is being held whenever there is a concern that a child must be removed from home or within 72 hours of an emergency removal. Between January and June 2005, 165 family team meetings were held due to the removal of children from their home. These meetings served 303 children. Each month, the Family Team Meeting Unit is identifying more relatives who are likely kinship candidates for accepting children into their homes. Although more family members are being identified to participate as kinship placement providers through the use of the Family Team Meeting, very few family members are actually becoming licensed to accept the children into their homes. There remain significant barriers to placing children with their relatives including the underutilization

---

[4] Not determined refers to instances in which the Medical Examiner issued an autopsy report but was not able to determine the cause of death.

of the temporary licensure of kinship providers and the on-going barriers with the Interstate Compact on the Placement of Children.

- **Quicker access to police records for placement clearances.** CFSA is installing a finger print machine to quickly assess the criminal status of potential placement resources. Currently, CFSA must send off finger prints of potential kinship providers who are identified when children are removed from their homes. This slows the process for determining which relatives are acceptable placement resources and when relatives cannot be quickly assessed and licensed, children are more likely to enter non-relative foster care. A contract with Motorola was finalized in September 2005 for the purchase of the finger print machine and the target date for having finger printing capacity at CFSA is December 20, 2005. CFSA is also completing a MOU with the Metropolitan Police Department, which is required for the use of the equipment.

- **Implementation of decision making tool for investigations and assessment of risk.** The Structured Decision-Making™ (SDM) Family Risk Assessment tool will assist workers in the decision-making about whether or not to open a case and/or refer to a community agency. Training is currently underway and a rolling implementation process begins in November 2005, with full implementation anticipated in January 2006. The tool will be incorporated into the FACES system. CPS staff were also re-trained on the use of an SDM risk assessment tool completed during the course of an investigation.

- **Release of first annual Child Fatalities report.** Written in July 2005, this report analyzes data and provides recommendations for practice improvement from the Agency's child fatality reviews. This well-written, constructive document has not been widely distributed to the public or stakeholders in the community where it could serve to highlight the challenges faced by both the District and the Agency; the steps the Agency has taken to taken to address them; and opportunities for city-wide stakeholders to join in efforts to protect children. CFSA indicates the report will be released to the public by the end of 2005.

*What's Not Working Well*

- **The investigations backlog remains high.** CFSA continues to track the backlog on a daily basis and reports weekly to the Monitor. While there remains a backlog, CFSA has put concerted effort towards reducing the number of investigations that go beyond the 30 day case closure requirement. The Monitor believes additional staff are needed in the Investigations unit so that only a small number of investigations remain incomplete after 30 days and only in instances where the investigation legitimately requires more time.

- **While CFSA continues to make progress in the timely initiation and completion of investigations, the Implementation Plan benchmarks were not met.** The Implementation Plan requires the Agency to initiate 90% of its investigations within 48 hours; in July 2005, 72% were initiated within that time period. Getting out to interview children and families quickly during the investigation process is an essential component of child protective services practice. Additionally, too many investigations are

not completed within 30 days and these cases contribute to the backlog. In July, only 45% of general investigations and 67% of institutional investigations were completed within 30 days, which is unacceptable.

- **District of Columbia automobiles are not always readily available for investigators to use.** This issue was addressed some time ago when a fleet of cars were made available to the investigations unit. As staffing has increased and other demands have been made on the fleet of cars, proportionately fewer cars are currently available. Additionally, CFSA investigation workers are extremely reluctant to use their own automobiles for their work, citing the Agency's difficulty in quickly reimbursing them for out of pocket expenditures. There may be additional factors that make workers hesitant to use their own cars. As a result, if a car is not immediately available, the worker delays investigative work in non-emergency cases. Resources should be put into place immediately to increase the number of available cars for investigations workers.

- **There has been turnover in the Program Administrator position for the Intake and Investigations Unit.** The program administrator who was hired approximately one year ago is transitioning to a new position at CFSA and a program manager from an in-home and reunification unit is stepping in as acting program administrator. This leadership transition must be carefully managed to ensure that the progress made in the last year continues and is not reversed.

- **Too few children receive medical evaluations within 48 hours of a substantiated investigation.** Only 30% of children included in substantiated investigations received a medical evaluation prior to or within 48 hours of that substantiation. Children's medical needs must be thoroughly assessed and addressed whenever CFSA intervenes in a family's life.

- **In June 2005, CFSA changed policy to divert new allegations of neglect for families with open CFSA cases back to the original case carrying social worker.** This policy was designed, in part, to ensure continuity of work with families but completely circumvented the investigation process. The Monitor met with CFSA to discuss concerns about this change. As a result, the Agency has rescinded this policy and reinstituted investigations for all allegations of neglect, regardless of whether or not an open case is being managed at CFSA. Other steps will be added to ensure coordination with the ongoing worker.

- **There continues to be some progress, although slow, towards the implementation of an advanced telephone system at the Hotline.** CFSA has been working unsuccessfully for several years to install a telephone system that will allow for live supervision of Hotline calls, recording of calls for later review by managers and a tracking of all calls. A contract with Syntellect was finalized on September 26, 2005 and CFSA expects the system to be installed by mid-December, with initial use to begin end of December. The Monitor is looking forward to the installation of this technology and plans to participate in observations of the phone system in its first weeks of implementation.

B.     **Services to Families and Children**

As of July 31, 2005, 1507 families with 2891 children were receiving in-home services from CFSA as a result of substantiated cases of abuse or neglect. This is a slight decrease from December 2004 when 1541 families with 3167 children were served through in-home services. In-home services are provided to families after an investigation is substantiated but a determination is made that some or all of the children can remain safely in the home.

In some cases, it is determined that families with a substantiated report are at very low risk level but services are needed. These families, as well as other families who are not substantiated for abuse or neglect but need services, are referred to the Healthy Families Thriving Communities Collaboratives. This community-based system of services remains a critical part of the family support infrastructure in the District and frequently acts to prevent child abuse or neglect by providing universally accessible services to families in their communities.

*Services to Meet the Goals of Safety, Permanency and Well-Being*
CFSA is required to provide all appropriate services to families and children to meet the goals of safety, permanency and well-being. These include services to:
- enable children who have been the subject of a substantiated report to avoid placement and to remain safely in their own homes;
- enable children who have been returned home from foster care to avoid replacement into care;
- avoid the disruption of an adoptive placement that has not been finalized; and
- avoid the disruption of a foster home placement.

CFSA and the Monitor are in the process of completing a Quality Service Review of 40 cases to determine if the appropriate services have been provided. The Quality Service Review takes an in-depth look at how children and families are faring and how the child welfare system is functioning. To gather this information, teams of reviewers interview everyone involved in the child welfare case to include children, parents, teachers, therapists, doctors, social workers, supervisors, attorneys, etc. One area of focus of the Quality Service Review is to determine what services are currently in place, what additional services are needed and whether or not the service constellation is effective in helping children and families meet the goals of safety, permanency and well-being. As previously noted, findings from the Quality Services Review will be available in December 2005.

*Visits to Children and Families Receiving In-Home Services*
In July 2005, there were 2891 children living in their own homes under the supervision and case management of CFSA and the private agencies with whom CFSA contracts for services. The Implementation Plan requires by June 30, 2005, that assigned social workers visit at least monthly in 90% of in-home cases. Of the 2891 children living at home, there is documentation that 1714 children (59%) were seen at least once by their social worker during the month of July.

The Implementation Plan also requires CFSA to visit twice monthly in 40% of cases by June 30, 2005. Of the 2891 children living at home, 568 (20%) were visited by their social worker at least twice during July.  For 1177 children (41%), no social worker visits were documented in July.

While performance data on social work contacts with children and families under CFSA supervision continue to improve each month, the results still are unacceptably below the benchmark for this at-risk population. We are particularly concerned about the large number of children in families under protective supervision with no documented social work contact. (See Figure 8)

**Figure 8:**
**Social Worker Visits to Children Receiving In-Home Services**
**as of July 31, 2005**
**(N=2891\*)**



Source: CFSA administrative data
\*Percentages are greater than 100% as children seen at least twice are reflected in two categories – "children seen at least once" and "children seen at least twice."

***Referrals to Collaboratives and Other Community Services***

As previously noted, CFSA makes referrals to the Healthy Families Thriving Communities Collaboratives for families who become known to the child welfare agency but pose no immediate safety concerns and no case is opened at CFSA. Additionally, families who receive unfounded determinations during an investigation are also referred to the Collaboratives or other community based service providers if specific service needs are identified. The Implementation Plan requires CFSA, by December 2004, to make these referrals in 50% of cases. CFSA is in the process of developing an administrative data report regarding these referrals but the report does not yet accurately reflect the referral patterns. The Collaboratives are also working to implement the *Efforts to Outcomes* program to track case management services that is anticipated to be operational in the second quarter of FY 2006. Table 2 below provides information on the total number of referrals made to the Collaboratives by CFSA in the six-month period between October 1, 2004 and February 28, 2005.

**Table 2:**
**CFSA Referrals to the Healthy Families Thriving Communities Collaboratives**
**between October 1, 2004 and February 28, 2005**

| Type of Referral | Number of Referrals |
|---|---|
| Community Cases | 1440 Families |
| Information and Referral | 5130 Referrals |
| Family Team Meetings | 77 Families |
| Supportive Cases | 515 Families |
| Aftercare Services | 120 Teens |

Source: CFSA

***Additional Service Development***

CFSA has worked in the past year to develop additional services to support parents with substance abuse problems. Child and Family Futures, which is part of the National Center for Substance Abuse and Child Welfare, has been contracted to assist in an assessment of the District's substance abuse treatment delivery system and to help develop a long term, cross systems strategic plan for building capacity to work with families affected by substance abuse. This work will include a partnership between CFSA, the Family Court, the District's Addiction Prevention and Recovery Agency (APRA) and the Healthy Families Thriving Communities Collaboratives. Services will be provided to families at risk of entering the child welfare system and to parents whose children have been removed from their care. This collaboration was spurred, in part, by the findings of the Agency's previous needs assessment that identified the high percentage of families known to the child welfare system who are struggling with substance abuse concerns. The initial assessment and planning phase will culminate with a final plan, which is anticipated by the end of November 2005.

The Family Drug Treatment Court has been developed to provide intensive intervention with substance abusing mothers and their children. Mothers enter a drug treatment program, which allows young children to reside with them, as a condition of their court case. Since the inception of the Family Treatment Court, there have been 259 referrals. Fifty mothers with 179 children have been accepted into the program and 75 children were able to reside with their mothers in a residential program during the treatment process.  Of these 50 families, 12 mothers with 35 children have completed the entire program including both residential and aftercare. They have been reunited with their children and their court cases have been closed.  The average length of time in the program for these 12 mothers was 14 months, with minimum of 12 months, 17 days and the longest 15 months, 9 days.  Twenty three children living with their mothers are currently participating in the aftercare program.

*What's Working Well*

- **CFSA continues to identify opportunities for building additional service capacity to serve families with substance abuse problems**.  During FY 2005, the Office of Clinical Practice within CFSA received 269 referrals for substance abuse services, 176 for adults and 93 for youth.  All adults were referred to the APRA, the District's substance abuse agency, and 73 youth were referred to the APRA youth system.  CFSA and APRA have identified additional service needs and will use over $500,000 to augment substance abuse services and assessments. The Family Treatment Court provides intensive substance abuse treatment opportunities for some mothers, allowing them to remain with their young children in a supervised environment; 35 children have been able to successfully remain with their mothers as a result of the program.

- **The increased capacity for mental health services for children and families through the Department of Mental Health is beginning to yield results.** Between August 2, 2004 and February 28, 2005, CFSA made 430 service referrals to 25 providers through the new Department of Mental Health Access Help Line. This level of access has not been available in the past. Services include crisis stabilization, therapy, in-home supports and other mental health services designed to ensure the safety, permanency and well-being of children. In addition to the services provided by the Department of Mental Health, CFSA maintains its own capacity to directly purchase or arrange for mental health services for some children as there is not yet adequate capacity at the Department of Mental Health to serve all children in foster care. During this same period, referrals for 212 children were made to mental health services providers under direct CFSA contract. The Quality Service Review will provide more information regarding children's receipt of appropriate services and whether services are making a difference in children's lives.

*What's Not Working Well*

- **The frequency of visits to families with in-home protective services cases is improving but inadequate.** It was expected that by June 30, 2005, Agency social workers would visit 90% of families monthly and 40% of families twice a month. Workers visited 59% of children monthly and 20% of children twice a month as of the end of July. Especially troublesome is that 41% of children in families receiving in-home services were not visited at all during July. These children are a particularly vulnerable population in that there have been substantiated incidents of abuse or neglect and a decision has been made to open a child protective services case because of concerns about safety or risk of future harm. Social workers need to visit families to regularly assess for safety and ensure that adequate services and supports are in place.

- **Two areas identified as problems in the Monitor's last report remain unresolved –a policy on the use of flexible funds and on-call access to social workers.** In both instances, the Agency has not produced a revised plan for implementation. The Monitor provided extensive comments on a proposed flexible fund policy in April, 2005 on the need to reduce bureaucratic barriers built into the policy and procedures that will make it difficult to use the funds in a timely way to provide individualized services to families and children. CFSA reports staff were to meet in October to resolve issues related to the Monitor's recommendations. The on-call program was designed to ensure that all families (whether birth parents, kinship parents or resource parents) experiencing a crisis after-hours have immediate access to a social worker. Under the original design, social workers volunteered and were compensated for participation in the on-call program. Due to a lack of volunteers for the program, CFSA has not been able to provide this needed support to families and was working to develop an alternative. Recently, two on call staff have been hired and they are in training. Social workers have been advised to update their voice mails to direct caretakers and others to contact the Hotline in the event of an after hours emergency. More capacity will be needed to ensure sufficient on-call coverage is available.

- **Case planning with families is improving but continues to lag behind expectations.** As of July 31, 2005, 79% of family case plans were up-to-date even though the Implementation Plan states there would be full compliance with this requirement by June 30, 2005. This represents an improvement in practice from July 31, 2004 when 61% of family case plans were up-to-date.[5]

---

[5] In August 2005, 78% of families had a current case plan.

C.    **Placement of Children**

During this monitoring period, the Agency has been in crisis regarding placement services, despite the decrease in the overall number of children in placement.  Six hundred and five (605) children were placed in the six months between April 1, 2005 and September 1, 2005.  These include children placed into foster care for the first time as well as replacements of children. Pressures on placement resources resulted in 18 children sleeping overnight at CFSA on 10 occasions between April 1, 2005 and October 18, 2005. During this period, CFSA's new contracts for placements did not provide sufficient capacity. There were 143 new contracted beds that could not be used immediately as staffing and licensure requirements had not yet been met. Additionally, four contractual providers were ending their involvement with CFSA, which resulted in fewer available placement beds.

Over the past several months, CFSA has been implementing a number of strategies to address the placement crisis, including increasing the number of available foster home resources through new contracts for placement beds. Since June 2005, CFSA has increased capacity by adding:

- 39 foster care beds through existing contracts
- 50 traditional beds and 50 therapeutic beds under a new contract (as of October 2005, 35 of these beds were available with the remaining 65 beds to be available by the end of the year)[6]

Complying with the Interstate Compact for the Placement of Children (ICPC) with Maryland continues to be a barrier. Maryland has not agreed to allow the District's Temporary Licensure of Kinship Providers to apply to the licensure of kin in Maryland and this seriously restricts placement options. Families must continue to go through Maryland child placing agencies that CFSA contracts with to obtain licensure. This process is often protracted and forces CFSA to use non-kinship resources for children as the initial placement, even when there are potentially viable kin placements. CFSA has been interested in and attempting to negotiate the licensure provisions with Maryland. These discussions have not been successful to date. It is critical for children of the District to have quick access to their relatives in Maryland, who often reside within no more than a 20-mile radius of those children. The District and Maryland must reach some type of agreement that expedites and facilitates the placement of children across the state border. External pressure, including Congressional action, may be needed to resolve this issue.

Placement challenges during this period also included the expiration of a number of Maryland foster home licenses, which made these homes inaccessible. Because of the interstate complications, CFSA cannot license these families. While CFSA worked with the Maryland private child placing agencies to bring these homes back on line with renewal licenses, the effect was an additional burden on an already overwhelmed placement system.

In addition to a decrease in the number of available placements for children, too many children move from placement to placement and foster parents continue to report that they do not receive

---

[6] CFSA reports that these contracted beds are not readily available since providers have to hire additional staff to manage the increased capacity.

enough support to maintain children in their home. More has to be done on the practice level to make better placement matches initially and to provide services to stabilize placements and reduce the steady stream of children needing replacement. Additionally, it was hoped the Family Team Meeting process would begin to reduce foster care placements. CFSA is conducting the meetings within 72 hours after an initial removal and then working to return children home with a safety plan or place children safely with their relatives. While the Family Team Meetings are identifying possible kinship placements, other barriers work against this desired result as very few relatives identified in FTMs are becoming licensed providers.

In its April 2005 Resource Development Plan, CFSA projected a continued decrease in the total foster care population because of efforts to provide more services to keep families safely together and more progress toward timely permanency for children. As of July 31, 2005, there were 2,625 children in CFSA custody. The majority (51%) of these children are ages 6 – 15 and an overwhelming majority (77%) of all children in placement reside in a family-based setting. (See Table 3) CFSA maintains its commitment to reduce reliance on congregate settings by placing children with resource families. In order to preserve family-based placements for children, the Agency must increase its efforts to support foster parents in meeting the needs of children with an anticipated reduction in the number of placements children experience.

The 2005 Resource Development Plan also highlights that the number and percentage of youth residing in independent living (IL) settings have increased. As of December 31, 2003, 136 (4.7% of the then total children in foster care) youth resided in such settings. As of December 31, 2004, 196 or 7.4% of the children in foster care were in independent living settings. The Agency believes the increase is related to additional capacity in IL programs, which has enabled youth who were in group homes to move to an IL setting, and to the increased number of older youth in care. This trend also calls attention to the need to systematically engage youth in identifying caring adults who can support them as they achieve independence from the foster care system and provide for their needs as interdependent young adults. Additionally, some of the youth who are moving from foster home settings should be aided in maintaining relationships with their former foster families when possible. CFSA intends to implement *"Youth Connections,"* a formal process of engaging youth and those who work with them in permanency planning, in the hope that this work will aid in reducing congregate care utilization and increasing placement with permanent families.

