UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Shirley Tabb, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| District of Columbia; | ) | Civil Action No. 06-00789 (PLF) |
| Brenda Donald Walker; | ) | |
| Mindy Good, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF SHIRLEY TABB

I, Shirley Linda Tabb, depose and state the following:

1.     I am an adult and resident of Washington, District of Columbia. I am the Plaintiff in the above-captioned matter.

2.     I was hired in August 1992 to recruit foster and adoptive parents for District foster children.

3.     During my tenure, I have made significant contributions to the District's mission to provide permanent and nurturing homes for foster children, and raised thousands of dollars in fund-raising events when there was no money for foster and adoptive home recruitment during the time the government was under the guidance of a control board.

4.     I have worked for almost 14 years at DC Child and Family Services Agency (CFSA) as a Licensed Independent Clinical Social Worker (LICSW).

5.  Like all District Government employees with proven and documented acceptable work performance, I achieved progressive step increases and incremental raises based upon the District of Columbia's Personnel Policy and the collective bargaining agreement.

6.  As a result of my accomplishments, good evaluations, progressive step increases, and 2 promotions, I became a grade 14 – step 6 with an annual salary

of approximately $92,848 per year.

7.    Most significant among my accomplishments as an adoptions and foster home recruitment social worker and supervisor include creating public private partnerships with major local radio stations where I profiled children waiting for adoption and recruited parents for a sibling group of 4 little boys over the age of 6 with emotional problems and another sibling group of 7 children during one of my weekly Adopt-a-Child Spotlight features.

8.    I remained in my role as a recruitment unit social work supervisor until promoted to the *Office of Public Information as Acting Public Information Officer* (OPI) during the receivership under Ernestine Jones in 2000.

9.    CFSA continued to utilize my special skills as a social worker with marketing expertise and I continued to work with the adoptions and foster home recruitment unit.  My sales and marketing skills were also used by human resource management to recruit much needed social workers nationally.

10.    During my tenure at CFSA and through my last evaluation signed in June 2005, my overall annual performance was never rated as "unsatisfactory" by any supervisor.

11.    In 2004, after a period of illness, I was diagnosed with Type II diabetes.

12.    I have struggled some with my diabetes and have had to take leave periodically for doctors visits and to properly regulate my symptoms.

13.    In early March 2005, I requested family leave so that I could properly care for my Mother.  I received family leave for the period March through July 2005.

14.    In mid-March 2005, my Mother suffered a stroke.  My Mother lived in my home. She was seriously ill and her care was very difficult and stressful.

15.    Unfortunately, in mid-April 2005, my Mother died.   It took me a few weeks to settle her affairs and tend to my grief.  I did not use all of my family and medical leave and I returned to work on or about May 9, 2006.

16.    I have reviewed the "statement of facts" presented to the Court by the Defendants in section II of their Memorandum of Points and Authorities (Def. Memo at 1 - 5).  Reviewing the "statement of facts" I am unable to determine who is making the statements, and there is no sworn affidavit(s) submitted in support of the "facts" alleged in the "statement of facts."

17.    Defendants' "statement of facts" alleges that I "almost immediately failed to perform to the[ ] standards" set out by Defendant Mindy Good.  Def. Memo at 2 (and Exhibit 1).  This statement is incorrect as I worked on the tasks assigned and competed work as promptly as possible given the timing of the assignments, resources provided, and my family and medical leave status.  It was well known to Defendant Good and other CFSA managers and staff that I was very involved in the care of my elderly Mother during 2005 until her death in mid-April.  As noted previously, I was specifically given family medical leave for the period March through mid-July 2005.   Attached as Exhibit A is a true and correct copy of the authorization I received for family and medical leave.

18.    However, I am unable to fully address the suggestion that I may have failed to compete any particular assignments (or phases of any assignment)

because I do not have all the records and communications relating to my work activities. I would be able to more specifically address the allegations about my work performance if I were able obtain these records and corresponding testimony through discovery.

19.    On March 2, 2005, Ms. Good issued a Notification of Unacceptable Performance and Corrective Action Plan (Def.s' Exhibit 2 at 1 - 7). This memo is unfairly and inaccurately critical of my performance on the FACES.net project and the *CFSA Reporter*. Moreover, this memo ignored my other work and contributions to CFSA. Complicating matters, at the time this memo was issued I was seeking family medical leave to further assist my eighty-nine year old Mother who I moved from Arkansas to live with me in 2004 after my Father died.

20.    Despite my concerns with the accuracy and fairness of Defendant Good's corrective action plan, I responded constructively. See, Def. Memo at 2 - 3 (and Def.s' Exhibit 2). Attached as Exhibit B is a true and correct copy of the comments I submitted on March 17, 2005 in response to Defendant Good's corrective action concerns. Def.s' Exhibit 2).

21.    Defendant Good states that I missed every dead line the FACES.net assignment. Def. Memo at 2 (and Exhibit 2). This statement is incorrect and unsupported by the facts for several reasons:

► The FACES.net Project was given to me with only 2 weeks before the final product was due.

► Defendant Good initially assigned the project to Derek Stewart and had met with FACES staff several times before the day she took me to the meeting with her and involved me in the project.

► It was obvious at this meeting that every one in the room knew what they were talking about except me. This was the first time I knew any thing about the deadline and expectations.

► She assured me that I should give it my best shot and that more time would be allotted if needed.

► Defendant Good was out of the office on sick leave during this critical period following this impromptu assignment and I was left to work with FACES staff on my own.

► Documents were emailed to one of two home email addresses she provided me. She did not get the documents because she gave me the incorrect email address.

22.    Defendant Good claimed she emailed assignments and deadlines to Derek Stewart and me on February 10, 2005 (Def.s' Exhibit 1), but this information never made it to my District government email box.  Instead, I was working in the office that weekend on February 12, 2005 and found a copy in Derek Stewart's office when I went into his office to use his color printer.

23.    In addition, I never received the March 2005 unit calendar that Ms. Good said she emailed and had to request that she send it to me again.   Attached as Exhibit C is a true and correct copy of my March 3, 2005 Email to Mindy Good Re: March Schedule.

24.    I was also out sick a couple of days during these final 2 weeks of the FACES.net project dealing with complications of diabetes – but maintained constant contact with Defendant Good and the FACES client.

25.    I worked directly with the FACES client who wrote me and Defendant Good an email expressing her gratitude and praising me for my work and support.

26.    Defendant Good emailed the client back and told her that she should not have been satisfied because OPI did not provide adequate customer service. See Def.s' Exhibit 2 at 24 - 25 ( February 25 and 26, 2005 Email exchanges between Ms. Sharmaine Allen (FACES client) Ms. Good and me).

