# Exhibit 1

**Page 153**

1  to options, discussion, merely a list was given that
2  you could do discipline of various types perhaps, and
3  then up through termination, and it was the role of
4  folks after the meeting to make recommendations on
5  those options. Is that right?
6      A  Not exactly like that.
7      Q  Okay.
8      A  It was basically, as I said, that I had
9  reached a conclusion that I felt that Shirley was not
10 serving the department well and wanted to know, given
11 all of the issues, performance, time and attendance,
12 violation of a client's confidentiality, protection,
13 and that we wanted to -- that I wanted to know what
14 our options were.
15     Q  Okay. So after the meeting you were
16 describing, which occurs --
17     A  Within a few days after --
18     Q  Within a few days after the media reports?
19 So that's within a few days of September 20, 2005.
20 When was the next time you either met on the subject
21 of what to do with respect to Ms. Tabb?
22     A  It would have been within the next few days

**Page 154**

1  or however long it took them to research and come
2  back.
3      Q  And who was involved in that second meeting?
4      A  Same people.
5      Q  Same people?
6      A  Ronnie Charles and general counsel.
7      Q  Okay. And so what transpired in that
8  meeting?
9      A  Then they came back and said that here are
10 the grounds, we have resources, we've looked at the
11 whole file, and based on all of the factors, the
12 document performance issues, the concerns about
13 abusive leave, and the going outside of the chain of
14 command, violated the admonition, letter of
15 admonition, and then exposing a client, which for us
16 was the straw that broke the camel's back, that we had
17 enough grounds to terminate her.
18         And those things were cited, and I
19 can't remember if they came in with a letter or a
20 letter that was subsequently drafted, but those things
21 were identified in the letter, or for the letter.
22     Q  Okay. So based on this second meeting,

**Page 155**

1  there was a conversation about the -- well, strike
2  that.
3          THE VIDEOGRAPHER: Ms. Donald,
4  please move back to the middle.
5          THE WITNESS: I'm sorry.
6  BY MR. CONDIT:
7      Q  In this second meeting that you were
8  testifying about, was termination the only option that
9  was discussed?
10         MR. WILLIAMS: Counsel, in an
11 abundance of caution, I know that the general
12 counsel was at this meeting. So I'm trying to --
13 I'm trying to have you get as much testimony as
14 you can without breaching any type of
15 attorney-client privilege or any type of
16 communication general counsel might have made in
17 regards to, you know, legal recourse. So I'm
18 trying to let you get as much information as you
19 can.
20         But also I want to -- I'm going to
21 instruct you to not answer those questions. But
22 as they come up, identify them so we know, you

**Page 156**

1  know, how you're not answering. I'm trying not
2  to do that.
3          MR. CONDIT: Okay.
4          MR. WILLIAMS: See --
5          MR. CONDIT: So, counsel, let me
6  make sure I understand. You're instructing the
7  witness not to answer the general question, which
8  is not focused on any --
9          MR. WILLIAMS: No, no, no.
10         MR. CONDIT: -- particular person?
11         MR. WILLIAMS: No, no, no. I'm
12 going to let her answer the general questions,
13 but when it comes to actual advice from counsel
14 in that meeting, that, I believe, is
15 appropriately attorney-client, privileged under
16 attorney-client.
17         MR. CONDIT: I see.
18         MR. WILLIAMS: So I'm trying to give
19 you as much as you need but be sensitive to that
20 fact, too.
21         MR. CONDIT: Okay. I think I
22 understand where you're coming from.