# Exhibit A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SHIRLEY TABB,          :
                   :
        Plaintiff,      :
                   :
v.                 :     Civil Action No. 06-789 (PLF)
                   :
DISTRICT OF COLUMBIA, *et. al.,*:
                   :
        Defendants.   :

## DEFENDANT DISTRICT OF COLUMBIA'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

TO:    Shirley Tabb
       c/o Richard Condit, Esq.
       1612 K Street, NW
       Suite 1100
       Washington, DC 20006

Marlene Bailey and LaShawna Lynch, Paralegal Specialists, Office of the Attorney General, 441 4th Street, N.W. Washington, D.C., 20001, and pursuant to Fed. R. Civ. P. 33, having been designated by defendant, District of Columbia, by and through counsel, herein under oath, and upon information and belief, gives the following answers to interrogatories propounded to defendant by plaintiff:

(a) The information supplied in these answers is not based solely on the knowledge of the executing party, but includes knowledge of the party, its agents, representatives, and attorneys, unless privileged.

(b) The word usage and sentence structure may be that of the attorney assisting in the preparation of these answers and thus, does not necessarily purport to be the precise language of the executing party.

(c) Defendant reserves the right to amend, revise, or supplement its answers to

these interrogatories if and when new or different information becomes available.

(d) For any additional responsive information made available through deposition testimony, the defendant incorporates such information for the purposes of giving the plaintiff notice that such information exists, but does not adopt such testimony as accurate and complete.

(e) Defendant may provide documents, which will answer plaintiff's interrogatory in accordance with FRCP Civil 33.

## General Objections

Defendant objects to the production of any documents or information, which is protected by the attorney-client privilege, deliberative process privilege, work product doctrine or any similarly recognized privilege. Inadvertent production of any information or documents so privileged does not constitute a waiver of such privilege or any other grounds for objecting to the discovery request. Additionally, defendant objects to any part of the plaintiff's instructions which seeks to impose any discovery requirements outside the scope of the rules, especially any obligation to produce information not in the defendant's control or not currently known to it after reasonable inquiry.

## INTERROGATORIES

1.    Please state the complete factual and legal bases for the Defendants' First and Third through Tenth defenses stated in your Answer to Plaintiff's Amended Complaint.

**Answer: Objection, seeks legal conclusion. Further objection as premature and seeks information protected by attorney client privilege, and attorney work**

-2-

product and/or deliberative process doctrine.  Notwithstanding and without waiving the objections, see Plaintiff's Amended Complaint, and these Defendants' Motion for Summary Judgment, at Docket Entries ## 4, and 18.   As discovery is ongoing, these defendants reserve their right to amend and/or supplement this response.

2.      For each paragraph in your Answer to Plaintiffs Amended Complaint wherein you stated that you lacked sufficient knowledge or information to admit or deny an allegation, please re-state the allegation and state whether the allegation is now admitted or denied and provide a full explanation for your response.

**Answer:  Objection, as vague and ambiguous, and as premature.  Further objection to the extent the request seeks information protected by attorney client privilege, attorney work product and/or deliberative process doctrine. Notwithstanding and without waiving the objections, this defendant has no amendments to its Answer at this time.**

3.      For each of the individual defendants, please state their current (or if current information is not known state their last known) home address, business address, telephone number, cell phone number, facsimile number, and e-mail address(es).

**Answer:  Objection as to relevance.  Further objection as the request is a personal invasion of privacy, evokes safety concerns, and the non-disclosure may be protected by D.C. Official Code §§ 1-631.01, 1-631.03, and D.C. Personnel Regulation at 31A District Personnel Manual ("DPM") Sec. 3105, 3112, and 3113.6.  Notwithstanding and without waiving the objections, the only remaining individual defendant in this**

-3-

matter is Brenda Donald, who is represented by counsel from the Office of the Attorney General. Absent a protective order, her personal information will not be released. Furthermore, as defendant Donald is represented by counsel, any ex parte contact with her would be improper. Accordingly, with regard to any issues related to defendant Donald, you may contact her attorneys Michael Bruckheim and/or Zuberi Williams by mail at 441 4th St., NW, 6th Floor South, Washington, DC 20001, by phone: 202-724-6649 and 202-724-6650 respectively, fax 202-727-3625, and email: Michael.bruckheim@dc.gov and Zuberi.williams@dc.gov.

4.     For each of the individual Defendants named in this suit, please state each position held within the District government; dates of employment; salaries; position; and title.

Answer: Objection as to relevance, and as overly broad. Notwithstanding and without waiving the objection, Brenda Donald was employed with the District Government as Chief of Staff of Child and Family Service Administration (CFSA) from 2001 to 2003, as Director of CFSA from 2003-2005 and as Deputy Mayor from 2005-2006.

5.     For current/former District employee Susan Newman, please state her current (or if current information is not known state her last known) home address, business address, telephone number, cell phone number, facsimile number, and e-mail address(es).

Answer: Objection as to relevance, and the non-disclosure of a former District of Columbia employee is protected by D.C. Official Code §§ 1-631.01, 1-631.03, and

**D.C. Personnel Regulation at 31A District Personnel Manual ("DPM") Sec. 3105, 3112, and 3113.6.**

6.      For current/former District employee Neil Albert, please state his current (or if current information is not known state his last known) home address, business address, telephone number, cell phone number, facsimile number, and e-mail address(es).

**Answer:  See response to #5.**

7.      For Ronnie Charles, please state each position held within the District government; dates of employment; salaries; position; and title.

**Answer:  Objection as overly broad and irrelevant.   Notwithstanding and without waiving the objections and further answering, Ronnie Charles has been employed with the District Government as Deputy Director for Administration for CFSA since February 2003.**

8.      For Joseph Addis, please state each position held within the District government; dates of employment; salaries; position; and title.

**Answer:  Objection as overly broad and irrelevant.   Notwithstanding and without waiving the objections and further answering, Joseph Addis was employed with the District Government as Contact Manager for CFSA from June 2005 to September 2005, and as Acting Contract Procurement Administrator for CFSA from September 2005 to January 2006.**

9.      For Deborah Wilson, please state each position held within the District government; dates of employment; salaries; position; and title.

**Answer:  Objection as overly broad and irrelevant.   Notwithstanding and without**

-5-

waiving the objections and further answering, Deborah Wilson has been employed with the District Government as Human Resources Manager (EE/Labor Relations) for CFSA since September 2004.

10.    Please state and completely describe every factual and legal basis for the allegations/claims and conclusions made in your October 3, 2005 letter notifying the Plaintiff that she was summarily removed from her position.

**Answer: Objection as overly broad, vague and ambiguous, and seeks a legal conclusion. Further answering, the letter speaks for itself. See October 3, 2005, letter. Notwithstanding and without waiving the objection and further answering, plaintiff had been counseled numerous times about her work performance and was afforded multiple opportunities to improve. Plaintiff constantly ignored procedures set in place, and continuously tried to circumvent her superior's authority by contacting people outside the agency without prior approval to accomplish her own personal goals.**

11.    Please specifically describe all "public benefits" Plaintiff has received that you consider an appropriate set-off and indicate the amount for each type of set-off and the total set-off you are asserting.

**Answer: Objection as this request seeks a legal conclusion. Notwithstanding its objection, as discovery is ongoing, this defendant reserves its right to supplement its response.**

12.    Identify each person that played any role in deciding that the Plaintiff should be summarily removed from her position at CFSA. For each person identified: state her/his

-6-

role, specify the dates s/he was involved in any role regarding Plaintiffs summary

removal, and state any information and opinions s/he offered regarding the Plaintiffs

summary removal.

**Answer: Objection as overly broad and as to relevance. Further objection as**

**violative of the deliberative process privilege, and the attorney-client privilege.**

**Notwithstanding and without waiving the objection and further answering, Mindy**

**Good was plaintiff's immediate supervisor and may be able to attest to plaintiff's**

**work performance, and points referenced in the October 3, 2005, letter to plaintiff.**

**Ronnie Charles, Deputy of Administration, and Brenda Donald, Chief of Staff of**

**Child and Family Service Administration (CFSA), may also have relevant**

**information regarding plaintiff's removal from her position.**

13.    Please identify and fully describe each factual and legal basis that you relied

upon to terminate the Plaintiff.

**Answer: Objection as the request seeks a legal conclusion. Further answering**

**without waiver of its objection, see October 3, 2005, letter to plaintiff. See also,**

**Response #10.**

14.    Identify each person involved in preparing responses to these interrogatories

and the Plaintiffs production of documents requests.

**Answer: Information was obtained from Brenda Donald, Mindy Good, and the**

**responses were prepared and/or reviewed by LaShawna Lynch, and Marlene**

**Bailey, Paralegal Specialists, 441 4th Street, N.W., Washington, D.C., 20001, Office**

**of the Attorney General for the District of Columbia, in consultation with**

**defendants' counsel.**

Pursuant to Fed. P. Civ. R. 33, I have been designated by the District to respond to the above discovery requests. I have read the foregoing answers to interrogatories, and they are true to the best of my knowledge, information and belief.

Marlene Bailey
Paralegal Specialist

SWORN AND SUBSCRIBED before me, a Notary Public, this _13th_ day of December, 2007.

Notary Public, DC

My Commission Expires: _____

GLORIA M. LATNEY
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires September 14, 2010

As to objections:                    Respectfully submitted:

LINDA SINGER
Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

PATRICIA A. JONES [428132]
Chief, General Litigation, Section IV

Michael Bruckheim [455192]
Assistant Attorney General
441 4th Street, N.W., 6th Floor North
Washington, DC 20001
(202) 724-6649; (202) 724-6295
(202) 727-3625 (fax)
E-mail: Michael.bruckheim@dc.gov

-8-

## CERTIFICATE OF SERVICE

I hereby certify that true copies of the foregoing responses to plaintiff's interrogatories were mailed first-class this ___14th___ day of December, 2007, to:

Richard E. Condit, Esq.
1612 K Street, NW, Suite 1100
Washington, D.C. 20006

Michael Bruckheim
Assistant Attorney General

# Exhibit B

0001

```
 1                    IN THE UNITED STATES DISTRICT COURT
 2                      FOR THE DISTRICT OF COLUMBIA
 3
 4
 5
 6    SHIRLEY TABB,                    Civil Action
                                       No. 06-0789 (PLF)
 7         Plaintiff,
 8    v.
 9    DISTRICT OF COLUMBIA,
10         Defendant.
11
12
                     DEPOSITION OF SHIRLEY TABB
13
                           Washington, DC
14
                     Friday, February 8, 2008
15
                           10:00 a.m.
16
17
18
19    Job No. 1-120053
20    Pages 1-275
21    Reported by: Linda S. Kinkade, CSR, RMR, CRR
22
```

0002
```
 1
 2                    Deposition of SHIRLEY TABB, held at the offices
 3      of:
 4
 5
 6                    Office of the Attorney General
 7                    for the District of Columbia
 8                    One Judiciary Square
 9                    441 4th Street, Northwest
10                    Washington, DC 20001
11
12
13
14
15                    Pursuant to applicable Rules of Civil
16      Procedure, before Linda S. Kinkade, CSR, RMR, CRR, a
17      Notary Public, in and for the District of Columbia.
18
19
20
21
22
```

```
0003
       1    APPEARANCES:
       2        On Behalf of Plaintiff:
       3            RICHARD CONDIT, ESQ.
       4            Law Offices of Richard Condit
       5            Suite 1100
       6            1612 K Street, Northwest
       7            Washington, DC 20006
       8            Telephone: 202.408.0034
       9
      10        On Behalf of Defendant:
      11            ZUBERI BAKARI WILLIAMS, ESQ.
      12            Assistant Attorney General
      13            Office of the Attorney General
      14            441 4th Street, Northwest
      15            Suite 600 South
      16            Washington, DC 20001
      17            Telephone: 202.724.6650
      18
      19    Also present:
      20            Patricia Jones, Chief, General Litigation
      21            Michael Bruckheim, Assistant Attorney General
      22            Laura Springer, Legal Intern
```

0004

```
 1
 2                        I N D E X
 3
 4    EXAMINATION OF SHIRLEY TABB              PAGE
 5        BY MR. WILLIAMS                      6, 265
 6        BY MR. CONDIT                        239
 7
 8                      E X H I B I T S
 9                (Attached to transcript)
10
11    EXHIBIT     DESCRIPTION                       PAGE
12    1           Two-page document entitled        24
13                "Shirley Tabb MSW LICSW"
14    2           "CFSA Application for             126
15                Family/Medical Leave"
16    3           E-mail chain                      144
17    4           "The Washington Post" - "After    181
18                Brianna..."
19    5           Amended Complaint                 188
20    6           Memorandum dated March 2, 2005    188
21    7           Advance Written Notice of Proposed 189
22                Official Reprimand
```

0005

```
 1
 2
 3                    I N D E X   (continued)
 4
 5     EXHIBIT     DESCRIPTION                      PAGE
 6     8           Notice of Final Decision         191
 7     9           CFSA Steps to Mediate Corrective 191
 8                 Action Concerns
 9     10          Letter dated August 15, 2005 to  192
10                 Dr. Heather Stowe
11     11          Letter dated October 3, 1005 re: 193
12                 Notice of Summary Removal
13     12          Letter dated October 10, 2005 to 194
14                 Mr. Joe Addis re: Response to
15                 Notice of Summary Removal
16     13          Letter dated November 3, 2005 to 195
17                 Ms. Tabb re: Notice of Final
18                 Decision
19
20
21
22
```

