VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

SHIRLEY TABB,                    :

      Plaintiff,            :      Civil Action No.:

v.                               :      1:06CV00789(PLF)

DISTRICT OF COLUMBIA,            :

et al.,                          :

      Defendants.           :

          -----------


Videotaped Deposition of

BRENDA DONALD

Washington, D.C.

Thursday, December 27, 2007

10:42 a.m.




Job No:  2-118552

Pages:  1 - 244

Reported by:  Kelly Carnegie, CSR, RPR

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

---

Page 2

1      Videotaped Deposition of BRENDA DONALD,
2  taken at the offices of:
3
4
5
6      L.A.D. Reporting Company
7      Suite 850
8      1100 Connecticut Avenue, Northwest
9      Washington, D.C.  20036
10
11
12
13
14
15
16      Pursuant to Notice, before Kelly
17  Carnegie, Certified Shorthand Reporter, Registered
18  Professional Reporter, and Notary Public in and for
19  the District of Columbia.
20
21
22

---

Page 3

1      A P P E A R A N C E S
2
3  ON BEHALF OF THE PLAINTIFF:
4      RICHARD CONDIT, ESQUIRE
5      Law Offices of Richard Condit
6      Suite 1100
7      1612 K Street, Northwest
8      Washington, D.C.  20006
9      (202) 408-0034
10
11
12  ON BEHALF OF THE DEFENDANTS:
13      ZUBERI WILLIAMS, ESQUIRE
14      Assistant Attorney General
15      District of Columbia
16      Sixth Floor, South
17      441 Fourth Street, Northwest
18      Washington, D.C.  20001
19      (202) 727-6295
20
21  ALSO PRESENT:  Shirley Tabb
22          Scott Forman, Videographer

---

Page 4

1      C O N T E N T S
2  EXAMINATION OF BRENDA DONALD        PAGE
3      By Mr. Condit              7
4      By Mr. Williams        220
5  FURTHER EXAMINATION OF BRENDA DONALD
6      By Mr. Condit        228
7      E X H I B I T S
8      (Exhibits attached to the transcript.)
9  DONALD DEPOSITION EXHIBITS        PAGE

10  1 Amended Notice of Deposition and Request
11      to Produce Records to Brenda Donald        6
12  2 Deposition of Brenda Donald
13      September 12, 2007        6
14  3 Defendant Brenda Donald Responses to
15      Plaintiff's First Set of Interrogatories    6
16  4 Best Practices Implementation Plan
17      Outcome Status Report - May 26, 2005     65
18  5 August 17, 2005 E-mail Chain        110
19  6 August 24, 2005 E-mail Chain        120
20  7 September 20, 2005 WUSA-9 Article     131
21  8 September 20, 2005 E-mail        137
22  9 September 20, 2005 Memorandum        141

---

Page 5

1      E X H I B I T S  ( C O N T I N U E D )

2  10 October 3, 2005 Notice of Summary Removal  158
3  11 September 21, 2005 WUSA-9 Article        186
4  12 LaShawn A. v. Williams - An Assessment
5      of The District of Columbia's Progress
6      as of June 30, 2005        204
7  13 Progress Report on LaShawn A. v.
8      Williams - February 13, 2006        207
9  14 October 18, 2005 Letter        210
10  15 October 7, 2005 E-mail        239
11
12
13
14
15
16
17
18
19
20
21
22

---

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 6

1          P R O C E E D I N G S
2          (Donald Deposition Exhibit Nos. 1 -
3     3 were marked for identification and were
4     attached to the deposition transcript.)
5          THE VIDEOGRAPHER:  Here begins tape
6     number one in the deposition of Brenda Donald in
7     the matter of Shirley Tabb versus District of
8     Columbia, et al., pending in the U.S. District
9     Court for the District of Columbia, Case No.
10    1:06CV00789(PLF).
11    Today's date is December 27, 2007.
12    The time is 10:42 a.m.  The video operator is
13    Scott Forman of LAD Reporting.  This deposition
14    is taking place at LAD Reporting Company, 1100
15    Connecticut Avenue, N.W., Washington, D.C.
16         Would counsel identify themselves
17    and state whom they represent.
18         MR. CONDIT:  Good morning.  Richard
19    Condit for the plaintiff, Shirley Tabb.
20         MR. WILLIAMS:  Zuberi Williams for
21    the defendants.
22         THE VIDEOGRAPHER:  Thank you.

Page 7

1      The court reporter is Kelly Carnegie
2     of LAD Reporting.  Would the reporter please
3     swear in the witness.
4              BRENDA DONALD
5      having been duly sworn, testified as follows:
6          THE VIDEOGRAPHER:  Please begin,
7     sir.
8      EXAMINATION BY COUNSEL FOR THE PLAINTIFF
9     BY MR. CONDIT:
10     Q  Good morning.
11     A  Good morning.
12     Q  Would you please state your name for the
13    record.
14     A  Brenda Donald.
15     Q  Good morning, Ms. Donald.  This is a
16    deposition in a case involving Shirley Tabb, and I'll
17    be asking you some questions today.  Do you understand
18    that based on taking the oath that you're required to
19    tell the whole truth in response to my questions or
20    the questions of your counsel?
21     A  Yes.
22     Q  All right.  And a few ground rules.

Page 8

1     Although this transcript is being prepared and an
2     audio and video version is being prepared as well, if
3     you could please make sure that your responses are
4     audible so that it's clear on the record what your
5     answer is to a question.  Would that be acceptable?
6       A  Yes.
7       Q  In addition, please allow either attorney to
8     complete his questions before you answer.  Would that
9     be acceptable?
10      A  Yes.
11      Q  All right.  And should you not understand a
12    question, please let me know and I'll be happy to
13    rephrase.  In addition, if you need a break of any
14    kind, please let us know that and we'll be happy to
15    accommodate you.  Is that okay?
16      A  That's okay.
17      Q  Okay.  Let me begin by asking have you done
18    any particular preparation associated with your
19    providing deposition today?
20      A  I did reread the complaint.
21      Q  Okay.  Anything else?
22      A  I talked to my attorney.

Page 9

1       Q  Okay.  Did you -- other than the complaint,
2     did you review any other documents associated with
3     this case?
4       A  No, I did not.
5       Q  I'm sorry?
6       A  No, I did not.
7       Q  So, for example, you haven't reviewed --
8       A  I apologize.  I did read the transcript from
9     a previous deposition that you led with me on another
10    case and reviewed the documents primarily about my
11    background, my educational and professional
12    background.
13      Q  Okay.  And would that have been the
14    deposition testimony that you gave in the case
15    involving Linda Ripley?
16      A  That is correct.
17      Q  So what you reviewed was the excerpts about
18    your background?
19      A  Yes.
20      Q  Okay.  Aside from those documents, did you
21    review any other documents from your tenure at CFSA or
22    as deputy mayor in the District involving anything to

3 (Pages 6 to 9)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 10

1  do with Shirley Tabb?
2      A  No, I did not.
3      Q  Let me show you what has been marked
4  Deposition Exhibit 1.  It is an Amended Notice of
5  Deposition with an attached document request.  I'll
6  present a copy to you.  If you would take a look at
7  that, please.
8          MR. CONDIT:  I have a copy for
9  counsel as well.
10         MR. WILLIAMS:  Thank you.
11  BY MR. CONDIT:
12     Q  Ms. Donald, have you seen this document
13  before?
14     A  No, I have not.
15     Q  Did you check to determine any -- whether
16  you had any documents that may have been responsive to
17  the request associated with this deposition notice?
18     A  Did I check?
19     Q  Did you check?
20     A  I'm not sure I understand.
21         MR. WILLIAMS:  He's referring to the
22  appendix.  There's -- in the appendix there's

Page 11

1  certain requests.  He just wants to know whether
2  or not -- I believe -- whether or not you've
3  checked for any of those documents.
4          MR. CONDIT:  Correct.
5          MR. WILLIAMS:  If you have anything.
6      A  Let me be clear.  I did not see this
7  document, Amended Notice of Deposition.  I do recall
8  the appendix requesting documents some time ago.  At
9  that time, I did check, but I have not done so
10  recently.
11  BY MR. CONDIT:
12     Q  Okay.  So did you determine, for example,
13  referring to the appendix in Exhibit 1, whether or not
14  you had any of the categories of documents referred to
15  as items one, two, and three?
16     A  Yes, I did check, and I did not have any of
17  those documents.
18     Q  Now, in terms of calendars and planners and
19  journals and notebooks, things of that nature, those
20  are things that you did not keep from your employment
21  with the District?
22     A  That is correct.

Page 12

1      Q  Would those be items, if they existed, that
2  would be in the custody of the District?
3      A  That is correct.
4      Q  Let me show you what's been marked
5  Deposition Exhibit 2.  This is the, I believe, the
6  excerpt of your deposition testimony in the Linda
7  Ripley matter which reflects your background and
8  education and such that I think you testified a moment
9  ago you had reviewed.  Please take a look at it and
10  tell me if this is the document you reviewed.
11         MR. CONDIT:  Counsel, I'll provide
12  you a copy.
13     A  I did not review this document in its
14  entirety.  I believe there were -- there was an
15  excerpt from this about my background that I reviewed.
16  BY MR. CONDIT:
17     Q  Right.  Now, what might be confusing you --
18  and I apologize for this -- is the formatting.  It's
19  obviously formatted in --
20     A  Right.  It's in addition to the formatting.
21  I don't remember reading this part all about the
22  Outlook calendar and my former assistant in the

Page 13

1  document that was e-mailed to me.  But the --
2      Q  Well, take a moment, please, to look through
3  it and let me know if there are any -- if there's any
4  of your prior testimony that you would be concerned
5  about.  What I'd like to do is have this exhibit
6  satisfy our need to get into your background and --
7      A  Okay.
8      Q  -- management and such.
9          MR. WILLIAMS:  Counsel, which of the
10  one you e-mailed to me -- do you remember what
11  the last page was?  Was it the entire version?
12         MR. CONDIT:  Uh-huh.
13         MR. WILLIAMS:  Or was it an excerpt
14  of it?
15         MR. CONDIT:  No, it wasn't the
16  entire version of the deposition, it was this
17  excerpt.  I double checked my e-mail this is
18  morning, and I believe this is the excerpt that I
19  provided to you.  I don't know if it came out in
20  this format or not.  It was probably an Adobe PDF
21  document.
22         MR. WILLIAMS:  Think about it and

4 (Pages 10 to 13)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 14

1  make sure.
2        Thank you, counsel.
3        THE WITNESS: I'm fine with the
4  document. It accurately reflects my testimony
5  and my background.
6        MR. CONDIT: Okay. Thank you.
7  BY MR. CONDIT:
8        Q  Let me show you then the next exhibit, which
9  has been marked Exhibit 3. These are Defendant Brenda
10 Donald Responses to Plaintiff's First Set of
11 Interrogatories, and I'd like you to take a look at
12 this document. First, tell me if you've seen it
13 before.
14       MR. CONDIT: Counsel --
15       A  I have not seen the document before.
16 BY MR. CONDIT:
17       Q  All right. Can you turn to the fifth page
18 of the document, please.
19       A  Yes.
20       Q  Is that your signature on that page?
21       A  Yes, it is.
22       Q  All right.

Page 15

1        THE WITNESS: Excuse me for a
2  minute.
3        MR. WILLIAMS: I need to consult --
4  I need to consult with my client.
5        MR. CONDIT: Do you need to go off
6  the record?
7        MR. WILLIAMS: Yes, please.
8        MR. CONDIT: We'll go off the
9  record.
10       THE VIDEOGRAPHER: We're going off
11 the record. The time is 10:52 a.m.
12       (A brief recess was had.)
13       THE VIDEOGRAPHER: We are back on
14 the record. The time is 10:52 a.m.
15       THE WITNESS: I stand corrected. I
16 did in fact see this document, and yes, that is
17 my signature on page 5.
18 BY MR. CONDIT:
19       Q  All right. Now, with respect to the
20 document, can you tell me what role, if any, you
21 played in drafting the responses that are reflected on
22 pages 2 through 5 of the document starting under the

Page 16

1  caption Interrogatories on page 2 and going to the
2  last answer on page 5?
3        A  It was a telephone interview with one of the
4  AGs, assistant attorneys general.
5        Q  And -- but with respect to my question -- I
6  guess maybe this answers it, but let me see if I can
7  understand -- with respect to the actual answers that
8  are provided here, did you prepare the answers, or did
9  someone else prepare them?
10       A  Someone else.
11       Q  And did you review the document when it was
12 completed?
13       A  Yes. First it was read to me over the
14 phone, which is why I didn't remember it in its
15 entirety when I saw it. Then I just reviewed it again
16 to make sure it was consistent with that, and then
17 signed it.
18       Q  Now, in the -- on the first page of the
19 document -- this is Exhibit 3, for the record --
20 there's a reference under Item A that says, "The
21 information supplied in these answers is not based
22 solely on the knowledge of the executing party but

Page 17

1  includes knowledge of the party, its agents,
2  representatives, attorneys, unless privileged." Do
3  you see that?
4        A  Yes.
5        Q  Do you understand what that means and
6  whether or not that's affected the answers to these
7  interrogatories in any way?
8        MR. WILLIAMS: I'm just going on the
9  record and say it's legal language, so she may
10 not know exactly what it means. I will say that
11 the information was based on the interview with
12 the defendant, and then put into this format.
13 That's typical. That's typically -- that's
14 typically the way that we do things at the Office
15 of Attorney General. So it's really not -- I'm
16 not sure exactly, you know, what you're looking
17 for, but this is her testimony under oath,
18 obviously, of -- in response to answers to
19 interrogatories. So I'm not sure exactly where
20 you're going, but I just wanted to make the
21 record clear.
22       MR. CONDIT: Okay.

5 (Pages 14 to 17)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 18

1      MR. WILLIAMS:  This is just legal
2 language, standard language.
3      MR. CONDIT:  Okay.  Well, let me ask
4 the question differently then given counsel's
5 explanation.
6 BY MR. CONDIT:
7      Q  With respect to the answers to the
8 interrogatories 1 through 8 that are on page 2 through
9 5, other than the objections, which I understand might
10 not be your work, is there any testimony or
11 information in there that's not yours, that's not
12 associated with you specifically?
13      MR. WILLIAMS:  Take your time.
14      A  Everything is correct.
15 BY MR. CONDIT:
16      Q  Okay.  So it's consistent with your
17 recollection of how you provided information --
18      A  Yes.
19      Q  -- in response to these questions?
20          Now, drawing your attention to page 4,
21 and this would be interrogatory number six.  Do you
22 see that item?

Page 19

1      A  Yes.
2      Q  It says, "Identify each person that played
3 any role in deciding that the plaintiff should be
4 summarily removed," et cetera.  Do you see that?
5      A  Yes.
6      Q  And in the answer below it, it says, "Mindy
7 Good," who starts on the third line of the answer,
8 "Mindy Good was plaintiff's immediate supervisor and
9 may be able to attest to plaintiff's work performance
10 and the points referenced in the October 3, 2005
11 letter to plaintiff."  Do you see that?
12      A  Yes.
13      Q  What are you referring to there with respect
14 to Mindy Good attesting to the plaintiff's work
15 performance?
16      A  Mindy Good was the plaintiff's direct
17 supervisor and would have had the most direct,
18 specific, and comprehensive knowledge about work
19 performance.
20      Q  Now, the question asked to identify persons
21 who played a role in deciding plaintiff should be
22 summarily removed.  Did Mindy Good play such a role?

Page 20

1      A  Yes.  She was her supervisor.
2      Q  Okay.  And so Mindy Good had a role in
3 determining whether the plaintiff should be summarily
4 removed?
5      A  Yes.
6      Q  Was there anyone else other than Mindy Good
7 that had such a role?
8      A  As indicated in the response, Ronnie
9 Charles, who is the deputy director for
10 administration, was also involved in that.
11      Q  And what did Mr. Charles do or say
12 concerning the decision of whether or not to summarily
13 remove Ms. Tabb from her position?
14      A  Mr. Charles advised me as of the legal
15 grounds in human resources or personnel requirements
16 are justification for making that decision, so that
17 was his role.
18      Q  So other than Ms. Good and Mr. Charles, was
19 there anyone else who played a role in deciding
20 whether or not the plaintiff should be summarily
21 removed?
22      A  I believe there was someone from the general

Page 21

1 counsel's office, but I do not recall who was in that
2 position at the time.
3      Q  Other than the person that you can't recall
4 at the moment from the general counsel's office, was
5 there anyone else who might have played a role in the
6 decision of whether or not to summarily remove Ms.
7 Tabb from her position?
8      A  Other than myself?
9      Q  Correct.
10      A  No.  Excuse me one minute.  I'll check with
11 counsel.
12      MR. WILLIAMS:  Go off the record
13 because of the microphone.
14      THE VIDEOGRAPHER:  We're going off
15 the record.  The time is 11:00 o'clock.
16      (A brief recess was had.)
17      THE VIDEOGRAPHER:  We're back on the
18 record.  The time is 11:01 a.m.
19      MR. WILLIAMS:  Counsel, I think
20 there's a correction that needs to be made in one
21 of the answers, just for her title in one of the
22 answers.

6 (Pages 18 to 21)

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 22

1        MR. CONDIT: Okay.
2        THE WITNESS: In that same -- the
3   answer to number six, it refers to me then as
4   chief of staff, and at that time I would have
5   been executive director of the agency.
6        MR. CONDIT: Okay. I appreciate
7   that clarification.
8   BY MR. CONDIT:
9    Q  I did have a question along those lines.
10  Again, we're referring to Exhibit 3, interrogatory
11  number six, which is on page 4 of the document. In
12  that line where you're referenced incorrectly as chief
13  of staff, the way it is written gives the appearance
14  that someone other than you wrote it because it says,
15  for example, "Ronnie Charles, deputy of
16  administration, and Brenda Donald, chief of staff of
17  Child and Family Services Administration, may also
18  have relevant information regarding plaintiff's
19  removal from her position." Did you have any hand in
20  crafting that language?
21   A  Not in the language per se, but this is in
22  reference to Ronnie Charles as deputy director for

Page 23

1   administration, who had oversight for human resources,
2   would have been the keeper of record of all documents,
3   including the above referenced October 3 letter, and
4   any personnel guidelines that would have been
5   referenced in that letter.
6        MR. WILLIAMS: Counsel, I just want
7   to -- try not to be at this long, but what I want
8   to say is that it seems you keep directing
9   questions regarding whether or not she actually
10  physically typed or drafted this document. I
11  think her testimony is that she was interviewed
12  over the phone by an associate from our office
13  and that that associate prepared it, read it to
14  her, she reviewed it, and then signed it, which
15  is common practice.
16       I just want to point out
17  interrogatory number eight where you specifically
18  asked that, and it specifically says was obtained
19  from Brenda Donald, reviewed by LaShawna Lynch,
20  in consultation with herself.
21       Some of the language sounds like
22  it's, you know, typed by a third party. I think

Page 24

1   that's -- I think that may answer your question,
2   but I just wanted to point you to interrogatory
3   number eight off of that.
4        MR. CONDIT: Okay. Well, just to be
5   clear, my concern is that the witness has
6   attested to providing information that was
7   obviously, you know, written by others, but that
8   it was reviewed by her, read by her, I'm not sure
9   which, and then signed.
10       I find it unusual that the witness
11  would refer to herself in the wrong position as
12  chief of staff and that she would refer to
13  herself as Brenda Donald. That's just not, you
14  know -- it doesn't comport with what is being
15  attested to. I'm not suggesting any problems of
16  any kind, I'm just trying to clarify for the
17  record what was involved, who was involved, and
18  what answers may or may not be completely
19  consistent with the witness's perspective on the
20  issues.
21       MR. WILLIAMS: I understand.
22       MR. CONDIT: That's my reason for

Page 25

1   the questions.
2        MR. WILLIAMS: So then just because
3   it's our position number eight properly attests
4   to that.
5        MR. CONDIT: All right.
6   BY MR. CONDIT:
7    Q  Ms. Donald, during your tenure as either
8   chief of staff at Child and Family Services Agency or
9   the interim director or director of Child and Family
10  Services Agency, did you ever have occasion to seek
11  the removal or approve the removal of any employee?
12   A  Yes.
13   Q  Okay. About how many employees do you think
14  you were involved in seeking the removal or approving
15  the removal?
16   A  I don't recall.
17   Q  Okay. More than one?
18   A  It's more than one.
19   Q  Can you give me an estimate?
20   A  I really can't.
21   Q  Okay. So do you think it was more than a
22  dozen?

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 26

1    A  I do not think it was more than a dozen, but
2 I do not know the exact number.
3    Q  Do you recall in 2005, other than the
4 removal of Ms. Tabb, if you were involved in the
5 removal of any other employees during that year?
6    A  I do not recall.
7    Q  Is there any record or piece of information
8 or document that would refresh you on the subject of
9 removals that you may have been involved in?
10    A  I'm sure there are records, certainly, of
11 any employee who was terminated that I would have
12 signed off on.  There certainly are documents,
13 records.  I just don't have them and I don't recall
14 off the top of my head who all I was involved in
15 terminating.
16    Q  During your tenure as chief of staff or the
17 director of CFSA, what was the process, as you recall
18 it, for terminating an employee?
19    A  There are different processes for different
20 types of employees.  Employees who were at-will or
21 under the management supervisory services
22 classification structure were considered at-will

Page 27

1 employees and could be terminated based on a
2 management decision, and there were some employees who
3 were terminated under that structure.
4    Q  When you say they could be terminated based
5 on a management decision, what does that mean?  What
6 do you mean by that?
7    A  That means that they did not -- that they
8 were at-will employees and the manager could decide to
9 reorganize, to go in a different direction, could just
10 make a decision and notify the employee of whatever
11 legal notice was required and could terminate that
12 position at will.
13    Q  Was Ms. Tabb an at-will employee at the time
14 she worked there in October of 2005?
15    A  No, she was not.
16    Q  What kind of employee was she, if you know?
17    A  She was a merit or civil service employee
18 and a union employee, which required a different type
19 of process for terminating that level of employee.
20    Q  Now, going back to the at-will employees for
21 a moment.  Was it the case during your tenure at CFSA
22 that they could be terminated simply by receiving a

Page 28

1 notice and a certain amount of time, for example, 30
2 days or two weeks?
3    A  Yes.
4    Q  And there didn't have to be cause?
5    A  Correct.
6    Q  Okay.  And what kinds of employees during
7 your tenure were those?  In other words, what kinds of
8 positions?
9    A  Well, of course they were all management
10 positions.  They were designated by the D.C. office of
11 personnel, certain classification, a grade 13 and
12 above with certain supervisory responsibilities, but
13 they were very clearly identified, and employees knew
14 if they were in that category and, you know, they had
15 a certain designation.
16    Q  Okay.  Was -- during this time of October
17 2005, for example, was Mindy Good an at-will employee?
18    A  Yes.
19    Q  So that would be an example of --
20    A  Yes.
21    Q  -- an at-will employee?
22        Now, were at-will employees evaluated

Page 29

1 or assessed any differently than civil service
2 employees?
3    A  There were two -- yes, yes.
4    Q  How -- what was the difference?
5    A  There were two different types of documents
6 that we used to evaluate employees.  Management
7 supervisory services had -- I think it's called PMP,
8 performance management plan, that was electronically
9 organized, and they were evaluated with that.  And
10 union employees were evaluated with a different
11 instrument.
12    Q  What was that instrument in, say, October of
13 2005?
14    A  I don't remember the name of the form, but
15 it was a written standard form.
16    Q  Now, during your tenure at CFSA whether as
17 chief of staff or as the director, did you have
18 Shirley Tabb directly under your supervision at any
19 point?
20    A  Not directly.  Her unit was directly under
21 me, but not Shirley Tabb herself.
22    Q  Okay.  And what unit was that?

8 (Pages 26 to 29)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 30

1    A  The public relations, office of public
2  relations or public information.
3    Q  Now, who headed that unit at the time Ms.
4  Tabb was employed at the agency?
5    A  At first it was Joann Williams when I was
6  chief of staff in 2001, and later was Mindy Good.
7    Q  And about when did Mindy Good come on, if
8  you know?
9    A  I don't recall.  I think 2002.
10    Q  Why did Joann Williams leave?
11    A  She was terminated under management
12  supervisory services.
13    Q  Who made that decision?
14    A  I did.
15    Q  And why was she terminated?
16      MR. WILLIAMS:  Objection, relevance.
17      Answer the question.
18    A  I just decided we needed a different level
19  of experience and qualification for that position.
20  BY MR. CONDIT:
21    Q  Did Ms. Williams go on to work anywhere else
22  in the agency?

Page 31

1    A  No, she did not.
2    Q  Now, when you were chief of staff, was the
3  office of public relations under your --
4    A  Yes.
5    Q  -- purview?
6    A  Yes, it was.
7    Q  And then when you became the interim
8  director and director of the agency, was the office of
9  public relations also directly under your purview?
10    A  Yes.
11    Q  Why didn't it stay with the chief of staff?
12    A  When I hired Mindy Good, we elevated the
13  office to report directly to the director.
14    Q  And at the time that Ms. Tabb was employed,
15  who was your chief of staff?
16    A  When I became director, my chief of staff
17  was Janet Maher, M-a-h-e-r.
18    Q  Did Ms. Maher play any role in the issue of
19  Ms. Tabb's summary removal and termination?
20    A  No, she did not.
21    Q  When you testified a little earlier that
22  someone from the office of general counsel may have

Page 32

1  played a role in Ms. Tabb's summary removal, were you
2  thinking that it may have been the general counsel at
3  the time, or someone else?
4    A  It may have been either the general counsel
5  or the deputy who was in charge of -- who was the
6  liaison for human resources.
7    Q  So the office of general counsel had an
8  official called a liaison?
9    A  Consultative role.  I don't know if it was
10  an official position.  They had specialists.  The
11  deputy general counsels had areas of specialty that
12  they served as liaisons for.  So I don't know if it
13  was official, but there was a point person in the GC's
14  office for human resources.
15    Q  And was that point person or someone in that
16  position in the office of general counsel typically
17  involved in all employment matters?
18    A  Yes.
19    Q  Do you recall whether or not you
20  communicated in any way, by memo or otherwise, to
21  anyone from the office of general counsel regarding
22  Ms. Tabb's removal or termination?

