**Page 1**

```
1        IN THE UNITED STATES DISTRICT COURT
2           FOR THE DISTRICT OF COLUMBIA
3   ----------------------------------+
4   SHIRLEY TABB,            +
5          Plaintiff,   +
6       v.              + Case No.
7   DISTRICT OF COLUMBIA, BRENDA     + 1:06CV00789
8   DONALD WALKER, and MINDY GOOD,   +
9          Defendants.  +
10  ----------------------------------+
11
12
13     Videotaped Deposition of RONNIE CHARLES
14            Washington, D.C.
15          Thursday, January 17, 2008
16              9:49 A.M.
17
18
19  Job No.: 2-119441
20  Pages 1 - 199
21  Reported by: Denice Z. Lombard, CSR
22  Videotaped by: Scott Pickering
```

**Page 2**

```
1        Deposition of RONNIE CHARLES,
2   held at the offices of:
3
4        L.A.D. REPORTING COMPANY
5        1100 Connecticut Avenue, Northwest
6        Suite 850
7        Washington, D.C. 20036
8        (202) 861-3410
9
10
11        Pursuant to agreement, before Denice Z.
12  Lombard, Certified Shorthand Reporter and Notary
13  Public in the District of Columbia.
```

**Page 3**

```
1           A P P E A R A N C E S
2
3        ON BEHALF OF PLAINTIFF:
4   RICHARD CONDIT, ESQUIRE
5   LAW OFFICES OF RICHARD CONDIT
6   1612 K Street, Northwest
7   Suite 1100
8   Washington, D.C. 20006
9   (202) 408-0034
10
11
12        ON BEHALF OF DEFENDANTS:
13  MICHAEL P. BRUCKHEIM, ESQUIRE
14  OFFICE OF THE ATTORNEY GENERAL
15  GOVERNMENT OF THE DISTRICT OF COLUMBIA
16  One Judiciary Square, 6th Floor - South
17  441 4th Street, Northwest
18  Washington, D.C. 20001
19  (202) 724-6649
20
21     ALSO PRESENT: Shirley Tabb.
22
```

**Page 4**

```
1          C O N T E N T S
2   EXAMINATION OF RONNIE CHARLES          PAGE
3   By Mr. Condit          8
4          E X H I B I T S
5     (Attached to the transcript.)
6   CHARLES DEPOSITION EXHIBIT          PAGE
7   Exhibit 1  Memo to Shirley Tabb from Mindy
8          Good dated 8-18-05, Subject:
9          Admonition, Bates 239-240      74
10  Exhibit 2  meeting 4:30, Bates 155       95
11  Exhibit 3  E-mail chain dated 10-6-05, the
12         top one from the witness to Uma
13         Ahluwalia re: Social Workers' Code
14         of Ethics, Bates 288-289      105
15  Exhibit 4  Letter to Shirley Tabb, from Brenda
16         Donald Walker, dated 10-3-05,
17         Re: Notice of Summary Removal      116
18  Exhibit 5  Letter to Joe Addis, from Shirley
19         Tabb, dated 10-10-05, re: Response
20         to Notice of Summary Removal,
21         Bates 145-149          141
22       C O N T E N T S, continued
```

Case 1:06-cv-00789-PLF-JMF   Document 41-12   Filed 04/22/2008   Page 2 of 76
VIDEOTAPED DEPOSITION OF RONNIE CHARLES
CONDUCTED ON THURSDAY, JANUARY 17, 2008

2 (Pages 5 to 8)

Page 5

1  EXAMINATION OF RONNIE CHARLES    PAGE
2  Exhibit 6  Letter to the witness from Joe
3       Addis, dated 11-1-05, Subject:
4       Hearing as Requested by
5       Ms. Shirley Tabb, Bates 136      150
6  Exhibit 7  E-mail chain with redactions
7       dated October 25 and 26, 2005,
8       the top one to the witness from
9       Deborah Wilson, Bates 717-720      154
10 Exhibit 8  E-mail chain dated 10-31-05, the
11       top one to Deborah Wilson and
12       Sam Spaght, from the witness,
13       Bates 707      169
14 Exhibit 9  Shirley Tabb - Chronology of Events,
15       dated 10-31-05, Bates 143-144      177
16 Exhibit 10  Letter to Shirley Tabb, from the
17       witness, dated 11-3-05, Re: Notice
18       of Final Decision Summary Removal,
19       Bates 133      178
20 Exhibit 11  Determination by Claims Examiner,
21       dated 11-17-05      186
22       C O N T E N T S, continued

Page 6

1  EXAMINATION OF RONNIE CHARLES    PAGE
2  Exhibit 12  Letter to Office of Administrative
3       Hearings, from Deborah Wilson,
4       dated 12-21-05, Bates 74      188
5  Exhibit 13  Document beginning with "Joanne
6       Vaughn, Supervisory Social Worker,"
7       and signed by her, Bates 229      189
8  Exhibit 14  DC Personnel Regulations,
9       Chapter 16, Part 1      191
10 Exhibit 15  Section 1-615.58 of D.C.
11       Whistleblower Protection law      193
12
13
14
15
16
17
18
19
20
21
22

Page 7

1            P R O C E E D I N G S
2       THE VIDEOGRAPHER:  Here begins Videotape
3  No. 1 in the deposition of Ronnie Charles in the
4  matter of Shirley Tabb versus District of Columbia,
5  Brenda Donald Walker and Mindy Good to be heard in
6  the United States District Court for the District of
7  Columbia, Case No. 1:06CV00789.
8       Today's date, January 17th, year 2008.  The
9  time on the video monitor is now 9:49 a.m.  The video
10 operator today is Scott Pickering.
11      This video deposition is taking place at
12 1100 Connecticut Avenue, Northwest, Suite 850,
13 Washington, D.C.
14      Counsel, please voice identify yourselves
15 and state whom you represent.
16      MR. CONDIT:  Good morning.  Richard Condit
17 for the plaintiff, Shirley Tabb.
18      MR. BRUCKHEIM:  Michael Bruckheim on behalf
19 of the defendants.
20      VIDEO OPERATOR:  The court reporter today is
21 Denice Lombard of L.A.D. Reporting.  Would the
22 reporter please swear in the witness.

Page 8

1       (Witness sworn.)
2            RONNIE CHARLES
3  having been duly sworn, testified as follows:
4       EXAMINATION BY COUNSEL FOR PLAINTIFF
5  BY MR. CONDIT:
6    Q   Good morning.
7    A   **Good morning.**
8    Q   Would you please state your name for the
9  record?
10   A   **My name is Ronnie Charles.**
11   Q   Mr. Charles, what state or jurisdiction do
12 you reside in?
13   A   **I have dual residency.  I reside here in the**
14 **District of Columbia for work purposes, and I also**
15 **reside in Richmond, Virginia.**
16   Q   All right.  What is your current position?
17   A   **I'm the senior deputy director at Child and**
18 **Family Services.**
19   Q   And Child and Family Services is an agency
20 of the District of Columbia government; is that
21 correct?
22   A   **That's correct.**

Case 1:06-cv-00789-PLF-JMF Document 41-12 Filed 04/22/2008 Page 3 of 76
VIDEOTAPE DEPOSITION OF KURSTIN A. BAILLIE
CONDUCTED ON THURSDAY, JANUARY 17, 2008

3 (Pages 9 to 12)

9

1    Q    And do you have any plans to leave your
2  position anytime within the next 12 months?
3    A    **If I'm lucky enough, yes.**
4    Q    Are you planning to retire?
5    A    **No.**
6    Q    And why do you say if you're lucky enough?
7    A    **Again, I've been away from my family for**
8  **approximately five years, and it's time to go home.**
9    Q    Do you have any plans of leaving in the next
10 three or four months?
11    A    **I have no idea.  If an employment**
12 **opportunity should present itself, yes.**
13    Q    Okay.  In that case, could you provide your
14 home address, please.
15    A    **16064 Parsons Road, Beaver Dam, Virginia.**
16    Q    And your District of Columbia address?
17    A    **429 N Street, Southwest.**
18    Q    Thank you.  Now, let me go over a few ground
19 rules, but I'll ask first, have you provided a
20 deposition testimony before?
21    A    **Yes, I have.**
22    Q    So you understand that you need to give

10

1  audible responses to the questions?
2    A    **Correct.**
3    Q    And you also understand that even though
4  this is being videotaped, that it is best for you to
5  give a very complete response to each of the
6  questions so that the record is clear?
7    A    **Yes.**
8    Q    And you understand because you've been
9  placed under oath that your response to the questions
10 of either counsel must be the whole truth?
11    A    **Yes.**
12    Q    Now, in order for me to understand a little
13 bit about your perspective on truthfulness, I'd like
14 to provide you with a hypothetical and ask for your
15 response.
16        The hypothetical is this.  Let's say that
17 there is a person who is the caretaker of a very
18 special tree.  And that tree had many, many green
19 leaves on it and is very, very bushy.  It's about
20 30 feet tall.
21        And the caretaker has to provide the water
22 for the tree, the fertilizer for the tree, and cares

11

1  for the tree all year long.  He also measures the
2  branches and determines its growth and its progress
3  and records all this information.
4        The caretaker happens to know, because he's
5  the only one that climbs in and out of the tree, that
6  two leaves on the tree are special.  One leaf is
7  green with some shades of red and orange, and another
8  leaf is green with some shades of yellow.  But people
9  who pass by and look from the ground cannot see these
10 two special leaves.
11        Now, the caretaker is asked the question
12 under oath, "What color are the leaves of this tree?"
13        And his answer is, "Green."
14        In your opinion, would that be a truthful or
15 non-truthful response?
16        MR. BRUCKHEIM:  I'm going to object as to
17 form and to relevance.
18        You can answer.  It was a nice story.
19        THE WITNESS:  Yes.
20 BY MR. CONDIT:
21    Q    Yes, it would be a truthful response?
22    A    **Sure.**

12

1    Q    Okay.  Let me ask, what have you done to
2  prepare for your deposition today?
3    A    **To prepare for my deposition I've met with**
4  **the attorney here.**
5    Q    Anything else?
6    A    **That's it.**
7    Q    Have you reviewed any documentation?
8    A    **Yes, I've reviewed documentation.**
9    Q    What documents have you reviewed?
10    A    **Just documents that were presented from my**
11 **attorney for my familiarity.**
12    Q    What documents were those?
13    A    **E-mails.**
14    Q    Which e-mails or to who or from whom were
15 they?
16    A    **I think they were e-mails, if I recall**
17 **correctly, potentially from Mindy Good, Brenda Donald**
18 **Walker.**
19    Q    Anyone else?
20    A    **That's all I recall.**
21    Q    Did you review any e-mails from Deborah
22 Wilson?

Case 1:06-cv-00789-PLF-JMF   Document 41-12   Filed 04/22/2008   Page 4 of 76
VIDEOTAPED DEPOSITION OF RUSSELL CHARLES
CONDUCTED ON THURSDAY, JANUARY 17, 2008

4 (Pages 13 to 16)

13

1    A   Yes.
2    Q   Did you review any e-mails from Michelle
3  Lewis?
4    A   I believe so.
5    Q   And just so the record is clear, who is
6  Mindy Good?
7    A   She is the public information officer for
8  Child and Family Services.
9    Q   And who is Brenda Donald Walker?
10    A   She is the former director of Child and
11  Family Services.
12    Q   And the two people I mentioned, who is
13  Deborah Wilson?
14    A   Both people that you mentioned are employee
15  and labor relations specialists from the Human
16  Resources Department of Child and Family Services.
17    Q   So that is both Deborah Wilson and Michelle
18  Lewis?
19    A   That's correct.
20    Q   Is Michelle Lewis still working at CFSA?
21    A   No.
22    Q   Do you know where she works now?

14

1    A   No.
2    Q   Other than the folks that you mentioned and
3  that I mentioned to you, were there any other folks
4  whose e-mail traffic you may have reviewed in advance
5  of this deposition?
6    A   Not that I can recall.
7    Q   Aside from e-mail, is there any other
8  documentation that you reviewed prior to the
9  deposition today?
10    A   No.
11    Q   Have you reviewed any of the testimony
12  that's been given so far in this case?
13    A   No.
14    Q   Has anyone told you or described to you any
15  of the testimony that's been given in this case thus
16  far?
17    MR. BRUCKHEIM:  Objection.
18    You can answer.
19    THE WITNESS:  No.
20  BY MR. CONDIT:
21    Q   Mr. Charles, if you could please describe
22  your college and graduate education, if any,

15

1  providing me with the names of institutions, dates of
2  graduation and degrees conferred, I would appreciate
3  that.
4    MR. BRUCKHEIM:  I'd like to just put in a
5  standing relevance objection as to the background
6  questions that are going to be coming.
7    MR. CONDIT:  Okay, thank you.
8    MR. BRUCKHEIM:  You can answer.
9    THE WITNESS:  I have a bachelor of science
10  in management from St. Paul's College conferred in
11  1991.
12  BY MR. CONDIT:
13    Q   Now, I notice in some of the documents that
14  I've seen there are a number of letters after your
15  name which obviously signify what those letters stand for.
16  Could you identify what those letters stand for.
17    A   The SPHR behind my name represents national
18  certification as a senior professional in human
19  resources.  The IPMACP represents my international
20  executive certification in human resources.
21    Q   Okay.  Let's start with the SPHR.  What are
22  the requirements to be conferred with national

16

1  certification as a professional in human resources?
2    A   You have to have at least six years of
3  exempt-level HR experience.  That's the first
4  criteria.  And you must pass a national exam
5  administered by the Human Resources Certification
6  Institute.
7    Q   When did you take your exam?
8    A   Probably in 1990.
9    Q   Are you required to engage in any
10  continuing-education courses in order to maintain
11  your designation?
12    A   You must acquire 60 hours every three years.
13    Q   And 60 hours of what exactly?
14    A   60 hours of continuing human resources
15  educational units.
16    Q   Now, for your international certification,
17  what did you have to do to receive that designation?
18    A   To receive that certification you have to
19  submit your entire human resources background, to
20  include a resume.  You also have to have
21  recommendations from at least two CEOs or two agency
22  heads.  And you must also pass an international

Case 1:06-cv-00789-PLF-JMF Document 41-12 Filed 04/22/2008 Page 5 of 76
VIDEOTAPED DEPOSITION OF RUSSELL PARKER
CONDUCTED ON THURSDAY, JANUARY 17, 2008

5 (Pages 17 to 20)

17

1 certification exam.
2    Q   When did you take the international
3 certification exam?
4    A   Probably 1995. I cannot be exact.
5    Q   And who were the agency heads or executives
6 that recommended you for that certification?
7    A   At that particular time that would have been
8 Dot Powell-Woodson and Charles James.
9    Q   And without getting into too much detail,
10 what organizations did those individuals work for?
11    A   I have no idea where Dot Powell is right
12 now. I have no idea. She left years ago, even
13 before I came to the District.
14        Charles James is the director of OFCCP.
15    Q   What is OFCCP?
16    A   Office of Federal Contracts and Compliance
17 Programs, federal.
18    Q   And so Mr. James works for the District of
19 Columbia government?
20    A   No, federal government.
21    Q   Federal government.
22        When Ms. Powell-Woodson provided you with a

18

1 recommendation, what organization did she work for at
2 that time?
3    A   She was the director of the Virginia
4 Department of Personnel and Training.
5    Q   Do you have any other certifications other
6 than those that we've just discussed?
7    A   No.
8    Q   Do you have any professional licenses?
9    A   No.
10    Q   Do you have a degree or training in social
11 work?
12    A   No.
13    Q   Do you have a degree or training in
14 counseling?
15    A   No.
16    Q   Do you have a degree or training in
17 sociology?
18    A   No.
19    Q   Do you have a degree or training in
20 psychology?
21    A   No.
22    Q   Do you have a degree or training in

19

1 mediation?
2    A   I do have training in mediation. I was
3 certified by the Virginia bar as a state mediator.
4    Q   When did you get that certification?
5    A   Early 1990s. I don't recall the exact date.
6    Q   Do you maintain that certification
7 presently?
8    A   Yes.
9    Q   What do you have to do to maintain that
10 certification?
11    A   Well, my HR recertification for SPHR
12 transfers directly to that certification.
13    Q   Have you ever received any training
14 informing you about the requirements of the District
15 of Columbia Human Rights Act?
16    A   Yes.
17    Q   And what type of training have you received
18 on the Human Rights Act?
19    A   It's just a half-day training program by the
20 OHR. I believe it was in 2004.
21    Q   Have you ever received any training
22 informing you about the requirements of the Americans

20

1 With Disabilities Act?
2    A   Yes.
3    Q   And what training have you received there?
4    A   I've received extensive training with the
5 Americans With Disability Act. It's a requirement to
6 be well versed for the purposes of obtaining
7 certification.
8    Q   Have you received any training or
9 information informing you about the requirements of
10 the District of Columbia's Whistleblower Protection
11 Act?
12    A   No.
13    Q   Are you familiar at all with the D.C.
14 Whistleblower Protection Act?
15    A   Somewhat familiar.
16    Q   What is your familiarity?
17    A   Basically that, for the most part, you have
18 various protections for reporting wrongdoing.
19    Q   And how is it that you know that bit of
20 information about the D.C. Whistleblower Protection
21 Act?
22    A   That was part of some of the training that

Case 1:06-cv-00789-PLF-JMF    Document 41-12    Filed 04/22/2008    Page 6 of 76
VIDEOTAPED DEPOSITION OF ROBERT CHARLES
CONDUCTED ON THURSDAY, JANUARY 17, 2008

6 (Pages 21 to 24)

21

1    we received from OHR, and it's in direct -- I would
2    say there's a federal whistleblower act for which the
3    D.C. act probably was derived from.
4        Q    Do you have some training or experience with
5    the Federal Whistleblower Protection Act?
6        A    Yes.
7        Q    What is that experience or training?
8        A    SPHR.
9        Q    So your certification as an SPHR required
10   you to learn something about the Federal
11   Whistleblower Protection Act?
12       A    Correct.
13       Q    And about when did you last have some
14   training on the Federal Whistleblower Protection Act?
15       A    I would say I haven't had formal training,
16   but I teach the certification course.
17       Q    And when have you last taught the
18   certification course?
19       A    October of last year.
20       Q    And just so that I'm clear, the
21   certification course you're teaching is specific to
22   the Federal Whistleblower Protection Act?

22

1        A    No. It's specific to obtaining your --
2    either your senior or your professional level human
3    resources certification.
4        Q    I understand.
5            And as part of that training, you make some
6    reference to or spend some time on the Federal
7    Whistleblower Protection Act; is that correct?
8        A    Correct.
9        Q    And when you teach or give instruction about
10   the Federal Whistleblower Protection Act, what is the
11   highlight of that piece of the presentation?
12       A    The highlight basically is, again, that
13   employees have rights to report wrongdoing and have
14   protections for doing that. That's the basic premise
15   of what's taught.
16       Q    Do you provide any handouts or more detailed
17   information for people who you are training on that
18   topic?
19       A    No.
20       Q    Mr. Charles, when did you first begin
21   working for the District of Columbia government?
22       A    February 18th, 2003.

23

1        Q    What position did you have at that time?
2        A    Deputy director for human resources.
3        Q    And how is that position, deputy director
4    for human resources, distinct, if it is at all, from
5    the position that you hold today?
6        A    That position reports to the position that I
7    hold today.
8        Q    So presently someone is under you who fills
9    the position that you first took when you came to the
10   District government.
11       A    That is correct.
12       Q    And who is that person?
13       A    That person would be Mr. Ken Columbia.
14       Q    Now, in 2005 did you have the position that
15   you hold today?
16       A    Yes.
17       Q    And who was your deputy at that time?
18       A    2005? I believe it was Kleartis Jackson.
19       Q    And what is the distinction between the
20   roles of the -- that you have now and the deputy?
21       A    There's a huge distinction. The distinction
22   is, in my role I'm responsible for a number of other

24

1    administrations in addition to human resources.
2            I'm responsible for contracts and
3    procurement, I'm responsible for facilities, physical
4    plant, fleet management. I'm responsible for the
5    business services administration. I'm responsible
6    for risk management.
7        Q    Now, is risk management an administration
8    within CFSA?
9        A    It is a single program within CFSA.
10       Q    And just generally what does that program
11   entail?
12       A    That program -- well, first of all, the
13   District requires us to have a risk officer for the
14   most part. And that position is responsible for
15   mitigating any risks for the entire agency.
16       Q    And what risks does the risk officer
17   primarily focus on?
18       A    All risks. I don't think there is any
19   primary focus. We deal with risk in everything that
20   we do. Risk with our fleet, for example. Any
21   liability that could occur with that. Risk with
22   Workers' Comp., anything that could occur with that.

Case 1:06-cv-00789-PLF-JMF Document 41-12 Filed 04/22/2008 Page 7 of 76
VIDEOTAPED DEPOSITION OF RUSSELL JOINER
CONDUCTED ON THURSDAY, JANUARY 17, 2008

7 (Pages 25 to 28)

25

1 Risk with workplace violence, anything that could
2 occur with that. Those type things.
3    Q   Okay. And aside from having the
4 responsibility of overseeing those administrations or
5 programs that you just described, what would you
6 consider to be your other major duties in your
7 position?
8    A   To watch over just about everything in the
9 agency on the administrative side of the house.
10   Q   Now, when you came to the District in 2003,
11 who hired you?
12   A   Olivia Golden, the director.
13   Q   And was Brenda Donald Walker with the agency
14 at that time?
15   A   Yes, she was.
16   Q   What position did she have?
17   A   I believe it was chief of staff.
18   Q   Now, when you were first hired in 2003, to
19 whom did you directly report?
20   A   Originally it was to Olivia Golden.
21   Q   And presently to whom do you directly
22 report?

26

1    A   The director.
2    Q   And who is the director of the agency at
3 this time?
4    A   Sharlynn Bobo.
5    Q   When Brenda Donald Walker was the director,
6 did you report directly to her?
7    A   Yes.
8    Q   Prior to coming to CFSA in 2003, what
9 position did you hold?
10   A   I was the director of human resources for
11 the Virginia Department of Human Resources
12 Management.
13   Q   During what period of time did you hold that
14 position?
15   A   If I'm not mistaken, from 1988 until I
16 acquired the position in the District of Columbia.
17   Q   And what were your major duties as the
18 director of human resources at the Virginia
19 Department of Human Resources Management
20       MR. BRUCKHEIM: I'm going to object as to
21 relevance.
22       You can answer.

27

1        THE WITNESS: I oversaw a workforce of
2 140,000 employees in all facets of HR.
3 BY MR. CONDIT:
4    Q   Now, when you came to the District of
5 Columbia in 2003, did you notice any distinctions or
6 differences of any significance between how human
7 resources was managed in Virginia versus how it's
8 managed in the District of Columbia?
9    A   There's only --
10       MR. BRUCKHEIM: Objection as to relevance
11 and form.
12       You can answer.
13       THE WITNESS: I'm sorry.
14       There's only one true distinction, and that
15 is Virginia is a right-to-work state, and here you
16 have labor -- you have unions.
17 BY MR. CONDIT:
18   Q   Do you have occasions to have to interact
19 with the unions that -- of which CFSA employees are
20 members?
21   A   Yes.
22   Q   And on what types of issues do you need to

28

1 interact with the unions?
2    A   I mainly interact with the union in what we
3 call labor-management partnerships where we try to
4 work together to acquire efficiencies for the agency
5 and to better the work opportunities for employees.
6    Q   Now, since coming to the District government
7 in 2003, have you had occasion to be involved in the
8 termination of any employees?
9        MR. BRUCKHEIM: Objection as to relevance,
10 but you can answer.
11       THE WITNESS: Yes.
12 BY MR. CONDIT:
13   Q   Since 2003, about how many employees have
14 you been involved in where they've been terminated?
15   A   I don't recall an exact number.
16   Q   Were you involved in the decision-making
17 surrounding Shirley Tabb's termination?
18   A   I was involved in policy review, not the
19 actual decision.
20   Q   What does that mean, policy review?
21   A   Review of the personnel regulations.
22   Q   And would you say that's the role that

Case 1:06-cv-00789-PLF-JMF VIDEOTAPED DEPOSITION OF RUSSELL CHARLES Filed 04/22/2008 Page 8 of 76
CONDUCTED ON THURSDAY, JANUARY 17, 2008

8 (Pages 29 to 32)

29

1  you've played in any other terminations of CFSA
2  employees that you may have been involved in or with
3  since 2003?
4      **A   I would say that I've had dual roles.  I**
5  **would say that I've actually had to make termination**
6  **decisions because I've terminated subordinates under**
7  **me.**
8      Q   So how many folks -- strike that.
9          How many CFSA employees have you had to make
10  the termination decision about?
11     **A   At least three.**
12     Q   Were these employees that were members of
13  the union?
14     **A   No.**
15     Q   Were the employees that you terminated
16  considered management employees?
17     **A   Yes.**
18     Q   What were the reasons for the terminations
19  of the three employees?
20     **A   Lack of performance.**
21         MR. BRUCKHEIM:  I'm going to put in a
22  relevance objection.

30

1      THE WITNESS:  Sorry.
2      MR. BRUCKHEIM:  You can answer.
3      THE WITNESS:  Lack of performance.
4  BY MR. CONDIT:
5      Q   And how was the lack of performance in the
6  case of those three employees documented, if it was
7  at all?
8      MR. BRUCKHEIM:  Same objection.
9      You can answer.
10     THE WITNESS:  Documented against established
11  performance standards.
12  BY MR. CONDIT:
13     Q   What does that mean?
14     **A   It means that these employees had**
15  **established performance expectations that they needed**
16  **to meet, and they did not meet them.**
17     Q   Were these performance standards that you're
18  referring to standards that were articulated as part
19  of the evaluation process?
20     **A   Articulated as part of the overall**
21  **performance management process or performance cycle**
22  **each year and/or the performance evaluation process.**

31

1      Q   Were the three employees that you were
2  involved in terminating provided any warnings that
3  their performance was inadequate?
4          MR. BRUCKHEIM:  Again, I'm going to object
5  as to relevance.  I mean, he's talking about issues
6  that have no relation to this lawsuit.
7          Obviously feel free to ask him any questions
8  about anything he may have done with your client.
9  But, you know, I don't see the need for us to go in
10  depth as to what he did or did not do with, you know,
11  other employees.
12         But, you know, for now I'll tell him he can
13  continue to answer.
14         So you can answer.
15         THE WITNESS:  Can you repeat the question?
16  BY MR. CONDIT:
17     Q   Mr. Charles, for each of the employees with
18  whom you were involved in the direct decision to
19  terminate their employment, were they provided any
20  written warning indicating that their performance may
21  be deficient?
22         MR. BRUCKHEIM:  I'll also object as to form.

32

1      You can answer.
2      THE WITNESS:  It depends on how you define
3  written warning.  Through employee counseling, yes.
4  BY MR. CONDIT:
5      Q   And when you say "employee counseling," what
6  do you mean?
7      **A   Supervision.**
8      Q   And are you referring to supervision that
9  you provided?
10     **A   Correct.**
11     Q   Are there standards that you were required
12  to follow in order to terminate the three employees
13  that we've been generally referring to?
14         MR. BRUCKHEIM:  Same objection as to form
15  and relevance.
16         You can answer.
17         THE WITNESS:  Yes.
18  BY MR. CONDIT:
19     Q   What are those standards?
20     **A   The District, under the Management**
21  **Supervisory Service Rules, require that these**
22  **employees be given at least a 15-day notice.**

Case 1:06-cv-00789-PLF-JMF   Document 41-12   Filed 04/22/2008   Page 9 of 76
VIDEOTAPE DEPOSITION OF RONNIE CHARLES
CONDUCTED ON THURSDAY, JANUARY 17, 2008

9 (Pages 33 to 36)

33

1    Q    What has to be contained in the notice?
2    **A    I don't recall the specificity at this**
3  **particular time.**
4    Q    Well, in general is there some type of
5  information that must be contained in the notice that
6  you're thinking of?
7    **A    It basically says that your employment's at**
8  **will and that we've chose not to continue your**
9  **employment.  And it also gives them their rights for**
10  **appeal.**
11    Q    And did any of the employees that you were
12  involved in terminating appeal the decision?
13    **A    No.**
14    Q    To whom would they have appealed if they had
15  executed their right to appeal?
16    **A    If I'm not mistaken, I think it's the**
17  **District's Office of Employee Appeals.**
18    Q    Now, aside from that notice requirement that
19  you just described, are there any other requirements
20  that one must follow to terminate an employee?
21        MR. BRUCKHEIM:  I just want to make a
22  clarification for the record that Mr. Charles can

34

1  testify as to his own personal knowledge, but he's
2  not here as a 30(b)(6) witness, so his testimony does
3  not impute to the District under that particular
4  rule.
5        So I'll have him answer based upon what he
6  knows with respect to your question, but I just
7  wanted that clarified.
8        MR. CONDIT:  Well, who would be the 30(b)(6)
9  expert if this gentleman, who is the senior deputy in
10  charge of all of personnel, is not the person?
11        MR. BRUCKHEIM:  I don't know.  But this is
12  not a 30(b)(6) deposition.  He was not noted as a
13  30(b)(6) witness.  He's testifying as a fact witness.
14        If you wish to note a 30(b)(6) witness, you
15  know, obviously you know how to do that.  I'm just
16  clarifying that he's not testifying in a 30(b)(6)
17  capacity, but he can testify as to whatever personal
18  knowledge he may have, as he's been doing.
19        MR. CONDIT:  But you don't dispute that he
20  is a senior-level official in the agency who's in
21  charge of personnel matters or human resource
22  matters, is that right?

35

1        MR. BRUCKHEIM:  I don't dispute anything
2  that he's testified to already on the record.  I do
3  dispute is his testimony is imputed to the
4  District in a manner that a 30(b)(6) witness's
5  testimony would be imputed to the District as the
6  District itself testifying.
7        He's not here testifying as the District.
8  He is testifying as Ronnie Charles based upon his own
9  personal knowledge.
10        MR. CONDIT:  Well, then, at your earliest
11  convenience, please advise me who the District would
12  certify as their 30(b)(6) expert on human resources
13  process, procedure and terminations, and then I will
14  notice the deposition accordingly.
15        MR. BRUCKHEIM:  Okay.
16        MR. CONDIT:  Thank you.
17        MR. BRUCKHEIM:  As I said, he can answer
18  that question based on his own personal knowledge,
19  which I believe is what he's been doing since we
20  began.
21  BY MR. CONDIT:
22    Q    Mr. Charles, when I asked you what role you

36

1  had in Ms. Tabb's termination, you indicated that
2  your role was policy review.  Do you recall that
3  testimony?
4    **A    I do.**
5    Q    And when I asked you what that meant, you
6  said it means that you reviewed the personnel
7  regulations.  Do you recall that testimony?
8    **A    I do.**
9    Q    What personnel regulations did you review
10  concerning Ms. Tabb's termination?
11    **A    It would have been the District Personnel**
12  **Manual, Chapter 16.**
13    Q    And what parts of Chapter 16 did you review?
14    **A    The disciplinary chapters.**
15    Q    Mr. Charles, I'm going to show you what was
16  marked as deposition Exhibit 1 in Deborah Wilson's
17  deposition, and we'll properly mark it after we can
18  make a clean copy for this deposition.
19        But these are the D.C. Personnel
20  Regulations, Chapter 16.  I'm going to present the
21  copy to Counsel so he can look at it first, and then
22  he'll provide it to you.

Case 1:06-cv-00789-PLF-JMF   Document 41-12   Filed 04/22/2008   Page 10 of 76
VIDEOTAPED DEPOSITION OF ROBERT GEARDOS
CONDUCTED ON THURSDAY, JANUARY 17, 2008

10 (Pages 37 to 40)

37

1      And when you receive it, I would like you to
2   please identify specifically what personnel
3   regulations in Chapter 16 you reviewed with respect
4   to Ms. Tabb's termination, all right?
5      A   (Nods head.)
6      MR. BRUCKHEIM:  I've seen this already, so
7   I'll just pass it on to you.
8      THE WITNESS:  Chapter 16, Section 1616,
9   Summary Removal.
10  BY MR. CONDIT:
11     Q   And why did you review that section?
12     A   This section was reviewed -- based on the
13  actions of the employee, this is the section that I
14  felt merited the offenses or covered the offenses.
15     Q   Who decided to pursue a summary removal with
16  respect to Ms. Tabb?
17     A   The agency head.
18     Q   At that time that was whom?
19     A   Brenda Donald.
20     Q   And why did Ms. Donald, if you know, decide
21  on summary removal for Ms. Tabb?
22     MR. BRUCKHEIM:  I would just object.  It

38

1   seems to be speculative, and just remind the witness
2   just to testify as to what he knew with respect to
3   whatever Ms. Donald may have told him.
4      So in that respect, you can answer.
5      THE WITNESS:  It was my understanding that
6   the employee had, on more than one occasion, failed
7   to comply with management directive and, as such, it
8   was detrimental to the agency from her viewpoint.
9   BY MR. CONDIT:
10     Q   What management directive or directives did
11  you understand Ms. Tabb to have failed to comply
12  with?
13     A   I'm not sure I recall all management
14  directives, but there were confidentiality policies
15  specifically.
16     Q   And what confidentiality policies did you
17  understand were being alleged that Ms. Tabb had
18  violated?
19     A   I don't recall specifically at this time.
20     Q   Do you recall at the time of the
21  decision-making around Ms. Tabb's removal and
22  termination there being an articulation by anyone

39

1   that you communicated with what confidentiality
2   standards or requirements or laws were being
3   violated?
4      A   It's over two and a half years ago.  I don't
5   recall specifically.  I do believe that it may have
6   had something to do with potentially confidential
7   information as it relates to clients.
8      Q   And was there a particular policy or law or
9   regulation that was cited or referenced that was
10  believed that Ms. Tabb had violated?
11     A   I believe that there was, but I cannot
12  recall what it is today.
13     Q   Is there any documentation that would
14  refresh your recollection on that issue?
15     A   I do not know.
16     Q   Does anyone under your supervision maintain
17  documentation that might refresh your recollection on
18  any issues with respect to the circumstances
19  surrounding Ms. Tabb's summary removal and
20  termination?
21     A   Sure.  It would be the human resources
22  function.

40

1      Q   And what information do you believe exists
2   there?
3      A   I believe the information that exists there
4   would be notification to the employee of the summary
5   removal and other adverse or corrective action.
6      Q   So the information that you just described
7   should be contained in a human resources file; is
8   that correct?
9      A   For the most part, and/or a former
10  supervisory file.
11     Q   What is a supervisory file?
12     A   A supervisory file is a file maintained by a
13  supervisor on the subordinate employee.
14     Q   And where are supervisory files maintained?
15     A   By the supervisor.
16     Q   So they would be kept in the supervisor's
17  office, for example?
18     A   Correct.
19     Q   Did you observe or review a supervisory file
20  pertaining to Shirley Tabb at the time the decisions
21  were being made regarding Ms. Tabb's summary removal
22  and termination?

Case 1:06-cv-00789-PLF-JMF    Document 41-13    Filed 04/22/2008    Page 11 of 76
VIDEOTAPED DEPOSITION OF RUSSELL EARLES
CONDUCTED ON THURSDAY, JANUARY 17, 2008

11 (Pages 41 to 44)

41

1    A   What I reviewed was the information that was
2  in the personnel file.
3    Q   Okay. So now we have three files. We have
4  a personnel file, a human resources file, and a
5  supervisory file.
6    A   The personnel file is the same as the human
7  resources file.
8    Q   All right.
9    A   They're one and the same.
10    Q   And what did you review in the personnel
11  file for Ms. Tabb?
12    A   Past disciplinary action.
13    Q   What was the past disciplinary action that
14  you reviewed?
15    A   If I recall, there was a letter of
16  admonition, there was a letter of reprimand.
17    Q   And when you reviewed the letter of
18  admonition and the reprimand, what specifically did
19  you consider or assess in helping you make your
20  judgments about the case?
21    A   I simply reviewed the file for
22  progressive-disciplinary purposes.

42

1    Q   What do you mean by progressive-disciplinary
2  purposes?
3    A   I believe that progressive discipline as
4  defined is that you look at an employee's record, you
5  weigh their overall experience, their contribution
6  and any levels of disciplinary actions proceeding
7  from the lowest to the highest as a progression to
8  what possibly could be next.
9    Q   So help me out, then. In the human
10  resources world at CFSA as you understand it in your
11  role, what would be the normal steps of progressive
12  discipline that would bring an employee to the brink
13  of termination?
14    A   I wouldn't say CFSA. I'd say in the
15  District's way of progressive discipline it starts
16  with employee counseling, admonitions, reprimands,
17  potential suspensions and ultimately termination.
18    Q   Okay. So let me make sure I've got the
19  progression correct.
20        The first step would be employee counseling,
21  correct?
22    A   Hopefully.

43

1    Q   And why do you say "hopefully"?
2    A   Because it depends on the nature of the
3  offense.
4    Q   Okay. And then the next step would be an
5  admonition; is that right?
6    A   Again, it could be. Depends on the nature
7  of the offense.
8    Q   All right. Well, let's clarify this line of
9  questioning a little bit. Let's assume that the
10  offense is not an immediately -- is not an offense
11  that would result in immediate termination, all
12  right?
13        So if the offense is not one -- let's say
14  it's a problem with work performance. Would it be
15  the normal course of events, then, to follow the
16  steps that you've outlined which would start with
17  employee counseling?
18    A   Maybe. Again, it depends on the
19  circumstance. It could be employee counseling, it
20  could be a performance-improvement plan, it could be
21  training. It could be a number of those things.
22    Q   What is a performance-improvement plan?

44

1    A   As defined by the District, a
2  performance-improvement plan is notification to an
3  employee of their deficiencies in performance. It
4  outlines what they need to do to correct that
5  performance, and it gives them the time frame to do
6  it.
7    Q   Do you know whether or not Ms. Tabb was put
8  on a performance-improvement plan at any time?
9    A   I do not recall specifically, but I believe
10  she was.
11    Q   What would refresh your recollection on that
12  point, if anything?
13    A   I would have to go back to the human
14  resources file, because something of that nature
15  should have been coordinated with HR.
16    Q   Okay, now, you have in front of you
17  Chapter 16, and you indicated in your testimony that
18  you reviewed Section 1616 of the District Personnel
19  Regulations or Manual.
20        Is there any other section that you reviewed
21  or considered or relied on in any way in consulting
22  about the removal or termination of Ms. Tabb?

