DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

1 (Pages 1 to 4)

**Page 1**

1   IN THE UNITED STATES DISTRICT COURT
2       FOR THE DISTRICT OF COLUMBIA
3
4
5
6   SHIRLEY TABB,         Civil Action
                No. 06-0789 (PLF)
7       Plaintiff,
8   v.
9   DISTRICT OF COLUMBIA,
10      Defendant.
11
12
        DEPOSITION OF SHIRLEY TABB
13
        Washington, DC
14
        Friday, February 8, 2008
15
        10:00 a.m.
16
17
18
19  Job No. 1-120053
20  Pages 1-275
21  Reported by: Linda S. Kinkade, CSR, RMR, CRR
22

**Page 3**

1   APPEARANCES:
2     On Behalf of Plaintiff:
3       RICHARD CONDIT, ESQ.
4       Law Offices of Richard Condit
5       Suite 1100
6       1612 K Street, Northwest
7       Washington, DC 20006
8       Telephone: 202.408.0034
9
10    On Behalf of Defendant:
11      ZUBERI BAKARI WILLIAMS, ESQ.
12      Assistant Attorney General
13      Office of the Attorney General
14      441 4th Street, Northwest
15      Suite 600 South
16      Washington, DC 20001
17      Telephone: 202.724.6650
18
19  Also present:
20      Patricia Jones, Chief, General Litigation
21      Michael Bruckheim, Assistant Attorney General
22      Laura Springer, Legal Intern

**Page 2**

1
2       Deposition of SHIRLEY TABB, held at the offices
3   of:
4
5
6       Office of the Attorney General
7       for the District of Columbia
8       One Judiciary Square
9       441 4th Street, Northwest
10      Washington, DC 20001
11
12
13
14
15      Pursuant to applicable Rules of Civil
16  Procedure, before Linda S. Kinkade, CSR, RMR, CRR, a
17  Notary Public, in and for the District of Columbia.
18
19
20
21
22

**Page 4**

1
2           I N D E X
3
4   EXAMINATION OF SHIRLEY TABB         PAGE
5     BY MR. WILLIAMS            6, 265
6     BY MR. CONDIT             239
7
8           E X H I B I T S
9         (Attached to transcript)
10
11  EXHIBIT   DESCRIPTION            PAGE
12  1     Two-page document entitled    24
13        "Shirley Tabb MSW LICSW"
14  2     "CFSA Application for        126
15        Family/Medical Leave"
16  3     E-mail chain              144
17  4     "The Washington Post" - "After   181
18        Brianna..."
19  5     Amended Complaint           188
20  6     Memorandum dated March 2, 2005   188
21  7     Advance Written Notice of Proposed  189
22        Official Reprimand

Case 1:06-cv-00789-PLF-JMF    Document 41-15    Filed 04/22/2008    Page 2 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

2 (Pages 5 to 8)

5

1
2
3              I N D E X  (continued)
4
5    EXHIBIT   DESCRIPTION              PAGE
6    8        Notice of Final Decision      191
7    9        CFSA Steps to Mediate Corrective   191
8             Action Concerns
9    10       Letter dated August 15, 2005 to    192
10            Dr. Heather Stowe
11   11       Letter dated October 3, 1005 re:   193
12            Notice of Summary Removal
13   12       Letter dated October 10, 2005 to   194
14            Mr. Joe Addis re: Response to
15            Notice of Summary Removal
16   13       Letter dated November 3, 2005 to   195
17            Ms. Tabb re: Notice of Final
18            Decision
19
20
21
22

6

1              P R O C E E D I N G S
2          (In session at 10:11 a.m.)
3            SHIRLEY TABB,
4     Being first duly sworn, was examined and
5    testified as follows:
6        THE WITNESS:  I do.
7            EXAMINATION
8    BY MR. WILLIAMS:
9       Q   Good morning.
10      A   Good morning.
11      Q   Will you please state your full name and
12   spell it for the record?
13      A   Shirley Tabb, S-H-I-R-L-E-Y, T-A-B-B, as in
14   boy.
15      Q   Thank you, Ms. Tabb.  My name is Zub
16   Williams.  We've met previously at other depositions.
17   I will be taking your deposition today on behalf of
18   the District.  I have with me in the room Ms. Patricia
19   Jones, my supervisor, and intern, Ms. Laura Springer.
20   And the other attorney on this case, Mr. Michael
21   Bruckheim, will join us later.
22      A   All right.

7

1       Q   Have you ever had your deposition taken
2    before?
3       A   No.
4       Q   This is your first time?
5       A   Yes.
6       Q   Okay.  I'm going to give you a couple rules
7    of the road.
8       A   All right.
9       Q   My depositions may be a little different
10   from what you've experienced before in any other cases
11   you've been on, but I'm just going to give you some
12   basic rules of the road that are going to help us make
13   sure that this deposition is successful.
14      A   All right.
15      Q   The first rule of the road I always say is
16   make sure that your responses are audible.
17      A   Yes.
18      Q   I have a bad habit of mumbling, keeping my
19   voice low.  If my mom was here, she would hit me on my
20   hand.  But you have a lot of important things to say,
21   so we want to make sure that what you say is heard by
22   the court reporter to my left and that it is recorded

8

1    correctly.
2       A   All right.
3       Q   And so any time I ask you a question, it is
4    important that you make your response audible for both
5    me, your attorney, in case he asks some questions,
6    and, most importantly, the court reporter.  Okay?
7       A   Okay.
8       Q   In the same vein, I just saw you did
9    something that I do, too.  I tend to nod my head and
10   give nonresponsive answers.  I'm going to ask you that
11   everything -- every response you make needs to be
12   audible.
13      A   All right.
14      Q   So instead of nodding your head in
15   agreement, you can say yes, or shaking your head in
16   disagreement, no, or whatever other response you're
17   going to give, just make sure that you say that
18   instead of nodding.  It is a bad habit for me, too.
19      A   All right.
20      Q   Do you understand?
21      A   Yes, I do.
22      Q   Okay.  Also, at any time during the

Case 1:06-cv-00789-PLF-JMF    Document 41-15    Filed 04/22/2008    Page 3 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

3 (Pages 9 to 12)

9

1  deposition, if you wish to take a break, you just let
2  me know.
3      A  All right.
4      Q  We have bathrooms, you know, right over
5  here, so if you have to go use the bathroom, just let
6  me know.
7      A  All right.
8      Q  The next rule of the road I'm going to tell
9  you is that I need to know if you do not understand my
10  questions.
11      A  All right.
12      Q  Sometimes I get stuck up in the lawyer
13  talk.  And because this case is very fact specific,
14  you may be talking about incidents that occurred and
15  you may get lost in my question.  I need you to make
16  sure that you understand the question that I ask you.
17  If I ask you a question and you don't understand the
18  answer, just let me know and I'll do my best to
19  rephrase it.
20      A  All right.
21      Q  All right.  And if you answer a question
22  that I've posed but don't understand it, if you answer

10

1  it, I'm going to assume that you understood the
2  question and that your answer is based on your
3  response to that question.  Is that okay?
4      A  That's fine.
5      Q  Those are the general rules of the road.
6  My next question for you is, what, if anything, did
7  you do to prepare for this deposition today?
8      A  Well, I did a couple of things.
9      Q  Okay.
10      A  I reviewed some of my documents that I have
11  in my files for the case.
12      Q  Now, I don't mean to interrupt you, but it
13  might work better if I ask you about the documents as
14  you go along.  I'm going to give you an opportunity to
15  answer the question in full, but it might be more
16  beneficial if you tell me what documents you reviewed.
17      A  Certainly.  I reviewed the August 18, 2005
18  admonition from my former supervisor, Mindy Good.
19      Q  Okay.
20      A  I reviewed my response to her admonition.
21      Q  Okay.
22      A  I reviewed my testimony before then Chair

11

1  of the Human Services Committee, Adrian Fenty, in
2  November 2005.  I reviewed the social workers' code of
3  ethics.
4      Q  Is it a general code of ethics or what is
5  it exactly?
6      A  I'm not sure what you mean by "general code
7  of ethics."
8      Q  Well, I'm not sure if it's just the social
9  workers' code of ethics or if there are chapters that
10  have different code of ethics.
11      A  I think it's the general code of ethics
12  with subtopics on different issues.
13      Q  Okay.  And do you know when that code of
14  ethics was either amended or updated?
15      A  Let me see if I can give you that.  No, I
16  don't know about -- approved by the 1996 NASW Delegate
17  Assembly, revised in 1999.
18      Q  Any other documents?
19      A  And some legal documents.  Oh, and my last
20  supervisory evaluation or employee evaluation.
21      Q  Now, I believe you said some legal
22  documents.

12

1      A  Yes.
2      Q  And I don't want you to tell me -- you can
3  just tell me, if they were communications, what the
4  communications were.
5      A  The Declaration of Shirley Tabb.
6      Q  Okay.  Your declaration?
7      A  Yes, the civil action.  Do you need the
8  number?
9      Q  No, I have it.
10      A  Okay.  So, I went through that.
11      Q  And what else?
12      A  And the defendant's motion to dismiss for
13  summary judgment.  And, secondly, I prayed.
14      Q  Okay.  Before we get into the nondocument
15  information, I'm just -- you had said the August 18th
16  admonition, which I believe we have copies of.
17      A  Right.
18      Q  Your response to that, which I believe we
19  have copies of.  The testimony before Adrian Fenty
20  that you gave.  I'm not sure.  There are two of us
21  working on the case, but I'm not sure if we have
22  copies of that.  Do you have copies of that with you

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

4 (Pages 13 to 16)

13

1  today?
2      **A  Yes, I do.**
3      Q  Okay.
4      **A  And I will be happy to leave it with you.**
5      Q  Thank you.  So before you leave, if I could
6  make copies of that.
7      **A  Certainly.**
8      Q  I would really appreciate it.  The social
9  workers' code of ethics?
10      **A  Yes.**
11      Q  I'm not sure if we have that either.  Do
12  you have that with you today?
13      **A  Yes.  You can get a copy.**
14      Q  I can have a copy of that before you leave?
15      **A  Certainly.**
16      Q  Your last employer evaluation, your
17  declaration we have and motion to dismiss.
18      Also, before we talk about your -- not the
19  documents -- but did you review any notes or do you
20  have any notes with you that you used in preparation
21  for this deposition?
22      **A  No.**

14

1      Q  None?
2      **A  No.**
3      Q  Okay.  I didn't mean to interrupt you.  I
4  believe your testimony was that you prayed.
5      **A  Yes, and asked family and friends to lift**
6  **me up in prayer in this case as well as children in**
7  **the District of Columbia.**
8      Q  Okay.  So it sounds to me like you
9  prayed -- correct me if I'm wrong -- that you prayed,
10  but then you also talked to other individuals --
11      **A  Yes.**
12      Q  -- and asked for their prayers, too?
13      **A  Yes.**
14      Q  Which is common.
15      **A  Yes.**
16      Q  Who did you talk to?
17      **A  I talked to my sister.**
18      Q  What's your sister's name?
19      **A  Patricia, Patricia Tabb.**
20      MR. CONDIT:  I'm going to object on
21  relevance grounds, but you can answer.
22  BY MR. WILLIAMS:

15

1      Q  Patricia Tabb.
2      **A  Yes.**
3      Q  And where does your sister live?
4      **A  In Monticello, Arkansas.**
5      Q  Can you spell Monticello?
6      **A  M-O-N-T-I-C-E-L-L-O.**
7      Q  Arkansas?
8      **A  Yes.**
9      Q  Okay.  Who else?
10      **A  My son and my daughter-in-law.**
11      Q  Okay.  What is your son's name?
12      **A  Kevin Frazier.  He lives in Baltimore.**
13      Q  How old is your son?
14      **A  My son is 38.  And my daughter-in-law,**
15  **Jackie.**
16      MR. CONDIT:  I'm going to have a continuing
17  objection to the relevance of personal family and
18  friends information or contacts.
19      MR. WILLIAMS:  Noted.
20  BY MR. WILLIAMS:
21      Q  What was her name again?
22      **A  Jacqueline.**

16

1      Q  Frazier?
2      **A  Yes.**
3      Q  She is in Baltimore as well?
4      **A  Yes.**
5      Q  Anybody else?
6      **A  And a good friend and colleague, Sandra**
7  **Damdar, D-A-M-D-A-R.**
8      Q  She is a friend and colleague?
9      **A  Yes.**
10      Q  Was she a colleague at CFSA?
11      **A  No.**
12      Q  Where was she a colleague at?
13      **A  At Senior Services here in the District.**
14      Q  Okay.  How was she your colleague, though?
15      **A  I worked with her in working with the**
16  **elderly, and she and I share some of the same clients.**
17  **And so we have become friends as well as colleagues.**
18      Q  Okay.  Anybody else?
19      **A  No, that's about it.  Except my attorney,**
20  **of course.**
21      Q  Of course.  I'm not going to ask you to say
22  anything about that.

Case 1:06-cv-00789-PLF-JMF    Document 41-15    Filed 04/22/2008    Page 5 of 101
DEPOSITION OF SHIRLEY LABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

5 (Pages 17 to 20)

17

1    A  Right.
2    Q  One second.
3    A  All right.
4    Q  And you mentioned with, I believe,
5  Sandra --
6    A  Damdar.
7    Q  Damdar.
8    A  D-A-M-D-A-R.
9    Q  That you worked with her with the elderly?
10    A  Yes.
11    Q  When did you start working with the
12  elderly?
13    A  I actually started working with the elderly
14  in 2005.
15    Q  When in 2005?
16    A  It was probably, probably around March,
17  February or March.
18    Q  February or March of 2005?
19    A  Yes.
20    Q  What were you doing?  How were you working
21  with the elderly?
22    A  Well, I provide social work assessments to

18

1  get home health services for seniors who -- in order
2  to try and keep them out of nursing home settings and
3  allow them to remain in their own homes and aging
4  place.
5    Q  So how would you go about finding these
6  elderly persons?
7    A  Well, I work with different contract
8  agencies who make the referrals to me.
9    Q  Okay.
10    A  And Ms. Damdar is one of the agencies.
11    Q  Which agencies were you working with during
12  that period?
13    A  Immaculate Home Health Services,
14  Immaculate, and T&N Reliable Nursing, and another one
15  is -- was -- Dynamic Visions Home Health.
16    Q  Okay.  And I'm a little new at this, so --
17    A  That's okay.
18    Q  They would contact you with individuals who
19  were elderly who needed assistance?
20    A  Exactly.
21    Q  So is this a paid position or how does that
22  work?

19

1    A  I am an independent contractor.
2    Q  Okay.
3    A  So I'm paid per assessment.
4    Q  And you're an independent contractor -- is
5  there a company that you have or is it just you
6  personally?
7    A  Personally.  I work for myself.
8    Q  And so they would pay you to do this.
9    A  To do these social work assessments.
10    Q  How much would they pay you?
11    A  $300 per assessment.
12    Q  And about how many assessments did you do
13  in 2005?
14    A  In 2005 I didn't do very many because for
15  the beginning in 2005 because I was still -- I was
16  just doing it part-time, so I couldn't afford to do
17  much.  I guess 2005 we could say -- and, I mean, this
18  is going to be an educated guess.
19    Q  Yes.
20    A  I guess probably we could say maybe 20, 20,
21  30 --
22    Q  About $300 a pop?

20

1    A  Yes.  Well, no.  I'm sorry.  I take that
2  back.  Strike that.
3    Q  Go right ahead.
4    A  We were getting $250, $250.
5    Q  At that time?
6    A  Yes.
7    Q  When did you start getting $300?
8    A  This year.
9    Q  This year?
10    A  Yes.
11    Q  So 2008 or --
12    A  2007, I mean, yes.
13    Q  Okay.  So up until that time it was $250?
14    A  Yes.
15    Q  So 2005, $250; 2006, $250?
16    A  Yes.
17    Q  And then 2007 --
18    A  Yes.
19    Q  -- there was a change to $300.
20    A  Yes.  There was a small increase.
21    Q  So in 2005 you said you did about -- I
22  believe your testimony was you did about 20?

Case 1:06-cv-00789-PLF-JMF   Document 41-15   Filed 04/22/2008   Page 6 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

6 (Pages 21 to 24)

21

1    A  Yeah, if that.  It may not quite have been
2  that many because up until October I was still
3  employed with CFSA, so I couldn't do much with a
4  full-time job.
5    Q  But you had time to do this independent
6  contractor --
7    A  Yes.
8    Q  -- on as-needed basis.
9    A  Exactly.
10    Q  I became a lawyer so I didn't have to do
11  math.  So 20 approximately occurrences at $250, about
12  how much did you earn in 2005?
13    A  I'm not good at math either, so -- I can't
14  remember how much I made in 2005 with that part-time.
15  I just can't remember.
16    Q  Okay.  It was about $250 and about 20.
17    A  Uh-huh.
18    Q  What about 2006?
19    A  2006 I made, I think I made about $60,000
20  in 2006.
21    Q  I'm specifically asking you about the
22  independent contractor.

22

1    A  Yes.
2    Q  Oh, you made about $60,000?
3    A  Yes.  Yes.
4    Q  So were you doing this full-time now?
5    A  Yes, it was.  I was fired.  I had to -- I
6  started doing it full-time.
7    Q  Okay.  Did you have your own company at
8  this time or have you ever had your own company?
9    A  Yes.
10    Q  When did you have your own company, at what
11  point in time?
12    A  I started that company in 2006.
13    Q  Okay.  Do you remember when in 2006?
14    A  It would have been around January.
15    Q  And what is the name of that company?
16    A  ShirleyTabb.com.
17    Q  Oh, okay.  Now, you said $60,000 in 2006.
18    A  Somewhere roughly.
19    Q  What about 2007?
20    A  2007 was -- I did considerably better.
21  2007 I made close to $100,000.
22    Q  Close to $100,000?

23

1    A  Yes.
2    Q  You did a little bit better?
3    A  Yes.
4    Q  And you were doing that full-time as well?
5    A  Yes.
6    Q  In your company, is it just you?
7    A  Just me.
8    Q  And you're still doing just the elderly --
9  helping out the elderly in the same way you described
10  earlier?
11    A  Yes, but I'm also trying to do some
12  multilevel marketing.
13    Q  Okay.
14    A  Trying to explore that.
15    Q  I'm new.  What is multilevel marketing?
16    A  Like Amway.
17    Q  Okay.
18    A  So it's moving products through a network.
19  I sell to you, you sell to her, and that's how network
20  marketing is.  They don't do advertising and spend a
21  lot of money on advertising dollars.  They put the
22  money into the product and they have a network of

24

1  people who sell their wares and goods.
2    Q  Okay.  And your company does that as well
3  now?
4    A  I do that as an individual.  That's not out
5  of my company.
6    Q  And when did you start doing that?
7    A  Probably around October of last year, of
8  2007.
9    Q  And how much did you earn that year doing
10  the direct marketing or --
11    A  Yeah.  I think I've sold about -- I have
12  sold only a few bottles of juice, of --
13    Q  Can you just approximate?
14    A  Probably three or four hundred dollars.
15    Q  And that was in 2007?
16    A  2007.
17    Q  And you're doing that now as well?
18    A  Well, I'm not selling anything right now.
19    Q  But you're still engaged in the process.
20    A  Yes, I am.  Yes.
21    Q  Ms. Tabb, I'm going to pass you a document
22  (Exhibit No. 1 marked for identification and

Case 1:06-cv-00789-PLF-JMF    Document 41-15    Filed 04/22/2008    Page 7 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

7 (Pages 25 to 28)

25

1  attached hereto.)
2  BY MR. WILLIAMS:
3      Q  Ms. Tabb, please take your time and review
4  this document and let me know when you're ready.
5      A  I'm ready.
6      Q  Do you recognize what this is?
7      A  Yes, I do.
8      Q  Can you tell me what it is?
9      A  It is from -- off of my Web site for
10  ShirleyTabb.com.
11      Q  Okay.  So it appears to be -- is it your
12  testimony that it appears to be a printout?
13      A  Yes.
14      Q  Taken from your Web site?
15      A  Yes, it is.
16      Q  Does it appear to be -- I'm not trying to
17  put words in your mouth, so correct me if I'm wrong.
18  Does it appear to be the "About Us" page, if you can
19  tell?
20          MR. CONDIT:  Object to the form, but you can
21  answer.
22          THE WITNESS:  "About Us"?

26

1  BY MR. WILLIAMS:
2      Q  Well, let me ask you a different question.
3  Do you see a box in the upper left-hand corner that
4  starts off "Home"?
5      A  Yes.  And "About Us" is highlighted, yes.
6      Q  And this says, this document reads that you
7  and staff are offering quality care?
8      A  Yes.
9      Q  Who is the staff?
10      A  And staff.  I am fully supported by the
11  staff in the agencies with which I contract -- T&N
12  Reliable Nursing, Immaculate Home Health.  While they
13  pay me directly, they allow me to use their staff for
14  clerical.
15      Q  For clerical.
16      A  Yes, and administrative support.
17      Q  So it's your testimony that it's for
18  clerical -- the staff is loaned or used --
19      A  Well, yes.  It's the -- we are
20  collaborative and we also work with RNs who is a part
21  of the team I represent because I represent the social
22  work piece.  Then the other staff, professionals,

27

1  represent a multi-disciplinary approach -- the RNs,
2  the therapists, the administrative people.
3      Q  Okay.  I think I understand.  Who pays the
4  clerical administrative staff?
5      A  The agencies.
6      Q  You don't.
7      A  No, I don't.
8      Q  You're the only person you pay.
9      A  Yes.  And then I pay -- I have an answering
10  service --
11      Q  Okay.
12      A  -- that I pay for.
13      Q  Can you look at the bottom of this page?
14      A  Yes.
15      Q  I believe there appears to be an address?
16      A  Yes.
17      Q  Is this the address of your company?
18      A  This is the address of one of the companies
19  that I work for -- that I work with.
20      Q  Okay.  You have to help me out.  So this
21  address isn't the address of your company.
22      A  No, because I work out of my home.

28

1      Q  Okay.
2      A  And I'm a single woman, and I'm not
3  comfortable putting my address on the Internet.
4      Q  So they allow you to use --
5      A  Yes.
6      Q  Which company is that?
7      A  That's Immaculate.  At one time both of the
8  agencies that I work closely with were in this
9  location.
10      Q  Okay.  But now it's just this one company?
11      A  It's the one company in that location, yes,
12  and I still work with them.
13      Q  So what is the address of your company?
14      A  200 K Street, Northwest.
15      Q  Washington, DC?
16      A  Yes, 2001.
17      Q  And is that solely used for your
18  enterprise?
19      A  No.  I live there, too.
20      Q  You live there, too.
21      A  Yes.
22      Q  Before we move on, I forgot a rule of the

Case 1:06-cv-00789-PLF-JMF    Document 41-15    Filed 04/22/2008    Page 8 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

8 (Pages 29 to 32)

29

1  road, and it's acronyms.  Acronyms are really bad.
2  You used the term "RN."  And I believe that means --
3      A  I'm sorry.
4      Q  No, it's my fault for not telling you.  I
5  believe that means registered nurse.
6      A  You're right.
7      Q  So any time there is an acronym, if you
8  could spell it out.
9      A  Sure.
10     Q  That's my fault, not yours.
11         All right.  Now, you testified to -- I believe
12  you testified that you have a son.
13     A  Yes.
14     Q  Do you have any other family members?
15     A  Yes.
16     Q  When I say "family members," I mean
17  immediate family members.
18         MR. CONDIT:  Objection as to relevance, but
19  you can answer.
20         THE WITNESS:  Yes.  I have a brother, a
21  sister, and in terms of close family, that's it.
22  BY MR. WILLIAMS:

30

1      Q  Well, immediate family.
2      A  Immediate family, that's it.
3      Q  So you have your son.
4      A  And my sister and my brother.
5      Q  What's your brother's name?
6      A  Marvin.
7         MR. CONDIT:  Continuing objection to this
8  line of questions.
9         MR. WILLIAMS:  Noted.
10  BY MR. WILLIAMS:
11     Q  What's his last name?
12     A  Tabb.
13     Q  And where does he live?
14     A  Houston, Texas.
15     Q  And your sister?
16     A  In Monticello, Arkansas.
17     Q  And her name?
18     A  Patricia Tabb.
19     Q  Anyone else?
20     A  Do you want uncles and aunts?  No?  Okay.
21     Q  No, that's okay.  All right.  Now I've been
22  asking you a lot of questions about your background.

31

1      A  Yes.
2      Q  One of the most important I need to ask you
3  is about your education.  I'm going to need you to
4  walk me through your education.
5         So where did you go to high school?
6      A  Marvell High School in Marvell,
7  M-A-R-V-E-L-L, Arkansas.
8      Q  Did you graduate from Marvell?
9      A  Yes, I did.
10     Q  Where did you go to college or university?
11     A  Undergraduate was the University of --
12  first it was -- when I went it was Arkansas State.
13  Wait a minute.  No, it wasn't.  It was -- it's been a
14  long time.
15     Q  Take your time.
16     A  It was AM&N College in Pine Bluff,
17  Arkansas.
18     Q  And when did you attend?
19     A  I went to AM&N in 1971 and was there two
20  years.  Then we merged with the University of
21  Arkansas.  So I finished the University of Arkansas in
22  1974 and went to graduate school, the Graduate School

32

1  of Social Work, at the University of Arkansas in
2  Little Rock.
3      Q  Okay.  When?
4      A  I was in an accelerated program.  It
5  started my junior year in college.  So I started in, I
6  think, it was '73, the first semester of '74.
7      Q  Okay.  We're just going to go back over
8  that really quickly.  AM&N --
9      A  College, yes.
10     Q  Where is that located?
11     A  In Pine Bluff, Arkansas.
12     Q  And it's your testimony that that merged
13  with the University of Arkansas?
14     A  Yes.
15     Q  And where's the University of Arkansas?
16     A  In Little Rock, Arkansas.
17     Q  And then during your, I believe it's your
18  testimony that, during your junior year, you started
19  an accelerated program.
20     A  Uh-huh, accelerated master's.
21     Q  Okay.  And you did that from your junior
22  year until what date?

Case 1:06-cv-00789-PLF-JMF   Document 41-15   Filed 04/22/2008   Page 9 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

9 (Pages 33 to 36)

33
1    A  From May of 1976.
2    Q  What was your degree in when you attended
3  AM&N and then at the University of Arkansas?
4    A  Social welfare -- sociology, social
5  welfare.
6    Q  You're going to have to forgive me again.
7  I'm not familiar with that, what that degree entails.
8  What does a person with a social welfare degree do?
9    A  The undergraduate was a B.A. degree,
10 bachelor of arts.
11   Q  Okay.
12   A  And then the graduate degree is the master
13 of social work, MSW, master of social work.
14   Q  And those degrees allow you to be a social
15 worker?
16   A  Yes.
17   Q  Is that the only way that you can become a
18 social worker through those degreed programs?
19   A  That's the only way you can become a
20 professional social worker.
21   Q  Is there a difference between -- are there
22 social workers who are not professional?

34
1    A  Well, I think because people -- people tend
2  to think because social work, they look at social work
3  as doing good, being nice, but you need training to be
4  a social worker.  So I'm sure there are people who are
5  not formally trained who call themselves social
6  workers.
7    Q  Okay.  Fair enough.  Do you have any other
8  degrees?
9    A  No.
10   Q  And so after -- and 1976 was the end of
11 your graduate program?
12   A  Yes.
13   Q  Okay.  After you finished your graduate
14 program, did you go to work or what did you do?
15   A  Yes, I did.  I went to work in Helena,
16 Arkansas.
17   Q  Where did you go?  What were you doing when
18 you were working?
19   A  I was a residential counselor for seriously
20 emotionally disturbed children.
21   Q  Can you explain to me what a residential
22 counselor in that context does?

35
1    A  I lived in the facility with one other MSW
2  social worker, and we provided therapy to the
3  children, we provided family counseling to prepare
4  them and make them ready to return to their parents or
5  return home and into the community.  We did treatment
6  plans.  We cooked.  We did everything.  We were like
7  the parents in the home.  We modeled behavior, had
8  group therapy, and interacted with the schools and the
9  children and their special needs.
10   Q  Okay.  And how many children did you help
11 during that time?  Strike that.
12     How long did you work there?
13   A  I worked there from 1976 -- I think I left
14 that facility in, somewhere around '81 or '82, early
15 1980.
16   Q  Okay.  Early 1980s?
17   A  Yes.
18   Q  During that, I guess, four-year period --
19   A  Yes.
20   Q  My math is bad again.  That's a four-year
21 period, correct?
22   A  Yes.

36
1    Q  During that four-year period, how many
2  children did you work with?
3    A  We probably, in that course of time, we
4  probably had 30 or 40 children, 50 maybe.  Because
5  some of them required longer stays than others.
6    Q  But at any one given time in the house or
7  residence --
8    A  The house, yes.
9    Q  -- how many children would you supervise?
10   A  Eight.
11   Q  But then over four years you would guess --
12   A  Yeah, 40, 50.  As they came and as they
13 were ready to be -- the service was terminated and
14 other children came in.
15   Q  Okay.  Now, I believe your testimony is
16 that you left that job in 1980.
17   A  '81, '82, somewhere like that.
18   Q  '81, '82.
19   A  Yes.
20   Q  Do you remember why you left that job?
21   A  I left that job because of personal
22 reasons.

Case 1:06-cv-00789-PLF-JMF     Document 41-15     Filed 04/22/2008     Page 10 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

10 (Pages 37 to 40)

37

1      Q   Okay.  I'm going to ask you what those
2   personal reasons are.
3           MR. CONDIT:  I'm going to object.
4           MR. WILLIAMS:  Noted.
5           THE WITNESS:  Okay.  Helena, Arkansas was
6   Helena, Arkansas.  I left because there were pressures
7   put on me because of my choice in who I wanted to love
8   and have in my life.  And that guy happened to be a
9   white guy.  So Helena, Arkansas was not ready for any
10  inter-racial dating, so I caught a lot of heat.  He
11  worked for one of the other agencies, and we were both
12  single, so I saw no reason -- he was a nice guy, but
13  it didn't go over too well.
14  BY MR. WILLIAMS:
15     Q   And when you say -- I just want to be clear
16  with the testimony you just gave.  You left because
17  you felt that there was pressure --
18     A   Yes.
19     Q   -- put on you?
20     A   Yes.
21     Q   Because of your inter-racial dating.
22     A   Yes.  Yes.

38

1      Q   What pressure was put on you?
2           MR. CONDIT:  Object again.
3           THE WITNESS:  Well, people were saying that
4   that just wasn't proper and appropriate.  You're
5   talking about a little town in the Mid-South and they
6   just didn't think that I should date a white man.
7   BY MR. WILLIAMS:
8      Q   Okay.  And so you decided to leave.
9      A   Yes.
10     Q   Where did you go after that?
11     A   I went to Houston, Texas.
12     Q   And what did you do in Houston?
13     A   I started working for a large
14  African-American hair care company, Johnson Products.
15     Q   What were you doing for Johnson?
16     A   I started out as a merchandiser.
17     Q   What does a merchandiser do?
18     A   Merchandisers go into the stores and make
19  sure that that particular company's products are
20  neatly stored on the shelves and it's clean, that
21  nobody has gone in and pilferaged and opened a blister
22  pack of lipstick or anything and make their section

39

1   look bad.  You make sure that they have adequate
2   parity with other companies in terms of shelving --
3   shelf space.  That's what merchandisers do.
4      Q   Were you assigned to a particular area,
5   particular chain of stores?
6      A   Yes.
7      Q   What area?
8      A   In Houston, Texas I think I covered
9   Walgreens, Krogers.  Those are the big --
10     Q   Albertsons?
11     A   We didn't have Albertsons in Houston, I
12  don't think.  At least it wasn't one of my accounts.
13     Q   Okay.  How long did you work there?
14     A   I was in Houston for a year, and then the
15  company wanted somebody to go to New York or to
16  California.  I chose New York.  So they moved me to
17  New York.
18     Q   So you were still with the same company?
19     A   Yes.
20     Q   Just moving to New York?
21     A   Yes.
22     Q   When you say New York, do you mean New York

40

1   City or just New York?
2      A   Well, what I mean by New York is, I was
3   covering the New York territory, but I couldn't afford
4   to live in New York, so I lived over on the New Jersey
5   side, but I covered New York, Massachusetts, Rhode
6   Island, Connecticut.
7      Q   Okay.  And what was your duty?
8      A   I had been promoted to a sales rep. by
9   then, a sales representative, and I called on
10  different beauty chains and beauty salons to sell
11  Johnson Products' hair care products.
12     Q   Was it solely hair care products?
13     A   No, they made a makeup line, too.  They had
14  hair care and makeup, a makeup line.
15     Q   Okay.  How long were you there?
16     A   I was with Johnson Products probably from
17  '82 until '86.
18     Q   And did you have the same position --
19     A   Yes.
20     Q   -- during that entire time?
21     A   Yes, I did.
22     Q   So you were a sales rep.

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

41

1    A  Yes.
2    Q  Were you a director of a territory or
3  anything of that nature?
4    A  I was not a director.  I was just a sales
5  representative covering those territories.
6    Q  Okay.  So in 1986 you left --
7    A  Yes.
8    Q  -- this position with Johnson.
9    A  Right.
10    Q  Where did you go next?
11    A  I started selling cars.
12    Q  Before we get into the car selling, why did
13  you decide to leave Johnson in 1986?
14    A  I left Johnson Products in '86 because I
15  felt that, with my degree, I could do some other
16  things.  And it was a wonderful company, I learned a
17  lot, but I was ready to move on and get with a company
18  that offered more professional opportunity.
19    Q  Okay.  So you left on your own --
20    A  Yes, I did.
21    Q  -- on your own account?
22    A  Yes, I did.

42

1    Q  It was not recommended for you to leave?
2    A  No, I was not.
3    Q  Let's talk about the cars.  What year was
4  that?
5    A  That was 1986.  So while I was searching
6  for a company pursuing pharmaceutical sales, I decided
7  that I had to do something to make a living, so I
8  decided I would take a chance on selling cars.
9    Q  Okay.
10    A  And I went to work for Inner Harbor Ford.
11    Q  And where was this?
12    A  That was in Baltimore.
13    Q  This was in '86?
14    A  Yes.
15    Q  And when you went to work for Inner Harbor
16  Ford, what was your position?
17    A  I was a car salesperson.
18    Q  Okay.  So you just sold --
19    A  Cars.
20    Q  -- the cars?
21    A  Yes.
22    Q  I don't do car sales, so you have to help

43

1  me out.
2    A  Yes.  That's fine.
3    Q  At any point did you change positions at
4  Inner Harbor?
5    A  No.
6    Q  You were always a car salesperson?
7    A  Yes.
8    Q  And so did you just sell cars or did you do
9  any kind of marketing with the cars as well?
10    A  Well, I didn't do marketing with the cars,
11  but I did marketing to get customers.
12    Q  What type of marketing did you do?
13    A  I did my own TV ads.
14    Q  You did TV ads.
15    A  Yes.
16    Q  How many did -- how many TV ads do you
17  think you did over the course -- strike that.
18        MR. CONDIT:  I'm going to object to
19  relevance, but you can answer.
20  BY MR. WILLIAMS:
21    Q  How long were you working at Inner Harbor
22  Ford?

44

1    A  I worked at Inner Harbor Ford for about a
2  year.
3    Q  During that year how many TV ads do you
4  think you did?
5    A  I probably did about three or four.
6    Q  Can you describe, were they all generally
7  the same?
8    A  Yes.
9    Q  Okay.  And it was just you appearing on TV?
10    A  Yes.
11    Q  Okay.  You did about three of them?
12    A  Yes.
13    Q  Okay.  Just one second.  I'm sorry.
14    A  That's okay.
15    Q  So you worked there for a year.
16    A  Yes.
17    Q  Where did you work after that?
18    A  I went to another dealership, Kuhns Ford,
19  still in Baltimore.
20    Q  In Baltimore.
21    A  Yes.
22    Q  What was your position at Kuhns Ford?

Case 1:06-cv-00789-PLF-JMF    Document 41-15    Filed 04/22/2008    Page 12 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

12 (Pages 45 to 48)

45

1    A   Car sales.
2    Q   I have to back up again.  Why did you leave
3  Inner Harbor --
4    A   Inner Harbor Ford?
5    Q   Yes.
6    A   Because the Kuhns organization had heard
7  about my sales abilities and they wanted me to come
8  and work for them, and they made an offer and I went.
9    Q   What was your position, again, at Kuhns?
10   A   Car sales.
11   Q   Car sales.  And how long were you at Kuhns?
12   A   I was at Kuhns probably about eight months.
13   Q   About eight months.
14   A   Yes.
15   Q   And while at Kuhns you were a car
16  salesperson.
17   A   Yes.
18   Q   Did you do any other type of marketing?
19   A   Yes.
20   Q   Did you do TV commercials?
21   A   Yes, I did.
22   Q   Did you do anything else?

46

1    A   No.
2    Q   How many TV commercials do you think you
3  did?
4    A   I probably did two or three while I was
5  there.
6    Q   So you left after eight months.
7    A   Yes.
8    Q   Why did you leave?
9    A   Because in the car business it's up and
10  down, and Ford Motor Credit tightened up on credit
11  requirements and it was very difficult to sell cars.
12  So I had to move on and find something that was going
13  to make a better living for myself.  So that's why I
14  left.
15   Q   So you left of your own accord.
16   A   Yes, I did.
17   Q   Where did you go next?
18   A   I started selling cemetery property.
19   Q   Cemetery property.
20   A   Yes.
21   Q   And where did you sell cemetery property?
22   A   For -- for a cemetery in Timonium,

47

1  Maryland, Dulaney Valley, Dulaney Valley Memorial
2  Gardens.
3    Q   Okay.  And how long were you at Dulaney
4  Valley?
5    A   I may have been there close to a year.
6    Q   You just sold cemetery plots?
7    A   Well, not just plots.
8    Q   I'm sorry.  I don't know -- can you explain
9  to me?
10   A   I sold what is called pre-need cemetery
11  property -- plots, if you wish.
12   Q   Okay.
13   A   When people don't have to make an emotional
14  buying decision.
15   Q   I understand.  So in anticipation --
16   A   Yes.
17   Q   Did you do any marketing for that?
18   A   No.  No.
19   Q   Did the customers just come to you or how
20  did you go about finding customers?
21   A   Well, we were given leads by the office.
22  We were given leads to go out on and to make our

48

1  presentations for pre-need property.
2    Q   So you would visit certain areas?
3    A   Yes.
4    Q   Give a presentation?
5    A   Yes.  Yes.
6    Q   How long were you there, again?
7    A   I was there maybe -- not quite a year.
8    Q   Okay.  So not a year.
9    A   Not quite a year.
10   Q   Why did you leave?
11   A   Because looking for -- looking for
12  something more stable, but I did go to another
13  cemetery.  I went to Ft. Lincoln Cemetery.
14   Q   And I think we might have gotten off track
15  with dates.  Do you remember what date you were at Ft
16  Lincoln?
17   A   It must have been somewhere around '89 or
18  '90.
19   Q   Okay.
20   A   It must have been around '89 or '90.  So I
21  worked for a couple of cemeteries in between, after I
22  left Dulaney Valley.

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

13 (Pages 49 to 52)

49

1    Q   Okay.  So one of the cemeteries you worked
2  for was Ft. Lincoln?
3    A   Yes.
4    Q   And you say that was about '89 or '90.
5    A   Ft. Lincoln was in '92.  Yes, it was.  I
6  remember that.  It was in '92.
7    Q   What did you do for Ft. Lincoln?
8    A   Sold pre-need cemetery property.
9    Q   And why did you leave Ft. Lincoln?
10   A   Because I heard about this wonderful job
11  opportunity --
12   Q   Okay.
13   A   -- with the Department of Human Services.
14  They were looking for social workers.
15   Q   Okay.  Now, before we get to that position,
16  I may have just misheard you, but I thought you said
17  you worked for several cemeteries.
18   A   Well, not several.  I worked for Dulaney
19  Valley, then I was at Woodlawn.
20   Q   Was that before Ft. Lincoln?
21   A   Yes.  I left Woodlawn and went to Ft.
22  Lincoln.

50

1    Q   Okay.  And you did the same thing there?
2    A   Yes.
3    Q   Why did you leave Woodlawn?
4    A   Because the leads were not good.
5    Q   Okay.
6    A   So it was --
7    Q   And then you went to Ft. Lincoln?
8    A   Yes.
9    Q   Were there any other cemeteries that you
10  worked for during that time?
11   A   No.
12   Q   Were there any other jobs you had -- when I
13  say "jobs," I mean part-time -- before we start
14  talking about Department of Human Services.
15   A   No.
16   Q   Okay.
17   A   Not that I remember.
18   Q   Now we're at the point where we're at the
19  Department of Human Services.
20   A   Yes.
21   Q   You heard about this -- I believe your
22  testimony was you heard about this wonderful position.

51

1    A   Yes.
2    Q   What was that position?
3    A   It was the Department of Human Services was
4  looking for master's level social workers.
5    (Ms. Jones exited the conference room).
6  BY MR. WILLIAMS:
7    Q   And you applied for this position?
8    A   Yes, I did.
9    Q   And you got this position?
10   A   Yes, I did.
11   Q   And so what was your position title?
12   A   My position title was recruitment social
13  worker.
14   Q   Okay.  And this was -- where was this
15  Department of Human Resources located?
16   A   Department of Human Services, it was the
17  Department of Human Services, and at that time Child
18  and Family Services was a division of the Department
19  of Human Services.  And it was over at 609 H Street,
20  Northeast.
21   Q   And was this a federal or --
22   A   District government.

52

1    Q   And you were a recruitment --
2    A   Social worker.
3    Q   -- social worker.
4    A   Yes.
5    Q   Can you explain to me what a recruitment
6  social worker does?
7    A   We worked out in the community, finding
8  foster and adoptive parents for children in the
9  District's custody.
10   Q   Can you tell me what you did particularly?
11   A   Recruited homes for foster and adoptive
12  children.
13   Q   So tell me if I'm wrong, but you would find
14  homes that CF -- well, CFSA Department of Human
15  Services would use.
16   A   Yes.
17   Q   How would you go about finding these
18  available homes?
19   A   Well, we worked with the community.  We
20  worked with churches.  We worked with different civic
21  organizations, the business community, and the medical
22  community.  I mean, everybody was a prospect.

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

14 (Pages 53 to 56)

53

1    Q  Okay.  And you would visit with these
2  places and you would try to recruit them to be a home
3    **A  Yes.  Yes.**
4    Q  How long did you work there?
5    **A  I worked there from August 24, 1992 until**
6  **October 3rd, 2005.**
7    Q  Okay.  I'm going to walk through those
8  years and try to figure out where, if any, your
9  positions changed.  So right now we have you at a
10  recruitment social worker.
11    **A  Yes.**
12    Q  And that was in '92.
13    **A  Yes.**
14    Q  What was your next position change?
15    **A  My next position change was supervisory**
16  **social worker.**
17    Q  When was that?
18    **A  It must have been around somewhere '93,**
19  **maybe 1993, '94.**
20    Q  I know it's a long time ago.
21    **A  Yeah, it is.**
22    Q  So just give your best --

54

1    **A  It would have been '93 or '94.**
2    Q  And what did a supervisor social worker do?
3    **A  I managed or supervised other recruitment**
4  **social workers.**
5    Q  Okay.
6    **A  And we did the same thing, identifying**
7  **homes for children, foster and adoptive homes for**
8  **children in the District's custody.**
9    Q  But in this role you're supervising other
10  recruitment social workers?
11    **A  Yes.**
12    Q  Could this be characterized as a promotion?
13    **A  Yes.**
14    Q  What was your next position change within
15  the same unit?
16    **A  Well --**
17    Q  I'm sorry.  Within the same agency.
18    **A  Then I was detailed to the Office of Public**
19  **Information, and I think that detail was around '95**
20  **maybe.  These dates escape me.**
21    Q  Well, take your time, think about it.
22    **A  I believe it was around '95.**

55

1    MR. CONDIT:  In any case, it would be in the
2  official personnel file, would it not?
3    THE WITNESS:  Yes, it would.
4    MR. CONDIT:  I don't think you need to
5  struggle with it.
6  BY MR. WILLIAMS:
7    Q  It was around '95.  That's good enough.
8    MR. WILLIAMS:  Thank you, Mr. Condit.
9    THE WITNESS:  Yes.
10  BY MR. WILLIAMS:
11    Q  Did your position change after that?
12    **A  Yes.  When I was detailed to the Office of**
13  **Public Information, I was acting as public information**
14  **officer for a very short period of time.**
15    Q  Okay.  And what does acting public
16  information officer do?
17    **A  In that role I was working directly with**
18  **the director along the lines of communication matters,**
19  **inter-agency communication, strategies, and -- and**
20  **that was about it.**
21    Q  And how long were you in that position?
22    **A  Probably six or seven months before they**

56

1  hired a public information officer.
2    Q  Who did they hire?
3    **A  They hired Joanne Williams.**
4    Q  So it is my understanding there was a
5  position change for you at that point?
6    **A  That's right.**
7    Q  What was that position change?
8    **A  I was made public information specialist.**
9    Q  Okay.  And what does a public information
10  specialist do?
11    **A  Well, at that time we did inter-agency**
12  **communications.  We published in-house newsletters.**
13  **We spoke with new social workers.  I particularly did**
14  **from the standpoint of being a social worker.**
15    **Initially, because when Joanne Williams was**
16  **hired, we were -- that was still a part of the**
17  **receivership, and so we did different things.  I**
18  **worked a lot with the community in organizing an**
19  **annual golf tournament to raise money for foster and**
20  **adoptive parent activities.  And that's about all I**
21  **remember that we did.**
22    Q  Okay.  Did you have any -- did you

Case 1:06-cv-00789-PLF-JMF     Document 41-15     Filed 04/22/2008     Page 15 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

15 (Pages 57 to 60)

57

1  supervise any other employees?
2      **A  No, I didn't.**
3      Q  And who was your supervisor?
4      **A  Joanne Williams.**
5      Q  How long were you in that position?
6      **A  I was in that position until October 3rd,**
7  **2005.**
8      Q  When you were being supervised by Joanne
9  Williams, what was your relationship like with Joanne
10  Williams, professional relationship?
11      **A  We had a good working relationship.  I**
12  **respected her and I think she respected me.**
13      Q  Were you ever -- did she ever admonish
14  you -- did you get any admonishments for anything you
15  did in that role under her?
16      **A  No.**
17      Q  Did she ever pull you aside and question
18  your work product at any point in time that you were
19  supervised by her?
20      **A  No.**
21      Q  How long were you -- how long was she your
22  supervisor?

58

1      **A  I think Joanne was my supervisor for about**
2  **a year and a half.**
3      Q  And then after Joanne?
4      **A  After Joanne, they hired Mindy Good.**
5      Q  And what year was that?
6      **A  I believe it was 2002.  It was about 2002.**
7      Q  One second, please.
8      **A  Sure.**
9      Q  Let's go back a little bit to your work
10  history at CFSA or Department of Human Services.
11      **A  Right.**
12      Q  I have here that or my understanding of
13  your testimony was that you were a supervisor social
14  worker.
15      **A  Yes.**
16      Q  And then you next held -- your next
17  position was in the Office of Public Information?
18      **A  Yes.**
19      Q  Okay.  Why did you go from the supervisor
20  social worker to the Office of Public Information?
21      **A  The receiver, the general receiver,**
22  **Ernestine Jones, detailed me to her office to act as**

59

1      **public information officer after the -- her public**
2  **information officer left.  So she wanted me to act**
3  **until they hired someone.**
4      Q  Did she say why she chose you?
5      **A  Well, not -- no, she didn't, not really.**
6  **She just --**
7      Q  Why do you think she chose you?
8      MR. CONDIT:  Objection.  You can answer, if
9  you know.
10      THE WITNESS:  Well, I think -- I think she
11  chose me because when the receivership period was a
12  very difficult time for the City, for the government,
13  as well as for people who were in that -- put in that
14  role by a federal judge to come in and have oversight
15  for the agency.  And there were some workers within
16  the agency who they felt had the agency's best
17  interest at heart, was on the agency's side, tried to
18  balance in the community -- tried to balance what --
19  what the media was projecting about the agency.  We
20  tried to keep balance there and show that there were
21  some positive changes being made under Ms. Jones'
22  administration.

60

1  BY MR. WILLIAMS:
2      Q  Okay.  And then after they found -- I
3  believe your testimony is they found somebody for that
4  position?
5      **A  Yes.**
6      Q  And then you moved to --
7      **A  A specialist.**
8      Q  -- a specialist.
9      **A  Yes.**
10      Q  Why were you -- do you know why you were
11  moved into a specialist and not back to a supervisor
12  social worker?
13      MR. CONDIT:  Objection, but you can answer,
14  if you know.
15      THE WITNESS:  No, I don't know the answer to
16  that.
17  BY MR. WILLIAMS:
18      Q  Did you request to be moved back into the
19  supervisor social worker position?
20      **A  No, I didn't.**
21      Q  Did you make any request for being moved to
22  any other position other than public information

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

61

1  officer?
2      A  After I had been in that role for a while
3  and when Mindy Good came, she and I both agreed that I
4  could make a good contribution to the recruitment
5  activities of the agency.  And she and I dialogued
6  about how we could make that happen, but it never
7  happened.
8      Q  Well, before that time, before your
9  interaction with Mindy Good, it is my understanding --
10  correct me if I'm wrong -- that you moved from the
11  acting position to the public information officer
12  position.
13      A  Yes.
14      Q  During that time, before Mindy Good, you
15  had that dialogue, did you ever request to be moved to
16  another position?
17      A  As a matter of fact, I did request to
18  Sondra Jackson, who was the interim receiver after Ms.
19  Jones left, I did request to go back to my activities
20  and position as supervisory social worker for
21  recruitment.
22      Q  Sondra Jackson?

62

1      A  Yes.
2      Q  And when did you make that request?
3      A  I made that request before Ms. Jackson left
4  the agency, which would have probably been somewhere
5  2002 -- 2002, 2003.
6      Q  And when you made that request, was it
7  granted?
8      A  No, because Ms. Jackson was in transition.
9  She was getting ready to leave the agency as another
10  director was coming in.  So she never did make the
11  switch.
12      Q  Okay.  It is my understanding that Ms.
13  Sondra Jackson was another supervisor of yours.
14      A  Yes, she was -- yes, she was the agency's
15  receiver while Ernestine Jones left.
16      Q  Okay.  How was your working relationship
17  with Ms. Jackson?
18      A  Excellent.
19      Q  Did Ms. Jackson ever reprimand you?
20      A  Never.
21      Q  Did you ever receive any official
22  admonishment from Ms. Jackson?

63

1      A  Never.
2      Q  Did she ever pull you aside and criticize
3  or -- criticize your work product?
4      A  Never.  Always the opposite.
5      Q  How long was she your supervisor?
6      A  Ms. Jackson probably was my supervisor for
7  six months or so.  A matter of months.  I don't think
8  it was a whole year.
9      Q  And after Ms. Jackson, who was your
10  supervisor?
11      A  After Ms. Jackson, Joanne Williams remained
12  my supervisor.
13      Q  I'm just a little confused and I'll ask you
14  to help me out.  Ms. Williams was your supervisor
15  before?
16      A  Yes.
17      Q  And then Ms. Jackson was your supervisor.
18      A  No.  Ms. Jackson was Joanne Williams'
19  supervisor and my supervisor.  She was the agency
20  head.
21      Q  Okay.  Okay.  But Ms. Williams was still
22  your supervisor.

64

1      A  Yes.  Yes.
2      Q  Okay.  And after Ms. Jackson, who was the
3  agency head?
4      A  That's when Olivia Golden came in.
5      Q  And how long was Olivia Golden the agency
6  head?
7      A  I think Olivia Golden was at the agency
8  about two years.
9      Q  Okay.  Did she ever supervise you?
10      A  No.
11      Q  Did you ever have any interaction with her
12  regarding your work product?
13      A  No.
14      Q  Did you have any interaction with her
15  regarding your work?
16      A  No.
17      Q  And after Olivia Golden, who was the next
18  agency head?
19      A  Brenda Donald.
20      Q  What year was that?
21      A  2003.  Late 2003, I believe.
22      Q  Did Ms. Williams stay your supervisor this

65

1  entire time?
2      A  Yes, she did.
3      Q  When did she stop being your supervisor?
4      A  When Mindy Good came on board around
5  2003 -- 2002 or 2003.
6      Q  So in 2002 or 2003, Mindy Good was your
7  supervisor?
8      A  Yes.
9      Q  And in 2003 Brenda Donald was the agency
10  head.
11      A  Yes.
12      Q  I've asked you a lot of questions about
13  your work history.  So I want you just to think back
14  to the answers you just gave and I want to know if
15  there are any other positions you held up until this
16  point that we are now.
17      A  In CFSA?
18      Q  No, just any work positions that you've
19  held.
20      MR. CONDIT:  I'm going to object to the form
21  and to the relevance, but you can answer, if you can
22  think of anything.

66

1      THE WITNESS:  Well, I sold Mary Kay for a
2  while.
3  BY MR. WILLIAMS:
4      Q  When did you sell Mary Kay?
5      A  '92 through about -- through about '97 --
6  '96, '97.
7      Q  Anything else?
8      A  Not that I recall.
9      Q  Ms. Tabb, I'm going to ask you about your
10  duties from 2002 onward for CFSA, which is the meat of
11  this matter.  In 2002 -- I've asked this, but I'll ask
12  it now -- who was your direct supervisor?
13      A  Joanne Williams.
14      Q  And the agency head was who?
15      A  2002, Ernestine Jones.  Well, Ms. Jones had
16  gone -- Sandra Jackson -- Sondra rather, S-O-N.
17      Q  And what were your duties in 2002?
18      A  In 2002 I was responsible for agency
19  communication plans.  I spearheaded the annual
20  celebrity golf tournament.
21      Q  Anything else?
22      A  I supported Joanne Williams in her

67

1  communication efforts and followed her guidelines
2  or -- her assignments, supported her assignments.
3      Q  I don't want to stop you in the middle, but
4  when you say "supported her assignments," what do you
5  mean?
6      A  Well, if she gave me assignments, then I
7  followed through on them.  I'm trying to think what
8  else -- 2002 has been a long time.
9      Q  I understand.  What type of assignments
10  would she give you typically?
11      A  I'm drawing a blank for some reason.  I
12  can't remember everything that we did.  The golf
13  tournament campaign.  Oh, I believe I, under Joanne, I
14  wrote narratives or profiles for children waiting for
15  adoptive homes.
16      Q  So it's my understanding that children who
17  were looking for adoptive homes, you would write
18  narratives --
19      A  Yes.
20      Q  -- I'm using the word entice, but --
21      A  Yes.
22      Q  -- attract people --

68

1      A  Exactly.
2      Q  -- people to adopt them.
3      A  Yes.  Yes.
4      Q  Anything else?
5      A  And we also -- Joanne would have me speak,
6  attend staff functions with her, and present the
7  public Information Office in terms of how staff could
8  utilize the Public Information Office for inter-agency
9  campaigns, to make life easier for them.
10      Q  Were there any other responsibilities you
11  had in 2002 under Joanne Williams and Sondra Jackson?
12      A  I attended -- yes.  I recruited social
13  workers as well.  I recruited social workers.
14      Q  Anything else that you can remember?
15      A  Not that -- I don't remember right now.
16      Q  Okay.  Who were your supervisors in 2003?
17      A  Mindy Good.
18      Q  Is that when Mindy Good first came?
19      A  Yes.
20      Q  2003?
21      A  Yes.  I believe.
22      Q  And who was the agency head?

Case 1:06-cv-00789-PLF-JMF   Document 41-15   Filed 04/22/2008   Page 18 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

18 (Pages 69 to 72)

69

1     A  Olivia Golden.
2     Q  Okay.  I'm going to back up for one second.
3  Back in 2002 when the agency head was Joanne Williams
4  and your supervisor was Sondra Jackson, did you
5  receive any admonishments during that time pursuant to
6  your work?
7         MR. CONDIT:  I need to object to the
8  question because you reversed the people.  Sondra
9  Jackson you said was her immediate supervisor and
10  Joanne Williams was the agency head.  So if you'd
11  rephrase the question so that it's clear.
12        MR. WILLIAMS:  What did I say?  I thought I
13  said --
14        MR. CONDIT:  You reversed them.  You said
15  Ms. Jackson was her immediate supervisor and Ms.
16  Williams was the agency head.  So I just didn't want
17  the record to be --
18  BY MR. WILLIAMS:
19     Q  Okay.  So when Sondra Jackson was the
20  agency head and Ms. Williams -- thank you,
21  Mr. Condit -- Ms. Williams was your supervisor, did
22  you receive any admonishments?

70

1     A  Never.
2     Q  Did you receive any reprimands?
3     A  Never.
4     Q  Did you receive any unsatisfactory
5  performance appraisals?
6     A  Never.
7     Q  Did you receive any satisfactory
8  performance appraisals?
9     A  No.
10     Q  Were you ever pulled aside during that time
11  period where your work was criticized?
12     A  Never.
13     Q  So now we're into 2003.
14     A  In 2002 I do believe that I got an
15  excellent rating for my evaluation.
16     Q  Thank you.
17     A  You're welcome.
18     Q  In 2003 where Mindy Good was your
19  supervisor and Olivia Golden -- Mr. Condit has got me
20  worried now -- where Mindy Good was your supervisor
21  and Olivia Golden was the agency head, what were your
22  duties?

71

1     Let me ask you this way.  Did your duties
2  change?
3     A  Yes, they did.
4     Q  What were your duties?
5     A  When Mindy came in, she redid the job
6  description, and I was responsible for editing and --
7  publishing and editing the CFSA "Reporter," which was
8  an in-house newsletter that came out every two weeks.
9     Then --
10     Q  I don't mean to stop you.  I'll give you a
11  chance to answer completely.  But when you said you
12  were responsible for the insider --
13     A  Yes, the CFSA "Reporter."
14     Q  What did you -- what were your duties with
15  the --
16     A  To collect stories relevant to the agency
17  and staff and publish it --
18     Q  Okay.
19     A  -- every two weeks.
20     Q  Were you also responsible for editing?
21     A  Yes.
22     Q  And were you responsible for the final

72

1  product that went out?
2     A  Yes, after -- after Mindy checked it.
3     Q  Okay.  Please continue.
4     A  Yes.  And then I was responsible for
5  providing customer service to other components in the
6  agency to develop communication plans for these other
7  departments.  Of course I was responsible for -- I was
8  the agency's customer service business partner in the
9  mayor's customer service initiative, and I managed
10  that project, being responsible for keeping all of the
11  900, plus or minus, employees seeing that they kept
12  their telephone voicemails compliant with the mayor's
13  initiative, making sure their voicemails were not
14  full, which was contrary to his initiative.
15     Then I also helped develop some of the agency
16  materials that Mindy wanted produced in order -- since
17  the agency was under new management, we had to produce
18  all these different documents so we would have
19  publications when the public called for information.
20     Q  Any others?  Any responsibilities?
21     A  There were -- you could get it out of my
22  personnel file and look at the job description,

Case 1:06-cv-00789-PLF-JMF   Document 41-15   Filed 04/22/2008   Page 19 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

19 (Pages 73 to 76)

73
1   because --
2       Q   As you sit here today, do you remember any
3   others?
4       A   No, not off the top of my head.
5       Q   Okay.  Did any of the responsibilities you
6   had in 2002 remain in 2003 after Mindy took over?
7       A   Not many.  Not many.  She came in and tried
8   to make the Office of Public Information more
9   succinct.  She felt that public information was
10  something that people just thought that you were
11  supposed to do everything.  Some people look at it
12  synonymously with public relations, and so she was
13  trying to streamline it and have it run almost like a
14  media entity.
15      Q   Okay.  Is that your view, too, that it
16  should be run like public relations?
17      A   Yeah, I think it should be.  Should have
18  been more public relations, yes.
19      Q   So is it your testimony you share that same
20  view as -- that view -- as Mindy did?
21          MR. CONDIT:  Object to the form, but you can
22  answer.

74
1           THE WITNESS:  No.  I'm saying that I
2   disagree with her -- the way she wanted to run it.
3   BY MR. WILLIAMS:
4       Q   Okay.  I might have missed something.  I
5   thought your testimony was that her view, that it
6   should have been run more like public --
7       A   No, just the opposite.  Her view was it
8   should have been more succinct and run like a media --
9   a little media entity, whereas, previous management
10  felt like it was a good place for your public
11  relations to come out of public information as well.
12      Q   Okay.  So it's your testimony that you
13  didn't share Mindy's view.
14      A   That's right.
15      Q   Is it your testimony that you shared the
16  former manager's view that it should be run more like
17  a public relations --
18      A   Well, I'm not saying that it should have
19  been run more like that.  What I'm saying is I think
20  that we could have done dual roles, not that it should
21  have been run like a public relations office, but we
22  should have had more -- we should have been more

75
1   responsive with our public relations and community
2   contact.
3       Q   Okay.  I think I understand your position.
4   I think I understand.
5           In 2004 who were your supervisors?
6       A   Mindy Good.
7       Q   And who was the agency head?
8       A   Brenda Donald.
9       Q   Was 2004 when Brenda Donald came on or --
10      A   She came on in 2003.
11      Q   Do you remember when in 2003?
12      A   I'm sorry?
13      Q   Do you remember when in 2003?
14      A   No, I don't.
15      Q   Was Mindy Good the supervisor at the time
16  of your termination?
17      A   Yes, she was.
18      Q   And was Brenda Donald the agency head at
19  the time of --
20      A   No, she wasn't.
21      Q   Who was?
22      A   When I was terminated?

76
1       Q   Yes.
2       A   Oh, yes, she was.  Yes, she was.  I'm
3   sorry.  I got distracted.
4           MR. WILLIAMS:  Mike distracts people all the
5   time.  Let the record reflect that Mike Bruckheim,
6   co-counsel on this, is now in the room.
7   BY MR. WILLIAMS:
8       Q   And in 2005, was Mindy still your
9   supervisor?
10      A   Yes.
11      Q   And Brenda Donald was the agency head?
12      A   That's right.
13      Q   At any time between 2003 and 2005, did you
14  have any other supervisor?
15      A   No.
16      Q   Any other agency?
17      A   No, not while I was there, no.
18      Q   And what were your duties in 2004?
19      A   In 2004 I was responsible for the CFSA
20  "Reporter."
21      Q   And that's different from the Insider?
22      A   The Insider?

Case 1:06-cv-00789-PLF-JMF    Document 41-15    Filed 04/22/2008    Page 20 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

20 (Pages 77 to 80)

77

1    Q   You said the "Reporter."
2    A   The CFSA "Reporter."
3    Q   "Reporter."  Okay.
4    A   Yes.  I was responsible for the CFSA
5    "Reporter."  I was responsible for developing
6    communication plans.  I was responsible for
7    maintaining the agency's compliance in the mayor's
8    customer service initiative.
9        As I said, I was responsible for helping to --
10   helping to design public information materials,
11   consulted with different departments about their
12   initiatives that they wanted us to get out among
13   staff.
14   Q   Okay.  Anything else?
15   A   I'm sure there is something else, but --
16   Q   As you sit here today, do you remember?
17   A   Oh, and I also was designated as the person
18   who would speak at new worker training because these
19   were social workers and they wanted me to speak to
20   them about the opportunities and challenges of being a
21   social worker at Child and Family Services as part of
22   their retention strategies.

78

1    Q   And from 2002 until -- I'm sorry.  If
2    you're not finished --
3    A   No, no.
4    Q   Okay.  In 2002 to 2005, did you work with
5    any other social workers in that position?
6    A   In which position?
7    Q   In your position as public information
8    officer.
9    A   Yes, I did.  Yes, I did.
10   Q   So there were other social workers who you
11   worked with?
12   A   In public -- developing public information
13   campaigns?
14   Q   Yes.
15   A   Yes.
16   Q   Okay.  In 2005 what were your duties?
17   A   The same:  the CFSA "Reporter," producing
18   public information campaigns and all other duties
19   assigned.  Mindy may come with a special project,
20   which she often did, and then I was responsible for
21   staying on top of that.  I also forwarded calls to her
22   house when she was not at work because we were not

79

1    allowed to talk directly -- contact the media
2    directly.  So when she was out, it was my
3    responsibility or Derek's to send the media calls to
4    her or take notes.
5    Q   I'm sorry.  Did you just testify that you
6    weren't supposed to contact the media directly?
7    A   That's right.
8    Q   How did you know you weren't supposed to do
9    that?
10   A   Because of the overall, of the general
11   culture of the agency, back -- going back as far as
12   the receivership, when the agency got a lot of adverse
13   media attention.  So they wanted to make sure that no
14   one spoke to the media who didn't have media training
15   and they wanted to -- because the Office of Public
16   Information was a place where a spin was put on
17   things.  So they had to be sure that the right person
18   was speaking with the media because of that need to
19   keep that spin on what was happening in the agency.
20   So we were not supposed to talk with the media.
21   Q   Did somebody tell you that or was that
22   written down anywhere?

80

1    A   It was well-known that we didn't -- well,
2    starting back from the receivership, we were told that
3    we don't talk to the media, not even managers, unless
4    Mindy has approved them talking to the media directly.
5    Q   I guess my question is, how did you know?
6    Who told you?
7    A   Mindy Good.
8    Q   Told you not to talk to the media?
9    A   Yes.  All media went to Mindy.
10   Q   And before Mindy Good, who told you not to
11   talk to the media?
12   A   The receiver, Sondra Jackson, Ernestine
13   Jones.
14   Q   So as far back as the receivership forward.
15   A   Yes.  Yes.
16   Q   Okay.  Also, you mentioned Derek Stewart.
17   Who is Derek Stewart?
18   A   Derek Stewart was the other Public
19   Information specialist in the office with me.
20   Q   So there were only two Public Information
21   specialists?
22   A   When I was there.

Case 1:06-cv-00789-PLF-JMF    Document 41-15    Filed 04/22/2008    Page 21 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

21 (Pages 81 to 84)

81

1    Q   When you were there?
2    A   Yes.
3    Q   And Derek was always the other person?
4    A   Oh, we had another person for a short time.
5    Her name was Nicole -- Nicki Smith -- Nikita Smith --
6    but she didn't stay but a few months, so primarily it
7    was just Derek and I.
8    Q   And when did Ms. Smith -- the limited time
9    she worked with you, when was she there?
10   A   I think she must have -- I think she must
11   have left early 2004.  She wasn't there but just a few
12   months.
13   Q   When did you and Derek start working
14   together?
15   A   When Ms. Jones detailed me to the Public
16   Information Office.
17   Q   What year was that?
18   A   I'm not sure, but I'm thinking '99,
19   somewhere like 1999.  But, again, that's a guess.
20   Q   I understand.  Just asking for what you can
21   recall as you sit here today.
22   A   Okay.

82

1    Q   What is your relationship like with Derek
2    Stewart -- what was your relationship like with Derek
3    Stewart in 2002?
4    A   We had --
5    MR. CONDIT:  Objection to the relevance, but
6    you can answer.
7    THE WITNESS:  We had a good working
8    relationship.
9    BY MR. WILLIAMS:
10   Q   Okay.  Did he review your materials that
11   you sent out?
12   A   No.  We might collaborate on projects, but
13   he didn't review -- he didn't review what I sent out.
14   Q   How many projects do you think that the two
15   of you collaborated with each other during the period
16   you worked together?
17   A   I couldn't give you a number.  I have no
18   idea.  But we would collaborate on different things,
19   but I have no idea how many projects.
20   Q   Was it more than ten?
21   A   I doubt it.  Because we were both
22   responsible for individual things, but he might come

83

1    to me and ask me what I thought, certainly if it was
2    something relevant to what a social worker might think
3    or do, and then he -- I would lean toward him for his
4    computer expertise sometimes.
5    Q   So concerning your collaboration, was it
6    less than five?
7    A   I don't know.
8    Q   Did you have a personal relationship with
9    Derek Stewart socially?
10   A   No.
11   Q   Do you still stay in contact with Derek
12   Stewart?
13   A   No.
14   Q   You do not?
15   A   No.
16   Q   When was the last time you had contact with
17   Derek Stewart?
18   A   The last time, when he was deposed.
19   Q   And before that time?
20   A   Right after I got fired he called me to
21   arrange to get one of the keys that I had to the -- to
22   a lock box in the lobby.  And so I don't have contact

84

1    with Derek.  I don't have contact with any of the
2    people at CFSA that I used to have lunch with.  Those
3    people have nothing to do with me.
4    (Discussion was had off the record.)
5    (Proceedings recessed at 11:40 a.m.)
6    (In session at 12:57 p.m.)
7    BY MR. WILLIAMS:
8    Q   Ms. Tabb, I want to ask you a question
9    based on a question I asked you before the lunch break
10   just for clarification purposes.  I had asked you the
11   question about, I believe you had answered a question
12   concerning who had the ability to speak on behalf of
13   CFSA.
14   A   Yes.
15   Q   Do you remember that?
16   A   Yes.
17   Q   Okay.  And I believe your testimony was
18   that only one person -- they didn't want everybody
19   speaking on behalf of CFSA to the media.  Do you
20   remember that?
21   A   Yes.
22   Q   Was that your response?  Do you remember?

Case 1:06-cv-00789-PLF-JMF    Document 41-15    Filed 04/22/2008    Page 22 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

22 (Pages 85 to 88)

85
1    A  Yes.
2    Q  So I take it from that testimony that
3  you're saying that there was designated individuals in
4  CFSA who were supposed to talk to the media?
5       MR. CONDIT: Object to the form.  You can
6  answer it, if you understand the question.
7       THE WITNESS:  Yes.
8  BY MR. WILLIAMS:
9    Q  And in 2005 who were those individuals?
10    A  Mindy Good and Brenda Donald.
11    Q  Okay.  And what does CFSA do as an
12  organization?
13    A  CFSA is the District of Columbia's Child
14  Protection Agency.
15    Q  Okay.  What does that mean?  What do they
16  do?
17    A  CFSA provides oversight and assistance to
18  children in danger of being neglected or abused or --
19  and they find foster homes for children who are unable
20  to remain in their homes and they find adoptive
21  parents for children for whom all of the efforts have
22  been exhausted toward reunification.

86
1    Q  Okay.  In the process of the duties you
2  just explained, does CFSA come across confidential
3  information of these children?
4    A  Yes.
5    Q  Okay.  And how is that information
6  generally kept by CFSA?
7       MR. CONDIT:  I'm going to object to the
8  extent that it may call, in the broad scope of the
9  question, it may call for expertise beyond the
10  witness's information and understanding.  If the
11  question is limited to the witness's information and
12  understanding, then that's fine.
13       THE WITNESS:  It's kept on computer in our
14  child welfare computer system faces.  And I would --
15  well, I don't want to guess, but the child welfare
16  system faces.
17  BY MR. WILLIAMS:
18    Q  But there is information gathered about the
19  child that is confidential; is that correct?
20    A  Yes.
21    Q  Okay.
22       MR. CONDIT:  I'm sorry.  Could we identify

87
1  who is in the room?
2       MR. WILLIAMS:  No problem.  One second.
3     Let the record reflect that Ahmed Shawky who is
4  an intern in our office is in the deposition room at
5  this time.
6  BY MR. WILLIAMS:
7    Q  Is it your testimony that CFSA gathers
8  confidential information about children?
9    A  Well, not just confidential information.
10    Q  Okay.  My question is specific.  Do they
11  gather confidential information, though?
12    A  Sometimes.
13    Q  Sometimes.  So CFSA has confidential
14  information regarding children.
15    A  Yes.
16    Q  Is that information generally released to
17  the public?
18       MR. CONDIT:  I'm going to object to the
19  form, but you can answer, if you understand the
20  question.
21       THE WITNESS:  Well, generally, I mean, I
22  wouldn't think so.

88
1  BY MR. WILLIAMS:
2    Q  Okay.  Let's try this a different way.
3  What I'm trying to do is identify whether or not CFSA
4  has confidential information regarding kids in its --
5  in the process, in the Child and Family Services
6  process.  You testified that, yes, there is some
7  information that you have that is confidential.
8    A  Yes.
9    Q  Do you remember that?
10    A  Yes.
11    Q  My question to you is, is that confidential
12  information disseminated freely to the public?
13       MR. CONDIT:  I'm going to also object to
14  these questions in that the term "confidential" may
15  have a special legal meaning in District law and this
16  witness cannot answer as to a legal meaning or
17  conclusion with respect to the term confidential.  And
18  so the only thing the witness can answer is her
19  understanding of what is confidential.
20       MR. WILLIAMS:  Noted.
21       THE WITNESS:  I would say that it was not
22  just given out to the general public.

89

1    BY MR. WILLIAMS:
2        Q   Okay.  Isn't it that the nature of CFSA has
3    confidential information of children that they protect
4    from the general public?
5        A   In most cases.
6        Q   Okay.  So do you know what the rules of
7    CFSA are in regards to the use and handling of
8    confidential information of children in its care?
9                MR. CONDIT:  Object to the extent it calls
10   for a legal conclusion, but the witness can answer as
11   to her understanding.
12               THE WITNESS:  Can you ask the question
13   again?
14   BY MR. WILLIAMS:
15       Q   No problem.  What is your understanding of
16   the rules -- while you were at CFSA, what was your
17   understanding of the rules regarding the use, the
18   dissemination and the handling of confidential
19   information regarding children in its care?
20               MR. CONDIT:  Same objection, but you can
21   answer.
22               THE WITNESS:  Well, I have never seen any

90

1    written policy.
2    BY MR. WILLIAMS:
3        Q   What was your understanding?
4        A   Well, my understanding is, naturally we
5    wouldn't go out and divulge primary information, like
6    name, address, who the parents are -- identifying
7    information.
8        Q   And what would -- what do you consider
9    identifying information?
10       A   Name, date of birth, parents' names,
11   grandparents' names, foster parents, prospective
12   adoptive parents.
13       Q   So is it your testimony that any
14   information that would be used -- that could be
15   used -- to identify a child in the care of CFSA?
16               MR. CONDIT:  I'm going to object.  That's a
17   leading question and mischaracterizes her testimony.
18   BY MR. WILLIAMS:
19       Q   Please answer.
20               MR. CONDIT:  You can answer, if you
21   understand the question.
22               THE WITNESS:  What was your question?

91

1    BY MR. WILLIAMS:
2        Q   No problem.  We'll start this over again.
3    I'm trying to find out -- you said that there is
4    certain information that's confidential.  I asked you
5    what type of information is confidential, and I
6    believe your testimony was identifying information.
7    I'm trying to ascertain through you what is -- what do
8    you characterize as identifying information.  You
9    testified that it was name, I believe you said
10   address, but I'm not sure --
11       A   Yes.
12       Q   -- address, parents' name, grandparents'
13   name.
14       A   Siblings.
15       Q   So my question to you was, you know, based
16   on what you have testified to, is it your further
17   testimony that it's information that could be used to
18   identify who a child is, that's identifying
19   information?
20       A   Yes.
21       Q   Okay.  Are there strict rules with regards
22   to this identifying information at CFSA?

92

1        A   As I said, out of the near 14 years I was
2    at CFSA, I never saw any written policy about
3    confidentiality.
4        Q   What was your understanding?
5        A   Well, I mean, my understanding was that,
6    whenever possible, we would maintain confidentiality,
7    whenever possible.
8        Q   When are some times when you could not --
9    that you would not be able to maintain identifying
10   information?
11       A   I'm not a policy person, okay, but from
12   what I understand is child fatalities, where if a
13   lawsuit is pending or the parents or relatives go out
14   and get an attorney, then some of these records would
15   be turned over in the event of a fatality, in cases
16   where we are looking for adoptive homes for children,
17   confidentiality is waived and they are shown on
18   television.  Their birth -- well, not particularly
19   dates of birth, but their ages, if they have siblings,
20   they are also shown on TV.  Then, also, as a social
21   worker, I understand that in some cases for us it is
22   admissible to waive confidentiality if it's in the

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

24 (Pages 93 to 96)

93

1  best interests of the child.  If the child or client
2  is in a threatening position where that child is
3  harmed, neglected, or otherwise hurt, then in those
4  cases confidentiality can be waived.
5      Q   Okay.  So there is a possible --
6  possibility -- to have a waiver of confidentiality in
7  certain circumstances.
8      A   Yes.
9      Q   And you testified -- you didn't say
10  Wednesday's Child -- something along the lines of
11  showing a child on television, it would be waived in
12  that --
13      A   Yes.
14      Q   So there are instances where it would be
15  waived, yes?
16      A   Yes.
17      Q   Is there a process for that waiver?
18      A   Yes, there is a process for that waiver.
19      Q   What's the process?
20      A   A judge signs a waiver of confidentiality.
21      Q   Okay.  So in order to have confidentiality
22  or -- confidential information, excuse me -- waived, a

94

1  judge would have to sign off on it?
2          MR. CONDIT:  Object to the extent it calls
3  for a legal conclusion, but the witness can testify as
4  to her understanding.
5          THE WITNESS:  That is one primary example.
6  BY MR. WILLIAMS:
7      Q   Is there another way?
8      A   Yes, there is another way.  If a
9  professional social worker feels that a child is being
10  neglected or otherwise harmed, that social worker has
11  an ethical duty to do what they have to do to mitigate
12  the circumstances and mitigate the situation according
13  to our code of ethics.
14      Q   Is it your testimony that that may include
15  stating confidential information?
16      A   It depends on what kind of confidential
17  information is stated.
18      Q   I asked you -- you said that sometimes --
19      You testified that sometimes a social worker,
20  if they think that a kid is being harmed, a child is
21  being harmed or is in a precarious situation, that a
22  social worker has an ethical obligation to do whatever

95

1  they have to do to mitigate the situation.
2      A   Yes.
3      Q   Is that true?
4      A   Yes.
5      Q   And I asked you, would that mitigation --
6  could that mitigation include the releasing of
7  confidential information?
8      A   Yes.
9      Q   Okay.  And that is -- is that any social
10  worker or a social worker on a certain case?
11      A   It's any social worker who is taking the
12  code, the social workers' code of ethics, seriously,
13  and any social worker who is brave enough to stand up
14  in the face of injustice and neglect.
15      Q   That wasn't my -- thank you for that, but
16  my question was very specific.  I asked whether or not
17  that applies to a social worker, any social worker, or
18  a social worker assigned to a specific case with a
19  specific child.
20      A   Any social worker, any professional social
21  worker.
22      Q   So is it your testimony that if you're a

96

1  social worker and you work at a sandwich shop and you
2  see a situation that you, where you think a kid may be
3  in danger, that you have an ethical obligation as a
4  social worker to mitigate that situation?
5      A   Yes.  If you are a social worker, if you
6  maintain a license and if you consider yourself a
7  professional social worker, yes, you are mandated to
8  do something about that or at least report it.
9      Q   Okay.  So it's your testimony that if
10  you're a social worker and if, I guess, sworn to the
11  code of ethics for social work -- I'm not sure how --
12      A   Well, it comes under the profession.
13      Q   If you're a social worker and you are not
14  practicing social work, that you still have this
15  obligation under the code of ethics to do everything
16  to mitigate that situation?
17          MR. CONDIT:  Object to the form, but you can
18  answer.
19          THE WITNESS:  If you consider yourself a
20  social worker, if you hold a license, if you are -- if
21  you consider yourself a social worker.  Some people
22  may be social workers, they may have retired and

Case 1:06-cv-00789-PLF-JMF    Document 41-15    Filed 04/22/2008    Page 25 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

25 (Pages 97 to 100)

97

1  decided they don't want to --
2  BY MR. WILLIAMS:
3      Q  So it's your testimony it's arbitrary,
4  depends on what the person feels?
5          MR. CONDIT:  Object to the form.  You can
6  answer it, if you understand.
7          THE WITNESS:  I'm not really sure what
8  you're asking.
9  BY MR. WILLIAMS:
10     Q  Well, I asked you whether or not a social
11 worker has this obligation under the code of ethics to
12 mitigate children in a situation --
13     A  Yes, they do.
14     Q  -- and I said every social worker, and you
15 said it depends -- I believe your testimony was it
16 depends, based on what that social worker considers,
17 whether or not they are a professional.
18     (Mr. Bruckheim is now present.)
19         MR. CONDIT:  Object to the form, but you can
20 answer if you understand it.
21         THE WITNESS:  Let me clear that up.  Any
22 social worker.

98

1  BY MR. WILLIAMS:
2      Q  Any social worker?
3      A  That's right.
4      Q  Regardless of profession.
5      A  That's right, any social worker.  That's my
6  understanding.
7      Q  And what do you base that understanding on?
8      A  The social workers' code of ethics.
9      Q  So what canon of ethics in the social
10 workers' code of ethics do you base -- base your
11 belief that any social worker in any profession has
12 this obligation?
13     A  I don't remember it verbatim.
14     Q  Tell me what you remember.
15     A  What I remember is that social workers have
16 a duty to maintain confidentiality in -- except when a
17 child or a client is in harm's way.
18     Q  A child or a client?
19     A  Yes.
20     Q  And that's in the code of ethics?
21     A  Yes.
22     Q  All right.  So I just want to be clear.  So

99

1  if you're not -- say that a person is a social worker
2  by trade but is not currently working as a social
3  worker, and they are walking down the street and they
4  see a situation that we've talked about where a child
5  is in some type of danger.  That child is not their
6  client.  They don't know that child.  And they are not
7  actively in the profession of social work.  They have
8  an obligation to mitigate that situation?
9      A  If they are a social worker.
10     Q  I guess -- what do you mean when you say
11 social work, that they are a social worker?  That they
12 have taken classes?  That they are certified?
13     A  Yes, that they have gotten the necessary
14 prerequisite courses to meet the standards of the
15 National Association of Social Workers, to meet those
16 educational requirements and standards, either at the
17 undergraduate or the graduate level.
18     Q  So they don't have to be engaged in
19 actually having clients and being part of a social
20 worker business.
21     A  I'm not comfortable answering that because
22 it sounds like a policy question, and I'm not a policy

100

1  expert, but I am testifying from my knowledge of being
2  a social worker.
3      Q  Well, and that's what I'm asking you to
4  rely on.  I'm not asking you as a policy.  I'm asking
5  you as a social worker what your understanding is.
6      A  Well, as a social worker, that is my
7  understanding.
8      Q  So even if the person is not engaged in the
9  profession of social work, simply because they have a
10 degree and have a social worker's license, they are
11 obligated to mitigate these situations where kids are
12 in harm?
13         MR. CONDIT:  Object to the form and the
14 characterization of prior testimony, but you can
15 answer, if you understand.
16         THE WITNESS:  That's hard to answer because
17 you're asking me about any social worker in the
18 situation.  I'm just really not comfortable, because
19 it sounds like policy, something from an
20 administrative level.
21 BY MR. WILLIAMS:
22     Q  I understand your concern.  What I'm asking

Case 1:06-cv-00789-PLF-JMF     Document 41-15     Filed 04/22/2008     Page 26 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

26 (Pages 101 to 104)

101

1 you is a very -- what I believe is a very
2 straightforward question. I'm asking you if an
3 individual who has a social worker degree, and an
4 individual who is not currently in the profession of
5 social work, has the same obligations and duties to
6 report children in a dangerous situation as a person
7 actively engaged in that profession.
8     A  I don't know.
9     Q  You don't know. Ms. Tabb, what was your
10 relationship with Mindy Good like in 2005?
11         MR. CONDIT:  Object to the form, but you can
12 answer.
13         THE WITNESS:  My relationship with Mindy in
14 2005 was an interesting one.
15 BY MR. WILLIAMS:
16     Q  Okay. What do you mean by "an interesting
17 one"?
18     A  It was -- she was supportive in many ways.
19 Then she would turn, just flip, to the opposite and
20 she would be mean, retaliatory, condescending. So it
21 was -- it was hard to read Mindy in 2005.
22     Q  Okay. Well, you just testified that she

102

1 did some things that were supportive.
2     A  Yes.
3     Q  What are those things?
4     A  Mindy was supportive in that she was
5 concerned about the agency's inability or failure or
6 inability, failure, to adequately recruit foster
7 homes. And because she knew my background, she was
8 supportive and wanted me -- thought I should have been
9 more involved with recruiting foster parents, and she
10 told me that. And she felt that I had a unique skill
11 set being an MSW with sales and marketing experience.
12 And she had even suggested to me that I go to the
13 director of the agency and tell the director how I
14 could help.
15         And I had talked with Mindy about, yes, I would
16 be -- Mindy thought she and I would work greatly
17 together -- great together -- with me pursuing
18 recruitment and her doing the communication piece, and
19 she was supportive of that.
20     Q  I think you just testified that she
21 suggested you go to the director?
22     A  Yes, she did.

103

1     Q  Okay. When did that happen?
2     A  That was at around May -- must have been
3 May or June.
4     Q  Of 2005?
5     A  Yes.
6     Q  Okay. And the director at that time was?
7     A  Brenda Donald.
8     Q  What did she suggest you go talk to Brenda
9 Donald about?
10     A  She suggested that I talk to Brenda about
11 how I could help recruit foster and adoptive parents.
12     Q  Where did this conversation take place?
13     A  In Mindy's office during supervision.
14     Q  You also testified that your relationship
15 with Mindy was supportive and then you said, I
16 believe, bad.
17     A  Antagonistic.
18     Q  Antagonistic. How was it antagonistic?
19     A  It was antagonistic because, as I
20 testified, I'm from Arkansas. My parents were in
21 Arkansas. My father got very ill and my sister called
22 me and said, Shirley, you need to come home because it

104

1 is just my sister down there caring for my father and
2 my mother. And I went to Mindy and told her, because
3 I thought we had a relationship where I could share my
4 fears and my concerns about my parents. And I said I
5 understand that my father may not have long. I would
6 like to take some time to go and spend some time. And
7 she was not supportive. And she said, well, do you
8 just have to go now? And, as a result of that, my
9 daddy died and I didn't get to see my daddy again.
10         Then when my daddy died in April of 2004, my
11 daddy died, I had to bring my 87-year-old mother back
12 here. And going through that was one of the most
13 horrific and difficult experiences I have ever had. I
14 had to bring mama here. I'm single. My son's in
15 Baltimore. He has his life. He was going to school.
16 All that fell on me. I went to Mindy and told Mindy
17 that, after I brought mama here, naturally I had to
18 take her to doctors, the geriatric doctors, doctors
19 who see old people, geriatric doctors. I had to get
20 home health services set up so I could go to work.
21 And I asked for a week off. Mindy told me she did not
22 think I needed a week off to do these things for my

Case 1:06-cv-00789-PLF-JMF    Document 41-15    Filed 04/22/2008    Page 27 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

27 (Pages 105 to 108)

105

1   mother.
2       Q   Okay.  Thank you for giving us that answer,
3   but my question was, and I want you to try to -- I
4   understand we -- and we offer you our condolences for
5   everything that's happened to you, your father dying
6   and your having to bring your mother.  I understand
7   that.  But I am going to ask you a very specific
8   question and I want you to focus in on the behavior of
9   Mindy that was antagonistic.
10      It seems to me that you've testified to --
11  correct me if I'm wrong -- that Mindy became
12  antagonistic when you tried to take time off for
13  family.
14      A   That was one occasion.
15      Q   Okay.  Please list for me the other
16  occasions when she became antagonistic.
17      A   The other -- one other occasion was as
18  editor of the CFSA "Reporter," the in-house newspaper
19  it's my job to find stories for the paper.  So this
20  particular day I had done my draft.  Because she would
21  read it and give me approval of whether it could go
22  out or not.  I had put a lot of effort into this

106

1   paper.  It was during Black History week.  So another
2   employee at the agency every year would send out Black
3   History trivia questions.
4       So he had sent me the list of names of people
5   who had won little gifts for the correct questions.  I
6   included that in the CFSA "Reporter."  And when I --
7   when she gave it back to me, she had taken it out.
8       And I asked her, Mindy, what happened to my
9   Black History story?  She said she took it out because
10  she didn't feel that the CFSA "Reporter" was an
11  appropriate place to put it because that was an
12  in-house organ primarily for managers who wanted to
13  disseminate communication information.
14      So that didn't quite sit with me when we were
15  an agency that was, in terms of our client population,
16  that was about 94% black.  But that was her position.
17  So she took the story out.
18      Then only a couple of additions down the road,
19  when I was out on sick leave, I guess it was, she had
20  an article in the CFSA "Reporter" about saving some
21  trees or something.  So, I mean --
22      And then another time when she was

107

1   antagonistic, I was walking down the hall.  She was
2   standing in somebody else's door.  And I walked by and
3   I said, "good morning, Mindy."  And she turned around
4   and screamed at me.
5       And another time was when we were in a staff
6   meeting, and they were talking about -- Brenda Donald
7   was talking about, and Mindy had talked to Derek and I
8   in our unit meetings about how CFSA employees were
9   entering into illegal procurement contracts without
10  going through procurement.  So we were racking up a
11  lot of bills because the people needed car seats, they
12  would just call somebody up and say, I need car seats,
13  bill it to District government.  So they were trying
14  to stop that way of doing business.
15      And so I suggested, which I had been told was
16  my responsibility as the public information
17  specialist, I suggested that I go to Mr. Sammy
18  Feinberg, who was the director of procurement, and
19  tell him what the Office of Public Information could
20  offer him in terms of creating a communication plan
21  for him to share with other staff through my CFSA
22  "Reporter" and posters, whatever would be necessary,

108

1   for that communication plan.  I've spoke out just like
2   we are sitting at this table, and I said I'll go to
3   Mr. Feinberg and tell him we can do this.
4       So like to took my head off when that meeting
5   was over.  She said that I had no right to speak out
6   in a meeting like that and she didn't know anything
7   about it.
8       Q   From what you've listed so far -- my
9   question was how was she antagonistic.  You said that
10  she was antagonistic in that she did not want you to
11  take time off for your family.
12      A   That was one.
13      Q   And I believe your testimony was that she
14  was antagonistic because she edited your CFSA
15  "Reporter" to take out information regarding Black
16  History month.
17      A   (Nodding head up and down).
18      Q   How is that antagonistic, editing your
19  document?
20      A   Because I was the editor.  She had let me
21  put articles in before and hadn't taken anything out.
22      Q   Who sees the CFSA "Reporter" before it goes

Case 1:06-cv-00789-PLF-JMF    Document 41-15    Filed 04/22/2008    Page 28 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

28 (Pages 109 to 112)

109

1  out?
2      **A  She does.**
3      Q  And she has the last ability to say what
4  goes out ultimately?
5      **A  Yes.**
6      Q  Okay.  So here she exercised that ability
7  by taking out Black History information.
8      **A  Yes.**
9      Q  Okay.  How is that antagonistic?
10     **A  Because to that point that had not been our**
11 **relationship.  We had not worked that way.  She had**
12 **not been --**
13     Q  I understand -- I don't mean to cut you
14 off, but I understand that you're saying that wasn't
15 the way your relationship was.  But you said that this
16 is an activity that showed that she was antagonistic
17 to you.  And you've testified that she had last -- she
18 looked at the CFSA "Reporter" last.  She edited it
19 last.  That was her function.
20     **A  Right.**
21     Q  She did it here.  And somehow you felt that
22 that was antagonistic.  And I'm trying to figure out

110

1  how that is antagonistic.
2      So my question to you is:  How is that
3  antagonistic?
4      **A  Because it was an appropriate article.  It**
5  **was in February.  Everybody was celebrating black**
6  **history, and I just thought that would have been a**
7  **very appropriate, as the editor -- and I felt it was**
8  **antagonistic.  Though I respected her position to take**
9  **it out, she took it out.  We sent it out.  But that**
10 **was the first time that she had just chopped up my**
11 **paper by taking out a significant article.**
12     Q  Okay.  One second, please.
13     The staffing, when you spoke up regarding a, I
14 believe you testified, a different way to do
15 procurement.
16     **A  Yes.**
17     Q  Do you remember testifying to that?
18     **A  Yes.**
19     Q  Mindy was in the staff meeting, too?
20     **A  Yes.**
21     Q  And after the staff meeting she asked you
22 not to speak out in the staff meeting regarding stuff

111

1  that she had not -- that she didn't know about.
2      MR. CONDIT:  Object to the characterization,
3  object to the form, but you can answer, if you
4  understand.
5      THE WITNESS:  She didn't ask me not to.  She
6  told me -- asked me -- said, how dare you speak out
7  about a campaign, about doing something, when I didn't
8  know anything about it.  And that was new.
9  BY MR. WILLIAMS:
10     Q  So was it your experience at these staff
11 meetings, that anybody talked about anything?
12     **A  It certainly was.**
13     Q  And you didn't have to talk with anybody
14 ahead of time?
15     **A  No, absolutely not, including myself.**
16     Q  Okay.  So you don't have to speak with your
17 supervisor ahead of time.
18     **A  Of course not.  It's free speech.**
19     Q  I understand that you're saying it's free
20 speech, but was it the practice, when you were there,
21 that people could talk about anything they wanted
22 to --

112

1      **A  Yes.**
2      Q  -- at the meeting?
3      **A  Yes.**
4      MR. CONDIT:  Objection, asked and answered.
5  BY MR. WILLIAMS:
6      Q  You also indicated there was an incident
7  where Mindy screamed at you in the hallway.  Can you
8  describe that incident?
9      **A  It was one morning I spoke to her.  And**
10 **first she didn't speak, and I spoke again, and she**
11 **screamed, "Hi Shirley," or something, in a very harsh**
12 **tone.**
13     Q  Okay.  She screamed "hi" to you in a harsh
14 tone?
15     **A  Yes.**
16     Q  Okay.  Was it a loud tone?
17     **A  Yes, very loud, embarrassing and degrading**
18 **because she was standing in the door of another staff**
19 **person and they commented on it.**
20     Q  So is it your testimony that she was
21 antagonistic when, one morning, she yelled to you, "hi
22 Shirley"?

Case 1:06-cv-00789-PLF-JMF     Document 41-15     Filed 04/22/2008     Page 29 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

29 (Pages 113 to 116)

113

1        MR. CONDIT:  Counsel, I'm going to object to
2   questions.  I'm going to have to lodge a lot of
3   objections when you keep characterizing the witness's
4   testimony.  Is it your testimony.  Is it your
5   testimony.  She has just testified.  If you want to
6   ask a clarifying question without saying is this your
7   testimony, I'm not going to have a problem with that,
8   but I am going to start objecting all the time when
9   you say, is it your testimony, and you recharacterize
10  the witness's testimony.
11       MR. WILLIAMS:  Noted.
12  BY MR. WILLIAMS:
13       Q   Answer the question.
14       MR. CONDIT:  Can you ask the question again?
15  I don't recall it.
16  BY MR. WILLIAMS:
17       Q   Is it your testimony that Mindy Good was
18  acting antagonistic towards you when she said good
19  morning to you in a loud voice from the doorway of
20  another person's office?  Is that your testimony?
21       MR. CONDIT:  Object to the form.  Object to
22  the characterization of the testimony.

114

1        MR. WILLIAMS:  It's noted.
2   BY MR. WILLIAMS:
3        Q   Answer the question.
4        A   That was one of a series of things.  Had
5   those series of things not been there -- maybe she was
6   just hung over, I don't know, but she -- this was a
7   number of things.  It was not an isolated incident.
8        Q   What was your relationship with Brenda
9   Donald like in 2005?
10       MR. CONDIT:  Object to the form, but you can
11  answer.
12       THE WITNESS:  We really didn't have much of
13  a relationship in 2005 because Mindy -- I reported
14  directly to Mindy.  So I didn't see Brenda a lot.
15  BY MR. WILLIAMS:
16       Q   Okay.
17       A   So we really didn't --
18       Q   What about in 2004?
19       MR. CONDIT:  Object to the form.  Object as
20  vague.
21       THE WITNESS:  2004, we never had what you
22  would call a relationship, so we really didn't have

115

1   any kind of relationship other than she was the
2   director.  If it was something she wanted me to do and
3   she asked, of course I did it, but in terms of a
4   relationship, no, there was none.
5        Q   It wasn't antagonistic the way you
6   testified about Mindy Good?
7        A   No, but she supported Mindy.  She was
8   supportive of Mindy.
9        Q   Okay.  And what is the basis for your
10  belief that she supported Mindy?
11       A   Because when Mindy had a problem with me
12  suggesting that I do my job and create a communication
13  campaign for procurement, she agreed with Mindy that I
14  shouldn't have suggested that without speaking to her
15  first.
16       Q   And that -- I'm sorry.  And that showed
17  that she was supportive of Mindy?
18       A   Yeah.  Mindy and Brenda were playing good
19  cop/bad cop.
20       Q   What do you mean by that, "good cop/bad
21  cop"?
22       A   When something happened with Mindy and I

116

1   went to Brenda to mediate it, she pretended that she
2   had -- she understood my position, but yet she would
3   go back and side with Mindy.
4        Q   Okay.  Can you name a specific instance
5   where that occurred?
6        A   Yes.  My employee evaluation.
7        Q   Okay.
8        A   In 2004 and 2005.
9        Q   All right.  Can you describe what happened
10  with that occurrence?
11       A   Yes.  Before that evaluation was finalized,
12  we have a chance to do a self-evaluation.  And once we
13  see the proposed evaluation, we also -- used to with
14  the agency -- we had an opportunity, and this had been
15  the case with Mindy and Brenda until 2005, where the
16  employee had the right and an opportunity to defend
17  his position in terms of disagreeing with the
18  evaluation.
19       I disagreed strongly with my evaluation in
20  2005.  Mindy told Derek and I that, if you disagree
21  with your evaluation, then give us some supporting
22  documents so we can -- Brenda can look at it, I can

Case 1:06-cv-00789-PLF-JMF    Document 41-15    Filed 04/22/2008    Page 30 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

30 (Pages 117 to 120)

117

1  look at it.
2      I put together a 300-page binder with
3  documentation rebutting what she said in the
4  evaluation. And they didn't even give -- they made
5  their minds up about the evaluation before I even had
6  a chance to say, hey, here's my proof that Mindy is
7  not telling it like it is in this evaluation. Here's
8  300 pages.
9      Q   How did you know they made up their mind
10 before --
11     A   Because Mindy had sent me in her office to
12 get newspapers, and I went to get the newspapers. And
13 she had left a copy of my evaluation and Derek's
14 evaluation on her desk. And there was a little sticky
15 note from Brenda Donald Walker saying, sounds good to
16 me. And after that, she gave us the evaluation signed
17 by herself and Brenda.
18     Q   This is before you gave your 300-page
19 binder?
20     A   Yes. Yes. And Mindy had seen the binder.
21 And she had seen me putting it together. Derek had
22 put a big stack of stuff together. We never got a

118

1  chance to submit it.
2      Q   Okay. What did your evaluation say that
3  you disagreed with?
4      A   It said I would -- I would need to look at
5  a copy, but it said that I lacked initiative, which I
6  know wasn't true. I got a negative on the quality
7  of -- on the amount of work. Well, I didn't assign
8  work to myself. That was her responsibility to assign
9  me work. I would go to Mindy and say, Mindy, can I do
10 this? Can I do this? This department wants this
11 done.
12     Mindy's position was, no, that's not your job.
13 You need to do OPI work. And I said, but, Mindy, I
14 don't mind doing it. This is a good way to develop
15 loyal customers, being people in the agency. She
16 would not do it. She wouldn't let me do it.
17     Q   What else did the evaluation say that you
18 didn't agree with?
19     A   It said lack of initiative, quality of
20 work, ability to maintain -- and I'm paraphrasing
21 because I'm not looking at an evaluation -- but that I
22 didn't work well in new situations, which was not

119

1  true. And, I don't know, maybe attendance. It was a
2  whole lot of things that she had given me minuses on.
3  However, the end result was a satisfactory evaluation.
4      Q   We're going to come back to the evaluation
5  and other documents.
6      A   Okay.
7      Q   Did you take family medical leave in 2005?
8      A   Yes.
9      Q   When?
10     A   March.
11     Q   How long did you take?
12     A   I used family medical leave in two parts.
13 I was approved for family medical leave from sometime
14 in March through sometime in mid October 2005.
15     Q   In mid October 2005?
16     A   Yes.
17     Q   How many weeks did you take?
18     A   I don't know how many weeks that amounted
19 to.
20     Q   Let me tell you why I'm asking the
21 questions. It seems to me during 2005 you took family
22 medical leave and some other sick leave. I want to

120

1  know, during 2005, when you were taking family medical
2  leave and when you were taking just sick leave.
3      A   Okay.
4      Q   So we can start month by month, if you
5  would like.
6      MR. CONDIT: Do you have records you want to
7  show her? I don't know that anybody can remember what
8  leave they took and what kind of leave they took and
9  when they took it.
10     MR. WILLIAMS: Your objection is noted. I
11 understand. She should answer to the best of her
12 ability at this point.
13     MR. CONDIT: That's fine.
14     THE WITNESS: To the best of my ability, I
15 took family medical leave in March when my mother had
16 a brain stroke. And I was out with my mother until
17 she died in April. She died April the 14th of 2005.
18 And I came back to work, I think, mid May. And then
19 by the time my mother had had that stroke and I had
20 buried her, and all the stress, my blood sugar levels,
21 because I'm a diabetic, my blood sugar levels were
22 three and 400. So my doctor was -- she couldn't

121

1  believe that I was still going. So she approved time
2  for me to take off so I could try to take better care
3  of myself and get my blood sugar levels back down.
4      So I came back to work mid May. Then around
5  August I decided that I would just go and take a block
6  of leave so I could just focus on my health rather
7  than trying to go to work and deal with the diabetes
8  and going to the doctor once a week and all this. I
9  thought -- I proposed that I just take some time off
10 with my doctor's authorization to try to get my health
11 back together, and that's what I did.
12     Q  Okay. So it's your testimony that you took
13 family medical leave from, I believe you said, March
14 2005 to April 2005?
15     A  Yes.
16     Q  And you testified that you returned to work
17 in May, mid May --
18     A  Yes.
19     Q  -- 2005. And then you applied for
20 additional family medical leave?
21     A  **This was medical leave.**
22     Q  Just medical leave?

122

1      A  **It wasn't family; it was medical.**
2      Q  In August, is that what you said?
3      A  **Yes, I believe it was August.**
4      Q  Was there any other medical leave during
5  2005 that you applied for that you can remember
6  sitting here today?
7      A  **Not that I can remember.**
8      Q  Okay. What about sick leave?
9      A  **That was one and the same, I thought. Sick**
10 **leave was the medical leave.**
11     Q  So in August when you applied for medical
12 leave -- I believe your testimony was -- were you
13 taking sick leave?
14     A  **Yes.**
15     Q  From that, that was sick leave.
16     A  **Sick leave, yes.**
17     Q  In August.
18     A  **Yes.**
19     Q  Now the one that you took in March, what
20 was that?
21     A  **Family, because I was caring for my dying**
22 **mother.**

123

1      Q  Did you take any other sick leave or sick
2  days during 2005?
3      A  **During that period in August?**
4      Q  I'm starting from March. In March, did you
5  take any sick leave?
6      A  **I don't remember. I don't remember. I**
7  **know that mid March my mother had the stroke and I**
8  **didn't go back to work until after she was gone and I**
9  **had buried her.**
10     MR. WILLIAMS: Give me one second.
11 BY MR. WILLIAMS:
12     Q  Did you fill out leave slips for sick leave
13 in March of 2005? Do you remember that?
14     A  **I don't recall when I filled out sick**
15 **leave.**
16     Q  Did you take days off because you were sick
17 in March of 2005?
18     A  **I don't remember.**
19     Q  What about April?
20     A  **I don't remember what days. I know that I**
21 **was out some because of my diabetes and because of my**
22 **mother, but I don't remember the specific days.**

124

1      Q  Okay. Now your diabetes is different from
2  family medical leave that you took because of your
3  mother; is that correct?
4      A  **Well, I'm not sure about the terms, the**
5  **family medical leave, the sick leave, the medical**
6  **leave. I mean, I just filled out the forms to use the**
7  **leave that I had.**
8      Q  Okay. Do you know -- strike that.
9      So when you were taking off time away from work
10 for your diabetes, you're not sure if that was for
11 your -- under the Family Medical Leave Act or under
12 just traditional sick leave.
13     A  **I'm not sure.**
14     Q  Okay. When you applied for leave under the
15 Family Medical Leave Act, did you state it was for
16 your mom or did you state it was for diabetes?
17     A  **For my mother.**
18     Q  Okay. So if you were taking time off for
19 diabetes, you wouldn't be taking it under the Family
20 Medical Leave Act; is that correct?
21     A  **Like I said, I don't know all the tenets of**
22 **family medical leave. All I know is sick leave and**

Case 1:06-cv-00789-PLF-JMF   Document 41-15   Filed 04/22/2008   Page 32 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

32 (Pages 125 to 128)

125

1  family, being my mother.
2     Q   Okay.  No problem.  I understand.  It is
3  very confusing even for me.  So I understand your
4  confusion.  But what I'm trying to get at is what you
5  were taking the leave for.
6        You said that you applied for -- you testified
7  that you applied for Family Medical Leave Act; is that
8  correct?
9     A   Yes.
10    Q   In March of 2005.
11    A   Yes.
12    Q   And you just testified that you applied for
13  that leave because of your sick mom.
14    A   Yes.
15    Q   Okay.  You also testified that you took
16  some time off for your diabetes in March.
17    A   Right.  Yes.
18    Q   And I'm asking you whether or not you took
19  time off for your diabetes because you had time off
20  under the Family Medical Leave Act or was there a
21  specific sick leave for your diabetes?
22    A   There was a specific sick leave for my

126

1  diabetes, I believe, because -- yeah, I believe it was
2  because of my diabetes.
3     Q   You testified that you took medical
4  leave -- you applied for medical leave in August 2005?
5     A   I'm not -- I really don't remember exactly
6  how it was executed.
7     Q   Do you remember how you applied for it?
8     A   I remember bringing back a statement from
9  my doctor stating the period of time that she was
10  having me out to work on my diabetes.  I remember
11  bringing that back.  And I remember a meeting with
12  Mindy Good and Michelle Lewis where we agreed that, if
13  the doctor concurred, that I would go on out and work
14  on my diabetes and come back when my levels had
15  stabled, stabilized.
16        (Exhibit No. 2 marked for identification and
17  attached hereto.)
18  BY MR. WILLIAMS:
19    Q   Can you take time to review this document,
20  Ms. Tabb?  Let me know when you have reviewed it.
21    A   Yeah, this is the medical leave form.
22    Q   So you recognize that?

127

1     A   Yes.
2     Q   And what is it again, please?
3     A   It is a medical leave form.
4     Q   Is that your answer?
5     A   Yes, a medical leave form.
6     Q   Can you turn to page 2?
7     A   Yes.
8     Q   Do you see at the bottom where it says
9  "certification"?
10    A   Yes.
11    Q   It says, "I certify that the above
12  statements are true to the best of my knowledge."  Do
13  you see that?
14    A   Yes.
15    Q   Whose signature appears below?  Is that
16  your signature below that?
17    A   Yes.
18    Q   So after reviewing this document, do you
19  know whether you applied for medical leave or sick
20  leave in August of 2005?
21        MR. CONDIT:  Object --
22        THE WITNESS:  I don't know the difference.

128

1        MR. CONDIT:  I'm going to object because the
2  document speaks for itself and to the extent it calls
3  for the witness to be an expert in personnel and
4  family medical leave law.
5  BY MR. WILLIAMS:
6     Q   On page 2 -- I'm sorry.  Are you ready?
7     A   Yes.
8     Q   Page 2, Ms. Tabb, under C, I believe it is,
9  it says the period of medical leave requested for
10  above is taken, and there is a check mark in the box
11  that says, I believe, in the continuous block from
12  August 18th, 2005 to 9-16-2005.  And then underneath
13  that is another block that says intermittently as
14  medically necessary.
15        Do you remember checking this box?
16    A   Yes.
17    Q   Now the period of time that you have there
18  for the continuous block, what was that time for?
19  Were you applying for the medical -- under the Family
20  Medical Leave Act -- for your diabetes problem that
21  you testified to before or what was the reason for
22  taking that block of time?

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

33 (Pages 129 to 132)

129

1    A  The diabetes.
2    Q  The diabetes.  And I believe you testified
3  that your doctor had given you supporting documents
4  for that?
5    A  Yes.
6    Q  And so during that period of time -- strike
7  that.
8    What did you mean when you checked the box,
9  intermittently as medically necessary?
10    A  Because I was hoping that there could be a
11  period where I could go to work, as I was doing
12  better, I could go to work.  Then if I didn't feel
13  good, I could go -- I could take off and it wouldn't
14  be -- they wouldn't expect me to be there
15  continuously, but I could go in and do something.
16    Q  I'm just a little bit confused because both
17  boxes are checked.  So was it the fact that you were
18  taking off a continuous block of time as you testified
19  because of your diabetes or was it that you wanted to
20  come back intermittently?
21    MR. CONDIT:  Object to the form, but you can
22  answer, if you understand it.

130

1    THE WITNESS:  I think when I first filled
2  this out, I wanted to come back intermittently.  And
3  then there was a meeting and we agreed that I would
4  take a continuous block of time.
5  BY MR. WILLIAMS:
6    Q  Okay.  So this should -- so you filled this
7  form out and then there was a meeting?
8    A  Yes.
9    Q  Who was at the meeting?
10    A  Michelle Lewis, who was human resources
11  specialist, and Mindy Good.
12    Q  And at the conclusion of the meeting you
13  agreed or -- everybody agreed that it should have been
14  a continuous block of time?
15    A  Yes.
16    Q  Now, I'm going to go to No. 5 under the
17  certification, which I directed you to before.
18    A  All right.
19    Q  By signing this and certifying this, were
20  you certifying this because, due to your diabetes,
21  that you needed this continuous block of time off?
22    MR. CONDIT:  Object to the form, but you can

131

1  answer, if you understand.
2    THE WITNESS:  I understand it, that it is
3  certifying that I'm taking medical leave.
4  BY MR. WILLIAMS:
5    Q  But aren't you signing this saying you were
6  too sick to work between -- because of your
7  diabetes -- between 8-18-05 and 9-16-05?
8    A  I'm not sure I understand your question.
9  Can you rephrase it, please?
10    Q  Well, you signed this document requesting
11  leave under a continuous block of time.  That's what
12  you testified to.  And you said that was based on your
13  diabetes had escalated to a point that your doctor
14  said you needed time off because you were too sick.
15    A  Yes.
16    Q  So I'm asking you, your certification of
17  this, you're saying that you were too sick to work
18  between the dates of 8-18-05 and 9-16-05 because of
19  your diabetes.
20    A  Well, I'm not exactly saying that, but I am
21  saying that I want to take medical leave to take
22  better care of myself.  I mean, I wasn't terminal.

132

1    Q  But the basis of this application you
2  testified to was because of your diabetes, correct?
3    A  Correct.
4    Q  Okay.  And you stated that it was so high
5  that -- the level was so bad or high that your doctor
6  said you needed to take time off; is that correct?
7    A  Yes.  Yes.
8    Q  And you filled out this application to take
9  time off pursuant to your doctor's orders; is that
10  correct?
11    A  Yes.
12    Q  And your doctor supplied medical documents
13  showing that you were -- that your diabetes level was
14  bad or high; is that correct?
15    A  Yes.
16    Q  Okay.  So you applied because of your
17  diabetes; is that correct?
18    A  That's correct.
19    Q  So you're signing it here saying that you
20  are -- isn't it correct that you're signing here
21  because you're asking for time off because you were
22  too sick to work because of your diabetes?

Case 1:06-cv-00789-PLF-JMF    Document 41-15    Filed 04/22/2008    Page 34 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

34 (Pages 133 to 136)

133

1    MR. CONDIT:  Objection to the
2 characterization of the testimony.  You can answer, if
3 you understand.
4    THE WITNESS:  I don't understand.
5 BY MR. WILLIAMS:
6    Q   When was this approved?
7    A   I don't know.  I see what's on the form,
8 but I don't know --
9    Q   What's on the form?
10    A   August 23rd.
11    Q   2005?
12    A   2005.
13    MR. WILLIAMS:  We're going to take a short
14 five-minute break.
15    (Proceedings recessed at 2:04 p.m.)
16    (In session at 2:11 p.m.)
17 BY MR. WILLIAMS:
18    Q   Ms. Tabb, you indicated that your doctor
19 was treating you for diabetes during this time.
20    A   Yes.
21    Q   August 2005.  What was the level of your
22 diabetes?  How bad was it?

134

1    A   Well, I have not been diabetic long enough
2 to know all the -- all about diabetes, but I do
3 understand that you run a real high risk of getting
4 diabetic complications when the higher your levels are
5 and the longer you leave those levels high like that.
6 My levels were 350, 400, and I know that people can go
7 into a diabetic coma around 600, I think.
8    Q   Well, how did your doctor -- what did your
9 doctor prescribe for you to reduce your levels, your
10 diabetic levels?
11    A   She told me to try to eliminate some of the
12 stress, and she took me off of pills and put me on
13 insulin.
14    Q   Was this insulin that you give to yourself?
15    A   Yes.
16    Q   Did she prescribe anything else other than
17 time off and insulin?
18    A   And she prescribed a drug for the
19 cholesterol that was high.
20    Q   Do you remember the name of the drug?
21    A   Vytorin, V-Y-T-O-R-I-N.
22    Q   Did Vytorin affect you in making you sleepy

135

1 or lethargic in any way?
2    A   No, it didn't.
3    Q   So, for the prescription, other than time
4 off, you could have taken insulin at work; is that
5 correct?
6    A   Yes, I could have taken insulin at work,
7 but I had other complications of the diabetes.
8    Q   What complications were those?
9    A   My vision was much less.
10    Q   I'm going to let you finish, but when you
11 say "much less," what do you mean?
12    A   It means I had blurry vision -- blurred
13 vision.  I could be sitting at my computer and barely
14 be able to see the monitor.
15    Q   And was this episodic, meaning from time to
16 time your vision would be blurry and then clear and
17 then be blurry?
18    A   No.  During that time my eyesight, my
19 prescription, changed.  My eyes got so -- one night I
20 had worked late at CFSA, and I was on my way home.  I
21 go through the Third Street tunnel.  And except for
22 the fact that I know my way home and I've gone through

136

1 that tunnel several times, I don't know what would
2 have happened.  I could have killed somebody or myself
3 in the tunnel.  Because when I got in the tunnel and I
4 had on my other prescription, all I could see was the
5 blur of this red.  I assumed they were taillights.
6 And that's a scary feeling at night when you can't see
7 something up ahead of you.
8    Q   I understand that.  So your vision was
9 blurry.
10    A   And I had squigglies at night.  The lights
11 are not round lights like headlights.  They look like
12 stars.
13    Q   Okay.  Do you remember when your vision
14 started to be blurry?  Was it in August of 2005?
15    A   It started around May, after my mother had
16 been buried.
17    Q   And in August your vision was still blurry?
18    A   Yes, because --
19    Q   What did the doctor recommend for your
20 blurry vision?
21    A   She wanted to try to get my blood levels
22 down and suggested that she put me on a diabetic pump,

Case 1:06-cv-00789-PLF-JMF    Document 41-15    Filed 04/22/2008    Page 35 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

35 (Pages 137 to 140)

137

1  which I was not ready to make that kind of commitment.
2  I was hoping that maybe I could get my levels down and
3  just have a lifestyle change, less stress and more
4  yoga, without having to go to the pump.
5      And another way that my diabetes was affecting
6  me, too, at work as to why I just wanted to take some
7  time off to get myself together was, when your blood
8  sugar is high, you don't even think as clearly -- I
9  don't -- think as clearly. I'm clumsy. I bump into
10 things.
11     Q  Okay. When you say "think as clearly," are
12 you unable to process things the same way?
13     A  Your thought process -- my thought
14 process -- gets blurry. My speech -- it affects my
15 speech.
16     Q  Okay.
17     A  I get tongue-tied.
18     Q  And it's all -- you had these sicknesses in
19 August of 2005?
20     A  I'm sorry?
21     Q  The illnesses, the blurry vision --
22     A  The complications --

138

1      Q  -- that was all in August of 2005?
2      A  May through August.
3      Q  Did it go further than August?
4      A  September -- yes.
5      Q  September? When did it stop?
6      A  Well, I still have some of the vision
7  problems, and my vision is a little better, but not
8  much better.
9      Q  But there was -- is it your testimony that
10 it was severe in August 2005?
11     A  Yes, it was severe in August.
12     Q  Is it your testimony that it was severe in
13 November of 2005?
14     A  It was getting better. I was no longer at
15 CFSA in November.
16     Q  September, excuse me, 2005.
17     MR. CONDIT: Object to the form. You can
18 answer it, if you understand.
19     THE WITNESS: I was still on the insulin, so
20 I don't know if the insulin is what was stabilizing
21 the blood sugars or if I had been going back on the
22 pill, maybe they would have been down, maybe they

139

1  wouldn't have. But I continued to stay on the insulin
2  until --
3  BY MR. WILLIAMS:
4      Q  Okay. My question was, was your
5  illnesses -- the blurry vision, the blurry thought
6  process, the clumsiness -- was that still severe in
7  September 2005?
8      A  It was bad.
9      Q  It was bad.
10     A  Yes.
11     Q  Was it as severe as in August 2005?
12     A  I don't remember. It's all a blur.
13     Q  But you were in bad shape; is it fair to
14 say that?
15     A  I was in pretty bad shape.
16     Q  In both August and September?
17     A  Yeah.
18     Q  Were you bedridden?
19     A  No. I spent a lot of time in the bed, but
20 I -- I was ambulatory.
21     Q  Okay. Were you hospitalized during this
22 period?

140

1      A  No.
2      Q  Were you hospitalized at all for your
3  diabetes during 2005?
4      A  No.
5      Q  Ms. Tabb, I want to focus on allegations
6  you've made in this case and the basis for those
7  allegations. All right?
8      A  All right.
9      Q  You allege that the District of Columbia
10 violated your First Amendment rights. What is the
11 basis for your belief that the District violated your
12 First Amendment rights?
13     MR. CONDIT: Objection to the extent it
14 calls for the witness to reach a legal conclusion or
15 have legal expertise.
16     MR. WILLIAMS: If that's a standing
17 objection for the questions, that's fine, too.
18     MR. CONDIT: Also, to the extent that you're
19 asking the witness about statements in a document, I
20 would ask that you show her the document.
21     MR. WILLIAMS: I'm not going to show it to
22 her right now.

Case 1:06-cv-00789-PLF-JMF    Document 41-15    Filed 04/22/2008    Page 36 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

36 (Pages 141 to 144)

141

1     MR. CONDIT: Well, then I might instruct her
2  not to answer because she is not going to answer a
3  question about a statement that's attributed to her
4  without seeing the statement itself. Your
5  characterization of the statement --
6     MR. WILLIAMS: If you're going to instruct
7  your witness not to answer, it has to be on the basis
8  of either privileged, harassment -- it has to be --
9     MR. CONDIT: The rules allow for a person to
10  be confronted with a statement to be able to see the
11  statement.
12     MR. WILLIAMS: I can ask her anything I want
13  and ask her her recollection. And if you instruct her
14  not to answer in a deposition, that's an improper
15  instruction. So --
16     MR. CONDIT: Well, I'm going to be very
17  concerned about your characterization of statements --
18  I don't even know what complaint you're talking about.
19  The original complaint? Amended complaint? You
20  haven't made any of that clear.
21  BY MR. WILLIAMS:
22     Q  Ms. Tabb, you've alleged that the District

142

1  has violated your First Amendment rights. In what way
2  has the District violated your First Amendment rights
3  as far as you know?
4     A  Can you explain the question more?
5     Q  You allege that the District of Columbia
6  has violated your First Amendment right to free
7  speech. And I'm asking you in what way in this matter
8  that the District has violated that right.
9     MR. CONDIT: And I'm going to note my
10  objection on the grounds the witness is not a legal
11  expert.
12     THE WITNESS: I am not a legal expert, so
13  I'm not -- I don't think I'm qualified to answer that.
14  That's why I hired an attorney.
15  BY MR. WILLIAMS:
16     Q  But you have -- you allege that there was
17  some wrong that the District did in regards to your
18  ability to have free speech. Do you remember that?
19     A  You mean when I was unable to speak up at
20  meetings at CFSA, when I was rebuffed for speaking
21  out?
22     Q  I'm asking you what is the basis of your

143

1  belief that the District of Columbia has violated your
2  free speech, your First Amendment right to free
3  speech?
4     A  I'm going to defer to my attorney.
5     MR. WILLIAMS: We're actually going to copy
6  the amended complaint for you.
7     THE WITNESS: Thank you.
8     MR. WILLIAMS: So if you could just hold on
9  for one second.
10     Counsel, I'm going to move on while we're
11  copying that.
12     MR. CONDIT: Okay.
13  BY MR. WILLIAMS:
14     Q  We're going to move to an issue that I have
15  a couple questions about.
16     Do you remember contacting Mr. Neil Albert in
17  September of 2005?
18     A  I did.
19     Q  And do you remember what you contacted him
20  regarding?
21     A  Yes, I do.
22     Q  What was that?

144

1     A  It was around my concerns that we --
2  meaning the agency -- did not have enough placement
3  resources and children were being left in the building
4  at night to sleep without adequate accommodations.
5     Q  Okay. And when did you first communicate
6  with him?
7     A  I do not remember.
8     Q  Was it in September?
9     A  I don't remember.
10     (Exhibit No. 3 marked for identification and
11  attached hereto.)
12  BY MR. WILLIAMS:
13     Q  Can you take time and review this document?
14     A  Sure. Yes, I recognize it.
15     Q  What is it?
16     A  It is an e-mail from me to Neil Albert.
17     Q  Okay. I'm not trying to put words in your
18  mouth. Is it a series of e-mail conversations between
19  you and Mr. Albert? If you look at page 1 --
20     A  Yes.
21     Q  And I believe at the end is another e-mail.
22     A  Yes.

Case 1:06-cv-00789-PLF-JMF   Document 41-15   Filed 04/22/2008   Page 37 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

37 (Pages 145 to 148)

145

1    Q  So would it be fair to say this is a
2 colloquy e-mail?
3    **A  Yes.**
4    Q  Colloquy of e-mails between you and
5 Mr. Albert?
6    **A  Yes.**
7    Q  In the e-mail dated September 3rd, 2005, is
8 that the first time you contacted Mr. Neil Albert
9 about this matter?
10    MR. CONDIT:  Objection in that it's vague,
11 but you can answer, if you understand.
12    THE WITNESS:  No.
13 BY MR. WILLIAMS:
14    Q  When did you first talk to Mr. Albert?
15    **A  It would have been sometime in August**
16 **because we had had a meeting before this.**
17    Q  You had a meeting where you physically went
18 to see him or he -- he went to see you?
19    **A  Yes.**
20    Q  And that happened sometime in August?
21    **A  Yes.**
22    Q  Do you remember if it was early August or

146

1 late August?
2    **A  I don't remember.**
3    Q  Okay.  You just testified that in September
4 of 2005 that you had high levels of -- your diabetic
5 level was high.
6    **A  Yes.**
7    Q  And that you had blurry vision problems.
8 Do you remember that?
9    **A  Yes.**
10    Q  And that you had a blurry mind?
11    **A  Yes.**
12    Q  And that you were clumsy, that you had --
13 you had a lot of clumsiness.  Do you remember
14 testifying to that?
15    **A  Yes.**
16    Q  And that you were trying to reduce your
17 stress levels.  Do you remember testifying to that?
18    **A  Yes.**
19    Q  Okay.  If you turn to the second page --
20 actually, I'm sorry, can you turn back to the second
21 page?  At the very bottom there is an e-mail from you
22 that, I believe, is on Friday, September 2nd.  Do you

147

1 see that?
2    **A  Yes.**
3    Q  What time is noted there for the -- that
4 this e-mail was sent?
5    **A  3:00 a.m.**
6    Q  3:00 a.m.?
7    **A  3:00 a.m.**
8    Q  And so you were writing this e-mail at 3:00
9 a.m.; is that correct?
10    **A  I couldn't certify or attest to that**
11 **because that was an older computer.  I didn't**
12 **understand the date and times, so that -- the time**
13 **could have been off.**
14    Q  Could you turn to the second page, please,
15 the third paragraph from the bottom, where you say, I
16 have not been this excited about my work in three
17 years.  It's 3:00 in the morning and I'm excited and
18 I'm still up at my computer.  Do you see that?
19    **A  Yes.**
20    Q  Okay.  So were you writing this at 3:00
21 a.m.?
22    **A  Well, I must have.  I have it in here.**

148

1    Q  Okay.  So if you are sick, if you have
2 blurry vision, you're trying not to be stressed out,
3 you have mental blurriness, and your doctor has told
4 you to reduce your stress level, why are you up at
5 3:00 in the morning writing this letter to Mr. Neil
6 Albert about work?
7    **A  Well, Mr. Williams, as a social worker, my**
8 **job with CFSA was one of the most rewarding**
9 **experiences I had ever had.  I felt vested in the**
10 **children, vested in this community, and vested in that**
11 **agency.  And, yes, I had diabetes, but I had needles**
12 **to shoot up with insulin when I didn't feel good.**
13    **This was an opportunity to try and do something**
14 **for these poor children.  And Neil Albert had**
15 **indicated that he was interested in helping us find**
16 **more foster homes.  And I could have been in a**
17 **hospital and I would have been trying to help those**
18 **children.**
19    Q  I understand your testimony.  But it seems
20 to me, Ms. Tabb, that you are on medical leave because
21 of your diabetes, if you're having all the ailments
22 related to diabetes, as you say, it is disjunctive for

Case 1:06-cv-00789-PLF-JMF    Document 41-15    Filed 04/22/2008    Page 38 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

38 (Pages 149 to 152)

149

1  me that you're sitting up at 3:00 in the morning and
2  writing about work. So I'm trying to figure out why
3  you were doing this, if you were afflicted so with
4  diabetes.
5       MR. CONDIT: I'm going to object as
6  argumentative. If you want to ask a proper question
7  the witness can answer -- but I'll direct the witness
8  not to address that question or that statement, I
9  should say.
10 BY MR. WILLIAMS:
11      Q  If you're too sick to go to work, how were
12 you able to stay up until 3:00 in the morning and
13 write this letter?
14      A  Well, as I said, I spent a lot of time in
15 bed. So on this particular day, obviously that was
16 one of those times where I had been in bed all day,
17 got up to check e-mails. I also checked my voicemail
18 every day while I was home sick to make sure that the
19 agency stayed in compliance with the customer service
20 initiative. So any opportunity that I get to help
21 children, I'm going to take that opportunity.
22      Q  But you also just testified that you were

150

1  able to take shots of insulin and feel better. Do you
2  remember that testimony?
3       A  Yes. Temporarily, yes.
4       Q  Temporarily.
5       A  Yes.
6       Q  So why didn't you take shots of insulin at
7  work to feel better and go to work?
8       A  Because my doctor didn't feel that I should
9  be at work when I should be home where I could better
10 focus on my diabetes. This was just one incident
11 where I was doing something outside of staying in bed,
12 getting plenty of rest, exercising, trying to get my
13 eating better.
14      Q  I understand your testimony -- I understand
15 what you're saying. But you're too sick to go to
16 work. You testified that you were too sick to go to
17 work, correct?
18      A  Yes, I did.
19      Q  Okay. But you're not too sick to write
20 Neil Albert regarding your resume and a project
21 proposal; is that correct?
22      MR. CONDIT: Object to the question being

151

1  argumentative, object to the form, but you can answer,
2  if you understand.
3       THE WITNESS: I had a proposal already
4  ready. It didn't take ten minutes to do an e-mail, to
5  prepare an e-mail.
6  BY MR. WILLIAMS:
7       Q  Okay. But you weren't too sick to write
8  this e-mail. That's my question.
9       MR. CONDIT: Asked and answered and it's
10 getting to the point of badgering.
11      MR. WILLIAMS: I don't believe --
12 Mr. Condit, I don't believe she has answered the
13 question.
14      MR. CONDIT: It is getting to the point of
15 badgering. You have repeated several times now you're
16 too sick to do this, you're too sick to do that.
17 You're saying the same thing over and over again. And
18 if you continue to badger the witness, I will instruct
19 her not to answer and I will move for relief. So I
20 would ask you to frame your question properly.
21      MR. WILLIAMS: I don't believe she has
22 answered the question.

152

1       MR. CONDIT: She hasn't answered what you
2  want her to say.
3       MR. WILLIAMS: No, I don't believe she has
4  answered the question. My question was whether or not
5  saying that --
6  BY MR. WILLIAMS:
7       Q  My question is, if you're too sick to go to
8  work, why aren't you too sick to write this e-mail?
9       MR. CONDIT: Object to the form, but you can
10 answer, for what it's worth.
11      THE WITNESS: Like I said, I care about
12 children. I love children. And I made the sacrifice
13 to send this to somebody who may have been in a
14 position to help them because obviously I was not.
15 BY MR. WILLIAMS:
16      Q  Why are you submitting him your resume?
17      A  Because he had indicated to me that he was
18 willing to help with this recruitment campaign to find
19 resource families for the agency, something that was
20 not being done.
21      Q  Were you looking for a job?
22      A  No.

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

39 (Pages 153 to 156)

153

1    Q   Okay.  I'll point your attention to the
2  first e-mail, the penultimate paragraph.
3    A   The where?
4    Q   The next to the last paragraph.
5        MR. CONDIT:  I'm sorry.  The first e-mail?
6  The first page?
7        MR. WILLIAMS:  First page, the most recent
8  e-mail.
9  BY MR. WILLIAMS:
10   Q   Go ahead.  You can read it.
11   A   (Reading the document.)
12       What I was talking about there is not a new
13  job.  That would have just been a lateral detail.  I
14  didn't look at it as a new job.  I was doing the same
15  thing that I would have been doing, the same thing
16  that I was hired to do.
17   Q   So it's your testimony -- I'm trying to
18  figure out, it's your testimony that you weren't
19  looking for another job when you had -- when you made
20  the statement, have you spoken to Yvonne Gilchrest and
21  how soon can I expect to give CFSA my resignation?
22   A   Well, I didn't look at it as another job.

154

1  This was a detail.  I saw it as a detail.
2    Q   Was it a different job than what you had?
3    A   Different set of responsibilities, I guess,
4  different set of activities.
5    Q   Did it have the same job title?
6    A   We hadn't made a title.  We hadn't come up
7  with a title.  This was all --
8    Q   I understand.  So there wasn't a job title.
9  Did it have the same pay grade?
10   A   None of that was worked out.  I have no
11  idea what -- it could have been a demotion.  I don't
12  know.
13   Q   Would it be the same job, exact same job
14  description?
15   A   Well, I'm sure it wouldn't be the same job
16  description.
17   Q   Would the second job be at CFSA?
18   A   No.
19   Q   So how could it be the same job?
20   A   I saw it as one and the same because it was
21  doing work that should have been done at CFSA.
22   Q   Okay.

155

1    A   Just as I had talked with Mindy about
2  partnering with her in that effort to recruit
3  families.
4    Q   So it's not in CFSA, you don't know whether
5  the job title would be the same or different, you
6  don't know if the job responsibilities would be the
7  same or different, but you maintain that it's not a
8  different job; is that true?
9    A   At this point I'm so confused.  You got me
10  so confused, I don't know --
11   Q   No problem.  Ms. Tabb, according to this
12  e-mail, you submitted a resume to Neil Albert.  For
13  what position were you submitting that resume for?
14   A   There was no position.
15   Q   Okay.
16   A   There was none.
17   Q   Why did you submit him the resume?
18   A   He had indicated to me that he would detail
19  me to DHS to work with the recruitment unit.  So I
20  forwarded him my resume so that he could see my
21  recruitment activities.
22   Q   So it's your testimony that he talked about

156

1  some position at DHS, you said?
2    A   Yes, Department of Human Services.
3    Q   Okay.  In recruitment.
4    A   No.  There was no such position.  We were
5  talking about detailing me over there and I would have
6  created a recruitment strategy, a district-wide
7  recruitment activity or campaign.
8    Q   So it would be a new position over at DHS?
9  Because you said there wasn't one.
10   A   I can't say that it was a new position.  I
11  mean, we really didn't get to discuss it enough.  It
12  didn't go anywhere, so I can't really say.  There
13  was never another meeting after this, so I can't say
14  what it was going to be outside of what you see here.
15   Q   All right.  So you were sending Neil Albert
16  your resume for the same job that you were doing at
17  CFSA.
18   A   No.
19   Q   Well, then, help me understand why.
20   A   I just said, I was sending it to him for
21  him to see what I had done in recruitment activity
22  when I was first hired with the agency.

Case 1:06-cv-00789-PLF-JMF    Document 41-15    Filed 04/22/2008    Page 40 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

40 (Pages 157 to 160)

157
1    When I went to Neil, I was looking for an
2    opportunity to get kids out of the building.
3    MR. WILLIAMS: One second.
4    BY MR. WILLIAMS:
5    Q  So when you say you're anxious to move on
6    and go from DHS, what do you mean by that?
7    A  I was anxious to do something to help those
8    children. That's what I was anxious -- to find
9    nurturing homes and get them out of the intake
10   division where they were sleeping under desks, in the
11   halls, and roaming the building. That's what I was
12   anxious, to stop that neglect.
13   Q  And so when you say you want to work out at
14   DHS, you want to move the location of where you would
15   be working from CFSA to DHS, correct?
16   A  Yes.
17   Q  Would you keep the same supervisor, Mindy
18   Good?
19   A  We hadn't worked -- none of that had been
20   worked out. I don't know what -- how we would have --
21   Q  So is it your testimony that this wasn't an
22   attempt for you to get a different job?

158
1    A  That's my testimony.
2    Q  Also in this e-mail you note pictures of a
3    teenager sleeping in a short blue coat.
4    A  Cot, C-O-T.
5    Q  Do you want to take that back? Okay. On a
6    blue cot. Do you remember that?
7    A  Yes. Which line?
8    Q  On the second -- first sentence.
9    A  First sentence, second line?
10   Q  So after the hello, Neil, then --
11   A  Okay.
12   Q  -- the body.
13   A  All right. Yes, I see it.
14   Q  What pictures are you referring to there?
15   A  The pictures of the young man sleeping on a
16   blue cot half his size.
17   Q  How did you go about getting those
18   pictures?
19   A  I took them.
20   Q  You took those pictures.
21   A  Yes.
22   Q  When did you take those pictures?

159
1    A  I don't remember the exact date.
2    Q  Approximately.
3    A  It must have been August or September, I
4    guess. It had to be August or September.
5    Q  August or September?
6    A  Or September, yes.
7    Q  Now, you were sick in August and September,
8    so when could you have taken the pictures?
9    A  I don't think I was -- I think I was still
10   at the agency for part of August.
11   Q  Okay.
12   A  I was there for part of August.
13   Q  So was it before you left the agency that
14   you took these pictures referred to here?
15   A  Yes.
16   Q  How did you go about taking the picture?
17   Whose camera did you use?
18   A  The agency's.
19   Q  Who -- I won't say regard -- but who had
20   the agency's camera at this point in time?
21   A  It was in Derek Stewart's office. We
22   shared it.

160
1    Q  What do you mean by "we shared it"?
2    A  Because we had just one camera in the
3    Office of Public Information. So if I needed to cover
4    a story and take pictures, I used it. If he needed to
5    do a story and take pictures, he used it.
6    Q  Was the camera locked up?
7    A  No.
8    Q  It was just out in the open in his office?
9    A  Yes.
10   Q  Was his office locked?
11   A  No.
12   Q  So you could just go into his office?
13   A  Yes.
14   Q  And grab the camera?
15   A  Yes.
16   Q  So on that day that you took the picture,
17   what happened? How did you go about taking the
18   picture?
19   MR. CONDIT: Object to the form, but you can
20   answer.
21   THE WITNESS: Can you be a little more
22   specific?

Case 1:06-cv-00789-PLF-JMF    Document 41-15    Filed 04/22/2008    Page 41 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

41 (Pages 161 to 164)

161

1 BY MR. WILLIAMS:
2    Q  Okay.  Did you go into Derek's room to take
3 the camera from Derek's office?
4    A  Yes.
5    Q  What did you do after that?
6    A  After that I went down to the intake unit,
7 now known as CPS, Child Protective Services.
8    Q  Okay.  And then what?
9    A  And when I got down there, I saw this young
10 man on this cot, a cot that they use in day care
11 centers, with a dirty white blanket.  And I asked him
12 how he was doing and asked him what he would have me
13 tell management about preparing for children who come
14 in to the agency and have to stay in the building.
15    Q  Were you able to ascertain whether or not
16 he was a child of CFSA?
17    A  I assumed he was a child of CFSA.  He was
18 down there.
19    Q  But you didn't know for sure.
20    A  Yes, I did.  I knew for sure.
21    Q  How did you know for sure?
22    A  Because his social worker -- a social

162

1 worker was sitting there who indicated that the child
2 had come in the night before.
3    Q  Okay.  Who was that social worker?
4    A  Dennis Howard.
5    Q  What did the child tell you about what he
6 wanted management to do?
7    A  He told me that he would want management to
8 perhaps bring in some roll-away beds or some sleeping
9 bags.
10    Q  Okay.  What did you do?
11    A  And I said that I will do that and we are
12 working on ways to find places for you to go, for
13 children to go -- foster homes or perhaps next door at
14 the Holiday Inn.
15    Q  What did you do then?
16    A  And after that, he was lying there, I asked
17 him if he had a problem with me getting a couple of
18 shots so I could go and talk to management about the
19 need for better resources, better places for children
20 to sleep, and he said he had no problem with that.
21    Q  So he gave you permission to take his
22 picture?

163

1    A  Yes, he did.
2    Q  So that you could go to management.
3    A  Yes.
4    Q  For what purpose again, please?
5    A  To try to get management to create a sense
6 of urgency and to get rid of those two damn cots.
7    Q  Did he give you permission to share the
8 photos with anybody else?
9    A  He didn't tell me not to share them with
10 anybody else.
11    Q  My question is very precise.  Did he give
12 you permission to share the pictures with anybody
13 else?
14    A  Who do you mean by "anybody else"?
15    Q  Anybody else who is not in management.
16    A  I didn't ask him for that permission.
17    Q  Okay.  You didn't ask him for that
18 permission.
19    A  For anybody else.
20    Q  Just to be clear.  He gave you permission
21 to take photos to take to management so that they
22 could get the blankets and furniture that they needed.

164

1    A  That's right.
2    Q  But nothing more than that.
3    A  Not that I recall.
4    Q  Okay.  Did he give you permission for you
5 to put it on TV?
6    A  No.  Because I didn't even have any
7 intention of putting it on TV.
8    Q  He didn't give you permission for that.
9    A  No.
10    Q  And so then what did you do with the
11 picture?
12    A  I went back upstairs.  And by that time
13 Derek Stewart had come back to his desk, and I asked
14 him if he would download them off of his -- off of the
15 camera and forward them to my e-mail.
16    Q  So you went back to Derek's office.
17    A  Yes.
18    Q  And asked him to help you with the
19 technical downloading?
20    A  Yes.
21    Q  And e-mail them to you.
22    A  Yes.

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

42 (Pages 165 to 168)

165

1    Q   Did you tell him what the pictures were of?
2    **A   No.**
3    Q   Did he see the pictures?
4    **A   Yes, I'm sure he saw them.**
5    Q   Did he know why you were taking the
6  pictures?
7    **A   No.**
8    Q   Did you ever discuss with him your
9  intentions to submit it to management?
10   **A   No, I didn't discuss anything with him. I**
11 **just asked him to download them for me.**
12   Q   He did not make any comments to you with
13 regard to the picture when he downloaded it?
14   **A   No, because he would download pictures for**
15 **me all the time for CFSA stories and communication**
16 **pieces that Mindy would have me doing. So there**
17 **wouldn't have been any reason for him to dialogue**
18 **about it.**
19   Q   So if Derek Stewart says he doesn't
20 remember ever downloading anything or he didn't
21 download pictures or wasn't involved with the pictures
22 in the camera, would that be the truth or would that

166

1  not be the way you remember it?
2    **A   That would not be the truth.**
3    Q   That would not be the truth.
4    **A   Right.**
5    Q   What next did you do with the pictures
6  after they were downloaded and e-mailed to you?
7    **A   I made copies of the pictures.**
8    Q   Okay. And when you say "copies," you mean
9  hard copies?
10   **A   Yes.**
11   Q   Were they color copies?
12   **A   Yes.**
13   Q   What did you use to make copies?
14   **A   Our color copy -- the agency's color**
15 **copier.**
16   Q   So you printed them out with the agency's
17 color copier?
18   **A   Yes.**
19   Q   What did you do next? I'm sorry. Strike
20 that.
21       How many printouts did you make?
22   **A   I don't remember how many printouts there**

167

1  were.
2    Q   Were there more than five?
3    **A   No, I don't think so.**
4    Q   One or two?
5    **A   Three or four.**
6    Q   Three or four? Okay. So what did you do
7  with the hard copy printouts?
8    **A   I filed them. I put them on file.**
9    Q   Where did you file them? You said you put
10 them on file?
11   **A   Yes. I locked them up in the file in my**
12 **drawer and left them there for a week or two, I guess.**
13 **I don't remember the time frame. But I did put them**
14 **away and left them in the file cabinet.**
15   Q   Okay. So you left them in your file
16 cabinet?
17   **A   Yes.**
18   Q   Where did you -- did you put them in a
19 specific folder or -- with the information that you
20 were gathering? How did you organize it?
21   **A   I just put them in a folder and put them in**
22 **the drawer and locked it.**

168

1    Q   Less than five of them, all three or four
2  of them?
3    **A   Yes.**
4    Q   What, if anything, did you do with those
5  pictures after that?
6    **A   I sent them to Neil Albert. He asked for**
7  **copies --**
8    Q   The hard copies, what, if anything, did you
9  do with the hard copies after you put them in the
10 drawer, in the filing cabinet?
11   **A   Then after I -- I think I sent Neil Albert**
12 **the electronics, and then after I saw that there was**
13 **no urgency to get these kids out of the building off**
14 **of those two cots and one blanket, and after I had**
15 **made several attempts to get help and was rebuffed at**
16 **every point, then I called Channel 9.**
17   Q   Okay. Let's back up. We're going to get
18 to that and the rest of your case. We're going to get
19 to that in just a second. But it's your testimony
20 that you didn't do anything else with the hard copies
21 in the file cabinet; they stayed locked in that
22 cabinet?

Case 1:06-cv-00789-PLF-JMF    Document 41-15    Filed 04/22/2008    Page 43 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

43 (Pages 169 to 172)

169
1      A   When I left, I took them with me.
2      Q   You took them with you.
3      A   Yes.
4      Q   How long were they in the file cabinet?
5      A   I don't remember.
6      Q   Okay.  Did you share them with Mindy?
7      A   No.
8      Q   Did you share them with -- did you share
9   them with Derek other than him downloading them?
10     A   No.
11     Q   Did you share them with Brenda?
12     A   No.
13     Q   Did you share them with anybody else at
14  CFSA?
15     A   I don't recall that I did.
16     Q   Okay.  You just put them in a cabinet and
17  waited to see if anything was going to be done with
18  what you saw as a problem, meaning, kids sleeping in
19  the building?
20     A   I didn't even wait to see what was going to
21  happen.  It's not like I took those pictures waiting
22  to say, give me an opportunity.  I took the pictures

170
1   simply because at that point I had lost all respect
2   for -- and trust and confidence -- in the management
3   team.
4      Q   Were you upset with the management team?
5      A   No, I wasn't upset with them.  I was
6   disappointed.
7      Q   Disappointed about their inaction?  I'm not
8   trying to put words in your mouth.  Why were you
9   disappointed?
10     A   I was very disappointed in the lack of
11  urgency, in the blatant indifference to something so
12  simple as getting four or five rooms at the Holiday
13  Inn or going out, buying some sleeping bags, heaven
14  sakes, when this problem went back to 1987, kids
15  sleeping in the building.  Here it is 2005, and we've
16  even digressed.  Because at one time I think it was
17  five or six blue cots and we were down to two and one
18  blanket.  And for me, culturally, even when children
19  come to your home, you will find someplace comfortable
20  for them to sleep.  These children were being left in
21  the agency.  And if they -- five, the night -- six in
22  the building.  If you weren't fortunate enough to be

171
1   the first two, you didn't even get a cot.  So I was
2   conflicted with that.
3      Q   I definitely understand.  Let's back up a
4   second.  You asked the individual to take his picture
5   so you could share with management the pictures in the
6   hopes that you would get blankets --
7      A   Yes.
8      Q   Okay.  But you didn't share it with Mindy
9   Good.
10     A   No.  I shared it with management.
11     Q   I'm sorry.  You didn't share it with Mindy
12  Good.
13     A   No.
14     Q   And you didn't share it with Brenda?
15     A   No.
16         MR. CONDIT:  All asked and answered and
17  getting argumentative.
18  BY MR. WILLIAMS:
19     Q   You shared it with Neil Albert?
20     A   Yes, I did.
21     Q   Okay.  And -- okay.  And so your hope for
22  sharing it with Neil Albert was what?

172
1      A   That he --
2      Q   Those pictures.
3      A   That he being at the helm -- because it
4   wasn't going to do me any good to go to Mindy.  I knew
5   how she felt.  Wasn't going to do me any good to go
6   back to Brenda, whom I had been to, who walked past
7   intake every morning coming to work.  She knew those
8   kids were sleeping in the building.  So why would I go
9   back to her?  I was trying to go up the chain of
10  command to get somebody to help.  And Neil Albert was
11  Brenda Donald's boss, so I thought he was a good
12  enough choice.
13     Q   Okay.  But to go up the chain of command
14  and exclude Mindy and Brenda would also mean you had
15  to go out of the chain of command.
16     A   I had been to them.
17     Q   My question is very specific.  In order to
18  go up the chain of command by foregoing Mindy Good and
19  Brenda Donald means you'd have to go out of the chain
20  of command to do that; is that correct?
21     A   No.
22         MR. CONDIT:  Object to the form.

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

44 (Pages 173 to 176)

173

1    THE WITNESS: It's not correct.  I started
2  with Mindy.  I went to Brenda before I went to Neil.
3  BY MR. WILLIAMS:
4    Q   I just asked, Ms. Tabb, I just asked you
5  what you did with the pictures and you told me -- or
6  you testified -- that you didn't go to Mindy and you
7  didn't go to Brenda; you submitted them straight to
8  Neil Albert.  Do you remember that testimony?
9    A   Deputy Mayor Neil Albert.
10   Q   And so my question is, in order to go up
11 the chain of command regarding the pictures, you went
12 out of the chain of command to get to Neil Albert; is
13 that true?
14    MR. CONDIT:  Object to the form.
15    THE WITNESS:  That's not true.  That's not
16 true.
17 BY MR. WILLIAMS:
18   Q   So how is that not going outside the chain
19 of command?
20    A   I see it going up the chain of command.
21   Q   Well, typically, to go up the chain of
22 command you will go to your immediate supervisor, your

174

1  supervisor after that, and so on up the chain of
2  command.  You didn't do that here.  How is that still
3  up the chain of command and not outside the chain of
4  command?
5    A   Because I started with my supervisor, who
6  advised me to go to her supervisor, the director, who
7  I went to.
8    Q   Ms. Tabb, I think we're getting two issues
9  confused here.  I'm asking specifically about the
10 pictures.
11   A   And I'm not agreeing with that.  You're
12 trying to get me to say I went outside the chain of
13 command.  I went up the chain of command.
14   Q   Ms. Tabb, I'm only trying to get to you
15 tell the truth so much as you know it.  And I've asked
16 you questions about the chain of command and the
17 pictures.  And you've testified that you didn't show
18 the pictures to Mindy Good, and I believe because you
19 didn't think it was going to do any good.  Same thing
20 for Brenda Donald.  And you said you submitted them
21 directly to -- the soft copies -- directly to Neil
22 Albert because you thought that it would be effective.

175

1    And my question to you is, how is that not
2  going out of the chain of command?
3    A   Because I saw him over Brenda.  I saw that
4  up the chain of command.  That's the way I see it.
5    Q   Okay.  And so did you send the soft copies
6  to anybody else, the scanned copies, the e-mailable
7  copies?
8    A   I don't recall.  I really don't remember.
9  I don't recall.  I may have sent them to Julie
10 Meltzer.  I don't remember.
11   Q   Who is Julie Meltzer?
12   A   Court monitor.
13   Q   Anybody else?
14   A   Not that I recall.
15   Q   Did you send them to any of the news
16 agencies?
17   A   Two news organizations covered the story,
18 and I did give one or two of the pictures to them.
19   Q   Just to be clear, are you talking about the
20 hard copy pictures?
21   A   Yes.
22   Q   Or the e-mailable, soft copy pictures?

176

1    A   The hard copies.
2    Q   And do you remember which news organization
3  you gave them to?
4    A   Channel 7 and Channel 9.
5    Q   Ms. Tabb, you testified that this had
6  been -- children sleeping in the building had been a
7  problem since 1987.  Do you remember that testimony?
8    A   That's right.
9    Q   And that individuals seemed --
10 individuals -- you said management at CFSA seemed
11 indifferent.  Do you remember that testimony?
12   A   Yes.
13   Q   Okay.  Isn't it true that everybody knew
14 that kids were sleeping in the building as CFSA, it
15 was public knowledge?
16    MR. CONDIT:  Objection, lack of foundation,
17 object to the form.  You can answer, if you know.
18    THE WITNESS:  I think people knew, but I
19 don't say -- I don't think everybody knew but some
20 people did know.
21 BY MR. WILLIAMS:
22   Q   Who did you think knew?

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

45 (Pages 177 to 180)

177

1    A  I mean, I know Brenda knew.  Brenda Donald
2  knew.  Mindy Good knew.  I mean, it's hard to say who
3  all knew because people who were coming in, a social
4  worker coming in early in the morning or working late
5  at night who had to go down to intake, they would see
6  the kids down there.
7    Q  Was this an issue that CFSA was readily
8  aware of in 2005?
9       MR. CONDIT:  Objection to the question, the
10  form, in that it's vague as to who CFSA is, but you
11  can answer, if you understand.
12       THE WITNESS:  Who do you mean by CFSA?
13  BY MR. WILLIAMS:
14    Q  Isn't it -- are you aware if it was being
15  discussed, the problem of having children sleeping in
16  the building, amongst managers of CFSA during 2005?
17    A  No, I'm not aware.  Because I didn't attend
18  those meetings.  I only went to our staff meetings and
19  the director's executive staff meetings, at which time
20  they were not discussed.
21    Q  Are you aware of any public hearings where
22  the issue of children sleeping in the building at CFSA

178

1  was discussed?
2    A  The only public hearing I am aware of with
3  that practice being discussed was with the oversight
4  hearing before then chairman Adrian Fenty for the --
5  in front of the Human Services committee.
6    Q  And when was that?
7    A  That was in November of 2005 when it was
8  Mr. Fenty's statement that he didn't know children
9  were sleeping in the building.
10    Q  Okay.  But before, I guess, the press
11  stories, the news stories happened, are you aware of
12  any discussions at public hearings regarding the issue
13  of children sleeping in the building at CFSA?
14    A  I'm not aware of any public hearings, no.
15    Q  Are you aware if this problem ever reached
16  the court monitor?
17    A  Yes.
18    Q  And when was that?
19       MR. CONDIT:  Object to the form, but you can
20  answer, if you understand.
21       THE WITNESS:  The court monitor back -- must
22  have been somewhere around 2003 or 2004 -- the court

179

1  monitor related to me that children were sleeping in
2  the building back then on a regular basis, so much so
3  that she would get up out of her bed in the middle of
4  the night and come over to CFSA unannounced.  So since
5  intake didn't know when she might pop up, she -- and
6  she came up with some kind of reporting mechanism, but
7  she thought it had stopped when she stopped --
8  apparently when she stopped making the surprise
9  visits, they started leaving kids in the building
10  again.
11  BY MR. WILLIAMS:
12    Q  That's what she told you.
13    A  Yes, that's what she told me.
14    Q  Okay.  So the court monitor knew; is that
15  correct?
16    A  The court monitor didn't know they were
17  sleeping in the building in 2005.
18    Q  But she knew they were sleeping in the
19  building before 2005.
20    A  Yes, she did.
21    Q  Did the -- do you know if anybody knew --
22  not anybody -- strike that.

180

1       Do you know whether the public was aware that
2  kids were sleeping in the building at CFSA overnight?
3       MR. CONDIT:  Objection, vague, speculative.
4       THE WITNESS:  I wouldn't know what the
5  public knew.  I don't know.
6  BY MR. WILLIAMS:
7    Q  Why did you submit the pictures to the news
8  media?
9    A  I submitted the pictures to the news media
10  because I felt that, if it was taken to that level,
11  then somebody would take it seriously.
12    Q  So your motivation was to have somebody
13  take it seriously?
14    A  To get placements or hotel rooms and never
15  have another child get left in that building at night
16  on the most difficult day or night of their lives.
17    Q  And it's your belief that, if the media
18  knew that, that the issue would be resolved; is that
19  true?
20    A  That I was hoping that we would get some
21  help.
22    Q  But I guess my question is a little bit

Case 1:06-cv-00789-PLF-JMF     Document 41-15     Filed 04/22/2008     Page 46 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

46 (Pages 181 to 184)

181

1 more narrow than that. But it was your belief that
2 taking it to the media would help resolve the issue.
3     **A  Yes.**
4     Q  Is that correct?
5     **A  Yes.**
6     **(Exhibit No. 4 marked for identification and**
7 **attached hereto.)**
8 BY MR. WILLIAMS:
9     Q  Can you take a second to review that
10 document, please?
11     **A  I see it.**
12     Q  Showing you what appears to be an article,
13 a news article, from "The Washington Post" dated March
14 3rd of 2000, Final Edition, and the excerpt is from A
15 section, page 8 -- I'm sorry -- A01 -- and the title
16 is, "After Brianna, Pandemonium in the DC Foster
17 Care."
18     Can you read paragraph No. 4?
19     MR. CONDIT:  On the first page?
20     MR. WILLIAMS:  On the first page.
21     THE WITNESS:  No. 4?
22 BY MR. WILLIAMS:

182

1     Q  Four, five and six, please.
2     **A  At least 23 children ranging in age from**
3 **five months to 14 years spent Wednesday night in the**
4 **building, child welfare sources said, and some of the**
5 **children slept in a first floor area known as the**
6 **respite room.  The carpeted room, which has an**
7 **oversized playhouse and toys scattered around the**
8 **floor, is not meant to serve as an overnight shelter.**
9 **The chief of the city's child welfare agency said last**
10 **night that she is doing the best she can under**
11 **difficult circumstances.  She said many of the**
12 **children brought to the agency Wednesday night were**
13 **removed because their mothers had been arrested during**
14 **a drug raid.  We are very tight in the numbers of**
15 **homes that are available, Ernestine Jones, the**
16 **court-appointed receiver said, running the Child and**
17 **Family Services Agency, which is responsible for 3,000**
18 **children in foster care and an additional 3,200 under**
19 **government supervision.  She attributed the lack of**
20 **homes and the high number of foster children to the**
21 **effect that the Brianna Blackman case -- well, Brianna**
22 **case -- has had on social workers.**

183

1     **Is that enough paragraphs?**
2     Q  Yes.
3     **A  Okay.**
4     Q  So the press knew about children sleeping
5 in the building at CFSA, correct?
6     **A  This was five years ago.**
7     MR. CONDIT:  Objection, vague, speculative.
8 BY MR. WILLIAMS:
9     Q  But even though it was five years ago, the
10 press was made aware; is that correct?
11     **A  Yes.**
12     Q  But it's your testimony that it continued
13 after that point, correct?
14     **A  Yes.**
15     Q  So your belief that going to the media
16 would help resolve the problem -- I believe your
17 testimony was that you went to the media because you
18 wanted something to get done finally.  So your belief
19 that, if you were going to the media that something
20 would be done, is not necessarily true, is it.
21     **A  I disagree with that.**
22     Q  And in light of this story, you still

184

1 disagree that going to the media would have solved the
2 problem.
3     **A  Yes, I do.**
4     Q  And why do you disagree?
5     **A  Because shortly after the media stories Uma**
6 **Ahluwalia or someone from CFSA sent out a**
7 **communication piece to all staff talking about the**
8 **outpouring of community sentiment and concern.  And,**
9 **also, as a result of the media coverage, finally a**
10 **room was set up in CFSA for children to have some**
11 **modicum of comfort when they were removed from their**
12 **homes during the aftermath of the media story.**
13     Q  Could you have alerted the media without
14 showing them a picture?
15     **A  Yes, I could have alerted them without**
16 **showing them the picture.**
17     Q  Why did you decide to use the picture?
18     **A  Because I knew -- I was well aware of the**
19 **dynamic in the -- among the management team.  I had**
20 **lost all faith and confidence and trust.**
21     Q  I understand that, but I don't think that
22 answers --

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

47 (Pages 185 to 188)

185

1    MR. CONDIT: Would you please let the
2 witness answer the question?
3    THE WITNESS: I had no respect left, and I
4 know, to try to manage this and get help for these
5 kids, the real story was not going to be told. As a
6 matter of fact -- it just was not told. And that's
7 just -- that was a fact of life at CFSA.
8 BY MR. WILLIAMS:
9    Q  Thank you. Let's break down your answer.
10 My question was why did you show the media a
11 picture -- why did you decide to use a picture to show
12 the media. And your response was, I believe your
13 testimony was, because I lost all respect for the
14 management; is that true?
15    MR. CONDIT: Asked and answered.
16    THE WITNESS: No, that's not the main
17 reason. The main reason is to depict the awful,
18 traumatic, neglectful -- I see that as being an
19 atrocity. After five years -- 30 years -- countless
20 millions of dollars, we still can't get kids a decent
21 place to sleep?
22 BY MR. WILLIAMS:

186

1    Q  And you knew the picture --
2    **A  Excuse me.**
3    Q  Trying to play footsie.
4    **A  Excuse me.**
5    Q  And you knew that using a picture would be
6 a visual representation of what was going on at CFSA;
7 is that true?
8    **A  I knew that the picture would make it**
9 **difficult for management to skirt around the issue.**
10    Q  Okay. So you wanted to make sure that
11 management couldn't talk -- I'm not trying to put
12 words in your mouth -- but couldn't skirt around or
13 talk their way out of the situation; is that true?
14    **A  I wanted to make sure that they couldn't**
15 **deny it.**
16    Q  Okay. You've had a lot of marketing
17 experience, correct?
18    **A  Not a lot.**
19    Q  But you've been on TV several times. You
20 had your own commercials when you worked for the Kuhns
21 and Inner Harbor Ford. So you understand what the
22 impact of pictures are; is that correct?

187

1    MR. CONDIT: Object to the form, but you can
2 answer, if you understand.
3    THE WITNESS: Well, it depends on the kind
4 of pictures and different variables, from my marketing
5 experience -- my limited marketing experience.
6 BY MR. WILLIAMS:
7    Q  Is it your view that pictures have a
8 greater effect than words when it comes to press and
9 media?
10    **A  Yes.**
11    Q  Okay. And isn't one of the reasons you
12 submitted the photo is because you wanted to have the
13 strongest, most visceral impact with the story?
14    **A  No, that's not the reason.**
15    Q  Okay. Well, what is the reason?
16    **A  That's not the reason. I wanted to ensure**
17 **children who found themselves in that position would**
18 **no longer have to be put in that position if**
19 **management was forced to deal with the truth and to**
20 **deal with the matter at hand, that this practice never**
21 **stopped.**
22    Q  Okay.

188

1    (Proceedings recessed at 3:18 p.m.)
2    (Exhibit No. 5 marked for identification and
3 attached hereto.)
4    (In session at 3:27 p.m.)
5 BY MR. WILLIAMS:
6    Q  Ms. Tabb, you have in front of you what's
7 been marked as Exhibit 5. Do you recognize this
8 document?
9    **A  Yes.**
10    Q  What is it?
11    **A  It is the amended complaint that my**
12 **attorney prepared.**
13    Q  In this matter?
14    **A  In this matter, yes.**
15    Q  We're going to turn to that in one second.
16    (Exhibit No. 6 marked for identification and
17 attached hereto.)
18 BY MR. WILLIAMS:
19    Q  Can you look at Exhibit No. 6, please?
20    **A  Yes.**
21    Q  Can you just take a few minutes to just
22 look over it? I'm going to ask about the first six

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

48 (Pages 189 to 192)

189

1  pages.
2      A  Okay.
3      Q  The first six pages, do you recognize what
4  this document is?
5      A  Yes.
6      Q  What is it?
7      A  It's notification of Unacceptable
8  Performance and Corrective Action Plan Mindy Good sent
9  to me.
10     Q  Okay.  Did you receive this?
11     A  Yes.
12     Q  I'll hand you another document.
13     (Exhibit No. 7 marked for identification and
14  attached hereto.)
15  BY MR. WILLIAMS:
16     Q  Can you just take a couple minutes to
17  review this document?  The document I passed you
18  actually appears to be two documents.  I'm going to
19  ask you about the first two pages.
20     A  All right.
21     Q  Do you recognize that?
22     A  Yes.

190

1      Q  What is that?
2      A  That's a Notice of Proposed Official
3  Reprimand from Mindy Good.
4      MR. CONDIT:  I'm sorry.  Are we talking
5  about Exhibit 7?  Are we looking at Exhibit 6 or 7?
6  That's Exhibit 7.  I just wanted to make sure we were
7  not on 6 but we were on 7.
8      MR. WILLIAMS:  We're done with 6.
9      MR. CONDIT:  All right.
10  BY MR. WILLIAMS:
11     Q  I'm sorry.  Do you recognize this?
12     A  Yes, I do.
13     Q  Okay.  What is it?
14     A  It's Advance Written Notice of Proposed
15  Official Reprimand received from Mindy Good.
16     Q  Did you receive this?
17     A  Yes.
18     Q  This is going to be a little keystone cop,
19  but I'm going to ask you to tear off that last page --
20     MR. CONDIT:  Meaning the Notice of Final
21  Decision?
22     MR. WILLIAMS:  Exactly.  And I'm going to

191

1  mark this as another exhibit.
2      (Exhibit No. 8 marked for identification and
3  attached hereto.)
4  BY MR. WILLIAMS:
5      Q  Can you review that, please, Ms. Tabb, No.
6  8?  Let me know when you're done with Exhibit No. 8.
7      A  I'm ready.
8      Q  Do you recognize that?
9      A  Yes.
10     Q  What is that?
11     A  No. 7 or 8?
12     Q  No. 8.
13     A  No. 8 is the Notice of Final Decision on
14  the Proposed Official Reprimand.
15     Q  Did you have a chance to review No. 8?
16     A  Yes.
17     Q  Did you receive this?
18     A  Yes, I did.
19     Q  Okay.
20     (Exhibit No. 9 marked for identification and
21  attached hereto.)
22  BY MR. WILLIAMS:

192

1      Q  Can you take a second and look at that
2  document?
3      (Exhibit No. 10 marked for identification and
4  attached hereto.)
5  BY MR. WILLIAMS:
6      Q  Do you recognize that document?
7      A  Exhibit 9?
8      Q  Yes.
9      A  Yes.
10     Q  Do you recognize Exhibit No. 9?
11     A  Yes.
12     Q  What is this document?
13     A  That's Steps to Mediate the Corrective
14  Action Concerns from me to Mindy Good.
15     Q  So you drafted this document?
16     A  Yes.
17     Q  And is that your handwriting where it says
18  from/to?
19     A  Yes.
20     Q  This was sent to Mindy Good?
21     A  Probably because -- I probably gave it to
22  her by hand since I had handwritten this.

Case 1:06-cv-00789-PLF-JMF    Document 41-15    Filed 04/22/2008    Page 49 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

49 (Pages 193 to 196)

193

1    Q  You can put that aside.
2    A  Which one?
3    Q  No. 9.  I believe we're up to 10 right now.
4    A  Okay.
5    Q  Do you recognize Exhibit No. 10?
6    A  Yes, I do.
7    Q  What is it?
8    A  This is my Response to the Proposal of
9  Official Reprimand sent to Dr. Heather Stowe, who was
10  the deciding official.
11   Q  You drafted this document?
12   A  Yes.
13   Q  Did you send this document to Dr. Stowe?
14   A  Yes.
15   (Exhibit No. 11 marked for identification and
16  attached hereto.)
17  BY MR. WILLIAMS:
18   Q  Are you finished?
19   A  Yes.
20   Q  Okay.  Do you recognize this document?
21   A  Yes, I do.
22   Q  Okay.  What is this document?

194

1    A  Exhibit 10?
2    MR. CONDIT:  Exhibit 11.
3  BY MR. WILLIAMS:
4    Q  Take your time to review Exhibit No. 11.
5  Let me know when you're ready.
6    A  Okay.
7    Q  Do you recognize Exhibit No. 11?
8    A  Yes.
9    Q  What is Exhibit No. 11?
10   A  That's the Notice of Summary Removal sent
11  to me by Brenda Donald Walker.
12   Q  Did you receive this?
13   A  Yes, I did.
14   Q  We're done with that for right now.
15   (Exhibit No. 12 marked for identification and
16  attached hereto.)
17  BY MR. WILLIAMS:
18   Q  Let me know when you're ready.
19   A  I'm ready.
20   Q  Do you recognize this document?
21   A  Yes.
22   Q  What is this document?

195

1    A  This is Exhibit 12?
2    Q  Yes, ma'am.
3    A  My Response to the Notice of Summary
4  Removal that went to Mr. Joe Addis, who was -- I guess
5  he was -- he was the one that -- the deciding
6  official.  He would have been the deciding official.
7    Q  When you say "the deciding official," you
8  mean -- what do you mean?
9    A  He would have -- he would have been the one
10  to uphold the action.
11   Q  The --
12   A  Summary removal, yes.
13   Q  Would you turn to the last page underneath
14  the highlighting.
15   A  Yes.
16   Q  Is that your signature?
17   A  Yes.
18   Q  Okay.  Did you send this document?
19   A  To Joe Addis, yes.
20   Q  Thank you.
21   (Exhibit No. 13 marked for identification and
22  attached hereto.)

196

1  BY MR. WILLIAMS:
2    Q  Let me ask you one more question about 12.
3  Have you had an opportunity to review this document?
4    A  Yes.
5    Q  Is this a true, accurate and fair copy of
6  what you said in response to your Notice of Summary
7  Removal?
8    A  Yes.
9    Q  Okay.  Now we're done with it.  So now
10  we're on to No. 13.  Just take a second to review
11  that.
12   A  Okay.
13   Q  Do you recognize that document?
14   A  Yes, I do.
15   Q  What is that document?
16   A  This is the Notice of Final Decision on the
17  summary removal.
18   Q  Do you remember receiving this document?
19   A  Yes.
20   Q  If you look at document No. 13, Exhibit No.
21  13, in the first paragraph, the last sentence, can you
22  read that sentence, please?

Case 1:06-cv-00789-PLF-JMF     Document 41-15     Filed 04/22/2008     Page 50 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

50 (Pages 197 to 200)

197

1     A  You did not appear for your scheduled
2  hearing of October 27, 2005.
3     Q  Okay.  Is that true?
4     A  Yes, it is.
5     Q  Okay.  And why did you not go to the
6  hearing?
7     A  I did not go to the hearing and called
8  Mr. Joe Addis, who was the hearing official, and made
9  him aware that I was not going.  I also sent a letter.
10  I did not go for two reasons:
11     1.  The Union official, Steven White, had
12  called Brenda Donald Walker and asked if we could come
13  in and meet with her because the Union was concerned
14  and wanted to get involved.  And she told Steven White
15  that she didn't see it doing any good because she
16  didn't see the act being overturned.  And I decided to
17  get an attorney and I pursued -- pursue it through the
18  courts.
19     Q  How do you know she told Mr. White that --
20  I'm sorry.  What did she tell Mr. White again?
21     A  She told Mr. White that she didn't see his
22  meeting with her -- he and I meeting with her -- as

198

1  doing any good.
2     Q  Okay.  And how do you know that's what --
3     A  He had called me and told me he was going
4  to see if he could set that meeting up.  He called me
5  back and told me that she told him she didn't see it
6  doing any good, so he didn't go -- we didn't go.
7     Q  Okay.  And, based on that, you decided not
8  to go to the hearing?
9     A  Yes.  But I submitted my letter in writing
10  and by that time I had retained an attorney.
11     Q  Okay.  Did you retain an attorney before or
12  after the hearing, the date of the hearing?
13     A  Before.  I believe it was before.
14     Q  You sent the letter explaining that you
15  weren't going to go to the hearing before or after the
16  hearing date of October 27th?
17     A  I don't remember.  I don't remember that
18  date.
19     Q  We're going to go back to the amended
20  complaint.  Can you take a second and review it so
21  that you feel comfortable with it?
22     A  Okay.

199

1     Q  If you can turn to page No. 8.  We're going
2  to go through the complaint with the counts that you
3  allege against the District and, I believe, Brenda
4  Donald.
5     A  Okay.
6     Q  Now, in Count One you allege that the
7  District of Columbia violated your First Amendment
8  rights.  My question to you is in what way -- did you
9  want to read --
10     A  So now on Count One, you mean No. 31, on
11  page 8, No. 31?  Plaintiff re-alleges and states
12  paragraphs 1 through 32 --
13     MR. CONDIT:  Yes, that's Count One.
14     THE WITNESS:  Okay.
15     MR. CONDIT:  That's the section.
16     THE WITNESS:  Okay.
17  BY MR. WILLIAMS:
18     Q  Under that count.
19     A  Okay.
20     Q  How did the District violate your First
21  Amendment right?
22     MR. CONDIT:  Objection to the extent it

200

1  calls for the witness to make a legal conclusion.  The
2  witness is not trained in the law.
3     You can answer, if you understand the question.
4     THE WITNESS:  I do not understand that
5  question.
6  BY MR. WILLIAMS:
7     Q  What are you saying that the District did
8  that prevented you or violated your right to free
9  speech?
10     A  Okay.  Could ask you the question again,
11  please?
12     Q  No problem.  What actions do you say the
13  District did that violated your right to free speech
14  or your First Amendment right to free speech?
15     A  They fired me.
16     Q  Okay.  Why do you think that was -- what
17  evidence do you have that that firing was based on
18  your right to free speech --
19     What facts, what evidence, do you have that
20  would lead you to believe that that termination was
21  based on the abridgement of your right to free speech?
22     MR. CONDIT:  I'm going to object to the

Case 1:06-cv-00789-PLF-JMF    Document 41-15    Filed 04/22/2008    Page 51 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

51 (Pages 201 to 204)

201

1  extent it calls for the witness to make a legal
2  conclusion, but she can answer, if she understands.
3      MR. WILLIAMS: Noted.
4      THE WITNESS: What does "abridgement" mean?
5  BY MR. WILLIAMS:
6      Q  No problem. That interfered with your
7  right to free speech.
8      A  Ask the question again.
9      Q  No problem. What facts, what actions, do
10  you allege or do you say that the District took -- I'm
11  sorry. Strike that.
12      You said the District terminated you.
13      A  I did.
14      Q  And that was the abridgement of your free
15  speech. And my question to you is, what facts do you
16  have or know that that termination was based on the
17  District's interference with your right to free
18  speech?
19      A  That was one of the reasons stated in the
20  termination letter I received.
21      Q  Okay. So in the termination letter -- so
22  it's your testimony that in your termination letter

202

1  the District stated that -- I'm not trying to put
2  words in your mouth. What are you saying that the
3  termination letter stated in regards to your freedom
4  of speech?
5      A  This is not it. I'm looking for the --
6      Q  The final?
7      A  No, not the final, the termination letter
8  dated October 3rd. Thank you.
9      Q  No. 11, I believe.
10      A  Yes.
11      MR. CONDIT: I'm not -- don't pay any
12  attention to me, Shirley. I don't want to interfere
13  with your thinking. But I'm just going to note my
14  objection to the extent this asks the witness to make
15  any legal conclusions about evidence or standards of
16  establishing a claim under the First Amendment or
17  anything of that nature, but you can answer to the
18  extent --
19      MR. WILLIAMS: Noted.
20      THE WITNESS: Okay. Well, for me, the one
21  sentence in here, on or about September 19, 2005, you
22  misrepresented agency practice to the media.

203

1  BY MR. WILLIAMS:
2      Q  There is more to that sentence, correct?
3      A  Yes, but you asked me what I felt violated
4  my freedom of speech in the termination letter.
5  That's --
6      Q  So the sentence reads, correct me if I'm
7  wrong, on or about September 19, 2005, you
8  misrepresented agency practice to the media, violated
9  CFSA confidentiality laws in showing the image of a
10  child in CFSA's custody, and disclosing detailed
11  personal information about why the child was in CFSA
12  custody.
13      Is that the sentence you're pointing to?
14      A  That's two sentences. I made --
15      Q  You're saying the semicolon --
16      A  Yes. It reads, to me, that this first one
17  leading up to the semicolon is one charge in itself,
18  and then these others are separate.
19      Q  Well, I mean, doesn't matter what I think,
20  but this appears to be one sentence. So you maintain
21  that you misrepresented the agency -- that they
22  alleged you misrepresented the agency practice to the

204

1  media constitutes your right to free speech that was
2  abridged or interfered with?
3      MR. CONDIT: Same objection, but you can
4  answer.
5      THE WITNESS: Not being an attorney, that's
6  what I think.
7  BY MR. WILLIAMS:
8      Q  Okay. Now, the sentence goes on to say,
9  violated CFSA confidentiality laws in showing the
10  image of a child in CFSA custody and disclosing
11  detailed personal information about why the child was
12  in CFSA custody.
13      Is it your belief that you have a First
14  Amendment right to -- strike that.
15      Is it your belief that you have a First
16  Amendment right to disclose a child's picture to the
17  media -- a child in CFSA custody -- to the media?
18      MR. CONDIT: I'm going to object to the
19  extent it calls for the witness to reach a legal
20  conclusion. That is really a legal question that I
21  don't think this witness is capable of answering.
22  BY MR. WILLIAMS:

Case 1:06-cv-00789-PLF-JMF     Document 41-15     Filed 04/22/2008     Page 52 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

52 (Pages 205 to 208)

205

1    Q   Answer the question.
2    **A   And I can't answer it the way that it has**
3    **been posed to me.  So can you rephrase, restate the**
4    **question?**
5    Q   Do you think that stating or providing an
6    image and stating personal, confidential information
7    about a child in CFSA custody -- strike that.  Give me
8    a second.
9    Ms. Tabb, do you think the First Amendment
10   allows you to disclose a picture or personal
11   information of a child in CFSA custody even though
12   that information might be confidential?
13   MR. CONDIT:  Objection to requiring a legal
14   conclusion from the witness and facts not in evidence.
15   There is no evidence that any confidential information
16   was revealed.  So the question presumes something that
17   has not been established and no facts have been
18   offered on that issue.  But the witness can answer, if
19   she understands the question.
20   THE WITNESS:  I don't understand the
21   question because I don't understand enough about the
22   different Amendments.

206

1    BY MR. WILLIAMS:
2    Q   Well, let me ask you this:  Do you think
3    that -- I asked you this question earlier, I believe,
4    in the morning hours.  Do you believe that you're
5    allowed to release confidential information about a
6    child in CFSA custody under any circumstance --
7    Under what circumstances do you think that
8    you're allowed to release information about a child in
9    CFSA custody?  Confidential information.  Excuse me.
10   **A   As a social worker, if the child is being**
11   **harmed, if the child is being harmed.**
12   Q   Then you have that ability to do that?
13   **A   Yes.**
14   Q   Ms. Tabb, do you think you were fired when
15   you disclosed the picture of a child in CFSA custody
16   to the media?
17   MR. CONDIT:  Objection, calls for
18   speculation.  You can answer, if you understand.
19   THE WITNESS:  Ask the question again.
20   BY MR. WILLIAMS:
21   Q   Do you think that you were fired -- noting
22   counsel's objection -- do you think that you were

207

1    fired for displaying a picture of a child in CFSA
2    custody to the media?
3    **A   That's what's in the summary removal**
4    **letter.**
5    Q   I understand that, but I'm asking you what
6    do you think?  What do you believe?
7    MR. CONDIT:  Calls for speculation.
8    THE WITNESS:  I don't know what to believe
9    I don't know what to believe.  It's a lot of stuff in
10   here, so -- a lot of charges.  So I'm not sure what to
11   believe short of what's on this paper in black and
12   white.
13   BY MR. WILLIAMS:
14   Q   Okay.  You can put that down for a second.
15   Turn to page No. 11 in the complaint.  Can you
16   review that count?
17   **A   Okay.**
18   Q   Count Number Three.  Let me know when
19   you're finished.
20   **A   I'm done.**
21   Q   Do you see in paragraph No. 48, through
22   your attorney, you allege plaintiff was not given any

208

1    opportunity to rebut or challenge the allegations made
2    against her in support of her removal or termination?
3    Do you see that?
4    **A   Yes.**
5    Q   Were you not given the opportunity to raise
6    issues in response to your termination at CFSA?
7    MR. CONDIT:  I'll object to the extent it
8    calls for a legal conclusion, but the witness can
9    answer.
10   THE WITNESS:  Again, not being an attorney,
11   I feel that my -- I was denied due process because the
12   Union was not involved in my termination.
13   BY MR. WILLIAMS:
14   Q   Okay.  I'm not asking you about what you
15   think legally.  I'm asking you whether or not
16   factually -- because this happened to you, and so you
17   had an ability to either respond or not respond to
18   different actions that were taken towards you in this
19   context.
20   And I'm asking you, when you received your
21   Notice of Summary Removal, that letter from Brenda
22   Donald, I believe, on October 3rd, did you not have an

Case 1:06-cv-00789-PLF-JMF   Document 41-15   Filed 04/22/2008   Page 53 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

53 (Pages 209 to 212)

209

1 opportunity to respond or supply a response?
2     **A  I was not given the opportunity to respond**
3 **because I was summarily removed. I think, as a Union**
4 **employee, I was supposed to be given due process to**
5 **mitigate. The Union could have had more time to**
6 **mitigate my dismissal and that didn't happen.**
7     Q  Okay.  Can you turn to -- take out Exhibit
8 No. 11, please, the October 3rd letter.  Would you
9 turn to the second page, please?  Can you look at the
10 third paragraph, please?
11    **A  Yes.**
12    Q  Now, you testified you received this
13 notice, correct?
14    **A  Yes.**
15    Q  The third paragraph says, you have a right
16 to review material upon which this action is based and
17 to prepare a written response to the notice including
18 affidavits and other documentation within six days of
19 receipt of this written notice.  You have the right to
20 be represented by an attorney or other representation.
21    And in the next paragraph it says, your
22 response should be -- your response, should you

210

1 prepare one, may raise every defense, fact or
2 supporting matter and extenuating exculpation or
3 mitigation of which you have knowledge or reasonably
4 should have knowledge which is relevant to the reasons
5 in support of the proposed action.
6     Do you see that there?
7     **A  Yes.**
8     Q  And I believe the next paragraph talks
9 about the procedure.  It says, Joseph Addis, acting
10 contracting procurement administrator -- do you see
11 that paragraph, too?
12    **A  Yes.**
13    Q  Okay.  And you received this letter,
14 correct?
15    **A  Yes.**
16    Q  Doesn't this outline for you how to respond
17 to this letter that you were sent?
18    **A  It's after the fact.**
19    Q  Well --
20    **A  It's after I was fired.**
21    Q  Well, that's not -- well, look at the
22 letter.  The letter sets forth a Notice of Summary

211

1 Removal, correct?
2     **A  Yes.**
3     Q  And then it outlines ways for you to
4 respond and object or respond and -- respond to the
5 Notice of Removal.
6     **A  Yes.**
7     Q  Is that true?
8     **A  That's true.**
9     Q  And you did that; is that true?
10    **A  Well, the Union representative called**
11 **Brenda and was told that to go through any**
12 **administrative process was futile as far as she was**
13 **concerned.**
14    Q  That's what you say Mr. White told to you.
15    **A  Yes.**
16    Q  Correct?
17    **A  Yes.**
18    Q  But I'm asking you what this letter says.
19 When you received this letter, this is what the letter
20 says, correct?
21    **A  Yes.**
22    Q  Sorry.

212

1     **A  Yeah.  The letter is outlining what I could**
2 **do.**
3     Q  Okay.  And you did that.
4     **A  Yes.**
5     Q  Okay.  Look at Exhibit No. 12.  I
6 believe you testified earlier that you sent this
7 letter.
8     **A  Yes.**
9     Q  Okay.  And this letter is to Mr. Joe Addis,
10 who the previous letter announces as who has been
11 appointed as the hearing officer; is that correct?
12    **A  That's correct.**
13    Q  And this is your response to this letter.
14    **A  Yes.**
15    Q  Okay.  So you had the opportunity to write
16 this response and it was sent; is that correct?
17    **A  Yes.**
18    Q  Or through your lawyer you wrote the
19 letter; is that correct?
20    **A  Yes.**
21    Q  And, also, you testified earlier that you
22 had the option to appear for a hearing; is that

Case 1:06-cv-00789-PLF-JMF    Document 41-15    Filed 04/22/2008    Page 54 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

54 (Pages 213 to 216)

213

1   correct? You testified that you did not appear at a
2   hearing.
3       A   That's right.
4       Q   What was your understanding of what the
5   hearing was?
6       A   My understanding, Mr. Williams, of what the
7   hearing was, was something very comparable to a
8   kangaroo court.
9       Q   A kangaroo court.
10      A   That's right.
11      Q   Okay. What's a kangaroo -- I know, but I
12  want to make a record.
13      A   That's a court where the defendant or the
14  plaintiff -- and I get my terminology, plaintiff --
15      Q   That's fine.
16      A   -- where I didn't stand a snowball's chance
17  of getting any justice out of this. Mr. Joseph Addis
18  was MSS at-will employee who reported to Ronnie
19  Charles who reported to Brenda Donald. And no one can
20  seriously think that he was going to put his
21  hundred-thousand-dollars-a-year job on the line for
22  me.

214

1       Q   Well, I understand what you're saying, but
2   you had an opportunity -- you filed this response.
3       A   Yes, I did.
4       Q   Okay. And it's a pretty detailed response.
5       A   Yes.
6       Q   Very detailed. And you cite dates and
7   bullet points about exactly why the summary removal
8   was inappropriate; is that correct?
9       A   That's correct.
10      Q   So at the point where you submitted your
11  response, you thought that you would have an
12  opportunity to oppose the summary removal; is that
13  correct?
14      A   No.
15      Q   What did you think?
16      A   I didn't think I stood a chance.
17      Q   But you --
18      A   This was --
19      Q   I'm sorry. Go ahead.
20      A   This was a process, but I knew that Joe
21  Addis was not going to side with the director who
22  could fire him.

215

1       Q   So -- I'm sorry. So is it your
2   understanding that this was the process?
3       A   Yes.
4       Q   You just didn't have any faith in the
5   process.
6       A   Yes, exactly.
7       Q   But you weren't denied this process.
8       A   No.
9       Q   And you took advantage of this process.
10      A   I took advantage of writing --
11      Q   Writing a response.
12      A   Yes.
13      Q   And you decided not to take advantage of
14  the hearing.
15      A   Right. That's true.
16      Q   For whichever reason, which you decided not
17  to take that.
18      A   Yes.
19      Q   Which was offered to you?
20      A   Yes.
21      Q   Well, how does that -- excuse me.
22      Thank you. Page 13 of the amended complaint,

216

1   Count Number Five.
2       A   13?
3       Q   Yes, please. And take a second to review
4   Count Number Five.
5       A   All right. Okay. I'm sorry. Did you ask
6   me --
7       Q   I was just asking you to review it and let
8   me know when you're ready.
9       A   How far?
10      Q   Count Number Five. So it goes to 63.
11      A   Okay. Down to 63. Okay. I'm ready.
12      Q   Look at paragraph No. 59, please. Actually
13  look at page 14. Part of that paragraph, plaintiff
14  has the right to disclose information --
15      A   Which paragraph now?
16      Q   I'm sorry.
17      A   Page 14?
18      Q   Page 14, paragraph No. 59, which is at the
19  top, and it's the last sentence of that paragraph.
20      A   All right.
21      Q   It starts "moreover."
22      A   Yes.

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

55 (Pages 217 to 220)

217

1    Q   Moreover, pursuant to District law, the
2  plaintiff has the right to disclose information
3  unlawfully suppressed, information concerning illegal
4  or unethical conduct which threatens or which is
5  likely to threaten public's health and safety.
6       Is it your -- is it your testimony that the
7  information of concern here is that children were
8  sleeping in the building of CFSA overnight?
9       MR. CONDIT:  Object to the form.
10      THE WITNESS:  Ask the question again.
11  BY MR. WILLIAMS:
12      Q   Okay.  Is it your testimony that the
13  information that you gave to the media, which is
14  children were sleeping overnight in CFSA building, is
15  the information unlawfully suppressed here?  To the
16  extent that you know.
17      **A   Yes.**
18      Q   Okay.  You testified earlier, I believe,
19  that the court monitor knew that the kids were
20  sleeping -- children -- were sleeping in the building
21  overnight.
22      **A   She knew in 2003, 2004, but she was not**

218

1  **aware that they were sleeping in the building again in**
2  **2005.**
3      Q   So my question was very precise, though.
4  Did the court monitor know of the problem about
5  children sleeping in the building?  I'm not asking
6  specifically to 2005.  Before 2005, did that court
7  monitor know?
8      **A   Yes.**
9      Q   And I believe your testimony from this
10  morning was that -- correct me if I'm wrong; it's been
11  a long day -- that Council member Fenty knew as well?
12      **A   Yes.  He did not know.**
13      Q   He didn't know.
14      **A   He says he didn't.**
15      Q   And this morning I showed you two -- showed
16  you one "Washington Post" article that was with
17  regards to children sleeping in the building.  Do you
18  remember that?
19      **A   Yes, I do.**
20      Q   Is that correct, that that article
21  reflected that children were sleeping in the building?
22      **A   Yes, in 2000.**

219

1      Q   In 2000.  Okay.  Well, how do you -- how
2  are you claiming that this information, children
3  sleeping in the building, was unlawfully suppressed?
4       MR. CONDIT:  Object to the extent it calls
5  for the witness to make a legal conclusion, but she
6  can answer in lay person's terms.
7       THE WITNESS:  Well, I think because when
8  "The Washington Post" released or published that
9  article about the Brianna Blackman case and was
10  talking about people bringing children and leaving
11  them in the building, we were, first of all, that was
12  2000 -- year 2000 -- we were still under receivership.
13  They were still trying to get the agency to -- they
14  were still trying to build more reform in 2000.  Then
15  here we go to 2005 when the District is getting ready
16  to take the agency back and we are right back where we
17  started from, not just 2000, but 1987.
18  BY MR. WILLIAMS:
19      Q   Okay.  I understand that.  I understand
20  that's your belief and your testimony.  My question
21  is:  How is that tantamount to suppression?
22      **A   Because that was not being disclosed to the**

220

1  **public nor was -- it was not being disclosed to the**
2  **City Council, if Adrian Fenty, who headed up the Human**
3  **Services committee didn't know and he had oversight**
4  **for CFSA; Neil Albert didn't know, he was the deputy**
5  **mayor for children, youth, family and elders, he**
6  **didn't know.**
7      Q   I understand that you said it wasn't
8  disclosed or they didn't know, but my question is very
9  precise.  How was it suppressed?
10      **A   By omission.**
11      Q   Suppression by omission?
12      **A   Yes.  They would not -- at these**
13  **testimonies, they were not out telling the community**
14  **children are sleeping in the building.**
15      Q   But the court monitor knew it, correct?
16      **A   The court monitor knew at one time.**
17      Q   But the court monitor knew.
18      **A   Yes, she did.**
19      Q   And there was a "Washington Post" article
20  talking about that in 2000.
21      **A   A five-year-old "Washington Post" article,**
22  **yes.**

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

56 (Pages 221 to 224)

221

1    Q   So that was known, too.  Do you have any
2  information or facts that say that they were
3  purposefully left out of these reports?
4    A   Well, I know for a fact I worked in the
5  Office of Public Information under Mindy Good, who was
6  excellent at spinning -- they call them spin
7  doctors -- and she could take some -- she could take
8  some dirt and make you think it was pie.
9    Q   I understand what a spin doctor -- I think
10  I understand what a spin doctor is.  We're in a pretty
11  heated election.  I understand that.
12    A   Yeah, a lot of spinning.
13    Q   But how is that tantamount to suppression,
14  taking one thing and characterizing it a different
15  way?
16        MR. CONDIT:  I'm going to note my continuing
17  objection to this line of questioning as it's
18  referring to specific terminology in the statute and I
19  believe requiring the witness to make legal
20  conclusions, but she can answer as a lay person.
21  BY MR. WILLIAMS:
22    Q   So how does -- sorry.

222

1        MR. WILLIAMS:  Noted.  I'm sorry.
2  BY MR. WILLIAMS:
3    Q   Answer the question.
4    A   They were not telling people.  They were
5  not telling stakeholders.  They were not telling
6  stakeholders.
7    Q   And that's suppression.
8    A   Yes.
9    Q   I'm going to refer back to the picture, the
10  child -- the picture you took of the child in CFSA.
11    A   Yes.
12    Q   Did you know when that child was brought in
13  to CFSA?
14    A   Sometime in August.
15    Q   Okay.
16    A   Mid August.
17    Q   On the day that you took the picture, do
18  you know when he came into CFSA?
19    A   He had come in the night before.
20    Q   How do you know that?
21    A   The social worker told me.
22    Q   And what was the social worker's name?

223

1    A   Dennis, Dennis Howard.
2    Q   Did he say when he came in?
3    A   No.  He just said he came in last night.
4    Q   Do you know how many hours that he was in
5  the CFSA building?
6    A   No, I don't.
7    Q   If a child comes in at night in the CFSA
8  building and -- where does the child sleep or -- while
9  the child waits for placement?
10    A   There were two cots about three and a half
11  feet long and one blanket that everybody -- that
12  blanket had been carried over from the days of the
13  receivership, and it was a dirty, white blanket.
14  Children who were fortunate enough to get there in
15  time to get one of the two cots slept on the cots --
16  no padding, no sheets, no pillows.  Those who didn't
17  get a chance to get the cot slept sitting up in
18  chairs, or if they went to sleep at all, and --
19    Q   Sorry.
20    A   And some of them roamed around the building
21  in people's offices.
22    Q   Now, it's my understanding -- I'm sorry.

224

1  Strike that.
2      Now, do you know -- going back to the child in
3  the picture.  Do you know if the child spent the night
4  in the building or whether the child arrived at night
5  and was just sleeping while he was waiting for
6  placement?  Do you know that?
7        MR. CONDIT:  Object to the form, but you can
8  answer.
9        THE WITNESS:  I was told that the child came
10  in last night and this was over in the afternoon.  So
11  he had spent considerable -- if he came in the night
12  before, he had been there for a while, overnight.
13  BY MR. WILLIAMS:
14    Q   Now, when kids are brought into CFSA --
15  when kids come into CFSA during the night,
16  typically -- I'm unfamiliar with CFSA.  You've been
17  there longer.  Why are kids taken out of households
18  and brought to CFSA in the middle of the night?
19    A   They are taken out if there is suspected
20  abuse or neglect.
21    Q   Okay.  So help me out here.  Somebody
22  receives -- somebody calls CFSA and says, we think

225
1  that there may be a problem.
2      A  Yes.
3      Q  Is that what happens?
4      A  Yes.
5      Q  They call a hotline?
6      A  Yes. Yes.
7      Q  CFSA responds by doing what?
8      A  **Well, they go out to substantiate the**
9  **allegation.**
10     Q  Okay.
11     A  **And if it's substantiated, then they remove**
12  **the children.**
13     Q  Okay.  So if there is an allegation of
14  neglect or some type of inappropriate behavior, they
15  will remove the child from that.  Why would they do
16  that, first?  Why would they do that?
17     A  **For the safety of the child.**
18     Q  Okay.  So they would take the child out of
19  the house for the safety of the child.
20     A  Yes.
21     Q  And would bring the child to CFSA.
22     A  Yes.

226
1      Q  The child gets, I guess, processed for
2  placement -- for replacement, temporary replacement;
3  is that how that works?
4      A  **Yes, or until a family member is identified**
5  **for them to go and spend time until they go through**
6  **the court process.**
7      Q  Okay.  So they are at CFSA, though.
8      A  Yes.
9      Q  Are there -- do people work at CFSA
10  overnight?
11     A  **There are some people who work inside CFSA**
12  **overnight, but they are not in there sitting watching**
13  **children.**
14     Q  Okay.
15     A  **But I have been down there and seen**
16  **children down there.  People are on the hotline trying**
17  **to take other allegations.  People are doing -- out in**
18  **the field doing investigations and children are not**
19  **adequately monitored or supervised.**
20     Q  Now, isn't it safer for a child to be -- to
21  sleep in an office building or CFSA office building
22  than stay in a neglectful or abusive household?

227
1          MR. CONDIT:  Object to the extent it calls
2  for speculation, but the witness can answer to the
3  extent she knows.
4          THE WITNESS:  Well, from my point of view, I
5  see what CFSA was doing as being neglectful in itself.
6  I mean, depends on how you want to look at safety.
7  BY MR. WILLIAMS:
8      Q  Well, I understand that may be your view,
9  but my question is very narrow.  Isn't it better -- my
10  question to you is:  Do you think that it's better for
11  a child to be in CFSA, sleeping in an office building
12  on a cot, although it's too small, than being in a
13  neglectful and abusive household?
14     A  **Abusive, neglectful, no.**
15     Q  So abusive, yes.
16     A  **Where the child's life might be in danger,**
17  **but neglect -- we were taking them from one neglectful**
18  **environment and bringing them to another, dropping**
19  **them off.  And it is just not the general piece of**
20  **children sleeping in the building.  I mean, these**
21  **children, they are already traumatized, and the agency**
22  **is further traumatizing them to bring them into a big,**

228
1  **cold office building.  It gets very cold in there at**
2  **night.  There is nothing to cover yourself with.  They**
3  **are wondering about mommy and daddy.  And they don't**
4  **have a bed and trying to sleep under cubicles.  And**
5  **children need nurturing as well as a safe environment**
6  **where they can get a hot meal, get someone to help**
7  **them with homework perhaps, and talk to them about**
8  **what just happened to them.**
9      Q  So you've answered my question that, from
10  neglect, maybe it's not better, but for abuse, you
11  think that it is better for them to be in an office
12  building than in an abusive household; is that
13  correct?
14     A  **If their lives are in jeopardy.**
15     Q  In jeopardy.
16     A  **If their lives are in jeopardy.**
17     Q  Do you know if the young man in the picture
18  was in a neglectful or abusive household?
19     A  **No.**
20     Q  So he could have been in an abusive
21  household where physical harm may have been present.
22     A  **I don't know the specifics, but I was not**

Case 1:06-cv-00789-PLF-JMF   Document 41-15   Filed 04/22/2008   Page 58 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

58 (Pages 229 to 232)

229

1 told that --
2    Q  But he could have been, because children
3 who are taken may or may not have been in an abusive
4 household; is that correct?
5    A  I'm trying to recall what Dennis had told
6 me. I don't remember the exact reason.
7    Q  So you don't know.
8    A  No.
9    Q  Okay. So it could be that he was safer
10 sleeping on that cot in the building than being at
11 whatever house he was taken from; is that correct?
12    A  Well, I think at some point, though, it
13 goes past being safe when the child is still there and
14 it's almost coming into the second evening.
15    Q  I understand. My question is very precise.
16 It is very, very precise. It could have been that he
17 was taken from a physically abusive -- that it would
18 be better for him to sleep on that cot in CFSA than
19 remain in an abusive household.
20    A  Now that I recollect, he was -- his family
21 was homeless. They were homeless.
22    Q  Okay.

230

1    A  And it was not --
2    Q  How do you know he was homeless?
3    A  Because that's what I was told. That's
4 what the social worker told me as to why.
5    Q  What was the social worker's name again?
6    A  Dennis Howard.
7    Q  Did he tell you anything about him being
8 homeless and being abused?
9    A  No.
10    Q  He didn't say anything or did you ask about
11 that?
12    A  He just said this kid came in last night.
13 He was homeless. His parents dropped him off there
14 because they were homeless and they thought he could
15 get refuge inside CFSA. And he was lucky; he did get
16 a blue cot.
17    MR. WILLIAMS: One second, please.
18 BY MR. WILLIAMS:
19    Q  A couple more questions for you. I know.
20 I'm looking at my watch.
21    A  I'm just seeing if mine's still ticking.
22    Q  Are you alleging that you lost any pay or

231

1 any compensatory damages from this incident?
2    A  Yes.
3    MR. CONDIT: I'm going to object to the
4 extent it calls for the witness to reach a legal
5 conclusion on what compensatory damage is.
6 BY MR. WILLIAMS:
7    Q  Any pay.
8    A  I'm sorry. Can you ask your question
9 again?
10    Q  I'm asking you whether or not if you're out
11 any monetary damage -- any money -- from the incident
12 that occurred that's alleged in the complaint.
13    A  Yes.
14    Q  What is that?
15    A  I was put in a position where I had to get
16 my retirement dollars out in order to pay my expenses,
17 pay my rent. It was a while before the agency
18 released the necessary paperwork for me to get my --
19    Q  I'm sorry. Go ahead.
20    A  -- for me to get money for vacation pay and
21 comp. time that had accumulated. And, also, I needed
22 money in order to buy supplies and equipment to work

232

1 as an independent social worker. Right now I pay $350
2 a month for Blue Cross Blue Shield. I've grappled
3 with a $700 annual, what do they call it, not
4 co-pay -- deduction -- I have a limit of $1500 on my
5 prescriptions. So if I exceed $1500, then I'm left to
6 buying my own medicines. I pay a higher tax rate
7 because I work for myself. I have no leave, no
8 retirement plan because, I mean, I'm -- I'm hustling,
9 what I'm doing. It's a hustle.
10    Q  Now, let me ask you this. I believe your
11 testimony this morning was that you were an
12 independent contractor working with the elderly in
13 March of 2005.
14    A  That's right.
15    Q  And you said in entire 2005 you may have 20
16 individuals you helped at a cost of $250; is that
17 correct?
18    A  That's correct.
19    Q  Okay. And I believe your testimony was
20 that next year that you made $60,000 approximately?
21    A  It was in that -- yes.
22    Q  So in 2006 you made $60,000 approximately

Case 1:06-cv-00789-PLF-JMF    Document 41-15    Filed 04/22/2008    Page 59 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

59 (Pages 233 to 236)

233

1  doing the service, shirleytabb.com.
2      A  Yes.
3      Q  And I believe your testimony was in 2007,
4  the year after that, you made a hundred thousand
5  dollars.
6      A  That's correct.
7      Q  Okay.  And so is it your testimony that
8  you're still having trouble paying your rent and your
9  Blue Cross Blue Shield and all of that?
10     A  Yes.  I struggle because I have overhead as
11 an independent contractor.  I operate a vehicle.  I
12 pay rent.  I buy toner cartridge.  I have had to
13 replace a fax machine.  I buy paper.  It's -- I have
14 expenses.
15     Q  I only know this because it is almost tax
16 season, but printer cartridges, overhead, if you have
17 an -- if you're an independent contractor and have
18 your own business, isn't that stuff tax deductible?
19     A  It's tax deductible for a certain point.
20 But my experience has been you don't get a whole big
21 break on that on taxes.
22     Q  But you may get some kind of depreciation;

234

1  you get some benefit.
2      A  You get some benefit.  You get some
3  benefit.  But I don't mind telling you that I miss my
4  sick days.  I mean, I'm 54 years old.  I have
5  diabetes.  I'm out here on the streets in bad
6  neighborhoods trying to make a living.  And I don't
7  even know how long the District is going to have money
8  for this elder health program.  And then what's going
9  to happen?  So my income could seriously be impacted
10 at any point in time.
11     Q  Okay.  Any other money damages that you
12 incurred because of what's alleged in the complaint?
13     MR. CONDIT:  Object to the form, but you can
14 answer, if you understand.
15     THE WITNESS:  I started going to acupuncture
16 for stress, but I couldn't afford to keep going.
17 BY MR. WILLIAMS:
18     Q  You went to acupuncture?
19     A  Yes.
20     Q  Who was your acupuncturist?
21     A  I don't remember her name now.
22     Q  Does she have a studio?

235

1      A  Yes, on South Capitol somewhere.  I don't
2  remember.  I went to a few sessions, but I couldn't
3  afford to pay $125 a week.
4      Q  $125 a week?  And you went to how many
5  sessions?
6      A  I probably went to about six or seven
7  sessions.
8      Q  At $125 a week or --
9      A  Each.
10     Q  Okay.
11     A  And I'm sure there are other financial and
12 economic considerations, but I'm just --
13     Q  Well, if you think of some more, be sure to
14 let us know.
15     A  I certainly will.
16     Q  Okay.  I'm going to ask you about emotional
17 stress.  Are there any -- did you see any doctors for
18 emotional -- I'm not talking about an acupuncturist as
19 a doctor, but were there any other licensed physicians
20 or doctors?
21     A  Yes.  When I was first fired, I started
22 seeing a psychiatrist.

236

1      Q  What's the psychiatrist's name?
2      A  Dr. Lawson.  I can't recall the first name
3  but Dr. Lawson.
4      Q  Do you know where his --
5      A  At Howard University Hospital.
6      Q  Okay.  And when did you start seeing him?
7      A  I started seeing Dr. Lawson, it must have
8  been November or December of 2005.
9      Q  Okay.
10     A  And then I saw Audrey Chapman.
11     Q  Audrey Chapman?
12     A  Audrey Chapman.  I saw her for a few weeks.
13     Q  She is a psychiatrist as well?
14     A  She is a psychologist.
15     Q  So Lawson is a psychiatrist, correct?
16     A  Lawson is a psychiatrist, yes.
17     Q  And she is a psychologist.  The
18 psychiatrist Lawson, about how much per session does
19 he charge?
20     A  Well --
21     Q  Charged, I guess.
22     A  Probably -- I don't know.  Because at that

Case 1:06-cv-00789-PLF-JMF    Document 41-15    Filed 04/22/2008    Page 60 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

60 (Pages 237 to 240)

237
1  time I had managed to get some little obscure
2  insurance plan, and they did take -- Howard University
3  was a part of their little network, so I don't
4  remember.
5      Q  So some kind of discounted --
6      A  Right.
7      Q  And how long did you see him?
8      A  I saw Dr. Lawson for probably -- I saw
9  Dr. Lawson probably for seven or eight months.
10     Q  Okay.  And what about Audrey Chapman?
11     A  I saw Audrey for just a few sessions,
12 because she didn't take my insurance, and that was
13 about $125 every session.
14     Q  And you said a few --
15     A  I saw Audrey -- maybe I saw Audrey about
16 eight sessions.  Then I had to cut that because I
17 couldn't --
18     Q  Where is Audrey Chapman located?
19     A  She has -- her company is on Pennsylvania
20 Avenue.  She is under Chapman and Associates.
21     Q  Is she still there now?
22     A  Yes.

238
1      Q  Okay.  Any other doctor, psychiatrist?
2      A  Not that --
3      Q  Any other professional that you saw or went
4  to?
5      MR. CONDIT:  I will note for the record that
6  the witness has seen a non-testifying at the moment
7  expert that I have secured, but I'm not going to
8  discuss or reveal that nor will the witness because at
9  the moment this person is a non-testifying expert.
10     MR. WILLIAMS:  I understand.
11     MR. CONDIT:  I just wanted to make that
12 clear so that there wasn't any ambiguity about what
13 the witness was testifying to.
14     MR. WILLIAMS:  Thank you.
15 BY MR. WILLIAMS:
16     Q  Anybody else?
17     A  No.
18     Q  Did you receive any Medicare or Medicaid or
19 any government assistance since this incident?
20     A  No.
21     Q  What about before this incident?
22     A  Before I was fired?

239
1      Q  Yes, ma'am.
2      A  No.
3      Q  Any other form of public assistance?
4      A  No.
5      Q  All right.
6      MR. WILLIAMS:  We're going to take a
7  five-minute break, but I think we've exhausted what I
8  have.  And I assume Mr. Condit has some questions.
9  We'll take a five-minute break, but I think that I'm
10 almost ready to turn it over.
11     (Proceedings recessed at 4:57 p.m.)
12     (In session at 5:13 p.m.)
13     MR. WILLIAMS:  I don't have any more
14 questions.  Thank you, Ms. Tabb.  I've asked you the
15 questions that I have.  I believe your attorney is
16 going to ask you some more questions.
17     THE WITNESS:  Thank you.
18         EXAMINATION
19 BY MR. CONDIT:
20     Q  Ms. Tabb, you were asked some questions by
21 Mr. Williams about making reports about kids sleeping
22 in the building and about the ethics issues or your

240
1  perception of your ethical obligations on that issue.
2  Do you recall that --
3      A  Yes.
4      Q  -- generally, that line of questions?
5      A  Yes, I do.
6      Q  Are you familiar with the term or phrase
7  "mandatory reporter"?
8      A  Yes, I am.
9      Q  What is that?
10     A  Mandatory reporter is a law under the Child
11 Abuse and Neglect Act that mandates certain
12 professionals to report any and all allegations or
13 suspicions of child abuse and neglect.  And this
14 includes social workers, doctors, nurses, policemen,
15 teachers, those kind of people who come in contact
16 with children on a regular basis.
17     Q  And at the time you worked for CFSA, did
18 you believe yourself to be a mandatory reporter?
19     A  Yes, I did.  Yes, I did.
20     Q  And do you presently believe yourself to be
21 a mandatory reporter?
22     A  Yes, I do.  As long as I maintain a license

Case 1:06-cv-00789-PLF-JMF    Document 41-15    Filed 04/22/2008    Page 61 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

61 (Pages 241 to 244)

241
1  as a social worker, certainly practicing as a social
2  worker, I am a mandatory reporter.
3      Q  Have you received training in the past on
4  mandatory reporting?
5      A  As a matter of fact, when I was at CFSA, we
6  prepared communication documents to send out to people
7  to give to other social workers and professionals in
8  the community about mandatory reporting.
9      Q  Another area of questioning by Mr. Williams
10  had to do with evaluations that you had in 2004 or
11  2005.  And by that I'm talking about your annual
12  evaluation.
13      A  Yes.
14      Q  Do you recall that line of questioning?
15      A  Yes, I do.
16      Q  Part of your testimony, you indicated that
17  you had some disagreement with your evaluation in
18  2005.  Do you recall that testimony?
19      A  Yes, I do.
20      Q  And I believe you said, but correct the
21  record if I'm incorrect here, that you put together an
22  approximately 300-page rebuttal.

242
1      A  Yes, I did.
2      Q  And who was that rebuttal submitted to?
3      A  I went to give it to Mindy Good for the
4  meeting that she had scheduled for us to sit down and
5  talk about the evaluation.  When I got to the meeting,
6  she gave me a copy and she had already signed off on
7  it as had Brenda Donald Walker.
8      Q  A copy of what?
9      A  My 2005 evaluation.
10      Q  So let me just make sure I'm clear on this.
11  Had you had the opportunity to review with Ms. Good
12  your 300-page submittal before the evaluation was
13  finalized?
14      A  No, I didn't get that chance.
15      Q  There were a number of questions from
16  Mr. Williams about leave, and I think the terms were
17  family leave, medical leave, or sick leave.  Do you
18  recall that line of discussion generally?
19      A  Yes.  Yes, I do.
20      Q  In terms of when you were out from the
21  office in 2005, was there any occasion in which you
22  did not request and receive some type of leave for the

243
1  time you were out of work?
2      A  Never.
3      Q  And did leave have to be approved by some
4  supervisory official?
5      A  Yes, it did.
6      Q  You were asked on examination by
7  Mr. Williams about the issue of the picture of a child
8  that was taken who was staying overnight at the CFSA
9  office building, I guess it was in August of 2005.  Do
10  you recall that discussion?
11      A  Yes, I do.
12      Q  Now, when you took the picture and for the
13  actions that you took thereafter, including talking to
14  the media about the issue of children sleeping in the
15  building, did you know the name of the child?
16      A  No, I didn't.
17      Q  So did you ever provide the name of the
18  child to anyone?
19      A  No, because I didn't know who the child
20  was.
21      Q  Did you know the name of the family?
22      A  No.

244
1      Q  And so you never presented that name to
2  anyone.
3      A  No.
4      Q  Did you know where the child had lived or
5  where the child came from?
6      A  No, I didn't.
7      Q  What steps did you take, if any, to protect
8  the identity of the child when you shared the picture
9  with the media?
10      A  Well, I told the reporters that that photo
11  was confidential because this was a client and a
12  minor, and they assured me that the face would be
13  obscured.  And I, to be on the safe side, redacted the
14  eyes, took a black marker and blackened out this part
15  of his face (indicating).
16      Q  Let the record reflect you're covering your
17  nose and your eyes.
18      A  Yes, where we are normally identified by
19  our eyes down to about the top of our -- bottom of our
20  nose.
21      Q  Okay.  Now, did you provide the picture to
22  the media folks with the redaction in place?

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

62 (Pages 245 to 248)

245

1    A  Yes, I did.
2    Q  During the examination by Mr. Williams
3  there were a number of documents presented to you,
4  which I'd like to show you one or two of, and ask you
5  a couple follow-up questions, if you don't mind.
6    A  I don't.
7    Q  You were presented with Exhibit 6 in the
8  record in your deposition, which is the March 2nd,
9  2005 Notification of Unacceptable Performance and
10  Corrective Action Plan from Mindy Good to you.
11    A  Yes.
12    Q  Let me show it to you and ask you if you
13  recall talking about that document?
14    A  Yes, I do.
15    Q  Now, Ms. Tabb, did you prepare a response
16  to that document?
17    A  Yes, I did.
18    Q  And about when did you prepare a response?
19    A  Shortly after I got it, she sent it -- or,
20  rather, she drafted it March 2nd, so it wasn't long --
21  I may have been out when she drafted it, but I
22  immediately responded to tell her how I would mediate

246

1  her concerns.
2    Q  And how did you -- in what form did your
3  response -- was your response submitted?
4    A  It was -- I believe Mr. Williams -- it's in
5  one of those documents.
6    Q  It's in one of the other documents?
7    A  It's in one of those he gave us.  It had --
8  I think it had To Mindy Good/From Shirley Tabb.
9    Q  So is it one of the exhibits you saw today?
10    A  Yes, it's one of the exhibits.  That's it
11  right there.
12    Q  This one, Exhibit 9?
13    A  Yes.
14    Q  So is that your response?
15    A  Yes, it was, dated March 17.
16    Q  And did you provide any other response
17  beyond that?
18    A  No.  Because what happened was I had
19  prepared this response March 17 and submitted it to
20  Mindy, but my mother had her brain stroke around this
21  time.  And all of the dates on here, my deadline
22  dates, I was out with my mother.

247

1    Q  Were you out at that time on family medical
2  leave?
3    A  Yes, I was.
4    Q  Now, when you returned from family medical
5  leave, did the issues that -- strike that.  When you
6  returned from family medical leave, did Ms. Good
7  reraise the issues with you that she presented
8  originally in her March 2nd memo, which you see as
9  Exhibit 6?
10    A  I believe she did reraise those issues in
11  the admonition -- in the reprimand.
12    Q  Okay.  I'm not speaking of that.  I
13  understand that.  Did she talk to you when you came
14  back to work about addressing any of the performance
15  issues?
16    A  Oh, no.  No, she didn't.
17    Q  But you say she reraised them, in other
18  words, she stated them again in the later documents.
19    A  Right.
20    Q  Did she give you an opportunity when you
21  returned from family medical leave to work out the
22  issues that she had identified on the March 2nd memo?

248

1    A  No.  They were never mentioned to me again.
2    Q  I'll take those back.  Thank you.
3    You were also shown the letter which you
4  received regarding your removal from service at the
5  Child and Family Services Agency.  Do you recall that?
6    A  Yes.
7    Q  And this is Exhibit 11 in the deposition.
8  It's the October 3, 2005 letter from Brenda Donald
9  Walker, the director of the agency, to you.  I'll
10  present it to you again.
11    A  Thank you.
12    Q  A couple questions about this document.
13  First of all, do you recall being asked questions
14  about this document and confirming your receipt of it?
15    A  Yes.
16    Q  Now, a couple of points I'd like to raise
17  with you.  First of all, if I could draw your
18  attention to the first page of the document and the
19  last paragraph, which starts, on or about September
20  19, 2005.  Do you see that?
21    A  Yes, I do.
22    Q  Okay.  Let me start with that first part of

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

63 (Pages 249 to 252)

249

1  the sentence or clause there.  It says, on or about
2  September 19, 2005, you misrepresented agency practice
3  to the media.
4       Do you see that?
5       A  Yes, I do.
6       Q  Aside from those words there, did anyone
7  ever explain to you what that meant?
8       **A  No, they didn't.**
9       Q  Did anyone ever provide you any information
10  which indicated what you misrepresented allegedly?
11       **A  No, they didn't.**
12       Q  Let's move on to the next part.  It says,
13  you violated CFSA confidentiality laws in showing the
14  image of a child in CFSA's custody and disclosing
15  detailed personal information about why the child was
16  in CFSA's custody.
17       Do you see that?
18       **A  Yes, I do.**
19       Q  Were you ever provided a copy of any
20  confidentiality laws that you allegedly violated?
21       **A  No, I -- I never did.**
22       Q  Were you ever told what confidentiality

250

1  laws you allegedly violated?
2       **A  No, I wasn't.**
3       Q  Were you ever told what confidentiality
4  policy you violated?
5       **A  No.**
6       Q  Now, it goes on to say that you disclosed
7  detailed personal information about why the child was
8  in CFSA's custody.
9       Do you see that?
10       **A  Yes.**
11       Q  Did you ever tell anyone in the media or in
12  the public why the child was in CFSA's custody?
13       **A  I don't recall telling them why he was in
14  custody.**
15       Q  Now, with respect to the statement in this
16  letter about personal information, did you provide any
17  personal information to anyone about the child?
18       **A  No, because I didn't have any.**
19       Q  Let me draw your attention to that same
20  paragraph on the first page.  It's the last, sort of
21  long sentence.  Let me read it to you for the record.
22       It says, again, you failed to obtain permission

251

1  from your supervisor to disseminate information to the
2  media, which constitutes malfeasance and
3  insubordination, as you had been admonished for
4  similar conduct earlier this year.
5       My question to you is:  Had you been admonished
6  prior to this letter, October 3, 2005, for sharing
7  information with the media?
8       **A  No.  No.**
9       Q  Let me draw your attention, again, in this
10  exhibit, Exhibit 11, to looks like the second full
11  paragraph, which begins with the words "in March
12  2005."  Do you see that?
13       **A  On the second page?**
14       Q  I'm sorry.  First page.
15       **A  First page?  Yes.**
16       Q  It says, in March 2005.  Do you see that?
17       **A  Yes.**
18       Q  It says, in March 2005, you used the CFSA
19  e-mail system to approach another government agency
20  about an unauthorized campaign to raise awareness
21  about child abuse and neglect and promote
22  implementation of specific projects without notifying

252

1  or obtaining prior approval from your supervisor.
2       Do you see that?
3       **A  Yes, I do.**
4       Q  The first question.  To your knowledge and
5  experience as a 14-year employee of CFSA, do CFSA
6  employees typically e-mail other agencies?
7       **A  Yes.**
8       Q  Just, for example, why do you e-mail other
9  agencies?
10       **A  Well, we could e-mail other agencies to
11  encourage and initiate inter-agency partnerships,
12  community partnerships.  We used to talk a lot about
13  community stakeholders and the concept that it takes a
14  village to raise children.  So we used to do it all
15  the time.**
16       Q  Were there agencies in the District
17  government at the time you were there in 2005 that
18  were considered to be sister agencies of CFSA?
19       **A  Certainly.**
20       Q  What are those agencies?
21       **A  Department of Human Services, Department of
22  Mental Health, Department of Youth and Rehabilitative**

Case 1:06-cv-00789-PLF-JMF    Document 41-15    Filed 04/22/2008    Page 64 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

64 (Pages 253 to 256)

253
1    Services, Parks and Recreation.
2        Q   And would you or others within CFSA
3    typically have interactions with those agencies?
4        A   Certainly.
5        Q   Now, did you understand when you
6    e-mailed -- well, let me ask this.  What did you
7    understand that the agency to be referring to when it
8    says, you used the CFSA e-mail system to approach
9    another government agency about an unauthorized
10   campaign?  Do you know what they were talking about?
11       A   Yes, I do.  When T.C. Lacomba was at the
12   agency as the number two person to the director,
13   Olivia Golden, she had selected me to work with DHS in
14   a campaign to make the community aware of the dangers
15   of having little babies sleep on their tummies as
16   opposed to having them sleep on their backs, thus
17   called the Back to Sleep campaign.  And they gave us
18   lots of nice materials.  But Ms. Lacomba didn't stay
19   at the agency, so -- she left.
20       So after going to so many fatality review
21   hearings, hearing about horrendous things that were
22   happening to children in the District and all over the

254
1    country, every time I heard this, I just saw a part of
2    my soul die.  And I had approached Brenda about
3    reaching out to the community with -- no, first I went
4    to Mindy -- with a prevention and awareness campaign.
5    So if we couldn't find enough homes for kids, let's
6    try to keep them safe out there where they are or at
7    least heighten the awareness of the community.  So if
8    children are in trouble, they will know what to do,
9    people know who mandatory reporters are.
10       Mindy felt that prevention and public awareness
11   in the community was not CFSA's role.  So I thought
12   that reaching out to the public information officer at
13   DHS would allow me to dialogue with her and perhaps
14   get enough information to bring back to sit down with
15   Brenda again and say, well, look, DHS is willing to
16   partner with us and do this.  But once Mindy killed
17   it, Brenda didn't want anything to do with it.  And I
18   was cited for going out -- going to another government
19   agency about an unauthorized campaign.  It wasn't a
20   campaign; I was just fact finding.
21       Q   Did you ever tell the DHS person that you
22   were communicating with that what you were talking

255
1    about was a campaign that had been approved by CFSA?
2        A   Oh, no, no, no.  My e-mail to her was more
3    of a query-like letter.
4        Q   And then it says in that same paragraph,
5    you, again, mentioned the unauthorized campaign at an
6    executive staff meeting.  As a result, you were
7    reprimanded.
8        A   This is a total fabrication.  This sentence
9    here is absolutely not true.  I testified earlier this
10   morning about why I was reprimanded for speaking out
11   in the meeting.  That was offering, suggesting, that I
12   go to procurement and offer my services to do a
13   communication plan.
14       Q   So this, the unauthorized campaign, which
15   is alleged by the agency wherein you communicated with
16   DHS, was not the issue that you raised at the
17   executive staff meeting?
18       A   No, absolutely not, not at all.
19       Q   Now let me ask you to draw your attention
20   onto the second page, please.  In the top paragraph of
21   page 2 of Exhibit 11, the removal letter, it says, you
22   have been on family medical leave since August 18,

256
1    2005, based on the claim that you are suffering from a
2    serious medical condition which prevents you from
3    working.  Do you see that?
4        A   Yes.
5        Q   Drawing your attention to your earlier
6    testimony today, is that reference to the period of
7    time that there was an agreement that you would take
8    time off in order to get your diabetes under control?
9        A   Yes.
10       Q   And was that discussion you were having
11   with Michelle Lewis and Mindy Good about that topic?
12       A   Yes.
13       Q   And then it says, yet you were able to
14   coordinate a photo of a child, an audiotape of a
15   co-worker, and coordinate interviews with the media
16   during that time.  CFSA considers such action an abuse
17   of family medical leave.  Do you see that?
18       A   Yes.
19       Q   What kind of effort was involved in talking
20   to the media about the issue of children sleeping in
21   the building?
22       A   Very minimal effort.  I called them.  They

Case 1:06-cv-00789-PLF-JMF    Document 41-15    Filed 04/22/2008    Page 65 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

65 (Pages 257 to 260)

257
1  came over to my apartment and interviewed me in my
2  robe.
3      Q  Now, with respect to the reference to an
4  audiotape here --
5      A  Right.
6      Q  -- do you know what that is?
7      A  Yes.  That's a tape -- since I had talked
8  with Neil Albert, who at that time gave the illusion
9  that he was interested in helping to recruit families,
10  while I was on sick leave, as I testified this
11  morning, I would call to check my voicemail messages
12  throughout the day or the week to make sure that I was
13  in compliance with the mayor's customer service
14  initiative.
15      So this particular morning I called in to check
16  my voicemail messages and heard Joanne Vaughn, a
17  social worker from night intake, literally begging for
18  quilts and comforters.  And that was just -- that was
19  just hard to accept after all I knew about the
20  agency's inactivity around recruitment and trying to
21  help these children.  So that's when I taped the
22  recording so I could give it to Neil Albert.

258
1      Q  Now, with respect to the recording, I want
2  the record to be clear, was the recording from Ms.
3  Vaughn a recording of a message left on your CFSA
4  voicemail?
5      A  Yes, it was.  It was left on my CFSA
6  voicemail through the agency's OPTI voicemail system.
7      Q  You may have testified to this, but let me
8  clarify it, if you have.  During the period that you
9  were on leave, August 18th period, did you do, other
10  than checking your voicemail, did you do anything else
11  to try to sort of stay up with any parts of what was
12  going on within the agency?
13      A  Well, I would check my e-mails to see what
14  was going on with all staff e-mails, and that was
15  about it.
16      Q  Okay.  The rest of the time you were
17  spending recuperating and trying to get yourself in
18  shape?
19      A  Right.  Right.
20      Q  You testified on questions from
21  Mr. Williams about the public's knowledge of the issue
22  of children sleeping in the building.  Do you recall

259
1  that discussion?
2      A  Yes, I do.
3      Q  And there was a reference to a "Washington
4  Post" article and some other things.  Do you recall
5  that?
6      A  Yes.
7      Q  In part of your testimony you referenced
8  once or twice that Mayor Fenty, who at the time was
9  the Chair of the Human Services Committee for the
10  council --
11      A  Right.
12      Q  -- was unaware of children sleeping in the
13  building.  Do you recall that testimony?
14      A  Yes, I do.
15      Q  How do you know that?
16      A  Because I testified before Mayor Fenty at
17  the November oversight hearing just a month following
18  my termination, and he said to the audience that he
19  commended Ms. Tabb for coming forward, because had she
20  not come forward, he never would have known about
21  children sleeping in the building.  He learned about
22  it through the media, is what he said.

260
1      Q  All right.  You were asked some questions
2  by Mr. Williams about your damages.
3      A  Yes.
4      Q  Do you recall that discussion?
5      A  Yes, I do.
6      Q  And I believe you testified as to your
7  income in 2006 and 2007?
8      A  Yes.
9      Q  As to those incomes, the estimates that you
10  gave, was that gross income or was that after taxes
11  and other expenses?
12      A  Gross.
13      Q  Now, with respect to that income, did
14  you -- strike that.
15      How many hours would you say you have to work
16  to earn the income that you're presently earning per
17  week?
18      A  Probably 80 hours or so, 80, 80, 90.  The
19  earliest I have started an appointment has been about
20  6:00 in the morning.  The latest I have gone to a
21  family's house to do an assessment has been at
22  midnight.

Case 1:06-cv-00789-PLF-JMF    Document 41-15    Filed 04/22/2008    Page 66 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

66 (Pages 261 to 264)

261

1    Q   Now, when you testified a little earlier
2    about damages and you indicated that you made a
3    hundred thousand dollars gross for 2007, is that
4    working the kind of hours that you just described?
5        A   That's right.  And that's Saturday,
6    Sundays, holidays.  When I was first fired, it took me
7    some time to realize that I had to learn to cut it off
8    because there was nobody there to say, okay, it's
9    4:45, it's time to get off.  I would literally get up
10   on my computer, I can start doing assessments or
11   answering e-mails at 6:00 in the morning, and at 9:00,
12   10:00 I'm still at my computer doing paperwork.
13       Q   Now, what, if any, effect does that kind of
14   schedule have on your health?
15       A   It's grueling because I'm not taking care
16   of myself, as I should.  Sometimes I run out -- I got
17   an early meeting or some senior citizen, 100-year-old
18   person needs health care and I'm trying to get that
19   done before they die, and I might forget to take a
20   shot or I might forget to take my medicine for my
21   neuropathy in my hands and my feet.  So it is
22   grueling.  It is a grueling -- it is a grueling

262

1    lifestyle.
2        Q   So why not just get a different job?
3        A   Because nobody is going to hire me and I've
4    been fired from CFSA.  I went to one employer, one
5    interview, and the people called me.  I went back to
6    the second interview, and I thought I had a real good
7    chance of getting this case management job with
8    Washington Hospital Center.  And at the second
9    interview where they called in all the staff to meet
10   me and called me, told me I would spend about eight
11   hours with them going through their process, that was
12   dead when one woman looked down at my resume and said,
13   oh, why did you leave Child and Family Services?  And
14   I couldn't tell a lie.  I had to tell her why.
15       Q   What did you tell her?
16       A   I told her I was fired when I spoke out
17   about children sleeping in the building, child neglect
18   inside the District's own child welfare system.
19       Q   And did you get a call back after?
20       A   No, I didn't.
21       Q   Do you want your CFSA job back?
22       A   Yes, I do.

263

1        Q   Why?
2        A   Richard, because working at CFSA, since
3    1992, I saw that job working with those kids and
4    families as a calling.  For me it was more than a
5    8:00, 8:15 to -- 8:15 to 4:45.  That was a calling.
6    That was God's work, as far as I was concerned.  So I
7    would work long hours there, decorate the building,
8    because I took ownership of that job.  I feel vested
9    in this community.  I feel vested in CFSA, the
10   children.  And now when I talk to people, I still say
11   "we."  I still talk as if I'm a part of CFSA because I
12   am a part of CFSA and it does take a community to
13   raise and make sure that these children are safe and
14   to create that safety net that the agency puts their
15   spin out talking about a safety net.  Well, the net
16   right now has huge holes in it.
17       Q   What advantages would there be aside from
18   your commitment to returning to a regular hour
19   position at CFSA?
20       A   Well, I would be back in familiar territory
21   doing a job that I love working with children in
22   whichever capacity.  I would be back in an agency that

264

1    I came to love, as well as having benefits, sick days,
2    health insurance, and opportunity for a 401(k) where
3    the District makes up some contribution, and that
4    would be wonderful.
5        Q   Now, one last question.  You were asked by
6    Mr. Williams about any type of government assistance
7    you may have received, and I think you may have
8    omitted something.  Did you receive at any point in
9    time any unemployment insurance?
10       A   Yes, I did.  I forgot about that.  About
11   eight to ten weeks after I was terminated I did get
12   unemployment for that short period of time that they
13   give it to you.
14       Q   And about how much was the unemployment?
15       A   It was about $300 a week, I believe it was.
16       Q   For about how many weeks?
17       A   For about, I think I got it -- I don't
18   remember because it wasn't much money, but I'm trying
19   to -- I think it may have been for six months and then
20   it stopped.  And I called them, and I wanted to know,
21   well, my unemployment stopped.  And they were, like,
22   well, that's it.  I said, 14 years and -- 14 years,

Case 1:06-cv-00789-PLF-JMF    Document 41-15    Filed 04/22/2008    Page 67 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

67 (Pages 265 to 268)

265

1  **$92,000 when I left, and this is it?  They said, yep,**
2  **until you go somewhere and build up some more**
3  **quarters.**
4      MR. CONDIT:  That's all the questions I
5  have.  Mr. Williams might have some additional
6  questions.
7      MR. WILLIAMS:  I just have two additional
8  questions.
9          EXAMINATION (resumed)
10 BY MR. WILLIAMS:
11     Q   Do you remember testifying when your
12 counsel asked you questions regarding the Washington
13 Hospital job interview that you went to?
14     A   Yes.
15     Q   I believe your testimony is you went for
16 the second interview.
17     A   Yes.
18     Q   And I believe you testified that, during
19 the second interview, some person, one of their
20 interviewers, referenced -- asked you why you left
21 CFSA.
22     **A   Yes.**

266

1      Q   And you testified that you had to tell them
2  the truth, that you were terminated.
3      **A   Yes.**
4      Q   And then you testified that you didn't get
5  a call, I guess, a third call back.
6      **A   Right.**
7      Q   How do you know that that was the reason
8  that you didn't get the third call back?
9      **A   I know that was the reason because we**
10 **discussed it.  They wanted to know -- there was one**
11 **doctor there, and they were looking at me and said,**
12 **well, so if somebody in the room -- somebody in the**
13 **room said, oh, I remember that, I saw that on TV.  So**
14 **then I had to say, well, it is what it is.  I'm a**
15 **social worker, and, yes, I spoke up for children and**
16 **that's what I do.  That's the way I have chosen to**
17 **live my life working for the disenfranchised.  And I**
18 **think somebody asked if I would do it the same way.**
19 **And I said, well, maybe perhaps not the same way, but**
20 **I'm going to always be an advocate for the**
21 **disenfranchised.**
22     Q   Okay.  I guess my question was how do you

267

1  know that that, you being terminated, played a part in
2  you not getting the job?
3      **A   I can't think of anything else that it**
4  **could have been because we talked specifically, who**
5  **wants to hire somebody, especially in the hospital**
6  **setting, who has gone to the media about something.**
7      Q   Who did you -- you said you had that
8  conversation with somebody?
9      **A   No.  That's just a hypothetical question.**
10 **I was saying, who's going to hire --**
11     Q   But you really don't know why you didn't
12 get a call back; is that correct?
13     **A   All I know is they picked somebody else.**
14 **And they didn't tell me naturally that it was because**
15 **of that, but because of my experience, because of how**
16 **hard I have been working out here, they knew all about**
17 **me because we share clients.**
18     Q   But you don't know why they didn't give you
19 a call back.
20     **A   I don't know specifically, no.**
21     Q   The second question I have -- I guess the
22 second line of questioning I have -- you referred to

268

1  one of the things that you want is to go back to CFSA.
2  Do you remember that testimony?
3      **A   Yes.**
4      Q   It was unclear to me whether you were
5  saying that you wanted to go back to that position
6  that you had left at CFSA or you wanted some other
7  position.  Can you clarify that for me?
8      **A   Yes, I can.  After all that has happened,**
9  **Mr. Williams, and I always felt this way, but I was**
10 **never in any position to do anything about it, but if**
11 **I'm given the opportunity to go back to CFSA, I would**
12 **hope to go back in a decision-making capacity, where I**
13 **can actually effect change and work toward reform**
14 **because I was not a decision-making person.  My vision**
15 **or my ideas weren't that important.  And, of course, I**
16 **was -- I had no problem supporting my superiors, but**
17 **my disillusionment came when I saw the duplicity in**
18 **the agency and the political games and the spin**
19 **doctoring, and I just got very disillusioned because**
20 **it wasn't all about children.**
21     Q   What type of work -- before you were a
22 public information officer.

Case 1:06-cv-00789-PLF-JMF    Document 41-15    Filed 04/22/2008    Page 68 of 101
DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

68 (Pages 269 to 272)



269
1    A  Yes.
2    Q  And you said you wanted to be a
3 decision-maker?
4    A  Yes.
5    Q  And you can be a decision-maker in public
6 information.
7    A  Yes.
8    Q  But is there any other type of work?
9    A  Yes, on the program side.
10   Q  On the program side.  Can you explain to me
11 that what that means?
12   A  Where the social workers work, where
13 decisions are made about kinship care, about foster
14 care and adoptions.  See, you have the program side
15 and you have the administrative side.  I want to be on
16 the program side actually working with families and
17 children to impact the lives of children and provide
18 greater nurturing for them.
19   Q  And that will make you feel good?
20   A  Yes, it would.
21   Q  Okay.
22       MR. WILLIAMS:  I have asked you all the

270
1 questions I have.
2       MR. CONDIT:  I don't have anything else.
3 Thank you.
4       MR. WILLIAMS:  So I want to just thank you
5 for coming in.  We asked a lot of questions today and
6 it was a very long day.
7       THE WITNESS:  Thank you.
8       MR. WILLIAMS:  So I want to thank you for
9 putting the time in and bearing with us.
10      THE WITNESS:  Sure.  Thank you.
11      MR. WILLIAMS:  I do want to let you know
12 that you're going to have the right to review this
13 transcript for errors.
14      THE WITNESS:  Okay.
15      MR. WILLIAMS:  While you can't make
16 wholistic changes, you are able to review that, and
17 you have that election.  You can either elect to
18 review it or you can trust that it's going to be
19 done -- you have a lawyer to consult.
20      MR. CONDIT:  She will review.
21      MR. WILLIAMS:  Thank you very much.  That
22 closes this deposition.

271
2       (Signature having not been waived, the
3 deposition of SHIRLEY TABB was concluded at 5:51 p.m.)

272
1          ACKNOWLEDGEMENT OF DEPONENT
3       I, SHIRLEY TABB, do hereby acknowledge
4 that I have read and examined the foregoing testimony,
5 and the same is a true, correct and complete
6 transcription of the testimony given by me and any
7 corrections appear on the attached errata sheet signed
8 by me.

12 _____  _____
13   (Date)          (Signature)

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

69 (Pages 273 to 275)

273

1
2
3    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
4
5        I, LINDA S. KINKADE, Registered Professional
6    and Registered Merit Reporter, Certified Shorthand
7    Reporter and Certified Realtime Reporter, the officer
8    before whom the foregoing proceedings were taken, do
9    hereby certify that the foregoing transcript is a true
10   and correct record of the proceedings; that said
11   proceedings were taken by me stenographically and
12   thereafter reduced to typewriting; and that I am
13   neither counsel for or related to, nor employed by any
14   of the parties to this case and have no interest,
15   financial or otherwise, in its outcome.
16       IN WITNESS WHEREOF, I have hereunto set my hand
17   and affixed my notarial seal this 17th day of
18   February, 2008.
19       My commission expires:  July 14, 2012.
20   _____
21   NOTARY PUBLIC IN AND FOR
22   THE DISTRICT OF COLUMBIA

275

1            E R R A T A   S H E E T
2        SHIRLEY TABB v. DISTRICT OF COLUMBIA
3    RETURN BY:  _____
4
5    PAGE   LINE    CORRECTION and REASON
6    _____ _____ _____
7    _____ _____ _____
8    _____ _____ _____
9    _____ _____ _____
10   _____ _____ _____
11   _____ _____ _____
12   _____ _____ _____
13   _____ _____ _____
14   _____ _____ _____
15   _____ _____ _____
16   _____ _____ _____
17   _____ _____ _____
18   _____ _____ _____
19   _____ _____ _____
20   _____ _____ _____
21   _____ _____
22       (DATE)            (SIGNATURE)

274

1            E R R A T A   S H E E T
2        SHIRLEY TABB v. DISTRICT OF COLUMBIA
3    RETURN BY:  _____
4
5    PAGE   LINE    CORRECTION and REASON
6    _____ _____ _____
7    _____ _____ _____
8    _____ _____ _____
9    _____ _____ _____
10   _____ _____ _____
11   _____ _____ _____
12   _____ _____ _____
13   _____ _____ _____
14   _____ _____ _____
15   _____ _____ _____
16   _____ _____ _____
17   _____ _____ _____
18   _____ _____ _____
19   _____ _____ _____
20   _____ _____ _____
21   _____ _____
22   (DATE)            (SIGNATURE)

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

276

## A

**abilities** 45:7
**ability** 84:12
    109:3,6 118:20
    120:12,14
    142:18 206:12
    208:17
**able** 92:9 135:14
    141:10 149:12
    150:1 161:15
    256:13 270:16
**abridged** 204:2
**abridgement**
    200:21 201:4,14
**absolutely** 111:15
    255:9,18
**abuse** 224:20
    228:10 240:11
    240:13 251:21
    256:16
**abused** 85:18
    230:8
**abusive** 226:22
    227:13,14,15
    228:12,18,20
    229:3,17,19
**accelerated** 32:4
    32:19,20
**accept** 257:19
**accommodations**
    144:4
**accord** 46:15
**account** 41:21
**accounts** 39:12
**accumulated**
    231:21
**accurate** 196:5
**acknowledge**
    272:3
    **ACKNOWLED...**
    272:1
**acronym** 29:7
**acronyms** 29:1,1
**act** 58:22 59:2
    124:11,15,20
    125:7,20 128:20

197:16 240:11
**acting** 55:13,15
    61:11 113:18
    210:9
**action** 1:6 5:8
    12:7 189:8
    192:14 195:10
    209:16 210:5
    245:10 256:16
**actions** 200:12
    201:9 208:18
    243:13
**actively** 99:7
    101:7
**activities** 56:20
    61:5,19 154:4
    155:21
**activity** 109:16
    156:7,21
**acupuncture**
    234:15,18
**acupuncturist**
    234:20 235:18
**Addis** 5:14 195:4
    195:19 197:8
    210:9 212:9
    213:17 214:21
**additional** 121:20
    182:18 265:5,7
**additions** 106:18
**address** 27:15,17
    27:18,21,21 28:3
    28:13 90:6
    91:10,12 149:8
**addressing**
    247:14
**adequate** 39:1
    144:4
**adequately** 102:6
    226:19
**administration**
    59:22
**administrative**
    26:16 27:2,4
    100:20 211:12
    269:15

**administrator**
    210:10
**admissible** 92:22
**admonish** 57:13
**admonished**
    251:3,5
**admonishment**
    62:22
**admonishments**
    57:14 69:5,22
**admonition** 10:18
    10:20 12:16
    247:11
**adopt** 68:2
**adoptions** 269:14
**adoptive** 52:8,11
    54:7 56:20
    67:15,17 85:20
    90:12 92:16
    103:11
**Adrian** 11:1 12:19
    178:4 220:2
**ads** 43:13,14,16
    44:3
**Advance** 4:21
    190:14
**advantage** 215:9
    215:10,13
**advantages**
    263:17
**adverse** 79:12
**advertising** 23:20
    23:21
**advised** 174:6
**advocate** 266:20
**affect** 134:22
**affidavits** 209:18
**affixed** 273:17
**afflicted** 149:3
**afford** 19:16 40:3
    234:16 235:3
**African-Americ...**
    38:14
**aftermath** 184:12
**afternoon** 224:10
**age** 182:2

**agencies** 18:8,10
    18:11 26:11
    27:5 28:8 37:11
    175:16 252:6,9
    252:10,16,18,20
    253:3
**agency** 54:17
    59:15,16,19 61:5
    62:4,9 63:19
    64:3,5,7,18 65:9
    66:14,18 68:22
    69:3,10,16,20
    70:21 71:16
    72:6,15,17 75:7
    75:18 76:11,16
    79:11,12,19
    85:14 102:13
    106:2,15 116:14
    118:15 144:2
    148:11 149:19
    152:19 156:22
    159:10,13
    161:14 170:21
    182:9,12,17
    202:22 203:8,21
    203:22 219:13
    219:16 227:21
    231:17 248:5,9
    249:2 251:19
    253:7,9,12,19
    254:19 255:15
    258:12 263:14
    263:22 268:18
**agency's** 59:16,17
    62:14 72:8 77:7
    102:5 159:18,20
    166:14,16
    257:20 258:6
**ages** 92:19
**aging** 18:3
**ago** 53:20 183:6,9
**agree** 118:18
**agreed** 61:3
    115:13 126:12
    130:3,13,13
**agreeing** 174:11

**agreement** 8:15
    256:7
**ahead** 20:3 111:14
    111:17 136:7
    153:10 214:19
    231:19
**Ahluwalia** 184:6
**Ahmed** 87:3
**ailments** 148:21
**Albert** 143:16
    144:16,19 145:5
    145:8,14 148:6
    148:14 150:20
    155:12 156:15
    168:6,11 171:19
    171:22 172:10
    173:8,9,12
    174:22 220:4
    257:8,22
**Albertsons** 39:10
    39:11
**alerted** 184:13,15
**allegation** 225:9
    225:13
**allegations** 140:5
    140:7 208:1
    226:17 240:12
**allege** 140:9 142:5
    142:16 199:3,6
    201:10 207:22
**alleged** 141:22
    203:22 231:12
    234:12 255:15
**allegedly** 249:10
    249:20 250:1
**alleging** 230:22
**allow** 18:3 26:13
    28:4 33:14
    141:9 254:13
**allowed** 79:1
    206:5,8
**allows** 205:10
**ambiguity** 238:12
**ambulatory**
    139:20
**amended** 4:19

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

277

11:14 141:19
143:6 188:11
198:19 215:22
**Amendment**
140:10,12 142:1
142:2,6 143:2
199:7,21 200:14
202:16 204:14
204:16 205:9
**Amendments**
205:22
**amount** 118:7
**amounted** 119:18
**Amway** 23:16
**AM&N** 31:16,19
32:8 33:3
**announces** 212:10
**annual** 56:19
66:19 232:3
241:11
**answer** 9:18,21,22
10:2,15 14:21
25:21 29:19
43:19 59:8
60:13,15 65:21
71:11 73:22
82:6 85:6 87:19
88:16,18 89:10
89:21 90:19,20
96:18 97:6,20
100:15,16
101:12 105:2
111:3 113:13
114:3,11 120:11
127:4 129:22
131:1 133:2
138:18 141:2,2,7
141:14 142:13
145:11 149:7
151:1,19 152:10
160:20 176:17
177:11 178:20
185:2,9 187:2
200:3 201:2
202:17 204:4
205:1,2,18

206:18 208:9
219:6 221:20
222:3 224:8
227:2 234:14
**answered** 84:11
112:4 151:9,12
151:22 152:1,4
171:16 185:15
228:9
**answering** 27:9
99:21 204:21
261:11
**answers** 8:10
65:14 184:22
**antagonistic**
103:17,18,18,19
105:9,12,16
107:1 108:9,10
108:14,18 109:9
109:16,22 110:1
110:3,8 112:21
113:18 115:5
**anticipation**
47:15
**anxious** 157:5,7,8
157:12
**anybody** 16:5,18
111:11,13 120:7
163:8,10,12,14
163:15,19
169:13 175:6,13
179:21,22
238:16
**apartment** 257:1
**apparently** 179:8
**appear** 25:16,18
197:1 212:22
213:1 272:7
**APPEARANCES**
3:1
**appearing** 44:9
**appears** 25:11,12
27:15 127:15
181:12 189:18
203:20
**applicable** 2:15

**application** 4:14
132:1,8
**applied** 51:7
121:19 122:5,11
124:14 125:6,7
125:12 126:4,7
127:19 132:16
**applies** 95:17
**applying** 128:19
**appointed** 212:11
**appointment**
260:19
**appraisals** 70:5,8
**appreciate** 13:8
**approach** 27:1
251:19 253:8
**approached** 254:2
**appropriate** 38:4
106:11 110:4,7
**approval** 105:21
252:1
**approved** 11:16
80:4 119:13
121:1 133:6
243:3 255:1
**approximate**
24:13
**approximately**
21:11 159:2
232:20,22
241:22
**April** 104:10
120:17,17
121:14 123:19
**arbitrary** 97:3
**area** 39:4,7 182:5
241:9
**areas** 48:2
**aren't** 131:5 152:8
**argumentative**
149:6 151:1
171:17
**Arkansas** 15:4,7
30:16 31:7,12,17
31:21,21 32:1,11
32:13,15,16 33:3

34:16 37:5,6,9
103:20,21
**arrange** 83:21
**arrested** 182:13
**arrived** 224:4
**article** 106:20
110:4,11 181:12
181:13 218:16
218:20 219:9
220:19,21 259:4
**articles** 108:21
**arts** 33:10
**ascertain** 91:7
161:15
**aside** 57:17 63:2
70:10 193:1
249:6 263:17
**asked** 14:5,12
65:12 66:11
84:9,10 91:4
94:18 95:5,16
97:10 104:21
106:8 110:21
111:6 112:4
115:3 151:9
161:11,12
162:16 164:13
164:18 165:11
168:6 171:4,16
173:4,4 174:15
185:15 197:12
203:3 206:3
239:14,20 243:6
248:13 260:1
264:5 265:12,20
266:18 269:22
270:5
**asking** 21:21
30:22 81:20
97:8 100:3,4,4
100:17,22 101:2
119:20 125:18
131:16 132:21
140:19 142:7,22
174:9 207:5
208:14,15,20

211:18 216:7
218:5 231:10
**asks** 8:5 202:14
**Assembly** 11:17
**assessment** 19:3
19:11 260:21
**assessments** 17:22
19:9,12 261:10
**assign** 118:7,8
**assigned** 39:4
78:19 95:18
**assignments** 67:2
67:2,4,6,9
**assistance** 18:19
85:17 238:19
239:3 264:6
**Assistant** 3:12,21
**Associates** 237:20
**Association** 99:15
**assume** 10:1
239:8
**assumed** 136:5
161:17
**assured** 244:12
**as-needed** 21:8
**atrocity** 185:19
**attached** 4:9 25:1
126:17 144:11
181:7 188:3,17
189:14 191:3,21
192:4 193:16
194:16 195:22
272:7
**attempt** 157:22
**attempts** 168:15
**attend** 31:18 68:6
177:17
**attendance** 119:1
**attended** 33:2
68:12
**attention** 79:13
153:1 202:12
248:18 250:19
251:9 255:19
256:5
**attest** 147:10

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

278

**attorney** 2:6 3:12
3:13,21 6:20 8:5
16:19 92:14
142:14 143:4
188:12 197:17
198:10,11 204:5
207:22 208:10
209:20 239:15
**attract** 67:22
**attributed** 141:3
182:19
**at-will** 213:18
**audible** 7:16 8:4
8:12
**audience** 259:18
**audiotape** 256:14
257:4
**Audrey** 236:10,11
236:12 237:10
237:11,15,15,18
**August** 5:9 10:17
12:15 53:5
121:5 122:2,3,11
122:17 123:3
126:4 127:20
128:12 133:10
133:21 136:14
136:17 137:19
138:1,2,3,10,11
139:11,16
145:15,20,22
146:1 159:3,4,5
159:7,10,12
222:14,16 243:9
255:22 258:9
**aunts** 30:20
**authorization**
121:10
**available** 52:18
182:15
**Avenue** 237:20
**aware** 177:8,14
177:17,21 178:2
178:11,14,15
180:1 183:10
184:18 197:9

218:1 253:14
**awareness** 251:20
254:4,7,10
**awful** 185:17
**a.m** 1:15 6:2 84:5
147:5,6,7,9,21
**A01** 181:15

___

## B

**B** 4:8
**babies** 253:15
**bachelor** 33:10
**back** 20:2 32:7
45:2 58:9 60:11
60:18 61:19
65:13 69:2,3
79:11,11 80:2,14
104:11 106:7
116:3 119:4
120:18 121:3,4
121:11 123:8
126:8,11,14
129:20 130:2
138:21 146:20
158:5 164:12,13
164:16 168:17
170:14 171:3
172:6,9 178:21
179:2 198:5,19
219:16,16 222:9
224:2 247:14
248:2 253:17
254:14 262:5,19
262:21 263:20
263:22 266:5,8
267:12,19 268:1
268:5,11,12
**background**
30:22 102:7
**backs** 253:16
**bad** 7:18 8:18
29:1 35:20 39:1
103:16 132:5,14
133:22 139:8,9
139:13,15 234:5
**badger** 151:18

**badgering** 151:10
151:15
**bags** 162:9 170:13
**BAKARI** 3:11
**balance** 59:18,18
59:20
**Baltimore** 15:12
16:3 42:12
44:19,20 104:15
**barely** 135:13
**base** 98:7,10,10
**based** 10:2 84:9
91:15 97:16
131:12 198:7
200:17,21
201:16 209:16
256:1
**basic** 7:12
**basis** 21:8 115:9
132:1 140:6,11
141:7 142:22
179:2 240:16
**bathroom** 9:5
**bathrooms** 9:4
**bearing** 270:9
**beauty** 40:10,10
**bed** 139:19 149:15
149:16 150:11
179:3 228:4
**bedridden** 139:18
**beds** 162:8
**begging** 257:17
**beginning** 19:15
**begins** 251:11
**behalf** 3:2,10 6:17
84:12,19
**behavior** 35:7
105:8 225:14
**belief** 98:11
115:10 140:11
143:1 180:17
181:1 183:15,18
204:13,15
219:20
**believe** 11:21
12:16,18 14:4

17:4 20:22
27:15 29:2,5,11
32:17 36:15
50:21 54:22
58:6 60:3 64:21
67:13 68:21
70:14 84:11,17
91:6,9 97:15
101:1 103:16
108:13 110:14
121:1,13 122:3
122:12 126:1,1
128:8,11 129:2
144:21 146:22
151:11,12,21
152:3 174:18
183:16 185:12
193:3 198:13
199:3 200:20
202:9 206:3,4
207:6,8,9,11
208:22 210:8
212:6 217:18
218:9 221:19
232:10,19 233:3
239:15 240:18
240:20 241:20
246:4 247:10
260:6 264:15
265:15,18
**beneficial** 10:16
**benefit** 234:1,2,3
**benefits** 264:1
**best** 9:18 53:22
59:16 93:1
120:11,14
127:12 182:10
**better** 10:13 22:20
23:2 46:13
121:2 129:12
131:22 138:7,8
138:14 150:1,7,9
150:13 162:19
162:19 227:9,10
228:10,11
229:18

**beyond** 86:9
246:17
**big** 39:9 117:22
227:22 233:20
**bill** 107:13
**bills** 107:11
**binder** 117:2,19
117:20
**birth** 90:10 92:18
92:19
**bit** 23:2 58:9
129:16 180:22
**black** 106:1,2,9,16
108:15 109:7
110:5 207:11
244:14
**blackened** 244:14
**Blackman** 182:21
219:9
**blank** 67:11
**blanket** 161:11
168:14 170:18
223:11,12,13
**blankets** 163:22
171:6
**blatant** 170:11
**blister** 38:21
**block** 121:5
128:11,13,18,22
129:18 130:4,14
130:21 131:11
**blood** 120:20,21
121:3 136:21
137:7 138:21
**blue** 158:3,6,16
170:17 230:16
232:2,2 233:9,9
**Bluff** 31:16 32:11
**blur** 136:5 139:12
**blurred** 135:12
**blurriness** 148:3
**blurry** 135:12,16
135:17 136:9,14
136:17,20
137:14,21 139:5
139:5 146:7,10

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

279

148:2
**board** 65:4
**body** 158:12
**boss** 172:11
**bottles** 24:12
**bottom** 27:13
127:8 146:21
147:15 244:19
**box** 26:3 83:22
128:10,15 129:8
**boxes** 129:17
**boy** 6:14
**brain** 120:16
246:20
**brave** 95:13
**break** 9:1 84:9
133:14 185:9
233:21 239:7,9
**Brenda** 64:19
65:9 75:8,9,18
76:11 85:10
103:7,8,10 107:6
114:8,14 115:18
116:1,15,22
117:15,17
169:11 171:14
172:6,11,14,19
173:2,7 174:20
175:3 177:1,1
194:11 197:12
199:3 208:21
211:11 213:19
242:7 248:8
254:2,15,17
**Brianna** 4:18
181:16 182:21
182:21 219:9
**bring** 104:11,14
105:6 162:8
225:21 227:22
254:14
**bringing** 126:8,11
219:10 227:18
**broad** 86:8
**brother** 29:20
30:4

**brother's** 30:5
**brought** 104:17
182:12 222:12
224:14,18
**Bruckheim** 3:21
6:21 76:5 97:18
**build** 219:14
265:2
**building** 144:3
157:2,11 161:14
168:13 169:19
170:15,22 172:8
176:6,14 177:16
177:22 178:9,13
179:2,9,17,19
180:2,15 182:4
183:5 217:8,14
217:20 218:1,5
218:17,21 219:3
219:11 220:14
223:5,8,20 224:4
226:21,21
227:11,20 228:1
228:12 229:10
239:22 243:9,15
256:21 258:22
259:13,21
262:17 263:7
**bullet** 214:7
**bump** 137:9
**buried** 120:20
123:9 136:16
**business** 46:9
52:21 72:8
99:20 107:14
233:18
**buy** 231:22
233:12,13
**buying** 47:14
170:13 232:6
**B.A** 33:9

_____
**C**

**C** 6:1 128:8
**cabinet** 167:14,16
168:10,21,22

169:4,16
**California** 39:16
**call** 34:5 86:8,9
107:12 114:22
221:6 225:5
232:3 257:11
262:19 266:5,5,8
267:12,19
**called** 40:9 47:10
72:19 83:20
103:21 168:16
197:7,12 198:3,4
211:10 253:17
256:22 257:15
262:5,9,10
264:20
**calling** 263:4,5
**calls** 78:21 79:3
89:9 94:2 128:2
140:14 200:1
201:1 204:19
206:17 207:7
208:8 219:4
224:22 227:1
231:4
**camera** 159:17,20
160:2,6,14 161:3
164:15 165:22
**campaign** 67:13
111:7 115:13
152:18 156:7
251:20 253:10
253:14,17 254:4
254:19,20 255:1
255:5,14
**campaigns** 68:9
78:13,18
**canon** 98:9
**can't** 21:13,15
67:12 136:6
156:10,12,13
185:20 205:2
236:2 267:3
270:15
**capable** 204:21
**capacity** 263:22

268:12
**Capitol** 235:1
**car** 41:12 42:17
42:22 43:6 45:1
45:10,11,15 46:9
107:11,12
**care** 26:7 38:14
40:11,12,14 89:8
89:19 90:15
121:2 131:22
152:11 161:10
181:17 182:18
261:15,18
269:13,14
**caring** 104:1
122:21
**carpeted** 182:6
**carried** 223:12
**cars** 41:11 42:3,8
42:19,20 43:8,9
43:10 46:11
**cartridge** 233:12
**cartridges** 233:16
**case** 6:20 8:5 9:13
10:11 12:21
14:6 55:1 95:10
95:18 116:15
140:6 168:18
182:21,22 219:9
262:7 273:14
**cases** 7:10 89:5
92:15,21 93:4
**caught** 37:10
**celebrating** 110:5
**celebrity** 66:20
**cemeteries** 48:21
49:1,17 50:9
**cemetery** 46:18,19
46:21,22 47:6,10
48:13,13 49:8
**Center** 262:8
**centers** 161:11
**certain** 48:2 91:4
93:7 95:10
233:19 240:11
**certainly** 10:17

13:7,15 83:1
111:12 235:15
241:1 252:19
253:4
**CERTIFICATE**
273:3
**certification**
127:9 130:17
131:16
**certified** 99:12
273:6,7
**certify** 127:11
147:10 273:9
**certifying** 130:19
130:20 131:3
**CF** 52:14
**CFSA's** 203:10
249:14,16 250:8
250:12 254:11
**chain** 4:16 39:5
172:9,13,15,18
172:19 173:11
173:12,18,20,21
174:1,3,3,12,13
174:16 175:2,4
**chains** 40:10
**Chair** 10:22 259:9
**chairman** 178:4
**chairs** 223:18
**challenge** 208:1
**challenges** 77:20
**chance** 42:8 71:11
116:12 117:6
118:1 191:15
213:16 214:16
223:17 242:14
262:7
**change** 20:19 43:3
53:14,15 54:14
55:11 56:5,7
71:2 137:3
268:13
**changed** 53:9
135:19
**changes** 59:21
270:16

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

280

**Channel** 168:16 176:4,4
**Chapman** 236:10 236:11,12 237:10,18,20
**chapters** 11:9
**characterization** 100:14 111:2 113:22 133:2 141:5,17
**characterize** 91:8
**characterized** 54:12
**characterizing** 113:3 221:14
**charge** 203:17 236:19
**Charged** 236:21
**charges** 207:10
**Charles** 213:19
**check** 128:10 149:17 257:11 257:15 258:13
**checked** 72:2 129:8,17 149:17
**checking** 128:15 258:10
**chief** 3:20 182:9
**child** 51:17 77:21 85:13 86:14,15 86:19 88:5 90:15 91:18 92:12 93:1,1,2 93:10,11 94:9,20 95:19 98:17,18 99:4,5,6 161:7 161:16,17 162:1 162:5 180:15 182:4,9,16 203:10,11 204:10,11,17 205:7,11 206:6,8 206:10,11,15 207:1 222:10,10 222:12 223:7,8,9 224:2,3,4,9

225:15,17,18,19
225:21 226:1,20
227:11 229:13
240:10,13 243:7
243:15,18,19
244:4,5,8 248:5
249:14,15 250:7
250:12,17
251:21 256:14
262:13,17,18
**children** 14:6 34:20 35:3,9,10 36:2,4,9,14 52:8 52:12 54:7,8 67:14,16 85:18 85:19,21 86:3 87:8,14 89:3,8 89:19 92:16 97:12 101:6 144:3 148:10,14 148:18 149:21 152:12,12 157:8 161:13 162:13 162:19 170:18 170:20 176:6 177:15,22 178:8 178:13 179:1 182:2,5,12,18,20 183:4 184:10 187:17 217:7,14 217:20 218:5,17 218:21 219:2,10 220:5,14 223:14 225:12 226:13 226:16,18 227:20,21 228:5 229:2 240:16 243:14 252:14 253:22 254:8 256:20 257:21 258:22 259:12 259:21 262:17 263:10,13,21 266:15 268:20 269:17,17
**child's** 204:16

227:16
**choice** 37:7 172:12
**cholesterol** 134:19
**chopped** 110:10
**chose** 39:16 59:4 59:7,11
**chosen** 266:16
**churches** 52:20
**circumstance** 206:6
**circumstances** 93:7 94:12 182:11 206:7
**cite** 214:6
**cited** 254:18
**citizen** 261:17
**City** 40:1 59:12 220:2
**city's** 182:9
**civic** 52:20
**civil** 1:6 2:15 12:7
**claim** 202:16 256:1
**claiming** 219:2
**clarification** 84:10
**clarify** 258:8 268:7
**clarifying** 113:6
**classes** 99:12
**clause** 249:1
**clean** 38:20
**clear** 37:15 69:11 97:21 98:22 135:16 141:20 163:20 175:19 238:12 242:10 258:2
**clearly** 137:8,9,11
**clerical** 26:14,15 26:18 27:4
**client** 93:1 98:17 98:18 99:6 106:15 244:11
**clients** 16:16

99:19 267:17
**close** 22:21,22 29:21 47:5
**closely** 28:8
**closes** 270:22
**clumsiness** 139:6 146:13
**clumsy** 137:9 146:12
**coat** 158:3
**code** 11:2,4,6,9,10 11:11,13 13:9 94:13 95:12,12 96:11,15 97:11 98:8,10,20
**cold** 228:1,1
**collaborate** 82:12 82:18
**collaborated** 82:15
**collaboration** 83:5
**collaborative** 26:20
**colleague** 16:6,8 16:10,12,14
**colleagues** 16:17
**collect** 71:16
**college** 31:10,16 32:5,9
**colloquy** 145:2,4
**color** 166:11,14 166:14,17
**Columbia** 1:2,9 2:7,17 14:7 140:9 142:5 143:1 199:7 273:22 274:2 275:2
**Columbia's** 85:13
**coma** 134:7
**come** 45:7 47:19 59:14 74:11 78:19 82:22 86:2 103:22 119:4 126:14

129:20 130:2
154:6 161:13
162:2 164:13
170:19 179:4
197:12 222:19
224:15 240:15
259:20
**comes** 96:12 187:8 223:7
**comfort** 184:11
**comfortable** 28:3 99:21 100:18 170:19 198:21
**comforters** 257:18
**coming** 62:10 172:7 177:3,4 229:14 259:19 270:5
**command** 172:10 172:13,15,18,20 173:11,12,19,20 173:22 174:2,3,4 174:13,13,16 175:2,4
**commended** 259:19
**commented** 112:19
**comments** 165:12
**commercials** 45:20 46:2 186:20
**commission** 273:19
**commitment** 137:1 263:18
**committee** 11:1 178:5 220:3 259:9
**common** 14:14
**communicate** 144:5
**communicated** 255:15
**communicating**

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

281

254:22
**communication**
  55:18,19 66:19
  67:1 72:6 77:6
  102:18 106:13
  107:20 108:1
  115:12 165:15
  184:7 241:6
  255:13
**communications**
  12:3,4 56:12
**community** 35:5
  52:7,19,21,22
  56:18 59:18
  75:1 148:10
  184:8 220:13
  241:8 252:12,13
  253:14 254:3,7
  254:11 263:9,12
**comp** 231:21
**companies** 27:18
  39:2
**company** 19:5
  22:7,8,10,12,15
  23:6 24:2,5
  27:17,21 28:6,10
  28:11,13 38:14
  39:15,18 41:16
  41:17 42:6
  237:19
**company's** 38:19
**comparable** 213:7
**compensatory**
  231:1,5
**complaint** 4:19
  141:18,19,19
  143:6 188:11
  198:20 199:2
  207:15 215:22
  231:12 234:12
**complete** 272:5
**completely** 71:11
**compliance** 77:7
  149:19 257:13
**compliant** 72:12
**complications**

134:4 135:7,8
  137:22
**components** 72:5
**computer** 83:4
  86:13,14 135:13
  147:11,18
  261:10,12
**concept** 252:13
**concern** 100:22
  184:8 217:7
**concerned** 102:5
  141:17 197:13
  211:13 263:6
**concerning** 83:5
  84:12 217:3
**concerns** 5:8
  104:4 144:1
  192:14 246:1
**concluded** 271:3
**conclusion** 88:17
  89:10 94:3
  130:12 140:14
  200:1 201:2
  204:20 205:14
  208:8 219:5
  231:5
**conclusions**
  202:15 221:20
**concurred** 126:13
**condescending**
  101:20
**condition** 256:2
**condolences**
  105:4
**conduct** 217:4
  251:4
**conference** 51:5
**confidence** 170:2
  184:20
**confidential** 86:2
  86:19 87:8,9,11
  87:13 88:4,7,11
  88:14,17,19 89:3
  89:8,18 91:4,5
  93:22 94:15,16
  95:7 205:6,12,15

206:5,9 244:11
**confidentiality**
  92:3,6,17,22
  93:4,6,20,21
  98:16 203:9
  204:9 249:13,20
  249:22 250:3
**confirming**
  248:14
**conflicted** 171:2
**confronted**
  141:10
**confused** 63:13
  129:16 155:9,10
  174:9
**confusing** 125:3
**confusion** 125:4
**Connecticut** 40:6
**consider** 90:8
  96:6,19,21
**considerable**
  224:11
**considerably**
  22:20
**considerations**
  235:12
**considered**
  252:18
**considers** 97:16
  256:16
**constitutes** 204:1
  251:2
**consult** 270:19
**consulted** 77:11
**contact** 18:18
  75:2 79:1,6
  83:11,16,22 84:1
  240:15
**contacted** 143:19
  145:8
**contacting** 143:16
**contacts** 15:18
**context** 34:22
  208:19
**continue** 72:3
  151:18

**continued** 5:3
  139:1 183:12
**continuing** 15:16
  30:7 221:16
**continuous**
  128:11,18
  129:18 130:4,14
  130:21 131:11
**continuously**
  129:15
**contract** 18:7
  26:11
**contracting**
  210:10
**contractor** 19:1,4
  21:6,22 232:12
  233:11,17
**contracts** 107:9
**contrary** 72:14
**contribution** 61:4
  264:3
**control** 256:8
**conversation**
  103:12 267:8
**conversations**
  144:18
**cooked** 35:6
**coordinate** 256:14
  256:15
**cop** 115:19,21
  190:18
**copier** 166:15,17
**copies** 12:16,19
  12:22,22 13:6
  166:7,8,9,11,13
  168:7,8,9,20
  174:21 175:5,6,7
  176:1
**copy** 13:13,14
  117:13 118:5
  143:5 166:14
  167:7 175:20,22
  196:5 242:6,8
  249:19
**copying** 143:11
**cop/bad** 115:19

115:20
**corner** 26:3
**correct** 14:9 25:17
  35:21 61:10
  86:19 105:11
  106:5 124:3,20
  125:8 132:2,3,6
  132:10,14,17,18
  132:20 135:5
  147:9 150:17,21
  157:15 172:20
  173:1 179:15
  181:4 183:5,10
  183:13 186:17
  186:22 203:2,6
  209:13 210:14
  211:1,16,20
  212:11,12,16,19
  213:1 214:8,9,13
  218:10,20
  220:15 228:13
  229:4,11 232:17
  232:18 233:6
  236:15 241:20
  267:12 272:5
  273:10
**CORRECTION**
  274:5 275:5
**corrections** 272:7
**Corrective** 5:7
  189:8 192:13
  245:10
**correctly** 8:1
**cost** 232:16
**cot** 158:4,6,16
  161:10,10 171:1
  223:17 227:12
  229:10,18
  230:16
**cots** 163:6 168:14
  170:17 223:10
  223:15,15
**couldn't** 19:16
  21:3 40:3 82:17
  120:22 147:10
  186:11,12,14

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

282

237:17 254:5
262:14
**council** 218:11
220:2 259:10
**counsel** 113:1
143:10 265:12
273:13
**counseling** 35:3
**counselor** 34:19
34:22
**counsel's** 206:22
**count** 199:6,10,13
199:18 207:16
207:18 216:1,4
216:10
**countless** 185:19
**country** 254:1
**counts** 199:2
**couple** 7:6 10:8
48:21 106:18
143:15 162:17
189:16 230:19
245:5 248:12,16
**course** 16:20,21
36:3 43:17 72:7
111:18 115:3
268:15
**courses** 99:14
**court** 1:1 7:22 8:6
175:12 178:16
178:21,22
179:14,16 213:8
213:9,13 217:19
218:4,6 220:15
220:16,17 226:6
**courts** 197:18
**court-appointed**
182:16
**cover** 160:3 228:2
**coverage** 184:9
**covered** 39:8 40:5
175:17
**covering** 40:3
41:5 244:16
**co-counsel** 76:6
**co-pay** 232:4

**co-worker** 256:15
**CPS** 161:7
**create** 115:12
163:5 263:14
**created** 156:6
**creating** 107:20
**credit** 46:10,10
**criticize** 63:2,3
**criticized** 70:11
**Cross** 232:2 233:9
**CRR** 1:21 2:16
**CSR** 1:21 2:16
**cubicles** 228:4
**culturally** 170:18
**culture** 79:11
**currently** 99:2
101:4
**custody** 52:9 54:8
203:10,12
204:10,12,17
205:7,11 206:6,9
206:15 207:2
249:14,16 250:8
250:12,14
**customer** 72:5,8,9
77:8 149:19
257:13
**customers** 43:11
47:19,20 118:15
**cut** 109:13 237:16
261:7
**C-O-T** 158:4

─────────

**D**

**D** 4:2 5:3 6:1
**daddy** 104:9,9,10
104:11 228:3
**damage** 231:5,11
**damages** 231:1
234:11 260:2
261:2
**Damdar** 16:7 17:6
17:7 18:10
**damn** 163:6
**danger** 85:18 96:3
99:5 227:16

**dangerous** 101:6
**dangers** 253:14
**dare** 111:6
**date** 32:22 38:6
48:15 90:10
147:12 159:1
198:12,16,18
272:13 274:22
275:22
**dated** 4:20 5:9,11
5:13,16 145:7
181:13 202:8
246:15
**dates** 48:15 54:20
92:19 131:18
214:6 246:21,22
**dating** 37:10,21
**daughter-in-law**
15:10,14
**day** 105:20 149:15
149:16,18
160:16 161:10
180:16 218:11
222:17 257:12
270:6 273:17
**days** 123:2,16,20
123:22 209:18
223:12 234:4
264:1
**DC** 1:13 2:10 3:7
3:16 28:15
181:16
**dead** 262:12
**deadline** 246:21
**deal** 121:7 187:19
187:20
**dealership** 44:18
**December** 236:8
**decent** 185:20
**decide** 41:13
184:17 185:11
**decided** 38:8 42:6
42:8 97:1 121:5
197:16 198:7
215:13,16
**deciding** 193:10

195:5,6,7
**decision** 5:6,18
47:14 190:21
191:13 196:16
**decisions** 269:13
**decision-maker**
269:3,5
**decision-making**
268:12,14
**declaration** 12:5,6
13:17
**decorate** 263:7
**deduction** 233:18
233:19
**deduction** 232:4
**defend** 116:16
**defendant** 1:10
3:10 213:13
**defendant's** 12:12
**defense** 210:1
**defer** 143:4
**definitely** 171:3
**degrading** 112:17
**degree** 33:2,7,8,9
33:12 41:15
100:10 101:3
**degreed** 33:18
**degrees** 33:14
34:8
**Delegate** 11:16
**demotion** 154:11
**denied** 208:11
215:7
**Dennis** 162:4
223:1,1 229:5
230:6
**deny** 186:15
**department** 49:13
50:14,19 51:3,15
51:16,17,18
52:14 58:10
118:10 156:2
252:21,21,22
**departments** 72:7
77:11
**depends** 94:16

97:4,15,16 187:3
227:6
**depict** 185:17
**DEPONENT**
272:1
**deposed** 83:18
**deposition** 1:12
2:2 6:17 7:1,13
9:1 10:7 13:21
87:4 141:14
245:8 248:7
270:22 271:3
**depositions** 6:16
7:9
**depreciation**
233:22
**deputy** 173:9
220:4
**Derek** 80:16,17,18
81:3,7,13 82:1,2
83:9,11,17 84:1
107:7 116:20
117:21 159:21
164:13 165:19
169:9
**Derek's** 79:3
117:13 161:2,3
164:16
**describe** 44:6
112:8 116:9
**described** 23:9
261:4
**description** 4:11
5:5 71:6 72:22
154:14,16
**design** 77:10
**designated** 77:17
85:3
**desk** 117:14
164:13
**desks** 157:10
**detail** 54:19
153:13 154:1,1
155:18
**detailed** 54:18
55:12 58:22

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

283

81:15 203:10
204:11 214:4,6
249:15 250:7
detailing 156:5
develop 72:6,15
118:14
developing 77:5
78:12
DHS 155:19 156:1
156:8 157:6,14
157:15 253:13
254:13,15,21
255:16
diabetes 121:7
123:21 124:1,10
124:16,19
125:16,19,21
126:1,2,10,14
128:20 129:1,2
129:19 130:20
131:7,13,19
132:2,13,17,22
133:19,22 134:2
135:7 137:5
140:3 148:11,21
148:22 149:4
150:10 234:5
256:8
diabetic 120:21
134:1,4,7,10
136:22 146:4
dialogue 61:15
165:17 254:13
dialogued 61:5
die 254:2 261:19
died 104:9,10,11
120:17,17
difference 33:21
127:22
different 7:9
11:10,12 18:7
26:2 40:10
52:20 56:17
72:18 76:21
77:11 82:18
88:2 110:14

124:1 154:2,3,4
155:5,7,8 157:22
187:4 205:22
208:18 221:14
262:2
difficult 46:11
59:12 104:13
180:16 182:11
186:9
digressed 170:16
direct 24:10 66:12
149:7
directed 130:17
directly 26:13
55:17 79:1,2,6
80:4 114:14
174:21,21
director 41:2,4
55:18 62:10
102:13,13,21
103:6 107:18
115:2 174:6
214:21 248:9
253:12
director's 177:19
dirt 221:8
dirty 161:11
223:13
disagree 74:2
116:20 183:21
184:1,4
disagreed 116:19
118:3
disagreeing
116:17
disagreement
8:16 241:17
disappointed
170:6,7,9,10
disclose 204:16
205:10 216:14
217:2
disclosed 206:15
219:22 220:1,8
250:6
disclosing 203:10

204:10 249:14
discounted 237:5
discuss 156:11
165:8,10 238:8
discussed 177:15
177:20 178:1,3
266:10
discussion 84:4
242:18 243:10
256:10 259:1
260:4
discussions
178:12
disenfranchised
266:17,21
disillusioned
268:19
disillusionment
268:17
disjunctive
148:22
dismiss 12:12
13:17
dismissal 209:6
displaying 207:1
disseminate
106:13 251:1
disseminated
88:12
dissemination
89:18
distracted 76:3
distracts 76:4
District 1:1,2,9
2:7,17 6:18 14:7
16:13 51:22
85:13 88:15
107:13 140:9,11
141:22 142:2,5,8
142:17 143:1
199:3,7,20 200:7
200:13 201:10
201:12 202:1
217:1 219:15
234:7 252:16
253:22 264:3

273:22 274:2
275:2
District's 52:9
54:8 201:17
262:18
district-wide
156:6
disturbed 34:20
division 51:18
157:10
divulge 90:5
doctor 120:22
121:8 126:9,13
129:3 131:13
132:5,12 133:18
134:8,9 136:19
148:3 150:8
221:9,10 235:19
238:1 266:11
doctoring 268:19
doctors 104:18,18
104:18,19 221:7
235:17,20
240:14
doctor's 121:10
132:9
document 4:12
24:21 25:4 26:6
108:19 126:19
127:18 128:2
131:10 140:19
140:20 144:13
153:11 181:10
188:8 189:4,12
189:17,17 192:2
192:6,12,15
193:11,13,20,22
194:20,22
195:18 196:3,13
196:15,18,20
245:13,16
248:12,14,18
documentation
117:3 209:18
documents 10:10
10:13,16 11:18

11:19,22 13:19
72:18 116:22
119:5 129:3
132:12 189:18
241:6 245:3
246:5,6 247:18
doesn't 165:19
203:19 210:16
doing 17:20 19:16
22:4,6 23:4,8
24:6,9,17 34:3
34:17 38:15
102:18 107:14
111:7 118:14
129:11 149:3
150:11 153:14
153:15 154:21
156:16 161:12
165:16 182:10
197:15 198:1,6
225:7 226:17,18
227:5 232:9
233:1 261:10,12
263:21
dollars 23:21
24:14 185:20
231:16 233:5
261:3
Donald 64:19
65:9 75:8,9,18
76:11 85:10
103:7,9 107:6
114:9 117:15
172:19 174:20
177:1 194:11
197:12 199:4
208:22 213:19
242:7 248:8
Donald's 172:11
door 107:2 112:18
162:13
doorway 113:19
doubt 82:21
download 164:14
165:11,14,21
downloaded

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

284

165:13 166:6
**downloading**
164:19 165:20
169:9
**Dr** 5:10 193:9,13
236:2,3,7 237:8
237:9
**draft** 105:20
**drafted** 192:15
193:11 245:20
245:21
**draw** 248:17
250:19 251:9
255:19
**drawer** 167:12,22
168:10
**drawing** 67:11
256:5
**dropped** 230:13
**dropping** 227:18
**drug** 134:18,20
182:14
**dual** 74:20
**due** 130:20 208:11
209:4
**Dulaney** 47:1,1,3
48:22 49:18
**duly** 6:4
**duplicity** 268:17
**duties** 66:10,17
70:22 71:1,4,14
76:18 78:16,18
86:1 101:5
**duty** 40:7 94:11
98:16
**dying** 105:5
122:21
**dynamic** 18:15
184:19
**D-A-M-D-A-R**
16:7 17:8

**E**

**E** 4:2,8 5:3 6:1,1
274:1,1,1 275:1
275:1,1

**earlier** 23:10
206:3 212:6,21
217:18 251:4
255:9 256:5
261:1
**earliest** 260:19
**early** 35:14,16
81:11 145:22
177:4 261:17
**earn** 21:12 24:9
260:16
**earning** 260:16
**easier** 68:9
**eating** 150:13
**economic** 235:12
**edited** 108:14
109:18
**editing** 71:6,7,20
108:18
**Edition** 181:14
**editor** 105:18
108:20 110:7
**educated** 19:18
**education** 31:3,4
**educational** 99:16
**effect** 182:21
187:8 261:13
268:13
**effective** 174:22
**effort** 105:22
155:2 256:19,22
**efforts** 67:1 85:21
**eight** 36:10 45:12
45:13 46:6
237:9,16 262:10
264:11
**either** 11:14 13:11
21:13 99:16
141:8 208:17
270:17
**elder** 234:8
**elderly** 16:16 17:9
17:12,13,21 18:6
18:19 23:8,9
232:12
**elders** 220:5

**elect** 270:17
**election** 221:11
270:17
**electronics** 168:12
**eliminate** 134:11
**else's** 107:2
**embarrassing**
112:17
**emotional** 47:13
235:16,18
**emotionally** 34:20
**employed** 21:3
273:13
**employee** 11:20
106:2 116:6,16
209:4 213:18
252:5
**employees** 57:1
72:11 107:8
252:6
**employer** 13:16
262:4
**encourage** 252:11
**engaged** 24:19
99:18 100:8
101:7
**ensure** 187:16
**entails** 33:7
**entering** 107:9
**enterprise** 28:18
**entice** 67:20
**entire** 40:20 65:1
232:15
**entitled** 4:12
**entity** 73:14 74:9
**environment**
227:18 228:5
**episodic** 135:15
**equipment** 231:22
**Ernestine** 58:22
62:15 66:15
80:12 182:15
**errata** 272:7
**errors** 270:13
**escalated** 131:13
**escape** 54:20

**especially** 267:5
**ESQ** 3:3,11
**established**
205:17
**establishing**
202:16
**estimates** 260:9
**ethical** 94:11,22
96:3 240:1
**ethics** 11:3,4,7,9
11:10,11,14 13:9
94:13 95:12
96:11,15 97:11
98:8,9,10,20
239:22
**evaluation** 11:20
11:20 13:16
70:15 116:6,11
116:13,18,19,21
117:4,5,7,13,14
117:16 118:2,17
118:21 119:3,4
241:12,17 242:5
242:9,12
**evaluations**
241:10
**evening** 229:14
**event** 92:15
**everybody** 52:22
84:18 110:5
130:13 176:13
176:19 223:11
**evidence** 200:17
200:19 202:15
205:14,15
**exact** 154:13
159:1 229:6
**exactly** 11:5 18:20
21:9 68:1 126:5
131:20 190:22
214:7 215:6
**examination** 4:4
6:7 239:18
243:6 245:2
265:9
**examined** 6:4

272:4
**example** 94:5
252:8
**exceed** 232:5
**excellent** 62:18
70:15 221:6
**excerpt** 181:14
**excited** 147:16,17
**exclude** 172:14
**exculpation** 210:2
**excuse** 93:22
138:16 186:2,4
206:9 215:21
**executed** 126:6
**executive** 177:19
255:6,17
**exercised** 109:6
**exercising** 150:12
**exhausted** 85:22
239:7
**exhibit** 4:11 5:5
24:22 126:16
144:10 181:6
188:2,7,16,19
189:13 190:5,5,6
191:1,2,6,20
192:3,7,10 193:5
193:15 194:1,2,4
194:7,9,15 195:1
195:21 196:20
209:7 212:5
245:7 246:12
247:9 248:7
251:10,10
255:21
**exhibits** 246:9,10
**exited** 51:5
**expect** 129:14
153:21
**expenses** 231:16
233:14 260:11
**experience** 102:11
111:10 186:17
187:5,5 233:20
252:5 267:15
**experienced** 7:10

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

285

104:13 148:9
**expert** 100:1
128:3 142:11,12
238:7,9
**expertise** 83:4
86:9 140:15
**expires** 273:19
**explain** 34:21
47:8 52:5 142:4
249:7 269:10
**explained** 86:2
**explaining** 198:14
**explore** 23:14
**extent** 86:8 89:9
94:2 128:2
140:13,18
199:22 201:1
202:14,18
204:19 208:7
217:16 219:4
227:1,3 231:4
**extenuating** 210:2
**eyes** 135:19
244:14,17,19
**eyesight** 135:18
**e-mail** 4:16
144:16,18,21
145:2,7 146:21
147:4,8 151:4,5
151:8 152:8
153:2,5,8 155:12
158:2 164:15,21
251:19 252:6,8
252:10 253:8
255:2
**e-mailable** 175:6
175:22
**e-mailed** 166:6
253:6
**e-mails** 145:4
149:17 258:13
258:14 261:11

**F**

**fabrication** 255:8
**face** 95:14 244:12

244:15
**faces** 86:14,16
**facility** 35:1,14
**fact** 9:13 61:17
129:17 135:22
185:6,7 210:1,18
221:4 241:5
254:20
**facts** 200:19 201:9
201:15 205:14
205:17 221:2
**factually** 208:16
**failed** 250:22
**failure** 102:5,6
**fair** 34:7 139:13
145:1 196:5
**faith** 184:20 215:4
**familiar** 33:7
240:6 263:20
**families** 152:19
155:3 257:9
263:4 269:16
**family** 14:5 15:17
29:14,16,17,21
30:1,2 35:3
51:18 77:21
88:5 105:13
108:11 119:7,12
119:13,21 120:1
120:15 121:13
121:20 122:1,21
124:2,5,11,15,19
124:22 125:1,7
125:20 128:4,19
182:17 220:5
226:4 229:20
242:17 243:21
247:1,4,6,21
248:5 255:22
256:17 262:13
**family's** 260:21
**Family/Medical**
4:15
**far** 79:11 80:14
108:8 142:3
211:12 216:9

263:6
**fatalities** 92:12
**fatality** 92:15
253:20
**father** 103:21
104:1,5 105:5
**fault** 29:4,10
**fax** 233:13
**fears** 104:4
**February** 1:14
17:17,18 110:5
273:18
**federal** 51:21
59:14
**feel** 106:10 129:12
148:12 150:1,7,8
198:21 208:11
263:8,9 269:19
**feeling** 136:6
**feels** 94:9 97:4
**feet** 223:11 261:21
**Feinberg** 107:18
108:3
**fell** 104:16
**felt** 37:17 41:15
59:16 73:9
74:10 102:10
109:21 110:7
148:9 172:5
180:10 203:3
254:10 268:9
**Fenty** 11:1 12:19
178:4 218:11
220:2 259:8,16
**Fenty's** 178:8
**field** 226:18
**figure** 53:8 109:22
149:2 153:18
**file** 55:2 72:22
167:8,9,10,11,14
167:15 168:21
169:4
**filed** 167:8 214:2
**files** 10:11
**filing** 168:10
**fill** 123:12

**filled** 123:14
124:6 130:1,6
132:8
**final** 5:6,17 71:22
181:14 190:20
191:13 196:16
202:6,7
**finalized** 116:11
242:13
**finally** 183:18
184:9
**financial** 235:11
273:15
**find** 46:12 52:13
85:19,20 91:3
105:19 148:15
152:18 157:8
162:12 170:19
254:5
**finding** 18:5
47:20 52:7,17
254:20
**fine** 10:4 43:2
86:12 120:13
140:17 213:15
**finish** 135:10
**finished** 31:21
34:13 78:2
193:18 207:19
**fire** 214:22
**fired** 22:5 83:20
200:15 206:14
206:21 207:1
210:20 235:21
238:22 261:6
262:4,16
**firing** 200:17
**first** 6:4 7:4,15
31:12 32:6
68:18 110:10
112:10 115:15
130:1 140:10,12
142:1,2,6 143:2
144:5 145:8,14
153:2,5,6,7
156:22 158:8,9

171:1 181:19,20
182:5 188:22
189:3,19 196:21
199:7,20 200:14
202:16 203:16
204:13,15 205:9
219:11 225:16
235:21 236:2
248:13,17,18,22
250:20 251:14
251:15 252:4
254:3 261:6
**five** 83:6 167:2
168:1 170:12,17
170:21 182:1,3
183:6,9 185:19
216:1,4,10
**five-minute**
133:14 239:7,9
**five-year-old**
220:21
**flip** 101:19
**floor** 182:5,8
**focus** 105:8 121:6
140:5 150:10
**folder** 167:19,21
**folks** 244:22
**followed** 67:1,7
**following** 259:17
**follows** 6:5
**follow-up** 245:5
**footsie** 186:3
**forced** 187:19
**Ford** 42:10,16
43:22 44:1,18,22
45:4 46:10
186:21
**foregoing** 172:18
272:4 273:8,9
**forget** 261:19,20
**forgive** 33:6
**forgot** 28:22
264:10
**form** 25:20 65:20
73:21 85:5
87:19 96:17

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

286

97:5,19 100:13
101:11 111:3
113:21 114:10
114:19 126:21
127:3,5 129:21
130:7,22 133:7,9
138:17 151:1
152:9 160:19
172:22 173:14
176:17 177:10
178:19 187:1
217:9 224:7
234:13 239:3
246:2
**formally** 34:5
**former** 10:18
74:16
**forms** 124:6
**forth** 210:22
**fortunate** 170:22
223:14
**forward** 80:14
164:15 259:19
259:20
**forwarded** 78:21
155:20
**foster** 52:8,11
54:7 56:19
85:19 90:11
102:6,9 103:11
148:16 162:13
181:16 182:18
182:20 269:13
**found** 60:2,3
187:17
**foundation**
176:16
**four** 24:14 36:11
44:5 167:5,6
168:1 170:12
182:1
**four-year** 35:18
35:20 36:1
**frame** 151:20
167:13
**Frazier** 15:12

16:1
**free** 111:18,19
142:6,18 143:2,2
200:8,13,14,18
200:21 201:7,14
201:17 204:1
**freedom** 202:3
203:4
**freely** 88:12
**Friday** 1:14
146:22
**friend** 16:6,8
**friends** 14:5 15:18
16:17
**from/to** 192:18
**front** 178:5 188:6
**Ft** 48:13,15 49:2,5
49:7,9,20,21
50:7
**full** 6:11 10:15
72:14 251:10
**fully** 26:10
**full-time** 21:4
22:4,6 23:4
**function** 109:19
**functions** 68:6
**furniture** 163:22
**further** 91:16
138:3 227:22
**futile** 211:12

**G**
**G** 6:1
**games** 268:18
**Gardens** 47:2
**gather** 87:11
**gathered** 86:18
**gathering** 167:20
**gathers** 87:7
**general** 2:6 3:12
3:13,20,21 10:5
11:4,6,11 58:21
79:10 88:22
89:4 227:19
**generally** 44:6
86:6 87:16,21

240:4 242:18
**geriatric** 104:18
104:19
**getting** 20:4,7
62:9 134:3
138:14 150:12
151:10,14
158:17 162:17
170:12 171:17
174:8 213:17
219:15 262:7
267:2
**gifts** 106:5
**Gilchrest** 153:20
**give** 7:6,11 8:10
8:17 10:14
11:15 48:4
53:22 67:10
71:10 82:17
105:21 116:21
117:4 123:10
134:14 153:21
163:7,11 164:4,8
169:22 175:18
205:7 241:7
242:3 247:20
257:22 264:13
267:18
**given** 36:6 47:21
47:22 88:22
119:2 129:3
207:22 208:5
209:2,4 268:11
272:6
**giving** 105:2
**God's** 263:6
**goes** 108:22 109:4
204:8 216:10
229:13 250:6
**Golden** 64:4,5,7
64:17 69:1
70:19,21 253:13
**golf** 56:19 66:20
67:12
**good** 6:9,10 10:18
16:6 21:13 34:3

50:4 55:7 57:11
58:4 61:3,4,9,14
65:4,6 68:17,18
70:18,20 74:10
75:6,15 80:7,10
82:7 85:10
101:10 107:3
113:17,18 115:6
115:18,20
117:15 118:14
126:12 129:13
130:11 148:12
157:18 171:9,12
172:4,5,11,18
174:18,19 177:2
189:8 190:3,15
192:14,20
197:15 198:1,6
221:5 242:3,11
245:10 247:6
256:11 262:6
269:19
**goods** 24:1
**Good/From** 246:8
**gotten** 48:14
99:13
**government** 51:22
59:12 107:13
182:19 238:19
251:19 252:17
253:9 254:18
264:6
**grab** 160:14
**grade** 154:9
**graduate** 31:8,22
31:22 33:12
34:11,13 99:17
**grandparents**
90:11 91:12
**granted** 62:7
**grappled** 232:2
**great** 102:17
**greater** 187:8
269:18
**greatly** 102:16
**gross** 260:10,12

261:3
**grounds** 14:21
142:10
**group** 35:8
**grueling** 261:15
261:22,22,22
**guess** 19:17,18,20
35:18 36:11
80:5 81:19
86:15 96:10
99:10 106:19
154:3 159:4
167:12 178:10
180:22 195:4
226:1 236:21
243:9 266:5,22
267:21
**guidelines** 67:1
**guy** 37:8,9,12

**H**
**H** 4:8 51:19 274:1
275:1
**habit** 7:18 8:18
**hadn't** 108:21
154:6,6 157:19
**hair** 38:14 40:11
40:12,14
**half** 58:2 158:16
223:10
**hall** 107:1
**halls** 157:11
**hallway** 112:7
**hand** 7:20 187:20
189:12 192:22
273:16
**handling** 89:7,18
**hands** 261:21
**handwriting**
192:17
**handwritten**
192:22
**happen** 61:6
103:1 169:21
209:6 234:9
**happened** 37:8

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

287

61:7 105:5
106:8 115:22
116:9 136:2
145:20 160:17
178:11 208:16
228:8 246:18
268:8
**happening** 79:19
253:22
**happens** 225:3
**happy** 13:4
**harassment** 141:8
**Harbor** 42:10,15
43:4,21 44:1
45:3,4 186:21
**hard** 100:16
101:21 166:9
167:7 168:8,9,20
175:20 176:1
177:2 257:19
267:16
**harm** 100:12
228:21
**harmed** 93:3
94:10,20,21
206:11,11
**harm's** 98:17
**harsh** 112:11,13
**hasn't** 52:1
**haven't** 141:20
**head** 8:9,14,15
63:20 64:3,6,18
65:10 66:14
68:22 69:3,10,16
69:20 70:21
73:4 75:7,18
76:11 108:4,17
**headed** 220:2
**headlights** 136:11
**health** 18:1,13,15
26:12 104:20
121:6,10 217:5
234:8 252:22
261:14,18 264:2
**heard** 7:21 45:6
49:10 50:21,22

254:1 257:16
**hearing** 178:2,4
197:2,6,7,8
198:8,12,12,15
198:16 212:11
212:22 213:2,5,7
215:14 253:21
259:17
**hearings** 177:21
178:12,14
253:21
**heart** 59:17
**heat** 37:10
**heated** 221:11
**Heather** 5:10
193:9
**heaven** 170:13
**heighten** 254:7
**held** 2:2 58:16
65:15,19
**Helena** 34:15 37:5
37:6,9
**hello** 158:10
**helm** 172:3
**help** 7:12 27:20
35:10 42:22
63:14 102:14
103:11 148:17
149:20 152:14
152:18 156:19
157:7 164:18
168:15 172:10
180:21 181:2
183:16 185:4
224:21 228:6
257:21
**helped** 72:15
232:16
**helping** 23:9 77:9
77:10 148:15
257:9
**hereto** 25:1
126:17 144:11
181:7 188:3,17
189:14 191:3,21
192:4 193:16

194:16 195:22
**hereunto** 273:16
**here's** 117:6,7
**hey** 117:6
**hi** 112:11,13,21
**high** 31:5,6 132:4
132:5,14 134:3,5
134:19 137:8
146:4,5 182:20
**higher** 134:4
232:6
**highlighted** 26:5
**highlighting**
195:14
**hire** 56:2 262:3
267:5,10
**hired** 56:1,3,16
58:4 59:3
142:14 153:16
156:22
**history** 58:10
65:13 106:1,3,9
108:16 109:7
110:6
**hit** 7:19
**hold** 96:20 143:8
**holes** 263:16
**Holiday** 162:14
170:12
**holidays** 261:6
**home** 18:1,2,13,15
26:4,12 27:22
35:5,7 53:2
103:22 104:20
135:20,22
149:18 150:9
170:19
**homeless** 229:21
229:21 230:2,8
230:13,14
**homes** 18:3 52:11
52:14,18 54:7,7
67:15,17 85:19
85:20 92:16
102:7 148:16
157:9 162:13

182:15,20
184:12 254:5
**homework** 228:7
**hope** 171:21
268:12
**hopes** 171:6
**hoping** 129:10
137:2 180:20
**horrendous**
253:21
**horrific** 104:13
**hospital** 148:17
236:5 262:8
265:13 267:5
**hospitalized**
139:21 140:2
**hot** 228:6
**hotel** 180:14
**hotline** 225:5
226:16
**hour** 263:18
**hours** 206:4 223:4
260:15,18 261:4
262:11 263:7
**house** 36:6,8
78:22 225:19
229:11 260:21
**household** 226:22
227:13 228:12
228:18,21 229:4
229:19
**households**
224:17
**Houston** 30:14
38:11,12 39:8,11
39:14
**Howard** 162:4
223:1 230:6
236:5 237:2
**huge** 263:16
**human** 11:1 49:13
50:14,19 51:3,15
51:16,17,19
52:14 58:10
130:10 156:2
178:5 220:2

252:21 259:9
**hundred** 24:14
233:4 261:3
**hundred-thous...**
213:21
**hung** 114:6
**hurt** 93:3
**hustle** 232:9
**hustling** 232:8
**hypothetical**
267:9

I

**idea** 82:18,19
154:11
**ideas** 268:15
**identification**
24:22 126:16
144:10 181:6
188:2,16 189:13
191:2,20 192:3
193:15 194:1
195:21
**identified** 226:4
244:18 247:22
**identify** 86:22
88:3 90:15
91:18
**identifying** 54:6
90:6,9 91:6,8,18
91:22 92:9
**identity** 244:8
**illegal** 107:9 217:3
**illnesses** 137:21
139:5
**illusion** 257:8
**image** 203:9
204:10 205:6
249:14
**Immaculate** 18:13
18:14 26:12
28:7
**immediate** 29:17
30:1,2 69:9,15
173:22
**immediately**

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

288

245:22
**impact** 186:22
  187:13 269:17
**impacted** 234:9
**implementation**
  251:22
**important** 7:20
  8:4 31:2 268:15
**importantly** 8:6
**improper** 141:14
**inability** 102:5,6
**inaction** 170:7
**inactivity** 257:20
**inappropriate**
  214:8 225:14
**incident** 112:6,8
  114:7 150:10
  231:1,11 238:19
  238:21
**incidents** 9:14
**include** 94:14
  95:6
**included** 106:6
**includes** 240:14
**including** 111:15
  209:17 243:13
**income** 234:9
  260:7,10,13,16
**incomes** 260:9
**incorrect** 241:21
**increase** 20:20
**incurred** 234:12
**independent** 19:1
  19:4 21:5,22
  232:1,12 233:11
  233:17
**indicated** 112:6
  133:18 148:15
  152:17 155:18
  162:1 241:16
  249:10 261:2
**indicating** 244:15
**indifference**
  170:11
**indifferent** 176:11
**individual** 24:4

82:22 101:3,4
  171:4
**individuals** 14:10
  18:18 85:3,9
  176:9,10 232:16
**information**
  12:15 15:18
  54:19 55:13,13
  55:16 56:1,8,9
  58:17,20 59:1,2
  60:22 61:11
  68:7,8 72:19
  73:8,9 74:11
  77:10 78:7,12,18
  79:16 80:19,20
  81:16 86:3,5,10
  86:11,18 87:8,9
  87:11,14,16 88:4
  88:7,12 89:3,8
  89:19 90:5,7,9
  90:14 91:4,5,6,8
  91:17,19,22
  92:10 93:22
  94:15,17 95:7
  106:13 107:16
  107:19 108:15
  109:7 160:3
  167:19 203:11
  204:11 205:6,11
  205:12,15 206:5
  206:8,9 216:14
  217:2,3,7,13,15
  219:2 221:2,5
  249:9,15 250:7
  250:16,17 251:1
  251:7 254:12,14
  268:22 269:6
**Initially** 56:15
**initiate** 252:11
**initiative** 72:9,13
  72:14 77:8
  118:5,19 149:20
  257:14
**initiatives** 77:12
**injustice** 95:14
**Inn** 162:14 170:13

**Inner** 42:10,15
  43:4,21 44:1
  45:3,4 186:21
**inside** 226:11
  230:15 262:18
**insider** 71:12
  76:21,22
**instance** 116:4
**instances** 93:14
**instruct** 141:1,6
  141:13 151:18
**instruction**
  141:15
**insubordination**
  251:3
**insulin** 134:13,14
  134:17 135:4,6
  138:19,20 139:1
  148:12 150:1,6
**insurance** 237:2
  237:12 264:2,9
**intake** 157:9
  161:6 172:7
  177:5 179:5
  257:17
**intention** 164:7
**intentions** 165:9
**interacted** 35:8
**interaction** 61:9
  64:11,14
**interactions** 253:3
**interest** 59:17
  273:14
**interested** 148:15
  257:9
**interesting** 101:14
  101:16
**interests** 93:1
**interfere** 202:12
**interfered** 201:6
  204:2
**interference**
  201:17
**interim** 61:18
**intermittently**
  128:13 129:9,20

130:2
**intern** 3:22 6:19
  87:4
**Internet** 28:3
**interrupt** 10:12
  14:3
**interview** 262:5,6
  262:9 265:13,16
  265:19
**interviewed** 257:1
**interviewers**
  265:20
**interviews** 256:15
**inter-agency**
  55:19 56:11
  68:8 252:11
**inter-racial** 37:10
  37:21
**investigations**
  226:18
**involved** 102:9
  165:21 197:14
  208:12 256:19
**in-house** 56:12
  71:8 105:18
  106:12
**Island** 40:6
**isn't** 27:21 89:2
  132:20 176:13
  177:14 187:11
  226:20 227:9
  233:18
**isolated** 114:7
**issue** 143:14 177:7
  177:22 178:12
  180:18 181:2
  186:9 205:18
  240:1 243:7,14
  255:16 256:20
  258:21
**issues** 11:12 174:8
  208:6 239:22
  247:5,7,10,15,22
**it's** 11:8,11 23:18
  26:17,17,19
  28:10,11 29:1,4

31:13 32:12,17
  38:20 46:9
  53:20 67:16
  69:11 74:12
  86:13 91:17
  92:22 95:11
  96:9 97:3,3
  105:19 111:18
  111:19 114:1
  121:12 137:18
  139:12 145:10
  147:17 151:9
  152:10 153:17
  153:18 155:4,7
  155:22 168:19
  169:21 173:1
  177:2,10 180:17
  183:12 189:7
  190:14 201:22
  207:9 210:18,20
  214:4 216:19
  218:10 221:17
  223:22 225:11
  227:10,12
  228:10 229:14
  232:9 233:13,19
  246:4,6,7,10
  248:8 250:20
  261:8,9,15
  270:18
**I'd** 245:4 248:16
**I'll** 9:18 63:13
  66:11 71:10
  108:2 149:7
  153:1 189:12
  208:7 248:2,9
**I've** 9:22 24:11
  30:21 65:12
  66:11 108:1
  135:22 174:15
  232:2 239:14
  262:3

_____

**J**
_____

**Jackie** 15:15
**Jackson** 61:18,22

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

290

**level** 51:4 99:17
 99:17 100:20
 132:5,13 133:21
 146:5 148:4
 180:10
**levels** 120:20,21
 121:3 126:14
 134:4,5,6,9,10
 136:21 137:2
 146:4,17
**Lewis** 126:12
 130:10 256:11
**license** 96:6,20
 100:10 240:22
**licensed** 235:19
**LICSW** 4:13
**lie** 262:14
**life** 37:8 68:9
 104:15 185:7
 227:16 266:17
**lifestyle** 137:3
 262:1
**lift** 14:5
**light** 183:22
**lights** 136:10,11
**limit** 232:4
**limited** 81:8 86:11
 187:5
**Lincoln** 48:13,16
 49:2,5,7,9,20,22
 50:7
**Linda** 1:21 2:16
 273:5
**line** 30:8 40:13,14
 158:7,9 213:21
 221:17 240:4
 241:14 242:18
 267:22 274:5
 275:5
**lines** 55:18 93:10
**lipstick** 38:22
**list** 105:15 106:4
**listed** 108:8
**literally** 257:17
 261:9
**Litigation** 3:20

**little** 7:9 18:16
 23:2 32:2,16
 38:5 58:9 63:13
 74:9 106:5
 117:14 129:16
 138:7 160:21
 180:22 190:18
 237:1,3 253:15
 261:1
**live** 15:3 28:19,20
 30:13 40:4
 266:17
**lived** 35:1 40:4
 244:4
**lives** 15:12 180:16
 228:14,16
 269:17
**living** 42:7 46:13
 234:6
**loaned** 26:18
**lobby** 83:22
**located** 32:10
 51:15 237:18
**location** 28:9,11
 157:14
**lock** 83:22
**locked** 160:6,10
 167:11,22
 168:21
**lodge** 113:2
**long** 31:14 35:12
 39:13 40:15
 43:21 45:11
 47:3 48:6 53:4
 53:20 55:21
 57:5,21,21 63:5
 64:5 67:8 104:5
 119:11 134:1
 169:4 218:11
 223:11 234:7
 237:7 240:22
 245:20 250:21
 263:7 270:6
**longer** 36:5 134:5
 138:14 187:18
 224:17

**look** 27:13 34:2
 39:1 72:22
 73:11 116:22
 117:1 118:4
 136:11 144:19
 153:14,22
 188:19,22 192:1
 196:20 209:9
 210:21 212:5
 216:12,13 227:6
 254:15
**looked** 109:18
 262:12
**looking** 48:11,11
 49:14 51:4
 67:17 92:16
 118:21 152:21
 153:19 157:1
 190:5 202:5
 230:20 266:11
**looks** 251:10
**lost** 9:15 170:1
 184:20 185:13
 230:22
**lot** 7:20 23:21
 30:22 37:10
 41:17 56:18
 65:12 79:12
 105:22 107:11
 113:2 114:14
 119:2 139:19
 146:13 149:14
 186:16,18 207:9
 207:10 221:12
 252:12 270:5
**lots** 253:18
**loud** 112:16,17
 113:19
**love** 37:7 152:12
 263:21 264:1
**low** 7:19
**loyal** 118:15
**lucky** 230:15
**lunch** 84:2,9
**lying** 162:16

**M**

**machine** 233:13
**main** 185:16,17
**maintain** 92:6,9
 96:6 98:16
 118:20 155:7
 203:20 240:22
**maintaining** 77:7
**makeup** 40:13,14
 40:14
**making** 72:13
 134:22 179:8
 239:21
**malfeasance**
 251:2
**mama** 104:14,17
**man** 38:6 158:15
 161:10 228:17
**manage** 185:4
**managed** 54:3
 72:9 237:1
**management**
 72:17 74:9
 161:13 162:6,7
 162:18 163:2,5
 163:15,21 165:9
 170:2,4 171:5,10
 176:10 184:19
 185:14 186:9,11
 187:19 262:7
**managers** 80:3
 106:12 177:16
**manager's** 74:16
**mandated** 96:7
**mandates** 240:11
**mandatory** 240:7
 240:10,18,21
 241:2,4,8 254:9
**March** 4:20 17:16
 17:17,18 119:10
 119:14 120:15
 121:13 122:19
 123:4,4,7,13,17
 125:10,16
 181:13 232:13
 245:8,20 246:15

246:19 247:8,22
 251:11,16,18
**mark** 128:10
 191:1
**marked** 24:22
 126:16 144:10
 181:6 188:2,7,16
 189:13 191:2,20
 192:3 193:15
 194:15 195:21
**marker** 244:14
**marketing** 23:12
 23:15,20 24:10
 43:9,10,11,12
 45:18 47:17
 102:11 186:16
 187:4,5
**Marvell** 31:6,6,8
**Marvin** 30:6
**Mary** 66:1,4
**Maryland** 47:1
**Massachusetts**
 40:5
**master** 33:12,13
**master's** 32:20
 51:4
**material** 209:16
**materials** 72:16
 77:10 82:10
 253:18
**math** 21:11,13
 35:20
**matter** 61:17 63:7
 66:11 142:7
 145:9 185:6
 187:20 188:13
 188:14 203:19
 210:2 241:5
**matters** 55:18
**may** 7:9 9:14,15
 21:1 33:1 47:5
 49:16 78:19
 86:8,9 88:14
 94:14 96:2,22,22
 103:2,3 104:5
 120:18 121:4,17

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

291

121:17 136:15
138:2 152:13
175:9 210:1
225:1 227:8
228:21 229:3,3
232:15 233:22
245:21 258:7
264:7,7,19
**mayor** 173:9
220:5 259:8,16
**mayor's** 72:9,12
77:7 257:13
**ma'am** 195:2
239:1
**meal** 228:6
**mean** 10:12 11:6
14:3 19:17
20:12 29:16
39:22 40:2
50:13 52:22
67:5 71:10
85:15 87:21
92:5 99:10
101:16,20
106:21 109:13
115:20 124:6
129:8 131:22
135:11 142:19
156:11 157:6
160:1 163:14
166:8 172:14
177:1,2,12 195:8
195:8 199:10
201:4 203:19
227:6,20 232:8
234:4
**meaning** 88:15,16
135:15 144:2
169:18 190:20
**means** 29:2,5
135:12 172:19
269:11
**meant** 182:8
249:7
**meat** 66:10
**mechanism** 179:6

**media** 59:19
73:14 74:8,9
79:1,3,6,13,14
79:14,18,20 80:3
80:4,8,9,11
84:19 85:4
180:8,9,17 181:2
183:15,17,19
184:1,5,9,12,13
185:10,12 187:9
202:22 203:8
204:1,17,17
206:16 207:2
217:13 243:14
244:9,22 249:3
250:11 251:2,7
256:15,20
259:22 267:6
**mediate** 5:7 116:1
192:13 245:22
**Medicaid** 238:18
**medical** 52:21
119:7,12,13,22
120:1,15 121:13
121:20,21,22
122:1,4,10,11
124:2,5,5,11,15
124:20,22 125:7
125:20 126:3,4
126:21 127:3,5
127:19 128:4,9
128:19,20 131:3
131:21 132:12
148:20 242:17
247:1,4,6,21
255:22 256:2,17
**medically** 128:14
129:9
**Medicare** 238:18
**medicine** 261:20
**medicines** 232:6
**meet** 99:14,15
197:13 262:9
**meeting** 107:6
108:4,6 110:19
110:21,22 112:2

126:11 130:3,7,9
130:12 145:16
145:17 156:13
197:22,22 198:4
242:4,5 255:6,11
255:17 261:17
**meetings** 107:8
111:11 142:20
177:18,18,19
**Meltzer** 175:10,11
**member** 218:11
226:4
**members** 29:14
29:16,17
**memo** 247:8,22
**Memorandum**
4:20
**Memorial** 47:1
**mental** 148:3
252:22
**mentioned** 17:4
80:16 248:1
255:5
**merchandiser**
38:16,17
**merchandisers**
38:18 39:3
**merged** 31:20
32:12
**Merit** 273:6
**message** 258:3
**messages** 257:11
257:16
**met** 6:16
**Michael** 3:21 6:20
**Michelle** 126:12
130:10 256:11
**mid** 119:14,15
120:18 121:4,17
123:7 222:16
**middle** 67:3 179:3
224:18
**midnight** 260:22
**Mid-South** 38:5
**Mike** 76:4,5
**millions** 185:20

**mind** 117:9
118:14 146:10
234:3 245:5
**minds** 117:5
**Mindy** 10:18 58:4
61:3,9,14 65:4,6
68:17,18 70:18
70:20 71:5 72:2
72:16 73:6,20
75:6,15 76:8
78:19 80:4,7,9
80:10 85:10
101:10,13,21
102:4,15,16
103:15 104:2,16
104:16,21 105:9
105:11 106:8
107:3,7 110:19
112:7 113:17
114:13,14 115:6
115:7,8,10,11,13
115:17,18,22
116:3,15,20
117:6,11,20
118:9,9,13
126:12 130:11
155:1 157:17
165:16 169:6
171:8,11 172:4
172:14,18 173:2
173:6 174:18
177:2 189:8
190:3,15 192:14
192:20 221:5
242:3 245:10
246:8,20 254:4
254:10,16
256:11
**Mindy's** 74:13
103:13 118:12
**mine's** 230:21
**minimal** 256:22
**minor** 244:12
**minus** 72:11
**minuses** 119:2
**minute** 31:13

**minutes** 151:4
188:21 189:16
**mischaracterizes**
90:17
**misheard** 49:16
**misrepresented**
202:22 203:8,21
203:22 249:2,10
**missed** 74:4
**mitigate** 94:11,12
95:1 96:4,16
97:12 99:8
100:11 209:5,6
**mitigation** 95:5,6
210:3
**modeled** 35:7
**modicum** 184:11
**mom** 7:19 124:16
125:13
**moment** 238:6,9
**mommy** 228:3
**monetary** 231:11
**money** 23:21,22
56:19 231:11,20
231:22 234:7,11
264:18
**monitor** 135:14
175:12 178:16
178:21 179:1,14
179:16 217:19
218:4,7 220:15
220:16,17
**monitored** 226:19
**month** 108:16
120:4,4 232:2
259:17
**months** 45:12,13
46:6 55:22 63:7
63:7 81:6,12
182:3 237:9
264:19
**Monticello** 15:4,5
30:16
**morning** 6:9,10
107:3 112:9,21
113:19 147:17

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

292

148:5 149:1,12 172:7 177:4 206:4 218:10,15 232:11 255:10 257:11,15 260:20 261:11
**mother** 104:2,11 105:1,6 120:15 120:16,19 122:22 123:7,22 124:3,17 125:1 136:15 246:20 246:22
**mothers** 182:13
**motion** 12:12 13:17
**motivation** 180:12
**Motor** 46:10
**mouth** 25:17 144:18 170:8 186:12 202:2
**move** 28:22 41:17 46:12 143:10,14 151:19 157:5,14 249:12
**moved** 39:16 60:6 60:11,18,21 61:10,15
**moving** 23:18 39:20
**MSS** 213:18
**MSW** 4:13 33:13 35:1 102:11
**multilevel** 23:12 23:15
**multi-disciplina...** 27:1
**mumbling** 7:18
**M-A-R-V-E-L-L** 31:7
**M-O-N-T-I-C-...** 15:6

**N**

**N** 4:2 5:3 6:1
**name** 6:11,15

14:18 15:11,21 22:15 30:5,11,17 81:5 90:6,10 91:9,12,13 116:4 134:20 222:22 230:5 234:21 236:1,2 243:15 243:17,21 244:1
**names** 90:10,11 106:4
**narratives** 67:14 67:18
**narrow** 181:1 227:9
**NASW** 11:16
**National** 99:15
**naturally** 90:4 104:17 267:14
**nature** 41:3 89:2 202:17
**near** 92:1
**neatly** 38:20
**necessarily** 183:20
**necessary** 99:13 107:22 128:14 129:9 231:18
**need** 9:9,15 12:7 31:2,3 34:3 55:4 69:7 79:18 103:22 107:12 118:4,13 162:19 228:5
**needed** 18:19 104:22 107:11 130:21 131:14 132:6 160:3,4 163:22 231:21
**needles** 148:11
**needs** 8:11 35:9 261:18
**negative** 118:6
**neglect** 95:14 157:12 224:20 225:14 227:17 228:10 240:11

240:13 251:21 262:17
**neglected** 85:18 93:3 94:10
**neglectful** 185:18 226:22 227:5,13 227:14,17 228:18
**neighborhoods** 234:6
**Neil** 143:16 144:16 145:8 148:5,14 150:20 155:12 156:15 157:1 158:10 168:6,11 171:19 171:22 172:10 173:2,8,9,12 174:21 220:4 257:8,22
**neither** 273:13
**net** 263:14,15,15
**network** 23:18,19 23:22 237:3
**neuropathy** 261:21
**never** 61:6 62:10 62:20 63:1,4 70:1,3,6,12 89:22 92:2 114:21 117:22 156:13 180:14 187:20 243:2 244:1 248:1 249:21 259:20 268:10
**new** 18:16 23:15 39:15,16,17,20 39:22,22 40:1,2 40:3,4,4,5 56:13 72:17 77:18 111:8 118:22 153:12,14 156:8 156:10
**news** 175:15,17 176:2 178:11

180:7,9 181:13
**newsletter** 71:8
**newsletters** 56:12
**newspaper** 105:18
**newspapers** 117:12,12
**nice** 34:3 37:12 253:18
**Nicki** 81:5
**Nicole** 81:5
**night** 135:19 136:6,10 144:4 162:2 170:21 177:5 179:4 180:15,16 182:3 182:10,12 222:19 223:3,7 224:3,4,10,11,15 224:18 228:2 230:12 257:17
**Nikita** 81:5
**nod** 8:9
**nodding** 8:14,18 108:17
**nondocument** 12:14
**nonresponsive** 8:10
**non-testifying** 238:6,9
**normally** 244:18
**Northeast** 51:20
**Northwest** 2:9 3:6 3:14 28:14
**nose** 244:17,20
**notarial** 273:17
**Notary** 2:17 273:3 273:21
**note** 117:15 142:9 158:2 202:13 221:16 238:5
**noted** 15:19 30:9 37:4 88:20 113:11 114:1 120:10 147:3

201:3 202:19 222:1
**notes** 13:19,20 79:4
**notice** 4:21 5:6,12 5:15,17 190:2,14 190:20 191:13 194:10 195:3 196:6,16 208:21 209:13,17,19 210:22 211:5
**notification** 189:7 245:9
**notifying** 251:22
**noting** 206:21
**November** 5:16 11:2 138:13,15 178:7 236:8 259:17
**number** 12:8 82:17 114:7 182:20 207:18 216:1,4,10 242:15 245:3 253:12
**numbers** 182:14
**nurse** 29:5
**nurses** 240:14
**nursing** 18:2,14 26:12
**nurturing** 157:9 228:5 269:18

**O**

**O** 6:1
**object** 14:20 25:20 37:3 38:2 43:18 65:20 69:7 73:21 85:5 86:7 87:18 88:13 89:9 90:16 94:2 96:17 97:5,19 100:13 101:11 111:2,3 113:1,21 113:21 114:10

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

293

114:19,19
127:21 128:1
129:21 130:22
138:17 149:5
150:22 151:1
152:9 160:19
172:22 173:14
176:17 178:19
187:1 200:22
204:18 208:7
211:4 217:9
219:4 224:7
227:1 231:3
234:13
**objecting** 113:8
**objection** 15:17
29:18 30:7 59:8
60:13 82:5
89:20 112:4
120:10 133:1
140:13,17
142:10 145:10
176:16 177:9
180:3 183:7
199:22 202:14
204:3 205:13
206:17,22
221:17
**objections** 113:3
**obligated** 100:11
**obligation** 94:22
96:3,15 97:11
98:12 99:8
**obligations** 101:5
240:1
**obscure** 237:1
**obscured** 244:13
**obtain** 250:22
**obtaining** 252:1
**obviously** 149:15
152:14
**occasion** 105:14
105:17 242:21
**occasions** 105:16
**occurred** 9:14
116:5 231:12

**occurrence**
116:10
**occurrences** 21:11
**October** 5:11,13
21:2 24:7 53:6
57:6 119:14,15
197:2 198:16
202:8 208:22
209:8 248:8
251:6
**offer** 45:8 105:4
107:20 255:12
**offered** 41:18
205:18 215:19
**offering** 26:7
255:11
**office** 2:6 3:13
47:21 54:18
55:12 58:17,20
58:22 68:7,8
73:8 74:21
79:15 80:19
81:16 87:4
103:13 107:19
113:20 117:11
159:21 160:3,8
160:10,12 161:3
164:16 221:5
226:21,21
227:11 228:1,11
242:21 243:9
**officer** 55:14,16
56:1 59:1,2 61:1
61:11 78:8
212:11 254:12
268:22 273:7
**offices** 2:2 3:4
223:21
**official** 4:22 55:2
62:21 190:2,15
191:14 193:9,10
195:6,6,7 197:8
197:11 243:4
**oh** 11:19 22:2,17
67:13 76:2
77:17 81:4

247:16 255:2
262:13 266:13
**old** 15:13 104:19
234:4
**older** 147:11
**Olivia** 64:4,5,7,17
69:1 70:19,21
253:13
**omission** 220:10
220:11
**omitted** 264:8
**once** 116:12 121:8
254:16 259:8
**onward** 66:10
**open** 160:8
**opened** 38:21
**operate** 233:11
**OPI** 118:13
**opportunities**
77:20
**opportunity**
10:14 41:18
49:11 116:14,16
148:13 149:20
149:21 157:2
169:22 196:3
208:1,5 209:1,2
212:15 214:2,12
242:11 247:20
264:2 268:11
**oppose** 214:12
**opposed** 253:16
**opposite** 63:4 74:7
101:19
**OPTI** 258:6
**option** 212:22
**order** 18:1 72:16
93:21 172:17
173:10 231:16
231:22 256:8
**orders** 132:9
**organ** 106:12
**organization** 45:6
85:12 176:2
**organizations**
52:21 175:17

**organize** 167:20
**organizing** 56:18
**original** 141:19
**originally** 247:8
**outcome** 273:15
**outline** 210:16
**outlines** 211:3
**outlining** 212:1
**outpouring** 184:8
**outside** 150:11
156:14 173:18
174:3,12
**overall** 79:10
**overhead** 233:10
233:16
**overnight** 180:2
182:8 217:8,14
217:21 224:12
226:10,12 243:8
**oversight** 59:14
85:17 178:3
220:1 259:17
**oversized** 182:7
**overturned**
197:16
**ownership** 263:8

_____

**P**

**P** 6:1
**pack** 38:22
**padding** 223:16
**page** 4:4,11 5:5
25:18 27:13
127:6 128:6,8
144:19 146:19
146:21 147:14
153:6,7 181:15
181:19,20
190:19 195:13
199:1,11 207:15
209:9 215:22
216:13,17,18
248:18 250:20
251:13,14,15
255:20,21 274:5
275:5

**pages** 1:20 117:8
189:1,3,19
**paid** 18:21 19:3
**Pandemonium**
181:16
**paper** 105:19
106:1 110:11
207:11 233:13
**paperwork**
231:18 261:12
**paragraph** 147:15
153:2,4 181:18
196:21 207:21
209:10,15,21
210:8,11 216:12
216:13,15,18,19
248:19 250:20
251:11 255:4,20
**paragraphs** 183:1
199:12
**paraphrasing**
118:20
**parent** 56:20
**parents** 35:4,7
52:8 85:21 90:6
90:10,11,12
91:12 92:13
102:9 103:11,20
104:4 230:13
**parity** 39:2
**Parks** 253:1
**part** 26:20 56:16
77:21 99:19
159:10,12
216:13 237:3
241:16 244:14
248:22 249:12
254:1 259:7
263:11,12 267:1
**particular** 38:19
39:4,5 105:20
149:15 257:15
**particularly**
52:10 56:13
92:18
**parties** 273:14

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

294

**partner** 72:8
254:16
**partnering** 155:2
**partnerships**
252:11,12
**parts** 119:12
258:11
**part-time** 19:16
21:14 50:13
**pass** 24:21
**passed** 189:17
**Patricia** 3:20 6:18
14:19,19 15:1
30:18
**pay** 19:8,10 26:13
27:8,9,12 154:9
202:11 230:22
231:7,16,17,20
232:1,6 233:12
235:3
**paying** 233:8
**pays** 27:3
**pending** 92:13
**Pennsylvania**
237:19
**penultimate** 153:2
**people** 24:1 27:2
34:1,1,4 38:3
47:13 59:13
67:22 68:2 69:8
73:10,11 76:4
84:2,3 96:21
104:19 106:4
107:11 111:21
118:15 134:6
176:18,20 177:3
219:10 222:4
226:9,11,16,17
240:15 241:6
254:9 262:5
263:10
**people's** 223:21
**perception** 240:1
**performance** 70:5
70:8 189:8
245:9 247:14

**period** 18:12
35:18,21 36:1
55:14 59:11
70:11 82:15
123:3 126:9
128:9,17 129:6
129:11 139:22
256:6 258:8,9
264:12
**permission**
162:21 163:7,12
163:16,18,20
164:4,8 250:22
**person** 27:8 33:8
77:17 79:17
81:3,4 84:18
92:11 97:4 99:1
100:8 101:6
112:19 141:9
221:20 238:9
253:12 254:21
261:18 265:19
268:14
**personal** 15:17
36:21 37:2 83:8
203:11 204:11
205:6,10 249:15
250:7,16,17
**personally** 19:6,7
**personnel** 55:2
72:22 128:3
**persons** 18:6
**person's** 113:20
219:6
**pharmaceutical**
42:6
**photo** 187:12
244:10 256:14
**photos** 163:8,21
**phrase** 240:6
**physical** 228:21
**physically** 145:17
229:17
**physicians** 235:19
**picked** 267:13
**picture** 159:16

160:16,18
162:22 164:11
165:13 171:4
184:14,16,17
185:11,11 186:1
186:5,8 204:16
205:10 206:15
207:1 222:9,10
222:17 224:3
228:17 243:7,12
244:8,21
**pictures** 158:2,14
158:15,18,20,22
159:8,14 160:4,5
163:12 165:1,3,6
165:14,21,21
166:5,7 168:5
169:21,22 171:5
172:2 173:5,11
174:10,17,18
175:18,20,22
180:7,9 186:22
187:4,7
**pie** 221:8
**piece** 26:22
102:18 184:7
227:19
**pieces** 165:16
**pilferaged** 38:21
**pill** 138:22
**pillows** 223:16
**pills** 134:12
**Pine** 31:16 32:11
**place** 18:4 74:10
79:16 103:12
106:11 185:21
244:22
**placement** 144:2
223:9 224:6
226:2
**placements**
180:14
**places** 53:2
162:12,19
**plaintiff** 1:7 3:2
199:11 207:22

213:14,14
216:13 217:2
**plan** 107:20 108:1
189:8 232:8
237:2 245:10
255:13
**plans** 35:6 66:19
72:6 77:6
**play** 186:3
**played** 267:1
**playhouse** 182:7
**playing** 115:18
**please** 6:11 25:3
58:7 72:3 90:19
105:15 110:12
127:2 131:9
147:14 163:4
181:10 182:1
185:1 188:19
191:5 196:22
200:11 209:8,9
209:10 216:3,12
230:17 255:20
**plenty** 150:12
**PLF** 1:6
**plots** 47:6,7,11
**plus** 72:11
**point** 22:11 43:3
50:18 56:5
57:18 65:16
109:10 120:12
131:13 151:10
151:14 153:1
155:9 159:20
168:16 170:1
183:13 214:10
227:4 229:12
233:19 234:10
264:8
**pointing** 203:13
**points** 214:7
248:16
**policemen** 240:14
**policy** 90:1 92:2
92:11 99:22,22
100:4,19 250:4

**political** 268:18
**poor** 148:14
**pop** 19:22 179:5
**population**
106:15
**posed** 9:22 205:3
**position** 18:21
40:18 41:8
42:16 44:22
45:9 49:15
50:22 51:2,7,9
51:11,12 53:14
53:15 54:14
55:11,21 56:5,7
57:5,6 58:17
60:4,19,22 61:11
61:12,16,20 75:3
78:5,6,7 93:2
106:16 110:8
116:2,17 118:12
152:14 155:13
155:14 156:1,4,8
156:10 187:17
187:18 231:15
263:19 268:5,7
268:10
**positions** 43:3
53:9 65:15,18
**positive** 59:21
**possibility** 93:6
**possible** 92:6,7
93:5
**Post** 4:17 181:13
218:16 219:8
220:19,21 259:4
**posters** 107:22
**practice** 111:20
178:3 187:20
202:22 203:8,22
249:2
**practicing** 96:14
241:1
**prayed** 12:13 14:4
14:9,9
**prayer** 14:6
**prayers** 14:12

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

295

**precarious** 94:21
**precise** 163:11
218:3 220:9
229:15,16
**preparation**
13:20
**prepare** 10:7 35:3
151:5 209:17
210:1 245:15,18
**prepared** 188:12
241:6 246:19
**preparing** 161:13
**prerequisite**
99:14
**prescribe** 134:9
134:16
**prescribed** 134:18
**prescription**
135:3,19 136:4
**prescriptions**
232:5
**present** 3:19 68:6
97:18 228:21
248:10
**presentation** 48:4
**presentations**
48:1
**presented** 244:1
245:3,7 247:7
**presently** 240:20
260:16
**press** 178:10
183:4,10 187:8
**pressure** 37:17
38:1
**pressures** 37:6
**presumes** 205:16
**pretended** 116:1
**pretty** 139:15
214:4 221:10
**prevented** 200:8
**prevention** 254:4
254:10
**prevents** 256:2
**previous** 74:9
212:10

**previously** 6:16
**pre-need** 47:10
48:1 49:8
**primarily** 81:6
106:12
**primary** 90:5 94:5
**printed** 166:16
**printer** 233:16
**printout** 25:12
**printouts** 166:21
166:22 167:7
**prior** 100:14
251:6 252:1
**privileged** 141:8
**probably** 17:16
17:16 19:20
24:7,14 36:3,4
40:16 44:5
45:12 46:4
55:22 62:4 63:6
192:21,21 235:6
236:22 237:8,9
260:18
**problem** 87:2
89:15 91:2
113:7 115:11
125:2 128:20
155:11 162:17
162:20 169:18
170:14 176:7
177:15 178:15
183:16 184:2
200:12 201:6,9
218:4 225:1
268:16
**problems** 138:7
146:7
**procedure** 2:16
210:9
**proceedings** 84:5
133:15 188:1
239:11 273:8,10
273:11
**process** 24:19
86:1 88:5,6
93:17,18,19

137:12,13,14
139:6 208:11
209:4 211:12
214:20 215:2,5,7
215:9 226:6
262:11
**processed** 226:1
**procurement**
107:9,10,18
110:15 115:13
210:10 255:12
**produce** 72:17
**produced** 72:16
**producing** 78:17
**product** 23:22
57:18 63:3
64:12 72:1
**products** 23:18
38:14,19 40:11
40:11,12,16
41:14
**profession** 96:12
98:4,11 99:7
100:9 101:4,7
**professional**
33:20,22 41:18
57:10 94:9
95:20 96:7
97:17 238:3
273:5
**professionals**
26:22 240:12
241:7
**profiles** 67:14
**program** 32:4,19
34:11,14 234:8
269:9,10,14,16
**programs** 33:18
**project** 72:10
78:19 150:20
**projecting** 59:19
**projects** 82:12,14
82:19 251:22
**promote** 251:21
**promoted** 40:8
**promotion** 54:12

**proof** 117:6
**proper** 38:4 149:6
**properly** 151:20
**property** 46:18,19
46:21 47:11
48:1 49:8
**proposal** 150:21
151:3 193:8
**proposed** 4:21
116:13 121:9
190:2,14 191:14
210:5
**prospect** 52:22
**prospective** 90:11
**protect** 89:3 244:7
**Protection** 85:14
**Protective** 161:7
**provide** 17:22
243:17 244:21
246:16 249:9
250:16 269:17
**provided** 35:2,3
249:19
**provides** 85:17
**providing** 72:5
205:5
**psychiatrist**
235:22 236:13
236:15,16,18
238:1
**psychiatrist's**
236:1
**psychologist**
236:14,17
**public** 2:17 54:18
55:13,13,15 56:1
56:8,9 58:17,20
59:1,1 60:22
61:11 68:7,8
72:19 73:8,9,12
73:16,18 74:6,10
74:11,17,21 75:1
77:10 78:7,12,12
78:18 79:15
80:18,20 81:15
87:17 88:12,22

89:4 107:16,19
160:3 176:15
177:21 178:2,12
178:14 180:1,5
220:1 221:5
239:3 250:12
254:10,12
268:22 269:5
273:3,21
**publications**
72:19
**public's** 217:5
258:21
**publish** 71:17
**published** 56:12
219:8
**publishing** 71:7
**pull** 57:17 63:2
**pulled** 70:10
**pump** 136:22
137:4
**purpose** 163:4
**purposefully**
221:3
**purposes** 84:10
**pursuant** 2:15
69:5 132:9
217:1
**pursue** 197:17
**pursued** 197:17
**pursuing** 42:6
102:17
**put** 23:21 25:17
37:7,19 38:1
59:13 79:16
105:22 106:11
108:21 117:2,22
134:12 136:22
144:17 164:5
167:8,9,13,18,21
167:21 168:9
169:16 170:8
186:11 187:18
193:1 202:1
207:14 213:20
231:15 241:21

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

296

**puts** 263:14
**putting** 28:3
  117:21 164:7
  270:9
**p.m** 84:6 133:15
  133:16 188:1,4
  239:11,12 271:3

**Q**

**qualified** 142:13
**quality** 26:7 118:6
  118:19
**quarters** 265:3
**query-like** 255:3
**question** 8:3 9:15
  9:16,17,21 10:2
  10:3,6,15 26:2
  57:17 69:8,11
  80:5 84:8,9,11
  84:11 85:6 86:9
  86:11 87:10,20
  88:11 89:12
  90:17,21,22
  91:15 95:16
  99:22 101:2
  105:3,8 108:9
  110:2 113:6,13
  113:14 114:3
  131:8 139:4
  141:3 142:4
  149:6,8 150:22
  151:8,13,20,22
  152:4,4,7 163:11
  172:17 173:10
  175:1 177:9
  180:22 185:2,10
  196:2 199:8
  200:3,5,10 201:8
  201:15 204:20
  205:1,4,16,19,21
  206:3,19 217:10
  218:3 219:20
  220:8 222:3
  227:9,10 228:9
  229:15 231:8
  251:5 252:4

264:5 266:22
  267:9,21
**questioning**
  221:17 241:9,14
  267:22
**questions** 8:5 9:10
  30:8,22 65:12
  88:14 106:3,5
  113:2 119:21
  140:17 143:15
  174:16 230:19
  239:8,14,15,16
  239:20 240:4
  242:15 245:5
  248:12,13
  258:20 260:1
  265:4,6,8,12
  270:1,5
**quickly** 32:8
**quilts** 257:18
**quite** 21:1 48:7,9
  106:14

**R**

**R** 6:1 274:1,1
  275:1,1
**racking** 107:10
**raid** 182:14
**raise** 56:19 208:5
  210:1 248:16
  251:20 252:14
  263:13
**raised** 255:16
**ranging** 182:2
**rate** 232:6
**rating** 70:15
**reach** 140:14
  204:19 231:4
**reached** 178:15
**reaching** 254:3,12
**read** 101:21
  105:21 153:10
  181:18 196:22
  199:9 250:21
  272:4
**readily** 177:7

**Reading** 153:11
**reads** 26:6 203:6
  203:16
**ready** 25:4,5 35:4
  36:13 37:9
  41:17 62:9
  128:6 137:1
  151:4 191:7
  194:5,18,19
  216:8,11 219:15
  239:10
**real** 134:3 185:5
  262:6
**realize** 261:7
**really** 13:8 29:1
  32:8 59:5 97:7
  100:18 114:12
  114:17,22 126:5
  156:11,12 175:8
  204:20 267:11
**Realtime** 273:7
**reason** 37:12
  67:11 128:21
  165:17 185:17
  185:17 187:14
  187:15,16
  215:16 229:6
  266:7,9 274:5
  275:5
**reasonably** 210:3
**reasons** 36:22
  37:2 187:11
  197:10 201:19
  210:4
**rebuffed** 142:20
  168:15
**rebut** 208:1
**rebuttal** 241:22
  242:2
**rebutting** 117:3
**recall** 66:8 81:21
  113:15 123:14
  164:3 169:15
  175:8,9,14 229:5
  236:2 240:2
  241:14,18

242:18 243:10
  245:13 248:5,13
  250:13 258:22
  259:4,13 260:4
**receipt** 209:19
  248:14
**receive** 62:21 69:5
  69:22 70:2,4,7
  189:10 190:16
  191:17 194:12
  238:18 242:22
  264:8
**received** 190:15
  201:20 208:20
  209:12 210:13
  211:19 241:3
  248:4 264:7
**receiver** 58:21,21
  61:18 62:15
  80:12 182:16
**receivership**
  56:17 59:11
  79:12 80:2,14
  219:12 223:13
**receives** 224:22
**receiving** 196:18
**recessed** 84:5
  133:15 188:1
  239:11
**recharacterize**
  113:9
**recognize** 25:6
  126:22 144:14
  188:7 189:3,21
  190:11 191:8
  192:6,10 193:5
  193:20 194:7,20
  196:13
**recollect** 229:20
**recollection**
  141:13
**recommend**
  136:19
**recommended**
  42:1
**record** 6:12 69:17

76:5 84:4 87:3
  213:12 238:5
  241:21 244:16
  245:8 250:21
  258:2 273:10
**recorded** 7:22
**recording** 257:22
  258:1,2,3
**records** 92:14
  120:6
**Recreation** 253:1
**recruit** 53:2 102:6
  103:11 155:2
  257:9
**recruited** 52:11
  68:12,13
**recruiting** 102:9
**recruitment** 51:12
  52:1,5 53:10
  54:3,10 61:4,21
  102:18 152:18
  155:19,21 156:3
  156:6,7,21
  257:20
**recuperating**
  258:17
**red** 136:5
**redacted** 244:13
**redaction** 244:22
**redid** 71:5
**reduce** 134:9
  146:16 148:4
**reduced** 273:12
**refer** 222:9
**reference** 256:6
  257:3 259:3
**referenced** 259:7
  265:20
**referrals** 18:8
**referred** 159:14
  267:22
**referring** 158:14
  221:18 253:7
**reflect** 76:5 87:3
  244:16
**reflected** 218:21

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

297

**reform** 219:14
268:13
**refuge** 230:15
**regard** 159:19
165:13
**regarding** 64:12
64:15 87:14
88:4 89:17,19
108:15 110:13
110:22 143:20
150:20 173:11
178:12 248:4
265:12
**Regardless** 98:4
**regards** 89:7
91:21 142:17
202:3 218:17
**registered** 29:5
273:5,6
**regular** 179:2
240:16 263:18
**Rehabilitative**
252:22
**related** 148:22
179:1 273:13
**relations** 73:12,16
73:18 74:11,17
74:21 75:1
**relationship** 57:9
57:10,11 62:16
82:1,2,8 83:8
101:10,13
103:14 104:3
109:11,15 114:8
114:13,22 115:1
115:4
**relatives** 92:13
**release** 206:5,8
**released** 87:16
219:8 231:18
**releasing** 95:6
**relevance** 14:21
15:17 29:18
43:19 65:21
82:5
**relevant** 71:16

83:2 210:4
**Reliable** 18:14
26:12
**relief** 151:19
**rely** 100:4
**remain** 18:3 73:6
85:20 229:19
**remained** 63:11
**remember** 21:14
21:15 22:13
36:20 48:15
49:6 50:17
56:21 67:12
68:14,15 73:2
75:11,13 77:16
84:15,20,22 88:9
98:13,14,15
110:17 120:7
122:5,7 123:6,6
123:13,18,20,22
126:5,7,8,10,11
128:15 134:20
136:13 139:12
142:18 143:16
143:19 144:7,9
145:22 146:2,8
146:13,17 150:2
158:6 159:1
165:20 166:1,22
167:13 169:5
173:8 175:8,10
176:2,7,11
196:18 198:17
198:17 218:18
229:6 234:21
235:2 237:4
264:18 265:11
266:13 268:2
**removal** 5:12,15
194:10 195:4,12
196:7,17 207:3
208:2,21 211:1,5
214:7,12 248:4
255:21
**remove** 225:11,15
**removed** 182:13

184:11 209:3
**rent** 231:17 233:8
233:12
**rep** 40:8,22
**repeated** 151:15
**rephrase** 9:19
69:11 131:9
205:3
**replace** 233:13
**replacement**
226:2,2
**report** 96:8 101:6
240:12
**reported** 1:21
114:13 213:18
213:19
**reporter** 7:22 8:6
71:7,13 76:20
77:1,2,3,5 78:17
105:18 106:6,10
106:20 107:22
108:15,22
109:18 240:7,10
240:18,21 241:2
273:3,6,7,7
**reporters** 244:10
254:9
**reporting** 179:6
241:4,8
**reports** 221:3
239:21
**represent** 26:21
26:21 27:1
**representation**
186:6 209:20
**representative**
40:9 41:5
211:10
**represented**
209:20
**reprimand** 4:22
62:19 190:3,15
191:14 193:9
247:11
**reprimanded**
255:7,10

**reprimands** 70:2
**request** 60:18,21
61:15,17,19 62:2
62:3,6 242:22
**requested** 128:9
**requesting** 131:10
**required** 36:5
**requirements**
46:11 99:16
**requiring** 205:13
221:19
**reraise** 247:7,10
**reraised** 247:17
**residence** 36:7
**residential** 34:19
34:21
**resignation**
153:21
**resolve** 181:2
183:16
**resolved** 180:18
**resource** 152:19
**resources** 51:15
130:10 144:3
162:19
**respect** 88:17
170:1 185:3,13
250:15 257:3
258:1 260:13
**respected** 57:12
57:12 110:8
**respite** 182:6
**respond** 208:17
208:17 209:1,2
210:16 211:4,4,4
**responded** 245:22
**responds** 225:7
**response** 5:14 8:4
8:11,16 10:3,20
12:18 84:22
185:12 193:8
195:3 196:6
208:6 209:1,17
209:22,22
212:13,16 214:2
214:4,11 215:11

245:15,18 246:3
246:3,14,16,19
**responses** 7:16
**responsibilities**
68:10 72:20
73:5 154:3
155:6
**responsibility**
79:3 107:16
118:8
**responsible** 66:18
71:6,12,20,22
72:4,7,10 76:19
77:4,5,6,9 78:20
82:22 182:17
**responsive** 75:1
**rest** 150:12
168:18 258:16
**restate** 205:3
**result** 104:8 119:3
184:9 255:6
**resume** 150:20
152:16 155:12
155:13,17,20
156:16 262:12
**resumed** 265:9
**retain** 198:11
**retained** 198:10
**retaliatory** 101:20
**retention** 77:22
**retired** 96:22
**retirement** 231:16
232:8
**return** 35:4,5
274:3 275:3
**returned** 121:16
247:4,6,21
**returning** 263:18
**reunification**
85:22
**reveal** 238:8
**revealed** 205:16
**reversed** 69:8,14
**review** 13:19 25:3
82:10,13,13
126:19 144:13

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

298

181:9 189:17
191:5,15 194:4
196:3,10 198:20
207:16 209:16
216:3,7 242:11
253:20 270:12
270:16,18,20
**reviewed** 10:10,16
10:17,20,22 11:2
126:20
**reviewing** 127:18
**revised** 11:17
**rewarding** 148:8
**re-alleges** 199:11
**Rhode** 40:5
**Richard** 3:3,4
263:2
**rid** 163:6
**right** 6:22 7:8,14
8:2,13,19 9:3,4,7
9:11,20,21 12:17
17:1,3 20:3
24:18 29:6,11
30:21 41:9 53:9
56:6 58:11
68:15 74:14
76:12 79:7,17
83:20 98:3,5,22
108:5 109:20
116:9,16 125:17
130:18 140:7,8
140:22 142:6,8
143:2 156:15
158:13 164:1
166:4 176:8
189:20 190:9
193:3 194:14
199:21 200:8,13
200:14,18,21
201:7,17 204:1
204:14,16
209:15,19 213:3
213:10 215:15
216:5,14,20
217:2 219:16
232:1,14 237:6

239:5 246:11
247:19 257:5
258:19,19
259:11 260:1
261:5 263:16
266:6 270:12
**rights** 140:10,12
142:1,2 199:8
**risk** 134:3
**RMR** 1:21 2:16
**RN** 29:2
**RNs** 26:20 27:1
**road** 7:7,12,15 9:8
10:5 29:1
106:18
**roamed** 223:20
**roaming** 157:11
**robe** 257:2
**Rock** 32:2,16
**role** 54:9 55:17
57:15 59:14
61:2 254:11
**roles** 74:20
**roll-away** 162:8
**Ronnie** 213:18
**room** 6:18 51:5
76:6 87:1,4
161:2 182:6,6
184:10 266:12
266:13
**rooms** 170:12
180:14
**roughly** 22:18
**round** 136:11
**rule** 7:15 9:8
28:22
**rules** 2:15 7:6,12
10:5 89:6,16,17
91:21 141:9
**run** 73:13,16 74:2
74:6,8,16,19,21
134:3 261:16
**running** 182:16
_____
**S**
**S** 1:21 2:16 4:8

6:1 273:5 274:1
275:1
**sacrifice** 152:12
**safe** 228:5 229:13
244:13 254:6
263:13
**safer** 226:20
229:9
**safety** 217:5
225:17,19 227:6
263:14,15
**sakes** 170:14
**sales** 40:8,9,22
41:4 42:6,22
45:1,7,10,11
102:11
**salesperson** 42:17
43:6 45:16
**salons** 40:10
**Sammy** 107:17
**Sandra** 16:6 17:5
66:16
**sandwich** 96:1
**satisfactory** 70:7
119:3
**Saturday** 261:5
**saving** 106:20
**saw** 8:8 37:12
92:2 154:1,20
161:9 165:4
168:12 169:18
175:3,3 236:10
236:12 237:8,8
237:11,15,15
238:3 246:9
254:1 263:3
266:13 268:17
**saying** 38:3 74:1
74:18,19 85:3
109:14 111:19
113:6 117:15
131:5,17,20,21
132:19 150:15
151:17 152:5
200:7 202:2
203:15 214:1

267:10 268:5
**says** 26:6 127:8,11
128:9,11,13
165:19 192:17
209:15,21 210:9
211:18,20
218:14 224:22
249:1,12 250:22
251:16,18 253:8
255:4,21 256:13
**scanned** 175:6
**scary** 136:6
**scattered** 182:7
**schedule** 261:14
**scheduled** 197:1
242:4
**school** 31:5,6,22
31:22 104:15
**schools** 35:8
**scope** 86:8
**screamed** 107:4
112:7,11,13
**seal** 273:17
**searching** 42:5
**season** 233:16
**seats** 107:11,12
**second** 17:2 44:13
58:7 69:2 87:2
110:12 123:10
143:9 146:19,20
147:14 154:17
157:3 158:8,9
168:19 171:4
181:9 188:15
192:1 196:10
198:20 205:8
207:14 209:9
216:3 229:14
230:17 251:10
251:13 255:20
262:6,8 265:16
265:19 267:21
267:22
**secondly** 12:13
**section** 38:22
181:15 199:15

**secured** 238:7
**see** 11:15 26:3
96:2 99:4 104:9
104:19 114:14
116:13 127:8,13
133:7 135:14
136:4,6 141:10
145:18,18 147:1
147:18 155:20
156:14,21
158:13 165:3
169:17,20
173:20 175:4
177:5 181:11
185:18 197:15
197:16,21 198:4
198:5 207:21
208:3 210:6,10
227:5 235:17
237:7 247:8
248:20 249:4,17
250:9 251:12,16
252:2 256:3,17
258:13 269:14
**seeing** 72:11
141:4 230:21
235:22 236:6,7
**seen** 89:22 117:20
117:21 226:15
238:6
**sees** 108:22
**selected** 253:13
**self-evaluation**
116:12
**sell** 23:19,19 24:1
40:10 43:8
46:11,21 66:4
**selling** 24:18
41:11,12 42:8
46:18
**semester** 32:6
**semicolon** 203:15
203:17
**send** 79:3 106:2
152:13 175:5,15
193:13 195:18

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

299

241:6
sending 156:15,20
senior 16:13
  261:17
seniors 18:1
sense 163:5
sent 82:11,13
  106:4 110:9
  117:11 147:4
  168:6,11 175:9
  184:6 189:8
  192:20 193:9
  194:10 197:9
  198:14 210:17
  212:6,16 245:19
sentence 158:8,9
  196:21,22
  202:21 203:2,6
  203:13,20 204:8
  216:19 249:1
  250:21 255:8
sentences 203:14
sentiment 184:8
separate 203:18
September 138:4
  138:5,16 139:7
  139:16 143:17
  144:8 145:7
  146:3,22 159:3,4
  159:5,6,7 202:21
  203:7 248:19
  249:2
series 114:4,5
  144:18
serious 256:2
seriously 34:19
  95:12 180:11,13
  213:20 234:9
serve 182:8
service 27:10
  36:13 72:5,8,9
  77:8 149:19
  233:1 248:4
  257:13
services 11:1
  16:13 18:1,13

49:13 50:14,19
51:3,16,17,18,19
52:15 58:10
77:21 88:5
104:20 156:2
161:7 178:5
182:17 220:3
248:5 252:21
253:1 255:12
259:9 262:13
session 6:2 84:6
  133:16 188:4
  236:18 237:13
  239:12
sessions 235:2,5,7
  237:11,16
set 102:11 104:20
  154:3,4 184:10
  198:4 273:16
sets 210:22
setting 267:6
settings 18:2
seven 55:22 235:6
  237:9
severe 138:10,11
  138:12 139:6,11
shaking 8:15
shape 139:13,15
  258:18
share 16:16 73:19
  74:13 104:3
  107:21 163:7,9
  163:12 169:6,8,8
  169:11,13 171:5
  171:8,11,14
  267:17
shared 74:15
  159:22 160:1
  171:10,19 244:8
sharing 171:22
  251:6
Shawky 87:3
sheet 272:7
sheets 223:16
shelf 39:3
shelter 182:8

shelves 38:20
shelving 39:2
Shield 232:2
  233:9
Shirley 1:6,12 2:2
  4:4,13 6:3,13
  12:5 103:22
  112:11,22
  202:12 246:8
  271:3 272:3
  274:2 275:2
shirleytabb.com
  22:16 25:10
  233:1
shoot 148:12
shop 96:1
short 55:14 81:4
  133:13 158:3
  207:11 264:12
Shorthand 273:3
  273:6
shortly 184:5
  245:19
shot 261:20
shots 150:1,6
  162:18
shouldn't 115:14
show 59:20 120:7
  140:20,21
  174:17 185:10
  185:11 245:4,12
showed 109:16
  115:16 218:15
  218:15
showing 93:11
  132:13 181:12
  184:14,16 203:9
  204:9 249:13
shown 92:17,20
  248:3
siblings 91:14
  92:19
sick 106:19
  119:22 120:2
  122:8,9,13,15,16
  123:1,1,5,12,14

123:16 124:5,12
124:22 125:13
125:21,22
127:19 131:6,14
131:17 132:22
148:1 149:11,18
150:15,16,19
151:7,16,16
152:7,8 159:7
234:4 242:17
257:10 264:1
sicknesses 137:18
side 40:5 59:17
  116:3 214:21
  244:13 269:9,10
  269:14,15,16
sign 94:1
signature 127:15
  127:16 195:16
  271:2 272:13
  274:22 275:22
signed 117:16
  131:10 242:6
  272:7
significant 110:11
signing 130:19
  131:5 132:19,20
signs 93:20
similar 251:4
simple 170:12
simply 100:9
  170:1
single 28:2 37:12
  104:14
sister 14:17 15:3
  29:21 30:4,15
  103:21 104:1
  252:18
sister's 14:18
sit 73:2 77:16
  81:21 106:14
  242:4 254:14
site 25:9,14
sitting 108:2
  122:6 135:13
  149:1 162:1

223:17 226:12
situation 94:12,21
  95:1 96:2,4,16
  97:12 99:4,8
  100:18 101:6
  186:13
situations 100:11
  118:22
six 55:22 63:7
  170:17,21 182:1
  188:22 189:3
  209:18 235:6
  264:19
size 158:16
skill 102:10
skirt 186:9,12
sleep 144:4
  162:20 170:20
  185:21 223:8,18
  226:21 228:4
  229:18 253:15
  253:16,17
sleeping 157:10
  158:3,15 162:8
  169:18 170:13
  170:15 172:8
  176:6,14 177:15
  177:22 178:9,13
  179:1,17,18
  180:2 183:4
  217:8,14,20,20
  218:1,5,17,21
  219:3 220:14
  224:5 227:11,20
  229:10 239:21
  243:14 256:20
  258:22 259:12
  259:21 262:17
sleepy 134:22
slept 182:5 223:15
  223:17
slips 123:12
small 20:20
  227:12
Smith 81:5,5,8
snowball's 213:16

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

300

socially 83:9
sociology 33:4
soft 174:21 175:5
  175:22
sold 24:11,12
  42:18 47:6,10
  49:8 66:1
solely 28:17 40:12
solved 184:1
somebody 39:15
  60:3 79:21
  107:2,12 136:2
  152:13 172:10
  180:11,12
  224:21,22
  266:12,12,18
  267:5,8,13
someplace 170:19
son 15:10,13,14
  29:12 30:3
Sondra 61:18,22
  62:13 66:16
  68:11 69:4,8,19
  80:12
son's 15:11
  104:14
soon 153:21
sorry 20:1 29:3
  44:13 47:8
  54:17 75:12
  76:3 78:1 79:5
  86:22 115:16
  128:6 137:20
  146:20 153:5
  166:19 171:11
  181:15 190:4,11
  197:20 201:11
  211:22 214:19
  215:1 216:5,16
  221:22 222:1
  223:19,22 231:8
  231:19 251:14
sort 250:20
  258:11
soul 254:2
sounds 14:8 99:22

100:19 117:15
sources 182:4
South 3:15 235:1
space 39:3
speak 68:5 77:18
  77:19 84:12
  108:5 110:22
  111:6,16 112:10
  142:19
speaking 79:18
  84:19 115:14
  142:20 247:12
  255:10
speaks 128:2
spearheaded
  66:19
special 35:9 78:19
  88:15
specialist 56:8,10
  60:7,8,11 80:19
  107:17 130:11
specialists 80:21
specific 9:13
  87:10 95:16,18
  95:19 105:7
  116:4 123:22
  125:21,22
  160:22 167:19
  172:17 221:18
  251:22
specifically 21:21
  174:9 218:6
  267:4,20
specifics 228:22
speculation
  206:18 207:7
  227:2
speculative 180:3
  183:7
speech 111:18,20
  137:14,15 142:7
  142:18 143:2,3
  200:9,13,14,18
  200:21 201:7,15
  201:18 202:4
  203:4 204:1

spell 6:12 15:5
  29:8
spend 23:20 104:6
  226:5 262:10
spending 258:17
spent 139:19
  149:14 182:3
  224:3,11
spin 79:16,19
  221:6,9,10
  263:15 268:18
spinning 221:6,12
spoke 56:13 79:14
  108:1 110:13
  112:9,10 262:16
  266:15
spoken 153:20
Springer 3:22
  6:19
Square 2:8
squigglies 136:10
stabilized 126:15
stabilizing 138:20
stable 48:12
stabled 126:15
stack 117:22
staff 26:7,9,10,11
  26:13,18,22 27:4
  68:6,7 71:17
  77:13 107:5,21
  110:19,21,22
  111:10 112:18
  177:18,19 184:7
  255:6,17 258:14
  262:9
staffing 110:13
stakeholders
  222:5,6 252:13
stand 95:13
  213:16
standards 99:14
  99:16 202:15
standing 107:2
  112:18 140:16
standpoint 56:14
stars 136:12

start 17:11 20:7
  24:6 50:13
  81:13 91:2
  113:8 120:4
  236:6 248:22
  261:10
started 17:13 22:6
  22:12 32:5,5,18
  38:13,16 41:11
  46:18 136:14,15
  173:1 174:5
  179:9 219:17
  234:15 235:21
  236:7 260:19
starting 80:2
  123:4
starts 26:4 216:21
  248:19
state 6:11 31:12
  124:15,16
stated 94:17 132:4
  201:19 202:1,3
  247:18
statement 126:8
  141:3,4,5,10,11
  149:8 153:20
  178:8 250:15
statements 127:12
  140:19 141:17
states 1:1 199:11
stating 94:15
  126:9 205:5,6
statute 221:18
stay 64:22 81:6
  83:11 139:1
  149:12 161:14
  226:22 253:18
  258:11
stayed 149:19
  168:21
staying 78:21
  150:11 243:8
stays 36:5
stenographically
  273:11
steps 5:7 192:13

244:7
Steven 197:11,14
Stewart 80:16,17
  80:18 82:2,3
  83:9,12,17
  164:13 165:19
Stewart's 159:21
sticky 117:14
stood 214:16
stop 65:3 67:3
  71:10 107:14
  138:5 157:12
stopped 179:7,7,8
  187:21 264:20
  264:21
stored 38:20
stores 38:18 39:5
stories 71:16
  105:19 165:15
  178:11,11 184:5
story 106:9,17
  160:4,5 175:17
  183:22 184:12
  185:5 187:13
Stowe 5:10 193:9
  193:13
straight 173:7
straightforward
  101:2
strategies 55:19
  77:22
strategy 156:6
streamline 73:13
street 2:9 3:6,14
  28:14 51:19
  99:3 135:21
streets 234:5
stress 120:20
  134:12 137:3
  146:17 148:4
  234:16 235:17
stressed 148:2
strict 91:21
strike 20:2 35:11
  43:17 124:8
  129:6 166:19

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

301

179:22 201:11
204:14 205:7
224:1 247:5
260:14
**stroke** 120:16,19
123:7 246:20
**strongest** 187:13
**strongly** 116:19
**struggle** 55:5
233:10
**stuck** 9:12
**studio** 234:22
**stuff** 110:22
117:22 207:9
233:18
**submit** 118:1
155:17 165:9
180:7
**submittal** 242:12
**submitted** 155:12
173:7 174:20
180:9 187:12
198:9 214:10
242:2 246:3,19
**submitting**
152:16 155:13
**substantiate**
225:8
**substantiated**
225:11
**subtopics** 11:12
**successful** 7:13
**succinct** 73:9 74:8
**suffering** 256:1
**sugar** 120:20,21
121:3 137:8
**sugars** 138:21
**suggest** 103:8
**suggested** 102:12
102:21 103:10
107:15,17
115:14 136:22
**suggesting** 115:12
255:11
**Suite** 3:5,15
**summarily** 209:3

**summary** 5:12,15
12:13 194:10
195:3,12 196:6
196:17 207:3
208:21 210:22
214:7,12
**Sundays** 261:6
**superiors** 268:16
**supervise** 36:9
57:1 64:9
**supervised** 54:3
57:8,19 226:19
**supervising** 54:9
**supervision**
103:13 182:19
**supervisor** 6:19
10:18 54:2 57:3
57:22 58:1,13,19
60:11,19 62:13
63:5,6,10,12,14
63:17,19,19,22
64:22 65:3,7
66:12 69:4,9,15
69:21 70:19,20
75:15 76:9,14
111:17 157:17
173:22 174:1,5,6
251:1 252:1
**supervisors** 68:16
75:5
**supervisory** 11:20
53:15 61:20
243:4
**supplied** 132:12
**supplies** 231:22
**supply** 209:1
**support** 26:16
208:2 210:5
**supported** 26:10
66:22 67:2,4
115:7,10
**supporting**
116:21 129:3
210:2 268:16
**supportive** 101:18
102:1,4,8,19

103:15 104:7
115:8,17
**supposed** 73:11
79:6,8,20 85:4
209:4
**suppressed** 217:3
217:15 219:3
220:9
**suppression**
219:21 220:11
221:13 222:7
**sure** 7:13,16,21
8:17 9:16 11:6,8
12:20,21 13:11
29:9 34:4 38:19
39:1 58:8 72:13
77:15 79:13,17
81:18 91:10
96:11 97:7
124:4,10,13
131:8 144:14
149:18 154:15
161:19,20,21
165:4 186:10,14
190:6 207:10
235:11,13
242:10 257:12
263:13 270:10
**surprise** 179:8
**suspected** 224:19
**suspicions** 240:13
**switch** 62:11
**sworn** 6:4 96:10
**synonymously**
73:12
**system** 86:14,16
251:19 253:8
258:6 262:18
**S-H-I-R-L-E-Y**
6:13
**S-O-N** 66:16

_____

**T**

**T** 4:8 274:1,1
275:1,1
**Tabb** 1:6,12 2:2

4:4,13 5:17 6:3
6:13,15 12:5
14:19 15:1
24:21 25:3
30:12,18 66:9
84:8 101:9
126:20 128:8
133:18 140:5
141:22 148:20
155:11 173:4
174:8,14 176:5
188:6 191:5
205:9 206:14
239:14,20
245:15 246:8
259:19 271:3
272:3 274:2
275:2
**table** 108:2
**taillights** 136:5
**take** 9:1 20:1 25:3
31:15 42:8
54:21 79:4 85:2
103:12 104:6,18
105:12 108:11
108:15 110:8
119:7,11,17
121:2,2,5,9
123:1,5,16
126:19 129:13
130:4 131:21,21
132:6,8 133:13
137:6 144:13
149:21 150:1,6
151:4 158:5,22
160:4,5 161:2
162:21 163:21
163:21 171:4
180:11,13 181:9
188:21 189:16
192:1 194:4
196:10 198:20
209:7 215:13,17
216:3 219:16
221:7,7 225:18
226:17 237:2,12

239:6,9 244:7
248:2 256:7
261:19,20
263:12
**taken** 7:1 25:14
99:12 106:7
108:21 128:10
135:4,6 159:8
180:10 208:18
224:17,19 229:3
229:11,17 243:8
273:8,11
**takes** 252:13
**talk** 9:13 13:18
14:16 42:3 79:1
79:20 80:3,8,11
85:4 103:8,10
111:13,21
145:14 162:18
186:11,13 228:7
242:5 247:13
252:12 263:10
263:11
**talked** 14:10,17
99:4 102:15
107:7 111:11
155:1,22 257:7
267:4
**talking** 9:14 38:5
50:14 80:4
107:6,7 141:18
153:12 156:5
175:19 184:7
190:4 219:10
220:20 235:18
241:11 243:13
245:13 253:10
254:22 256:19
263:15
**talks** 210:8
**tantamount**
219:21 221:13
**tape** 257:7
**taped** 257:21
**tax** 232:6 233:15
233:18,19

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

302

**taxes** 233:21
  260:10
**teachers** 240:15
**team** 26:21 170:3
  170:4 184:19
**tear** 190:19
**technical** 164:19
**teenager** 158:3
**telephone** 3:8,17
  72:12
**television** 92:18
  93:11
**tell** 9:8 10:16 12:2
  12:3 25:8,19
  52:10,13 79:21
  98:14 102:13
  107:19 108:3
  119:20 161:13
  162:5 163:9
  165:1 174:15
  197:20 230:7
  245:22 250:11
  254:21 262:14
  262:14,15 266:1
  267:14
**telling** 29:4 117:7
  220:13 222:4,5,5
  234:3 250:13
**Temporarily**
  150:3,4
**temporary** 226:2
**ten** 82:20 151:4
  264:11
**tend** 8:9 34:1
**tenets** 124:21
**term** 29:2 88:14
  88:17 240:6
**terminal** 131:22
**terminated** 36:13
  75:22 201:12
  264:11 266:2
  267:1
**termination** 75:16
  200:20 201:16
  201:20,21,22
  202:3,7 203:4

208:2,6,12
  259:18
**terminology**
  213:14 221:18
**terms** 29:21 39:2
  68:7 106:15
  107:20 115:3
  116:17 124:4
  219:6 242:16,20
**territories** 41:5
**territory** 40:3
  41:2 263:20
**testified** 6:5 29:11
  29:12 88:6 91:9
  91:16 93:9
  94:19 101:22
  102:20 103:14
  103:20 105:10
  109:17 110:14
  113:5 115:6
  121:16 125:6,12
  125:15 126:3
  128:21 129:2,18
  131:12 132:2
  146:3 149:22
  150:16 173:6
  174:17 176:5
  209:12 212:6,21
  213:1 217:18
  255:9 257:10
  258:7,20 259:16
  260:6 261:1
  265:18 266:1,4
**testify** 79:5 94:3
**testifying** 100:1
  110:17 146:14
  146:17 238:13
  265:11
**testimonies**
  220:13
**testimony** 10:22
  12:19 14:4
  20:22 25:12
  26:17 32:12,18
  36:15 37:16
  50:22 58:13

60:3 73:19 74:5
  74:12,15 84:17
  85:2 87:7 90:13
  90:17 91:6,17
  94:14 95:22
  96:9 97:3,15
  100:14 108:13
  112:20 113:4,4,5
  113:7,9,10,17,20
  113:22 121:12
  122:12 133:2
  138:9,12 148:19
  150:2,14 153:17
  153:18 155:22
  157:21 158:1
  168:19 173:8
  176:7,11 183:12
  183:17 185:13
  201:22 217:6,12
  218:9 219:20
  232:11,19 233:3
  233:7 241:16,18
  256:6 259:7,13
  265:15 268:2
  272:4,6
**Texas** 30:14 38:11
  39:8
**thank** 6:15 13:5
  55:8 69:20
  70:16 95:15
  105:2 143:7
  185:9 195:20
  202:8 215:22
  238:14 239:14
  239:17 248:2,11
  270:3,4,7,8,10
  270:21
**therapists** 27:2
**therapy** 35:2,8
**thing** 50:1 54:6
  88:18 151:17
  153:15,15
  174:19 221:14
**things** 7:20 10:8
  41:16 56:17
  79:17 82:18,22

102:1,3 104:22
  114:4,5,7 119:2
  137:10,12
  253:21 259:4
  268:1
**think** 11:11 21:19
  24:11 27:3 32:6
  34:1,2 35:13
  38:6 39:8,12
  43:17 44:4 46:2
  48:14 54:19,21
  55:4 57:12 58:1
  59:7,10,10 63:7
  64:7 65:13,22
  67:7 73:17
  74:19 75:3,4
  81:10,10 82:14
  83:2 87:22
  94:20 96:2
  102:20 104:22
  120:18 130:1
  134:7 137:8,9,11
  142:13 159:9,9
  167:3 168:11
  170:16 174:8,19
  176:18,19,22
  184:21 200:16
  203:19 204:6,21
  205:5,9 206:2,7
  206:14,21,22
  207:6 208:15
  209:3 213:20
  214:15,16 219:7
  221:8,9 224:22
  227:10 228:11
  229:12 235:13
  239:7,9 242:16
  246:8 264:7,17
  264:19 266:18
  267:3
**thinking** 81:18
  202:13
**third** 135:21
  147:15 209:10
  209:15 266:5,8
**thought** 49:16

69:12 73:10
  74:5 83:1 102:8
  102:16 104:3
  110:6 121:9
  122:9 137:13,13
  139:5 172:11
  174:22 179:7
  214:11 230:14
  254:11 262:6
**thousand** 233:4
  261:3
**threaten** 217:5
**threatening** 93:2
**threatens** 217:4
**three** 24:14 44:5
  44:11 46:4
  120:22 147:16
  167:5,6 168:1
  207:18 223:10
**ticking** 230:21
**tight** 182:14
**tightened** 46:10
**times** 92:8 136:1
  147:12 149:16
  151:15 186:19
**Timonium** 46:22
**title** 51:11,12
  154:5,6,7,8
  155:5 181:15
**today** 6:17 10:7
  13:1,12 73:2
  77:16 81:21
  122:6 246:9
  256:6 270:5
**told** 80:2,6,8,10
  102:10 104:2,16
  104:21 107:15
  111:6 116:20
  134:11 148:3
  162:7 173:5
  179:12,13 185:5
  185:6 197:14,19
  197:21 198:3,5,5
  211:11,14
  222:21 224:9
  229:1,5 230:3,4

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

303

244:10 249:22
250:3 262:10,16
**tone** 112:12,14,16
**toner** 233:12
**tongue-tied**
137:17
**top** 73:4 78:21
216:19 244:19
255:20
**topic** 256:11
**total** 255:8
**tournament** 56:19
66:20 67:13
**town** 38:5
**toys** 182:7
**track** 48:14
**trade** 99:2
**traditional** 124:12
**trained** 34:5
200:2
**training** 34:3
77:18 79:14
241:3
**transcript** 4:9
270:13 273:9
**transcription**
272:6
**transition** 62:8
**traumatic** 185:18
**traumatized**
227:21
**traumatizing**
227:22
**treating** 133:19
**treatment** 35:5
**trees** 106:21
**tried** 59:17,18,20
73:7 105:12
**trivia** 106:3
**trouble** 233:8
254:8
**true** 95:3 118:6
119:1 127:12
155:8 173:13,15
173:16 176:13
180:19 183:20

185:14 186:7,13
196:5 197:3
211:7,8,9 215:15
255:9 272:5
273:9
**trust** 170:2 184:20
270:18
**truth** 165:22
166:2,3 174:15
187:19 266:2
**try** 18:2 53:2,8
88:2 105:3
121:2,10 134:11
136:21 148:13
163:5 185:4
254:6 258:11
**trying** 23:11,14
25:16 67:7
73:13 88:3 91:3
91:7 107:13
109:22 121:7
125:4 144:17
146:16 148:2,17
149:2 150:12
153:17 170:8
172:9 174:12,14
186:3,11 202:1
219:13,14
226:16 228:4
229:5 234:6
257:20 258:17
261:18 264:18
**tummies** 253:15
**tunnel** 135:21
136:1,3,3
**turn** 101:19 127:6
146:19,20
147:14 188:15
195:13 199:1
207:15 209:7,9
239:10
**turned** 92:15
107:3
**TV** 43:13,14,16
44:3,9 45:20
46:2 92:20

164:5,7 186:19
266:13
**twice** 259:8
**two** 12:20 31:19
46:4 64:8 71:8
71:19 80:20
82:14 119:12
163:6 167:4,12
168:14 170:17
171:1 174:8
175:17,18
189:18,19
197:10 203:14
218:15 223:10
223:15 245:4
253:12 265:7
**Two-page** 4:12
**type** 43:12 45:18
67:9 91:5 99:5
225:14 242:22
264:6 268:21
269:8
**typewriting**
273:12
**typically** 67:10
173:21 224:16
252:6 253:3
**T&N** 18:14 26:11
**T-A-B-B** 6:13
**T.C** 253:11

_____

**U**
**Uh-huh** 21:17
32:20
**ultimately** 109:4
**Uma** 184:5
**unable** 85:19
137:12 142:19
**Unacceptable**
189:7 245:9
**unannounced**
179:4
**unauthorized**
251:20 253:9
254:19 255:5,14
**unaware** 259:12

**unclear** 268:4
**uncles** 30:20
**undergraduate**
31:11 33:9
99:17
**underneath**
128:12 195:13
**understand** 8:20
9:9,16,17,22
27:3 47:15 67:9
75:3,4 81:20
85:6 87:19
90:21 92:12,21
97:6,20 100:15
100:22 104:5
105:4,6 109:13
109:14 111:4,19
120:11 125:2,3
129:22 131:1,2,8
133:3,4 134:3
136:8 138:18
145:11 147:12
148:19 150:14
150:14 151:2
154:8 156:19
171:3 177:11
178:20 184:21
186:21 187:2
200:3,4 205:20
205:21 206:18
207:5 214:1
219:19,19 220:7
221:9,10,11
227:8 229:15
234:14 238:10
247:13 253:5,7
**understanding**
56:4 58:12 61:9
62:12 67:16
86:10,12 88:19
89:11,15,17 90:3
90:4 92:4,5 94:4
98:6,7 100:5,7
213:4,6 215:2
223:22
**understands**

201:2 205:19
**understood** 10:1
116:2
**unemployment**
264:9,12,14,21
**unethical** 217:4
**unfamiliar** 224:16
**Union** 197:11,13
208:12 209:3,5
211:10
**unique** 102:10
**unit** 54:15 107:8
155:19 161:6
**UNITED** 1:1
**university** 31:10
31:11,20,21 32:1
32:13,15 33:3
236:5 237:2
**unlawfully** 217:3
217:15 219:3
**unsatisfactory**
70:4
**updated** 11:14
**uphold** 195:10
**upper** 26:3
**upset** 170:4,5
**upstairs** 164:12
**urgency** 163:6
168:13 170:11
**use** 9:5 26:13 28:4
52:15 89:7,17
124:6 159:17
161:10 166:13
184:17 185:11
**utilize** 68:8

_____

**V**
**v** 1:8 274:2 275:2
**vacation** 231:20
**vague** 114:20
145:10 177:10
180:3 183:7
**Valley** 47:1,1,4
48:22 49:19
**variables** 187:4
**Vaughn** 257:16

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

304

258:3
**vehicle** 233:11
**vein** 8:8
**verbatim** 98:13
**vested** 148:9,10
148:10 263:8,9
**view** 73:15,20,20
74:5,7,13,16
187:7 227:4,8
**village** 252:14
**violate** 199:20
**violated** 140:10
140:11 142:1,2,6
142:8 143:1
199:7 200:8,13
203:3,8 204:9
249:13,20 250:1
250:4
**visceral** 187:13
**vision** 135:9,12,13
135:16 136:8,13
136:17,20
137:21 138:6,7
139:5 146:7
148:2 268:14
**Visions** 18:15
**visit** 48:2 53:1
**visits** 179:9
**visual** 186:6
**voice** 7:19 113:19
**voicemail** 149:17
257:11,16 258:4
258:6,6,10
**voicemails** 72:12
72:13
**Vytorin** 134:21,22
**V-Y-T-O-R-I-N**
134:21

**W**

**wait** 31:13 169:20
**waited** 169:17
**waiting** 67:14
169:21 224:5
**waits** 223:9
**waive** 92:22

**waived** 92:17 93:4
93:11,15,22
271:2
**waiver** 93:6,17,18
93:20
**Walgreens** 39:9
**walk** 31:4 53:7
**walked** 107:2
172:6
**Walker** 117:15
194:11 197:12
242:7 248:9
**walking** 99:3
107:1
**want** 7:21 12:2
30:20 37:15
65:13,14 67:3
69:16 84:8,18
86:15 97:1
98:22 105:3,8
108:10 113:5
119:22 120:6
131:21 140:5
141:12 149:6
152:2 157:13,14
158:5 162:7
199:9 202:12
213:12 227:6
254:17 258:1
262:21 268:1
269:15 270:4,8
270:11
**wanted** 37:7
39:15 45:7 59:2
72:16 74:2
77:12,19 79:13
79:15 102:8
106:12 111:21
115:2 129:19
130:2 136:21
137:6 162:6
183:18 186:10
186:14 187:12
187:16 190:6
197:14 238:11
264:20 266:10

268:5,6 269:2
**wants** 118:10
267:5
**wares** 24:1
**Washington** 1:13
2:10 3:7,16 4:17
28:15 181:13
218:16 219:8
220:19,21 259:3
262:8 265:12
**wasn't** 31:13 38:4
39:12 75:20
81:11 95:15
109:14 115:5
118:6 122:1
131:22 154:8
156:9 157:21
165:21 170:5
172:4,5 220:7
238:12 245:20
250:2 254:19
264:18 268:20
**watch** 230:20
**watching** 226:12
**way** 23:9 33:17,19
71:1 74:2 88:2
94:7,8 98:17
107:14 109:11
109:15 110:14
115:5 118:14
135:1,20,22
137:5,12 142:1,7
166:1 175:4
186:13 199:8
205:2 221:15
266:16,18,19
268:9
**ways** 101:18
162:12 211:3
**Web** 25:9,14
**Wednesday** 182:3
182:12
**Wednesday's**
93:10
**week** 104:21,22
106:1 121:8

167:12 235:3,4,8
257:12 260:17
264:15
**weeks** 71:8,19
119:17,18
236:12 264:11
264:16
**welcome** 70:17
**welfare** 33:4,5,8
86:14,15 182:4,9
262:18
**well-known** 80:1
**went** 12:10 31:12
31:19,22 34:15
38:11 42:10,15
44:18 45:8
48:13 49:21
50:7 72:1 80:9
104:2,16 116:1
117:12 145:17
145:18 157:1
161:6 164:12,16
170:14 173:2,2
173:11 174:7,12
174:13 177:18
183:17 195:4
223:18 234:18
235:2,4,6 238:3
242:3 254:3
262:4,5 265:13
265:15
**weren't** 79:6,8
151:7 153:18
170:22 198:15
215:7 268:15
**We'll** 91:2 239:9
**we're** 32:7 50:18
50:18 70:13
119:4 133:13
143:5,10,14
168:17,18 174:8
188:15 190:8
193:3 194:14
196:9,10 198:19
199:1 221:10
239:6

**we've** 6:16 99:4
170:15 239:7
**what's** 14:18 30:5
30:11 93:19
133:7,9 188:6
207:3,11 213:11
234:8,12 236:1
**WHEREOF**
273:16
**where's** 32:15
**whichever** 215:16
263:22
**white** 37:9 38:6
161:11 197:11
197:14,19,20,21
207:12 211:14
223:13
**wholistic** 270:16
**who's** 267:10
**willing** 152:18
254:15
**wish** 9:1 47:11
**witness** 6:6 25:22
29:20 37:5 38:3
55:3,9 59:10
60:15 66:1 74:1
82:7 85:7 86:13
87:21 88:16,18
88:21 89:10,12
89:22 90:22
94:3,5 96:19
97:7,21 100:16
101:13 111:5
114:12,21
120:14 127:22
128:3 130:1
131:2 133:4
138:19 140:14
140:19 141:7
142:10,12 143:7
145:12 149:7,7
151:3,18 152:11
160:21 173:1,15
176:18 177:12
178:21 180:4
181:21 185:2,3

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

305

185:16 187:3
199:14,16 200:1
200:2,4 201:1,4
202:14,20 204:5
204:19,21
205:14,18,20
206:19 207:8
208:8,10 217:10
219:5,7 221:19
224:9 227:2,4
231:4 234:15
238:6,8,13
239:17 270:7,10
270:14 273:16
**witness's** 86:10,11
113:3,10
**woman** 28:2
262:12
**won** 106:5
**wonderful** 41:16
49:10 50:22
264:4
**wondering** 228:3
**won't** 159:19
**Woodlawn** 49:19
49:21 50:3
**word** 67:20
**words** 25:17
144:17 170:8
186:12 187:8
202:2 247:18
249:6 251:11
**work** 10:13 17:22
18:7,22 19:7,9
26:20,22 27:19
27:19,22 28:8,12
32:1 33:13,13
34:2,2,14,15
35:12 36:2
39:13 42:10,15
44:17 45:8 53:4
57:18 58:9 63:3
64:12,15 65:13
65:18 69:6
70:11 78:4,22
96:1,11,14 99:7

99:11 100:9
101:5 102:16
104:20 118:7,8,9
118:13,20,22
120:18 121:4,7
121:16 123:8
124:9 126:10,13
129:11,12 131:6
131:17 132:22
135:4,6 137:6
147:16 148:6
149:2,11 150:7,7
150:9,16,17
152:8 154:21
155:19 157:13
172:7 226:9,11
231:22 232:7
243:1 247:14,21
253:13 260:15
263:6,7 268:13
268:21 269:8,12
**worked** 16:15
17:9 35:13
37:11 44:1,15
48:21 49:1,17,18
50:10 52:7,19,20
52:20 53:5
56:18 78:11
81:9 82:16
109:11 135:20
154:10 157:19
157:20 186:20
221:4 240:17
**worker** 33:15,18
33:20 34:4 35:2
51:13 52:2,3,6
53:10,16 54:2
56:14 58:14,20
60:12,19 61:20
77:18,21 83:2
92:21 94:9,10,19
94:22 95:10,10
95:11,13,17,17
95:18,20,21 96:1
96:4,5,7,10,13
96:20,21 97:11

97:14,16,22 98:2
98:5,11 99:1,3,9
99:11,20 100:2,5
100:6,17 101:3
148:7 161:22
162:1,3 177:4
206:10 222:21
230:4 232:1
241:1,2 257:17
266:15
**workers** 11:2,9
13:9 33:22 34:6
49:14 51:4 54:4
54:10 56:13
59:15 68:13,13
77:19 78:5,10
95:12 96:22
98:8,10,15 99:15
182:22 240:14
241:7 269:12
**worker's** 100:10
222:22 230:5
**working** 12:21
16:15 17:11,13
17:20 18:11
34:18 38:13
43:21 55:17
57:11 62:16
81:13 82:7 99:2
157:15 162:12
177:4 232:12
256:3 261:4
263:2,3,21
266:17 267:16
269:16
**works** 226:3
**worried** 70:20
**worth** 152:10
**wouldn't** 87:22
90:5 118:16
124:19 129:13
129:14 139:1
154:15 165:17
180:4
**write** 67:17
149:13 150:19

151:7 152:8
212:15
**writing** 147:8,20
148:5 149:2
198:9 215:10,11
**written** 4:21
79:22 90:1 92:2
190:14 209:17
209:19
**wrong** 14:9 25:17
52:13 61:10
105:11 142:17
203:7 218:10
**wrote** 67:14
212:18

_____

**X**

**X** 4:2,8 5:3

_____

**Y**

**yeah** 21:1 24:11
36:12 53:21
73:17 115:18
126:1,21 139:17
212:1 221:12
**year** 20:8,9 24:7,9
32:5,18,22 39:14
42:3 44:2,3,15
47:5 48:7,8,9
58:2,5 63:8
64:20 81:17
106:2 219:12
232:20 233:4
251:4
**years** 31:20 36:11
53:8 64:8 92:1
147:17 182:3
183:6,9 185:19
185:19 234:4
264:22,22
**yelled** 112:21
**yep** 265:1
**yoga** 137:4
**York** 39:15,16,17
39:20,22,22 40:1
40:2,3,4,5

**young** 158:15
161:9 228:17
**youth** 220:5
252:22
**you'd** 69:10
172:19
**you're** 8:16 19:4
23:8 24:17,19
25:4 27:8 29:6
33:6 38:4 54:9
70:17 78:2 85:3
95:22 96:10,13
97:8 99:1
100:17 109:14
111:19 124:10
131:17 132:19
132:20,21
140:18 141:6,18
148:2,21 149:1
149:11 150:15
150:15,19
151:15,16,17
152:7 157:5
174:11 191:6
194:5,18 203:13
203:15 206:4,8
207:19 214:1
216:8 231:10
233:8,17 244:16
260:16 270:12
**you've** 7:10,11
65:18 105:10
108:8 109:17
140:6 141:22
174:17 186:16
186:19 224:16
228:9
**Yvonne** 153:20

_____

**Z**

**Zub** 6:15
**ZUBERI** 3:11

_____

**$**

**$100,000** 22:21,22
**$125** 235:3,4,8

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

306

237:13
**$1500** 232:4,5
**$250** 20:4,4,13,15
20:15 21:11,16
232:16
**$300** 19:11,22
20:7,19 264:15
**$350** 232:1
**$60,000** 21:19
22:2,17 232:20
232:22
**$700** 232:3
**$92,000** 265:1

**0**

**06-0789** 1:6

**1**

**1** 4:12 24:22
144:19 197:11
199:12
**1-120053** 1:19
**1-275** 1:20
**10** 5:9,13 192:3
193:3,5 194:1
**10:00** 1:15 261:12
**10:11** 6:2
**100-year-old**
261:17
**1005** 5:11
**11** 5:11 193:15
194:2,4,7,9
202:9 207:15
209:8 248:7
251:10 255:21
**11:40** 84:5
**1100** 3:5
**12** 5:13 194:15
195:1 196:2
212:5
**12:57** 84:6
**126** 4:14
**13** 5:16 195:21
196:10,20,21
215:22 216:2
**14** 92:1 182:3

216:13,17,18
264:22,22
273:19
**14th** 120:17
**14-year** 252:5
**144** 4:16
**15** 5:9
**1612** 3:6
**17** 246:15,19
**17th** 273:17
**18** 10:17 255:22
**18th** 12:15 128:12
258:9
**181** 4:17
**188** 4:19,20
**189** 4:21
**19** 202:21 203:7
248:20 249:2
**191** 5:6,7
**192** 5:9
**193** 5:11
**194** 5:13
**195** 5:16
**1971** 31:19
**1974** 31:22
**1976** 33:1 34:10
35:13
**1980** 35:15 36:16
**1980s** 35:16
**1986** 41:6,13 42:5
**1987** 170:14 176:7
219:17
**1992** 53:5 263:3
**1993** 53:19
**1996** 11:16
**1999** 11:17 81:19

**2**

**2** 4:14,20 126:16
127:6 128:6,8
255:21
**2nd** 146:22 245:8
245:20 247:8,22
**2:04** 133:15
**2:11** 133:16
**20** 19:20,20 20:22

21:11,16 232:15
**200** 28:14
**2000** 181:14
218:22 219:1,12
219:12,14,17
220:20
**20001** 2:10 3:16
**20006** 3:7
**2001** 28:16
**2002** 58:6,6 62:5,5
65:5,6 66:10,11
66:15,17,18 67:8
68:11 69:3
70:14 73:6 78:1
78:4 82:3
**2003** 62:5 64:21
64:21 65:5,5,6,9
68:16,20 70:13
70:18 73:6
75:10,11,13
76:13 178:22
217:22
**2004** 75:5,9 76:18
76:19 81:11
104:10 114:18
114:21 116:8
178:22 217:22
241:10
**2005** 4:20 5:9,13
5:16 10:17 11:2
17:14,15,18
19:13,14,15,17
20:15,21 21:12
21:14 53:6 57:7
76:8,13 78:4,16
85:9 101:10,14
101:21 103:4
114:9,13 116:8
116:15,20 119:7
119:14,15,21
120:1,17 121:14
121:14,19 122:5
123:2,13,17
125:10 126:4
127:20 128:12
133:11,12,21

136:14 137:19
138:1,10,13,16
139:7,11 140:3
143:17 145:7
146:4 170:15
177:8,16 178:7
179:17,19 197:2
202:21 203:7
218:2,6,6 219:15
232:13,15 236:8
241:11,18 242:9
242:21 243:9
245:9 248:8,20
249:2 251:6,12
251:16,18
252:17 256:1
**2006** 20:15 21:18
21:19,20 22:12
22:13,17 232:22
260:7
**2007** 20:12,17
22:19,20,21 24:8
24:15,16 233:3
260:7 261:3
**2008** 1:14 20:11
273:18
**2012** 273:19
**202.408.0034** 3:8
**202.724.6650** 3:17
**23** 182:2
**23rd** 133:10
**239** 4:6
**24** 4:12 53:5
**265** 4:5
**27** 197:2
**27th** 198:16

**3**

**3** 4:16 5:11,16
144:10 248:8
251:6
**3rd** 53:6 57:6
145:7 181:14
202:8 208:22
209:8
**3,000** 182:17

**3,200** 182:18
**3:00** 147:5,6,7,8
147:17,20 148:5
149:1,12
**3:18** 188:1
**3:27** 188:4
**30** 19:21 36:4
185:19
**300** 117:8
**300-page** 117:2,18
241:22 242:12
**31** 199:10,11
**32** 199:12
**350** 134:6
**38** 15:14

**4**

**4** 4:17 181:6,18,21
**4th** 2:9 3:14
**4:45** 261:9 263:5
**4:57** 239:11
**40** 36:4,12
**400** 120:22 134:6
**401(k)** 264:2
**441** 2:9 3:14
**48** 207:21

**5**

**5** 4:19 130:16
188:2,7
**5:13** 239:12
**5:51** 271:3
**50** 36:4,12
**54** 234:4
**59** 216:12,18

**6**

**6** 4:5,20 188:16,19
190:5,7,8 245:7
247:9
**6:00** 260:20
261:11
**600** 3:15 134:7
**609** 51:19
**63** 216:10,11

**7**

DEPOSITION OF SHIRLEY TABB
CONDUCTED ON FRIDAY, FEBRUARY 8, 2008

307

| | | | | |
|---|---|---|---|---|
| **7** 4:21 176:4<br>189:13 190:5,5,6<br>190:7 191:11<br>**73** 32:6<br>**74** 32:6 | | | | |
| **8** | | | | |
| **8** 1:14 5:6 181:15<br>191:2,6,6,11,12<br>191:13,15 199:1<br>199:11<br>**8-18-05** 131:7,18<br>**8:00** 263:5<br>**8:15** 263:5,5<br>**80** 260:18,18,18<br>**81** 35:14 36:17,18<br>**82** 35:14 36:17,18<br>40:17<br>**86** 40:17 41:14<br>42:13<br>**87-year-old**<br>104:11<br>**89** 48:17,20 49:4 | | | | |
| **9** | | | | |
| **9** 5:7 168:16 176:4<br>191:20 192:7,10<br>193:3 246:12<br>**9-16-05** 131:7,18<br>**9-16-2005** 128:12<br>**9:00** 261:11<br>**90** 48:18,20 49:4<br>260:18<br>**900** 72:11<br>**92** 49:5,6 53:12<br>66:5<br>**93** 53:18 54:1<br>**94** 53:19 54:1<br>**94%** 106:16<br>**95** 54:19,22 55:7<br>**96** 66:6<br>**97** 66:5,6<br>**99** 81:18 | | | | |