**Table 3:**
**Selected Demographics for Children in Foster Care as of July 31, 2005**

| Gender | Number | Percent |
|--------|--------|---------|
| Female | 1313 | 50% |
| Male | 1312 | 50% |
| **TOTAL:** | 2625 | 100% |
| **Age** | **Number** | **Percent** |
| 1 year or less | 151 | 6% |
| 2 – 5 years | 333 | 13% |
| 6 – 12 years | 809 | 31% |
| 13 – 15 years | 532 | 20% |
| 16 – 17 years | 355 | 13% |
| 18 – 21 years | 445 | 17% |
| **TOTAL:** | **2625** | **100%** |
| **Ward of Origin**** | **Number** | **Percent** |
| Ward - 1 | 178 | 7% |
| Ward - 2 | 91 | 3% |
| Ward - 3 | 15 | <1% |
| Ward - 4 | 188 | 7% |
| Ward - 5 | 332 | 13% |
| Ward - 6 | 315 | 12% |
| Ward - 7 | 396 | 15% |
| Ward - 8 | 595 | 23% |
| Unknown | 515 | 20% |
| **TOTAL:** | **2625** | **100%** |

Source:  CFSA administrative data
*The "Ward of Origin" is the child's permanent home address.

CFSA is making some progress toward reducing the time children spend in foster care.  Cohort data for children entering foster care in the first half of 2001 shows that 71% have left foster care. Cohort data from children entering foster care in the first half of 2002 shows that 76% have left foster care. Of children who entered foster care in the first half of 2003, 57% have left foster care. More than half of the children in foster care leave care within two years.

**Table 4:**
**Permanency Goals for Children in Foster Care as of July 31, 2005**

| Permanency Goal | Number of Children | Percent |
|---|---|---|
| Reunification | 617 | 23% |
| Adoption | 654 | 25% |
| Guardianship & Legal Custody | 391 | 15% |
| Another Planned Permanent Living Arrangement | 552 | 21% |
| Independence* | 219 | 8% |
| Long Term Foster Care* | 9 | < 1% |
| No Goal | 183 | 7% |
| **TOTAL** | **2625** | |

Source:  CFSA administrative data.
*These are not approved permanency goals under Federal ASFA but are nevertheless set by the District's Family Court in a small number of cases.

Table 4 above shows the permanency goals for children in care. There are 780 children (30%) in custody who have a permanency goal of 'Another Planned Permanent Living Arrangement', 'Independence', or 'Long Term Foster care', which assumes they will remain in the foster care system until age 21 or they "age-out" of the foster care system. These data highlight the need for continued work to explore all legal permanency options with children, their caretakers and their extended families, as required by the District and the Federal Adoption and Safe Families Act (ASFA).  It is hoped that many of these older children can still be provided with a legally permanent home. CFSA, OAG, the Monitor and the Court have worked over the last several months on an agreed upon standard for "compelling reasons" not to file a termination of parental rights petition and are currently developing guidelines on the establishment of Another Planned Permanent Living Arrangement as a permanency goal. The standards and guidelines will serve as a resource for the Agency, its providers and the Court.

### Keeping Siblings Together
The Implementation Plan requires that by June 2005, 75% of children would be placed with their siblings. In July 2005, there were 1681 children in foster care with one or more siblings. Of these 1681 children, 954 children (57%) were placed with one or more of their siblings. This represents a slight decline from July 2004 when 60% of children were placed with one or more of their siblings.

***Ensuring Regular Sibling Visits When Living Apart***
The Implementation Plan requires that children placed apart from their siblings will have at least twice monthly visitation. By June 2005, 70% of children are to have at least twice monthly visits with their siblings. In July 2005, there were 1090 foster children placed apart from some or all of their siblings. Of these 1090 children, 206 children (19%) visited two or more times with one or more of their siblings. There were 237 children (22%) who had one sibling visit and 647 children (59%) who had no documented sibling visits. When siblings are not living together, efforts must be made to ensure they have regular visits and other contacts to maintain a relationship, unless not recommended for therapeutic reasons. (See Figure 9)

**Figure 9:**
**Sibling Visitation for Children Placed Apart**
**as of July 31, 2005**
**(N=1,090)**



Source: CFSA administrative data.

***Placing children in family-based settings***
The Implementation Plan requires that children placed in out-of-home settings be placed in the least restrictive, most family-like setting appropriate to their needs. CFSA surpassed the December 2004 benchmark of 70% of children placed in the least restrictive, most family-like setting appropriate to their needs. As of January 31, 2005, 78% of all children in CFSA custody were placed in a foster home. Performance remained steady through July 31, 2005 when 77% of children in out-of-home care were placed in a family foster home.

***Young Children in Congregate Care Settings***
The Implementation Plan requires by June 30, 2005 that no child under the age of 12 would be placed in a group care setting for more than 30 days and that no child under the age of 6 would be placed in a group setting at all. As of July 31, 2005, the benchmark has not been met for either of these measures. There were 14 children under the age of 12 placed in a group setting for more than 30 days and 11 children under age 6 placed in a group setting. (See Figure 10).[7]

**Figure 10:**
**Children Under 6 * and Children Under 12 in Congregate Care\*\***
**(January 2004 – July 2005)**



Source: CFSA administrative data.
*Data for children 0-5 years of age include all children in congregate care regardless of the length of stay.
\*\*Data for children under age 12 are for those who remained in the setting for more than 30 days.

_____

[7] In some cases, young children have been court ordered to remain at St. Ann's pending kin licensure or ICPC approval.

***Placing Children Close to the District***

The Implementation Plan required by June 2005 that CFSA place no more than 35 children over 100 miles away from the District. CFSA reports that in July 2005, 124 children were placed more than 100 miles away from the District; this does not include children placed in medical settings outside of the District. The majority (94) of those children were living in a residential treatment setting. These facilities are used because they provide specialized clinical treatment and there are no comparable facilities closer to the District. CFSA's Office of Clinical Practice monitors the children's progress in treatment and length of stay in order to effectively plan for return to the District. For each of these children, there is no plan to return them to the District at this time.

Thirty of the 124 children placed more than 100 miles away from the District were in a family-based setting, both kinship and non-kinship. Eleven of the 30 children in family based settings have the permanency goal of adoption; 10 have the permanency goal of another planned permanent living arrangement; and nine have the permanency goal of guardianship.

***Reducing Number of Multiple Placements***

Frequent placement changes are not good for children's well-being. The Implementation Plan requires by June 2005 that only 5% of children would experience three or more placements during a twelve-month period. Of the 2625 children in foster care in July 2005, there were 449 children (17%) who had resided in three or more placements[8] during the previous 12 months. This represents an increase from the previous reporting period when 11% (449 of 2,625) children experienced three or more placements during the preceding 12 months. As Figure 11 below depicts, the number of children with three or more placements has steadily increased since the beginning of the year and the July 2005 outcome represents a peak over a 20-month period. This is a serious problem requiring focused efforts to understand the root causes and address them.

The Implementation Plan also required a reduction in the percentage of children entering foster care after January 1, 2003 who experience three or more placements. At this time, CFSA is not able to provide cohort data to assess progress in this area.[9]

---

[8] CFSA, the Court Monitor and the Superior Court recently reached agreement on what constitutes a change in placement. CFSA will make minor modifications in FACES to implement this change, which may affect future multiple placement data.

[9] CFSA will generate a draft FACES report for review and discussion with the Monitor. A final report is planned for January 2006.

**Figure 11:**
**Number of Children in Foster Care with Three or More Placements**
**in the Previous 12 Months as of July 31, 2005**
**(N=2,625)**



Source: CFSA administrative data

### Investigating Relatives as Placement Resources

The Implementation Plan requires CFSA to explore relative resources in cases requiring the removal of children from their homes. The Monitor is currently conducting a case record review to assess this requirement. Results will be provided in a separate report to be released in December 2005.

### Professional Evaluation of Children Who Experience a Placement Disruption

The Implementation Plan requires by December 31, 2004 that 70% of children experiencing a placement disruption would receive a professional evaluation to determine their needs. In August 2005, the Agency expanded the use of Family Team Meetings (FTMs) to include all children who experience a placement change. The FTM handbook outlines a process for clinical consultation from the Office of Clinical Practice staff (OCP), as well as referrals for more formal evaluations of children, if appropriate. The participation of the OCP staff in Family Team Meetings that are held for placement disruptions meets the expectation of an evaluation of the child's needs. In their assessment of appropriate next steps, OCP staff also rely on evaluations children have had prior to the placement disruption. Before August 2005, there was no systematic method to ensure that children who experienced a placement disruption received a

professional evaluation. Because this data is not maintained in FACES, CFSA must continue to manually produce performance data in this area.

### Number of Children in Foster Homes

The Implementation Plan requires by June 2005 that no more than 10% of foster children would be placed in foster homes which exceed identified capacity standards. The Agency has met each of the benchmarks for the number of children in placements that meet MFO standards. (See Table 5)

**Table 5**
**Performance in Meeting MFO Placement Standards**

| REQUIREMENT | July 2005 PERFORMANCE |
|---|---|
| **June 2005 BENCHMARK**: *No more than 10% in any category* | |
| Children in foster homes with more than three foster children | 6% |
| Children in foster homes with more than six total children, including the foster family's own children | .8% |
| Children in foster homes with more than two children under age 2 | .15% |
| Children in foster homes with more than three children under age 6 | .2% |

Source: CFSA administrative data

### Adhering to Licensing Capacity

The Implementation Plan requires by June 30, 2005 that no more than 23 children be placed in a foster care home or facility in excess of its licensed capacity.[10] In July 2005, there were 2012 children placed in foster homes. Of these 2012 children, 125 children were placed in foster homes exceeding licensed capacity limits. This is a significant spike in the number of children placed in foster homes exceeding licensed capacity limits and reflects the recent placement crisis.

---

[10]  This benchmark was set as a 50% reduction from the June 2004 performance of 45 children.

*Emergency Placements*

The Implementation Plan requires by December 31, 2004 that there would be no more than 15 children placed in an emergency setting for more than 30 days.[11] As of July 31, 2005, there were 19 children who had remained in an emergency placement for more than 30 days.

*Number of Children in Group Care Settings*

The Implementation Plan requires by June 30, 2005 that there would be no more than 52 children in a group care setting with a capacity in excess of eight children without express written approval of Director or designee.[12] As of July 31, 2005, there were 78 children residing in a group care setting in excess of capacity limits. The Agency reports that these placements were done with approval of the appropriate designee. The Monitor has not yet reviewed the reasons for approval of these placements but intends to do so.

*Foster Home and Congregate Care Licensure*

The Implementation Plan requires by December 31, 2004 that there be full compliance with the requirement that children be placed in foster homes and other placements that meet licensing and other MFO placement standards.

- *Foster Home Licensure*

As of July 2005, CFSA reports there are 1204 foster homes. Of these 1204 homes, 978 homes (81%) held a valid license.

- *Congregate Care Licensure*

As of July 31, 2005, 90% of group homes and 53% of independent living facilities had a valid license. The current licensure status for congregate care overall is 62%. Eight of the facilities in the District which have a provisional license or are unlicensed are all targeted for licensure by the end of November 2005. A single provider of 32 apartments in Maryland is in the process of obtaining a Maryland license. The Agency reports that each of the apartments has been inspected and meets District facility standards.

*Health Screening Prior to Placement*

The Implementation Plan requires by December 31, 2004 that 75% of children receive a health screen prior to placement. Children who enter foster care, re-enter care or experience a placement change meet the criteria for this measure. Of the 336 children who entered foster care, re-entered foster care or experienced a placement change, 246 children (73%) received the required health screening.

There are significant difference is the provision of health screens between the children entering foster care and the children experiencing a placement disruption. Of the 336 children, 83 children entered or re-entered care during July 2005 and all of them (100%) received a health screening.

---

[11]  This benchmark was set as a 50% reduction in the number of 29 children placed in an emergency setting for more than 30 days in December of 2003.

[12]  This benchmark was set as a 50% reduction from the June 30, 2004 performance of 104.

During the same period, 118 children experienced 253 placement changes and health screening was completed prior to 163 (64%) of those 253 placement changes.

### Medical and Dental Evaluations

The Implementation Plan requires by December 31, 2004 that 75% of children receive a full medical and dental evaluation within 30 days of placement. Data is not available on the number of children who *received* evaluations. CFSA can report on the number of children with *scheduled appointments* for evaluations. Only five of 83 children (6%) who entered or re-entered foster care in July 2005 were scheduled for a medical and dental appointments respectively within 30 days of placement. An additional 15 children were scheduled for a medical evaluation beyond 30 days; an additional 25 children were scheduled for a dental evaluation beyond 30 days of placement. CFSA reports that until recently, its contracted provider did not schedule children for medical evaluations if the child's medical record indicated he or she had a recent medical evaluation. The data on medical exams for children who experience a placement disruption is not reliable. An appointment for a medical evaluation was scheduled within 30 days for three of the 118 children (3%) who experienced a placement disruption. For an additional 12 children (10%), an appointment was scheduled for a medical evaluation beyond 30 days of the placement disruption. An appointment for a dental evaluation was scheduled beyond 30 days for seven of the 118 children (6%) who experienced a placement disruption and for an additional 12 children (10%), an appointment was scheduled for a dental evaluation beyond 30 days of the placement disruption.

### What's Working Well

- **Steps are being taken to address the placement crisis**. The Agency developed short, medium, and long-term plans to directly address the placement crisis and has implemented strategies to increase placement resources including:
  - centralizing placement functions within the Agency with a Placement Administration that is accessible to staff 24 hours a day;
  - developing therapeutic placement criteria;
  - increasing capacity by expanding contracts; and
  - reaching out to inactive foster parents, adoptive parents, and parents licensed as adoptive parents who are not serving as foster parents.

- **CFSA has renegotiated and improved its contract with DC Kids for medical care for children in placement.** This new contract includes requirements to improve tracking of initial medical screenings and EPSDT/30-day assessments.

- **Children are receiving health screenings prior to initial placements and re-entries to foster care.** Each child who entered foster care in July 2005 received a health screening.

- **The majority of children are living in family-based settings.** The majority of children in placement are in the least restrictive setting and the percentage of children in family-based settings has remained stable.

*What's Not Working Well*

- **The Agency does not now have sufficient placement capacity available to it to meet the needs of the District's children requiring foster care placement.** While CFSA has developed strategies to increase appropriate resources, the situation over the past few months has been dire. Increasing the number of resource parents ready and able to open their hearts and homes to children who present with a range of needs, is essential to the stable functioning of a child welfare agency.

- **There has been a distressing increase in the number of children experiencing multiple placements in last 12 months.** There are many negative consequences to placement disruptions for children, including likely changes in school placement, which affect educational progress.

- **Family Team Meetings are yielding a low number of licensed kinship care placements.** From January – June there were 209 FTMs held. Relatives were identified as possible placement resources in 98 FTMs (48%), however, kinship foster care licenses were granted for only 14 families (7%). Some of these relatives may reside in Maryland; there is no option for temporary kinship licensure for Maryland residents.

- **Many siblings are not living together and when living apart, do not see each other regularly or at all.** CFSA has to develop and implement strategies to place more siblings together and to promote regular sibling visits in natural settings when they are living apart.

- **Too many young children continue to be placed for significant time periods in congregate care.** Although aggregate numbers are relatively small, the practice of placing young children in group settings and allowing them to stay more than 30 days must stop.

- **The benchmark for foster home licensure has not been met.** This area of practice may impact the safety and well-being of children and may also negatively impact their stability and permanency.

**D.**    **Planning**

CFSA is responsible for developing plans with families to ensure the safety, permanency and well-being of their children. Planning begins as soon as a family enters the child welfare system and is focused on ensuring that all services and supports are in place to assist them. Additionally, plans should reflect a clear roadmap (i.e. the specific tasks, steps and behavioral changes necessary) to assist families in reaching established permanency goals. (For more information on permanency goal for children in foster care, see Table 4 in the Placement Section.) In addition to including the family in the planning process, social workers should include a team of supports such as the teacher, therapist, doctor, attorney etc. to ensure all parties are knowledgeable about and working toward the same plan with the family.

The Agency currently develops two types of case plans and these plans must be updated every six months or more frequently as conditions and situations change within families. The "family plan" is developed whenever a family is receiving in-home services, the permanency goal is reunification for children in foster placement and whenever children are placed in "kinship non-foster care 3rd party placements."[13] The "child plan" is developed for all children who are in out-of-home placement.  In many cases, there are both child and family case plans.

The Agency has started training for a rolling implementation of Structured Decision Making™ (SDM) tools to aid in assessment of the strengths and needs of parents and children, change in parent functioning, and the impact of service provision in both in-home service and all foster care cases.  SDM tools are also to be used to re-assess risk in in-home cases at various intervals. Social workers are to complete strengths and needs assessments in conjunction with case plans to inform and enhance case planning and to improve decisions about safe case closure. Additional SDM tools will provide minimum contact guidelines based on risk assessment between social workers and parents and social workers and children beyond the requirements of the Implementation Plan.  The tools are also intended to help workers assess safety issues in open in-home services and reunification cases.  Feedback from other jurisdictions that have implemented SDM emphasize the importance of their consistent application with the support and encouragement of supervisors and ongoing evaluation of their utilization and impact. Additionally, in systems that have adopted family-centered practice, consideration has to be given to the lessons of incorporating these tools in the collaborative work with families.

Earlier in the year, CFSA instituted Family Team Meetings (FTMs) to drive the family engagement and initial planning process whenever a child is removed from home. More recently, these meetings are being used whenever a child is at risk of a placement change or has an emergency placement change. In the ideal, Family Team Meetings will be used to support families and enhance the planning process throughout a family's involvement with CFSA insofar as these meetings can be used at multiple transition points, when any team member believes a meeting would be beneficial, and when case plans need to be updated.

---

[13] The 3rd Party Placements are placements with relatives that are made the Court without benefit of foster care licensure or payment to the kinship provider. CFSA is not currently making third party placements unless so ordered by the Court.  Some children in 3rd Party Placement, however, have been there for some time and were originally placed by CFSA.

### Case Planning
The Implementation Plan requires by December 31, 2004 that 95% of case plans would be current and by June 30, 2005 there would be full compliance with the requirement that all open cases have current case plans. The Agency's performance in case planning is described below.

### Family Plans[14]
There were 1423 family cases open for more than 30 days as of July 31, 2005. Of these 1423 cases, 79% (1119) had a current case plan, 13% (178) had an expired case plan and 126 (9%) had no case plan.

### Child Specific Plans
As of July 31, 2005, there were 2603 children in foster care for more than 30 days. Of these children, 91% (2368) had a current case plan, 188 (7%) had an expired case plan and 47 (2%) had no case plan.

Figure 12 illustrates the trend in case planning for both family and child case plans.

**Figure 12:**
**Current Case Plans for Foster Care Cases and Family Cases***
**as of July 31, 2005**



Source: CFSA administrative data
*Cases open for 30 days or more.

---

[14] Family case plans are created with those families where there is: a) at least one child under the age of 21 at home, b) no children are home but at least one child has the goal of reunification and c) no children are at home but at least one child is in a kinship non-foster care 3rd party placement.