27.    On or about March 18, 2005, my Mother had a stroke. I took family and medical leave to care for her until her death. As mentioned earlier, I returned from leave on or about May 9, 2005. When I returned to work in May, I met with Defendant Good and proceeded to resume my duties. During the period May - July 2005, I carried out my duties and received no comments from the Defendants indicating that my work or conduct was deficient in any manner.

28.    Earlier in the year and after I returned from leave, I heard from other CFSA staff that children who were being brought in for intake and investigations were sometimes sleeping overnight in the CFSA office building. I had also been informed that CFSA did not have adequate facilities and supplies to try and make children comfortable while awaiting placement. I knew this was a serious problem because CFSA had declared in 2003 that it had ended the practice of children sleeping overnight in the CFSA office building.

29.     I mentioned my concern about this issue to Defendant Good. She replied that the agency should consider using me to help with recruitment of foster homes. Defendant Good encouraged me to meet with Defendant Walker to discuss the issue and suggest a plan to resolve the problem.

30.     On July 6, 2005, I met with Defendant Walker and discussed the lack of emergency foster home resources that had resulted in children sleeping in the CFSA office building.

31.     During the meeting, I asked Defendant Walker if I could use my social work and marketing skills to recruit emergency homes in the faith-based community. In addition, I suggested that I could assume senior level responsibility over two poorly performing recruitment units that the agency depends upon for placement resources. Defendant Walker rejected my suggestions.

32.     Following the July 2005 meeting with Defendant Walker, children continued to sleep in the CFSA office building.

33.    In early August 2005, I was home on sick leave when I received a letter from Defendant Good proposing that I receive a reprimand for allegedly failing to sustain satisfactory performance. Def.s' Exhibit 3. I was shocked and surprised to receive this document as Defendant Good had not raised any concerns regarding my performance upon my return from family and medical leave following my Mother's death.

34.    The issues raised by Defendant Good are not supported by the facts. If I were permitted discovery, I could more fully address these issues through documents and witness testimony. However, I can respond, at least in part, to several issues raised in the notice.

▶    Work with Tori Russell regarding the Quality Service Review. This project was not given to me until July 5 or 6, 2005. On Thursday, July 7, I still did not have the information I needed from Defendant Good. In addition, I was unable to reach the two supervisors who had to be interviewed. My recollection is that they may have worked off-site and were very difficult to reach. These factors made it impossible for me to prepare draft materials by Monday, July 11.

▶ Complicating matters further, problems associated with my diabetes required me to take leave July 11 - 22, July 26, and July 29 - August 8, 2005. All of the leave was authorized by my doctors and approved by CFSA management.

▶ Children's Law Center FOIA request. This project was being handled by Defendant Good for two or three months before she gave it to me. That is why CFSA's response was, in Defendant Good's words, "extremely late." The timeliness of the FOIA response had nothing to do with my work on the project.

▶ Fifteen minute OPI presentation at Employee Orientation.  I missed the orientation because I was out sick.  I had not arranged for a substitute because the date for the orientation had changed a few times and I was unaware of the final date that was selected.

▶ *CFSA Reporter.*  Defendant Good was out sick on August 1, so she was unable to meet with her to discuss the *CFSA Reporter* before August 2, 2005.  Attached as Exhibit D is a true and correct copy of an email I received from Defendant Good stating that she would be out sick on August 1.  I made the corrections to the draft immediately after I received Defendant Good's comments.  Attached as Exhibit E is a true and correct

copy of the version of the *CFSA Reporter* with my corrections.

- On August 15, 2005, I briefly responded in writing to the notice of reprimand. Attached as Exhibit F is a true and correct copy of my letter to Dr. Heather Stowe. Dr. Stowe was the CFSA official charged with reviewing the reprimand issue. She was also the Administrator of the Intake and Investigations Administration, which was responsible for addressing the problem of children sleeping overnight at CFSA. Consequently, I was not surprised when Dr. Stowe sustained the reprimand.

- The reprimand was contrived by the Defendants and Dr. Stowe in retaliation for my raising the issue of children sleeping overnight at CFSA. It was issued less than a month after my meeting with Defendant Walker.

35.    On August 15, 2005, I communicated with Susan Newman, senior advisor, Religious Affairs, Executive Office of the Mayor.   I advised Ms. Newman that (a) CFSA had children sleeping in the building for lack of foster home resources; (b) I wanted the opportunity to do something about it, and ( c ) I recommended to Defendant Walker and/or Deputy Mayor Neil Albert emergency placement of

children at the Holiday Inn a few blocks from the CFSA office building. I also

discussed the recruitment of emergency foster homes in the faith-based

community with Ms. Newman.

36.    On August 18, 2005, I received an official admonition from Defendant

Mindy Good (Def.s' Exhibit 5). Defendant Good admonished me for speaking to

Susan Newman about children sleeping in the CFSA office building and my

desire to implement some emergency plan to address the problem. In support of

her admonishment, Defendant Good also referenced that I had contacted a public

information officer at the D.C. Department of Human Services (DHS) in March

2005 about developing a campaign to increase awareness around child abuse and

neglect, reviving the Back to Sleep Campaign and other projects.

36.    In response, on August 18, 2005, the I submitted a ten-page, written

rebuttal to Defendant Good's admonition. My rebuttal stated, in part, "[w]e are

breaking the law when children sleep in the agency." I also stated that "[w]e

remove children from neglectful and abusive situations, only to bring them into

another neglectful, abusive and degrading situation (in our custody)." Attached

as Exhibit G is a true and correct copy of my rebuttal to management's

admonition.

37.    Despite my detailed responses to Defendant Good's admonition, to the best of my knowledge, the admonition was not retracted.   In fact, reference to the admonition was made in support of the decision to summarily remove me from my position.

38.    Unfortunately, complications associated with my diabetes was still causing troublesome symptoms such as blurry or dim vision and tingling in my hands, legs, and feet.  On August 18, 2005, I received a disability certificate from my doctor indicating that I needed to take leave from August 18 through September 16, 2005.   Following an appointment with my doctor on September 14, my disability was extended through October 3, 2005.  Then on September 27th, my doctor again extended medical authorization for leave through October 24, 2005. Attached as Exhibit H is a true and correct copy of my authorized family medical leave and subsequent extensions by my doctor.

39.    In September 2005, having failed to get any positive response from CFSA management, I contacted then-Deputy Mayor Neil Albert.  Deputy Mayor Albert

was responsible for the performance of CFSA and other social service agencies.