0055

```
 1              MR. CONDIT:  In any case, it would be in the
 2    official personnel file, would it not?
 3              THE WITNESS:  Yes, it would.
 4              MR. CONDIT:  I don't think you need to
 5    struggle with it.
 6    BY MR. WILLIAMS:
 7         Q    It was around '95.  That's good enough.
 8              MR. WILLIAMS:  Thank you, Mr. Condit.
 9              THE WITNESS:  Yes.
10    BY MR. WILLIAMS:
11         Q    Did your position change after that?
12         A    Yes.  When I was detailed to the Office of
13    Public Information, I was acting as public information
14    officer for a very short period of time.
15         Q    Okay.  And what does acting public
16    information officer do?
17         A    In that role I was working directly with
18    the director along the lines of communication matters,
19    inter-agency communication, strategies, and -- and
20    that was about it.
21         Q    And how long were you in that position?
22         A    Probably six or seven months before they
```

0056

```
 1   hired a public information officer.
 2        Q    Who did they hire?
 3        A    They hired Joanne Williams.
 4        Q    So it is my understanding there was a
 5   position change for you at that point?
 6        A    That's right.
 7        Q    What was that position change?
 8        A    I was made public information specialist.
 9        Q    Okay.  And what does a public information
10   specialist do?
11        A    Well, at that time we did inter-agency
12   communications.  We published in-house newsletters.
13   We spoke with new social workers.  I particularly did
14   from the standpoint of being a social worker.
15        Initially, because when Joanne Williams was
16   hired, we were -- that was still a part of the
17   receivership, and so we did different things.  I
18   worked a lot with the community in organizing an
19   annual golf tournament to raise money for foster and
20   adoptive parent activities.  And that's about all I
21   remember that we did.
22        Q    Okay.  Did you have any -- did you
```

0057
```
 1    supervise any other employees?
 2         A    No, I didn't.
 3         Q    And who was your supervisor?
 4         A    Joanne Williams.
 5         Q    How long were you in that position?
 6         A    I was in that position until October 3rd,
 7    2005.
 8         Q    When you were being supervised by Joanne
 9    Williams, what was your relationship like with Joanne
10    Williams, professional relationship?
11         A    We had a good working relationship.  I
12    respected her and I think she respected me.
13         Q    Were you ever -- did she ever admonish
14    you -- did you get any admonishments for anything you
15    did in that role under her?
16         A    No.
17         Q    Did she ever pull you aside and question
18    your work product at any point in time that you were
19    supervised by her?
20         A    No.
21         Q    How long were you -- how long was she your
22    supervisor?
```

0058

```
 1          A    I think Joanne was my supervisor for about
 2   a year and a half.
 3          Q    And then after Joanne?
 4          A    After Joanne, they hired Mindy Good.
 5          Q    And what year was that?
 6          A    I believe it was 2002.  It was about 2002.
 7          Q    One second, please.
 8          A    Sure.
 9          Q    Let's go back a little bit to your work
10   history at CFSA or Department of Human Services.
11          A    Right.
12          Q    I have here that or my understanding of
13   your testimony was that you were a supervisor social
14   worker.
15          A    Yes.
16          Q    And then you next held -- your next
17   position was in the Office of Public Information?
18          A    Yes.
19          Q    Okay.  Why did you go from the supervisor
20   social worker to the Office of Public Information?
21          A    The receiver, the general receiver,
22   Ernestine Jones, detailed me to her office to act as
```

0059

```
 1    public information officer after the -- her public
 2    information officer left.  So she wanted me to act
 3    until they hired someone.
 4            Q    Did she say why she chose you?
 5            A    Well, not -- no, she didn't, not really.
 6    She just --
 7            Q    Why do you think she chose you?
 8            MR. CONDIT:  Objection.  You can answer, if
 9    you know.
10            THE WITNESS:  Well, I think -- I think she
11    chose me because when the receivership period was a
12    very difficult time for the City, for the government,
13    as well as for people who were in that -- put in that
14    role by a federal judge to come in and have oversight
15    for the agency.  And there were some workers within
16    the agency who they felt had the agency's best
17    interest at heart, was on the agency's side, tried to
18    balance in the community -- tried to balance what --
19    what the media was projecting about the agency.  We
20    tried to keep balance there and show that there were
21    some positive changes being made under Ms. Jones'
22    administration.
```

0060

```
 1   BY MR. WILLIAMS:
 2        Q   Okay.  And then after they found -- I
 3   believe your testimony is they found somebody for that
 4   position?
 5        A   Yes.
 6        Q   And then you moved to --
 7        A   A specialist.
 8        Q   -- a specialist.
 9        A   Yes.
10        Q   Why were you -- do you know why you were
11   moved into a specialist and not back to a supervisor
12   social worker?
13            MR. CONDIT:  Objection, but you can answer,
14   if you know.
15            THE WITNESS:  No, I don't know the answer to
16   that.
17   BY MR. WILLIAMS:
18        Q   Did you request to be moved back into the
19   supervisor social worker position?
20        A   No, I didn't.
21        Q   Did you make any request for being moved to
22   any other position other than public information
```

0061

```
 1   officer?
 2         A   After I had been in that role for a while
 3   and when Mindy Good came, she and I both agreed that I
 4   could make a good contribution to the recruitment
 5   activities of the agency.  And she and I dialogued
 6   about how we could make that happen, but it never
 7   happened.
 8         Q   Well, before that time, before your
 9   interaction with Mindy Good, it is my understanding --
10   correct me if I'm wrong -- that you moved from the
11   acting position to the public information officer
12   position.
13         A   Yes.
14         Q   During that time, before Mindy Good, you
15   had that dialogue, did you ever request to be moved to
16   another position?
17         A   As a matter of fact, I did request to
18   Sondra Jackson, who was the interim receiver after Ms.
19   Jones left, I did request to go back to my activities
20   and position as supervisory social worker for
21   recruitment.
22         Q   Sondra Jackson?
```

0062

```
 1        A    Yes.
 2        Q    And when did you make that request?
 3        A    I made that request before Ms. Jackson left
 4   the agency, which would have probably been somewhere
 5   2002 -- 2002, 2003.
 6        Q    And when you made that request, was it
 7   granted?
 8        A    No, because Ms. Jackson was in transition.
 9   She was getting ready to leave the agency as another
10   director was coming in.  So she never did make the
11   switch.
12        Q    Okay.  It is my understanding that Ms.
13   Sondra Jackson was another supervisor of yours.
14        A    Yes, she was -- yes, she was the agency's
15   receiver while Ernestine Jones left.
16        Q    Okay.  How was your working relationship
17   with Ms. Jackson?
18        A    Excellent.
19        Q    Did Ms. Jackson ever reprimand you?
20        A    Never.
21        Q    Did you ever receive any official
22   admonishment from Ms. Jackson?
```

0063

```
 1          A    Never.
 2          Q    Did she ever pull you aside and criticize
 3   or -- criticize your work product?
 4          A    Never.  Always the opposite.
 5          Q    How long was she your supervisor?
 6          A    Ms. Jackson probably was my supervisor for
 7   six months or so.  A matter of months.  I don't think
 8   it was a whole year.
 9          Q    And after Ms. Jackson, who was your
10   supervisor?
11          A    After Ms. Jackson, Joanne Williams remained
12   my supervisor.
13          Q    I'm just a little confused and I'll ask you
14   to help me out.  Ms. Williams was your supervisor
15   before?
16          A    Yes.
17          Q    And then Ms. Jackson was your supervisor.
18          A    No.  Ms. Jackson was Joanne Williams'
19   supervisor and my supervisor.  She was the agency
20   head.
21          Q    Okay.  Okay.  But Ms. Williams was still
22   your supervisor.
```

0064

```
 1          A    Yes.  Yes.
 2          Q    Okay.  And after Ms. Jackson, who was the
 3     agency head?
 4          A    That's when Olivia Golden came in.
 5          Q    And how long was Olivia Golden the agency
 6     head?
 7          A    I think Olivia Golden was at the agency
 8     about two years.
 9          Q    Okay.  Did she ever supervise you?
10          A    No.
11          Q    Did you ever have any interaction with her
12     regarding your work product?
13          A    No.
14          Q    Did you have any interaction with her
15     regarding your work?
16          A    No.
17          Q    And after Olivia Golden, who was the next
18     agency head?
19          A    Brenda Donald.
20          Q    What year was that?
21          A    2003.  Late 2003, I believe.
22          Q    Did Ms. Williams stay your supervisor this
```

0065

```
 1    entire time?
 2         A    Yes, she did.
 3         Q    When did she stop being your supervisor?
 4         A    When Mindy Good came on board around
 5    2003 -- 2002 or 2003.
 6         Q    So in 2002 or 2003, Mindy Good was your
 7    supervisor?
 8         A    Yes.
 9         Q    And in 2003 Brenda Donald was the agency
10    head.
11         A    Yes.
12         Q    I've asked you a lot of questions about
13    your work history.  So I want you just to think back
14    to the answers you just gave and I want to know if
15    there are any other positions you held up until this
16    point that we are now.
17         A    In CFSA?
18         Q    No, just any work positions that you've
19    held.
20              MR. CONDIT:  I'm going to object to the form
21    and to the relevance, but you can answer, if you can
22    think of anything.
```

0066

```
 1              THE WITNESS:  Well, I sold Mary Kay for a
 2  while.
 3  BY MR. WILLIAMS:
 4         Q    When did you sell Mary Kay?
 5         A    '92 through about -- through about '97 --
 6  '96, '97.
 7         Q    Anything else?
 8         A    Not that I recall.
 9         Q    Ms. Tabb, I'm going to ask you about your
10  duties from 2002 onward for CFSA, which is the meat of
11  this matter.  In 2002 -- I've asked this, but I'll ask
12  it now -- who was your direct supervisor?
13         A    Joanne Williams.
14         Q    And the agency head was who?
15         A    2002, Ernestine Jones.  Well, Ms. Jones had
16  gone -- Sandra Jackson -- Sondra rather, S-O-N.
17         Q    And what were your duties in 2002?
18         A    In 2002 I was responsible for agency
19  communication plans.  I spearheaded the annual
20  celebrity golf tournament.
21         Q    Anything else?
22         A    I supported Joanne Williams in her
```

# Exhibit C

Shirley Tabb
Response to Donald Walker
Page 1 of 5

## GOVERNMENT OF THE DISTRICT OF COLUMBIA
### Child and Family Services Agency





October 10, 2005

Mr. Joe Addis
Contracts & Procurement Adm.
955 L'Enfant Plaza, Suite 5200
Washington, D.C. 20024



RE: Response to Notice of Summary Removal

Dear Mr. Addis:

This is my response to Brenda Donald Walker's October 3, 2005 *Notice of Summary Removal* from my job after nearly 14 years and the position of Public Information Specialist in the Child and Family Services Agency, Office of Public Information (CFSA OPI) since 2000.

The summary removal was based on alleged *conduct over the past year that threatens the integrity of government operations* and, to which, I submit the following:

Brenda Donald Walker's attempts to remove me from my Grade 14 in the collective bargaining union and reduce my salary resulted in increased hostility and retaliation following a failed attempt to remove me from OPI in January 2005 and the harassment continued and worsened February - March 2005.

**February 2005 – I included the results of an employee's Black History Trivia Contest in my regular edition of the e-newsletter *CFSA Reporter* and Mindy Good took it out without any discussion. I was Black History activities were informal, spontaneous, employee generated and sponsored and did not belong in the "house organ". (See Mindy Good's 3/2/05 email to me.)**

This is a weak argument in an agency with low staff morale and in an agency a predominantly African American staff and client base. What is more – Black History month is commemorated in state, local and federal governments. Why not this one in a city with an African American mayor and citizenry? Even President George Bush participated in activities to show his support and respect for these 28 days in February set a side once a year to remember the contributions of African Americans. The agency should have embraced this activity – especially since employees feel devalued and demoralized.

**In March 2005 - I e-mailed the PIO at the D.C. Department of Human Services (DHS) about developing a campaign to increase awareness around child abuse and neglect, reviving the Back to Sleep Campaign and other child safety projects.**

**First of all – I was never admonished or reprimanded for this overture to DHS – though it is being "thrown" into this mix now for- obvious reasons (see March 2 – 3 e-mail exchange between Debra Daniels, DHS, Brenda Donald Walker and I).**

I did not initiate an advance discussion or attempt to obtain management approval to contact DHS for the same reason I found it necessary to go outside the agency to find help for our children this time, when I was admonished in August 2005 because of CFSA's:

145

1. Lack of urgency for child maltreatment issues and problems;
2. Unwillingness to become proactive partners in preventing child abuse and neglect; and
3. Refusal to initiate community awareness activities and public information campaigns to protect children -- in stead, we sit around and wait until children are in trouble or enter foster care system -- when it's too late - to get involved.