Page 33

1    A  I do not recall if I did it directly or if I
2  asked Ronnie Charles to get a legal consult, but I'm
3  sure that we did have legal consultation.  I just
4  can't remember if it was directly or indirectly
5  through Mr. Charles.
6    Q  Okay.  And at the time, again October of
7  2005, Mr. Charles is the deputy director of
8  administration?
9    A  Correct.
10    Q  And do you know whether or not anyone under
11  Mr. Charles was involved in assessing the situation
12  with respect to Ms. Tabb's summary removal?
13    A  I do not know.
14    Q  Did you -- do you recall receiving anything
15  in writing from Mr. Charles about the issue of Ms.
16  Tabb's removal or any of the issues associated with
17  her removal?
18    A  I would have seen a draft of the letter that
19  ultimately -- the letter terminating her.
20    Q  Okay.  Anything else that you can recall?
21    A  Not in writing.
22    Q  Now, were there meetings among various

9 (Pages 30 to 33)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 34

1 officials or persons within the agency about the issue
2 of Ms. Tabb's removal?
3     A  Yes.
4     Q  And who was involved in those meetings?
5     A  Myself, Mindy Good, and Ronnie Charles.
6     Q  About how many meetings do you think the
7 three of you had on this topic?
8     A  I don't know, maybe two.
9     Q  Do you know about what time frame you may
10 have had these meetings?
11     A  No, I do not.
12     Q  If Ms. Tabb's removal letter was dated
13 October 3, 2005, for example, do you know whether or
14 not the meetings would have occurred before or after?
15     A  Certainly would have occurred before, and
16 probably shortly before, within a week or so.
17     Q  Do you know whether there were any notes
18 taken of those meetings?
19     A  I do not know.
20     Q  Were there any administrative staff involved
21 in those meetings that would have assisted with note
22 taking or other functions of that nature?

Page 35

1     A  No.
2     Q  Now, we were talking a little earlier about
3 the distinction between an at-will employee, a
4 management employee, and a union or civil service
5 employee, and you described for me the circumstance
6 for terminating a management employee.  What are the
7 steps, as you recall it, for terminating a civil
8 service employee?
9     A  I don't know them myself, which is why I got
10 advice from HR and the general counsel's office, but
11 there's certainly documentation, and depending on the
12 cause would determine what type of documentation was
13 needed.
14     Q  For Ms. Tabb's situation, do you know what
15 type of documentation was needed?
16     A  No, I do not know offhand.
17     Q  Do you know where -- well, strike that.
18         Was there documentation that you
19 reviewed that was associated with the action of
20 summarily removing Ms. Tabb?
21     A  Was there documentation?  Did I -- I'm not
22 sure what you're asking.

Page 36

1     Q  Were there any documents that you reviewed
2 that played any role in the decision to summarily
3 remove Ms. Tabb?
4     A  I did not personally review the documents.
5 I would have reviewed the draft letter that referenced
6 the justifications for the termination.
7     Q  When was the first time that Shirley Tabb
8 ever discussed with you, if she did at all, her
9 concern about children sleeping in the CFSA office
10 building?
11     A  I don't remember exactly when, but certainly
12 there were conversations around that time of the
13 October, you know, dismissal.  But I don't remember
14 the first time.
15     Q  Do you know whether or not there would be
16 any e-mail or documentation of any kind of such a
17 meeting with Ms. Tabb discussing that issue?
18     A  I don't know.
19     Q  Do you recall doing -- having any
20 conversation with Ms. Tabb on the subject of children
21 sleeping in the building by e-mail?
22     A  Yes, I do.  I just don't recall when.

Page 37

1         MR. CONDIT:  Pardon me one second,
2 please.
3         (Discussion off the record.)
4 BY MR. CONDIT:
5     Q  Now, do you believe that Ms. Tabb discussed
6 the issue of children sleeping in the building with
7 you before October of 2005?
8     A  Yes.
9     Q  Okay.  Do you believe it may have happened
10 several months before October of 2005?
11     A  I'm not sure.
12     Q  Would there be anything that would refresh
13 your memory on that topic that you can recall?
14     A  I don't know.  If you have something, I'd be
15 happy to look at it.
16     Q  No.  What I mean is are there documents that
17 you may have prepared at the time, notations you may
18 have made, e-mails that may have gone back and forth?
19     A  About my conversations with Shirley on this?
20     Q  Yes.
21     A  I do not think so.  I had several
22 conversations with Shirley about her career interests,

10 (Pages 34 to 37)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 38

1  and some of those conversations included the issue of
2  the children sleeping in the building, and one of them
3  was actually -- that was certainly the reason for the
4  discussion or was the reason for a proposal that she
5  made about a career -- an opportunity for her within
6  the department, and that was part of that same
7  conversation, but there may have been other
8  conversations.
9        This issue was a big issue in the
10  department for some time before October.  The senior
11  staff was very heavily involved in a strategy around
12  placements for the department, increasing the number
13  of family foster homes and having adequate placements.
14        So there was a lot of discussion about
15  this issue, most of which did not -- was not
16  involved -- that Shirley Tabb was not involved in, but
17  clearly it was a big priority for the department.  So
18  it would not have been unusual to have had
19  conversations about that.
20    Q  Okay.  Considering your positions as chief
21  of staff and then as director, when did the issue of
22  children sleeping in the building first come to your

Page 39

1  attention?
2    A  Well, actually, that was an issue that was
3  part of the LaShawn lawsuit, which is the lawsuit, the
4  class action lawsuit against the department.  It was
5  one of the compliance areas for the Child and Family
6  Services Agency to get out of the receivership and to
7  get out of court oversight.  It's always one of the
8  key compliance areas about placements.
9        When I first came to the agency as
10  chief of staff in 2001, there was an on-site respite
11  center on the first floor of the building that had
12  accommodations for children to sleep overnight, and
13  within the first year the new administration -- that's
14  the post-receivership administration under which I
15  came -- worked with our court monitor, and we agreed
16  to close that facility, which we did.  And part of the
17  strategy for closing it was to increase the number of
18  family foster homes and appropriate placements for
19  children.  So that was an issue, a longstanding issue,
20  within the department.
21    Q  Why did the court monitor and the agency
22  agree to close the respite center?

Page 40

1        MR. WILLIAMS:  Objection,
2  speculation.
3        Answer the question.
4        THE WITNESS:  Okay.
5    A  Because it was not an appropriate place for
6  children to sleep.
7  BY MR. CONDIT:
8    Q  So can you tell me about when the respite
9  center was closed?
10    A  I think it was in 2002.
11    Q  So going forward after the respite center
12  was closed, what actions did the agency take to ensure
13  that children could receive a prompt placement such
14  that they wouldn't have to sleep in the building?
15    A  We developed a set of other placement
16  resources.  We had emergency placement shelters and
17  homes.  We had a whole strategy for increasing the
18  number of family foster homes.  At the same time, the
19  population was declining, so we had more resources
20  available to place children.
21        We also had policies internally that
22  required that we would not keep children in the

Page 41

1  building overnight and that we would place children,
2  if they had to, in an emergency overnight placement,
3  but anywhere other than the building.  Not anywhere
4  other than the building, other appropriate licensed
5  and approved placements.
6    Q  So what happened after 2002, I guess --
7  well, let me strike that.
8        Were there children sleeping in the
9  building in 2002 after the respite center was closed?
10    A  No.  There may have been occasions when a
11  child came in the middle of the night and stayed
12  until the next shift came and we were able to place a
13  child.
14    Q  And how is the data on this issue tracked
15  and who tracked it?
16    A  The data -- I'm not sure who tracked it, but
17  the data was tracked.  We had a standing report that
18  we submitted to the court monitor as part of our
19  LaShawn reporting requirements that would document
20  children coming in through our intake and where they
21  were placed, and we submitted a regular report on
22  whether or not there were children in the building or

11 (Pages 38 to 41)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 42

1  children that we were unable to place.
2      Q  And what were the criteria for judging when
3  a child was staying in the building too long?
4      A  I believe the policy said that if a child
5  came in after 2:00 a.m. and had to stay until the day
6  shift, that after 2:00 a.m. was not considered an
7  overnight.  If a child was brought in prior to that
8  and stayed, then that was considered overnight.  There
9  was written policies that identified that.
10     Q  And where are those policies kept?
11     A  CFSA has an office of policy and planning.
12 They're online, their policy manuals.  Placement
13 resources unit would certainly have the policies.
14     Q  So what provisions were there for a child
15 that came in, say, at 2:15 in the morning and needed
16 to stay for a number of hours in the building?
17     A  What provisions?
18     Q  In other words, a place to sleep, a place to
19 wash up, whatever would be needed for someone in those
20 early hours of the morning who's coming from their
21 home?
22         MR. WILLIAMS:  I'm just going to

Page 43

1  object to form.  Just when -- just in general for
2  a child?  I'm just trying to find out when.
3         MR. CONDIT:  I'm basing my question
4  on the witness's statement about the policy, and
5  I don't have a when at the moment.  It's just a
6  policy that --
7         THE WITNESS:  Right.  Any time a
8  child had to come in and could not be immediately
9  placed, a social worker had to stay with the
10 child at all times.
11         There were some cots.  Children
12 sometimes stayed.  Some children came in who
13 might have been sick, and they would stay in the
14 -- with the social worker in the social worker's
15 cubicle or area, or would be transported over to
16 Children's Hospital, which is the initial
17 screening site for -- all children coming into
18 foster care had to get medical screening, and
19 would within an hour or two be transported there
20 for a medical screen.
21         But we did not have facilities per
22 se.  We had cots that could be pulled out if a

Page 44

1  child had to stay there for several hours and any
2  time in the day or night.
3  BY MR. CONDIT:
4      Q  So when you testified a little earlier that
5  one of the plans that the agency had to combat the
6  issue of children having to spend too long a time or
7  sleep overnight in the building was that there would
8  be emergency placement resources, what did you mean by
9  that?
10     A  There were emergency foster homes who would
11 take a child any time of day or night and keep a child
12 for a short period of time while we were doing a
13 longer term placement.
14     Q  So such emergency foster homes would be
15 available to a child who came in at 2:00 a.m. or
16 later?
17     A  Yes.
18     Q  Now, you indicated also in your testimony a
19 few moments ago that there was data collected and a
20 standing report prepared on this issue, as well as
21 others obviously.  Who would be responsible for
22 preparing that segment of the report or that data

Page 45

1  during your administration?
2      A  It would be our placement unit, placement
3  and/or intake, which at one point were together and
4  then were later separated.
5      Q  So during your tenure, who would have been
6  responsible in placement and/or intake to acquire the
7  data and to report the data on children sleeping in
8  the building?
9      A  I don't know the individuals' names.
10     Q  I understand that at one time during your
11 tenure, I believe, there was intake and
12 investigations, and then later there became a separate
13 office of placement.  Is that right?
14     A  That's correct.
15     Q  Okay.  And when the separate office of
16 placement was created, I believe Jill Forbes was hired
17 as the director, is that right, the program director?
18     A  She was.  I'm not sure if she was the first
19 director of placement, but --
20     Q  Okay.  So there may have been someone else
21 in that position?
22     A  There may have been.

12 (Pages 42 to 45)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 46

1    Q   About when was that office created, if you
2  know?
3    A   I don't remember.
4    Q   Do you know if it was before or after 2002?
5    A   I'm sure it would have been after 2002.
6    Q   Now, once the placement office was created,
7  would that likely have been the office that was
8  responsible for identifying when children were
9  sleeping in the building and reporting on that data?
10    A   Again, I'm not sure if that's intake or
11  placement.
12    Q   Is there any documentation or information
13  that one could review that would tell who is
14  responsible for providing that data?
15    A   Certainly.
16    Q   Who would that be?
17    A   The office of policy and planning, the
18  office responsible for assembling the data and
19  developing the reports to the court monitor.  They
20  would have reports.  Any data that was generated by a
21  particular unit would go to that office and be
22  compiled into our court reports.

Page 47

1    Q   Now, during this period, we'll say 2002 to
2  2005, was the court monitor actively involved in
3  evaluating this issue of children sleeping in the
4  building?
5    A   The court monitor was actively involved in
6  working with the department to increase its placement
7  resources.  So yes, that included if there were ever
8  any children in the building.  That was only one
9  aspect of our whole placement strategy.
10    Q   And how would the court monitor know whether
11  or not children, for example, had been sleeping in the
12  building?
13    A   As I said, we submitted reports.
14    Q   Okay.  But beyond the reports, was there
15  data or other information that was kept to back up the
16  reports?
17    A   Yes.
18    Q   Okay.  What kind --
19    A   I thought I had described that.  The data
20  from either intake or placement for every child coming
21  into foster care, we had to document when the child
22  comes in and where and when the child was placed.  So

Page 48

1  we had reports that were submitted to the court
2  monitor, as I said.  We also have our -- the Faces
3  child welfare information system that is the system of
4  record for every child in foster care.
5    Q   So would the Faces system, for example,
6  record when a child came in and then when they were
7  ultimately placed?
8    A   Yes.
9    Q   Would it be specific as to date and time,
10  for example?
11    A   I'm not sure about time.  Certainly date.
12    Q   Now, during your tenure as the director, did
13  you have meetings that were known generally as
14  executive team meetings?
15    A   Yes.
16    Q   What is an executive team meeting?
17    A   We had -- the executive team is a team who
18  reported directly to me, would have been the two
19  deputies, deputy for administration, deputy for
20  programs, chief of staff, general counsel, and I
21  believe that's it.
22    Q   And who were the members of your executive

Page 49

1  team in the fall of 2005?
2    A   That would have been Uma Ahluwalia, who was
3  the deputy for programs; Ronnie Charles, who was the
4  deputy for administration; Janet Maher, chief of
5  staff.
6    Q   Okay.
7    A   And I believe we were in between general
8  counsels at the time.  I can't remember if that was
9  after the previous general counsel, Terri Thompson
10  Mallett, left, and then Donald Terrell, who then was
11  later general counsel.  There might have been -- there
12  might have been in between time.
13    Q   So if a general counsel was in the position
14  at the time, that person would have also been part of
15  the executive team?
16    A   Yes.
17    Q   Now, were there minutes kept of executive
18  team meetings?
19    A   Not minutes per se.  It just would have been
20  individual notes.
21    Q   And who would keep the notes of the
22  executive team meetings?

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 50

1    A  We didn't have notes of record.  Everybody
2  took notes.
3        Q  So notes were kept but not of record?  Would
4  you keep notes during executive team meetings?
5        A  I always take notes, but yes.
6        Q  And where would those notes be at this point
7  in time?
8        A  I have no idea.  They weren't notes for the
9  file, they were just follow-up and my own personal
10  notes.  I would not have kept them anywhere per se.
11        Q  So would there be any notes of executive
12  team meetings that you're aware of that would have
13  been maintained in any way?
14        A  There might have been if there was
15  particular follow-up.  There may be a file, but I
16  don't have it and I don't know if it was kept after I
17  left.
18        Q  What types of issues would the executive
19  team deal with?
20        A  Everything.  I mean, policy issues, looking
21  at the week ahead, political issues, any particular
22  top priorities.

Page 51

1        Q  And during what part of the week did these
2  executive team meetings typically take place?
3        A  I can't remember.  I think they were every
4  Wednesday morning, but I'm not sure.  It was a morning
5  meeting.  It was a standing weekly meeting.
6        Q  And during what time would it occur?
7        A  It would have been in the morning.
8        Q  About how long would these meetings last?
9        A  Maybe an hour.
10        Q  Now, would the executive team during your
11  tenure as the CFSA director have addressed the issue
12  of children sleeping in the building?
13        A  Yes.
14        Q  And about how frequently during executive
15  team meetings do you recall that issue being raised?
16        A  Well, since that was a priority issue that
17  we were dealing with as -- from a departmental
18  standpoint, we certainly would have had discussions
19  about that, you know, on an ongoing basis.  This was a
20  big issue for about a year, and certainly all of 2005.
21        We had a plan and we had a lot of
22  strategies that we were trying to implement to --

Page 52

1  again, not just focused on children sleeping in the
2  building, because there were a number of incidents,
3  but this was not a regular occurrence.  There was
4  specific instances that we documented that we reported
5  on and that we addressed.  And we reported these to
6  the court, to the court monitor, city council in
7  public testimony, and we had to report.  That was
8  extremely well documented.
9        And so again, placement issues were
10  priorities for the department.  It was one of our top
11  two priorities, the other one being intake and
12  investigations.
13        Q  Okay.  Now, when you say you reported to the
14  court, are you speaking specifically of reporting on
15  the issue of children sleeping in the building, among
16  others?
17        A  Yes.
18        Q  So children sleeping in the building would
19  have been one of the featured items of discussion?
20        A  Placements would have been the featured
21  items, and as part of our placement challenges,
22  children who slept in the building overnight, and

Page 53

1  there were, I believe, about a dozen incidents that we
2  chronicled and reported by date in one or more
3  reports, and that certainly was a salient issue around
4  our placement challenges, but yes.
5        Q  And then what would these reports that the
6  agency would issue be called?  Did they have some
7  title or name?
8        A  There would have been a section in the court
9  monitor's report on placements.
10        Q  And that's a report prepared by the court
11  monitor?
12        A  No, that's a report prepared by the agency
13  to the court monitor.  We also detailed the number of
14  instances of children sleeping overnight to the city
15  council in a report for a city council oversight
16  hearing.
17        Q  And when was that?
18        A  I'm not -- I don't recall.  I think it was
19  in the fall of 2005.
20        Q  Was it before or after Ms. Tabb's summary
21  removal?
22        A  It was around the same time.

14 (Pages 50 to 53)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 54

1    Q   So it was around October 3 of 2005?
2    A   Yeah.  It was in the fall.  I don't remember
3  the exact date.
4    Q   Do you recall testifying at such a hearing?
5    A   Yes.
6    Q   Okay.  And do you recall whether or not Ms.
7  Tabb testified at that hearing?
8    A   She testified at a hearing.  I'm not sure if
9  it was the one.  I think we had two oversight hearings
10  that year, one in the spring and one in the fall, if
11  I'm not mistaken, and she testified at the one in the
12  fall.
13    Q   And do you recall the nature of her
14  testimony in the fall?
15    A   She was very critical of the agency and of
16  our efforts on behalf of placement resources for
17  children.
18    Q   Was now-Mayor Fenty then the chair of the
19  committee who reviewed these issues?
20    A   Yes.
21    Q   So how did Mr. Fenty's committee become
22  alerted to the issue of children sleeping in the

Page 55

1  building, if you know?
2    A   I believe he was initially alerted because
3  of our court monitor's report.
4    Q   Because the court monitor's report indicated
5  that children were sleeping in the building?
6    A   Right.  As I said, we reported on that.  We
7  had to give a daily census any time a child stayed
8  overnight, as well as how we were doing in terms of
9  implementing our placement resources plan.
10    Q   Did Mr. Fenty typically review all of the
11  items in the court monitor's report?
12    A   Yes, yes.  We distributed the court -- he
13  was on the distribution list, and his staff reviewed
14  those reports and formulated questions for the
15  department based on those reports.
16    Q   And was it your understanding of the typical
17  practice when Mr. Fenty was the chair of the committee
18  that he would ask questions at hearing on all of the
19  items in the report?
20    A   Not on every single item, but on items of
21  concern or interest.  Not just ask questions at the
22  hearing, but submit questions for the department to

Page 56

1  answer in writing prior to the hearing, which we did,
2  and this was one of the big issues, so yes.
3    Q   Do you know why in the fall of 2005 this was
4  one of the issues -- that is children sleeping in the
5  building -- was one of the issues highlighted by Mr.
6  Fenty?
7    A   I can't -- I don't know why he would have
8  chosen to highlight it.  It had become an issue
9  because, as I stated earlier, we closed the intake,
10  that respite center, around 2002.
11        We had a period of time where we did
12  not have any children sleeping in the building, and
13  then at some point, either late 2004, early 2005, we
14  had a number of instances, which I believe was around
15  a dozen, where we did have children staying overnight,
16  and there was concern that perhaps this was going to
17  become -- we were going in the wrong direction in
18  terms of our trend, our trend lines on that.
19        So it was certainly an issue that we
20  were all concerned with, which is why everyone at the
21  senior level in the department was involved in trying
22  to address it.  And it was very -- we were all very

Page 57

1  open about it and engaged the court monitor in a lot
2  of discussions about our foster home recruitment plan,
3  our placement strategies.  So this was -- this was
4  certainly an open issue.
5    Q   And at the time this issue was being
6  discussed in the fall of 2005, who was the court
7  monitor?
8    A   Judith Meltzer.
9    Q   What organization is Ms. Meltzer with?
10    A   The Center for the Study of Social Policy.
11    Q   Is there anyone else from her organization
12  that functioned as the court monitor role, or assisted
13  her in that role?
14    A   Claire Anderson was her assistant.
15    Q   Did you have meetings or communications of
16  any kind with either Ms. Meltzer or Ms. Anderson
17  during the fall of 2005 on the issue of children
18  sleeping in the building?
19    A   We had meetings with them throughout the
20  whole year on children sleeping in the building.
21    Q   I appreciate that, but focusing on the time
22  period I bring to your attention --

15 (Pages 54 to 57)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 58

1    A  I don't know.
2    Q  And if you had communications during the
3  fall of 2005 with Ms. Meltzer or Ms. Anderson or
4  someone in their agency, how would those
5  communications have occurred?  E-mail, meetings?
6    A  Well, yeah.  We had our monthly report, and
7  we had to report on how many children, if there were
8  any, who had slept in the building, and we had to
9  report on how well we were doing in terms of our
10  recruitment strategy.  So that was part of the overall
11  focus on placements.  And we also had several work
12  sessions with the court monitor and staff on what
13  strategies we could use to increase the number of
14  placement resources.
15    Q  When you say you had work sessions with the
16  court monitor and staff, describe that for me.  What
17  does that mean?
18    A  We would have typically two or three times a
19  year -- just as part of the overall LaShawn lawsuit,
20  we would meet with key members of the senior staff and
21  the Center for the Study of Social Policy staff on
22  particular areas of interest and/or concern, and we

Page 59

1  would have an all-day meeting and present where we
2  were in terms of our own plans and our efforts to
3  remedy a particular challenge, and they would be
4  involved in helping us in reviewing and questioning
5  and offering advice.
6    Q  And during 2005, when did these work session
7  meetings with the Center for the Study of Social
8  Policy take place?
9    A  I don't recall, but I know we had some
10  earlier that year.  We had at least one, I believe, in
11  the spring and another one in the summer on placement
12  issues specifically.
13    Q  Were there any meetings with the Center for
14  the Study of Social Policy of this nature during the
15  fall of 2005?
16    A  I don't recall.
17    Q  But both meetings during the spring and
18  summer of 2005 with the Center for the Study of Social
19  Policy focused on placement?
20    A  That would have been one of the big agenda
21  items.
22    Q  Are there records of these meetings such as

Page 60

1  an agenda, minutes?
2    A  Certainly.  The Center for the Study of
3  Social Policy acted as the secretary at those
4  meetings, so they would have organized the agenda and
5  captured the minutes and sent those out.
6    Q  So although the Center for the Study of
7  Social Policy would have perhaps created an agenda and
8  kept minutes, those agendas and minutes would have
9  been sent to the agency?
10    A  Yes.
11    Q  Ant that would be part of the agency's
12  records?
13    A  Yes.
14    Q  Now, other than these work session meetings,
15  do you recall any meetings in the fall of 2005 which
16  I'll define as the September, October, November time
17  period with the Center for the Study of Social Policy
18  on the issue of children sleeping in the building?
19    A  I don't recall the time frame, if they were
20  in the fall or the summer.  I don't know.
21    Q  Do you recall receiving or communicating in
22  any way with Ms. Meltzer by e-mail on the subject of

Page 61

1  children sleeping in the building during the fall of
2  2005?
3    A  I don't -- I don't recall, but it wouldn't
4  have been unusual.
5    Q  During that time period, the fall of 2005 as
6  I've defined it, what was your typical communication
7  pattern with Ms. Meltzer?  In other words, would you
8  speak weekly, communicate by e-mail?  What can -- how
9  can you describe that?
10    A  We had -- we met, had a one-on-one meeting
11  every other week.  We didn't always keep the meeting,
12  but it was a meeting on the calendar every other week,
13  and e-mail, telephone occasionally, depending on the
14  issues.
15    Q  Did there ever come a time when the issue of
16  Ms. Tabb raising the concerns about children sleeping
17  in the building or Ms. Tabb's summary removal become
18  the subject of conversation with Judy Meltzer or
19  anyone from the Center for the Study of Social Policy?
20    A  No.
21    Q  When you testified before the city council
22  in the fall of 2005, did you provide written

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 62

1 testimony?
2     A  Yes.
3     Q  And when you testified to the city council,
4 was your testimony under oath?
5     A  Yes.  Government witnesses are always sworn
6 in.
7     Q  Okay.  Do you recall if your written or
8 verbal testimony in the fall of 2005 specifically
9 discussed the children sleeping in the building issue?
10    A  I believe that it did.
11    Q  Do you know if both the written and verbal
12 testimony would have discussed that issue, or just one
13 or the other?
14    A  It would have been both.  We had -- also had
15 the questions, the written questions submitted in
16 advance, and that would have been -- we would have
17 responded to that.
18    Q  And when would you have received those
19 questions?
20    A  Typically about two weeks before the
21 hearing.
22    Q  Were those questions submitted directly from

Page 63

1 at the time Mr. Fenty to you?
2     A  Yes.
3     Q  And did you provide any written answers in
4 advance of your testimony?
5     A  Yes.
6     Q  And about how far in front of the actual
7 hearing, public hearing, did you provide answers to
8 the questions?
9     A  Usually three to five days.
10    Q  Now, aside --
11        MR. WILLIAMS:  Mr. Condit?
12        MR. CONDIT:  Yes.
13        THE WITNESS:  Can we get some more
14 water, please?
15        MR. CONDIT:  Certainly.  Let's go
16 off the record.
17        THE VIDEOGRAPHER:  We're going off
18 the record.  The time is 11:54 a.m.
19        (A brief recess was had.)
20        THE VIDEOGRAPHER:  We are back on
21 the record.  The time is 12:05 p.m.
22        MR. CONDIT:  Thank you.