Case 1:06-cv-00789-PLF-JMF   Document 41-12   Filed 04/22/2008   Page 12 of 76
VIDEOTAPED DEPOSITION OF ROBERT CHARLES
CONDUCTED ON THURSDAY, JANUARY 17, 2008

12 (Pages 45 to 48)

45

1    A    This is the section that I specifically
2  reviewed.  I would, however, think that there were
3  subordinate staff, such as the employee in labor
4  relations analyst, who reviewed other sections of
5  this particular chapter.
6    Q    What makes you say that?
7    A    Based on the reasons that were outlined in
8  the employee summary removal.
9    Q    When is the last time you reviewed the
10 summary removal for Ms. Tabb?
11   A    I reviewed the actual letter this week.
12   Q    And other than reviewing that letter, did
13 you review any other letters or parts of the
14 personnel file prior to coming to provide testimony
15 in this deposition?
16   A    Only the e-mails that I acknowledged
17 earlier.
18   Q    Okay.  So, for example, did you not review
19 whatever admonition might exist in the personnel file
20 for Ms. Tabb; is that correct?
21   A    I don't recall.
22   Q    Do you think you might have reviewed the

46

1  admonition before coming to this deposition?
2    A    I may have.
3    Q    And what about the reprimand?  Do you think
4  you may have reviewed the reprimand prior to coming
5  to this deposition?
6    A    I may have.
7    Q    But you can't specifically recall.
8    A    No.
9        MR. BRUCKHEIM:  I'm just going to put a
10 relevance objection in for those questions, you know.
11 And just note that through discovery Counsel has been
12 provided with the file and also it's referenced
13 documents.  And he's free to use those to refresh
14 Mr. Charles' recollection as to whether or not he
15 reviewed it before the deposition.
16       MR. CONDIT:  I assume, since it wasn't that
17 long ago, he'd remember what he reviewed.  But I will
18 take you up on your suggestion shortly.
19   Q    Okay.  So we've gotten closure on the
20 District personnel regulations that you reviewed.  It
21 was essentially 1616, which deals with summary
22 removal, correct?

47

1    A    Yes.
2    Q    You didn't review any other District
3  personnel regulations concerning Ms. Tabb's
4  circumstances.
5    A    Not that I can recall.
6    Q    Okay.  Now, the you also indicated that you
7  reviewed the personnel file for progressive
8  discipline, am I right?
9    A    I reviewed the human resources employee and
10 labor relations file.
11   Q    And that's different from the personnel
12 file?
13   A    It could be.
14   Q    How would it be different?
15   A    Because we don't, for example, put e-mails
16 and all those type of things in an OPF or official
17 personnel file.  They're normally kept in an employee
18 relations confidential file.
19   Q    And was there such a file in 2005 for
20 Ms. Tabb?
21   A    I'm sure there was.
22   Q    Does that file still exist?

48

1    A    It probably does.
2    Q    And if it exists, where would it be located?
3    A    It would be located in CFSA's human
4  resources shop.
5    Q    Please state again what that file would be
6  called?  Labor relations --
7    A    Employee and labor relations file.
8    Q    In 2005, who would have been in charge of
9  collecting information and maintaining the employee
10 and labor relations file pertaining to Shirley Tabb?
11   A    It would have been the HR director, Kleartis
12 Jackson.
13   Q    I understand Mr. Jackson is no longer with
14 the agency; is that correct?
15   A    That is correct.
16   Q    Was there someone that took over for
17 Mr. Jackson shortly after he left the agency?
18   A    Yes.
19   Q    Who was that?
20   A    That would have been Darlene Mansfield.
21   Q    When did Ms. Mansfield take the position
22 that Mr. Jackson held?

Case 1:06-cv-00789-PLF-JMF    Document 41-12    Filed 04/22/2008    Page 13 of 76
VIDEOTAPED DEPOSITION OF ROBERT C. BARFIELD
CONDUCTED ON THURSDAY, JANUARY 17, 2008

13 (Pages 49 to 52)

49

1    A    I don't recall a specific date at this time.
2    Q    And at the time in 2005, who worked directly
3 under Kleartis Jackson in the Human Resources
4 Department?
5    A    There were 16 individuals in the department
6 who would have reported to Mr. Jackson.
7    Q    Who would have been the person immediately
8 under him?
9    A    You would have had your employee relations
10 manager, Deborah Wilson.  You would have had your
11 comp and benefits manager, Stan Spaght.  And you had
12 your recruitment manager, Norma Hatot.
13    Q    Please repeat what Mr. Spaght's position
14 was?
15    A    Compensation and benefits manager.
16    Q    And at the time of the agency's
17 consideration of Ms. Tabb's summary removal or
18 termination, aside from reviewing the personnel
19 records -- excuse me, the personnel regulations that
20 you've identified and the employee and labor
21 relations file or personnel file, is there anything
22 else that you reviewed at that time to provide input

50

1 or advice on how to address Ms. Tabb's situation?
2    A    That's all that I recall.
3    Q    When did you first get involved in any
4 meetings or communications concerning the possibility
5 of taking any type of disciplinary action against
6 Shirley Tabb?
7    A    I do not remember.
8    Q    Is there any documentation that would
9 refresh your memory on that point?
10    A    The only documentation that I can think of
11 would be the notice, to give me some time frame of
12 when this occurred.  CFSA is a fast-moving place.
13 And that's as much as I can remember right now.
14    Q    Now, you mentioned a little earlier in your
15 testimony that one of the steps in progressive
16 discipline might be a performance-improvement plan.
17       Do you recall that testimony?
18    A    I do.
19    Q    And you indicated that you couldn't recall,
20 but you thought that Ms. Tabb might have had a
21 performance-improvement plan at some point; is that
22 correct?

51

1    A    Correct.
2    Q    Now, are there standards under the personnel
3 regulations for how a performance-improvement plan is
4 implemented and how the outcome is evaluated?
5       MR. BRUCKHEIM:  Objection as to form.  He
6 can testify as to his own knowledge of that.
7       So you can answer.
8       THE WITNESS:  As far as my knowledge, the
9 District gives you a template, but they don't
10 necessarily give you standards as to how you measure
11 an outcome.
12 BY MR. CONDIT:
13    Q    And when you say "template," what do you
14 mean?
15    A    The template that supports the tenets that I
16 just talked about.  It outlines the deficiencies,
17 what are the performance expectations, how can the
18 employee improve, and then normally a time frame to
19 get it done.  That's the template.
20    Q    And this would be a document that would be
21 shared with the employee; is that right?
22    A    That's correct.

52

1    Q    When did you first meet Shirley Tabb?
2    A    I believe Shirley was in the agency when I
3 arrived in 2003.  Exactly when, I cannot tell you.
4    Q    During the course of your tenure at CFSA,
5 have you had occasion to work with Ms. Tabb on any
6 project or issue?
7    A    I don't specifically recall us working
8 together on any particular project together, but
9 we've conversated on things that we could do in HR,
10 for example, because of her background to help us
11 recruit social workers.  We've had that conversation.
12 But no direct working relationship.
13    Q    Did you have any knowledge in 2005 -- and by
14 that I mean personal knowledge from personal
15 experience -- of Ms. Tabb's work performance?
16    A    I did.  I do know that Ms. Tabb, to my
17 knowledge, was a very qualified employee, the best
18 that I can remember.
19    Q    What makes you say that Ms. Tabb was a very
20 qualified employee?
21    A    Through our discussions, through knowing her
22 past marketing and selling experience.  And also I

53

1    believe she ran our customer-service operations at
2    the time.  And we were always one of the best
3    agencies because she stayed on top of it.
4        Q    And what was the customer service issue or
5    plan that she was involved in at that time?
6        A    Well, the District has customer-service
7    standards for which to apply to each agency.  And
8    each agency is graded on those standards, whether
9    it's telephonic, phone; voicemail; responsiveness to
10   the customer, those type things.
11       Q    And I take it that that customer service
12   means service to I guess citizens or residents of the
13   District who interact with the agency; is that right?
14       A    Both internal and external.
15       Q    Okay.  And so what was Ms. Tabb doing in
16   that regard?
17       A    Well, the Mayor's Office would sends reports
18   which would outline deficiencies in whatever area or
19   how you're doing well.
20           If there are deficiencies, there were
21   promotions (sic) agency wide notifying employees what
22   they need to do to bring things up to par.

54

1        Q    And how would the deficiencies or notices
2    from the the Mayor's Office that you were describing
3    apply in any way to work that Ms. Tabb was doing?
4        A    Well, she was the liaison with the Mayor's
5    Office.  Each agency has to have a liaison.
6        Q    Aside from the customer-service work that
7    you were familiar with for Ms. Tabb, was there any
8    other -- and her qualifications and experience -- was
9    there any other reason that you refer to her as a
10   very qualified employee?
11       A    No.
12       Q    Now, at the time of the consideration of
13   whether or not to remove and/or terminate Ms. Tabb,
14   were you personally aware of, by personal experience,
15   the issues that were being raised about Ms. Tabb's
16   work performance?
17       A    I had some knowledge.
18       Q    What was that knowledge?
19       A    There was knowledge that there were issues
20   dealing with performance as it related to attendance,
21   missed deadlines.  Those are the things that I can
22   remember.

55

1        Q    And what is your personal knowledge of
2    Ms. Tabb's attendance record at that time?
3        A    I don't have much of a personal knowledge.
4    I just know that Ms. Tabb was personally ill.
5        Q    And was the attendance issue that you have
6    knowledge of a factor in deciding whether or not to
7    remove Ms. Tabb from her position?
8        A    I don't recall.
9        Q    Is there any information that would refresh
10   your recollection on whether Ms. Tabb's attendance
11   record in 2005 was a factor in her summary removal or
12   termination?
13       A    Could you repeat the question?  I'm sorry.
14       Q    Is there any information or documentation
15   that would refresh your recollection on whether or
16   not Ms. Tabb's attendance record in 2005 played any
17   role in her summary removal or termination?
18       A    I do not believe so.
19       Q    If Ms. Tabb's attendance record in 2005 was
20   a factor in her summary removal, should it have been
21   identified in the summary-removal letter that she
22   received?

56

1        A    If, under the circumstances, yes.
2        Q    What do you mean under the circumstances?
3        A    If it was a major factor, then I think that
4    probably so.
5        Q    Probably so but not definitely so?
6        A    If it was a major factor.  I'm only privy to
7    the information that I've discussed with you before.
8    I did not have an in-depth knowledge of attendance.
9        Q    But I just want to be clear, though.  If
10   attendance was a major factor as you're describing
11   it, if it was a major factor, then should it have
12   been identified in the removal letter that Ms. Tabb
13   received?
14       A    In my opinion, I do not believe so.
15       Q    What is the purpose of the summary-removal
16   letter that an employee receives when they're being
17   removed in that fashion?
18           MR. BRUCKHEIM:  Objection as to form.  I
19   just ask the witness to testify as to his own
20   knowledge or understanding.
21           You can answer.
22           THE WITNESS:  Summary-removal letter

Case 1:06-cv-00789-PLF-JMF   Document 41-12   Filed 04/22/2008   Page 15 of 76
VIDEOTAPED DEPOSITION OF RONNIE CHARLES
CONDUCTED ON THURSDAY, JANUARY 17, 2008

15 (Pages 57 to 60)

57

1  basically just notifies the employee that they are
2  terminated immediately, unlike other terminations
3  where employees are required notice.
4        For example, as I've discussed, MSS, it
5  could be a 15-day notice.  A union employee, it could
6  be a 30-day notice, for example.
7  BY MR. CONDIT:
8     Q   Okay.  And once the employee receives the
9  summary-removal letter, what are their rights at that
10  juncture?
11        MR. BRUCKHEIM:  Same objection as to form.
12        You can testify as to your knowledge.
13        MR. CONDIT:  And I'm just going to note for
14  the record that this gentleman has testified about
15  his certifications both internationally and
16  domestically in human rights -- excuse me, human
17  resources processes, procedures.  He teaches courses.
18        And I appreciate your objections, but I'm
19  going to make clear that I'm expecting as -- given
20  his position in the agency and responsibilities that
21  he has, that he's going to be able to address these
22  issues with some clarity.

58

1        So, you know, you are obviously in your
2  right to note your objections, but I do not want the
3  record compromised as to this gentleman's asserted
4  expertise.
5        MR. BRUCKHEIM:  I understand.
6        He's not here testifying as an expert.  He
7  testified as to his background.  He's here today
8  testifying as Ronnie Charles.  He's not sitting here
9  testifying as the District.
10       As you know, in a 30(b)(6) deposition you
11  designate a corporate designee to testify as that
12  corporation.  It's as if that corporation is, in
13  fact, testifying.  That's not what we have here
14  today.
15       So that's why I'm clarifying the record,
16  that he's not testifying as the District, he's
17  testifying as Ronnie Charles based on his notice.
18       And his background, his experience is
19  already in the record, and we can continue --
20       MR. CONDIT:  Very well.
21       MR. BRUCKHEIM:  -- but that's why I make the
22  clarifications.

59

1  BY MR. CONDIT:
2     Q   So Mr. Charles, once the employee receives
3  the summary-removal letter, what rights, if any, do
4  they have?
5        MR. BRUCKHEIM:  And same objection as
6  before, but you can answer as to what you know.
7        THE WITNESS:  It all depends.  If you're an
8  MSS employee as I stated earlier, you have rights
9  under the Office of the Employee Appeals, okay?
10       If you are a union employee, you have the
11  right for review.  You also have a right to go to, if
12  I'm not mistaken, the Office of Human Rights to also
13  file a complaint.
14  BY MR. CONDIT:
15    Q   Now, what status did Ms. Tabb have as an
16  employee in 2005, if you know?  Union?  MSS?  What
17  was her status?
18    A   I believe that Ms. Tabb may have been union.
19  I'm not sure.
20    Q   And would the status of an employee
21  determine what information as to their rights would
22  be contained in the summary-removal letter?

60

1     A   I cannot tell you that sitting here without
2  looking at the regulations themselves.
3     Q   And what regulations would you consult on
4  that topic?
5     A   The collective bargaining agreement would be
6  a document that would need to be looked at and/or
7  Chapter 16.  Chapter 16 -- every provision of
8  Chapter 16 does not apply for a union employee.
9     Q   Do you know whether or not you or others who
10  were involved in assessing Ms. Tabb's situation in
11  October of 2005 consulted the collective bargaining
12  agreement or the regulations that you've just
13  referenced?
14    A   I would think that we probably consulted
15  both with our general counsel.
16    Q   Are you sure that both sources were
17  consulted with respect to Ms. Tabb's circumstances in
18  2005?
19    A   If Ms. Tabb was a union employee,
20  absolutely.
21    Q   And who would have done the assessment or
22  determination of what rights apply to Ms. Tabb as a

Case 1:06-cv-00789-PLF-JMF    Document 41-12    Filed 04/22/2008    Page 16 of 76
VIDEOTAPED DEPOSITION OF ROQUE GERALD
CONDUCTED ON THURSDAY, JANUARY 17, 2008

16 (Pages 61 to 64)

61
1 union employee?
2 **A   The HR director at the time, Kleartis**
3 **Jackson.**
4 Q   Tell me if I'm mistaken about this given the
5 process that you've described.  My understanding is
6 that the summary-removal letter would provide the
7 employee an opportunity to respond; is that correct?
8 **A   I'm not sure.**
9 Q   Are there circumstances when a
10 summary-removal letter is issued and there is no
11 opportunity for the employee to respond or challenge
12 the allegations made against them?
13 **A   I'm not sure.**
14 Q   Are there requirements for removal of a CFSA
15 employee that are mandated by the United States
16 Constitution?
17 **A   Could you repeat the question?**
18 Q   Are there requirements with respect to the
19 removal or termination of a CFSA employee that are
20 mandated by the United States Constitution?
21      MR. BRUCKHEIM:  Objection as to form.  It
22 calls for a legal conclusion.

62
1      But you can answer as to your own knowledge.
2      THE WITNESS:  I think that due process has a
3 lot to do with our Constitution.
4 BY MR. CONDIT:
5 Q   Is that your answer?
6 **A   It is.**
7 Q   So am I -- would I be correctly
8 understanding you to say that due process is a
9 constitutional requirement that you would understand
10 would apply to an employee's situation when they're
11 being removed or terminated?
12      MR. BRUCKHEIM:  Same objection as to form.
13 You can answer.
14      THE WITNESS:  Yes.
15 BY MR. CONDIT:
16 Q   Now, would you agree, then, that in order to
17 be able to respond and have some measure of due
18 process one would have to know the basis for the
19 actions being taken against you; is that correct?
20      MR. BRUCKHEIM:  Objection as to form.
21 You can answer.
22      THE WITNESS:  Yes.

63
1      MR. CONDIT:  So earlier you testified that
2 if attendance was a major factor with respect to
3 Ms. Tabb, that that attendance issue wouldn't
4 necessarily have to be reflected in the
5 summary-removal letter.
6 Q   Do you remember that testimony?
7 **A   I remember the testimony.**
8 Q   Did I misunderstand you?
9 **A   Maybe I misunderstood you.**
10 Q   Okay.
11 **A   What I'm saying is that the reasons that**
12 **were outlined in her summary removal, from my**
13 **thinking, really weren't focused on strictly**
14 **attendance.  They were focused on other issues that**
15 **were outlined in the summary removal.**
16 Q   Okay.  Would you agree, though, that the
17 summary-removal letter would have to provide the
18 employee with adequate notice of the allegations
19 against them in order for the employee to be able to
20 effectively respond?
21      MR. BRUCKHEIM:  Objection as to form.
22      But you can answer as to your own knowledge.

64
1      THE WITNESS:  No.  Summary removal is just
2 the opposite of what you just described.  Summary
3 removal removes an individual immediately.  It
4 doesn't give them an opportunity to respond at that
5 particular point, if I'm understanding you correctly.
6 It does not.
7 BY MR. CONDIT:
8 Q   Right, I understand that.  But they do get a
9 chance to respond; isn't that correct?
10 **A   There are avenues, as I've discussed,**
11 **correct.**
12      MR. CONDIT:  Why don't we take a break for
13 about five or 10 minutes.
14      THE VIDEOGRAPHER:  We should go off the
15 record.  It's 11:04 a.m.
16      (Recess taken.)
17      THE VIDEOGRAPHER:  We're back on the record.
18 The time now is 11:15 a.m.
19 BY MR. CONDIT:
20 Q   Mr. Charles, prior to Ms. Tabb's
21 circumstances and the assessment of whether to remove
22 and/or terminate her, had you ever been involved in a

Case 1:06-cv-00789-PLF-JMF    Document 41-12    Filed 04/22/2008    Page 17 of 76
VIDEOTAPED DEPOSITION OF ROQUE R. GERALD
CONDUCTED ON THURSDAY, JANUARY 17, 2008

17 (Pages 65 to 68)

65

1  situation where someone was disciplined because it
2  was purported or alleged that they violated
3  confidentiality laws?
4       MR. BRUCKHEIM: I'm just going to object as
5  to relevance.
6       But you can answer.
7       THE WITNESS: Not that I can recall.
8  BY MR. CONDIT:
9    Q   Now, what role, if any, did you play in
10  creating the summary-removal letter for Ms. Tabb?
11   A   That would have been the HR director,
12  Kleartis Jackson.
13   Q   So are you saying you did not have any role
14  in the creation of that letter?
15   A   The letter came directly from HR.
16   Q   Okay.  So if the letter came directly from
17  HR, are you saying that you did not have any role in
18  the creation of the summary-removal letter that was
19  sent to Ms. Tabb?
20       MR. BRUCKHEIM: I'd just object and just ask
21  you to clarify.  Do you mean just in writing, the
22  letter or --

66

1       THE WITNESS: That helps me.
2       MR. BRUCKHEIM: I think it's the term
3  "creation" that could be a little fuzzy.
4       MR. CONDIT: Okay.  Well, I can ask about
5  the different elements of creation.
6    Q   Mr. Charles, did you have any role in
7  writing the letter or suggesting language to go in
8  the letter that was issued to Ms. Tabb notifying her
9  of her summary removal?
10   A   I did not solely have a role in that.  Yes,
11  I did have some role, as I stated earlier, when I
12  reviewed the tenets of Chapter 16, which included
13  that language in the summary-removal language.
14       But I did not actually create the letter.
15   Q   You did not draft the summary-removal letter
16  that was issued to Ms. Tabb.
17   A   No, I did not.
18   Q   All right.  Do you know who did?
19   A   Kleartis Jackson.
20   Q   And where is Mr. Jackson located presently?
21   A   I do not know.
22   Q   Do you know where Mr. Jackson went when he

67

1  left his position at Child and Family Services
2  Agency?
3    A   All I know it was a company in Alexandria.
4  That's all I know.
5    Q   Have you had any occasion to communicate
6  with Mr. Jackson since he left the employ of the
7  Child and Family Services Agency?
8    A   No.
9    Q   Would there be anything on record in
10  Mr. Jackson's personnel records that would indicate
11  where he went following his employment at CFSA?
12   A   No.
13   Q   Do you know why Mr. Jackson left his employ
14  at CFSA?
15   A   Job compatibility is my understanding.
16   Q   And what does that mean?
17   A   The environment was much faster than he was
18  used to, that he wanted to continue to do.
19   Q   Did he say that to you?
20   A   Yes.
21   Q   So did he speak to you and explain his
22  reasons for leaving the agency?

68

1    A   Yes.
2    Q   Aside from the fast pace at CFSA, did
3  Mr. Jackson indicate any other reasons why he was
4  leaving the agency?
5    A   He's used to corporate America.  Government
6  is too slow for him in getting things done.
7    Q   Did he say anything else?
8    A   That's it.
9    Q   Now, you mentioned earlier in your testimony
10  that someone from the general counsel's office was
11  also involved in the process concerning the issues
12  and the evaluation of issues regarding Ms. Tabb; is
13  that right?
14   A   That's correct.
15   Q   And who was involved in that issue?
16   A   Let's see if I can remember the person's
17  name.  I can only remember the first name at this
18  time, and it's Terri.  That's all I can remember was
19  her name.
20   Q   Would it be Terri Thompson Mallett?
21   A   Correct.
22   Q   And was she the general counsel of the

Case 1:06-cv-00789-PLF-JMF    Document 41-12    Filed 04/22/2008    Page 18 of 76
VIDEOTAPED DEPOSITION OF BRENDA DONALD WALKER
CONDUCTED ON THURSDAY, JANUARY 17, 2008

18 (Pages 69 to 72)

69

1  agency at that time?
2     A   Correct.
3     Q   Was there anyone else from the Office of
4  General Counsel for CFSA that was involved in
5  evaluating the situation with respect to Ms. Tabb?
6        MR. BRUCKHEIM:  I'm just going to object as
7  to form and just ask if you could rephrase.  If you
8  want to ask if he consulted anybody about that, I'll
9  allow him to testify as to who he consulted.  But
10  I'll ask him not to testify as to what exactly he
11  discussed with counsel.
12        MR. CONDIT:  Right, and I didn't think I was
13  asking that question, but let me ask it more directly
14  then.
15     Q   Who, within the Office of General Counsel,
16  to your knowledge, was consulted about the Shirley
17  Tabb case?
18     A   To my knowledge, only Terri.
19     Q   And I understand that Ms. Mallett no longer
20  works for the agency; is that correct?
21     A   That's correct.
22     Q   Do you know why she left the agency?

70

1     A   No, I do not.
2     Q   Do you know where she works now?
3     A   No, I do not.
4     Q   Have you had any communications with Terri
5  Thompson Mallett since she left the employ of CFSA?
6     A   I've had an e-mail communication where I was
7  invited to a Christmas party maybe a year and a
8  half -- maybe two years ago, a year ago.
9     Q   Did you attend the party?
10     A   No.
11     Q   Do you know anyone within CFSA or D.C.
12  government who would know where Terri Thompson
13  Mallett works?
14     A   I would think the Office of the Attorney
15  General maybe.
16     Q   So just so the record is clear, you do not
17  recall at least any other persons from the general
18  counsel's office working on the issue pertaining to
19  the summary removal or termination of Ms. Tabb in
20  2005; is that right?
21     A   That's correct.
22     Q   Do you know whether or not one of the issues

71

1  that was relied upon to summarily remove Ms. Tabb
2  involved family and medical leave?
3     A   Yes.
4     Q   And what's your recollection about that
5  issue as it pertained to Ms. Tabb?
6     A   It was my understanding that Ms. Tabb was on
7  family medical leave, unable to work.  However,
8  Ms. Tabb was able to be involved in other
9  organizational issues while on family medical leave.
10     Q   And what do you mean by "Ms. Tabb was
11  involved in other organizational issues while on
12  family medical leave"?
13     A   That's my understanding.  I don't recall the
14  exact specifics.  But I do think that there were --
15  if I recall correctly -- and I may not be recalling
16  correctly -- there were communications about agency
17  operations and those type of things while Ms. Tabb
18  was out, to the Mayor's Office and other entities
19  possibly.
20     Q   And in your understanding, what was it about
21  those communications or other organizational
22  activities that had anything to do with the concern

72

1  about family medical leave?
2     A   I believe they were communications on how we
3  could improve our recruitment of foster parents or
4  foster homes, things of that nature, to the Mayor's
5  Office that I can recall right now.
6     Q   And why was that a problem, if it was, with
7  respect to family medical leave?
8     A   Because these type of things were being done
9  when the employee basically said that she could not
10  come to work, and these communications were -- some
11  of the communications were contrary to I believe
12  agency objectives at that particular time, yet they
13  were being communicated to the executive branch from
14  an agency standpoint when they really were not the
15  agency standpoint, from an employee who was supposed
16  to be on family medical leave who could not work but
17  was utilizing work equipment to communicate messages
18  that were not consistent necessarily with agency
19  objectives.
20     Q   Okay.  If Ms. Tabb was on family medical
21  leave, how was it that she was using work equipment
22  to communicate the issues that you just described?

Case 1:06-cv-00789-PLF-JMF   Document 41-12   Filed 04/22/2008   Page 19 of 76
VIDEOTAPED DEPOSITION OF ROBERT CHARLES
CONDUCTED ON THURSDAY, JANUARY 17, 2008

19 (Pages 73 to 76)

73
1    A   I'm not necessarily sure of that, I'm just
2 recalling from my memory what my understanding was.
3    Q   Did you evaluate at all, as part of your
4 assessment on the issue of summarily removing
5 Ms. Tabb, the Family Medical Leave issue?
6    A   Not directly.  It was -- that would have
7 been Kleartis Jackson also.
8    Q   So when you say "not directly," did you have
9 any role in providing advise or recommendations with
10 respect to the Family Medical Leave issue as it
11 pertained to Ms. Tabb?
12    A   Not necessarily any role.  Again, in
13 communications with the then HR director, Kleartis
14 Jackson, on rationale as I just explained to you, as
15 far as the background as I understood it, why that
16 would have been a part of the summary removal.
17       But no role, so to speak.
18    Q   So if I'm understanding your testimony
19 correctly -- and please correct me if I'm wrong --
20 you were briefed in the manner that you described in
21 terms of the facts or alleged facts that you were
22 given, but you did not specifically make any

74
1 judgments or provide any recommendations with respect
2 to the Family Medical Leave issue concerning
3 Ms. Tabb; is that right?
4    A   That would be correct.
5       MR. CONDIT:  Let me show you what I'll mark
6 as the first deposition exhibit.
7       (Whereupon, Plaintiff's Exhibit 1 was marked
8 for identification and attached to the transcript.)
9       MR. CONDIT:  Mr. Charles, I'm showing you
10 what has been marked as deposition Exhibit 1.
11       THE WITNESS:  Okay.
12       MR. CONDIT:  This is an August 18, 2005
13 memo, it appears, from Mindy Good to Shirley Tabb.
14 Ms. Good's initials appear to be next to her name on
15 the first page.  And the subject is "Admonition."
16    Q   I'd like you to please take a look at it and
17 tell me if you recognize the document.
18       (Witness reviews document.)
19       THE WITNESS:  Yes.
20 BY MR. CONDIT:
21    Q   And when did you first see this document?
22    A   I don't recall when I first saw this

75
1 document.
2    Q   Is it possible that the first time you saw
3 it was when you were involved in evaluating whether
4 or not Ms. Tabb should be removed from her position?
5    A   It is possible.
6    Q   And when you did see this document
7 previously, how did you come to receive it.  In other
8 words, did someone give it to you?  Did you find it
9 in a file?  How did you come to look at this
10 document?
11    A   Well, this document was looked at when we
12 were -- when we were assessing the situation as far
13 as the summary removal.
14       Again, when you look at progressive
15 discipline, this is something that was presented by
16 the -- probably at the time, the HR director,
17 Kleartis Jackson.
18    Q   Now, if Mr. Jackson was not in the position
19 of HR director when these events were transpiring in
20 October 2005, who would have been the HR
21 representative on the issue?
22    A   Deborah Wilson.

76
1    Q   Now, when you reviewed this admonition in
2 October 2005, what advice or information or
3 recommendations did you provide based on it?
4    A   I don't know if I provided any specific
5 advice or recommendations based on this solely.
6    Q   And if this admonition had been the only
7 thing -- negative thing, let's say, in Ms. Tabb's
8 personnel record at the time of the evaluation of her
9 circumstances, would it have been enough in and of
10 itself for Ms. Tabb to be summarily removed from her
11 position?
12    A   Possibly it could have been.
13    Q   And under what circumstances could this
14 admonition, which we see as Exhibit 1, been
15 sufficient for a summary removal?
16    A   Again, I would have to go back to the
17 provisions of Chapter 16.  I believe that it was the
18 understanding or the recommendation of the general
19 counsel with consultation with the agency head that
20 the actions of the employee dealt with
21 Chapter 16.1616.
22       Therefore, the admonition by itself wouldn't

Case 1:06-cv-00789-PLF-JMF  Document 41-12  Filed 04/22/2008  Page 20 of 76
VIDEOTAPED DEPOSITION OF ROQUE GERARDUS
CONDUCTED ON THURSDAY, JANUARY 17, 2008

20 (Pages 77 to 80)

77
1  have mattered if they felt that it met that criteria.
2      Q  Okay.  I understand your response, but that
3  wasn't exactly my question.
4      A  Okay.
5      Q  Let me try it again and see if we can . . .
6          I'm simply asking if this admonition,
7  including its contents, you know, the subject of the
8  admonition, was the only negative item in Ms. Tabb's
9  record, would it have been sufficient basis, in your
10 experience, for summary removal?
11     A  Probably so.
12     Q  And why do you say that?
13     A  I say that based on my own personal
14 assessment of what I was told by the general counsel,
15 by the supervisor, that it met the criteria of
16 Chapter 16.
17     Q  And in particular within Chapter 16,
18 Section 1616; is that right?
19     A  Correct.
20     Q  In your experience, has there ever been a
21 circumstance when an employee at CFSA has been
22 summarily removed or terminated based solely on an

78
1  admonition?
2          MR. BRUCKHEIM:  Objection as to relevance,
3  but you can answer.
4          THE WITNESS:  I don't recall.  I haven't
5  been directly in human -- human resources is under my
6  purview, but it's not my day-to-day.  So I don't
7  recall.
8  BY MR. CONDIT:
9      Q  Turn to the second page of Exhibit 1 if you
10 would.
11     A  Okay.
12     Q  And do you know that -- I'm sorry, that's my
13 cell phone vibrating in my bag.  I apologize.
14         Do you know the signature at the bottom of
15 the page?
16     A  I can only guess, but it looks like Roque
17 Jerrold.
18     Q  Who is Roque Jerrold?
19     A  He is a deputy director for the Office of
20 Clinical Practice, Child and Family Services.
21     Q  Then why would Roque Jerrold, given his
22 position, be signing this form?

79
1      A  I don't know.
2          MR. BRUCKHEIM:  I'd just object because it
3  mischaracterizes where his signature is on the
4  document.
5          But he could answer.  He already did.
6  BY MR. CONDIT:
7      Q  Okay.  Looking at page 2 of the document, is
8  Mr. Jerrold signing as a witness?
9      A  I would assume.
10     Q  And rephrasing my question or stating my
11 question again, do you have any reason to know why
12 Mr. Jerrold, in August of 2005, would be signing as a
13 witness in this particular document?
14     A  I can only assume that Mr. Jerrold was
15 available as another manager to Ms. Good when this
16 was presented to the employee as a witness.  Could
17 have been Roque Jerrold, could have been another
18 manager.
19     Q  All right.  Now, Mr. Charles, during the
20 October -- September, October 2005 time period when
21 Ms. Tabb's circumstances were being evaluated, did
22 you try to become familiar with any of the facts

80
1  alleged in this admonition?
2      A  Yes, I did.
3      Q  And how did you become familiar with
4  facts -- any of the facts alleged in the admonition?
5      A  Through discussions, again, with general
6  counsel; through discussions with the agency head;
7  through discussions with the supervisor; and through
8  discussions with the HR director at the time.
9      Q  What did you come to understand based on
10 those discussions that you just identified?
11         MR. BRUCKHEIM:  I would just ask the witness
12 not to testify as to any discussions he had with
13 general counsel.
14         As to all other discussions you referenced,
15 you can answer.
16         THE WITNESS:  Excuse me?
17         MR. BRUCKHEIM:  Don't testify specifically
18 as to conversations you had with the general counsel.
19         But any other conversation you had with
20 anyone who is not in the general counsel's office,
21 you can answer.
22         THE WITNESS:  Okay.  Discussed, again, with

Case 1:06-cv-00789-PLF-JMF    Document 41-12    Filed 04/22/2008    Page 21 of 76
VIDEOTAPED DEPOSITION OF ROQUE GERALD
CONDUCTED ON THURSDAY, JANUARY 17, 2008

21 (Pages 81 to 84)

81

1  the immediate supervisor and the agency head, HR
2  person, about the actual conducting of agency
3  business outside the chain of command without
4  approval, to validate that, for example.
5  BY MR. CONDIT:
6    Q   I'm sorry, what do you mean to validate
7  that?
8    A   Well, that it actually occurred.
9    Q   So you were inquiring whether these -- the
10 events reflected in Exhibit 1 actually occurred?
11   A   I would think that not only myself, anybody
12 who's before you issuing a letter of admonition, that
13 you have to have a basis for doing it.  So it's a
14 validation of that basis.
15   Q   And in the discussions that you're
16 referencing, was there a discussion or assessment of
17 whether or not there was a factual basis for this
18 admonition?
19   A   Yes.
20   Q   And who provided the information on the
21 factual basis for the admonition?
22   A   I don't recall specifically, but I think the

82

1  supervisor had input.  I believe that there was
2  demonstrated e-mail to illustrate the point, and I
3  think there was even e-mail from the Mayor's Office
4  back to our agency director to validate those type of
5  points.
6    Q   And these were documents that you reviewed
7  with others at the time?  And by "documents," I mean
8  e-mail, for example.
9    A   I believe so, yes.
10   Q   Now, I notice when I review the admonition
11 that I don't see a specific reference to a violation
12 of any particular policy or regulation or standard.
13 Am I missing something in the document?
14       MR. BRUCKHEIM:  I would just object.  I
15 mean, the document speaks for itself.
16       But you can answer.
17       THE WITNESS:  All I can -- the document
18 speaks for itself.  That's my answer.
19 BY MR. CONDIT:
20   Q   Okay.
21   A   I don't -- the admonition, from my
22 viewpoint, dealt with carrying out agency business

83

1  outside of the chain of command; creating an
2  impression of official knowledge when in fact details
3  of issues, strategies, et cetera, were outside the
4  purview of the employee.
5       And it dealt with the use of District-owned
6  e-mail to promote personal interest, not necessarily
7  anything to doing with policy specifically.
8    Q   And I see that you're referring to the
9  bulleted items in the middle of page 1 of Exhibit 1;
10 is that right?
11   A   That would be correct.
12   Q   Are you aware of any policy or regulation or
13 law which would forbid an employee like Ms. Tabb from
14 engaging, as the first bullet indicates, in
15 ". . . agency business outside your chain of command
16 without approval"?
17   A   No.
18   Q   The admonition on page 1 in the second full
19 paragraph refers to Ms. Tabb conveying information to
20 Susan Newman.  Who is Susan Newman, if you know?
21   A   To my knowledge, based on what's in the
22 admonition, Susan Newman was just as stated here,

84

1  senior advisor in the Executive Office of the Mayor.
2    Q   And according to this admonition, what
3  Ms. Tabb communicated to Ms. Newman was that CFSA has
4  children sleeping in the building.  Do you see that?
5    A   I do.
6    Q   When was -- when was the first time that you
7  became aware in any way that children were sleeping
8  in the CFSA office building?
9    A   I really wasn't aware of CFSA having
10 children sleeping in the office buildings.  I had
11 heard that it had occurred prior to me arriving there
12 but that the problem had been fixed.
13   Q   So after your arrival in 2003, when was the
14 first time that you learned that children might be
15 sleeping in the CFSA office building?
16   A   I don't recall specifically.
17   Q   Now, directing your attention to the second
18 bullet on page 1 of the exhibit, it says:
19       "Created an impression of official
20       knowledge when in fact details of issues,
21       strategies, activities and progress in
22       CFSA's Child Placement Administration and

Case 1:06-cv-00789-PLF-JMF    Document 41-13    Filed 04/22/2008    Page 22 of 76
VIDEOTAPED DEPOSITION OF ROQUE GERALD
CONDUCTED ON THURSDAY, JANUARY 17, 2008

22 (Pages 85 to 88)

85

1    Foster and Adoptive Parent Recruitment
2    Units are outside your purview as a public
3    affairs specialist."
4    Do you see that?
5    A   Um-hm.
6    Q   Can you verbally --
7    A   I do.
8    Q   Was it discussed in the meetings that you
9    were describing a short time ago what the information
10   or facts were that supported that particular bullet?
11   A   It may have been.  I don't recall
12   specifically.
13   Q   All right.  And then the third bullet says:
14   "Used the District Government-owned e-mail
15   system to promote your personal interests
16   and qualifications."
17   Do you see that?
18   A   I do.
19   Q   Is there a particular regulation or standard
20   that applies to the use of District government-owned
21   e-mail or computer systems?
22   MR. BRUCKHEIM:  Objection as to form.

86

1    You can testify as to whatever knowledge you
2    may have as to that question.
3    THE WITNESS:  I believe that there is.
4    BY MR. CONDIT:
5    Q   Do you know where it is or where it might be
6    found?
7    A   Not at this time.  The District is very
8    complex.  It might not even only be CFSA's policy.
9    It could be OCTO's policy, because OCTO owns the
10   District's e-mail.
11   Q   And just so the record is clear, what is
12   OCTO?
13   A   The Office of the Chief Technology Officer.
14   Q   And what does that office do?
15   A   They manage the District's computer systems.
16   Q   Now, my understanding is that it's part of
17   your purview to deal with information-technology
18   matters within CFSA; is that right?
19   A   That is correct.
20   Q   So tell me a little bit about what it is
21   that you and the staff under you do with respect to
22   information-technology matters for CFSA.

87

1    A   The main thing that we do, and one of the
2    most important things that we do, we maintain the
3    District's State Automated Child Information System
4    or SACWIS system known as FACES.  FACES is our
5    case-management system that our social workers
6    utilize, it is our provider payment system for which
7    we provide payments to our foster parents, for
8    example, for which we provide payments to group home
9    owners, those type things.  That's the main system.
10   In addition to that, we manage our local
11   area network, we manage our own servers, and we
12   manage the e-mail within the agency under the purview
13   of the Office of the Chief Technology Officer.
14   Q   Thank you for that description.
15   When you indicate that you manage e-mail,
16   what does that mean?
17   A   It just means that we manage from a server
18   standpoint.  We make sure that we have enough
19   throughput for the e-mails to go through the system,
20   that type thing.  OCTO determines how much storage
21   someone can have, et cetera.  They, for the most
22   part, have policy.