### *Quality of Case Planning*

The Implementation Plan requires case plans to be current, comprehensive and appropriate to needs. The plans should a) reflect the needs of both children and families as it relates to the permanency goal, b) be developed in partnership with families and include their informal support network, c) identify appropriate permanency planning goals, d) identify specific services and supports and include timetables for plan implementation and e) show evidence of supervisory review of case plan progress.

The Monitor and CFSA are using the Quality Service Review methodology to determine the quality of case planning and there are measures in the Quality Service Review instrument specifically related to case planning. Findings from the Quality Service Review will be available in December 2005.

### *Visits Between Children and Their Parents*

The Implementation Plan requires that by June 30, 2005, CFSA would facilitate weekly visits between parents and their children in 85% of foster care cases where reunification is the goal. Of the 617 children in foster care with a permanency goal of reunification, only 37 children (6%) had four or more visits in July; 26 children (4%) had three visits; 45 children (7%) had two visits; and 110 children (18%) had one visit. There were 399 children (65%) for whom there was no documentation that they had any visits with their parents in July. (See Figure 13)

The Monitor is particularly alarmed and dismayed at this low number of parent/child visits. It is also an area in which performance is decreasing rather than improving. Children need to see their parents and the Agency must make every effort to facilitate those visits. Further, it is impossible for social workers to determine if reunification is appropriate or how to best support reunification if these visits do not occur. CFSA administrators believe that visits are occurring more frequently in the community but these visits are not being documented by the social worker. The Quality Service Reviews also have highlighted that CFSA is performing relatively well in maintaining family connections. These disparate data reflect the need for additional analysis. Importantly, however, if a CFSA social worker is actively managing a case, then he or she must be aware of how often visits are occurring and should document them accordingly. Such documentation is an important part of the permanency planning record.

Twelve community sites for parent child visitation were developed through a contract with the Collaboratives but it appears this readily available service is underutilized by CFSA social workers. During FY04, the contract for visitation services had a target of serving 145 families but these services were provided for 38 families. CFSA reports that the visitation requests sent to the Collaborative during FY05 have been minimal and they anticipate use of the community sites to be at or below the FY04 levels. The Monitor has requested data on the number of families using the service in FY05 and expects to review these data in early November.

**Figure 13:**
**Visits Between Children and Parents in July 2005 When the Goal is Reunification**
**(N=617)**



Source: CFSA administrative data

*Visits to Parents by Social Workers and Other Approved Service Providers*
The Implementation Plan requires the social worker or other approved service provider to visit with the parents at least twice a month during the first three months post placement for 60% of cases as of December 31, 2004 (unless there is documentation that parents are unavailable or refuse to cooperate). These visits are critical to ensure that appropriate services and supports are in place to assist the parent in addressing the specific concerns that brought the child(ren) into care and that contribute to a parent's inability to provide a safe and nurturing environment.

In July 2005, there were 98 children who had been newly placed into foster care within the past three months. There were 73 parents[15] identified for these 98 children. Of the 73 parents, 24 (33%) received two or more visits from a social worker during the month of July.  CFSA reports that additional approved providers are also visiting with some of the parents. These providers can include homemaker services, family support workers, therapists, etc. This data is not systematically entered into FACES. Additionally, the Agency's data system is not able to

---

[15] Parents are defined as the caretaker at the time of removal and could include grandparents, step-parents or other caretakers.

systematically reflect when a parent's location is unknown or if a parent refuses to cooperate with services.

The Quality Service Review will provide additional information about social worker and/or other provider visits with parents during the first three months of a child's placement. The sample of cases used for the Quality Service Review includes 13 cases that were closed in investigations during June 2005 and opened in an In-Home and Reunification Unit.

***Permanency Goals***
The Implementation Plan requires that permanency goals for children in foster care will be appropriate to their needs and family's situation and consistent with requirements for permanency in District and Federal law.  An appropriate permanency goal is intended to reflect the outcome of a safe, stable and legally permanent family for each child.  The Implementation Plan also requires by June 30, 2004, 90% of children would have appropriate permanency planning goals.  Listed below are the number of children with inappropriate goals, as defined by the Implementation Plan and the Agency's performance as of July 31, 2005.

- A child under the age of 12 should not have a permanency goal of "legal custody with permanent caretakers" unless he or she is placed with a relative who is willing to assume long-term responsibility for the child and who has legitimate reasons for not adopting the child and it is in the child's best interest to remain in the home of the relative rather than be considered for adoption by another person. In July 2005, no child under the age of 12 had a permanency goal of legal custody with permanent caretakers.

  A child under the age of 12 should not have a permanency goal of continued foster care unless CFSA has made every reasonable effort, documented in the record, to return the child home, to place the child with an appropriate family member, or to place the child for adoption, and CFSA has considered and rejected the possibility of the child's foster parents assuming legal custody as permanent care takers of the child. In July 2005, no child under the age of twelve had a permanency goal of continued foster care.

- A child under the age of 16 should not have a permanency goal of "independent living."  In July 2005, nine children under the age of 16 had a permanency goal of independent living.

- A child should not have a permanency goal of return home if a) both parents have relinquished custody or are deceased or b) the parents cannot be located after a diligent search, not to exceed three months from the child's entering placement or c) a child's parents have been found guilty of repeated serious abuse or neglect of the child or the siblings such that termination of parental rights is appropriate.
  In July 2005, 72 children had a goal of return home and the parents met the conditions described in this category.

*What's Working Well*

- **Case plans are being developed and used more frequently in the planning process.** As of July 31, 2005, 91% of children in foster care had a current case plan and 79% of families had a current case plan.[16] This is significant progress.

- **Family Team Meetings are being used to develop plans with families when children may be removed from home and whenever a child may experience a placement change.** The Monitor looks forward to an expanded use of Family Team Meetings to include planning activities throughout the life of a family's involvement with CFSA.

*What's Not Working Well*

- **Visitation with children and families remains unacceptably low.** Only 6% of children visited with their parents on a weekly basis and only 33% of parents were visited twice a month by a social worker. Visits must occur on a regular basis for planning purposes and for implementing the stated plans. CFSA must take immediate action to remedy the lack of regular visitation.

---

[16] In August 2005, 93% of foster care cases and 78% of family cases had a current case plan.

E.     **Adoption and Post Adoption**

Establishing a permanent legal arrangement with a family member through adoption or guardianship or with a non-relative through adoption are the preferable options for children who cannot be reunited with their birth parents. Ensuring the availability of supportive and therapeutic services after achieving permanency and informing adoptive parents and legal guardians of those services is also the Agency's charge. During fiscal year 2004 there were 337 adoptions finalized and 248 children exited the foster care system through guardianship. Table 6 below shows the number of finalized adoptions for fiscal year 2005 up to July 2005. In the same period, 198 additional children exited the foster care system through guardianship. Performance so far this year suggests that the number of adoption finalizations for fiscal year 2005 may surpass fiscal year 2004 performance. This is a significant accomplishment.

**Table 6:**
**Finalized Foster Care Adoptions at CFSA**
**October 2004 – July 2005**

| FY 2005 | Adoption Finalizations |
|---------|------------------------|
| October | 26 |
| November | 42 |
| December | 34 |
| January | 23 |
| February | 13 |
| March | 31 |
| April | 28 |
| May | 21 |
| June | 32 |
| July | 28 |
| **TOTAL** | **278** |

Source: CFSA administrative data

CFSA is developing a plan to phase-in a restructuring of the adoption case management process in an effort to better meet the needs of children and families. As in private agency cases, CFSA social workers in on-going units will maintain case management responsibilities in cases while social workers in adoption units will serve as consultants and take responsibility for moving the

adoption process along. This change means that children and families will not experience the disruption of a case transfer once the child's permanency goal is changed to adoption. Agency management is credited for the careful consideration given to improving this case management process to benefit both clients and staff. Work on drafting a sound Adoption Policy has been delayed. However, these critical process decisions had to be made before moving forward.  It is anticipated that a new draft policy will be forthcoming.

### *Timely Movement to Pre-Adoptive Placement*

Children with a permanency goal of adoption need to be living with a pre-adoptive family as quickly as possible.  When children cannot be reunited with their parents, efforts to establish legal permanency through adoption or guardianship and integrate them into family life are paramount.  The Implementation Plan requires that by December 2004, 75% of children be residing in an approved adoptive placement within nine months of their goal becoming adoption. In order to evaluate this requirement, the Monitor looked at all of the children whose goal was changed to adoption in November 2004 to determine their placement status in July 2005 (which was nine months after the initiation of the goal of adoption). Of the 18 children whose permanency goal was changed to adoption in November 2004, 11 (61%) were residing in a pre-adoption home in July 2005.

Of the 654 total children with a goal of adoption, 48% were residing with a pre-adoptive family in July of 2005. (See Figure 14)

**Figure 14:**
**Placement of Children with a Goal of Adoption**
**as of July 31, 2005**
**(N=654)**



Source: CFSA administrative data.

### *Legal Action to Free Children for Adoption*

Once a child's permanency goal is changed to adoption, the Implementation Plan requires the initiation of legal action to free the child for adoption within 30 days. By December 31, 2004, the Implementation Plan required legal action to begin within 30 days in 75% of cases. In July 2005, there were 650 children with a goal of adoption for more than 30 days. Of these 650 children, legal activity had been initiated prior to the goal changing to adoption or within 30 days of the goal change for 292 children (45%). For 173 (27%) of those children, there was legal activity, but it occurred after the 30 days. For 185 (28%) children, there was no documentation of legal activity to free them for adoption since their permanency goal was changed to adoption.

### *Termination of Parental Rights*

CFSA and the Office of the Attorney General (OAG) have worked diligently this year to identify cases where it is appropriate to file a termination of parental rights petition (TPR). CFSA and the OAG conducted joint TPR training for attorneys and CFSA staff and the OAG dedicated attorneys to focus on these cases. Since February 2005, the Agency has filed over 165 TPRs. This is an historic accomplishment. Of the 40 TPR cases tried in Court, 32 have been granted, one was not and seven cases are awaiting decision as of September 2005. Over 130 TPR cases remain active in the Court (i.e. set for a hearing). This proactive legal action represents an important shift in the District's practice and reflects a new level of cooperation between CFSA and OAG staff and a new willingness by the Family Court to comply with ASFA requirements on legal steps to promote permanency.

### *Adoption Finalization within 12 Months of Placement in Pre-Adoptive Home*

By June 30, 2005, the Implementation Plan expected that for 65% of children, CFSA would make reasonable efforts to finalize their adoption within 12 months of placement in an approved adoptive home. CFSA is not able to reliably report on this measure and expects to do so by March 2006 by reporting on the universe of children adopted in a given month and retrospectively providing the date the child was placed in that home.

### *Child-Specific Staffing*

The Implementation Plan requires CFSA to convene a permanency planning team to develop a child-specific recruitment plan, as needed, within 95 days of a child's permanency planning goal becoming adoption. By June 30, 2005, the Implementation Plan required full compliance with this requirement. From June 2004 through June 2005, there were 38 children whose permanency goal was changed to adoption and who were not residing in a pre-adoptive home at that time. Of the 38 children, a child-specific staffing was held for 18 children (47%) but only nine children (24%) had the staffing prior to the goal change or within the required 95 days. For four of these nine children, the staffing was held prior to the court's approval of the goal change and for five children, the staffing took place within 95 days of the goal change. For the remaining nine children, the staffing was held beyond the required 95-day period. There were 20 other children whose goal was changed to adoption between June 2004 and June 2005 and no staffing had been held as of August 2005. CFSA reports that none of those 20 children need a recruitment staffing for reasons including: the current caretaker has decided to adopt; a relative placement has been identified for the child and the licensing process is underway; or a court order is in place barring recruitment and allowing the current foster parents additional time to decide whether or not they would like to adopt the child.

### Processing Applications for Foster/Adoptive Parents

The Implementation Plan requires CFSA to have a process in place for recruiting, studying and approving families interested in becoming foster or adoptive parents that result in the necessary training, home studies and decisions on approval being completed within 120 days of application[17]. By June 30, 2005, the Implementation Plan requires a decision about approval within 120 days of application for 75% of foster parent applicants. CFSA has not met the benchmark for this measure. Of 29 District applicants in March 2005, a decision was made within 120 days for 20 families (69%). Of the eight applicants who are Maryland residents, a decision was made within 120 days for one family (14%). The overall performance for District and Maryland residents combined is 57% (21 of 37 applicants).

CFSA does not have comparable data at this time for homes recruited and trained by contracted foster care providers.

### Post-adoption Services and Notification

The Agency has extended and increased its contract with the Adoption Resource Center operated by Family and Child Services, Inc. The Center provides the following services:

- *Crisis intervention and assessment*: face to face counseling sessions with licensed clinical social workers for up to one hundred clients who currently are or previous were involved in the adoption process.

- *Reference library*:  Web page and reference library, making available reference books, tapes, videos, CDs and other resources that contain information relating to a whole host of issues for adoptive families.

- *Training programs*:  programs for professionals to address such topics as abandonment, loss and separation, parenting the adoptive child, and cultural issues as they relate to the adoption process.

- *Support groups for parents, children, and youth*:  Support groups for children, youth and parents to engage participants in a supportive environment to address both family and personal dynamics impacted by the adoption.

The limited array of post-adoption services may deter families from adopting a child in their care because of concerns about loss of access to needed supports. Recognizing the need for additional resources, the Agency plans to contract in January 2006 for additional services necessary to preserve families who have adopted a child from CFSA or from a contacted agency.

The Senate Appropriations Committee approved $750,000 to assist CFSA in providing supportive post permanency services to adoptive families and families granted guardianship of children. In addition, the District recently received the fourth largest Adoption Incentive Grant ($1.07 million) from the federal government based on the Agency's increased number of

---

[17] For District homes, the 120-day licensing process begins on the first day of pre-service training. For Maryland homes the 120-day licensing process begins upon completion of pre-service training.

finalized adoptions. CFSA plans to use the Incentive Grant to fund direct services such as respite care, Youth Connections to engage youth and staff in active permanency planning, family camp, and additional services at the Adoption Resource Center. The grant will also be used to enhance the flexible fund to provide individual services and supports to families.

Although the range of services available is limited, CFSA continues to provide information to adoptive parents regarding the current availability of post adoption services. While families may not initially use these services, they are given the information and are encouraged to contact CFSA directly for additional information as their needs change.

### *What's Working Well*

- **The Agency has employed strategies, proven effective in other child welfare systems, in recruiting foster/adoptive parents.** CFSA has produced an excellent video to aid in recruitment of permanent families for children. The video incorporates youth and their foster parents speaking about their experiences. Youth are also serving as guest speakers in foster and adoptive parent training sessions in an effort to encourage families to consider being a foster/adoptive resource for an older child.

- **The array of intensive community-based mental health services developed in collaboration between CFSA and the District's Department of Mental Health was extended to adoptive families in the District.** Intensive home and community-based services, multi-systemic therapy, and mobile response and stabilization services, previously available only to children in foster care or children living at home with CFSA monitoring, are now available to adoptive families. This is an important step forward in the provision of post-adoptive services.

- **CFSA and OAG have successfully collaborated to address a backlog of cases where a petition to terminate parental rights needed to be filed and continue to work together on this effort.** OAG and CFSA worked together to file and try a record number of TPRs this year and continue in this effort to establish legal permanency for children as required by federal law.

### *What's Not Working Well*

- **CFSA has explored national models for accelerating permanency for older children but has not yet begun implementation.** Over a year ago, the Agency expressed interest in incorporating a practice of engaging youth and those who work with them in permanency planning, building on a successful model of practice known as the "Massachusetts Model." This model includes identifying adults to serve as supports beyond foster care involvement and working with older youth, foster families, and staff towards successful adoptions of teenagers. Implementation has not yet occurred. CFSA now plans to implement Youth Connections, to engage youth and those who work with them in active permanency planning. The initial focus will be to identify permanent families for youth in congregate care.

- **More than half of the children with a permanency goal of adoption are awaiting a pre-adoptive placement.** Aggressive work needs to be done on behalf of these children when the key decision has been made to change their permanency goal to adoption but the child remains in an uncertain living situation. The Agency may need to better understand why many children are residing with families who have chosen not to adopt, determine if these decisions reflect systemic problems that can be changed and address these issues as needed. **The limited array of post-adoptive and post-permanency supports remains one o f the key barriers.**

- **Child-specific staffings (planning meetings that aid in the process of identifying adoptive families for children) are not being held in a timely manner.** The Agency needs to more quickly match children with families interested in adoption. Planning should begin prior to a permanency goal change but must certainly be substantively underway within three months of an adoption decision.

- **There continue to be delays in initiating legal action to free children for adoption.** Despite huge progress in the last nine months, the legal steps needed to achieve the established permanency goal of adoption are still not initiated in a timely manner for many children.

## F.    <u>Supervision of Placement</u>

Supervision by social workers of children in foster care placement is a critical practice area. Workers must visit regularly with the children on their caseload to ensure their ongoing safety and well-being. Foster parents also need regular contact with social workers to discuss children's current status. The assessments conducted during these visits assist workers in determining the stability of the placement and allow for the timely introduction of additional supports and services if stability or a child's well-being is compromised.

While not yet meeting the benchmarks for social worker supervision of placement, CFSA continues to make significant progress. Social worker caseloads at CFSA are continuing to decline, allowing workers to more comprehensively support a more manageable number of children and families. The Agency is struggling with stability of children's placements as is discussed in Section C of this report but it is now feasible that CFSA focus more specifically on the ways in which social workers interact with children and foster parents during planned visits in order to support placement stability. For example, on every visit, workers need to assess whether there are factors that put the placement at risk for disruption and develop plans to ameliorate them. If social workers are able to more quickly determine that a placement may disrupt, preventive interventions and supports, including Family Team Meetings, could be promptly implemented. These kinds of strategies, when implemented Agency-wide, would likely increase overall placement stability. Further, efforts must continue to address issues consistently raised by foster parents that contribute to placement stability including respect, access to information, appropriate training and timely support.

***Weekly Visits to Children in Foster Care During the First 8 Weeks of a New Placement***
Data to measure this requirement are not available. The Monitor has reviewed a proposed data report and provided recommendations for amending the "logic" of how the data are retrieved from FACES to accurately reflect visits to children during the crucial period in a new placement. CFSA anticipates an updated data report will be available in November 2005.

***Monthly and Bi-Monthly Visits to Children in Foster Care***
The Implementation Plan requires by December 31, 2004 that the Agency be in full compliance with the requirement to visit all children in foster care on a monthly basis. In July 2005, there were 2501 children in foster care placed in D.C., Maryland, and Virginia. Of these 2501 children, 2110 children (84%) were visited at least once during July.

The Implementation Plan also requires by June 30, 2005 that 80% of the children in foster care be visited twice a month by their social worker. In July 2005, 1018 children (41%) were seen at least twice during July.