40.    In my communications with Deputy Mayor Albert, I stated my desire to
transfer from CFSA to DHS and develop a faith-based recruitment and
community awareness project.

41.    I also communicated to Deputy Mayor Albert that children were sleeping
in the CFSA office building.  I shared pictures of children sleeping in the building
with the Deputy Mayor.  I also advised the Deputy Mayor Albert that a
placement worker had advised me that intake social workers were not calling
potential foster families after 12 midnight or 1 a.m. to secure placements for
children because it was too late.

42.    In mid-September 2005, while on medical leave, I received a telephone
message from a social worker colleague who reported that she had six children in
the office one night and only one blanket.  The social worker asked if I could
provide some comforters.

43.    CFSA management's failure to address the problem of children sleeping in the CFSA office building prompted me to take action to bring further attention to the issue. I contacted the media to alert them to the problem. The media reported that children were sleeping in the CFSA office building.

44.    On September 19 and 20, 2005, WUSA-TV did three news stories on the issue. Each story included interviews of the Plaintiff. Two of the stories played the voice mail of my colleague asking for comforters for children at CFSA. WJLA-TV also carried the story.

45.    In response to the WUSA-TV reports, Defendant Mindy Good stated that children sleeping in the CFSA office building was "totally unacceptable." CFSA's Principal Deputy Director Uma Ahlualia was also filmed providing a response to the news stories.

46.    On October 3, 2005, while I was still on medical leave, Defendant Walker issued a "Notice of Summary Removal." The Notice stated, in part, that "effective October 3, 2005 . . . [the Plaintiff was] summarily removed from . . . [her] position of Public Relations Specialist in the Child and Family Services

Agency, Office of Public Information (CFSA OPI)."

47.    Defendant Walker's Notice cited, in part, (a) my use of the CFSA e-mail system to "approach another government agency about an unauthorized campaign to raise awareness about child abuse and neglect . . ." in March 2005; and (b) that on or about September 19, 2005 I allegedly "misrepresented agency practice to the media; violated CFSA confidentiality laws in showing the image of a child in CFSA's custody." However, no identifying characteristics of the child in the photograph were shown.

48.    I was given no advance notice of my removal and no opportunity to contest the allegations raised against me pre-removal.  At the time of my removal, my pay grade was DS-14, step 6, which earned me an annual salary of $92,848.00.

49.    On October 10, 2005, I filed a written response to my summary removal contesting the claims raised by the Defendants.  Attached as Exhibit I is a true and accurate copy of the written response I filed with CFSA.  In my response, I again detailed the problems within the Office of Public Information and how

CFSA had been violating the rights of children by failing to provide timely and appropriate placements. I noted that at least ten children slept in the CFSA office building during the week of September 5, 2005. In addition, I refuted the specific allegations made against me regarding my work performance.

50.    On October 21, 2005, my attorney hand delivered a letter to Defendant Walker. Attached as Exhibit J is a true and accurate copy of the letter my attorney delivered to CFSA. The letter objected to the claims made against me in the removal letter. In addition, through this letter, I notified the Defendants that I had elected to file a civil action under the D.C. Whistleblower Protection Act in order to contest the removal and other prohibited personnel actions being taken against me. See, D.C. Code §§ 1-615.53, 1-615.54 and 1-615.56.

51.    On November 17, 2005, CFSA admitted in the *CFSA Reporter*, an internal agency newsletter, that the *LaShawn A.* Court Monitor had reported that "CFSA has experienced a crisis in placement services." The Monitor's November 3, 2005 assessment of progress through June 30, 2005 makes note of the placement crisis (Monitor's report at 4) and the fact that children had been sleeping overnight in the CFSA building (Monitor's report at 88). In addition, based upon employee

exit surveys, the Monitor reported that a suggestion for improvement offered by

some departing CFSA employees was "[c]reate an environment that fosters open

communication without retaliation" (Monitor's report at 58).  Attached as Exhibit

K is a true and accurate copy of the *LaShawn A.* Court Monitor's report dated

November 3, 2005 (highlighting on the referenced pages was added).


    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the

foregoing is true and correct.

Shirley L. Tabb, LICSW

Executed on: *September 4, 2006*



**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**Child and Family Services Agency**



August 18, 2005

**To:**      Mindy Good
             Public Information Officer

**From:**    Shirley Tabb MSW LICSW
             Public Information Officer

**SUBJECT:** Response to 8/18/05 Admonition
_____

### WHAT ABOUT THE CHILDREN

**We are breaking the law when children sleep in the agency.** CFSA and all Social Workers and are bound by DC Code §4-1301 - §4-1321.06 to intervene in abuse and neglect. Unfortunately – in this case, it is the agency that is guilty of what caused sent us into receivership.



Adopt a Pet Here!

Don't our kids deserve good marketing campaigns, too?

- The intent of the Child and Abuse Reporting Law is to protect children from all types of neglect and abuse – this includes our agency.
- Kinship families must meet District Government regulations to foster their own relatives and children are required to have basic human dignities such as a place to sleep in a ventilated room with windows, dresser drawers for their belongings and adequate living space.
- How are we justified in breaching these basic requirements for the maintenance and enhancement of basic human dignities? Prison cells have defined sleeping quarters and the cots are padded.

- **CFSA is stalling and wasting valuable time with protocol and bureaucracy.** Rather than positioning itself to fire a valuable employee and agency resource, filibuster tactics are at work to stifle a good worker and someone with a strong history and investment in the agency. There is strong resistance to the utilization of my unique skill set as an MSW with marketing expertise and excellent community organization skills with equitable compensation, as is the case with others in the Donald Walker administration.
- I am a 13-year agency employee and Licensed and Independent Clinical Social Worker who served as Adoptions and Foster Home Recruitment Social Worker; Supervisory Recruitment Social Worker; acting Public Information Officer and Public Information Specialist, my current position.

- In each of these roles, my primary concern was and remains the well-being of children.
- I love CFSA – which is why I never denounce the agency – though I take issue with existing administrative and operational deficiencies. –
- As a Social Worker, mother and grandmother, allowing children to sleep in the agency is unacceptable.

**Employees have complained, but feared retaliation for months.** Staff complain, but are reluctant to speak out for fear of what is happening to me now. And, at least one other employee informed Director Donald Walker of the inhumane treatment in Intake and Investigations, yet the problem has remains.