**PIO Mindy Good rejected DHS' initial overture toward community awareness activities 2 years ago and we lost the opportunity to make a significant contribution.**

- I am a social worker and tired of going to fatality reviews knowing that CFSA is not doing all we can to save the lives of some of these children (i.e., crib deaths and Sudden Infant Death Syndrome) (see 3/5/05 e-mail to Brenda Donald Walker)
- DHS made an overture to CFSA during Principal Deputy Director Leticia Lacomba's administration who wanted me to spearhead a community campaign. We were both excited about the prospect.
- PIO Mindy Good was against the partnership and felt a community campaign was not CFSA's responsibility -- but that of DHS.
- Children continue to get hurt and die at the hands of care takers; and young, inexperienced mothers continue exhibiting behaviors that result in tragedy and sorrow -- while bureaucrats "pass the buck" over who is responsible and no one is taking responsibility.
- Instead, all of the materials (Video tapes/brochures/door hangers/magnets) we received to disseminate among young parents, clients, foster/adoptive parents, and in the community, remain in boxes outside the Public Information offices in a closet.
- The work environment in the Office of Public Information was hostile, retaliatory, and unproductive following a failed attempt to remove me from my unionized position through unfair labor tactics that resulted in Union involvement.
- The harassment from the director and public information officer became progressively worse after I went to the Union in January 2005 **(see letter to Ronnie Charles declining the director's proposed demotion Jan. 19, 2005 and my request to Union representatives about my hostile work environment June 21, 2005).**

I was not in a decision making position while at CFSA, but the agency's position on our involvement in this important -- life and death initiative - made no sense and was incongruent with my moral and professional ethics. I saw the agency's attitude as socially, morally and spiritually irresponsible. Therefore -- I was compelled to take some action.

The "unauthorized campaign" mentioned in the *Notice of Summary Removal* did not happen in March 2005, but in August 2005 when:

- During a recent staff meeting, I took the initiative to suggest a reasonable solution to an agency-wide problem with the procurement process and wanted to help.
- I mentioned that I would like go to Mr. Samuel Fienberg, Procurement and Contracts Administrator; offer OPI services, and prepare a communication plan for him;
- As Public Information Specialist, it was my job to develop communication campaigns for agency programs.
- I merely made a *suggestion* and fully understood that Mindy Good would have the final word about any project -- but my job was to assist other program areas like Contracts and Procurement.
- The PIO was livid and verbally admonished me following the meeting. She also reacted inappropriately as I was speaking - in front of other employees and subordinates who complained of her unprofessional attitude immediately following the meeting.
- Mindy Good said that if I had gotten permission from here to speak first, I would have gotten credit for *"initiative"*. This is only one of many degrading, oppressive, hostile and controlling encounters with this senior manager.

◆    Then when I went to Brenda Donald Walker – she agreed that I should have gotten permission before I "*thought out aloud*" -- more retaliation and attempts to intimidate.

**August 2005 Admonition - Please see the attached Response to Mindy Good's August 18, 2005 admonition for full details. However, deadlines were missed on these projects for the following reasons:**

- **QSR communication plan** – I was out sick and returned with a doctor's excuse.
- **FTM facilitators/coordinators' fact sheet** – This deadline was missed due to employee resignations, snow days, and the FTM director's busy schedule and vacation. Photos were involved and once I had gone to off site locations, including L'Enfant Plaza and Southeastern University, to photograph individuals and the FTM group, one or two of them had resigned.
- Once I prepared the written draft, the FTM Director went on vacation. When she returned, it was difficult to get her to return calls or catch up with her in the office.
- This went on and on and I had some sick days and my mother died in between.
- **CFSA Reporter** was due August 29 and the deadline missed because I was ill. When I returned – the edition was completed.
- **Customer Service** – There were no problems in this area in August.

Following Mindy Good's directive from Brenda Donald Walker to send An Advanced Written Notice of Official Reprimand while I was out on sick leave, Mindy Good and I met with CFSA Human Resources specialist Michelle Lewis and discussed assignments. We all agreed take I would take extended sick leave to return to work for a full work load.

It is up to the public information officer to assign work projects and I was doing the work she gave me. The problem was – work was withheld in order to justify my removal. Mindy Good hoarded work for herself; gave the other public information specialist assignments, but only gave me a few small projects, because she and the director strategically aligned themselves to remove me from my job.

The Children's Law Center Freedom of Information Act request was given to me only after Mindy Good had hoarded and held on to it until it was already late. Then she gave it to me and e-mailed several documents she had received weeks earlier. I was not provided adequate instructions.

- Mindy Good had a habit of giving me assignments late and expecting them right back.
- I received no formal training if FOIA or media training since assuming my position as public information specialist – yet I was held accountable as though I were properly trained.
- This was all part of the plan to remove me from my job.

In response to Mindy Good's closing statement in the August 18, 2005 Admonition, she wrote, "*You should not be seeking new projects at this time – but rather completing OPI assignments already on your plate, some of which are well behind schedule*".

I don't disagree that my assignments were priorities, but I was functioning in a very dysfunctional work environment erosion of professional trust and respect for my superiors. It was difficult to concentrate because of attempts to brace myself for the next adverse personnel action (see March 2, 2005 email to Brenda Donald Walker).

In addition to the hostile and retaliatory work environment, the desire to do something to save lives and ensure child well being in the metro area was not just any other *project*. My ideas had merit, but fell on deaf ears in an administration without child welfare advocate and expert at the helm.

My God given talents and work experience equipped me to do much more than I was given an opportunity to do in OPI – even saving lives was not seen as significant. In stead, I was forced to remain in OPI where I the expertise (for which the District government hired me) were not adequately utilized.  In

stead the agency locked me into a role more suitable for *spin doctor* to elude public trust and confidence in CFSA's ability to keep children safe and in a dignified manner.

**Going to the Media**

I told Mindy Good, Director Brenda Donald Walker, and Deputy Mayor Neil Albert that children were being left homeless and sleeping in offices in the agency. I saw no sense of urgency, nor was I given any information to indicate that any thing significant was being done. What I knew was that children continued to be demoralized, mistreated, and neglected in care of the District of Columbia, in an agency mandated to protect them. I made a spiritual, moral, and ethical decision to try and give these children a voice.

They come to us as a last resort during the most difficult time in any child's life – only to be brought into a strange place – among strange people – scared and lonely, only to sit up in a chair and try to sleep all night. That is if they are not fortunate enough to get 1 only 2 cots – much too small for most of them.

If Brenda Donald Walker was aware of children being treated this way in her custody, why has it taken this long to take some action? If the media had not been called, how long would it have taken? If it is true and the mayor and city administrator are aware of the atrocities faced by these children because of scarce placement resources – why in God's name didn't someone initiated a sleeping bag campaign, buy some more cots, pillows, bedding, and reserve a room to make children comfortable? Why? Why Why?

Now Brenda Donald Walker seems confident telling the public it was ONLY 15 – which is not true, it has been many, many more. At least 10 slept there the week of September 5, 2005. I know it for a fact. However, 1 child is too many to treat this way. No child should have to tolerate this kind of treatment, especially in the most powerful city in the world.

Protecting children from physical and emotional harm supercedes the agency's confidentiality laws and if the agency is comfortable with the way that child was treated, while he was here over night on August 16, 2005 – surely they can come to terms with how the media attention has helped countless others, in that maybe they will get serious about dignity in care.

I did not go to my supervisor because if I was not allowed to speak at a meeting without permission – I seriously doubt that I would have gotten the green light to go out and ask the public for help in getting poor, disenfranchised and predominantly Black children a decent place to sleep at night and restore their human dignity.

We violated these children's basic human rights.

- No place to sleep
- No place to bath or freshen up, except the public toilet
- No toiletry kit or change of clothes/underwear for the next morning
- No provisions to rest, relax, do home work or eat a nutritious meal
- No comfort, no dignity

They come to us broken and demoralized. How can anyone justify what has happened to these poor children who can't even count on their families for protection?

**Family Medical Leave (FML)**

I left work August 18 for extended Family Medical Leave due to complications of Diabetes that got out of control between March and April when my mother had a hemorrhagic stroke of the brain and died. Her care took up a lot of my time and I did not take good care of myself – the stress and retaliatory environment reeked havoc on my health and productivity.

I was on medically approved leave - but am a mandated reporter and required by law to report child abuse and neglect (even in the work place that happens to be the District of Columbia's *safety net*).

Shirley Tabb
Response to Donald Walker
Page 5 of 5

I also became a social worker over 30 years ago and the professional code of ethics means something to me, especially when clients are young, vulnerable and helpless. These ethics are with some of us 24/7 – through sickness and in health. If I can help anyone – I will always opt to do so – if I can.

There was no misuse of FML. My leave was certified by a licensed physician and regular visits were made during my leave period.

Everything I did in this effort was done from my bedside except the picture, which was secured before I went on leave.

I am requesting a hearing on this personnel action and will appreciate your assistance. My Union representative, Steven White, can be reached: office - 202-234-6506 or cell – 202-365-7163. I may be reached at 202-289-1923 or Shirley.tabb@starpower.net.

Thank you for your assistance.


Shirley Linda Tabb MSW LICSW


Enclosures

**Cc:** Stephen White
     AFSFME Local 2401
     Uma Ahluwalia
     Deborah Wilson
     Mindy Good
     Attorney Richard Goldstein

149

# Exhibit D

0066

```
 1              THE WITNESS:  Well, I sold Mary Kay for a
 2   while.
 3   BY MR. WILLIAMS:
 4         Q    When did you sell Mary Kay?
 5         A    '92 through about -- through about '97 --
 6   '96, '97.
 7         Q    Anything else?
 8         A    Not that I recall.
 9         Q    Ms. Tabb, I'm going to ask you about your
10   duties from 2002 onward for CFSA, which is the meat of
11   this matter.  In 2002 -- I've asked this, but I'll ask
12   it now -- who was your direct supervisor?
13         A    Joanne Williams.
14         Q    And the agency head was who?
15         A    2002, Ernestine Jones.  Well, Ms. Jones had
16   gone -- Sandra Jackson -- Sondra rather, S-O-N.
17         Q    And what were your duties in 2002?
18         A    In 2002 I was responsible for agency
19   communication plans.  I spearheaded the annual
20   celebrity golf tournament.
21         Q    Anything else?
22         A    I supported Joanne Williams in her
```

0067

```
 1    communication efforts and followed her guidelines
 2    or -- her assignments, supported her assignments.
 3         Q   I don't want to stop you in the middle, but
 4    when you say "supported her assignments," what do you
 5    mean?
 6         A   Well, if she gave me assignments, then I
 7    followed through on them.  I'm trying to think what
 8    else -- 2002 has been a long time.
 9         Q   I understand.  What type of assignments
10    would she give you typically?
11         A   I'm drawing a blank for some reason.  I
12    can't remember everything that we did.  The golf
13    tournament campaign.  Oh, I believe I, under Joanne, I
14    wrote narratives or profiles for children waiting for
15    adoptive homes.
16         Q   So it's my understanding that children who
17    were looking for adoptive homes, you would write
18    narratives --
19         A   Yes.
20         Q   -- I'm using the word entice, but --
21         A   Yes.
22         Q   -- attract people --
```

0068

```
 1          A    Exactly.
 2          Q    -- people to adopt them.
 3          A    Yes.  Yes.
 4          Q    Anything else?
 5          A    And we also -- Joanne would have me speak,
 6     attend staff functions with her, and present the
 7     public Information Office in terms of how staff could
 8     utilize the Public Information Office for inter-agency
 9     campaigns, to make life easier for them.
10          Q    Were there any other responsibilities you
11     had in 2002 under Joanne Williams and Sondra Jackson?
12          A    I attended -- yes.  I recruited social
13     workers as well.  I recruited social workers.
14          Q    Anything else that you can remember?
15          A    Not that -- I don't remember right now.
16          Q    Okay.  Who were your supervisors in 2003?
17          A    Mindy Good.
18          Q    Is that when Mindy Good first came?
19          A    Yes.
20          Q    2003?
21          A    Yes.  I believe.
22          Q    And who was the agency head?
```

# Exhibit E



**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**Child and Family Services Agency**



August 18, 2005

**To:**     Mindy Good
            Public Information Officer

**From:**   Shirley Tabb MSW LICSW
            Public Information Officer

**SUBJECT:** Response to 8/18/05 Admonition

## WHAT ABOUT THE CHILDREN

**We are breaking the law when children sleep in the agency.** CFSA and all Social Workers and are bound by DC Code §4-1301 - §4-1321.06 to intervene in abuse and neglect. Unfortunately – in this case, it is the agency that is guilty of what caused sent us into receivership.



- The intent of the Child and Abuse Reporting Law is to protect children from all types of neglect and abuse – this includes our agency.
- Kinship families must meet District Government regulations to foster their own relatives and children are required to have basic human dignities such as a place to sleep in a ventilated room with windows, dresser drawers for their belongings and adequate living space.
- How are we justified in breaching these basic requirements for the maintenance and enhancement of basic human dignities? Prison cells have defined sleeping quarters and the cots are padded.

- CFSA is stalling and wasting valuable time with protocol and bureaucracy. Rather than positioning itself to fire a valuable employee and agency resource, filibuster tactics are at work to stifle a good worker and someone with a strong history and investment in the agency. There is strong resistance to the utilization of my unique skill set as an MSW with marketing expertise and excellent community organization skills with equitable compensation, as is the case with others in the Donald Walker administration.
- I am a 13-year agency employee and Licensed and Independent Clinical Social Worker who served as Adoptions and Foster Home Recruitment Social Worker; Supervisory Recruitment Social Worker; acting Public Information Officer and Public Information Specialist, my current position.

- In each of these roles, my primary concern was and remains the well-being of children.
- I love CFSA – which is why I never denounce the agency – though I take issue with existing administrative and operational deficiencies. —
- As a Social Worker, mother and grandmother, allowing children to sleep in the agency is unacceptable.

**Employees have complained, but feared retaliation for months. Staff complain, but are reluctant to speak out for fear of what is happening to me now.** And, at least one other employee informed Director Donald Walker of the inhumane treatment in Intake and Investigations, yet the problem has remains.