Page 64

1 BY MR. CONDIT:
2     Q  Ms. Donald, before we took a break, we were
3 discussing the communications between your office when
4 you were in the District at CFSA and the court
5 monitor.  Do you recall generally?
6     A  Yes.
7     Q  All right.  One question I had as a
8 follow-up was is there a particular office within CFSA
9 that would keep the communications to and from the
10 court monitor?
11    A  Yes, the office of policy and planning.
12    Q  And who headed that office when you were
13 there?
14    A  Andrea Guy.
15    Q  And what types of records regarding
16 communication with the court monitor would the office
17 of policy and planning maintain?
18    A  They would be the official office who
19 compiled the monthly reports to the court monitor, so
20 they would have had backup data as well as the final
21 reports.
22    Q  And was Ms. Guy still in that position when

Page 65

1 you changed over from being the director of the agency
2 to becoming deputy mayor?
3     A  Yes.
4     Q  Do you know if she's still there?
5     A  I believe she still is.
6     Q  I'm going to show you what I'll mark as the
7 next exhibit, which I believe is Exhibit 4.
8        (Donald Deposition Exhibit No. 4 was
9 marked for identification and was attached to the
10 deposition transcript.)
11 BY MR. CONDIT:
12    Q  Ms. Donald, I'm going to show you what's
13 marked as Exhibit 4.  It's titled Best Practices
14 Implementation Plan, Outcome Status Report, May 26,
15 2005.  It's by the Child and Family Services Agency.
16 Take a look at it and tell me if you recognize it.
17    A  I do recognize it.
18    Q  Now, when you were testifying a little
19 earlier, you were saying that there were regular
20 reports submitted to the court monitor by the office
21 of planning and policy.  Is this one of those reports?
22    A  This is a part of one of the reports.  This

17 (Pages 62 to 65)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 66

1 is not the complete standard monthly report.
2    Q  Okay.  Do you know why this report was
3 prepared at the time in May of 2005?
4    A  It was a -- again, it was part of a standard
5 monthly report that kept us on track in terms of our
6 implementation plan for the court monitor.
7    Q  And the implementation plan, did that
8 address the issue of children sleeping in the building
9 beyond the larger issue of placement generally?
10    A  No.  The standard -- this identifies the
11 standard compliance requirements and how the agency is
12 performing.  So this particular report, again, is not
13 a complete report, would have only identified the
14 agency's performance against a particular benchmark.
15 There's also a narrative portion of the report that
16 would describe any particular issues of concern.
17    Q  Are you saying there's a narrative for this
18 particular report, Exhibit 4?
19    A  I'm not sure if it's for this particular
20 report, but this looks to be an excerpt of a monthly
21 report.  This may have even been our internal
22 implementation plan benchmarks report and not the

Page 67

1 report to the court, but I'm not certain.
2    Q  Okay.  I notice if you look at the bottom
3 right corner of the document, it indicates the words
4 associated with whatever section of the report, and
5 then it has the page numbers 4 of 17 indicating to me
6 there are 17 total pages for this report.  Do you
7 believe as you're sitting here that this is a complete
8 document?
9    A  Perhaps it is, but this is not the standard
10 monthly report that went to the court monitor.
11        MR. WILLIAMS:  And also, just for
12 the record, I believe her testimony was is that
13 this isn't -- this is part of -- maybe part of a
14 report, not the complete report.
15        MR. CONDIT:  All right.  I heard.
16        MR. WILLIAMS:  Thank you.  Okay.
17 BY MR. CONDIT:
18    Q  Is there a place in this report where the
19 issue of children sleeping in the building would be
20 addressed somewhere?
21    A  Well, we can look in the placement section
22 that starts on page 5, and this would have been the

Page 68

1 like, and it does not address children sleeping
2 overnight.  So that was not one of the templated
3 benchmarks required in the implementation plan.  It's
4 about placements, as I explained several times
5 earlier, the more general category of placement
6 issues.
7        We did have a report, as I've
8 testified, that we submitted on a daily census
9 whenever there was a child who slept overnight that we
10 submitted to the court monitor and to city council.
11 We had submitted a report to city council.  We
12 responded to that in terms of some questions from city
13 council, which is why I remember about a dozen
14 incidents, because we had to list them out by date.
15    Q  Let me make sure I understand your
16 testimony.  So Exhibit 4 is not the standard monthly
17 report --
18    A  That is correct.
19    Q  -- that the agency would produce?
20    A  This is not.
21    Q  Okay.
22    A  This, in fact, looks like an internal report

Page 69

1 that we use for the management team to track our
2 compliance with the LaShawn requirements.
3    Q  Okay.  Now, with respect to this report
4 which is reflected in Exhibit 4, would it be the case
5 that all of the LaShawn requirements are reflected
6 somewhere here?
7    A  Yes.
8    Q  And if I were to get, for example, a court
9 monitor's report from this same period, would these
10 issues roughly match up?  In other words, placement
11 services, services to children and families?
12    A  Yes, yes.  This is organized to be
13 consistent with the implementation plan requirements
14 of the court monitor.
15    Q  Okay.  So in other words, an agreed upon
16 template of issues --
17    A  Yes.
18    Q  -- that would be reported on?
19    A  Yes.
20    Q  All right.  How often would the type of
21 report that we see here as Exhibit 4 be issued within
22 the agency during your tenure?

18 (Pages 66 to 69)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 70

1    A  I believe we did it monthly.
2    Q  Now, aside from the monthly report that you
3  would provide to the court monitor and any specific
4  questions that you'd get from the council or other
5  stakeholders, was there any other reporting that would
6  be generated by the agency that would discuss the
7  children sleeping in the building issue for any
8  reason?
9    A  We had a placement strategic plan that may
10  have addressed that that certainly would have
11  addressed the need for adequate and appropriate
12  placement so that children would not have to sleep in
13  the building.  But whether it specifically addressed
14  the incidents where children slept in the building, I
15  don't -- I'm not sure.
16    Q  Was anyone else -- and by this I mean
17  outside of CFSA but within District government --
18  concerned about the children sleeping in the building
19  issue such that they reflected it to you during the
20  summer or fall of 2005?
21    A  The deputy mayor at the time, Neil Albert,
22  to whom I reported, was aware.  I made him aware.  And

Page 71

1  I think there was some -- maybe even some news
2  reports, but I certainly would brief him on key issues
3  that the department was facing, and this was one.
4    Q  Do you recall -- strike that.
5        Was there an occasion when you
6  specifically briefed the deputy mayor -- Deputy Mayor
7  Albert, that is -- on the issue of children sleeping
8  in the building?
9    A  Yes.  There may have been several occasions,
10  just at our regular supervision meetings.  I don't
11  recall a specific meeting to talk about children
12  sleeping in the building.
13    Q  Now, when you say you had regular
14  supervision meetings with Deputy Mayor Albert, when
15  would these meetings occur?
16    A  We had a standing meeting every other week,
17  but we didn't always have it.
18    Q  And were there notes kept of that meeting by
19  you or Deputy Mayor Albert?
20    A  The same type of notes that I would keep for
21  any meeting, but not minutes or anything that went in
22  a file.

Page 72

1    Q  Was there any other person who would attend
2  these meetings?
3    A  Occasionally his chief of staff.
4    Q  Who was that?
5    A  At the time, Aretha Ferrell Jones.
6    Q  What role did Ms. Jones typically play in
7  these supervision meetings?
8    A  If there was a follow-up item or if we were
9  talking about a specific issue that she was involved
10  in or that he, the deputy mayor, wanted her to work
11  with me on, then that was her role.
12    Q  Do you recall at all speaking with the
13  deputy mayor -- Deputy Mayor Albert, that is -- prior
14  to September 2005 about the issue of children sleeping
15  in the building?
16    A  Oh, sure.  It was -- again, that was the
17  salient issue for that year.  So I would have
18  certainly briefed him on that sometime, spring or
19  summer.
20    Q  Do you know whether or not Shirley Tabb had
21  spoken to Deputy Mayor Albert about the issue of
22  children sleeping in the building?

Page 73

1    A  I found out about it subsequently that she
2  had.
3    Q  And when did you find out about it, that
4  conversation?
5    A  I don't remember when.  Sometime around that
6  time in the fall, I guess.
7    Q  Sometimes around October of 2005?
8    A  I don't remember when.  All of that, a lot
9  of that stuff, was happening around the same time, but
10  I don't remember the sequence of it.
11    Q  How did you find out that Ms. Tabb was
12  communicating with the deputy mayor?
13    A  He either called me or forwarded me an
14  e-mail.
15    Q  Do you remember the nature of the
16  communication in terms of the substance?
17    A  He wanted to know what was going on and
18  wanted to alert me of the fact that one of our CFSA
19  employees had communicated to the office of the mayor,
20  the deputy mayor, issues pertaining to CFSA, and
21  wanted to know what I knew about it and wanted to
22  alert me that that had occurred.

19 (Pages 70 to 73)

# VIDEOTAPED DEPOSITION OF BRENDA DONALD
## CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 74

1    Q   And what was your reaction?
2    A   I was surprised that Shirley had gone
3  outside of the department to raise an issue with the
4  deputy mayor and the mayor's office that we had
5  already communicated to them about.
6    Q   Was Ms. Tabb still employed by the agency
7  when the communications that you're discussing had
8  taken place?
9    A   Yes.
10    Q   So following the communication from Deputy
11  Mayor Albert, what steps, if any, did you take
12  regarding this issue?
13    A   The issue -- which issue?
14    Q   The issue of Ms. Tabb communicating with the
15  deputy mayor's office.
16    A   I think there are two separate issues.  One
17  was the deputy mayor's office, and then one was the
18  mayor's office, and the issue that was brought to my
19  attention was the communication with the office of the
20  mayor, the mayor's office of religious affairs, which
21  was an e-mail.
22    Q   How was the issue of the communication with

Page 75

1  the mayor's office of religious affairs brought to
2  your attention?
3    A   Again, it was either a phone call or
4  forwarding of an e-mail.  There was definitely a phone
5  conversation with the deputy mayor about it, but I
6  can't remember if he forwarded the e-mail and said do
7  you know about this and then we talked about it, or
8  did we talk about it and then he forwarded the e-mail.
9  But I certainly saw an e-mail that she had sent to the
10  mayor's office making a proposal and highlighting the
11  issue of children sleeping in the building.
12    Q   Now, you expressed in your testimony a few
13  moments ago that you were concerned -- I think that
14  was the word you used, but you can correct me -- about
15  Ms. Tabb's communication with the mayor's office
16  and/or the deputy mayor's office.  Why were you
17  concerned?
18    A   Because it was going outside of the chain of
19  command and -- well, for several reasons.  That was
20  one, that it was policy that you don't communicate --
21  employees would not communicate directly with the
22  mayor's office or the deputy mayor's office without

Page 76

1  going through the chain of command, which would have
2  been for her Mindy Good and up through me to the
3  deputy mayor to the mayor's office.  So that was one
4  thing.  And then the second one, that she was raising
5  an issue that has already been raised and that we were
6  all working on in the department.
7            Third, the e-mail seemed to be a
8  proposal for a job for her with the office of -- the
9  mayor's office of religious affairs.  And fourth, I
10  was surprised that she seemed to be so unaware of the
11  salient issues the department had been working on for
12  almost the past nine months to a year in her role as
13  the number two person the office of public
14  information.  I expected that she would have been well
15  aware and actively involved in working with the team
16  to address that issue internally.
17    Q   Okay.  I got the first, second, and fourth
18  issue.  Can you remind me what the third reason was
19  for your concern?
20    A   The third was that the e-mail seemed to be a
21  proposal for a job for her in the mayor's office of
22  religious affairs.

Page 77

1    Q   All right.  Now, with respect to your
2  concern about there being a policy that employees
3  don't communicate directly with the deputy mayor's
4  office or the mayor's office, can you tell me where
5  that policy is reflected?
6    A   No, I don't think it's a written policy.
7    Q   And how would employees know about this
8  policy if it wasn't written?
9    A   It would have been communicated.  It would
10  have certainly been standard operating procedure that
11  you go up the chain of command.
12    Q   Now, were you aware of any policies or laws
13  in place at the time that would have specifically
14  provided permission for District employees to make the
15  types of communications that you were concerned about?
16    A   No.
17    Q   Now, your other concern was that Ms. Tabb
18  was raising an issue that was being worked on, already
19  worked on, by the agency.  Why was that a concern?
20    A   Shirley Tabb was the number two person in
21  the office of public information, and in that role
22  certainly should have been aware of all the top

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 78

1  priorities the department was working on and aware of
2  our placement strategy and the discussions and
3  activity around the department to address those
4  issues.
5      Q  How -- at the time, how was the
6  communications office, Mindy Good's office, involved
7  in the issue of children sleeping in the building or
8  the placement issue, if at all?
9      A  Mindy as part of the management team would
10  have been involved in the placement issue, because any
11  time we had big issues for the department, I involved
12  the whole management team.  So Mindy would have been
13  part of those discussions.  She would have -- she and
14  the public information office also would have been
15  involved in preparing testimony for me, responding to
16  city council questions, and responding to any media
17  inquiries about that particular issue or others.
18      Q  Now, the preparing testimony and city
19  council questions, however, would have only come up
20  after Ms. Tabb was reporting on this issue.  Isn't
21  that right?
22      A  No, because we had a city council hearing in

Page 79

1  the spring, which was our budget hearing, and I
2  believe that issue was already an issue then.
3  Certainly we were working on the whole placement
4  strategy as far as recruiting, a focus on recruiting
5  foster homes.  And, again, the children in the
6  building is one aspect of an overall placement focus
7  for the department.
8      Q  I understand.  Do you recall whether
9  specifically the issue of children sleeping in the
10  building was identified and discussed during the
11  spring city council meeting, spring of 2005?
12      A  I do not recall.
13      Q  So if the issue of children sleeping in the
14  building wasn't addressed in that city council meeting
15  in the spring of 2005 but was only addressed in the
16  fall, then the communications office would not have
17  been involved in preparing testimony on that subject
18  until the fall.  Isn't that right?
19      A  That's not correct.  Again, placement issues
20  were front and center.  We had an ongoing work group
21  who was working on a placement strategy or a set of
22  placement strategies.  That had been underway most of

Page 80

1  that year and I believe started even in 2004.  So that
2  would have been one of our top priorities that we
3  talked about and would have been threaded into every
4  part of our testimony and anything before city
5  council.  So the public information office would have
6  and should have been aware of that.
7      Q  Okay.  But you understand the distinction,
8  or perhaps not, that I'm trying to draw, which is
9  there is the larger issue of placement --
10      A  Yes.
11      Q  -- which involves recruitment and a whole
12  host of other issues, correct?
13      A  Correct.
14      Q  I'm really narrowly focused on the issue of
15  children sleeping in the building.
16      A  Right.
17      Q  And your testimony is going to the broader
18  issue of placement, which I understand, but I'm
19  specifically asking why would the communications
20  office have been engaged in the question of children
21  sleeping in the building before the fall of 2005?
22      A  Because that issue didn't just crop up in

Page 81

1  the fall of 2005.  I don't remember when the first
2  reported incident of a child sleeping in the building,
3  but I know it was before the fall of 2005.  It was a
4  period of several months when that occurred on more
5  than one occasion, and then we had to report out
6  initially to the court monitor, and then to the city
7  council.
8          I don't remember if that came about
9  before the spring budget hearings before the city
10  council or not, but I know children sleeping in the
11  building, the incidents occurred before the fall of
12  2005, and the department as a whole was concerned
13  about that and working with strategies to address it.
14      Q  Okay.  Now, you said in your testimony a
15  moment ago that you weren't sure when the first
16  incident of children -- a child or children sleeping
17  in the building was reported.  Do you remember how you
18  learned about it, even if you don't remember exactly
19  when?
20      A  I do.  It was reported to me by our deputy
21  for programs, and it was Uma Ahluwalia at the time who
22  had -- and I forgot who her -- the next person in the

21 (Pages 78 to 81)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 82

1  program administration side of the house, but sometime
2  in the spring, I believe, I was informed that we had a
3  child who slept overnight in the building, and then
4  shortly thereafter there was another incident, and we
5  then said we had to -- I said we have to report it to
6  the court monitor.  And then we were required to start
7  keeping track of it and make a report any time a child
8  slept overnight.
9      Q   And did you have to keep track of it because
10  that's what the court monitor requested?
11     A   Yes, primarily.
12     Q   And the court monitor would make this
13  request of you in the spring of 2005?
14     A   Again, I'm not sure of the time frame.  I
15  just know it was over a period of time earlier in that
16  year.
17     Q   So the court monitor's request to track when
18  children slept in the building was requested of the
19  agency prior to September, October of 2005?
20     A   Correct, definitely.
21     Q   What form did that request take?  Was it in
22  writing, or how did you --

Page 83

1      A   I don't recall.
2      Q   And when you said your deputy for programs
3  at the time, Uma Ahluwalia, had raised this issue with
4  you, how was it raised?  Was that in a meeting, by
5  e-mail?
6      A   I don't recall.
7      Q   A short time ago in your testimony you also
8  testified that Mindy Good was part of the management
9  team.  Do you recall that testimony?
10     A   Yes.
11     Q   Is that -- the management team, is that
12  different from the executive team?
13     A   Yes, yes.  It's a larger group.
14     Q   How would you generally define the
15  management team during your tenure at the agency?
16     A   Management team consisted of everyone on the
17  executive team, as well as all of the deputy directors
18  for the various areas.  So the deputy for planning and
19  policy, deputy for clinical practice, the -- there
20  were about ten or twelve people in that group.
21     Q   And how often did the management team meet?
22     A   Every other week.

Page 84

1      Q   Did you chair those meetings?
2      A   Yes.
3      Q   Any notes or minutes kept of those meetings?
4      A   Sporadically.
5      Q   Who would keep them?
6      A   I think we -- I think we experimented with
7  rotating around and having people take the minutes,
8  and sometimes someone's executive assistant would be
9  in there, but -- so they weren't always -- they
10  weren't kept consistently.
11     Q   And where would the notes or minutes be
12  maintained once they were taken?
13     A   Probably in my office, office of the
14  director.
15     Q   And who in your office when you worked there
16  would have kept that, those records, for you?
17     A   My executive assistant at the time was
18  Angela Robinson.
19     Q   Do you recall whether or not the management
20  team focused specifically at all on the question of
21  children sleeping in the building?
22     A   Not specifically on children sleeping in the

Page 85

1  building.
2      Q   You testified a little earlier that the
3  policy was that when children came in at 2:00 a.m. or
4  later, a placement was not typically sought at that
5  time.  Is that right?
6      A   No, that's not correct.
7      Q   Okay.
8      A   I said 2:00 a.m. was the cut-off to
9  determine whether or not a child slept overnight.  If
10  the child came in after 2:00 a.m., there was still the
11  policy to try to immediately place that child.  But if
12  a placement could not be made until the beginning of
13  the business day, as sometimes happened, that did not
14  count as an overnight.
15     Q   Were you aware at all at the time -- and I'm
16  talking again about the fall of 2005 -- that it was
17  the practice of the intake or placement folks not to
18  call for placements after 12:00 midnight?
19     A   No, I'm not aware of that.
20     Q   So that wasn't the policy of the agency?
21     A   That was not the policy, no.
22     Q   Other than being involved in -- excuse me.

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 86

1 Strike that. I got a bit sidetracked.
2      We were talking about your concerns
3 regarding Ms. Tabb's communications with the deputy
4 mayor and the mayor's office. Do you recall that?
5   A Yes.
6   Q And I believe you got through the first two.
7 The third one was that the e-mail that Ms. Tabb had
8 presented to the deputy mayor or the office of
9 religious affairs for the mayor was a proposal for a
10 job. Do you recall that?
11   A Yes.
12   Q Okay. Why was that a concern?
13   A I just didn't think it was appropriate to
14 use the agency e-mail to job hunt basically.
15   Q Didn't employees typically use the agency
16 e-mail and intranet to learn about jobs --
17   A I don't know.
18   Q -- within the agency, that sort of thing?
19   A I don't know if they typically did or not.
20   Q Was there a policy that prevented such
21 things?
22   A I don't know specifically.

Page 87

1   Q Then your fourth concern was that you were
2 surprised that Ms. Tabb was unaware that CFSA was
3 already working on the children sleeping in the
4 building issue. Is that right?
5   A Yes.
6   Q Why was that a concern?
7   A Because in her role as the number two person
8 in the public information office, I felt she should
9 have been well aware of that.
10   Q Now, could it not have been the case that
11 she was aware that the agency was working on it but
12 that the agency wasn't making adequate progress?
13   A Sure. That's a possibility.
14   Q Now, did you have any occasion prior to
15 dealing with Ms. Tabb concerning these communications
16 with the mayor's office and her summary removal to be
17 involved in any kind of oversight of her job function
18 or duties?
19   A Can you be more specific?
20   Q Yeah, and I'm focusing on, for example, did
21 you interact with Ms. Good, her immediate supervisor,
22 about any issues concerning Ms. Tabb? Did you have

Page 88

1 any direct communications with Ms. Tabb about her
2 performance or issues during 2005, anything of that
3 nature?
4   A Sure. Mindy Good obviously reported to me,
5 and I had to sign off on performance reviews, which I
6 did, and she conducted performance reviews on Ms.
7 Tabb. And I recall one, and I don't recall if it was
8 in 2005, that was -- where she raised some concerns in
9 that performance review, and I don't recall what the
10 rating was, but Ms. Tabb thought that it was a low
11 rating and she filed a rebuttal.
12      There were also conversations that
13 Mindy Good had about Ms. Tabb's performance and
14 concerns she had about time and attendance. And so
15 some of those were in our regular meetings that we
16 had, one-on-one meetings that we would have every
17 other week, and then the performance -- performance
18 appraisal review discussions.
19   Q What day and time during the week did you
20 typically meet with Ms. Good every other week?
21   A I don't remember our meeting time.
22   Q When you said in your testimony a few

Page 89

1 moments ago that there was one performance review of
2 Ms. Tabb where you weren't sure if it was 2005 or not
3 where Ms. Tabb had a concern and filed a rebuttal,
4 were you involved in that rebuttal?
5   A What do you mean, "involved?"
6   Q In other words, were you called to make a
7 judgement about whether the performance review should
8 be changed?
9   A It was submitted to me, and then Ms. Good
10 made whatever her recommendation was. So I supported
11 whatever her recommendation was.
12   Q So you were not asked to review the issues
13 that Ms. Tabb was raising and then make a judgement
14 about how to handle them, or were you?
15   A Not in that way, because I didn't -- she
16 didn't work for me directly. So it was her manager's
17 assessment of her performance that I would have been
18 aware of.
19   MR. CONDIT: Let's go off the record
20 for a moment.
21   THE VIDEOGRAPHER: This marks the
22 end of tape one in the deposition of Ms. Donald.

23 (Pages 86 to 89)

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 90

1  We're going off the record.  The time is 12:40
2  p.m.
3       (A lunch recess was had.)
4       THE VIDEOGRAPHER:  This marks the
5  beginning of tape two in the deposition of Ms.
6  Donald.  We're back on the record.  The time is
7  1:32 p.m.
8       MR. CONDIT:  Thank you.
9  BY MR. CONDIT:
10      Q   Good afternoon, Ms. Donald.
11      A   Good afternoon.
12      Q   Now, before we broke for lunch, you were
13  discussing Mindy Good's reporting to you and something
14  about the reporting structure.  You talked a little
15  about signing off on performance reviews, and you
16  remembered or recalled one instance when Ms. Tabb
17  filed a rebuttal to her performance review.  Do you
18  recall generally that line of conversation?
19      A   Yes.
20      Q   My follow-up question to that whole line
21  was, was there ever an occasion during your tenure
22  where you made assignments of any kind directly to

Page 91

1  Shirley Tabb, not through Mindy Good?
2      A   I don't believe so, unless it was just an
3  immediate task to do.  I don't think that I made any
4  direct assignments.
5      Q   Okay.  And then you had referred in your
6  testimony a few times to Ms. Tabb being the number two
7  person in the office of public information.
8      A   Yes.
9      Q   What's your reason for making that
10  statement?
11      A   Because she was.
12      Q   Okay.  Was there some designation?  In other
13  words, did she have a particular title that would
14  indicate that she was the number two person?
15      A   I don't -- we have functional titles and
16  official titles, but she was the backup if Mindy was
17  out.  She was -- it's a small shop.  There's only
18  three professionals and an admin person, and she was
19  the senior of the other two public information
20  specialists.  And at that level, I would expect her to
21  be aware of major issues and strategies that the
22  department was undertaking.