88

1    Q   Do you or the folks under you that are
2    involved in information-technology matters for CFSA
3    determine whether or not e-mail of CFSA employees is
4    stored or deleted?
5    A   No.  That's the Office of the Chief
6    Technology Officer.
7    Q   Is there presently a policy in place that
8    indicates when e-mail is deleted, in other words how
9    old it is before it is deleted and removed from the
10   system?
11   A   I'm sure there is.  I don't know the
12   specifics of it, but I'm sure there is.
13   Q   And one would find that policy with OCTO?
14   A   That would be correct.
15   Q   Now, further down in Exhibit 1 on the first
16   page, it's actually the last full paragraph, the
17   document, the admonition, states:
18   "In March 2005, you used the CFSA e-mail
19   system to approach the Public Information
20   Officer at the D.C. Department of Human
21   Services about 'developing a campaign to
22   increase awareness around child abuse and

Case 1:06-cv-00789-PLF-JMF    Document 41-12    Filed 04/22/2008    Page 23 of 76
VIDEOTAPED DEPOSITION OF ROQUE GERALD
CONDUCTED ON THURSDAY, JANUARY 17, 2008

23 (Pages 89 to 92)

89

1    neglect, reviving the Back To Sleep
2    Campaign and other projects . . .'"
3        Do you see that?
4    A   I do.
5    Q   Are you aware of any policy, law, rule or
6    regulation that would be violated by that type of
7    conduct?
8        MR. BRUCKHEIM:  Objection as to form.
9        You can answer as to whatever knowledge you
10   may have personally.
11       THE WITNESS:  I'm not aware.
12   BY MR. CONDIT:
13   Q   As the lead manager, I guess I'd say, or
14   head manager in CFSA of information-technology
15   matters, do you know generally what the policies are
16   about the use of the government e-mail system by CFSA
17   employees, what are the boundaries for such use?
18   **A   The boundaries basically say that e-mail**
19   **should be used strictly for government purposes, not**
20   **for any personal use, not to surf the Web all day,**
21   **not to visit pornographic Web sites, things of that**
22   **nature.**

90

1    Q   Okay.  So in the instances that we've
2    reviewed on page 1 of the admonition that concern
3    Ms. Tabb's communication with the Mayor's Office and
4    then with the public information officer in the D.C.
5    Department of Human Services, would you understand
6    those to be sanctioned government e-mail use
7    functions?
8        MR. BRUCKHEIM:  Well, just object as to
9    form.  And I'd ask if you could sort of restate the
10   question.  It's a little -- are you asking as to what
11   his understanding is as to what's stated in the
12   letter, or his understanding as to policy or --
13       MR. CONDIT:  I can rephrase the question.
14       MR. BRUCKHEIM:  Okay, thanks.
15   BY MR. CONDIT:
16   Q   Mr. Charles, you understand, do you not, by
17   looking at the examples we've been discussing on
18   page 1 of the admonition that part of the admonition
19   is focused on Ms. Tabb's communications, apparently
20   via e-mail, with the Mayor's Office and then with a
21   public information officer in the D.C. Department of
22   Human Services; is that correct?

91

1    A   Yes.
2    Q   My question is, based on your understanding
3    of e-mail policy for CFSA employees, are those
4    actions in violation of that policy?
5        MR. BRUCKHEIM:  I'm going to object as to
6    form and again say you can answer as to what his own
7    personal understanding or opinion is, and based on
8    his own knowledge.  And you can answer.
9        THE WITNESS:  I do not know specifically.  I
10   don't think that that was the intent from my reading
11   of this admonition.  I think that my reading of this
12   admonition was that the employee reached out to other
13   agencies for which other agencies understood to
14   create a partnership that was not sanctioned by
15   management.
16   BY MR. CONDIT:
17   Q   And what gives you that understanding?
18   Where do you derive your understanding of the issue
19   that you just described?
20   **A   Created an impression of official knowledge**
21   **when in fact details of issues are outside of the**
22   **purview of the employee.**

92

1    Q   And what is your understanding of what
2    Ms. Tabb was allegedly creating an impression of
3    official knowledge about?
4        MR. BRUCKHEIM:  I'm sorry.  Are you asking
5    him based on what he understands the admonition to
6    say?
7        MR. CONDIT:  I'm asking him based on both
8    his understanding of the admonition itself and the
9    discussions he had with his colleagues when they were
10   evaluating this admonition as part of the basis for
11   Ms. Tabb's removal.
12       MR. BRUCKHEIM:  Okay.  You can answer.
13       THE WITNESS:  I can only go on what the
14   admonition itself says.  And our evaluation on the
15   admonition for the events that you're talking about,
16   again, it was from a progressive-disciplinary
17   standpoint.
18       I did not get into the day-to-day
19   administration of an admonition, because an
20   admonition is neither corrective nor adverse action.
21   That would be something that would be handled in HR.
22       So I can only go by what I have here.

Case 1:06-cv-00789-PLF-JMF    Document 41-12    Filed 04/22/2008    Page 24 of 76
VIDEOTAPED DEPOSITION OF FRANK R. CHARLES
CONDUCTED ON THURSDAY, JANUARY 17, 2008

24 (Pages 93 to 96)

93
1 BY MR. CONDIT:
2    Q    All right.  So an admonition, you just said,
3 I believe, is not corrective or adverse; is that
4 right?
5    A    By District rules, an admonition is
6 considered neither adverse or corrective action.
7 It's, for the most part, counseling in nature.
8    Q    And is there a time when an admonition as a
9 document that's part of a personnel file would
10 expire?
11    A    I'm not sure.  I'd have to check the
12 regulations.
13    MR. CONDIT:  Let's take a break, because we
14 need a tape change.
15    THE VIDEOGRAPHER:  This is the end of
16 Tape 1.  We should go off the record at 11:57 a.m.
17    (Recess taken.)
18    THE VIDEOGRAPHER:  This is the beginning of
19 Videotape No. 2.  We're back on the record.  The time
20 is 12:04 p.m.
21 MR. CONDIT:
22    Q    You said an admonition is neither averse nor

94
1 something.  You used another term.
2    A    Adverse nor corrective.
3    Q    Nor corrective.
4    I believe you indicated that it's primarily
5 a counseling type of instrument; is that right?
6    A    Correct.
7    Q    Given that, what role, if any, did this
8 admonition play, to your knowledge, in the decision
9 made to summarily remove Ms. Tabb from her position?
10    A    Based on my knowledge, I believe it played
11 into it somewhat, showing a pattern of discipline and
12 counseling, but I don't think it was the main thrust
13 of a summary removal.
14    Q    And what is your basis for the opinion that
15 you just shared about the role of the admonition in
16 Ms. Tabb's summary removal?
17    A    My opinion is, of such, is that an
18 admonition does not meet the criteria for summary
19 discharge.
20    Q    Do you recall what event or action, if any,
21 that created the circumstances whereby Ms. Tabb was
22 being considered for summary removal?

95
1    A    If I recall correctly, it had something to
2 do with stating that children were sleeping in the
3 building is what I recall.
4    Q    Stating to whom?
5    A    The individuals from the Mayor's Office I
6 believe.
7    MR. CONDIT:  Let me show you what I'll mark
8 as the next exhibit.
9    (Whereupon, Plaintiff's Exhibit 2 was marked
10 for identification and attached to the transcript.)
11    MR. CONDIT:  Mr. Charles, you're being shown
12 what has been marked as Deposition Exhibit 2.  It
13 appears to be typed and handwritten notes from a
14 meeting dated 9-20-2005.
15    Q    I'd like you to take a look at it, please,
16 and tell me if it refreshes your recollection about
17 any of the meetings that you may have been involved
18 in concerning Ms. Tabb's summary removal and the
19 timing of those meetings.
20    A    I don't recall this particular document, but
21 some of the things that are included here absolutely
22 were discussed.

96
1    Q    And what things in particular?
2    A    Disruption to the operation of agency
3 business, unprofessionalism as a public information
4 officer, failure to follow supervisory instructions.
5 As I can recall right now.
6    Q    And do you recall after seeing this note
7 whether or not you may have been involved in meetings
8 pertaining to Ms. Tabb's situation as early as
9 September 20, 2005?
10    A    I do not.
11    Q    Do you know who may have created this note,
12 Exhibit 2?
13    A    Someone in the human resources office could
14 have.
15    Q    Now, when you said a few moments ago in your
16 testimony that the issues -- one of the issues,
17 excuse me, that was discussed was "disruptive to the
18 operation of agency business" as reflected in this
19 note, what did you understand that to mean?
20    A    It's my understanding going outside of the
21 purview of the employee's direct responsibilities,
22 stating objectives of the agency that were not

Case 1:06-cv-00789-PLF-JMF Document 41-12 Filed 04/22/2008 Page 25 of 76
VIDEOTAPED DEPOSITION OF REGINA TAXARUDES
CONDUCTED ON THURSDAY, JANUARY 17, 2008

25 (Pages 97 to 100)

97

1  objectives of the agency.
2      Q   And do you recall what facts or information
3  were provided to indicate that Ms. Tabb had been
4  disruptive to the operation of the agency's business
5  as is reflected in this note?
6      A   The statement that I just made earlier.
7  There may have been -- I do not recall -- there may
8  have been media -- unfair media attention that was
9  brought to the agency based on the activities of the
10  employee that would be considered disruptive to the
11  operation of the agency's business.  But again,
12  that's to the best of my recollection.
13      Q   What do you recall about the unfair media
14  attention, as you just described it?
15      A   It's just my personal viewpoint.  As I
16  stated earlier, there was -- we did not have children
17  sleeping in the building as it was presented by the
18  media.
19      Q   How do you know that?
20      A   Because we would have known that.
21      Q   How would you have known that?
22      A   It would have been discussed at the

98

1  executive level.
2      Q   Are you saying that there's some type of
3  regular executive meetings that would have discussed
4  that topic?
5      A   I'm saying that it was actual policy not to
6  have this happen, and it did not routinely happen as
7  it had in the past prior to my and others' arrivals.
8      Q   What do you recall about the media attention
9  that came to this issue of children sleeping in the
10  building aside from the fact that it, in your view,
11  was unfair?  Do you recall, for example, if it was in
12  print?  It was on television?
13      A   I do not recall.
14      Q   Do you recall at the time in 2005 reading or
15  seeing any of the media stories?
16      A   I do not recall.
17      Q   Do you recall during the meetings that
18  you've been describing that you attended involving
19  the evaluation of Ms. Tabb's situation, whether media
20  reports were discussed or presented in those
21  meetings?
22      A   I do not remember.

99

1      Q   Now, the other item that you recognized from
2  Exhibit 2 as an item that was discussed regarding
3  Ms. Tabb was unprofessional -- was being
4  unprofessional as a public information officer; is
5  that right?
6      A   That's correct.
7      Q   And what were the facts as you understood
8  them about that issue?
9      A   The facts as I understood them, as in any
10  organization, the public information office maintains
11  a positive image for the organization.
12      Q   And how does what you just said relate to
13  what I asked you, which is what are the facts that
14  support the notion that Ms. Tabb was unprofessional
15  as a public information officer?
16      A   I can only speak from personal opinion.  I
17  don't know -- I cannot recall specific fact.
18      Q   Okay.
19      A   And that would be, before it's -- an
20  employee, before telling their own management of
21  issues, that they're exploited externally, in my
22  opinion, would fit that statement.

100

1      Q   And did you believe that Ms. Tabb had not
2  raised the issue, for example, of children sleeping
3  in the building, to management before she approached
4  others about the issue?
5      A   I do not know.
6      Q   So what is the basis for your opinion that
7  you just gave?
8      A   The basis for my opinion is, my
9  understanding is -- and I don't know it to be fact;
10  that's the reason I couched it the way -- I don't
11  know it to be fact.  My understanding is, from
12  everything that we know, is that this information was
13  conveyed externally without management knowing
14  anything about it.
15      Q   Help me understand "externally."  When you
16  say "externally," does that include the Mayor's
17  Office?
18      A   Sure.
19      Q   So does CFSA consider itself somehow
20  separate from the Mayor's Office?
21      A   No.
22      Q   Okay.  So then how is a communication with

Case 1:06-cv-00789-PLF-JMF    Document 41-12    Filed 04/22/2008    Page 26 of 76
VIDEOTAPED DEPOSITION OF RENAUDINE TABB
CONDUCTED ON THURSDAY, JANUARY 17, 2008

26 (Pages 101 to 104)

101
1 the Mayor's Office an external communication in your
2 view?
3    A   It's outside of the purview of CFSA. That's
4 simply my view.
5    Q   If you had a concern personally that related
6 in any way to the safety of children being cared for
7 by CFSA, and you could not get a response from
8 management at CFSA, would you go to the Mayor's
9 Office with that issue?
10       MR. BRUCKHEIM:  Objection.
11       You can answer.
12       THE WITNESS:  I do not know.
13 BY MR. CONDIT:
14    Q   Well, what would you need to know in order
15 to make a judgment about whether or not you would
16 take such an issue to the Mayor's Office?
17       MR. BRUCKHEIM:  Same objection.
18       You can answer.
19       THE WITNESS:  It would depend on the
20 situation.  I just can't define it based on what
21 you've presented.
22       MR. CONDIT:  Okay.  Let's say that you

102
1 become aware, through whatever means, that children
2 are, again, sleeping in the CFSA office building, and
3 you raise that issue at executive meetings and no one
4 does anything about it.
5    Q   Would that be a circumstance under which you
6 would then feel that you could go to the Mayor's
7 Office with that issue?
8       MR. BRUCKHEIM:  Objection as to form and
9 relevance, but you can answer.
10       THE WITNESS:  Possibly, I might want to go
11 to the court monitor.  I don't know.
12 BY MR. CONDIT:
13    Q   Would presenting an issue to the court
14 monitor be an external communication in your view?
15    A   It's outside of the purview of CFSA.
16    Q   So anything outside of the purview of CFSA,
17 from your point of view, would be an external
18 communication; is that right?
19    A   In the context of this case, yes.
20    Q   You also agreed with one of the other
21 items -- or I should say recognized one other item on
22 Exhibit 2 -- or I should say listed in Exhibit 2 was

103
1 an issue that was discussed in the meetings that
2 you've been describing, and that is "failure to
3 follow supervisory instructions"; is that correct?
4    A   That's correct.
5    Q   What were the facts as you understood them
6 about Ms. Tabb's alleged failure to follow
7 supervisory instructions?
8    A   As I understood it, the failure to comply
9 with supervisory instructions is, if at first you're
10 warned not to continue to have these time of
11 communications with external agencies that present a
12 picture of management objectives that are not true
13 and you do it again, that's failure to follow
14 supervisory instructions.
15    Q   Okay.  What was not true about what Ms. Tabb
16 presented to the Mayor's Office, for example?
17    A   About what was presented to the Mayor's
18 Office?
19    Q   About children sleeping in the building, for
20 example.  What was untrue about whatever she
21 presented on that issue to the Mayor's Office?
22    A   I wasn't speaking to what -- that particular

104
1 one.  I was speaking to an external communication for
2 which we saw in the admonition where there were
3 communications with DMH, for example, establishing a
4 partnership with CFSA without the said authority.
5    Q   Okay.  So am I understanding you correctly
6 to mean that in your view -- and I'm looking now at
7 the admonition, Exhibit 1 on page 1, the last full
8 paragraph -- do you mean that Ms. Tabb's
9 communication inquiring about "developing a campaign
10 to increase awareness around child abuse and neglect,
11 reviving the Back To Sleep Campaign and other
12 projects" was an inappropriate communication?
13    A   Yes.
14    Q   And you believe that that was an
15 inappropriate communication because it was
16 misrepresenting something factually?  Or help me out.
17    A   That was my understanding.
18    Q   But you didn't know that personally.
19    A   Not necessarily, no.  I don't deal on the
20 program ops side, and this is getting into program
21 operations.
22       MR. CONDIT:  Let me show you what I'll mark

Case 1:06-cv-00789-PLF-JMF VIDEOTAPED DEPOSITION OF RONNIE CHARLES Filed 04/22/2008 Page 27 of 76
CONDUCTED ON THURSDAY, JANUARY 17, 2008

27 (Pages 105 to 108)

105

1 as the next exhibit.
2     (Whereupon, Plaintiff's Exhibit 3 was marked
3 for identification and attached to the transcript.)
4     MR. CONDIT: Mr. Charles, you've been shown
5 what has been marked as Exhibit 3.
6     THE WITNESS: Um-hm.
7     MR. CONDIT: At the very top of this
8 two-page exhibit there's a reference to Deborah
9 Wilson suggesting that this is printed off from her
10 e-mail.
11     The message, though, at the top of the page
12 is from you, Ronnie Charles, to Uma Ahluwalia and
13 cc'd to others. And the subject is "Social Workers'
14 Code of Ethics."
15   Q   If you'd take a look at this document, both
16 pages, and let me know if you've seen this before.
17   A   I have.
18   Q   And did you write the message that we see
19 identified at the top of the page, page 1 of the
20 exhibit?
21   A   I would agree to that.
22   Q   You would agree that -- I'm sorry.

106

1   A   I would agree that this was my e-mail.
2   Q   Do you recall why this was an issue, the
3 Social Workers' Code of Ethics as identified in the
4 subject line?
5   A   I do not.
6   Q   Is there anything in reviewing the document
7 that refreshes your memory on that topic?
8     (Witness reviews document.)
9     THE WITNESS: No.
10     MR. CONDIT: Okay. Let me ask you a few
11 questions about the content of your message here.
12 And again, I'm directing you to the top of the page
13 of Exhibit 3.
14     You state in the second line of your e-mail
15 there, ". . . I am told the SW," which I assume means
16 social worker, correct?
17   A   Correct.
18   Q   ". . . used this information to call Shirley
19 without knowledge of any potential motives
20 of Shirley."
21     What did you mean by "potential motives of
22 Shirley"?

107

1   A   I don't recall.
2   Q   Now, in the next e-mail down from the top of
3 the page, this is an e-mail to you from Uma
4 Ahluwalia. If you take a minute to review that
5 e-mail, please.
6     For the record, that e-mail is dated
7 Thursday, October 6, 2005 at 10:51 a.m.
8     (Witness reviews document.)
9 BY MR. CONDIT:
10   Q   Now, with respect to that e-mail, do you
11 recall receiving that message?
12   A   Not necessarily.
13   Q   Do you have any reason to believe that the
14 message that we're reviewing in this exhibit is not
15 authentic or not genuine?
16   A   No.
17   Q   When you review that message to you from
18 Ms. Ahluwalia, do you recall what the issue was or
19 why you were dialoguing with her on that subject?
20   A   No.
21   Q   Do you know who JoAnn Vaughn is?
22   A   No.

108

1   Q   And what position did Uma Ahluwalia have at
2 the time of this e-mail message, which is October 6,
3 2005?
4   A   I believe she was the principal deputy for
5 program operations.
6   Q   Would that make her the No. 2 person in
7 CFSA?
8   A   She was at that time.
9   Q   And she eventually became the interim
10 director of CFSA; is that correct?
11   A   That's correct.
12   Q   And did you, at some point in time, report
13 directly to her?
14   A   I did.
15   Q   Now, in the message from Ms. Ahluwalia to
16 you she says, down in the second line:
17     "Also did we track the e-mail that Shirley
18     sent to Heather about having blankets. We
19     need . . . to strengthen our case. Why
20     would Shirley even intimate that she had
21     blankets when she [had] . . . nothing to do
22     with after hours care and was out on FMLA

Case 1:06-cv-00789-PLF-JMF   Document 41-12   Filed 04/22/2008   Page 28 of 76
VIDEOTAPED DEPOSITION OF ROBERT C. ARBUCKLE
CONDUCTED ON THURSDAY, JANUARY 17, 2008

28 (Pages 109 to 112)

109

1    at that time?"
2         Do you see that part of the message?
3    A   I do.
4    Q   Do you recall why that issue was being
5    discussed with you?
6    A   I do not.
7    Q   When Ms. Ahluwalia says in the message we're
8    referring to on Exhibit 3, "We need . . . to
9    strengthen our case," what is she referring to?
10        MR. BRUCKHEIM:  Objection.  I'm going to
11   instruct the witness not to answer that question as
12   phrased because it's purely speculative.
13        If you rephrase it as to whether or not she
14   may have asked him about it or whether they may have
15   discussed it, I'll tell him he can answer.  But as
16   phrased, that's pure speculation, and I won't have
17   him speculate.
18   BY MR. CONDIT:
19   Q   Did you have any conversations with
20   Ms. Ahluwalia, either by e-mail or otherwise, where
21   she indicated to you what case she's talking about
22   strengthening with respect to Shirley Tabb?

110

1    A   I may have.  I do not recall.
2    Q   Is there any documentation that would
3    refresh your recollection on that subject?
4    A   None that I'm aware of.
5    Q   Near the very bottom of the page, or at the
6    very bottom of the page there's a message from
7    Ms. Ahluwalia to others, and that message says, "If
8    we terminated her, how come she still has access to
9    her e-mail?  This is incredible to me."
10        Do you see that message?
11   A   I do.
12   Q   Do you recall some concern being raised at
13   the time -- and this is October 6, 2005 -- about
14   Ms. Tabb having access to her e-mail?
15   A   I do not.
16   Q   But the information technology staff that
17   you supervise, they would have control over how
18   people are able to access their e-mail; is that
19   correct?
20   A   From a security standpoint they would have
21   the ability to coordinate with OCTO whether someone
22   has e-mail or not.

111

1    Q   And would the IT office in CFSA be the
2    office that would initiate any action with respect to
3    removing an employee from e-mail?
4    A   That is correct.
5    Q   Do you recall whether or not any type of
6    investigation in order to gather facts associated
7    with the "children sleeping in the building" issue
8    was initiated by CFSA management after it was raised
9    by Ms. Tabb?
10   A   I'm almost sure there was an investigation
11   initiated, because there was concern that this could
12   have been occurring again, and that would have
13   happened by order of the court monitor at a minimum.
14   Q   Okay.  And are you familiar or were you
15   involved in any parts of an investigation on that
16   subject?
17   A   No.
18   Q   Did you attend any executive-level meetings
19   where the subject of investigating the issue of
20   children sleeping in the building was discussed?
21   A   I may have been involved in a meeting where
22   it's been discussed at a high level, but never from

112

1    an investigatory level.
2    Q   And if you were involved in a meeting where
3    that issue of children sleeping in the building was
4    discussed at a high level, what type of meeting would
5    that have been?
6    A   That could have been the senior leadership
7    team meeting or a management team meeting.
8    Q   In 2005, when the events at issue were
9    taking place, were there senior-leadership team
10   meetings being regularly conducted?
11   A   They were regularly conducted, yes.
12   Q   And who would chair those meetings?
13   A   The director.
14   Q   Were notes or minutes taken of
15   senior-leadership team meetings?
16   A   In 2005 I do not believe so.
17   Q   Would you make notes of senior-leadership
18   team meetings in 2005?
19   A   I probably did.
20   Q   And where would you keep your notes after
21   you made them?
22   A   In a note pad similar to this.

Case 1:06-cv-00789-PLF-JMF    Document 41-12    Filed 04/22/2008    Page 29 of 76
VIDEOTAPED DEPOSITION OF ROBERT CHARLES
CONDUCTED ON THURSDAY, JANUARY 17, 2008

29 (Pages 113 to 116)

113

1    Q    And would you store them in some way?
2    A    No.
3    Q    So they would be discarded?
4    A    When the notebook's filled, I get another
5    one.
6    Q    Now, with respect to management team
7    meetings, were they regularly conducted in the
8    October 2005 time period?
9    A    I'm sure they were.
10   Q    And what was difference between a management
11   team meeting and a senior-leadership team meeting?
12   A    Senior-leadership team members are pretty
13   much your deputy directors and your director.
14        Management team meetings would include
15   your -- all of your administrators and program
16   managers with the deputies and the director.
17   Q    So if I'm understanding correctly, the
18   management team meetings are a larger group.
19   A    Huge group.
20   Q    Huge group.  So about how many people are in
21   management team meetings?
22   A    At least probably 30 to 40.

114

1    Q    And about how many people were typically in
2    senior-leadership team meetings?
3    A    Eight to 10.
4    Q    Are there notes or minutes taken of
5    management team meetings?
6    A    At that time I don't believe so.
7    Q    In 2005 were there agendas issued for either
8    senior-leadership team or management team meetings?
9    A    Probably for the management team meetings
10   there were.  For the senior leadership, I do not
11   recall.
12   Q    Would you retain those agendas for any
13   reason?
14   A    Not personally, no.
15   Q    Do you know who would generally prepare the
16   agendas in 2005 for management team meetings?
17   A    The director's office.
18   Q    And I take it based on your earlier
19   testimony you can't recall whether the issue of
20   children sleeping in the building was discussed at
21   the senior-leadership team level or the management
22   team level; is that right?

115

1    A    No, I don't think that's what I -- I said
2    I'm not sure -- if I'm correct, I'm not sure which
3    level of meeting it was discussed, but it surely
4    would have been discussed had it occurred.
5    Q    All right.  Well, let me try to clarify.
6        In 2005 was the issue of children sleeping
7    in the CFSA office building discussed, to your
8    knowledge, in any senior-leadership team meeting?
9    A    At least at a management-team-meeting level.
10   I'm unsure of a senior level.
11   Q    All right.  So your recollection presently
12   is that the discussion of children sleeping in the
13   building in 2005 happened at least at the
14   management-team-meeting level.
15   A    Yes.
16       MR. CONDIT:  All right.  Why don't we break
17   for lunch.
18       THE VIDEOGRAPHER:  We should go off the
19   record as of 12:32 p.m.
20       (Lunch recess taken.)
21       THE VIDEOGRAPHER:  Back on the record.  The
22   time is now 1:21 p.m.

116

1    BY MR. CONDIT:
2    Q    Good afternoon, Mr. Charles.
3    A    Good afternoon.
4        (Whereupon, Plaintiff's Exhibit 4 was marked
5    for identification and attached to the transcript.)
6        MR. CONDIT:  Let me show you what I've
7    marked as the next deposition exhibit which is
8    Exhibit 4.  This is the October 3, 2005 notice of
9    summary removal provided to Ms. Tabb.
10   Q    Would you take a look at it please and
11   familiarize yourself with it and tell me if you've
12   seen it before.
13       (Witness reviews document.)
14       THE WITNESS:  I do.
15   BY MR. CONDIT:
16   Q    Okay.  And when was the first time that you
17   saw this letter or a draft of it?
18   A    I can only surmise sometime in late
19   September, early October of 2005.
20   Q    And what role did you play, if any, in
21   drafting this letter that we see as Exhibit 4?
22   A    I do not believe I played a role in drafting

117
1  of this letter.
2      Q   Okay.  Are you aware -- strike that.
3          Who do you understand prepared the letter
4  that we see as Exhibit 4?
5      **A   It would be my understanding that this was**
6  **prepared by Mr. Kleartis Jackson.**
7      Q   Now, in an earlier deposition in this case I
8  asked the same question about this document to Brenda
9  Donald.  And in her testimony she indicated that you
10  authored this letter, the October 3rd, 2005 letter.
11          Is she mistaken?
12          MR. BRUCKHEIM:  Objection.
13          You can answer.
14          THE WITNESS:  She must be.  I don't recall
15  authoring this letter.
16          MR. CONDIT:  Let me draw your attention to
17  portions of the letter, then, and see if you had any
18  role in those.
19      Q   Drawing your attention to the first page of
20  Exhibit 4 and the second full paragraph that begins,
21  "In March, 2005," do you see that?
22      **A   I do.**

118
1      Q   Did you play any role in crafting, drafting
2  or approving that language that we see in that second
3  full paragraph on page 1 of the exhibit?
4      **A   Not that I can recall.**
5      Q   Okay.  Then moving on to the next paragraph
6  which starts, "In August, 2005," do you see that?
7      **A   I do.**
8      Q   Did you play any role in drafting or
9  approving the language in that paragraph?
10      **A   Not that I recall.**
11      Q   If you don't recall, is it possible that you
12  did but you just don't remember?
13          MR. BRUCKHEIM:  Objection.
14          You can answer.
15          THE WITNESS:  I seriously doubt that I did.
16  BY MR. CONDIT:
17      Q   And why do you seriously doubt that you did?
18      **A   Because this is routine for this type of**
19  **action to be drafted in the HR Department.**
20      Q   Okay.  Let me draw your attention then back
21  to Exhibit 4, page 1, the paragraph at the bottom of
22  the page which starts on -- which says, "On or about

119
1  September 19, 2005," do you see that?
2      **A   I do.**
3      Q   Do you recall having any hand in drafting
4  that language or approving the language in that
5  paragraph?
6      **A   I do not.**
7      Q   Then turning over to the second page,
8  please.  The top two paragraphs, one starting, You
9  have been on "Family Medical Leave since August 18,
10  2005," do you see that?
11      **A   I do.**
12      Q   And then the next paragraph, "Your violation
13  of supervisory instructions," do you see that?
14      **A   I do.**
15      Q   Did you have any role in drafting or
16  approving the language in those paragraphs?
17      **A   Not that I recall.**
18      Q   Now, based on the meetings that you had that
19  you were describing earlier in your testimony, do you
20  recall discussing the development of this letter,
21  this summary-removal letter, in any way?
22      **A   I do not recall the development of this**

120
1  **summary-removal letter.**
2      Q   So in the meetings that you attended, you
3  did not discuss what elements might need to be
4  included or excluded from the summary-removal letter?
5      **A   Not that I recall, no.**
6      Q   Do you recall having a meeting -- one or
7  more meetings, I should say -- with the director at
8  the time, Brenda Donald, about Ms. Tabb's summary
9  removal?
10      **A   I do recall at least a couple of meetings.**
11      Q   And do you recall about when those meetings
12  may have taken place if this letter is dated
13  October 3, 2005?
14      **A   I do not.**
15      Q   Do you think the meetings that you're
16  thinking of took place before the October 3, 2005
17  letter or after?
18      **A   Before.**
19      Q   What can you recall about the content of
20  those meetings in terms of what was discussed and
21  what information was shared?
22      **A   I recall discussions around summary removal**

Case 1:06-cv-00789-PLF-JMF Document 41-12 Filed 04/22/2008 Page 31 of 76
VIDEOTAPED DEPOSITION OF BRENDA DONALD WALKER
CONDUCTED ON THURSDAY, JANUARY 17, 2008

31 (Pages 121 to 124)

121

1 and looking at Chapter 16.
2    Q    Okay, and that's general.
3       Do you recall any of the specifics around
4 those issues, looking at Chapter 16 and summary
5 removal?
6    A    No.
7    Q    Is there any documentation or information or
8 other reference that would help refresh your
9 recollection on the details of what may have
10 transpired in the meetings that you attended prior to
11 the October 3, 2005 summary-removal letter being
12 issued?
13    A    Not that I can think of.
14    Q    Let me draw your attention, please, to the
15 last paragraph on the first page of Exhibit 4 which
16 is the summary-removal letter.  And again, this is
17 the paragraph that starts with, "On or about
18 September 19, 2005."  Do you see that?
19    A    I do.
20    Q    It says in this paragraph that "you,"
21 meaning Ms. Tabb, represented agency -- excuse me,
22 "misrepresented agency practice to the media."

122

1       Do you see that?
2    A    I do.
3    Q    What was it that was misrepresented with
4 respect to agency practice to the media as you
5 understood it?
6    A    **As I understood it, I think it had to do**
7 **with children sleeping in the building.**
8    Q    What was it about children sleeping in the
9 building that was a misrepresentation of agency
10 practice to the media?
11    A    **It was my understanding that what was**
12 **represented to the media is that children were**
13 **consistently sleeping in the building, and that was**
14 **absolutely false.**
15    Q    And did anyone tell you that that is what
16 Ms. Tabb expressed to the media?
17    A    **I don't recall specifically, but -- but it**
18 **was in that context I believe.  It's just been a long**
19 **time.**
20    Q    In any of the meetings that you attended,
21 were you provided with any evidence, such as a video
22 of a news program, a copy of a news story in print or

123

1 any other information, that would have indicated to
2 you that Ms. Tabb misrepresented agency practice to
3 the media?
4    A    I do not remember.
5    Q    Is there any information that you might be
6 able to consult that would refresh your recollection
7 on that point?
8    A    Not that I can remember at this time.
9    Q    Drawing your attention to the same
10 paragraph, which is the last paragraph on page 1 of
11 Exhibit 4, the summary-removal letter, it also says,
12 in the very next line, that Ms. Tabb, quote:
13    ". . . violated CFSA confidentiality laws
14       in showing the image of a child in CFSA's
15       custody and disclosing detailed personal
16       information about why the child was in
17       CFSA's custody."
18       Do you see that?
19    A    I do.
20    Q    What information are you aware of that
21 corroborates that statement?
22    A    **I am not aware of any specific information.**

124

1 **However, I believe that the general counsel, it was**
2 **their responsibility to validate the violation that**
3 **is stated here.**
4    Q    What do you mean by it was the
5 responsibility of the general counsel to validate the
6 violation?
7    A    **Any legal issues in the agency or any**
8 **determination of compliance or noncompliance, it has**
9 **always been practice, to my knowledge, that it would**
10 **be the role of general counsel to advise.**
11    Q    When you say "validate the violations," do
12 you mean to gather the facts or understand what is
13 true and correct about the facts being represented?
14    A    **Yes.**
15    Q    Do you know, other than the general
16 counsel's office, of anyone else who was involved
17 with Ms. Tabb's case that was involved in validating
18 the facts?
19    A    **Only -- I can only think of the supervisor,**
20 **Mindy Good.**
21    Q    Anyone else?
22    A    **Maybe human resources.**

Case 1:06-cv-00789-PLF-JMF   Document 41-12   Filed 04/22/2008   Page 32 of 76
VIDEOTAPED DEPOSITION OF ROBERT LEE ROBINSON
CONDUCTED ON THURSDAY, JANUARY 17, 2008

32 (Pages 125 to 128)

125

1    Q    Anyone in particular from human resources?
2    A    It would be the HR director and his staff.
3    Q    Which would have been Mr. Jackson --
4    A    And Ms. Wilson.
5    Q    -- and Ms. Wilson?
6         Now, just so the record is clear, it's my
7    understanding from your testimony so far today that
8    you were not involved in validating the facts that
9    were alleged against Ms. Tabb; is that correct?
10   A    That would be correct.
11   Q    Do you know, referring back to the exhibit
12   in the section we were just discussing, what personal
13   information about why the child was in CFSA's custody
14   is being referred to there?
15        More simply stated, do you know what the
16   personal information is that was at issue?
17   A    Not that I can recall.
18   Q    Do you think that the general counsel also
19   validated that issue with respect to a factual basis
20   for making that claim?
21   A    I don't know for a fact, but again, I would
22   think that they would, because it's inferring client

126

1    information, which would be on the program ops side,
2    for which I had no involvement, and I can't think of
3    anybody else who would have been involved.
4    Q    All right.  Then going further down in that
5    same paragraph on page 1 of Exhibit 4, it says right
6    near the bottom:
7         ". . . you failed to obtain permission from
8         your supervisor to disseminate information
9         to the media which constitutes malfeasance
10        and insubordination as you had been
11        admonished for similar conduct earlier this
12        year."
13        Do you see that?
14   A    I do.
15   Q    And aside from the admonishment, which we've
16   already talked about, are you aware of what facts
17   support or corroborate that statement?
18   A    No.
19   Q    Does a CFSA employee to your knowledge have
20   to obtain the permission of anyone within CFSA to
21   interact with the media on their own time?
22   A    I am not sure.

127

1    Q    What would you consult or whom would you
2    consult in order to understand the answer to that
3    question or get an answer to that question?
4    A    It would be the Office of the General
5    Counsel.
6    Q    Do you know why, in the paragraph that we've
7    been discussing, there's reference made to, "On or
8    about September 19, 2005 . . . "?  Do you know what's
9    significant about that date, if anything?
10   A    Not right off, no.
11   Q    At the time this letter was issued,
12   October 3, 2005, were you aware of whether or not
13   Ms. Tabb had been on approved leave status?
14   A    I believe that Ms. Tabb was on approved
15   Family Medical Leave status.
16   Q    And what is your basis for that statement?
17   A    It's just my own memory that I just don't
18   think that she was there at the time of this letter.
19   Q    Now let me ask you to please turn to the
20   second page of Exhibit 4.  And again, this is the
21   summary-removal letter.
22        Top of the page, the first paragraph

128

1    references the family and medical leave issue and
2    concludes by stating, quote:
3         "CFSA considers such actions an abuse of
4         Family Medical Leave."
5         Do you see that?
6    A    I do.
7    Q    Are you aware of any facts that corroborate
8    the statements made in that top paragraph on page 2?
9    A    I think that it is factual that the employee
10   did coordinate interviews with the media, and I do
11   believe that it's factual that there was coordination
12   of a photo of a child.
13   Q    Okay.  And what is your basis or personal
14   knowledge of either of those statements, the
15   coordinating of the photo or the coordinating with
16   the media?
17   A    I believe that their -- that the media
18   itself -- listed the employee as the person who
19   provided them with information on the child in
20   question.
21   Q    And so do you remember that from reviewing a
22   media report or a video or something of that nature?

Case 1:06-cv-00789-PLF-JMF   Document 41-13   Filed 04/22/2008   Page 33 of 76
VIDEOTAPED DEPOSITION OF BRENDA DARROW
CONDUCTED ON THURSDAY, JANUARY 17, 2008

33 (Pages 129 to 132)

129

1  A   I may have, but I cannot say specifically.
2  Q   So it's your understanding that the media --
3  whatever media in whatever form it was, represented
4  that Ms. Tabb had provided the information about --
5  including a photo of a child; is that right?
6  A   If I recall correctly, yes.
7  Q   And what about those actions would be
8  considered an abuse of Family Medical Leave, if you
9  know?
10  A   I think it's inferred in the paragraph that
11  if an employee is out on a serious medical condition
12  which prevents them from working, the question
13  becomes, if they're that ill, how did they do all
14  these other things and they cannot work.
15  Q   And all of what other things are we
16  referring to?
17  A   The coordination of a photo, the
18  coordination of interviews with the media.
19  Q   And at the time that these issues were being
20  discussed by you and other managers within CFSA, did
21  anyone indicate what the facts were about what type
22  or level of coordination Ms. Tabb was involved in

130

1  with the media?
2  A   I don't recall specifically.
3  Q   Could it have been that Ms. Tabb just called
4  somebody up from the news media on the telephone and
5  said, "I have a concern about this issue" and they
6  came over to her house?
7  MR. BRUCKHEIM:  Objection.  That just calls
8  for speculation.  If you restate it, I'll tell him
9  that he can answer, but I'm not going to have him
10  speculate.
11  BY MR. CONDIT:
12  Q   Is that a possibility?
13  MR. BRUCKHEIM:  Same objection.  It's a
14  little better.  You can answer that.  But not much
15  better.
16  THE WITNESS:  It's a possibility.
17  BY MR. CONDIT:
18  Q   Are there any facts that you're aware of
19  that would discount the possibility that I just
20  described to you which is that all Ms. Tabb did was
21  call somebody on the phone and they came over and
22  talked to her?