There were 391 children (16%) for whom there was no documentation of any worker visits in July. (See Figure 15)

**Figure 15:**
**Social Worker Visitation to Children in Foster Care**
**(N=2501*)**



Source: CFSA administrative data
*Does not include children residing greater than 100 miles from D.C.

***Visits to Children Placed in Maryland through the Interstate Compact on the Placement of Children***

Visits to children placed in Maryland are covered under the *Interim Agreement Between the State of Maryland and the District of Columbia Regarding Interstate Placement of Children.* This agreement was developed in 2002 after Maryland expressed concern that children placed by the District in foster homes in their state were not being regularly monitored by CFSA workers. In August 2005, CFSA reported there were 1205 children placed in Maryland. Of these 1205 children, 1076 children (89%) received a monthly visit from a CFSA or private agency social worker.

*What's Working Well*

- **Although the Agency is far from full compliance regarding social work visits, there is documentation that social workers are visiting children in foster care more regularly.** The percent of children receiving at least monthly visits has improved from 76% in July 2004 to 84% in July 2005. The percent of children receiving at least twice monthly visits has increased from 10% in July 2004 to 41% in July 2005.

*What's Not Working Well*

- **Placement stability has not been positively affected in the aggregate by increased social worker visitation.** In general, it would be anticipated that placement stability would increase as social workers visit children more regularly to assess their status and needs and implement additional services and supports. Unfortunately, this does not seem to be the case. It is not clear to the Monitor if this disconnect relates to social workers' lack of knowledge and ability to use visits for assessment, planning and initiation of services and supports to address problems.  Additionally, it is possible that workers do not know what additional resources can be brought to bear to stabilize placements once problems are identified. During a focus group held with social workers in June 2005, the Monitor learned that many workers are not requesting a Family Team Meeting for likely placement changes until they have exhausted their own interventions and until it is often too late to stabilize the placement. Rather, social workers could be using the Family Team Meeting at the first sign of instability. This would allow for all members of the team to come together to determine what supports can be put into place to maintain the placement and thereby reduce the number of children needlessly experiencing multiple disruptions.

G.    **Case Review System**

Case reviews are held regularly at CFSA to assist with decision-making and to monitor and track progress of children and families towards permanency goals and outcomes of child safety and well-being. Case reviews required by the Implementation Plan include semi-annual Administrative Review for children who have been in foster care 180 days or more and case specific reviews of children and families who meet specific criteria outlined in the Modified Final Order. Permanency Hearings are held in the District's Family Court to provide judicial oversight and review of how well children and families are moving toward their permanency goal.

In addition to these required reviews, CFSA has taken significant efforts to develop internal capacity to conduct Quality Service Reviews as part of their internal quality improvement activities. These reviews provide a qualitative look at the functional status of children and families and the child welfare system's ability to support them. As a developmental step, CFSA initially relied on the Monitor to identify and provide reviewers and to analyze the data produced from the reviews.  Based on the utility of early pilots, CFSA has crafted its own protocol and is developing internal capacity to manage and conduct the QSR process.  A Quality Service Review of 40 cases involving children in foster care and in child protective services cases has just been completed primarily using internal CFSA staff supplemented with staff from the Monitor and other qualified external consultants. A Quality Service Review Unit now exists within the Quality Improvement Administration and staff specialists have received extensive training in managing these reviews.  Preliminary findings were presented to managers and staff in mid-October and a complete report and accompanying action plan will be available shortly.

*Administrative Reviews*
The Implementation Plan requires by December 31, 2004 that there be full compliance with the requirement that all children in foster care receive an Administrative Review within 180 days of entering care and every 180 days thereafter. As reported in the last monitoring report, CFSA has redesigned the Administrative Review process and this process is yielding results. In July 2005, of the 2625 children in foster care, there were 2135 children who had been in care 180 days or more. Of these 2135 children, 2103 (98.5%) had an Administrative Review in the last 180 days. There were 22 children (1%) who were overdue for an Administrative Review and only 10 children (0.5%) who have been in care more than 180 days and have never had an Administrative Review. (See Figure 16)

**Figure 16:**
**Administrative Reviews for Children in Foster Care**
**as of July 31, 2005**
**(N=2135)**



Source: CFSA administrative data

***Permanency Planning Hearings in Family Court***

The Implementation Plan requires CFSA to make every reasonable effort to ensure children in foster care have a permanency hearing in Family Court no later than 14 months after their initial placement. On July 31, 2005, there were 928 children who had entered care within the previous 18 months. Of these 928 children, 411 children have been in care for 14 months or more as of July 31, 2005. Of these 411 children, 395 (96%) had a Family Court permanency hearing within 14 months of entering care. The remaining 16 children (4%) have not yet had a permanency hearing. (See Figure 17)

**Figure 17:**
**Permanency Hearings in Court for Children in Foster Care 14 Months or More**
**(N=411*)**



Source: CFSA administrative data.
*Number of children who entered foster care in the 18-month period between January 2004 and July 2005 and who have been in care 14 months or more by July 31, 2005.

*Case Specific Reviews*
The Implementation Plan requires CFSA to conduct case specific reviews in corrective action categories as described below. By December 31, 2005, CFSA is required to ensure that appropriate case specific reviews occur for 75% of applicable cases.

- Cases with four or more reports of neglect or abuse concerning a single child, single perpetrator or single family
- Cases in which a child has been placed in four different placements, excluding a return home
- Cases in which a child has a plan of return home for more than 24 months
- Cases in which a child has a permanency goal of adoption for more than one year and has not been placed in an adoptive home
- Cases in which a child has been returned home and reentered care more than twice and has a plan of return home

CFSA has provided no data to the Monitor regarding the implementation of case specific reviews. While the Monitor recognizes that some of these reviews have occurred through the Administrative Review, the Family Team Meeting and other case staffings, it is also clear that CFSA is struggling to determine how these reviews should be conducted, by whom and under whose authority. The reason for the requirement in the Court Order is to ensure an added level of case accountability for children in unacceptable status. These reviews need to be conducted regularly and with a clear process for collecting and using the information.

### *What's Working Well*

- **CFSA redesigned the Administrative Review process and is conducting timely Administrative Reviews of case progress for nearly 100% of children in care.** This is a tremendous accomplishment for the Agency.

- **Permanency hearings in Court are occurring for almost all children in foster care 14 months or more.** CFSA and the Family Court have joined in partnership to ensure children and families are provided adequate and timely judicial oversight of case progress. The Child Welfare Leadership Team, which includes the CFSA director, the Chief Judge of the Family Court, the Office of the Attorney General (OAG), Council for Court Excellence Director and representatives from other District agencies meets bi-monthly to discuss matters affecting CFSA and Family Court interface and to troubleshoot issues that impede achieving permanency outcomes for children in the District. The progress on conducting timely permanency planning hearings in Court is an example of the results of the collaborative work.

- **CFSA has developed internal capacity to conduct Quality Service Reviews.** These reviews provide extensive information about the quality of case practice. Additionally, when the information from the Quality Service Review is used strategically, it has the potential to help identify policy, practice and resource barriers to successful outcomes for children and families. CFSA is already beginning to see some initial progress in the Quality Service Review outcomes, which is not uncommon for systems using this review approach. When workers, supervisors, managers and administrators can see and understand what practice currently looks like on a case by case basis, as the Quality Service Review allows, they are better able to make adjustments to training, supervision and policy and administrative supports to promote better frontline practice.

### *What's Not Working Well*

- **Special case reviews are not being held at the level required by the Implementation Plan.** As noted above, there are five specific areas for which CFSA is required to conduct case specific reviews. While it is clear that some of these case reviews are occurring, they are not being held systematically or at the necessary level of regularity. The situations of the children and families for whom these reviews are required are indicative of poor outcomes and needed additional support and services.

The Monitor does not clearly understand the barriers to fully implementing special case reviews. Staffing levels in the Quality Improvement Administration could be increased as one strategy for conducting these case reviews. Additionally, although the responsibility for ensuring the reviews are completed lies within the Quality Improvement Administration, it does not appear to be authorized to require cooperation between administrations in the implementation of the reviews.

## H.    Special Corrective Action

The requirement for the Agency to address Special Review Categories (SRCs) and Corrective Action Categories (CACs) is directly stated in the Modified Final Order and more specifically addressed in the Implementation Plan. To meet these requirements, the Quality Improvement Administration has worked to establish accurate baseline data and conduct some analysis to determine which families/children fall into each category and why.

To establish an accurate baseline, QIA has worked with FACES to develop new management data reports for four of the five special review categories. The following provides information about the status of these reports, as well as a very basic summary of data recently extracted from four of the five reports.

- **Category 1: Four or more reports of abuse or neglect**
  As of May 2, 2005, 819 children and adults who have had a fourth report within the last 12 months were in this category. The report logic is under revision to report children and exclude adults. The former CPS Administrator conducted a limited number of reviews over the past on children in this category, however, no reports have been provided to the Monitor regarding practice or systemic issues identified or steps taken to address them.

- **Category 2: Children with four or more different placements (excluding a return home)**
  As of May 31, 2005, CFSA had 2,695 children in out-of-home care. A total of 132 children (5%) had four or more placements in the last 12 months. CFSA reports that each of these children's cases was reviewed in either Administrative Reviews, Family Team Meetings or separate staffings. No reports have been provided to the Monitor regarding how the issue of the child's multiple placements in the previous 12-month period was addressed in these reviews.

- **Category 3: Children with the goal of reunification for more than 24 months**
  As of May 9, 2005, 54 children were in this category including 29 CFSA cases and 25 private agency cases. The goal of reunification had been in place on average for 41 months for these children. All of these children (100%) were current with Administrative Reviews. In addition to the Administrative Reviews, 14 children had been the subject of a special staffing, but none of the staffings took place within the last three months, and only two focused on the child's goal of reunification. For those two cases in which the

child's goal of reunification was discussed, no reports which identify remedial actions, as required by the Implementation Plan, have been distributed.

- **Category 4: Children who have returned home and reentered care more than twice and have a plan to return home.**
  As of May 9, 2005, 5 children have returned home and reentered care more than twice and have a plan to return home. CFSA reports three of the five children are siblings and are placed in therapeutic foster homes. The remaining two children are in residential placement. The ages of the children range from 10 years of age to 16 years of age.

*What's Not Working*

**The Agency is not actively addressing the Implementation Plan requirement to review children in special action categories and use this information for system improvements.** While some reports that identify children in each category have been developed, no substantive work to comprehensively review these cases has been completed. The monitoring and proactive functions inherent in this requirement have broad implications for both system and practice improvement. For additional information, refer to the Case Specific Reviews in the Case Review System of this report (Section G).

I.    <u>**Staffing and Caseloads**</u>

*Staffing*

Table 7 below compares July 2004 and July 2005 staffing levels for CFSA supervisors, social workers and social work associates.

Staffing levels at the Agency held steady during the past year. The total number of social work staff on July 31, 2004 was 357 and on July 31, 2005 was 360. During this same period, the number of available positions increased from 394 to 419, an increase of 25 positions. While monthly data on hires and separations vary, it appears that undesired worker turnover is slowing. Five (5) social workers separated in May 2005 compared with 12 social workers leaving in May 2004. The monthly average of separations[18] currently ranges between 5 to 7 social workers. As of June 2004, 53 social workers had separated from the Agency during FY04 compared to 36 as of June 2005. (Of the 53 separations, 13 of them were the last remaining unlicensed trainees hired before September 2003 who were not able to meet social work licensing standards.)

---

[18] Separations include both resignations and terminations.

**Table 7:**
**Social Work Staffing as of July 31, 2004 and July 31, 2005**

| Position | Total Filled Positions | | Vacancies | | Total Positions Authorized | |
|---|---|---|---|---|---|---|
| | *2004* | *2005* | *2004* | *2005* | *2004* | *2005* |
| **Supervisors** | 64 | 63 | 6 | 13 | 70 | 76 |
| **Social Workers** | 270 | 273 | 31 | 46 | 301 | 319 |
| **Social Work Associates** | 23 | 24 | 0 | 0 | 23 | 24 |
| ***Total*** | 357 | 360 | 31 | 59 | 394 | 419 |

CFSA is fortunate to have access to sufficient funding to achieve *LaShawn* caseload standards. As we have previously reported to the Court, the Council of the District of Columbia's original FY 2006 budget did not include adequate funding for staff and was less than requested by the Mayor to support CFSA staffing. The Council had initially reduced the Mayor's budget request because of concerns about the Agency's multi-year inability to fill all positions. Subsequently, however, the Council enacted a Budget Support Act that included an additional $1 million in personnel funds to allow for needed hiring at CFSA. Further, in legislation entitled "Funding Safeguards for the Child and Family Services Agency Act of 2005," the Council committed to additional FY 2006 funds for staff to be allocated by the Council if the Mayor requests the funds (not to exceed the original FY 2006 staffing request), identifies a source for the funding and the Chief Financial Officer certifies these funds are available and needed to hire personnel. CFSA has already requested an additional $2 million and will request additional funds as needed under this Act.

As of June 30, 2005, CFSA's a vacancy rate was 8.3%. The turnover rate for the entire Agency was 14.8% and the social worker turnover rate was 17.7%.[19] While these overall numbers are relatively low compared to national data on the child welfare workforce, CFSA remains committed to implementing a comprehensive retention and recruitment plan to ensure a stable social work workforce.

Overarching goals of the Recruitment and Retention Plan for FY06 include:

- Reduce social worker turnover by three percent, from 17.7% to 14.7%.

- Reduce supervisor turnover by at least 5%.

- Improve leadership skills of supervisors.

---

[19] The vacancy rate is calculated by dividing the number of vacancies by the total number of positions. The turnover rate is calculated by dividing the number of separations by the number of filled positions.

- Improve work environment to attract, support, and retain social workers and supervisors who have the values and competencies required to advance the Agency's mission.

The plan also examined a number of efforts CFSA is making to improve both the quantity and quality of its workforce.[20] Several strategies are yielding results:

- **Hiring only licensed social workers or social workers who have passed the licensing exam.** This strategy has reduced the number of workers who were hired without licenses and subsequently had to be terminated because they were unable to obtain licensure within a reasonable time period.

- **Internet recruitment.** CFSA is using monster.com, usajobs.com, careerbuilders.com and nasw.org as well as posting positions on the internet job banks of local universities. While this strategy has not yet produced the level of recruitment desired by CFSA, new workers have been recruited in the past year from Massachusetts, Georgia, Ohio, Mississippi, Michigan, Texas, Washington, South Carolina, North Carolina, Louisiana, Alabama, New York, and New Jersey.

- **Use of Congressional funding for incentive payments.** A pilot program with a goal of extending social worker tenure was funded by Congress in 2004. This program provided participants up to $18,000 to assist in repaying student loans in exchange for a continued service agreement of two years beyond the basic program eligibility period of two years. The program was officially launched during the spring of 2004 and concluded on September 30, 2004. The first payments were due in July 2005. Unfortunately, the $3 million in funding was received in March 2004 and had to be allocated by the end of September 2004. Carryover funding was not available and what had hoped to be a multiyear strategy remained a six month program. Nevertheless, 140 of the Agency's 190 eligible social workers and 9 social workers from the private providers enrolled in this program by the end of September 2004. The results of the innovative strategy in terms of the effect on retention will not be known until 2006. This program has national significance since social worker recruitment and retention issues are pervasive across the nation's child welfare systems.

- **Reward and Recognition Program.** This program includes a variety of rewards ranging from monetary awards, honorary citations, letters of appreciation, gift certificates, and time off without charge to leave for excellent service.

- **Exit surveys.** CFSA conducts exits interviews with workers who are separating from the Agency in an attempt to gather information related to their reasons for leaving and to determine if additional supports can be put in place to avoid future separations. Accepting another position was the number one reason for exiting during the past year. Lack of support, untimely promotions, inconsistent supervisory consultation, excess paperwork required to obtain services for children, and frequent court appearances rank high on the

---

[20] *Recruiting and Retaining Social Workers Annual Report* (June 2005) can be obtained by contacting the CFSA Human Resources Administration at 202-442-6100.

list of exit reasons. Quarterly reports of these findings are being distributed quarterly to senior managers to ensure Agency-wide learning regarding separations.

Exit surveys were conducted with 123 of the 129 employees who left CFSA between October 2004 and September 2005. Exit surveys were conducted with workers leaving the Agency on a voluntary basis as well as with workers who were terminated. The below information highlights some of the findings:

*Reasons for Leaving the Agency*
- Relocation or job growth with another organization outside of the District
- Medical reasons
- Transferred to another unit
- Lack of management support or technical resources
- Poor compensation structure for grade and step increases
- Long hours and work related stress
- Not satisfied with current position

*What did you like least about the Agency?*
- Poor leadership at the frontline
- Agency structure and too much "red tape"
- Poor service delivery; process not in place to spend adequate time/resources with and for children
- Lack of coaching and mentoring from supervisors
- Lack of external support from the Court
- Lack of improvement processes, lack of time management and focus on being organized
- Lack of integrity, diplomacy among the ranks and nepotism
- Heavy handed management tactics to accomplish goals and tasks
- Lack of good employee benefits

*What did you like most about working for the Agency?*
- Good work environment
- Friendly assistance from colleagues and a team approach to handling concerns
- Training opportunities and pre-service training
- Supportive supervisors
- Array of available resources
- Professional development opportunities
- Being treated respectfully; integrity and intelligence of employees
- Being part of successful outcomes for children and families
- Salary

*What steps could have been taken to retain you?*
- Process promotions and transfers in a timely manner
- Complete performance evaluations in a timely manner so workers can measure their professional development
- Lower caseloads and give more supports (administrative and SSA positions)

- Expand benefits to include relation, mileage and tuition
- Train tenure staff in change management so when new employees are hired there is not a hostile work environment

*What are your suggestions for improvements?*
- Create an environment that fosters open communication without retaliation
- Train and value workers and managers to meet the demands of the position
- Offer more career mobility
- Improve technology (PASS system) and purchase new equipment (phones, copiers, etc.)
- Create incentives to help employees regroup and refocus
- Create an environment where private visitation and meetings are possible
- Improve relations between staff and management

In addition to maintaining the strategies begun in 2004 and 2005, additional goals and strategies were identified in the latest recruitment and retention plan. These include:

- **Collaborate closely with local schools of social work.** CFSA plans to use current Agency staff as ambassadors to the schools so that students hear directly from workers about public child welfare agency practices and the benefits of public service. Several managers have recently become adjunct faculty at local schools of social work to further this effort. The collaboration also includes an effort to ensure social work schools are encouraging their graduating students to take the licensure exam prior to graduation.

- **New strategies to fill all vacant positions in the Intake and Investigations Administration.** The Agency is considering several new strategies in this area: a) a differential pay scale for workers remaining in Intake for at least one to two years (target of December 2005), b) training units for new hires to include 9 to 12 months of coaching and mentoring by a seasoned worker after their training unit experience ends, c) a focused effort to provide professional development and learning opportunities for Intake supervisors, d) divert many of the more seasoned applicants to the Intake and Investigations Administration in an effort to increase not only the number of workers in Intake but also the skill level and e) strengthen the leadership and supervisory skills for managers in Intake.