- Earlier this year, I e-mailed Director Donald Walker about these concerns and suggested that we explore renting a block of rooms next door at the Holiday Inn, as a practical solution and alternative to having children sleep in the building. Unfortunately, I received no response and staff continued to express concerns about children sleeping in the building.
- I was in the agency around 6:30 a.m. one morning and went down to Intake and Investigations where I saw a young man a sleep on a thin blue army or camping cot. He was very tall and his legs hung from the small cot, where he struggled to get comfortable, tossing and turning - as he tried to pull his jacket over his head to shield himself from the bright light in the office.
- Some of these cots were used in day care centers for toddlers during nap time and are too short for older, taller children.

**We remove children from neglectful and abusive situations, only to bring them into another neglectful, abusive and degrading situation (in our custody).** I suppose that in this case, it is true that "*a leopard never changes his spots*", and though I am in a support function, as indicated in this indictment against me - I am still a Social Worker.

- I am struggling with a need to protect those less fortunate, and in this case – the city's most vulnerable constituents (our children).
- Other employees are concerned about what is happening to our children in the agency and some of them have expressed their disdain during exit interviews.
- Some are even predicting how long it is going to take under this administration for something horrible to happen to a child.
- However and apparently, unfortunately in my case, there comes a time when we must stop complaining and become a part of the solution – even when *our jobs and security* are threatened, as in this case.

### Facts That Led to My Strong Desire and Attempt to Help

CFSA hired me as an adoptive and foster home recruitment Social Worker for my sales and marketing skills.
I was assigned local churches as a recruitment Social Worker in 1992 and became a "regular" on Heaven 1580 AM, MAJIC 102.3 and other local radio and television stations where I:

- Successfully brokered relationships and profiled waiting children during our Adopt-a-Child Spotlight Radio Segments and;

- ◆ Recruited a family for a sibling group of 4 emotionally disturbed male children (Heaven 1580);
- ◆ Recruited a 2-parent family for a sibling group of 7 seriously disturbed children (MAJIC 102.3).
- ◆ These relationships netted District Government over $100 thousand in free media time in the absence of a recruitment budget or media office.

**Director Donald Walker rejected my offer and proposal to manage agency recruitment activities.**

- ◆ I met with the Director in early July 2005 about how I could help the agency and eliminate the need for children to sleep in the building and proposed that:

  1. the agency better utilize my unique skills and training and allow me to manage the 2 adoption and foster home recruitment units because:

     a. My unique skill set as an MSW, with sales and marketing expertise, can increase the number of families recruited.
     b. Neither of the recruitment Supervisory Social Workers have sales or marketing experience, which is apparent in the lack of foster home resources recruited.
     c. This should be a prerequisite to working in the recruitment unit.

- ◆ Director Donald Walker was not moved by my appeal and reiterated that there were 2 recruitment units in place.
- ◆ The fact that the supervisors have no marketing training or skills ever entered the equation.
- ◆ When I expressed my concern about children sleeping in the building, reference was made about steps in place, but without details.

**Major focus was placed upon my grade and salary after 13 years of District Government service, instead of my abilities.** Unfortunately, instead of discussing how we could get children out of the building and into nurturing, emergency foster homes, the Director remained fixated on my salary and lack of supervisory responsibilities and "grief" as she called it.

- ◆ I went to her and asked to assume major management responsibilities including:

  1. Assuming senior level responsibility for 2 poor performing recruitment units, upon which we are dependent for placement resources;
  2. Launching a specified faith-based emergency foster parent recruitment campaign

- ◆ However, the Director was adamant that she was not going to this and was more interested in her concerns about my grade and salary after 13 years of government service.
- ◆ Other agency experts are compensated without penalty – why the double standard?
- ◆ August 8, 2005 – I e-mailed Director Donald Walker and proposed to assume supervisory responsibility of 3 front desk telephone operators to improve the agency's poor performance in this District telephone customer service category.

1. This would resolve the concern with my grade and salary without supervisory responsibilities.
2. I am the obvious choice because of my seniority in the agency, maturity, and knowledge of the customer service initiative as the agency's customer service business partner.
3. Director Donald Walker found the proposal "interesting" – but wanted to know how the PIO felt about it – when she is aware of her directive to the PIO to manage the agency's campaign of harassment and retaliation (See attached).
4. Again, no action was taken to endorse another proactive proposal and no other response has been made.

**Children continue to sleep in the building since the meeting with the Director.**

♦ There are compelling reasons to seek a solution in the absence of any sense of urgency in this matter.
♦ As long as a single child must sleep in this building, it is too many.

**My attempts were to capitalize upon an untapped demographic with a formalized Faith-Based initiative.**

To encourage Director Donald Walker to re-consider my proposal to provide, I took the following steps with the option of a detail to another District agency:

♦ Drafted a proposed faith-based emergency foster home recruitment initiative.
♦ I took the actions below in the interest of basic child welfare and good social work ethics.

**Accusations in Admonition Letter**

**Count Number One …**

1. On August 15, I contacted Dr. Susan Newman, senior advisor, Religious Affairs, Executive Office of the Mayor, to research problems encountered by the One Church, One Child contractor.
2. The fact that children are sleeping in our building is a well known fact. Everyone in the agency knows it, as well community people. Though shameful and ugly, this is only a symptom of a greater problem – *the lack of placement resources* (for which I have a reasonable solution).
3. I supervised the first recruitment unit from approximately 1995 – 1999 and the agency's recruitment efforts have not faired as well since. I am confident that I could make a sustained contribution as Recruitment Director.
4. When I first e-mailed Director Donald Walker about children sleeping in the building, I offered an obvious solution, which was renting rooms at the Holiday Inn. It's next door; convenient; and would provide comfort, shelter and dignity for children in crisis.
5. My recommendation was an attempt to offer a solution, as opposed to just complaining about the problem.

**My Attempts to Help Children Is a Prophecy Fulfilled.** It appears that after 13 years with CFSA, I have arrived at a critical junction in my career, about which I was warned

by an old criminology professor at the University of Arkansas in Little Rock who said, "*If as a Social Worker, you have not been fired at least once – you have not done good Social Work*". It's ironical that Director Donald Walker and I, both, had the pleasure of knowing Dr. Robert Sarver. Little did I know where fate would lead me almost 30 years later.

## Response to Charges in August 18, 2005 Admonition

♦   **Carried agency business outside my chain of command without approval** –
This was not my intention. Unfortunately – when children hurt, protocol and bureaucracy lend more to the problem, than the solution.

Children have reportedly been sleeping in the building over 2 years and I have trouble understanding how that is going to suddenly change without a paradigm shift.