- Earlier this year, I e-mailed Director Donald Walker about these concerns and suggested that we explore renting a block of rooms next door at the Holiday Inn, as a practical solution and alternative to having children sleep in the building. Unfortunately, I received no response and staff continued to express concerns about children sleeping in the building.
- I was in the agency around 6:30 a.m. one morning and went down to Intake and Investigations where I saw a young man a sleep on a thin blue army or camping cot. He was very tall and his legs hung from the small cot, where he struggled to get comfortable, tossing and turning - as he tried to pull his jacket over his head to shield himself from the bright light in the office.
- Some of these cots were used in day care centers for toddlers during nap time and are too short for older, taller children.

**We remove children from neglectful and abusive situations, only to bring them into another neglectful, abusive and degrading situation (in our custody).** I suppose that in this case, it is true that "*a leopard never changes his spots*", and though I am in a support function, as indicated in this indictment against me - I am still a Social Worker.

- I am struggling with a need to protect those less fortunate, and in this case – the city's most vulnerable constituents (our children).
- Other employees are concerned about what is happening to our children in the agency and some of them have expressed their disdain during exit interviews.
- Some are even predicting how long it is going to take under this administration for something horrible to happen to a child.
- However and apparently, unfortunately in my case, there comes a time when we must stop complaining and become a part of the solution – even when *our jobs and security* are threatened, as in this case.

## Facts That Led to My Strong Desire and Attempt to Help

**CFSA hired me as an adoptive and foster home recruitment Social Worker for my sales and marketing skills.**
I was assigned local churches as a recruitment Social Worker in 1992 and became a "regular" on Heaven 1580 AM, MAJIC 102.3 and other local radio and television stations where I:

- Successfully brokered relationships and profiled waiting children during our Adopt-a-Child Spotlight Radio Segments and;

- Recruited a family for a sibling group of 4 emotionally disturbed male children (Heaven 1580);
- Recruited a 2-parent family for a sibling group of 7 seriously disturbed children (MAJIC 102.3).
- These relationships netted District Government over $100 thousand in free media time in the absence of a recruitment budget or media office.

**Director Donald Walker rejected my offer and proposal to manage agency recruitment activities.**

- I met with the Director in early July 2005 about how I could help the agency and eliminate the need for children to sleep in the building and proposed that:

  1. the agency better utilize my unique skills and training and allow me to manage the 2 adoption and foster home recruitment units because:

     a. My unique skill set as an MSW, with sales and marketing expertise, can increase the number of families recruited.
     b. Neither of the recruitment Supervisory Social Workers have sales or marketing experience, which is apparent in the lack of foster home resources recruited.
     c. This should be a prerequisite to working in the recruitment unit.

- Director Donald Walker was not moved by my appeal and reiterated that there were 2 recruitment units in place.
- The fact that the supervisors have no marketing training or skills ever entered the equation.
- When I expressed my concern about children sleeping in the building, reference was made about steps in place, but without details.

**Major focus was placed upon my grade and salary after 13 years of District Government service, instead of my abilities.** Unfortunately, instead of discussing how we could get children out of the building and into nurturing, emergency foster homes, the Director remained fixated on my salary and lack of supervisory responsibilities and "grief" as she called it.

- I went to her and asked to assume major management responsibilities including:

  1. Assuming senior level responsibility for 2 poor performing recruitment units, upon which we are dependent for placement resources;
  2. Launching a specified faith-based emergency foster parent recruitment campaign

- However, the Director was adamant that she was not going to this and was more interested in her concerns about my grade and salary after 13 years of government service.
- Other agency experts are compensated without penalty – why the double standard?
- August 8, 2005 – I e-mailed Director Donald Walker and proposed to assume supervisory responsibility of 3 front desk telephone operators to improve the agency's poor performance in this District telephone customer service category.

1. This would resolve the concern with my grade and salary without supervisory responsibilities.
2. I am the obvious choice because of my seniority in the agency, maturity, and knowledge of the customer service initiative as the agency's customer service business partner.
3. Director Donald Walker found the proposal "interesting" – but wanted to know how the PIO felt about it – when she is aware of her directive to the PIO to manage the agency's campaign of harassment and retaliation (See attached).
4. Again, no action was taken to endorse another proactive proposal and no other response has been made.

## Children continue to sleep in the building since the meeting with the Director.

- There are compelling reasons to seek a solution in the absence of any sense of urgency in this matter.
- As long as a single child must sleep in this building, it is too many.

## My attempts were to capitalize upon an untapped demographic with a formalized Faith-Based initiative.

To encourage Director Donald Walker to re-consider my proposal to provide, I took the following steps with the option of a detail to another District agency:

- Drafted a proposed faith-based emergency foster home recruitment initiative.
- I took the actions below in the interest of basic child welfare and good social work ethics.

## Accusations in Admonition Letter

### Count Number One ...

1. On August 15, I contacted Dr. Susan Newman, senior advisor, Religious Affairs, Executive Office of the Mayor, to research problems encountered by the One Church, One Child contractor.
2. The fact that children are sleeping in our building is a well known fact. Everyone in the agency knows it, as well community people. Though shameful and ugly, this is only a symptom of a greater problem – *the lack of placement resources* (for which I have a reasonable solution).
3. I supervised the first recruitment unit from approximately 1995 – 1999 and the agency's recruitment efforts have not faired as well since. I am confident that I could make a sustained contribution as Recruitment Director.
4. When I first e-mailed Director Donald Walker about children sleeping in the building, I offered an obvious solution, which was renting rooms at the Holiday Inn. It's next door; convenient; and would provide comfort, shelter and dignity for children in crisis.
5. My recommendation was an attempt to offer a solution, as opposed to just complaining about the problem.

**My Attempts to Help Children Is a Prophecy Fulfilled.** It appears that after 13 years with CFSA, I have arrived at a critical junction in my career, about which I was warned

by an old criminology professor at the University of Arkansas in Little Rock who said, "*If as a Social Worker, you have not been fired at least once – you have not done good Social Work*". It's ironical that Director Donald Walker and I, both, had the pleasure of knowing Dr. Robert Sarver. Little did I know where fate would lead me almost 30 years later.

## Response to Charges in August 18, 2005 Admonition

- ♦ **Carried agency business outside my chain of command without approval –** This was not my intention. Unfortunately – when children hurt, protocol and bureaucracy lend more to the problem, than the solution.

   Children have reportedly been sleeping in the building over 2 years and I have trouble understanding how that is going to suddenly change without a paradigm shift.

   It is difficult to sleep at night knowing children are sleeping in someone's office or under someone's desk in the District's agency, whose mission is to protect and shelter abused and neglected children.

- ♦ **Attempt to create an impression of *official knowledge*.**
   The fact is, children are sleeping in this building, whether it is official or not.

- ♦ **Facts and details of issues, strategies, activities, and progress in CFSA's Child Placement Administration and Foster and Adoptive Parent Recruitment units are outside my purview as a public information specialist.**
   Conversely, my responsibility is to know about program activities and initiatives in the agency, as editor of the agency's e-newsletter, CFSA Reporter, and Public Information Specialist.

   My job is to stay abreast of systemic issues, problems and progress.

   The PIO references discussions about the lack of placement resources in senior management meetings during OPI staff meetings.

- ♦ **Used District Government-owned e-mail system to promote my personal interests and qualifications.**
   I used agency equipment to assist District of Columbia children in a critical situation under authority of DC Code §4-1301 - §4-1321.06

   My interests in the well-being of children are **personal**, as well as **professional**.

   My **qualifications** remain the same as when hired in 1992.

   The agency hired me to recruit adoptive and foster homes because of my sales and marketing background (please see attached bio).

   My bio reflects the use of my **qualifications** solely in the interest of children and families in the District of Columbia for 13 years.

**Count Number Two...**

In March 2005, I e-mailed the PIO at the D.C. Department of Human Services about developing a campaign to increase awareness around child abuse and neglect, reviving the Back to Sleep Campaign and other child safety projects.

I did not initiate an advance discussion or attempt to obtain management approval to contact DHS for the same reason I found it necessary to go outside the agency to find help for our children this time as well as:

1. An apparent lack of urgency for child maltreatment issues and problems;
2. Failure to act proactively to prevent child abuse and neglect.
3. No community awareness efforts – in stead, we sit and wait until children are in trouble to get involved;

**PIO Mindy Good rejected DHS' initial overture toward community awareness activities.**

- It is all about the clients for me.
- DHS made an overture to CFSA during Principal Deputy Director Leticia Lacomba's administration in 2002 and Deputy Director Lacomba wanted me to spearhead a community campaign. We were both excited about the prospect.
- PIO Mindy Good was against the partnership and felt this community campaign was not CFSA's responsibility – but that of DHS.
- Children continue to get hurt and die at the hands of care takers; and young, inexperienced mothers continue exhibiting behaviors that result in tragedy and sorrow – while bureaucrats "pass the buck" over who is responsible and no one is taking responsibility.
- Instead, all of the materials (Video tapes/brochures/door hangers/magnets) we received to disseminate among young parents, clients, foster/adoptive parents, and in the community remain in boxes outside the Public Information Offices in a closet.

**Retaliatory and Hostile Working Environment in Office of Public Information**

- Director Donald Walker and the PIO have been strategic in their efforts against me, because of my grade and salary, as they continue to play "good cop – bad cop".
- My work environment is oppressive, controlling and hostile;
- I am unable to exercise independent thinking or judgment (see Mindy Good's first paragraph on page 2 of the 8/18/05 admonition). ____
- I came under heavy fire when I suggested we offer public information services to Contracts and Procurement, because the process is bureaucratic and reminiscent of how the agency was managed pre-receivership.
- Director Donald Walker and the PIO even prohibit light refreshments at business meetings I host for the Mayor's Customer Service Business Partners – in spite of my willingness to use my own time and money.
- I have an entrepreneurial spirit and seek solutions first.

**The overture to DHS was an attempt to transfer my expertise and energy to a District agency more responsive and proactive to community needs.**

♦ I sought an agency interested in an awareness campaign that could save young lives and enhance the well-being of children and families.

### Count Number Three ...

This admonition is typical of my oppressive, hostile, controlling and recently retaliatory work environment (see July 25, 2003 response to my April 1, 2002 – March 31, 2003 performance evaluation).

♦ During a recent staff meeting, I took the initiative to suggest a reasonable solution to an agency-wide problem with the procurement process and wanted to ~~help.~~
♦ I told the group that I would go to Mr. Samuel Fienberg, Procurement and Contracts Administrator and offer my services;
♦ As Public Information Specialist, it is my job to develop communication campaigns for agency programs.
♦ I merely made a suggestion and fully understood that the PIO would have the final word about any project – but my job is to assist other program areas like Contracts and Procurement.
♦ The PIO was livid and verbally admonished me following the meeting.
♦ I was told that if I had gotten permission to speak first, I would have gotten credit for "initiative". This is only one of many degrading and controlling encounters with this senior manager.

**Hostile, Retaliatory Environment and Unfair Labor Practices Affected My Health and Work Assignments.**

OPI is a fast paced environment – sometimes with tight deadlines and this is understandable. Unfortunately, the incongruence between my professional ethics and the agency's disrespect for children, in addition to the hostile and retaliatory environment, my work and health have been adversely affected requiring me to take extended sick leave.

### Unfair Labor Practices

♦ It is difficult to concentrate and work in an environment where there is such duplicity and inequity.
♦ My skills as a Social Worker with marketing skills are not utilized where they are sorely needed.
♦ "Sniper attacks" and harassment from the Director and PIO are frequent – leaving me feeling off-key and depressed, after 13 years of strong commitment to CFSA and its mission.
♦ H R is in an incestuous relationship with the Director and HR professionals are unable to do their jobs, because of the Director's control and strong involvement.
♦ This function must be returned to DCOP to eliminate this blatant abuse of power and authority.

**When strategic attempts to remove me from my grade and position in OPI failed, I became the target of other hostile and unfair labor tactics.**

- January 04, 2005 – I requested a week off to manage my mother's medical needs and the PIO told me that she did not understand why I needed a week to take care of my mother.
- January 19, 2005 – The PIO and H R Administrator summoned me to a meeting and informed me that I was going to H R to work in an area outside my level of training and experience.
- I was told that the position would take me outside the collective bargaining unit (where my current position is); and that my salary would be reviewed in 6 months.
- January 20, 2005 – I contacted the union and was told that the agency could not remove me from my union position without my consent.
- January 24, 2005 – I informed the HR Administrator, PIO and the Director that I was unwilling to take the position offered in HR because:

  1. The HR specialist position was outside my area of training and expertise;
  2. The position was a grade 12 and I am a grade 14;
  3. The position would have reduced my salary almost $30,000, after working my way up for 13 years with incremental step increases and 2 promotions (one as a Supervisory Social Worker and Public Information Specialist);
  4. I am not interested in a demotion after 13 years and all I have and continue to contribute to District Government.

- February 19, 2005 – I submitted my regular draft of the CFSA Reporter to the PIO that included a feature on employee winners of an employee's annual Black History Trivia Contest and the feature was cut from that edition.

  This was hostile and retaliatory, though the explanation was that Black History belonged in a "feel good" piece and was the responsibility of HR – not OPI; And that the CFSA Reporter was a management organ that supported management initiatives – in spite of the fact that the agency and the city are predominately Black, and run by a Black mayor. There are also a large number of Black managers and clientele is over 90% Black.

  Not long after that, the PIO included a story in this same e-newsletter about saving trees or some thing so benign that it certainly appeared she was retaliatory and biased in censoring my Black History story.