Page 92

1      Q   So would it have been your expectation
2  during your tenure that if Ms. Good was out sick or
3  away from the office and some development occurred
4  that required a media response that Ms. Tabb would --
5      A   That's correct.
6      Q   -- provide that response?
7      A   Yes.
8      Q   So she -- you would have expected that, for
9  example, she would have interacted with the media or
10  gone on camera, whatever was necessary?
11      A   I would have expected her to, yes, in
12  Mindy's absence, and whenever we had any media
13  inquiries we would make a decision if I as a director
14  or a senior person on the program side would respond,
15  or if it would be through the public information
16  office.  So it wasn't always that the public
17  information office would be the spokesperson.  But
18  yes, she had the -- she would be the backup.
19      Q   And the example you just gave where another
20  official within the agency but not within the office
21  of public information would be the on-camera person or
22  the interviewed person, would the office of public

Page 93

1  information participate in developing the strategy
2  around --
3      A   Yes.
4      Q   -- that discussion?
5      A   Yes.
6      Q   Okay.  When did you first meet Shirley Tabb?
7      A   It would have been when I first came on
8  board in August of 2001.
9      Q   And what was Ms. Tabb doing and what were
10  you doing when you first met in 2001?  In other words,
11  what were your positions?
12      A   I was chief of staff and she was in her role
13  as public information specialist, number two person
14  under Joann Williams, the then-public information
15  officer.
16      Q   Okay.  Was there a time either during your
17  tenure or perhaps before your tenure where Ms. Tabb
18  functioned as the de facto head of the public
19  information office?
20      A   Not during my tenure.
21      Q   And during that early stage of your career
22  with the agency, August 2001 and shortly thereafter,

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 94

1  did you have occasion to interact with Ms. Tabb for
2  any particular projects or for other reasons?
3      A  Oh, sure.  As I said, the public information
4  office reported up to me as chief of staff, so we had
5  lots of interaction.  It was a small office and
6  typically would be with the entire office, all three
7  persons, in addition to the director.
8      Q  So as the chief of staff at that time, would
9  you have regular meetings --
10     A  Yes.
11     Q  -- with the staff of the public information
12  office?
13     A  Yes.
14     Q  And what was your assessment at that time,
15  say August 2001, early 2002, of Ms. Tabb as a staff
16  member of that office?
17     A  I don't know that I made an assessment, a
18  formal assessment.  The public information office at
19  that time had a different focus under the previous
20  administration that we ultimately had, so it was more
21  focused on employee events, promotional activity,
22  community outreach, those kinds of things, and in that

Page 95

1  role my assessment was that she did a fine job.
2      Q  Now, did there come a point in time,
3  obviously after August 2001, when the role of the
4  public information office changed?
5      A  As I told you, that I terminated the
6  then-director, and I don't remember how long, it was
7  sometime in that next year, so sometime in 2002, and
8  after making an assessment that the leadership of that
9  unit needed to be different and have a different level
10  of skills, and then I recruited for a new director,
11  and Mindy -- we hired Mindy Good.
12     Q  So would you say then that the change of the
13  focus of the office of public information occurred
14  with the hiring of Mindy Good?
15     A  I would.
16     Q  And in terms of the change of focus, do you
17  mean to suggest that the other functions that you were
18  describing earlier about focusing on employee events
19  and employee communication, were those then not any
20  longer a function of the office of public information,
21  or --
22     A  They were still a function, but they were

Page 96

1  not the primary function.
2      Q  So how would you describe the new primary
3  functions of the office?
4      A  More strategic communications, crisis
5  management, messaging, much heavier emphasis on
6  written communications, strategic writing, speeches,
7  testimony, that sort of thing.
8      Q  Are you familiar with an employee from the
9  office of public information by the name of Derrick
10  Stuart?
11     A  Yes.
12     Q  What -- sorry.
13     A  He was there, a number -- along with Shirley
14  as the second public information specialist.
15     Q  Okay.  What would you distinguish, if
16  anything, between Mr. Stuart's role in the public
17  information office and Ms. Tabb's role?
18     A  There was some overlap, but Shirley
19  primarily was responsible for employee events, the
20  news -- the employee newsletter and special events,
21  promotional activities.  Derrick's role was more --
22  the Web site was his big project, development and

Page 97

1  updating of the Web site.  He also did some
2  photography.  And then he assisted in special events
3  or activities that the whole unit undertook.
4      Q  And do you know whether or not Mr. Stuart
5  and Ms. Tabb had different titles?
6      A  As I said, there were functional titles and
7  official titles.  I think they were both public
8  information specialists.  I believe Shirley was a one
9  and he was a two, but I'm not sure.
10     Q  And is there a distinction between a public
11  information specialist one and two?
12     A  There would be a difference of a grade or
13  some steps in terms of the salary structure.
14     Q  Do you know whether or not Mr. Stuart was as
15  long a tenured employee at the agency as Shirley Tabb?
16     A  I don't -- I don't think he was there as
17  long, but I'm not sure.  They both were there when I
18  got there.
19     Q  A little earlier in your testimony I asked
20  you some questions about circumstances under which you
21  had to remove employees.
22     A  Yes.

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 98

1  Q  Do you recall generally that discussion? I
2  think if I'm remembering your testimony correctly, you
3  were indicating that you couldn't recall some of the
4  specifics --
5  A  Right.
6  Q  -- of these events.  Does an employee of the
7  name of Kenneth Bickerstaff come to mind?
8  A  Yes.
9  Q  Do you know, was Mr. Bickerstaff a person
10  that was summarily removed from the agency?
11  A  I believe -- I'm not sure if he resigned or
12  was terminated, but that was not something I was
13  directly involved in.
14  Q  Who would have been directly involved in his
15  situation?
16  A  His supervisor.
17  Q  And who was that?
18  A  I don't remember which unit he was in.  He
19  was in one of the social work units, I think the
20  foster home recruitment unit, but I'm not sure.
21  Q  Do you know what his infraction or issue was
22  that caused him to be terminated or resign?

Page 99

1  THE WITNESS:  Counsel, do I just --
2  A  I mean, I don't -- I don't recall.  But, I
3  mean, there was a whole series of things with him, but
4  I don't know what the relevance --
5  MR. WILLIAMS:  Can you ask the
6  question again, please, counsel?
7  MR. CONDIT:  Sure.
8  BY MR. CONDIT:
9  Q  Do you know what the issue was with Mr.
10  Bickerstaff that caused him to be removed or resign?
11  MR. WILLIAMS:  Objection, relevance.
12  You have to answer the question.
13  THE WITNESS:  Yeah.
14  A  I don't know what the ultimate issue was.
15  There were -- there were concerns with his performance
16  and behavior for a while, but I don't know what
17  ultimately was the cause of his separation from the
18  department.
19  BY MR. CONDIT:
20  Q  So your involvement in his situation would
21  have been as a reviewing official, or no involvement
22  at all?

Page 100

1  A  I probably -- as the agency director, if he
2  left when I was agency director, which I don't recall,
3  then I would have had to sign the official paperwork.
4  But I wasn't involved in a decision about him.
5  Q  Okay.  So you would not have been the person
6  to have made a specific decision about his --
7  A  No.
8  Q  -- situation?  Okay.
9  Now, can I refresh your recollection by
10  suggesting that he may have been involved in
11  discharging a weapon of some kind?  Does that ring a
12  bell for you?
13  A  There was an allegation of that.
14  Q  Was that ever established?
15  A  I don't believe it was.
16  MR. WILLIAMS:  Counsel, I'm just
17  going to object to this line of questioning
18  concerning Mr. Bickerstaff and his termination.
19  MR. CONDIT:  Okay.
20  BY MR. CONDIT:
21  Q  So who would -- would Mr. Charles have the
22  paperwork on this issue, Mr. Bickerstaff's case?

Page 101

1  A  Certainly if there was a -- yes, he would
2  have -- he has the official -- he's the official
3  keeper of personnel records for the department, or
4  within his purview.
5  Q  Now, we were talking a little earlier about
6  your concerns and the fact that Ms. Tabb had made --
7  had had some communications with the office of the
8  mayor --
9  A  Yes.
10  Q  -- and the office of the deputy mayor.  Do
11  you recall that?
12  A  Yes.
13  Q  Aside from what you've already described in
14  your testimony and describing your concerns as you
15  did, were there any other steps that you took to
16  address the issue of Ms. Tabb making those specific
17  communications?
18  A  She was issued a letter of admonition after
19  the e-mail to the mayor's office.
20  Q  And the letter of admonition, who was behind
21  that, or who asked for that to be done?
22  A  It was a discussion between Mindy Good and

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 102

1  HR and the general counsel's office and myself.
2      Q   And as I understand it then, that letter of
3  admonition was focused on the fact that Ms. Tabb
4  communicated with the office of the mayor?
5      A   I believe that was the basis for the
6  admonition.
7      Q   Did you have a particular role of any kind
8  in the creation or issuance of that letter of
9  admonition?
10     A   I do not believe I signed that letter, but I
11 may have if I was officially required to do it.
12     Q   Who would have -- you said Mindy Good was
13 involved.  Anyone else involved in assessing that
14 situation and making that judgement?
15     A   Ronnie Charles and someone from the general
16 counsel's office.
17     Q   Okay.  But you don't know who from the
18 general counsel's office?
19     A   No.
20     Q   If there was a general counsel in place at
21 the time, do you think it would have been the general
22 counsel, or do you think it would have been the

Page 103

1  liaison person you were describing earlier?
2      A   I'm not sure.
3      Q   Did you have any written communications
4  other than the letter of admonition itself involving
5  this issue of admonishing Ms. Tabb for the
6  communication with the mayor's office?
7      A   Not that I recall.
8      Q   So there were no e-mails between you and Ms.
9  Good, for example?
10     A   Not that I recall, unless it was to forward
11 the e-mail.  I probably would have forwarded the
12 e-mail that I got from the deputy mayor saying did you
13 see this e-mail and we need to discuss it, but I don't
14 remember a specific e-mail about it.
15     Q   And was there a particular rule, law,
16 requirement, or policy that was violated that was the
17 center of the authorization for this letter of
18 admonition?
19     A   That would have been cited in the letter.  I
20 can't recite it by heart.
21     Q   Okay.  So whatever authority would have
22 existed for that action you say would be in the letter

Page 104

1  itself?
2      A   Yes, I believe so.
3      Q   And around what time period was it that this
4  letter of admonition was issued, if you know?
5      A   It was shortly before the -- her ultimate
6  termination, maybe within a couple of weeks.
7      Q   And do you know what reaction Ms. Tabb had
8  officially to the letter of admonition?
9      A   I believe she responded in writing.
10     Q   Did you review that?
11     A   Again, I believe she responded in writing.
12 If she did, I would have reviewed it, yes.
13     Q   And what was the purpose of her responding
14 in writing?  Was it to, for example, challenge the
15 allegations in the admonition?  Was it part of a
16 process?
17     A   I'm not sure.
18     Q   Is there a particular reference in the
19 District's personnel policy or regulations that
20 indicate how an admonition issue is dealt with, what
21 the process is?
22     A   I don't know what it is, but I believe so.

Page 105

1      Q   And that would have been Ronnie Charles's
2  job?
3      A   Yes.
4      Q   When did you first contemplate removal and
5  termination of Ms. Tabb?  When did that first become
6  something what you were seriously considering?
7      A   Well, when the whole issue with the e-mail,
8  I asked for advice on was there any disciplinary
9  action we can take and what would that be, and I don't
10 recall.  We might have discussed the possibility of
11 termination then.  But upon advice, we issued the
12 letter of admonition.
13         Then when the next incident occurred,
14 that was shortly after the letter of admonition, which
15 was similar in some respects in terms of going outside
16 of the department, raising, you know, awareness of an
17 issue that was an issue that we were already well
18 aware of.  There were also issues of concerns about
19 leave time and attendance and whether the leave usage
20 was valid, and all these things were a culmination of
21 things that occurred.
22         So when the incident that -- when Ms.

27 (Pages 102 to 105)

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 106

1  Tabb showed the child, you know, to the media, the
2  child sleeping in the building, then the same -- I got
3  my advisors, which was general counsel or someone from
4  general counsel's office, and Ronnie Charles from HR
5  and Mindy to say this kind of behavior is continuing
6  and it's -- you know, what recourses do we have.
7      Q  During your response to my question, you
8  indicated the next incident after the --
9      A  It's the incident when -- when she engaged
10 the media or went on camera in the media with the
11 child, the picture of the child sleeping in the
12 building.
13     Q  Okay.  That seemed to be a different step in
14 your testimony, but let me go back for just a second
15 and make sure I'm clear.
16         You testified that you sought counsel
17 on disciplinary options regarding the e-mail to the
18 mayor's office and that termination may have been
19 discussed at that point, correct?
20     A  Right.
21     Q  Then you said after that there was the next
22 incident, and I believe you were referring to the

Page 107

1  deputy -- contact with the deputy mayor's office?
2      A  No.
3      Q  No, that's not it?
4      A  No, because if you recall from my earlier
5  testimony, that contact with the deputy mayor and the
6  mayor's office of religious affairs were intertwined
7  in my mind.
8      Q  Okay.
9      A  So I don't know which came -- if they were
10 sequenced or if they were together.  It was the deputy
11 mayor raising to me the awareness of her e-mail to the
12 mayor's office of religious affairs.
13     Q  Okay.  Would the admonishment be addressing
14 both the communication with the mayor's office and
15 communication with the deputy mayor?
16     A  I'm not sure.  I believe it would.
17     Q  Now, then you said in your testimony that
18 the child sleeping in the building issue arose with
19 Ms. Tabb providing information to the media.  Is that
20 right?
21     A  Yes.
22     Q  Okay.  And how did you first become aware of

Page 108

1  the children -- the children sleeping in the building
2  issue becoming part of any media program or report?
3      A  Someone told me.  I didn't see it on the
4  news, but -- and I can't remember who reported it to
5  me.
6      Q  Did you ever have occasion to either review
7  any print media or video of that story?
8      A  Yes, after the fact.
9      Q  "After the fact" being after the story's
10 aired?
11     A  Yes.  I think there were two nights the
12 story ran, and I don't know if they were consecutive
13 or some time in between.
14     Q  How were you able to review or see the
15 stories after they had already been on television?
16     A  I don't know if someone had taped it or if
17 it was online.  I don't recall.
18     Q  Was someone within CFSA sort of the point
19 person on addressing this issue of children sleeping
20 in the building when it emerged as a story of interest
21 in the media?
22     A  What -- I'm not sure I understand the

Page 109

1  question.
2      Q  Was there a point person or person sort of
3  charged with addressing the media's interest in the
4  issue?
5      A  Addressing the media's interest?
6      Q  Yes.
7      A  Or addressing the issue of children sleeping
8  in the building?
9      Q  No, addressing the media's interest.
10     A  That would have been Mindy Good.
11     Q  So Ms. Good was the person at that time --
12     A  Yes.
13     Q  -- addressing the issue?  Okay.
14         So you got the -- you saw the media
15 report.  Did you see any print media stories on this
16 issue?
17     A  There had been a Washington Post -- I
18 believe a Washington Post article earlier about this,
19 but I don't remember the sequencing of it.
20     Q  You mean a Washington Post article that
21 preceded the television news report?
22     A  I believe so.  But again, I don't remember

28 (Pages 106 to 109)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 110

1 the sequencing of it.
2    Q   Other than the Washington Post, was there
3 any other print media that you reviewed that discussed
4 the children sleeping in the building issue as raised
5 by Ms. Tabb?
6    A   I don't think so.
7    Q   Do you know about when this story was given
8 to the media, about when in the year?
9    A   I think it was late September.
10    Q   Of 2005?
11    A   Correct.
12       MR. CONDIT:  Let's mark the next
13 exhibit, please.
14       (Donald Deposition Exhibit No. 5 was
15 marked for identification and was attached to the
16 deposition transcript.)
17 BY MR. CONDIT:
18    Q   Ms. Donald, I'm going to show you what's
19 been marked as Exhibit 5.  This is a two-page e-mail
20 chain with your e-mail to Mindy Good and Ronnie
21 Charles being the more recent of the e-mails.  The
22 date is August 17, 2005.  I'd like you to take a look

Page 111

1 at it.  Please tell me if you've seen this before.
2    A   Okay.  This looks familiar.  Certainly this
3 is the e-mail from Shirley to the mayor's director for
4 religious affairs.
5    Q   And is that Dr. Susan Newman?
6    A   Yes.
7    Q   And prior to this e-mail exchange, had you
8 met Dr. Newman?
9    A   I may have met her at a press conference
10 when the mayor appointed her, but I didn't know her.
11    Q   Did you have any interaction with her office
12 during this time?
13    A   No.  She was fairly new, if I recall
14 correctly.
15    Q   Now, do you recall receiving this e-mail and
16 preparing the e-mail that we see at the top of the
17 first page?
18    A   This looks right.
19    Q   Okay.  So your e-mail message after having
20 the message forwarded to you indicating that Ms. Tabb
21 was communicating with Dr. Newman says, "I am furious,
22 we need to talk about this tomorrow."  Do you see

Page 112

1 that?
2    A   Okay.  Yes.
3    Q   Now, I also see that there's an attachment
4 listed in the e-mail.  It says STabb Bio.  Do you see
5 that?
6    A   Yes.
7    Q   What was that document?
8    A   It seems to be the bio that she attached in
9 her e-mail to Dr. Newman that I considered as a pitch
10 for a job.
11    Q   Okay.  And when you say you are furious, and
12 use an exclamation point, what was it that you were
13 furious about at this?
14    A   Whatever I already described, that we have
15 an employee who was going outside of the chain of
16 command, raising an issue with the mayor's office that
17 then gets to my boss, the deputy mayor, and is, you
18 know, taken out of context.  So --
19    Q   Okay.  What was taken out of context?
20    A   I was just -- well, I don't know if that was
21 the right -- if that was the right terminology.  When
22 the deputy mayor says, "Are kids sleeping in office

Page 113

1 buildings," like he went right to one particular
2 point, that -- in the overall e-mail from Shirley,
3 that was just one aspect of it.  So I said that was
4 taken out of context.
5    Q   Okay.  Now, earlier in your testimony you
6 indicated that the issue of kids sleeping in the
7 building had been discussed throughout the year
8 basically, at least 2005.  Is that right?
9    A   Correct.
10    Q   And that -- if I'm misunderstanding your
11 testimony, correct me.  I believe your testimony was
12 that you had briefed Deputy Mayor Albert on this
13 subject --
14    A   I had, yes.
15    Q   -- prior to this event, prior to this
16 exhibit.  Is that correct?
17    A   I don't remember the timing of this exhibit.
18 I think when you asked me those questions before, you
19 kept referring to October 2005, and I said at some
20 point that I had discussed it with him.
21    Q   Okay.  Well, let me ask it this way, then.
22 Prior to the date of your e-mail on this exhibit at

29 (Pages 110 to 113)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 114

1  the top of page 1, August 17, 2005, had you briefed
2  Deputy Mayor Albert on the issue of children sleeping
3  in the building prior to August 17, 2005?
4      A  I'm not sure.
5      Q  Is there any information that exists either
6  that you have or that the agency might have that would
7  refresh your recollection on that subject of when you
8  briefed the deputy mayor first on this topic?
9          MR. WILLIAMS:  Objection,
10  speculation.
11          You can answer if you know.
12      A  I don't know.
13  BY MR. CONDIT:
14      Q  Now, your e-mail message at the top of the
15  exhibit, Exhibit 5, says, "We need to talk about this
16  tomorrow," and you're communicating with Mindy Good
17  and Ronnie Charles.  Is that correct?
18      A  Yes.
19      Q  Okay.  And was there a meeting about this
20  the following day?
21      A  There was a meeting.  I'm not sure if it was
22  the following day.

Page 115

1      Q  Now, I notice that the e-mail is sent at
2  10:15 p.m.  Were you in the office when you prepared
3  this e-mail?
4      A  I doubt it, but I work out -- you know,
5  would have a Treo or Blackberry or whatever, wireless
6  device.
7      Q  Okay.  Now, would there be some kind of
8  designation if it was a Blackberry or wireless device
9  that your message was being transmitted from such a
10  device?  In other words --
11      A  Not necessarily.  Sometimes you'll have a
12  tagline at the end -- I never did -- that said this
13  was being sent from a Blackberry device, but we work
14  around the clock.  I can assure you I would not have
15  been at the office at 10:15.
16      Q  Would it be an indication to you that
17  perhaps you had not previously briefed Deputy Mayor
18  Albert on the subject of children sleeping in the
19  building because his e-mail message that you're
20  reacting to says, "Are kids sleeping in the office
21  buildings?"
22      A  That's possible.

Page 116

1      Q  So this may have been the first time he
2  heard about this issue?
3      A  I would not say it's the first time he
4  learned about the issue because, again, we had been
5  making reports to the court monitor and we had the
6  whole placement resources plan.  But again, that was
7  in a broader context.  So I don't know if he would
8  have been focused on the number of incidents with the
9  kids sleeping in the building prior to this.
10      Q  Now, from this e-mail message that you
11  received from Deputy Mayor Albert, did you respond to
12  him directly?  Because I notice the e-mail we have
13  here is a forwarded message to Mindy Good and Ronnie
14  Charles.  But did you respond to the deputy mayor?
15      A  Yes, I would have talked to him and then
16  discussed it in a meeting, subsequent meeting.
17      Q  Would you have responded to his e-mail
18  message via e-mail?
19      A  I believe by phone, but it could have -- I
20  could have well said let's talk about it.
21      Q  Do you know about when after you received
22  his e-mail message you may have talked to him about

Page 117

1  this subject?
2      A  I'm sure I would have reached out to him
3  right away.
4      Q  So it would have been within 24 hours?
5      A  I don't know.
6      Q  48 hours?
7      A  I mean, I'm sure I would have.  He's my
8  boss.  So if he sent me an e-mail, I'm going to
9  respond either by calling or sending him an e-mail,
10  but I just don't recall exactly.  But it's reasonable
11  that would have been within 24 hours.
12      Q  And when you had that initial communication
13  with him, you think it was by telephone?
14      A  Again, I don't recall.
15      Q  Do you recall any of the substance of your
16  dialogue with him after receiving his e-mail message
17  which is reflected in Exhibit 5?
18      A  There was -- this is you don't have all the
19  facts, let me sit down and talk to you about -- you
20  know, let you know what we're doing and what this is
21  all about.
22      Q  Do you recall anything of his reaction to

30 (Pages 114 to 117)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 118

1  the issue?
2      A  No, other than he wanted to be informed.
3      Q  Did Deputy Mayor Albert give you any
4  particular direction or advice on this subject?
5      A  No.
6      Q  Did he ask you to report to him on this
7  issue by a certain time or within a certain amount of
8  time?
9      A  I don't recall, but typically he would just
10  want me to keep him abreast of how we were doing.
11      Q  So going back to your testimony a short time
12  ago.  Would this e-mail chain which we see in Exhibit
13  5 have been the basis for the admonition?
14      A  Yes, I believe so.
15      Q  Now, once you received this e-mail message,
16  which is dated -- let me see -- and I'm referring to
17  the second e-mail message on the exhibit, which is
18  Deputy Mayor Albert's.  Once you received this on
19  August 15 or so -- he sent it, it looks like, on
20  August 15 -- were there any steps other than
21  communicating with the deputy mayor that you took
22  regarding the issue of children sleeping in the

Page 119

1  building?
2          MR. WILLIAMS:  I'm sorry, counsel.
3  Can you just -- I think -- I'm not sure if you're
4  identifying the right message.  Can you just say
5  whatever it is again?
6          MR. CONDIT:  Certainly.
7  BY MR. CONDIT:
8      Q  Going back to Exhibit 5, the message that's
9  sent to you from Deputy Mayor Albert, which I believe
10  is the second message in the chain which has -- poses
11  the question, "Are kids sleeping in the office
12  buildings."  Do you see that?
13      A  Yes.
14      Q  Okay.  After you received that message,
15  aside from reaching out to the deputy mayor, were
16  there any other actions that you took with respect to
17  the issue of children sleeping in the building?
18      A  Other than the ones we were already taking
19  as part of our plan?
20      Q  Yes.
21      A  I don't think so.
22      Q  In order to keep the deputy mayor informed

Page 120

1  or inform him further about the issue of children
2  sleeping in the building, did you take any steps or
3  require anyone else to take any steps or provide any
4  information that would help you inform the deputy
5  mayor?
6      A  I don't recall unless -- it's likely it
7  would have been to inform him on the reports that we
8  were making to the court monitor if we hadn't been
9  already, but I think we had.  So I'm not sure if
10  anything additional that we would have done.
11      Q  If anything additional was done, who would
12  have been involved in doing that additional data
13  collection or information development?
14      A  The same people who were involved, intake,
15  placement people, deputy who was overseeing the
16  placement plan, members of the management team.
17          MR. CONDIT:  Mark the next exhibit.
18          (Donald Deposition Exhibit No. 6 was
19  marked for identification and was attached to the
20  deposition transcript.)
21  BY MR. CONDIT:
22      Q  Ms. Donald, I'm going to show you what's

Page 121

1  been marked as Exhibit 6.  This is also an e-mail
2  chain, one page, with the top e-mail being from you to
3  Mindy Good dated Wednesday, August 24, 2005.  Take a
4  look at it, please, and tell me if you recognize it.
5      A  Okay.
6      Q  Is this e-mail chain familiar to you?
7      A  Yes.
8      Q  And do you recall that you sent an e-mail to
9  Mindy Good saying, "Let's discuss when we meet?"
10      A  I mean, I see it here.
11      Q  Okay.  Do you have any reason to doubt its
12  authenticity?
13      A  No.
14      Q  Now, what was the reason for the information
15  that we see in the middle of this exhibit about dates
16  and children?  Why was that developed?
17      A  To give us an update on how many kids had
18  slept in the building over a period of time, over this
19  -- obviously since Jill Forbes first came on board,
20  who was then the new placement director, and it was to
21  make sure that we had all of our facts correct.
22      Q  Okay.  Now, I notice if we go to the very

31 (Pages 118 to 121)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 122

1  bottom of the exhibit, the bottom of the page, there's
2  an e-mail message from you to Ms. Forbes asking Ms.
3  Forbes to produce this information since she's been
4  here. Do you see that?
5      A  Yes.
6      Q  Why was that necessary if this issue of
7  children sleeping in the building has been -- was
8  being tracked?
9      A  I don't know. I think maybe because it was
10  suggested that this was a regular occurrence, that we
11  were having kids sleeping in the building all the
12  time, and we knew that there had been some incidences
13  of children sleeping in the building and that I wanted
14  to get a complete report from -- just to make sure
15  that we didn't -- you know, it wasn't occurring all
16  the time. And I remember seeing a chronology at a
17  certain point in time, but we had to report.
18      Let me clarify. When we report to the
19  court monitor on any particular instance when a child
20  slept overnight, we would have to alert the court
21  monitor. So if we had a child on April 19, and then a
22  child on April 20, we would have to do a daily report,