131

1  A   I believe there were, but I don't recall
2  specifically.
3  Q   Okay.  Do you know who might have those
4  facts or that information that you can't recall at
5  this time?
6  A   Maybe the public information officer, Mindy
7  Good.
8  Q   Anyone else you can think of that might have
9  that information?
10  A   That's all that I can think of right now.
11  Q   Okay.  Then drawing your attention on the
12  exhibit -- again, Exhibit 4, second page, paragraph 2
13  from the top starts with, "Your violation of
14  supervisory instructions."  Do you see that?
15  A   I do.
16  Q   That particular paragraph or sentence
17  concludes with the words "threatens the integrity of
18  government operations."  Do you see that?
19  A   I do.
20  Q   What does that mean, "threatens the
21  integrity of government operations," if you know?
22  A   Again, in the context of this letter, I

132

1  believe it goes to the integrity of the actual
2  operations of our intake and Child Protective
3  Services function.
4  Q   And what is it, what is the integrity issue
5  that you're thinking of with respect to the Child
6  Protective Services function?
7  A   Reputation.  Trust from the community.
8  Q   And what is it, in your understanding of the
9  situation with respect to Ms. Tabb, that impacted
10  that trust?
11  A   The assertion that it was consistent
12  practice when it was not.
13  Q   And when you say "the assertion that it was
14  a consistent practice," what are you referring to?
15  A   Children sleeping in the building.
16  Q   And what facts or information leads you to
17  believe that Ms. Tabb asserted that it was a
18  consistent practice that children were sleeping in
19  the building?
20  A   Because that's what -- that is what was
21  displayed to the media, or what the media in turn
22  displayed to the general public after conversations

Case 1:06-cv-00789-PLF-JMF Document 41-13 Filed 04/22/2008 Page 34 of 76
VIDEOTAPED DEPOSITION OF BRENDA LARKINS
CONDUCTED ON THURSDAY, JANUARY 17, 2008

34 (Pages 133 to 136)

133

1  with Ms. Tabb.
2  Q   So was it the media that made the statements
3  about the consistent practice, or was it Ms. Tabb, to
4  your knowledge?
5  **A   Again, I think that the media displayed to**
6  **the community what they were told by Ms. Tabb.**
7  Q   So are you saying that the media was quoting
8  Ms. Tabb?
9  **A   I don't recall.**
10  Q   Do you know who within CFSA investigated the
11  question of whether or not Ms. Tabb had asserted that
12  children sleeping in the building was some kind of
13  consistent or regular practice?
14  **A   Could you repeat the question again?**
15  Q   Do you know at the time of the issues that
16  we're discussing, roughly the October 2005 time
17  period, anyone within CFSA who investigated or tried
18  to determine the facts as to whether or not Ms. Tabb
19  made representations to the media that children
20  sleeping in the building was somehow a consistent or
21  regular practice?
22      MR. BRUCKHEIM:  Objection as to form, but

134

1  you can answer.
2      THE WITNESS:  I would think probably the
3  director.  I would think that probably the court --
4  assigned court monitor.  I would think probably those
5  would be the two key individuals anyway.
6  BY MR. CONDIT:
7  Q   And that's your thinking, but you don't
8  know.
9  **A   I don't recall with specificity who else,**
10  **but I just think that those would be the two key**
11  **people.**
12  Q   Did Ms. Donald, as the director, talk with
13  you about the issue of what Ms. Tabb allegedly
14  represented to the media?
15  **A   Yes.**
16  Q   And what did she tell you?
17  **A   The representation that this is a routine**
18  **practice.  And it's not.**
19  Q   That was Ms. Donald's interpretation?
20  **A   That was the agency and Ms. Donald's**
21  **interpretation I believe.**
22  Q   And do you know upon what facts that

135

1  interpretation was based?
2  **A   Practice is all I know.**
3  Q   What do you mean by practice?
4  **A   It became policy that children could not**
5  **continue to sleep in the building well before, again,**
6  **I arrived.  And supposedly, that had stopped, as far**
7  **as I had knew.  I had no reports of it.  That's what**
8  **that's based on.**
9  Q   Do you recall any communications from the
10  agency following the revelation of children sleeping
11  in the office building to the media where the agency
12  had to explain these issues to the D.C. City Council,
13  for example?
14  **A   Not specifically, no.**
15  Q   So you would not have been involved in any
16  of the follow-up meetings?
17  **A   No.**
18  Q   Now, at the time this exhibit was issued,
19  October 3, 2005, was there a file, a physical file of
20  supporting information that corroborated what was
21  stated in this letter?
22  **A   I believe that there would have been a**

136

1  **cumulative file of other actions, for example, the**
2  **admonition, the reprimand, potentially a**
3  **performance-improvement plan or corrective-action**
4  **plan, and whatever information maybe the general**
5  **counsel may have provided.  Yes, I do believe there**
6  **would probably be a file that had those documents.**
7  Q   But did you see a file that was the
8  corroborating information for this October 3, 2005
9  letter which we've marked as Exhibit 4?
10  **A   Not specifically.**
11  Q   Now, if you know, let me ask, you why does
12  Brenda Donald sign this letter as opposed to some
13  other official within the agency?
14  **A   I'm not sure why this happened the way it**
15  **did at this particular time.**
16  Q   Are there any documents ore other
17  information that you could review that would inform
18  you about that topic?
19  **A   I'm sure that we could go back to the**
20  **District Personnel Manual.  There should be some**
21  **information that gives us a road man on the structure**
22  **of the document.**

Case 1:06-cv-00789-PLF-JMF Document 41-12 Filed 04/22/2008 Page 35 of 76
VIDEOTAPED DEPOSITION OF RONNIE CHARLES
CONDUCTED ON THURSDAY, JANUARY 17, 2008

35 (Pages 137 to 140)

137

1    Q    Now, I notice on page 2 of the exhibit there
2  are a number of people who are carbon-copied down at
3  the bottom of the document.  Do you see that?
4    A    I do.
5    Q    Do you know who Deborah Courtney is?
6    A    Union president.
7    Q    And do you know who Joe Addis is?
8    A    The acting contracting procurement
9  administrator at that time, appointed as the hearing
10  officer in this case.
11    Q    Do you know why Kleartis Jackson would not
12  be listed on the cc list for this letter?
13    A    I think the intent was human resources was
14  representative of Kleartis Jackson.
15    Q    So the reference to "Human Resources" in the
16  cc list would be referencing him?
17    A    That would be my opinion.
18    Q    Now, I notice that this summary-removal
19  letter provides Ms. Tabb with an opportunity to
20  respond and for a hearing.
21        Do you notice that in the letter?
22    A    I do.

138

1    Q    Do you know whether or not she took
2  advantage of those opportunities?
3    A    It is my understanding that she did not.
4    Q    And what is the basis for your
5  understanding?
6    A    I believe there was an e-mail from Mr. Joe
7  Addis himself that Ms. Tabb did not show up for the
8  scheduled hearing.
9    Q    And do you know why Ms. Tabb did not attend
10  the hearing?
11    A    I do not recall.  I do not know.
12    Q    Were you involved at all, either directly or
13  by communications from other parties, in the process
14  of Mr. Addis's determination of Ms. Tabb's case?
15    A    No.  I specifically told him I could not be
16  involved.
17    Q    And why did you say that?
18    A    I was informed, and I believe rightfully so
19  by HR, so that there's no management influence on the
20  independent hearing officer.
21    Q    So I take it that means then that you were
22  not coordinated with, in terms of the setting up of

139

1  the hearing and the location or any other aspects of
2  that issue.
3    A    No sir.
4    Q    How was it that you came to be formed that
5  Ms. Tabb did not attend the hearing?
6    A    Because the hearing officer has to notify
7  Ronnie Charles, in this letter, as the deciding
8  official.  And that's how I was notified.
9    Q    Now, what notification did you receive from
10  Mr. Addis other than the fact that Ms. Tabb did not
11  attend the hearing?
12    A    That's all I can recall right now.  I think
13  that was the extent.
14    Q    Did you receive any information from
15  Mr. Addis that would inform you about your role as
16  the deciding official?
17    A    I don't recall receiving anything other than
18  the notice that Ms. Tabb did not show up, and
19  therefore I believe his recommendation was to go with
20  the proposed notice of summary removal.
21    Q    And why was it that you were the person that
22  was assigned the task of issuing a notice of final

140

1  decision?
2    A    I was appointed by the agency head.
3    Q    Ms. Walker gave you that role?  Ms. Donald?
4  Excuse me.
5    A    I think it was between Ms. Donald and human
6  resources.
7    Q    And what is it that you would have to do as
8  the person making or issuing the notice of final
9  decision?  What steps or what actions would you have
10  to take?
11    A    The final decision person would review what
12  was presented as far as the allegations -- normally
13  it would include the information, a response from the
14  employee, and the information from the hearing
15  officer -- and then issue a final decision.
16    Q    And so what information did you consider
17  prior to the issuing your final decision?
18    A    I believe I reviewed the information of the
19  progressive discipline, the information around the
20  media, and any recommendations that maybe general
21  counsel gave regarding policy.
22    Q    So you said you reviewed the progressive

Case 1:06-cv-00789-PLF-JMF   Document 41-13   Filed 04/22/2008   Page 36 of 76
VIDEOTAPED DEPOSITION OF ROBERT CHARLES
CONDUCTED ON THURSDAY, JANUARY 17, 2008

36 (Pages 141 to 144)

141
1 discipline, recommendations from general counsel
2 regarding policy, and what was the third item?
3   **A   Any media information that may have been**
4 **validated, given to me.  I can't recall the**
5 **specifics.  Too long a period of time.**
6   Q   Did you review anything that was provided by
7 Ms. Tabb?
8   **A   I don't recall receiving anything from**
9 **Ms. Tabb.**
10   Q   Help me out with the procedure here.  Were
11 you essentially the decision maker with respect to
12 whether or not Ms. Tabb was going to be terminated?
13   **A   No.  I consider this role of the person who**
14 **just validates the decision that was made much**
15 **earlier.**
16   Q   Who was the decision-maker regarding whether
17 Ms. Tabb would be terminated?
18   **A   I think that it would be Brenda Donald**
19 **Walker, the director.**
20     MR. CONDIT:  Let me show you what I'll mark
21 as the next exhibit.
22     (Whereupon, Plaintiff's Exhibit 5 was marked

142
1 for identification and attached to the transcript.)
2     MR. CONDIT:  Mr. Charles, I'll show you what
3 has been marked as Deposition Exhibit 5.  It's an
4 October 10, 2005 letter to Mr. Joe Addis from Shirley
5 Tabb copied to a number of individuals.
6   Q   Please take a look at it and tell me if
7 you've seen it before.
8   **A   I do not recall.  I may have.**
9   Q   You may have but you don't recall?
10   **A   Not specifically, no.**
11   Q   In questioning you a few minutes ago you
12 said you didn't receive anything from Ms. Tabb.
13 Is seeing this document refreshing your
14 recollection in some way?
15   **A   Not necessarily, no.**
16   Q   So why do you think you may have seen this
17 document before?
18   **A   Because it's addressed -- it's a copy to**
19 **Deborah Wilson, and as I said, I reviewed the file.**
20 **I just didn't recall specifically getting anything**
21 **from Shirley Tabb.**
22   Q   So how can we be sure on the record what you

143
1 reviewed in issuing the final notice regarding
2 Ms. Tabb's termination?
3   **A   All I can tell you is from my memory.  I**
4 **have no other recollection.**
5   Q   And there would be no specific file that is
6 the file of the noticing official and what that
7 official reviewed?
8   **A   There could be.  I just don't recall.**
9   Q   Have you been in this role before where
10 you've been the official that has issued the notice
11 of termination after other steps have been taken?
12   **A   Yes.**
13   Q   About how many times?
14   **A   Less than a handful.**
15   Q   A handful being five?
16   **A   Being five.**
17   Q   In those other circumstances, did you
18 typically review information from the employee?
19   **A   Sure.**
20   Q   And did you typically set up a file that was
21 specific to the information that you reviewed?
22   **A   Didn't necessarily set up a file.  A file**

144
1 **was normally presented to me from human resources.**
2   Q   So as we sit here today, how would you
3 recommend the parties figure out what information you
4 reviewed in making your decision about issuing or not
5 issuing the notice to terminate Ms. Tabb?
6   **A   My recommendation would be that you review**
7 **the file in human resources.  There should be one**
8 **collective file.**
9   Q   And would there be any way by looking at
10 that file to know what you reviewed in your role as
11 the person who would issue or not issue the notice of
12 termination?
13     MR. BRUCKHEIM:  Objection as to form.
14     You can answer.
15     THE WITNESS:  I think it should be.
16 BY MR. CONDIT:
17   Q   How would we be able to determine that by
18 looking at the file?
19   **A   Because the file should contain all the**
20 **documentation of the case which would include any**
21 **allegations, which would include the proposal, which**
22 **would include any information from the employee.**

145

1    Q    Well, I understand that the file in total
2  would contain a lot of information.
3        My question to you more specifically though
4  is how do we know, in looking at the file now, what
5  you looked at in October, November of 2005 in making
6  your decision?
7    A    Again, all I can say is you would have to go
8  to the employee relations file on this particular
9  case and assume professional integrity occurred as
10  I've stated.
11    Q    Now, when do you mean by "assume
12  professional integrity occurred"?
13    A    That the things that I've told you that I
14  believe that I reviewed were the things that I used
15  to make my decision.
16    Q    Well, and I'm not suggesting in any of my
17  questions that I'm challenging in any way your
18  professional integrity.  So I hope that message is
19  not being conveyed, because it's not my intention.
20    A    It's not.
21    Q    Where I'm hung up, however, is here we are
22  in 2008, and we're trying to figure out what

146

1  happened, right?  This document comes up, which we've
2  now reviewed, Exhibit 5, which is Ms. Tabb's response
3  to Mr. Addis.
4        Your testimony, as I'm understanding it, is
5  you're not sure whether or not you reviewed this
6  particular document, Exhibit 5, in advance of issuing
7  the notice.  Am I correct about that?
8    A    That's correct.
9    Q    And all I'm trying to get at -- and maybe
10  you've answered it, and I apologize if you have, but
11  give me any further clarification if you can.
12        All I'm trying to determine is how, if we
13  went back and looked at whatever file you think we
14  could look at, would we be able to determine what you
15  actually personally reviewed in making a decision
16  about whether to issue or not issue the notice of
17  termination for Ms. Tabb?
18    A    Again, I believe that good HR practice,
19  they're going to ensure that all the documentation
20  that was used for my decision is in that file, and
21  there should be something there to support what I'm
22  saying.  That's the best that I can tell you.

147

1    Q    Okay.  So taking that at face value, does
2  what you just said mean that there should be some
3  either sub file or index or something that indicates
4  in the file what you reviewed?
5    A    I don't know per se index.  I'm just saying
6  whatever relevant documentation is in the file is
7  what I used to make the final decision.
8    Q    Would you take a moment, please, to review
9  the contents of Exhibit 5, which is Ms. Tabb's
10  response to Mr. Addis, and carefully consider in
11  looking over some of this content whether or not you
12  may have seen this document some time in making your
13  decision.
14        (Witness reviews document.)
15        THE WITNESS:  I cannot say with certainty.
16        MR. CONDIT:  Okay.
17        THE REPORTER:  Could we take a quick break?
18        MR. CONDIT:  Certainly.
19        THE VIDEOGRAPHER:  We should go off the
20  record at 2:10 p.m.
21        (Recess taken.)
22        THE VIDEOGRAPHER:  We're back on the record.

148

1  The time now is 2:23 p.m.
2  BY MR. CONDIT:
3    Q    So Mr. Charles, going back to our discussion
4  prior to the break about what documents you may have
5  reviewed in your role as the official who was to
6  decide whether or not to notice Ms. Tabb's
7  termination, do you have any sense, if you don't
8  recall the specific documents, of what volume of
9  material you may have reviewed?
10    A    No, I do not.
11    Q    During what period of time were you engaged
12  in this role of the noticing official?
13        And is that the proper term by the way?
14  What's the proper term, if I'm not using the proper
15  terminology?  What was the name?
16    A    It's the -- it's just a person who makes a
17  final decision.
18    Q    Okay.  Now, what final decision did you
19  think you were making?
20    A    As to whether to uphold the proposed notice
21  of summary removal.
22    Q    And the decision, as I understand your

Case 1:06-cv-00789-PLF-JMF    Document 41-12    Filed 04/22/2008    Page 38 of 76
VIDEOTAPED DEPOSITION OF RONALD CHARLES
CONDUCTED ON THURSDAY, JANUARY 17, 2008

38 (Pages 149 to 152)

149

1  testimony, as to whether or not to summarily remove
2  Ms. Tabb was made by the then director Brenda Donald;
3  is that right?
4      A   That is correct.
5      Q   Now, during what period of time were you
6  engaged in that role as the official that would
7  review and then issue the notice?
8      A   I'm not exactly sure. I would say probably
9  within a week's time frame.
10     Q   Okay. So if the summary-removal letter was
11 issued on October 3rd, 2005, are you saying sometime
12 about a week after October 3, 2005 would have been
13 the period of time you'd have been involved?
14     A   No. I am saying the period of time that I
15 would have been involved would have been after the
16 six days that the employee had to respond, after the
17 hearing officer had a chance to review the
18 documentation and make a recommendation to me as the
19 person who makes the final decision. So one week
20 after that period of time.
21     MR. CONDIT: All right. Let me show what
22 you I'll mark as the next deposition exhibit.

150

1      (Whereupon, Plaintiff's Exhibit 6 was marked
2  for identification and attached to the transcript.)
3      MR. CONDIT: Mr. Charles, you've been
4  handed what has been marked deposition Exhibit 6.
5  It's a one-page letter dated November 1, 2005 to
6  Mr. Ronnie Charles from Joseph Addis, Senior, Hearing
7  Officer.
8      Q   Take a look at it please and tell me if you
9  recognize the document.
10     (Witness reviews document.)
11     THE WITNESS: I do.
12 BY MR. CONDIT:
13     Q   And what is this document?
14     A   As far as I can tell, this is the document
15 from the hearing officer, Mr. Joseph Addis, making
16 his recommendation to the deciding official.
17     Q   Okay. And as I understand it, his decision
18 as hearing officer is to recommend to you to uphold
19 the summary removal; is that correct?
20     A   As stated in this memo, correct.
21     Q   Now, when you received this letter, did you
22 receive with it or shortly after, the information

151

1  that Mr. Addis looked at or considered before making
2  his decision?
3      A   I'm sure I did receive the packet, probably
4  from HR.
5      Q   Would this have been a separate packet of
6  information? And by that I mean separate from the
7  personnel file or other routine personnel
8  documentation.
9      A   I would think so. It probably could have
10 included the actual personnel file.
11     Q   Do you know whether or not the information
12 reviewed and relied upon by Mr. Addis would be
13 designated in some way in the file?
14     A   I think that this probably represents the
15 designation of his review.
16     Q   Okay. Is there any information in this
17 letter which we marked as Exhibit 6 that indicates
18 specifically what files or specific documents
19 Mr. Addis reviewed?
20     A   The only specificity would go toward
21 Ms. Tabb's employment files, and I would think that
22 that would probably be the personnel file he's

152

1  referring, to and any other official agency
2  documents.
3      Q   Do you know what he's referring to when he's
4  talking about other "official agency documents and
5  affidavits"?
6      A   I would think he would probably be talking
7  about the employee relations file that's separate
8  from the official personnel file.
9      Q   And do you know that for a fact that he's
10 talking about the employee relations file?
11     A   I don't know that for a fact.
12     Q   Other than receiving this letter, which
13 we've marked as Exhibit 6, from Mr. Addis, did you
14 have any other communications with Mr. Addis about
15 Ms. Tabb's case?
16     A   No. None that I can remember.
17     Q   No e-mail communication with Mr. Addis?
18     A   Not that I can recall.
19     Q   If you had had any e-mail communication with
20 Mr. Addis, would you still have it today?
21     MR. BRUCKHEIM: Objection as to form.
22     But you can answer.

Case 1:06-cv-00789-PLF-JMF Document 41-12 Filed 04/22/2008 Page 39 of 76
VIDEOTAPED DEPOSITION OF RICHARD CHARLES
CONDUCTED ON THURSDAY, JANUARY 17, 2008

39 (Pages 153 to 156)

153
1    THE WITNESS: I doubt it.
2  BY MR. CONDIT:
3    Q   Why do you doubt it?
4    **A   Because of the way the District archives**
5  **e-mails. If it wasn't printed and put in as a part**
6  **of the file, I doubt that we would have it. They**
7  **don't let you archive documents that long.**
8    Q   Now, but would you have separately archived
9  or saved e-mails relating to Mr. Addis's
10 communications with you or you with him?
11   **A   I doubt that. As a former employee, if I**
12 **had a e-mail file like we normally have in Outlook,**
13 **for example, that person would be deleted, because it**
14 **just junks the box up. I would not keep it.**
15   Q   So when -- strike that.
16     Now what we have in the record, in this
17 deposition at least, is we have the October 3, 2005
18 summary-removal letter, and then we have Ms. Tabb's
19 October 10, 2005 response to summary removal, and now
20 we have this October (sic) 1, 2005 letter from
21 Mr. Addis to you.
22     Does that inform you better about within

154
1  what time frame you may have considered information
2  about Ms. Tabb's case before making your decision?
3    **A   This is pretty much specific to my**
4  **description that I gave earlier, that my involvement**
5  **for the most part was upon the conclusion of getting**
6  **information from the hearing officer, yes.**
7    Q   So how long after you received this letter,
8  which we've marked as Exhibit 6, would you have made
9  your decision?
10   **A   I don't recall.**
11   Q   Does the information referenced in
12 Mr. Addis's letter to you refresh your memory at all
13 on what documents specifically you may have reviewed
14 in making the decision?
15   **A   No, just the employee relations file,**
16 **potentially, as I discussed before.**
17   MR. CONDIT: Okay. Let me show you what
18 I'll mark as the next deposition exhibit, please.
19     (Whereupon, Plaintiff's Exhibit 7 was marked
20 for identification and attached to the transcript.)
21   MR. CONDIT: Mr. Charles, I'm showing you
22 what has been marked as Deposition Exhibit 7. It is

155
1  a four-page e-mail chain with an e-mail from Deborah
2  Wilson to you dated October 26, 2005 on the top of
3  the first page.
4    Q   I'd like you to take a look at it and tell
5  me if you recognize it.
6      I will note for the record that the
7  redactions on the document were not done by the
8  plaintiff or her counsel, but by the District
9  government.
10   MR. BRUCKHEIM: He is correct.
11   (Witness reviews document.)
12   THE WITNESS: I don't recall specifically,
13 but apparently I received this e-mail.
14 BY MR. CONDIT:
15   Q   Would you have any reason to doubt that you
16 received this e-mail chain on October 26, 2005?
17   **A   No.**
18   Q   Perusing the document and looking at some of
19 the information in it, do you recall what the issue
20 was or why you would have been copied or sent this
21 e-mail?
22   **A   It talks about a lot of different things in**

156
1  **this e-mail. From what I can see from some of the**
2  **headers, it talks about critical event meetings,**
3  **which is normally something that's on the program**
4  **operations side.**
5      **And again, I think that any involvement I**
6  **may have had, based on what I can ascertain from**
7  **this, goes back to some of the things that I stated**
8  **earlier this morning when I talked about validation**
9  **of offenses as it may have related to Chapter 16,**
10 **and/or progressive discipline.**
11   Q   Okay. What information in Exhibit 7 do you
12 think speaks to those issues of validation of
13 offenses?
14   **A   Specifically the e-mail from me at 12:54**
15 **p.m. to Deborah Wilson.**
16   Q   That's on the first page there?
17   **A   Yes, it is.**
18   Q   And if I'm picking that e-mail out
19 correctly, is it the one that says, "Give Janet a
20 list of bullets that led to the offenses," and then
21 in parens, "admonishment, reprimand, termination,"
22 end of parens, "list of the" changes -- excuse me,

Case 1:06-cv-00789-PLF-JMF    Document 41-12    Filed 04/22/2008    Page 40 of 76
VIDEOTAPED DEPOSITION OF ROBERT GEARDES
CONDUCTED ON THURSDAY, JANUARY 17, 2008

40 (Pages 157 to 160)

157
1  "charges as outlined in the letter"?  Is that it?
2      A   That's what I'm talking about, yes.
3      Q   What are you referring to there?
4      A   I don't -- all I can tell you is what I just
5  described.  I'm not really sure based on the date of
6  this and what was going on at that time.
7      Q   And who is the Janet that you're referring
8  to?
9      A   Janet was then the chief of staff of the
10  agency.
11      Q   What was her last name?
12      A   Maher?  Janet Maher I think.
13      Q   Would it be Mahr, M-a-h-r?
14      A   It could be, yes.
15      Q   Or M-a-h-e-r?
16      A   I think it's M-a-h-a-r or e-r, yes.
17      Q   Okay.  What involvement did Janet Maher have
18  in the circumstances surrounding Shirley Tabb's
19  whistleblowing?
20      A   Not much to my knowledge.
21      Q   There's an e-mail on this exhibit that's
22  down at the bottom of the page and goes over to

158
1  page 2.  It's from Uma Ahluwalia to Brenda Donald,
2  copy to Mindy Good.  It says:
3          "I just spoke with Judy.  Shirley Tabb sent
4      her stuff to Judge Hogan.  He wanted
5      answers and said something to the effect
6      that this was a big mess.  She, Judy, is
7      drafting a response for him and wanted the
8      personnel information on her.  Janet is
9      pulling that together."
10          Do you see that?
11      A   I do.
12      Q   And then your later message is, "Give Janet
13  a list of bullets that led to the offenses,"
14  et cetera, right?
15      A   Right.
16      Q   So is it your understanding that the
17  information that's being pulled together is going to
18  be given to Judy?
19      A   I cannot honestly say.  There could have
20  been a conversation in between that -- before
21  respond -- I don't know.
22      Q   And who is the Judy that's being referred to

159
1  here?
2      A   That's the court monitor.
3      Q   What is her last name?
4      A   Meltzer.
5      Q   Judy Meltzer?
6      A   Yes.
7      Q   So if I'm following this e-mail chain
8  correctly, help me out here, we start out at the
9  bottom of page 1 with the message I just read from
10  Uma Ahluwalia to Brenda Donald, copy to Mindy Good,
11  which references Judy, and Shirley Tabb sending her
12  stuff to Judge Hogan, right?
13          You see that?
14      A   I do.
15      Q   That's at 9:55 in the morning, correct?
16      A   Correct.
17      Q   Then at 12:52 that same day, October 26,
18  2005, Mindy Good forwards that prior e-mail to you;
19  is that correct?
20      A   That would be correct.
21      Q   And then at 12:54 on that same day, you
22  respond to the message you received from Mindy by

160
1  sending a message to Deborah Wilson that says, "Give
2  Janet a list of bullets that lead to the offenses,"
3  et cetera; is that correct?
4      A   That is correct.
5      Q   Okay.  So it would be fair to say, would it
6  not, that given this e-mail chain, the bullets that
7  led to the offenses and the list of the charges that
8  you're referencing are supposed to be going to Judy
9  Meltzer.
10      A   I can't --
11          MR. BRUCKHEIM:  Objection as to form.
12  It's -- I mean, the e-mail does speak for itself.
13  I'll have him answer again, and also say that he can
14  testify if he has any direct knowledge as to whether
15  that information was provided to Judy or Janet or
16  anybody as far as he knows.
17          You can answer.
18          THE WITNESS:  I cannot say that this, --
19  based on what I see here, that this was intended to
20  go to Judy Meltzer.
21  BY MR. CONDIT:
22      Q   All right.  Now let's focus on the e-mail at

Case 1:06-cv-00789-PLF-JMF   Document 41-13   Filed 04/22/2008   Page 41 of 76
VIDEOTAPED DEPOSITION OF RHONDA CZARDUS
CONDUCTED ON THURSDAY, JANUARY 17, 2008

41 (Pages 161 to 164)

161
1  the very top of the page which is the same day but at
2  2:54 p.m., which is about two hours after your e-mail
3  to Deborah Wilson. Do you see that?
4      **A   I do.**
5      Q    And this says "Janet" -- excuse me.
6          It says:
7          "Janet said she didn't need this until
8      Friday. She would be meeting with Judy on
9      Monday and will take it with her then. I
10     will extract that data and provide it to
11      you and Stan prior to giving it to Janet."
12     **A   Um-hm.**
13     Q    Based on that message, is it your
14  understanding that the information about
15  Ms. Tabb's -- the personnel action being taken
16  against Ms. Tabb was intended to be given to Janet
17  Maher, and Janet Maher was going to give it to Judy
18  Meltzer?
19     **A   It's possible.**
20     Q    Is that a violation of any personnel law
21  requirements by -- and by violation, I mean in giving
22  that kind of information to an outside person such as

162
1  Judy Meltzer prior to the conclusion of the personnel
2  process?
3      MR. BRUCKHEIM: I just object as to
4  relevance and it calls for a legal conclusion. And,
5  I mean, if we're looking at the language of the
6  e-mail, I mean, it clearly says your client sent her
7  stuff to Judge Hogan initially and said that he
8  wanted answers.
9          So even if we're going to broach that topic
10  it seems apparent that your client would have waived
11  that.
12          But to the extent that you know, you know,
13  I'll allow you to answer that.
14      THE WITNESS: I'm not sure.
15  BY MR. CONDIT:
16     Q    So you're not sure if it would be a
17  violation of personnel law?
18     **A   To provide a list of offenses? Probably
19  not.**
20     Q    Okay. Can you provide me, then, the list of
21  offenses related to the list of CFSA employees who
22  were recently terminated involving the incident of

163
1  the four girls that were killed in the city? Can you
2  provide me the list of offenses?
3      MR. BRUCKHEIM: Objection as to relevance.
4      THE WITNESS: I would not.
5  BY MR. CONDIT:
6     Q    You would not?
7     **A   I would not.**
8     Q    Why not?
9     **A   I just would not.**
10     Q    You just told me that providing a list of
11  offenses would not be a violation of personnel law.
12     **A   The list of offenses in the case of the four
13  girls that recently happened in CFSA --**
14     Q    Right.
15     **A   -- have been painted across the Washington
16  Post for the last four or five days.**
17     Q    Not the list of offenses of the people who
18  were fired.
19     **A   Oh, yes, it was.**
20     Q    That's what I'm asking you.
21     **A   Well, I would not.**
22     Q    So it would be okay for you to withhold that

164
1  information now, but it was okay then for similar
2  information to be transmitted about Ms. Tabb.
3          Is that what we're saying?
4      MR. BRUCKHEIM: Objection. Richard, I'm not
5  going to have him answer a question that's clearly
6  argumentative. I mean, he's testified as to what
7  he's known.
8          Again, you know, the e-mail speaks for
9  itself. And if you're really going to broach that
10  topic, I mean, your client is going to be deposed in
11  this matter too. Clearly she sent her information to
12  Judge Hogan initially, so I fail to see how there is
13  an issue raised if, in response to Judge Hogan
14  receiving that information from your client and he
15  asked CFSA for information, that they provide
16  information to him.
17      MR. CONDIT: Well, it would depend, would it
18  not, on what information was sent to Judge Hogan,
19  correct?
20      MR. BRUCKHEIM: Well, it's -- it might, you
21  know, but you're painting this in a light which, you
22  know, is quite different from the facts as we see

165

1  them here. And again, we're getting into some
2  argumentative questions, especially in light of the
3  recent events.
4      So I'd ask you to rephrase or find
5  another subject.
6  BY MR. CONDIT:
7      Q   Okay. So is it okay to provide a list of
8  offenses relating to an employee's personnel
9  situation prior to the conclusion of that personnel
10  matter, yes or no?
11      MR. BRUCKHEIM: Again, I'm going to object,
12  and I'm not going to have him answer that question as
13  phrased. Because again, it's clear that this
14  information was requested by the judge.
15      MR. CONDIT: On what basis would you
16  instruct him not to answer? I'd like a legal basis
17  on the record in case I need to call the judge on
18  this.
19      MR. BRUCKHEIM: A legal basis on the record
20  is if a question as phrased is general and vague in
21  terms of it's invoking a policy or a question about,
22  you know, whether or not generally information would

166

1  be provided at all.
2      And as established here, you know, by the
3  facts already, the information was provided because
4  the judge requested that the information be provided.
5      So again, if the question is phrased in
6  accordance with the testimony and the evidence that's
7  already in the record, and that's -- and also that is
8  which clearly reflected in the exhibit that you
9  introduced, then I'll have him answer it.
10      But in terms of having him answering, you
11  know, these general questions which clearly don't
12  relate to what we have here, you know, I'm not going
13  to have him do that.
14      MR. CONDIT: Okay. Well, I'm not agreeing
15  with you at the moment, but I'll follow your
16  suggestion for a second.
17      Q   Mr. Charles if I can draw your attention
18  back down to the bottom of page 1 of Exhibit 7.
19      A   Um-hm.
20      Q   Now, that e-mail message from Uma Ahluwalia
21  to Brenda Donald at 9:55 a.m. On 10-26-05 says, in
22  part, "Shirley Tabb sent her stuff to Judge Hogan."

167

1      Do you see that?
2      A   I do.
3      Q   Okay. Now, it doesn't say what stuff, does
4  it.
5      A   No, it doesn't.
6      Q   Okay. Then it says, the next sentence:
7  "He wanted answers and said something to
8  the effect that this was a big mess."
9      Do you see that.
10      A   I've seen that.
11      Q   Okay. Then it says:
12  "She, Judy, is drafting a response for him
13  and wanted the personnel information on
14  her."
15      Meaning Shirley Tabb; would that be your
16  understanding?
17      A   Yes.
18      Q   Okay. And then it says:
19  "Janet is pulling that together."
20      Okay. Now, do you interpret, from those
21  words that I've just read to you, that Judge Hogan is
22  asking for Shirley Tabb's personnel information?

168

1      A   It could be interpreted that way.
2      Q   It could be interpreted that way.
3      But is that how you interpret it?
4      A   For the first time seeing this after two and
5  a half years, it could be.
6      Q   Can you tell me any other situation that
7  you're familiar with, given all the certifications
8  that you have as a personnel official, et cetera,
9  where someone's personnel information in terms of
10  bullets or lists of offenses or lists of charges was
11  provided to any person outside the agency prior to
12  the personnel matter being concluded?
13      MR. BRUCKHEIM: Again, I'm going to object
14  as to relevance.
15      But you can answer if you know.
16      THE WITNESS: No.
17  BY MR. CONDIT:
18      Q   Sorry?
19      A   No.
20      Q   So there is no case that you can recall of
21  that nature.
22      A   Not in my experience.

Case 1:06-cv-00789-PLF-JMF    Document 41-12    Filed 04/22/2008    Page 43 of 76
VIDEOTAPED DEPOSITION OF RICHARD CHARLES
CONDUCTED ON THURSDAY, JANUARY 17, 2008

43 (Pages 169 to 172)

169

1    THE VIDEOGRAPHER:  Counsel, we have two
2  minutes left on the videotape.  Do you want me to go
3  ahead and change now while your research or do you
4  want to wait?
5    MR. CONDIT:  No, I want to wait.  Thank you.
6    Let me mark the next exhibit, please.
7    (Whereupon, Plaintiff's Exhibit 8 was marked
8  for identification and attached to the transcript.)
9    MR. CONDIT:  Mr. Charles, you've been handed
10  what's been marked Exhibit 8.  This is a one-page
11  e-mail chain with the e-mail on top of the page from
12  you to Deborah Wilson, and then two messages below
13  that.
14    Q    Would you please take a look at it and tell
15  me if you've seen it before?
16    A    **Apparently I have.**
17    Q    Well, do you believe you've seen it before?
18    A    **Yes.**
19    Q    Okay.  And the messages are from
20  October 31st, 2005.  Do you see that?
21    A    **I do.**
22    Q    All during the period of approximately,

170

1  looks like around 11:30 to a little after 12:00 noon.
2    Do you see that?
3    A    **Um-hm, I do.**
4    Q    The message on the very bottom of page 1
5  from Janet Maher to LaTonya Bryant copied to Deborah
6  Wilson -- do you see that?
7    A    **I do.**
8    Q    It says:
9    "Need today the personnel history
10    chronology of Shirley Tabb."
11    Do you see that?
12    A    **I do.**
13    Q    Who is LaTonya Bryant?
14    A    **She is my executive assistant.**
15    Q    And why was she asking for that information
16  at that time?
17    MR. BRUCKHEIM:  Objection.  Clearly calls
18  for speculation.  I'm not going to have him
19  speculate.  If you rephrase the question so he won't
20  have to speculate, I'll tell him to answer.
21  BY MR. CONDIT:
22    Q    Is LaTonya Bryant your executive assistant,

171

1  you testified?
2    A    **That's correct.**
3    Q    Does she take direction from you on a
4  day-to-day basis?
5    A    **She does.**
6    Q    Do you know why LaTonya Bryant was asking
7  for that information that is sought in this e-mail
8  message?
9    A    **It's probably because I was not available.**
10    MR. BRUCKHEIM:  And I'm sorry, Richard, if I
11  could just make a clarification.  The question was do
12  you know why LaTonya Bryant was asking for that
13  information.
14    I think from the e-mail it appears that
15  Janet Maher was asking about that information but
16  LaTonya Bryant was a recipient of that request of
17  e-mail.
18    MR. CONDIT:  Thank you.  You're correct.
19    Q    So Janet Maher may have been asking for the
20  information from LaTonya Bryant because you were not
21  available?  Is that a possibility?
22    A    **Yes.**

172

1    Q    Okay.  Then the next e-mail in the chain as
2  we see it on the page, going from the bottom to the
3  top, is from Deborah Wilson to Sam Spaght and you.
4  And it says:
5    "Janet is asking for Shirley Tabb's
6    personnel history.  Let me know when I can
7    send it."
8    Do you see that?
9    A    **I do.**
10    Q    And then the very next message, which is at
11  the very top of the page, is from you to Deborah
12  Wilson and Sam Spaght, and you say, "Send it."
13    Do you see that?
14    A    **I do.**
15    Q    What was your understanding of who would be
16  the ultimate recipients of the information about
17  Shirley Tabb's personnel history?
18    A    **The requester from this e-mail.**
19    Q    And who is that?
20    A    **Janet Maher.**
21    Q    Okay.  And what did you understand, if you
22  did at all, what Ms. Maher was going to do with that

Case 1:06-cv-00789-PLF-JMF    Document 41-12    Filed 04/22/2008    Page 44 of 76
VIDEOTAPED DEPOSITION OF RONNIE CHARLES
CONDUCTED ON THURSDAY, JANUARY 17, 2008

44 (Pages 173 to 176)

173

1  information?
2  **A   I don't recall.**
3  Q   Does the prior exhibit tell you anything
4  about that? Inform you in any way? Refresh your
5  recollection?
6  **A   No.**
7  Q   So you don't think this is the information
8  that was going to be given to Judy Meltzer?
9  **A   Not that I recall. I don't know.**
10  Q   Do you think there was be a separate file
11  which would indicate what information was given to
12  Judy Meltzer?
13  **A   I don't know.**
14  Q   Now, why did you say to send the information
15  to Janet Maher as is reflected in this e-mail
16  message?
17  **A   She's the chief of staff, ranks higher than**
18  **me, and was an internal executive.**
19  Q   Did you ever see whatever information was
20  that was put together as the personnel history or
21  chronology for Ms. Tabb that's referenced in
22  Exhibit 8?