- **Evaluate the use of the BSW workers.** CFSA has been using a small number of workers with Bachelor's Degrees in Social Work (BSWs) as case managers for several years. In an effort to better understand the effectiveness of this practice, CFSA is assessing the types of assignments given to BSWs and results of their work. CFSA is also considering revising the job description of the BSW after receiving consultation from the Child Welfare League of America.

- **Implement the new District-wide human resources management tool, PeopleSoft.** CFSA plans to train all managers in the use of PeopleSoft, which will allow for the tracking of personnel requests and actions, completion of probationary requirements, eligibility for step promotions, and semi-annual licensing requirements. This program

facilitates the production of reports that will improve workforce planning, overall recruitment and retention practices including demographic data for new hires, analyzing exit interviews, tracking movement of social workers who could receive awards, promotions, and disciplinary actions.

In general, the Recruitment and Retention Plan is well thought out and provides specific measurable goals and strategies for the coming year. As noted above, some of the strategies put into place as a result of last year's plan are beginning to yield preliminary results. Areas to watch closely over the coming year include the Agency's plan to have managers develop individual performance standards for their workers. The Monitor is concerned that this practice could result in highly variable performance standards and practice across the Agency. Additionally, the Agency is currently reporting that it takes up to 30 days after references have been checked to issue an offer of employment. This time frame seems particularly long and steps should be taken to reduce it.

The Monitor had expected to have reviewed the Agency's workload study by the time of this report. The Agency contracted with the Child Welfare League of America in August 2004 to complete an analysis of workloads at CFSA and to make recommendations about needed changes to staffing patterns. Specifically, the workload study was designed to assist the Agency in determining the adequacy of the MFO caseload standards and propose modifications if necessary. The study was also intended to provide specific recommendations regarding the use of BSWs at the Agency. Multiple delays have been experienced in receiving the report from the Child Welfare League of America. CFSA now anticipates a completed report by the end of October.

### *Caseloads*

CFSA has worked to equalize caseloads over the past year and to continue to bring down the number of cases managed by each worker. The table below provides information on current caseloads.

**Table 8: Caseloads for CFSA Social Workers as of December 31, 2004**

| Type of Work | June 30, 2005 Benchmark | July 31, 2005 Performance | Direction of Change from 12/31/04 |
|---|---|---|---|
| *Investigations* | 12 investigations per worker | 10 of 49 investigators (20%) with more than 12 investigations<br><br>(5 workers with 13-16 cases; 4 workers with 17-20 cases and 1 worker with 22 cases.)<br><br>(62 cases were being managed in Intake that should be transferred to on-going units) | Improved ↑ |
| *Case Carrying Workers\**<br><br>Family Cases and Foster Care Cases | 17 cases per worker\*\* | 74 of 262 workers with more than 17 total cases (28%)\*\*\*<br><br>(45 workers with 18 to 20 cases; 21 workers with 21 to 27 cases; 8 worker with 28-30 cases. No worker had over 30 cases.) | Declined ↓ |
| *Adoptions* | 12 adoption cases | 6 of 38 workers (16%) with more than 12 adoption cases<br><br>(4 workers with 13 cases; 1 worker with 14 cases and 1 worker with 16 cases) | Declined ↓ |
| *Home Study* | 30 | No Data Provided | Unable to Determine |
| *Supervisors & Managers Carrying Cases\** | 90% of supervisor will not be responsible for cases except when a worker leaves without notice and then for only 5 days | 85%<br>(13 of 86 supervisors with cases – 3 at CFSA & 10 at private agencies) | Improved ↑ |
| *Unassigned Cases* | There will be no unassigned cases | 80 cases unassigned for more than 24 hours | Declined ↓ |

\*Does not include social workers or supervisors in training units. Includes both CFSA workers and private agency workers.
\*\* The *LaShawn* Modified Final Order requires workers to carry no more than 17 family cases, 20 foster care cases or 12 foster care cases of children with special needs. The Agency is currently held to a standard of no more than 17 total cases. The Monitor will be working with CFSA to determine ways to assess the number of special needs children on each case load.
\*\*\*CFSA reports 15 of these workers carry some 3rd Party Placement cases and Out of Town Inquiry Cases (ICPC cases), which they report require less intense case management than family cases or foster care cases.
Source: CFSA administrative data from week ending 7/31/05.

*Unassigned Cases*

The Implementation Plan requires there to be no unassigned cases. As of July 31, 2005, there were 80 unassigned cases. Of these 80 cases, CFSA reports that 41 cases (51%) were unassigned between 1 and 5 days. Six cases (7%) were unassigned between 6 and 10 days. Sixteen cases (20%) were unassigned between 11 and 20 days. Seventeen cases (21%) were assigned for 30 days or more. The Monitor has asked for more information on the status of unassigned cases.

*What's Working Well*

- **The percent of workers with more than 20 cases has continued to decline.** The number of workers carrying more than 20 cases decreased slightly from 31 to 29 workers. Currently, 11% of case carrying workers are responsible for more than 20 cases. Twenty-one workers were carrying caseloads between 21 and 25 cases. Eight workers carried between 25 and 30 cases. No worker had a caseload over 30 cases.

- **CFSA met the benchmark for ensuring supervisors are responsible for no more than five case workers.**

- **CFSA came close to meeting the benchmark for ensuring that supervisors would not be responsible for carrying cases except in those instances in which the assigned worker leaves the Agency without providing notice, and in such instances, only for a five day period.**

*What's Not Working Well*

- **The caseload in adoptions is increasing.** In December 2004, only 5% of adoption workers had more cases than required by the Implementation Plan. In July 2005, 16% of workers were carrying more cases than required by the Implementation Plan. This increase no doubt reflects work to more quickly identify and transfer cases to adoptions when a child's goal is changed. However, it does not appear that staffing has kept pace with the positive practice change.

- **There continue to be cases unassigned for more than 24 hours.** The number of unassigned cases has gone up since December 2004 when there were 71 total unassigned cases. In July 2005, there were 80 unassigned cases for more than 24 hours.

**J.**     **Training**

By the end of FY05, the Training Administration had expanded to 10 full time employees, including:

- Training Administrator
- Program Manager
- Five Trainers
- Training Coordinator
- Training Assistant
- Program Secretary

CFSA reports these staffing levels fall just short of the National Bureau of Affairs and American Society for Training and Professional Development recommendation of one trainer per 100 workers. There are currently 560 people whose training needs are supported by the Training Administration, which means there is one trainer for every 112 workers at CFSA. CFSA believes the current staffing pattern is adequate to meet its needs, as they also provide training through contracted training providers.

CFSA submitted its FY06 Training Plan to the Monitor on October 3, 2005. One of the primary goals of the training plan is to redesign the pre-service training for new workers to better meet learning needs and be more relevant to best practice. The decision to improve the training came after internal and external assessments of the quality of both the pre-service classroom training and the on-the-job training units. The Monitor commissioned an assessment of the pre-service training by the Child Welfare Policy and Practice Group, which is near completion and will be available to the Court as a written document in November 2005. Simultaneously, CFSA completed an internal assessment of the training and came to many of the same conclusions as the Child Welfare Group. These assessments revealed that the training curriculum and the format of the training are unduly focused on knowledge acquisition and there are not enough skill building opportunities for new workers. In addition to curriculum redesign with a greater focus on skill building, CFSA has moved to restructure the training units to locate them within the Office of Training Services (OTS). A new manager, who reports to the Training Administrator, has been hired to oversee the training units.  This realignment is designed to better integrate the classroom training with practice and improve the readiness of new workers to meet practice expectations.

The Training Plan is designed to coordinate training that supports practice and system change. Plans for the in-service training in FY06 include integrating mandatory training on Structured Decision Making™: Safety and Risk Training, which will begin in mid-October for managers and supervisors, and a training on Quality Service Reviews, which will focus on the qualitative aspects of practice that are measured in the QSR. This training will provide supervisors with a guide to review cases with their line staff consistent with QSR protocol.   In a follow-up to last year's training on Family Team Meetings, CFSA will offer "Family Team Meetings: The Art of Follow-Up," which was designed in part to help workers understand their role in developing, nurturing, leading and sustaining teams to support families. Training in planning and permanency, which was originally slated to occur in FY05 but was delayed due to a decision to

first provide training on FTMs, will include information on assessment, developing a purposeful case plan, concurrent planning and timely permanency.

Training for new supervisors will continue to include the five module "Mastering the Art of Child Welfare Supervision." For in-service training, supervisors will be trained before line staff on all mandated training (i.e., supervisors will be trained on Structured Decision-Making™ prior to line social work staff receiving training). Supervisors will also be trained on the Quality Service Review protocol and many will participate on QSR review teams. QSR training is intended to reinforce the Agency's practice values and expectations. CFSA is also considering developing a Pre-Supervisory Academy for workers who exhibit leadership potential and are interested in furthering their careers at the Agency.

During FY2005, all supervisors, managers and program administrators in case carrying units were required to attend a three day course on High Impact Leadership and a two day course on High Impact Coaching and Feedback.

During FY05, CFSA partnered with *Zero to Three* to provide a ten-session curriculum on the special needs of newborns and toddlers. The training was also designed to help workers improve their case practice decision making related to young children. Zero to Three has applied for a second grant to focus this training on new workers. Approximately 15 workers volunteered to participate in this special offering. The Family Ties Project, under a Federal grant from the U.S. Department of Health and Human Services, conducted an assessment of the CFSA training and policy needs related to HIV/AIDs in families served by CFSA. Of the 113 staff and foster parents who provided input for the assessment, 65% indicated they did not feel they have had enough guidance to work with clients who are infected or affected by HIV/AIDS. CFSA reports it will collaborate with the Department of Health's HIV/AIDS office to develop more comprehensive training for social workers and foster parents.

Table 9 below lists the mandatory training topics that will be provided in FY 2006.

**Table 9:**
**Summary of FY06 Mandatory Training for Staff and Other Training**

| Case-Carrying Social Workers in All Administrations | | |
|---|---|---|
| *Class* | *Hours* | *Target Time Frame* |
| Structured Decision Making (Safety and Risk Assessment) | 9 | Nov. 05-Jan. 06 |
| Permanency and Planning with Families | 12-18 | March 06 – July 06 |
| Family Team Meetings:  The Art of Follow-Up | 6 | Jan. 06 – Dec. 06 |
| FACES Training for Web-Based FACES System | 9 | Jan. 06 – Feb.  06 |
| **Program Managers and Program Administrators** | | |
| *Class* | *Hours* | *Target Time Frame* |
| Structured Decision Making (Risk Assessment) | 9 | Oct. 2005 |
| FACES Training for Web-Based FACES System | 9 | Jan. 06 – Feb.  06 |
| Permanency and Planning with Families | 3 | March –Apr. 06 |
| Management Training (TBD) | | |
| **Supervisors of Case-Carrying Units** | | |
| *Class* | *Hours* | *Target Time Frame* |
| Structured Decision Making (Risk Assessment) | 9 | Oct. 2005 |
| FACES Training for Web-Based FACES System | 9 | Jan. 06 – Feb.  06 |
| Permanency and Planning with Families | 3 | March –Apr. 06 |
| Management Training (TBD) | | |
| Quality Service Review Training | 12 | Jan and March 2005 |
| **Child Protective Services Administration** | | |
| *Class* | *Hours* | *Target Time Frame* |
| Forensic Interviewing | 40 | 2x/yr |
| CPS Management and Building Supervisory Capacity | 160 | Over FY2006 |
| **Family Court Magistrate Judges** | | |
| *Class* | *Hours* | *Target Time Frame* |
| Family Court 4th Annual Conference | 6 | Oct. 05 |
| **Foster /Adoptive Parents** | | |
| *Class* | *Hours* | *Target Time Frame* |
| Learning to Create a Team: Effective Social Worker/Resource Parent Rel. | 6 | Oct. 2005 |
| Building Bridges of Better Understanding: Annual Conference (1) | 6 | Nov. 2005 |
| Understanding Children's Attachment Issues & Holiday Visiting | 6 | Dec. 2005 |
| Skill building based on needs assessment (TBD) | 2 or 6 | Jan – Sept. 2005 |

Source: CFSA Training Plan FY06

### *Evaluation of CFSA Pre-Service Training*

As noted above, the Monitor asked the Child Welfare Policy and Practice Group to evaluate CFSA's pre-service training for new workers.  CWPPG is a non-profit organization with significant expertise in the development and delivery of training. Preliminary findings from the evaluation include the following strengths and challenges:

### Strengths

- CFSA meets the requirement to provide a training and development period for new workers.

- Training provides extensive coverage of information.

- On-the-job training provides intensive supervision as new workers assume responsibility for families.

- All new workers are trained on the information system.

- The skills of the trainers greatly enhance the training.

- Training administrators work toward continuous improvement of training.

- CFSA has added an evaluation component to test social workers' knowledge acquisition and the quality of training after each module.

### Challenges

- The curriculum design limits skill development.

- On-the-job training could be enhanced by a more direct relationship to classroom training. CFSA anticipates that the upcoming organizational move of the training units to the Office of Training Services will facilitate this linkage.

- The CFSA staff who act as guest lecturers frequently have competing responsibilities resulting in cancellations or frequent tardiness.

- Training on the information system is not well integrated into the daily work of new staff.

- The physical training environment is not conducive to learning.

The Monitor is currently finalizing this report and it will be available for Parties and the Court's review in November 2005.

### Training for New Workers

The Implementation Plan requires all new workers to receive the 80 hours of pre-service training through a combination of classroom and on-the-job training in assigned training units. By December 31, 2004, the Implementation Plan requires full compliance with this outcome.

In 2004, 134 new workers were hired including 79 CFSA workers and 55 private agency workers. Of these 134 new workers, 73 (54%) completed the required 80 hours. Of the 79 new workers at CFSA, 58 (73%) completed the required training. Of the 55 new workers at the private agencies, 15 (27%) completed the required training.

CFSA reports it is likely that the pre-service training hours for CFSA workers is slightly undercounted. All new workers, with the exception of workers who have received a formal waiver due to previous employment at CFSA or the private agencies, must participate in the pre-service training prior to assignment to a unit. It was not until this year that the FACES system could identify those workers who received a waiver.

The extremely low percentage of new private agency workers receiving pre-service training is unacceptable. CFSA reports it has notified all private agency workers who have not completed the 80 hours. CFSA is currently strategizing with the Office of Licensing and Management and the private agencies on how workers can meet the required 80 hours. A meeting with private agencies is scheduled for November 2005.

### Training for Previously Hired Workers

The Implementation Plan requires all previously hired workers to receive annually a minimum of 40 hours of in-service training geared toward professional development and specific core and advanced competencies. By June 30, 2005, 80% of previously hired workers are to receive the required 40 hours annually. Preliminary data suggest that of the 300 social workers hired prior to January 1, 2004, 23% received the required training. When separately looking at training at CFSA and the private agencies, it appears that 20% of CFSA workers and 30% of private agency workers completed the required 40 hours in 2004.[21] It is likely that some workers received training hours independently of the Office of Training Services at CFSA. The District of Columbia's Health Professional Licensing Administration requires 24 hours of continuing education every two years in order to maintain a social work license. These hours can be obtained through conferences, workshops and distance learning. CFSA's capacity to provide data related to in-service training remains problematic.

### Training for New Supervisors

The Implementation Plan requires new supervisors to receive a minimum of 40 hours of pre-service training on supervision of child welfare workers. The training is to begin within three months of a person assuming supervisory responsibility and the training is to be completed over a five month period. By June 30, 2005, there was to be full compliance with this requirement.

The Monitor looked at all of the supervisors hired in 2004 to determine their training patterns during the first eight months (training is to begin within three months and is to be completed over a five month period) of tenure in supervisory positions. There were six supervisors hired in 2004. Of these six supervisors, five (83%) supervisors completed the required training within eight months. Three of these four completed 72 hours, one completed 60 hours and one completed 54 hours of training.

The one supervisor who had not completed 40 hours of training within eight months had completed 30 hours of training.

---

[21] CFSA believes the data somewhat undercounts the percentage of workers receiving in-service training due to a need to refine the FACES report. Additionally, data on private agency in-service training are incomplete. CFSA provided data on 12 of the 18 private agencies. More accurate data are expected for the next monitoring period.

*Training for Supervisors*

The Implementation Plan requires previously hired supervisors to receive annually a minimum of 24 hours of on-going training. By June 30, 2005, 85% of supervisors were to receive the required training. In 2004, 75% of supervisors received the required training of 24 hours.

*Training for Administrators and Managers*

The Implementation Plan requires administrators to receive annually a minimum of 24 hours of training. By December 31, 2004, 85% of administrators were to receive the required training. In 2004, 46% of CFSA program managers received 24 hours of training and 100% of CFSA administrators received the required training. CFSA has not provided data on in-service training for program managers and administrators in the private agencies.

*Foster Parent Pre-Service Training*

The Implementation Plan requires foster parents to receive a minimum of 15 hours of pre-service training. By December 31, 2004, there was to be full compliance with this requirement.

CFSA reports there were 166 homes licensed in D.C. (non-contracted) between August 1, 2004 and June 30, 2005. Of these 166 homes, 162 homes (98%) received 30 hours of pre-service training. The remaining four homes (2%) received no pre-service training.

CFSA reports there were 65 private agency foster homes (contracted) licensed between August 1, 2004 and June 30, 2005. Of these 65 homes, 59 homes (91%) received 30 hours of pre-service training. There were four homes (6%) that received between 15 and 39 hours of training and two homes (3%) that received no pre-service training.

Pre-service training totals include 231 homes (166 CFSA homes and 65 private agency homes). Of these 231 homes, 225 homes (97%) received the required 15 hours of pre-service training. Six homes (2%) received no pre-service training.

*Foster Parent In-Service Training*

The Implementation Plan requires that foster parents receive a minimum of 15 hours of in-service training each year. By December 31, 2004, 90% of foster parents are to receive the required 15 hours of training. Between January 1, 2004 and June 30, 2004, there were 692 foster families licensed through CFSA and the private agencies. The Monitor reviews this cohort of homes as this time frame allows each of the homes to have one year to complete training by June 30, 2004. Of these 692 foster families, 152 are currently closed and no data were provided. An additional eleven homes were closed due to adoption, guardianship or the ending of a temporary kinship license. Of the remaining 529 foster families, 350 families (66%) received 15 hours or more of training. There were 110 foster families (21%) who received less than the required 15 hours. Fifty-nine families (11%) received no in-service training. There were at least 10 homes (2%) that were closed one year or more after the initiation of the license and would have been had time to complete the training but no data were provided.