It is difficult to sleep at night knowing children are sleeping in someone's office or under someone's desk in the District's agency, whose mission is to protect and shelter abused and neglected children.

♦   **Attempt to create an impression of *official knowledge*.**
The fact is, children are sleeping in this building, whether it is official or not.

♦   **Facts and details of issues, strategies, activities, and progress in CFSA's Child Placement Administration and Foster and Adoptive Parent Recruitment units are outside my purview as a public information specialist.**
Conversely, my responsibility is to know about program activities and initiatives in the agency, as editor of the agency's e-newsletter, CFSA Reporter, and Public Information Specialist.

My job is to stay abreast of systemic issues, problems and progress.

The PIO references discussions about the lack of placement resources in senior management meetings during OPI staff meetings.

♦   **Used District Government-owned e-mail system to promote my personal interests and qualifications.**
I used agency equipment to assist District of Columbia children in a critical situation under authority of DC Code §4-1301 - §4-1321.06

My interests in the well-being of children are **personal**, as well as **professional**.

My **qualifications** remain the same as when hired in 1992.

The agency hired me to recruit adoptive and foster homes because of my sales and marketing background (please see attached bio).

My bio reflects the use of my **qualifications** solely in the interest of children and families in the District of Columbia for 13 years.

**Count Number Two...**

In March 2005, I e-mailed the PIO at the D.C. Department of Human Services about developing a campaign to increase awareness around child abuse and neglect, reviving the Back to Sleep Campaign and other child safety projects.

I did not initiate an advance discussion or attempt to obtain management approval to contact DHS for the same reason I found it necessary to go outside the agency to find help for our children this time as well as:

1.  An apparent lack of urgency for child maltreatment issues and problems;
2.  Failure to act proactively to prevent child abuse and neglect.
3.  No community awareness efforts – in stead, we sit and wait until children are in trouble to get involved;

**PIO Mindy Good rejected DHS' initial overture toward community awareness activities.**

*   It is all about the clients for me.
*   DHS made an overture to CFSA during Principal Deputy Director Leticia Lacomba's administration in 2002 and Deputy Director Lacomba wanted me to spearhead a community campaign. We were both excited about the prospect.
*   PIO Mindy Good was against the partnership and felt this community campaign was not CFSA's responsibility – but that of DHS.
*   Children continue to get hurt and die at the hands of care takers; and young, inexperienced mothers continue exhibiting behaviors that result in tragedy and sorrow – while bureaucrats "pass the buck" over who is responsible and no one is taking responsibility.
*   Instead, all of the materials (Video tapes/brochures/door hangers/magnets) we received to disseminate among young parents, clients, foster/adoptive parents, and in the community remain in boxes outside the Public Information Offices in a closet.

**Retaliatory and Hostile Working Environment in Office of Public Information**

*   Director Donald Walker and the PIO have been strategic in their efforts against me, because of my grade and salary, as they continue to play "good cop – bad cop".
*   My work environment is oppressive, controlling and hostile;
*   I am unable to exercise independent thinking or judgment (see Mindy Good's first paragraph on page 2 of the 8/18/05 admonition).
*   I came under heavy fire when I suggested we offer public information services to Contracts and Procurement, because the process is bureaucratic and reminiscent of how the agency was managed pre-receivership.
*   Director Donald Walker and the PIO even prohibit light refreshments at business meetings I host for the Mayor's Customer Service Business Partners – in spite of my willingness to use my own time and money.
*   I have an entrepreneurial spirit and seek solutions first.

**The overture to DHS was an attempt to transfer my expertise and energy to a District agency more responsive and proactive to community needs.**

- ♦ I sought an agency interested in an awareness campaign that could save young lives and enhance the well-being of children and families.

## Count Number Three …

This admonition is typical of my oppressive, hostile, controlling and recently retaliatory work environment (see July 25, 2003 response to my April 1, 2002 – March 31, 2003 performance evaluation).

- ♦ During a recent staff meeting, I took the initiative to suggest a reasonable solution to an agency-wide problem with the procurement process and wanted to ~~help~~.
- ♦ I told the group that I would go to Mr. Samuel Fienberg, Procurement and Contracts Administrator and offer my services;
- ♦ As Public Information Specialist, it is my job to develop communication campaigns for agency programs.
- ♦ I merely made a suggestion and fully understood that the PIO would have the final word about any project – but my job is to assist other program areas like Contracts and Procurement.
- ♦ The PIO was livid and verbally admonished me following the meeting.
- ♦ I was told that if I had gotten permission to speak first, I would have gotten credit for "initiative". This is only one of many degrading and controlling encounters with this senior manager.

**Hostile, Retaliatory Environment and Unfair Labor Practices Affected My Health and Work Assignments.**

OPI is a fast paced environment – sometimes with tight deadlines and this is understandable. Unfortunately, the incongruence between my professional ethics and the agency's disrespect for children, in addition to the hostile and retaliatory environment, my work and health have been adversely affected requiring me to take extended sick leave.

### Unfair Labor Practices

- ♦ It is difficult to concentrate and work in an environment where there is such duplicity and inequity.
- ♦ My skills as a Social Worker with marketing skills are not utilized where they are sorely needed.
- ♦ "Sniper attacks" and harassment from the Director and PIO are frequent – leaving me feeling off-key and depressed, after 13 years of strong commitment to CFSA and its mission.
- ♦ H R is in an incestuous relationship with the Director and HR professionals are unable to do their jobs, because of the Director's control and strong involvement.
- ♦ This function must be returned to DCOP to eliminate this blatant abuse of power and authority.

When strategic attempts to remove me from my grade and position in OPI failed, I became the target of other hostile and unfair labor tactics.

- January 04, 2005 – I requested a week off to manage my mother's medical needs and the PIO told me that she did not understand why I needed a week to take care of my mother.
- January 19, 2005 – The PIO and H R Administrator summoned me to a meeting and informed me that I was going to H R to work in an area outside my level of training and experience.
- I was told that the position would take me outside the collective bargaining unit (where my current position is); and that my salary would be reviewed in 6 months.
- January 20, 2005 – I contacted the union and was told that the agency could not remove me from my union position without my consent.
- January 24, 2005 – I informed the HR Administrator, PIO and the Director that I was unwilling to take the position offered in HR because:

  1. The HR specialist position was outside my area of training and expertise;
  2. The position was a grade 12 and I am a grade 14;
  3. The position would have reduced my salary almost $30,000, after working my way up for 13 years with incremental step increases and 2 promotions (one as a Supervisory Social Worker and Public Information Specialist);
  4. I am not interested in a demotion after 13 years and all I have and continue to contribute to District Government.