- February 2005 – Around the second week of February, the PIO took me to a meeting with the FACES staff and announced that, since I would not be leaving OPI, she was going to give me some work.

  a. She knew about the FACES project for at least 60 days prior– with the intention to assign it to the other PIO Specialist.
  b. Without adequate provision of all facts and details, I was written up and given a corrective action plan, because I did not have enough time to respond as she thought.
  c. February 25, 2005 - The FACES client was satisfied with my level of service – but the PIO took exception and began a campaign of retaliation and harassment that has continued.

    d.  In stead of discussing her dissatisfaction 1-1, with hostility and retaliation, the PIO e-mailed the FACES client and told them that we had not done our jobs (meaning me) in an attempt to belittle me to agency staff.

♦ March 2, 2005 – I received a Notification of Unacceptable Performance and Corrective Action Plan.

♦ March 4, 2005 – Tired of the hostile and retaliatory environment, I contacted DHS to discuss a community awareness campaign and child safety initiative;

♦ I wanted to meet with DHS and return to Director Donald Walker with my ideas, in hope of a detail or transferred.

♦ March 14, 2005 – The PIO held me responsible for keeping my own time and attendance – causing me to lose some 50 hours in leave. Time and Attendance issues are widespread throughout the District Government and leave balances are often incorrect – In this case, she held me responsible because the time keeper failed to notify employees of the last day to use or lose leave.

♦ March 16, 2005 – My mother had a brain hemorrhage.  I took FMLA and returned to work in mid-May.

♦ May 2005 – Shortly after my mother died and I returned to work – I was evaluated after a 6 -8 weeks absence and received unsatisfactory ratings in several sub factors in the April 2004-March 2005 performance evaluation.

♦ The ratings in these sub factors were bogus, subjective, hostile, punitive and retaliatory (see self assessment for this review period in my personnel file).

♦ My rebuttal includes almost 300 pages of documentation on assignments during April 2004 – March 2005, in spite of having been out 6-8 weeks with the illness and death of my mother.

♦ June 19, 2005 – I wrote a letter to Fonda Hankerson and Deborah Courtney describing the hostile, angry, and retaliatory treatment in OPI.

♦ This rapidly deteriorating work environment was reported to the Director in an email and in person in July with no intervention.

♦ August 5, 2005 – I received *an advanced written notification of proposed official reprimand* after having been out with medical certification in July 2005.

♦ August 18, 2005 – (A.M.) I saw the PIO in the hall way in front of another employee's cubicle and spoke to her. When she did not speak – I spoke again. She turned around and screamed at me. Other employees witnessed this.

♦ August 18, 2005 – (P.M.) in less than 2 weeks following the *advanced written notification of proposed official reprimand*, I received a *letter of admonition* for my attempt to research the receptivity of the faith-based community to end the agency's practice of allowing children to sleep in the building because of scarce placement resources.

**Proposed official reprimand is only another retaliatory act to create a paper trail and further damage my employment without acknowledging my credentials and potential.**

- ◆ This serious and punitive personnel action will become a part of my personnel file for 3 years and the PIO can go back and use it against me at her discretion at any time.
- ◆ The agency official, Dr. Heather Stowe, who had the final decision has serious allegations against her and personnel issues. She is not without bias. (Please see Shirley Mims personnel file for details of a grievance against this CFSA official).

Please add this documentation to my personnel file in response to the August 18, 2005 admonition letter from Mindy Good.

# Exhibit F

0251

```
 1    from your supervisor to disseminate information to the
 2    media, which constitutes malfeasance and
 3    insubordination, as you had been admonished for
 4    similar conduct earlier this year.
 5         My question to you is:  Had you been admonished
 6    prior to this letter, October 3, 2005, for sharing
 7    information with the media?
 8         A    No.  No.
 9         Q    Let me draw your attention, again, in this
10    exhibit, Exhibit 11, to looks like the second full
11    paragraph, which begins with the words "in March
12    2005."  Do you see that?
13         A    On the second page?
14         Q    I'm sorry.  First page.
15         A    First page?  Yes.
16         Q    It says, in March 2005.  Do you see that?
17         A    Yes.
18         Q    It says, in March 2005, you used the CFSA
19    e-mail system to approach another government agency
20    about an unauthorized campaign to raise awareness
21    about child abuse and neglect and promote
22    implementation of specific projects without notifying
```

0252
```
 1   or obtaining prior approval from your supervisor.
 2         Do you see that?
 3         A   Yes, I do.
 4         Q   The first question.  To your knowledge and
 5   experience as a 14-year employee of CFSA, do CFSA
 6   employees typically e-mail other agencies?
 7         A   Yes.
 8         Q   Just, for example, why do you e-mail other
 9   agencies?
10         A   Well, we could e-mail other agencies to
11   encourage and initiate inter-agency partnerships,
12   community partnerships.  We used to talk a lot about
13   community stakeholders and the concept that it takes a
14   village to raise children.  So we used to do it all
15   the time.
16         Q   Were there agencies in the District
17   government at the time you were there in 2005 that
18   were considered to be sister agencies of CFSA?
19         A   Certainly.
20         Q   What are those agencies?
21         A   Department of Human Services, Department of
22   Mental Health, Department of Youth and Rehabilitative
```

0253

```
 1    Services, Parks and Recreation.
 2         Q   And would you or others within CFSA
 3    typically have interactions with those agencies?
 4         A   Certainly.
 5         Q   Now, did you understand when you
 6    e-mailed -- well, let me ask this.  What did you
 7    understand that the agency to be referring to when it
 8    says, you used the CFSA e-mail system to approach
 9    another government agency about an unauthorized
10    campaign?  Do you know what they were talking about?
11         A   Yes, I do.  When T.C. Lacomba was at the
12    agency as the number two person to the director,
13    Olivia Golden, she had selected me to work with DHS in
14    a campaign to make the community aware of the dangers
15    of having little babies sleep on their tummies as
16    opposed to having them sleep on their backs, thus
17    called the Back to Sleep campaign.  And they gave us
18    lots of nice materials.  But Ms. Lacomba didn't stay
19    at the agency, so -- she left.
20         So after going to so many fatality review
21    hearings, hearing about horrendous things that were
22    happening to children in the District and all over the
```

0254

1  country, every time I heard this, I just saw a part of
2  my soul die.  And I had approached Brenda about
3  reaching out to the community with -- no, first I went
4  to Mindy -- with a prevention and awareness campaign.
5  So if we couldn't find enough homes for kids, let's
6  try to keep them safe out there where they are or at
7  least heighten the awareness of the community.  So if
8  children are in trouble, they will know what to do,
9  people know who mandatory reporters are.
10          Mindy felt that prevention and public awareness
11  in the community was not CFSA's role.  So I thought
12  that reaching out to the public information officer at
13  DHS would allow me to dialogue with her and perhaps
14  get enough information to bring back to sit down with
15  Brenda again and say, well, look, DHS is willing to
16  partner with us and do this.  But once Mindy killed
17  it, Brenda didn't want anything to do with it.  And I
18  was cited for going out -- going to another government
19  agency about an unauthorized campaign.  It wasn't a
20  campaign; I was just fact finding.
21          Q   Did you ever tell the DHS person that you
22  were communicating with that what you were talking

0255

1   about was a campaign that had been approved by CFSA?
2       A   Oh, no, no, no.  My e-mail to her was more
3   of a query-like letter.
4       Q   And then it says in that same paragraph,
5   you, again, mentioned the unauthorized campaign at an
6   executive staff meeting.  As a result, you were
7   reprimanded.
8       A   This is a total fabrication.  This sentence
9   here is absolutely not true.  I testified earlier this
10   morning about why I was reprimanded for speaking out
11   in the meeting.  That was offering, suggesting, that I
12   go to procurement and offer my services to do a
13   communication plan.
14       Q   So this, the unauthorized campaign, which
15   is alleged by the agency wherein you communicated with
16   DHS, was not the issue that you raised at the
17   executive staff meeting?
18       A   No, absolutely not, not at all.
19       Q   Now let me ask you to draw your attention
20   onto the second page, please.  In the top paragraph of
21   page 2 of Exhibit 11, the removal letter, it says, you
22   have been on family medical leave since August 18,

# Exhibit G

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Shirley Tabb,<br><br>     Plaintiff,<br><br>v.<br><br>District of Columbia;<br>Brenda Donald Walker;<br>Mindy Good,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 06-00789 (PLF) |

**DECLARATION OF SHIRLEY TABB**

I, Shirley Linda Tabb, depose and state the following:

1.     I am an adult and resident of Washington, District of Columbia. I am the

Plaintiff in the above-captioned matter.

Page 1 of 20

2.    I was hired in August 1992 to recruit foster and adoptive parents for District foster children.

3.    During my tenure, I have made significant contributions to the District's mission to provide permanent and nurturing homes for foster children, and raised thousands of dollars in fund-raising events when there was no money for foster and adoptive home recruitment during the time the government was under the guidance of a control board.

4.    I have worked for almost 14 years at DC Child and Family Services Agency (CFSA) as a Licensed Independent Clinical Social Worker (LICSW).

5.  Like all District Government employees with proven and documented acceptable work performance, I achieved progressive step increases and incremental raises based upon the District of Columbia's Personnel Policy and the collective bargaining agreement.

6.  As a result of my accomplishments, good evaluations, progressive step increases, and 2 promotions, I became a grade 14 – step 6 with an annual salary

of approximately $92,848 per year.

7.    Most significant among my accomplishments as an adoptions and foster home recruitment social worker and supervisor include creating public private partnerships with major local radio stations where I profiled children waiting for adoption and recruited parents for a sibling group of 4 little boys over the age of 6 with emotional problems and another sibling group of 7 children during one of my weekly Adopt-a-Child Spotlight features.

8.    I remained in my role as a recruitment unit social work supervisor until promoted to the *Office of Public Information as Acting Public Information Officer (OPI)* during the receivership under Ernestine Jones in 2000.

9.    CFSA continued to utilize my special skills as a social worker with marketing expertise and I continued to work with the adoptions and foster home recruitment unit.  My sales and marketing skills were also used by human resource management to recruit much needed social workers nationally.

10.    During my tenure at CFSA and through my last evaluation signed in June 2005, my overall annual performance was never rated as "unsatisfactory" by any supervisor.

11.    In 2004, after a period of illness, I was diagnosed with Type II diabetes.

12.    I have struggled some with my diabetes and have had to take leave periodically for doctors visits and to properly regulate my symptoms.

13.    In early March 2005, I requested family leave so that I could properly care for my Mother.  I received family leave for the period March through July 2005.

14.    In mid-March 2005, my Mother suffered a stroke.  My Mother lived in my home. She was seriously ill and her care was very difficult and stressful.

15.    Unfortunately, in mid-April 2005, my Mother died.   It took me a few weeks to settle her affairs and tend to my grief.   I did not use all of my family and medical leave and I returned to work on or about May 9, 2006.

16.    I have reviewed the "statement of facts" presented to the Court by the Defendants in section II of their Memorandum of Points and Authorities (Def. Memo at 1 - 5).  Reviewing the "statement of facts" I am unable to determine who is making the statements, and there is no sworn affidavit(s) submitted in support of the "facts" alleged in the "statement of facts."

17.    Defendants' "statement of facts" alleges that I "almost immediately failed to perform to the[ ] standards" set out by Defendant Mindy Good.  Def. Memo at 2 (and Exhibit 1).  This statement is incorrect as I worked on the tasks assigned and competed work as promptly as possible given the timing of the assignments, resources provided, and my family and medical leave status.  It was well known to Defendant Good and other CFSA managers and staff that I was very involved in the care of my elderly Mother during 2005 until her death in mid-April.  As noted previously, I was specifically given family medical leave for the period March through mid-July 2005.   Attached as Exhibit A is a true and correct copy of the authorization I received for family and medical leave.

18.    However, I am unable to fully address the suggestion that I may have failed to compete any particular assignments (or phases of any assignment)

because I do not have all the records and communications relating to my work activities. I would be able to more specifically address the allegations about my work performance if I were able obtain these records and corresponding testimony through discovery.

19.     On March 2, 2005, Ms. Good issued a Notification of Unacceptable Performance and Corrective Action Plan (Def.s' Exhibit 2 at 1 - 7). This memo is unfairly and inaccurately critical of my performance on the FACES.net project and the *CFSA Reporter*. Moreover, this memo ignored my other work and contributions to CFSA. Complicating matters, at the time this memo was issued I was seeking family medical leave to further assist my eighty-nine year old Mother who I moved from Arkansas to live with me in 2004 after my Father died.

20.     Despite my concerns with the accuracy and fairness of Defendant Good's corrective action plan, I responded constructively. See, Def. Memo at 2 - 3 (and Def.s' Exhibit 2). Attached as Exhibit B is a true and correct copy of the comments I submitted on March 17, 2005 in response to Defendant Good's corrective action concerns. Def.s' Exhibit 2).

21.    Defendant Good states that I missed every dead line the FACES.net assignment.  Def. Memo at 2 (and Exhibit 2).  This statement is incorrect and unsupported by the facts for several reasons:

- The FACES.net Project was given to me with only 2 weeks before the final product was due.

- Defendant Good initially assigned the project to Derek Stewart and had met with FACES staff several times before the day she took me to the meeting with her and involved me in the project.

- It was obvious at this meeting that every one in the room knew what they were talking about except me. This was the first time I knew any thing about the deadline and expectations.

- She assured me that I should give it my best shot and that more time would be allotted if needed.

- Defendant Good was out of the office on sick leave during this critical period following this impromptu assignment and I was left to work with FACES staff on my own.