Page 123

1  and we didn't -- might not have had the whole
2  chronology of how many kids had slept in the building
3  over a period of time, and that was the purpose of
4  this, to look at it in one place.
5      Q  I see. So is it your testimony then that
6  when a child slept in the building, there was a daily
7  report which was issued that went to the court
8  monitor?
9      A  Yes.
10      Q  And who saw those daily reports other than
11  yourself?
12      A  I'm not sure. I'm not sure how we even
13  transmitted. Those were just an e-mail alert or what.
14      Q  And who would be responsible for sending
15  those daily reports?
16      A  As I said before, I thought it was either
17  intake or placement, but obviously it would have been
18  placement that would have gathered the information.
19  I'm not sure who would have sent it, probably our --
20  might be Andrea Guy's office of policy and planning,
21  I'm not sure, because that's who normally communicated
22  with the court monitor, and we had a protocol about

Page 124

1  correspondence with the court monitor other than
2  meetings and that sort of thing.
3      Q  Would the document itself be entitled or
4  identified in some way as a daily report?
5      A  I'm not sure.
6      Q  Can you tell me how one might identify it
7  among the number of papers that go to the court
8  monitor?
9      A  Again, I'm not sure. I think at some point
10  it was incorporated into our monthly court report, but
11  we had to do it on an individual basis. So whenever a
12  child stayed overnight, there had to be an alert, just
13  like if there was any critical incident, special
14  event, critical event to a child, or certain things
15  that we were required to report, a fatality, and so I
16  don't know if those were -- I don't know if we had a
17  special report, or if we just did an e-mail alert, or
18  even -- so I don't know what that would look like.
19      Q  So if you were to -- if you were asked to go
20  over to CFSA today and pull whatever reports there
21  might be or alerts there might be for children
22  sleeping in the building for 2005, what steps would

Page 125

1  you take? How would you figure that out?
2      A  I would go to the court -- the documents
3  that we submit to the court monitor and would ask for
4  those to see if there was a special report or if it
5  was included in the monthly report. I know for a fact
6  that we did something similar to this in response to a
7  city council oversight hearing question that fall, so
8  I know we would have had it there. I would have
9  looked in that, those documents. And it probably
10  would have gone to -- the most direct source would be
11  placement, which is Jill Forbes's office.
12      Q  So if placement -- if the placement office,
13  excuse me, was responsible for at least identifying
14  this data as it occurred, children sleeping in the
15  building, would it -- was it your understanding during
16  your tenure that then Jill Forbes or someone from
17  placement would transmit that to Andrea Guy or someone
18  from the policy and planning office for it to be
19  transmitted to the monitor?
20      A  Yes. I'm not sure of the chain of
21  transmittal. Obviously they would have to notify my
22  office, the deputy director for programs first, who

32 (Pages 122 to 125)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 126

1  had oversight for placement, and at that time would
2  have been Uma Ahluwalia, and then me. I don't know if
3  it came at the same time and if the court monitor
4  would have been cc'ed if it was an e-mail, or did it
5  come up to us and then went via our standard
6  reporting. I don't know how it was transmitted.
7      Q  Were the alerts or daily reports that you've
8  been describing in your testimony routinely given
9  Deputy Mayor Albert or anyone in the mayor's office?
10     A  I don't believe so.
11     Q  So, for example, such alerts would not have
12  been given to the mayor's office of counsel?
13     A  I don't think so.
14     Q  Okay. I notice -- focusing your attention
15  on Exhibit 6 in the middle e-mail, which is from Jill
16  Forbes to you at 9:54. She reflects in that message
17  that on June 7, or about June 7, was when you were
18  going to pay for the motel, and you see that --
19     A  Yes.
20     Q  -- discussion there? What is she talking
21  about there, do you know?
22     A  Yes. We had a child, may have been a set of

Page 127

1  siblings who came in late that evening, and they
2  couldn't find placements for them, and the placement
3  office was supposed to notify me or the deputy
4  director whenever we had problems placing kids so that
5  we could figure out what to do, and the only option
6  that was recommended by the placement office at that
7  time was to put them in a motel.
8          They had arranged for the motel, but
9  our -- no one -- we didn't have a corporate credit
10  card or other means to pay for the hotel with an
11  advanced payment. I said I would put it on my
12  personal credit card if necessary to make sure that we
13  had a place for the children. And they were able to
14  figure out some -- an emergency placement and didn't
15  have to use the motel.
16     Q  Now, then she goes on to say -- and I don't
17  know if it's the same message -- that "since then we
18  have developed an approved hotel list with vacancies
19  and a running list of volunteers to do the overtime if
20  need be." Do you see that?
21     A  Yes.
22     Q  Were you involved or informed about this

Page 128

1  approved hotel list and these volunteers?
2      A  Yes. That was one of the strategies to
3  mitigate having children sleeping in the building
4  overnight, was that if we ever got into a situation
5  where we didn't have a placement for a child that our
6  backup plan was to use a hotel, and we had to have a
7  case worker on site that would be awake to supervise
8  the children there. And after, I guess, the incident
9  in June when we found a hotel and didn't have a way to
10  bill for it or properly pay for it, then they went
11  back and developed a list of hotels that would take
12  our kids on an emergency basis.
13          The next paragraph talks about yet
14  another strategy. As I described earlier, we had a
15  whole plan and a number of strategies we were
16  employing to try to avoid having kids sleep overnight.
17  So this whole Lutheran Social Service and Martin
18  Pollak was another one of our strategies, was to
19  increase their contract and do this lease case without
20  the case management piece, which has to do with social
21  workers being available, and we added an extra 24
22  beds, and that relieved us from having kids sleeping

Page 129

1  overnight.
2          So, again, we were -- had been working
3  on this for, you know, most of that year, earlier in
4  the spring, as I had indicated, and we had some
5  strategies and backup plans and the motel/hotel was
6  one, the expansion of beds at these two providers was
7  another. All of this was in, you know, spring and
8  early summer.
9      Q  So as of the dates of these e-mails, which
10  is August 24, 2005, was one of the placement options
11  when there was no foster home available, a situation
12  that on an emergency basis a case worker would be in a
13  hotel or motel overnight or until a placement could be
14  determined?
15     A  That was an option, and I'm not sure how
16  often we used it, if at all, but --
17     Q  She also reflects -- and this is Ms. Forbes
18  in the same e-mail message -- that the extra beds from
19  Lutheran Social Service and Martin Pollak have covered
20  the needs for the moment, but then she says, "The last
21  two weeks have been very slow, so we've been okay.
22  But it is heating up again." Do you see that?

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 130

1    A  Yes.
2    Q  Okay.  Do you know whether or not after this
3  time, August 24, there were situations when children
4  slept in the building because none of these other
5  emergency options were available or utilized?
6    A  Well, yes.  Obviously it happened in
7  September, I think it was September, whenever it was
8  when the child was shown on TV sleeping in the
9  building.
10    Q  So in that instance, why wouldn't someone
11  from intake or placement have exercised the option to
12  go to a hotel or motel?
13    A  I don't know.
14        MR. WILLIAMS:  Objection,
15  speculation.
16    A  I don't know.
17  BY MR. CONDIT:
18    Q  Did you inquire into that when you
19  investigated this issue?
20    A  Yes, but I don't recall what the response
21  was.  Obviously the system didn't work.
22    Q  Let me show you what I'll mark as the next

Page 131

1  exhibit.
2        (Donald Deposition Exhibit No. 7 was
3  marked for identification and was attached to the
4  deposition transcript.)
5  BY MR. CONDIT:
6    Q  Ms. Donald, I'm going to show you what's
7  been marked as Exhibit 7.  This is a print story done
8  by WUSA TV 9 that appeared on their Web site
9  apparently around September 20, 2005.  I'd like to
10  show it to you and ask you if you've seen it before.
11    A  Okay.  Yes, this is the article or the
12  transcript of the news story that Shirley was
13  interviewed and showed a picture of a child sleeping
14  in the building.
15    Q  So I guess more specifically my question,
16  though, is have you seen this print version of this
17  story from TV 9 prior to today, I guess?
18    A  This format doesn't look familiar, but I do
19  recall the story.
20    Q  Okay.
21    A  I don't remember how I saw it.
22    Q  Now, turning to the second page.  The second

Page 132

1  page provides a picture that TV 9 provided with the
2  story, and is that picture familiar to you?
3    A  Yes.
4    Q  Okay.  When did you first see that picture,
5  if you recall?
6    A  Again, it was -- I didn't see it on the
7  news.  It was after the fact.
8    Q  Do you recall if you ever saw the picture
9  that we're seeing in this exhibit, Exhibit 7, in a
10  print story or in a video version?
11    A  I believe it was a video version.
12    Q  Did you ever have occasion prior to today to
13  see a still photograph like the one we see on the
14  second page of Exhibit 7?
15    A  I don't recall that.  I don't recall if I
16  saw a video or a -- the picture in the video or a
17  still picture.  I don't remember how I saw it.
18    Q  When you saw the picture, wherever you saw
19  it, whether it was on video or in still form, were you
20  able to recognize the features of the child?
21    A  No.
22    Q  Were you able to identify the child in terms

Page 133

1  of who he or she was?
2    A  No.
3    Q  Do you know whether the agency ever
4  identified the child that was depicted in any of the
5  pictures or videos?
6    A  No, I do not.
7    Q  Did you do any stand-ups in front of camera
8  or reporters to address this issue of children
9  sleeping in the building around this time of September
10  of 2005?
11    A  I don't think -- I don't think I did.
12    Q  Now, in the middle of this exhibit, Exhibit
13  7, the first page, there's a discussion of a message
14  on an answering machine.  Would you take a look at the
15  mid page.  It says, for example, "In her message, the
16  social worker says..." and then it gives the message.
17  Had you heard about the message that is being
18  reflected in the story?
19    A  Yes, I heard about it, but I don't remember
20  when.
21    Q  Okay.  Did you ever hear the actual audio of
22  that message?

34 (Pages 130 to 133)

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 134

1    A  No, I did not.
2    Q  How did you hear about the message?
3    A  It was in a discussion with Mindy about --
4  after the -- I believe after the news story aired, and
5  it was in addition.  There was this e-mail or voice
6  mail when Shirley was off on sick leave with a worker
7  about this issue about blankets.  So it was discussed
8  in that, in the overall conversation.
9    Q  Did you ever come to know who the worker was
10 who left that message?
11   A  No.
12   Q  Did you ever investigate or have anyone
13 investigate that issue?
14   A  I didn't.
15   Q  Do you know if anyone did investigate that
16 issue?
17   A  No, I don't.
18   Q  Now, once the story broke on or around
19 September 20, what action, if any, were you involved
20 in taking to address the story or to address Ms.
21 Tabb's involvement in the story, or both?
22   A  Well, to address the story, we gathered the

Page 135

1  facts about how many nights -- how many kids we had
2  sleeping in the building overnight, and I believe that
3  Mindy Good did an interview to -- Mindy or Uma, I
4  believe -- did an interview with Channel 9 to say here
5  are the facts and here's what we've been doing about
6  it, and by the way, we need more foster homes.  So
7  that would have been our public response, a media
8  response.  I don't remember if it was covered or not.
9  I believe it was.  I believe it was Mindy on the air.
10   Q  Why weren't you the person that did the
11 interviews or appeared on camera?
12   A  Usually Mindy was our principal spokesperson
13 on media issues.  Sometimes I would do it.  We would
14 just decide what made the most sense on a particular
15 case.  When she was there, for the most part she
16 did -- she was the agency spokesperson on air.
17   Q  At this point in time, September 20, 2005,
18 were you being considered for the deputy mayor
19 position?
20   A  Yes.
21   Q  And when was it first -- when did you first
22 know that you were being considered for that position?

Page 136

1         MR. WILLIAMS:  Objection, relevance.
2    A  We had discussions for a couple of months
3  before I went over there, which was October 31.  So I
4  would have been having discussions with the deputy
5  mayor and the mayor's office around that time.
6  BY MR. CONDIT:
7    Q  So it would have been around September of
8  2005?
9    A  Yes, that's about right.  It might have been
10 a little earlier.
11   Q  So you may also have been discussing the
12 possibility of becoming deputy mayor in August of
13 2005?
14   A  Could have been.  I'm trying to remember
15 when Neil Albert decided to leave, but it was over
16 several months that we had the conversations.
17   Q  Did the fact that you might become the
18 deputy mayor play any role in the decision whether to
19 appear on camera on this issue of children sleeping in
20 the building?
21   A  No, not at all.
22   Q  What was the rationale at the time for

Page 137

1  having Mindy Good or Uma Ahluwalia appear on camera on
2  this issue rather than yourself?
3    A  Again, Mindy was our spokesperson.  She did
4  almost all the interviews, and I can't -- again, I
5  don't remember if it was Uma, but if it was, she would
6  have been over the programs side of the house that was
7  responsible for implementing the plans to address the
8  issues, and that's normally how we did it.  We would
9  have our agency spokesperson and the point person from
10 the programs side.
11   Q  Okay.
12        MR. CONDIT:  Mark the next exhibit.
13        (Donald Deposition Exhibit No. 8 was
14 marked for identification and was attached to the
15 deposition transcript.)
16 BY MR. CONDIT:
17   Q  Ms. Donald, I'm going to show you what has
18 been marked as Exhibit 8.  It is an e-mail from Mindy
19 Good, looks like from Mindy Good's e-mail, but it is
20 an e-mail that was apparently prepared by Uma
21 Ahluwalia to a whole host of people from the council
22 and cc'ed to yourself and others.  I'd like to know if

35 (Pages 134 to 137)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 138

1 you've seen this document before.
2     A  It looks familiar.
3     Q  Did you have any role in a strategy to
4 communicate with the council about the children
5 sleeping in the building issue once the story broke in
6 the media?
7     A  Certainly I would have.
8     Q  Do you recall what your role was in
9 developing that strategy?
10     A  Well, I would have been the one that made
11 the final decision about how we communicated anything
12 to the office of the mayor or the city council, and
13 it's likely that we had discussion about now this
14 issue has gotten some traction through this news
15 report, we need to set the facts straight, and let's
16 make sure that we notify the council and the mayor's
17 office and get them the chronology of instances where
18 kids were overnight and what we're doing, what we've
19 been doing to address it.
20     Q  Okay.  And I see that there's an attachment
21 to this e-mail, which is identified by the file name
22 Children Overnight.doc.  Do you see that?

Page 139

1     A  Yes.
2     Q  Do you know what that document contained?
3     A  No, I don't.
4     Q  Do you recall whether you reviewed that
5 document before it was sent to the council?
6     A  I'm sure I would, and it's more than likely
7 the list of dates where children stayed overnight and
8 what we were doing to address it.  I would -- I'm
9 assuming that those two were sent together, but I
10 don't remember this particular one.
11     Q  Why was a communication strategy, and in
12 particular this e-mail, sent to the council?
13         MR. WILLIAMS:  Objection,
14 speculation.
15         Answer if you know.
16         THE WITNESS:  Sure.
17     A  I mean, because we're Washington, D.C., and
18 anything that gets in the news the city council is
19 very interested in, and if there was any incident
20 pertaining to the agency, we had a child fatality or
21 any critical incident that got media attention or was
22 likely to get media attention, we would give a

Page 140

1 heads-up to the council and to the deputy mayor.
2 BY MR. CONDIT:
3     Q  During this time period, August, September
4 2005, were there any other issues like this where
5 there was some kind of communication of this broad a
6 nature given to the council relating to the agency?
7     A  I don't know.
8     Q  Now, at the time of this e-mail, September
9 20, 2005, with your knowledge that you might become
10 deputy mayor, was Uma Ahluwalia being considered as
11 the next director of the agency?
12     A  Yes.
13     Q  And who was in the loop on the discussions
14 on that possibility?
15     A  Myself and Neil Albert, and at the time when
16 we talked to the mayor, then that was the
17 recommendation to the mayor.
18     Q  Is that the reason why Ms. Ahluwalia is
19 sending this message to the council instead of
20 yourself?
21     A  I'm not sure, quite frankly.  I mean,
22 normally I would have sent it, unless maybe I was out

Page 141

1 of town.  I'm really not sure.
2     Q  Did you get any calls or responses from the
3 city council on this e-mail message?
4     A  I don't recall getting any.
5     Q  Do you know if you received any e-mail about
6 this e-mail message or the document that was attached
7 to the e-mail message that we see in Exhibit 8?
8     A  I don't recall that.
9         MR. CONDIT:  Mark the next exhibit,
10 please.
11         (Donald Deposition Exhibit No. 9 was
12 marked for identification and was attached to the
13 deposition transcript.)
14 BY MR. CONDIT:
15     Q  Ms. Donald, I'm going to show you what's
16 been marked as Exhibit 9.  This is a one-page
17 document, the date of September 20, 2005 on it.  It's
18 from Uma Ahluwalia, principal deputy director, and the
19 subject is facts about children spending the night at
20 CFSA.  Tell me if you've seen this document before.
21     A  Yes.
22     Q  What is this document?

36 (Pages 138 to 141)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 142

1    A  It's a memo that is describing the situation
2  and what we were -- what we were doing to address it.
3    Q  Was it distributed to anyone?
4    A  I'm not sure. I believe it went to all
5  staff, quite frankly, but I don't see evidence of that
6  from this document.
7    Q  No. Is it possible that this is the
8  document that we saw in reference in the previous
9  exhibit as Children Overnight.doc?
10    MR. WILLIAMS:  Object to
11  speculation.
12    Answer if you know.
13    A  I don't know.
14  BY MR. CONDIT:
15    Q  Did you have -- play any role in the
16  crafting of this document?
17    A  I certainly would have reviewed it and
18  approved it.
19    Q  Do you recall whether you reviewed this
20  document at the time?
21    A  I don't recall.
22    Q  In terms of the content of the document, are

Page 143

1  you familiar with that?
2    A  Yes.
3    Q  Okay. And do you know whether or not this
4  similar content was utilized in some other document
5  that was addressing the children sleeping in the
6  building issue, if not in this one?
7    A  Yes. This was -- these were strategies
8  taken from our overall placement plan that I've spoken
9  about several times and that we were working with over
10  the past year and working with the court monitor on.
11  These were some of the strategies that we had been --
12  that were under development to address our placement
13  issues.
14    Q  All right. Now, in the memo down near the
15  bottom, third paragraph from the bottom says, "Since
16  June 7, two girls, ages 7 and 19, spent the night at
17  CFSA." Do you see that?
18    A  Yes.
19    Q  Is this memo designed to bring whoever it is
20  going to up to date on the status of children sleeping
21  in the building and when they have done so and when
22  they haven't?

Page 144

1    A  Can you ask that again?
2    Q  Is this memo designed to bring whoever it's
3  given to up to date on when children have slept in the
4  building at the agency during this year, 2005?
5    MR. WILLIAMS:  objection,
6  speculation.
7    Answer if you know.
8    A  I don't think this -- this memo is an
9  attempt to set out, to outline the facts, and to
10  assure people that we are aware of the issue, that it
11  has occurred infrequently but has occurred, and that
12  we've been working diligently to alleviate the
13  situation, and that our strategies are starting to
14  take hold, and that we had since June only two
15  additional instances of children overnight. So we're
16  trying to say it's, you know, it's working and we're
17  on top of it.
18  BY MR. CONDIT:
19    Q  Okay. Now, but since June there were more
20  than just the two girls that are referenced here that
21  slept in the building overnight because there was the
22  child that's identified in the news story, correct?

Page 145

1    A  I don't know. I know that when this memo
2  was put out, those was the facts as we knew them and
3  as we believed to be true.
4    Q  So would it be fair to say then that this
5  memo does not account for the child that we saw in the
6  news article?
7    MR. WILLIAMS:  Just a point of
8  clarification. I don't think -- I could be
9  wrong -- but I don't think her testimony said
10  that that child in the picture spent the night.
11  I think you asked questions about the features of
12  the child and had she seen pictures before, but
13  I'm not sure that she ever said that that child
14  spent the night. So when you ask here whether it
15  was one of the kids that spent the night, I'm not
16  sure. I think it's a mischaracterization.
17    MR. CONDIT:  Okay.
18  BY MR. CONDIT:
19    Q  Ms. Donald, can you pull the exhibit with
20  the child's picture in it? I think it's the WUSA TV 9
21  story. What exhibit number is that?
22    A  7.

37 (Pages 142 to 145)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 146

1    Q  Okay.  Page 2 is the picture of the child on
2  Exhibit 7.  Was it ever determined whether or not that
3  child spent the night at CFSA?
4    A  Not that I know of.
5    Q  Not that you know of?  You mean it was never
6  determined, or that they didn't spend the night?
7    A  Either one.  I don't know if the child spent
8  the night or if it was determined that the child spent
9  the night.
10   Q  Okay.
11   A  And if, in fact, when the child was taken in
12  the picture.
13   Q  Okay.  So following the news story and news
14  reports around the 20th of September, 2005, what steps
15  or actions, if any, did you take with respect to
16  Shirley Tabb's involvement in those stories?
17   A  Again, I met with Mindy and Ronnie Charles
18  and/or general counsel's office to discuss the
19  situation and to find out if there's anything that we
20  could or should do about it.
21   Q  How soon after the news reports aired did
22  you have the meeting that you're describing with Ms.

Page 147

1  Good, Mr. Charles, and someone from the office of
2  general counsel?
3    A  I don't remember, but fairly soon.
4    Q  So would it have been within a day, a week?
5    A  I would say within a week.  I'm not sure how
6  soon.
7    Q  And where did the meeting take place?
8    A  I believe it was in my office.
9    Q  Other than yourself, Ms. Good, Mr. Charles,
10  and a member of the office of general counsel's staff,
11  was there anyone else in the meeting?
12   A  No, I don't think so.
13   Q  And about how long did the meeting last?
14   A  I don't know, an hour maybe.
15   Q  And did you chair the meeting or run the
16  meeting?
17   A  Yes.
18   Q  And what were the subject areas that were
19  touched upon in the meeting?
20   A  Well, we obviously discussed the fact that
21  Shirley was on sick leave and participated in a news
22  story about the department and identified or showed a

Page 148

1  picture of one of our clients to the media, and we
2  were concerned about that.
3        And then we discussed Shirley Tabb in
4  general in terms of other concerns that we had which
5  went to possible misuse of leave, and this was an
6  example of was supposed to be on sick leave, how do
7  you participate in a media interview; performance
8  issues that have been documented and discussed
9  previously about if you've got a person who is the
10  public information officer, is that person not aware
11  of all that we've been doing over the past year to try
12  to address the issue of placements, and then is she --
13  how can she represent the department in her role as a
14  spokesperson and advocate for the department by going
15  to the media and basically trashing the department.
16        And then we looked at the letter of
17  admonition and the events that prompted that, we
18  looked at performance issues, and we put everything on
19  the table and said that we felt that -- I felt that,
20  based on everything, that this was an employee who was
21  not serving the agency well and what options did we
22  have.

Page 149

1    Q  So is it fair to say that this meeting that
2  you're describing would not have taken place had it
3  not been for the media event?
4    A  I don't think that would be fair at all
5  because we had had conversations about performance
6  issues.  We had had conversations about this going to
7  the mayor's office and going above the chain of
8  command and not appropriately and properly
9  representing the department as an employee whose job
10  it was to do that.
11        So those were discussions that we had,
12  and there were also the concerns about the possible
13  misuse of leave and that time and attendance issues
14  that addressed performance and a lot of documentation
15  about that.
16   Q  So are you telling me then that this meeting
17  that you're just describing was scheduled prior to the
18  events of the media reports about children sleeping in
19  the building?
20   A  No, I'm not.
21   Q  So it would be fair to say that it was
22  scheduled as a result of those reports, right?