174

1  **A   I do not recall.**
2  Q   But you suggested, based on the previous
3  message, that it be a list of offenses and bullets of
4  certain information.
5  Do you recall seeing the work product from
6  that suggestion?
7  **A   I do not recall at this time.**
8  Q   Would the personnel history chronology that
9  was pulled together be part of the personnel file or
10  any file maintained by human resources as far as you
11  know?
12  **A   It wouldn't be the personnel file, but it**
13  **could be in the employee and labor relations file.**
14  Q   Labor relations file. Okay.
15  MR. CONDIT: And Counsel, do you know if
16  we've been provided with the employee relations file
17  that Mr. Charles has been referring to several times?
18  MR. BRUCKHEIM: I do not know. As far as I
19  know, you've been provided with everything that's
20  been contained in any kind of file that was kept for
21  Ms. Tabb related to her personnel file and other
22  files kept, you know, in conjunction with that.

175

1  So I believe you have all of that
2  information. I will double check and see.
3  I trust you're interested in the chronology
4  that's referenced in this e-mail. That's the
5  ultimate --
6  MR. CONDIT: Right, yes but also, because
7  the witness has reflected several times on this, it
8  sounds like a smaller subset file of the employee
9  relations file. If there is such a separate file,
10  even if somehow it were mixed in with the material
11  provided, it would probably be informative to have it
12  as it exists.
13  And if it's burdensome in some way I'd be
14  happy to come look at it or do whatever would make it
15  easier, but --
16  MR. BRUCKHEIM: I will inquire, and if we
17  have it, then it will be produced.
18  MR. CONDIT: Okay. Thank you.
19  Why don't we take a break to allow a change
20  of the tape then at this time.
21  THE VIDEOGRAPHER: This is end of Tape
22  No. 2. We go off the record as of 2:58 p.m.

176

1  (Recess taken.)
2  THE VIDEOGRAPHER: Back on the record. Here
3  marks the beginning of Tape No. 3 in the deposition
4  of Ronnie Charles. The time is now 3:10 p.m.
5  MR. BRUCKHEIM: Shall I memorialize what we
6  discussed?
7  MR. CONDIT: Please.
8  MR. BRUCKHEIM: Yeah. Off the record
9  Mr. Condit and I were discussing how we might be able
10  to distinguish of all the documents that have been
11  produced to plaintiff in this case, exactly which of
12  those documents were found in the -- in Ms. Tabb's
13  employee relations file.
14  To answer that question, I am going to
15  consult with Deborah Wilson from human resources
16  who will retrieve a copy of Ms. Tabb's employee
17  relations file.
18  And over the phone she will tell me what documents
19  she sees in there. And I will look at the documents
20  that have been produced to Mr. Condit and basically
21  highlight which of those documents appear in the
22  employee relations file and then let him know as soon

Case 1:06-cv-00789-PLF-JMF    Document 41-12    Filed 04/22/2008    Page 45 of 76
VIDEOTAPED DEPOSITION OF ROBERT CHARLES
CONDUCTED ON THURSDAY, JANUARY 17, 2008

45 (Pages 177 to 180)

177
1  as I get all that information.
2       So hopefully that will run as smoothly as I
3  have just described it on the record.
4       MR. CONDIT:  Thank you.
5       MR. BRUCKHEIM:  And we'll try to get that
6  done before close of business tomorrow.
7       MR. CONDIT:  Thank you.  All right.  Let's
8  go on to the next exhibit, please
9       (Whereupon, Plaintiff's Exhibit 9 was marked
10 for identification and attached to the transcript.)
11      MR. CONDIT:  Mr. Charles, you're being
12 handed what has been marked as Exhibit 9.  It is an
13 October 31, 2005 chronology of events pertaining to
14 Shirley Tabb.  It's two pages.
15   Q   If you would take a look at it, please, and
16 tell me if you recognize it.
17      (Witness reviews document.)
18      THE WITNESS:  Not specifically.
19 BY MR. CONDIT:
20   Q   Do you know or have an idea of who may have
21 prepared this document?
22   **A   It would have been the Office of Human**

178
1  **Resources in CFSA.**
2    Q   And why do you think the Office of Human
3  Resources would have prepared the document we see as
4  Exhibit 9?
5    **A   Because it contains confidential employee**
6  **information, and there is nowhere else in the**
7  **organization where that information would be stored.**
8    Q   But as you sit here today, you do not
9  specifically recognize or recall Exhibit 9; is that
10 right?
11   **A   Not specifically, no.**
12      MR. CONDIT:  Let's go on to the next
13 exhibit.
14      (Whereupon, Plaintiff's Exhibit 10 was
15 marked for identification and attached to the
16 transcript.)
17      MR. CONDIT:  Mr. Charles, you've been handed
18 what has been marked Exhibit 10.  It is a November 3,
19 2005 letter from yourself to Shirley Tabb, subject:
20 "Notice of Final Decision Summary Removal."
21   Q   Please take a look at it and tell me if you
22 recognize it.

179
1    **A   I do.**
2    Q   And is this your letter?
3    **A   It is.**
4    Q   So you prepared this letter?
5    **A   The letter was prepared by human resources**
6  **and submitted for my signature.**
7    Q   Who in human resources prepared the letter?
8    **A   This would have been Deborah Wilson or**
9  **Kleartis Jackson in conjunction -- both of them**
10 **probably did.**
11   Q   In the signature block there, is that your
12 signature?
13   **A   That is correct.**
14   Q   Now, this is the letter that advises
15 Ms. Tabb that you've made the determination to
16 sustain the summary removal; is that correct?
17   **A   That's correct.**
18   Q   Now, I don't want to belabor the terrain
19 that we've already been through, but just so the
20 record is clear, is it correct to say that in
21 reaching the determination reflected in Exhibit 10
22 you reviewed the employee relations file, and did you

180
1  review anything else?
2    **A   I would have reviewed the contents of the**
3  **employee relations file.**
4    Q   That would have been the primary
5  documentation that you would have reviewed?
6    **A   Yes.**
7    Q   So other than the documents that are part of
8  the employee relations file, would there have been
9  any other documents that you would have reviewed
10 leading up to making the decision reflected in
11 Exhibit 10?
12   **A   I cannot recall any other documents at this**
13 **time that were utilized.**
14   Q   In the letter, second paragraph, you
15 summarize what the bases are for upholding the
16 determination of summary removal, and that
17 information is in bold.  Do you see that?
18   **A   I do.**
19   Q   Now, did you intend for that information to
20 be bolded in the letter?
21   **A   I don't think that it was I intended for it.**
22 **I think that this is procedurally the template that's**

Case 1:06-cv-00789-PLF-JMF   Document 41-12   Filed 04/22/2008   Page 46 of 76
VIDEOTAPED DEPOSITION OF RHONDA EARDLEY
CONDUCTED ON THURSDAY, JANUARY 17, 2008

46 (Pages 181 to 184)

181
1  given to agencies by now what's called the D.C.
2  Department of Human Resources.
3     Q   Okay.  So the bolding of the reasons for the
4  action is a part of the template that's used for
5  these kinds of documents; is that right?
6     A   I believe so, yeah.
7     Q   All right.  Bolding aside, how did you
8  determine what language to use in describing the
9  reasons for upholding the decision of summary
10  removal?
11    A   Based on the language that was used in the
12  notice of proposal by Ms. Donald, and as instructed
13  by human resources.
14    Q   What instructions did you receive from human
15  resources?
16    A   When I say "instructions," they format the
17  letter, they provide the language for the most part.
18    Q   So did you write the reasons that are listed
19  in the second paragraph of Exhibit 10, or did someone
20  else write those?
21    A   Someone else wrote those.  Human resources.
22    Q   And if Kleartis Jackson was not in the Human

182
1  Resources Department at that time, would it have been
2  Deborah Wilson that would have written this?
3     A   That's correct.
4     Q   Prior to issuing the letter that we see as
5  Exhibit 10, did you make any effort to verify any of
6  the factual support, if any, for the violations that
7  are stated in the second paragraph?
8     A   Yes, I would have reviewed the employee
9  labor relations file of Ms. Tabb.  I'm sure I would
10  have done that.
11    Q   Aside from the labor relations file, would
12  you have relied on any statements from any
13  individuals in support of the action being taken
14  against Ms. Tabb?
15    A   For the most part that I can remember, only
16  any statements that were a part of the record of the
17  employee and labor relations file.
18    Q   So it would have to be in the labor
19  relations file to have been considered; is that
20  correct?
21    A   I'm not saying that that's correct.  I'm
22  saying that, as far as I can recall, I based my

183
1  decision on the information that was presented to me
2  in the employee and labor relations file.
3     Q   Okay.  I understand.
4         Did you spend any, you know, significant
5  amount of time reviewing this letter or the
6  information contained in it prior to signing off and
7  having it sent to Ms. Tabb?  And by significant
8  amount of time I mean, you know, did you spend an
9  hour, or did you spend 15 minutes, or what do you
10  recall about that?
11    A   I don't recall the specific amount of time.
12        But I do know that from a personal
13  standpoint, anytime a decision is made that's going
14  to affect someone's livelihood, I'm going to spend
15  the necessary amount of time to support my decision.
16  So I would say yes.
17    Q   Okay.  Now, you were involved in discussions
18  with Ms. Donald and others pertaining to the decision
19  of whether or not to initially summarily remove
20  Ms. Tabb from her position; isn't that correct.
21  Wasn't that your testimony earlier today?
22    A   I believe I was in discussions with

184
1  Ms. Donald, yes.
2     Q   Now, given that fact, why would you be put
3  in the position of being the deciding official for
4  the determination of whether or not to sustain the
5  charge or charges that are supposed to form the basis
6  for summary removal?
7         MR. BRUCKHEIM:  I would just object as to
8  the "why" portion.  If you can restate so that he
9  doesn't have to speculate.  Like if he knows how he
10  was in that position or -- then I'll let him answer.
11  BY MR. CONDIT:
12    Q   Well, is it appropriate for someone who's
13  involved in the initial action to also be the
14  deciding official?
15    A   Well, when you say "initial action," I want
16  to clarify that my discussions dealt with
17  disciplinary in general and from the perspective of
18  coordinating with HR where are we exactly from a
19  progressive-disciplinary standpoint.  Those were the
20  initial discussions with Ms. Donald.
21    Q   And you didn't discuss anything else with
22  Ms. Donald?

Case 1:06-cv-00789-PLF-JMF    Document 41-13    Filed 04/22/2008    Page 47 of 76
VIDEOTAPED DEPOSITION OF ROBERT CHARLES
CONDUCTED ON THURSDAY, JANUARY 17, 2008

47 (Pages 185 to 188)

185

1    A   Initial discussions never -- there was no
2  discussion from my standpoint about summary removal
3  with Ms. Donald initially.  I didn't have enough
4  information or anything else in initial discussions
5  to talk about summary removal.
6    Q   And you've already testified I guess -- but
7  I'd like to make sure of this -- that Ms. Donald's
8  statement that you were involved in drafting the
9  summary-removal letter is incorrect?  Is that right?
10  Do I understand you correctly?
11   A   That's correct, that would have been HR,
12  human resources.
13   Q   But as you sit here today, you can't recall
14  how much time you might have spent reviewing
15  information associated with making the decision
16  that's reflected in Exhibit 10.
17   A   No, I can't, not specifically, but a
18  considerable amount of time.
19   Q   Now, do you know whether or not Ms. Tabb,
20  after her termination, sought unemployment benefits?
21   A   I don't recall.
22   Q   Would you typically be involved in any way

186

1  in matters involving employees seeking unemployment
2  benefits after they're terminated?
3    A   In my role as deputy of human resources,
4  absolutely.  Occasionally as the deputy for
5  administration.
6    MR. CONDIT:  Okay.  Let me show you the next
7  exhibit.
8    (Whereupon, Plaintiff's Exhibit 11 was
9  marked for identification and attached to the
10  transcript.)
11   MR. CONDIT:  Mr. Charles, you've been
12  handed what has been marked as Deposition Exhibit 11.
13  It is captioned on the top "Determination By Claims
14  Examiner."  It's from the Department of Employment
15  Services, Central Adjudication Branch, dated
16  November 17, 2005.  The claimant Shirley Tabb, the
17  employer Child and Family Services agency.
18   Q   Please tell me if you've seen this document
19  before.
20   A   Not that I can recall.  I may have, but I
21  just don't recall.
22   Q   And who would have handled the claim by

187

1  Ms. Tabb for unemployment benefits at this time,
2  November of 2005?
3    A   I'm not sure.
4    Q   Well, do you know what part of the human
5  resources organization would have handled it?
6    A   It probably would have been the benefits
7  section I would think.
8    Q   And at the time, Mr. Spaght was over that
9  section?
10   A   I believe so, yes.
11   Q   Based on your experience with unemployment
12  matters, do you know what it means when it says,
13  under "Findings of Fact" -- well, it's checked off --
14  "Not discharged for misconduct"?  Do you know what
15  that means?
16   MR. BRUCKHEIM:  I would just object and just
17  ask him to clarify that if you know personally what
18  that means, when he's just testifying on behalf of
19  his own personal knowledge and not as to what it
20  means in a grand scheme of things.
21   MR. CONDIT:  I asked him based on his
22  experience with unemployment matters.

188

1    MR. BRUCKHEIM:  Okay.
2    If you know, you can answer.
3    THE WITNESS:  Just based on what I'm reading
4  here.  "Not discharged for misconduct."
5  BY MR. CONDIT:
6    Q   So you don't have any other knowledge or
7  information about what that particular phrase or
8  determination means?
9    A   No.
10   MR. CONDIT:  Let me show you the next
11  exhibit.
12   (Whereupon, Plaintiff's Exhibit 12 was
13  marked for identification and attached to the
14  transcript.)
15   MR. CONDIT:  Mr. Charles, you've been handed
16  what has been marked Deposition Exhibit 12.  This is
17  a letter from Deborah Wilson of human resources to
18  the Office of Administrative Hearings dated
19  December 21, 2005.  It's indicated at the bottom of
20  the letter that it's copied to you.
21   Q   Please take a look at it and tell me if you
22  recognize it.

189

1    A    I do today.
2    Q    I'm sorry?
3    A    I do today.
4    Q    Okay.  You recall seeing this document
5  before?
6    A    No.
7    Q    No.  Does anything about the content of the
8  document refresh your memory on the issue of Ms. Tabb
9  seeking unemployment benefits?
10    A    No.
11    Q    Is there any other documentation or
12  information that would fresh you on that subject?
13    A    No, sir.
14    Q    I'm sorry?
15    A    No.
16    **(Whereupon, Plaintiff's Exhibit 13 was**
17  **marked for identification and attached to the**
18  **transcript.)**
19    MR. CONDIT:  Mr. Charles, you've been handed
20  what has been marked Deposition Exhibit 13.  It is a
21  one-page appears to be a statement.  At the top of
22  the page it says "Joanne Vaughn, Supervisory Social

190

1  Worker."  At the bottom it appears to be signed
2  "JoAnn Vaughn, LICSW, Supervisory Social Worker."
3    Q    Please take a look at it and tell me if
4  you've seen this document before.
5    (Witness reviews document.)
6    THE WITNESS:  I may have seen it before.
7  BY MR. CONDIT:
8    Q    Do you know whether or not this document was
9  one of the documents you reviewed leading up to your
10  decision to uphold the summary removal of Ms. Tabb?
11    A    I'm not sure.
12    Q    Is there any information or documentation
13  that would refresh your recollection as to what role
14  this document may have played in your
15  decision-making?
16    A    Not specifically, no.
17    Q    If Exhibit 13 was part of the employee
18  relations file that you've been generally describing
19  through your testimony today, would it likely, then,
20  have been a document that you reviewed?
21    A    If it had been a part of the file you said?
22    Q    Yes.

191

1    A    Then I could have, yes.  I'm sure I would
2  have.
3    Q    Looking at the document today and seeing
4  some of its content, do you recall at all what role
5  JoAnn Vaughn played in the whole evaluation of
6  Shirley Tabb's case?
7    A    No.
8    MR. CONDIT:  Let's go off the record for
9  about five minutes.  We may be just about done.
10    THE VIDEOGRAPHER:  We should go off the
11  record as of 3:31 p.m.
12    (Recess taken.)
13    THE VIDEOGRAPHER:  We're back on the record.
14  The time's now 3:44 p.m.
15  BY MR. CONDIT:
16    Q    Mr. Charles, do you recall earlier in your
17  testimony today we discussed the D.C. Personnel
18  Regulations, and I showed you a copy of an exhibit of
19  those regulations which was from Ms. Wilson's
20  deposition?
21    A    Yes.
22    **(Whereupon, Plaintiff's Exhibit 14 was**

192

1  **marked for identification and attached to the**
2  **transcript.)**
3  BY MR. CONDIT:
4    Q    I'm going to now show you, properly marked
5  as Exhibit 14 for this case, those same regulations.
6  And I'd just like you to confirm that these are the
7  personnel regulations that you were looking at and
8  have been referring to in our discussion today.
9    (Witness reviews document.)
10    THE WITNESS:  Yes.
11  BY MR. CONDIT:
12    Q    So Exhibit 14 a an accurate reflection of
13  the personnel regulations that you were referring to
14  earlier today?
15    A    Correct.
16    Q    Now, also earlier today we were talking
17  about external communications and in particular the
18  context was Ms. Tabb's communications with the
19  Mayor's Office, for example, or other D.C. agencies
20  and the fact of whether or not those were considered
21  external communications.
22    Do you recall that discussion?

193

1    A   Yes, I do.
2    Q   Would Ms. Tabb's communications with Judge
3  Hogan, who is the judge in the LeShawn class-action
4  suit, also be considered, in your view, an external
5  communication?
6    A   Yes.
7        MR. CONDIT:  Let me mark the next exhibit,
8  please.
9        (Whereupon, Plaintiff's Exhibit 15 was
10  marked for identification and attached to the
11  transcript.)
12       MR. CONDIT:  Mr. Charles, you've been
13  handed what has been marked deposition Exhibit 15.
14  It is a section of the D.C. law on Whistleblower
15  Protection for Employees of Contractors and
16  Instrumentalities of the District Government.
17       In particular this is Section 1-615.58
18  entitled, "Employee responsibilities."
19    Q   I'd like you to take a look at it and tell
20  me if you recognize it at all.
21       (Witness reviews document.)
22       THE WITNESS:  I haven't read it recently, so

194

1  no.
2  BY MR. CONDIT:
3    Q   Did the section of the Whistleblower
4  Protection Act that we see as Exhibit 15 or any other
5  part of that act play any role in your decision
6  regarding whether or not to sustain Ms. Donald's
7  decision to summarily remove Ms. Tabb from her
8  position?
9        MR. BRUCKHEIM:  Objection as to form.
10       You can answer.
11       THE WITNESS:  Not based on any information
12  that -- anything I can recall, no.
13  BY MR. CONDIT:
14    Q   Mr. Charles, have you been asked by anyone
15  to determine whether you have records that might be
16  responsive or documents that might be responsive to
17  any discovery in this case?
18    A   Not that I can remember specific from me.
19  If something came in, it probably would have come in
20  to the agency head and then given to HR and general
21  counsel to respond to.
22    Q   Do you typically maintain a calendar of any

195

1  kind that records your meetings, appointments and
2  that sort of thing?
3    A   Yes.
4    Q   In 2005 did you maintain a calendar?
5    A   Yes.
6    Q   Do you know whether or not you have a copy
7  of your calendar from 2005?
8    A   I do not know.
9    Q   If your calendar from 2005 existed, what
10  form would it be in and where might it be?
11    A   It would be in an automated form from
12  Microsoft Outlook I believe is where my calendar
13  would be.
14    Q   Okay.  And is that something that would be
15  on your computer?
16    A   If not on my computer, maybe archived on a
17  District server.
18    Q   Aside from your calendar, do you maintain a
19  journal or any kind of record of activities,
20  job-related activities that you engage in?
21    A   The calendar would probably be the most
22  accurate thing that I would use, tool that I would

196

1  use.
2    Q   Do you typically put any kind of notations
3  on your calendar beyond just the fact that you have a
4  particular appointment?
5    A   Generally just the fact that I had an
6  appointment is generally what you'll find.
7    Q   In 2005 did you have an assistant?
8    A   Yes.
9    Q   Who was that?
10    A   LaTonya Bryant.
11    Q   And is she your assistant today?
12    A   Yes, she is.
13    Q   Now, did Ms. Bryant typically attend
14  meetings with you?
15    A   No.
16    Q   So her functions were separate from yours on
17  a day-to-day basis?
18    A   Correct.
19    Q   Would she at any point in time either take
20  notes for you or take information in the form of your
21  notes and file them in any way?
22    A   No.

197

1    Q   In terms of the files that you maintain in
2  your direct possession and office, what kinds of
3  files do you maintain?
4    **A   Budget files, LeShawn files, contract files,**
5  **Medicaid-related files, revenue type of files. Those**
6  **are the type of files that I maintain.**
7    Q   And when you say you maintain LeShawn files,
8  what do you mean?
9    **A   Implementation plan, bench marks, that type**
10 **of thing.**
11   Q   Why do you maintain those files?
12   **A   Because as a senior executive in the agency,**
13 **I should be aware of the LeShawn files -- the**
14 **modified final order; we now have an amended**
15 **implementation plan, et cetera -- because it has**
16 **impact even in my areas, even though it's not**
17 **necessarily on a program operation side.**
18   Q   Aside from the files that you just
19 described, do you maintain or think you might have
20 any files in your direct possession, either in hard
21 copy or on your computer, that pertain in any way to
22 Shirley Tabb?

198

1    A   No.
2      MR. CONDIT:  I have no further questions for
3  you at this time. Counsel for the District may have
4  questions though.  Thank you for your time.
5      THE WITNESS:  Thank you.
6      MR. BRUCKHEIM:  I do not have any questions.
7      THE VIDEOGRAPHER:  Here marks the ends of
8  Videotape No. 3 in the deposition of Ronnie Charles.
9  Going off the record.  The time is now 3:53 p.m.
10     (Signature having been waived, the
11 deposition of RONNIE CHARLES was concluded at
12 3:53 p.m.)
13
14
15
16
17
18
19
20
21
22

199

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2      I, Denice Zelma Lombard, Certified Shorthand
3  Reporter, the officer before whom the foregoing
4  proceedings were taken, do hereby certify that the
5  foregoing transcript is a true and correct record of
6  the proceedings; that said proceedings were taken by
7  me stenographically and thereafter reduced to
8  typewriting under my supervision; and that I am
9  neither counsel for, related to, nor employed by any
10 of the parties to this case and have no interest,
11 financial or otherwise, in its outcome.
12     IN WITNESS WHEREOF, I have hereunto set my
13 hand and affixed my notarial seal this 1st day of
14 February, 2008.
15 My commission expires April 30, 2008.
16
17
18 _____
19 NOTARY PUBLIC IN AND FOR
20 THE DISTRICT OF COLUMBIA
21
22

200

| A |
|---|

**ability** 110:21
**able** 57:21 62:17
  63:19 71:8
  110:18 123:6
  144:17 146:14
  176:9
**absolutely** 60:20
  95:21 122:14
  186:4
**abuse** 88:22
  104:10 128:3
  129:8
**access** 110:8,14
  110:18
**accurate** 192:12
  195:22
**acknowledged**
  45:16
**acquire** 16:12
  28:4
**acquired** 26:16
**act** 19:15,18 20:1
  20:5,11,14,21
  21:2,3,5,11,14
  21:22 22:7,10
  194:4,5
**acting** 137:8
**action** 40:5 41:12
  41:13 50:5
  92:20 93:6
  94:20 111:2
  118:19 161:15
  181:4 182:13
  184:13,15
**actions** 37:13 42:6
  62:19 76:20
  91:4 128:3
  129:7 136:1
  140:9
**activities** 71:22
  84:21 97:9
  195:19,20
**actual** 28:19
  45:11 81:2 98:5
  132:1 151:10
**Addis** 4:18 5:3
  137:7 138:7

139:10,15 142:4
146:3 147:10
150:6,15 151:1
151:12,19
152:13,14,17,20
153:21
**Addis's** 138:14
153:9 154:12
**addition** 24:1
87:10
**address** 9:14,16
50:1 57:21
**addressed** 142:18
**adequate** 63:18
**Adjudication**
186:15
**administered**
16:5
**administration**
24:5,7 84:22
92:19 186:5
**administrations**
24:1 25:4
**administrative**
6:2 25:9 188:18
**administrator**
137:9
**administrators**
113:15
**admonished**
126:11
**admonishment**
126:15 156:21
**admonition** 4:9
41:16,18 43:5
45:19 46:1
74:15 76:1,6,14
76:22 77:6,8
78:1 80:1,4
81:12,18,21
82:10,21 83:18
83:22 84:2
88:17 90:2,18
90:18 91:11,12
92:5,8,10,14,15
92:19,20 93:2,5
93:8,22 94:8,15
94:18 104:2,7

136:2
**admonitions**
42:16
**Adoptive** 85:1
**advance** 14:4
146:6
**advantage** 138:2
**adverse** 40:5
92:20 93:3,6
94:2
**advice** 50:1 76:2,5
**advise** 35:11 73:9
124:10
**advises** 179:14
**advisor** 84:1
**affairs** 85:3
**affect** 183:14
**affidavits** 152:5
**affixed** 199:13
**afternoon** 116:2,3
**agencies** 53:3
91:13,13 103:11
181:1 192:19
**agency** 8:19 16:21
17:5 24:15 25:9
25:13 26:2 28:4
34:20 37:17
38:8 48:14,17
52:2 53:7,8,13
53:21 54:5
57:20 67:2,7,22
68:4 69:1,20,22
71:16 72:12,14
72:15,18 76:19
80:6 81:1,2 82:4
82:22 83:15
87:12 96:2,18
96:22 97:1,9
121:21,22 122:4
122:9 123:2
124:7 134:20
135:10,11
136:13 140:2
152:1,4 157:10
168:11 186:17
194:20 197:12
**agency's** 49:16
97:4,11

**agendas** 114:7,12
114:16
**ago** 17:12 39:4
46:17 70:8,8
85:9 96:15
142:11
**agree** 62:16 63:16
105:21,22 106:1
**agreed** 102:20
**agreeing** 166:14
**agreement** 2:11
60:5,12
**ahead** 169:3
**Ahluwalia** 4:13
105:12 107:4,18
108:1,15 109:7
109:20 110:7
158:1 159:10
166:20
**Alexandria** 67:3
**allegations** 61:12
63:18 140:12
144:21
**alleged** 38:17 65:2
73:21 80:1,4
103:6 125:9
**allegedly** 92:2
134:13
**allow** 69:9 162:13
175:19
**amended** 197:14
**America** 68:5
**Americans** 19:22
20:5
**amount** 183:5,8
183:11,15
185:18
**analyst** 45:4
**and/or** 30:22 40:9
54:13 60:6
64:22 156:10
**answer** 11:13,18
14:18 15:8
26:22 27:12
28:10 30:2,9
31:13,14 32:1
32:16 34:5
35:17 38:4 51:7

56:21 59:6 62:1
62:5,13,21
63:22 65:6 78:3
79:5 80:15,21
82:16,18 89:9
91:6,8 92:12
101:11,18 102:9
109:11,15
117:13 118:14
127:2,3 130:9
130:14 134:1
144:14 152:22
160:13,17
162:13 164:5
165:12,16 166:9
168:15 170:20
176:14 184:10
188:2 194:10
**answered** 146:10
**answering** 166:10
**answers** 158:5
162:8 167:7
**anybody** 69:8
81:11 126:3
160:16
**anytime** 9:2
183:13
**anyway** 134:5
**apologize** 78:13
146:10
**apparent** 162:10
**apparently** 90:19
155:13 169:16
**appeal** 33:10,12
33:15
**appealed** 33:14
**Appeals** 33:17
59:9
**appear** 74:14
176:21
**appears** 74:13
95:13 171:14
189:21 190:1
**applies** 85:20
**apply** 53:7 54:3
60:8,22 62:10
**appointed** 137:9
140:2

201

**appointment**
196:4,6
**appointments**
195:1
**appreciate** 15:2
57:18
**approach** 88:19
**approached**
100:3
**appropriate**
184:12
**approval** 81:4
83:16
**approved** 127:13
127:14
**approving** 118:2
118:9 119:4,16
**approximately**
9:8 169:22
**April** 199:15
**archive** 153:7
**archived** 153:8
195:16
**archives** 153:4
**area** 53:18 87:11
**areas** 197:16
**argumentative**
164:6 165:2
**arrival** 84:13
**arrivals** 98:7
**arrived** 52:3
135:6
**arriving** 84:11
**articulated** 30:18
30:20
**articulation** 38:22
**ascertain** 156:6
**aside** 14:7 25:3
33:18 49:18
54:6 68:2 98:10
126:15 181:7
182:11 195:18
197:18
**asked** 11:11 35:22
36:5 99:13
109:14 117:8
164:15 187:21
194:14

**asking** 69:13 77:6
90:10 92:4,7
163:20 167:22
170:15 171:6,12
171:15,19 172:5
**aspects** 139:1
**asserted** 58:3
132:17 133:11
**assertion** 132:11
132:13
**assess** 41:19
**assessing** 60:10
75:12
**assessment** 60:21
64:21 73:4
77:14 81:16
**assigned** 134:4
139:22
**assistant** 170:14
170:22 196:7,11
**associated** 111:6
185:15
**assume** 43:9
46:16 79:9,14
106:15 145:9,11
**attached** 4:5 74:8
95:10 105:3
116:5 142:1
150:2 154:20
169:8 177:10
178:15 186:9
188:13 189:17
192:1 193:10
**attend** 70:9
111:18 138:9
139:5,11 196:13
**attendance** 54:20
55:2,5,10,16,19
56:8,10 63:2,3
63:14
**attended** 98:18
120:2 121:10
122:20
**attention** 84:17
97:8,14 98:8
117:16,19
118:20 121:14
123:9 131:11

166:17
**attorney** 3:14
12:4,11 70:14
**audible** 10:1
**August** 74:12
79:12 118:6
119:9
**authentic** 107:15
**authored** 117:10
**authoring** 117:10
**authority** 104:4
**automated** 87:3
195:11
**available** 79:15
171:9,21
**Avenue** 2:5 7:12
**avenues** 64:10
**averse** 93:22
**aware** 54:14
83:12 84:7,9
89:5,11 102:1
110:4 117:2
123:20,22
126:16 127:12
128:7 130:18
197:13
**awareness** 88:22
104:10
**a.m** 1:16 7:9
64:15,18 93:16
107:7 166:21

---

**B**

**B** 4:4
**bachelor** 15:9
**back** 44:13 64:17
76:16 82:4 89:1
93:19 104:11
115:21 118:20
125:11 136:19
146:13 147:22
148:3 156:7
166:18 176:2
191:13
**background** 15:5
16:19 52:10
58:7,18 73:15
**bag** 78:13
**bar** 19:3

**bargaining** 60:5
60:11
**based** 34:5 35:8
35:18 37:12
45:7 58:17 76:3
76:5 77:13,22
80:9 83:21 91:2
91:7 92:5,7
94:10 97:9
101:20 114:18
119:18 135:1,8
156:6 157:5
160:19 161:13
174:2 181:11
182:22 187:11
187:21 188:3
194:11
**bases** 180:15
**basic** 22:14
**basically** 20:17
22:12 33:7 57:1
72:9 89:18
176:20
**basis** 62:18 77:9
81:13,14,17,21
92:10 94:14
100:6,8 125:19
127:16 128:13
138:4 165:15,16
165:19 171:4
184:5 196:17
**Bates** 4:9,10,14
4:21 5:5,9,13,15
5:19 6:4,7
**Beaver** 9:15
**began** 35:20
**beginning** 6:5
93:18 176:3
**begins** 7:2 117:20
**behalf** 3:3,12 7:18
187:18
**belabor** 179:18
**believe** 13:4 19:20
23:18 25:17
35:19 39:5,11
40:1,3 42:3 44:9
52:2 53:1 55:18
56:14 59:18

72:2,11 76:17
82:1,9 86:3 93:3
94:4,10 95:6
100:1 104:14
107:13 108:4
112:16 114:6
116:22 122:18
124:1 127:14
128:11,17 131:1
132:1,17 134:21
135:22 136:5
138:6,18 139:19
140:18 145:14
146:18 169:17
175:1 181:6
183:22 187:10
195:12
**believed** 39:10
**bench** 197:9
**benefits** 49:11,15
185:20 186:2
187:1,6 189:9
**best** 10:4 52:17
53:2 97:12
146:22
**better** 28:5
130:14,15
153:22
**beyond** 196:3
**big** 158:6 167:8
**bit** 10:13 20:19
43:9 86:20
**blankets** 108:18
108:21
**block** 179:11
**Bobo** 26:4
**bold** 180:17
**bolded** 180:20
**bolding** 181:3,7
**bottom** 78:14
110:5,6 118:21
126:6 137:3
157:22 159:9
166:18 170:4
172:2 188:19
190:1
**boundaries** 89:17
89:18

Case 1:06-cv-00789-PLF-JMF   Document 41-12   Filed 04/22/2008   Page 53 of 76
VIDEOTAPED DEPOSITION OF RONALD CHARLES
CONDUCTED ON THURSDAY, JANUARY 17, 2008

202

**box** 153:14
**branch** 72:13
  186:15
**branches** 11:2
**break** 64:12 93:13
  115:16 147:17
  148:4 175:19
**Brenda** 1:7 4:15
  7:5 12:17 13:9
  25:13 26:5
  37:19 117:8
  120:8 136:12
  141:18 149:2
  158:1 159:10
  166:21
**briefed** 73:20
**bring** 42:12 53:22
**brink** 42:12
**broach** 162:9
  164:9
**brought** 97:9
**Bruckheim** 3:13
  7:18,18 11:16
  14:17 15:4,8
  26:20 27:10
  28:9 29:21 30:2
  30:8 31:4,22
  32:14 33:21
  34:11 35:1,15
  35:17 37:6,22
  46:9 51:5 56:18
  57:11 58:5,21
  59:5 61:21
  62:12,20 63:21
  65:4,20 66:2
  69:6 78:2 79:2
  80:11,17 82:14
  85:22 89:8 90:8
  90:14 91:5 92:4
  92:12 101:10,17
  102:8 109:10
  117:12 118:13
  130:7,13 133:22
  144:13 152:21
  155:10 160:11
  162:3 163:3
  164:4,20 165:11
  165:19 168:13

170:17 171:10
  174:18 175:16
  176:5,8 177:5
  184:7 187:16
  188:1 194:9
  198:6
**Bryant** 170:5,13
  170:22 171:6,12
  171:16,20
  196:10,13
**Budget** 197:4
**building** 84:4,8
  84:15 95:3
  97:17 98:10
  100:3 102:2
  103:19 111:7,20
  112:3 114:20
  115:7,13 122:7
  122:9,13 132:15
  132:19 133:12
  133:20 135:5,11
**buildings** 84:10
**bullet** 83:14 84:18
  85:10,13
**bulleted** 83:9
**bullets** 156:20
  158:13 160:2,6
  168:10 174:3
**burdensome**
  175:13
**bushy** 10:19
**business** 24:5
  81:3 82:22
  83:15 96:3,18
  97:4,11 177:6

_____
      **C**
**C** 3:1 4:1,22 5:22
  7:1
**calendar** 194:22
  195:4,7,9,12,18
  195:21 196:3
**call** 28:3 106:18
  130:21 165:17
**called** 48:6 130:3
  181:1
**calls** 61:22 130:7
  162:4 170:17
**campaign** 88:21

89:2 104:9,11
**can't** 46:7 101:20
  114:19 126:2
  131:4 141:4
  160:10 185:13
  185:17
**capacity** 34:17
**captioned** 186:13
**carbon-copied**
  137:2
**care** 108:22
**cared** 101:6
**carefully** 147:10
**cares** 10:22
**caretaker** 10:17
  10:21 11:4,11
**carrying** 82:22
**case** 1:6 7:7 9:13
  14:12,15 30:6
  41:20 69:17
  102:19 108:19
  109:9,21 117:7
  124:17 137:10
  138:14 144:20
  145:9 152:15
  154:2 163:12
  165:17 168:20
  176:11 191:6
  192:5 194:17
  199:10
**case-manageme...**
  87:5
**cc** 137:12,16
**cc'd** 105:13
**cell** 78:13
**Central** 186:15
**CEOs** 16:21
**certain** 174:4
**Certainly** 147:18
**certainty** 147:15
**CERTIFICATE**
  199:1
**certification**
  15:18,20 16:1,5
  16:16,18 17:1,3
  17:6 19:4,6,10
  19:12 20:7 21:9
  21:16,18,21

22:3
**certifications** 18:5
  57:15 168:7
**certified** 2:12
  19:3 199:2
**certify** 35:12
  199:4
**cetera** 83:3 87:21
  158:14 160:3
  168:8 197:15
**CFSA** 13:20 24:8
  24:9 26:8 27:19
  29:1,9 42:10,14
  50:12 52:4
  61:14,19 67:11
  67:14 68:2 69:4
  70:5,11 77:21
  84:3,8,9,15
  86:18,22 88:2,3
  88:18 89:14,16
  91:3 100:19
  101:3,7,8 102:2
  102:15,16 104:4
  108:7,10 111:1
  111:8 115:7
  123:13 126:19
  126:20 128:3
  129:20 133:10
  133:17 162:21
  163:13 164:15
  178:1
**CFSA's** 48:3
  84:22 86:8
  123:14,17
  125:13
**chain** 4:11 5:6,10
  81:3 83:1,15
  155:1,16 159:7
  160:6 169:11
  172:1
**chair** 112:12
**challenge** 61:11
**challenging**
  145:17
**chance** 64:9
  149:17
**change** 93:14
  169:3 175:19

**changes** 156:22
**chapter** 6:9 36:12
  36:13,20 37:3,8
  44:17 45:5 60:7
  60:7,8 66:12
  76:17,21 77:16
  77:17 121:1,4
  156:9
**chapters** 36:14
**charge** 34:10,21
  48:8 184:5
**charges** 157:1
  160:7 168:10
  184:5
**Charles** 1:13 2:1
  4:2,6 5:1 6:1 7:3
  8:2,10,11 14:21
  17:8,14 22:20
  31:17 33:22
  35:8,22 36:15
  46:14 58:8,17
  59:2 64:20 66:6
  74:9 79:19
  90:16 95:11
  105:4,12 116:2
  139:7 142:2
  148:3 150:3,6
  154:21 166:17
  169:9 174:17
  176:4 177:11
  178:17 186:11
  188:15 189:19
  191:16 193:12
  194:14 198:8,11
**check** 93:11 175:2
**checked** 187:13
**chief** 25:17 86:13
  87:13 88:5
  157:9 173:17
**child** 8:17,19 13:8
  13:10,16 67:1,7
  78:20 84:22
  87:3 88:22
  104:10 123:14
  123:16 125:13
  128:12,19 129:5
  132:2,5 186:17
**children** 84:4,7

Case 1:06-cv-00789-PLF-JMF   Document 41-12   Filed 04/22/2008   Page 54 of 76
VIDEOTAPED DEPOSITION OF RONALD CHARLES
CONDUCTED ON THURSDAY, JANUARY 17, 2008