*Adoptive Parent Training*

The Implementation Plan requires that adoptive parents will receive a minimum of 30 hours of training, excluding the orientation process. By December 31, 2004, there was to be full

compliance with this requirement. CFSA is currently licensing all foster parents as prospective adoptive parents. Additionally, prospective adoptive parents are first licensed as foster parents. As a result, data specific to "adoptive parent" training are not needed. As noted above, 96% of foster/adoptive parents are receiving 30 hours of training prior to receiving a foster home license.

*Judicial Training*
CFSA is regularly participating in the development of the annual Family Court training on child welfare issues. In FY05, CFSA, the National Council of Juvenile and Family Court Judges and the American Humane Society provided training for judges on the Family Team Meeting process and the role of the court. Training was also offered on therapeutic foster care and on foster parent recruitment. The Family Court 4th Annual Interdisciplinary Training was scheduled for October 2005; CFSA participates in the development of this learning opportunity.

*What's Working Well*

- **CFSA is redesigning the pre-service training for new workers.** After assessing the current training and working with the Child Welfare Policy and Practice Group, CFSA is undertaking a broad new implementation of the pre-service training. This reflects an on-going commitment to improving the quality of training for CFSA staff.

- **Foster parents are receiving the required 30 hours of pre-service training.** Both CFSA and the private agencies are working to ensure foster parents receive adequate training as they begin their work in supporting foster children and their birth parents.

- **CFSA and the Family Court are collaborating to ensure Judges and Magistrates are kept up-to-date on best practices and the latest practice changes at CFSA.**

- **CFSA and OAG developed a series of cross-training sessions for CFSA and OAG staff that focused on "Partnering for Permanency for Family Court."**

*What's Not Working Well*

- **Far too few workers attend in-service training despite the fact that the Agency has mandated their attendance.** The Training Plan outlines strategies to increase participation in training. The OTS has recommended that each supervisor develop training plans with his or her workers and track the number of hours received.

  For pre-service training of new workers, private agency workers are required to obtain their training hours through CFSA. Given the relatively poor performance of the private agencies in ensuring their new workers receive pre-service training, additional strategies are needed. The OTS reports it will identify barriers experienced by private agency workers in meeting the training requirement.

- **CFSA has not developed a reliable capacity to electronically report on worker training.** While much work has been done to enter training experiences in FACES, the FACES reports on training hours are not yet reliable. The Monitor met with CFSA

regarding the training data and made several recommendations regarding the "logic" needed to obtain accurate reports. CFSA is now working to integrate this logic in an effort to provide reports that are useful to both CFSA and the Monitor. Manual data is being used in the interim to determine the training experiences of previously hired workers, all supervisors and administrators.  CFSA will work with the provider community and FACES to determine how provider agencies can enter training data directly into FACES.

## K.    **Resource Development**

CFSA completes an annual Resource Development plan to project resource needs for the following year. This year's plan addresses resources needed for foster care placement, services for children and families and community based services. The plan is well done and comprehensive in scope.

***Foster Care Placement***
The plan highlights the projected foster care placement needs and the resources CFSA will require to ensure adequate placement resources. In particular, CFSA has identified the following groups of foster children whose placement needs are not adequately being addressed:

- Teen Parents
- Children and Youth with Therapeutic Behavioral Needs
- Gay, Lesbian, and Trans-Gendered Youth
- Older Youth and College Students (18-21)
- Teens Served by CFSA and Youth Services Administration.

Given the placement crisis at CFSA, the Monitor believes that particular attention must be given to developing placement resources for the categories of children identified by CFSA and two other groups of children not specifically highlighted in the Resource Development Plan. The Monitor has been tracking several special needs children through the placement process. One of these children, a quadriplegic child, was placed at a medical facility for several months due to the lack of a resource home for medically fragile children. The Agency repeatedly indicated they were diligently searching for a home for the child but that no family was prepared to take him. In our view, increasing the number of homes for medically fragile children should also be a priority over the next year. CFSA reports an RFP will be released in January 2006 to address this need. In addition, CFSA continues to have difficulty keeping siblings together and steps need to be taken to specifically develop homes for larger sibling groups.

CFSA reports an RFP that will be issued before the end of this year to expand therapeutic treatment homes, increase placements for children returning from residential treatment, those waiting for residential treatment placement, and specialized resources for teen parents and older youth.

In addition to identifying the above mentioned placement needs, CFSA reported a decline in the recruitment of resource parents during the past year. There was a decrease in the number of

completed applications to become resource parents. They believe this is due to the 70 fewer kinship applications received during the year and the implementation of temporary licenses for kinship providers. Table 10 illustrates resource parent recruitment in 2003 and in 2004.

Developing this baseline data is an important step towards tracking recruitment of foster parents, however, the data CFSA has been collecting and analyzing on resource family recruitment and retention is too limited. Data on the number of active homes, the number of new homes recruited and licensed, number of placement disruptions per home, and the number of homes no longer serving children should be regularly collected and used for strategy development and decision making.

**Table 10: Resource Parent Recruitment**
**2003 and 2004**

|  | *2003* | *2004* |
|---|---|---|
| **Inquired Regarding Resource Parenting** | 2149 | 1929 |
| **Completed Applications** | 701 | 603 |
| **Attended Orientation** | 686 | 758 |
| **Completed Training** | No Data Provided | No Data Provided |
| **Issued Full Licenses** | No Data Provided | No Data Provided |
| **Issued Temporary Licenses** | N/A | 68 |

In addition to CFSA's efforts to recruit and retain foster parents, the Metropolitan Washington Council of Governments' received a Federal appropriation for $1,093,510 to support, in part, the development of the "*Work of Heart Respite and Recruitment Program.*" As of April 2005, 43 families had been trained to provide respite care and six of them had been fully licensed. FBI clearances and police background checks were identified as the primary barrier to obtaining licensure. An MOU has been developed with these organizations in an effort to eliminate or reduce this barrier.

New action steps regarding resource family recruitment identified for FY05 include:

- Ensuring children with a goal of adoption and no identified adoptive resource will have a child specific recruitment plan within 95 days of the goal becoming adoption. This structural process at CFSA, when consistently implemented, will help to identify adoptive resources for children who need a permanent home.

- Implementing a public information campaign for recruitment of foster and adoptive homes. A grant from the Freddie Mac Foundation is supporting the development of brochures, information kits and exhibits.

- Reviewing the results of questionnaires and exit interviews and using these data to improve recruitment and retention strategies.

- Improving and maintaining a tracking system on resource parent recruitment activities. This important step will assist the Agency in determining what is working well and what is not working for recruitment.

- Coordinating recruitment activities with the private agencies. This will allow CFSA and the private agencies to join forces to recruit parents rather than working at cross purposes to independently recruit the same population.

Additional strategies are needed to increase the number of foster care resources and to finally resolve the Interstate Compact for the Placement of Children issues with the State of Maryland. A multi-pronged approach is needed to make sure that all children can be appropriately and promptly placed with approved relatives or families. This includes negotiating an agreement with Maryland for emergency approval and placement with kin, increasing the number of contracted foster care placement resources, setting and tracking specific foster parent recruitment goals each year and continuing to increase the number of kinship homes licensed subsequent to the Family Team Meetings. In addition, CFSA must continue to improve its practice and supports for resource parents including routinely providing placement packets and informing them of children's needs, having a functional after-hours capacity to respond to resource parents' needs, and routinely and respectfully involving resource parents in case planning and decision making.

### *Increasing Services to Children and Families*

There have been a number of specific improvements in the area of services to children and families over the past year. A FY 2004 Federal appropriation of $1.75 million allowed CFSA and the Department of Mental Health to partner on a number of initiatives aimed at serving foster children with mental health and behavioral needs. The Monitor has been impressed with the development of these initiatives and programs and their direct connection to the identified needs of the system. The newly developed service capacity includes:

- **Mobile Response Stabilization Service**, which provides immediate in-home response that can last up to 72 hours,

- **Multi-Systemic Therapy**, which provides community-based and intensive individual and family therapy for adolescents (10-17),

- **Intensive Home and Community-Based Service,** which provides 24 hour a day, seven day a week interventions that last an average of four months in the home and community; this service began in January 2005 with an initial capacity of up to 90 families,

- **Specialized Child Traumatic Stress Treatment Interventions,** which provides services such as cognitive therapy and other clinical interventions to support children and youth experiencing trauma, grief and loss, separation and substance abuse,

- **Increased Clinical Capacity at Department of Mental Health,** which includes the hiring of 10 additional child forensic psychologists, three psychiatrists and one additional social worker to increase capacity at the Assessment Center.

In addition to these significant improvements, the Department of Mental Health has co-located staff at CFSA to assist in the implementation of the above programs. This valuable and innovative use of resources is designed to ensure appropriate referrals are made for services and to reduce wait times for service delivery.

CFSA has also developed a system for tracking referrals for assessments and services. In FY 2005, CFSA reports referrals for 129 psychiatric assessment and 572 psychological assessments were made to the Department of Mental Health. During this same period, 1032 children were connected to "core service agencies" for mental health services.

These programs and services provide needed additional resources for the children and families served by CFSA. The importance of the Federal appropriation cannot be understated. In FY2005, an additional $1.25 million was allocated to the Department of Mental Health to provide mental health screening, assessment and treatment services for CFSA foster children.

CFSA reports the accessibility of these services is reducing the wait time usually experienced by children and adults. While some social workers continue to express concerns about the amount of time it takes for a child to see a provider, CFSA has been tracking these data and report a measurable improvement.

New actions steps in the area of services for children and families in FY 2005 include:

- Expanding the capacity of Department of Mental Health Assessment Center. The FY 2005 Federal appropriation will be used for this expansion to ensure children and families have timely access to screenings, assessment and treatment.

- Developing internal capacity to ensure continuity of services once Federal dollars have been used. CFSA and the Department of Mental health are working together to assist providers in obtaining Medicaid certification. This will allow the providers to bill Medicaid directly for the services rather than the current practice of relying on special Federal funds.

- Hiring a Department of Mental Health monitor based at CFSA to ensure a high quality of service delivery throughout these new programs. This monitor has been hired and is located at CFSA.

- ▪ Referring children in residential treatment centers or children who are at risk for these placements to the new mental health programs in an effort to ensure children are placed in the least restrictive environment.

- ▪ Developing a monitoring unit within the Office of Clinical Practice to visit children in residential treatment to ensure they are receiving appropriate services and to assist in the discharge process. This unit became operational on October 1, 2005 and has completed two site visits.   The unit is responsible for monitoring 33 facilities, 4 within DC and 29 outside DC.  Each facility will be visited by unit staff at least once per year.

### Substance Abuse

The Family Treatment Court Program is used for families at risk for removal or at risk of not reunifying due to substance abuse problems. During FY 2005, $1.4 million in local funds was used to support the Family Treatment Court. The Addiction Prevention and Recovery Agency (APRA) has initiated the annual evaluation of the Family Treatment Court Program and a preliminary report was expected by October 31st.

Additionally, CFSA transferred $422,000 (one-time local dollars) to APRA to cover the cost of jointly developing, implementing, and monitoring the pilot of *Intensive Outpatient Substance Abuse Treatment Program* (IOP) for up to 40 women with children. *The Effective Black Parenting Program* (EBPP), an evidence-based parenting model, was embedded within this IOP for families involved in the child welfare system.  APRA intends to build the IOP into a broader continuum of care, the *Inner Journey Program*, which will also include day treatment and out-patient services.  APRA will also continue using the EBPP for CFSA mothers accessing substance abuse treatment services.  CFSA has proposed utilizing a portion of the 2005 Federal Appropriation for Early Intervention Services to support the full implementation of these services in 2006.  Such funding would support two 15-week EBPP programs annually as part of the substance abuse services continuum of care, serving up to eighty (80) substance-using mothers, and up to 120 children between 0-4yrs of age.

CFSA also used one-time local dollars to contract with two temporary nurses to address the backlog of referrals of substance-affected infants who are no longer eligible for services from DC Healthy Start due to their age (over 3 months).  From May 2005-September 2005, the nurses reviewed 92 cases and made 70 referrals for early intervention services. Due to the limited and short-term nature of the funding, only one nurse will remain on contract through January 2006 to continue working with the backlog cases.

Recognizing the critical need for substance abuse treatment services, CFSA continues to seek out grant funding opportunities related to substance abuse treatment. Additionally, CFSA and APRA are working together under a Memorandum of Understanding to serve families. In an effort to expand service capacity, they are helping current service providers become Medicaid certified. Additionally, staff from APRA will be co-located by the end of 2005 at CFSA in the Investigations and Intake Unit to assess family members and link them to treatment programs.

Additional action steps include:

- Developing additional substance abuse services for CFSA children and families. This includes hiring a planner to develop strategies for increasing the District's capacity to meet the needs of substance abusing families in the child welfare system or at risk of entering the child welfare system. CFSA also plans to use local District funding to provide intensive outpatient substance abuse treatment services and parenting services to an additional 30 parents through APRA. Nurses will also be added to the delivery system to serve families with substance affected infants. Assessment services and home visitation services will be provided to these families.

- Partnering with APRA and the Family Treatment Court to improve practices. CFSA contracted with Children and Family Futures to assist with the designing of a full system of services and supports to meet the needs of families with substance abuse problems.

***Housing***

As affordable housing in the District continues to become more scarce, CFSA is working to develop additional resources in an environment that is being significantly impacted by increased property values. The most promising strategy is the *Rapid Housing Program* that CFSA is implementing in partnership with the Collaboratives. CFSA is using up to $1 million in local District dollars to support families where the only barrier to reunification is lack of housing and to assist youth who are transitioning to adulthood. Participants are eligible for financial assistance with rent, security deposits, utility bills, debt reduction to improve credit, and furniture. A budget and spending plan is developed at the outset of involvement with the program. Collaborative relationships with area landlords are used to secure and maintain housing. Forty-eight families were referred to the program and 28 had found housing by September 30. Of the original 48 families, 11 are no longer eligible due to a change in the permanency goal. Sixty-seven youth participated in the program in 2005, with 53 youth finding housing (including 28 teens with 32 children).

A promising action step from last year's Resource Development Plan was reinvigorating the MOU with the DC Housing Authority to access the *Family Unification Program* (a Housing and Urban Development supported program) to quickly obtain vouchers for families unable to reunify due to housing issues. Unfortunately, this did not occur. While the Housing Authority initially provided 150 vouchers in 2001, no additional vouchers have been provided. There have been recent Federal changes to the program and as a result, CFSA does not anticipate receiving additional vouchers.

One additional strategy currently under development is to work with the Department of Human Services and Department of Mental Health to pool resources to support the housing needs of those families served by all three agencies.

***Community and Neighborhood Based Services***

The primary vehicle for community based services in the District is through CFSA's partnerships with the Healthy Families Thriving Community Collaboratives. CFSA continues to support the seven Collaboratives and the Collaborative Council. In FY 2006 $10 million[22] was allocated for the Collaboratives and $780,000 for the Collaborative Council.

During this past year, CFSA and two Collaboratives worked together to implement Family Team Meetings at CFSA. The Collaboratives are assisting by contacting families members and coordinating the logistics for the meetings. In FY 2004 and 2005, CFSA and the Collaboratives also worked as partners in the Mayor's Hot Spot Initiative, which identified 14 areas in the District needing intensive attention from multiple District agencies. Initial results from this effort were promising – reported crime was down 14% and violent crime was down 34% in those areas.

CFSA also reports continued implementation of geo-assigning cases to social workers. This geo-assignment is very broad insofar as cases are assigned to one of two administrations based on location. Ward 7 is assigned to In-home and Reunification Division I, which includes Wards 1, 4, and 5. Ward 8 is assigned to In-Home and Reunification Division II, which includes Wards 2, 3, and 6. CFSA completed a study of the geo-assignment of cases in June 2005. Major findings from interviews and focus groups with workers include:

*Benefits*
- Increased confidence in identifying community resources
- Increased knowledge of District neighborhoods and community
- Better teamwork with Collaboratives located in Division I

*Challenges*
- Caseload burden (particularly among IHRS I workers)
- Unequal distribution of resources and supports

*Recommendations*
- Continue with the current model of case assignment and re-evaluate its progress after January 2006.
- Caseload equalization and distribution should be adjusted semi-annually.
- CFSA should develop a clear process (or protocol) for assigning new workers to the units.
- CFSA should re-evaluate the application of the geographic case assignment model within the Intake and Investigations Administration.
- Remaining teen cases should be moved to the Office of Youth Development for case management.
- Clarify worker roles between CFSA and the Collaboratives.
- Develop additional resources in Wards 7 and 8.

---

[22] An additional $1.5 million was provided as a pass-through for the Second Responder program with the Metropolitan Police Department.

- ▪ Explore the need for improved working relationships with the District of Columbia Public Schools, as it relates to facilitating educational services to children and youth.

It is likely that CFSA's approach to assigning cases on a geographic basis is too broad to be effective. Ideally, individual supervisory units would be assigned to specific zip code areas rather than the broad application of this practice. While workers are reporting an increased awareness of neighborhoods and resources, it is likely that this enhanced knowledge is still not specific enough to make a difference for children and families. CFSA reports it will continue to evaluate the effectiveness of the geo-assignment of cases.

Additional action steps for community and neighborhood based services include:

- ▪ Working with the Collaboratives on multiple initiatives including Family Team Meetings, Hot Spots and the new truancy program. The truancy program was initiated by the Family Court and a member of the District's School Board to reduce unexcused absences at school. An MOU has been developed between CFSA and the public school system that spells out how and when CFSA will be notified regarding unexcused absences. Many of the families identified in the past year have been referred to the Collaboratives for intervention.

- ▪ Providing up to $500,000 in flexible funding dollars to meet the individualized needs of families. These funds are intended to be used to help stabilize families and meet their concrete needs when other funds are not available**.**
- ▪

CFSA is in the process of completing its next Needs Assessment to determine what additional or different resources will be needed in 2006. The Agency anticipates releasing the Needs Assessment by the end of this year.

## L.    <u>Contracts</u>

### *Provider Payment Issues*

The problems that were previously brought to the Court's attention regarding the District's difficulty making timely and accurate provider payments and the resulting large sums of money that are owed providers and/or in dispute from prior fiscal years remain. During the last two months, the District has been providing bi-weekly reports to the U.S. District Court and the Monitor about their progress in resolving these urgent problems. Despite high level attention and considerable effort, the problems have not been resolved.

As of this report, all agencies have been paid and reconciled through FY 2003. CFSA and the Office of the Chief Financial Officer (OCFO) have completed reconciliation through FY 2004 and have paid the private agencies what they can document as owed. A few agencies have reconciled their records with CFSA's and are now fully paid for FY 2004. Other agencies still have differences with CFSA on the FY 2004 reconciliations. Meetings will be held next week to <u>finally</u> resolve issues with each provider and the Monitor expects all FY 2004 issues to be resolved and bills paid by November 20,

2005. The remaining differences are not insignificant for some agencies. For example, one private agency reports the current outstanding receivables for FY 2004 are $177,829.84 while CFSA reports that all valid invoices have been paid.