- February 19, 2005 – I submitted my regular draft of the CFSA Reporter to the PIO that included a feature on employee winners of an employee's annual Black History Trivia Contest and the feature was cut from that edition.

  This was hostile and retaliatory, though the explanation was that Black History belonged in a "feel good" piece and was the responsibility of HR – not OPI; And that the CFSA Reporter was a management organ that supported management initiatives – in spite of the fact that the agency and the city are predominately Black, and run by a Black mayor. There are also a large number of Black managers and clientele is over 90% Black.

  Not long after that, the PIO included a story in this same e-newsletter about saving trees or some thing so benign that it certainly appeared she was retaliatory and biased in censoring my Black History story.

- February 2005 – Around the second week of February, the PIO took me to a meeting with the FACES staff and announced that, since I would not be leaving OPI, she was going to give me some work.

  a. She knew about the FACES project for at least 60 days prior– with the intention to assign it to the other PIO Specialist.
  b. Without adequate provision of all facts and details, I was written up and given a corrective action plan, because I did not have enough time to respond as she thought.
  c. February 25, 2005 - The FACES client was satisfied with my level of service – but the PIO took exception and began a campaign of retaliation and harassment that has continued.

    d.  In stead of discussing her dissatisfaction 1-1, with hostility and retaliation, the PIO e-mailed the FACES client and told them that we had not done our jobs (meaning me) in an attempt to belittle me to agency staff.

- March 2, 2005 – I received a Notification of Unacceptable Performance and Corrective Action Plan.
- March 4, 2005 – Tired of the hostile and retaliatory environment, I contacted DHS to discuss a community awareness campaign and child safety initiative;
- I wanted to meet with DHS and return to Director Donald Walker with my ideas, in hope of a detail or transferred.
- March 14, 2005 – The PIO held me responsible for keeping my own time and attendance – causing me to lose some 50 hours in leave. Time and Attendance issues are widespread throughout the District Government and leave balances are often incorrect – In this case, she held me responsible because the time keeper failed to notify employees of the last day to use or lose leave.
- March 16, 2005 – My mother had a brain hemorrhage.  I took FMLA and returned to work in mid-May.
- May 2005 – Shortly after my mother died and I returned to work – I was evaluated after a 6 -8 weeks absence and received unsatisfactory ratings in several sub factors in the April 2004-March 2005 performance evaluation.
- The ratings in these sub factors were bogus, subjective, hostile, punitive and retaliatory (see self assessment for this review period in my personnel file).
- My rebuttal includes almost **300** pages of documentation on assignments during April 2004 – March 2005, in spite of having been out 6-8 weeks with the illness and death of my mother.
- June 19, 2005 – I wrote a letter to Fonda Hankerson and Deborah Courtney describing the hostile, angry, and retaliatory treatment in OPI.
- This rapidly deteriorating work environment was reported to the Director in an email and in person in July with no intervention.
- August 5, 2005 – I received *an advanced written notification of proposed official reprimand* after having been out with medical certification in July 2005.
- August 18, 2005 – (A.M.) I saw the PIO in the hall way in front of another employee's cubicle and spoke to her. When she did not speak – I spoke again. She turned around and screamed at me. Other employees witnessed this.
- August 18, 2005 – (P.M.) in less than 2 weeks following the *advanced written notification of proposed official reprimand*, I received a *letter of admonition* for my attempt to research the receptivity of the faith-based community to end the agency's practice of allowing children to sleep in the building because of scarce placement resources.

**Proposed official reprimand is only another retaliatory act to create a paper trail and further damage my employment without acknowledging my credentials and potential.**

- ♦ This serious and punitive personnel action will become a part of my personnel file for 3 years and the PIO can go back and use it against me at her discretion at any time.
- ♦ The agency official, Dr. Heather Stowe, who had the final decision has serious allegations against her and personnel issues. She is not without bias. (Please see Shirley Mims personnel file for details of a grievance against this CFSA official).

Please add this documentation to my personnel file in response to the August 18, 2005 admonition letter from Mindy Good.

Shirley Tabb
Response to Donald Walker
Page 1 of 5



## GOVERNMENT OF THE DISTRICT OF COLUMBIA
### Child and Family Services Agency



October 10, 2005

Mr. Joe Addis
Contracts & Procurement Adm.
955 L'Enfant Plaza, Suite 5200
Washington, D.C. 20024

RE: Response to Notice of Summary Removal

Dear Mr. Addis:

This is my response to Brenda Donald Walker's October 3, 2005 *Notice of Summary Removal* from my job after nearly 14 years and the position of Public Information Specialist in the Child and Family Services Agency, Office of Public Information (CFSA OPI) since 2000.

The summary removal was based on alleged *conduct over the past year that threatens the integrity of government operations* and, to which, I submit the following:

Brenda Donald Walker's attempts to remove me from my Grade 14 in the collective bargaining union and reduce my salary resulted in increased hostility and retaliation following a failed attempt to remove me from OPI in January 2005 and the harassment continued and worsened February - March 2005.

**February 2005 – I included the results of an employee's Black History Trivia Contest in my regular edition of the e-newsletter *CFSA Reporter* and Mindy Good took it out without any discussion. I was Black History activities were informal, spontaneous, employee generated and sponsored and did not belong in the "house organ". (See Mindy Good's 3/2/05 email to me.)**

This is a weak argument in an agency with low staff morale and in an agency a predominantly African American staff and client base. What is more – Black History month is commemorated in state, local and federal governments. Why not this one in a city with an African American mayor and citizenry? Even President George Bush participated in activities to show his support and respect for these 28 days in February set a side once a year to remember the contributions of African Americans. The agency should have embraced this activity – especially since employees feel devalued and demoralized.

**In March 2005 - I e-mailed the PIO at the D.C. Department of Human Services (DHS) about developing a campaign to increase awareness around child abuse and neglect, reviving the Back to Sleep Campaign and other child safety projects.**

**First of all – I was never admonished or reprimanded for this overture to DHS – though it is being "thrown" into this mix now for- obvious reasons (see March 2 – 3 e-mail exchange between Debra Daniels, DHS, Brenda Donald Walker and I).**

I did not initiate an advance discussion or attempt to obtain management approval to contact DHS for the same reason I found it necessary to go outside the agency to find help for our children this time, when I was admonished in August 2005 because of CFSA's:

1. Lack of urgency for child maltreatment issues and problems;
2. Unwillingness to become proactive partners in preventing child abuse and neglect; and
3. Refusal to initiate community awareness activities and public information campaigns to protect children – in stead, we sit around and wait until children are in trouble or enter foster care system – when it's too late - to get involved.