- Documents were emailed to one of two home email addresses she provided me.  She did not get the documents because she gave me the incorrect email address.

22.    Defendant Good claimed she emailed assignments and deadlines to Derek Stewart and me on February 10, 2005 (Def.s' Exhibit 1), but this information never made it to my District government email box.  Instead, I was working in the office that weekend on February 12, 2005 and found a copy in Derek Stewart's office when I went into his office to use his color printer.

23.    In addition, I never received the March 2005 unit calendar that Ms. Good said she emailed and had to request that she send it to me again.   Attached as Exhibit C is a true and correct copy of my March 3, 2005 Email to Mindy Good Re: March Schedule.

24.    I was also out sick a couple of days during these final 2 weeks of the FACES.net project dealing with complications of diabetes – but maintained constant contact with Defendant Good and the FACES client.

25.    I worked directly with the FACES client who wrote me and Defendant Good an email expressing her gratitude and praising me for my work and support.

26.    Defendant Good emailed the client back and told her that she should not
have been satisfied because OPI did not provide adequate customer service. See
Def.s' Exhibit 2 at 24 - 25 ( February 25 and 26, 2005 Email exchanges between
Ms. Sharmaine Allen (FACES client) Ms. Good and me).


27.    On or about March 18, 2005, my Mother had a stroke.  I took family and
medical leave to care for her until her death.  As mentioned earlier, I returned
from leave on or about May 9, 2005.  When I returned to work in May, I met with
Defendant Good and proceeded to resume my duties.  During the period May -
July 2005, I carried out my duties and received no comments from the
Defendants indicating that my work or conduct was deficient in any manner.


28.    Earlier in the year and after I returned from leave, I heard from other CFSA
staff that children who were being brought in for intake and investigations were
sometimes sleeping overnight in the CFSA office building.  I had also been
informed that CFSA did not have adequate facilities and supplies to try and
make children comfortable while awaiting placement.  I knew this was a serious
problem because CFSA had declared in 2003 that it had ended the practice of
children sleeping overnight in the CFSA office building.

29.    I mentioned my concern about this issue to Defendant Good.  She replied that the agency should consider using me to help with recruitment of foster homes.  Defendant Good encouraged me to meet with Defendant Walker to discuss the issue and suggest a plan to resolve the problem.

30.    On July 6, 2005, I met with Defendant Walker and discussed the lack of emergency foster home resources that had resulted in children sleeping in the CFSA office building.

31.    During the meeting, I asked Defendant Walker if I could use my social work and marketing skills to recruit emergency homes in the faith-based community.   In addition, I suggested that I could assume senior level responsibility over two poorly performing recruitment units that the agency depends upon for placement resources.  Defendant Walker rejected my suggestions.

32.    Following the July 2005 meeting with Defendant Walker, children continued to sleep in the CFSA office building.

33.    In early August 2005, I was home on sick leave when I received a letter from Defendant Good proposing that I receive a reprimand for allegedly failing to sustain satisfactory performance. Def.s' Exhibit 3.  I was shocked and surprised to receive this document as Defendant Good had not raised any concerns regarding my performance upon my return from family and medical leave following my Mother's death.

34.    The issues raised by Defendant Good are not supported by the facts.  If I were permitted discovery, I could more fully address these issues through documents and witness testimony.  However, I can respond, at least in part, to several issues raised in the notice.

▸    Work with Tori Russell regarding the Quality Service Review.  This project was not given to me until July 5 or 6, 2005.  On Thursday, July 7, I still did not have the information I needed from Defendant Good.  In addition, I was unable to reach the two supervisors who had to be interviewed.  My recollection is that they may have worked off-site and were very difficult to reach.  These factors made it impossible for me to prepare draft materials by Monday, July 11.

▸   Complicating matters further, problems associated with my diabetes
    required me to take leave July 11 - 22, July 26, and July 29 - August 8, 2005.
    All of the leave was authorized by my doctors and approved by CFSA
    management.

▸   Children's Law Center FOIA request.  This project was being handled by
    Defendant Good for two or three months before she gave it to me.  That is
    why CFSA's response was, in Defendant Good's words, "extremely late."
    The timeliness of the FOIA response had nothing to do with my work on
    the project.

▸   Fifteen minute OPI presentation at Employee Orientation.   I missed the
    orientation because I was out sick.  I had not arranged for a substitute
    because the date for the orientation had changed a few times and I was
    unaware of the final date that was selected.

▸   *CFSA Reporter*.  Defendant Good was out sick on August 1, so she was
    unable to meet with her to discuss the *CFSA Reporter* before August 2,
    2005.  Attached as Exhibit D is a true and correct copy of an email I
    received from Defendant Good stating that she would be out sick on
    August 1.  I made the corrections to the draft immediately after I received
    Defendant Good's comments.  Attached as Exhibit E is a true and correct

copy of the version of the *CFSA Reporter* with my corrections.

▸ On August 15, 2005, I briefly responded in writing to the notice of reprimand. Attached as Exhibit F is a true and correct copy of my letter to Dr. Heather Stowe. Dr. Stowe was the CFSA official charged with reviewing the reprimand issue. She was also the Administrator of the Intake and Investigations Administration, which was responsible for addressing the problem of children sleeping overnight at CFSA. Consequently, I was not surprised when Dr. Stowe sustained the reprimand.

▸ The reprimand was contrived by the Defendants and Dr. Stowe in retaliation for my raising the issue of children sleeping overnight at CFSA. It was issued less than a month after my meeting with Defendant Walker.

35. On August 15, 2005, I communicated with Susan Newman, senior advisor, Religious Affairs, Executive Office of the Mayor. I advised Ms. Newman that (a) CFSA had children sleeping in the building for lack of foster home resources; (b) I wanted the opportunity to do something about it, and ( c ) I recommended to Defendant Walker and/or Deputy Mayor Neil Albert emergency placement of

children at the Holiday Inn a few blocks from the CFSA office building.  I also

discussed the recruitment of emergency foster homes in the faith-based

community with Ms. Newman.


36.     On August 18, 2005, I received an official admonition from Defendant

Mindy Good (Def.s' Exhibit 5).  Defendant Good admonished me for speaking to

Susan Newman about children sleeping in the CFSA office building and my

desire to implement some emergency plan to address the problem.  In support of

her admonishment, Defendant Good also referenced that I had contacted a public

information officer at the D.C. Department of Human Services (DHS) in March

2005 about developing a campaign to increase awareness around child abuse and

neglect, reviving the Back to Sleep Campaign and other projects.


36.     In response, on August 18, 2005, the I submitted a ten-page, written

rebuttal to Defendant Good's  admonition.  My rebuttal stated, in part, "[w]e are

breaking the law when children sleep in the agency."  I also stated that "[w]e

remove children from neglectful and abusive situations, only to bring them into

another neglectful, abusive and degrading situation (in our custody)."   Attached

as Exhibit G is a true and correct copy of my rebuttal to management's

admonition.

37.    Despite my detailed responses to Defendant Good's admonition, to the best of my knowledge, the admonition was not retracted.    In fact, reference to the admonition was made in support of the decision to summarily remove me from my position.

38.    Unfortunately, complications associated with my diabetes was still causing troublesome symptoms such as blurry or dim vision and tingling in my hands, legs, and feet.    On August 18, 2005, I received a disability certificate from my doctor indicating that I needed to take leave from August 18 through September 16, 2005.    Following an appointment with my doctor on September 14, my disability was extended through October 3, 2005.  Then on September 27th, my doctor again extended medical authorization for leave through October 24, 2005. Attached as Exhibit H is a true and correct copy of my authorized family medical leave and subsequent extensions by my doctor.

39.    In September 2005, having failed to get any positive response from CFSA management, I contacted then-Deputy Mayor Neil Albert.  Deputy Mayor Albert

was responsible for the performance of CFSA and other social service agencies.

40.    In my communications with Deputy Mayor Albert, I stated my desire to transfer from CFSA to DHS and develop a faith-based recruitment and community awareness project.

41.    I also communicated to Deputy Mayor Albert that children were sleeping in the CFSA office building.  I shared pictures of children sleeping in the building with the Deputy Mayor.  I also advised the Deputy Mayor Albert that a placement worker had advised me that intake social workers were not calling potential foster families after 12 midnight or 1 a.m. to secure placements for children because it was too late.

42.    In mid-September 2005, while on medical leave, I received a telephone message from a social worker colleague who reported that she had six children in the office one night and only one blanket.  The social worker asked if I could provide some comforters.

43.    CFSA management's failure to address the problem of children sleeping in the CFSA office building prompted me to take action to bring further attention to the issue. I contacted the media to alert them to the problem. The media reported that children were sleeping in the CFSA office building.

44.    On September 19 and 20, 2005, WUSA-TV did three news stories on the issue. Each story included interviews of the Plaintiff. Two of the stories played the voice mail of my colleague asking for comforters for children at CFSA. WJLA-TV also carried the story.

45.    In response to the WUSA-TV reports, Defendant Mindy Good stated that children sleeping in the CFSA office building was "totally unacceptable." CFSA's Principal Deputy Director Uma Ahlualia was also filmed providing a response to the news stories.

46.    On October 3, 2005, while I was still on medical leave, Defendant Walker issued a "Notice of Summary Removal." The Notice stated, in part, that "effective October 3, 2005 . . . [the Plaintiff was] summarily removed from . . . [her] position of Public Relations Specialist in the Child and Family Services

Agency, Office of Public Information (CFSA OPI)."

47.    Defendant Walker's Notice cited, in part, (a) my use of the CFSA e-mail system to "approach another government agency about an unauthorized campaign to raise awareness about child abuse and neglect . . ." in March 2005; and (b) that on or about September 19, 2005 I allegedly "misrepresented agency practice to the media; violated CFSA confidentiality laws in showing the image of a child in CFSA's custody." However, no identifying characteristics of the child in the photograph were shown.

48.    I was given no advance notice of my removal and no opportunity to contest the allegations raised against me pre-removal. At the time of my removal, my pay grade was DS-14, step 6, which earned me an annual salary of $92,848.00.

49.    On October 10, 2005, I filed a written response to my summary removal contesting the claims raised by the Defendants. Attached as Exhibit I is a true and accurate copy of the written response I filed with CFSA. In my response, I again detailed the problems within the Office of Public Information and how

CFSA had been violating the rights of children by failing to provide timely and appropriate placements.  I noted that at least ten children slept in the CFSA office building during the week of September 5, 2005.  In addition, I refuted the specific allegations made against me regarding my work performance.

50.    On October 21, 2005, my attorney hand delivered a letter to Defendant Walker.  Attached as Exhibit J is a true and accurate copy of the letter my attorney delivered to CFSA.  The letter objected to the claims made against me in the removal letter.  In addition, through this letter, I notified the Defendants that I had elected to file a civil action under the D.C. Whistleblower Protection Act in order to contest the removal and other prohibited personnel actions being taken against me.  See, D.C. Code §§ 1-615.53, 1-615.54 and 1-615.56.

51.    On November 17, 2005, CFSA admitted in the *CFSA Reporter*, an internal agency newsletter, that the *LaShawn A.* Court Monitor had reported that "CFSA has experienced a crisis in placement services."  The Monitor's November 3, 2005 assessment of progress through June 30, 2005 makes note of the placement crisis (Monitor's report at 4) and the fact that children had been sleeping overnight in the CFSA building (Monitor's report at 88).  In addition, based upon employee

exit surveys, the Monitor reported that a suggestion for improvement offered by some departing CFSA employees was "[c]reate an environment that fosters open communication without retaliation" (Monitor's report at 58).  Attached as Exhibit K is a true and accurate copy of the *LaShawn A.* Court Monitor's report dated November 3, 2005 (highlighting on the referenced pages was added).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Shirley L. Tabb, LICSW

Executed on: September 7, 2006

# Exhibit H

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**Child and Family Services Agency**

 

IN REPLY REFER TO:

August 18, 2005

To: Shirley Tabb

From: Mindy Good

SUBJECT:    Admonition



EXHIBIT
1

In accordance with § 1602 of the District Personnel Manual (DPM), this constitutes an
admonition advising you about specific deficiencies regarding your conduct as a public
affairs specialist in the Child and Family Services Agency Office of Public Information
and to warn you that future violations will result in corrective or adverse action.

On August 15, you conveyed to Susan Newman, senior advisor, Religious Affairs,
Executive Office of the Mayor that (1) CFSA has children sleeping in our building for
lack of foster home resources, (2) that you want the opportunity to do something about it,
and (3) that you have recommended to the Director emergency placement of children at
the Holiday Inn. In so doing, you:

- Carried agency business outside your chain of command without approval.
- Created an impression of official knowledge when in fact details of issues,
  strategies, activities, and progress in CFSA's Child Placement Administration and
  Foster and Adoptive Parent Recruitment Units are outside your purview as a
  public affairs specialist.
- Used the District Government-owned e-mail system to promote your personal
  interests and qualifications.

This is the second time this year that you have displayed this conduct. In March 2005,
you used the CFSA e-mail system to approach the Public Information Officer at the D.C.
Department of Human Services about "developing a campaign to increase awareness
around child abuse and neglect, reviving the Back to Sleep Campaign and other projects .
. . ." In that instance, you did not initiate an advance discussion or obtain approval to
contact DHS with what they perceived as an official CFSA gesture toward partnership.
When questioned about this activity, you said in an e-mail to Director Walker: "This was
not intended to be an OPI project"—although you used on-duty time and government

239

equipment to pursue the activity. Also without advance discussion or permission, you announced during an Executive Staff meeting your intent to work with CFSA Procurement & Contracts on an internal communication campaign.