38 (Pages 146 to 149)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 150

1    A  The meeting itself?
2    Q  Yes.
3    A  Okay.  That's fair.
4    Q  Now, with respect to the items that you were
5  reflecting in your testimony a few moments ago that
6  you considered to be performance related issues, had
7  those issues, such as concerns about leave, time and
8  attendance, performance, had those been reflected to
9  Ms. Tabb in some way?
10    A  They had --
11    Q  Had they been communicated to her?
12    A  Yes, and certainly we talked earlier about
13  the performance appraisal that was critical of
14  performance.  Mindy had developed a -- I don't know if
15  "corrective action" is the proper term, but a
16  performance improvement plan, I believe is what we
17  call it, that identified concerns about performance
18  and Shirley's attendance and ability to complete
19  assignments.  Those had been raised with Ms. Tabb and
20  all were documented as well.
21    Q  Okay.  With respect to the performance
22  appraisal that you're referring to, was that appraisal

Page 151

1  less than satisfactory, do you recall?
2    A  I'm not sure if it was less than
3  satisfactory.
4    Q  With respect to the performance improvement
5  plan, what was the status of that plan and how long
6  had it been in effect when you had this meeting
7  shortly after September 20, 2005?
8    A  I don't remember.  I believe it was in
9  effect, but I'm not sure what period of time it
10  covered.
11    Q  Did you review any of Ms. Tabb's work
12  product or actions or activities associated with that
13  performance improvement plan?
14    A  I did, yes, I had at the time Mindy brought
15  that up to me, and when I first signed off on the
16  plan, and then Shirley's response to it, her rebuttal.
17  Not the plan, the appraisal and her rebuttal.  Yes.
18    Q  Okay.  I think we might have some things
19  confused.  My question was had you reviewed at the
20  time of this meeting or by the time of this meeting,
21  which is shortly after September 20, 2005, had you
22  reviewed any work products that Ms. Tabb was producing

Page 152

1  in accordance with the performance improvement plan
2  that Ms. Good had instituted?
3    A  I'm not sure.
4    Q  And, now, you said that you had determined
5  in the meeting you were describing with Ms. Good and
6  others that you felt based on everything that you were
7  reviewing that you needed to consider options with
8  respect to Ms. Tabb.  Is that correct?
9    A  Yes.
10    Q  And what options, if any, were discussed in
11  this meeting?
12    A  Discipline and up to termination.
13    Q  And did you evaluate each of those options,
14  discipline up through termination, in this meeting in
15  the conversation that was going on?
16    A  No.  That meeting was to discuss what kind
17  -- what were the options, and then for HR, through
18  Ronnie Charles and general counsel, to review the
19  whole file, all of the circumstances, and to come back
20  with a recommendation or set of recommendations.
21    Q  Okay.  So if I'm understanding correctly, at
22  the meeting you've been testifying about, when it got

Page 153

1  to options, discussion, merely a list was given that
2  you could do discipline of various types perhaps, and
3  then up through termination, and it was the role of
4  folks after the meeting to make recommendations on
5  those options.  Is that right?
6    A  Not exactly like that.
7    Q  Okay.
8    A  It was basically, as I said, that I had
9  reached a conclusion that I felt that Shirley was not
10  serving the department well and wanted to know, given
11  all of the issues, performance, time and attendance,
12  violation of a client's confidentiality, protection,
13  and that we wanted to -- that I wanted to know what
14  our options were.
15    Q  Okay.  So after the meeting you were
16  describing, which occurs --
17    A  Within a few days after --
18    Q  Within a few days after the media reports?
19  So that's within a few days of September 20, 2005.
20  When was the next time you either met on the subject
21  of what to do with respect to Ms. Tabb?
22    A  It would have been within the next few days

39 (Pages 150 to 153)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 154

1  or however long it took them to research and come
2  back.
3      Q   And who was involved in that second meeting?
4      A   Same people.
5      Q   Same people?
6      A   Ronnie Charles and general counsel.
7      Q   Okay.  And so what transpired in that
8  meeting?
9      A   Then they came back and said that here are
10  the grounds, we have resources, we've looked at the
11  whole file, and based on all of the factors, the
12  document performance issues, the concerns about
13  abusive leave, and the going outside of the chain of
14  command, violated the admonition, letter of
15  admonition, and then exposing a client, which for us
16  was the straw that broke the camel's back, that we had
17  enough grounds to terminate her.
18          And those things were cited, and I
19  can't remember if they came in with a letter or a
20  letter that was subsequently drafted, but those things
21  were identified in the letter, or for the letter.
22      Q   Okay.  So based on this second meeting,

Page 155

1  there was a conversation about the -- well, strike
2  that.
3          THE VIDEOGRAPHER:  Ms. Donald,
4  please move back to the middle.
5          THE WITNESS:  I'm sorry.
6  BY MR. CONDIT:
7      Q   In this second meeting that you were
8  testifying about, was termination the only option that
9  was discussed?
10          MR. WILLIAMS:  Counsel, in an
11  abundance of caution, I know that the general
12  counsel was at this meeting.  So I'm trying to --
13  I'm trying to have you get as much testimony as
14  you can without breaching any type of
15  attorney-client privilege or any type of
16  communication general counsel might have made in
17  regards to, you know, legal recourse.  So I'm
18  trying to let you get as much information as you
19  can.
20          But also I want to -- I'm going to
21  instruct you to not answer those questions.  But
22  as they come up, identify them so we know, you

Page 156

1  know, how you're not answering.  I'm trying not
2  to do that.
3          MR. CONDIT:  Okay.
4          MR. WILLIAMS:  See --
5          MR. CONDIT:  So, counsel, let me
6  make sure I understand.  You're instructing the
7  witness not to answer the general question, which
8  is not focused on any --
9          MR. WILLIAMS:  No, no, no.
10          MR. CONDIT:  -- particular person?
11          MR. WILLIAMS:  No, no, no.  I'm
12  going to let her answer the general questions,
13  but when it comes to actual advice from counsel
14  in that meeting, that, I believe, is
15  appropriately attorney-client, privileged under
16  attorney-client.
17          MR. CONDIT:  I see.
18          MR. WILLIAMS:  So I'm trying to give
19  you as much as you need but be sensitive to that
20  fact, too.
21          MR. CONDIT:  Okay.  I think I
22  understand where you're coming from.

Page 157

1  BY MR. CONDIT:
2      Q   So, Ms. Donald, was termination the only
3  option that was discussed in this second meeting that
4  you've been testifying about?
5      A   I believe it was.
6      Q   About how long was the second meeting?
7      A   Less than an hour.
8      Q   What steps were taken then and by whom with
9  respect to Ms. Tabb after the conclusion of the second
10  meeting?
11      A   Then the letter was sent.  I don't know if
12  the letter had been drafted, but a letter was
13  finalized that stated the reasons for the termination,
14  and I don't know how the letter was delivered or who
15  was responsible.  I think Mindy was to contact Shirley
16  who was on leave at the time, and there were concerns
17  because of the picture of the child and other e-mails
18  that were -- that had been going on with other
19  employees that for her to come back into the office at
20  the time would be risky, and so the decision was was
21  that she was going to be terminated and not invited to
22  come back, other than to arrange for her personal

40 (Pages 154 to 157)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 158

1  belongings.
2      Q  Okay.  Let me understand your testimony
3  then.  You're saying it was -- she was terminated
4  because it was too risky to have her come back --
5      A  No.
6      Q  -- because of these issues?
7      A  As I said, she was -- I gave you the reasons
8  for the termination --
9      Q  Okay.
10     A  -- right, that were cited in the letter?  In
11 terms of her coming back on site, that we believe that
12 she might have done further damage to the department
13 and that we wanted to protect the department, and so
14 she was entitled to get her personal belongings, but
15 that her -- we did not want her to come back into the
16 building unescorted.
17     Q  Let me show you what I'll mark as the next
18 exhibit.
19         (Donald Deposition Exhibit No. 10
20 was marked for identification and was attached to
21 the deposition transcript.)
22 BY MR. CONDIT:

Page 159

1      Q  Ms. Donald, I'm going to show you what has
2  been marked as Exhibit 10.  This is an October 3, 2005
3  letter to Ms. Shirley Tabb from you.  It's a two-page
4  letter.  I'd like you to look at it and tell me if
5  you've seen that before.
6      A  Yes, I'm familiar with the letter.
7      Q  Did you prepare this letter?
8      A  It was prepared for my signature.
9      Q  Who prepared it?
10     A  HR, human resources.
11     Q  Who in human resources prepared it?
12     A  It would have been Ronnie Charles.  I don't
13 know if he authored the whole thing, but he would have
14 been the primary person.
15     Q  When was the first time you saw a draft of
16 this letter?
17     A  As I said, when we had that second meeting.
18     Q  Was that second meeting in close proximity
19 to the date of this letter, October 3?
20     A  I believe so.
21     Q  And when you saw a draft of the letter, did
22 you make any changes to it?

Page 160

1      A  I'm not sure.  They would have -- if I had
2  made any changes, they would have been some editorial
3  changes, not substantive changes.
4      Q  Okay.  So you identify several issues that
5  are the basis for the summary removal, is that
6  correct, in this letter?
7      A  Yes.
8      Q  And were all these bases that are reflected
9  in the letter provided by others such as Mr. Charles,
10 or did you contribute to the substance of any of the
11 bases used in the letter?
12     A  I'm not sure I understand.
13     Q  Well, you're saying that the letter was
14 prepared by someone else, correct?
15     A  Right.
16     Q  For your signature, right?
17     A  Correct.
18     Q  I'm simply asking if any of the substance of
19 the bases used for the summary removal were things
20 that you contributed to?  In other words, you
21 indicated that you wanted this particular issue in the
22 removal letter, or that particular issue in the

Page 161

1  removal letter, even if you didn't author the words on
2  the page.  Do you see the distinction?
3      A  Yes, and no, I did not direct the specific
4  substantive issues in the letter, although the
5  substantive issues were part of the discussion leading
6  up to the decision of termination.  We talked about
7  performance, misuse of leave, the violation of the
8  client's rights, the failure to adhere to the
9  admonition letter.  So those were things that were
10 discussed.
11         And as areas that led me to make the
12 decision that I wanted to terminate her, then the
13 question was, well, you know, are those grounds enough
14 for termination.  And so the specific references to
15 any particular violations of personnel rules or
16 anything like that were written by HR, but --
17     Q  Okay.  Thank you.
18         Now, let me draw your attention to the
19 first page of Exhibit 10, the removal letter, and the
20 second paragraph, which seems to be the first reason
21 in your list of reasons for the summary removal, and
22 in that paragraph you reference the e-mail, using "the

41 (Pages 158 to 161)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 162

1 CFSA e-mail system to approach another government
2 agency about an unauthorized campaign to raise
3 awareness about child abuse and neglect and to promote
4 implementation of specific projects without notifying
5 or obtaining prior approval from your supervisor." Do
6 you see that?
7    A  Yes.
8    Q  We discussed this a little bit earlier, I
9 think, but I want to be clear on the record since this
10 is the removal letter.  Was there a policy or law or
11 regulation concerned with that particular basis for
12 removing Ms. Tabb?
13    A  Actually, we didn't discuss this particular
14 issue.
15    Q  Okay.
16    A  This was not the issue of the e-mail to the
17 office of the mayor.  This was an e-mail to another
18 department outside of CFSA about this campaign, and
19 this is one that Mindy Good was furious about because
20 she had -- she specifically said she didn't want to do
21 this kind of -- this campaign, which was child abuse
22 prevention, and she didn't see that as something that

Page 163

1 CFSA should do, and she saw Shirley as having gone
2 outside of her to contact another public information
3 officer to promote this idea.
4        And she admonished her about that, and
5 I believe it was in writing, but I wasn't directly
6 involved in that particular issue, although Mindy
7 brought it to my attention.
8    Q  Okay.  So did you actually see any
9 documentation of this issue that is reflected as the
10 first item in the list of bases for --
11    A  Yes, I did.
12    Q  -- summary removal?
13    A  Yes, I did.
14    Q  What documentation did you see?
15    A  That was the e-mail that she sent promoting
16 this campaign that Mindy came in and said that she
17 didn't authorize and she thought Shirley was going
18 outside of the bounds of her position, and she was not
19 happy about it and she reprimanded her.
20    Q  And sending that e-mail that's described in
21 this letter to the other agency -- I take it it was an
22 agency within the District government?

Page 164

1    A  Yes.
2    Q  Sending that e-mail violated what law, rule,
3 policy that you're aware of?
4    A  I do not know.
5    Q  Did you inquire as to whether or not it
6 violated any law, rule, or policy?
7    A  I might have, but I don't remember the
8 answer.
9    Q  Okay.  Then the second part of that
10 paragraph, again this March 2005 e-mail issue, it
11 says -- the last sentence in that paragraph says, "You
12 again mention the unauthorized campaign at an
13 executive staff meeting.  As a result, you were
14 reprimanded."  Do you see that?
15    A  Yes.
16    Q  Okay.  What is the evidence of that issue,
17 that she mentioned the campaign in an executive staff
18 meeting?
19    A  I'm not sure I understand your question.
20 What was the evidence?
21    Q  Did you have personal knowledge of that
22 issue?

Page 165

1    A  If it was an executive staff meeting, then I
2 was probably in it.  But it was brought up by Mindy
3 as I told Shirley we're not going to do this campaign,
4 I don't support it, and now she's talking about it
5 again as if it's something that we're going to do, and
6 we're not.  And so she violated her supervisor's
7 instructions.
8    Q  So can a supervisor prevent an employee from
9 raising issues or suggesting ideas at an executive
10 staff meeting?
11    A  I don't know if she had told her not to
12 after she saw the e-mail to the other agency and said
13 we're not doing it and you shouldn't talk about it
14 anymore, and then she did, and obviously her
15 supervisor felt that she was being insubordinate.
16    Q  Was Mindy Good suggesting to you,
17 recommending to you, or otherwise supporting the idea
18 of terminating and removing Ms. Tabb?
19    A  Yes, on more than one occasion.
20    Q  But in the instance where you're executing
21 an action on October 3, 2005, at that time, to your
22 knowledge was Mindy Good advocating Ms. Tabb's

42 (Pages 162 to 165)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 166

1 termination?
2    A  She was in support of it.  I don't know if
3 she was advocating it.
4    Q  And how would you --
5    A  As I said, it was my -- it was my decision.
6 It was a culmination of all of these things, and the
7 incident with the media was just the straw that broke
8 the camel's back, and we felt we had an employee who
9 was not serving the agency well.
10        And Mindy had several times asked to --
11 wanted to reassign Shirley and move her out.  She
12 wasn't serving her department well, wasn't performing
13 well, and I even tried to find a -- create a job for
14 Shirley in another department that I thought was more
15 suited to her skills and her interests, which were
16 employee events and promotional activities.  And I
17 worked with Ronnie Charles to create a position in
18 human resources, because Mindy said Shirley is not
19 here, she's not performing, I can't count on her, I
20 need a higher level of skills, and I need somebody
21 who's going to be here.  And this -- I mean, she had
22 come to me several times with that.

Page 167

1        And so my first response was, well, I
2 think Shirley has value for the department, let's find
3 another role that's more suited to her.  We tried --
4 we created this position, and Shirley declined to
5 accept the position.  So then Mindy said, you know, I
6 need someone who can perform, and so this was all part
7 of the decision making process for this termination.
8    Q  All of the statements that you're
9 attributing to Mindy Good in your testimony a moment
10 ago, were any of those communicated to you in writing?
11    A  All of these statements about performance
12 issues?
13    Q  Yeah, about Mindy Good said this and she
14 wanted you to do that, or she wanted to move Shirley,
15 all that.  Was any of that communicated in writing?
16    A  Well, the performance issues were
17 communicated in writing, as we talked about, through
18 the performance appraisal and the performance
19 improvement plan and the -- there may have been other
20 things that were written, that were documented, and
21 I'm sure you have access to all of that, that
22 documentation from Mindy's files.

Page 168

1        The creation of a new position, that to
2 put Shirley in human resources, we created the
3 position.  I don't remember the chronology of we're
4 going to create this position and move Shirley over
5 there, but that was something that had been in
6 discussion and in development for a couple of months
7 previously, earlier in the year.
8        Shirley was unhappy.  I had Mindy and
9 Shirley almost like revolving doors coming to me about
10 how it just wasn't working, and Shirley felt that
11 Mindy was unfair and had, you know, unfair standards.
12 She was upset about her performance evaluation.  She
13 wanted to stay with the department.
14        She made a proposal to me about being
15 -- doing foster home recruitment and reporting
16 directly to me.  I told her that I couldn't support
17 that because we had a whole unit that did foster home
18 recruitment, and I wasn't going to create a
19 substructure over that just to put her in there.  That
20 structurally did not make any sense and I didn't
21 support that.
22        That's when I started thinking about

Page 169

1 what else could we do, because I wanted to keep her in
2 the department.  I didn't feel that she was performing
3 in her role, and that situation was just not working.
4 So they both were coming to me about how this is not
5 working, we need to do something else.
6    Q  And my question is did Mindy Good come to
7 you in writing, other than what we described about
8 performance, and say that this is not working, I'd
9 like you to do something else with Shirley Tabb?
10    A  Not in those words.
11    Q  Or anything to that effect?
12    A  Other than -- like I said, her performance
13 evaluation and subsequent performance improvement plan
14 and maybe some updates on that.
15    Q  Now, the position in human resources that
16 you're mentioning that you suggested that Ms. Tabb
17 take, was that a position that would require her to
18 change her status as an employee in the agency?
19    A  Her -- it would have paid less money, but
20 she still would have been a union merit employee, or
21 whatever they call it in the District.
22    Q  She still would have been in the union?

43 (Pages 166 to 169)

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 170

1    A   It was not an MS position -- an MSS
2  position, so I think all other positions were part of
3  the union.  Maybe not.  Maybe in HR they were exempt
4  positions, but it wasn't MSS, so I'm not sure about
5  that.
6    Q   But it would have required her to take a cut
7  in salary?
8    A   That's correct.
9    Q   All right.  Now, with respect to this first
10 paragraph -- excuse me, the second paragraph on the
11 first page of Exhibit 10, your October 3 letter, was
12 anything transmitted to Ms. Tabb in writing about the
13 issues that are raised in that paragraph prior to --
14   A   I don't recall.
15   Q   -- that decision?
16   A   I believe -- well, I don't know.
17   Q   So you're not sure whether she was given a
18 written warning about these issues or anything?
19   A   I'm not certain.
20   Q   And then the very next paragraph, which is
21 the third paragraph on this first page, says, "In
22 August, 2005, you were admonished for failure to

Page 171

1  perform your job duties in a competent and timely
2  manner despite receiving clear direction and
3  timeliness (sic) from your supervisor."  Do you see
4  that?
5    A   Yes.
6    Q   What is that referring to?
7    A   I don't recall the document itself, but
8  there was obviously a document that cited a failure to
9  perform on a particular task.  It was a performance
10 issue, and she was cited by Mindy for not completing
11 that assignment.
12   Q   And what document or documents do you think
13 you reviewed, if any, on that particular document?
14   A   I believe that would have been a memo.
15   Q   A memo from who?
16   A   Mindy.
17   Q   From Mindy Good?
18   A   Yes.
19   Q   To you?
20   A   No, it would have been to Shirley.
21   Q   And do you recall what the performance issue
22 allegedly was?

Page 172

1    A   There was one particular project, and I'm
2  sorry, I don't remember exactly what it was, but it
3  was a fairly large project that was assigned to
4  Shirley.
5    Q   And how do you know -- as you state in the
6  paragraph that we're referring to here that you say,
7  "Despite receiving clear direction and timeliness
8  (sic) from your supervisor," how do you know that?
9  How do you know it was clear direction and timeliness?
10   A   It says timelines.
11   Q   Timelines, I'm sorry.
12   A   Because Mindy was excellent at documenting
13 her work and directives, and she was very clear about
14 here's what -- here's the assignment, here's what I
15 want you to do.  Even if they had a verbal meeting, it
16 would be followed up in writing because, again, she
17 had problems with performance and time and attendance,
18 and was creating a record, a document path of that.
19 So she was very diligent about that.
20   Q   Was Ms. Tabb advised of a concern about her
21 time and attendance in writing, or warned in a
22 specific way prior to this October 3, 2005 removal

Page 173

1  letter?
2    A   I believe that she was.
3    Q   What's the basis for your belief?
4    A   It was brought to my attention by Mindy
5  and --
6    Q   What was brought to your attention?
7    A   That she had concerns that Shirley was
8  abusing leave and that she was never there -- I
9  shouldn't say never there, excuse me.  That she was
10 frequently absent, that she was absent during critical
11 times when there were big projects with deadlines, and
12 that she wasn't able to perform.  And since Mindy had
13 identified these issues for several months or -- she
14 was starting to document and create a file on it.
15       So I believe, even though I don't
16 recall a particular document, I'm reasonably certain
17 that she would have given her something in writing
18 about concerns about the leave, but I don't recall
19 seeing it.  It was brought to my attention.  I don't
20 know what the transmittal was.
21   Q   So if there was a concern about abusing
22 leave, was there evidence shown to you that leave was

44 (Pages 170 to 173)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 174

1  being abused by Ms. Tabb?  And if so, what was the
2  evidence?
3      A  I don't recall evidence, but more citing of
4  patterns of leave usage, of last-minute calling in for
5  emergency leave requests, that sort of thing, and I do
6  recall Mindy showing me a chronology of leave usage
7  over a period of time that was quite a bit.
8      Q  Was Ms. Tabb using leave that she did not
9  have access to or was not banked in her --
10     A  No.
11     Q  -- account?
12     A  No.  She had leave.
13     Q  So I'm trying to pin down what the abuse is
14  here.  What is the abuse that you were allegedly
15  concerned about?
16     A  That her supervisor was concerned about?
17     Q  That her supervisor was concerned about.
18     A  The pattern of leave usage and the amount
19  that occurred during critical deadlines when there
20  were big projects due, and after that actually
21  escalated after the less than stellar performance
22  review.

Page 175

1      Q  Now, during this time, 2005 let's say, were
2  there any issues that you were aware of with respect
3  to Mindy Good's time and attendance?
4      A  Yes.
5      Q  And what was --
6      A  Mindy Good has a chronic --
7         MR. WILLIAMS:  Objection to
8  relevance.
9         THE WITNESS:  Right.
10        MR. WILLIAMS:  Answer the question.
11     A  She has a chronic illness that required her
12  to be out.  She was sick quite often.
13  BY MR. CONDIT:
14     Q  Has Ms. Good been disciplined in any way for
15  being out frequently?
16        MR. WILLIAMS:  Objection, relevance.
17  I'm going to object to this whole line of
18  questioning.
19        Answer the question.
20     A  No.  Her leave and illness were well
21  documented by her doctor, and she also completed
22  assignments because she worked at home, and when she

Page 176

1  couldn't work at home, then she took leave or took
2  leave without pay.  And when she could, she would work
3  at home, and then she would come in when she could.
4  So she was still performing at a high level and
5  meeting my expectations.
6  BY MR. CONDIT:
7      Q  Is it the case that in part Ms. Good was
8  performing at a high level because when she would have
9  these problems where she couldn't work, she would at
10  the last minute dump some assignments onto Ms. Tabb or
11  others?  Are you aware of that situation?
12     A  I don't know about the word "dump," but
13  certainly if you've got one person out and someone is
14  sick and there's work to be done and a deadline, that
15  you obviously want your staff -- you expect your staff
16  to be able to pick it up.  So yes, certainly Shirley
17  and Derrick picked up some work when Mindy was out.
18     Q  Were you aware during 2005 that Ms. Tabb was
19  struggling with diabetes?
20     A  Yes, I was.
21     Q  Were you aware that she had also had some
22  losses in her family --

Page 177

1      A  Yes.
2      Q  -- where she took family medical leave?
3      A  Yes.
4      Q  Did these issues factor at all into your
5  assessment of her use of leave?
6      A  Yes, they did.
7      Q  How did they?
8      A  And there was -- because she obviously had
9  some legitimate reasons for being on leave.  In
10  addition, the assessment of her supervisor and the
11  pattern of her additional leave usage suggested that
12  she was stretching the definition of that sick leave,
13  that it seemed to be above and beyond her
14  circumstances.
15     Q  And prior to October 3, 2005, was she -- was
16  Ms. Tabb put on written notice of how management was
17  perceiving her as stretching or somehow abusing leave?
18     A  I'm not sure.
19     Q  Did you inquire as to whether such
20  communication was given?
21     A  I don't recall.
22     Q  The last paragraph on page 1 of Exhibit 10

45 (Pages 174 to 177)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 178

1  says on the first sentence, "On or about September 19,
2  2005, you misrepresented agency practice to the
3  media." What is that referring to?
4      A  It's referring to misstatements of fact in
5  terms of the situation with children sleeping in the
6  building overnight and the agency not doing anything
7  about it.
8      Q  Okay. What were the -- specifically the
9  misstatements of fact that you attribute to Ms. Tabb?
10     A  That the agency didn't care about children
11  sleeping overnight, that the agency was not doing
12  anything about it, and that she was the only one
13  concerned, and that the agency was worried about --
14  that the agency was abusing and neglecting children.
15  Those are misstatements, not true.
16     Q  Okay. With respect to those three or four
17  items that you just listed as misstatements, did you
18  directly attribute those to her by either some type of
19  video account of her discussion with the media or
20  print account of her discussion with the media? How
21  did you know these statements were hers, is what I'm
22  trying to figure out?

Page 179

1      A  That would have been the review of the
2  transcript or the news clip that we discussed earlier.
3      Q  Okay. So can you go back to Exhibit 8, I
4  believe it was.
5      A  7?
6      Q  7. Tell me if there's a misstatement by Ms.
7  Tabb that's attributed, specifically as a quote, to
8  Ms. Tabb.
9      A  Well, if you go toward the bottom of the
10  page, fourth paragraph from the bottom, "Tabb contends
11  housing foster children in a government building is a
12  regular occurrence," which is not correct. She says,
13  "In the interest of the children, we need the
14  community's help. I'm mandated by social work ethics
15  and by D.C. law to report anybody that's abusing and
16  neglecting children and that includes Child and Family
17  Services Agency."
18     Q  Okay. So again, we're looking at Exhibit 7,
19  and the first page, and I note that the first
20  reference you made which starts with the words "As for
21  Tabb, who contends housing..." do you see that?
22     A  Yes.

Page 180

1      Q  I notice that that's not in quotes. Would
2  you agree?
3      A  True, but it's attributed to her.
4      Q  Well, it is, but do we know for a fact that
5  she made that statement?
6      A  No.
7      Q  And the next item is in quotes in part, two
8  different statements, it looks like. Let's take the
9  first one. "In the interest of children, we need the
10  community's help." Do you have a problem with that
11  statement?
12     A  No.
13     Q  Then the second statement is, "I'm mandated
14  by the social work ethics and by D.C. law to report
15  anybody that's abusing and neglecting children and
16  that includes Child and Family Services Agency," and
17  then there's dot, dot, dot, and end of quote. Do you
18  have a problem with that statement?
19     A  Yes, I do.
20     Q  What is the concern there?
21     A  That it suggests that the Child and Family
22  Services Agency is abusing and neglecting children.

Page 181

1  First of all, the mandate is that you call 671-SAFE
2  and report all suspected abuse and neglect to the
3  hotline. Everybody knows that. Even I had to do
4  that. If someone brought an allegation to my
5  attention, I had to call the hotline. So you don't
6  call the media. That's not reporting abuse and
7  neglect. But never mind.
8          `The CFSA wasn't abusing and neglecting
9  children, and she's in the role of public information
10  specialist saying that her agency is doing something
11  that is not -- that we were not doing and does not
12  state the facts correctly.
13     Q  So --
14     A  About what all we were trying to do, so --
15     Q  Well, my first question is with respect to
16  that second quote about the abusing and neglecting
17  children that we've been discussing. Did you confirm
18  whether or not those were the words that Ms. Tabb used
19  with the reporter?
20     A  No.
21     Q  Did you ask Ms. Tabb if those were her
22  words?

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 182

1    A  No.
2    Q  The next question with respect to reporting
3  abuse and neglect, the hotline you're referring to, I
4  take it, is staffed by CFSA folks?
5    A  That's correct.
6    Q  Okay.  And the concern that you seem to have
7  is that -- and correct me if I'm wrong -- is that it's
8  not neglectful to have children sleep in the building.
9  Is that your position?
10    A  It does not meet the legal standard of abuse
11  or neglect for -- in child welfare, and Shirley knows
12  that.
13    Q  All right.  If parents had their kids --
14    A  We're keeping kids safe.  We're bringing
15  kids in from an abusive or neglectful situation to
16  place them.  If we have no place to place them, we
17  keep them in the building with a social worker until
18  you can find an adequate and appropriate placement.
19  That is keeping children safe.  The only reason the
20  child would be in the building is because we had to
21  remove the child from his or her family situation
22  because of safety concerns.