203

84:10,14 95:2
97:16 98:9
100:2 101:6
102:1 103:19
111:7,20 112:3
114:20 115:6,12
122:7,8,12
132:15,18
133:12,19 135:4
135:10
**chose** 33:8
**Christmas** 70:7
**chronology** 5:14
170:10 173:21
174:8 175:3
177:13
**circumstance**
43:19 77:21
102:5
**circumstances**
39:18 47:4 56:1
56:2 60:17 61:9
64:21 76:9,13
79:21 94:21
143:17 157:18
**cited** 39:9
**citizens** 53:12
**city** 135:12 163:1
**claim** 125:20
186:22
**claimant** 186:16
**Claims** 5:20
186:13
**clarification**
33:22 146:11
171:11
**clarifications**
58:22
**clarified** 34:7
**clarify** 43:8 65:21
115:5 184:16
187:17
**clarifying** 34:16
58:15
**clarity** 57:22
**class-action** 193:3
**clean** 36:18
**clear** 10:6 13:5

21:20 56:9
57:19 70:16
86:11 125:6
165:13 179:20
**clearly** 162:6
164:5,11 166:8
166:11 170:17
**client** 31:8 125:22
162:6,10 164:10
164:14
**clients** 39:7
**climbs** 11:5
**Clinical** 78:20
**close** 177:6
**closure** 46:19
**Code** 4:13 105:14
106:3
**colleagues** 92:9
**collecting** 48:9
**collective** 60:5,11
144:8
**college** 14:22
15:10
**color** 11:12
**Columbia** 1:2,7
2:13 3:15 7:4,7
8:14,20 9:16
17:19 19:15
22:21 23:13
26:16 27:5,8
199:20
**Columbia's** 20:10
**come** 72:10 75:7,9
80:9 110:8
175:14 194:19
**comes** 146:1
**coming** 15:6 26:8
28:6 45:14 46:1
46:4
**command** 81:3
83:1,15
**commission**
199:15
**communicate**
67:5 72:17,22
**communicated**
39:1 72:13 84:3
**communication**

70:6 90:3
100:22 101:1
102:14,18 104:1
104:9,12,15
152:17,19 193:5
**communications**
50:4 70:4 71:16
71:21 72:2,10
72:11 73:13
90:19 103:11
104:3 135:9
138:13 152:14
153:10 192:17
192:18,21 193:2
**community** 132:7
133:6
**comp** 24:22 49:11
**company** 2:4 67:3
**compatibility**
67:15
**Compensation**
49:15
**complaint** 59:13
**complete** 10:5
**complex** 86:8
**compliance** 17:16
124:8
**comply** 38:7,11
103:8
**compromised**
58:3
**computer** 85:21
86:15 195:15,16
197:21
**concern** 71:22
90:2 101:5
110:12 111:11
130:5
**concerning** 36:10
47:3 50:4 68:11
74:2 95:18
**concluded** 168:12
198:11
**concludes** 128:2
131:17
**conclusion** 61:22
154:5 162:1,4
165:9

**Condit** 3:4,5 4:3
7:16,16 8:5
11:20 14:20
15:7,12 27:3,17
28:12 30:4,12
31:16 32:4,18
34:8,19 35:10
35:16,21 37:10
38:9 46:16
51:12 57:7,13
58:20 59:1,14
62:4,15 63:1
64:7,12,19 65:8
66:4 69:12 74:5
74:9,12,20 78:8
79:6 81:5 82:19
86:4 89:12
90:13,15 91:16
92:7 93:1,13,21
95:7,11 101:13
101:22 102:12
104:22 105:4,7
106:10 107:9
109:18 115:16
116:1,6,15
117:16 118:16
130:11,17 134:6
141:20 142:2
144:16 147:16
147:18 148:2
149:21 150:3,12
153:2 154:17,21
155:14 160:21
162:15 163:5
164:17 165:6,15
166:14 168:17
169:5,9 170:21
171:18 174:15
175:6,18 176:7
176:9,20 177:4
177:7,11,19
178:12,17
184:11 186:6,11
187:21 188:5,10
188:15 189:19
190:7 191:8,15
192:3,11 193:7
193:12 194:2,13

198:2
**condition** 129:11
**conduct** 89:7
126:11
**conducted** 112:10
112:11 113:7
**conducting** 81:2
**conferred** 15:2,10
15:22
**confidential** 39:6
47:18 178:5
**confidentiality**
38:14,16 39:1
65:3 123:13
**confirm** 192:6
**conjunction**
174:22 179:9
**Connecticut** 2:5
7:12
**consider** 25:6
41:19 100:19
140:16 141:13
147:10
**considerable**
185:18
**consideration**
49:17 54:12
**considered** 29:16
44:21 93:6
94:22 97:10
129:8 151:1
154:1 182:19
192:20 193:4
**considers** 128:3
**consistent** 72:18
132:11,14,18
133:3,13,20
**consistently**
122:13
**constitutes** 126:9
**Constitution**
61:16,20 62:3
**constitutional**
62:9
**consult** 60:3
123:6 127:1,2
176:15
**consultation**

76:19
**consulted** 60:11
  60:14,17 69:8,9
  69:16
**consulting** 44:21
**contain** 144:19
  145:2
**contained** 33:1,5
  40:7 59:22
  174:20 183:6
**contains** 178:5
**content** 106:11
  120:19 147:11
  189:7 191:4
**contents** 77:7
  147:9 180:2
**context** 102:10
  122:18 131:22
  192:18
**continue** 31:13
  33:8 58:19
  67:18 103:10
  135:5
**continued** 4:22
  5:22
**continuing** 16:14
**continuing-edu...**
  16:10
**contract** 197:4
**contracting** 137:8
**Contractors**
  193:15
**contracts** 17:16
  24:2
**contrary** 72:11
**contribution** 42:5
**control** 110:17
**convenience**
  35:11
**conversated** 52:9
**conversation**
  52:11 80:19
  158:20
**conversations**
  80:18 109:19
  132:22
**conveyed** 100:13
  145:19

**conveying** 83:19
**coordinate** 110:21
  128:10
**coordinated**
  44:15 138:22
**coordinating**
  128:15,15
  184:18
**coordination**
  128:11 129:17
  129:18,22
**copied** 142:5
  155:20 170:5
  188:20
**copy** 36:18,21
  122:22 142:18
  158:2 159:10
  176:16 191:18
  195:6 197:21
**corporate** 58:11
  68:5
**corporation** 58:12
  58:12
**correct** 8:21,22
  10:2 13:19
  21:12 22:7,8
  23:11 32:10
  40:8,18 42:19
  42:21 44:4
  45:20 46:22
  48:14,15 50:22
  51:1,22 61:7
  62:19 64:9,11
  68:14,21 69:2
  69:20,21 70:21
  73:19 74:4
  77:19 83:11
  86:19 88:14
  90:22 94:6 99:6
  103:3,4 106:16
  106:17 108:10
  108:11 110:19
  111:4 115:2
  124:13 125:9,10
  146:7,8 149:4
  150:19,20
  155:10 159:15
  159:16,19,20

160:3,4 164:19
  171:2,18 179:13
  179:16,17,20
  182:3,20,21
  183:20 185:11
  192:15 196:18
  199:5
**corrective** 40:5
  92:20 93:3,6
  94:2,3
**corrective-action**
  136:3
**correctly** 12:17
  62:7 64:5 71:15
  71:16 73:19
  95:1 104:5
  113:17 129:6
  156:19 159:8
  185:10
**corroborate**
  126:17 128:7
**corroborated**
  135:20
**corroborates**
  123:21
**corroborating**
  136:8
**couched** 100:10
**couldn't** 50:19
**Council** 135:12
**counsel** 7:14 8:4
  10:10 36:21
  46:11 60:15
  68:22 69:4,11
  69:15 76:19
  77:14 80:6,13
  80:18 124:1,5
  124:10 125:18
  127:5 136:5
  140:21 141:1
  155:8 169:1
  174:15 194:21
  198:3 199:9
**counseling** 18:14
  32:3,5 42:16,20
  43:17,19 93:7
  94:5,12
**counsel's** 68:10

70:18 80:20
  124:16
**couple** 120:10
**course** 21:16,18
  21:21 43:15
  52:4
**courses** 16:10
  57:17
**court** 1:1 7:6,20
  102:11,13
  111:13 134:3,4
  159:2
**Courtney** 137:5
**covered** 37:14
**crafting** 118:1
**create** 66:14
  91:14
**created** 84:19
  91:20 94:21
  96:11
**creating** 65:10
  83:1 92:2
**creation** 65:14,18
  66:3,5
**criteria** 16:4 77:1
  77:15 94:18
**critical** 156:2
**CSR** 1:21
**cumulative** 136:1
**current** 8:16
**custody** 123:15,17
  125:13
**customer** 53:4,10
  53:11
**customer-service**
  53:1,6 54:6
**cycle** 30:21

_____
        **D**
_____

**D** 7:1
**Dam** 9:15
**Darlene** 48:20
**data** 161:10
**date** 7:8 19:5 49:1
  127:9 157:5
**dated** 4:8,11,16
  4:19 5:3,7,10,15
  5:17,21 6:4
  95:14 107:6

120:12 150:5
  155:2 186:15
  188:18
**dates** 15:1
**day** 89:20 159:17
  159:21 161:1
  199:13
**days** 149:16
  163:16
**day-to-day** 78:6
  92:18 171:4
  196:17
**DC** 6:8
**deadlines** 54:21
**deal** 24:19 86:17
  104:19
**dealing** 54:20
**deals** 46:21
**dealt** 76:20 82:22
  83:5 184:16
**Deborah** 5:9,11
  6:3 12:21 13:13
  13:17 36:16
  49:10 75:22
  105:8 137:5
  142:19 155:1
  156:15 160:1
  161:3 169:12
  170:5 172:3,11
  176:15 179:8
  182:2 188:17
**December** 188:19
**decide** 37:20
  148:6
**decided** 37:15
**deciding** 55:6
  139:7,16 150:16
  184:3,14
**decision** 5:18
  28:19 29:10
  31:18 33:12
  94:8 140:1,9,11
  140:15,17
  141:11,14 144:4
  145:6,15 146:15
  146:20 147:7,13
  148:17,18,22
  149:19 150:17

154:14 178:20
180:10 181:9
183:1,13,15,18
185:15 190:10
194:5,7
**decisions** 29:6
40:20
**decision-maker**
141:16
**decision-making**
28:16 38:21
190:15
**defendants** 1:9
3:12 7:19
**deficiencies** 44:3
51:16 53:18,20
54:1
**deficient** 31:21
**define** 32:2
101:20
**defined** 42:4 44:1
**definitely** 56:5
**degree** 18:10,13
18:16,19,22
**degrees** 15:2
**deleted** 88:4,8,9
153:13
**demonstrated**
82:2
**Denice** 1:21 2:11
7:21 199:2
**department** 13:16
18:4 26:11,19
49:4,5 88:20
90:5,21 118:19
181:2 182:1
186:14
**depend** 101:19
164:17
**depends** 32:2 43:2
43:6,18 59:7
**deposed** 164:10
**deposition** 1:13
2:1 4:6 7:3,11
9:20 12:2,3 14:5
14:9 34:12
35:14 36:16,17
36:18 45:15

46:1,5,15 58:10
74:6,10 95:12
116:7 117:7
142:3 149:22
150:4 153:17
154:18,22 176:3
186:12 188:16
189:20 191:20
193:13 198:8,11
**depth** 31:10
**deputies** 113:16
**deputy** 8:17 23:2
23:3,17,20 34:9
78:19 108:4
113:13 186:3,4
**derive** 91:18
**derived** 21:3
**describe** 14:21
**described** 14:14
25:5 33:19 40:6
61:5 64:2 72:22
73:20 91:19
97:14 130:20
157:5 177:3
197:19
**describing** 54:2
56:10 85:9
98:18 103:2
119:19 181:8
190:18
**description** 87:14
154:4
**designate** 58:11
**designated**
151:13
**designation** 16:11
16:17 151:15
**designee** 58:11
**detail** 17:9
**detailed** 22:16
123:15
**details** 83:2 84:20
91:21 121:9
**determination**
5:20 60:22
124:8 138:14
179:15,21
180:16 184:4

186:13 188:8
**determine** 59:21
88:3 133:18
144:17 146:12
146:14 181:8
194:15
**determines** 11:2
87:20
**detrimental** 38:8
**developing** 88:21
104:9
**development**
119:20,22
**dialoguing** 107:19
**didn't** 47:2 69:12
104:18 142:12
142:20 143:22
161:7 184:21
185:3
**difference** 113:10
**differences** 27:6
**different** 47:11,14
66:5 155:22
164:22
**direct** 21:1 31:18
52:12 96:21
160:14 197:2,20
**directing** 84:17
106:12
**direction** 171:3
**directive** 38:7,10
**directives** 38:10
38:14
**directly** 19:12
25:19,21 26:6
49:2 65:15,16
69:13 73:6,8
78:5 108:13
138:12
**director** 8:17
13:10 17:14
18:3 23:2,3
25:12 26:1,2,5
26:10,18 48:11
61:2 65:11
73:13 75:16,19
78:19 80:8 82:4
108:10 112:13

113:13,16 120:7
125:2 134:3,12
141:19 149:2
**directors** 113:13
**director's** 114:17
**Disabilities** 20:1
**Disability** 20:5
**discarded** 113:3
**discharge** 94:19
**discharged**
187:14 188:4
**disciplinary**
36:14 41:12,13
42:6 50:5
184:17
**discipline** 42:3,12
42:15 47:8
50:16 75:15
94:11 140:19
141:1 156:10
**disciplined** 65:1
**disclosing** 123:15
**discount** 130:19
**discovery** 46:11
194:17
**discuss** 120:3
184:21
**discussed** 18:6
56:7 57:4 64:10
69:11 80:22
85:8 95:22
96:17 97:22
98:3,20 99:2
103:1 109:5,15
111:20,22 112:4
114:20 115:3,4
115:7 120:20
129:20 154:16
176:6 191:17
**discussing** 90:17
119:20 125:12
127:7 133:16
176:9
**discussion** 81:16
115:12 148:3
185:2 192:8,22
**discussions** 52:21
80:5,6,7,8,10,12

80:14 81:15
92:9 120:22
183:17,22
184:16,20 185:1
185:4
**displayed** 132:21
132:22 133:5
**dispute** 34:19
35:1,3
**Disruption** 96:2
**disruptive** 96:17
97:4,10
**disseminate** 126:8
**distinct** 23:4
**distinction** 23:19
23:21,21 27:14
**distinctions** 27:5
**distinguish**
176:10
**District** 1:1,2,7
2:13 3:15 7:4,6
7:6 8:14,20 9:16
17:13,18 19:14
20:10 22:21
23:10 24:13
25:10 26:16
27:4,8 28:6
32:20 34:3 35:4
35:5,6,7,11
36:1 44:1,18
46:20 47:2 51:9
53:6,13 58:9,16
85:14,20 86:7
93:5 136:20
153:4 155:8
193:16 195:17
198:3 199:20
**District's** 33:17
42:15 86:10,15
87:3
**District-owned**
83:5
**DMH** 104:3
**document** 6:5
51:20 60:6
74:17,18,21
75:1,6,10,11
79:4,7,13 82:13

Case 1:06-cv-00789-PLF-JMF   Document 41-12   Filed 04/22/2008   Page 57 of 76
VIDEOTAPED DEPOSITION OF RONALD CHARLES
CONDUCTED ON THURSDAY, JANUARY 17, 2008

206

82:15,17 88:17
93:9 95:20
105:15 106:6,8
107:8 116:13
117:8 136:22
137:3 142:13,17
146:1,6 147:12
147:14 150:9,10
150:13,14 155:7
155:11,18
177:17,21 178:3
186:18 189:4,8
190:4,5,8,14,20
191:3 192:9
193:21
**documentation**
12:7,8 14:8
39:13,17 50:8
50:10 55:14
110:2 121:7
144:20 146:19
147:6 149:18
151:8 180:5
189:11 190:12
**documented** 30:6
30:10
**documents** 12:9
12:10,12 15:13
46:13 82:6,7
136:6,16 148:4
148:8 151:18
152:2,4 153:7
154:13 176:10
176:12,18,19,21
180:7,9,12
181:5 190:9
194:16
**doesn't** 64:4
167:3,5 184:9
**doing** 22:14 34:18
35:19 53:15,19
54:3 81:13 83:7
**domestically**
57:16
**Donald** 1:8 4:16
7:5 12:17 13:9
25:13 26:5
37:19,20 38:3

117:9 120:8
134:12 136:12
140:3,5 141:18
149:2 158:1
159:10 166:21
181:12 183:18
184:1,20,22
185:3
**Donald's** 134:19
134:20 185:7
194:6
**don't** 19:5 24:18
28:15 31:9 33:2
34:11,19 35:1
38:19 39:4
45:21 47:15
49:1 51:9 52:7
55:3,8 64:12
71:13 74:22
76:4 78:4,6 79:1
80:17 81:22
82:11,21 84:16
85:11 88:11
91:10 94:12
95:20 99:17
100:9,10 102:11
104:19 107:1
114:6 115:1,16
117:14 118:11
118:12 122:17
125:21 127:17
130:2 131:1
133:9 134:7,9
139:17 141:8
142:9 143:8
147:5 148:7
152:11 153:7
154:10 155:12
157:4 158:21
166:11 173:2,7
173:9,13 175:19
179:18 180:21
183:11 185:21
186:21 188:6
**Dot** 17:8,11
**double** 175:2
**doubt** 118:15,17
153:1,3,6,11

155:15
**draft** 66:15
116:17
**drafted** 118:19
**drafting** 116:21
116:22 118:1,8
119:3,15 158:7
167:12 185:8
**draw** 117:16
118:20 121:14
166:17
**drawing** 117:19
123:9 131:11
**dual** 8:13 29:4
**due** 62:2,8,17
**duly** 8:3
**duties** 25:6 26:17
**D.C** 1:14 2:7 3:8
3:18 6:10 7:13
20:13,20 21:3
36:19 70:11
88:20 90:4,21
135:12 181:1
191:17 192:19
193:14

---

## E

**E** 3:1,1 4:1,4,22
5:22 7:1,1
**earlier** 45:17
50:14 59:8 63:1
66:11 68:9 97:6
97:16 114:18
117:7 119:19
126:11 141:15
154:4 156:8
183:21 191:16
192:14,16
**earliest** 35:10
**early** 19:5 96:8
116:19
**easier** 175:15
**education** 14:22
**educational** 16:15
**effect** 158:5 167:8
**effectively** 63:20
**efficiencies** 28:4
**effort** 182:5
**Eight** 114:3

**either** 10:10 22:2
109:20 114:7
128:14 138:12
147:3 196:19
197:20
**elements** 66:5
120:3
**employ** 67:6,13
70:5
**employed** 199:9
**employee** 13:14
32:3,5 33:17,20
37:13 38:6 40:4
40:13 42:12,16
42:20 43:17,19
44:3 45:3,8 47:9
47:17 48:7,9
49:9,20 51:18
51:21 52:17,20
54:10 56:16
57:1,5,8 59:2,8
59:9,10,16,20
60:8,19 61:1,7
61:11,15,19
63:18,19 72:9
72:15 76:20
77:21 79:16
83:4,13 91:12
91:22 97:10
99:20 111:3
126:19 128:9,18
129:11 140:14
143:18 144:22
145:8 149:16
152:7,10 153:11
154:15 174:13
174:16 175:8
176:13,16,22
178:5 179:22
180:3,8 182:8
182:17 183:2
190:17 193:18
**employees** 22:13
27:2,19 28:5,8
28:13 29:2,9,12
29:15,16,19
30:6,14 31:1,11
31:17 32:12,22

33:11 53:21
57:3 88:3 89:17
91:3 162:21
186:1 193:15
**employee's** 42:4
62:10 96:21
165:8
**employer** 186:17
**employment** 9:11
31:19 33:9
67:11 151:21
186:14
**employment's**
33:7
**ends** 198:7
**engage** 16:9
195:20
**engaged** 148:11
149:6
**engaging** 83:14
**ensure** 146:19
**entail** 24:11
**entire** 16:19 24:15
**entities** 71:18
**entitled** 193:18
**environment**
67:17
**equipment** 72:17
72:21
**especially** 165:2
**ESQUIRE** 3:4,13
**essentially** 46:21
141:11
**established** 30:10
30:15 166:2
**establishing**
104:3
**et** 83:3 87:21
158:14 160:3
168:8 197:15
**Ethics** 4:14
105:14 106:3
**evaluate** 73:3
**evaluated** 51:4
79:21
**evaluating** 69:5
75:3 92:10
**evaluation** 30:19

30:22 68:12
76:8 92:14
98:19 191:5
**event** 94:20 156:2
**events** 5:14 43:15
75:19 81:10
92:15 112:8
165:3 177:13
**eventually** 108:9
**evidence** 122:21
166:6
**exact** 17:4 19:5
28:15 71:14
**exactly** 16:13 52:3
69:10 77:3
149:8 176:11
184:18
**exam** 16:4,7 17:1
17:3
**EXAMINATION**
4:2 5:1 6:1 8:4
**Examiner** 5:20
186:14
**example** 24:20
40:17 45:18
47:15 52:10
57:4,6 81:4 82:8
87:8 98:11
100:2 103:16,20
104:3 135:13
136:1 153:13
192:19
**examples** 90:17
**excluded** 120:4
**excuse** 49:19
57:16 80:16
96:17 121:21
140:4 156:22
161:5
**executed** 33:15
**executive** 15:20
72:13 84:1 98:1
98:3 102:3
170:14,22
173:18 197:12
**executives** 17:5
**executive-level**
111:18

**exempt-level** 16:3
**exhibit** 4:6,7,10
4:11,15,18 5:2,6
5:10,14,16,20
6:2,5,8,10 36:16
74:6,7,10 76:14
78:9 81:10 83:9
84:18 88:15
95:8,9,12 96:12
99:2 102:22,22
104:7 105:1,2,5
105:8,20 106:13
107:14 109:8
116:4,7,8,21
117:4,20 118:3
118:21 121:15
123:11 125:11
126:5 127:20
131:12,12
135:18 136:9
137:1 141:21,22
142:3 146:2,6
147:9 149:22
150:1,4 151:17
152:13 154:8,18
154:19,22
156:11 157:21
166:8,18 169:6
169:7,10 173:3
173:22 177:8,9
177:12 178:4,9
178:13,14,18
179:21 180:11
181:19 182:5
185:16 186:7,8
186:12 188:11
188:12,16
189:16,20
190:17 191:18
191:22 192:5,12
193:7,9,13
194:4
**exist** 45:19 47:22
**existed** 195:9
**exists** 40:1,3 48:2
175:12
**expectations**
30:15 51:17

**expecting** 57:19
**experience** 16:3
21:4,7 42:5
52:15,22 54:8
54:14 58:18
77:10,20 168:22
187:11,22
**expert** 34:9 35:12
58:6
**expertise** 58:4
**expire** 93:10
**expires** 199:15
**explain** 67:21
135:12
**explained** 73:14
**exploited** 99:21
**expressed** 122:16
**extensive** 20:4
**extent** 139:13
162:12
**external** 53:14
101:1 102:14,17
103:11 104:1
192:17,21 193:4
**externally** 99:21
100:13,15,16
**extract** 161:10
**e-mail** 4:11 5:6,10
14:4,7 70:6 82:2
82:3,8 83:6
85:14,21 86:10
87:12,15 88:3,8
88:18 89:16,18
90:6,20 91:3
105:10 106:1,14
107:2,3,5,6,10
108:2,17 109:20
110:9,14,18,22
111:3 138:6
152:17,19
153:12 155:1,1
155:13,16,21
156:1,14,18
157:21 159:7,18
160:6,12,22
161:2 162:6
164:8 166:20
169:11,11 171:7

171:14,17 172:1
172:18 173:15
175:4
**e-mails** 12:13,14
12:16,21 13:2
45:16 47:15
87:19 153:5,9
**e-r** 157:16

**F**

**face** 147:1
**FACES** 87:4,4
**facets** 27:2
**facilities** 24:3
**fact** 34:13 58:13
83:2 84:20
91:21 98:10
99:17 100:9,11
125:21 139:10
152:9,11 184:2
187:13 192:20
196:3,5
**factor** 55:6,11,20
56:3,6,10,11
63:2
**facts** 73:21,21
79:22 80:4,4
85:10 97:2 99:7
99:9,13 103:5
111:6 124:12,13
124:18 125:8
126:16 128:7
129:21 130:18
131:4 132:16
133:18 134:22
164:22 166:3
**factual** 81:17,21
125:19 128:9,11
182:6
**factually** 104:16
**fail** 164:12
**failed** 38:6,11
126:7
**failure** 96:4 103:2
103:6,8,13
**fair** 160:5
**false** 122:14
**familiar** 20:13,15
54:7 79:22 80:3

111:14 168:7
**familiarity** 12:11
20:16
**familiarize**
116:11
**family** 8:18,19 9:7
13:8,11,16 67:1
67:7 71:2,7,9,12
72:1,7,16,20
73:5,10 74:2
78:20 119:9
127:15 128:1,4
129:8 186:17
**far** 14:12,16 51:8
73:15 75:12
125:7 135:6
140:12 150:14
160:16 174:10
174:18 182:22
**fashion** 56:17
**fast** 68:2
**faster** 67:17
**fast-moving** 50:12
**February** 22:22
199:14
**federal** 17:16,17
17:20,21 21:2,5
21:10,14,22
22:6,10
**feel** 31:7 102:6
**feet** 10:20
**felt** 37:14 77:1
**fertilizer** 10:22
**figure** 144:3
145:22
**file** 40:7,10,11,12
40:12,19 41:2,4
41:4,5,6,7,11,21
44:14 45:14,19
46:12 47:7,10
47:12,17,18,19
47:22 48:5,7,10
49:21,21 59:13
75:9 93:9
135:19,19 136:1
136:6,7 142:19
143:5,6,20,22
143:22 144:7,8

VIDEOTAPED DEPOSITION OF RONALD CHARLES
CONDUCTED ON THURSDAY, JANUARY 17, 2008

208

144:10,18,19
145:1,4,8
146:13,20 147:3
147:4,6 151:7
151:10,13,22
152:7,8,10
153:6,12 154:15
173:10 174:9,10
174:12,13,14,16
174:20,21 175:8
175:9,9 176:13
176:17,22
179:22 180:3,8
182:9,11,17,19
183:2 190:18,21
196:21
**files** 40:14 41:3
151:18,21
174:22 197:1,3
197:4,4,4,5,5,6
197:7,11,13,18
197:20
**filled** 113:4
**fills** 23:8
**final** 5:18 139:22
140:8,11,15,17
143:1 147:7
148:17,18
149:19 178:20
197:14
**financial** 199:11
**find** 75:8 88:13
165:4 196:6
**Findings** 187:13
**fired** 163:18
**first** 9:19 16:3
22:20 23:9
24:12 25:18
36:21 42:20
50:3 52:1 68:17
74:6,15,21,22
75:2 83:14 84:6
84:14 88:15
103:9 116:16
117:19 121:15
127:22 155:3
156:16 168:4
**fit** 99:22

**five** 9:8 64:13
143:15,16
163:16 191:9
**fixed** 84:12
**fleet** 24:4,20
**Floor** 3:16
**FMLA** 108:22
**focus** 24:17,19
160:22
**focused** 63:13,14
90:19
**folks** 14:2,3 29:8
88:1
**follow** 32:12
33:20 43:15
96:4 103:3,6,13
166:15
**following** 67:11
135:10 159:7
**follows** 8:3
**follow-up** 135:16
**forbid** 83:13
**foregoing** 199:3,5
**form** 11:17 27:11
31:22 32:14
51:5 56:18
57:11 61:21
62:12,20 63:21
69:7 78:22
85:22 89:8 90:9
91:6 102:8
129:3 133:22
144:13 152:21
160:11 184:5
194:9 195:10,11
196:20
**formal** 21:15
**format** 181:16
**formed** 139:4
**former** 13:10 40:9
153:11
**forwards** 159:18
**foster** 72:3,4 85:1
87:7
**found** 86:6 176:12
**four** 9:10 163:1
163:12,16
**four-page** 155:1

**frame** 44:5 50:11
51:18 149:9
154:1
**free** 31:7 46:13
**fresh** 189:12
**Friday** 161:8
**front** 44:16
**full** 83:18 88:16
104:7 117:20
118:3
**function** 39:22
132:3,6
**functions** 90:7
196:16
**further** 88:15
126:4 146:11
198:2
**fuzzy** 66:3

─────────
**G**
**G** 7:1
**gather** 111:6
124:12
**general** 3:14 33:4
60:15 68:10,22
69:4,15 70:15
70:17 76:18
77:14 80:5,13
80:18,20 121:2
124:1,5,10,15
125:18 127:4
132:22 136:4
140:20 141:1
165:20 166:11
184:17 194:20
**generally** 24:10
32:13 89:15
114:15 165:22
190:18 196:5,6
**gentleman** 34:9
57:14
**gentleman's** 58:3
**genuine** 107:15
**getting** 17:9 68:6
104:20 142:20
154:5 165:1
**girls** 163:1,13
**give** 9:22 10:5
22:9 50:11

51:10 64:4 75:8
146:11 156:19
158:12 160:1
161:17
**given** 14:12,15
32:22 57:19
61:4 73:22
78:21 94:7
141:4 158:18
160:6 161:16
168:7 173:8,11
181:1 184:2
194:20
**gives** 33:9 44:5
51:9 91:17
136:21
**giving** 161:11,21
**go** 9:8,18 31:9
44:13 59:11
64:14 66:7
76:16 87:19
92:13,22 93:16
101:8 102:6,10
115:18 136:19
139:19 145:7
147:19 151:20
160:20 169:2
175:22 177:8
178:12 191:8,10
**goes** 132:1 156:7
157:22
**going** 11:16 15:6
26:20 29:21
31:4 36:15,20
46:9 57:13,19
57:21 65:4 69:6
91:5 96:20
109:10 126:4
130:9 141:12
146:19 148:3
157:6 158:17
160:8 161:17
162:9 164:5,9
164:10 165:11
165:12 166:12
168:13 170:18
172:2,22 173:8
176:14 183:13

183:14 192:4
198:9
**Golden** 25:12,20
**good** 1:8 4:8 7:5
7:16 8:6,7 12:17
13:6 74:13
79:15 116:2,3
124:20 131:7
146:18 158:2
159:10,18
**Good's** 74:14
**gotten** 46:19
**government** 3:15
8:20 17:19,20
17:21 22:21
23:10 28:6 68:5
70:12 89:16,19
90:6 131:18,21
155:9 193:16
**government-ow...**
85:14,20
**graded** 53:8
**graduate** 14:22
**graduation** 15:2
**grand** 187:20
**green** 10:18 11:7
11:8,13
**ground** 9:18 11:9
**group** 87:8
113:18,19,20
**growth** 11:2
**guess** 53:12 78:16
89:13 185:6

─────────
**H**
**H** 4:4
**half** 39:4 70:8
168:5
**half-day** 19:19
**hand** 119:3
199:13
**handed** 150:4
169:9 177:12
178:17 186:12
188:15 189:19
193:13
**handful** 143:14
143:15
**handled** 92:21

Case 1:06-cv-00789-PLF-JMF   Document 41-12   Filed 04/22/2008   Page 60 of 76
VIDEOTAPED DEPOSITION OF RONALD CHARLES
CONDUCTED ON THURSDAY, JANUARY 17, 2008

209

186:22 187:5
handouts 22:16
handwritten 95:13
happen 98:6,6
happened 111:13 115:13 136:14 146:1 163:13
happens 11:4
happy 175:14
hard 197:20
Hatot 49:12
haven't 21:15 78:4 193:22
head 37:5,17 76:19 80:6 81:1 89:14 140:2 194:20
headers 156:2
heads 16:22 17:5
heard 7:5 84:11
hearing 5:4 137:9 137:20 138:8,10 138:20 139:1,5 139:6,11 140:14 149:17 150:6,15 150:18 154:6
Hearings 6:3 188:18
Heather 108:18
held 2:2 48:22
help 42:9 52:10 100:15 104:16 121:8 141:10 159:8
helping 41:19
helps 66:1
hereunto 199:12
he'd 46:17
he'll 36:22
he's 11:4 31:5 34:1,13,16,18 35:2,7,19 46:13 57:21 58:6,7,8 58:16,16 68:5 151:22 152:3,3 152:9 164:6,7 187:18

high 111:22 112:4
higher 173:17
highest 42:7
highlight 22:11 22:12 176:21
hired 25:11,18
history 170:9 172:6,17 173:20 174:8
Hogan 158:4 159:12 162:7 164:12,13,18 166:22 167:21 193:3
hold 23:5,7,15 26:9,13
home 9:8,14 87:8
homes 72:4
honestly 158:19
hope 145:18
hopefully 42:22 43:1 177:2
hour 183:9
hours 16:12,13,14 108:22 161:2
house 25:9 130:6
HR 16:3 19:11 27:2 44:15 48:11 52:9 61:2 65:11,15,17 73:13 75:16,19 75:20 80:8 81:1 92:21 118:19 125:2 138:19 146:18 151:4 184:18 185:11 194:20
huge 23:21 113:19,20
human 13:15 15:18,20 16:1,5 16:14,19 19:15 19:18 22:2 23:2 23:4 24:1 26:10 26:11,18,19 27:6 34:21 35:12 39:21 40:7 41:4,6 42:9

44:13 47:9 48:3 49:3 57:16,16 59:12 78:5,5 88:20 90:5,22 96:13 124:22 125:1 137:13,15 140:5 144:1,7 174:10 176:15 177:22 178:2 179:5,7 181:2 181:13,14,21,22 185:12 186:3 187:4 188:17
hung 145:21
hypothetical 10:14,16

I
idea 9:11 17:11 17:12 177:20
identification 74:8 95:10 105:3 116:5 142:1 150:2 154:20 169:8 177:10 178:15 186:9 188:13 189:17 192:1 193:10
identified 49:20 55:21 56:12 80:10 105:19 106:3
identify 7:14 15:16 37:2
illustrate 82:2
image 99:11 123:14
immediate 43:11 81:1
immediately 43:10 49:7 57:2 64:3
impact 197:16
impacted 132:9
implementation 197:9,15
implemented 51:4
important 87:2

impression 83:2 84:19 91:20 92:2
improve 51:18 72:3
impute 34:3
imputed 35:3,5
inadequate 31:3
inappropriate 104:12,15
incident 162:22
include 16:20 100:16 113:14 140:13 144:20 144:21,22
included 66:12 95:21 120:4 151:10
including 77:7 129:5
incorrect 185:9
increase 88:22 104:10
incredible 110:9
independent 138:20
index 147:3,5
indicate 67:10 68:3 87:15 97:3 129:21 173:11
indicated 36:1 44:17 47:6 50:19 94:4 109:21 117:9 123:1 188:19
indicates 83:14 88:8 147:3 151:17
indicating 31:20
individual 64:3
individuals 17:10 49:5 95:5 134:5 142:5 182:13
inferred 129:10
inferring 125:22
influence 138:19
inform 136:17 139:15 153:22

173:4
information 11:3 13:7 20:9,20 22:17 33:5 39:7 40:1,3,6 41:1 48:9 55:9,14 56:7 59:21 76:2 81:20 83:19 85:9 87:3 88:19 90:4,21 96:3 97:2 99:4,10,15 100:12 106:18 110:16 120:21 121:7 123:1,5 123:16,20,22 125:13,16 126:1 126:8 128:19 129:4 131:4,6,9 132:16 135:20 136:4,8,17,21 139:14 140:13 140:14,16,18,19 141:3 143:18,21 144:3,22 145:2 150:22 151:6,11 151:16 154:1,6 154:11 155:19 156:11 158:8,17 160:15 161:14 161:22 164:1,2 164:11,14,15,16 164:18 165:14 165:22 166:3,4 167:13,22 168:9 170:15 171:7,13 171:15,20 172:16 173:1,7 173:11,14,19 174:4 175:2 177:1 178:6,7 180:17,19 183:1 183:6 185:4,15 188:7 189:12 190:12 194:11 196:20
information-tec...
86:17,22 88:2 89:14

210

**informative**
175:11
**informed** 138:18
**informing** 19:14
19:22 20:9
**initial** 184:13,15
184:20 185:1,4
**initially** 162:7
164:12 183:19
185:3
**initials** 74:14
**initiate** 111:2
**initiated** 111:8,11
**input** 49:22 82:1
**inquire** 175:16
**inquiring** 81:9
104:9
**instances** 90:1
**Institute** 16:6
**institutions** 15:1
**instruct** 109:11
165:16
**instructed** 181:12
**instruction** 22:9
**instructions** 96:4
103:3,7,9,14
119:13 131:14
181:14,16
**instrument** 94:5
**Instrumentalities**
193:16
**insubordination**
126:10
**intake** 132:2
**integrity** 131:17
131:21 132:1,4
145:9,12,18
**intend** 180:19
**intended** 160:19
161:16 180:21
**intent** 91:10
137:13
**intention** 145:19
**interact** 27:18
28:1,2 53:13
126:21
**interest** 83:6
199:10

**interested** 175:3
**interests** 85:15
**interim** 108:9
**internal** 53:14
173:18
**international**
15:19 16:16,22
17:2
**internationally**
57:15
**interpret** 167:20
168:3
**interpretation**
134:19,21 135:1
**interpreted** 168:1
168:2
**interviews** 128:10
129:18
**intimate** 108:20
**introduced** 166:9
**investigated**
133:10,17
**investigating**
111:19
**investigation**
111:6,10,15
**investigatory**
112:1
**invited** 70:7
**invoking** 165:21
**involved** 28:7,14
28:16,18 29:2
31:2,18 33:12
50:3 53:5 60:10
64:22 68:11,15
69:4 71:2,8,11
75:3 88:2 95:17
96:7 111:15,21
112:2 124:16,17
125:8 126:3
129:22 135:15
138:12,16
149:13,15
183:17 184:13
185:8,22
**involvement**
126:2 154:4
156:5 157:17

**involving** 98:18
162:22 186:1
**in-depth** 56:8
**IPMACP** 15:19
**isn't** 64:9 183:20
**issue** 39:14 52:6
53:4 55:5 63:3
68:15 70:18
71:5 73:4,5,10
74:2 75:21
91:18 98:9 99:8
100:2,4 101:9
101:16 102:3,7
102:13 103:1,21
106:2 107:18
109:4 111:7,19
112:3,8 114:19
115:6 125:16,19
128:1 130:5
132:4 134:13
139:2 140:15
144:11,11
146:16,16 149:7
155:19 164:13
189:8
**issued** 61:10 66:8
66:16 114:7
121:12 127:11
135:18 143:10
149:11
**issues** 27:22 31:5
39:18 54:15,19
57:22 63:14
68:11,12 70:22
71:9,11 72:22
83:3 84:20
91:21 96:16,16
99:21 121:4
124:7 129:19
133:15 135:12
156:12
**issuing** 81:12
139:22 140:8,17
143:1 144:4,5
146:6 182:4
**item** 77:8 99:1,2
102:21 141:2
**items** 83:9 102:21