Similar problems remain for FY 2005 payments and while CFSA and OFCO have been working to resolve discrepancies in monthly invoices and are making regular payments, these payments are typically in amounts that differ from private agency accounts. Many agencies report significant accumulated receivables for FY 2005. The "short-payment letters," which were added as a stop-gap measure to inform agencies when payments differ from their invoices, are not functional in that they do not address the problem of "add-on" discrepancies, that is, reconciling agency records on additional children placed or discrepant dates of placement in CFSA FACES data.. Private agencies continue to report they send in documentation regarding outstanding invoices multiple times. They also report that CFSA and OCFO staff are now more responsive to phone calls and emails but these efforts do not lead to prompt problem resolution.  The payment teams, another stop-gap measure developed to expedite problem solving, are meeting but problems are not efficiently resolved and there are mounting funds owed to the private agencies. The same agency noted above reports their outstanding receivables for FY 2005 are $678,409.09 as of September 30, 2005.

At the urging of the Court Monitor, CFSA hired an independent consultant, Bert Smith & Co., to assess the payment process and accounts payable system. The final report was completed in September and offered the following findings and recommendations:

*Findings*
- Inaccurate placement data is entered into FACES thereby rendering subsequent invoices and payments inaccurate.
- Vender invoices are not accurately logged in, distributed or corrected upon entering the payment system.
- There are inadequate training, policies and procedures.
- There is not enough staff to complete the necessary tasks.
- Internal control processes are limited in scope.

*Recommendations*
- Develop a quality control process for ensuring accurate and timely data in FACES.
- Develop a centralized and automated logging system to track invoices.
- Produce accurate and timely remittance advice to vendors.
- Enter all child specific expenses into FACES.
- Track the invoices back to the purchaser in the initiating department and ensure the accuracy of billed goods and services against the original purchase order.
- Reduce the redundant cross check of PASS invoices when there are no errors in the purchasing or receiving process.
- Infrastructure and training needs should be identified and addressed before large scale contract changes are made.
- Update policies and procedures, develop manuals for all staff.
- Provide appropriate training for all staff on policies, procedures and internal controls.
- Review internal/organizational controls and implement additional controls.

Bert Smith also recommended a tightly managed and controlled effort over the next six months to establish and monitor performance benchmarks related to FACES data entry, payments and invoicing processes and to ensure sufficient management oversight to identify and solve operational problems related to performance.

The Monitor believes the Bert Smith report accurately identified many of the problems but did not go far enough in recommending solutions that will simplify current processes, whose complexity and multiple points of responsibility contribute to the problems. The Monitor strongly recommends the following immediate actions:

- **Hire additional and different staff in two areas.** The OCFO needs a high level manager, who could be hired as a temporary consultant, to oversee all aspects of the payment process – from invoice to check generation – and to make sure all staff know their responsibilities and carry them out within agreed upon timeframes. CFSA also needs at least two additional staff who are responsible for keeping accurate data on current placement dates, licensure status of foster parents and contract information in FACES to dramatically reduce the number of payment errors and delays.
- **Retrain all provider agencies and the CFSA placement staff** on how to enter accurate placement data in FACES.
- **Retrain CFSA contracting staffing on the District's PASS payment system**.
- **Develop clear policies and procedures with timelines** for each step necessary to ensure accurate payment in compliance with the District's Quick Payment Act. In addition, policies and procedures must be developed and communicated to District staff and private agencies regarding invoicing and payment procedures for services under the "continuing case management" and "cost reimbursable" provisions of the contracts.

On a longer term basis, the Monitor believes the entire billing and payment process must be streamlined. CFSA and OCFO have now agreed to change the invoice process so that it starts with provider agency invoices and moves the responsibility for initial reconciliation to CFSA rather than individual private agencies. This change will be phased in by January 1, 2006. Further, both CFSA and OFCO need to determine equipment and technology needs and purchase these items so that information can be shared electronically with private providers rather than the current system of relying on the mail and fax machines, which causes unnecessary delays.

The Monitor has asked the District to produce a clear plan to address both short and long-term solutions no later than November 10, 2005. The Monitor will be working with all parties to make sure the necessary resources to implement a reasonable plan are available immediately.

### *Performance Based Contracting*

CFSA continues working towards the implementation of performance based contracting. Recently issued contracts have language indicating that a joint process between CFSA and providers will be used to develop performance measures and incentives during the first year. The Agency reports that data related to provider performance are being increasingly used in contracting decisions. While these are important steps towards performance based contracting, CFSA remains far from the goal of a fully functioning performance based contracting system. CFSA is working with a consultant, McCullough Associates, to assist in moving towards a

comprehensive performance based contracting system. A timeline for issuing performance based contracts for family-based care has been created. This timeline suggests the first contracts for family based care, which include financial incentives and disincentives for outcome performance, will be issued in December 2006. The initial work plan indicates performance based contracts for congregate care will likely be issued in 2007. The Monitor believes this timeframe is not aggressive enough and will be meeting with CFSA and the consultant to determine how to move this work forward more quickly.

CFSA's Contracts Administrator has recently resigned. The consultant report on contract performance was completed a year ago identified lack of stability in the management and leadership of the contracts functions as a primary contributor to on-going contracting problems. To date, the contract functions have appeared to be overly complex and lacking a sense of urgency. Our initial assessment is that the contract functions at CFSA have not been developed sufficiently enough to meet the needs of the children and families served by CFSA.
This new vacancy in the Administrator position makes resolving the problems in the Contracting Administration even more challenging but this remains an urgent need.

### DCKids Contract
CFSA has continued to struggle to develop a new contract for providing health care and health care management for children in foster care. As a result, the current DCKids contract was extended to February 28, 2006.  The medical services RFP was expected to be issued on November 1, 2005, with an award date by March 1, 2006.  The Monitor remains concerned that this critical area of service delivery remains in a seemingly constant state of temporary extensions.

### Contracts Issued for Foster Care

#### Family-Based Foster Care
Family based foster care contracts were awarded in March 2005 to 17 providers for the following 1160 placements:

- 500 beds – traditional foster care
- 660 beds – specialized foster care; including younger teen parents, sibling groups and children with complex medical needs.

In addition to the 1160 placement beds contracted in March, CFSA added another 139 contract placement beds over the summer. This brings the total number of family-based foster care beds to 1299.

#### Congregate Care
Congregate care contracts were awarded in December 2004 to 21 providers for the following 523 placements:
- 25 beds   -   Diagnostic/emergency services (age 12 and under)
- 16 beds   -   Diagnostic/emergency services (age 13 and over)
- 137 beds -   Traditional Group Home
- 8 beds     -   Specialized ILP

- 72 beds  -  Independent Living Program, Main Facility
- 125 beds  -  Independent Living Program, Residential Units
- 114 beds  -  Independent Living Program, Teen Parent
- 26 beds  -  Medically fragile/mentally retarded

## M.    <u>Information Systems</u>

There are no Implementation Plan benchmarks or outcomes in the area of Information Systems for this monitoring period. The following is presented as an update on the Agency's accomplishments with its management information system.

### *CFSA Achieves Federal Approval of SACWIS*
In 1994, Congress mandated that each state and the District of Columbia develop a State Administered Child Welfare Information System (SACWIS) as the basis for periodic reporting of child welfare statistics to the U.S. Department of Health and Human Services (DHHS), Administration for Children and Families. SACWIS approval means that DHHS considers an automated case management system to be sound and child welfare data to be highly reliable. SACWIS approval also aids maintaining major Federal child welfare funding streams which account for a critical portion of a system's annual budget.

In January 2005, DHHS approved CFSA's automated child information system, FACES, as a SACWIS. The official approval designation is "*SACWIS Implemented-Assessment Process Complete with Approved Action Plans*" which is a level of Federal approval earned by only eight states at that time.

### *FACES on Target for Web Access*
With funding granted in 2004 by Congress, CFSA has been working to develop a web-based version of its FACES data system. The launch date was initially scheduled for December of 2005 but FACES.NET is now scheduled to go on-line on February 27, 2006. User testing is planned for October through December 2005. Training of all CFSA, provider agency staff, and OAG staff is scheduled for January through February 2006. The web-based system will give CFSA and authorized private agency staff the same access to the FACES system. The system will also be accessible to authorized users from any location with internet access. CFSA is the first District agency to move its data system in this direction. The District's plans for data systems integration on the web, termed the Human Services Modernization Program, will eventually allow for some sharing of client information across systems.

### *Provider Payment Issues*
CFSA continues to struggle with the provider payment issues described in the Contracts section (Section L) of this report. Many of the problems have been caused by inaccurate placement data in FACES. Inaccurate placement data (e.g. wrong start and end dates) are often entered into FACES and the payment system responds by not recognizing the accurate dates of placement and either not issuing a payment or issuing a payment that is over or under the correct amount. When this occurs over a period of time for small private agencies or in short periods for private agencies serving many children, the incorrect payments accrue quickly. Bert Smith, the private consultant hired to assess the

provider payment issues, stated: "The primary reason for payment issues is the inaccuracy of the data entered in the FACES information system used primarily by the Program Operation and Licensing and Monitoring departments.  There is also a failure to enforce established ordering and receiving procedures in the PASS information system used by all departments. Consequently, inaccurate data enters the billing stream and is used to create invoices in FACES; or inaccurate data is compared with vendor invoices prior to payment.  As a result, the inaccurate data must be corrected before payments can be made.  The responsibility for correcting these quality control issues during the initiation of a transaction, or during the receiving of goods and services, have not been implemented."[23]

## N.      Financial Development

As reported to the Court in July 2005, the Council of the District of Columbia approved a FY 2006 base budget for CFSA of $236,761,657 as well as additional funds through a supplemental Budget Support Act. (See Table 11) The Budget Support Act supplemented the CFSA budget with another $1 million in personnel funds to allow for additional hiring at CFSA. Additionally, in separate legislation entitled "Funding Safeguards for the Child and Family Services Agency Act of 2005," the Council agreed that funds for CFSA staff will be allocated in FY 2006 by the Council if the Mayor requests the funds (not to exceed his original FY 2006 request), identifies a source for the funding and the Chief Financial Officer certifies these funds are available and needed to hire personnel.

In addition to the personnel funding agreement, the Budget Support Act includes funding over and above the base budget in three areas. First, $780,000 was allocated to fund cost of living increases for the community-based Healthy Families - Thriving Communities Collaboratives. Second, $2.1 million was made available to provide non-Medicaid mental health services for foster children who cannot be served through the Department of Mental Health (DMH). This funding can be accessed after CFSA submits a plan to the Council outlining how it will systematically reduce its reliance on non-Medicaid certified mental health providers. Third, the Council allowed the transfer of up to $3.3 million in funding for mental health services for children in foster care currently allocated to Department of Mental Health in the event DMH is unable to build sufficient capacity to provide mental health services to foster care children in FY 2006.

In October 2005, CFSA submitted its budget request for personnel services to the Deputy Mayor. The request indicates CFSA's personnel budget for FY 2006 is $59.5 million, with an approximate short-fall from the base budget of $2 million beginning October 1, 2005. Funds will also be needed for 83 unfilled positions for which CFSA is currently recruiting.  The Monitor assumes that both the $2 million already requested and funds for the additional 83 positions will be released as needed in accordance with the Budget Support Act and Funding Safeguard Act.

---

[23] Bert Smith & Co. (2005) *District of Columbia Child and Family Services Agency Assessment of the Payment Process and Accounts Payable System. Page 6.*

**Table 11:**
**CFSA FY 2006 Budget**

| DC Council FY 2006 APPROVED Budget | $236,761,657 |
| --- | --- |
| **Budget Support Act Provisions as a Supplement to CFSA FY 2006 Budget** | |
| **Personnel Funds** | $1,000,000<br>*plus additional funds up to a total of $5 million if the Agency fills current positions, the Mayor requests the funds and identifies a funding source and the Chief Financial Officer certifies the positions are needed* |
| **Healthy Families/Thriving Communities Collaboratives** | $ 780,000 |
| **Non-Medicaid Mental Health** | $2,100,000<br>*to provide services for foster children who cannot be served through the Department of Mental Health* |
| **Allowable Transfer for Mental Health Services** | **(up to) $3,300,000**<br>*dollars are currently allocated to Department of Mental Health; in the event DMH is unable to build capacity to provide mental health services to foster care children in FY 2006 the funds will be transferred to CFSA* |
| **Additional Funds Provided by Budget Support Act** | **(up to) $11,480,000** |

*Foster Parent Board Rates*

The Implementation Plan requires CFSA to increase foster parent board rates each year January in accordance to the United States Department of Agriculture's (USDA) for raising a child in the urban south. During calendar year 2005, CFSA has struggled to meet this requirement. Although CFSA foster parents received the board increases in a timely fashion, there have been tremendous difficulties in providing the contract agencies with the required increase.

As of early October 2005, there were six foster care private agency providers due to receive Foster Parent Board Rate payment increases for their foster parents and each was asked to submit a claim for the increased payment. The remaining private agencies are currently paid at a higher rate than the USDA rate because they serve special needs children or offer therapeutic foster care

and were not eligible for this specific increase. As of early October 2005, three of the six providers had submitted a claim for the rate increase and had received payments for the total amount identified in the claim (two providers have been paid through June 2005 and one provider has been paid through July 2005). One provider has submitted a claim through February 2005 and received the increased payment for that time period. Two providers have not submitted a claim for 2005. Contract modifications for the period beginning July 1, 2005 have finally been completed and signed, and in November the six vendors are expected to submit the remaining claims. CFSA's information management system, FACES, has been updated to compensate all providers at the new Board Rates, effective November 1, 2005.

It is unacceptable that this problem continued from December 2004 to October 2005 and it still remains partially unresolved. The Monitor believes this problem and the provider payment problems reflect systemic issues with both the contracting and procurement processes at CFSA.

## V.    SUMMARY OF PERFORMANCE ON IMPLEMENTATION PLAN BENCHMARKS[24]

| REQUIREMENT | DECEMBER 2004 BENCHMARK | JUNE 2005 BENCHMARK | JULY 2005 PERFORMANCE | BENCHMARK ACHIEVEMENT | DIRECTION OF CHANGE |
|---|---|---|---|---|---|
| **PROTECTIVE SERVICES** | | | | | |
| 1.  Investigations will be initiated[25] within 48 hours.  As of December 31, 2002, 43% of investigations were initiated within 24 hours. | 85% | 90% | 72% | No | Improved ↑ |
| 2.  Investigations will be completed within 30 days.  As of December 31, 2002, 57% of investigations were complete within 30 days. | | 80% | 45% | No | Improved ↑ |
| 3.  CFSA will routinely conduct quality investigations. Evidence of acceptable investigations will include:  a.  Child abuse and neglect reports will include evidence of the use of CFSA's risk assessment protocol(s) in prioritizing response times for initiating investigations, and decisions resulting from an investigation;  b.  Report findings will be based on a full and systematic analysis of a family's situation and the factors placing a child at risk; | 75%  75% | | Data will be available in December 2005 from Case Record Review and Quality Service Review. | | |

---

[24] In those instances where we have determined that CFSA administrative data from FACES accurately tracks progress, no other independent data gathering was needed.

[25] CPS investigations are "initiated" as defined in Section II.G. of the LaShawn Modified Final Order (MFO).

---

| REQUIREMENT | DECEMBER 2004 BENCHMARK | JUNE 2005 BENCHMARK | JULY 2005 PERFORMANCE | BENCHMARK ACHIEVEMENT | DIRECTION OF CHANGE |
|---|---|---|---|---|---|
| c. Investigations will include appropriate interviews with all children in the household outside the presence of the caretaker, parents or caregivers, and needed collateral contacts or will include documentation, by the worker, of good faith efforts to see the child and that the worker has been unable to locate the child. | 70% | | | | |
| d. Investigations will show evidence of overall quality. | 60% | | | | |
| 4. Reports of abuse and neglect in foster homes and institutions shall be comprehensively investigated in accordance with investigation timeframes and policies. | 85% | | 67% | No | Improved ↑ |
| 5. Child abuse and/or neglect reports will show evidence that the investigator checked for prior reports of abuse and/or neglect. | 90% | | 100% check performed electronically Case Record Review to provide additional data | Yes | **Benchmark Achieved** |
| 6. CFSA shall provide appropriate medical, psychological or psychiatric evaluations of children, as outlined in the MFO, as part of the investigation of abuse or neglect in cases where it is determined that such evaluations are necessary. | 60% | | Data will be available in December 2005 from Case Record Review | | |

| Requirement | December 2004 Benchmark | June 2005 Benchmark | July 2005 Performance | Benchmark Achievement | Direction of Change |
|---|---|---|---|---|---|
| 7.  CFSA will ensure that children with substantiated abuse or neglect reports who have not had a physical examination during the investigation and have not had a recent exam in the time period recommended by the EPSDT schedule, receive a physical examination within 48 hours of substantiation of cases. | 50% | | 30% | No | Not previously measured. |
| **SERVICES TO CHILDREN AND FAMILIES** | | | | | |
| ▪  There will be evidence that families routinely are offered and assisted to use MFO required services to meet the goals of safety, permanency and well-being for children.<br><br>a.  Appropriate services, including all services identified in the case plan, will be offered and children/families will be assisted to use services, when applicable, for the purpose of enabling children who have been the subject of a substantiated abuse/neglect report to avoid placement and to remain safely in their own homes. | 75% | | Data will be available in December 2005 from Quality Service Review | | |
| b.  Appropriate services, including all services identified in the case plan, will be offered and children/families will be assisted to use services, when applicable, for the purpose of enabling children who have been returned from foster care to parents or relatives to remain with those family members and avoid replacement in foster care. | | | | | |
| c.  Appropriate services, including all services identified in the case plan, will be offered and children/families will be assisted to use services, when applicable, for the purpose of avoiding the disruption of an adoptive placement that has not been finalized. | 75% | | Data will be available in December 2005 from Quality Service Review | | |

| REQUIREMENT | DECEMBER 2004 BENCHMARK | JUNE 2005 BENCHMARK | JULY 2005 PERFORMANCE | BENCHMARK ACHIEVEMENT | DIRECTION OF CHANGE |
|---|---|---|---|---|---|
| d.  Appropriate services, including all services identified in the case plan, will be provided for the purpose of preventing the disruption of a foster home placement, under those circumstances in which the placement is a long-term placement and the placement is beneficial to the child. | 75% | | Data will be available in December 2005 from Quality Service Review | | |
| ▪  A CFSA worker or a qualified worker from a service provider authorized by CFSA will visit families in which there has been substantiated abuse or neglect, with a determination that children can be maintained safely in the home with services. | | 90% Monthly<br><br>40% Twice monthly | 59%<br><br>20% | No | Improved ↑ |
| ▪  Families who have been the subject of a report of neglect/abuse that has not been founded, will be referred to an appropriate Collaborative or community agency when appropriate. | 50% | | Data will be available in December 2005 from Case Record Review | | |
| **PLACEMENT OF CHILDREN** | | | | | |
| 1.  Children will be placed in appropriate placements.<br><br>a.  Children in out-of-home placement will be placed with some or all of their siblings. | | 75% | 57% | No | Minimal Change ↔ |