**PIO Mindy Good rejected DHS' initial overture toward community awareness activities 2 years ago and we lost the opportunity to make a significant contribution.**

- I am a social worker and tired of going to fatality reviews knowing that CFSA is not doing all we can to save the lives of some of these children (i.e., crib deaths and Sudden Infant Death Syndrome) (see 3/5/05 e-mail to Brenda Donald Walker)
- DHS made an overture to CFSA during Principal Deputy Director Leticia Lacomba's administration who wanted me to spearhead a community campaign. We were both excited about the prospect.
- PIO Mindy Good was against the partnership and felt a community campaign was not CFSA's responsibility – but that of DHS.
- Children continue to get hurt and die at the hands of care takers; and young, inexperienced mothers continue exhibiting behaviors that result in tragedy and sorrow – while bureaucrats "pass the buck" over who is responsible and no one is taking responsibility.
- Instead, all of the materials (Video tapes/brochures/door hangers/magnets) we received to disseminate among young parents, clients, foster/adoptive parents, and in the community, remain in boxes outside the Public Information offices in a closet.
- The work environment in the Office of Public Information was hostile, retaliatory, and unproductive following a failed attempt to remove me from my unionized position through unfair labor tactics that resulted in Union involvement.
- The harassment from the director and public information officer became progressively worse after I went to the Union in January 2005 (**see letter to Ronnie Charles declining the director's proposed demotion Jan. 19, 2005 and my request to Union representatives about my hostile work environment June 21, 2005**).

I was not in a decision making position while at CFSA, but the agency's position on our involvement in this important – life and death initiative - made no sense and was incongruent with my moral and professional ethics. I saw the agency's attitude as socially, morally and spiritually irresponsible. Therefore – I was compelled to take some action.

The *"unauthorized campaign"* mentioned in the *Notice of Summary Removal* did not happen in March 2005, but in August 2005 when:

- During a recent staff meeting, I took the initiative to suggest a reasonable solution to an agency-wide problem with the procurement process and wanted to help.
- I mentioned that I would like go to Mr. Samuel Fienberg, Procurement and Contracts Administrator; offer OPI services, and prepare a communication plan for him;
- As Public Information Specialist, it was my job to develop communication campaigns for agency programs.
- I merely made a *suggestion* and fully understood that Mindy Good would have the final word about any project – but my job was to assist other program areas like Contracts and Procurement.
- The PIO was livid and verbally admonished me following the meeting. She also reacted inappropriately as I was speaking - in front of other employees and subordinates who complained of her unprofessional attitude immediately following the meeting.
- Mindy Good said that if I had gotten permission from here to speak first, I would have gotten credit for *"initiative"*. This is only one of many degrading, oppressive, hostile and controlling encounters with this senior manager.

Shirley Tabb
Response to Donald Walker
Page 3 of 5

♦  Then when I went to Brenda Donald Walker – she agreed that I should have gotten permission
before I "*thought out aloud*" – more retaliation and attempts to intimidate.

**August 2005 Admonition - Please see the attached Response to Mindy Good's August 18, 2005
admonition for full details. However, deadlines were missed on these projects for the following
reasons:**

- **QSR communication plan** - I was out sick and returned with a doctor's excuse.
- **FTM facilitators/coordinators' fact sheet** – This deadline was missed due to employee
  resignations, snow days, and the FTM director's busy schedule and vacation. Photos were
  involved and once I had gone to off site locations, including L'Enfant Plaza and Southeastern
  University, to photograph individuals and the FTM group, one or two of them had resigned.
- Once I prepared the written draft, the FTM Director went on vacation. When she returned, it was
  difficult to get her to return calls or catch up with her in the office.
- This went on and on and I had some sick days and my mother died in between.
- *CFSA Reporter* was due August 29 and the deadline missed because I was ill. When I returned
  – the edition was completed.
- **Customer Service** – There were no problems in this area in August.

Following Mindy Good's directive from Brenda Donald Walker to send An Advanced Written Notice of
Official Reprimand while I was out on sick leave, Mindy Good and I met with CFSA Human Resources
specialist Michelle Lewis and discussed assignments. We all agreed take I would take extended sick
leave to return to work for a full work load.

It is up to the public information officer to assign work projects and I was doing the work she gave me.
The problem was – work was withheld in order to justify my removal. Mindy Good hoarded work for
herself; gave the other public information specialist assignments, but only gave me a few small projects,
because she and the director strategically aligned themselves to remove me from my job.

The Children's Law Center Freedom of Information Act request was given to me only after Mindy Good
had hoarded and held on to it until it was already late. Then she gave it to me and e-mailed several
documents she had received weeks earlier. I was not provided adequate instructions.

- Mindy Good had a habit of giving me assignments late and expecting them right back.
- I received no formal training if FOIA or media training since assuming my position as public
  information specialist – yet I was held accountable as though I were properly trained.
- This was all part of the plan to remove me from my job.

In response to Mindy Good's closing statement in the August 18, 2005 Admonition, she wrote, "*You
should not be seeking new projects at this time – but rather completing OPI assignments already on your
plate, some of which are well behind schedule*".

I don't disagree that my assignments were priorities, but I was functioning in a very dysfunctional work
environment erosion of professional trust and respect for my superiors. It was difficult to concentrate
because of attempts to brace myself for the next adverse personnel action (see March 2, 2005 email to
Brenda Donald Walker).

In addition to the hostile and retaliatory work environment, the desire to do something to save lives and
ensure child well being in the metro area was not just any other *project*. My ideas had merit, but fell on
deaf ears in an administration without child welfare advocate and expert at the helm.

My God given talents and work experience equipped me to do much more than I was given an
opportunity to do in OPI – even saving lives was not seen as significant. In stead, I was forced to remain
in OPI where I the expertise (for which the District government hired me) were not adequately utilized. In

Shirley Tabb
Response to Donald Walker
Page 4 of 5

stead the agency locked me into a role more suitable for *spin doctor* to elude public trust and confidence in CFSA's ability to keep children safe and in a dignified manner.

**Going to the Media**
I told Mindy Good, Director Brenda Donald Walker, and Deputy Mayor Neil Albert that children were being left homeless and sleeping in offices in the agency. I saw no sense of urgency, nor was I given any information to indicate that any thing significant was being done. What I knew was that children continued to be demoralized, mistreated, and neglected in care of the District of Columbia, in an agency mandated to protect them. I made a spiritual, moral, and ethical decision to try and give these children a voice.