On August 16, during a meeting at CFSA Human Resources, we discussed your current assignments as a public affairs specialist in the CFSA OPI and the need for greatly improved productivity and quality. This morning, at my request, you gave me information pertaining to the Children's Law Center Freedom of Information Act request. I now reiterate that you must devote your time and attention to the next priorities among your assignments:

1. Develop and execute a QSR communication plan and internal information campaign which I assigned to you July 1.
2. Complete the FTM facilitators/coordinators fact sheet, which you started months ago.
3. Prepare the *CFSA Reporter* due to me August 29, bearing in mind that your goal is to do so with little need for editing on my part.
4. Customer service.

You should not be seeking new projects at this time but rather completing OPI assignments already on your plate, some of which are well behind schedule.

If you wish to clarify, expand upon, or take exception to any of the statements contained in this admonition, you may respond in writing within two (2) workdays of receipt. Any written response received during that time will be filed with this admonition for as long as it is retained by the agency or for up to three (3) years, during which time the admonition and written response, if there is one, may be considered in determining a penalty for any proposed corrective or adverse action.

## ACKNOWLEDGEMENT OF RECEIPT

Signature of Employee                                    Date

Signature of Witness (*If the employee fails to acknowledge receipt*)    8/18/05    Date

240

# Exhibit I

0177

1       A   I mean, I know Brenda knew.   Brenda Donald
2 knew.   Mindy Good knew.   I mean, it's hard to say who
3 all knew because people who were coming in, a social
4 worker coming in early in the morning or working late
5 at night who had to go down to intake, they would see
6 the kids down there.
7       Q   Was this an issue that CFSA was readily
8 aware of in 2005?
9       MR. CONDIT:   Objection to the question, the
10 form, in that it's vague as to who CFSA is, but you
11 can answer, if you understand.
12       THE WITNESS:   Who do you mean by CFSA?
13 BY MR. WILLIAMS:
14       Q   Isn't it -- are you aware if it was being
15 discussed, the problem of having children sleeping in
16 the building, amongst managers of CFSA during 2005?
17       A   No, I'm not aware.   Because I didn't attend
18 those meetings.   I only went to our staff meetings and
19 the director's executive staff meetings, at which time
20 they were not discussed.
21       Q   Are you aware of any public hearings where
22 the issue of children sleeping in the building at CFSA

0178

```
 1   was discussed?
 2            A    The only public hearing I am aware of with
 3   that practice being discussed was with the oversight
 4   hearing before then chairman Adrian Fenty for the --
 5   in front of the Human Services committee.
 6            Q    And when was that?
 7            A    That was in November of 2005 when it was
 8   Mr. Fenty's statement that he didn't know children
 9   were sleeping in the building.
10            Q    Okay.  But before, I guess, the press
11   stories, the news stories happened, are you aware of
12   any discussions at public hearings regarding the issue
13   of children sleeping in the building at CFSA?
14            A    I'm not aware of any public hearings, no.
15            Q    Are you aware if this problem ever reached
16   the court monitor?
17            A    Yes.
18            Q    And when was that?
19            MR. CONDIT:  Object to the form, but you can
20   answer, if you understand.
21            THE WITNESS:  The court monitor back -- must
22   have been somewhere around 2003 or 2004 -- the court
```

0179

```
 1    monitor related to me that children were sleeping in
 2    the building back then on a regular basis, so much so
 3    that she would get up out of her bed in the middle of
 4    the night and come over to CFSA unannounced.  So since
 5    intake didn't know when she might pop up, she -- and
 6    she came up with some kind of reporting mechanism, but
 7    she thought it had stopped when she stopped --
 8    apparently when she stopped making the surprise
 9    visits, they started leaving kids in the building
10    again.
11    BY MR. WILLIAMS:
12         Q    That's what she told you.
13         A    Yes, that's what she told me.
14         Q    Okay.  So the court monitor knew; is that
15    correct?
16         A    The court monitor didn't know they were
17    sleeping in the building in 2005.
18         Q    But she knew they were sleeping in the
19    building before 2005.
20         A    Yes, she did.
21         Q    Did the -- do you know if anybody knew --
22    not anybody -- strike that.
```

0181

```
 1   more narrow than that.  But it was your belief that
 2   taking it to the media would help resolve the issue.
 3        A    Yes.
 4        Q    Is that correct?
 5        A    Yes.
 6        (Exhibit No. 4 marked for identification and
 7   attached hereto.)
 8   BY MR. WILLIAMS:
 9        Q    Can you take a second to review that
10   document, please?
11        A    I see it.
12        Q    Showing you what appears to be an article,
13   a news article, from "The Washington Post" dated March
14   3rd of 2000, Final Edition, and the excerpt is from A
15   section, page 8 -- I'm sorry -- A01 -- and the title
16   is, "After Brianna, Pandemonium in the DC Foster
17   Care."
18        Can you read paragraph No. 4?
19             MR. CONDIT:  On the first page?
20             MR. WILLIAMS:  On the first page.
21             THE WITNESS:  No. 4?
22   BY MR. WILLIAMS:
```

0182

```
 1        Q    Four, five and six, please.
 2        A    At least 23 children ranging in age from
 3   five months to 14 years spent Wednesday night in the
 4   building, child welfare sources said, and some of the
 5   children slept in a first floor area known as the
 6   respite room.  The carpeted room, which has an
 7   oversized playhouse and toys scattered around the
 8   floor, is not meant to serve as an overnight shelter.
 9   The chief of the city's child welfare agency said last
10   night that she is doing the best she can under
11   difficult circumstances.  She said many of the
12   children brought to the agency Wednesday night were
13   removed because their mothers had been arrested during
14   a drug raid.  We are very tight in the numbers of
15   homes that are available, Ernestine Jones, the
16   court-appointed receiver said, running the Child and
17   Family Services Agency, which is responsible for 3,000
18   children in foster care and an additional 3,200 under
19   government supervision.  She attributed the lack of
20   homes and the high number of foster children to the
21   effect that the Brianna Blackman case -- well, Brianna
22   case -- has had on social workers.
```

# Exhibit J

0145

```
 1          Q    So would it be fair to say this is a
 2   colloquy e-mail?
 3          A    Yes.
 4          Q    Colloquy of e-mails between you and
 5   Mr. Albert?
 6          A    Yes.
 7          Q    In the e-mail dated September 3rd, 2005, is
 8   that the first time you contacted Mr. Neil Albert
 9   about this matter?
10          MR. CONDIT:  Objection in that it's vague,
11   but you can answer, if you understand.
12          THE WITNESS:  No.                    .
13   BY MR. WILLIAMS:
14          Q    When did you first talk to Mr. Albert?
15          A    It would have been sometime in August
16   because we had had a meeting before this.
17          Q    You had a meeting where you physically went
18   to see him or he -- he went to see you?
19          A    Yes.
20          Q    And that happened sometime in August?
21          A    Yes.
22          Q    Do you remember if it was early August or
```

0146

```
 1    late August?
 2         A    I don't remember.
 3         Q    Okay.  You just testified that in September
 4    of 2005 that you had high levels of -- your diabetic
 5    level was high.
 6         A    Yes.
 7         Q    And that you had blurry vision problems.
 8    Do you remember that?
 9         A    Yes.
10         Q    And that you had a blurry mind?
11         A    Yes.
12         Q    And that you were clumsy, that you had --
13    you had a lot of clumsiness.  Do you remember
14    testifying to that?
15         A    Yes.
16         Q    And that you were trying to reduce your
17    stress levels.  Do you remember testifying to that?
18         A    Yes.
19         Q    Okay.  If you turn to the second page --
20    actually, I'm sorry, can you turn back to the second
21    page? At the very bottom there is an e-mail from you
22    that, I believe, is on Friday, September 2nd.  Do you
```

0147

```
 1   see that?
 2        A    Yes.
 3        Q    What time is noted there for the -- that
 4   this e-mail was sent?
 5        A    3:00 a.m.
 6        Q    3:00 a.m.?
 7        A    3:00 a.m.
 8        Q    And so you were writing this e-mail at 3:00
 9   a.m.; is that correct?
10        A    I couldn't certify or attest to that
11   because that was an older computer.  I didn't
12   understand the date and times, so that -- the time
13   could have been off.
14        Q    Could you turn to the second page, please,
15   the third paragraph from the bottom, where you say, I
16   have not been this excited about my work in three
17   years.  It's 3:00 in the morning and I'm excited and
18   I'm still up at my computer.  Do you see that?
19        A    Yes.
20        Q    Okay.  So were you writing this at 3:00
21   a.m.?
22        A    Well, I must have.  I have it in here.
```

# Exhibit K

0196

```
 1    BY MR. WILLIAMS:
 2         Q    Let me ask you one more question about 12.
 3    Have you had an opportunity to review this document?
 4         A    Yes.
 5         Q    Is this a true, accurate and fair copy of
 6    what you said in response to your Notice of Summary
 7    Removal?
 8         A    Yes.
 9         Q    Okay.  Now we're done with it.  So now
10    we're on to No. 13.  Just take a second to review
11    that.
12         A    Okay.
13         Q    Do you recognize that document?
14         A    Yes, I do.
15         Q    What is that document?
16         A    This is the Notice of Final Decision on the
17    summary removal.
18         Q    Do you remember receiving this document?
19         A    Yes.
20         Q    If you look at document No. 13, Exhibit No.
21    13, in the first paragraph, the last sentence, can you
22    read that sentence, please?
```

0197

```
 1          A    You did not appear for your scheduled
 2   hearing of October 27, 2005.
 3          Q    Okay.  Is that true?
 4          A    Yes, it is.
 5          Q    Okay.  And why did you not go to the
 6   hearing?
 7          A    I did not go to the hearing and called
 8   Mr. Joe Addis, who was the hearing official, and made
 9   him aware that I was not going.  I also sent a letter.
10   I did not go for two reasons:
11          1.  The Union official, Steven White, had
12   called Brenda Donald Walker and asked if we could come
13   in and meet with her because the Union was concerned
14   and wanted to get involved.  And she told Steven White
15   that she didn't see it doing any good because she
16   didn't see the act being overturned.  And I decided to
17   get an attorney and I pursued -- pursue it through the
18   courts.
19          Q    How do you know she told Mr. White that --
20   I'm sorry.  What did she tell Mr. White again?
21          A    She told Mr. White that she didn't see his
22   meeting with her -- he and I meeting with her -- as
```

0198
```
 1    doing any good.
 2         Q    Okay.  And how do you know that's what --
 3         A    He had called me and told me he was going
 4    to see if he could set that meeting up.  He called me
 5    back and told me that she told him she didn't see it
 6    doing any good, so he didn't go -- we didn't go.
 7         Q    Okay.  And, based on that, you decided not
 8    to go to the hearing?
 9         A    Yes.  But I submitted my letter in writing
10    and by that time I had retained an attorney.
11         Q    Okay.  Did you retain an attorney before or
12    after the hearing, the date of the hearing?
13         A    Before.  I believe it was before.
14         Q    You sent the letter explaining that you
15    weren't going to go to the hearing before or after the
16    hearing date of October 27th?
17         A    I don't remember.  I don't remember that
18    date.
19         Q    We're going to go back to the amended
20    complaint.  Can you take a second and review it so
21    that you feel comfortable with it?
22         A    Okay.
```

0199

```
 1          Q   If you can turn to page No. 8.  We're going
 2    to go through the complaint with the counts that you
 3    allege against the District and, I believe, Brenda
 4    Donald.
 5          A   Okay.
 6          Q   Now, in Count One you allege that the
 7    District of Columbia violated your First Amendment
 8    rights.  My question to you is in what way -- did you
 9    want to read --
10          A   So now on Count One, you mean No. 31, on
11    page 8, No. 31?  Plaintiff re-alleges and states
12    paragraphs 1 through 32 --
13              MR. CONDIT:  Yes, that's Count One.
14              THE WITNESS:  Okay.
15              MR. CONDIT:  That's the section.
16              THE WITNESS:  Okay.
17    BY MR. WILLIAMS:
18          Q   Under that count.
19          A   Okay.
20          Q   How did the District violate your First
21    Amendment right?
22              MR. CONDIT:  Objection to the extent it
```

# Exhibit L

0193

```
 1          Q    You can put that aside.
 2          A    Which one?
 3          Q    No. 9.  I believe we're up to 10 right now.
 4          A    Okay.
 5          Q    Do you recognize Exhibit No. 10?
 6          A    Yes, I do.
 7          Q    What is it?
 8          A    This is my Response to the Proposal of
 9     Official Reprimand sent to Dr. Heather Stowe, who was
10     the deciding official.
11          Q    You drafted this document?
12          A    Yes.
13          Q    Did you send this document to Dr. Stowe?
14          A    Yes.
15          (Exhibit No. 11 marked for identification and
16     attached hereto.)
17     BY MR. WILLIAMS:
18          Q    Are you finished?
19          A    Yes.
20          Q    Okay.  Do you recognize this document?
21          A    Yes, I do.
22          Q    Okay.  What is this document?
```

0194

```
 1          A   Exhibit 10?
 2              MR. CONDIT:  Exhibit 11.
 3  BY MR. WILLIAMS:
 4          Q   Take your time to review Exhibit No. 11.
 5  Let me know when you're ready.
 6          A   Okay.
 7          Q   Do you recognize Exhibit No. 11?
 8          A   Yes.
 9          Q   What is Exhibit No. 11?
10          A   That's the Notice of Summary Removal sent
11  to me by Brenda Donald Walker.
12          Q   Did you receive this?
13          A   Yes, I did.
14          Q   We're done with that for right now.
15              (Exhibit No. 12 marked for identification and
16  attached hereto.)
17  BY MR. WILLIAMS:
18          Q   Let me know when you're ready.
19          A   I'm ready.
20          Q   Do you recognize this document?
21          A   Yes.
22          Q   What is this document?
```

0195

```
 1          A    This is Exhibit 12?
 2          Q    Yes, ma'am.
 3          A    My Response to the Notice of Summary
 4    Removal that went to Mr. Joe Addis, who was -- I guess
 5    he was -- he was the one that -- the deciding
 6    official.  He would have been the deciding official.
 7          Q    When you say "the deciding official," you
 8    mean -- what do you mean?
 9          A    He would have -- he would have been the one
10    to uphold the action.
11          Q    The --
12          A    Summary removal, yes.
13          Q    Would you turn to the last page underneath
14    the highlighting.
15          A    Yes.
16          Q    Is that your signature?
17          A    Yes.
18          Q    Okay.  Did you send this document?
19          A    To Joe Addis, yes.
20          Q    Thank you.
21          (Exhibit No. 13 marked for identification and
22    attached hereto.)
```

# Exhibit M

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**Child and Family Services Agency**





October 3, 2005

Ms. Shirley Tabb
200 K Street N. W. , #618
Washington, D.C. 20001

RE: <u>**Notice of Summary Removal**</u>

Dear Ms. Tabb:

This is written notice that effective October 3, 2005 you are summarily removed from your position of Public Relations Specialist in the Child and Family Services Agency, Office of Public Information (CFSA OPI). This action is taken in accordance with the provisions of Chapter 16, § 1616 of The District Personnel Manual (DPM). The summary removal is based on your conduct over the past year. Such conduct threatens the integrity of government operations.