Page 183

1        We have licensed social workers there
2  with the children.  No, it's not an ideal situation,
3  but we're keeping children safe.  We're not abusing or
4  neglecting them.
5        And we're doing all we can, working day
6  and night to try to remedy the situation, and to have
7  an official of the department to go to the news media
8  in a self-serving way to talk about how bad the
9  department is and how she can make it better if only
10  she were allowed to run recruitment or retention or be
11  in another position is -- you know, that's just not
12  acceptable.
13    Q  Is that what she said to the media, that if
14  she were allowed, she could make it better if she were
15  in the position?
16    A  Not directly.
17    Q  Did she say anything like that to you?
18    A  I don't know if she said that to the media.
19  She said that to the mayor's office.
20    Q  Right.  So if it's not abuse or neglect to
21  sleep in the building, for children to sleep in the
22  building, it's still a problem because it is addressed

Page 184

1  by the court --
2    A  Of course it's a problem.
3    Q  -- and the monitor?
4    A  Yes.
5    Q  Okay.  So your concern here is over the
6  choice of words?
7    A  I'm concerned that she misrepresented what
8  the department was doing about a situation that we
9  were all trying to remedy and that she is not
10  representing the department, and she should in her
11  official capacity to help educate the public about the
12  issues that the department faced and what the
13  department was trying to do about those issues.  That
14  was her job, that's why she got paid at Child and
15  Family Services Agency, not to misrepresent what we
16  were doing and to draw negative attention to the
17  department.
18    Q  Do you think that prior to the news story on
19  September 20, 2005 that most residents of the District
20  of Columbia were aware that there were times when
21  children who were taken from their homes slept in the
22  CFSA office building?

Page 185

1        MR. WILLIAMS:  Objection,
2  speculation.
3        Answer if you know.
4        THE WITNESS:  Yeah.
5    A  No, I don't know.
6  BY MR. CONDIT:
7    Q  Do you think that was something that --
8    A  No, I don't think people would --
9        MR. WILLIAMS:  Objection,
10  speculation.
11        Answer if you know.
12    A  I don't think the general public would even
13  understand what that means.  I don't think they knew
14  when we had a respite center in the building.  So no,
15  I don't think the general public knew or was focused
16  on that particular issue, other than the people who
17  were -- who had oversight over the department knew and
18  were focused on the issue, being the court, the court
19  monitor, and the city council, and knew that we were
20  all working on it and knew that there were incidents,
21  but not that many of them, and that that was not a
22  routine occurrence, and we were trying to deal with

47 (Pages 182 to 185)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 186

1  it.
2       MR. CONDIT:  Let's take a break so
3  the tape can be changed.
4       THE VIDEOGRAPHER:  This marks the
5  end of tape two in the deposition of Ms. Donald.
6  We're going off the record.  It is 3:32 p.m.
7       (A brief recess was had.)
8       (Donald Deposition Exhibit No. 11
9  was marked for identification and was attached to
10  the deposition transcript.)
11       THE VIDEOGRAPHER:  This marks the
12  beginning of tape three in the deposition of
13  Brenda Donald.  We're back on the record at 3:43
14  p.m.
15  BY MR. CONDIT:
16      Q  Ms. Donald, before we get back to Exhibit
17  10, I want to show you what I had marked as Exhibit
18  11.  It is a single-page print story, again from WUSA
19  9, and I'd like you to take a look at it and tell me
20  if you've seen that document before today.
21      A  Yes, I remember this.
22      Q  When did you first see that story?

Page 187

1      A  I don't remember.  Shortly after it aired, I
2  believe.  I don't think I actually saw the story.
3  Again, either a clip or a transcript.
4      Q  And this story identifies a Shirley Meyers.
5  Do you know who that is?
6      A  No, I don't.
7      Q  Did you or anyone at CFSA attempt to
8  investigate who Shirley Meyers was?
9      A  I didn't.  I'm sure people made inquiries,
10  but I don't recall if anyone -- if she used to work at
11  the agency before our current administration was
12  there, so we didn't know her.
13      Q  Okay.  Now, let's go back to Exhibit 10.
14  You were discussing the first referenced reason for
15  Ms. Tabb's summary removal in the fourth paragraph,
16  which is the last paragraph of the exhibit that
17  begins, "On or about September 19, 2005."  Do you see
18  that?
19      A  Yes.
20      Q  And we were discussing what you understood
21  or believed to be the misrepresentation of agency
22  practice.  Do you recall that discussion before the

Page 188

1  break?
2      A  Yes.
3      Q  Other than the items that you've already
4  testified to, were there any other bases for claiming
5  that Ms. Tabb misrepresented agency practice to the
6  media?
7      A  No, I don't think so.
8      Q  Now, the next item in that same paragraph in
9  Exhibit 10 says, "Violated CFSA confidentiality laws
10  in showing the image of a child in CFSA's custody and
11  disclosing detailed personal information about why the
12  child was in CFSA's custody."  Do you see that?
13      A  Yes.
14      Q  Okay.  And what do you rely upon to make
15  that statement?
16      A  I relied upon our HR and attorney's review
17  of the confidentiality laws, interpretation of Ms.
18  Tabb's behavior in respect to our confidentiality laws
19  or policies, I guess it would be.
20      Q  What laws or policies in your understanding
21  at the time you signed this letter were violated?
22      A  Exposing a child who is a client of ours to

Page 189

1  the news media.
2      Q  Is there a particular regulation or policy
3  or law with a number or something that we can track?
4      A  I'm sure there is, but I do not know it.
5      Q  Why wasn't that referenced in this letter?
6      A  I do not know.
7      Q  You indicated a little earlier that human
8  resources prepared this letter, correct?
9      A  Yes.
10      Q  Okay.  Why didn't, for example, Mr. Charles
11  sign it instead of you signing it if he prepared it?
12      A  Because I was the ultimate authority for the
13  department and I have to sign off on all terminations,
14  I believe.
15      Q  Now, with respect to the image of the child
16  in CFSA's custody that's reflected in the last
17  paragraph, page 1 of Exhibit 10, what image were you
18  referring to?
19      A  The image that was in the photograph.
20      Q  Which photograph is that?
21      A  The one that was shown on Channel 9.
22      Q  Okay.  Is it one of the items that you've

48 (Pages 186 to 189)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 190

1  seen in an exhibit here today?
2      A  Yes.  I'm not sure if that is the only
3  photograph, but that would be one of -- that would be
4  one of the ones in reference.
5      Q  Okay.  So let's just make sure we know what
6  we're speaking of here.  So going back to Exhibit 7, I
7  believe it is, on the second page.
8      A  Yes.
9      Q  Is that one of the photographs that you rely
10 upon for the representation that you make in your
11 summary removal letter?
12     A  Yes, that would be one.
13     Q  Okay.  And what were the others?
14     A  I'm not sure.  I'm not -- I can't remember
15 if there were more than one, if there was more than
16 one photograph.
17     Q  Okay.  Now drawing your attention, though,
18 just for a moment to this photograph on Exhibit 7,
19 page 2.  I don't notice that there's any way to
20 identify who this is.  Is there anything that tells
21 you from looking at the picture that we see in this
22 exhibit who this is or any identifying feature?

Page 191

1      A  No.
2      Q  Now, the statement in your letter of October
3  3 also says that, or alleges, that Ms. Tabb disclosed
4  detailed personal information about why the child was
5  in CFSA's custody.  Do you see that in that last
6  paragraph?
7      A  Yes, I do.
8      Q  What is your basis for that statement?
9      A  I'm not sure.  I believe whoever saw the
10 news report believed that personal information was
11 described about the child or why the child was in
12 care.
13     Q  At the time that you signed this letter, did
14 you know what personal information was being
15 referenced?
16     A  At the time I signed the letter, I might
17 have.  I do not recall now.
18     Q  Is there a file that you maintain of
19 information that supported this October 3, 2005 letter
20 we see as Exhibit 10?
21     A  That would be in HR, human resources.
22     Q  But there wasn't a file that you maintained

Page 192

1  on that?
2      A  No.
3      Q  Did you see the file that HR maintained on
4  this issue?
5      A  The complete file?  No, I did not.
6      Q  Did anyone ever show you the file?
7      A  No.  I didn't ask for the file per se.
8      Q  Then drawing your attention to that same
9  paragraph in Exhibit 10, the last paragraph on the
10 first page.  You also say -- looks like the last
11 sentence of the paragraph -- "Again, you failed to
12 obtain permission from your supervisor to disseminate
13 information to the media which constitutes malfeasance
14 and insubordination as you had been admonished for
15 similar conduct earlier this year."  Do you see that?
16     A  Yes.
17     Q  Again, what is the policy reference or
18 personnel or any reference that provides that that's a
19 violation?
20     A  There's a communications policy that was
21 developed by Mindy Good and was approved by me and the
22 department and disseminated.

Page 193

1      Q  What is the communications policy?
2      A  I can't cite it, but there are strict
3  protocols about who talks to the media and how
4  information is released to the media and what steps
5  have to be taken.
6      Q  Now, does that policy apply to someone when
7  they're off hours?
8      A  If they're acting in their official
9  capacity, it would.
10     Q  Is there anything in any of the news
11 articles or videos that indicate that Ms. Tabb is
12 saying that she's acting in her official capacity?
13     A  I can go back and look, but I believe that
14 she says that she is an agency employee and has worked
15 at the agency for a number of years and she's the
16 public information specialist for the department.  So
17 how do you -- well, never mind.
18     Q  Are you looking at Exhibit 7?
19     A  Yes, I am.
20     Q  Okay.
21     A  She's identified as a public information
22 specialist for the agency.

49  (Pages 190 to 193)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 194

1    Q   And where are you reading?
2    A   I am at the penultimate paragraph on the
3  first page.  Actually, in the first paragraph it says
4  a social worker, which I guess she could have been a
5  social worker for somebody else, but --
6    Q   Ms. Tabb is a licensed --
7    A   It says several places, yeah, licensed
8  social worker, but it does say she's a public
9  information specialist for the agency.
10   Q   But it doesn't say that she's claiming to
11 speak for the agency on this matter, does it?
12   A   No, it does not.
13   Q   And she didn't say that I'm making a
14 statement on behalf of CFSA anywhere, does she?
15   A   No, she does not in here.
16   Q   And as you understand it, Ms. Tabb is a
17 licensed independent social worker, correct?
18   A   Yes.
19   Q   Do you know what that designation means in
20 terms of her obligations beyond whoever her employer
21 is?
22   A   Certainly there's a code of ethics to that

Page 195

1  practice, for that practice.
2    Q   Does CFSA require its licensed social
3  workers to follow that code of ethics?
4    A   CFSA wouldn't require, the board of social
5  work would, and the CFSA would support that.
6    Q   Now, let me draw your attention back to
7  Exhibit 10, and go over to the second page, please.
8    A   Okay.
9    Q   And the top of the page, I believe,
10 indicates a new or additional basis that you're
11 claiming for the removal, and that says, "You have
12 been on family medical leave since August 18, 2005,
13 based on a claim that you are suffering from a serious
14 medical condition which prevents you from working.
15 Yet you were able to coordinate a photo of a child, an
16 audiotape of a coworker, and coordinate interviews
17 with the media during this time.  CFSA considers such
18 actions an abuse of family medical leave."  Do you see
19 that?
20   A   Yes.
21   Q   Okay.  Now, are you aware of when or under
22 what circumstances these alleged events that you

Page 196

1  depict in this paragraph took place?  In other words,
2  were they during working hours, were they during
3  non-working hours, do you know?
4    A   No.
5    Q   Do you know whether or not Ms. Tabb ever had
6  to leave her home to allegedly coordinate any of these
7  activities reflected in this paragraph?
8    A   I do not.
9    Q   And what is it then that CFSA -- why is it
10 that CFSA considered these alleged actions to be abuse
11 of family medical leave?
12   A   Our human resources department felt that
13 they met the standard of abuse of family medical
14 leave.
15   Q   Is that standard or some articulation of
16 when leave is being abused, is that reflected in
17 writing anywhere?
18   A   I believe that it is.
19   Q   Do you know where?
20   A   I would believe that it's in the HR policy
21 manual, and I'm sure there's something in the city's
22 family medical leave policies, but human resources

Page 197

1  policies is what I would refer to.
2    Q   Do you know why that wasn't cited in this
3  paragraph?
4    A   No, I do not.
5        MR. WILLIAMS:  Objection
6  speculation.
7        THE REPORTER:  I'm sorry.  I didn't
8  hear your objection.
9        MR. WILLIAMS:  Speculation.
10       Answer the question.
11   A   No, I do not know.
12 BY MR. CONDIT:
13   Q   Going on to the next paragraph on page 2 of
14 Exhibit 10, which is the second paragraph from the
15 top.  It says, "Your violation of supervisory
16 instructions, blatant disregard for agency procedures
17 and confidentiality laws, disruptive behavior, and
18 misuse of family medical leave threatens the integrity
19 of government operations."  Do you see that?
20   A   Yes.
21   Q   What does that mean, "threatens the
22 integrity of government operations," if you know?

50 (Pages 194 to 197)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 198

1    A  To me, it means that all of these things
2  taken in summary impede the operation of -- imped
3  the operation of the department.
4    Q  And how was the operation of the department
5  impeded by this story of children sleeping in the
6  building going public?
7    A  That's not what we said and that's not what
8  I'm saying.  It's not the story of the children in the
9  building going public, it's the combination of
10  violating supervisory instructions, disregarding
11  agency procedures, confidentiality laws, disruptive
12  behavior, and misuse of the family medical leave that
13  we all cited, we believe in summary is what I said
14  earlier, that this employee does not serve the
15  department well.
16    Q  In this paragraph that we're discussing,
17  what is the violation of supervisory instructions that
18  you're referring to?
19    A  That's referring to the admonitions in the
20  second and third and fourth paragraphs, admonitions or
21  directives in the second, third, and fourth paragraphs
22  that were cited.

Page 199

1    Q  On page 1?
2    A  Correct.
3    Q  In the fourth paragraph, what is the
4  violation of supervisory instructions, if you can
5  point that out to me?
6    A  Failing to obtain permission from your
7  supervisor to disseminate information to the media.
8    Q  Okay.  Thank you.  All right.
9        Then the blatant disregard of agency
10  procedures and confidentiality laws, is there a
11  distinction in that phrase between agency procedures
12  and confidentiality laws, or is that supposed to be
13  taken together?
14    A  I believe it's taken together.
15    Q  Okay.  And so as I understand it then, it's
16  the violation of confidentiality law that's being
17  stated here is one where this picture that we've seen
18  in Exhibit 7 and possibly other pictures of a child
19  were released to the media.  Is that right?
20    A  Yes.
21    Q  Now, if the agency never determined whether
22  or not the child -- strike that.

Page 200

1        If the agency never determined who the
2  child was, and if the images of the child do not
3  identify who the child is, how is it a violation of
4  confidentiality laws?
5    A  Well, if you recall, I said I did not know
6  if the agency determined who the child was.  We -- the
7  child was portrayed as a child, a client of Child and
8  Family Services Agency.  A photograph was taken, which
9  we believe violated that child's rights, and was shown
10  to the media, which we believed to be an exploitation
11  of that child's rights.  And all of that is subsumed
12  under the confidentiality laws in our interpretation.
13    Q  Was there any inquiry made with the child or
14  the child's family about their feelings on this issue?
15    A  I do not know.
16    Q  Now, the very next paragraph on page 2 of
17  Exhibit 10 indicates that Ms. Tabb has the right to
18  review the documents or information upon which the
19  action is based.  Where was that material housed
20  during this time, October of 2005?
21    A  Well, the official file would have been in
22  HR, and then of course whatever documentation that

Page 201

1  Mindy Good as her supervisor would have.
2    Q  At the time that you signed this letter, Ms.
3  Donald, were you aware of what the District's
4  standards were for summary removal?
5    A  As -- not in total.  I was advised by HR and
6  in consultation with our general counsel that these
7  were grounds enough to justify that.
8    Q  Did you make any effort to determine on your
9  own whether or not the information that was being
10  alleged to you was sufficient basis for summary
11  removal?
12    A  On my own?  No, I did not.
13    Q  So you relied on others?
14    A  Yes.
15    Q  And those others were HR and someone from
16  the office of general counsel?
17    A  Yes.
18    Q  And is it -- was it primarily Mr. Charles
19  within HR, or was there someone else?
20    A  I'm sure he would have had his employee
21  relations person to be involved in this, but I don't
22  know.  There was not an individual who was involved in

51 (Pages 198 to 201)

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 202

1    any conversations.
2        Q  So you don't know what other HR person might
3    have been involved?
4        A  No, I do not.
5        Q  Now, further down on page 2 of Exhibit 10
6    there's a reference to Joseph Addis --
7        A  Yes.
8        Q  -- acting contract and procurement
9    administrator.  Mr. Addis apparently, according to
10   this letter, was appointed hearing officer to do an
11   administrative review of this action.  Is that
12   correct?
13       A  Yes.
14       Q  Who appointed Mr. Addis?
15       A  HR, Mr. Charles.
16       Q  And the reference to Mr. Addis as acting
17   contract and procurement administrator, for what
18   agency did he work?
19       A  For Child and Family Services Agency.
20       Q  Why was someone from within Child and Family
21   Services Agency acting as the reviewing officer for an
22   action being taken by the director of the agency?

Page 203

1        A  That was in accordance with procedures.
2    That's how it was always done.  It would be a neutral
3    third party who would act as a hearing officer, and
4    then make a recommendation.  If the recommendation was
5    contrary to the decision that we had made, then that
6    would come back up to me.
7        Q  Would it be fair to say, though, that Mr.
8    Addis in his role as acting contract and procurement
9    administrator reported to you?
10       A  To the extent that everybody reported to me,
11   yes.
12       Q  Well, but he doesn't -- I mean, he's not a
13   social worker, he's not down on the chain, he's in
14   management.  Isn't that right?
15       A  Yes.  He would not have reported directly to
16   me.  In fact, he reported directly to Ronnie Charles.
17       Q  Okay.  Was Mr. Addis an at-will employee?
18       A  Yes, I believe so.  In that position he
19   would have been.
20       Q  So you could have, or Mr. Charles could
21   have, dismissed Mr. Addis as an at-will employee
22   because you wanted to make a management change, for

Page 204

1    example.  Is that correct?
2        A  Yes.
3        Q  Ms. Donald, do you know if you were ever
4    shown either the personnel regulations or standards or
5    the confidentiality laws or standards that allegedly
6    applied to Ms. Tabb's case?
7        A  No, I would not have been shown that.
8        Q  Let me show you what I'll mark as the next
9    exhibit.
10           (Donald Deposition Exhibit No. 12
11   was marked for identification and was attached to
12   the deposition transcript.)
13   BY MR. CONDIT:
14       Q  Ms. Donald, I'm going to show you what I've
15   marked as Exhibit 12.  This is titled LaShawn A.
16   versus Williams, an Assessment of the District of
17   Columbia's Progress as of June 30, 2005.  It is a
18   document of the Center for the Study of Social Policy,
19   and it's dated on November 3, 2005.  It's an excerpt.
20   I'd like you to take a look at it and see if you're
21   familiar with it, please.
22       A  I'm familiar with the report.

Page 205

1        Q  And would this exhibit be an example of a
2    report to the court, or is it a report to the agency?
3        A  It is a report to the court.
4        Q  And I notice the last page of the except,
5    which is labeled in the bottom right corner as page
6    88, there's a reference to item E on that page.  "CFSA
7    will have no children stay overnight in its in-house
8    intake center."  Do you see that?
9        A  Yes.
10       Q  Okay.  Is that the category that was being
11   monitored that you discussed throughout your
12   testimony?
13       A  Yes.  That is one of the elements of
14   placement compliance requirements.
15       Q  Okay.  Now, I notice that it says in the
16   column indicating July 2005 Performance --
17       A  Yes.
18       Q  It says, "18 children overnight at CFSA
19   between April and October."
20       A  Yes.
21       Q  And the previous exhibit we looked at where
22   Ms. Forbes was writing you on the subject indicated 15

52 (Pages 202 to 205)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 206

1 children between April and July, I believe it was. Do
2 you recall that?
3     A  Yes.
4     Q  Okay. So that would mean that three other
5 children sometime between July and October slept
6 overnight in the building. Would that be a fair
7 statement?
8     A  I think that's correct.
9     Q  Again, this information, the monitor would
10 have this information because of these daily
11 reports --
12     A  Yes.
13     Q  -- or alerts that you would send?
14     A  Yes.
15     Q  Or the agency -- I'm sorry -- would send?
16     A  Yes.
17     Q  All right. Now, what is the reason for the
18 benchmark being framed as children under the age of
19 12?
20        MR. WILLIAMS: Objection,
21 speculation.
22        Answer if you know.

Page 207

1        THE WITNESS: Right.
2     A  We have different -- there are different
3 standards for younger children in foster care than
4 older children, so we would judge by the different
5 categories on that.
6 BY MR. CONDIT:
7     Q  Was there a standard for sleeping in the
8 building for any child 12 or over?
9     A  No.
10     Q  And was that -- was that data then recorded
11 or captured in any way?
12     A  I believe we reported by child and what the
13 child's -- how old the child was, but we didn't -- it
14 wasn't that it didn't count if the child was over 12.
15     Q  Okay. So on the daily reports or --
16     A  Yes. We would say Joe Blow, age 13, came in
17 such and such time, stayed this long, left this time,
18 here was the placement.
19     Q  So it wouldn't matter what the age was?
20     A  No.
21     Q  Let me show you the next exhibit.
22        (Donald Deposition Exhibit No. 13

Page 208

1 was marked for identification and was attached to
2 the deposition transcript.)
3 BY MR. CONDIT:
4     Q  Ms. Donald, I'm going to show you what's
5 been marked as Exhibit 13. This is another LaShawn A.
6 versus Williams progress report dated February 13,
7 2006. Take a look at it. Again, it's an excerpt.
8     A  Okay.
9     Q  Tell me if you're familiar with it, please.
10     A  Yes, this looks familiar.
11     Q  Is this another report to the court?
12     A  Yes.
13     Q  Now, I notice if you go to the last page of
14 the exhibit, which is labeled on the bottom right
15 corner as page 24, do you see that?
16     A  Yes.
17     Q  And again, go under the Requirement column
18 to item E. It talks about CFSA will have no children
19 stay overnight. Do you see that.
20     A  Yes.
21     Q  All right. And then it says in the
22 Performance column, Performance as of December 2005,

Page 209

1 one child stayed overnight at CFSA between October 1,
2 and January 20, 2006.
3     A  Yes.
4     Q  Is that consistent with your understanding
5 at the time?
6     A  I don't remember a particular child, but we
7 would have continued to report the daily alerts if
8 there were any children overnight. So apparently one
9 stayed between that period of time.
10     Q  Now, during the time of this report,
11 February 2006, were you the deputy mayor?
12     A  Yes.
13     Q  Okay. Do you know why the hotel option
14 wasn't working, why this child ended up sleeping
15 overnight in the building?
16     A  I do not.
17        MR. CONDIT: I'm pretty close to
18 concluding, but I'd like to review some
19 materials. So let's go off the record for a few
20 minutes, and then we'll see if we can wrap it up.
21        THE VIDEOGRAPHER: We're going off
22 the record. The time is 4:13 p.m.

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 210

1      (A brief recess was had.)
2      THE VIDEOGRAPHER:  We are back on
3  the record.  The time is 4:22 p.m.
4      MR. CONDIT:  Let me mark the next
5  deposition exhibit, please.
6      (Donald Deposition Exhibit No. 14
7  was marked for identification and was attached to
8  the deposition transcript.)
9  BY MR. CONDIT:
10     Q   Ms. Donald I'm going to show you what's been
11 marked as Exhibit 14.  This is an October 18, 2005
12 letter to you from the National Association of Social
13 Workers, D.C. Metro Chapter.  It's a two-page
14 document.  Take a look at it, please, and tell me if
15 you recognize it.
16     A   Yes, I'm aware of this.  I recall.
17     Q   Did you receive this letter?
18     A   Yes.
19     Q   And did you respond to it?
20     A   Yes, I'm sure we did.
21     Q   Who would have provided the response for the
22 agency?