**it's** 9:8 10:19
19:19 20:5 21:1
22:1 27:7 33:16
39:4 43:14
46:12 53:9
58:12 64:15
66:2 68:18 78:6
81:13 86:16
88:16 90:10
93:7 94:4 96:20
97:15 99:19
101:3 102:15
109:12 111:22
122:18 125:6,22
127:17 128:11
129:2,10 130:13
130:16 134:18
142:3,18,18
145:19,20
148:16,16 150:5
157:16 158:1
160:12 161:19
164:20 165:13
165:21 171:9
175:13 177:14
186:14 187:13
188:19,20
197:16
**I'd** 10:13 15:4
42:14 65:20
74:16 79:2
89:13 90:9
93:11 95:15
155:4 165:4,16
175:13 185:7
192:6 193:19
**I'll** 9:19 31:12,22
34:5 37:7 69:8
69:10 74:5 95:7
104:22 109:15
130:8 141:20
142:2 149:22
154:18 160:13
162:13 166:9,15
170:20 184:10
**I'm** 8:17 9:3 11:16
21:20 23:22
24:2,3,4,5 26:15

26:20 27:13
29:21 31:4
33:16 34:15
36:15,20 38:13
46:9 47:21
55:13 56:6
57:13,18,19
58:15 59:12,19
61:4,8,13 63:11
64:5 65:4 69:6
73:1,1,18,19
74:9 77:6 78:12
81:6 88:11,12
89:11 91:5 92:4
92:7 93:11 98:5
104:6 105:22
106:12 109:10
110:4 111:10
113:9,17 115:2
115:2,2,10
130:9 136:14,19
145:16,17,21
146:4,9,12,21
147:5 148:14
149:8 151:3
154:21 156:18
157:2,5 159:7
162:14 163:20
164:4 165:11,12
166:12,14
168:13 170:18
171:10 182:9,21
182:21 183:14
187:3 188:3
189:2,14 190:11
191:1 192:4
**I've** 9:7 12:3,8
15:14 20:4 29:4
29:5,6 37:6
42:18 56:7 57:4
64:10 70:6
116:6 145:10,13
167:10,21

_____
**J**
_____
**Jackson** 23:18
48:12,13,17,22
49:3,6 61:3
65:12 66:19,20

66:22 67:6,13
68:3 73:7,14
75:17,18 117:6
125:3 137:11,14
179:9 181:22
**Jackson's** 67:10
**James** 17:8,14,18
**Janet** 156:19
157:7,9,12,17
158:8,12 160:2
160:15 161:5,7
161:11,16,17
167:19 170:5
171:15,19 172:5
172:20 173:15
**January** 1:15 7:8
**Jerrold** 78:17,18
78:21 79:8,12
79:14,17
**JoAnn** 107:21
190:2 191:5
**Joanne** 6:5
189:22
**Job** 1:19 67:15
**job-related**
195:20
**Joe** 4:18 5:2 137:7
138:6 142:4
**Joseph** 150:6,15
**journal** 195:19
**judge** 158:4
159:12 162:7
164:12,13,18
165:14,17 166:4
166:22 167:21
193:2,3
**judgment** 101:15
**judgments** 41:20
74:1
**Judiciary** 3:16
**Judy** 158:3,6,18
158:22 159:5,11
160:8,15,20
161:8,17 162:1
167:12 173:8,12
**juncture** 57:10
**junks** 153:14
**jurisdiction** 8:11

**K**

**K** 3:6
**keep** 112:20
153:14
**Ken** 23:13
**kept** 40:16 47:17
174:20,22
**key** 134:5,10
**killed** 163:1
**kind** 133:12
161:22 174:20
195:1,19 196:2
**kinds** 181:5 197:2
**Kleartis** 23:18
48:11 49:3 61:2
65:12 66:19
73:7,13 75:17
117:6 137:11,14
179:9 181:22
**knew** 38:2 135:7
**know** 11:4 13:22
20:19 31:9,10
31:12 34:11,15
34:15 37:20
39:15 44:7
46:10 52:16
55:4 58:1,10
59:6,16 60:9
62:18 66:18,21
66:22 67:3,4,13
69:22 70:2,11
70:12,22 76:4
77:7 78:12,14
79:1,11 83:20
86:5 88:11
89:15 91:9
96:11 97:19
99:17 100:5,9
100:11,12
101:12,14
102:11 104:18
105:16 107:21
114:15 124:15
125:11,15,21
127:6,8 129:9
131:3,21 133:10
133:15 134:8,22
135:2 136:11

137:5,7,11
138:1,9,11
144:10 145:4
147:5 151:11
152:3,9,11
158:21 162:12
162:12 164:8,21
164:22 165:22
166:2,11,12
168:15 171:6,12
172:6 173:9,13
174:11,15,18,19
174:22 176:22
177:20 183:4,8
183:12 185:19
187:4,12,14,17
188:2 190:8
195:6,8
**knowing** 52:21
100:13
**knowledge** 34:1
34:18 35:9,18
51:6,8 52:13,14
52:17 54:17,18
54:19 55:1,3,6
56:8,20 57:12
62:1 63:22
69:16,18 83:2
83:21 84:20
86:1 89:9 91:8
91:20 92:3 94:8
94:10 106:19
115:8 124:9
126:19 128:14
133:4 157:20
160:14 187:19
188:6
**known** 87:4 97:20
97:21 164:7
**knows** 34:6
160:16 184:9

**L**

**labor** 13:15 27:16
45:3 47:10 48:6
48:7,10 49:20
174:13,14 182:9
182:11,17,18
183:2

**labor-managem...**
28:3
**lack** 29:20 30:3,5
**language** 66:7,13
66:13 118:2,9
119:4,4,16
162:5 181:8,11
181:17
**larger** 113:18
**late** 116:18
**LaTonya** 170:5
170:13,22 171:6
171:12,16,20
196:10
**law** 3:5 6:11 39:8
83:13 89:5
161:20 162:17
163:11 193:14
**laws** 39:2 65:3
123:13
**lawsuit** 31:6
**lead** 89:13 160:2
**leadership** 112:6
114:10
**leading** 180:10
190:9
**leads** 132:16
**leaf** 11:6,8
**learn** 21:10
**learned** 84:14
**leave** 9:1 71:2,7,9
71:12 72:1,7,16
72:21 73:5,10
74:2 119:9
127:13,15 128:1
128:4 129:8
**leaves** 10:19 11:6
11:10,12
**leaving** 9:9 67:22
68:4
**led** 156:20 158:13
160:7
**left** 17:12 48:17
67:1,6,13 69:22
70:5 169:2
**legal** 61:22 124:7
162:4 165:16,19
**LeShawn** 193:3

197:4,7,13
**letter** 4:15,18 5:2
5:16 6:2 41:15
41:16,17 45:11
45:12 55:21
56:12,16,22
57:9 59:3,22
61:6,10 63:5,17
65:10,14,15,16
65:18,22 66:7,8
66:14,15 81:12
90:12 116:17,21
117:1,3,10,10
117:15,17
119:20,21 120:1
120:4,12,17
121:11,16
123:11 127:11
127:18,21
131:22 135:21
136:9,12 137:12
137:19,21 139:7
142:4 149:10
150:5,21 151:17
152:12 153:18
153:20 154:7,12
157:1 178:19
179:2,4,5,7,14
180:14,20
181:17 182:4
183:5 185:9
188:17,20
**letters** 15:14,16
45:13
**let's** 10:16 15:21
43:8,9,13 68:16
76:7 93:13
101:22 160:22
177:7 178:12
191:8
**level** 22:2 98:1
111:22 112:1,4
114:21,22 115:3
115:9,10,14
129:22
**levels** 42:6
**Lewis** 13:3,18,20
**liability** 24:21

Case 1:06-cv-00789-PLF-JMF   Document 41-12   Filed 04/22/2008   Page 63 of 76
VIDEOTAPED DEPOSITION OF RONALD CHARLES
CONDUCTED ON THURSDAY, JANUARY 17, 2008

212

**liaison** 54:4,5
**licenses** 18:8
**LICSW** 190:2
**light** 164:21 165:2
**line** 43:8 106:4,14
 108:16 123:12
**list** 137:12,16
 156:20,22
 158:13 160:2,7
 162:18,20,21
 163:2,10,12,17
 165:7 174:3
**listed** 102:22
 128:18 137:12
 181:18
**lists** 168:10,10
**little** 10:12 43:9
 50:14 66:3
 86:20 90:10
 130:14 170:1
**livelihood** 183:14
**local** 87:10
**located** 48:2,3
 66:20
**location** 139:1
**Lombard** 1:21
 2:12 7:21 199:2
**long** 11:1 46:17
 122:18 141:5
 153:7 154:7
**longer** 48:13
 69:19
**look** 11:9 36:21
 42:4 74:16 75:9
 75:14 95:15
 105:15 116:10
 142:6 146:14
 150:8 155:4
 169:14 175:14
 176:19 177:15
 178:21 188:21
 190:3 193:19
**looked** 60:6 75:11
 145:5 146:13
 151:1
**looking** 60:2 79:7
 90:17 104:6
 121:1,4 144:9

144:18 145:4
 147:11 155:18
 162:5 191:3
 192:7
**looks** 78:16 170:1
**lot** 62:3 145:2
 155:22
**lowest** 42:7
**lucky** 9:3,6
**lunch** 115:17,20
**L.A.D** 2:4 7:21

**M**
**Maher** 157:12,12
 157:17 161:17
 161:17 170:5
 171:15,19
 172:20,22
 173:15
**Mahr** 157:13
**main** 87:1,9 94:12
**maintain** 16:10
 19:6,9 39:16
 87:2 194:22
 195:4,18 197:1
 197:3,6,7,11,19
**maintained** 40:12
 40:14 174:10
**maintaining** 48:9
**maintains** 99:10
**major** 25:6 26:17
 56:3,6,10,11
 63:2
**maker** 141:11
**making** 125:20
 140:8 144:4
 145:5 146:15
 147:12 148:19
 150:15 151:1
 154:2,14 180:10
 185:15
**malfeasance**
 126:9
**Mallett** 68:20
 69:19 70:5,13
**man** 136:21
**manage** 86:15
 87:10,11,12,15
 87:17

**managed** 27:7,8
**management**
 15:10 24:4,6,7
 26:12,19 29:16
 30:21 32:20
 38:7,10,13
 91:15 99:20
 100:3,13 101:8
 103:12 111:8
 112:7 113:6,10
 113:14,18,21
 114:5,8,9,16,21
 138:19
**management-te...**
 115:9,14
**manager** 49:10,11
 49:12,15 79:15
 79:18 89:13,14
**managers** 113:16
 129:20
**mandated** 61:15
 61:20
**manner** 35:4
 73:20
**Mansfield** 48:20
 48:21
**Manual** 36:12
 44:19 136:20
**March** 88:18
 117:21
**mark** 36:17 74:5
 95:7 104:22
 141:20 149:22
 154:18 169:6
 193:7
**marked** 36:16
 74:7,10 95:9,12
 105:2,5 116:4,7
 136:9 141:22
 142:3 150:1,4
 151:17 152:13
 154:8,19,22
 169:7,10 177:9
 177:12 178:15
 178:18 186:9,12
 188:13,16
 189:17,20 192:1
 192:4 193:10,13

**marketing** 52:22
**marks** 176:3
 197:9 198:7
**material** 148:9
 175:10
**matter** 7:4 164:11
 165:10 168:12
**mattered** 77:1
**matters** 34:21,22
 86:18,22 88:2
 89:15 186:1
 187:12,22
**may** 14:4 29:2
 31:8,20 34:18
 38:3 39:5 46:2,4
 46:6 59:18
 71:15 85:11
 86:2 89:10
 95:17 96:7,11
 97:7,7 109:14
 109:14 110:1
 111:21 120:12
 121:9 129:1
 136:5 141:3
 142:8,9,16
 147:12 148:4,9
 154:1,13 156:6
 156:9 171:19
 177:20 186:20
 190:6,14 191:9
 198:3
**Mayor** 84:1
**Mayor's** 53:17
 54:2,4 71:18
 72:4 82:3 90:3
 90:20 95:5
 100:16,20 101:1
 101:8,16 102:6
 103:16,17,21
 192:19
**mean** 28:20 30:13
 31:5 32:6 42:1
 51:14 52:14
 56:2 65:21
 67:16 71:10
 81:6 82:7,15
 87:16 96:19
 104:6,8 106:21

124:4,12 131:20
 135:3 145:11
 147:2 151:6
 160:12 161:21
 162:5,6 164:6
 164:10 183:8
 197:8
**meaning** 121:21
 167:15
**means** 30:14 36:6
 53:12 87:17
 102:1 106:15
 138:21 187:12
 187:15,18,20
 188:8
**meant** 36:5
**measure** 51:10
 62:17
**measures** 11:1
**media** 97:8,8,13
 97:18 98:8,15
 98:19 121:22
 122:4,10,12,16
 123:3 126:9,21
 128:10,16,17,22
 129:2,3,18
 130:1,4 132:21
 132:21 133:2,5
 133:7,19 134:14
 135:11 140:20
 141:3
**mediation** 19:1,2
**mediator** 19:3
**Medicaid-related**
 197:5
**medical** 71:2,7,9
 71:12 72:1,7,16
 72:20 73:5,10
 74:2 119:9
 127:15 128:1,4
 129:8,11
**meet** 30:16,16
 52:1 94:18
**meeting** 4:10
 95:14 111:21
 112:2,4,7,7
 113:11,11 115:3
 115:8 120:6

161:8
**meetings** 50:4
85:8 95:17,19
96:7 98:3,17,21
102:3 103:1
111:18 112:10
112:12,15,18
113:7,14,18,21
114:2,5,8,9,16
119:18 120:2,7
120:10,11,15,20
121:10 122:20
135:16 156:2
195:1 196:14
**Meltzer** 159:4,5
160:9,20 161:18
162:1 173:8,12
**members** 27:20
29:12 113:12
**memo** 4:7 74:13
150:20
**memorialize**
176:5
**memory** 50:9 73:2
106:7 127:17
143:3 154:12
189:8
**mentioned** 13:12
13:14 14:2,3
50:14 68:9
**merited** 37:14
**mess** 158:6 167:8
**message** 105:11
105:18 106:11
107:11,14,17
108:2,15 109:2
109:7 110:6,7
110:10 145:18
158:12 159:9,22
160:1 161:13
166:20 170:4
171:8 172:10
173:16 174:3
**messages** 72:17
169:12,19
**met** 12:3 77:1,15
**Michael** 3:13 7:18
**Michelle** 13:2,17

13:20
**Microsoft** 195:12
**middle** 83:9
**Mindy** 1:8 4:7 7:5
12:17 13:6
74:13 124:20
131:6 158:2
159:10,18,22
**minimum** 111:13
**minute** 107:4
**minutes** 64:13
112:14 114:4
142:11 169:2
183:9 191:9
**mischaracterizes**
79:3
**misconduct**
187:14 188:4
**misrepresentati...**
122:9
**misrepresented**
121:22 122:3
123:2
**misrepresenting**
104:16
**missed** 54:21
**missing** 82:13
**mistaken** 26:15
33:16 59:12
61:4 117:11
**misunderstand**
63:8
**misunderstood**
63:9
**mitigating** 24:15
**mixed** 175:10
**modified** 197:14
**moment** 147:8
166:15
**moments** 96:15
**Monday** 161:9
**monitor** 7:9
102:11,14
111:13 134:4
159:2
**months** 9:2,10
**morning** 7:16 8:6
8:7 156:8

159:15
**motives** 106:19,21
**moving** 118:5
**MSS** 57:4 59:8,16
**M-a-h-a-r** 157:16
**M-a-h-e-r** 157:15
**M-a-h-r** 157:13

**N**

**N** 3:1 4:1,1,22,22
5:22,22 7:1 9:17
**name** 8:8,10
15:15,17 68:17
68:17,19 74:14
148:15 157:11
159:3
**names** 15:1
**national** 15:17,22
16:4
**nature** 43:2,6
44:14 72:4
89:22 93:7
128:22 168:21
**near** 110:5 126:6
**necessarily** 51:10
63:4 72:18 73:1
73:12 83:6
104:19 107:12
142:15 143:22
197:17
**necessary** 183:15
**need** 9:22 27:22
31:9 44:4 53:22
60:6 93:14
101:14 108:19
109:8 120:3
161:7 165:17
170:9
**needed** 30:15
**negative** 76:7
77:8
**neglect** 89:1
104:10
**neither** 92:20
93:6,22 199:9
**network** 87:11
**never** 111:22
185:1
**Newman** 83:20,20

83:22 84:3
**news** 122:22,22
130:4
**nice** 11:18
**Nods** 37:5
**noncompliance**
124:8
**non-truthful**
11:15
**noon** 170:1
**Norma** 49:12
**normal** 42:11
43:15
**normally** 47:17
51:18 140:12
144:1 153:12
156:3
**Northwest** 2:5 3:6
3:17 7:12
**notarial** 199:13
**Notary** 2:12 199:1
199:19
**notations** 196:2
**note** 34:14 46:11
57:13 58:2 96:6
96:11,19 97:5
112:22 155:6
**notebook's** 113:4
**noted** 34:12
**notes** 95:13
112:14,17,20
114:4 196:20,21
**notice** 4:17,20
5:17 15:13 27:5
32:22 33:1,5,18
35:14 50:11
57:3,5,6 58:17
63:18 82:10
116:8 137:1,18
137:21 139:18
139:20,22 140:8
143:1,10 144:5
144:11 146:7,16
148:6,20 149:7
178:20 181:12
**notices** 54:1
**noticing** 143:6
148:12

**notification** 40:4
44:2 139:9
**notified** 139:8
**notifies** 57:1
**notify** 139:6
**notifying** 53:21
66:8
**notion** 99:14
**November** 145:5
150:5 178:18
186:16 187:2
**number** 15:14
23:22 28:15
43:21 137:2
142:5

**O**

**O** 4:1,22 5:22 7:1
**oath** 10:9 11:12
**object** 11:16
26:20 31:4,22
37:22 65:4,20
69:6 79:2 82:14
90:8 91:5 162:3
165:11 168:13
184:7 187:16
**objection** 14:17
15:5 27:10 28:9
29:22 30:8
32:14 46:10
51:5 56:18
57:11 59:5
61:21 62:12,20
63:21 78:2
85:22 89:8
101:10,17 102:8
109:10 117:12
118:13 130:7,13
133:22 144:13
152:21 160:11
163:3 164:4
170:17 194:9
**objections** 57:18
58:2
**objectives** 72:12
72:19 96:22
97:1 103:12
**observe** 40:19
**obtain** 126:7,20

Case 1:06-cv-00789-PLF-JMF   Document 41-12   Filed 04/22/2008   Page 65 of 76
VIDEOTAPED DEPOSITION OF RONALD MARKS
CONDUCTED ON THURSDAY, JANUARY 17, 2008

214

**obtaining** 20:6
22:1
**obviously** 15:15
31:7 34:15 58:1
**occasion** 28:7
38:6 52:5 67:5
**Occasionally**
186:4
**occasions** 27:18
**occur** 24:21,22
25:2
**occurred** 50:12
81:8,10 84:11
115:4 145:9,12
**occurring** 111:12
**OCTO** 86:9,12
87:20 88:13
110:21
**October** 5:7 21:19
60:11 75:20
76:2 79:20,20
107:7 108:2
110:13 113:8
116:8,19 117:10
120:13,16
121:11 127:12
133:16 135:19
136:8 142:4
145:5 149:11,12
153:17,19,20
155:2,16 159:17
169:20 177:13
**OCTO's** 86:9
**OFCCP** 17:14,15
**offense** 43:3,7,10
43:10,13
**offenses** 37:14,14
156:9,13,20
158:13 160:2,7
162:18,21 163:2
163:11,12,17
165:8 168:10
174:3
**office** 3:14 6:2
17:16 33:17
40:17 53:17
54:2,5 59:9,12
68:10 69:3,15

70:14,18 71:18
72:5 78:19
80:20 82:3 84:1
84:8,10,15
86:13,14 87:13
88:5 90:3,20
95:5 96:13
99:10 100:17,20
101:1,9,16
102:2,7 103:16
103:18,21 111:1
111:2 114:17
115:7 124:16
127:4 135:11
177:22 178:2
188:18 192:19
197:2
**officer** 13:7 24:13
24:16 86:13
87:13 88:6,20
90:4,21 96:4
99:4,15 131:6
137:10 138:20
139:6 140:15
149:17 150:7,15
150:18 154:6
199:3
**offices** 2:2 3:5
**official** 34:20
47:16 83:2
84:19 91:20
92:3 136:13
139:8,16 143:6
143:7,10 148:5
148:12 149:6
150:16 152:1,4
152:8 168:8
184:3,14
**Oh** 163:19
**OHR** 19:20 21:1
**okay** 9:13 12:1
15:7,21 25:3
35:15 41:3
42:18 43:4
44:16 45:18
46:19 47:6
53:15 57:8 59:9
63:10,16 65:16

66:4 72:20
74:11 77:2,4
78:11 79:7
80:22 82:20
90:1,14 92:12
99:18 100:22
101:22 103:15
104:5 106:10
111:14 116:16
117:2 118:5,20
121:2 128:13
131:3,11 147:1
147:16 148:18
149:10 150:17
151:16 154:17
156:11 157:17
160:5 162:20
163:22 164:1
165:7,7 166:14
167:3,6,11,18
167:20 169:19
172:1,21 174:14
175:18 181:3
183:3,17 186:6
188:1 189:4
195:14
**old** 88:9
**Olivia** 25:12,20
**once** 57:8 59:2
**one-page** 150:5
169:10 189:21
**operation** 96:2,18
97:4,11 197:17
**operations** 53:1
71:17 104:21
108:5 131:18,21
132:2 156:4
**operator** 7:10,20
**OPF** 47:16
**opinion** 11:14
56:14 91:7
94:14,17 99:16
99:22 100:6,8
137:17
**opportunities**
28:5 138:2
**opportunity** 9:12
61:7,11 64:4

137:19
**opposed** 136:12
**opposite** 64:2
**ops** 104:20 126:1
**orange** 11:7
**order** 10:12 16:10
32:12 62:16
63:19 101:14
111:6,13 127:2
197:14
**ore** 136:16
**organization** 18:1
99:10,11 178:7
187:5
**organizational**
71:9,11,21
**organizations**
17:10
**Originally** 25:20
**outcome** 51:4,11
199:11
**outline** 53:18
**outlined** 43:16
45:7 63:12,15
157:1
**outlines** 44:4
51:16
**Outlook** 153:12
195:12
**outside** 81:3 83:1
83:3,15 85:2
91:21 96:20
101:3 102:15,16
161:22 168:11
**overall** 30:20 42:5
**oversaw** 27:1
**overseeing** 25:4
**owners** 87:9
**owns** 86:9

———————————
**P**
———————————
**P** 3:1,1,13 7:1
**pace** 68:2
**packet** 151:3,5
**pad** 112:22
**page** 4:2,6 5:1 6:1
74:15 78:9,15
79:7 83:9,18
84:18 88:16

90:2,18 104:7
105:11,19,19
106:12 107:3
110:5,6 117:19
118:3,21,22
119:7 121:15
123:10 126:5
127:20,22 128:8
131:12 137:1
155:3 156:16
157:22 158:1
159:9 161:1
166:18 169:11
170:4 172:2,11
189:22
**pages** 1:20 105:16
177:14
**painted** 163:15
**painting** 164:21
**par** 53:22
**paragraph** 83:19
88:16 104:8
117:20 118:3,5
118:9,21 119:5
119:12 121:15
121:17,20
123:10,10 126:5
127:6,22 128:8
129:10 131:12
131:16 180:14
181:19 182:7
**paragraphs** 119:8
119:16
**parens** 156:21,22
**Parent** 85:1
**parents** 72:3 87:7
**Parsons** 9:15
**part** 6:9 20:17,22
22:5 24:14
30:18,20 40:9
73:3,16 86:16
87:22 90:18
92:10 93:7,9
109:2 153:5
154:5 166:22
174:9 180:7
181:4,17 182:15
182:16 187:4

190:17,21 194:5
**particular** 17:7
33:3 34:3 39:8
45:5 52:8 64:5
72:12 77:17
79:13 82:12
85:10,19 95:20
96:1 103:22
125:1 131:16
136:15 145:8
146:6 188:7
192:17 193:17
196:4
**parties** 138:13
144:3 199:10
**partnership**
91:14 104:4
**partnerships** 28:3
**parts** 36:13 45:13
111:15
**party** 70:7,9
**pass** 11:9 16:4,22
37:7
**pattern** 94:11
**Paul's** 15:10
**payment** 87:6
**payments** 87:7,8
**people** 11:8 13:12
13:14 22:17
110:18 113:20
114:1 134:11
137:2 163:17
**performance**
29:20 30:3,5,11
30:15,17,21,21
30:22 31:3,20
43:14 44:3,5
51:17 52:15
54:16,20
**performance-i...**
43:20,22 44:2,8
50:16,21 51:3
136:3
**period** 26:13
79:20 113:8
133:17 141:5
148:11 149:5,13
149:14,20

169:22
**permission** 126:7
126:20
**person** 10:17
23:12,13 34:10
49:7 81:2 108:6
128:18 139:21
140:8,11 141:13
144:11 148:16
149:19 153:13
161:22 168:11
**personal** 34:1,17
35:9,18 52:14
52:14 54:14
55:1,3 77:13
83:6 85:15
89:20 91:7
97:15 99:16
123:15 125:12
125:16 128:13
183:12 187:19
**personally** 54:14
55:4 89:10
101:5 104:18
114:14 146:15
187:17
**personnel** 6:8
18:4 28:21
34:10,21 36:6,9
36:11,19 37:2
41:2,4,6,10
44:18 45:14,19
46:20 47:3,7,11
47:17 49:18,19
49:21 51:2
67:10 76:8 93:9
136:20 151:7,7
151:10,22 158:2
158:8 161:15,20
162:1,17 163:11
165:8,9 167:13
167:22 168:8,9
168:12 170:9
172:6,17 173:20
174:8,9,12,21
191:17 192:7,13
**persons** 70:17
**person's** 68:16

**perspective** 10:13
184:17
**pertain** 197:21
**pertained** 71:5
73:11
**pertaining** 40:20
48:10 70:18
96:8 177:13
183:18
**Perusing** 155:18
**phone** 53:9 78:13
130:21 176:18
**photo** 128:12,15
129:5,17
**phrase** 188:7
**phrased** 109:12
109:16 165:13
165:20 166:5
**physical** 24:3
135:19
**Pickering** 1:22
7:10
**picking** 156:18
**picture** 103:12
**piece** 22:11
**place** 7:11 50:12
88:7 112:9
120:12,16
**placed** 10:9
**Placement** 84:22
**plaintiff** 1:5 3:3
7:17 8:4 155:8
176:11
**Plaintiff's** 74:7
95:9 105:2
116:4 141:22
150:1 154:19
169:7 177:9
178:14 186:8
188:12 189:16
191:22 193:9
**plan** 43:20,22
44:2,8 50:16,21
51:3 53:5 136:3
136:4 197:9,15
**planning** 9:4
**plans** 9:1,9
**plant** 24:4

**play** 65:9 94:8
116:20 118:1,8
194:5
**played** 29:1 55:16
94:10 116:22
190:14 191:5
**please** 7:14,22 8:8
9:14 14:21
35:11 37:2 48:5
49:13 73:19
74:16 95:15
107:5 116:10
119:8 121:14
127:19 142:6
147:8 150:8
154:18 169:6,14
176:7 177:8,15
178:21 186:18
188:21 190:3
193:8
**point** 44:12 50:9
50:21 64:5 82:2
102:17 108:12
123:7 196:19
**points** 82:5
**policies** 38:14,16
89:15
**policy** 28:18,20
36:2 39:8 82:12
83:7,12 86:8,9
87:22 88:7,13
89:5 90:12 91:3
91:4 98:5 135:4
140:21 141:2
165:21
**pornographic**
89:21
**portion** 184:8
**portions** 117:17
**position** 8:16 9:2
23:1,3,5,6,6,9
23:14 24:14
25:7,16 26:9,14
26:16 48:21
49:13 55:7
57:20 67:1 75:4
75:18 76:11
78:22 94:9

108:1 183:20
184:3,10 194:8
**positive** 99:11
**possession** 197:2
197:20
**possibility** 50:4
130:12,16,19
171:21
**possible** 75:2,5
118:11 161:19
**possibly** 42:8
71:19 76:12
102:10
**Post** 163:16
**potential** 42:17
106:19,21
**potentially** 12:17
39:6 136:2
154:16
**Powell** 17:11
**Powell-Woodson**
17:8,22
**practice** 78:20
121:22 122:4,10
123:2 124:9
132:12,14,18
133:3,13,21
134:18 135:2,3
146:18
**premise** 22:14
**prepare** 12:2,3
114:15
**prepared** 117:3,6
177:21 178:3
179:4,5,7
**present** 3:21 9:12
36:20 103:11
**presentation**
22:11
**presented** 12:10
75:15 79:16
97:17 98:20
101:21 103:16
103:17,21
140:12 144:1
183:1
**presenting** 102:13
**presently** 19:7

23:8 25:21
66:20 88:7
115:11
**president** 137:6
**pretty** 113:12
154:3
**prevents** 129:12
**previous** 174:2
**previously** 75:7
**primarily** 24:17
94:4
**primary** 24:19
180:4
**principal** 108:4
**print** 98:12
122:22
**printed** 105:9
153:5
**prior** 14:8 26:8
45:14 46:4
64:20 84:11
98:7 121:10
140:17 148:4
159:18 161:11
162:1 165:9
168:11 173:3
182:4 183:6
**privy** 56:6
**probably** 16:8
17:4 21:3 48:1
56:4,5 60:14
75:16 77:11
112:19 113:22
114:9 134:2,3,4
136:6 149:8
151:3,9,14,22
152:6 162:18
171:9 175:11
179:10 187:6
194:19 195:21
**problem** 43:14
72:6 84:12
**procedurally**
180:22
**procedure** 35:13
141:10
**procedures** 57:17
**proceeding** 42:6

**proceedings**
199:4,6,6
**process** 30:19,21
30:22 35:13
61:5 62:2,8,18
68:11 138:13
162:2
**processes** 57:17
**procurement** 24:3
137:8
**produced** 175:17
176:11,20
**product** 174:5
**professional**
15:18 16:1 18:8
22:2 145:9,12
145:18
**program** 19:19
24:9,10,12
104:20,20 108:5
113:15 122:22
126:1 156:3
197:17
**programs** 17:17
25:5
**progress** 11:2
84:21
**progression** 42:7
42:19
**progressive** 42:3
42:11,15 47:7
50:15 75:14
140:19,22
156:10
**progressive-dis...**
41:22 42:1
92:16 184:19
**project** 52:6,8
**projects** 89:2
104:12
**promote** 83:6
85:15
**promotions** 53:21
**proper** 148:13,14
148:14
**properly** 36:17
192:4
**proposal** 144:21

181:12
**proposed** 139:20
148:20
**Protection** 6:11
20:10,14,20
21:5,11,14,22
22:7,10 193:15
194:4
**protections** 20:18
22:14
**Protective** 132:2,6
**provide** 9:13
10:14,21 22:16
36:22 45:14
49:22 61:6
63:17 74:1 76:3
87:7,8 161:10
162:18,20 163:2
164:15 165:7
181:17
**provided** 9:19
17:22 31:2,19
32:9 46:12 76:4
81:20 97:3
116:9 122:21
128:19 129:4
136:5 141:6
160:15 166:1,3
166:4 168:11
174:16,19
175:11
**provider** 87:6
**provides** 137:19
**providing** 15:1
73:9 163:10
**provision** 60:7
**provisions** 76:17
**psychology** 18:20
**public** 2:13 13:7
85:2 88:19 90:4
90:21 96:3 99:4
99:10,15 131:6
132:22 199:1,19
**pulled** 158:17
174:9
**pulling** 158:9
167:19
**pure** 109:16

**purely** 109:12
**purported** 65:2
**purpose** 56:15
**purposes** 8:14
20:6 41:22 42:2
89:19
**Pursuant** 2:11
**pursue** 37:15
**purview** 78:6 83:4
85:2 86:17
87:12 91:22
96:21 101:3
102:15,16
**put** 15:4 29:21
44:7 46:9 47:15
153:5 173:20
184:2 196:2
**p.m** 93:20 115:19
115:22 147:20
148:1 156:15
161:2 175:22
176:4 191:11,14
198:9,12

**Q**

**qualifications**
54:8 85:16
**qualified** 52:17,20
54:10
**question** 11:11
31:15 34:6
35:18 55:13
61:17 69:13
77:3 79:10,11
86:2 90:10,13
91:2 109:11
117:8 127:3,3
128:20 129:12
133:11,14 145:3
164:5 165:12,20
165:21 166:5
170:19 171:11
176:14
**questioning** 43:9
142:11
**questions** 10:1,6,9
15:6 31:7 46:10
106:11 145:17
165:2 166:11

198:2,4,6
**quick** 147:17
**quite** 164:22
**quote** 123:12
128:2
**quoting** 133:7

**R**

**R** 3:1 7:1
**raise** 102:3
**raised** 54:15
100:2 110:12
111:8 164:13
**ran** 53:1
**ranks** 173:17
**rationale** 73:14
**reached** 91:12
**reaching** 179:21
**read** 159:9 167:21
193:22
**reading** 91:10,11
98:14 188:3
**really** 63:13 72:14
84:9 157:5
164:9
**reason** 54:9 79:11
100:10 107:13
114:13 155:15
**reasons** 29:18
45:7 63:11
67:22 68:3
181:3,9,18
**recall** 12:16,20
14:6 19:5 28:15
33:2 36:2,7
38:13,19,20
39:5,12 41:15
44:9 45:21 46:7
47:5 49:1 50:2
50:17,19 52:7
55:8 65:7 70:17
71:13,15 72:5
74:22 78:4,7
81:22 84:16
85:11 94:20
95:1,3,20 96:5,6
97:2,7,13 98:8
98:11,13,14,16
98:17 99:17

106:2 107:1,11
107:18 109:4
110:1,12 111:5
114:11,19
117:14 118:4,10
118:11 119:3,17
119:20,22 120:5
120:6,10,11,19
120:22 121:3
122:17 125:17
129:6 130:2
131:1,4 133:9
134:9 135:9
138:11 139:12
139:17 141:4,8
142:8,9,20
143:8 148:8
152:18 154:10
155:12,19
168:20 173:2,9
174:1,5,7 178:9
180:12 182:22
183:10,11
185:13,21
186:20,21 189:4
191:4,16 192:22
194:12
**recalling** 71:15
73:2
**receive** 16:17,18
37:1 75:7 139:9
139:14 142:12
150:22 151:3
181:14
**received** 19:13,17
19:21 20:3,4,8
21:1 55:22
56:13 150:21
154:7 155:13,16
159:22
**receives** 56:16
57:8 59:2
**receiving** 107:11
139:17 141:8
152:12 164:14
**recertification**
19:11
**recess** 64:16

93:17 115:20
147:21 176:1
191:12
**recipient** 171:16
**recipients** 172:16
**recognize** 74:17
150:9 155:5
177:16 178:9,22
188:22 193:20
**recognized** 99:1
102:21
**recollection** 39:14
39:17 44:11
46:14 55:10,15
71:4 95:16
97:12 110:3
115:11 121:9
123:6 142:14
143:4 173:5
190:13
**recommend** 144:3
150:18
**recommendation**
18:1 76:18
139:19 144:6
149:18 150:16
**recommendatio...**
16:21 73:9 74:1
76:3,5 140:20
141:1
**recommended**
17:6
**record** 8:9 10:6
13:5 33:22 35:2
42:4 55:2,11,16
55:19 57:14
58:3,15,19
64:15,17 67:9
70:16 76:8 77:9
86:11 93:16,19
107:6 115:19,21
125:6 142:22
147:20,22
153:16 155:6
165:17,19 166:7
175:22 176:2,8
177:3 179:20
182:16 191:8,11

191:13 195:19
198:9 199:5
**records** 11:3
49:19 67:10
194:15 195:1
**recruit** 52:11
**recruitment**
49:12 72:3 85:1
**red** 11:7
**redactions** 5:6
155:7
**reduced** 199:7
**refer** 54:9
**reference** 22:6
82:11 105:8
121:8 127:7
137:15
**referenced** 39:9
46:12 60:13
80:14 154:11
173:21 175:4
**references** 128:1
159:11
**referencing** 81:16
137:16 160:8
**referred** 125:14
158:22
**referring** 30:18
32:8,13 83:8
109:8,9 125:11
129:16 132:14
152:1,3 157:3,7
174:17 192:8,13
**refers** 83:19
**reflected** 63:4
81:10 96:18
97:5 166:8
173:15 175:7
179:21 180:10
185:16
**reflection** 192:12
**refresh** 39:14,17
44:11 46:13
50:9 55:9,15
110:3 121:8
123:6 154:12
173:4 189:8
190:13

**refreshes** 95:16
106:7
**refreshing** 142:13
**regard** 53:16
**regarding** 40:21
68:12 99:2
140:21 141:2,16
143:1 194:6
**regular** 98:3
133:13,21
**regularly** 112:10
112:11 113:7
**regulation** 39:9
82:12 83:12
85:19 89:6
**regulations** 6:8
28:21 36:7,9,20
37:3 44:19
46:20 47:3
49:19 51:3 60:2
60:3,12 93:12
191:18,19 192:5
192:7,13
**relate** 99:12
166:12
**related** 54:20
101:5 156:9
162:21 174:21
199:9
**relates** 39:7
**relating** 153:9
165:8
**relation** 31:6
**relations** 13:15
45:4 47:10,18
48:6,7,10 49:9
49:21 145:8
152:7,10 154:15
174:13,14,16
175:9 176:13,17
176:22 179:22
180:3,8 182:9
182:11,17,19
183:2 190:18
**relationship**
52:12
**relevance** 11:17
15:5 26:21

27:10 28:9
29:22 31:5
32:15 46:10
65:5 78:2 102:9
162:4 163:3
168:14
**relevant** 147:6
**relied** 44:21 71:1
151:12 182:12
**remember** 46:17
50:7,13 52:18
54:22 63:6,7
68:16,17,18
98:22 118:12
123:4,8 128:21
152:16 182:15
194:18
**remind** 38:1
**removal** 4:17,20
5:18 37:9,15,21
38:21 39:19
40:5,21 44:22
45:8,10 46:22
49:17 55:11,17
55:20 56:12
61:14,19 63:12
63:15 64:1,3
66:9 70:19
73:16 75:13
76:15 77:10
92:11 94:13,16
94:22 95:18
116:9 120:9,22
121:5 139:20
148:21 150:19
153:19 178:20
179:16 180:16
181:10 184:6
185:2,5 190:10
**remove** 54:13
55:7 64:21 71:1
94:9 149:1
183:19 194:7
**removed** 56:17
62:11 75:4
76:10 77:22
88:9
**removes** 64:3

removing 73:4
111:3
repeat 31:15
49:13 55:13
61:17 133:14
rephrase 69:7
90:13 109:13
165:4 170:19
rephrasing 79:10
report 22:13
25:19,22 26:6
108:12 128:22
135:7
reported 1:21
49:6
reporter 2:12
7:20,22 147:17
199:1,3
reporting 2:4
7:21 20:18
reports 23:6
53:17 98:20
135:7
represent 7:15
representation
134:17
representations
133:19
representative
75:21 137:14
represented
121:21 122:12
124:13 129:3
134:14
represents 15:17
15:19 151:14
reprimand 41:16
41:18 46:3,4
136:2 156:21
reprimands 42:16
Reputation 132:7
request 171:16
requested 5:4
165:14 166:4
requester 172:18
require 32:21
required 16:9
21:9 32:11 57:3
requirement 20:5