| REQUIREMENT | DECEMBER 2004 BENCHMARK | JUNE 2005 BENCHMARK | JULY 2005 PERFORMANCE | BENCHMARK ACHIEVEMENT | DIRECTION OF CHANGE |
|---|---|---|---|---|---|
| b.  Children placed in out-of-home placement will be placed in the least restrictive, most family-like setting appropriate to their needs. | 70% | | 77% foster home 20% congregate 3% other | Yes | **Benchmark achieved** |
| c.  Children under 12 will not be routinely placed in congregate care settings.<br><br>No child under age 6 will be placed in a group setting unless there are exceptional needs. | No more than 20 children | Full compliance | 14 children under age 12 in congregate care more than 30 days<br><br>11 children under age 6 in congregate care | No | Improved ↑ |
| d.  Children placed apart from their siblings will have at least twice monthly visitation with some or all of their siblings. | | 70% | 19% | No | Improved ↑ |
| e.  CFSA will have no children stay overnight in its in-house Intake Center. | CFSA will have no child under age 12 stay overnight in its in-house intake center | CFSA will have no child under age 12 stay overnight in its in-house intake center | 18 children overnight at CFSA between April and October | No | Declined ↓ |
| f.  CFSA will not place children more than 100 miles outside the District of Columbia. | | No more than 35 children | 94 in residential 13 in non-kinship 100+ miles | No | Declined ↓ |

| REQUIREMENT | DECEMBER 2004 BENCHMARK | JUNE 2005 BENCHMARK | JULY 2005 PERFORMANCE | BENCHMARK ACHIEVEMENT | DIRECTION OF CHANGE |
|---|---|---|---|---|---|
| g.  CFSA will investigate relative resources in cases requiring removal of children from their homes. | | 75% | Data will be available in December 2005 from Case Record Review | | |
| h.  CFSA will ensure that children in its custody whose placements are disrupted are provided with a thorough, professional evaluation to determine their service and re-placement needs within 30 days of re-placements. | 70% | | Insufficient data provided by CFSA | Unable to Determine | Unable to Determine |
| 2.  CFSA will work to reduce multiple placements of children in foster care:<br><br>a.  There will be a reduction in the percentage of children who enter foster care after January 1, 2003 who have had three or more placements. | Benchmarks not set | | CFSA is working to develop cohort data capacity | | |
| b.  There will be a reduction in the percentage of children in foster care who will have had three or more placements in a twelve-month period. | | No more than 5% | 17% | No | Declined ↓ |
| 3.  Children will be placed in foster homes and other placements that meet licensing and other MFO placement standards.<br><br>a.  Foster homes, group homes, and independent living facilities will have a current and valid license. | Full compliance | Full compliance | 81% foster homes 90% group homes 53% independent living facilities | No | Improved ↑ |

| Requirement | December 2004 Benchmark | June 2005 Benchmark | July 2005 Performance | Benchmark Achievement | Direction of Change |
|---|---|---|---|---|---|
| b. Children in foster home placements will be in homes that (a) have no more than three foster children or (b) have six total children including the family's natural children; (c) no more than two children under two years of age or (d) more than three children under six years of age. The sole exception shall be those instances in which the placement of a sibling group, with no other children in the home, will exceed these limits. | | No more than 10% | a. 29 homes (2%) 125 children (6%)<br><br>b. 2 homes (.2%) 16 children (.8%)<br><br>c. 1 home (.15%)<br><br>d. 1 home (.2%) | Yes | **Benchmark achieved** |
| c. No child will remain in emergency, short-term, or shelter facility or foster home for more than 30 days. | 50% reduction from baseline (15 children) | | 19 children | No | Declined ↓ |
| d. No child will be placed in a group-care setting with a capacity in excess of 8 children without express written approval by the Director or designee based on written documentation that the child's needs can be met only in that specific facility, including a description of the services available in the facility to address the individual child's needs. | | 52 Children<br><br>(50% reduction from 6/30/04 performance of 104) | 78 children | No | Improved ↑ |
| e. Children will not be placed in a foster care home or facility in excess of its licensed capacity. The sole exception shall be those instances in which the placements of a sibling group, with no other children in the home, will exceed the limits. | | 23 children<br><br>(50% reduction from 6/30/04 performance of 45) | 125 children | No | Declined ↓ |

| REQUIREMENT | DECEMBER 2004 BENCHMARK | JUNE 2005 BENCHMARK | JULY 2005 PERFORMANCE | BENCHMARK ACHIEVEMENT | DIRECTION OF CHANGE |
|---|---|---|---|---|---|
| 4. Children in foster care will have a health screening prior to placement. | 75% | | 73% | No | Improved ↑ |
| 5. Children in foster care will receive a full medical and dental evaluation within 30 days of placement. | 75% | | Insufficient data provided by CFSA | Unable to Determine | Unable to Determine |
| **PLANNING** | | | | | |
| 1. All open cases will have current case plans, as defined in a, b and c below:<br><br>a. Initial case plans will be created within the first 30 days of a child's removal from home.<br><br>b. Case plans will be updated to reflect changing needs.<br><br>c. Case plans will be updated minimally every six months. | 95% | Full Compliance | 91% child plans 79% family plans | No | Improved ↑ |
| 2. CFSA will develop timely, comprehensive, and appropriate case plans that are developed with the family and reflect current conditions and needs.<br><br>a. Case plans will be reflective of a timely assessment of the individual needs of the child in placement, and the needs of both parents and children as they relate to a child's permanency goal. | 75% | | Data will be available in December 2005 from Quality Service Review | | |

| REQUIREMENT | DECEMBER 2004 BENCHMARK | JUNE 2005 BENCHMARK | JULY 2005 PERFORMANCE | BENCHMARK ACHIEVEMENT | DIRECTION OF CHANGE |
|---|---|---|---|---|---|
| b.  Every reasonable effort will be made to locate family and to develop case plans in partnership with families, their informal support network, and other formal resources working with or needed by the family. | 75% | | Data will be available in December 2005 from Quality Service Review | | |
| c.  Case plans will identify permanency-planning goals for children that are appropriate for the child and family and are compliant with District law requirements and timeframes for permanency. | 75% | | Data will be available in December 2005 from Quality Service Review | | |
| d.  Case plans will identify specific services and supports and timetables for providing services needed by families to achieve identified goals. | 90% | | Data will be available in December 2005 from Quality Service Review | | |
| e.  Cases will show evidence of appropriate supervisory review of case plan progress. | 60% | | 100% supervisory review is required in FACES before a case plan can be finalized | Yes | **Benchmark achieved** |
| 3.  For children with a goal of reunification, CFSA will facilitate weekly visits between children and their parents. | 80% | 85% | 6% | No | Declined ↓ |
| 4.  For children with a goal of reunification, in accordance with the case plan, the assigned worker or designated family services provider shall meet with the parent(s) no less frequently than twice a month in the first three months post-placement unless there is documentation that the parent(s) is(are) unavailable or refuses to cooperate with the Agency. | 60% | | 33% (Additional data to be provided by Quality Service Review) | No | Improved ↑ |

| REQUIREMENT | DECEMBER 2004 BENCHMARK | JUNE 2005 BENCHMARK | JULY 2005 PERFORMANCE | BENCHMARK ACHIEVEMENT | DIRECTION OF CHANGE |
|---|---|---|---|---|---|
| 5.  Permanency goals for children in foster care will be appropriate to their needs and family situation and compliant with requirements for permanency in District law, absent a court order requiring a different goal. Goals would be *inappropriate* if: | 90% | | | | |
| a.  A child under the age of 12 has a permanency goal of legal custody with permanent caretakers unless he or she is placed with a relative who is willing to assume long-term responsibility for the child and who has legitimate reasons for not adopting the child and it is in the child's best interest to remain in the home of the relative rather than be considered for adoption by another person. | | | Unable to Determine | Unable to Determine | |
| b.  A child under the age of 12 has a permanency goal of continued foster care unless CFSA has made every reasonable to return the child home, to place with an appropriate family member, or to place for adoption, and CFSA has considered and rejected the possibility of the child's foster parents assuming legal custody as permanent caretakers of the child. | | | Unable to Determine | Unable to Determine | |
| c.  A child under the age of 16 has a permanency goal of independent living. | | | 9 children (<1%) | Yes | **Benchmark achieved.** |
| d.  A child has a goal of return home if (a) both parents have relinquished custody or are deceased; (b) the parents cannot be located after a diligent search, not to exceed three months from the child's entering placement or a child's parents have been found guilty of repeated serious abuse of or neglect of the child or the siblings such that termination of parental rights is appropriate. | | | 72 children (3%) | Yes | **Benchmark achieved.** |

| REQUIREMENT | DECEMBER 2004 BENCHMARK | JUNE 2005 BENCHMARK | JULY 2005 PERFORMANCE | BENCHMARK ACHIEVEMENT | DIRECTION OF CHANGE |
|---|---|---|---|---|---|
| **ADOPTION AND POST ADOPTION** | | | | | |
| 1. CFSA will have a timely process for moving children to adoption. Evidence of compliance will include:<br><br>a. Children with a permanency goal of adoption will be in an approved adoptive placement within nine months of their goal becoming adoption. | 75% | | 61% | No | Not previously measured. |
| b. Children with a permanency goal of adoption will have legal action initiated to free them for adoption within 30 days of their permanency goal becoming adoption. | 75% | | 45% | No | Improvement ↑ |
| c. CFSA will make all reasonable efforts to ensure children with a permanency goal of adoption will have their adoptions finalized within 12 months of placement in an approved adoptive home. | | 65% | Insufficient data provided by CFSA | Unable to Determine | |
| 2. Within 95 days of a child's permanency goal becoming adoption, CFSA will convene a permanency planning team which will develop a child-specific recruitment plan, if needed, which may include contracting with a private adoption agency. | Full Compliance | Full Compliance | 24% | No | Improved ↑ |
| 3. CFSA will have in place a process for recruiting, studying and approving families interested in becoming foster or adoptive parents that results in the necessary training, home studies and decisions on approval being completed within 120 days of application. | | 75% | 57% for CFSA homes<br><br>No data provided for private agency homes | Unable to Determine | |

| REQUIREMENT | DECEMBER 2004 BENCHMARK | JUNE 2005 BENCHMARK | JULY 2005 PERFORMANCE | BENCHMARK ACHIEVEMENT | DIRECTION OF CHANGE |
|---|---|---|---|---|---|
| 4. CFSA will make available post-adoption services necessary to preserve families who have adopted a child from CFSA or from a contract agency providing adoption services to children committed to CFSA. | | 60% | CFSA has extended the current contract but intends to procure additional services Jan. 2006 | No | Unable to Determine |
| 5. Adoptive families will receive notification at the time that the adoption becomes final of the availability of post-adoption services. | | 90% | CFSA sends letters to all families notifying them of post adoptive services at time of adoption | Yes | **Benchmark Achieved** |
| **SUPERVISION OF PLACEMENT** | | | | | |
| CFSA will increase visitation: <br><br> a. CFSA or contract agencies with any level of case responsibility shall make weekly visits during the first eight weeks of placement to children newly placed in out-of-home care (foster family homes, group homes, congregate care, independent living programs, etc.) or moved to a new placement. | 75% | 90% | Unable to Determine | Unable to Determine | |
| b. CFSA or contract social workers with case management responsibility shall make monthly visits to children in out-of-home care (foster family homes, group homes, congregate care, independent living programs, etc.). | Full Compliance | Full Compliance | 84% | No | Improved ↑ |
| c. CFSA and contract social workers shall make bi-weekly (twice monthly) visits to children in out-of-home care (foster family homes, group homes, congregate care, independent living programs, etc.). | 60% | 80% | 41% | No | Improved ↑ |

| REQUIREMENT | DECEMBER 2004 BENCHMARK | JUNE 2005 BENCHMARK | JULY 2005 PERFORMANCE | BENCHMARK ACHIEVEMENT | DIRECTION OF CHANGE |
|---|---|---|---|---|---|
| **CASE REVIEW SYSTEM** | | | | | |
| 1.  Foster care cases will have had an Administrative Case Review within 180 days of entering care and every 180 days thereafter. | Full compliance | Full compliance | 99% | Substantively Achieved | Improved ↑ |
| 2.  CFSA shall make every reasonable effort to ensure that children in foster care have a permanency hearing in Family Court no later than 14 months after their initial placement. | | Full compliance | 96% | Substantively Achieved | Improved ↑ |
| 3.  CFSA will conduct appropriate case specific reviews as specified in Section X, D.1 of the Modified Final Order according to the timetable for phased implementation approved by the Court Monitor by September 30, 2003. CFSA will notify the Director or the Director's designee and the Court Monitor on a monthly basis of the cases requiring special case review and the status and outcome of each review. | 75% | Full compliance | Data not provided; Anecdotally, some reviews are occurring but many are not | No | No Change ↔ |

| REQUIREMENT | DECEMBER 2004 BENCHMARK | JUNE 2005 BENCHMARK | JULY 2005 PERFORMANCE | BENCHMARK ACHIEVEMENT | DIRECTION OF CHANGE |
|---|---|---|---|---|---|
| **CASELOADS, STAFFING, AND WORKER QUALIFICATION** | | | | | |
| 1.  The caseload of each worker conducting investigations of reports of abuse and/or neglect shall not exceed a maximum of 12 investigations at any one time. | Full compliance | Full compliance | 10 of 49 (20%) investigators with more than 12 investigations<br><br>(5 workers with 13-16 cases; 4 workers with 17-20 cases and 1 worker with 22 cases)<br><br>62 investigators managing cases | No | Improved ↑ |
| 2.  The caseload of each CFSA worker and private agency worker providing services to children and families in which the child or children in the family are living in their home shall not exceed 17 families. | Full compliance | Full compliance | Mixed caseloads of both family cases and child cases.<br><br>75 of 262 workers with more than 17 cases. (28%)<br><br>(45 workers with 18-20 cases; 21 workers with 21-27 cases; 8 workers with 28-30 cases.  No worker had over 30 cases) | No | Declined ↓ |

| REQUIREMENT | DECEMBER 2004 BENCHMARK | JUNE 2005 BENCHMARK | JULY 2005 PERFORMANCE | BENCHMARK ACHIEVEMENT | DIRECTION OF CHANGE |
|---|---|---|---|---|---|
| 3.  The caseload of each CFSA worker and private agency worker providing services to children in placement, including children in Emergency Care and children in any other form of CFSA physical custody, shall not exceed 12 for children with special needs and shall not exceed 20 for all other children. | Full compliance | Full compliance | Mixed caseloads of both child cases and family cases. 75 of 263 workers with more than 17 cases. (29%) | No | Improved ↑ |
| 4.  The caseload of each CFSA worker having responsibility for any child in the Adoption Unit shall not exceed 12 children, or 15 children involving cases of independent adoption. | Full Compliance | Full Compliance | 6 of 38 workers (16%)  (4 workers with 13 cases; 1 worker with 14 cases and 1 worker with 16 cases) | No | Declined ↓ |
| 5.  The caseload of each CFSA and private agency worker having responsibility for conducting home studies shall not exceed 30 cases. | Full compliance | Full Compliance | No data provided by CFSA | Unable to Determine | |
| 6.  Supervisors who are responsible for supervising CFSA and private agency social workers who carry caseloads shall be responsible for no more than six workers, including case aides, or five case workers. | 90% | | 92% (6 of 86 supervisors with more than 5 workers) | Yes | Improved ↑ |
| 7.  No CFSA or private agency supervisor will be responsible for the management of any cases except in those situations in which the assigned worker leaves without providing notice, and in such circumstances, only for a five-day period. | 90% (June 30, 2004 benchmark) | | 85% (13 of 86 supervisors with cases – 3 at CFSA & 10 at private agencies) | Substantively Achieved | Improved ↑ |

| REQUIREMENT | DECEMBER 2004 BENCHMARK | JUNE 2005 BENCHMARK | JULY 2005 PERFORMANCE | BENCHMARK ACHIEVEMENT | DIRECTION OF CHANGE |
|---|---|---|---|---|---|
| 8.  Beginning September 30, 2003 and thereafter, there will be no unassigned cases. | Full Compliance | Full Compliance | 80 cases unassigned for more than 24 hours | No | Declined ↓ |
| **TRAINING** | | | | | |
| 1.  New workers will receive the required 80 hours of pre-service training through a combination of classroom and on-the-job training in assigned training units. | Full Compliance | Full Compliance | 54% | No | Declined ↓ |
| 2.  Foster parents will receive a minimum of 15 hours of pre-service training. | Full Compliance | Full Compliance | 97% | Substantively Achieved | **Substantively Achieved** |
| 3.  Adoptive parents will receive a minimum of 30 hours of training, excluding the orientation process. | Full Compliance | Full Compliance | 96% | Substantively Achieved | **Substantively Achieved** |
| 4.  Beginning September 30, 2003, CFSA will offer regularly scheduled judicial training. | Full compliance | Full Compliance | Yes | Substantively Achieved | **Substantively Achieved** |
| 5.  Previously hired workers will receive annually a minimum of 40 hours of in-service training geared toward professional development and specific core and advanced competencies. | | 80% | Unable to Determine | Unable to Determine | |

| REQUIREMENT | DECEMBER 2004 BENCHMARK | JUNE 2005 BENCHMARK | JULY 2005 PERFORMANCE | BENCHMARK ACHIEVEMENT | DIRECTION OF CHANGE |
|---|---|---|---|---|---|
| 6.  New supervisors will receive a minimum of 40 hours of pre-service training on supervision of child welfare workers. | 90% | Full Compliance | 83% | No | Improved ↑ |
| 7.  Supervisors will receive annually a minimum of 24 hours of ongoing training. |  | 85% | 75% | No | Improved ↑ |
| 8.  CFSA and contract agency foster parents will receive annually a minimum of 15 hours of in-service training. | 90% |  | 66% | No | Improved ↑ |
| 9.  Social workers and supervisors at contract private agencies will receive the required 80 hours of pre-service training and ongoing training, as required for CFSA social workers. | 90% |  | 27% pre-service training<br><br>30% in-service training (partial data) | No<br><br>Unable to Determine | Improved ↑ |
| 10. CFSA administrators will receive annually a minimum of 24 hours of training. | 85% |  | 46% CFSA program managers<br><br>100% CFSA administrators | No<br><br>Yes | Improved ↑ |