They come to us as a last resort during the most difficult time in any child's life – only to be brought into a strange place – among strange people – scared and lonely, only to sit up in a chair and try to sleep all night. That is if they are not fortunate enough to get 1 only 2 cots – much too small for most of them.

If Brenda Donald Walker was aware of children being treated this way in her custody, why has it taken this long to take some action? If the media had not been called, how long would it have taken? If it is true and the mayor and city administrator are aware of the atrocities faced by these children because of scarce placement resources – why in God's name didn't someone initiated a sleeping bag campaign, buy some more cots, pillows, bedding, and reserve a room to make children comfortable? Why? Why Why?

Now Brenda Donald Walker seems confident telling the public it was ONLY 15 – which is not true, it has been many, many more. At least 10 slept there the week of September 5, 2005. I know it for a fact. However, 1 child is too many to treat this way. No child should have to tolerate this kind of treatment, especially in the most powerful city in the world.

Protecting children from physical and emotional harm supercedes the agency's confidentiality laws and if the agency is comfortable with the way that child was treated, while he was here over night on August 16, 2005 – surely they can come to terms with how the media attention has helped countless others, in that maybe they will get serious about dignity in care.

I did not go to my supervisor because if I was not allowed to speak at a meeting without permission – I seriously doubt that I would have gotten the green light to go out and ask the public for help in getting poor, disenfranchised and predominantly Black children a decent place to sleep at night and restore their human dignity.

We violated these children's basic human rights.

- No place to sleep
- No place to bath or freshen up, except the public toilet
- No toiletry kit or change of clothes/underwear for the next morning
- No provisions to rest, relax, do home work or eat a nutritious meal
- No comfort, no dignity

They come to us broken and demoralized. How can anyone justify what has happened to these poor children who can't even count on their families for protection?

**Family Medical Leave (FML)**
I left work August 18 for extended Family Medical Leave due to complications of Diabetes that got out of control between March and April when my mother had a hemorrhagic stroke of the brain and died. Her care took up a lot of my time and I did not take good care of myself – the stress and retaliatory environment reeked havoc on my health and productivity.

I was on medically approved leave - but am a mandated reporter and required by law to report child abuse and neglect (even in the work place that happens to be the District of Columbia's *safety net*).

I also became a social worker over 30 years ago and the professional code of ethics means something to me, especially when clients are young, vulnerable and helpless. These ethics are with some of us 24/7 – through sickness and in health. If I can help anyone – I will always opt to do so – if I can.

There was no misuse of FML. My leave was certified by a licensed physician and regular visits were made during my leave period.

Every thing I did in this effort was done from my bedside except the picture, which was secured before I went on leave.

I am requesting a hearing on this personnel action and will appreciate your assistance. My Union representative, Steven White, can be reached: office - 202-234-6506 or cell – 202-365-7163. I may be reached at 202-289-1923 or Shirley.tabb@starpower.net.

Thank you for your assistance.

Shirley Linda Tabb MSW LICSW

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SHIRLEY TABB, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 06-00789 (PLF) |
| v. | ) ) ) ) | |
| DISTRICT OF COLUMBIA, <u>et. al.</u>, | ) ) ) ) | |
| Defendant. | ) ) | |

**DECLARATION OF BARBARA BAILEY**

I, Barbara Bailey, declare under the penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.      My name is Barbara Bailey.  I have served as Employee and Labor Relations Manager for the District of Columbia Government  for over Twenty years.

2.      In accordance with the Department of Personnel Regulations, Chapter 16, Part 1 a summary removal under the DPM does not sever the employment relationship between the affected employee and the government until final agency action is taken.  The effect of the summary removal is to remove the employee from the workplace immediately.  The removal becomes permanent, <u>i.e.</u>, the employment relationship is terminated if either the decision is sustained after a hearing or the employee chooses not to seek a hearing.

Further declarant sayeth not.

Dated: July 21, 2006

Barbara Bailey

# CHILD AND FAMILY SERVICES AGENCY
## APPLICATION FOR FAMILY/MEDICAL LEAVE

~~☻~~ COMPLETED BY THE EMPLOYEE

~~I~~NTIFICATION INFORMATION

~~Name~~e: _TAbb_, _Shirley_ _Linda_
     (Last)          (First)          (Middle)

~~Soci~~al Security Number: _432 989192_

~~Title~~/Series/Grade: _Public Information Specialist 14-05-301_

~~Admi~~nistration & Program: _Ofc of the Director - OPI_

~~Org~~anization Code: _____

~~CA~~TEGORY OF LEAVE REQUESTED

~~I he~~reby make application for leave under the authority of the District of Columbia Family and Medical Leave Act of 1990
~~(D.~~C. Law 8-181, D.C. Code § 36-1301, 1991 Supp.) and  Chapter 16 of Title 4, District of Columbia Municipal
~~Reg~~ulations.

~~(ch~~eck one): ☐ Family Leave ☒ Medical Leave

~~TO~~ BE COMPLETED IF APPLYING FOR FAMILY LEAVE

     I hereby request _____ hours of family leave for one of the following purposes:     N/A
☐ ~~To~~ birth of my child
☐ ~~The~~ placement of child within my home for adoption or foster care
☐ The placement of a child within my home for whom I will discharge and assume parental responsibility
☐ To provide care for a family member who has a serious health condition

     I am requesting the following type(s) of leave for family leave. (I understand that I may elect to use my accrued
annual leave, personal leave, and/or compensatory time for family leave and, in so using this leave, any annual leave,
and/or compensatory time will count against my total 16-workweek entitlement to family leave.)

(check appropriate box(s)
☐ Annual leave: * Number of hours _____
☐ Personal; Leave:* Number of hours _____     N/A
☐ Compensatory time off:* Number of hours _____
☐ Leave without pay: Number of hours _____

                         Total hours _____

* (If you are requesting this type of leave, you must file and attach Form SF71. * Application for Leave with this
request)

~~If thi~~s application is to provide care for a family member, a certification of the "serious health condition", issued by your family
~~mem~~ber's health care provider, must be attached to this application.

     The period of family leave requested in 3A above is to be taken:     N/A
☐ In a continuous block of time from _____ to _____
                                                                                        to
☐ On ~~a~~ reduced leave schedule as mutually agreed to by my administration  from _____
_____. I understand that the 16 weeks of family leave on a reduced leave schedule must be taken
within a period that does not exceed 24 consecutive workweeks.

PENDIX B                         Continued on back                         Form CFSA: 99-25