In March, 2005, you used the CFSA e-mail system to approach another government agency about an unauthorized campaign to raise awareness about child abuse and neglect and to promote implementation of specific projects, without notifying or obtaining prior approval from your supervisor. You again mentioned the unauthorized campaign at an executive staff meeting. As a result, you were reprimanded.

In August, 2005, you were admonished for failure to perform your job duties in a competent and timely manner despite receiving clear direction and timelines from your supervisor.

On or about September 19, 2005, you misrepresented agency practice to the media; violated CFSA confidentiality laws in showing the image of a child in CFSA's custody and disclosing detailed personal information about why the child was in CFSA's custody. As a Public Relations Specialist, you are well aware of CFSA confidentiality laws and the need to protect children in our care from the stigma of involvement with our agency. Again, you failed to obtain permission from your supervisor to disseminate information to the media which constitutes malfeasance and insubordination as you had been admonished for similar conduct earlier this year.



EXHIBIT
4

Page 2
October 3, 2005
Tabb Letter

You have been on Family Medical Leave since August 18, 2005, based on a claim that you are suffering from a serious medical condition which prevents you from working. Yet you were able to coordinate a photo of a child, an audiotape of a co-worker and coordinate interviews with the media during this time. CFSA considers such actions an abuse of Family Medical Leave.

Your violation of supervisory instructions, blatant disregard for agency procedures and confidentiality laws, disruptive behavior and misuse of Family Medical Leave, threatens the integrity of government operations.

You have the right to review any material upon which this proposed action is based and to prepare a written response to the notice, including affidavits and other documentation, within six (6) days of receipt of this written notice. You have the right to be represented by an attorney or other representation.

Your response, should you prepare one, may raise every defense, fact or supporting matter in extenuation, exculpation, or mitigation of which you have knowledge or reasonably should have knowledge, or which is relevant to the reasons in support of the proposed action, specification(s), or the penalty.

Joseph Addis, Acting Contract & Procurement Administrator has been appointed as the hearing officer to conduct the administrative review of the summary removal action taken. Accordingly, any response you prepare must be presented to Mr. Addis at 955 L'Enfant Plaza, Suite 5200, Washington, D.C. 20024. He may also be reached at (202) 724-5300.

In conducting the administrative review, the hearing officer will review this written notice, your response, if there is one, and conduct an adversary hearing when directed by me or my designee. After conducting the administrative review, the hearing officer will make a written report and recommendation to Mr. Ronnie Charles, Deputy Director for Administration, who will issue a notice of final decision.

The material upon which the proposed action is based may be reviewed in DC Child and Family Services Agency, Office of Human Resources located at 955 L'Enfant Plaza, Suite 5200, Washington, DC 20024. You may arrange to review the material by contacting HR Manager Deborah Wilson at (202) 724-7373.

Sincerely,

Brenda Donald Walker
Director


cc:   Uma Ahluwalia
      Ronnie Charles
      Mindy Good
      Joe Addis
      Deborah Courtney
      Human Resources

# Exhibit N

0196

```
 1   BY MR. WILLIAMS:
 2        Q    Let me ask you one more question about 12.
 3   Have you had an opportunity to review this document?
 4        A    Yes.
 5        Q    Is this a true, accurate and fair copy of
 6   what you said in response to your Notice of Summary
 7   Removal?
 8        A    Yes.
 9        Q    Okay.  Now we're done with it.  So now
10   we're on to No. 13.  Just take a second to review
11   that.
12        A    Okay.
13        Q    Do you recognize that document?
14        A    Yes, I do.
15        Q    What is that document?
16        A    This is the Notice of Final Decision on the
17   summary removal.
18        Q    Do you remember receiving this document?
19        A    Yes.
20        Q    If you look at document No. 13, Exhibit No.
21   13, in the first paragraph, the last sentence, can you
22   read that sentence, please?
```

0197

```
 1         A    You did not appear for your scheduled
 2    hearing of October 27, 2005.
 3         Q    Okay.  Is that true?
 4         A    Yes, it is.
 5         Q    Okay.  And why did you not go to the
 6    hearing?
 7         A    I did not go to the hearing and called
 8    Mr. Joe Addis, who was the hearing official, and made
 9    him aware that I was not going.  I also sent a letter.
10    I did not go for two reasons:
11         1.  The Union official, Steven White, had
12    called Brenda Donald Walker and asked if we could come
13    in and meet with her because the Union was concerned
14    and wanted to get involved.  And she told Steven White
15    that she didn't see it doing any good because she
16    didn't see the act being overturned.  And I decided to
17    get an attorney and I pursued -- pursue it through the
18    courts.
19         Q    How do you know she told Mr. White that --
20    I'm sorry.  What did she tell Mr. White again?
21         A    She told Mr. White that she didn't see his
22    meeting with her -- he and I meeting with her -- as
```

0198

```
 1   doing any good.
 2         Q   Okay.  And how do you know that's what --
 3         A   He had called me and told me he was going
 4   to see if he could set that meeting up.  He called me
 5   back and told me that she told him she didn't see it
 6   doing any good, so he didn't go -- we didn't go.
 7         Q   Okay.  And, based on that, you decided not
 8   to go to the hearing?
 9         A   Yes.  But I submitted my letter in writing
10   and by that time I had retained an attorney.
11         Q   Okay.  Did you retain an attorney before or
12   after the hearing, the date of the hearing?
13         A   Before.  I believe it was before.
14         Q   You sent the letter explaining that you
15   weren't going to go to the hearing before or after the
16   hearing date of October 27th?
17         A   I don't remember.  I don't remember that
18   date.
19         Q   We're going to go back to the amended
20   complaint.  Can you take a second and review it so
21   that you feel comfortable with it?
22         A   Okay.
```

0199

```
 1          Q    If you can turn to page No. 8.  We're going
 2   to go through the complaint with the counts that you
 3   allege against the District and, I believe, Brenda
 4   Donald.
 5          A    Okay.
 6          Q    Now, in Count One you allege that the
 7   District of Columbia violated your First Amendment
 8   rights.  My question to you is in what way -- did you
 9   want to read --
10          A    So now on Count One, you mean No. 31, on
11   page 8, No. 31?  Plaintiff re-alleges and states
12   paragraphs 1 through 32 --
13               MR. CONDIT:  Yes, that's Count One.
14               THE WITNESS:  Okay.
15               MR. CONDIT:  That's the section.
16               THE WITNESS:  Okay.
17   BY MR. WILLIAMS:
18          Q    Under that count.
19          A    Okay.
20          Q    How did the District violate your First
21   Amendment right?
22               MR. CONDIT:  Objection to the extent it
```

# Exhibit O

# Exhibit P

CHILD AND FAMILY SERVICES AGENCY
APPLICATION FOR FAMILY/MEDICAL LEAVE

**:e bœLETED BY THE EMPLOYEE**

**NTIFICATION INFORMATION**

ιe: _____ *Tabb* _____ , _____ *Shirley* _____ *Linda* _____
     (Last)            (First)           (Middle)

al Security Number: ____ *432 98 9192* ____

ɪe/Series/Grade: *Public Information Specialist 14-05-301*

ninistration & Program: *Ofc of the Director – OPI*

;anization Code: _____

**TEGORY OF LEAVE REQUESTED**

ιreby make application for leave under the authority of the District of Columbia Family and Medical Leave Act of 1990
C. Law 8-181, D.C. Code § 36-1301, 1991 Supp.) and  Chapter 16 of Title 4, District of Columbia Municipal
ɡulations.
ιeck one): ☐ Family Leave  ☒ Medical Leave

**ι BE COMPLETED IF APPLYING FOR FAMILY LEAVE**

    I hereby request _____ hours of family leave for one of the following purposes:

☐ The birth of my child
☐ The placement of child within my home for adoption or foster care
☐ The placement of a child within my home for whom I will discharge and assume parental responsibility
☐ To provide care for a family member who has a serious health condition

*N/A*

    I am requesting the following type(s) of leave for family leave.  (I understand that I may elect to use my accrued
annual leave, personal leave, and/or compensatory time for family leave and, in so using this leave, any annual leave,
and/or compensatory time will count against my total 16-workweek entitlement to family leave.)

(check appropriate box(s)
☐ Annual leave: * Number of hours _____
☐ Personal; Leave:* Number of hours _____
☐ Compensatory time off:* Number of hours _____
☐ Leave without pay: Number of hours _____

*N/A*

               Total hours _____

    * (If you are requesting this type of leave, you must file and attach Form SF71.  * Application for Leave with this
request)

s application is to provide care for a family member, a certification of the "serious health condition", issued by your family
ber's health care provider, must be attached to this application.

*N/A*

    The period of family leave requested in 3A above is to be taken:
☐ In a continuous block of time from _____ to _____ to
☐ O. .educed leave schedule as mutually agreed to by my administration  from _____
_____.  I understand that the 16 weeks of family leave on a reduced leave schedule must be taken
within a period that does not exceed 24 <u>consecutive workweeks</u>.

PENDIX B               Continued on back          Form CFSA: 99-25

# Exhibit R

0010
```
 1    it, I'm going to assume that you understood the
 2    question and that your answer is based on your
 3    response to that question.  Is that okay?
 4         A    That's fine.
 5         Q    Those are the general rules of the road.
 6    My next question for you is, what, if anything, did
 7    you do to prepare for this deposition today?
 8         A    Well, I did a couple of things.
 9         Q    Okay.
10         A    I reviewed some of my documents that I have
11    in my files for the case.
12         Q    Now, I don't mean to interrupt you, but it
13    might work better if I ask you about the documents as
14    you go along.  I'm going to give you an opportunity to
15    answer the question in full, but it might be more
16    beneficial if you tell me what documents you reviewed.
17         A    Certainly.  I reviewed the August 18, 2005
18    admonition from my former supervisor, Mindy Good.
19         Q    Okay.
20         A    I reviewed my response to her admonition.
21         Q    Okay.
22         A    I reviewed my testimony before then Chair
```

# Exhibit S

0240

1    perception of your ethical obligations on that issue.
2    Do you recall that --
3        A    Yes.
4        Q    -- generally, that line of questions?
5        A    Yes, I do.
6        Q    Are you familiar with the term or phrase
7    "mandatory reporter"?
8        A    Yes, I am.
9        Q    What is that?
10        A    Mandatory reporter is a law under the Child
11    Abuse and Neglect Act that mandates certain
12    professionals to report any and all allegations or
13    suspicions of child abuse and neglect.  And this
14    includes social workers, doctors, nurses, policemen,
15    teachers, those kind of people who come in contact
16    with children on a regular basis.
17        Q    And at the time you worked for CFSA, did
18    you believe yourself to be a mandatory reporter?
19        A    Yes, I did.  Yes, I did.
20        Q    And do you presently believe yourself to be
21    a mandatory reporter?
22        A    Yes, I do.  As long as I maintain a license

0241

1    as a social worker, certainly practicing as a social
2    worker, I am a mandatory reporter.
3         Q   Have you received training in the past on
4    mandatory reporting?
5         A   As a matter of fact, when I was at CFSA, we
6    prepared communication documents to send out to people
7    to give to other social workers and professionals in
8    the community about mandatory reporting.
9         Q   Another area of questioning by Mr. Williams
10   had to do with evaluations that you had in 2004 or
11   2005.  And by that I'm talking about your annual
12   evaluation.
13        A   Yes.
14        Q   Do you recall that line of questioning?
15        A   Yes, I do.
16        Q   Part of your testimony, you indicated that
17   you had some disagreement with your evaluation in
18   2005.  Do you recall that testimony?
19        A   Yes, I do.
20        Q   And I believe you said, but correct the
21   record if I'm incorrect here, that you put together an
22   approximately 300-page rebuttal.