Page 211

1      A   It probably would have been a combination of
2  people who would have collaborated on this, but more
3  than likely Mindy would have been the principal
4  author, or it might have been Uma Ahluwalia.
5      Q   Did you have a dialogue with Barbara
6  Strother, the president of the Metro chapter of the
7  NASW board, about this letter?
8      A   I don't think so.  I don't recall that name.
9      Q   Did you make any effort to do any outreach
10 beyond having Ms. Good or Ms. Ahluwalia provide a
11 response in writing?
12     A   No, I don't believe so.
13     Q   Now, in this letter in the second paragraph
14 on the first page, Ms. Strother indicates that in her
15 view, or in the National Association of Social
16 Workers, D.C. Metro Chapter's view, that the
17 circumstances that they viewed on Channel 9 News
18 violate the NASW code of ethics regarding commitment
19 to clients and is in conflict with other standards.
20 Do you see that?
21     A   Yes, I do.
22     Q   Did you agree or disagree with that

Page 212

1  assessment?
2      A   That's their opinion.  I don't know the NASW
3  code of ethics, so --
4      Q   Did you take into consideration the NASW
5  code of ethics when you evaluated Ms. Tabb's
6  circumstances in making a determination about whether
7  to remove or terminate her?
8      A   Yes, we did.  That factored into the whole
9  issue of confidentiality, but that wasn't under CFSA's
10 purview, it was our -- CFSA's own confidentiality laws
11 that we believed she violated.  But I know there was
12 some discussion about her being a licensed social
13 worker, and there's a code of ethics for social
14 workers that we felt was violated.
15     Q   And so who would have discussed the
16 application of the NASW code of ethics in Ms.
17 Tabb's --
18     A   I don't know.  I think it was just in
19 discussion.
20     Q   Just generally?
21     A   Just she's a licensed social worker, and
22 they have a code of ethics, and they violate that, to

Page 213

1  exploit a child who's in our care and shown to the
2  media, something along those lines.
3      Q   I understand that point, but what I'm trying
4  to determine is if you considered the point that NASW,
5  Metro D.C. Chapter, is making, which is to have
6  children sleeping in the building as a violation of
7  the code of ethics?
8      A   As I said, I don't know the code of ethics,
9  and that is their interpretation.  We've agreed --
10 I've agreed all along that it's not the right thing to
11 do, to have children sleeping in the building, and so
12 we wouldn't have argued it, that point.
13     Q   And if Ms. Tabb's conduct in disclosing the
14 situation with children sleeping in the building to
15 the media fell within the canons and requirements of
16 the NASW code of ethics, would you have a different
17 view of that conduct?
18     A   Say it again.
19     Q   If Ms. Tabb's actions in disclosing children
20 sleeping in the building to the media fell within the
21 NASW code of ethics, and by that I mean was supported
22 by that code, would you have a different view of the

54 (Pages 210 to 213)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 214

1  action you took with respect to her employment?
2        MR. WILLIAMS: Objection,
3  speculation.
4        Answer the question.
5        THE WITNESS: Okay.
6     A  So I don't interpret this to read that the
7  code of ethics says that a social worker should report
8  a violation to the media.
9        I don't know what their canon of ethics
10  requires them to do if there is a suspected violation,
11  to whom do you report. Do you report to the
12  authorities, which in our case would be the court who
13  already were aware of this, or to the city council, or
14  to the mayor's office, again to whom we had testified
15  about this and reported in public documents. So I'm
16  not sure that what their code of ethics says that you
17  do about a violation.
18        We already talked about if there's a
19  child -- if there's a suspected allegation of abuse or
20  neglect, there's a requirement to do that to the
21  hotline. So who do you tell? I don't know that this
22  is saying that a social worker who is -- who is

Page 215

1  licensed by NASW standards sees a violation or
2  perceives a violation and then reports it to the
3  media, is that what their code of ethics says? I
4  don't have no way of knowing that.
5  BY MR. CONDIT:
6     Q  Okay. My question wasn't that. My question
7  was if Ms. Tabb's conduct was supported by the NASW
8  code of ethics, would you view the action that you
9  took to remove Ms. Tabb differently?
10        MR. WILLIAMS: Objection
11  speculation.
12        Answer the question.
13     A  No, I don't think so.
14  BY MR. CONDIT:
15     Q  Okay.
16     A  Not in sum total.
17     Q  In addressing the issue you raised, let me
18  direct your attention to the second page of the
19  letter, and the second full paragraph says, "Regarding
20  Ms. Shirley Tabb." Do you see that?
21     A  Yes.
22     Q  And it says, "NASW supports her advocacy on

Page 216

1  behalf of District children. We applaud her
2  commitment to the principle that it is the
3  responsibility to all social work professionals to
4  advocate for poor and vulnerable individuals," and
5  they express some concern if the reports that they are
6  hearing are true that she's been terminated. Do you
7  see that?
8     A  Yes.
9     Q  Do you know if the letter or whatever
10  response was provided by the agency addressed that
11  part of this letter that we see as Exhibit 12?
12     A  I do not know.
13     Q  Did you sign off on the letter?
14     A  I'm sure I did.
15     Q  Now, at this point in time, October 18,
16  2005, were you still the director of CFSA, or were
17  you --
18     A  Yes. I was just double checking the date.
19  Yes, I was.
20     Q  Directing your attention to the second page
21  of the exhibit to the closing paragraph, and about
22  near the end of that paragraph it says, "Again, we

Page 217

1  look forward to speaking with the agency
2  administrators to address this longstanding problem
3  within the agency." Was there any effort made to
4  incorporate the NASW Metro Chapter in sort of the
5  discussion or dialogue about addressing the children
6  sleeping in the building issue?
7        MR. WILLIAMS: Objection, relevance.
8        Answer the question.
9        THE WITNESS: Yeah.
10     A  I don't believe there was. I don't think
11  there were -- they ever participated with us on any
12  activities to address solutions to agencies problems.
13  BY MR. CONDIT:
14     Q  Now, after you left your position as
15  director of the agency, you became deputy mayor. Is
16  that right?
17     A  That's correct.
18     Q  And when about did you become deputy mayor?
19     A  October 31, 2005.
20     Q  And what was your jurisdiction or what areas
21  did your role as deputy mayor cover within city
22  government?

55 (Pages 214 to 217)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 218

1    A  I had authority over Child and Family
2  Services Agency, human services, mental health,
3  health, mental retardation administration.  Did I say
4  human services?
5    Q  Yes.
6    A  I forgot.  I had eight agencies.  How many
7  is that?
8    Q  That's about four.
9    A  Parks and recreation, CFSA, DMH, mental
10  health, health, human services, parks and recreation,
11  and MRDDA, and I'm missing one.
12    Q  Would that have been the Department of Youth
13  Rehabilitation Services?
14    A  That's it.
15    Q  Now, do you recall being involved in
16  testimony before Mr. Fenty when he was a council
17  member regarding some problems with reporting of
18  fatalities by the Mental Retardation Development
19  Disabilities Agency?
20    A  Yes.
21    Q  And this would have been around October of
22  2006.  Do you recall that time frame roughly?

Page 219

1    A  Yes.
2    Q  Do you recall the line of questions being
3  asked by Mr. Fenty, and I believe also Council Member
4  Gray, about a particular person within MRDDA by the
5  name of Tony Perry?
6    A  No, I don't remember that name.
7    Q  Do you recall that one of the controversies
8  at the time was that there had been some information
9  redacted from a report?
10    A  Yes.
11    Q  And do you recall that there was an
12  individual that was involved in that action?
13    A  Okay.  Yes.
14    Q  Does Tony Perry ring a bell?
15    A  That might be the person.
16    Q  Okay.  Do you know what, if any, action was
17  taken with respect to Tony Perry's involvement in that
18  issue?
19    MR. WILLIAMS:  Objection to
20  relevance.
21    Answer if you know.
22    A  I don't know.

Page 220

1    MR. CONDIT:  I have no further
2  questions at this time.  However, I am leaving
3  the deposition open for whatever time remains on
4  it because we have some discovery items that have
5  still not been produced.  I'm including video
6  clips of the news reports we've been talking
7  about and some other things.  So we'll make an
8  effort not to have to call you back, but there's
9  a chance we may for some relatively short
10  testimony.
11    THE WITNESS:  Okay.
12    MR. CONDIT:  Thank you for your
13  time.  Counsel may have some questions for you.
14    MR. WILLIAMS:  I just have a couple
15  questions.
16    EXAMINATION BY COUNSEL FOR THE DEFENDANTS
17  BY MR. WILLIAMS:
18    Q  First I want to go back to the two reports.
19  I'm not sure what numbers they were.
20    A  Okay.
21    Q  One was pages -- this is the LaShawn A.
22  versus Williams reports.

Page 221

1    A  Yes.
2    Q  One was dated June 30, and the other was
3  dated February 13.
4    A  Yes.
5    Q  Can you go back to that, please.
6    A  Yes, I have them.
7    Q  Turn to the last page of these excerpts.
8    MR. CONDIT:  Can we identify the
9  exhibit, please?
10    MR. WILLIAMS:  Oh, yes.
11    THE WITNESS:  12 and 13.
12    MR. WILLIAMS:  12 and 13.
13    MR. CONDIT:  So which one are we
14  looking at?
15    MR. WILLIAMS:  We're looking at both
16  of them.
17    THE WITNESS:  You want us to go to
18  the last page of both?
19  BY MR. WILLIAMS:
20    Q  Do you remember this document?
21    A  Yes.
22    Q  Do you remember counsel's questioning about

56 (Pages 218 to 221)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 222

1  this document?
2      A   Yes, about the children staying overnight.
3      Q   Okay.  I believe he referenced E in both
4  documents.
5      A   Yes.
6      Q   Okay.  Item E, okay.  I'm looking
7  specifically at the November 3 document.
8      A   Yes.  The one that says page 88?
9      Q   I'm going to direct your attention to where
10 counsel had said 18 children overnight.
11     A   Yes.
12     Q   Do you remember that?
13     A   Yes.
14     Q   Okay.  I'm going to reference the February
15 13 document under E.
16     A   Yes.
17     Q   And I believe under Performance as of
18 December 2005, it says one child.
19     A   Yes.
20     Q   What do you -- what do you attribute that
21 reduction in the number of children staying overnight
22 to?

Page 223

1      A   Well, the strategies that we had developed
2  and began implementing under our placement resources
3  plan were starting to bear fruit, and we had expanded
4  a contract with two new providers that increased the
5  number of beds, 24 foster care beds.  We allowed one
6  emergency placement provider to expand its capacity.
7  We also issued an RFP and got 100 additional foster
8  care beds that were coming online.  Not all of them
9  were there then.  And we also had, you know, a couple
10 of backup plans in place.
11         So the things we had been working on
12 that whole year were starting to bear fruition, and as
13 a result we were able to almost eliminate children
14 sleeping overnight, other than that one child between
15 October and January.
16     Q   Okay.  So is it your testimony that the
17 programs -- correct me if I'm wrong -- that the
18 programs that were instituted far in advance of Ms.
19 Tabb's -- the media incident with Ms. Tabb were
20 actually working?  Is that your testimony?
21     A   Yes.
22         MR. CONDIT:  Objection.

Page 224

1         MR. WILLIAMS:  Okay.
2  BY MR. WILLIAMS:
3      Q   Can you turn to the NASW.
4      A   Yes.
5      Q   That is Exhibit 14.
6      A   Yes.
7      Q   Okay.  What, if any -- strike that.
8         Are you familiar with the NASW?
9      A   Yes.
10     Q   What, if any, impact to personnel matters of
11 individuals who were not social workers during your
12 tenure as director did the NASW have -- what, if any,
13 impact did they have regarding those individuals?
14     A   None.
15     Q   Okay.  Did you ever go to NASW to ask
16 questions of -- to ask their opinion regarding
17 personnel --
18     A   No.
19     Q   -- who were not acting as social workers?
20     A   No.
21     Q   Okay.  Did you go -- would you go to NASW
22 over human resources when it comes to --

Page 225

1      A   No.
2      Q   Would you go to the NASW over your general
3  counsel?
4      A   Never.
5      Q   Okay.  Can you please turn to the notice of
6  summary removal.
7      A   Yes, I have it.
8      Q   Which exhibit is that?
9      A   10.
10     Q   Exhibit No. 10.  In this exhibit, you
11 testified that these were reasons -- that the letter
12 contains reasons of why Ms. Tabb was dismissed.
13     A   Yes.
14     Q   Are there other reasons that aren't included
15 here that you took into account?
16     A   Overall performance issues --
17     Q   Okay.
18     A   -- that have been documented under -- with
19 performance appraisals and corrective action plans.
20 Those were not cited in here but certainly taken into
21 consideration.
22     Q   So it's your testimony that it's these five,

57 (Pages 222 to 225)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 226

1 but there are also ones that weren't directly cited --
2     A   That's correct.
3         MR. CONDIT:  Objection.
4 BY MR. WILLIAMS:
5     Q   -- that weren't part of the conversation?
6     A   Yes.
7         MR. CONDIT:  Objection.
8 BY MR. WILLIAMS:
9     Q   Okay.  And what were those again?
10     A   Performance issues, inability to perform, to
11 meet the standards required by the position or of the
12 position.
13     Q   Of the position?  Okay.  Give me one second.
14         Ms. Donald, do you know if Channel 9,
15 WUSA, was the only news organization to cover this?
16     A   I believe that there was an earlier article
17 in the Washington Post, but --
18     Q   And by --
19     A   -- I cannot recall when.
20     Q   Sorry.  Excuse me.  By "earlier article,"
21 what do you mean?  Earlier than when?
22     A   Earlier than this news report, the September

Page 227

1 20 airing on the channel.  I believe that this was
2 reported in the Post sometime before.
3     Q   The same incident reported --
4     A   Not this particular incident, but the fact
5 that we have placement challenges and that there were
6 children who were sleeping in the building.
7     Q   Okay.  Let's back up just for a second.
8 When do you -- can you recall when that Post article
9 came out?
10     A   I can't, and -- that period of time is kind
11 of running together.  It may have been after, it may
12 have been after a city council hearing, but I thought
13 there might have been a previous article, and we can
14 just check.
15     Q   Okay.  Was it before Ms. Tabb went to the
16 media, or was it after?  Can you --
17     A   I think it was before, but I'm not sure.
18     Q   You're not certain?  Okay.  Could there have
19 been other media that you reviewed other than this
20 news program, or the audio or videotapes that we're
21 still trying to get?  There could have been other
22 media that you reviewed before you made your decision,

Page 228

1 do you know?
2     A   I'm not sure.
3     Q   Okay.  What about Mindy Good?
4     A   In terms of?
5     Q   Would there have been other media that,
6 since she was the direct supervisor, whether she would
7 have made --
8     A   She would have monitored the media, you
9 know.  We have regular news clippings, but I just seem
10 to recall a Washington Post article, but I haven't
11 seen it.  I haven't looked for it.
12     Q   Okay.
13         MR. WILLIAMS:  Follow-up?
14         MR. CONDIT:  Yes.
15     FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFF
16 BY MR. CONDIT:
17     Q   With respect to the items that you testified
18 to that were taken into consideration but not
19 reflected in the October 3, 2005 letter --
20     A   Yes.
21     Q   -- you identified them as -- generally as
22 performance issues.

Page 229

1     A   Yes.
2     Q   And how were they considered in this -- in
3 your determination as to whether or not to summarily
4 remove Ms. Tabb from her position?
5     A   As I said, we looked at everything and we
6 discussed Shirley's performance as an employee of CFSA
7 and concerns that we had, and performance played into
8 that discussion.
9     Q   Now, if it's not documented or articulated
10 in the October 3, 2005 letter, how would Ms. Tabb be
11 able to respond to it?
12     A   Well, actually, it is documented in here, so
13 I -- it's the third paragraph on the first page.
14     Q   The reference to the August 2005
15 admonishment?
16     A   Oh, I'm sorry.  I thought that was general.
17 So I don't -- I don't know exactly what your question
18 is.  How would she have been able to respond?
19         The question I thought earlier was were
20 there other things that we took into consideration in
21 making a decision to terminate, and I said in the
22 discussion about Shirley Tabb as an employee we took

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 230

1  the issues of performance into consideration, you
2  know.  Whether those rose to the occasion or met the
3  standard of being documented as grounds for
4  termination, perhaps they did not.  But certainly
5  there was a paper trail of performance issues, and
6  that factored into the discussion, which is what the
7  attorney asked me.
8      Q  Let me try to clear up the record here
9  because I'm confused now.  Mr. Williams specifically
10  referenced you to Exhibit 10, which is your October 3,
11  2005 letter, and he asked you are there other reasons
12  not referenced in the letter that played a role in
13  your determination for Ms. Tabb's termination.  And
14  you said yes, and you said there were perform issues
15  that were not documented in the letter.  So I'm not
16  understanding your testimony now.  Is it that there
17  were performance issues not documented in the letter
18  that were a factor in her termination or not?
19      A  Yes.
20      Q  And what were they, and how would she have
21  known that those were issues if they're not documented
22  in the letter?

Page 231

1      MR. WILLIAMS:  Objection, compound.
2      MR. CONDIT:  Okay.
3  BY MR. CONDIT:
4      Q  First what were they?
5      A  What were they?  We already testified
6  several times that there was a performance review done
7  by Mindy, there was a performance improvement plan,
8  there were other documented instances of failure to
9  perform, to complete at least one large project that I
10  recall, and those -- there were counseling sessions
11  and ongoing documentation about performance issues.
12  So if that -- whether they were in the letter or not,
13  they weren't unknown to Ms. Tabb.
14      Q  But they're unknown to her as a basis for
15  her summary removal.  Isn't that correct?
16      A  I thought the question was did I consider
17  anything else, and so I considered these are the
18  things that we identified as grounds for termination.
19      Q  And the items that you just listed, is it
20  true or not that they are not in this October 3, 2005
21  letter?
22      A  The general performance issues are not in

Page 232

1  there.
2      Q  I'm sorry.  I didn't hear you.
3      A  I said the overall performance issues are
4  not in here.
5      Q  They're not?
6      A  Just specific ones.
7      Q  And you testified earlier that the
8  performance review that you're referring to now, you
9  weren't sure whether it was unsatisfactory or not,
10  correct?
11      A  That is correct.
12      Q  So if it was satisfactory, that wouldn't be
13  a basis for termination, would it?
14      A  Not in and of itself.
15      Q  Well, if it was satisfactory, how would it
16  be any basis for termination?
17      A  I said not in and of itself.  If you have a
18  number of other things, including suspected abuse of
19  leave, inability to complete assignments, violating
20  confidentiality laws, disregarding supervisory
21  directives, you put all of those things together in
22  conjunction with performance, then we believe that's

Page 233

1  the basis for termination.
2      Q  Okay.  Please focus with me for a moment on
3  performance review.  That was one of the items you've
4  listed that was part of the overall performance
5  problem that you just identified.  And my question is
6  if a performance review is satisfactory, how does
7  that -- does it get on the list of things that
8  contribute to a person's termination?
9      MR. WILLIAMS:  I believe she --
10  objection, asked and answered.
11      MR. CONDIT:  I would appreciate it
12  if you would not coach the witness.
13      MR. WILLIAMS:  I'm not coaching the
14  witness.
15      MR. CONDIT:  I understand.
16      MR. WILLIAMS:  I'm making the record
17  clear to you.
18      MR. CONDIT:  If you have an
19  objection --
20      MR. WILLIAMS:  Objection.  I can say
21  the basis of my objection.  Objection, asked and
22  answered.

59 (Pages 230 to 233)

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 234

1      MR. CONDIT: That's all you need to
2  say. You do not need to tell the witness --
3      MR. WILLIAMS: She testified before
4  --
5      THE REPORTER: One at a time,
6  please.
7      MR. WILLIAMS: Okay.
8      MR. CONDIT: I would appreciate it
9  if you would not tell the witness what to answer.
10 You said objection, asked and answered.
11     MR. WILLIAMS: Objection, asked and
12 answered.
13     MR. CONDIT: And that's good. Now
14 the witness can answer the question, correct?
15 BY MR. CONDIT:
16     Q  Can you answer the question?
17     A  I said that there were ongoing performance
18 issues with Shirley Tabb that -- and I referenced the
19 performance appraisal as one piece of documentation
20 that I vividly recall, and a corrective action plan or
21 performance improvement plan as a result of that,
22 along with Shirley's rebuttal. There were other

Page 235

1  instances of performance problems that were cited by
2  her supervisor to me either in meetings and/or
3  documented in directives to Shirley Tabb.
4      So the answer to your question about
5  whether a performance appraisal itself that was not
6  unsatisfactory could be the grounds for a
7  performance-based termination, the answer would be no.
8  But can that in conjunction with other performance
9  issues be? I believe yes.
10     Q  Okay. My question is how can a satisfactory
11 performance review be in a laundry list of things
12 that --
13     A  Depends on when that performance review was
14 --
15     Q  Can you -- I'm sorry. Can you let me --
16     A  Sorry. Go ahead.
17     Q  -- finish the question, because the record
18 gets confused.
19     A  Sorry.
20     Q  How can a satisfactory performance review be
21 added to a laundry list of things that are indicated
22 by the agency as the basis for some kind of adverse

Page 236

1  action, in this case termination?
2      A  Right. Two things. One, I said I did not
3  recall the period of time of that particular
4  performance review. And secondly, I did not recall
5  what the rating was, whether it was satisfactory or
6  unsatisfactory. When you asked me, I said I was not
7  sure.
8      Q  And I was saying if it was satisfactory, how
9  does it get on the laundry list of things that --
10     A  Because there could --
11     Q  -- contributed to her termination?
12     MR. WILLIAMS: Objection,
13 speculation.
14     Answer the question.
15     A  Depending on the time of that particular
16 performance review, there was a period that would have
17 followed that under which or during which performance
18 would have been reviewed but perhaps not yet
19 documented in an official performance appraisal
20 report, which is due at certain times of the year. So
21 if that ongoing performance is noted, monitored, and
22 assessed as being underperforming, then that would be

Page 237

1  taken into consideration.
2  BY MR. CONDIT:
3      Q  Okay. I don't think I understand, but I
4  know you answered.
5      With respect to the item of being on a
6  performance improvement plan, I believe you testified
7  earlier -- and correct me if I'm wrong -- that you did
8  not know whether or not Ms. Tabb was making progress
9  or not in the performance improvement plan. Is that
10 correct?
11     A  You asked me if I had seen evidence of it,
12 and I said I did not recall.
13     Q  All right. And then you said that there
14 were other documented instances of performance issues,
15 I guess, including a failure to complete one large
16 project that you were aware of. Do you recall that
17 testimony?
18     A  Yes.
19     Q  What is -- what is the project you're
20 referring to?
21     A  I said I couldn't remember what it was then.
22 I don't remember. It was a big issue. It was one

60 (Pages 234 to 237)

c87c10fa-eb59-4a9d-b17f-dfc3c6e84edd

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 238

1  that Mindy came to me and said here's another example
2  of, you know, Shirley's not here and she couldn't
3  complete this, we had a big deadline, and I need
4  someone who can -- who can do the work.
5      Q  So if these things that you've been
6  describing and we've been discussing back and forth
7  based on your counsel's questions were things that
8  were considered in Ms. Tabb's summary removal, my
9  question now is how is it that she was supposed to
10  know to respond to those things if it wasn't contained
11  specifically in the October 3 letter?
12      A  I do not know the answer to that question.
13  I was advised by my experts, who were HR and general
14  counsel, that the grounds that were listed in this
15  letter were sufficient to meet the government standard
16  for termination, and that's what we put in the letter.
17      Q  Did the HR experts advise you that you could
18  propose as grounds for summary removal conditions or
19  issues that were not reflected in the letter?
20      A  I don't know that it -- I asked that
21  question or if that was posed in that way.
22          MR. CONDIT:  I have one final

Page 239

1  exhibit, which doesn't have directly to do with
2  rebuttal, but I don't think it would make sense
3  to conclude the deposition without seeing it.
4  I'm just going to ask the witness if it's her
5  document, and I don't expect extensive testimony.
6          If you could just mark that for me,
7  please.
8          (Donald Deposition Exhibit No. 15
9  was marked for identification and was attached to
10  the deposition transcript.)
11  BY MR. DONALD:
12      Q  Ms. Donald, let me show you what's been
13  marked as Exhibit 15.  This is an e-mail from you to
14  all CFSA staff.  I'm trying to see a date.  October 7,
15  2005.  I'd just like you to take a look at it and tell
16  me if this is a document that you prepared and sent to
17  all CFSA staff.
18      A  Yes.  I recall.
19      Q  Is this your document?
20      A  Yes.
21          MR. CONDIT:  That's all I have for
22  now.

Page 240

1          Thank you.
2          MR. WILLIAMS:  All right.
3          THE WITNESS:  Okay.
4          THE VIDEOGRAPHER:  This marks the
5  end of volume one in the deposition of Brenda
6  Donald.  The number of tapes used is three.
7  We're going off the record.  The time is 4:41.
8          (Signature having not been waived,
9  the deposition of BRENDA DONALD was concluded at
10  4:41 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22

Page 241

1          ACKNOWLEDGEMENT OF DEPONENT
2          I, BRENDA DONALD, do hereby acknowledge
3  that I have read and examined the foregoing testimony,
4  and the same is a true, correct and complete
5  transcription of the testimony given by me and any
6  corrections appear on the attached Errata sheet signed
7  by me.
8
9
10  _____  _____
11      (DATE)            (SIGNATURE)
12
13
14
15
16
17
18
19
20
21
22

61 (Pages 238 to 241)

VIDEOTAPED DEPOSITION OF BRENDA DONALD
CONDUCTED ON THURSDAY, DECEMBER 27, 2007

Page 242

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2      I, Kelly Carnegie, Certified Shorthand
3  Reporter, Registered Professional Reporter, the
4  officer before whom the foregoing proceedings were
5  taken, do hereby certify that the foregoing transcript
6  is a true and correct record of the proceedings; that
7  said proceedings were taken by me stenographically and
8  thereafter reduced to typewriting under my
9  supervision; and that I am neither counsel for,
10  related to, nor employed by any of the parties to this
11  case and have no interest, financial or otherwise, in
12  its outcome.
13      IN WITNESS WHEREOF, I have hereunto set my
14  hand and affixed my notarial seal this 5th day of
15  January, 2008.
16  My commission expires:
17  February 9, 2012
18
19
20  _____
21  NOTARY PUBLIC IN AND FOR THE
22  DISTRICT OF COLUMBIA

Page 243

1          E R R A T A  S H E E T
2      IN RE:  TABB VS. DISTRICT OF COLUMBIA, ET AL.
3  RETURN BY:
4  PAGE    LINE        CORRECTION AND REASON
5  ____   ____  _____
6  ____   ____  _____
7  ____   ____  _____
8  ____   ____  _____
9  ____   ____  _____
10  ____   ____  _____
11  ____   ____  _____
12  ____   ____  _____
13  ____   ____  _____
14  ____   ____  _____
15  ____   ____  _____
16  ____   ____  _____
17  ____   ____  _____
18  ____   ____  _____
19  ____   ____  _____
20  ____   ____  _____
21  _____  _____
22  (DATE)        (SIGNATURE)

Page 244

1          E R R A T A  S H E E T
2      IN RE:  TABB VS. DISTRICT OF COLUMBIA, ET AL.
3  RETURN BY:
4  PAGE    LINE        CORRECTION AND REASON
5  ____   ____  _____
6  ____   ____  _____
7  ____   ____  _____
8  ____   ____  _____
9  ____   ____  _____
10  ____   ____  _____
11  ____   ____  _____
12  ____   ____  _____
13  ____   ____  _____
14  ____   ____  _____
15  ____   ____  _____
16  ____   ____  _____
17  ____   ____  _____
18  ____   ____  _____
19  ____   ____  _____
20  ____   ____  _____
21  _____  _____
22  (DATE)        (SIGNATURE)

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664