33:18 62:9
requirements
15:22 19:14,22
20:9 33:19 39:2
61:14,18 161:21
requires 24:13
research 169:3
reside 8:12,13,15
residency 8:13
residents 53:12
resource 34:21
resources 13:16
15:19,20 16:1,5
16:14,19 22:3
23:2,4 24:1
26:10,11,18,19
27:7 35:12
39:21 40:7 41:4
41:7 42:10
44:14 47:9 48:4
49:3 57:17 78:5
96:13 124:22
125:1 137:13,15
140:6 144:1,7
174:10 176:15
178:1,3 179:5,7
181:2,13,15,21
182:1 185:12
186:3 187:5
188:17
respect 34:6 37:3
37:16 38:2,4
39:18 60:17
61:18 63:2 69:5
72:7 73:10 74:1
86:21 107:10
109:22 111:2
113:6 122:4
125:19 132:5,9
141:11
respond 61:7,11
62:17 63:20
64:4,9 137:20
149:16 158:21
159:22 194:21
response 4:19
10:5,9,15 11:15
11:21 77:2

101:7 140:13
146:2 147:10
153:19 158:7
164:13 167:12
responses 10:1
responsibilities
57:20 96:21
193:18
responsibility
25:4 124:2,5
responsible 23:22
24:2,3,4,5,14
responsive 194:16
194:16
responsiveness
53:9
restate 90:9 130:8
184:8
result 43:11
resume 16:20
retain 114:12
retire 9:4
retrieve 176:16
revelation 135:10
revenue 197:5
review 12:21 13:2
28:18,20,21
36:2,9,13 37:11
40:19 41:10
45:13,18 47:2
59:11 82:10
107:4,17 136:17
140:11 141:6
143:18 144:6
147:8 149:7,17
151:15 180:1
reviewed 12:7,8,9
14:4,8,11 36:6
37:3,12 41:1,14
41:17,21 44:18
44:20 45:2,4,9
45:11,22 46:4
46:15,17,20
47:7,9 49:22
66:12 76:1 82:6
90:2 140:18,22
142:19 143:1,7
143:21 144:4,10

145:14 146:2,5
146:15 147:4
148:5,9 151:12
151:19 154:13
179:22 180:2,5
180:9 182:8
190:9,20
reviewing 45:12
49:18 106:6
107:14 128:21
183:5 185:14
reviews 74:18
106:8 107:8
116:13 147:14
150:10 155:11
177:17 190:5
192:9 193:21
reviving 89:1
104:11
Richard 3:4,5
7:16 164:4
171:10
Richmond 8:15
right 8:16 17:11
33:15 34:22
37:4 41:8 43:5,8
43:12 47:8
50:13 51:21
53:13 58:2
59:11,11 64:8
66:18 68:13
69:12 70:20
72:5 74:3 77:18
79:19 83:10
85:13 86:18
93:2,4 94:5 96:5
99:5 102:18
114:22 115:5,11
115:16 126:4,5
127:10 129:5
131:10 139:12
146:1 149:3,21
158:14,15
159:12 160:22
163:14 175:6
177:7 178:10
181:5,7 185:9
rightfully 138:18

rights 19:15,18
22:13 33:9 57:9
57:16 59:3,8,12
59:21 60:22
right-to-work
27:15
risk 24:6,7,13,16
24:19,20,21
25:1
risks 24:15,16,18
road 9:15 136:21
role 23:22 28:22
35:22 36:2
42:11 55:17
65:9,13,17 66:6
66:10,11 73:9
73:12,17 94:7
94:15 116:20,22
117:18 118:1,8
119:15 124:10
139:15 140:3
141:13 143:9
144:10 148:5,12
149:6 186:3
190:13 191:4
194:5
roles 23:20 29:4
Ronnie 1:13 2:1
4:2 5:1 6:1 7:3
8:2,10 35:8 58:8
58:17 105:12
139:7 150:6
176:4 198:8,11
Roque 78:16,18
78:21 79:17
roughly 133:16
routine 118:18
134:17 151:7
routinely 98:6
rule 34:4 89:5
rules 9:19 32:21
93:5
run 177:2

_____
**S**
S 3:1 4:1,4,22
5:22 7:1
SACWIS 87:4
safety 101:6

219

**Sam** 5:12 172:3
172:12
**sanctioned** 90:6
91:14
**saved** 153:9
**saw** 74:22 75:2
104:2 116:17
**saying** 63:11
65:13,17 98:2,5
133:7 146:22
147:5 149:11,14
164:3 182:21,22
**says** 33:7 84:18
85:13 92:14
108:16 109:7
110:7 118:22
121:20 123:11
126:5 156:19
158:2 160:1
161:5,6 162:6
166:21 167:6,11
167:18 170:8
172:4 187:12
189:22
**scheduled** 138:8
**scheme** 187:20
**science** 15:9
**Scott** 1:22 7:10
**se** 147:5
**seal** 199:13
**second** 78:9 83:18
84:17 106:14
108:16 117:20
118:2 119:7
127:20 131:12
166:16 180:14
181:19 182:7
**section** 6:10 37:8
37:11,12,13
44:18,20 45:1
77:18 125:12
187:7,9 193:14
193:17 194:3
**sections** 45:4
**security** 110:20
**see** 11:9 31:9
68:16 74:21
75:6 76:14 77:5

82:11 83:8 84:4
85:4,17 89:3
105:18 109:2
110:10 116:21
117:4,17,21
118:2,6 119:1
119:10,13
121:18 122:1
123:18 126:13
128:5 131:14,18
136:7 137:3
156:1 158:10
159:13 160:19
161:3 164:12,22
167:1,9 169:20
170:2,6,11
172:2,8,13
173:19 175:2
178:3 180:17
182:4 194:4
**seeing** 96:6 98:15
142:13 168:4
174:5 189:4
191:3
**seeking** 186:1
189:9
**seen** 15:14 37:6
105:16 116:12
142:7,16 147:12
167:10 169:15
169:17 186:18
190:4,6
**sees** 176:19
**selling** 52:22
**send** 172:7,12
173:14
**sending** 159:11
160:1
**sends** 53:17
**senior** 8:17 15:18
22:2 34:9 84:1
112:6 114:10
115:10 150:6
197:12
**senior-leadership**
112:9,15,17
113:11,12 114:2
114:8,21 115:8

**senior-level** 34:20
**sense** 148:7
**sent** 65:19 108:18
155:20 158:3
162:6 164:11,18
166:22 183:7
**sentence** 131:16
167:6
**separate** 100:20
151:5,6 152:7
173:10 175:9
196:16
**separately** 153:8
**September** 79:20
96:9 116:19
119:1 121:18
127:8
**serious** 129:11
**seriously** 118:15
118:17
**server** 87:17
195:17
**servers** 87:11
**service** 32:21 53:4
53:11,12
**services** 8:18,19
13:8,11,16 24:5
67:1,7 78:20
88:21 90:5,22
132:3,6 186:15
186:17
**set** 143:20,22
199:12
**setting** 138:22
**shades** 11:7,8
**shared** 51:21
94:15 120:21
**Sharlynn** 26:4
**she's** 109:21
173:17
**Shirley** 1:4 3:21
4:7,15,18 5:5,14
5:16 7:4,17
28:17 40:20
48:10 50:6 52:1
52:2 69:16
74:13 106:18,20
106:22 108:17

108:20 109:22
142:4,21 157:18
158:3 159:11
166:22 167:15
167:22 170:10
172:5,17 177:14
178:19 186:16
191:6 197:22
**shop** 48:4
**short** 85:9
**Shorthand** 2:12
199:1,2
**shortly** 46:18
48:17 150:22
**show** 36:15 74:5
95:7 104:22
116:6 138:7
139:18 141:20
142:2 149:21
154:17 186:6
188:10 192:4
**showed** 191:18
**showing** 74:9
94:11 123:14
154:21
**shown** 95:11
105:4
**sic** 53:21 153:20
**side** 25:9 104:20
126:1 156:4
197:17
**sign** 136:12
**signature** 78:14
79:3 179:6,11
179:12 198:10
**signed** 6:7 190:1
**significance** 27:6
**significant** 127:9
183:4,7
**signify** 15:15
**signing** 78:22
79:8,12 183:6
**similar** 112:22
126:11 164:1
**simply** 41:21 77:6
101:4 125:15
**single** 24:9
**sir** 139:3 189:13

**sit** 144:2 178:8
185:13
**sites** 89:21
**sitting** 58:8 60:1
**situation** 50:1
60:10 62:10
65:1 69:5 75:12
96:8 98:19
101:20 132:9
165:9 168:6
**six** 16:2 149:16
**sleep** 89:1 104:11
135:5
**sleeping** 84:4,7,10
84:15 95:2
97:17 98:9
100:2 102:2
103:19 111:7,20
112:3 114:20
115:6,12 122:7
122:8,13 132:15
132:18 133:12
133:20 135:10
**slow** 68:6
**smaller** 175:8
**smoothly** 177:2
**social** 4:13 6:6
18:10 52:11
87:5 105:13
106:3,16 189:22
190:2
**sociology** 18:17
**solely** 66:10 76:5
77:22
**somebody** 130:4
130:21
**someone's** 168:9
183:14
**somewhat** 20:15
94:11
**soon** 176:22
**sorry** 27:13 30:1
55:13 78:12
81:6 92:4
105:22 168:18
171:10 189:2,14
**sort** 90:9 195:2
**sought** 171:7

220

185:20
**sounds** 175:8
**sources** 60:16
**South** 3:16
**Southwest** 9:17
**Spaght** 5:12 49:11
172:3,12 187:8
**Spaght's** 49:13
**speak** 67:21 73:17
99:16 160:12
**speaking** 103:22
104:1
**speaks** 82:15,18
156:12 164:8
**special** 10:18 11:6
11:10 15:15
**specialist** 85:3
**specialists** 13:15
**specific** 21:21
22:1 49:1 76:4
82:11 99:17
123:22 143:5,21
148:8 151:18
154:3 183:11
194:18
**specifically** 37:2
38:15,19 39:5
41:18 44:9 45:1
46:7 52:7 73:22
80:17 81:22
83:7 84:16
85:12 91:9
122:17 129:1
130:2 131:2
135:14 136:10
138:15 142:10
142:20 145:3
151:18 154:13
155:12 156:14
177:18 178:9,11
185:17 190:16
**specificity** 33:2
134:9 151:20
**specifics** 71:14
88:12 121:3
141:5
**speculate** 109:17
130:10 170:19

170:20 184:9
**speculation**
109:16 130:8
170:18
**speculative** 38:1
109:12
**spend** 22:6 183:4
183:8,9,14
**spent** 185:14
**SPHR** 15:17,21
19:11 21:8,9
**spoke** 158:3
**Square** 3:16
**St** 15:10
**staff** 25:17 45:3
86:21 110:16
125:2 157:9
173:17
**Stan** 49:11 161:11
**stand** 15:16
**standard** 82:12
85:19
**standards** 30:11
30:17,18 32:11
32:19 39:2 51:2
51:10 53:7,8
**standing** 15:5
**standpoint** 72:14
72:15 87:18
92:17 110:20
183:13 184:19
185:2
**start** 15:21 43:16
159:8
**starting** 119:8
**starts** 42:15 118:6
118:22 121:17
131:13
**state** 7:15 8:8,11
19:3 27:15 48:5
87:3 106:14
**stated** 59:8 66:11
83:22 90:11
97:16 124:3
125:15 135:21
145:10 150:20
156:7 182:7
**statement** 97:6

99:22 123:21
126:17 127:16
185:8 189:21
**statements** 128:8
128:14 133:2
182:12,16
**states** 1:1 7:6
61:15,20 88:17
**stating** 79:10 95:2
95:4 96:22
128:2
**status** 59:15,17,20
127:13,15
**stayed** 53:3
**stenographically**
199:7
**step** 42:20 43:4
**steps** 42:11 43:16
50:15 140:9
143:11
**stopped** 135:6
**storage** 87:20
**store** 113:1
**stored** 88:4 178:7
**stories** 98:15
**story** 11:18
122:22
**strategies** 83:3
84:21
**Street** 3:6,17 9:17
**strengthen** 108:19
109:9
**strengthening**
109:22
**strictly** 63:13
89:19
**strike** 29:8 117:2
153:15
**structure** 136:21
**stuff** 158:4 159:12
162:7 166:22
167:3
**sub** 147:3
**subject** 4:8 5:3
74:15 77:7
105:13 106:4
107:19 110:3
111:16,19 165:5

178:19 189:12
**submit** 16:19
**submitted** 179:6
**subordinate**
40:13 45:3
**subordinates** 29:6
**subset** 175:8
**sufficient** 76:15
77:9
**suggested** 174:2
**suggesting** 66:7
105:9 145:16
**suggestion** 46:18
166:16 174:6
**suit** 193:4
**Suite** 2:6 3:7 7:12
**summarily** 71:1
73:4 76:10
77:22 94:9
149:1 183:19
194:7
**summarize**
180:15
**summary** 4:17,20
5:18 37:9,15,21
39:19 40:4,21
45:8,10 46:21
49:17 55:11,17
55:20 63:12,15
64:1,2 66:9
70:19 73:16
75:13 76:15
77:10 94:13,16
94:18,22 95:18
116:9 120:8,22
121:4 139:20
148:21 150:19
153:19 178:20
179:16 180:16
181:9 184:6
185:2,5 190:10
**summary-remo...**
55:21 56:15,22
57:9 59:3,22
61:6,10 63:5,17
65:10,18 66:13
66:15 119:21
120:1,4 121:11

121:16 123:211
127:21 137:18
149:10 153:18
185:9
**supervise** 110:17
**supervision** 32:7
32:8 39:16
199:8
**supervisor** 40:13
40:15 77:15
80:7 81:1 82:1
124:19 126:8
**supervisory** 6:6
32:21 40:10,11
40:12,14,19
41:5 96:4 103:3
103:7,9,14
119:13 131:14
189:22 190:2
**supervisor's**
40:16
**support** 99:14
126:17 146:21
182:6,13 183:15
**supported** 85:10
**supporting**
135:20
**supports** 51:15
**supposed** 51:15
160:8 184:5
**supposedly** 135:6
**sure** 11:22 38:13
39:21 42:18
47:21 59:19
60:16 61:8,13
73:1 87:18
88:11,12 93:11
100:18 111:10
113:9 115:2,2
126:22 136:14
136:19 142:22
143:19 146:5
149:8 151:3
157:5 162:14,16
182:9 185:7
187:3 190:11
191:1
**surely** 115:3

**surf** 89:20
**surmise** 116:18
**surrounding**
28:17 39:19
157:18
**Susan** 83:20,20
83:22
**suspensions** 42:17
**sustain** 179:16
184:4 194:6
**SW** 106:15
**swear** 7:22
**sworn** 8:1,3
**system** 85:15 87:3
87:4,5,6,9,19
88:10,19 89:16
**systems** 85:21
86:15

**T**

**T** 4:1,1,4,22,22
5:22,22
**Tabb** 1:4 3:21 4:7
4:15,19 5:5,14
5:16 7:4,17
37:16,21 38:11
38:17 39:10
40:20 41:11
44:7,22 45:10
45:20 47:20
48:10 50:6,20
52:1,5,16,19
53:15 54:3,7,13
55:4,7 56:12
59:15,18 60:19
60:22 63:3
65:10,19 66:8
66:16 68:12
69:5,17 70:19
71:1,5,6,8,10,17
72:20 73:5,11
74:3,13 75:4
76:10 83:13,19
84:3 92:2 94:9
94:21 97:3 99:3
99:14 100:1
103:15 109:22
110:14 111:9
116:9 121:21

122:16 123:2,12
125:9 127:13,14
129:4,22 130:3
130:20 132:9,17
133:1,3,6,8,11
133:18 134:13
137:19 138:7,9
139:5,10,18
141:7,9,12,17
142:5,12,21
144:5 146:17
149:2 158:3
159:11 161:16
164:2 166:22
167:15 170:10
173:21 174:21
177:14 178:19
179:15 182:9,14
183:7,20 185:19
186:16 187:1
189:8 190:10
194:7 197:22
**Tabb's** 28:17 36:1
36:10 37:4
38:21 39:19
40:21 47:3
49:17 50:1
52:15 54:15
55:2,10,16,19
60:10,17 64:20
76:7 77:8 79:21
90:3,19 92:11
94:16 95:18
96:8 98:19
103:6 104:8
120:8 124:17
138:14 143:2
146:2 147:9
148:6 151:21
152:15 153:18
154:2 157:18
161:15 167:22
172:5,17 176:12
176:16 191:6
192:18 193:2
**take** 16:7 17:2
46:18 48:21
53:11 64:12

74:16 93:13
95:15 101:16
105:15 107:4
114:18 116:10
138:21 140:10
142:6 147:8,17
150:8 155:4
161:9 169:14
171:3 175:19
177:15 178:21
188:21 190:3
193:19 196:19
196:20
**taken** 62:19 64:16
93:17 112:14
114:4 115:20
120:12 143:11
147:21 161:15
176:1 182:13
191:12 199:4,6
**talk** 134:12 185:5
**talked** 51:16
126:16 130:22
156:8
**talking** 31:5 92:15
109:21 152:4,6
152:10 157:2
192:16
**talks** 155:22
156:2
**tall** 10:20
**tape** 93:14,16
175:20,21 176:3
**task** 139:22
**taught** 21:17
22:15
**teach** 21:16 22:9
**teaches** 57:17
**teaching** 21:21
**team** 112:7,7,9,15
112:18 113:6,11
113:11,12,14,18
113:21 114:2,5
114:8,8,9,16,21
114:22 115:8
**technology** 86:13
87:13 88:6
110:16

**telephone** 130:4
**telephonic** 53:9
**television** 98:12
**tell** 31:12 52:3
60:1 61:4 74:17
86:20 95:16
109:15 116:11
122:15 130:8
134:16 142:6
143:3 146:22
150:8,14 155:4
157:4 168:6
169:14 170:20
173:3 176:18
177:16 178:21
186:18 188:21
190:3 193:19
**telling** 99:20
**template** 51:9,13
51:15,19 180:22
181:4
**tenets** 51:15 66:12
**tenure** 52:4
**term** 66:2 94:1
148:13,14
**terminate** 31:19
32:12 33:20
54:13 64:22
144:5
**terminated** 28:14
29:6,15 57:2
62:11 77:22
110:8 141:12,17
162:22 186:2
**terminating** 31:2
33:12
**termination** 28:8
28:17 29:5,10
36:1,10 37:4
38:22 39:20
40:22 42:13,17
43:11 44:22
49:18 55:12,17
61:19 70:19
143:2,11 144:12
146:17 148:7
156:21 185:20
**terminations** 29:1

29:18 35:13
57:2
**terminology**
148:15
**terms** 73:21
120:20 138:22
165:21 166:10
168:9 197:1
**terrain** 179:18
**Terri** 68:18,20
69:18 70:4,12
**testified** 8:3 35:2
57:14 58:7 63:1
164:6 171:1
185:6
**testify** 34:1,17
38:2 51:6 56:19
57:12 58:11
69:9,10 80:12
80:17 86:1
160:14
**testifying** 34:13
34:16 35:6,7,8
58:6,8,9,13,16
58:17 181:19
**testimony** 9:20
14:11,15 34:2
35:3,5 36:3,7
44:17 45:14
50:15,17 63:6,7
68:9 73:18
96:16 114:19
117:9 119:19
125:7 146:4
149:1 166:6
183:21 190:19
191:17
**thank** 9:18 15:7
35:16 87:14
169:5 171:18
175:18 177:4,7
198:4,5
**thanks** 90:14
**that's** 8:22 12:6
12:20 13:19
14:12,15 16:3
22:14 28:22
47:11 50:2,13

222

| | | | | |
|---|---|---|---|---|
| 51:19,22 58:13 | 33:16 45:2,22 | 51:18 53:2,5 | 77:14 106:15 | **trust** 132:7,10 |
| 58:15,21 67:4 | 46:3 50:10 56:3 | 54:12 55:2 61:2 | 133:6 138:15 | 175:3 |
| 68:8,14,18 | 60:14 62:2 66:2 | 64:18 68:18 | 145:13 163:10 | **truth** 10:10 |
| 69:21 70:21 | 69:12 70:14 | 69:1 72:12 75:2 | **tomorrow** 177:6 | **truthful** 11:14,21 |
| 71:13 78:12 | 71:14 81:11,22 | 75:16 76:8 | **tool** 195:22 | **truthfulness** |
| 82:18 87:9 88:5 | 82:3 91:10,11 | 79:20 80:8 82:7 | **top** 4:12 5:8,11 | 10:13 |
| 93:9 97:12 99:6 | 94:12 115:1 | 84:6,14 85:9 | 53:3 105:7,11 | **try** 28:3 77:5 |
| 100:10 101:3 | 120:15 121:13 | 86:7 93:8,19 | 105:19 106:12 | 79:22 115:5 |
| 103:4,13 108:11 | 122:6 124:19 | 98:14 103:10 | 107:2 119:8 | 177:5 |
| 109:16 115:1 | 125:18,22 126:2 | 108:2,8,12 | 127:22 128:8 | **trying** 145:22 |
| 121:2 131:10 | 127:18 128:9 | 109:1 110:13 | 131:13 155:2 | 146:9,12 |
| 132:20 134:7 | 129:10 131:8,10 | 113:8 114:6 | 161:1 169:11 | **turn** 78:9 127:19 |
| 135:7,8 139:8 | 133:5 134:2,3,4 | 115:22 116:16 | 172:3,11 186:13 | 132:21 |
| 139:12 146:8,22 | 134:10 137:13 | 120:8 122:19 | 189:21 | **turning** 119:7 |
| 152:7 156:3,16 | 139:12 140:5 | 123:8 126:21 | **topic** 22:18 60:4 | **two** 11:6,10 13:12 |
| 157:2,21 158:17 | 141:18 142:16 | 127:11,18 | 98:4 106:7 | 16:21,21 39:4 |
| 158:22 159:2,15 | 144:15 146:13 | 129:19 131:5 | 136:18 162:9 | 70:8 119:8 |
| 163:20 164:5 | 148:19 151:9,14 | 133:15,16 | 164:10 | 134:5,10 161:2 |
| 166:6,7 171:2 | 151:21 152:6 | 135:18 136:15 | **total** 145:1 | 168:4 169:1,12 |
| 173:21 174:19 | 156:5,12 157:12 | 137:9 141:5 | **track** 108:17 | 177:14 |
| 175:4,4 179:17 | 157:16 171:14 | 147:12 148:1,11 | **traffic** 14:4 | **two-page** 105:8 |
| 180:22 181:4 | 173:7,10 178:2 | 149:5,9,13,14 | **training** 15:15 | **type** 19:17 25:2 |
| 182:3,21 183:13 | 180:21,22 187:7 | 149:20 154:1 | 18:4,10,13,16 | 33:4 47:16 50:5 |
| 185:11,16 | 197:19 | 157:6 168:4 | 18:19,22 19:2 | 53:10 71:17 |
| **there's** 21:2 23:21 | **thinking** 33:6 | 170:16 174:7 | 19:13,17,19,21 | 72:8 82:4 87:9 |
| 27:9,14 98:2 | 63:13 120:16 | 175:20 176:4 | 20:3,4,8,22 21:4 | 87:20 89:6 94:5 |
| 105:8 110:6 | 132:5 134:7 | 180:13 182:1 | 21:7,14,15 22:5 | 98:2 111:5 |
| 127:7 138:19 | **third** 85:13 141:2 | 183:5,8,11,15 | 22:17 43:21 | 112:4 118:18 |
| 157:21 | **Thompson** 68:20 | 185:14,18 187:1 | **transcript** 4:5 | 129:21 197:5,6 |
| **they're** 41:9 47:17 | 70:5,12 | 187:8 196:19 | 74:8 95:10 | 197:9 |
| 56:16 62:10 | **thought** 50:20 | 198:3,4,9 | 105:3 116:5 | **typed** 95:13 |
| 99:21 129:13 | **threatens** 131:17 | **times** 143:13 | 142:1 150:2 | **types** 27:22 |
| 146:19 186:2 | 131:20 | 174:17 175:7 | 154:20 169:8 | **typewriting** 199:8 |
| **they've** 28:14 | **three** 9:10 16:12 | **time's** 191:14 | 177:10 178:16 | **typically** 114:1 |
| **thing** 76:7,7 87:1 | 29:11,19 30:6 | **timing** 95:19 | 186:10 188:14 | 143:18,20 |
| 87:20 195:2,22 | 31:1 32:12 41:3 | **today** 7:10,20 | 189:18 192:2 | 185:22 194:22 |
| 197:10 | **throughput** 87:19 | 12:2 14:9 23:5,7 | 193:11 199:5 | 196:2,13 |
| **things** 25:2 43:21 | **thrust** 94:12 | 23:15 39:12 | **transfers** 19:12 | |
| 47:16 52:9 | **Thursday** 1:15 | 58:7,14 125:7 | **transmitted** 164:2 | **U** |
| 53:10,22 54:21 | 107:7 | 144:2 152:20 | **transpired** 121:10 | **ultimate** 172:16 |
| 68:6 71:17 72:4 | **time** 7:9 9:8 17:7 | 170:9 178:8 | **transpiring** 75:19 | 175:5 |
| 72:8 87:2,9 | 18:2 22:6 23:1 | 183:21 185:13 | **tree** 10:18,18,22 | **ultimately** 42:17 |
| 89:21 95:21 | 23:17 25:14 | 189:1,3 190:19 | 10:22 11:1,5,6 | **Uma** 4:12 105:12 |
| 96:1 129:14,15 | 26:3,13 33:3 | 191:3,17 192:8 | 11:12 | 107:3 108:1 |
| 145:13,14 | 37:18 38:19,20 | 192:14,16 | **tried** 133:17 | 158:1 159:10 |
| 155:22 156:7 | 40:20 44:5,8 | 196:11 | **true** 27:14 103:12 | 166:20 |
| 187:20 | 45:9 49:1,2,16 | **Today's** 7:8 | 103:15 124:13 | **Um-hm** 85:5 |
| **think** 12:16 24:18 | 49:22 50:11 | **told** 14:14 38:3 | 199:5 | 105:6 161:12 |
| | | | | 166:19 170:3 |

**unable** 71:7
**understand** 9:22
  10:3,8,12 22:4
  38:11,17 42:10
  48:13 58:5 62:9
  64:8 69:19 77:2
  80:9 90:5,16
  96:19 100:15
  117:3 124:12
  127:2 145:1
  148:22 150:17
  172:21 183:3
  185:10
**understanding**
  38:5 56:20 61:5
  62:8 64:5 67:15
  71:6,13,20 73:2
  73:18 76:18
  86:16 90:11,12
  91:2,7,17,18
  92:1,8 96:20
  100:9,11 104:5
  104:17 113:17
  117:5 122:11
  125:7 129:2
  132:8 138:3,5
  146:4 158:16
  161:14 167:16
  172:15
**understands** 92:5
**understood** 73:15
  91:13 99:7,9
  103:5,8 122:5,6
**unemployment**
  185:20 186:1
  187:1,11,22
  189:9
**unfair** 97:8,13
  98:11
**union** 28:2 29:13
  57:5 59:10,16
  59:18 60:8,19
  61:1 137:6
**unions** 27:16,19
  28:1
**United** 1:1 7:6
  61:15,20
**units** 16:15 85:2

**unprofessional**
  99:3,4,14
**unprofessionali...**
  96:3
**unsure** 115:10
**untrue** 103:20
**uphold** 148:20
  150:18 190:10
**upholding** 180:15
  181:9
**use** 46:13 83:5
  85:20 89:16,17
  89:20 90:6
  181:8 195:22
  196:1
**utilize** 87:6
**utilized** 180:13
**utilizing** 72:17

_____

**V**

**v** 1:6
**vague** 165:20
**validate** 81:4,6
  82:4 124:2,5,11
**validated** 125:19
  141:4
**validates** 141:14
**validating** 124:17
  125:8
**validation** 81:14
  156:8,12
**value** 147:1
**various** 20:18
**Vaughn** 6:6
  107:21 189:22
  190:2 191:5
**verbally** 85:6
**verify** 182:5
**versed** 20:6
**versus** 7:4 27:7
**vibrating** 78:13
**video** 7:9,9,11,20
  122:21 128:22
**VIDEOGRAP...**
  7:2 64:14,17
  93:15,18 115:18
  115:21 147:19
  147:22 169:1
  175:21 176:2

**191:10,13 198:7**
**videotape** 7:2
  93:19 169:2
  198:8
**videotaped** 1:13
  1:22 10:4
**view** 98:10 101:2
  101:4 102:14,17
  104:6 193:4
**viewpoint** 38:8
  82:22 97:15
**violated** 38:18
  39:3,10 65:2
  89:6 123:13
**violation** 82:11
  91:4 119:12
  124:2,6 131:13
  161:20,21
  162:17 163:11
**violations** 124:11
  182:6
**violence** 25:1
**Virginia** 8:15
  9:15 18:3 19:3
  26:11,18 27:7
  27:15
**visit** 89:21
**voice** 7:14
**voicemail** 53:9
**volume** 148:8

_____

**W**

**wait** 169:4,5
**waived** 162:10
  198:10
**Walker** 1:8 4:16
  7:5 12:18 13:9
  25:13 26:5
  140:3 141:19
**want** 33:21 56:9
  58:2 69:8
  102:10 169:2,4
  169:5 179:18
  184:15
**wanted** 34:7
  67:18 158:4,7
  162:8 167:7,13
**warned** 103:10
**warning** 31:20

**32:3**
**warnings** 31:2
**Washington** 1:14
  2:7 3:8,18 7:13
  163:15
**wasn't** 46:16 77:3
  84:9 103:22
  153:5 183:21
**watch** 25:8
**water** 10:21
**way** 42:15 44:21
  54:3 84:7
  100:10 101:6
  113:1 119:21
  136:14 142:14
  144:9 145:17
  148:13 151:13
  153:4 168:1,2
  173:4 175:13
  185:22 196:21
  197:21
**Web** 89:20,21
**week** 45:11
  149:12,19
**week's** 149:9
**weigh** 42:5
**went** 66:22 67:11
  146:13
**weren't** 63:13
**we'll** 36:17 177:5
**we're** 64:17 93:19
  107:14 109:7
  133:16 145:22
  147:22 162:5,9
  164:3 165:1
  191:13
**we've** 18:6 32:13
  33:8 46:19 52:9
  52:11 90:1,17
  126:15 127:6
  136:9 146:1
  152:13 154:8
  174:16 179:19
**what's** 22:15 71:4
  83:21 90:11
  127:8 148:14
  169:10 181:1
**WHEREOF**

**199:12**
**whistleblower**
  6:11 20:10,14
  20:20 21:2,5,11
  21:14,22 22:7
  22:10 193:14
  194:3
**whistleblowing**
  157:19
**who's** 34:20 81:12
  184:12
**wide** 53:21
**Wilson** 5:9,11 6:3
  12:22 13:13,17
  49:10 75:22
  105:9 125:4,5
  142:19 155:2
  156:15 160:1
  161:3 169:12
  170:6 172:3,12
  176:15 179:8
  182:2 188:17
**Wilson's** 36:16
  191:19
**wish** 34:14
**withhold** 163:22
**witness** 4:12 5:2,8
  5:12,17 7:22 8:1
  11:19 14:19
  15:9 27:1,13
  28:11 30:1,3,10
  31:15 32:2,17
  34:2,13,13,14
  37:8 38:1,5 51:8
  56:19,22 59:7
  62:2,14,22 64:1
  65:7 66:1 74:11
  74:18,19 78:4
  79:8,13,16
  80:11,16,22
  82:17 86:3
  89:11 91:9
  92:13 101:12,19
  102:10 105:6
  106:8,9 107:8
  109:11 116:13
  116:14 117:14
  118:15 130:16

134:2 144:15
147:14,15
150:10,11 153:1
155:11,12
160:18 162:14
163:4 168:16
175:7 177:17,18
188:3 190:5,6
192:9,10 193:21
193:22 194:11
198:5 199:12
**witness's** 35:4
**won't** 109:16
170:19
**words** 75:8 88:8
131:17 167:21
**work** 8:14 17:10
18:1,11 28:4,5
43:14 52:5,15
54:3,6,16 71:7
72:10,16,17,21
129:14 174:5
**worked** 49:2
**worker** 6:6
106:16 190:1,2
**workers** 4:13
24:22 52:11
87:5 105:13
106:3
**workforce** 27:1
**working** 13:20
22:21 52:7,12
70:18 129:12
**workplace** 25:1
**works** 13:22
17:18 69:20
70:2,13
**world** 42:10
**wouldn't** 42:14
63:3 76:22
174:12
**write** 105:18
181:18,20
**writing** 65:21
66:7
**written** 31:20
32:3 182:2
**wrong** 73:19

**wrongdoing**
20:18 22:13
**wrote** 181:21

--- **X** ---

**X** 4:4

--- **Y** ---

**yeah** 176:8 181:6
**year** 7:8 11:1
21:19 30:22
70:7,8 126:12
**years** 9:8 16:2,12
17:12 39:4 70:8
168:5
**yellow** 11:8
**you'd** 105:15
149:13
**you'll** 196:6
**you're** 9:6 21:21
30:17 33:6
53:19 56:10
59:7 81:15 83:8
92:15 95:11
103:9 120:15
130:18 132:5
146:5 157:7
160:8 162:16
164:9,21 168:7
171:18 175:3
177:11
**you've** 10:8 29:1
43:16 49:20
60:12 61:5
98:18 101:21
103:2 105:4,16
116:11 142:7
143:10 146:10
150:3 169:9,15
169:17 174:19
178:17 179:15
185:6 186:11,18
188:15 189:19
190:4,18 193:12

--- **Z** ---

**Z** 1:21 2:11
**Zelma** 199:2

--- **1** ---

**1** 1:20 4:7 6:9 7:3
36:16 74:7,10
76:14 78:9
81:10 83:9,9,18
84:18 88:15
90:2,18 93:16
104:7,7 105:19
118:3,21 123:10
126:5 150:5
153:20 159:9
166:18 170:4
**1st** 199:13
**1-615.58** 6:10
193:17
**1:06CV00789** 1:7
7:7
**1:21** 115:22
**10** 5:16 64:13
114:3 142:4
153:19 178:14
178:18 179:21
180:11 181:19
182:5 185:16
**10-10-05** 4:19
**10-26-05** 166:21
**10-3-05** 4:16
**10-31-05** 5:10,15
**10-6-05** 4:11
**10:51** 107:7
**105** 4:14
**11** 5:20 186:8,12
**11-1-05** 5:3
**11-17-05** 5:21
**11-3-05** 5:17
**11:04** 64:15
**11:15** 64:18
**11:30** 170:1
**11:57** 93:16
**1100** 2:5 3:7 7:12
**116** 4:17
**12** 6:2 9:2 188:12
188:16
**12-21-05** 6:4
**12:00** 170:1
**12:04** 93:20
**12:32** 115:19
**12:52** 159:17

**12:54** 156:14
159:21
**13** 6:5 189:16,20
190:17
**133** 5:19
**136** 5:5
**14** 6:8 191:22
192:5,12
**140,000** 27:2
**141** 4:21
**143-144** 5:15
**145-149** 4:21
**15** 6:10 183:9
193:9,13 194:4
**15-day** 32:22 57:5
**150** 5:5
**154** 5:9
**155** 4:10
**16** 6:9 36:12,13,20
37:3,8 44:17
49:5 60:7,7,8
66:12 76:17
77:16,17 121:1
121:4 156:9
**16.1616** 76:21
**16064** 9:15
**1612** 3:6
**1616** 37:8 44:18
46:21 77:18
**169** 5:13
**17** 1:15 186:16
**17th** 7:8
**177** 5:15
**178** 5:19
**18** 74:12 119:9
**18th** 22:22
**186** 5:21
**188** 6:4
**189** 6:7
**19** 119:1 121:18
127:8
**191** 6:9
**193** 6:11
**1988** 26:15
**199** 1:20
**1990** 16:8
**1990s** 19:5
**1991** 15:11

**1995** 17:4

--- **2** ---

**2** 4:10 79:7 93:19
95:9,12 96:12
99:2 102:22,22
108:6 128:8
131:12 137:1
158:1 175:22
**2-119441** 1:19
**2:10** 147:20
**2:23** 148:1
**2:54** 161:2
**2:58** 175:22
**20** 96:9
**20001** 3:18
**20006** 3:8
**2003** 22:22 25:10
25:18 26:8 27:5
28:7,13 29:3
52:3 84:13
**20036** 2:7
**2004** 19:20
**2005** 5:7 23:14,18
47:19 48:8 49:2
52:13 55:11,16
55:19 59:16
60:11,18 70:20
74:12 75:20
76:2 79:12,20
88:18 96:9
98:14 107:7
108:3 110:13
112:8,16,18
113:8 114:7,16
115:6,13 116:8
116:19 117:10
117:21 118:6
119:1,10 120:13
120:16 121:11
121:18 127:8,12
133:16 135:19
136:8 142:4
145:5 149:11,12
150:5 153:17,19
153:20 155:2,16
159:18 169:20
177:13 178:19
186:16 187:2

188:19 195:4,7
195:9 196:7
**2008** 1:15 7:8
145:22 199:14
199:15
**202** 2:8 3:9,19
**21** 188:19
**229** 6:7
**239-240** 4:9
**25** 5:7
**26** 5:7 155:2,16
159:17
**288-289** 4:14

**3**

**3** 4:11 105:2,5
106:13 109:8
116:8 120:13,16
121:11 127:12
135:19 136:8
149:12 153:17
176:3 178:18
198:8
**3rd** 117:10 149:11
**3:10** 176:4
**3:31** 191:11
**3:44** 191:14
**3:53** 198:9,12
**30** 10:20 113:22
199:15
**30(b)(6)** 34:2,8,12
34:13,14,16
35:4,12 58:10
**30-day** 57:6
**31** 177:13
**31st** 169:20

**4**

**4** 4:15 116:4,8,21
117:4,20 118:21
121:15 123:11
126:5 127:20
131:12 136:9
**4th** 3:17
**4:30** 4:10
**40** 113:22
**408-0034** 3:9
**429** 9:17
**441** 3:17

**5**

**5** 4:18 141:22
142:3 146:2,6
147:9

**6**

**6** 5:2 107:7 108:2
110:13 150:1,4
151:17 152:13
154:8
**6th** 3:16
**60** 16:12,13,14

**7**

**7** 5:6 154:19,22
156:11 166:18
**707** 5:13
**717-720** 5:9
**724-6649** 3:19
**74** 4:9 6:4

**8**

**8** 4:3 5:10 169:7
169:10 173:22
**8-18-05** 4:8
**850** 2:6 7:12
**861-3410** 2:8

**9**

**9** 5:14 177:9,12
178:4,9
**9-20-2005** 95:14
**9:49** 1:16 7:9
**9:55** 159:15
166:21
**95** 4:10