1 (Pages 1 to 4)

---

**1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

* * * * * * * *

SHIRLEY TABB          *

    Plaintiff          *

    vs.          * CA No. 1:06CV00789(PLF)

DISTRICT OF COLUMBIA, ET AL *

    Defendant          *

* * * * * * * *

VIDEO DEPOSITION OF MINDY GOOD

Washington, D.C.

Tuesday, December 4, 2007

12:36 p.m.

Job No. 2-117463

Pages 1 - 212

Reported by: Leslie L. Schneider

---

**2**

The video deposition of Mindy Good held at the offices of:

L.A.D. Reporting Company

1100 Connecticut Avenue, N.W.

Suite 850

Washington, D.C.  20036

Pursuant to notice, before Leslie L. Schneider, a Notary Public in and for the District of Columbia.

---

**3**

A-P-P-E-A-R-A-N-C-E-S

ON BEHALF OF THE PLAINTIFF:

Richard Condit, Esquire

Law Offices of Richard Condit

1612 K Street, N.W.

Suite 1100

Washington, D.C.  20006

(202) 408-0034

ON BEHALF OF THE DEFENDANT:

Zuberi Williams, Esquire

Assistant Attorney General

District of Columbia

441 Fourth Street, N.W.

Sixth Floor North

Washington, D.C.  20001

(202) 727-6295

Also Present:  Shirley Tabb

David Bayles, Videographer

---

**4**

CONTENTS

| Witness | Page |
|---|---|
| MINDY GOOD | |
| Examination by Mr. Condit | 6, 192 |
| Examination by Mr. Williams | 173 |

* * *

| Exhibits | | Page |
|---|---|---|
| 1 | Notice of Deposition and Request to Produce Records | 38 |
| 2 | Handwritten notes | 138 |
| 3 | Channel 9 Story | 147 |
| 4 | WUSA Print Story | 153 |
| 5 | WUSA 9 Story | 155 |
| 6 | Memo, 9/20/05, from Ms. Ahluwalia | 157 |
| 7 | E-mail, 9/20/05, from Ms. Ahluwalia | 159 |
| 8 | The Washington Times article | 165 |
| 9 | E-mail, 10/7/05, from Ms. Donald | 166 |
| 10 | Report of Performance Rating | 168 |
| 11 | Report of Performance Rating | 170 |

Note:  Exhibits marked and attached.

Case 1:06-cv-00789-PLF-JMF   Document 42-8   Filed 04/23/2008   Page 2 of 79
VIDEOTAPED DEPOSITION OF MINDY GOOD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

2 (Pages 5 to 8)

5

1          P-R-O-C-E-E-D-I-N-G-S
2          - - - - - - - - - -
3          THE VIDEOGRAPHER:  Here begins tape
4    number one in the deposition of Mindy Good in the
5    matter of Shirley Tabb versus District of Columbia,
6    et al, in the United States District Court for the
7    District of Columbia, civil action number
8    1:06CV00789PLF.
9          Today's date is December 4, 2007, the
10   time is 12:36 p.m.  The video operator is David
11   Bayles.  This video deposition is taking place at
12   1100 Connecticut Avenue, northwest, D.C.
13         Would counsel please voice identify
14   yourselves and state whom you represent.
15         MR. CONDIT:  My name is Richard Condit, I
16   represent the plaintiff Shirley Tabb.
17         MR. WILLIAMS:  My name is Zuberi Williams
18   and I'm representing the defendant, District of
19   Columbia.
20         THE VIDEOGRAPHER:  The court reporter is
21   Leslie Schneider of L.A.D. Reporting.  Would the
22   reporter please swear in the witness.

6

1          - - - - - - - - -
2      Thereupon,
3              MINDY GOOD,
4      the Witness herein, called for examination by
5    counsel for the Plaintiff, and, after having been
6    duly sworn by the notary, was examined and testified
7    as follows:
8      EXAMINATION BY COUNSEL FOR THE PLAINTIFF
9    BY MR. CONDIT:
10     Q   Good afternoon.  Would you please state
11   your name, business address and home address for the
12   record.
13     **A   Mindy Good, business address is 400 Sixth**
14   **Street, southwest, Washington, D.C.**
15         MR. WILLIAMS:  Excuse me.  We're going to
16   object to the home address, the personal information
17   address.  It is the policy of my office and D.C.
18   Government not to give out personal information.
19         I'm going to instruct the witness not to
20   answer the personal information.  But again, she's
21   willing to give her business address and her full
22   name.

7

1          MR. CONDIT:  Again, for the record, I
2    will note that because people frequently leave the
3    agency and because the agency cannot guarantee the
4    production of those individuals once they leave the
5    agency for further deposition testimony or trial
6    testimony that I am requesting that the witness
7    provide that information.
8          I understand that you have instructed the
9    witness not to answer.  I do not believe that
10   instruction to be proper, but will not belabor the
11   point beyond making that note on the record.
12         MR. WILLIAMS:  Okay.  And the District
13   just stands by its previous instruction not to answer
14   in the deposition of Derek Stewart.
15   BY MR. CONDIT:
16     Q   All right.  Ms. Good, my name is Richard
17   Condit, I am counsel to the plaintiff in this matter,
18   Shirley Tabb.  And this afternoon we'll be asking you
19   a series of questions regarding issues in Ms. Tabb's
20   case.  If you don't understand any of my questions or
21   have a problem hearing me or I've used a term or
22   phrase that you don't understand, please don't answer

8

1    the question and ask me to clarify or identify for me
2    what you're not understanding and I'll be happy to
3    rephrase my question.  Is that agreeable to you?
4      **A   Yes.**
5      Q   All right.  In addition, you will need to
6    answer all of my questions with a verbal response,
7    yes or no or some statement, shrugs or other gestures
8    are not necessarily something that the court reporter
9    can pick up for the purposes of creation of the
10   transcript.  Is it agreeable to you to answer my
11   questions verbally?
12     **A   Yes.**
13     Q   Then with respect to the testimony that
14   you're giving today -- excuse me, you have taken the
15   oath a few moments ago and do you understand that in
16   taking the oath, you are swearing to provide full and
17   complete answers to my questions?
18     **A   Yes.**
19     Q   Can you please state your current
20   position and title, if you will.
21     **A   Public Information Officer.**
22     Q   And for whom do you work?

Case 1:06-cv-00789-PLF-JMF    Document 42-8    Filed 04/23/2008    Page 3 of 79
VIDEOTAPED DEPOSITION OF MINDY GOOD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

3 (Pages 9 to 12)

9

1    A   D.C. Child and Family Services Agency.
2    Q   When did you first become the Public
3  Information Officer for the Child and Family Services
4  Agency?
5    A   2002.
6    Q   Prior to becoming the Public Information
7  Officer for Child and Family Services Agency for whom
8  did you work?
9    A   The Multimedia Consortium Center on New
10  York Avenue.
11    Q   What is the Multimedia Consortium Center?
12    A   Ah, I'm sorry, Communications Consortium
13  Media Center on New York Avenue.
14    Q   Okay.  What is the Communications
15  Consortium Media Center?
16    A   It's a non-profit organization that does
17  communication consulting for other non-profits.
18    Q   What position did you have with that
19  organization?
20    A   Special projects director.
21    Q   During what period of time did you occupy
22  that position?

10

1    A   2001 to 2002 when I came to the agency.
2    Q   And did you have an immediate supervisor?
3    A   In that position?
4    Q   Yes.
5    A   Yes.
6    Q   And who was that?
7    A   Kathy Bonk.
8    Q   What position did Ms. Bonk have in the
9  organization?
10    A   Director.
11    Q   Did Ms. Bonk evaluate your performance
12  during the time that you worked for the consortium?
13    A   No.
14    Q   Prior to working for the Communications
15  Consortium Media Center for whom did you work?
16    A   The Hamilton County Department of
17  Human -- of Job and Family Services.
18    Q   What state is that?
19    A   Ohio.
20    Q   What position did you have there?
21    A   Director of communications.
22    Q   Who did you report to as your immediate

11

1  supervisor in that position?
2    A   Director.
3    Q   Who was that?
4    A   Don Thomas.
5    Q   During what period of time did you work
6  at the Hamilton County Job and family Services
7  Center?
8    A   1993 I believe, to 2001.
9    Q   Why did you leave that position?
10    A   To come back to Washington.
11    Q   Had you worked in Washington previously?
12    A   Yes.
13    Q   And in what position or for what
14  organization?
15    A   I began my career here in 1972 -- '73 I'm
16  sorry, and had worked in Washington until 1992 when I
17  went to Ohio for seven years and then I came back.
18    Q   When you began your career in 1972 in
19  Washington, D.C. for whom did you initially work?
20    A   I worked for Wiley Learning Systems.
21    Q   What position did you have there?
22    A   I don't remember what they called it.  I

12

1  was a writer.
2    Q   And how long did you have the position or
3  until what year did you have the position at Wiley
4  Learning Systems?
5    A   About a year and a half.
6    Q   So now we're at 1973, '74, is that right?
7    A   Uh-huh.
8    Q   And what position did you have then?
9    A   I was a freelance writer for about two
10  years.
11    Q   For whom did you work as a freelance
12  writer?
13    A   Myself.
14    Q   And being self-employed, I take it that
15  you had contracts with groups or organizations?
16    A   Correct.
17    Q   And what -- generally what kinds of
18  groups did you do work for?
19    A   There were some associations, there were
20  some Federal Government agencies and a couple of
21  private companies.
22    Q   And after you were a freelance writer,

Case 1:06-cv-00789-PLF-JMF   Document 42-8   Filed 04/23/2008   Page 4 of 79
VIDEOTAPED DEPOSITION OF MINDY GIBSON
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

4 (Pages 13 to 16)

13
1  what position did you have next?
2      A  I went to work at MCI Telecommunications
3  Corporation.
4      Q  What year did you begin working at MCI?
5      A  I don't recall.
6      Q  Sometime after 1974?
7      A  Yes.
8      Q  What position or positions did you have
9  at MCI?
10     A  Marketing support specialist there.
11     Q  What did a marketing support specialist
12  do?
13     A  They were marketing telephone services,
14  and I prepared materials, marketing materials for
15  them, and also supported the sales teams.
16     Q  When did you leave that position at MCI?
17     A  I don't recall.  Maybe a year and a half
18  later.
19     Q  So now we're maybe 1975, '76 period?
20     A  Uh-huh.  Yeah.
21     Q  And what position did you next have after
22  the MCI position?

14
1      A  Worked at the -- I'm trying to think of
2  the name.  I worked for a consulting firm that was
3  owned by a man named Tom Clary.
4      Q  Where was the consulting firm located?
5      A  In northwest Washington.
6      Q  What kinds of things did you do for the
7  consulting firm?
8      A  I was in charge of writing proposals and
9  doing work for -- communications work for his
10  clients.
11     Q  How long did you work in that position?
12     A  Five years.
13     Q  So that takes us to about 1981, '82?
14     A  Yes.
15     Q  What position did you have then?
16     A  I went to Coopers and Lybrand.
17     Q  What position did you have there?
18     A  Marketing support specialist.
19     Q  And was the marketing support specialist
20  job at Coopers and Lybrand similar to what you were
21  doing at MCI, supporting the marketing team,
22  preparing materials?

15
1      A  Yes, with the difference that this
2  practice within Coopers and Lybrand was interested in
3  marketing the Federal Government, but they did not --
4  their consultants were not well-versed in how to
5  write a Federal proposal so I was teaching their
6  consultants how to write Federal proposals and also
7  teaching them how to basically market within the
8  Federal Government using the tools that are available
9  to do that.
10     Q  Did you have any other positions other
11  than marketing support specialist at Coopers and
12  Lybrand?
13     A  No.
14     Q  When did you leave that position?
15     A  I stayed there for about a year and then
16  I went to Dual and Associates.
17     Q  What is Dual and Associates?
18     A  It was a management consulting firm that
19  was working in the defense sector, it was a minority
20  small business, and I was the director of
21  communications and strategic planning for them.
22     Q  How long did you work in that position?

16
1      A  About five and a half years.
2      Q  That brings us up near 1989 roughly?
3      A  Well, it brings me up to -- it should
4  bring me up to when I went Ohio.  I worked at Dual
5  until I went to Ohio.
6      Q  Okay.  Why did you decide to take the job
7  with the Ohio agency?
8      A  When I went to Ohio, I did not have a job
9  so I was open to a great many different things and
10  that one happened to come available and was a good
11  offer.
12     Q  I don't I think I asked you this, what
13  was your position in the Hamilton County job in
14  family services?
15     A  Director of communications.
16     Q  Director of communications.  And what was
17  your general job duties for that position, director
18  of communications?
19     A  I was in charge of handling the media.  I
20  was in charge of all their external communication.  I
21  was in charge of their internal communication.  I had
22  a staff of three for most of the time I was there.  I

Case 1:06-cv-00789-PLF-JMF   Document 42-8   Filed 04/23/2008   Page 5 of 79
VIDEOTAPED DEPOSITION OF MINDY GOOD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

5 (Pages 17 to 20)

17

1 wrote their public information documents.
2    Q   What did the Hamilton County job in
3 family services agency do?
4    A   It was a large umbrella agency for the
5 county that had welfare, child welfare, child
6 support, adult protective services, and day-care, all
7 under a single umbrella for the entire county.
8    Q   What major cities or towns in Ohio were
9 in Hamilton County?
10    A   Cincinnati.
11    Q   How did you learn about the position with
12 Kathy Bonk's group?
13    A   Kathy Bonk has been a consultant for the
14 Annie E. Casey Foundation for some time.  The Annie
15 E. Casey Foundation is very active in the child
16 welfare arena.  So while I was in Ohio, I met Kathy
17 Bonk at various child welfare functions, and when I
18 began looking for a job to come back to Washington,
19 she was one of the people I contacted about possibly
20 having a job opening or being able to suggest
21 something to me.
22    Q   And so you came to D.C. and worked for

18

1 her initially?
2    A   Yes.
3    Q   At some point in time I take it then you
4 became familiar with the Child and Family Services
5 Agency?
6    A   Yes.
7    Q   While you were working with Ms. Bonk did
8 you consult with CFSA?
9    A   Yes.
10    Q   And what kinds of consulting activities
11 did you engage in with CFSA?
12    A   Again, Annie E. Casey Foundation who used
13 Kathy Bonk as a communication consultant was
14 interested in doing more work in the District, and
15 they told Kathy, please, you're right there in that
16 town, so please take good care of the people at CFSA.
17 So I was the consultant that Kathy was sending down
18 to CFSA to do the kinds of things that they needed
19 done since they had just come back from receivership.
20       They were interested in putting out an
21 external newsletter and we were consulting about
22 that.  They also were doing some press releases and

19

1 we were consulting about that.
2    Q   And about how much time per week or per
3 month would you say you spent working with CFSA in
4 this consulting capacity?
5    A   Maybe 15 to 20 percent.
6    Q   So other than working with CFSA, what
7 other organizations or groups did you work with while
8 you were in this consulting capacity?
9    A   We were doing some work directly for the
10 Casey Foundation and I was doing that work.  They
11 also were doing some work for the Carnegie Foundation
12 and I was involved in that.
13    Q   Did the work for the foundations, Casey
14 and Carnegie, have to do with media and
15 communications or something else?
16    A   The work for Casey had to do with media
17 and communications.  The work for Carnegie was
18 training but it was communication training but we
19 were holding the training course.
20    Q   So how is it that you came to be offered
21 a position at CFSA?
22    A   Brenda Donald, who worked at CFSA, when

20

1 that position -- or called me and said they had a
2 position available and was I interested.
3    Q   What did Ms. Donald say the position was
4 or what would it entail?
5    A   Public Information Officer.
6    Q   Does the Public Information Officer
7 position have a formal description?
8    A   Yes.
9    Q   And who crafted that description?
10    A   There was a description when I got there
11 and I redid it.
12    Q   Who had prepared the description when you
13 got there, do you know?
14    A   I don't know.
15    Q   When did you re-do the position
16 description?
17    A   During the first year that I was there.
18    Q   Why did you feel the need to re-do the
19 description?
20    A   The agency was coming out of receivership
21 and all of the position descriptions in the Public
22 Information Office were left over from the

Case 1:06-cv-00789-PLF-JMF Document 42-8 Filed 04/23/2008 Page 6 of 79
VIDEOTAPED DEPOSITION OF MINDY GOOD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

6 (Pages 21 to 24)

21

1 receivership and really were not very communication
2 oriented and needed to be clarified and streamlined.
3    Q   Let's talk about your education and
4 background.  What is your post-high school education
5 in terms of degrees you may have received and the
6 years you may have received them and institutions you
7 may have received them from?
8    A   B.A. 1973.
9    Q   What institution?
10    A   The American University.
11    Q   Did you have a particular major?
12    A   Literature.
13    Q   Any other degrees or certifications from
14 any educational or academic institutions?
15    A   No.
16    Q   All right.  Aside from formal education
17 through an academic institution, have you received or
18 been part of formal training courses of any kind?
19    A   Yes.
20    Q   And what kinds of training?
21    A   They are on my resume.  I can't list them
22 all here.  If you would like to have them, we can get

22

1 them for you.
2    Q   Can you generally describe the kinds of
3 training?
4    A   Quite a bit of training in strategic
5 planning.  At least two courses in media.
6    Q   And by courses, what are you referring
7 to?
8    A   Seminars.
9    Q   And these are seminars that you attended
10 or participated in?
11    A   Yes.
12    Q   And when did those seminars take place?
13    A   Again, I'll be happy to give you a copy
14 of my resume, they're all listed there.  I can't pull
15 them up in my head right now.
16    Q   Okay.  Well, if you would provide your
17 resume to Mr. Williams, then he can transfer it to me
18 when it's appropriate.
19    A   Is that okay?
20        MR. WILLIAMS:  No problem.  We might
21 redact out the home address.
22        MR. CONDIT:  Okay.  All right.

23

1 BY MR. CONDIT:
2    Q   Now, aside from trainings, do you have
3 any professional licenses of any kind?
4    A   No.
5    Q   Have you ever received any training in
6 social work?
7    A   No.
8    Q   Have you ever received any training in
9 counseling?
10    A   No.
11    Q   Prior to becoming the director of the
12 Public Information Office at CFSA, or the Public
13 Information Officer as you refer to it, did you have
14 occasion to work with social workers?
15    A   Yes.
16    Q   What was your earliest job experience
17 working with social workers?
18    A   Hamilton Department of Job and Family
19 Services.
20    Q   And what kinds of work did you do with
21 social workers there?
22    A   Again, I was representing them.  I was

24

1 the spokeswoman for the agency so I was representing
2 the agency's programs, activities, policies and other
3 activities to the public.
4    Q   Did the Hamilton County agency have any
5 issue -- legal issues like the CFSA had with respect
6 to being sued in a class action lawsuit over child
7 protection?
8    A   Yes.
9    Q   Okay.  And tell me about what you
10 understood about that legal issue.
11    A   They were sued by their local Legal Aid
12 Society.  It was -- the difference is that D.C.
13 Department of Child and -- or D.C. Child and Family
14 Services of the District Government was sued by
15 Marshall Lowery at Children's Rights, which is a
16 large national organization which I believe at this
17 point has about 12 lawsuits throughout the country.
18 Hamilton County's lawsuit was local.  It was local,
19 the Legal Aid Society.
20        Otherwise it was similar in that they
21 sued around foster children not having the services
22 that they were guaranteed under Federal law and that

25

1    kind of thing.  And when I went to work there, that
2    lawsuit had been going on for five years.  It was
3    five years underway.
4        Q    Was the lawsuit at Hamilton County
5    concluded by the time you left the agency?
6        A    Yes.
7        Q    And if you know, what was the vehicle or
8    basis for the conclusion of the lawsuit?
9        A    They negotiated what I believe could be
10    called an exit strategy.  In other words, a series of
11    goals or benchmarks that needed to be met in order
12    for the court to bring the lawsuit to an end or
13    decree it at an end, and they brought in a third
14    party outside consultant to evaluate once those
15    benchmarks were negotiated to determine whether or
16    not the agency had met those benchmarks.  And the
17    consultant concluded that yes, the agency had met
18    them, so they were able to go to court and bring the
19    thing to a conclusion.
20        Q    Do you know whether the Hamilton County
21    agency was ever in receivership?
22        A    No, it was not.

26

1        Q    Do you know what organization provided
2    the monitoring or the assessment of whether or not
3    the agency in Hamilton County was meeting its
4    benchmarks?
5        A    It was a consultant, and if my memory is
6    correct, he was named Paul Vincent.  He does a great
7    deal of work for the Casey Foundation.
8        Q    Do you know what Mr. Vincent's area of
9    expertise is?
10        MR. WILLIAMS:  Objection, relevance.
11    Answer the question.
12        A    Only that he's a noted expert about child
13    welfare systems, but beyond that, I don't know.
14        Q    In your position at CFSA, do you maintain
15    any records?
16        A    Yes.
17        Q    What kinds of records do you maintain?
18        A    Project records, records of evaluations
19    of my staff, documents that are informational about
20    different activities and initiatives the agency is
21    pursuing, a certain amount of data.
22        Q    What kinds of data?

27

1        A    There's a report about how many children
2    are currently in the system that I use frequently to
3    answer that question for the media and the public.
4        Q    All right.  So you maintain project
5    records, records involving staff evaluations,
6    information regarding agency initiatives, and certain
7    kinds of data related to the child welfare system, is
8    that right?
9        A    Yes.
10        Q    Anything else?
11        A    No.
12        Q    And how do you maintain these records?
13        A    Some are on the computer, some are in
14    paper files.
15        Q    And are the paper files maintained in
16    your office?
17        A    Some are and some are maintained at
18    support staff where support staff sit, and yeah,
19    that's it.  Oh, and some are in the main server.  The
20    report about how many children are in the system is
21    in the main agency server.
22        Q    Does the main agency server have a letter

28

1    or other designation?
2        A    Faces.
3        THE COURT REPORTER:  Faces?
4        THE WITNESS:  Uh-huh.
5    BY MR. CONDIT:
6        Q    So you are able as the Public Information
7    Officer to access Faces?
8        A    Yes.
9        Q    Are you able to access all data that is
10    in Faces?
11        A    No.
12        Q    What is your access restricted to?
13        A    It isn't restricted.  It's my capability
14    to navigate the system.  I really am only interested
15    in the most part in management reports that are in
16    there about different things that are going on and I
17    know how to get management reports.  That's just
18    about the only thing I know how to do in Faces.
19        Q    Okay.  Aside from data that you access
20    that's maintained on the Faces system, is there any
21    other data that you maintain electronically, such as
22    computer files, e-mail, that sort of thing?

Case 1:06-cv-00789-PLF-JMF    Document 42-8    Filed 04/23/2008    Page 8 of 79
VIDEOTAPED DEPOSITION OF MINDY GOOD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

8 (Pages 29 to 32)

29

1      **A   Yes, we have documents that we've**
2  **prepared about the agency, our public information**
3  **material, we have computer files of those materials.**
4      Q   And where is that maintained in the
5  server system?
6      **A   There is -- we each have under CFSA's**
7  **system a drive with our own name on it that's a**
8  **personal drive, and the Office of Public Information**
9  **also has a shared drive.**
10     Q   What is the designation for the Office of
11 Public Information shared drive?
12     **A   V-drive.**
13     Q   Was there a V-drive when you first came
14 on at CFSA in 2002?
15     **A   No.**
16     Q   When did the V-drive arrive?
17     **A   I don't remember.**
18     Q   Was it sometime after 2002?
19     **A   Yes.  We asked for it and got it.**
20     Q   Why did you ask for it?
21     **A   So that when we're all working on**
22 **documents at the same time, instead of e-mailing them**

30

1  **all around, we can just go to the share drive and use**
2  **the share drive to work on the documents.**
3      Q   Now, the personal drive that you have
4  designated for your work, does that have some type of
5  letter designation?
6      **A   I think it's called Mindy.**
7      Q   Now, e-mail, how is e-mail maintained or
8  how do you maintain e-mail?
9      **A   The way the system works is --**
10         MR. WILLIAMS:  I'm sorry, objection.
11 Before you answer the question, I just want to note
12 that Ms. Good is not a technical specialist.  Of
13 course, she can testify to how she thinks she
14 maintains the e-mail and the data structure of the
15 server and things of that nature, but just for the
16 record, she is not a tech specialist or to my
17 knowledge has, you know, any special knowledge about
18 computers or the way the system is maintained, but
19 she should answer the question.
20         MR. CONDIT:  We won't hold it against
21 her.
22 BY MR. CONDIT:

31

1      Q   So what is your understanding about how
2  your e-mail in particular is preserved, if it is at
3  all?
4      **A   The e-mail that I can see in Outlook will**
5  **not let you keep very much without telling you that**
6  **your e-mail is over the size limit.  So as a result**
7  **of that, I keep maybe ten days' worth of e-mail on**
8  **the system and that's it, because it constantly asks**
9  **you to delete and I don't archive anything.**
10     Q   Was the e-mail system that the agency
11 used when you came on in 2002 the Outlook system?
12     **A   No.**
13     Q   When did the Outlook system come into
14 play?
15     **A   I don't remember.**
16     Q   Do you know what happened to the e-mail
17 that you created and received prior to the time that
18 the Outlook system came into play?
19     **A   No.**
20     Q   Have you ever inquired about that?
21     **A   No.**
22     Q   Other than -- strike that.  I take it

32

1  that you have a desktop computer that you work from,
2  correct?
3      **A   Yes.**
4      Q   Do you also have a laptop that you work
5  from?
6      **A   No.**
7      Q   Do you work from home at all?
8      **A   Yes.**
9      Q   So do you have a computer from which you
10 work at home?
11     **A   Yes.**
12     Q   Is that a desktop or a laptop?
13     **A   Desktop.**
14     Q   Okay.  The desktop computer that you have
15 now at the agency, how long have you had that
16 particular computer?
17     **A   I think my computer has been changed once**
18 **since I've been there but I can't say that for sure.**
19     Q   Okay.  And if it was changed or when it
20 was changed, did you perform the change such as
21 transferring the files over --
22     **A   No.**

Case 1:06-cv-00789-PLF-JMF   Document 42-8   Filed 04/23/2008   Page 9 of 79
VIDEOTAPED DEPOSITION OF MINDY GOOD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

9 (Pages 33 to 36)

33

1    Q  -- that sort of thing?  Who would do
2  that?
3    **A  We have support from our internal**
4  **information systems people.**
5    Q  And are there people in particular that
6  you've worked with on computer transfer or computer
7  issues within the Public Information Office?
8    **A  No, it's whoever they assign to do it for**
9  **us.**
10    Q  And I take it that these computer
11  specialists, if you will, are people that work for
12  CFSA or do they work for the D.C. Government outside
13  of CFSA?
14    **A  CFSA.**
15    Q  So if you had a computer change at some
16  point in your tenure, it would have been the case
17  then that the computer specialist would have set up
18  your new computer and transferred any files over, is
19  that correct?
20    **A  Correct.**
21    Q  Now, in terms of the computer that you
22  currently have, do you maintain files not on the

34

1  server but on the hard drive of that computer?
2    **A  No.**
3    Q  Do you know whether or not any e-mail or
4  files are backed up onto the hard drive of the
5  computer that you're currently operating?
6    **A  I don't know.**
7    Q  Do you -- strike that.  The computer that
8  you have at home, has that computer which you use for
9  work from time to time been the same computer since
10  2002?
11    **A  Yes.**
12    Q  And when you work from home, do you have
13  a way of remotely connecting with the agency server?
14    **A  Yes.**
15    Q  And is that how you work from home?
16    **A  I am able to e-mail but I cannot get into**
17  **my drives from home.  I can't get into the agency**
18  **drives from my home computer, only e-mail.**
19    Q  Okay.  So you can access the agency
20  e-mail through Outlook?
21    **A  Yes.**
22    Q  But you cannot access your actual files

35

1  at the agency?
2    **A  Correct.**
3    Q  Are there home or private e-mail
4  addresses that you have used during your tenure to
5  receive e-mail related to work at CFSA?
6    **A  I'm sorry, ask the question again.**
7    Q  Are there private or home e-mail
8  addresses that you have used to do work with CFSA?
9    **A  I send documents back and forth to the**
10  **office via from home to the e-mail system, yes.**
11    Q  Okay.  And what e-mail address do you use
12  when you're sending documents to the system?
13    **A  My home e-mail address.**
14    Q  What is that?
15    **A  Well, I used to use my home e-mail**
16  **address but now I've learned that large files that**
17  **I'm creating go better if I access the e-mail at the**
18  **office and send the document to myself, downloading**
19  **it through the office system.**
20    Q  All right.  So in the case you were just
21  describing, you access the Outlook system remotely
22  and then through the e-mail interface, you basically

36

1  e-mail it to yourself at the office?
2    **A  Correct.**
3    Q  Now, aside from doing that, are there
4  e-mail addresses that you have used prior to working
5  with the Outlook system as you just described that
6  you used for some of the work that you've done with
7  CFSA?
8    **A  Yes.**
9    Q  And what are those addresses?
10    MR. WILLIAMS:  Objection.  I think that
11  this is the same type of personal information, her
12  personal e-mail address.  I understand where you're
13  going and I understand, but I think it's going to be
14  our position not to release the personal e-mail
15  address for the same reason about her personal phone
16  number, personal address.  So we're going to take
17  that position concerning the e-mail address.
18    MR. CONDIT:  My response is that that
19  analysis, with due respect, doesn't work because
20  unlike the situation with the home address, which may
21  not be used generally in a work context, the e-mail
22  addresses are used in a work context at times.  And

Case 1:06-cv-00789-PLF-JMF   Document 42-9   Filed 04/23/2008   Page 10 of 79
VIDEOTAPED DEPOSITION OF MINDY GOOD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

10 (Pages 37 to 40)

37
1  so I believe we're entitled to discover that
2  information and I don't believe there's any
3  applicable privilege or statutory or regulatory bar
4  to the testimony about that information.
5       MR. WILLIAMS:  Okay.  Well, I'm going to
6  instruct her not to answer that for the same basis as
7  before, but I understand your position, but for now
8  we're going to object to that.  We may give that
9  information up at another time, but for right now for
10 that personal information, I'm going to instruct her
11 not to answer for that, but there may come a time
12 that we just release that information for that
13 reason.  But out of an abundance of caution, I
14 instruct you not to answer that right now.
15      MR. CONDIT:  All right.  I obviously
16 don't agree with your position but I understand.
17 BY MR. CONDIT:
18      Q  Ms. Good, aside from the computer that
19 you have at home, the computer that you have at the
20 office, are there any other electronic devices that
21 you use, such as a Blackberry or a similar device for
22 work-related activity?

38
1       A  No.
2       Q  So you don't have a portable device like
3  a Blackberry, for example?
4       A  No.
5       Q  Do you have an agency issued cell phone?
6       A  No.
7       Q  Do you have any other -- other than a
8  cell phone or a device like a Blackberry, any other
9  electronic device that is used for work?
10      A  No.
11      **(Deposition Exhibit Number 1 was marked**
12 **for identification and attached to the transcript.)**
13 BY MR. CONDIT:
14      Q  Let me show you what has been marked as
15 Deposition Exhibit Number 1.  This is a Notice of
16 Deposition with an Appendix attached requesting
17 documents.  I ask you to take a look at it and tell
18 me if you've seen this before.
19      (Pause for document review.)
20      A  **I have not seen this before.**
21      Q  So I take it then that you have not
22 brought any documents for example with you regarding

39
1  this matter of this case today?
2       MR. WILLIAMS:  You can answer the
3  question truthfully.
4       A  No.
5       Q  Have you been asked by anyone within the
6  agency or within the District Government to search
7  for documents that are related to this case?
8       A  **Yes.**
9       Q  And what types of documents have you
10 searched for?
11      A  **Calendars.**
12      Q  Calendars.  And what kinds of calendars
13 are you searching for?
14      A  **Calendars for the last two years or the**
15 **years from 2005 to the end of 2006.**
16      Q  And did you maintain calendars during
17 that period?
18      A  **Yes.**
19      Q  And how did you maintain calendars?
20      A  **Handwritten.**
21      Q  In a planner?
22      A  **Yes.**

40
1       Q  Would this be a daily planner kind of
2  book?
3       A  **No, monthly planner.**
4       Q  Have you located those planners?
5       A  **Yes.**
6       Q  Have you provided them to counsel for the
7  District?
8       A  **Yes.**
9       Q  Were you asked to search for any other
10 documents related to this case?
11      A  **No.**
12      Q  Ms. Good, as you're sitting here today in
13 this deposition, do you understand whether
14 Mr. Williams, counsel for the District, represents
15 you personally or simply represents the District
16 Government?
17      A  **Yes.**
18      Q  What is your understanding?
19      A  **He represents the District Government.**
20      Q  Have you retained or sought counsel with
21 respect to this case or this issue?
22      A  **No.**

41

1    Q  In terms of records, do you have records
2  that you've maintained, whether they're e-mail,
3  electronically maintained files or hard copy files
4  that pertain to Shirley Tabb?
5    A  Yes.
6    Q  What kinds of records have you maintained
7  that pertain to Shirley Tabb?
8    A  There's a personnel file because she was
9  an employee who reported to me, and there is also
10  some -- actually that's it, her personnel file.
11    Q  And the personnel file that you're
12  referring to, where is that maintained?
13    A  In my office.
14    Q  What kinds of documents or information
15  are contained in that file?
16    A  Personnel evaluations, memoranda.  There
17  may be some copies of e-mails there.
18    Q  Has anyone from the District Government
19  asked you to produce that file?
20    A  Yes.
21    Q  And have you produced it for them?
22    A  Yes.

42

1        MR. WILLIAMS:  And for the record, sorry,
2  I don't mean to interrupt, I gave you -- I gave
3  counsel a packet of documents this morning in our
4  continuing effort to get all the documents we can.
5  Those documents were given to me by Ms. Good, that's
6  what she had turned over to me earlier this week.  So
7  just for the record.  But I understand Counsel just
8  received that this morning and hasn't had an
9  opportunity to review those documents.
10        MR. CONDIT:  Correct.
11  BY MR. CONDIT:
12    Q  Let me though, Ms. Good, I'm going to
13  hand you the packet that we were given today which
14  seems to have a number of documents in it, probably
15  more than 10 or 15.  It's about a quarter to half
16  inch thick.  I'd like you to take a look at it and
17  tell me whether or not this is the packet of
18  documents that you provided.
19        (Pause for document review.)
20    A  Yes, except that I believe this portion
21  all belongs together because what's back here are the
22  attachments to something that's in the front.

43

1    Q  I understand.
2    A  Other than that, yes, these are the
3  documents.
4    Q  Thank you.  When you took your position
5  with CFSA or since taking that position, have you
6  received any particular training in personnel law or
7  personnel management as it pertains to being an
8  employee in the District of Columbia?
9    A  No.
10    Q  Have you received any training or been
11  provided any information on the rights of employees
12  in the District of Columbia under the District of
13  Columbia Whistle Blower Protection Act?
14    A  No.
15    Q  Have you received any information or
16  training on the Federal Family and Medical Leave Act?
17    A  No.
18    Q  Have you received any information and
19  training on the District's Family and Medical Leave
20  Act?
21    A  No.
22    Q  Did you ever get any training since

44

1  coming on to CFSA in how to handle personnel matters
2  of any kind?
3    A  They have had mandatory sexual harassment
4  training.
5    Q  Is that the only type of training --
6    A  Yes.
7    Q  -- that you have received?
8    A  Yes.
9    Q  Have you received any training since
10  becoming an employee at CFSA on confidentiality laws
11  or restrictions that apply to information maintained
12  by the agency on children or families?
13    A  Not training.
14    Q  What have you received in that arena?
15    A  In child welfare there are certain
16  Federal confidentiality laws that span the United
17  States but then each state or jurisdiction has its
18  own laws.  So as the Public Information Officer, when
19  I came to the District, I understood that the
20  confidentiality laws here would differ somewhat from
21  those we had had in Ohio, and I sought out our
22  General Counsel's office early in my tenure there to

Case 1:06-cv-00789-PLF-JMF   Document 43-9   Filed 04/23/2008   Page 12 of 79
VIDEOTAPED DEPOSITION OF WANDA GOOD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

12 (Pages 45 to 48)

45

1  help me understand what the laws were in the
2  District.
3      Q  Who did you speak to in the General
4  Counsel's office?
5      A  I can't remember who our General Counsel
6  was when I first got there.  I have talked at some
7  times to Paul Kratchman about these issues.
8      Q  Although you can't remember the name of
9  the General Counsel, is it the case that you actually
10  had conversations with the General Counsel?
11      A  I think that what they did was they got
12  me to understand that the District code is on-line
13  and is fairly accessible, so I was able to go and
14  pull District code on what the confidentiality laws
15  are to give myself an idea of how much they differed
16  from Ohio or whether they differed from Ohio.
17      Q  But did you speak to the General Counsel
18  at CFSA about those issues, confidentiality issues?
19      A  Not in general.  We at times speak about
20  them in terms of particular instances.  But did we
21  sit down and have a conversation about that
22  particular topic, no.

46

1      Q  And what was Mr. Kratchman assigned or --
2  well, strike that.  What did Mr. Kratchman tell you
3  about those issues, the confidentiality issues?
4      MR. WILLIAMS:  I'm going to object.
5  Mr. Kratchman is an attorney in the office?
6      THE WITNESS:  Yes.
7      MR. WILLIAMS:  The communications between
8  Mr. Kratchman and Ms. Good may be of the nature of --
9  may be protected by attorney-client privilege.  I'm
10  going to instruct her not to answer for the actual
11  communications.  She can testify to whether she met
12  with him, where she met with him, but I'm going to
13  instruct her not to answer as to the contents of
14  those communications because I am -- under
15  attorney-client privilege at this time.
16      Q  Ms. Good, correct me if I'm wrong, but I
17  thought I understood your testimony regarding your
18  communications with Mr. Kratchman to be of the nature
19  that you were seeking advice on -- generally on the
20  confidentiality issues as they pertain to the
21  specifics of District law, is that correct?
22      A  When I first came to CFSA, I began asking

47

1  questions about how I could find out what the
2  confidentiality parameters here were, and Paul
3  Kratchman or someone else in the General Counsel's
4  office, helped me understand that the D.C. code is
5  on-line and roughly where I needed to look in the
6  code to find what I wanted to find and that kind of
7  conversation.
8      Q  So that's all they told you was where to
9  go look in the code?
10      A  Yes.
11      Q  So you were left to yourself to figure
12  out by reading the code what the requirements were?
13      A  Yes, but when individual issues about
14  confidentiality arise, I can always go and have a
15  conversation with them.
16      MR. CONDIT:  Let's break here for lunch,
17  and if it's acceptable to you, Ms. Good, and you
18  Mr. Williams, since we're right around 1:30 now, I'd
19  like to return at 2:15 if that's not pressing too
20  much?
21      MR. WILLIAMS:  For me 2:30, I have to
22  make a couple calls.

48

1      MR. CONDIT:  2:30 is fine.
2      THE VIDEOGRAPHER:  Going off the record,
3  the time is 1:31 p.m.
4      THE VIDEOGRAPHER:  Back on the record,
5  the time is 2:36 p.m.
6  BY MR. CONDIT:
7      Q  Ms. Good, when you arrived at Child and
8  Family Services Agency in 2002, who was on staff in
9  the Public Affairs Office?
10      A  Shirley Tabb and Derek Stewart.
11      Q  And during the time at least that
12  Ms. Tabb was --
13      A  Excuse me, Eunice Spence.
14      Q  What position did Eunice Spence have?
15      A  She was a support person.
16      Q  During what period of time did Eunice
17  Spence work in the Public Affairs Office?
18      A  I do not recall.
19      Q  Did she work for more than a year after
20  your arrival.
21      A  I believe not.
22      Q  Who did Ms. Spence report to while she

Case 1:06-cv-00789-PLF-JMF   Document 42-9   Filed 04/23/2008   Page 13 of 79
VIDEOTAPED DEPOSITION OF MINDY GOOD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

13 (Pages 49 to 52)

49

1  was there?
2      A  Brenda Donald.
3      Q  Did Ms. Spence have a formal title?
4      A  Yes, but I don't know what it was.
5      Q  And you said she was a support person.
6  What kind of support did she provide?
7      A  Photocopying, filing, answering phones.
8      Q  You indicate in your testimony that
9  Ms. Spence reported to Brenda Donald. At that time
10  was Ms. Donald the Chief of Staff?
11      A  Yes.
12      Q  When Ms. Spence left her position as a
13  support person, did anyone replace her in the Public
14  Affairs Office in that capacity?
15      A  Yes.
16      Q  Who was that?
17      A  Delicia, I can't remember her last name.
18      Q  And how long did Delicia work in that
19  support function?
20      A  Maybe a bit more than a year.  I can't
21  exactly remember.
22      Q  And has anyone served in the support

50

1  position since Delicia left?
2      A  Yes.  We got Eunice Spence, she returned.
3      Q  Okay.
4      A  Then over the past year we've had a temp.
5      Q  During 2005, who was the support person
6  in the Public Affairs Office?
7      A  Eunice Spence.
8      Q  During 2005, to whom did Ms. Spence
9  report?
10      A  It was either Brenda Donald or LaTonya
11  Bryant, I'm not sure which.
12      Q  Now, correct me if I'm wrong, but in 2005
13  Brenda Donald was the director of the agency, is that
14  correct?
15      A  Correct.
16      Q  And who is LaTonya Donald?
17      A  LaTonya Bryant, she is the administrative
18  assistant to the deputy director for administration.
19      Q  Is there a reason that the support person
20  for the Public Affairs Office is reporting to someone
21  other than you?
22      A  The Public Affairs Office is looked upon

51

1  as a function of the director's office and rather
2  than having our own support, we share support with
3  other entities within that office.
4      Q  As you understand it, in 2005, what
5  entities comprised the director's office?
6      A  Chief of Staff, volunteer services under
7  the Chief of Staff and a number of support people,
8  and the Office of Public Information and a number of
9  support people.  Now, those are not all the
10  director's direct reports, but that's what I believe
11  was the -- looked upon as in the director's function.
12      Q  Let me make sure I'm understanding your
13  testimony.  So is it the case then that within the
14  director's office configuration there was essentially
15  a Chief of staff and functions under the Chief of
16  Staff, and then the Public Information Office and
17  functions under the Public Information Office, is
18  that correct?
19      A  No, the Public Information Office had no
20  functions under it.
21      Q  Okay.  So just the Chief of Staff and the
22  functions thereunder and then the Public Information

52

1  Office?
2      A  And a number of support people.  Now,
3  again, there were other direct reports to the agency
4  director but they were outside of -- they were their
5  own administrations.
6      Q  So for example, the principal deputy
7  director I assume was a direct report to the
8  director?
9      A  Correct.
10      Q  But had her own at that time
11  administrations to deal with?
12      A  Yes, and that was a program operations
13  area of the agency.
14      Q  And who did you report to in 2005?
15      A  The agency director.
16      Q  Since you came to CFSA in 2002, were you
17  always reporting directly to the head of the agency?
18      A  No.  When I first came there I was
19  reporting to Brenda Donald as Chief of Staff, and
20  when she became the director, I still reported to
21  her.
22      Q  So even though when Ms. Donald became the

Case 1:06-cv-00789-PLF-JMF   Document 42-9   Filed 04/23/2008   Page 14 of 79
VIDEOTAPED DEPOSITION OF WILLIAM GORDON
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

14 (Pages 53 to 56)

53

1  Chief of Staff -- excuse me, became the director,
2  there was a new Chief of Staff and you still reported
3  to Ms. Donald, is that right?
4      A   Correct.
5      Q   And do you know why that was the case?
6      A   No.
7      Q   Since 2002, when you arrived at the
8  agency, have you been provided with annual
9  evaluations?
10     A   Yes.
11     Q   And who would perform your evaluations?
12     A   My immediate supervisor.
13     Q   Which would be Brenda Donald?
14     A   Yes, and then Uma Ahluwalia, and my most
15  recent one has been done by Shirley Bobeau.
16     Q   When Uma Ahluwalia provided your
17  evaluation, she was serving as the interim director?
18     A   Correct.  A-h-l-u-w-a-l-i-a.
19     Q   Now, when you were evaluated, are there
20  principal areas under which you're evaluated; in
21  other words, things that you're specifically
22  responsible for or is it a more general evaluation

54

1  than that?
2      A   The District has a two-part form for
3  employees who are in the professional -- what they
4  call PMP, I'm not sure what that stands for.  The
5  first part are general characteristics and the second
6  part are specific performance goals that we negotiate
7  each year with our supervisor.
8      Q   And how would that system of performance
9  evaluation differ from say how Shirley Tabb was
10  evaluated when she worked in the Public Affairs
11  Office?
12     A   During the time that we all were there,
13  myself, Shirley, all of us, they changed the
14  performance rating system.  In other words, because
15  the Child and Family Services Agency had come out of
16  Federal receivership and become a quote/unquote
17  stand-alone cabinet level agency of the District
18  Government, it slowly has been adopting District
19  Government practices which was the case with the
20  e-mail system.
21         The evaluation system was one of those
22  areas in which we joined the District evaluation

55

1  program.  So shortly after I got there, the way that
2  we did evaluations changed and the difference between
3  PMP and the level where Shirley was -- I'm trying to
4  think what they call it -- well, the forms are
5  somewhat the same but the general areas are different
6  for non-supervisory position and for a supervisory
7  position, and the rating scales are also different.
8      Q   How are the rating scales different?
9      A   It's a little complicated to explain, but
10  ours -- they each have their own rating system,
11  depending upon the number of items you're rating
12  somebody on.
13     Q   Is it the case that during your tenure at
14  CFSA that aside from having a formal position
15  description, you also had formal performance
16  standards that you and your supervisor signed off on
17  each year?
18     A   Yes, those are the goals that I'm talking
19  about that we negotiated between us, usually five of
20  them.
21     Q   Okay.  And when Ms. Tabb worked in the
22  Public Affairs Office, did she and other employees

56

1  there also have performance standards that were
2  negotiated as you describe them?
3      A   I think the first time that I evaluated
4  she and Derek in the evaluation cycle, it was still
5  the old system, but I think after that, we went to
6  the new system, so that yes, they had individual
7  performance goals that were negotiated along with a
8  series of general qualities or characteristics or
9  capabilities that we evaluated.
10     Q   When you began working with -- excuse me,
11  for CFSA in 2002, what position did Shirley Tabb and
12  Derek Stewart occupy in the agency?
13     A   They were both public information
14  specialists.
15     Q   And what did you understand when you came
16  on in 2002 to be Shirley Tabb's particular area
17  within the Public Affairs Office or types of issues
18  or tasks that she would do?
19     A   Actually, again, they were just coming
20  out of receivership, and my understanding was that
21  during the receivership, the whole organization of a
22  number of offices, including public affairs, was

Case 1:06-cv-00789-PLF-JMF     Document 42-9     Filed 04/23/2008     Page 15 of 79
VIDEOTAPED DEPOSITION OF WILLIAM GOULD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

15 (Pages 57 to 60)

57

1 somewhat loose and informal.  So one of the main
2 tasks was to -- among me and my colleagues who were
3 brought in as the quote/unquote clean-up crew on the
4 first management team after coming out of
5 receivership, was to organize, professionalize,
6 streamline or whatever needed to be done in these
7 functions to make them operate better than they had
8 during the receivership.
9       So I think that what she was doing versus
10 Derek during the receivership, to me when I came
11 there to me it seemed pretty loose, it wasn't well
12 defined.
13    Q  Okay.  I understand it wasn't well
14 defined, but what was it, what did you understand
15 Ms. Tabb's tasks or activities to be?
16    A  She had a job description at that time
17 that included some things to do with media, also had
18 some things to do with employee recruitment, had some
19 things to do with planning events, may have had some
20 things to do with written materials, I can't exactly
21 remember.
22    Q  What about Mr. Stewart, what did you

58

1 understand his tasks mainly to be when you first came
2 on in 2002?
3    A  He was primarily doing graphic design at
4 that time.
5    Q  As you understood it, graphic design for
6 what function?
7    A  For a number of functions.  People would
8 come to him from various places in the agency who
9 needed documents of some sort and draft Derek into
10 helping them.
11    Q  About what time of the year in 2002 did
12 you take the position at CFSA?
13    A  I think it was midsummer.
14    Q  Did you provide an evaluation for Derek
15 Stewart or Shirley Tabb during 2002?
16    A  I can't remember.  My guess is I hadn't
17 been there long enough.
18    Q  Do you know who provided their evaluation
19 for that year?
20    A  No.
21    Q  What about in 2003, did you provide an
22 evaluation for Ms. Tabb and Mr. Stewart in that year?

59

1    A  Yes.
2    Q  And I assume every year thereafter?
3    A  Yes.
4    Q  So you provided evaluations, if I'm
5 understanding correctly, for Ms. Tabb for the work
6 year 2003, 2004, and did you do an evaluation for
7 2005?
8    A  I can't remember.
9    Q  But do you recall specifically doing
10 evaluations for 2003 and 2004?
11    A  Yes.
12    Q  Would the evaluations that you performed
13 be in the personnel file that you maintain in your
14 office?
15    A  Yes.
16       MR. WILLIAMS:  Clarification, which
17 personnel file, her personnel or --
18       MR. CONDIT:  Yes, her personnel file.
19 Well, I'll clarify.
20 BY MR. CONDIT:
21    Q  You described earlier when we were going
22 over records that you had a personnel file for each

60

1 of your employees or the persons that you were
2 responsible for, is that right?
3    A  Yes.
4    Q  And I believe you testified that there
5 was one for Shirley Tabb, correct?
6    A  Yes.
7    Q  And my question was would any evaluations
8 you did for Ms. Tabb be in that file?
9    A  Yes.
10       MR. WILLIAMS:  Thank you, Counsel.
11       MR. CONDIT:  Sure.
12 BY MR. CONDIT:
13    Q  Now, during the times you were evaluating
14 Ms. Tabb in 2003, 2004, and possibly in 2005, what
15 were the general ratings that one could come up with
16 at the conclusion of the evaluation?  In other words,
17 they're usually some kind of adjective like
18 satisfactory or excellent or outstanding, what was
19 the nomenclature in the agency during that time?
20    A  Satisfactory.
21    Q  Satisfactory.  And what does satisfactory
22 mean in an evaluation?

61

1    A  That they were completing the things they
2  needed to complete in terms of the job.
3    Q  And what would be the next level up from
4  satisfactory, how would that be described?
5    A  I think there's excellent, and then
6  there's -- it's either outstanding and excellent or
7  the other way around.
8    Q  So beyond satisfactory there were, during
9  this time we're talking about 2003 to 2005, there
10  were two possible steps beyond satisfactory?
11    A  I think so.  I may be confusing -- those
12  evaluation are called PSS.  I may be confusing PSS
13  with PMP.
14    Q  What does PSS stand for?
15    A  I'm not sure.
16    Q  Did anyone from Human Resources or any
17  other part of the agency or D.C. Government train you
18  on employee evaluations using these systems?
19    A  No.
20    Q  When you worked in Hamilton County, did
21  you have to evaluate employees there?
22    A  Yes.

62

1    Q  What was the system like there in terms
2  of evaluation?
3    A  Somewhat similar.
4    Q  Somewhat similar.  So you had an
5  evaluation period and then performance standards?
6    A  Yes.
7    Q  Okay.  And then you would evaluate based
8  on the success in the performance standards?
9    A  Yes, as well as negotiated goals.
10    Q  Now, back to the District system during
11  the 2003, 2005 time period, what was the step below
12  satisfactory?  If you weren't satisfactory, what were
13  you?
14    A  Unsatisfactory.
15    Q  Okay.  And was there anything lower than
16  unsatisfactory?
17    A  I don't think so.
18    Q  Now, during the 2003 to 2005 time period,
19  was Ms. Tabb ever evaluated below satisfactory?
20    A  No, but her last evaluation was pretty
21  close.
22    Q  And for what year would that have been?

63

1    A  Whichever was the last one I did.
2    Q  So either 2004 or 2005?
3    A  Correct.
4    Q  Okay.  And when you say pretty close,
5  what do you mean?
6    A  It was not a very strong satisfactory.
7    Q  Did you do anything to prepare for your
8  deposition today?
9    A  No.
10    Q  You didn't review any documents?
11    A  No.
12    Q  You didn't talk to anybody about it?
13    A  No.
14    MR. WILLIAMS:  One second, I'm sorry.  I
15  need to confer.
16    (The Witness and Counsel confer off the
17  record.)
18    THE VIDEOGRAPHER:  Do you want to go off
19  the record?  I can hear.
20    MR. CONDIT:  Yes, let's go off the record
21  for a moment.
22    THE VIDEOGRAPHER:  Going off the record,

64

1  the time is 2:56 p.m.
2    THE VIDEOGRAPHER:  Back on the record,
3  the time is 2:57 p.m.
4    MR. WILLIAMS:  I think the witness just
5  wants to clarify a previous answer she just gave.  I
6  think the question was whether or not she had met
7  with anybody in preparation for this.
8    THE WITNESS:  I met with Mr. Williams.
9  BY MR. CONDIT:
10    Q  So other than counsel for the District,
11  did you meet or speak with anyone else regarding this
12  deposition?
13    A  No.
14    Q  And you already indicated you did not
15  read any documents in order to prepare for this
16  deposition?
17    A  Correct.
18    Q  Now, back to the last evaluation that you
19  were discussing, you indicated that Ms. Tabb's
20  evaluation, the last one, whichever year it was, was
21  pretty close to the borderline between satisfactory
22  and unsatisfactory, is that correct?

Case 1:06-cv-00789-PLF-JMF VIDEOTAPED DEPOSITION OF EMILY GOOD Filed 04/23/2008 Page 17 of 79
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

17 (Pages 65 to 68)

65

1    A   Correct.
2    Q   Do the evaluation -- does where you land
3  on the scale of evaluation for annual depend on some
4  kind of numeric judgment?
5    A   Yes.
6    Q   Okay.  And how is that done?
7    A   Well, first of all, it's not a judgment,
8  it's a scale that's part of the instrument.  So
9  depending upon the ratings that people get, there's
10  then a formula that you use to come up with the
11  rating.
12    Q   Okay.  And what is the general nature of
13  the formula?
14    A   I'm sorry, I can't -- I can't tell you
15  off the top of my head.
16    Q   Okay.
17    A   The instructions are available with the
18  form, so every year when you have to do it, you pull
19  out the instructions and.
20    Q   Now, during the course of an evaluation
21  year, is there a midyear or other evaluation prior to
22  the annual evaluation?

66

1    A   Not formal.
2    Q   So is there some type of informal
3  evaluation?
4    A   Employees need to know how they're doing
5  all the time, so if you are managing people properly,
6  you're having regular meetings with them and staying
7  in touch with them.
8    Q   Okay.  I appreciate that.  I'm just
9  trying to determine in your practice, and focusing
10  again on the years 2003 to 2005, did you make it a
11  point to have something that you would call or refer
12  to as a midyear or informal or other type of
13  evaluation to let somebody know how they're doing
14  over the course of a period of months, not just
15  day-to-day?
16    A   It was not called an evaluation, no.
17    Q   What was it called?
18    A   It wasn't called anything because people
19  got feedback on the products that they were bringing
20  forward for review, product-by-product, and every now
21  and then at our staff meeting, which we held every
22  other week, we would go back to their regular goals

67

1  that they had and look at where we were in terms of
2  that.  But it wasn't a formal process.
3    Q   Okay.  The staff meetings that you had
4  every other week, did they occur during a particular
5  time of the week or a day?
6    A   Yes.
7    Q   When was that?
8    A   Tuesdays I believe at either 1:00 or
9  1:30.
10    Q   And typically how long would a staff
11  meeting last?
12    A   Anywhere from an hour to three hours.
13    Q   And is that true in terms of both the
14  date -- or excuse me, the day of the week and the
15  average length for the period of 2003 to 2005?
16    A   I believe so.
17    Q   Now, in staff meetings, did you or anyone
18  in the meetings take notes or record minutes or
19  anything of that nature?
20    A   No.
21    Q   Excuse me.
22        MR. WILLIAMS:  Excuse me, I'm sorry.

68

1    Q   You said in your testimony a moment ago,
2  that you would have in some staff meetings a
3  discussion of where people were in their what,
4  performance standards for the year?
5    A   On occasion --
6    Q   Okay.
7    A   -- people would -- we would have -- I
8  would ask people to bring their goals and we'd take a
9  look at them and see whether the projects they were
10  working on were fulfilling the goals or we were
11  behind on some things or whatever the case was.
12    Q   And this would be done during staff
13  meetings?
14    A   Yes.
15    Q   So was this done with other employees
16  present?
17    A   Yes.
18    Q   And why was it done that way?
19    A   Because our work is in some ways
20  collective.  People's goals were derived from the
21  goals of the entire OPI so that there were no secrets
22  about what our objectives were or what we needed to

Case 1:06-cv-00789-PLF-JMF   Document 42-9   Filed 04/23/2008   Page 18 of 79
VIDEOTAPED DEPOSITION OF WANDA GOULD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

18 (Pages 69 to 72)

69

1 accomplish for the year. And the general tenor or
2 purpose of the staff meeting was people came in every
3 other week and reported on where they were on an
4 array of tasks on their plate at that time.
5 　　Q　Now, during this time period 2003 to
6 2005, were you evaluated in any interim way prior to
7 your formal evaluation each year by the person who
8 was evaluating you?
9 　　A　No.
10 　　Q　Did Ms. Tabb or Mr. Stewart have input
11 into their evaluations prior to them being finalized?
12 　　A　Yes.
13 　　Q　What was the input?
14 　　A　They did a self-evaluation that they gave
15 to me before I did their evaluation.
16 　　Q　So in the case of this particular
17 evaluation that you're thinking of where you say that
18 Ms. Tabb was close to the borderline between
19 satisfactory and unsatisfactory, did she provide you
20 with a self-evaluation for that particular
21 evaluation?
22 　　A　I can't recall.

70

1 　　Q　If she did, would it be in the personnel
2 folder that you keep?
3 　　A　No.
4 　　Q　Where would it be?
5 　　A　I probably did not keep the
6 self-evaluations.
7 　　Q　And why is that?
8 　　A　Because once we discussed them and the
9 evaluations were done, the only thing that I kept was
10 the final copy.
11 　　Q　Okay. Do you remember during the 2003 to
12 2005 time period, what time of year evaluations were
13 performed?
14 　　A　Their evaluations on that system are due
15 at the end of I think March.
16 　　Q　And if they're due at the end of March,
17 is the evaluation covering from March of the previous
18 year to the March when they're evaluated?
19 　　A　April through March 30th or 31st.
20 　　Q　Now, did there come a point in time while
21 you were serving as the director and Ms. Tabb was
22 working at the agency that there was a decision made

71

1 to remove Ms. Tabb from her position?
2 　　A　There was a decision made to transfer
3 her.
4 　　Q　Transfer her from where to where?
5 　　A　From OPI to Human Resources.
6 　　Q　Okay. And when was that decision made?
7 　　A　I want to say maybe late 2004 but I might
8 be wrong. I can't exactly remember.
9 　　Q　What documentation is there of this
10 transfer?
11 　　A　I don't have any.
12 　　Q　Okay. I appreciate that. But do you
13 know what documentation there was --
14 　　A　No.
15 　　Q　-- of this transfer?
16 　　A　No.
17 　　Q　How did you become informed of it?
18 　　A　Brenda Donald told me that there was
19 going to be a transfer.
20 　　Q　And did she describe why there was going
21 to be a transfer or indicate why?
22 　　A　No.

72

1 　　Q　So Ms. Donald just came to you one day
2 and said I'm transferring Shirley Tabb to Human
3 Resources and that was pretty much it?
4 　　A　Yes.
5 　　Q　Was that a surprise to you?
6 　　A　Yes.
7 　　Q　And how did you react?
8 　　A　I just sat and listened to what she had
9 to say.
10 　　Q　Did this discussion take place in
11 Ms. Donald's office or in your office?
12 　　A　Brenda's office.
13 　　Q　And what position did Ms. Donald have at
14 the time?
15 　　A　I think she was the director or interim
16 acting director.
17 　　Q　Of the agency?
18 　　A　I can't exactly remember. Since
19 she was my boss in both of her iterations, it all
20 runs together for me.
21 　　Q　Okay. I appreciate that. What time of
22 the day did this meeting take place?

Case 1:06-cv-00789-PLF-JMF Document 43-9 Filed 04/23/2008 Page 19 of 79
VIDEOTAPED DEPOSITION OF MILDRED GOOD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

19 (Pages 73 to 76)

73

1    A   Can't recall.
2    Q   Did you take any notes?
3    A   No.
4    Q   Did Ms. Donald take any notes that you're
5  aware of?
6    A   I don't know.
7    Q   Did she follow up this meeting with any
8  communication in writing such as by e-mail?
9    A   To me?
10    Q   Yes.
11    A   No.
12    Q   Do you know if Ms. Donald communicated
13  with anyone else about this decision?
14    A   I don't know.  Oh, yes, she communicated
15  with the director of administration at that time.
16    Q   Who was that?
17    A   Ronnie Charles.
18    Q   And do you know what she communicated to
19  Mr. Charles?
20    A   That she wanted to have Brenda -- I'm
21  sorry, Shirley transferred from OPI to Human
22  Resources because Human Resources was under his

74

1  authority at that time.
2    Q   And how is it that you came to know of
3  this communication between Ms. Donald and
4  Mr. Charles?
5    A   He is my neighbor and Brenda was -- I
6  went to him and asked him, since Brenda had told me
7  about this, whether he knew about it.  I wanted to
8  know whether he knew about it because Human Resources
9  was under his control.
10       MR. WILLIAMS:  Clarification, you said he
11  was your neighbor?
12       THE WITNESS:  His office is next to mine.
13  Sorry.
14       MR. WILLIAMS:  That's all right.
15  BY MR. CONDIT:
16    Q   So what else, if anything, did
17  Mr. Charles tell you when you discussed with him the
18  transfer of Ms. Tabb to Human Resources?
19    A   That he knew about it.
20    Q   He didn't say anything else?
21    A   No.
22    Q   So after you have this conversation with

75

1  Ms. Donald and Mr. Charles, what happens next with
2  respect to the transfer of Ms. Tabb to Human
3  Resources?
4    A   I thought that Brenda and Mr. Charles
5  would take care of it, but at meetings that I had
6  with Brenda after that, she started to ask me have
7  you talked to Shirley about this transfer yet, have
8  you talked to Shirley about this transfer yet.
9    Q   Is it your understanding that at the time
10  that you learned of the transfer from Ms. Donald that
11  Ms. Tabb was not aware of the transfer?
12    A   Yes.
13    Q   So once you were alerted that Ms. Donald
14  had some expectation that you were to communicate the
15  transfer to Ms. Tabb, what did you do?
16    A   I went to Ronnie Charles and said is
17  everything cleared in terms of Personnel for this
18  transfer to take place.
19    Q   What did he tell you?
20    A   I never really got an answer.
21    Q   What did he say?
22    A   I'm working on it.

76

1    Q   Did he say anything else?
2    A   No.
3    Q   All right.  What happened next?
4    A   Brenda continued to say to me have you
5  said anything to Shirley yet, so I went to Ronnie and
6  said Brenda is continuing to ask whether or not we
7  have announced to Shirley that this transfer is going
8  to be made so we need to set up a meeting to do this.
9    Q   And what did he say?
10    A   Okay.  And we set up a meeting and we
11  asked Shirley to come and we told her what was going
12  to happen.
13    Q   So this meeting involved yourself,
14  Mr. Charles, Ms. Tabb, is that correct?
15    A   Yes.
16    Q   Anyone else?
17    A   Kleartis.
18    Q   Who is that?
19    A   He was the Human Resources director at
20  the time.
21    Q   And about when did this meeting take
22  place?

Case 1:06-cv-00789-PLF-JMF   Document 42-9   Filed 04/23/2008   Page 20 of 79
VIDEOTAPED DEPOSITION OF WILLIE GOODE
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

20 (Pages 77 to 80)

77

1      A   Again, I don't recall.
2      Q   Do you know whether or not there was any
3  memorialization of this meeting?
4      A   No, I don't know.
5      Q   Who took the lead in the meeting?
6      A   I initially did.
7      Q   And what did you say?
8      A   I said that the transfer was going to be
9  made, that there was going to be a position in Human
10  Resources that Shirley was going to transfer to, that
11  she would be able to take CFSA Reporter which was the
12  internal newsletter with her, and then Kleartis and
13  Ronnie began talking about what else the position
14  would entail in HR.
15      Q   And what did Kleartis and Mr. Charles say
16  about what the job entailed?
17      A   That they had a number of communication
18  things relating to employee benefits and other issues
19  that they were eager to have a communication person
20  work on, and Kleartis said that he was looking
21  forward to having Shirley come and work in their
22  group.

78

1      Q   Now, Kleartis, is that a first name, a
2  last name?
3      A   That's a first name, and I think his last
4  name is Jackson.
5      Q   What did Ms. Tabb say, if anything, in
6  this meeting?
7      A   Initially she didn't say anything, and
8  then by the end of the meeting she said that will be
9  fine.
10      Q   Is that all she said?
11      A   That's the only thing I recall.
12      Q   Did the transfer from -- of Ms. Tabb from
13  the Public Affairs Office to Human Resources happen?
14      A   No.
15      Q   Why not?
16      A   As best I understand it, Shirley went the
17  next day or that day to see people in the union who I
18  believe said that the way this was being done was not
19  proper and that therefore Shirley did not have to
20  take part in it.
21      Q   And who did you learn that from?
22      A   I don't recall.

79

1      Q   How long after the meeting involving
2  Mr. Jackson, Mr. Charles, yourself and Ms. Tabb about
3  the transfer did it take before you learned that the
4  transfer was not going to go forward?
5      A   Two or three weeks.
6      Q   And in that -- during that interim
7  period, was Ms. Tabb continuing to work in the Public
8  Affairs Office?
9      A   Yes.
10      Q   Do you know if during that two or three
11  week period that you just mentioned there was any
12  further discussion among the managers, yourself,
13  Ms. Donald or anyone else about this issue?
14      A   There was no one -- no one approached me
15  about it.
16      Q   Were there any documents issued from
17  anyone that memorialized the decision not to go
18  forward with the transfer?
19      A   Not that I saw.
20      Q   So how did the fact that Ms. Tabb was not
21  transferred to Human Resources affect your
22  relationship with her, if it did at all?

80

1      A   The relationship after that was very
2  stressful and it wasn't a good relationship anymore.
3      Q   Do you think the event of the attempted
4  transfer had something to do with that?
5      A   Absolutely.
6      Q   And why do you think that?
7      A   Because I think that Shirley felt
8  ambushed.
9      Q   And was she ambushed?
10      A   From her perspective, yes.
11      Q   I mean from your perspective was she
12  ambushed?
13      A   Yes and no.
14      Q   Help me out with the no part of that.
15      A   If management wants to make a change in
16  your situation, management has the right to do that.
17      Q   But is it not the case that -- well, let
18  me ask you, I'm assuming from the way you were using
19  the term that by ambushed you meant surprised, is
20  that right?
21      A   Yes.
22      Q   So looking at it from that standpoint,

Case 1:06-cv-00789-PLF-JMF    Document 43-9    Filed 04/23/2008    Page 21 of 79
VIDEOTAPED DEPOSITION OF MINDY GOOD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

21 (Pages 81 to 84)

81

1    was the desire to transfer Ms. Tabb from Public
2    Affairs to Human Resources a surprise to you when it
3    was presented?
4         A   Yes.
5         Q   And then consequently was it a surprise,
6    as you understood it, to Ms. Tabb when it was
7    presented?
8              MR. WILLIAMS:  Objection, speculation.
9         Q   You can answer.
10        A   Yes.
11        Q   Now, do you attribute Ms. Tabb's
12   circumstances and the stressful relationship that you
13   described after this attempted transfer to have
14   something to do with Ms. Tabb's perception that you
15   had something to do with the attempted transfer?
16             MR. WILLIAMS:  Objection, speculation.
17   Answer the question.
18        A   I don't know.
19        Q   Did you ever attempt to explore the
20   nature of the stressful relationship that had
21   developed at that time with Ms. Tabb?
22        A   There were certain circumstances under

82

1    which I provided opportunities to clear the channels
2    of communication between us.  For example, there came
3    a point where we had a meeting at Human Resources
4    with a Human Resources representative later on, but
5    that was later on.
6         Q   What was the purpose of that meeting?
7         A   That was down the road aways, after
8    Shirley had -- was bringing in doctor's certificates
9    to have time off, and there was a -- and I wanted to
10   have an attempt with Human Resources to clarify how
11   much time are we talking, are we talking not being
12   able to assign anything, are we talking being able to
13   assign, you know, a few hours a week, no hours a week
14   or whatever.  So it was to clarify what this really
15   meant.
16        Q   And did you get clarification out of that
17   meeting?
18        A   No.
19        Q   Why not?
20        A   Didn't get clarification.
21        Q   What did Human Resources advise during
22   that meeting about Ms. Tabb's time off?

83

1         A   That the lines of communication needed to
2    be opened, that we needed to have some idea of
3    perhaps how long this absence was going to go on, and
4    whether or not she was able to do any work during
5    that time, some work during that time, no work during
6    that time, that we needed to get that clear and clear
7    that up.
8         Q   And what period of time was at issue when
9    you were having this meeting?
10        A   I would say it was during the spring or
11   summer of that year, of the last year, 2005, is that
12   it?
13        Q   And what did Ms. Tabb say in this meeting
14   that took place with the Human Resources
15   representative that you're describing?
16        A   I can't recall.
17        Q   Who was the Human Resources
18   representative?
19        A   I want to say that it was Michele
20   Singletary.
21        Q   Did anyone take notes or memorialize the
22   meeting?

84

1         A   I don't know.
2         Q   You didn't do that?
3         A   No.
4         Q   Do you know if Human Resources
5    memorialized the meeting?
6         A   I don't know.
7         Q   Aside from the situation with the Human
8    Resources attempted transfer, were there any other
9    efforts to relocate or transfer Ms. Tabb during your
10   tenure?
11        A   Not that I'm aware of.
12        Q   Did there come a point in time when you
13   became aware of a decision to remove Ms. Tabb from
14   her service as a District employee?
15        A   Yes.
16        Q   And when did you first become aware of
17   that decision?
18        A   When Brenda told me that that was the
19   decision.
20        Q   And about what time period was this?
21        A   This was not very long after the incident
22   with Channel 9 TV.

Case 1:06-cv-00789-PLF-JMF    Document 42-9    Filed 04/23/2008    Page 22 of 79
VIDEOTAPED DEPOSITION OF MILTON GOGOL
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

22 (Pages 85 to 88)

85

1    Q   What's the incident with Channel 9 TV
2 that you're referring to?
3    A   Shirley allegedly turned over to them
4 pictures of a young man who supposedly was a child
5 welfare client who had spent the night in the
6 building.  And Channel 9 showed up at our office with
7 that picture, asking questions about it and of course
8 did a story about it, so it was shortly after that
9 incident.  I believe that was late August of 2005.
10    Q   So how long after the incident that you
11 just described with Channel 9 was it before you
12 learned of Ms. Donald's decision to remove Ms. Tabb
13 from her service as a District employee?
14    A   I can't exactly remember, not very long.
15    Q   All right.  Help me out.  If we're
16 talking not very long, are we talking days or weeks?
17    A   Days.
18    Q   Okay.  Now, you said in your testimony a
19 few moments ago that Channel 9 showed up at the
20 agency, is that right?
21    A   Correct.
22    Q   Okay.  And did you deal with them?

86

1    A   Yes.
2    Q   And who was it you were dealing with from
3 Channel 9?
4    A   Phyllis Richmond.
5    Q   And what was the interaction?
6    A   It was what's known in the media business
7 as an ambush where they showed up with this
8 photograph and a camera, and Phyllis Richmond asking
9 me to -- I'm sorry, I'm sorry, Phyllis Armstrong, I'm
10 sorry, asked me to -- you know, the person at our
11 front desk downstairs called upstairs and said a news
12 channel is down here and they want to see you right
13 now, and I came downstairs and walked out of the
14 building and they were of course planted on the front
15 part of the building waiting for me.
16    Q   So was it the situation where basically
17 you came out, there was a mike in your face and they
18 were asking you questions?
19    A   Pretty much, yes.
20    Q   So what were they asking?
21    A   They were asking me about allegations
22 that children were sleeping in the building on

87

1 numerous occasions, many, many children sleeping in
2 the building, and they showed me this picture and
3 asked me what I knew about that, and showed me the
4 series of photographs.
5    Q   So it was more than one photograph?
6    A   Yes.
7    Q   Okay.  And did they give you copies of
8 the photographs?
9    A   Yes, they gave me one copy of one of the
10 photographs.
11    Q   And do you -- have you maintained a copy
12 of that photograph?
13    A   Yes.
14    Q   Where is that located?
15    A   It is not the photograph that they showed
16 on TV, it is another photograph in the series, and I
17 have a photocopy of it in one of my files.
18    Q   Which file?
19    A   One of the files pertaining -- it may be
20 in the personnel file.
21    Q   Do you know if the file with that
22 photograph has been provided to counsel for the

88

1 District?
2    A   Yes.
3    Q   Now, you say that the photo that you were
4 shown -- or excuse me, you were given a copy of was
5 not the photo or the picture that was shown on TV, is
6 that correct?
7    A   I think not, but it was similar.
8    Q   How many photos did they show you?
9    A   Two.
10    Q   Two photos?
11    A   But they only gave me one.
12    Q   What do the photos depict?
13    A   A young man attempting to lie down on a
14 cot that was much too small for him.
15    Q   Did the news people ask you specific
16 questions about that young man in that situation of
17 lying down on the cot that's too small?
18    A   Not specifically about that young man.
19 They were specifically asking me about children
20 sleeping overnight in the building and how many times
21 that was occurring and how often that was going on.
22    Q   And how did you respond?

Case 1:06-cv-00789-PLF-JMF   Document 42-9   Filed 04/23/2008   Page 23 of 79
VIDEOTAPED DEPOSITION OF MINDY GOOD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

23 (Pages 89 to 92)

89

1    A  Well, at the moment, the first question I
2  had was how do I know that this is a legitimate
3  picture.  You're telling me this was taken in our
4  building, I have no way to verify that except that
5  you have an allegation that that's the case.  And off
6  the top of my head, I can't give you numbers so I'll
7  have to, you know, get back to you with that.
8    Q   Did you tell the reporter for Channel 9
9  anything else in response to their questions, any
10  other response or substantive information?
11    A   Not that I can recall.
12    Q   About how long was the interview or
13  discussion?
14    A   Fairly short, well under ten minutes.
15    Q   Now, did the interview that you had with
16  Channel 9, or excerpts of it, show up on the evening
17  news?
18    A   I don't know if they did on that day.
19  They did at a later time because this wasn't a
20  one-day story.
21    Q   So how many stories do you recall there
22  being about this issue of children sleeping in the

90

1  building?
2    A   I think there were two or three
3  broadcasts and there was also material on the
4  station's website.
5    Q   Did you or anyone else in the agency do
6  anything to capture or record the news broadcasts
7  about the children sleeping in the building issue?
8    A   Yes.
9    Q   And who did that?
10    A   We bought a DVD of the stories put onto
11  the DVD specifically for us from what's known as a
12  media clip service that does that kind of electronic
13  clips.
14    Q   And where is a copy of that maintained?
15    A   I turned it over to Human Resources.
16    Q   And when did you turn it over to Human
17  Resources?
18    A   They began conducting an investigation
19  into the actual incident of this young man's picture
20  being taken and situations surrounding that, and at
21  that point I turned over various materials I had
22  about the situation to HR so they could conduct their

91

1  evaluation.
2    Q   Did you personally have any further
3  interaction with the media beyond this one out on the
4  stairs of CFSA on the issue of children sleeping in
5  the building?
6    A   Yes, there was a follow-up story.
7    Q   And were you filmed in that case?
8    A   Yes.
9    Q   Where were you filmed?
10    A   Out in front of the building.
11    Q   And what did you say at that time?
12    A   At that time I had gone and gotten the
13  actual numbers of -- official numbers of how many
14  children were sleeping in the building, so I was able
15  to provide that which was largely the point.
16    Q   What kind of -- strike that.  What did
17  you tell the media about children sleeping in the
18  building, the data on that subject?
19    A   There are two gateways into the child
20  protection system, either Intake which we now call
21  Child Protective Services, you either come in through
22  a call to the Hot Line or you come through Placement.

92

1  We had a Placement Services Administration.  So the
2  two places in the agency that would have accurate
3  data about how many children were sleeping in the
4  building were those two places, Child Protective
5  Services and Placement Services.
6      I went to Placement Services and they
7  told me that from April 1 through I believe it was
8  the end of August of 2005, we had 15 children
9  sleeping in the building on seven different
10  occasions.  So it was 15 children on seven occasions
11  over about five months.  And we received a typed -- a
12  message from Placement listing the figures that were
13  the appropriate figures to be used.
14    Q   Did you also check with Intake?
15    A   What I checked with Intake was I took the
16  picture of the young man that was allegedly taken in
17  our building who was allegedly a client, and I took
18  it down to Intake and asked them what they knew about
19  this.  It was pretty easy and quick to determine
20  where the picture had been taken because yes, it was
21  taken in our building.  It was pretty easy to figure
22  that out.

Case 1:06-cv-00789-PLF-JMF   Document 42-9   Filed 04/23/2008   Page 24 of 79
VIDEOTAPED DEPOSITION OF WENDY GOOD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

24 (Pages 93 to 96)

93

1    But then we wanted to know who this young
2 man was.  So I went to Intake first and they have
3 what they call a shift-to-shift report.  We have
4 night shift and day shift because we run a 24-hour
5 operation.  The night shift turns things over to the
6 day shift.  So they went back in the shift-to-shift
7 reports for several days prior to when Channel 9 had
8 brought this photograph and looked at the young
9 people who had come through Intake.
10    And this young man -- anyone matching his
11 age, description or characteristics, they couldn't
12 find anything.  We then took the picture around
13 through Intake and asked people do you recognize this
14 young man and no one recognized him.  So then I went
15 to Placement Services and did the same thing and no
16 one recognized him.
17    Q   So did anyone, to your knowledge, confirm
18 that the person in the picture or the young man in
19 the picture had been at CFSA?
20    A   No.
21    Q   But you indicated in your testimony a few
22 moments ago that it was clear where the picture was

94

1 taken, correct?
2    A   Correct.
3    Q   Why was that clear?
4    A   Because it was clear what place in our
5 building that was taken, and yes, we had those cots.
6    Q   So was the particular office set-up with
7 the cot that is depicted in the picture, was that
8 something that you saw when you went and surveyed the
9 scene?
10    A   No, it wasn't like that when I got there
11 because the cots are portable.
12    Q   So the cots had been moved or something
13 like that?
14    A   Yes.
15    Q   Now, was there any determination
16 ultimately made, to your knowledge, by the agency
17 with respect to the accuracy of the picture that you
18 were shown and that you were given a copy of by the
19 news media?
20    A   To this day, we can clearly see that the
21 picture was taken in our building, but whether the
22 young man depicted in the picture was ever a CFSA

95

1 client, it's my understanding no one has ever been
2 able to verify that or who he was.
3    Q   Nobody has been able to verify who he
4 was?
5    A   Correct.
6    Q   Okay.  You mentioned in your testimony
7 that you gave the clips that were captured by the
8 media service to Human Resources, correct?
9    A   Correct.
10    Q   What was the media service that captured
11 these clips?
12    A   I can't remember.  I can't remember.
13    Q   How many DVDs were there?
14    A   One.
15    Q   And how many clips were on it?
16    A   Two or three, I believe.
17    Q   And I'm assuming that these clips would
18 just have been about the stories that dealt with the
19 children sleeping in the building issue, is that
20 right?
21    A   Correct.
22    Q   So in other words, there wouldn't be

96

1 other parts of the broadcast on the clip?
2    A   No.
3    Q   Did you review this DVD yourself?
4    A   Yes.
5    Q   And who in Human Resources did you give
6 it to?
7    A   Either Deborah Wilson or Stan Spaght.
8    Q   How do you spell Mr. Spaght's name?
9    A   S-p-a-g-h-t.
10    Q   What position did Ms. Wilson have at the
11 time?
12    A   Labor Relations Manager.
13    Q   Pardon me, and what position did
14 Mr. Spaght have at the time?
15    A   I don't know his exact position.  They're
16 both employees of Human Resources.
17    Q   Other than giving the DVD of the clips to
18 them, one of them, did you involve yourself or were
19 you involved in any other way in the investigation
20 that you referenced?
21    A   I was told about an e-mail that Shirley
22 allegedly sent to people in Child Protective Services

Case 1:06-cv-00789-PLF-JMF   Document 42-9   Filed 04/23/2008   Page 25 of 79
VIDEOTAPED DEPOSITION OF MINDY GOOD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

25 (Pages 97 to 100)

97

1  asking them to contact her if they needed blankets.
2      Q   And I'm sorry, I'm not sure how that
3  answered my question. Were you responding to an
4  inquiry by someone in Human Resources in their
5  investigation or why are you mentioning that to me?
6      A   No, because in one of the news stories or
7  some other forum, a person calling from Human --
8  calling from Child Protective Services to Shirley's
9  phone asking for blankets was taped and you heard
10  them asking for the blankets. And this was used as a
11  way to show allegedly how desperate social workers
12  were to take care of kids who were sleeping in the
13  building. So I went to track down what all that
14  meant.
15          Because, again, remember we're in the
16  middle, at the early stages of a media deal going on
17  here and I'm having to respond, so this is before the
18  whole Human Resources thing got started. I'm
19  immediately trying to gather enough information that
20  when the media come back, we will be prepared to give
21  better answers than the first time. So we were all a
22  little curious to know, you know, who that was

98

1  talking on voice mail and how that all came to
2  happen.
3      Q   Did you find out?
4      A   I found out some information, yes.
5      Q   What was the information?
6      A   That the person talking on the voice mail
7  was a woman named Joanne who worked in Child
8  Protective Services, that she worked on the night
9  shift, that she had called Shirley looking for
10  blankets because Shirley had sent an e-mail telling
11  people that if she -- if they needed blankets, she
12  had some and they should contact her.
13      Q   Okay. And did you ever get a copy of the
14  e-mail?
15      A   No, I did not. I've never seen it.
16      Q   Did you have a conversation with Joanne?
17      A   No.
18      Q   Why not?
19      A   I did not. She worked the night shift
20  and she and I kept missing each other.
21      Q   Does Joanne still work at the agency?
22      A   I don't know.

99

1      Q   Do you know what Joanne's last name is?
2      A   Not off the top of my head, no.
3      Q   Did you record or take notes of your
4  inquiry into these issues and write it down in any
5  way or memorialize it in any way?
6      A   I don't think so.
7      Q   Let's take a break so that our
8  videographer change the tape.
9          THE VIDEOGRAPHER: Here ends tape number
10  one in the deposition of Mindy Good. Going off the
11  record, the time is 3:41 p.m.
12          THE VIDEOGRAPHER: Back on the record,
13  here begins tape number two in the deposition of
14  Mindy Good, the time 3:49 p.m.
15  BY MR. CONDIT:
16      Q   Now, we were talking before the break,
17  Ms. Good, about your search for facts I guess we'd
18  call it. Once the media approached the agency with
19  this children sleeping in the building issue, do you
20  recall that discussion?
21      A   Yes.
22      Q   All right. And I believe one of the

100

1  places we left off was that you were trying to
2  determine by contacting a worker by the name of
3  Joanne whether or not she had made a call to Shirley
4  Tabb and left a message that was I guess portrayed in
5  some of the media stories, is that correct?
6      A   It was actually played in some of the
7  media stories.
8      Q   Okay. And I think your testimony was,
9  but correct me if I'm wrong, that you never actually
10  got a chance to meet with Joanne and confirm that
11  situation, is that right?
12      A   I never met with her, but others
13  confirmed that the Joanne who worked in CPS was the
14  person whose voice mail had been played in the media.
15      Q   Okay. And who was it that confirmed that
16  to you?
17      A   I can't recall. I do recall the person
18  saying that Joanne was very startled and upset about
19  that.
20      Q   Did they say why she was startled and
21  upset?
22      A   Because she had left a voice mail inside

101

1 the office at CFSA on her voice mail system and she
2 had no idea it was going to end up as part of the
3 news.
4     Q   So do you know from what part of CFSA the
5 person or persons were working who confirmed that the
6 voice mail that was played by the media was Joanne's
7 voice mail?
8     A   It would have been someone who worked
9 with her in CPS.
10        MR. WILLIAMS:  Clarification, did you
11 testify that it was a voice mail or was it the
12 person's voice?
13        THE WITNESS:  It was voice mail.  She
14 left a voice mail message.
15        MR. WILLIAMS:  She left a voice mail
16 message.  And that's what was played?
17        THE WITNESS:  With Shirley.
18        MR. WILLIAMS:  Okay.
19 BY MR. CONDIT:
20     Q   Did you investigate any other aspects of
21 this issue aside from that which you've described to
22 me which are checking -- following through on

102

1 checking the validity of the picture and following
2 through and checking on the voice mail by Joanne?
3     A   And determining what the actual numbers
4 were of children who had slept in the building.
5     Q   When you checked with Intake as opposed
6 to placement, did you get any different sense of the
7 situation with respect to children sleeping in the
8 building than the Placement office had provided?
9     A   No, they told me you need to go to
10 Placement because they're the people who are actually
11 running the reports or keeping tally of that.
12     Q   Did you seek to communicate, by e-mail or
13 otherwise, with some of the social workers in Intake
14 to determine what their general experiences had been
15 over the months with children sleeping in the
16 building?
17     A   No.
18     Q   And why didn't you do that?
19     A   Because again, when an agency like ours
20 gets in a media crisis like this, time is at a
21 premium, and I should be able to go to official
22 sources and get official accurate numbers.  And so I

103

1 went to -- after Intake told me they didn't keep
2 track of that, I went directly to Placement and
3 Placement subsequently e-mailed I believe numbers to
4 Brenda which I was copied on, so we all had the same
5 numbers.
6     Q   And these numbers and information were
7 coming to you after the media had confronted you with
8 the story, is that right?
9     A   To me, yes.
10     Q   All right.  Prior to your being initially
11 confronted by media on this story of children
12 sleeping in the building, was that topic discussed
13 with you or by you with others within the agency?
14     A   Yes.
15     Q   And with whom did you participate or
16 overhear conversations on that subject?
17     A   When the agency had recently established
18 the Placement Services Administration -- I want to
19 say that they had established the Placement Services
20 Administration maybe in the spring of that year, late
21 winter, early spring, and they had done so at the
22 recommendation of the Casey Foundation, that they

104

1 have a separate Placement Administration and they had
2 hired an administrator at some point in the spring.
3        And we had executive team meetings,
4 meaning the top leaders from all of the various
5 administrations, every two weeks, and at one of those
6 meeting not very long after the new administrator had
7 come aboard, she came to an executive team meeting
8 and gave a presentation on what some of the placement
9 issues were, and there were a number of them, of
10 which we were all well aware because one of the
11 things that the agency had done in order to take care
12 of some of these placement issues they knew about was
13 to establish the Placement Services Administration.
14        So early in her tenure, the administrator
15 came and talked to us about her take on the issues,
16 and one of the things she talked about was children
17 sleeping overnight in the building along with some
18 other placement issues.
19     Q   Who was the administrator?
20     A   Jill Forbes.
21     Q   And you are testifying that the Placement
22 Services Administration was established in the late

Case 1:06-cv-00789-PLF-JMF    Document 42-9    Filed 04/23/2008    Page 27 of 79
VIDEOTAPED DEPOSITION OF MINDY GOOD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

27 (Pages 105 to 108)

105

1    spring of 2005?
2        A  Late winter or early spring, I believe.
3        Q  And about when was the executive team
4    meeting that you're describing where Ms. Forbes
5    discussed the problem of children sleeping in the
6    building?
7        A  Not long after the Placement Services
8    Administration had been established, so I would say
9    sometime during the spring.
10       Q  So sometime during the spring of 2005?
11       A  Yes.
12       Q  What did she say about the nature of the
13   problem?
14       A  That there were children who were
15   spending the night in the building, that we were
16   having a placement crisis, that beds that we had
17   contracted for with placement organizations had not
18   come to fruition because under licensing regulations
19   they had to meet certain standards in order to be
20   able to take children in and they were unable to meet
21   those standards so that we had contracted for them --
22   with them for a series of beds that they could not

106

1    always provide the total number we had contracted for
2    because they were having to meet these standards, so
3    they were bringing the beds on line slowly, slower
4    than we had hoped, that was one issue.
5            And she talked about a number of other
6    factors, all of which were affecting placements.  So
7    the idea that we were having problems with placement,
8    that there was a placement crisis, it had been known
9    at the executive level and discussed openly there.
10       Q  When the issue of the placement crisis
11   and children sleeping in the building was discussed
12   in the particular meeting that you're referencing by
13   Ms. Forbes, was there a plan then set forward to
14   address the issue?
15       A  Yes.
16       Q  What was the plan?
17       A  I can't exactly remember, but there were
18   a number of strategies that they were working to try
19   to alleviate a number of the issues.  One of them was
20   talking about whether there were other providers who
21   could meet certain standards, who could make beds
22   available to us and whether or not we could contract

107

1    with them quickly.  That was one potential solution
2    that was put forward.  There were others.
3        Q  Was it your understanding that in the
4    time frame that the media came to you about this
5    story -- which is I think you said late August of
6    2005?
7        A  I believe it was.
8        Q  Was it your understanding at that time
9    frame that there was still an issue of children
10   sleeping in the building?
11       A  Yes, but it was starting to be less
12   frequent than it had been.
13       Q  Do you know based on your executive team
14   meetings or based on other communications with
15   executives in CFSA whether or not the issue of
16   children sleeping in the building was an issue that
17   was being tracked by the court monitor in the LaShawn
18   litigation?
19       A  Do you mean was there a formal
20   requirement in LaShawn consent decree to track that
21   exact thing?
22       Q  No.  I mean was the monitor reporting on

108

1    it at all to your understanding?
2        A  I don't know.
3        Q  Did you review the LaShawn reports that
4    the monitor provided every once in awhile?
5        A  Not always in their entirety, no.
6        Q  When the issue of children sleeping in
7    the building was presented by the media in say late
8    August of 2005, what was the concern, if any, by the
9    agency executives in having that subject out in the
10   media?
11       A  I think that there were three responses.
12   The first one was that the numbers that were reported
13   were not accurate, they didn't match with what
14   Placement Services was telling us internally, they
15   were much inflated over the official numbers that we
16   had from Placement Services, but they were being
17   reported as if they were gospel.  So that was one
18   concern.
19           The second concern was that this was
20   presented as if the agency was trying -- was doing
21   something to cover this up when in fact the agency,
22   in terms of performance, had numerous problems as

109

1  everyone knew because we were under a Consent Decree
2  and working to bring best practices to the agency and
3  to turn around bad practices that had been in place
4  for a long time, and that while nobody had put out a
5  press release that we were having kids sleeping
6  overnight in the building, there had been no attempt
7  to ever try to say that that wasn't one of the
8  problems we were having, even though we did not do --
9  go out and perhaps announce that publicly.
10         But I think the court monitor knew that
11  we had kids sleeping overnight and others. And we
12  were sitting in the executive team meetings and
13  talking internally about what to do about that, all
14  10 or 14 of us as a group, everybody who was in
15  charge of something in the agency was there. So that
16  was the second thing.
17         You know, the media acting as if we tried
18  to hide this when in fact -- you know, the fact that
19  we didn't announce it doesn't mean that we're -- that
20  there's been any cover-up or that we're not trying to
21  do something about it.
22         And the third thing that was a shock was

110

1  that people were dumbfounded that Shirley had done
2  this, had gone to the media with the story, and
3  especially when she was allegedly out on medical
4  leave.
5      Q   And you say that Ms. Tabb was allegedly
6  out on medical leave. Was she not out on medical
7  leave at the time?
8      A   I think that she was, but getting her
9  onto FMLA had been somewhat problematic, but yes, I
10  think she was.
11     Q   So it's not allegedly, she was out on
12  leave?
13     A   She was. I guess the feeling was well,
14  if she's out on medical leave, you know, she
15  certainly has enough energy and health to be
16  engineering these kinds of things but not to come to
17  work.
18     Q   And who was saying that?
19     A   You asked me what the agency's attitude
20  was, that was the agency's attitude, a number of
21  people.
22     Q   Who?

111

1      A   I think Human Resources felt that way. I
2  think the director felt that way.
3      Q   The director was Brenda Donald?
4      A   Yes.
5      Q   Who in Human Resources?
6      A   Ronnie Charles.
7      Q   What did either Ms. Donald or Mr. Charles
8  say to give you that impression?
9      A   That we have an employee out on medical
10  leave who can't come to work but obviously is capable
11  of engineering public relations events outside of
12  work despite being ill.
13     Q   What was the evidence, if any, that
14  Ms. Tabb had engineered a public relations event as
15  you're describing it?
16     A   That Phyllis Armstrong showed up at our
17  building with this picture of this young man and said
18  flat out that she had gotten it from Shirley Tabb.
19     Q   Okay. And that would be considered
20  engineering an event?
21     A   I'm telling you what other people said.
22     Q   Okay. Now, you mentioned that -- you

112

1  were mentioning in your testimony three concerns by
2  the management team or the executives in the agency
3  about this issue.
4      A   Uh-huh.
5      Q   One of them was that the numbers were
6  greatly inflated. What numbers are you referring to?
7      A   The numbers of children that Channel 9
8  was telling us they were told were sleeping overnight
9  in the building.
10     Q   What numbers were they being told?
11     A   I don't recall. It was -- if I recall
12  correctly, it made it sound like it was somewhere
13  around 30, 40, 50 or more kids, that we had kids
14  sleeping in the building every single night.
15     Q   And was that representation that you've
16  just described reflected in either one of the news
17  clips that were done -- video clips that were done by
18  one of the news stations or in any of the print
19  media?
20     A   The news clips and the print -- well, I
21  can't exactly remember what was on the videos and
22  what was on their website, but the impression that

Case 1:06-cv-00789-PLF-JMF   Document 42-9   Filed 04/23/2008   Page 29 of 79
VIDEOTAPED DEPOSITION OF MINDY GOOD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

29 (Pages 113 to 116)

113

1   was left was the Child and Family Services Agency has
2   young people sleeping overnight in their building
3   every single night.
4       Q   And who created that impression in the
5   media clips or the print media on this issue?
6       A   I don't know.  I believe that the numbers
7   that they got, Shirley gave them.
8       Q   And how do you know that?
9       A   Along with the picture.
10      Q   And how do you know that?
11      A   I don't know that for a fact.  Phyllis
12  Armstrong told me that Shirley had given her the
13  picture, so when she said Shirley had been the source
14  of it, and when Shirley was interviewed about this
15  situation, I assumed that she was the person also
16  providing the statistics.
17      Q   But you don't know that for a fact?
18      A   No.
19      Q   Was there something in the clip of
20  Shirley's interview with the media that gave you the
21  impression that there were these -- that Shirley, for
22  example, was providing these inflated numbers?

114

1       A   I can't recall.
2       Q   Does Phyllis Armstrong still report for
3   Channel 9?
4       A   I don't believe so.
5       Q   Do you know if she's still in the area?
6       A   I believe she is, but I'm not exactly
7   sure what she's up to.
8       Q   Do you have any contact with her?
9       A   No.
10      Q   You also mentioned with respect to the
11  three concerns of the agency executives that the
12  story was being presented as though the agency was
13  covering up.  And your testimony was that -- I
14  believe that that wasn't the case because it was an
15  issue that was being openly discussed within the
16  agency, is that right?
17          Do you believe that families whose
18  children came into care knew that their children
19  might be ending up sleeping in the building if they
20  came in at certain times?
21      A   No.
22      Q   Now, you also said one of the concerns

115

1   was that -- or one of the reactions was that people
2   were dumbfounded that Shirley Tabb had done this.
3   Why -- what was the -- what was it that suggested to
4   you that people were dumbfounded?
5       A   I said there was discussion about it.
6       Q   Just a discussion about it?  I mean --
7       A   The next day --
8       Q   -- they were surprised?
9       A   The next day people were very surprised
10  and reeling from this having happened, and people
11  were sort of standing around saying -- well, first of
12  all, the numbers were incredibly inflated.  Second of
13  all, it looked like a huge scandal when we have been
14  in here for months trying to solve this problem.
15  It's not like we're not doing anything about it or
16  that we ever purposely tried to keep anyone from
17  knowing this or tried to cover it up from the court
18  monitor, or any of that, okay, and then it's an
19  employee, okay, who is out -- people were enumerating
20  what they were shocked about.  You see?
21      Q   Uh-huh.
22      A   People -- we have an employee out on

116

1   medical leave who supposedly is too ill to work, but
2   obviously is not too ill to be doing these kinds of
3   actions.  I mean people were all sort of standing
4   around dumbfounded, okay, and that was the little
5   tenor of the conversation that I remember.  I don't
6   exactly recall who said what or whatever.
7       Q   Do you think that before the media
8   confronted you and the agency with the children
9   sleeping in the building issue that members of the
10  City Council were aware of the issue?
11      A   I don't know.
12      Q   Do you think that then chairman of the
13  Human Services Committee, Adrian Fenty, was aware at
14  that time?
15      A   No.
16      Q   He was not aware?
17      A   I believe he wasn't.  Again, I just want
18  to say there's a difference between having a lot of
19  issues in the agency, all of which are not good, and
20  we're the clean-up team so we're going around the
21  agency cleaning up all these things and sitting
22  within the agency and actively working and

Case 1:06-cv-00789-PLF-JMF   Document 42-9   Filed 04/23/2008   Page 30 of 79
VIDEOTAPED DEPOSITION OF MINDY GOOD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

30 (Pages 117 to 120)

117

1 strategizing and having strategies and having
2 meetings about what to do to improve these
3 situations.
4        There's a difference between doing that
5 inside your agency as part of child welfare reform,
6 okay, and actively covering up what's going on or
7 that your agency has problems.  Everybody knows the
8 D.C. Child and Family Services Agency has had a lot
9 of problems.  Everybody knows that we were the
10 clean-up crew and that child welfare reform was
11 proceeding in some cases rapidly, in some cases not
12 so rapidly and in some cases some changes and
13 improvements we wanted to make were stalled, okay,
14 but I don't think you can call sitting around
15 internally talking about what to do about issues
16 altogether in a group and trying to fix things,
17 that's not the same as a cover-up.
18        And the fact that we didn't put out press
19 releases about all of our problems and issues, the
20 court monitor was actively monitoring things, and the
21 Feds are actively monitoring things, so I just want
22 to explain.

118

1        Q   I appreciate that, but if the chair of
2 the Human Services Committee and the general public
3 are not aware of the issue, I think that you would
4 agree that while that may not be a cover-up, that
5 it's pretty significant that such issues are not
6 brought to the attention of those folks?
7        A   No, I wouldn't agree.
8        Q   Okay.  Who was the court monitor at the
9 time this issue broke?
10        A   The same person it's always been, Judy
11 Meltzer.
12        Q   Did Ms. Meltzer indicate to your
13 knowledge that she was aware that children were
14 sleeping in the building in 2005 at CFSA?
15        A   Not to me, but I have not very much
16 contact with her.
17        Q   So when you said -- testified a short
18 time ago that it was -- that this issue was being
19 brought to the attention of the monitor, you don't
20 really know, do you?
21        A   No, I don't.
22        Q   Did you get a sense in the executive team

119

1 meetings that you attended that addressed this issue
2 of children sleeping in the building after it became
3 known in the media, did you get a sense that people
4 were angry about the issue having gone public?
5        A   Yes.
6        Q   And who was giving you the impression
7 that they were angry about it?
8        A   I think maybe angry is too strong,
9 dismayed, betrayed.
10        Q   And who was giving you the impression
11 that they were dismayed or betrayed?
12        A   A number of people.  We all knew that the
13 way it ended up being presented in the media was
14 going to give us a black eye.
15        Q   Okay.  And a black eye with whom?
16        A   The public.
17        Q   Okay.  Now, when you -- when you or other
18 members of your office, the Public Affairs Office,
19 responded to this issue, did you make it a point to
20 demonstrate in your presentations to the media or to
21 the public that in fact the issue was one of
22 long-standing and that it was being corrected and

120

1 these were all the steps that were being taken in
2 order to address the issue?
3        A   Yes.
4        Q   And did that get reported?
5        A   No.
6        Q   Okay.  Did you or others make
7 presentations to the Council -- City Council along
8 those same lines, that it's a matter of long-standing
9 and that it was being addressed?
10        A   While I was dealing with the media end of
11 it, what others did to contact the executive office
12 of the Mayor and Council members about this exact
13 issue at the same time, I do not know.  I sat in the
14 testimony where this became a key line of
15 questioning, but what actually went on at the time, I
16 don't know because I was dealing with the media and
17 other people would have been handling those
18 outreaches if they were made.
19        Q   All right.  So I take it then that during
20 the time of the media crisis we'll call it?
21        A   Yes.
22        Q   You were not engaged with other

Case 1:06-cv-00789-PLF-JMF    Document 42-9    Filed 04/23/2008    Page 31 of 79
VIDEOTAPED DEPOSITION OF MINDY GOOD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

31 (Pages 121 to 124)

121

1  executives within the agency in, for example,
2  preparing other types of communications to other
3  stakeholders or government officials on this topic,
4  is that right?
5      A  Correct.
6      Q  Would you normally have been a person
7  involved in those kinds of communications?
8      A  Not necessarily.
9      Q  So, for example, when agency officials
10  are making presentations to the City Council is that
11  that something that you're usually involved in or
12  not?
13      A  Well, remember, there's formal and
14  informal communication.  In formal testimony, yes, I
15  am generally involved, but when you have a situation
16  where there is a need to do immediate talking, if the
17  top people decide to pick up the phone and call
18  people they know, I'm not going to be involved in
19  that.
20      Q  Was there any communication during the
21  time of this issue becoming public where the Mayor's
22  office was communicating with the agency to figure

122

1  out what was going on or communicating some concern
2  or anything of that nature to your knowledge?
3      A  I don't know.  They did not talk to me.
4      Q  I believe you said in your testimony a
5  few moments ago that people in the executive sessions
6  or meetings were feeling -- or some were feeling
7  dismayed or betrayed I think was --
8      A  Yes.
9      Q  -- the phrase that you used or the
10  language you used.  Who was it that was giving you
11  that impression in the executive ranks?
12      A  I think everyone felt it to some degree.
13      Q  Did anyone say anything that gave you
14  that impression?
15      A  No, not any one -- not any one thing
16  stands out.
17      Q  Now, these executive team meetings that
18  occur every two weeks, is that right?
19      A  They did, yes.
20      Q  They did.  Is it a different practice
21  now?
22      A  Yes.

123

1      Q  Okay.  What is the practice now?
2      A  There's still -- there's a management
3  team meeting every two weeks.  There is an executive
4  team meeting once a month.  And there is a senior
5  team meeting once a month.
6      Q  Now, in 2005, did you have each of those
7  three types of meetings or just the executive
8  meetings?
9      A  I can't remember whether we were having
10  the management staff meetings or not at that time
11  period, but we were having the executive meetings,
12  and the thing that you need to know is we were having
13  executive team meetings every two weeks, and the
14  second -- or the first executive team meeting of the
15  month has now been expanded to include a larger group
16  of people, so that's the difference.
17      Q  So at the time in 2005 were executive
18  team meetings memorialized in any way?
19      A  Yes, there were minutes.
20      Q  Who prepared the minutes?
21      A  Either Joelle Myers or Brenda's
22  secretary, whose last name -- or administrative

124

1  assistant or secretary whose last name was Robinson.
2      Q  Do you think her first name was Angela?
3      A  Yes, that's correct, that's it.
4      Q  Would you see copies of these minutes
5  when they were completed?
6      A  They would be sent to me, yes.
7      Q  And were there minutes taken of the
8  meetings which discussed, for example, children
9  sleeping in the building?
10      A  My impression is that they took minutes
11  at every meeting, so inasmuch as that was a
12  discussion topic at one meeting, yes, there should
13  have been minutes.
14      Q  Were there any executive team meetings
15  that discussed the concerns about the media
16  portraying or discussing this children sleeping in
17  the building issue?
18      A  No.  Not per se, no.
19      Q  So the topic of children sleeping in the
20  building generally was discussed but not necessarily
21  the media's reaction to it, is that right?
22      A  Again, the topic of children sleeping in

Case 1:06-cv-00789-PLF-JMF VIDEOTAPED DEPOSITION OF MILDRED GOOD Document 43-9 Filed 04/23/2008 Page 32 of 79
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

32 (Pages 125 to 128)

125
1 **the building was discussed long before this ever got**
2 **into the media in the executive team. So the**
3 **discussion in the executive team took place quite**
4 **awhile or several weeks or months before we had the**
5 **media incident.**
6     Q   Okay. Now, with respect to the Human
7 Resources investigation that you mentioned earlier,
8 was there ever an outcome that you were aware of of
9 that investigation?
10     A   **No one told me.**
11     Q   Did you ever hear anything or see
12 anything that suggested that the Human Resources
13 Department completed an investigation on these
14 issues?
15     A   **No.**
16     Q   And by these issues, I mean the picture
17 that was in the media and so forth.
18     A   **No.**
19     Q   At the time in 2005 was Mr. Charles over
20 the Human Resources Department?
21     A   **As deputy director of administration,**
22 **yes. It was under him.**

126
1     Q   And do you know at the time in 2005 who
2 was immediately reporting to Mr. Charles from the
3 Human Resources Department?
4     A   **Kleartis Jackson and then the person**
5 **after him was Denise -- I can't remember.**
6     Q   But during 2005 it would have been
7 Kleartis Jackson?
8     A   **There may have been some overlap. I**
9 **can't remember when Kleartis left and Denise came.**
10     Q   All right. Now, you testified earlier
11 that it was communicated to you by Brenda Donald that
12 Ms. Tabb was going to be removed from her position in
13 District Government, correct?
14     A   **Yes.**
15     Q   So I take it that that was not your
16 decision?
17     A   **No, it wasn't.**
18     Q   Did you have any input into that action,
19 being the action of removing Ms. Tabb from her
20 position?
21     A   **No.**
22     Q   Do you know what Ms. Donald relied upon,

127
1 if anything, to make the decision that Ms. Tabb
2 should be removed from her position?
3     A   **No.**
4     Q   Do you know who other than Ms. Donald was
5 involved in evaluating the facts and then making a
6 judgment that Ms. Tabb should be removed from her
7 position?
8     A   **No.**
9     Q   What action, if any, with respect to
10 Ms. Tabb did you have to take once you were notified
11 that Ms. Tabb was going to be removed from her
12 position?
13     A   **Brenda told me to call her up at home**
14 **because she was on medical leave and let her know**
15 **that she was terminated, that her position was**
16 **terminated, and her employment with the agency was**
17 **terminated, and that HR would need to follow up with**
18 **a letter.**
19     Q   And did you make that call?
20     A   **Yes, I did, and I got someone from HR to**
21 **be on the call with me.**
22     Q   Who was that?

128
1     A   **I believe it was Deborah Wilson.**
2     Q   And did you actually reach Ms. Tabb?
3     A   **Yes.**
4     Q   And about when did you have this phone
5 call?
6     A   **I want to say it was late morning. I**
7 **can't be sure.**
8     Q   And would this have been within, as you
9 were describing earlier, a few days of the media
10 coming to the agency and raising this issue of
11 children sleeping in the building?
12     A   **I don't remember.**
13     Q   All right. It would have been -- was it
14 sometime though after the media brought this issue to
15 your attention?
16     A   **Yes.**
17     Q   And what did you communicate to Ms. Tabb
18 in the telephone conversation?
19     A   **That her employment with the agency was**
20 **being terminated, that I was notifying her of that,**
21 **that Deborah Wilson would get on the phone and talk**
22 **to her about paperwork or whatever needed to happen,**

Case 1:06-cv-00789-PLF-JMF   Document 43-9   Filed 04/23/2008   Page 33 of 79
VIDEOTAPED DEPOSITION OF MINDY GOOD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

33 (Pages 129 to 132)

129

1  and Deborah did get on the phone with her and they
2  talked a little back and forth.
3      Q   Did Ms. Tabb provide any response or
4  reaction to your news of her position?
5      A   If I recall, she was very unsurprised.
6      Q   But did she say anything?
7      A   I can't remember.
8      Q   Was the telephone call recorded?
9      A   No.
10     Q   Did anyone take notes?
11     A   No.
12     Q   Did you or Ms. Wilson then report to
13  Ms. Donald that step had been taken?
14     A   Yes.
15     Q   And how did you report that to
16  Ms. Donald?
17     A   I believe that Deborah Wilson took care
18  of that.
19     Q   Okay.  And do you know how Ms. Wilson
20  reported that?
21     A   No.
22     Q   What gave you the impression that

130

1  Ms. Wilson had taken care of reporting to Ms. Donald
2  about your telephone call with Ms. Tabb?
3      A   Well, because it had become an HR matter.
4      Q   And it had become an HR matter in your
5  understanding why?
6      A   Because there was a termination involved.
7      Q   Do you know whether or not the court
8  monitor in the LaShawn A. litigation made inquiries
9  about the issue of children sleeping in the building
10  once it came to public attention?
11     A   No, I don't know.
12     Q   Do you know whether or not any members of
13  the City Council made inquiries with the agency once
14  the issue of children sleeping in the building came
15  to public attention?
16     A   Yes, I believe Mr. Fenty, who was then
17  chair of the Human Services Committee, made
18  inquiries.
19     Q   Do you know with whom he made those
20  inquiries?
21     A   No, I don't know for a fact.
22     Q   Do you recall seeing any communications

131

1  to or from Mr. Fenty on this topic?
2      A   I can't recall.  I can't recall yes or
3  no.
4      Q   If you had any such communications, would
5  you have maintained a copy of them in any of your
6  files?
7      A   Yes.
8      Q   Is there a file dedicated to this issue,
9  for example?
10     A   No.
11     Q   Okay.  Where would such information have
12  been maintained?
13     A   I think everything pertaining to the
14  media situation about kids sleeping in the building
15  and all -- everything that came out of the aftermath,
16  I have it all in the same file as the material I have
17  on Shirley Tabb, I think it's altogether.
18     Q   Okay.  And how large in terms of volume
19  of pages or size of file is that particular file?
20     A   Maybe an inch thick.
21     Q   And what steps, if any, did the agency
22  take following the public revelation of the children

132

1  sleeping in the building issue to improve on that
2  topic more rapidly, if anything?
3      A   I'm not sure that they did anything more
4  rapidly except to keep going on the strategies they
5  had been working for months to put in place.
6      Q   So if say -- strike that.  If following
7  these media reports, say the next day some kids came
8  in late at night and there was no immediate
9  placement, would it have been likely in your
10  understanding that they would have slept in the
11  building?
12         MR. WILLIAMS:  Objection, speculation.
13     A   Yeah, right.  I don't know.
14     Q   Was there anything happening at that time
15  in terms of the agency's steps toward resolving this
16  issue that indicate to you that the issue would have
17  been dealt with differently within a few days or
18  weeks of this media attention?
19     A   No.
20     Q   Do you know what steps, if any, the
21  agency currently takes to address the issue of
22  avoiding children having to sleep in the building?

Case 1:06-cv-00789-PLF-JMF   Document 42-9   Filed 04/23/2008   Page 34 of 79
VIDEOTAPED DEPOSITION OF SHIRLEY GOOD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

34 (Pages 133 to 136)

133

1        MR. WILLIAMS:  Objection, relevance.
2   Answer the question.
3        **A   I don't think we've had any children**
4   **sleep in the building for quite some time.**
5        Q   And what's your basis for saying that?
6        MR. WILLIAMS:  Continuing objection,
7   relevance.
8        **A   The couple of times it's been brought up,**
9   **the comment has been well, we've gotten over that**
10  **hurdle.**
11       Q   And do you know what has happened to get
12  over that hurdle as you say?
13       **A   I think some of the strategies they were**
14  **attempting to put in place at that time have paid**
15  **off -- have actually worked and paid off.**
16       Q   And when you say children sleeping in the
17  building hasn't been an issue for quite some time,
18  how long has it been since a child may have slept in
19  the building?
20       **A   I don't know.**
21       Q   Have you done any investigating with the
22  Placement office, for example, to determine that

134

1   topic?
2        **A   No.**
3        Q   But the Placement office would be the
4   place to find that information?
5        **A   Correct.**
6        Q   Do you know whether or not the agency
7   following the media attention on the issue of
8   children sleeping in the building took some step, as
9   an interim step I take it, to provide some more
10  comfortable accommodations for kids if they ended up
11  needing to stay overnight?
12       **A   I don't know.**
13       Q   When Brenda Donald communicated to you
14  that she was going to remove Ms. Tabb from her
15  position and terminate her, did Ms. Donald indicate
16  her basis for taking that step?
17       **A   That she had violated confidentiality by**
18  **taking the picture of the alleged CFSA client to the**
19  **media.**
20       Q   Did Ms. Donald provide any other basis
21  for taking that action of removing and terminating
22  Ms. Tabb?

135

1        **A   Not to me.**
2        Q   Who was the Deputy Mayor over CFSA at the
3   time in 2005 if you know?
4        **A   Neil Albert.**
5        Q   Do you know if Mr. Albert became engaged
6   in this issue at all during that time?
7        **A   No.**
8        Q   You don't know?
9        **A   I don't know.**
10       Q   Did you play any role in the letters or
11  communications that were subsequently sent to
12  Ms. Tabb regarding her being terminated from the
13  agency?
14       **A   As her direct supervisor, I may have**
15  **signed one document, but I think Brenda and Human**
16  **Resources signed the majority.**
17       Q   What document is it that you think you
18  may have signed?
19       **A   There was a reprimand, a letter of**
20  **reprimand.**
21       Q   And when was this letter of reprimand
22  issued?

136

1        **A   I don't recall.**
2        Q   Was this letter of reprimand prepared in
3   order to support the termination?
4        **A   No, it was prior to that.**
5        Q   When was it prepared?
6        **A   Earlier that year but I can't exactly**
7   **recall when.**
8        Q   Do you know about how much earlier from
9   the time when the media revealed the children
10  sleeping in the building issue?
11       **A   No, sorry.**
12       Q   Were you involved in preparing any of the
13  internal communications within the agency or advising
14  others on the preparation of those communications
15  once this issue of children sleeping in the building
16  became public?
17       **A   Agency communications to Shirley?**
18       Q   No, I'm sorry, I mean to other agency
19  staff, informing them about the issue, addressing the
20  issue with them?
21       **A   About kids sleeping in the building?**
22       Q   Yes.

Case 1:06-cv-00789-PLF-JMF   Document 42-9   Filed 04/23/2008   Page 35 of 79
VIDEOTAPED DEPOSITION OF MINDY GOOD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

35 (Pages 137 to 140)

137

1    A  I can't remember.  I don't know.
2    Q  If such communications occurred during
3 the 2005 time period, would you likely have been
4 involved in assisting in their preparation?
5    A  Perhaps.
6    Q  Were there any persons other than Shirley
7 Tabb who after the issue became public, that is the
8 issue of children sleeping in the building became
9 known to the agency in terms of raising that issue or
10 similar issues and threatening to make them public?
11    A  I'm sorry, what's the question?
12    Q  The question is were there -- after the
13 media attention on the children sleeping in the
14 building issue, were there any persons that brought
15 to the attention of the agency other issues that they
16 were concerned about that they were threatening to go
17 to the media with or make public?
18    MR. WILLIAMS:  Objection, relevance.
19    A  You mean employees?
20    Q  Employees or other people in the
21 stakeholder community.
22    A  Nothing springs to mind.  We -- because

138

1 we're a child welfare agency, we sometimes have
2 clients who threaten to expose things in the media
3 and that is not a totally infrequent occurrence, so.
4 But nothing is standing out in my mind as an issue
5 around that time of someone else saying they were
6 taking something to the media.
7    Q  Do you typically get involved in those
8 issues where a client is raising a concern and
9 indicates that he or she may go to the media?
10    MR. WILLIAMS:  Objection, relevance.
11    A  Yes, often someone gives me a heads up
12 that there is a threat.
13    Q  But there's nothing that comes to mind
14 for you for the time period that we're discussing?
15    A  No.
16    Q  Let me show you what I'll mark as the
17 next exhibit.
18    (Deposition Exhibit Number 2 was marked
19 for identification and attached to the transcript.)
20 BY MR. CONDIT:
21    Q  Ms. Good, the court reporter has handed
22 you what has been marked as Exhibit 2 in the

139

1 deposition.  It's a single page of handwritten notes.
2 And I'd like you to tell me after looking at it if
3 you recognize it.
4    A  These are notes that I have obviously
5 taken, but when I took them or what they pertain to,
6 I'm not exactly sure.
7    Q  So you can't tell from reading them what
8 they pertain to?
9    MR. WILLIAMS:  Objection, she said she
10 doesn't -- just a point of clarification, she said
11 she read it and said -- indicated that she doesn't
12 know when they were taken and what they pertain to.
13 So now you're asking her to actually read the
14 document, it speaks for itself as to what it says as
15 opposed to what she remembers.
16    Q  Do you know what these notes pertain to
17 or not?
18    A  This business in here where it says
19 March, April, May, peak, May and June, spiking kids
20 in Intake, lack of resources, new contracts in TPR,
21 this is about the placement crisis.  And I would
22 guess that eight Lutheran Social Services, 16 Martin

140

1 Pollock, was one of the strategies we were attempting
2 to initiate to do something about those problems that
3 are listed up above.
4    MR. WILLIAMS:  I'm sorry, point of just
5 clarification, are you guessing that's what this is?
6    THE WITNESS:  No, I'm pretty sure that's
7 what this is in the middle, but some of the rest of
8 this I'm totally unclear about what it has to do
9 with.  But see where it says March, April, May,
10 that's when the placement crisis was.  And these are
11 notes about what the reasons for it was.  There was a
12 spike of kids in Intake, there was a lack of
13 resources, given the new contracts, and I explained
14 that to you earlier about we had contracted for a
15 certain number of beds which contractors could not
16 bring on as fast as we had hoped.  And then the TPR
17 project.
18    And down here, eight Lutheran Social
19 Services, 16 Martin Pollock, I cannot remember
20 exactly, but my guess is that is notes about the
21 strategy that we were working to bring more beds on,
22 and what the rest of this is, I'm clueless at the

Case 1:06-cv-00789-PLF-JMF  Document 42-9  Filed 04/23/2008  Page 36 of 79
VIDEOTAPED DEPOSITION OF MINDY GOOD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

36 (Pages 141 to 144)

141

1  moment, I can't recall.
2  BY MR. CONDIT:
3      Q   With respect to Exhibit 2 as you examine
4  it, is the handwriting your handwriting?
5      A   Yes.
6      Q   All of the handwriting?
7      A   Yes.
8      Q   Now, at the top of the page it says
9  August 26, due Thursday midnight.  In looking at that
10  phrase or sentence and considering it in the context
11  of the subject matter of these notes, do you know
12  what that August 26 deadline was?
13      A   No, I do not.
14      Q   Do you have an idea of what it was?
15      A   No, I do not.
16      Q   Do you believe that it may have had
17  something to do with responding to the media on the
18  children sleeping in the building issue?
19          MR. WILLIAMS:  Objection.  Objection.
20  speculation.  She answered she did not know what that
21  date was about.  You're asking her to speculate on
22  whether it could have been about this incident and

142

1  she's already said she doesn't know, so this is --
2  anything else is speculation.
3      Q   But you can answer the question.
4          MR. WILLIAMS:  Answer the question.
5      A   But I don't know.
6      Q   Who is Leslie Pinkston who is noted on
7  the top third of the document?
8      A   I have no idea.  This -- I have a book
9  that I carry about with me to most meetings and it
10  has grided paper in it and I may go to several
11  meetings over the period of let's say a week or two,
12  and I'm taking little notes on the same sheet of
13  paper from several incidents until finally some notes
14  I take reach a point of critical mass, at which point
15  I tear the sheet out and then it becomes my notes for
16  that day.  So there may be notes on here from several
17  different meetings over a week or more.
18      Q   Okay.
19      A   I have been doing that for years.  So
20  different things that you see on the sheet may or may
21  not relate at all.
22      Q   Okay.  So as you sit here today, do you

143

1  know or do you have any idea of what the notation
2  that you made on the left bottom -- near the bottom
3  left corner of Exhibit 2 that says, long career,
4  extraordinary individuals, group, level of ded.,
5  which I assume -- d-e-d, period, which I assume means
6  dedicated, and teamwork extraordinary, do you know
7  what that was referring to?
8      A   No idea.
9      Q   At the very bottom of the document there
10  is a sentence or a phrase that says, best practices,
11  dash, develop system for, in quotes, first, dash,
12  best, end of quote.  Do you know what that means?
13      A   Yes, that one of the goals for the
14  placement system was to have the first placement be
15  the best placement, that that was the goal.  So
16  instead of youngsters going into care and having
17  multiple placements, we would have first placement,
18  best placement.
19      Q   All right.  Then up near the middle of
20  the page written on a slant on the left side, it
21  says, we have foundation to d-e-v, period, b-p,
22  period.  Do you know what that means?

144

1      A   Develop best practices.
2      Q   And that best practice would refer again
3  to something like the first-best system?
4      A   Or that people felt we had resources
5  locally that we needed to tap but that things were
6  available to help us clean up the placement crisis we
7  were facing.
8      Q   Would it be fair to say that the notes on
9  this exhibit, Exhibit 2, reflect a discussion that
10  you were present for or a meeting that you were
11  present for involving the placement crisis and
12  children sleeping in the building?
13          MR. WILLIAMS:  Objection, speculation.
14  She's already testified that there were many
15  different, you know, notes on this page that may or
16  may not have been taken over a week's time.  So
17  you're asking her to speculate whether all these
18  notes go to that specific issue.
19          MR. CONDIT:  I'm not asking her to
20  speculate.
21          MR. WILLIAMS:  Well, which notes are
22  you -- she testified that there are many notes.

145

1    MR. CONDIT:  Counsel, can you just let
2 her try to answer the question.  And if you have an
3 objection, I'd appreciate it if you'd not coach the
4 witness with a lot of discussion.  You can note your
5 objection for the record and we'll move on, but I
6 don't wish the witness to be coached if you would
7 kindly.
8    MR. WILLIAMS:  No problem.  I'm not
9 coaching the witness.  Objection noted.
10    THE WITNESS:  Ask me the question again,
11 please.
12 BY MR. CONDIT:
13    Q   Sure.  In looking at Exhibit 2, which you
14 have indicated are your handwritten notes, is it fair
15 to say that the majority, if not all of these
16 handwritten notes, pertain to the placement crisis
17 and/or children sleeping in the building?
18    MR. WILLIAMS:  Same objection.  Answer.
19    **A   I think that they pertain to a discussion**
20 **at some point about possible solutions and what the**
21 **status was, that's my guess, but I don't remember**
22 **exactly when I took these or why.**

146

1    Q   Okay.  Now, you testified a few moments
2 ago that you have a notebook or a book of some kind
3 where you have grided paper like this and that you
4 pull out the pages once you've filled the page with
5 notes, is that right?
6    **A   Once something on the page, I've taken**
7 **notes that are critical and I need to keep them, I**
8 **pull it out.  And often there are three or four**
9 **subjects on the paper but I'm keeping the page now**
10 **because only one of them has come to a critical mass**
11 **and they're notes that I need.**
12    Q   Okay.  And if these notes pertain to a
13 particular issue that you were concerned about at the
14 time and you decided to save them, where would they
15 be saved?
16    **A   Again, they'd be in the file with the**
17 **other -- if they are about the placement crisis,**
18 **they'd be in the file with the information about kids**
19 **sleeping in the building.**
20    Q   Okay.  Let me show you what I'll mark as
21 Exhibit 3.
22    (Deposition Exhibit Number 3 was marked

147

1 for identification and attached to the transcript.)
2 BY MR. CONDIT:
3    Q   Ms. Good, the court reporter has handed
4 you what's been marked as Exhibit 3 and this is a
5 two-page document from the WUSA Channel 9 website
6 dated September 20, 2005 concerning the children
7 sleeping in the building issue.  I'd like you to take
8 a look at it and tell me if you've seen this before,
9 and the second page contains a picture that was on
10 the website attached to this article.
11    (Pause for document review.)
12    Q   Have you seen this article before?
13    **A   Yes.**
14    Q   When do you think you first saw it?
15    **A   Probably the same day it was posted on**
16 **the Channel 9 website.**
17    Q   Now, on page 2 of Exhibit 3, there's a
18 picture of looks like a young man or a young person
19 of some kind.  Is that picture familiar to you?
20    **A   Yes.**
21    Q   And when did you first see that picture?
22    **A   That is the same or very similar to the**

148

1 **picture that Phyllis Armstrong showed me when she**
2 **first came to see me at CFSA.**
3    Q   Is that the picture that Ms. Armstrong
4 gave you a copy of?
5    **A   Yes, or similar.**
6    Q   Now, with respect to this Exhibit 3, is
7 this an item that you were or others in the agency
8 copied and maintained as part of the media file on
9 this issue?
10    **A   Yes.**
11    Q   And where would you have maintained
12 copies of this particular article?
13    **A   I believe that I turned this information**
14 **over to Human Resources when they began their**
15 **investigation.**
16    Q   Now, with respect to page 2 of the
17 exhibit and the picture, I notice at least in this
18 picture that was on the website that I cannot discern
19 facial features of this person.  Is that the way that
20 you saw the picture that you received when the media
21 first confronted you with this issue?
22    **A   No.**

149
1    Q  So you're saying that you can see the
2  person's facial features?
3    **A  The picture was not altered in the way it**
4  **is altered here.**
5    Q  Okay.  So could you see the person's
6  facial features on the picture that you were given?
7    **A  We had other pictures of this person that**
8  **had been downloaded onto Derek Stewart's computer, so**
9  **we had a large set of photos from this series that**
10  **clearly showed this young man's face.**
11    Q  What pictures were downloaded onto Derek
12  Stewart's computer?
13    **A  There were a series of them that were**
14  **downloaded from the agency digital camera.**
15    Q  Okay.  So are these pictures that you're
16  referring to on Derek Stewart's computer that were
17  pictures that the media displayed?
18    **A  No, some of them match what the media**
19  **displayed.**
20    Q  Oh, okay.  Well, let me clarify the
21  record then, I think I'm understanding but tell me if
22  I'm wrong.  So in the search for who this child or

150
1  youth was, there was an examination done of photos
2  within the agency, including those that were
3  maintained by Mr. Stewart, is that right?
4    **A  No.  When this hit the airwaves, Derek**
5  **realized that he had downloaded pictures from the**
6  **agency camera that matched in some regards what we**
7  **were seeing on Channel 9 and he brought it to our**
8  **attention, and in that series there were more**
9  **pictures than Channel 9 showed.**
10    Q  Okay.  And did anyone make an effort to
11  confirm that the pictures that were in the hands of
12  the media were the same pictures that were downloaded
13  from the digital camera as you were describing?
14    **A  Sure looked like it.  They certainly**
15  **looked like they were the same pictures.**
16    Q  So I take it then the pictures from the
17  agency's digital camera showed this youth or young
18  person in a similar position on a cot of this nature,
19  dressed in a similar way?
20    **A  Correct.**
21    Q  All right.  Was there any indication from
22  the digital camera or the data -- shall we say the

151
1  mediadata around that file for the pictures of when
2  the pictures were taken?
3    **A  I don't know.**
4    Q  Do you know if anyone made an effort to
5  establish that?
6    **A  I don't know.**
7    Q  When was it discovered that pictures that
8  Derek Stewart had might match the pictures that the
9  media were showing on this issue?
10    **A  Not very long after Channel 9 ran this**
11  **information.**
12    Q  And who first announced the possibility
13  that pictures that the agency had might match the
14  person that was being represented in the media?
15    **A  Derek.**
16    Q  Derek did.  Was there an effort to
17  determine who within the agency had provided these
18  pictures to the media?
19    **A  Phyllis Armstrong told me the day she**
20  **arrived that Shirley Tabb had given those photos to**
21  **Channel 9.**
22    Q  Aside from the representations made by

152
1  the news person, was there any effort to your
2  knowledge to determine who provided the pictures to
3  the media?
4    **A  We took Ms. Armstrong at her word.**
5    Q  Was there any effort then to determine
6  who provided the pictures to Shirley Tabb if Shirley
7  was the one who shared them with the media?
8    **A  No.**
9    Q  Was there any effort to determine how
10  Ms. Tabb obtained the pictures?
11    **A  No.  Again, when Derek had pictures from**
12  **the agency camera that he had downloaded from the**
13  **agency camera into his computer that were very**
14  **similar to this, most of the time the people who used**
15  **the agency camera were Derek and Shirley because it**
16  **was the property of OPI.  Now, it was possible to**
17  **loan it to someone else but we did not often do that.**
18    **But no, was any effort taken to find out**
19  **exactly who took the pictures, no.**
20    Q  Let me show you what I'll mark as the
21  next exhibit.
22    (Deposition Exhibit Number 4 was marked

Case 1:06-cv-00789-PLF-JMF VIDEOTAPED DEPOSITION OF WILMA GOOD Filed 04/23/2008 Page 39 of 79
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

39 (Pages 153 to 156)

153

1  for identification and attached to the transcript.)
2  BY MR. CONDIT:
3      Q  Ms. Good, the court reporter has handed
4  you what's been marked as Exhibit 4.  It is another
5  version I believe of the same story, print story by
6  WUSA TV 9, and I'd like to know if you've seen this
7  document in the form you see it before?
8      A  Yes.
9      Q  Now, to the right of the text of the
10  article that appears on Exhibit 4 there's a -- looks
11  like some kind of sticky note that says -- looks like
12  agency's practices questioned.  Do you see that?
13      A  Yes.
14      Q  Do you know whose sticky note or writing
15  that is?
16      A  Mine.
17      Q  Okay.  And why did you put that sticky
18  note on this document?
19      A  I would get -- I would speculate that
20  someone told me the name of the story that was
21  running that day on Channel 9 and I wrote it on a
22  sticky note and then I went to my computer and pulled

154

1  it up off of the Channel 9 website and happened to
2  stick the note on which I had made this little
3  notation onto whatever I printed out.  That's what
4  looks to me like what happened.
5      Q  All right.  Now, I notice on this
6  document, much like the previous exhibit, Exhibit 3,
7  in the very beginning parts of the print story, in
8  fact in the second sentence, it says:  In a 9 news
9  exclusive, a social worker speaks out about what she
10  calls questionable practices at the D.C. Child and
11  Family Services Agency.  Do you see that?
12      A  Yes.
13      Q  Okay.  The reason I bring that to your
14  attention is to ask if on this date, September 20,
15  2005, if this was the first time the story broke?
16      A  I don't know.
17      MR. WILLIAMS:  Counsel, just for
18  clarification purposes, this appears to be not the
19  entire story, print story.  I think it's the same
20  story, but it appears, it says -- at the top
21  right-hand corner, it says one page of 2, at the
22  bottom it's cut off.  So it's just the one sheet of

155

1  paper, not the entire story.  Just for clarification.
2      MR. CONDIT:  That's all I have so I'm
3  giving you -- I'm showing the witness what I have
4  basically.
5      MR. WILLIAMS:  I'm just making it clear
6  for the record.
7      MR. CONDIT:  I appreciate that.  Thank
8  you.  Let's mark the next exhibit, please.
9      (Deposition Exhibit Number 5 was marked
10  for identification and attached to the transcript.)
11  BY MR. CONDIT:
12      Q  Ms. Good, you've been handed by the court
13  reporter what has been marked as Exhibit 5.  Exhibit
14  5 is a WUSA 9 print story identified on the top as
15  written by Nancy Yamada.
16      A  Yes.
17      Q  Dated 9-23-2005 at 12:50:29 p.m.  Tell me
18  when you have a chance to look at it if you've seen
19  this story before.
20      A  Yes, I have.
21      Q  Okay.  And do you think you first saw
22  this story that we see as Exhibit 5 on the 21st of

156

1  September 2005?
2      A  On the day that it was posted?
3      Q  Yes.
4      A  Yes.
5      Q  Okay.  And why are you sure of that?
6      A  I was tracking and following all of these
7  postings, so every day I was looking at what was
8  being posted.
9      Q  All right.  And did you prepare some kind
10  of response to this particular version of the story,
11  this September 21 version?
12      A  The one talking about Shirley Meyers?
13      Q  Yes.
14      A  Not that I recall.
15      Q  Okay.  And do you know who Shirley Meyers
16  is?
17      A  No, only what it says in the story.
18      Q  Okay.  Do you know if there were any
19  other print stories, other than the ones I've shown
20  you, on this particular issue in the fall of 2005?
21      A  I don't know.
22      Q  Now, given that the stories that I've

Case 1:06-cv-00789-PLF-JMF   Document 42-9   Filed 04/23/2008   Page 40 of 79
VIDEOTAPED DEPOSITION OF UMA GOOD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

40 (Pages 157 to 160)

157

1  shown you in these Exhibits 3, 4 and 5 are dated
2  September 20 and September 21, 2005, do you think it
3  more likely that this story broke in mid-September as
4  opposed to late August as you originally thought?
5      **A  Yes, I do.  I think I'm a month off in my**
6  **recollection and that these are the proper dates.**
7      Q  All right.  So the dates on these
8  articles refresh your memory on that issue?
9      **A  Yes.**
10     Q  All right.  Let me show you what I'll
11  mark as the next exhibit.
12         (Deposition Exhibit Number 6 was marked
13  for identification and attached to the transcript.)
14  BY MR. CONDIT:
15     Q  Ms. Good, the court reporter has shown
16  you what has been marked as Exhibit 6.  This is a
17  document copied or placed on Child and Family
18  Services Agency letterhead dated September 20, 2005,
19  from Uma Ahluwalia, principal deputy director,
20  subject, facts about children spending the night at
21  CFSA.  Please take a look at it and tell me if you've
22  seen this document before.

158

1         (Pause for document review.)
2      **A  I don't immediately recall having seen it**
3  **before.**
4      Q  Do you know -- strike that.  During the
5  time of this memo, September 20, 2005, do you recall
6  whether or not you were working with Ms. Ahluwalia or
7  others on communications of this nature?
8      **A  Definitely.**
9      Q  Is there anything about the document that
10  indicates that you may have worked on it or provided
11  input into it?
12     **A  Not particularly.**
13     Q  I notice in the upper right side at the
14  top of the document there's a header of some sort
15  that says Ms. Thompson Mallett, it says August 4,
16  2005, page 1.  Do you see that?
17     **A  Yes.**
18     Q  Do you know what that represents?
19     **A  No, I don't.**
20     Q  Do you know who Ms. Thompson Mallett is?
21     **A  Yes, she was the CFSA General Counsel.**
22     Q  And during -- was she the General Counsel

159

1  during 2005?
2      **A  I believe so.**
3      Q  Do you remember during this time period
4  of September 20, 2005 or thereabouts, talking
5  directly with Ms. Ahluwalia about the issue of
6  children sleeping in the building and communicating
7  to the public or others about that issue?
8      **A  Do I remember communicating with the**
9  **public?**
10     Q  No, with Ms. Ahluwalia about --
11     **A  About communicating with the public?**
12     Q  Yes.
13     **A  I'm sure I did, but there's no single**
14  **meeting that stands out.**
15     Q  Let me show you what I'll mark as the
16  next exhibit.
17         (Deposition Exhibit Number 7 was marked
18  for identification and attached to the transcript.)
19  BY MR. CONDIT:
20     Q  Ms. Good, the court reporter has handed
21  you what's been marked as Exhibit 7.  Exhibit 7 is a
22  one page e-mail from Uma Ahluwalia that looks like it

160

1  was perhaps printed from your e-mail account because
2  your name is indicated on the top.  Please take a
3  look at it and tell me if you are familiar with it.
4         (Pause for document review.)
5      **A  Again, I'm sure I've seen it before but I**
6  **wouldn't have remembered it until you showed it to**
7  **me.**
8      Q  Now, I notice the subject line says, CFSA
9  response to allegation that children are spending the
10  night at our office.  Do you see that?
11     **A  Yes.**
12     Q  Just above the subject line, your name is
13  listed as one of the recipients by a cc.  Do you see
14  that?
15     **A  Yes.**
16     Q  Do you believe that you received this
17  document?
18     **A  Yes.**
19     Q  Now, you were testifying earlier that it
20  wasn't -- that the issue of children sleeping in the
21  building was not being covered up or suppressed,
22  correct?

161

1    A   Correct.
2    Q   And I'm wondering then why it would be
3 referred to as an allegation that children were
4 spending the night at the office when it was readily
5 recognized that it was happening, do you know?
6    **A   Again, what I said was within the agency,**
7 **there was a great deal of discussion about the**
8 **placement crisis, the situation of what to do about**
9 **it and so forth.   There were many things going on in**
10 **the agency that were not child welfare best practices**
11 **because that's why we were having child welfare**
12 **reform.**
13         **The fact that we did not put out press**
14 **releases or otherwise go out in public and talk about**
15 **every step we've taken and every hurdle we've covered**
16 **in child welfare reform, that's a long way from any**
17 **kind of a cover-up.   The reason it says alleged here,**
18 **my guess is, and I did not write this, but again, I**
19 **said there was a feeling that the numbers that were**
20 **reported in the media were extremely inflated given**
21 **the numbers we internally were talking about.**
22         **So my guess is that the word allegation**

162

1 **here refers to those inflated numbers.   The media**
2 **made it look as if -- the impression in the agency**
3 **was that the media reporting had first made it look**
4 **as if we had children sleeping in the building every**
5 **single night, which was not true, and the media**
6 **reporting also made it appear that for some reason or**
7 **another there was some cover-up in the agency going**
8 **on about this when there is a difference between**
9 **running outside and telling people we have this**
10 **horrible problem, okay, and covering something up.**
11 **There's a huge difference.**
12         **Within the agency there was a great deal**
13 **of discussion about the placement crisis and what to**
14 **do about it.**
15    Q   Was the problem of children sleeping in
16 the building in your view a horrible problem as you
17 were referring to it a moment ago?
18    **A   Yes, there have been a number of things**
19 **at CFSA over the years that have been very serious**
20 **issues which is why we have had child welfare reform**
21 **here in the District and we still have some.**
22    Q   I believe that.   As a public information

163

1 officer, it is one of your tasks, is it not, to try
2 to put as good a perspective, shall we say, some may
3 say spin, on information being shared with those
4 outside the agency.   Would that be a fair statement
5 of one of the tasks of the public information
6 officer?
7    **A   It would be fair, but the way you put it,**
8 **the public has a right to know what's going on in our**
9 **agency, so that if people come forward and they ask**
10 **us things, we are always going to tell the truth**
11 **regardless of whether that's pretty or not.   There**
12 **have always been good things to say about the agency**
13 **and it has always had problems, and my job is to be**
14 **equally honest about both of those.**
15    Q   Would you say that it is honest to
16 suggest in this e-mail to the City Council that the
17 issue of children sleeping in the building is merely
18 an allegation?
19    **A   I did not write this e-mail.**
20    Q   I understand that.   I'm asking for your
21 opinion in the public information sense.
22    **A   Again, I did not write this.   I had no**

164

1 **control over it.**
2    Q   I understand that.   I'm asking for your
3 opinion as a public information official?
4    **A   My guess is that Uma Ahluwalia used the**
5 **word allegation because she was thinking inflated**
6 **numbers.**
7    Q   Well, I appreciate that very charitable
8 speculation.
9    **A   That's my guess.**
10    Q   But what I'm asking is a different
11 question.   And the question is, considering the
12 seriousness of the issue, considering that this
13 document that we're discussing, Exhibit 7, is a
14 communication to the City Council about this issue,
15 do you think that it is --
16    **A   Pardon me.**
17    Q   Certainly.   -- do you think that it is
18 honest to reflect in the subject line that the issue
19 of children spending the night at our office is an
20 allegation as opposed to more accurately stating it's
21 an ongoing issue we're dealing with?
22         MR. WILLIAMS:   Objection, asked and

Case 1:06-cv-00789-PLF-JMF   Document 42-9   Filed 04/23/2008   Page 42 of 79
VIDEOTAPED DEPOSITION OF MINDY GOOD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

42 (Pages 165 to 168)

165
1  answered. Answer.
2      A  I think there is no intent here
3  whatsoever to be dishonest.
4      Q  And you know that why?
5      A  My impression is that Uma Ahluwalia was a
6  very straight shooter.
7      Q  Let me show you what I'll mark as the
8  next exhibit.
9          (Deposition Exhibit Number 8 was marked
10  for identification and attached to the transcript.)
11  BY MR. CONDIT:
12      Q  Ms. Good, you're being shown what has
13  been marked as Exhibit 8 which is a one-page story
14  published it looks like on the website of The
15  Washington Times with a published date of October 6,
16  2005. Tell me if you've seen this story before?
17      A  I don't recall this.
18      Q  If you don't recall it, does that
19  necessarily mean that you might not -- that you did
20  not see it at the time?
21      A  No.
22      Q  If you had seen it at the time, would it

166
1  likely be in your files that you've been describing?
2      A  Perhaps.
3      Q  Let me show you what I'll have marked as
4  the next exhibit.
5          (Deposition Exhibit Number 9 was marked
6  for identification and attached to the transcript.)
7  BY MR. CONDIT:
8      Q  Ms. Good, you have been handed what has
9  been marked as Deposition Exhibit 9. This is a
10  one-page exhibit, a copy of an e-mail from Brenda
11  Donald to CFSA, all staff, copy to Neil Albert and
12  Judy Meltzer, the subject, message from the director.
13  The date is October 7, 2005. Take a look at this and
14  tell me if you've seen it before, please.
15          (Pause for document review.)
16      A  I don't recall this.
17      Q  So you do not recall receiving or reading
18  what we've marked as Exhibit 9?
19      A  No.
20      Q  Do you recall receiving or reading any
21  similar message from the director, Brenda Donald, on
22  or around October 7, 2005?

167
1      A  No.
2      Q  If you had received such a message, would
3  you have kept it?
4      A  Possibly.
5      Q  And if you had kept it, where would it be
6  in your files today?
7      A  With the rest of the information on kids
8  sleeping overnight.
9      Q  After the issue of children sleeping in
10  the CFSA office building became public, did the
11  agency have to deal with any inquiries by other
12  stakeholders in the child welfare sphere, such as the
13  Annie E. Casey Foundation, the foster parents
14  association, the social workers association, any of
15  those types of organizations to your knowledge?
16      A  I don't know.
17      Q  If such stakeholder communications being
18  concerned about that issue were being raised, do you
19  know who would have addressed them within the agency
20  at that time?
21      A  Brenda, Uma, possibly Janet Maher,
22  M-a-h-e-r.

168
1      Q  I believe you testified earlier that
2  there was one performance evaluation that you did for
3  Ms. Tabb that was satisfactory but close to being
4  unsatisfactory. Do you recall that?
5      A  Yes.
6      Q  Do you remember -- I have not found it in
7  my notes easily, do you remember what year that was?
8      A  No, I don't.
9      Q  But that would again be a document that
10  you would have in your files?
11      A  Yes.
12      Q  Do you recall if during any time wherein
13  you evaluated the performance of Ms. Tabb, she
14  received higher than a satisfactory evaluation?
15      A  Overall?
16      Q  Yes.
17      A  No, I don't.
18      Q  Let me show you what I'll mark as the
19  next exhibit.
20          (Deposition Exhibit Number 10 was marked
21  for identification and attached to the transcript.)
22  BY MR. CONDIT:

Case 1:06-cv-00789-PLF-JMF   Document 42-9   Filed 04/23/2008   Page 43 of 79
VIDEOTAPED DEPOSITION OF MINDY GOOD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

43 (Pages 169 to 172)

169

1    Q  Ms. Good, you've been handed what has
2  been marked as Exhibit 10.  This is a one-page
3  Government of the District of Columbia, Performance
4  Evaluation System, Report of Performance Rating,
5  Shirley Tabb's name is at the top of the document.
6  The signatures appear to be whited out.  I'd like you
7  to take a look at it and tell if you've seen this
8  document before?
9    A  I don't know.
10    Q  You don't know if you've seen it before?
11    A  No.
12    Q  Now, the rating period indicated on this
13  document seems to be from April 1, 2003 to March 31,
14  2000 -- and it's cut off but I would assume it's
15  2004.  Is that consistent with your understanding of
16  the rating periods used during that time?
17    A  Yes.
18    Q  Do you recall preparing an evaluation for
19  Ms. Tabb during that particular rating period, April
20  2003 through March 2004?
21    A  I should have, yes.
22    Q  You should have but you're not sure?

170

1    A  I prepared one for her.  I don't know
2  whether this is it.
3    Q  Let me show you what I'll mark as the
4  next deposition exhibit, Exhibit 11.
5      (Deposition Exhibit Number 11 was marked
6  for identification and attached to the transcript.)
7  BY MR. CONDIT:
8    Q  Ms. Good, you've been handed what has
9  been marked as Deposition Exhibit 11 which is a
10  two-page performance evaluation document with Shirley
11  Tabb's name on the top, with the rating period being
12  April 1, 2002 to March 31, 2003, and with signatures
13  on the bottom.  Do you recognize this document?
14    A  It appears to be a performance review,
15  yes.
16    Q  And although it's faint on the bottom, it
17  appears that Brenda Donald has signed it, and I think
18  that's your signature as well.  Can you confirm that?
19    A  Correct.
20    Q  Now, is this the evaluation where you
21  indicated that Ms. Tabb was close to unsatisfactory?
22    A  I don't know.

171

1    Q  If you were presented the evaluation that
2  you believe demonstrated that Ms. Tabb was close to
3  unsatisfactory, how would you determine if that was
4  the evaluation?
5    A  The rating sheets are missing.  This is
6  not everything.
7    Q  And the rating sheets would have those
8  numerical designations that you were referring to
9  earlier?
10    A  Correct.
11    Q  Now, I note on this document that
12  Ms. Tabb apparently disagreed with the evaluation.
13  Is that consistent with your memory?
14    A  Now that I see it, yes.  I wouldn't have
15  remembered that otherwise.
16    Q  Do you recall what her disagreement was?
17    A  No.
18    Q  How is a disagreement over a performance
19  evaluation addressed at CFSA if one wishes to contest
20  it?
21    A  I'm not sure.
22    Q  Ms. Good, do you know whether or not any

172

1  of your concerns about Ms. Tabb's performance were
2  factored into the decision to terminate her?
3    A  No, I don't know.
4    Q  Did you communicate to Ms. Donald or
5  anyone else who was involved in taking steps to
6  terminate Ms. Tabb, any concerns about her
7  performance?
8    A  Yes, but not at that time.  It had been
9  earlier than that.
10    Q  And when had that occurred?
11    A  Probably around the performance cycle
12  which as you can see ran from April through March, so
13  back in the spring.
14    Q  So it would have been -- if it happened
15  in 2005, for example, it would have been around March
16  or April of 2005?
17    A  Yes.
18    Q  Were you asked by anyone during the
19  August through October 2005 time period to provide
20  details or information about your concerns, if any,
21  regarding Ms. Tabb's performance?
22    A  No.

Case 1:06-cv-00789-PLF-JMF    Document 43-9    Filed 04/23/2008    Page 44 of 79
VIDEOTAPED DEPOSITION OF MINDY GOOD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

44 (Pages 173 to 176)

173

1    MR. CONDIT: Well, considering that we
2 have to leave the deposition open in light of the
3 document issues, I'll stop at this point. And I
4 appreciate your time today, Ms. Good. Counsel for
5 the District may have some follow-up questions for
6 you.
7    MR. WILLIAMS: I do have some follow-up
8 questions. I know it's late in the day but can we
9 pause for a five-minute bathroom break?
10    MR. CONDIT: Certainly.
11    THE VIDEOGRAPHER: Going off the record,
12 the time is 5:32 p.m.
13    THE VIDEOGRAPHER: Back on the record,
14 here begins tape number three in the deposition of
15 Mindy Good, the time is 5:37 p.m.
16    EXAMINATION BY COUNSEL FOR THE DEFENDANTS
17 BY MR. WILLIAMS:
18    Q  Ms. Good, I'm just going to ask you a few
19 questions based on your testimony so far that
20 Mr. Condit had asked you just to be clear on some
21 items.
22    You testified to evaluations that you

174

1 filled out for Ms. Tabb, correct?
2    **A  Yes.**
3    Q  Okay. Other than those annual
4 evaluations, I believe you testified too that there
5 were other appraisals during that time or --
6    **A  Not formal.**
7    Q  Not formal. Okay. Were there any
8 admonitions?
9    **A  Yes.**
10    Q  Okay. What is an admonition?
11    **A  It's a notice that employee performance
12 is not up to standard.**
13    Q  Okay.
14    **A  And there needs to be corrective action.**
15    Q  So is it your testimony that when an
16 employee is underperforming or if there's been a
17 problem that they may receive an admonition notice as
18 a result of that?
19    MR. CONDIT: Objection.
20    **A  Yes.**
21    Q  Okay. And who would send those
22 admonition notices, who would create those?

175

1    **A  The supervisor.**
2    Q  Okay. Did you ever create any admonition
3 notices for Ms. Tabb?
4    **A  Yes.**
5    Q  How many?
6    **A  I believe one.**
7    Q  You believe one. Do you remember when
8 you sent -- gave her a notice?
9    **A  No, I believe it was sometime in 2005 but
10 I can't remember exactly when.**
11    Q  Okay. I understand you can't remember
12 exactly. Was it before or after this incident we
13 call the media incident?
14    **A  Before.**
15    Q  Okay. And what did that admonition --
16 what was the basis for that admonition if you
17 remember?
18    **A  There was a performance issue but I can't
19 exactly remember what it was.**
20    Q  Okay. There was a performance issue but
21 you can't remember the specifics of it?
22    **A  Correct.**

176

1    Q  You had testified earlier about certain
2 absences, I believe you testified, there were certain
3 absences that Ms. Tabb had?
4    MR. CONDIT: Objection.
5    **A  I testified that she was on medical leave
6 and that we were having a hard time discovering what
7 exactly -- how long she planned to be out or whether
8 she was able to do any work at all or not do any work
9 at all or what that situation was.**
10    Q  Okay.
11    **A  So that was very unclear, but I'm not
12 sure the admonition had to do with that.**
13    Q  Okay. And Ms. Tabb's responsibility in
14 her day-to-day work, was she ever in charge of any
15 campaigns, any public relations campaigns?
16    **A  Yes, she was. She had an assignment to
17 do the campaign with our Information Systems people
18 that had to do with changing our internal network
19 from a server-based system to a web-based system that
20 they were going to call faces.net, and this was going
21 to take place throughout the agency and had a large
22 impact on people in the agency.**

45 (Pages 177 to 180)

177

1    Q  Okay.  And she was solely responsible for
2 that or was she in charge of that campaign?
3    A  When it became clear that she wasn't
4 going over to the Human Resources job that I talked
5 about earlier, I assigned her to that campaign.
6    Q  Okay.  Do you remember when you assigned
7 her to this campaign?
8    A  I want to say February.
9    Q  Of 2005?
10    A  Yes.
11    Q  Okay.  How did she perform on that
12 campaign?
13    A  Not well.  There was an important meeting
14 coming up in which the gentleman who headed Child
15 Information Systems who was the agency's chief
16 financial officer, was -- and his staff were looking
17 for materials to pass out and those materials were
18 not available when that group needed them.
19    Q  Okay.  So just to be clear there was an
20 individual who was in charge of that program that
21 needed certain documents from Ms. Tabb?
22    A  Yes.

178

1    Q  And when it came time for him to use or
2 need those, they weren't available?
3    MR. CONDIT:  Objection.
4    A  Correct.
5    Q  Okay.  Do you know why they weren't
6 available?
7    A  They had not been finished on time.
8    Q  Were they ever finished?
9    A  I don't recall.
10    Q  Okay.  What was the result -- what, if
11 any, communication did you have with Ms. Tabb
12 regarding her failure to have those documents ready?
13    A  I wrote quite a long memo about it.
14    Q  Okay.  Is this memo the same thing as the
15 admonition?
16    A  No.
17    Q  No.  It's a separate memo?
18    A  Yes.
19    Q  And do you remember the contents of that
20 memo?
21    A  I don't remember it off-hand but I have a
22 copy of it.

179

1    Q  Okay.  And do you remember the general
2 subject of that memo?
3    A  It laid out my side of the story
4 pertaining to what had happened with these documents
5 not being prepared and Information Systems being
6 pretty upset about it.
7    Q  Okay.  What was the result of you sending
8 that memo out, do you know what happened after that?
9        I'm sorry, backtrack, strike that.  Who
10 did you send the memo to?
11    A  Shirley.
12    Q  Anybody else?  Did you copy anybody else
13 on it?
14    A  I can't remember.
15    Q  Okay.  Do you know what the result of you
16 sending that e-mail -- I'm sorry, that memo was?
17    A  I can't remember except in terms of the
18 faces.net information campaign, except that later on
19 we reassigned that -- I reassigned it to Derek, but I
20 know that Shirley was upset about the memo I had
21 written and felt it was very unfair.
22    Q  Okay.  What, if anything, did she do?

180

1    A  I think she responded in writing but I'm
2 not sure.
3    Q  Okay.  The faces.net campaign, would you
4 characterize it as a big campaign or a small
5 campaign?
6    A  Given the kinds of campaigns, information
7 campaigns that we do within the agency, it was a
8 fairly large one in that it impacted a great many
9 people.
10    Q  Okay.
11    A  And Faces is the basic computer
12 management system for all of our case records.
13    Q  Okay.  Would you also characterize it as
14 an important campaign?
15    MR. CONDIT:  Objection.
16    A  Yes.
17    Q  Okay.  What, if any -- just give me a
18 second.  So is it your testimony that you had to
19 reassign the campaign to Derek Stewart?
20    MR. CONDIT:  Objection.
21    A  I did reassign it but I can't remember
22 exactly why.  I think some of it was -- the reason it

Case 1:06-cv-00789-PLF-JMF   Document 43-9   Filed 04/23/2008   Page 46 of 79
VIDEOTAPED DEPOSITION OF WILHEMINA GOOD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

46 (Pages 181 to 184)

181

1  got reassigned was because it was an ongoing project
2  that was going to take some time and Shirley was on
3  medical leave, so some of the reassignment had to do
4  with her not being available.
5      Q   Did any of the reassignment have to do
6  with her performance previously?
7          MR. CONDIT:  Objection.
8      A   I can't remember.
9      Q   Now, you testified to the evaluations
10  that you've given to Ms. Tabb, you've now
11  testified -- you've testified I believe to some
12  additional letters that were written to her, I cannot
13  remember -- I can't recall the name of them.
14      A   The one we were just talking about was a
15  memorandum.
16      Q   Okay.
17      A   And then I think there was also a letter
18  of admonition.
19      Q   Okay.  Were there any other documents
20  other than those three documents regarding the
21  performance -- sent to Ms. Tabb regarding her
22  performance?

182

1      A   I can't remember.
2      Q   Okay.  Do you think that there may be?
3      A   Perhaps.
4      Q   Okay.  So in characterizing Ms. Tabb's
5  performance on this specific faces.net campaign,
6  would it be fair to say that she dropped the ball?
7          MR. CONDIT:  Objection.
8      A   Yes.
9      Q   And you already testified that that was a
10  very important campaign?
11          MR. CONDIT:  Objection.
12      A   Yes.
13      Q   Okay.  I'm going to ask for clarification
14  on the number of children that you had reported had
15  slept in the office.  I believe you said there were
16  15 children on seven different days?
17      A   On seven different occasions.
18      Q   Occasions.
19      A   Okay.  Over about a five-month period.
20      Q   Over a five-month period.  To be clear,
21  is that 15 children on each occasion or 15 over
22  the --

183

1      A   Total.  Fifteen total children on seven
2  occasions over a period of months.
3      Q   Okay.  So it's possible to have one kid
4  on one occasion and two kids on another occasion?
5      A   Yes.
6      Q   And that total number at that point would
7  be three?
8      A   Yes.
9      Q   Okay.  So it wasn't 15 a day, so it was
10  spread out almost half a year?
11      A   I think so, yes.
12      Q   Okay.  Counsel, Mr. Condit, asked you
13  about the reasons for -- what your view of the
14  reasons for Ms. Donald's decision to terminate
15  Ms. Tabb.  Do you remember that?
16      A   Yes.
17      Q   Okay.  I believe your testimony was that
18  she had been terminated -- that -- strike that.  I
19  believe your testimony was that Ms. Donald told you
20  that she had been -- that Ms. Tabb had been
21  terminated because of confidentiality.  Was that your
22  testimony?

184

1      A   The reason I remember Brenda saying that
2  a termination was appropriate was because a child's
3  confidentiality had been violated when his
4  photographs were turned over to the news media.
5      Q   Okay.
6      A   And then subsequently broadcast there.
7      Q   And is it your understanding that
8  employees at the level of Ms. Tabb are not allowed or
9  prohibited by confidentiality means from releasing
10  pictures of children in the network to the media or
11  to other people?
12          MR. CONDIT:  Objection.
13      A   Employees at any level in CFSA, every
14  level, we are all prohibited from releasing names,
15  photographs or anything like that about the children
16  and families we serve in public venues without
17  getting certain permissions in advance.
18      Q   And if you do that and you don't get
19  certain permission in advance, what typically happens
20  to those employees?
21      A   I don't know.  There may be lots of
22  personnel actions going on all the time that no one

185

1  shares with me.
2      Q   Okay.  Have you ever heard of an employee
3  being fired for that?
4      A   No.
5      Q   Okay.  So you listed that as one reason
6  that Brenda Donald may have fired Ms. Tabb?
7          MR. CONDIT:  Objection.
8          MR. WILLIAMS:  Objection to -- what's the
9  basis?
10         MR. CONDIT:  I think you're
11  mischaracterizing the evidence.
12  BY MR. WILLIAMS:
13     Q   Okay.  So you testified that -- I believe
14  it's your testimony that that was one reason that
15  Ms. Donald told you why she terminated Ms. Tabb?
16     A   It's the one I remember her talking
17  about.
18     Q   Okay.  Could there have been others?
19     A   Yes.
20     Q   Okay.  Did you communicate with
21  Ms. Donald about Ms. Tabb's performance?
22     A   Yes.  I said a few minutes ago, yes, I

186

1  did.
2      Q   Did you make Ms. Donald aware of this
3  faces.net campaign, of the performance of Ms. Tabb in
4  that campaign?
5          MR. CONDIT:  Objection.
6      A   Yes, she knew about it in the spring.
7      Q   Okay.  And what was her reaction when you
8  told her, Ms. Donald?
9      A   I don't recall.
10     Q   Is it your testimony that there could
11  have been other reasons, you just don't know?
12         MR. CONDIT:  Objection.
13     A   Yes.
14     Q   I want you -- I'm not sure how this was
15  marked, but it purports to be an exhibit that looks
16  like it has grided lines on it.  For the record,
17  that's Exhibit 2 that Mr. Condit showed you.  And it
18  was your testimony -- I'm trying to be clear about
19  this document.  Was it your testimony that these
20  notes may be a conglomeration of different days?
21     A   Yes.
22     Q   And is it your testimony that you may or

187

1  may not know what was going on each day as you
2  assembled these notes --
3          MR. CONDIT:  Objection.
4      Q   -- now?
5      A   Are you asking me if I can look at this
6  sheet of paper and backtrack exactly when each one of
7  these was done?
8      Q   No, that's not my question.  My question
9  is whether or not -- just one second.  Let me ask a
10  different question.  Mr. Condit pointed you to the
11  middle of this sheet --
12     A   Uh-huh.
13     Q   -- where I believe it says eight
14  Lutheran?
15     A   Social Services.
16     Q   And Martin Pollock.  And you testified
17  that what you guess that would be.  Are you certain
18  about what you testified to what that may have been?
19     A   No.
20     Q   So it's your testimony that you can only
21  speculate what this is?
22         MR. CONDIT:  Objection.

188

1      A   I'm guessing what that has to do with the
2  placement crisis.
3      Q   Okay.  I want to talk about the digital
4  camera.  Who had access to the digital camera that
5  was used -- the digital camera that had the pictures
6  on it?
7      A   All of us who worked in the Office of
8  Public Information unless -- and anyone we loaned it
9  to, let's put it that way.
10     Q   Okay.  Around the time of the media
11  incident, who had -- do you know who had most recent
12  access to it during that time?
13     A   Derek and Shirley both.
14     Q   Typically did Derek and Shirley have
15  possession of the camera?
16     A   Yes.
17     Q   Can you explain to me how somebody would
18  go about getting the camera loaned from them --
19  strike that.  Can you explain to me how a person
20  would go about getting the camera from them on a loan
21  basis?
22     A   They would come and say that they had an

Case 1:06-cv-00789-PLF-JMF    Document 42-9    Filed 04/23/2008    Page 48 of 79
VIDEOTAPED DEPOSITION OF MINDY GOOD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

48 (Pages 189 to 192)

189

1 agency event that was taking place and they needed
2 pictures. Well, OPI was frequently spread too thin
3 to allow one of our folks to attend every agency
4 event in the guise of a photographer, playing the
5 role of a photographer. So sometimes Derek and/or
6 Shirley would loan the camera to someone else in the
7 agency to take to an agency event and use and then
8 they would bring the camera back to us to download
9 the photos for whatever use they wanted to make of
10 them.
11    Q   This is all inter -- or I guess
12 intra-agency use?
13    A   It's our department within the agency
14 loaning it to other programs within the agency, yes,
15 and I think that occurred occasionally.
16    Q   And what do you mean when you say
17 occasionally?
18    A   I don't think it was a standard practice,
19 but I think on occasion we did that.
20    Q   Okay. Occasion meaning twice a year,
21 three times a year? I'm just trying to get a
22 frequency.

190

1    A   I don't know.
2    Q   At the time of her termination, how would
3 you describe Ms. Tabb's work performance?
4    A   It's hard to answer that question because
5 at the time she was terminated, she hadn't been at
6 work on a regular basis for awhile, she had been out
7 on medical leave.
8    Q   Okay. Well, let me re-ask the question.
9 Three months before her termination, how would you
10 characterize her -- Ms. Tabb's performance?
11    A   Fair.
12    Q   Fair. And by fair, what do you mean?
13    A   Doing well in some areas or doing a
14 satisfactory job in some areas but not in others.
15    Q   Okay. Was she ever -- is it your
16 testimony that she was unsatisfactory in other areas?
17      MR. CONDIT:  Objection.
18    A   She was doing a fair or good job in some
19 areas but not a very good job in others.
20    Q   And what do you mean by not a very good
21 job?
22    A   I described the campaign situation and

191

1 the fact that the materials that they needed for
2 their meeting were not prepared on time, so missing
3 deadlines, for example, on an important initiative
4 like that.
5    Q   So in that case, she was below fair?
6    A   In that instance, yes.
7    Q   Were there other instances in that
8 three-month period that she was below fair?
9    A   That's the one that stands out.
10    Q   Okay. But were there other instances
11 where she was below fair?
12    A   I can't remember.
13    Q   Okay. I'm not trying to put words in
14 your mouth, when you say below fair, is that the same
15 thing as saying unsatisfactory?
16    A   Yes. Not meeting a deadline on an
17 important assignment like that was unsatisfactory.
18    Q   Just give me one second to make
19 sure I've covered everything.
20      MR. WILLIAMS:  Okay. Thank you,
21 Ms. Good. Mr. Condit?
22      REEXAMINATION BY COUNSEL FOR THE PLAINTIFF

192

1 BY MR. CONDIT:
2    Q   Thank you. Ms. Good, you just testified
3 a few moments ago that missing a deadline on an
4 important project was unsatisfactory. Do you recall
5 that testimony on questions from District's counsel?
6    A   Yes.
7    Q   By how much was the deadline missed that
8 you were referring to with respect to this project?
9    A   The point was that materials were
10 supposed to be prepared and delivered to Information
11 Systems in time for a meeting they were holding at
12 which they were going to communicate some important
13 messages to others in the agency about faces.net and
14 the materials were not available to them.
15    Q   Okay. Well, I'll ask the question again
16 since you didn't answer it. How much time was the
17 delay or the missing of the deadline, was it hours,
18 was it days, was it weeks, was it months?
19    A   It doesn't matter because the deadline
20 was missed.
21      MR. CONDIT:  Counsel, could you have the
22 witness answer the question, please.

193

1        MR. WILLIAMS: I believe that she has
2    answered the question. If there's a -- ask the
3    question again.
4        MR. CONDIT: I'll ask it again.
5    BY MR. CONDIT:
6        Q   When was the project due, what date and
7    time?
8        A   I don't specifically recall.
9        Q   Okay. How much time passed from the time
10   it was due to the time it was received? Do you
11   understand the question?
12       A   No.
13       Q   Okay. Let's say, for example, it was due
14   on Monday at 12 noon and my question is how much time
15   after 12 noon was it received?
16       A   I can't remember.
17       Q   So it could have been late by minutes,
18   hours, you don't remember?
19       A   I do know that the entire meeting at
20   which the materials were supposed to be available
21   took place without any of the materials.
22       Q   Understand. Have you had occasion to

194

1    miss any deadlines since you've been at CFSA?
2        MR. WILLIAMS: Objection, relevance.
3    Answer.
4        A   Very rarely.
5        Q   Okay. But you have missed some
6    deadlines?
7        MR. WILLIAMS: Objection, relevance.
8    This is going to be an objection to this whole line
9    of questioning. Answer the question.
10       A   Very rarely.
11       Q   So that's a yes, you have missed some
12   deadlines?
13       A   Let me put it this way, no, you find one
14   I have.
15       Q   Okay. Well, your answer a minute ago was
16   very rarely. Now you're answering --
17       A   I'm answering no.
18       Q   Now you're saying no?
19       A   Yes.
20       Q   So you're changing your testimony?
21       A   Yes.
22       MR. WILLIAMS: For the record, I believe

195

1    Ms. Good clarified her answer. She initially said
2    rarely, she was unsure. Counsel pressed on the issue
3    and then after giving it thought, she said no.
4        MR. CONDIT: Thank you for that
5    interpretation.
6    BY MR. CONDIT:
7        Q   So Ms. Good, why did you initially answer
8    the question very rarely?
9        A   Because I think nobody is perfect and
10   there's probably a couple I've missed, but I don't
11   make a practice of it, and especially when it's very
12   important because the communication business is a
13   deadline business and it always has been and it
14   always will be, and anybody who is going to be in it
15   has got to meet deadlines.
16       Q   Now, are you suggesting in that answer
17   that somehow Ms. Tabb was making a practice of
18   missing important deadlines?
19       A   She missed an important deadline.
20       Q   And what was it exactly that was supposed
21   to be produced for this meeting?
22       A   I can't remember.

196

1        Q   But you know it was important?
2        A   Yes.
3        Q   And how is it that you recall it was
4    important?
5        A   Because the Chief Information Officer
6    came to me after the meeting almost immediately and
7    said to me, quote, Mindy, you completely let us down.
8    I remember it clearly.
9        Q   Who was that?
10       A   Harold Beebout.
11       Q   And at that time Mr. Beebout was in what
12   position?
13       A   The Chief Information Officer for CFSA.
14       Q   And that would be the person that
15   supervises IT and computer-related issues?
16       A   Yes.
17       Q   Who is Sharmanne Allen?
18       A   Works in the Information Systems shop.
19       Q   Did Sharmanne Allen have the same
20   reaction as Mr. Beebout to this issue of the
21   production of the materials for the meeting?
22       A   I don't recall. I only remember him

Case 1:06-cv-00789-PLF-JMF Document 42-9 Filed 04/23/2008 Page 50 of 79
VIDEOTAPED DEPOSITION OF MINDY GOOD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

50 (Pages 197 to 200)

197

1 communicating with me directly after the meeting.
2    Q   And where were you two when this
3 communication allegedly took place?
4    A   In the hallway.
5    Q   Hallway where?
6    A   In the hallway on the fifth floor behind
7 the reception desk.
8    Q   How is it that you came to interact with
9 Mr. Beebout at that location?
10    A   I was coming out of my office and ran
11 into him coming to the fifth floor for something
12 after the meeting was over.
13    Q   And so he just explained to you what you
14 testified a few moments ago?
15    A   Yes.
16    Q   And did he say anything else?
17    A   No, but I knew exactly -- because I knew
18 exactly what he was talking about.
19    Q   So that was all he said and then you
20 parted company?
21    A   I apologized to him.
22    Q   And aside from your apology and his

198

1 statement, there was nothing else said and you two
2 parted company?
3    A   Not at that moment, correct.
4    Q   Not at that moment, you mean you didn't
5 part company at that moment?
6    A   No, we didn't go on talking about it at
7 that time.
8    Q   Okay.  Did you talk about it at another
9 time?
10    A   I'm not sure I talked to Harold about it
11 but I talked to someone about it after that.
12    Q   Do you think you talked to Sharmanne
13 Allen about it?
14    A   Maybe.
15    Q   Do you think Ms. Allen was let down or
16 expressed that she was let down by this?
17    A   I can't remember.
18    Q   Now, the materials that were at issue,
19 could they have been used at a subsequent meeting?
20    A   Materials can -- that are good
21 communication materials generally stand on their own
22 except there is an issue of timing with some

199

1 communications.
2    Q   And why was there -- aside from the fact
3 that a meeting was taking place, why, if at all, was
4 the timing important in this instance that you've
5 been discussing?
6    A   Well, the fact that a meeting is taking
7 place isn't a small deal because meetings are one of
8 the prime communication vehicles we have for
9 communicating to people at face-to-face at a certain
10 amount of time, and meetings are not held all the
11 time and it isn't easy to get people together.  So
12 it's good always to be able to take advantage if you
13 want to communicate in such a way that you don't have
14 one-way communication but you have someone presenting
15 to a group of people, and then they can ask
16 questions.  That's different than e-mail or some
17 other method.  That's a one-way method.  And meetings
18 only get held at a certain time so there are some
19 issues of timing.
20    Q   Okay.  I appreciate that public relations
21 spin, but that did not answer my question, so I'll
22 ask --

200

1       MR. WILLIAMS:  Objection.  I object to
2 the characterization of it being a public relations
3 spin.
4       THE WITNESS:  I do too.
5       MR. CONDIT:  Just complimenting the
6 witness.
7 BY MR. CONDIT:
8    Q   But let's see if we can answer the
9 question.  The question was aside from the fact that
10 the meeting was taking place what, if anything, was
11 important about the timing of the delivery of the
12 material that you're allegedly concerned about?
13    A   Well, if the question is, okay, the
14 deadline wasn't met, so wasn't the deadline
15 irrelevant?  No, it was not.
16    Q   No, that's not the question.  The
17 question is the question.
18    A   Yes, it is the question.  It isn't
19 irrelevant.
20    Q   The question, ma'am, is was there any
21 other reason other than the fact that a meeting was
22 taking place to be concerned about that particular

201
1  deadline for those particular materials?
2      A  Yes, because faces.net was on a schedule
3  and you want to communicate certain things to certain
4  people in such a way that they know about things
5  happening with a certain amount of advance notice,
6  and you start a campaign in such a way that you have
7  plenty of time to get people acclimated to what's
8  actually going to happen.
9      Q  That sounds good.  Now, with respect to
10 this particular meeting that the materials were
11 missing from, when did that meeting take place, was
12 it in 2005?
13     A  Yes.
14     Q  2004?
15     A  It was in 2005.
16     Q  Now, isn't it true that faces.net was
17 launched in February 2006?
18     A  I don't recall.  That may be it.
19     Q  Okay.  You testified on questions from
20 Mr. Williams that three months prior to Ms. Tabb's
21 termination, you had characterized her performance as
22 fair.  Do you recall that testimony?

202
1      A  On some things I said.
2      Q  So what was your overall evaluation for
3  the three months prior to Ms. Tabb's termination?
4      A  Fair.
5      Q  Fair.  Okay.  And in terms of the rating
6  scale that was used at the time of unsatisfactory,
7  satisfactory, et cetera, where would you have placed
8  it?
9      A  It was a very low satisfactory.
10     Q  All right.  Now, you also testified about
11 the digital camera use.  Was there a sign-out sheet
12 for the digital camera?
13     A  No.
14     Q  Was there some protocol for how that
15 camera would be accounted for if it was used by
16 others?
17     A  No.
18     Q  Was there a person in particular that was
19 responsible for that camera?
20     A  I think it primarily resided in Derek's
21 office.
22     Q  Okay.  So one would have to go to Derek

203
1  Stewart's office in order to get the camera?
2      A  Most of the time I think that was true,
3  yes.
4      Q  Okay.  Now, was the camera kept under
5  lock and key?
6      A  Derek locked his office when he left at
7  night.
8      Q  So the only way I take it under those
9  circumstances that one could use the camera is if
10 they had access to Derek's office either because he
11 was there or because they had a key to enter his
12 office, correct?
13     A  Yes.
14     Q  Who had keys to enter offices after
15 hours?
16     A  Eunice Spence kept keys to Shirley's
17 office, my office and Derek's office for use by any
18 one of the three of us.
19     Q  And where were they kept?
20     A  At Eunice's desk in a particular
21 receptacle.
22     Q  Okay.  So if you were needing to do

204
1  something after hours, you could come in and you
2  could use the keys to open your office if you didn't
3  have it or open another office if you needed to to
4  get access to some information you needed?
5      A  Yes.  One of the issues was that the
6  color printer for our entire department, the color
7  computer printer was in Derek's office, so if Derek,
8  for example, was out sick for the day, we still
9  needed to get to the color printer.
10     Q  Understand.  Thank you.  All right.  Now,
11 you were asked some questions about Exhibit 2 which
12 we discussed, your handwritten notes?
13     A  Yes.
14     Q  I just have a couple follow-ups there.
15 Counsel directed you to the center of the document,
16 and let me let you get there.  Do you have that in
17 front of you?
18     A  Uh-huh.
19     Q  Okay.  The center of the document and the
20 reference to Lutheran Social Services and Martin
21 Pollock, right?
22     A  Yes.

Case 1:06-cv-00789-PLF-JMF   Document 43-9   Filed 04/23/2008   Page 52 of 79
VIDEOTAPED DEPOSITION OF MINDY GOOD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

52 (Pages 205 to 208)

205
1    Q   Okay.  What is Lutheran Social Services
2   to your knowledge?
3    A   It is a provider that provides -- it is a
4   child -- pardon me, it is a child placing agency
5   which provides under contract to CFSA spaces for
6   kids, beds for kids.
7    Q   And what is or who is Martin Pollock?
8    A   Same, it's an organization that does the
9   same thing.
10    Q   Now, you testified on Mr. Williams'
11   questions that -- or reconfirmed I guess I should say
12   that what Ms. Brenda Donald told you about her
13   reasons for terminating Ms. Tabb were that
14   confidentiality was violated, is that correct?
15    A   Yes.
16    Q   Now, was it ever determined by anyone
17   within CFSA to your knowledge that confidentiality of
18   any individual was actually violated in this
19   instance?
20    A   I don't know.
21    Q   You testified on questions from
22   Mr. Williams on a couple of occasions about

206
1   Ms. Tabb's absences and the fact that she was on
2   family or medical leave.  Do you recall that -- those
3   references during your testimony?
4    A   Yes.
5    Q   What is your record in terms of absences,
6   are you frequently absent from the job, rarely, how
7   would you describe it?
8    A   I would say I've had bouts of absences.
9    Q   And when you have bouts of absences, what
10   is your attendance like during those times?
11    A   I think at one point I was off for maybe
12   two times since I've been at the agency.  I've been
13   off a whole week because of illness, but at other
14   times I'm not feeling well but I stay home and work.
15   I work at home.
16    Q   Okay.  So there are times when you're not
17   in the office but you're working at home, is that
18   correct?
19    A   Correct.
20    Q   Do you know whether or not you've ever
21   been evaluated on your absences; in other words, it's
22   shown up as part of your performance evaluation in

207
1   some way?
2         MR. WILLIAMS:  Object to relevance.
3   Answer the question.
4    A   I don't think that it shows up in my
5   performance evaluation but I think it shows up in the
6   attitudes of managers toward me.
7    Q   And what do you mean by that?
8         MR. WILLIAMS:  I'm going to object to
9   this whole line of questioning regarding Ms. Good's
10   attendance.  Answer the question.  Answer the
11   question.
12    A   Brenda did not find my working at home to
13   be a problem because she saw that there was product.
14   Other people have found that to be problematic.
15    Q   Would you say that staff of the Public
16   Affairs Office, as well as other CFSA staff that
17   interact with you or the Public Affairs Office, have
18   found your absences on occasion troubling or
19   problematic for their work?
20    A   No.
21    Q   That's never been communicated to you?
22    A   No.

208
1    Q   Pardon me just one second.
2         MR. CONDIT:  I have no other questions
3   for the witness at this time.
4         MR. WILLIAMS:  And I don't either.
5         MR. CONDIT:  But I will again remind us
6   that the deposition is remaining open pending the
7   completion of the discovery.
8         MR. WILLIAMS:  Okay.
9         THE VIDEOGRAPHER:  Hear ends the
10   deposition of Mindy Good.  There are three tapes.
11   Going off the record, the time is 6:15 p.m.
12
13
14
15
16
17
18
19
20
21
22

53 (Pages 209 to 212)

209

1          ACKNOWLEDGEMENT OF DEPONENT
2
3          I, Mindy Good, do hereby acknowledge that
4    I have read and examined the foregoing testimony, and
5    the same is a true, correct and complete
6    transcription of the testimony given by me and any
7    corrections appear on the attached Errata sheet
8    signed by me.
9
10
11
12
13    _____    _____
14     (Date)              (Signature)
15
16
17
18
19
20
21
22

211

1    CASE:  Tabb v. District of Columbia, et al
2    DEPOSITION OF:  Mindy Good
3    TAKEN:  Tuesday, December 4, 2007
4
5    PAGE  LINE  ERROR              CORRECTION
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10    ____  ____  _____
11    ____  ____  _____
12    ____  ____  _____
13    ____  ____  _____
14    ____  ____  _____
15    ____  ____  _____
16    ____  ____  _____
17    ____  ____  _____
18    ____  ____  _____
19    ____  ____  _____
20    ____  ____  _____
21    ____  ____  _____
22    ____  ____  _____

210

1          CERTIFICATE OF NOTARY
2          I, LESLIE L. SCHNEIDER, the reporter
3    before whom the aforegoing deposition was taken, do
4    hereby certify that the witness whose testimony
5    appears in the foregoing deposition was duly sworn by
6    me; that said deposition is a true record of the
7    testimony given by said witness.
8          I further certify that I am neither
9    counsel for, related to, nor employed by any of the
10    parties to the action in which this deposition was
11    taken; and, further, that I am not a relative or
12    employee of any attorney or counsel employed by the
13    parties hereto, nor financially or otherwise
14    interested in the outcome of this action.
15
16
17    _____
18          Leslie L. Schneider
          Notary Public in and for
          the District of Columbia
19
20
21
22    My commission expires November 14, 2008.

212

1    PAGE  LINE  ERROR              CORRECTION
2    ____  ____  _____
3    ____  ____  _____
4    ____  ____  _____
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10    ____  ____  _____
11    ____  ____  _____
12    ____  ____  _____
13    ____  ____  _____
14    ____  ____  _____
15    ____  ____  _____
16    ____  ____  _____
17    ____  ____  _____
18    ____  ____  _____
19    ____  ____  _____
20    ____  ____  _____
21    ____  ____  _____
22    ____  ____  _____

Case 1:06-cv-00789-PLF-JMF   Document 42-8   Filed 04/23/2008   Page 54 of 79
VIDEOTAPED DEPOSITION OF NINA GOOR
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

213

**A**

**able** 17:20 25:18
28:6,9 34:16
45:13 77:11
82:12,12 83:4
91:14 95:2,3
102:21 105:20
176:8 199:12
**aboard** 104:7
**absence** 83:3
**absences** 176:2,3
206:1,5,8,9,21
207:18
**absent** 206:6
**Absolutely** 80:5
**abundance** 37:13
**academic** 21:14
21:17
**acceptable** 47:17
**access** 28:7,9,12
28:19 34:19,22
35:17,21 188:4
188:12 203:10
204:4
**accessible** 45:13
**acclimated** 201:7
**accommodations**
134:10
**accomplish** 69:1
**account** 160:1
**accounted** 202:15
**accuracy** 94:17
**accurate** 92:2
102:22 108:13
**accurately** 164:20
**acknowledge**
209:3
**ACKNOWLE...**
209:1
**Act** 43:13,16,20
**acting** 72:16
109:17
**action** 5:7 24:6
126:18,19 127:9
134:21 174:14
210:10,14
**actions** 116:3
184:22
**active** 17:15

**actively** 116:22
117:6,20,21
**activities** 18:10
24:2,3 26:20
57:15
**activity** 37:22
**actual** 34:22
46:10 90:19
91:13 102:3
**addition** 8:5
**additional** 181:12
**address** 6:11,11
6:13,16,17,21
22:21 35:11,13
35:16 36:12,15
36:16,17,20
106:14 120:2
132:21
**addressed** 119:1
120:9 167:19
171:19
**addresses** 35:4,8
36:4,9,22
**addressing**
136:19
**adjective** 60:17
**administration**
50:18 73:15
92:1 103:18,20
104:1,13,22
105:8 125:21
**administrations**
52:5,11 104:5
**administrative**
50:17 123:22
**administrator**
104:2,6,14,19
**admonition**
174:10,17,22
175:2,15,16
176:12 178:15
181:18
**admonitions**
174:8
**adopting** 54:18
**Adrian** 116:13
**adult** 17:6
**advance** 184:17
184:19 201:5

**advantage** 199:12
**advice** 46:19
**advise** 82:21
**advising** 136:13
**affairs** 48:9,17
49:14 50:6,20
50:22 54:10
55:22 56:17,22
78:13 79:8 81:2
119:18 207:16
207:17
**affect** 79:21
**aforegoing** 210:3
**aftermath** 131:15
**afternoon** 6:10
7:18
**age** 93:11
**agencies** 12:20
**agency** 7:3,3,5 9:1
9:4,7 10:1 16:7
17:3,4 18:5
20:20 24:1,4
25:5,16,17,21
26:3,20 27:6,21
27:22 29:2
31:10 32:15
34:13,17,19
35:1 38:5 39:6
44:12 48:8
50:13 52:3,13
52:15,17 53:8
54:15,17 56:12
58:8 60:19
61:17 70:22
72:17 85:20
90:5 92:2 94:16
98:21 99:18
102:19 103:13
103:17 104:11
108:9,20,21
109:2,15 112:2
113:1 114:11,12
114:16 116:8,19
116:21,22 117:5
117:8 121:1,9
121:22 127:16
128:10,19
130:13 131:21
132:21 134:6

135:13 136:13
136:17,18 137:9
137:15 138:1
148:7 149:14
150:2,6 151:13
151:17 152:12
152:13,15
154:11 157:18
161:6,10 162:2
162:7,12 163:4
163:9,12 167:11
167:19 176:21
176:22 180:7
189:1,3,7,7,13
189:14 192:13
205:4 206:12
**agency's** 24:2
110:19,20
132:15 150:17
153:12 177:15
**ago** 8:15 68:1
85:19 93:22
118:18 122:5
146:2 162:17
185:22 192:3
194:15 197:14
**agree** 37:16 118:4
118:7
**agreeable** 8:3,10
**Ah** 9:12
**Ahluwalia** 4:15
4:16 53:14,16
157:19 158:6
159:5,10,22
164:4 165:5
**Aid** 24:11,19
**airwaves** 150:4
**al** 1:9 5:6 211:1
**Albert** 135:4,5
166:11
**alerted** 75:13
**allegation** 89:5
160:9 161:3,22
163:18 164:5,20
**allegations** 86:21
**alleged** 134:18
161:17
**allegedly** 85:3
92:16,17 96:22

97:11 110:3,5
110:11 197:3
200:12
**Allen** 196:17,19
198:13,15
**alleviate** 106:19
**allow** 189:3
**allowed** 184:8
**altered** 149:3,4
**altogether** 117:16
131:17
**ambush** 86:7
**ambushed** 80:8,9
80:12,19
**American** 21:10
**amount** 26:21
199:10 201:5
**analysis** 36:19
**and/or** 145:17
189:5
**Angela** 124:2
**angry** 119:4,7,8
**Annie** 17:14,14
18:12 167:13
**announce** 109:9
109:19
**announced** 76:7
151:12
**annual** 53:8 65:3
65:22 174:3
**answer** 6:20 7:9
7:13,22 8:6,10
26:11 27:3
30:11,19 37:6
37:11,14 39:2
46:10,13 64:5
75:20 81:9,17
133:2 142:3,4
145:2,18 165:1
190:4 192:16,22
194:3,9,15
195:1,7,16
199:21 200:8
207:3,10,10
**answered** 97:3
141:20 165:1
193:2
**answering** 49:7
194:16,17

214

**answers** 8:17
97:21
**anybody** 63:12
64:7 179:12,12
195:14
**anymore** 80:2
**apologized**
197:21
**apology** 197:22
**apparently**
171:12
**appear** 162:6
169:6 209:7
**appears** 153:10
154:18,20
170:14,17 210:5
**Appendix** 38:16
**applicable** 37:3
**apply** 44:11
**appraisals** 174:5
**appreciate** 66:8
71:12 72:21
118:1 145:3
155:7 164:7
173:4 199:20
**approached**
79:14 99:18
**appropriate**
22:18 92:13
184:2
**April** 70:19 92:7
139:19 140:9
169:13,19
170:12 172:12
172:16
**archive** 31:9
**area** 26:8 52:13
56:16 114:5
**areas** 53:20 54:22
55:5 190:13,14
190:16,19
**arena** 17:16 44:14
**Armstrong** 86:9
111:16 113:12
114:2 148:1,3
151:19 152:4
**array** 69:4
**arrival** 48:20
**arrive** 29:16

**arrived** 48:7 53:7
151:20
**article** 4:17
147:10,12
148:12 153:10
**articles** 157:8
**aside** 21:16 23:2
28:19 36:3
37:18 55:14
84:7 101:21
151:22 197:22
199:2 200:9
**asked** 16:12 29:19
39:5 40:9 41:19
74:6 76:11
86:10 87:3
92:18 93:13
110:19 164:22
172:18 173:20
183:12 204:11
**asking** 7:18 46:22
85:7 86:8,18,20
86:21 88:19
97:1,9,10
139:13 141:21
144:17,19
163:20 164:2,10
187:5
**asks** 31:8
**aspects** 101:20
**assembled** 187:2
**assessment** 26:2
**assign** 33:8 82:12
82:13
**assigned** 46:1
177:5,6
**assignment**
176:16 191:17
**assistant** 3:13
50:18 124:1
**assisting** 137:4
**Associates** 15:16
15:17
**association**
167:14,14
**associations**
12:19
**assume** 52:7 59:2
143:5,5 169:14

**assumed** 113:15
**assuming** 80:18
95:17
**attached** 4:22
38:12,16 138:19
147:1,10 153:1
155:10 157:13
159:18 165:10
166:6 168:21
170:6 209:7
**attachments**
42:22
**attempt** 81:19
82:10 109:6
**attempted** 80:3
81:13,15 84:8
**attempting** 88:13
133:14 140:1
**attend** 189:3
**attendance**
206:10 207:10
**attended** 22:9
119:1
**attention** 118:6
118:19 128:15
130:10,15
132:18 134:7
137:13,15 150:8
154:14
**attitude** 110:19
110:20
**attitudes** 207:6
**attorney** 3:13
46:5 210:12
**attorney-client**
46:9,15
**attribute** 81:11
**August** 85:9 92:8
107:5 108:8
141:9,12 157:4
158:15 172:19
**authority** 74:1
**available** 15:8
16:10 20:2
65:17 106:22
144:6 177:18
178:2,6 181:4
192:14 193:20
**Avenue** 2:5 5:12

9:10,13
**average** 67:15
**avoiding** 132:22
**aware** 73:5 75:11
84:11,13,16
104:10 116:10
116:13,16 118:3
118:13 125:8
186:2
**aways** 82:7
**awhile** 108:4
125:4 190:6
**A-h-l-u-w-a-l-i-a**
53:18
**A-P-P-E-A-R-...**
3:1

**B**
**back** 11:10,17
17:18 18:19
35:9 42:21 48:4
62:10 64:2,18
66:22 89:7 93:6
97:20 99:12
129:2 172:13
173:13 189:8
**backed** 34:4
**background** 21:4
**backtrack** 179:9
187:6
**bad** 109:3
**ball** 182:6
**bar** 37:3
**based** 62:7 107:13
107:14 173:19
**basic** 180:11
**basically** 15:7
35:22 86:16
155:4
**basis** 25:8 37:6
133:5 134:16,20
175:16 185:9
188:21 190:6
**bathroom** 173:9
**Bayles** 3:21 5:11
**becoming** 9:6
23:11 44:10
121:21
**beds** 105:16,22

106:3,21 140:15
140:21 205:6
**Beebout** 196:10
196:11,20 197:9
**began** 11:15,18
17:18 46:22
56:10 77:13
90:18 148:14
**beginning** 154:7
**begins** 5:3 99:13
173:14
**BEHALF** 3:3,11
**belabor** 7:10
**believe** 7:9 11:8
24:16 25:9 37:1
37:2 42:20
48:21 51:10
60:4 67:8,16
78:18 85:9 92:7
95:16 99:22
103:3 105:2
107:7 113:6
114:4,6,14,17
116:17 122:4
128:1 129:17
130:16 141:16
148:13 153:5
159:2 160:16
162:22 168:1
171:2 174:4
175:6,7,9 176:2
181:11 182:15
183:17,19
185:13 187:13
193:1 194:22
**belongs** 42:21
**benchmarks**
25:11,15,16
26:4
**benefits** 77:18
**best** 78:16 109:2
143:10,12,15,18
144:1,2 161:10
**betrayed** 119:9,11
122:7
**better** 35:17 57:7
97:21
**beyond** 7:11
26:13 61:8,10

215

91:3
**big** 180:4
**bit** 22:4 49:20
**black** 119:14,15
**Blackberry** 37:21
38:3,8
**blankets** 97:1,9
97:10 98:10,11
**Blower** 43:13
**Bobeau** 53:15
**Bonk** 10:7,8,11
17:13,17 18:7
18:13
**Bonk's** 17:12
**book** 40:2 142:8
146:2
**borderline** 64:21
69:18
**boss** 72:19
**bottom** 143:2,2,9
154:22 170:13
170:16
**bought** 90:10
**bouts** 206:8,9
**break** 47:16 99:7
99:16 173:9
**Brenda** 19:22
49:2,9 50:10,13
52:19 53:13
71:18 73:20
74:5,6 75:4,6
76:4,6 84:18
103:4 111:3
126:11 127:13
134:13 135:15
166:10,21
167:21 170:17
184:1 185:6
205:12 207:12
**Brenda's** 72:12
123:21
**bring** 16:4 25:12
25:18 68:8
109:2 140:16,21
154:13 189:8
**bringing** 66:19
82:8 106:3
**brings** 16:2,3
**broadcast** 96:1

184:6
**broadcasts** 90:3,6
**broke** 118:9
154:15 157:3
**brought** 25:13
38:22 57:3 93:8
118:6,19 128:14
133:8 137:14
150:7
**Bryant** 50:11,17
**building** 85:6
86:14,15,22
87:2 88:20 89:4
90:1,7 91:5,10
91:14,18 92:4,9
92:17,21 94:5
94:21 95:19
97:13 99:19
102:4,8,16
103:12 104:17
105:6,15 106:11
107:10,16 108:7
109:6 111:17
112:9,14 113:2
114:19 116:9
118:14 119:2
124:9,17,20
125:1 128:11
130:9,14 131:14
132:1,11,22
133:4,17,19
134:8 136:10,15
136:21 137:8,14
141:18 144:12
145:17 146:19
147:7 159:6
160:21 162:4,16
163:17 167:10
**business** 6:11,13
6:21 15:20 86:6
139:18 195:12
195:13
**b-p** 143:21
**B.A** 21:8

---
**C**

**C** 4:1
**CA** 1:8
**cabinet** 54:17

**calendars** 39:11
39:12,12,14,16
39:19
**call** 54:4 55:4
66:11 91:20,22
93:3 99:18
100:3 117:14
120:20 121:17
127:13,19,21
128:5 129:8
130:2 175:13
176:20
**called** 6:4 11:22
20:1 25:10 30:6
61:12 66:16,17
66:18 86:11
98:9
**calling** 97:7,8
**calls** 47:22 154:10
**camera** 86:8
149:14 150:6,13
150:17,22
152:12,13,15
188:4,4,5,15,18
188:20 189:6,8
202:11,12,15,19
203:1,4,9
**campaign** 176:17
177:2,5,7,12
179:18 180:3,4
180:5,14,19
182:5,10 186:3
186:4 190:22
201:6
**campaigns**
176:15,15 180:6
180:7
**can't** 21:21 22:14
32:18 34:17
45:5,8 49:17,20
57:20 58:16
59:8 65:14,14
69:22 71:8
72:18 73:1
83:16 85:14
89:6 95:12,12
100:17 106:17
111:10 112:21
114:1 123:9

126:5,9 128:7
129:7 131:2,2
136:6 137:1
139:7 141:1
175:10,11,18,21
179:14,17
180:21 181:8,13
182:1 191:12
193:16 195:22
198:17
**capabilities** 56:9
**capability** 28:13
**capable** 111:10
**capacity** 19:4,8
49:14
**capture** 90:6
**captured** 95:7,10
**care** 18:16 75:5
97:12 104:11
114:18 129:17
130:1 143:16
**career** 11:15,18
143:3
**Carnegie** 19:11
19:14,17
**carry** 142:9
**case** 7:20 33:16
35:20 39:1,7
40:10,21 45:9
51:13 53:5
54:19 55:13
68:11 69:16
80:17 89:5 91:7
114:14 180:12
191:5 211:1
**cases** 117:11,11
117:12
**Casey** 17:14,15
18:12 19:10,13
19:16 26:7
103:22 167:13
**caution** 37:13
**cc** 160:13
**cell** 38:5,8
**center** 9:9,11,13
9:15 10:15 11:7
204:15,19
**certain** 26:21 27:6
44:15 81:22

105:19 106:21
114:20 140:15
176:1,2 177:21
184:17,19
187:17 199:9,18
201:3,3,5
**certainly** 110:15
150:14 164:17
173:10
**CERTIFICATE**
210:1
**certificates** 82:8
**certifications**
21:13
**certify** 210:4,8
**cetera** 202:7
**CFSA** 18:8,11,16
18:18 19:3,6,21
19:22 23:12
24:5 26:14
29:14 33:12,13
33:14 35:5,8
36:7 43:5 44:1
44:10 45:18
46:22 52:16
55:14 56:11
58:12 77:11
91:4 93:19
94:22 101:1,4
107:15 118:14
134:18 135:2
148:2 157:21
158:21 160:8
162:19 166:11
167:10 171:19
184:13 194:1
196:13 205:5,17
207:16
**CFSA's** 29:6
**chair** 118:1
130:17
**chairman** 116:12
**chance** 100:10
155:18
**change** 32:20
33:15 80:15
99:8
**changed** 32:17,19
32:20 54:13

Case 1:06-cv-00789-PLF-JMF    Document 42-8    Filed 04/23/2008    Page 57 of 79
VIDEOTAPED DEPOSITION OF NANCY GOOR
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

216

55:2
**changes** 117:12
**changing** 176:18
194:20
**channel** 4:12
84:22 85:1,6,11
85:19 86:3,12
89:8,16 93:7
112:7 114:3
147:5,16 150:7
150:9 151:10,21
153:21 154:1
**channels** 82:1
**characteristics**
54:5 56:8 93:11
**characterization**
200:2
**characterize**
180:4,13 190:10
**characterized**
201:21
**characterizing**
182:4
**charge** 14:8 16:19
16:20,21 109:15
176:14 177:2,20
**charitable** 164:7
**Charles** 73:17,19
74:4,17 75:1,4
75:16 76:14
77:15 79:2
111:6,7 125:19
126:2
**check** 92:14
**checked** 92:15
102:5
**checking** 101:22
102:1,2
**chief** 49:10 51:6,7
51:15,15,21
52:19 53:1,2
177:15 196:5,13
**child** 9:1,3,7 17:5
17:5,15,17 18:4
24:6,13,13
26:12 27:7
44:15 48:7
54:15 85:4
91:19,21 92:4

96:22 97:8 98:7
113:1 117:5,8
117:10 133:18
138:1 149:22
154:10 157:17
161:10,11,16
162:20 167:12
177:14 205:4,4
**children** 24:21
27:1,20 44:12
86:22 87:1
88:19 89:22
90:7 91:4,14,17
92:3,8,10 95:19
99:19 102:4,7
102:15 103:11
104:16 105:5,14
105:20 106:11
107:9,16 108:6
112:7 114:18,18
116:8 118:13
119:2 124:8,16
124:19,22
128:11 130:9,14
131:22 132:22
133:3,16 134:8
136:9,15 137:8
137:13 141:18
144:12 145:17
147:6 157:20
159:6 160:9,20
161:3 162:4,15
163:17 164:19
167:9 182:14,16
182:21 183:1
184:10,15
**Children's** 24:15
**child's** 184:2
**Cincinnati** 17:10
**circumstances**
81:12,22 203:9
**cities** 17:8
**City** 116:10 120:7
121:10 130:13
163:16 164:14
**civil** 5:7
**clarification**
59:16 74:10
82:16,20 101:10

139:10 140:5
154:18 155:1
182:13
**clarified** 21:2
195:1
**clarify** 8:1 59:19
64:5 82:10,14
149:20
**Clary** 14:3
**class** 24:6
**clean** 144:6
**cleaning** 116:21
**clean-up** 57:3
116:20 117:10
**clear** 82:1 83:6,6
93:22 94:3,4
155:5 173:20
177:3,19 182:20
186:18
**cleared** 75:17
**clearly** 94:20
149:10 196:8
**client** 85:5 92:17
95:1 134:18
138:8
**clients** 14:10
138:2
**clip** 90:12 96:1
113:19
**clips** 90:13 95:7
95:11,15,17
96:17 112:17,17
112:20 113:5
**close** 62:21 63:4
64:21 69:18
168:3 170:21
171:2
**clueless** 140:22
**coach** 145:3
**coached** 145:6
**coaching** 145:9
**code** 45:12,14
47:4,6,9,12
**colleagues** 57:2
**collective** 68:20
**color** 204:6,6,9
**Columbia** 1:2,9
2:14 3:14 5:5,7
5:19 43:8,12,13

169:3 210:18
211:1
**come** 11:10 16:10
17:18 18:19
31:13 37:11
54:15 58:8
60:15 65:10
70:20 76:11
77:21 84:12
91:21,22 93:9
97:20 104:7
105:18 110:16
111:10 146:10
163:9 188:22
204:1
**comes** 138:13
**comfortable**
134:10
**coming** 20:20
44:1 56:19 57:4
103:7 128:10
177:14 197:10
197:11
**comment** 133:9
**commission**
210:22
**Committee**
116:13 118:2
130:17
**communicate**
75:14 102:12
128:17 172:4
185:20 192:12
199:13 201:3
**communicated**
73:12,14,18
126:11 134:13
207:21
**communicating**
121:22 122:1
159:6,8,11
197:1 199:9
**communication**
9:17 16:20,21
18:13 19:18
21:1 73:8 74:3
77:17,19 82:2
83:1 121:14,20
164:14 178:11

195:12 197:3
198:21 199:8,14
**communications**
9:12,14 10:14
10:21 14:9
15:21 16:15,16
16:18 19:15,17
46:7,11,14,18
107:14 121:2,7
130:22 131:4
135:11 136:13
136:14,17 137:2
158:7 167:17
199:1
**community**
137:21
**companies** 12:21
**company** 2:4
197:20 198:2,5
**complete** 8:17
61:2 209:5
**completed** 124:5
125:13
**completely** 196:7
**completing** 61:1
**completion** 208:7
**complicated** 55:9
**complimenting**
200:5
**comprised** 51:5
**computer** 27:13
28:22 29:3 32:1
32:9,14,16,17
33:6,6,10,15,17
33:18,21 34:1,5
34:7,8,9,18
37:18,19 149:8
149:12,16
152:13 153:22
180:11 204:7
**computers** 30:18
**computer-related**
196:15
**concern** 108:8,18
108:19 122:1
138:8
**concerned** 137:16
146:13 167:18
200:12,22

**concerning** 36:17 147:6
**concerns** 112:1 114:11,22 124:15 172:1,6 172:20
**concluded** 25:5 25:17
**conclusion** 25:8 25:19 60:16
**Condit** 3:4,5 4:4 5:15,15 6:9 7:1 7:15,17 22:22 23:1 28:5 30:20 30:22 36:18 37:15,17 38:13 42:10,11 47:16 48:1,6 59:18,20 60:11,12 63:20 64:9 74:15 99:15 101:19 138:20 141:2 144:19 145:1,12 147:2 153:2 155:2,7,11 157:14 159:19 165:11 166:7 168:22 170:17 173:1,10,20 174:19 176:4 178:3 180:15,20 181:7 182:7,11 183:12 184:12 185:7,10 186:5 186:12,17 187:3 187:10,22 190:17 191:21 192:1,21 193:4 193:5 195:4,6 200:5,7 208:2,5
**conduct** 90:22
**conducting** 90:18
**confer** 63:15,16
**confidentiality** 44:10,16,20 45:14,18 46:3 46:20 47:2,14 134:17 183:21 184:3,9 205:14

205:17
**configuration** 51:14
**confirm** 93:17 100:10 150:11 170:18
**confirmed** 100:13 100:15 101:5
**confronted** 103:7 103:11 116:8 148:21
**confusing** 61:11 61:12
**conglomeration** 186:20
**Connecticut** 2:5 5:12
**connecting** 34:13
**consent** 107:20 109:1
**consequently** 81:5
**considered** 111:19
**considering** 141:10 164:11 164:12 173:1
**consistent** 169:15 171:13
**consortium** 9:9 9:11,12,15 10:12,15
**constantly** 31:8
**consult** 18:8
**consultant** 17:13 18:13,17 25:14 25:17 26:5
**consultants** 15:4 15:6
**consulting** 9:17 14:2,4,7 15:18 18:10,21 19:1,4 19:8
**contact** 97:1 98:12 114:8 118:16 120:11
**contacted** 17:19
**contacting** 100:2
**contained** 41:15

**contains** 147:9
**contents** 46:13 178:19
**contest** 171:19
**context** 36:21,22 141:10
**continued** 76:4
**continuing** 42:4 76:6 79:7 133:6
**contract** 106:22 205:5
**contracted** 105:17,21 106:1 140:14
**contractors** 140:15
**contracts** 12:15 139:20 140:13
**control** 74:9 164:1
**conversation** 45:21 47:7,15 74:22 98:16 116:5 128:18
**conversations** 45:10 103:16
**Coopers** 14:16,20 15:2,11
**copied** 103:4 148:8 157:17
**copies** 41:17 87:7 124:4 148:12
**copy** 22:13 41:3 70:10 87:9,11 88:4 90:14 94:18 98:13 131:5 148:4 166:10,11 178:22 179:12
**corner** 143:3 154:21
**Corporation** 13:3
**correct** 12:16 26:6 32:2 33:19 33:20 35:2 36:2 42:10 46:16,21 50:12,14,15 51:18 52:9 53:4 53:18 60:5 63:3

64:17,22 65:1 76:14 85:21 88:6 94:1,2 95:5 95:8,9,21 100:5 100:9 121:5 124:3 126:13 134:5 150:20 160:22 161:1 170:19 171:10 174:1 175:22 178:4 198:3 203:12 205:14 206:18,19 209:5
**corrected** 119:22
**CORRECTION** 211:5 212:1
**corrections** 209:7
**corrective** 174:14
**correctly** 59:5 112:12
**cot** 88:14,17 94:7 150:18
**cots** 94:5,11,12
**couldn't** 93:11
**Council** 116:10 120:7,7,12 121:10 130:13 163:16 164:14
**counsel** 5:13 6:5,8 7:17 40:6,14,20 42:3,7 45:5,9,10 45:17 60:10 63:16 64:10 87:22 145:1 154:17 158:21 158:22 173:4,16 183:12 191:22 192:5,21 195:2 204:15 210:9,12
**counseling** 23:9
**Counsel's** 44:22 45:4 47:3
**country** 24:17
**county** 10:16 11:6 16:13 17:2,5,7,9 24:4 25:4,20 26:3 61:20
**County's** 24:18
**couple** 12:20

47:22 133:8 195:10 204:14 205:22
**course** 19:19 30:13 65:20 66:14 85:7 86:14
**courses** 21:18 22:5,6
**court** 1:1 5:6,20 8:8 25:12,18 28:3 107:17 109:10 115:17 117:20 118:8 130:7 138:21 147:3 153:3 155:12 157:15 159:20
**cover** 108:21 115:17
**covered** 160:21 161:15 191:19
**covering** 70:17 114:13 117:6 162:10
**cover-up** 109:20 117:17 118:4 161:17 162:7
**CPS** 100:13 101:9
**crafted** 20:9
**create** 174:22 175:2
**created** 31:17 113:4
**creating** 35:17
**creation** 8:9
**crew** 57:3 117:10
**crisis** 102:20 105:16 106:8,10 120:20 139:21 140:10 144:6,11 145:16 146:17 161:8 162:13 188:2
**critical** 142:14 146:7,10
**curious** 97:22
**current** 8:19
**currently** 27:2

Case 1:06-cv-00789-PLF-JMF   Document 42-8   Filed 04/23/2008   Page 59 of 79
VIDEOTAPED DEPOSITION OF NINA GOOD
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

218

33:22 34:5 132:21
cut 154:22 169:14
cycle 56:4 172:11

**D**

daily 40:1
dash 143:11,11
data 26:21,22 27:7 28:9,19,21 30:14 91:18 92:3 150:22
date 5:9 67:14 141:21 154:14 165:15 166:13 193:6 209:14
dated 147:6 155:17 157:1,18
dates 157:6,7
David 3:21 5:10
day 67:5,14 72:1 72:22 78:17,17 89:18 93:4,6 94:20 115:7,9 132:7 142:16 147:15 151:19 153:21 156:2,7 173:8 183:9 187:1 204:8
days 31:7 85:16 85:17 93:7 128:9 132:17 182:16 186:20 192:18
day-care 17:6
day-to-day 66:15 176:14
deadline 141:12 191:16 192:3,7 192:17,19 195:13,19 200:14,14 201:1
deadlines 191:3 194:1,6,12 195:15,18
deal 26:7 52:11 85:22 97:16 161:7 162:12 167:11 199:7

dealing 86:2 120:10,16 164:21
dealt 95:18 132:17
Deborah 96:7 128:1,21 129:1 129:17
December 1:15 5:9 211:3
decide 16:6 121:17
decided 146:14
decision 70:22 71:2,6 73:13 79:17 84:13,17 84:19 85:12 126:16 127:1 172:2 183:14
decree 25:13 107:20 109:1
ded 143:4
dedicated 131:8 143:6
defendant 1:10 3:11 5:18
DEFENDANTS 173:16
defense 15:19
defined 57:12,14
Definitely 158:8
degree 122:12
degrees 21:5,13
delay 192:17
delete 31:9
Delicia 49:17,18 50:1
delivered 192:10
delivery 200:11
demonstrate 119:20
demonstrated 171:2
Denise 126:5,9
department 10:16 23:18 24:13 125:13,20 126:3 189:13 204:6
depend 65:3

depending 55:11 65:9
depict 88:12
depicted 94:7,22
**DEPONENT** 209:1
deposition 1:13 2:1 4:9 5:4,11 7:5,14 38:11,15 38:16 40:13 63:8 64:12,16 99:10,13 138:18 139:1 146:22 152:22 155:9 157:12 159:17 165:9 166:5,9 168:20 170:4,5 170:9 173:2,14 208:6,10 210:3 210:5,6,10 211:2
deputy 50:18 52:6 125:21 135:2 157:19
Derek 7:14 48:10 56:4,12 57:10 58:9,14 149:8 149:11,16 150:4 151:8,15,16 152:11,15 179:19 180:19 188:13,14 189:5 202:22 203:6 204:7
Derek's 202:20 203:10,17 204:7
derived 68:20
describe 22:2 56:2 71:20 190:3 206:7
described 36:5 59:21 61:4 81:13 85:11 101:21 112:16 190:22
describing 35:21 83:15 105:4 111:15 128:9 150:13 166:1

description 20:7,9 20:10,12,16,19 55:15 57:16 93:11
descriptions 20:21
design 58:3,5
designated 30:4
designation 28:1 29:10 30:5
designations 171:8
desire 81:1
desk 86:11 197:7 203:20
desktop 32:1,12 32:13,14
desperate 97:11
despite 111:12
details 172:20
determination 94:15
determine 25:15 66:9 92:19 100:2 102:14 133:22 151:17 152:2,5,9 171:3
determined 205:16
determining 102:3
develop 143:11 144:1
developed 81:21
device 37:21 38:2 38:8,9
devices 37:20
didn't 63:10,12 74:20 78:7 82:20 84:2 102:18 103:1 108:13 109:19 117:18 192:16 198:4,6 204:2
differ 44:20 54:9
differed 45:15,16
difference 15:1 24:12 55:2 116:18 117:4

123:16 162:8,11
different 16:9 26:20 28:16 55:5,7,8 92:9 102:6 122:20 142:17,20 144:15 164:10 182:16,17 186:20 187:10 199:16
differently 132:17
digital 149:14 150:13,17,22 188:3,4,5 202:11,12
direct 51:10 52:3 52:7 135:14
directed 204:15
directly 19:9 52:17 103:2 159:5 197:1
director 9:20 10:10,21 11:2 15:20 16:15,16 16:17 23:11 50:13,18 52:4,7 52:8,15,20 53:1 53:17 70:21 72:15,16 73:15 76:19 111:2,3 125:21 157:19 166:12,21
director's 51:1,5 51:10,11,14
disagreed 171:12
disagreement 171:16,18
discern 148:18
discover 37:1
discovered 151:7
discovering 176:6
discovery 208:7
discussed 70:8 74:17 103:12 105:5 106:9,11 114:15 124:8,15 124:20 125:1 204:12
discussing 64:19

124:16 138:14
164:13 199:5
**discussion** 68:3
72:10 79:12
89:13 99:20
115:5,6 124:12
125:3 144:9
145:4,19 161:7
162:13
**dishonest** 165:3
**dismayed** 119:9
119:11 122:7
**displayed** 149:17
149:19
**District** 1:1,2,9
2:14 3:14 5:5,6
5:7,18 7:12
18:14 24:14
39:6 40:7,14,15
40:19 41:18
43:8,12,12
44:19 45:2,12
45:14 46:21
54:2,17,18,22
62:10 64:10
84:14 85:13
88:1 126:13
162:21 169:3
173:5 210:18
211:1
**District's** 43:19
192:5
**doctor's** 82:8
**document** 35:18
38:19 42:19
135:15,17
139:14 142:7
143:9 147:5,11
153:7,18 154:6
157:17,22 158:1
158:9,14 160:4
160:17 164:13
166:15 168:9
169:5,8,13
170:10,13
171:11 173:3
186:19 204:15
204:19
**documentation**

71:9,13
**documents** 17:1
26:19 29:1,22
30:2 35:9,12
38:17,22 39:7,9
40:10 41:14
42:3,4,5,9,14,18
43:3 58:9 63:10
64:15 79:16
177:21 178:12
179:4 181:19,20
**doesn't** 36:19
109:19 139:10
139:11 142:1
192:19
**doing** 14:9,21
18:14,22 19:9
19:10,11 36:3
57:9 58:3 59:9
66:4,13 108:20
115:15 116:2
117:4 142:19
190:13,13,18
**Don** 11:4
**Donald** 4:18
19:22 20:3 49:2
49:9,10 50:10
50:13,16 52:19
52:22 53:3,13
71:18 72:1,13
73:4,12 74:3
75:1,10,13
79:13 111:3,7
126:11,22 127:4
129:13,16 130:1
134:13,15,20
166:11,21
170:17 172:4
183:19 185:6,15
185:21 186:2,8
205:12
**Donald's** 72:11
85:12 183:14
**don't** 7:20,22,22
11:22 13:5,17
16:12 20:14
26:13 29:17
31:9,15 34:6
37:2,16 38:2

42:2 49:4 62:17
71:11 73:6,14
77:1,4 78:22
81:18 84:1,6
89:18 96:15
98:22 99:6
108:2 112:11
113:6,11,17
114:4 116:5,11
117:14 118:19
118:21 120:16
122:3 128:12
130:11,21
132:13 133:3,20
134:12 135:8,9
136:1 137:1
142:5 145:6,21
151:3,6 154:16
156:21 158:2,19
165:17,18
166:16 167:16
168:8,17 169:9
169:10 170:1,22
172:3 178:9,21
184:18,21 186:9
186:11 189:18
190:1 193:8,18
195:10 196:22
199:13 201:18
205:20 207:4
208:4
**download** 189:8
**downloaded**
149:8,11,14
150:5,12 152:12
**downloading**
35:18
**downstairs** 86:11
86:13
**draft** 58:9
**dressed** 150:19
**drive** 29:7,8,9,11
30:1,2,3 34:1,4
**drives** 34:17,18
**dropped** 182:6
**Dual** 15:16,17
16:4
**due** 36:19 70:14
70:16 141:9

193:6,10,13
**duly** 6:6 210:5
**dumbfounded**
110:1 115:2,4
116:4
**duties** 16:17
**DVD** 90:10,11
96:3,17
**DVDs** 95:13
**d-e-d** 143:5
**d-e-v** 143:21
**D.C** 1:14 2:7 3:8
3:17 5:12 6:14
6:17 9:1 11:19
17:22 24:12,13
33:12 47:4
61:17 117:8
154:10

---

**E**

**E** 4:1 17:14,15
18:12 167:13
**eager** 77:19
**earlier** 42:6 59:21
125:7 126:10
128:9 136:6,8
140:14 160:19
168:1 171:9
172:9 176:1
177:5
**earliest** 23:16
**early** 44:22 97:16
103:21 104:14
105:2
**easily** 168:7
**easy** 92:19,21
199:11
**education** 21:3,4
21:16
**educational** 21:14
**effort** 42:4 150:10
151:4,16 152:1
152:5,9,18
**efforts** 84:9
**eight** 139:22
140:18 187:13
**either** 50:10 61:6
63:2 67:8 91:20
91:21 96:7

111:7 112:16
123:21 203:10
208:4
**electronic** 37:20
38:9 90:12
**electronically**
28:21 41:3
**employed** 210:9
210:12
**employee** 41:9
43:8 44:10
57:18 61:18
77:18 84:14
85:13 111:9
115:19,22
174:11,16 185:2
210:12
**employees** 43:11
54:3 55:22 60:1
61:21 66:4
68:15 96:16
137:19,20 184:8
184:13,20
**employment**
127:16 128:19
**ended** 119:13
134:10
**ends** 99:9 208:9
**energy** 110:15
**engage** 18:11
**engaged** 120:22
135:5
**engineered**
111:14
**engineering**
110:16 111:11
111:20
**entail** 20:4 77:14
**entailed** 77:16
**enter** 203:11,14
**entire** 17:7 68:21
154:19 155:1
193:19 204:6
**entirety** 108:5
**entities** 51:3,5
**entitled** 37:1
**enumerating**
115:19
**equally** 163:14

Case 1:06-cv-00789-PLF-JMF   Document 42-8   Filed 04/23/2008   Page 61 of 79
VIDEOTAPED DEPOSITION OF NINA GOODSON
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

220

**Errata** 209:7
**ERROR** 211:5
  212:1
**especially** 110:3
  195:11
**Esquire** 3:4,12
**essentially** 51:14
**establish** 104:13
  151:5
**established**
  103:17,19
  104:22 105:8
**et** 1:9 5:6 202:7
  211:1
**Eunice** 48:13,14
  48:16 50:2,7
  203:16
**Eunice's** 203:20
**evaluate** 10:11
  25:14 61:21
  62:7
**evaluated** 53:19
  53:20 54:10
  56:3,9 62:19
  69:6 70:18
  168:13 206:21
**evaluating** 60:13
  69:8 127:5
**evaluation** 53:17
  53:22 54:9,21
  54:22 56:4
  58:14,18,22
  59:6 60:16,22
  61:12 62:2,5,20
  64:18,20 65:2,3
  65:20,21,22
  66:3,13,16 69:7
  69:15,17,21
  70:17 91:1
  168:2,14 169:4
  169:18 170:10
  170:20 171:1,4
  171:12,19 202:2
  206:22 207:5
**evaluations** 26:18
  27:5 41:16 53:9
  53:11 55:2 59:4
  59:10,12 60:7
  61:18 69:11

70:9,12,14
  173:22 174:4
  181:9
**evening** 89:16
**event** 80:3 111:14
  111:20 189:1,4
  189:7
**events** 57:19
  111:11
**everybody** 109:14
  117:7,9
**evidence** 111:13
  185:11
**exact** 96:15
  107:21 120:12
**exactly** 49:21
  57:20 71:8
  72:18 85:14
  106:17 112:21
  114:6 116:6
  136:6 139:6
  140:20 145:22
  152:19 175:10
  175:12,19 176:7
  180:22 187:6
  195:20 197:17
  197:18
**examination** 4:4,5
  6:4,8 150:1
  173:16
**examine** 141:3
**examined** 6:6
  209:4
**example** 38:3,22
  52:6 82:2
  113:22 121:1,9
  124:8 131:9
  133:22 172:15
  191:3 193:13
  204:8
**excellent** 60:18
  61:5,6
**excerpts** 89:16
**exclusive** 154:9
**excuse** 6:15 8:14
  48:13 53:1
  56:10 67:14,21
  67:22 88:4
**executive** 104:3,7

105:3 106:9
  107:13 109:12
  118:22 120:11
  122:5,11,17
  123:3,7,11,13
  123:14,17
  124:14 125:2,3
**executives** 107:15
  108:9 112:2
  114:11 121:1
**exhibit** 38:11,15
  138:17,18,22
  141:3 143:3
  144:9,9 145:13
  146:21,22 147:4
  147:17 148:6,17
  152:21,22 153:4
  153:10 154:6,6
  155:8,9,13,13
  155:22 157:11
  157:12,16
  159:16,17,21,21
  164:13 165:8,9
  165:13 166:4,5
  166:9,10,18
  168:19,20 169:2
  170:4,4,5,9
  186:15,17
  204:11
**Exhibits** 4:8,22
  157:1
**exit** 25:10
**expanded** 123:15
**expectation** 75:14
**experience** 23:16
**experiences**
  102:14
**expert** 26:12
**expertise** 26:9
**expires** 210:22
**explain** 55:9
  117:22 188:17
  188:19
**explained** 140:13
  197:13
**explore** 81:19
**expose** 138:2
**expressed** 198:16
**external** 16:20

18:21
**extraordinary**
  143:4,6
**extremely** 161:20
**eye** 119:14,15
**e-mail** 4:16,18
  28:22 30:7,7,8
  30:14 31:2,4,6,7
  31:10,16 34:3
  34:16,18,20
  35:3,5,7,10,11
  35:13,15,17,22
  36:1,4,12,14,17
  36:21 41:2
  54:20 73:8
  96:21 98:10,14
  102:12 159:22
  160:1 163:16,19
  166:10 179:16
  199:16
**e-mailed** 103:3
**e-mailing** 29:22
**e-mails** 41:17

————————
**F**
**face** 86:17 149:10
**Faces** 28:2,3,7,10
  28:18,20 180:11
**faces.net** 176:20
  179:18 180:3
  182:5 186:3
  192:13 201:2,16
**face-to-face** 199:9
**facial** 148:19
  149:2,6
**facing** 144:7
**fact** 79:20 108:21
  109:18,18
  113:11,17
  117:18 119:21
  130:21 154:8
  161:13 191:1
  199:2,6 200:9
  200:21 206:1
**factored** 172:2
**factors** 106:6
**facts** 99:17 127:5
  157:20
**failure** 178:12

**faint** 170:16
**fair** 144:8 145:14
  163:4,7 182:6
  190:11,12,12,18
  191:5,8,11,14
  201:22 202:4,5
**fairly** 45:13 89:14
  180:8
**fall** 156:20
**familiar** 18:4
  147:19 160:3
**families** 44:12
  114:17 184:16
**family** 9:1,3,7
  10:17 11:6
  16:14 17:3 18:4
  23:18 24:13
  43:16,19 48:8
  54:15 113:1
  117:8 154:11
  157:17 206:2
**far** 173:19
**fast** 140:16
**features** 148:19
  149:2,6
**February** 177:8
  201:17
**Federal** 12:20
  15:3,5,6,8 24:22
  43:16 44:16
  54:16
**Feds** 117:21
**feedback** 66:19
**feel** 20:18
**feeling** 110:13
  122:6,6 161:19
  206:14
**felt** 80:7 111:1,2
  122:12 144:4
  179:21
**Fenty** 116:13
  130:16 131:1
**Fifteen** 183:1
**fifth** 197:6,11
**figure** 47:11
  92:21 121:22
**figures** 92:12,13
**file** 41:8,10,11,15
  41:19 59:13,17

59:18,22 60:8
87:18,20,21
131:8,16,19,19
146:16,18 148:8
151:1
**files** 27:14,15
28:22 29:3
32:21 33:18,22
34:4,22 35:16
41:3,3 87:17,19
131:6 166:1
167:6 168:10
**filing** 49:7
**filled** 146:4 174:1
**filmed** 91:7,9
**final** 70:10
**finalized** 69:11
**finally** 142:13
**financial** 177:16
**financially** 210:13
**find** 47:1,6,6
93:12 98:3
134:4 152:18
194:13 207:12
**fine** 48:1 78:9
**finished** 178:7,8
**fired** 185:3,6
**firm** 14:2,4,7
15:18
**first** 9:2 20:17
29:13 45:6
46:22 52:18
54:5 56:3 57:4
58:1 65:7 78:1,3
84:16 89:1 93:2
97:21 108:12
115:11 123:14
124:2 143:11,14
143:17 147:14
147:21 148:2,21
151:12 154:15
155:21 162:3
**first-best** 144:3
**five** 14:12 16:1
25:2,3 55:19
92:11
**five-minute** 173:9
**five-month**
182:19,20

**fix** 117:16
**flat** 111:18
**floor** 3:16 197:6
197:11
**FMLA** 110:9
**focusing** 66:9
**folder** 70:2
**folks** 118:6 189:3
**follow** 73:7
127:17
**following** 101:22
102:1 131:22
132:6 134:7
156:6
**follows** 6:7
**follow-up** 91:6
173:5,7
**follow-ups** 204:14
**Forbes** 104:20
105:4 106:13
**foregoing** 209:4
210:5
**form** 54:2 65:18
153:7
**formal** 20:7 21:16
21:18 49:3
55:14,15 66:1
67:2 69:7
107:19 121:13
121:14 174:6,7
**forms** 55:4
**formula** 65:10,13
**forth** 35:9 125:17
129:2 161:9
**forum** 97:7
**forward** 66:20
77:21 79:4,18
106:13 107:2
163:9
**foster** 24:21
167:13
**found** 98:4 168:6
207:14,18
**foundation** 17:14
17:15 18:12
19:10,11 26:7
103:22 143:21
167:13
**foundations**

19:13
**four** 146:8
**Fourth** 3:15
**frame** 107:4,9
**freelance** 12:9,11
12:22
**frequency** 189:22
**frequent** 107:12
**frequently** 7:2
27:2 189:2
206:6
**front** 42:22 86:11
86:14 91:10
204:17
**fruition** 105:18
**fulfilling** 68:10
**full** 6:21 8:16
**function** 49:19
51:1,11 58:6
**functions** 17:17
51:15,17,20,22
57:7 58:7
**further** 7:5 79:12
91:2 210:8,11

**G**

**gateways** 91:19
**gather** 97:19
**general** 3:13
16:17 44:22
45:3,5,9,10,17
45:19 47:3
53:22 54:5 55:5
56:8 60:15
65:12 69:1
102:14 118:2
158:21,22 179:1
**generally** 12:17
22:2 36:21
46:19 121:15
124:20 198:21
**gentleman** 177:14
**gestures** 8:7
**getting** 110:8
184:17 188:18
188:20
**give** 6:18,21 22:13
37:8 45:15 87:7
89:6 96:5 97:20

111:8 119:14
180:17 191:18
**given** 42:5,13
88:4 94:18
113:12 140:13
149:6 151:20
156:22 161:20
180:6 181:10
209:6 210:7
**gives** 138:11
**giving** 8:14 96:17
119:6,10 122:10
155:3 195:3
**go** 25:18 30:1
35:17 45:13
47:9,14 63:18
63:20 66:22
79:4,17 83:3
102:9,21 109:9
137:16 138:9
142:10 144:18
161:14 188:18
188:20 198:6
202:22
**goal** 143:15
**goals** 25:11 54:6
55:18 56:7 62:9
66:22 68:8,10
68:20,21 143:13
**going** 6:15,19
25:2 28:16
36:13,13,16
37:5,8,10 42:12
46:4,10,12 48:2
59:21 63:22
71:19,20 76:7
76:11 77:8,9,10
79:4 83:3 88:21
97:16 99:10
101:2 116:20
117:6 119:14
121:18 122:1
126:12 127:11
132:4 134:14
143:16 161:9
162:7 163:8,10
173:11,18
176:20,20 177:4
181:2 182:13

184:22 187:1
192:12 194:8
195:14 201:8
207:8 208:11
**good** 1:13 2:1 4:3
5:4 6:3,10,13
7:16 16:10
18:16 30:12
37:18 40:12
42:5,12 46:8,16
47:17 48:7 80:2
99:10,14,17
116:19 138:21
147:3 153:3
155:12 157:15
159:20 163:2,12
165:12 166:8
169:1 170:8
171:22 173:4,15
173:18 190:18
190:19,20
191:21 192:2
195:1,7 198:20
199:12 201:9
208:10 209:3
211:2
**Good's** 207:9
**gospel** 108:17
**gotten** 91:12
111:18 133:9
**government** 6:18
12:20 15:3,8
24:14 33:12
39:6 40:16,19
41:18 54:18,19
61:17 121:3
126:13 169:3
**graphic** 58:3,5
**great** 16:9 26:6
161:7 162:12
180:8
**greatly** 112:6
**grided** 142:10
146:3 186:16
**group** 17:12
77:22 109:14
117:16 123:15
143:4 177:18
199:15

**groups** 12:15,18 19:7
**guarantee** 7:3
**guaranteed** 24:22
**guess** 58:16 99:17 100:4 110:13 139:22 140:20 145:21 161:18 161:22 164:4,9 187:17 189:11 205:11
**guessing** 140:5 188:1
**guise** 189:4

**H**

**hadn't** 58:16 190:5
**half** 12:5 13:17 16:1 42:15 183:10
**hallway** 197:4,5,6
**Hamilton** 10:16 11:6 16:13 17:2 17:9 23:18 24:4 24:18 25:4,20 26:3 61:20
**hand** 42:13
**handed** 138:21 147:3 153:3 155:12 159:20 166:8 169:1 170:8
**handle** 44:1
**handling** 16:19 120:17
**hands** 150:11
**handwriting** 141:4,4,6
**handwritten** 4:11 39:20 139:1 145:14,16 204:12
**happen** 76:12 78:13 98:2 128:22 201:8
**happened** 16:10 31:16 76:3 115:10 133:11

154:1,4 172:14 179:4,8
**happening** 132:14 161:5 201:5
**happens** 75:1 184:19
**happy** 8:2 22:13
**harassment** 44:3
**hard** 34:1,4 41:3 176:6 190:4
**Harold** 196:10 198:10
**hasn't** 42:8 133:17
**head** 22:15 52:17 65:15 89:6 99:2
**headed** 177:14
**header** 158:14
**heads** 138:11
**health** 110:15
**hear** 63:19 125:11 208:9
**heard** 97:9 185:2
**hearing** 7:21
**held** 2:1 66:21 199:10,18
**help** 45:1 80:14 85:15 144:6
**helped** 47:4
**helping** 58:10
**hereto** 210:13
**he's** 26:12
**hide** 109:18
**higher** 168:14
**hired** 104:2
**hit** 150:4
**hold** 30:20
**holding** 19:19 192:11
**home** 6:11,16 22:21 32:7,10 34:8,12,15,17 34:18 35:3,7,10 35:13,15 36:20 37:19 127:13 206:14,15,17 207:12
**honest** 163:14,15 164:18

**hoped** 106:4 140:16
**horrible** 162:10 162:16
**Hot** 91:22
**hour** 67:12
**hours** 67:12 82:13 82:13 192:17 193:18 203:15 204:1
**HR** 77:14 90:22 127:17,20 130:3 130:4
**huge** 115:13 162:11
**Human** 10:17 61:16 71:5 72:2 73:21,22 74:8 74:18 75:2 76:19 77:9 78:13 79:21 81:2 82:3,4,10 82:21 83:14,17 84:4,7 90:15,16 95:8 96:5,16 97:4,7,18 111:1 111:5 116:13 118:2 125:6,12 125:20 126:3 130:17 135:15 148:14 177:4
**hurdle** 133:10,12 161:15

**I**

**idea** 45:15 83:2 101:2 106:7 141:14 142:8 143:1,8
**identification** 38:12 138:19 147:1 153:1 155:10 157:13 159:18 165:10 166:6 168:21 170:6
**identified** 155:14
**identify** 5:13 8:1
**illness** 206:13

**immediate** 10:2 10:22 53:12 121:16 132:8
**immediately** 97:19 126:2 158:2 196:6
**impact** 176:22
**impacted** 180:8
**important** 177:13 180:14 182:10 191:3,17 192:4 192:12 195:12 195:18,19 196:1 196:4 199:4 200:11
**impression** 111:8 112:22 113:4,21 119:6,10 122:11 122:14 124:10 129:22 162:2 165:5
**improve** 117:2 132:1
**improvements** 117:13
**inasmuch** 124:11
**inch** 42:16 131:20
**incident** 84:21 85:1,9,10 90:19 125:5 141:22 175:12,13 188:11
**incidents** 142:13
**include** 123:15
**included** 57:17
**including** 56:22 150:2
**incredibly** 115:12
**indicate** 49:8 71:21 118:12 132:16 134:15
**indicated** 64:14 64:19 93:21 139:11 145:14 160:2 169:12 170:21
**indicates** 138:9 158:10
**indication** 150:21

**individual** 47:13 56:6 177:20 205:18
**individuals** 7:4 143:4
**inflated** 108:15 112:6 113:22 115:12 161:20 162:1 164:5
**informal** 57:1 66:2,12 121:14
**information** 6:16 6:18,20 7:7 8:21 9:3,6 17:1 20:5 20:6,22 23:12 23:13 27:6 28:6 29:2,8,11 33:4,7 36:11 37:2,4,9 37:10,12 41:14 43:11,15,18 44:11,18 51:8 51:16,17,19,22 56:13 89:10 97:19 98:4,5 103:6 131:11 134:4 146:18 148:13 151:11 162:22 163:3,5 163:21 164:3 167:7 172:20 176:17 177:15 179:5,18 180:6 188:8 192:10 196:5,13,18 204:4
**informational** 26:19
**informed** 71:17
**informing** 136:19
**infrequent** 138:3
**initially** 11:19 18:1 77:6 78:7 103:10 195:1,7
**initiate** 140:2
**initiative** 191:3
**initiatives** 26:20 27:6
**input** 69:10,13 126:18 158:11

223

**inquired** 31:20
**inquiries** 130:8,13
  130:18,20
  167:11
**inquiry** 97:4 99:4
**inside** 100:22
  117:5
**instance** 191:6
  199:4 205:19
**instances** 45:20
  191:7,10
**institution** 21:9
  21:17
**institutions** 21:6
  21:14
**instruct** 6:19 37:6
  37:10,14 46:10
  46:13
**instructed** 7:8
**instruction** 7:10
  7:13
**instructions**
  65:17,19
**instrument** 65:8
**Intake** 91:20
  92:14,15,18
  93:2,9,13 102:5
  102:13 103:1
  139:20 140:12
**intent** 165:2
**inter** 189:11
**interact** 197:8
  207:17
**interaction** 86:5
  91:3
**interested** 15:2
  18:14,20 20:2
  28:14 210:14
**interface** 35:22
**interim** 53:17
  69:6 72:15 79:6
  134:9
**internal** 16:21
  33:3 77:12
  136:13 176:18
**internally** 108:14
  109:13 117:15
  161:21
**interpretation**

195:5
**interrupt** 42:2
**interview** 89:12
  89:15 113:20
**interviewed**
  113:14
**intra-agency**
  189:12
**investigate**
  101:20
**investigating**
  133:21
**investigation**
  90:18 96:19
  97:5 125:7,9,13
  148:15
**involve** 96:18
**involved** 19:12
  76:13 96:19
  121:7,11,15,18
  127:5 130:6
  136:12 137:4
  138:7 172:5
**involving** 27:5
  79:1 144:11
**irrelevant** 200:15
  200:19
**isn't** 28:13 199:7
  199:11 200:18
  201:16
**issue** 24:5,10
  40:21 79:13
  83:8 89:22 90:7
  91:4 95:19
  99:19 101:21
  106:4,10,14
  107:9,15,16
  108:6 112:3
  113:5 114:15
  116:9,10 118:3
  118:9,18 119:1
  119:4,19,21
  120:2,13 121:21
  124:17 128:10
  128:14 130:9,14
  131:8 132:1,16
  132:16,21
  133:17 134:7
  135:6 136:10,15

136:19,20 137:7
  137:8,9,14
  138:4 141:18
  144:18 146:13
  147:7 148:9,21
  151:9 156:20
  157:8 159:5,7
  160:20 163:17
  164:12,14,18,21
  167:9,18 175:18
  175:20 195:2
  196:20 198:18
  198:22
**issued** 38:5 79:16
  135:22
**issues** 7:19 24:5
  33:7 45:7,18,18
  46:3,3,20 47:13
  56:17 77:18
  99:4 104:9,12
  104:15,18
  106:19 116:19
  117:15,19 118:5
  125:14,16
  137:10,15 138:8
  162:20 173:3
  196:15 199:19
  204:5
**item** 148:7
**items** 55:11
  173:21
**iterations** 72:19
**it's** 9:16 22:18
  28:13 30:6 33:8
  36:13 42:15
  47:17 55:9 61:6
  65:7,8 95:1
  110:11 115:15
  115:18 118:5,10
  120:8 131:17
  133:8 139:1
  154:19,22,22
  164:20 169:14
  169:14 170:16
  173:8 174:11
  178:17 183:3
  185:14,16
  187:20 189:13
  190:4 195:11

199:12 205:8
  206:21
**I'd** 42:16 47:18
  139:2 145:3
  147:7 153:6
  169:6
**I'll** 8:2 22:13
  59:19 89:6
  138:16 146:20
  152:20 157:10
  159:15 165:7
  166:3 168:18
  170:3 173:3
  192:15 193:4
  199:21
**I'm** 5:18 6:19
  9:12 11:15 14:1
  30:10 35:6,17
  37:5,10 42:12
  46:4,9,12,16
  50:11,12 51:12
  54:4 55:3,18
  59:4 61:15
  63:14 65:14
  66:8 67:22 72:2
  73:20 75:22
  80:18 84:11
  86:9,9,9 95:17
  97:2,2,17,18
  100:9 111:21
  114:6 121:18
  132:3 136:18
  137:11 139:6
  140:4,6,8,22
  142:12 144:19
  145:8 146:9
  149:21,22 155:2
  155:3,5 157:5
  159:13 160:5
  161:2 163:20
  164:2,10 171:21
  173:18 176:11
  179:9,16 180:1
  182:13 186:14
  186:18 188:1
  189:21 191:13
  194:17 198:10
  206:14 207:8
**I've** 7:21 32:18

35:16 98:15
  146:6 156:19,22
  160:5 191:19
  195:10 206:8,12
  206:12

---
### J
**Jackson** 78:4 79:2
  126:4,7
**Janet** 167:21
**Jill** 104:20
**Joanne** 98:7,16
  98:21 100:3,10
  100:13,18 102:2
**Joanne's** 99:1
  101:6
**job** 1:20 10:17
  11:6 14:20 16:6
  16:8,13,17 17:2
  17:18,20 23:16
  23:18 57:16
  61:2 77:16
  163:13 177:4
  190:14,18,19,21
  206:6
**Joelle** 123:21
**joined** 54:22
**judgment** 65:4,7
  127:6
**Judy** 118:10
  166:12
**June** 139:19
**jurisdiction** 44:17

---
### K
**K** 3:6
**Kathy** 10:7 17:12
  17:13,16 18:13
  18:15,17
**keep** 31:5,7 70:2,5
  103:1 115:16
  132:4 146:7
**keeping** 102:11
  146:9
**kept** 70:9 98:20
  167:3,5 203:4
  203:16,19
**key** 120:14 203:5
  203:11

224

**keys** 203:14,16
204:2
**kid** 183:3
**kids** 97:12 109:5
109:11 112:13
112:13 131:14
132:7 134:10
136:21 139:19
140:12 146:18
167:7 183:4
205:6,6
**kind** 21:18 23:3
25:1 40:1 44:2
47:6 49:6 60:17
65:4 90:12
91:16 146:2
147:19 153:11
156:9 161:17
**kindly** 145:7
**kinds** 12:17 14:6
18:10,18 21:20
22:2 23:20
26:17,22 27:7
39:12 41:6,14
110:16 116:2
121:7 180:6
**Kleartis** 76:17
77:12,15,20
78:1 126:4,7,9
**knew** 74:7,8,19
87:3 92:18
104:12 109:1,10
114:18 119:12
186:6 197:17,17
**know** 20:13,14
25:7,20 26:1,8
26:13 28:17,18
30:17 31:16
34:3,6 49:4 53:5
58:18 66:4,13
71:13 73:6,12
73:14,18 74:2,8
77:2,4 79:10
81:18 82:13
84:1,4,6 86:10
87:21 89:2,7,18
93:1 96:15
97:22,22 98:22
99:1 101:4

107:13 108:2
109:17,18
110:14 113:6,8
113:10,11,17
114:5 116:11
118:20 120:13
120:16 121:18
122:3 123:12
126:1,22 127:4
127:14 129:19
130:7,11,12,19
130:21 132:13
132:20 133:11
133:20 134:6,12
135:3,5,8,9
136:8 137:1
139:12,16
141:11,20 142:1
142:5 143:1,6
143:12,22
144:15 151:3,4
151:6 153:6,14
154:16 156:15
156:18,21 158:4
158:18,20 161:5
163:8 165:4
167:16,19 169:9
169:10 170:1,22
171:22 172:3
173:8 178:5
179:8,15,20
184:21 186:11
187:1 188:11
190:1 193:19
196:1 201:4
205:20 206:20
**knowing** 115:17
**knowledge** 30:17
30:17 93:17
94:16 118:13
122:2 152:2
167:15 205:2,17
**known** 86:6 90:11
106:8 119:3
137:9
**knows** 117:7,9
**Kratchman** 45:7
46:1,2,5,8,18
47:3

**L**
**L** 1:22 2:13 210:2
210:17
**Labor** 96:12
**lack** 139:20
140:12
**laid** 179:3
**land** 65:2
**language** 122:10
**laptop** 32:4,12
**large** 17:4 24:16
35:16 131:18
149:9 176:21
180:8
**largely** 91:15
**larger** 123:15
**LaShawn** 107:17
107:20 108:3
130:8
**late** 71:7 85:9
103:20 104:22
105:2 107:5
108:7 128:6
132:8 157:4
173:8 193:17
**LaTonya** 50:10
50:16,17
**launched** 201:17
**law** 3:5 24:22
43:6 46:21
**laws** 44:10,16,18
44:20 45:1,14
**lawsuit** 24:6,18
25:2,4,8,12
**lawsuits** 24:17
**lead** 77:5
**leaders** 104:4
**learn** 17:11 78:21
**learned** 35:16
75:10 79:3
85:12
**Learning** 11:20
12:4
**leave** 7:2,4 11:9
13:16 15:14
43:16,19 110:4
110:6,7,12,14
111:10 116:1
127:14 173:2

176:5 181:3
190:7 206:2
**left** 20:22 25:5
47:11 49:12
50:1 100:1,4,22
101:14,15 113:1
126:9 143:2,3
143:20 203:6
**legal** 24:5,10,11
24:19
**legitimate** 89:2
**length** 67:15
**Leslie** 1:22 2:13
5:21 142:6
210:2,17
**letter** 27:22 30:5
127:18 135:19
135:21 136:2
181:17
**letterhead** 157:18
**letters** 135:10
181:12
**let's** 21:3 47:16
63:20 99:7
142:11 155:8
188:9 193:13
200:8
**level** 54:17 55:3
61:3 106:9
143:4 184:8,13
184:14
**licenses** 23:3
**licensing** 105:18
**lie** 88:13
**light** 173:2
**limit** 31:6
**line** 91:22 106:3
120:14 160:8,12
164:18 194:8
207:9 211:5
212:1
**lines** 83:1 120:8
186:16
**list** 21:21
**listed** 22:14 140:3
160:13 185:5
**listened** 72:8
**listing** 92:12
**Literature** 21:12

**litigation** 107:18
130:8
**little** 55:9 97:22
116:4 129:2
142:12 154:2
**loan** 152:17
188:20 189:6
**loaned** 188:8,18
**loaning** 189:14
**local** 24:11,18,18
**locally** 144:5
**located** 14:4 40:4
87:14
**location** 197:9
**lock** 203:5
**locked** 203:6
**long** 12:2 14:11
15:22 32:15
49:18 58:17
67:10 79:1 83:3
84:21 85:10,14
85:16 89:12
104:6 105:7
109:4 125:1
133:18 143:3
151:10 161:16
176:7 178:13
**long-standing**
119:22 120:8
**look** 38:17 42:16
47:5,9 67:1 68:9
147:8 155:18
157:21 160:3
162:2,3 166:13
169:7 187:5
**looked** 50:22
51:11 93:8
115:13 150:14
150:15
**looking** 17:18
77:20 80:22
98:9 139:2
141:9 145:13
156:7 177:16
**looks** 147:1
153:10,11 154:4
159:22 165:14
186:15
**loose** 57:1,11

225

**lot** 116:18 117:8
145:4
**lots** 184:21
**low** 202:9
**lower** 62:15
**Lowery** 24:15
**lunch** 47:16
**Lutheran** 139:22
140:18 187:14
204:20 205:1
**Lybrand** 14:16,20
15:2,12
**lying** 88:17
**L.A.D** 2:4 5:21

**M**

**Maher** 167:21
**mail** 98:1,6
100:14,22 101:1
101:6,7,11,13
101:14,15 102:2
**main** 27:19,21,22
57:1
**maintain** 26:14
26:17 27:4,12
28:21 30:8
33:22 39:16,19
59:13
**maintained** 27:15
27:17 28:20
29:4 30:7,18
41:2,3,6,12
44:11 87:11
90:14 131:5,12
148:8,11 150:3
**maintains** 30:14
**major** 17:8 21:11
**majority** 135:16
145:15
**making** 7:11
121:10 127:5
155:5 195:17
**Mallett** 158:15,20
**man** 14:3 85:4
88:13,16,18
92:16 93:2,10
93:14,18 94:22
111:17 147:18
**management**

15:18 28:15,17
43:7 57:4 80:15
80:16 112:2
123:2,10 180:12
**Manager** 96:12
**managers** 79:12
207:6
**managing** 66:5
**mandatory** 44:3
**man's** 90:19
149:10
**March** 70:15,16
70:17,18,19
139:19 140:9
169:13,20
170:12 172:12
172:15
**mark** 138:16
146:20 152:20
155:8 157:11
159:15 165:7
168:18 170:3
**marked** 4:22
38:11,14 138:18
138:22 146:22
147:4 152:22
153:4 155:9,13
157:12,16
159:17,21 165:9
165:13 166:3,5
166:9,18 168:20
169:2 170:5,9
186:15
**market** 15:7
**marketing** 13:10
13:11,13,14
14:18,19,21
15:3,11
**Marshall** 24:15
**Martin** 139:22
140:19 187:16
204:20 205:7
**mass** 142:14
146:10
**match** 108:13
149:18 151:8,13
**matched** 150:6
**matching** 93:10
**material** 29:3

90:3 131:16
200:12
**materials** 13:14
13:14 14:22
29:3 57:20
90:21 177:17,17
191:1 192:9,14
193:20,21
196:21 198:18
198:20,21 201:1
201:10
**matter** 5:5 7:17
39:1 120:8
130:3,4 141:11
192:19
**matters** 44:1
**may** 21:5,6,7
36:20 37:8,11
41:17 46:8,9
57:19 61:11,12
87:19 118:4
126:8 133:18
135:14,18 138:9
139:19,19 140:9
141:16 142:10
142:16,20,20
144:15,16
158:10 163:2
173:5 174:17
182:2 184:21
185:6 186:20,22
187:1,18 201:18
**Mayor** 120:12
135:2
**Mayor's** 121:21
**ma'am** 200:20
**MCI** 13:2,4,9,16
13:22 14:21
**mean** 42:2 60:22
63:5 80:11
107:19,22
109:19 115:6
116:3 125:16
136:18 137:19
165:19 189:16
190:12,20 198:4
207:7
**meaning** 104:4
189:20

**means** 143:5,12
143:22 184:9
**meant** 80:19
82:15 97:14
**media** 9:13,15
10:15 16:19
19:14,16 22:5
27:3 57:17 86:6
90:12 91:3,17
94:19 95:8,10
97:16,20 99:18
100:5,7,14
101:6 102:20
103:7,11 107:4
108:7,10 109:17
110:2 112:19
113:5,5,20
116:7 119:3,13
119:20 120:10
120:16,20
124:15 125:2,5
125:17 128:9,14
131:14 132:7,18
134:7,19 136:9
137:13,17 138:2
138:6,9 141:17
148:8,20 149:17
149:18 150:12
151:9,14,18
152:3,7 161:20
162:1,3,5
175:13 184:4,10
188:10
**mediadata** 151:1
**media's** 124:21
**medical** 43:16,19
110:3,6,6,14
111:9 116:1
127:14 176:5
181:3 190:7
206:2
**meet** 64:11
100:10 105:19
105:20 106:2,21
195:15
**meeting** 26:3
66:21 67:11
69:2 72:22 73:7
76:8,10,13,21

77:3,5 78:6,8
79:1 82:3,6,17
82:22 83:9,13
83:22 84:5
104:6,7 105:4
106:12 123:3,4
123:5,14 124:11
124:12 144:10
159:14 177:13
191:2,16 192:11
193:19 195:21
196:6,21 197:1
197:12 198:19
199:3,6 200:10
200:21 201:10
201:11
**meetings** 66:6
67:3,17,18 68:2
68:13 75:5
104:3 107:14
109:12 117:2
119:1 122:6,17
123:7,8,10,11
123:13,18 124:8
124:14 142:9,11
142:17 199:7,10
199:17
**Meltzer** 118:11
118:12 166:12
**members** 116:9
119:18 120:12
130:12
**memo** 4:15 158:5
178:13,14,17,20
179:2,8,10,16
179:20
**memoranda**
41:16
**memorandum**
181:15
**memorialization**
77:3
**memorialize**
83:21 99:5
**memorialized**
79:17 84:5
123:18
**memory** 26:5
157:8 171:13

226

**mentioned** 79:11
95:6 111:22
114:10 125:7
**mentioning** 97:5
112:1
**merely** 163:17
**message** 92:12
100:4 101:14,16
166:12,21 167:2
**messages** 192:13
**met** 17:16 25:11
25:16,17 46:11
46:12 64:6,8
100:12 200:14
**method** 199:17,17
**Meyers** 156:12,15
**Michele** 83:19
**middle** 97:16
140:7 143:19
187:11
**midnight** 141:9
**midsummer**
58:13
**midyear** 65:21
66:12
**mid-September**
157:3
**mike** 86:17
**mind** 137:22
138:4,13
**Mindy** 1:13 2:1
4:3 5:4 6:3,13
30:6 99:10,14
173:15 196:7
208:10 209:3
211:2
**mine** 74:12
153:16
**minority** 15:19
**minute** 194:15
**minutes** 67:18
89:14 123:19,20
124:4,7,10,13
185:22 193:17
**mischaracterizi...**
185:11
**missed** 192:7,20
194:5,11 195:10
195:19

**missing** 98:20
171:5 191:2
192:3,17 195:18
201:11
**moment** 63:21
68:1 89:1 141:1
162:17 198:3,4
198:5
**moments** 8:15
85:19 93:22
122:5 146:1
192:3 197:14
**Monday** 193:14
**monitor** 107:17
107:22 108:4
109:10 115:18
117:20 118:8,19
130:8
**monitoring** 26:2
117:20,21
**month** 19:3 123:4
123:5,15 157:5
**monthly** 40:3
**months** 66:14
92:11 102:15
115:14 125:4
132:5 183:2
190:9 192:18
201:20 202:3
**morning** 42:3,8
128:6
**mouth** 191:14
**move** 145:5
**moved** 94:12
**Multimedia** 9:9
9:11
**multiple** 143:17
**Myers** 123:21
**M-a-h-e-r** 167:22

**N**

**N** 4:1,1
**name** 5:15,17
6:11,22 7:16
14:2 29:7 45:8
49:17 78:1,2,3,4
96:8 99:1 100:2
123:22 124:1,2
153:20 160:2,12

169:5 170:11
181:13
**named** 14:3 26:6
98:7
**names** 184:14
**Nancy** 155:15
**national** 24:16
**nature** 30:15 46:8
46:18 65:12
67:19 81:20
105:12 122:2
150:18 158:7
**navigate** 28:14
**near** 16:2 143:2
143:19
**necessarily** 8:8
121:8 124:20
165:19
**need** 8:5 20:18
63:15 66:4 76:8
102:9 121:16
123:12 127:17
146:7,11 178:2
**needed** 18:18 21:2
25:11 47:5 57:6
58:9 61:2 68:22
83:1,2,6 97:1
98:11 128:22
144:5 177:18,21
189:1 191:1
204:3,4,9
**needing** 134:11
203:22
**needs** 174:14
**negotiate** 54:6
**negotiated** 25:9
25:15 55:19
56:2,7 62:9
**neighbor** 74:5,11
**Neil** 135:4 166:11
**neither** 210:8
**network** 176:18
184:10
**never** 75:20 98:15
100:9,12 207:21
**new** 9:9,13 33:18
53:2 56:6 104:6
139:20 140:13
**news** 86:11 88:15

89:17 90:6
94:19 97:6
101:3 112:16,18
112:20 129:4
152:1 154:8
184:4
**newsletter** 18:21
77:12
**night** 85:5 93:4,5
98:8,19 105:15
112:14 113:3
132:8 157:20
160:10 161:4
162:5 164:19
203:7
**nomenclature**
60:19
**non-profit** 9:16
**non-profits** 9:17
**non-supervisory**
55:6
**noon** 193:14,15
**normally** 121:6
**North** 3:16
**northwest** 5:12
14:5
**notary** 2:14 6:6
210:1,18
**notation** 143:1
154:3
**note** 4:22 7:2,11
30:11 145:4
153:11,14,18,22
154:2 171:11
**notebook** 146:2
**noted** 26:12 142:6
145:9
**notes** 4:11 67:18
73:2,4 83:21
99:3 129:10
139:1,4,16
140:11,20
141:11 142:12
142:13,15,16
144:8,15,18,21
144:22 145:14
145:16 146:5,7
146:11,12 168:7
186:20 187:2

204:12
**notice** 2:13 4:9
38:15 148:17
154:5 158:13
160:8 174:11,17
175:8 201:5
**notices** 174:22
175:3
**notified** 127:10
**notifying** 128:20
**November** 210:22
**number** 5:4,7
36:16 38:11,15
42:14 51:7,8
52:2 55:11
56:22 58:7
77:17 99:9,13
104:9 106:1,5
106:18,19
110:20 119:12
138:18 140:15
146:22 152:22
155:9 157:12
159:17 162:18
165:9 166:5
168:20 170:5
173:14 182:14
183:6
**numbers** 89:6
91:13,13 102:3
102:22 103:3,5
103:6 108:12,15
112:5,6,7,10
113:6,22 115:12
161:19,21 162:1
164:6
**numeric** 65:4
**numerical** 171:8
**numerous** 87:1
108:22
**N.W** 2:5 3:6,15

**O**

**O** 4:1
**oath** 8:15,16
**object** 6:16 37:8
46:4 200:1
207:2,8
**objection** 26:10

227

30:10 36:10
81:8,16 132:12
133:1,6 137:18
138:10 139:9
141:19,19
144:13 145:3,5
145:9,18 164:22
174:19 176:4
178:3 180:15,20
181:7 182:7,11
184:12 185:7,8
186:5,12 187:3
187:22 190:17
194:2,7,8 200:1
**objectives** 68:22
**obtained** 152:10
**obviously** 37:15
  111:10 116:2
  139:4
**occasion** 23:14
  68:5 182:21
  183:4,4 189:19
  189:20 193:22
  207:18
**occasionally**
  189:15,17
**occasions** 87:1
  92:10,10 182:17
  182:18 183:2
  205:22
**occupy** 9:21 56:12
**occur** 67:4 122:18
**occurred** 137:2
  172:10 189:15
**occurrence** 138:3
**occurring** 88:21
**October** 165:15
  166:13,22
  172:19
**offer** 16:11
**offered** 19:20
**office** 6:17 20:22
  23:12 27:16
  29:8,10 33:7
  35:10,18,19
  36:1 37:20
  41:13 44:22
  45:4 46:5 47:4
  48:9,17 49:14

50:6,20,22 51:1
51:3,5,8,14,16
51:17,19 52:1
54:11 55:22
56:17 59:14
72:11,11,12
74:12 78:13
79:8 85:6 94:6
101:1 102:8
119:18,18
120:11 121:22
133:22 134:3
160:10 161:4
164:19 167:10
182:15 188:7
197:10 202:21
203:1,6,10,12
203:17,17,17
204:2,3,7
206:17 207:16
207:17
**officer** 8:21 9:3,7
  20:5,6 23:13
  28:7 44:18
  163:1,6 177:16
  196:5,13
**offices** 2:2 3:5
  56:22 203:14
**official** 91:13
  102:21,22
  108:15 164:3
**officials** 121:3,9
**off-hand** 178:21
**Oh** 27:19 73:14
  149:20
**Ohio** 10:19 11:17
  16:4,5,7,8 17:8
  17:16 44:21
  45:16,16
**okay** 7:12 9:14
  16:6 22:16,19
  22:22 24:9
  28:19 32:14,19
  34:19 35:11
  37:5 50:3 51:21
  55:21 57:13
  62:7,15 63:4
  65:6,12,16 66:8
  67:3 68:6 70:11

71:6,12 72:21
76:10 85:18,22
87:7 95:6 98:13
100:8,15 101:18
111:19,22
115:18,19 116:4
117:6,13 118:8
119:15,17 120:6
123:1 125:6
129:19 131:11
131:18 142:18
142:22 146:1,12
146:20 149:5,15
149:20 150:10
153:17 154:13
155:21 156:5,15
156:18 162:10
174:3,7,10,13
174:21 175:2,11
175:15,20
176:10,13 177:1
177:6,11,19
178:5,10,14
179:1,7,15,22
180:3,10,13,17
181:16,19 182:2
182:4,13,19
183:3,9,12,17
184:5 185:2,5
185:13,18,20
186:7 188:3,10
189:20 190:8,15
191:10,13,18,20
192:15 193:9,13
194:5,15 198:8
199:20 200:13
201:19 202:5,22
203:4,22 204:19
205:1 206:16
208:8
**old** 56:5
**once** 7:4 25:14
  32:17 70:8
  75:13 99:18
  108:4 123:4,5
  127:10 130:10
  130:13 136:15
  146:4,6
**ones** 156:19

**one-day** 89:20
**one-page** 165:13
  166:10 169:2
**one-way** 199:14
  199:17
**ongoing** 164:21
  181:1
**on-line** 45:12 47:5
**open** 16:9 173:2
  204:2,3 208:6
**opened** 83:2
**opening** 17:20
**openly** 106:9
  114:15
**operate** 57:7
**operating** 34:5
**operation** 93:5
**operations** 52:12
**operator** 5:10
**OPI** 68:21 71:5
  73:21 152:16
  189:2
**opinion** 163:21
  164:3
**opportunities**
  82:1
**opportunity** 42:9
**opposed** 102:5
  139:15 157:4
  164:20
**order** 25:11 64:15
  104:11 105:19
  120:2 136:3
  203:1
**organization** 9:16
  9:19 10:9 11:14
  24:16 26:1
  56:21 205:8
**organizations**
  12:15 19:7
  105:17 167:15
**organize** 57:5
**oriented** 21:2
**originally** 157:4
**outcome** 125:8
  210:14
**Outlook** 31:4,11
  31:13,18 34:20
  35:21 36:5

**outreaches**
  120:18
**outside** 25:14
  33:12 52:4
  111:11 162:9
  163:4
**outstanding**
  60:18 61:6
**overall** 168:15
  202:2
**overhear** 103:16
**overlap** 126:8
**overnight** 88:20
  104:17 109:6,11
  112:8 113:2
  134:11 167:8
**owned** 14:3

---

**P**

**packet** 42:3,13,17
**page** 4:2,8 139:1
  141:8 143:20
  144:15 146:4,6
  146:9 147:9,17
  148:16 154:21
  158:16 159:22
  211:5 212:1
**pages** 1:21 131:19
  146:4
**paid** 133:14,15
**paper** 27:14,15
  142:10,13 146:3
  146:9 155:1
  187:6
**paperwork**
  128:22
**parameters** 47:2
**pardon** 96:13
  164:16 205:4
  208:1
**parents** 167:13
**part** 21:18 28:15
  54:5,6 61:17
  65:8 78:20
  80:14 86:15
  101:2,4 117:5
  148:8 198:5
  206:22
**parted** 197:20

198:2
**participate**
103:15
**participated**
22:10
**particular** 21:11
31:2 32:16 33:5
43:6 45:20,22
56:16 67:4
69:16,20 94:6
106:12 131:19
146:13 148:12
156:10,20
169:19 200:22
201:1,10 202:18
203:20
**particularly**
158:12
**parties** 210:10,13
**parts** 96:1 154:7
**party** 25:14
**pass** 177:17
**passed** 193:9
**Paul** 26:6 45:7
47:2
**pause** 38:19 42:19
147:11 158:1
160:4 166:15
173:9
**peak** 139:19
**pending** 208:6
**people** 7:2 17:19
18:16 33:4,5,11
51:7,9 52:2 58:7
65:9 66:5,18
68:3,7,8 69:22
78:17 88:15
93:9,13 96:22
98:11 102:10
110:1,21 111:21
113:2 115:1,4,9
115:10,19,22
116:3 119:3,12
120:17 121:17
121:18 122:5
123:16 137:20
144:4 152:14
162:9 163:9
176:17,22 180:9

184:11 199:9,11
199:15 201:4,7
207:14
**People's** 68:20
**percent** 19:5
**perception** 81:14
**perfect** 195:9
**perform** 32:20
53:11 177:11
**performance** 4:19
4:20 10:11 54:6
54:8,14 55:15
56:1,7 62:5,8
68:4 108:22
168:2,13 169:3
169:4 170:10,14
171:18 172:1,7
172:11,21
174:11 175:18
175:20 181:6,21
181:22 182:5
185:21 186:3
190:3,10 201:21
206:22 207:5
**performed** 59:12
70:13
**period** 9:21 11:5
13:19 39:17
48:16 62:5,11
62:18 66:14
67:15 69:5
70:12 79:7,11
83:8 84:20
123:11 137:3
138:14 142:11
143:5,21,22
159:3 169:12,19
170:11 172:19
182:19,20 183:2
191:8
**periods** 169:16
**permission**
184:19
**permissions**
184:17
**person** 48:15 49:5
49:13 50:5,19
69:7 77:19
86:10 93:18

97:7 98:6
100:14,17 101:5
113:15 118:10
121:6 126:4
147:18 148:19
149:7 150:18
151:14 152:1
188:19 196:14
202:18
**personal** 6:16,18
6:20 29:8 30:3
36:11,12,14,15
36:16 37:10
**personally** 40:15
91:2
**personnel** 41:8,10
41:11,16 43:6,7
44:1 59:13,17
59:17,18,22
70:1 75:17
87:20 184:22
**persons** 60:1
101:5 137:6,14
**person's** 101:12
149:2,5
**perspective** 80:10
80:11 163:2
**pertain** 41:4,7
46:20 139:5,8
139:12,16
145:16,19
146:12
**pertaining** 87:19
131:13 179:4
**pertains** 43:7
**phone** 36:15 38:5
38:8 97:9
121:17 128:4,21
129:1
**phones** 49:7
**photo** 88:3,5
**photocopy** 87:17
**Photocopying**
49:7
**photograph** 86:8
87:5,12,15,16
87:22 93:8
**photographer**
189:4,5

**photographs** 87:4
87:8,10 184:4
184:15
**photos** 88:8,10,12
149:9 150:1
151:20 189:9
**phrase** 7:22 122:9
141:10 143:10
**Phyllis** 86:4,8,9
111:16 113:11
114:2 148:1
151:19
**pick** 8:9 121:17
**picture** 85:7 87:2
88:5 89:3 90:19
92:16,20 93:12
93:18,19,22
94:7,17,21,22
102:1 111:17
113:9,13 125:16
134:18 147:9,18
147:19,21 148:1
148:3,17,18,20
149:3,6
**pictures** 85:4
149:7,11,15,17
150:5,9,11,12
150:15,16 151:1
151:2,7,8,13,18
152:2,6,10,11
152:19 184:10
188:5 189:2
**Pinkston** 142:6
**place** 5:11 22:12
72:10,22 75:18
76:22 83:14
94:4 109:3
125:3 132:5
133:14 134:4
176:21 189:1
193:21 197:3
199:3,7 200:10
200:22 201:11
**placed** 157:17
202:7
**placement** 91:22
92:1,5,6,12
93:15 102:6,8
102:10 103:2,3

103:18,19 104:1
104:8,12,13,18
104:21 105:7,16
105:17 106:7,8
106:10 108:14
108:16 132:9
133:22 134:3
139:21 140:10
143:14,14,15,17
143:18 144:6,11
145:16 146:17
161:8 162:13
188:2
**placements** 106:6
143:17
**places** 58:8 92:2,4
100:1
**placing** 205:4
**plaintiff** 1:7 3:3
5:16 6:5,8 7:17
191:22
**plan** 106:13,16
**planned** 176:7
**planner** 39:21
40:1,3
**planners** 40:4
**planning** 15:21
22:5 57:19
**planted** 86:14
**plate** 69:4
**play** 31:14,18
135:10
**played** 100:6,14
101:6,16
**playing** 189:4
**please** 5:13,22
6:10 7:22 8:19
18:15,16 145:11
155:8 157:21
160:2 166:14
192:22
**plenty** 201:7
**PMP** 54:4 55:3
61:13
**point** 7:11 18:3
24:17 33:16
66:11 70:20
82:3 84:12
90:21 91:15

229

104:2 119:19
139:10 140:4
142:14,14
145:20 173:3
183:6 192:9
206:11
**pointed** 187:10
**policies** 24:2
**policy** 6:17
**Pollock** 140:1,19
187:16 204:21
205:7
**portable** 38:2
94:11
**portion** 42:20
**portrayed** 100:4
**portraying**
124:16
**position** 8:20 9:18
9:22 10:3,8,20
11:1,9,13,21
12:2,3,8 13:1,8
13:16,21,22
14:11,15,17
15:14,22 16:13
16:17 17:11
19:21 20:1,2,3,7
20:15,21 26:14
36:14,17 37:7
37:16 43:4,5
48:14 49:12
50:1 55:6,7,14
56:11 58:12
71:1 72:13 77:9
77:13 96:10,13
96:15 126:12,20
127:2,7,12,15
129:4 134:15
150:18 196:12
**positions** 13:8
15:10
**possession** 188:15
**possibility** 151:12
**possible** 61:10
145:20 152:16
183:3
**possibly** 17:19
60:14 167:4,21
**posted** 147:15

156:2,8
**postings** 156:7
**post-high** 21:4
**potential** 107:1
**practice** 15:2 66:9
122:20 123:1
144:2 189:18
195:11,17
**practices** 54:19
109:2,3 143:10
144:1 153:12
154:10 161:10
**premium** 102:21
**preparation** 64:7
136:14 137:4
**prepare** 63:7
64:15 156:9
**prepared** 13:14
20:12 29:2
97:20 123:20
136:2,5 170:1
179:5 191:2
192:10
**preparing** 14:22
121:2 136:12
169:18
**present** 3:20
68:16 144:10,11
**presentation**
104:8
**presentations**
119:20 120:7
121:10
**presented** 81:3,7
108:7,20 114:12
119:13 171:1
**presenting** 199:14
**preserved** 31:2
**press** 18:22 109:5
117:18 161:13
**pressed** 195:2
**pressing** 47:19
**pretty** 57:11
62:20 63:4
64:21 72:3
86:19 92:19,21
118:5 140:6
163:11 179:6
**previous** 7:13

64:5 70:17
154:6
**previously** 11:11
181:6
**primarily** 58:3
202:20
**prime** 199:8
**principal** 52:6
53:20 157:19
**print** 4:13 112:18
112:20 113:5
153:5 154:7,19
155:14 156:19
**printed** 154:3
160:1
**printer** 204:6,7,9
**prior** 9:6 10:14
23:11 31:17
36:4 65:21 69:6
69:11 93:7
103:10 136:4
201:20 202:3
**private** 12:21
35:3,7
**privilege** 37:3
46:9,15
**probably** 42:14
70:5 147:15
172:11 195:10
**problem** 7:21
22:20 105:5,13
115:14 145:8
162:10,15,16
174:17 207:13
**problematic**
110:9 207:14,19
**problems** 106:7
108:22 109:8
117:7,9,19
140:2 163:13
**proceeding**
117:11
**process** 67:2
**produce** 4:10
41:19
**produced** 41:21
195:21
**product** 207:13
**production** 7:4

196:21
**products** 66:19
**product-by-pro...**
66:20
**professional** 23:3
54:3
**professionalize**
57:5
**program** 52:12
55:1 177:20
**programs** 24:2
189:14
**prohibited** 184:9
184:14
**project** 26:18
27:4 140:17
181:1 192:4,8
193:6
**projects** 9:20 68:9
**proper** 7:10 78:19
157:6
**properly** 66:5
**property** 152:16
**proposal** 15:5
**proposals** 14:8
15:6
**protected** 46:9
**protection** 24:7
43:13 91:20
**protective** 17:6
91:21 92:4
96:22 97:8 98:8
**protocol** 202:14
**provide** 7:7 8:16
22:16 49:6
58:14,21 69:19
91:15 106:1
129:3 134:9,20
172:19
**provided** 26:1
40:6 42:18
43:11 53:8,16
58:18 59:4 82:1
87:22 102:8
108:4 151:17
152:2,6 158:10
**provider** 205:3
**providers** 106:20
**provides** 205:3,5

**providing** 113:16
113:22
**PSS** 61:12,12,14
**public** 2:14 8:21
9:2,6 17:1 20:5
20:6,21 23:12
23:12 24:3 27:3
28:6 29:2,8,11
33:7 44:18 48:9
48:17 49:13
50:6,20,22 51:8
51:16,17,19,22
54:10 55:22
56:13,17,22
78:13 79:7 81:1
111:11,14 118:2
119:4,16,18,21
121:21 130:10
130:15 131:22
136:16 137:7,10
137:17 159:7,9
159:11 161:14
162:22 163:5,8
163:21 164:3
167:10 176:15
184:16 188:8
199:20 200:2
207:15,17
210:18
**publicly** 109:9
**published** 165:14
165:15
**pull** 22:14 45:14
65:18 146:4,8
**pulled** 153:22
**purports** 186:15
**purpose** 69:2 82:6
**purposely** 115:16
**purposes** 8:9
154:18
**Pursuant** 2:13
**pursuing** 26:21
**put** 90:10 107:2
109:4 117:18
132:5 133:14
153:17 161:13
163:2,7 188:9
191:13 194:13
**putting** 18:20

P-R-O-C-E-E-...
5:1
**p.m** 1:16 5:10
48:3,5 64:1,3
99:11,14 155:17
173:12,15
208:11

**Q**
**qualities** 56:8
**quarter** 42:15
**question** 8:1,3
26:11 27:3
30:11,19 35:6
39:3 60:7 64:6
81:17 89:1 97:3
133:2 137:11,12
142:3,4 145:2
145:10 164:11
164:11 187:8,8
187:10 190:4,8
192:15,22 193:2
193:3,11,14
194:9 195:8
199:21 200:9,9
200:13,16,17,17
200:18,20 207:3
207:10,11
**questionable**
154:10
**questioned**
153:12
**questioning**
120:15 194:9
207:9
**questions** 7:19,20
8:6,11,17 47:1
85:7 86:18
88:16 89:9
173:5,8,19
192:5 199:16
201:19 204:11
205:11,21 208:2
**quick** 92:19
**quickly** 107:1
**quite** 22:4 125:3
133:4,17 178:13
**quote** 143:12
196:7

**quotes** 143:11
**quote/unquote**
54:16 57:3

**R**
**raised** 167:18
**raising** 128:10
137:9 138:8
**ran** 151:10 172:12
197:10
**ranks** 122:11
**rapidly** 117:11,12
132:2,4
**rarely** 194:4,10
194:16 195:2,8
206:6
**rating** 4:19,20
54:14 55:7,8,10
55:11 65:11
169:4,12,16,19
170:11 171:5,7
202:5
**ratings** 60:15 65:9
**reach** 128:2
142:14
**react** 72:7
**reaction** 124:21
129:4 186:7
196:20
**reactions** 115:1
**read** 64:15 139:11
139:13 209:4
**readily** 161:4
**reading** 47:12
139:7 166:17,20
**ready** 178:12
**realized** 150:5
**really** 21:1 28:14
75:20 82:14
118:20
**reason** 36:15
37:13 50:19
154:13 161:17
162:6 180:22
184:1 185:5,14
200:21
**reasons** 140:11
183:13,14
186:11 205:13

**reassign** 180:19
180:21
**reassigned** 179:19
179:19 181:1
**reassignment**
181:3,5
**recall** 13:5,17
48:18 59:9
69:22 73:1 77:1
78:11,22 83:16
89:11,21 99:20
100:17,17
112:11,11 114:1
116:6 129:5
130:22 131:2,2
136:1,7 141:1
156:14 158:2,5
165:17,18
166:16,17,20
168:4,12 169:18
171:16 178:9
181:13 186:9
192:4 193:8
196:3,22 201:18
201:22 206:2
**receive** 35:5
174:17
**received** 21:5,6,7
21:17 23:5,8
31:17 42:8 43:6
43:10,15,18
44:7,9,14 92:11
148:20 160:16
167:2 168:14
193:10,15
**receivership**
18:19 20:20
21:1 25:21
54:16 56:20,21
57:5,8,10
**receiving** 166:17
166:20
**receptacle** 203:21
**reception** 197:7
**recipients** 166:13
**recognize** 93:13
139:3 170:13
**recognized** 93:14
93:16 161:5

**recollection** 157:6
**recommendation**
103:22
**reconfirmed**
205:11
**record** 6:12 7:1
7:11 30:16 42:1
42:7 48:2,4
63:17,19,20,22
64:2 67:18 90:6
99:3,11,12
145:5 149:21
155:6 173:11,13
186:16 194:22
206:5 208:11
210:6
**recorded** 129:8
**records** 4:10
26:15,17,18,18
27:5,5,12 41:1,1
41:6 59:22
180:12
**recruitment**
57:18
**redact** 22:21
**redid** 20:11
**reeling** 115:10
**REEXAMINA...**
191:22
**refer** 23:13 66:11
144:2
**reference** 204:20
**referenced** 96:20
**references** 206:3
**referencing**
106:12
**referred** 161:3
**referring** 22:6
41:12 85:2
112:6 143:7
149:16 162:17
171:8 192:8
**refers** 162:1
**reflect** 144:9
164:18
**reflected** 112:16
**reform** 117:5,10
161:12,16
162:20

**refresh** 157:8
**regarding** 7:19
27:6 38:22
46:17 64:11
135:12 172:21
178:12 181:20
181:21 207:9
**regardless** 163:11
**regards** 150:6
**regular** 66:6,22
190:6
**regulations**
105:18
**regulatory** 37:3
**relate** 142:21
**related** 27:7 35:5
39:7 40:10
210:9
**relating** 77:18
**relations** 96:12
111:11,14
176:15 199:20
200:2
**relationship**
79:22 80:1,2
81:12,20
**relative** 210:11
**release** 36:14
37:12 109:5
**releases** 18:22
117:19 161:14
**releasing** 184:9
184:14
**relevance** 26:10
133:1,7 137:18
138:10 194:2,7
207:2
**relied** 126:22
**relocate** 84:9
**remaining** 208:6
**remember** 11:22
29:17 31:15
45:5,8 49:17,21
57:21 58:16
59:8 70:11 71:8
72:18 85:14
95:12,12 97:15
106:17 112:21
116:5 121:13

231

123:9 126:5,9
128:12 129:7
137:1 140:19
145:21 159:3,8
168:6,7 175:7
175:10,11,17,19
175:21 177:6
178:19,21 179:1
179:14,17
180:21 181:8,13
182:1 183:15
184:1 185:16
191:12 193:16
193:18 195:22
196:8,22 198:17
**remembered**
160:6 171:15
**remembers**
139:15
**remind** 208:5
**remotely** 34:13
35:21
**remove** 71:1
84:13 85:12
134:14
**removed** 126:12
127:2,6,11
**removing** 126:19
134:21
**rephrase** 8:3
**replace** 49:13
**report** 4:19,20
10:22 27:1,20
48:22 50:9 52:7
52:14 93:3
114:2 129:12,15
169:4
**reported** 1:22
41:9 49:9 52:20
53:2 69:3
108:12,17 120:4
129:20 161:20
182:14
**reporter** 5:20,22
8:8 28:3 77:11
89:8 138:21
147:3 153:3
155:13 157:15
159:20 210:2

**reporting** 2:4
5:21 50:20
52:17,19 107:22
126:2 130:1
162:3,6
**reports** 28:15,17
51:10 52:3 93:7
102:11 108:3
132:7
**represent** 5:14,16
**representation**
112:15
**representations**
151:22
**representative**
82:4 83:15,18
**represented**
151:14
**representing** 5:18
23:22 24:1
**represents** 40:14
40:15,19 158:18
**reprimand**
135:19,20,21
136:2
**Request** 4:9
**requesting** 7:6
38:16
**requirement**
107:20
**requirements**
47:12
**resided** 202:20
**resolving** 132:15
**resources** 61:16
71:5 72:3 73:22
73:22 74:8,18
75:3 76:19
77:10 78:13
79:21 81:2 82:3
82:4,10,21
83:14,17 84:4,8
90:15,17 95:8
96:5,16 97:4,18
111:1,5 125:7
125:12,20 126:3
135:16 139:20
140:13 144:4
148:14 177:4

**respect** 8:13 24:5
36:19 40:21
75:2 94:17
102:7 114:10
125:6 127:9
141:3 148:6,16
192:8 201:9
**respond** 88:22
97:17
**responded** 119:19
180:1
**responding** 97:3
141:17
**response** 8:6
36:18 89:9,10
129:3 156:10
160:9
**responses** 108:11
**responsibility**
176:13
**responsible** 53:22
60:2 177:1
202:19
**rest** 140:7,22
167:7
**restricted** 28:12
28:13
**restrictions** 44:11
**result** 31:6 174:18
178:10 179:7,15
**resume** 21:21
22:14,17
**retained** 40:20
**return** 47:19
**returned** 50:2
**revealed** 136:9
**revelation** 131:22
**review** 38:19 42:9
42:19 63:10
66:20 96:3
108:3 147:11
158:1 160:4
166:15 170:14
**re-ask** 190:8
**re-do** 20:15,18
**Richard** 3:4,5
5:15 7:16
**Richmond** 86:4,8
**right** 7:16 8:5

12:6 18:15
21:16 22:15,22
27:4,8 35:20
37:9,14,15
47:18 53:3 60:2
74:14 76:3
80:16,20 85:15
85:20 86:12
95:20 99:22
100:11 103:8,10
114:16 120:19
121:4 122:18
124:21 126:10
128:13 132:13
143:19 146:5
150:3,21 153:9
154:5 156:9
157:7,10 158:13
163:8 202:10
204:10,21
**rights** 24:15 43:11
**right-hand**
154:21
**road** 82:7
**Robinson** 124:1
**role** 135:10 189:5
**Ronnie** 73:17
75:16 76:5
77:13 111:6
**roughly** 16:2 47:5
**run** 93:4
**running** 102:11
153:21 162:9
**runs** 72:20

——————
**S**
**S** 4:1
**sales** 13:15
**sat** 72:8 120:13
**satisfactory** 60:18
60:20,21,21
61:4,8,10 62:12
62:12,19 63:6
64:21 69:19
168:3,14 190:14
202:7,9
**save** 146:14
**saved** 146:15
**saw** 79:19 94:8

147:14 148:20
155:21 207:13
**saying** 100:18
110:18 115:11
133:5 138:5
149:1 184:1
191:15 194:18
**says** 139:14,18
140:9 141:8
143:3,10,21
153:11 154:8,20
154:21 156:17
158:15,15 160:8
161:17 187:13
**scale** 65:3,8 202:6
**scales** 55:7,8
**scandal** 115:13
**scene** 94:9
**schedule** 201:2
**Schneider** 1:22
2:13 5:21 210:2
210:17
**school** 21:4
**se** 124:18
**search** 39:6 40:9
99:17 149:22
**searched** 39:10
**searching** 39:13
**second** 54:5 63:14
108:19 109:16
115:12 123:14
147:9 154:8
180:18 187:9
191:18 208:1
**secretary** 123:22
124:1
**secrets** 68:21
**sector** 15:19
**see** 31:4 68:9
78:17 86:12
94:20 115:20
124:4 125:11
140:9 142:20
147:21 148:2
149:1,5 153:7
153:12 154:11
155:22 158:16
160:10,13
165:20 171:14

232

172:12 200:8
**seeing** 130:22
  150:7
**seek** 102:12
**seeking** 46:19
**seen** 38:18,20
  98:15 147:8,12
  153:6 155:18
  157:22 158:2
  160:5 165:16,22
  166:14 169:7,10
**self-employed**
  12:14
**self-evaluation**
  69:14,20
**self-evaluations**
  70:6
**seminars** 22:8,9
  22:12
**send** 35:9,18
  174:21 179:10
**sending** 18:17
  35:12 179:7,16
**senior** 123:4
**sense** 102:6
  118:22 119:3
  163:21
**sent** 96:22 98:10
  124:6 135:11
  175:8 181:21
**sentence** 141:10
  143:10 154:8
**separate** 104:1
  178:17
**September** 147:6
  154:14 156:1,11
  157:2,2,18
  158:5 159:4
**series** 7:19 25:10
  56:8 87:4,16
  105:22 149:9,13
  150:8
**serious** 162:19
**seriousness**
  164:12
**serve** 184:16
**served** 49:22
**server** 27:19,21
  27:22 29:5

30:15 34:1,13
**server-based**
  176:19
**service** 84:14
  85:13 90:12
  95:8,10
**services** 9:1,3,7
  10:17 11:6
  13:13 16:14
  17:3,6 18:4
  23:19 24:14,21
  48:8 51:6 54:15
  91:21 92:1,5,5,6
  93:15 96:22
  97:8 98:8
  103:18,19
  104:13,22 105:7
  108:14,16 113:1
  116:13 117:8
  118:2 130:17
  139:22 140:19
  154:11 157:18
  187:15 204:20
  205:1
**serving** 53:17
  70:21
**sessions** 122:5
**set** 33:17 76:8,10
  106:13 149:9
**set-up** 94:6
**seven** 11:17 92:9
  92:10 182:16,17
  183:1
**sexual** 44:3
**share** 30:1,2 51:2
**shared** 29:9,11
  152:7 163:3
**shares** 185:1
**Sharmanne**
  196:17,19
  198:12
**sheet** 142:12,15
  142:20 154:22
  187:6,11 202:11
  209:7
**sheets** 171:5,7
**she's** 6:20 110:14
  114:5,7 142:1
  144:14

**shift** 93:4,4,5,6
  98:9,19
**shift-to-shift** 93:3
  93:6
**Shirley** 1:6 3:20
  5:5,16 7:18 41:4
  41:7 48:10
  53:15 54:9,13
  55:3 56:11,16
  58:15 60:5 72:2
  73:21 75:7,8
  76:5,7,11 77:10
  77:21 78:16,19
  80:7 82:8 85:3
  96:21 98:9,10
  100:3 101:17
  110:1 111:18
  113:7,12,13,14
  113:21 115:2
  131:17 136:17
  137:6 151:20
  152:6,6,15
  156:12,15 169:5
  170:10 179:11
  179:20 181:2
  188:13,14 189:6
**Shirley's** 97:8
  113:20 203:16
**shock** 109:22
**shocked** 115:20
**shooter** 165:6
**shop** 196:18
**short** 89:14
  118:17
**shortly** 55:1 85:8
**show** 38:14 88:8
  89:16 97:11
  138:16 146:20
  152:20 157:10
  159:15 165:7
  166:3 168:18
  170:3
**showed** 85:6,19
  86:7 87:2,3,15
  111:16 148:1
  149:10 150:9,17
  160:6 186:17
**showing** 151:9
  155:3

**shown** 88:4,5
  94:18 156:19
  157:1,15 165:12
  206:22
**shows** 207:4,5
**shrugs** 8:7
**sick** 204:8
**side** 143:20
  158:13 179:3
**signature** 170:18
  209:14
**signatures** 169:6
  170:12
**signed** 55:16
  135:15,16,18
  170:17 209:8
**significant** 118:5
**sign-out** 202:11
**similar** 14:20
  24:20 37:21
  62:3,4 88:7
  137:10 147:22
  148:5 150:18,19
  152:14 166:21
**simply** 40:15
**single** 17:7 112:14
  113:3 139:1
  159:13 162:5
**Singletary** 83:20
**sit** 27:18 45:21
  142:22
**sitting** 40:12
  109:12 116:21
  117:14
**situation** 36:20
  80:16 84:7
  86:16 88:16
  90:22 100:11
  102:7 113:15
  121:15 131:14
  161:8 176:9
  190:22
**situations** 90:20
  117:3
**Sixth** 3:16 6:13
**size** 31:6 131:19
**slant** 143:20
**sleep** 132:22
  133:4

**sleeping** 86:22
  87:1 88:20
  89:22 90:7 91:4
  91:14,17 92:3,9
  95:19 97:12
  99:19 102:7,15
  103:12 104:17
  105:5 106:11
  107:10,16 108:6
  109:5,11 112:8
  112:14 113:2
  114:19 116:9
  118:14 119:2
  124:9,16,19,22
  128:11 130:9,14
  131:14 132:1
  133:16 134:8
  136:10,15,21
  137:8,13 141:18
  144:12 145:17
  146:19 147:7
  159:6 160:20
  162:4,15 163:17
  167:8,9
**slept** 102:4 132:10
  133:18 182:15
**slower** 106:3
**slowly** 54:18
  106:3
**small** 15:20 88:14
  88:17 180:4
  199:7
**social** 23:6,14,17
  23:21 97:11
  102:13 139:22
  140:18 154:9
  167:14 187:15
  204:20 205:1
**Society** 24:12,19
**solely** 177:1
**solution** 107:1
**solutions** 145:20
**solve** 115:14
**somebody** 55:12
  66:13 188:17
**somewhat** 44:20
  55:5 57:1 62:3,4
  110:9
**sorry** 9:12 11:16

Case 1:06-cv-00789-PLF-JMF Document 42-8 Filed 04/23/2008 Page 74 of 79
VIDEOTAPED DEPOSITION OF NANCY GOODE
CONDUCTED ON TUESDAY, DECEMBER 4, 2007

233

30:10 35:6 42:1
63:14 65:14
67:22 73:21
74:13 86:9,9,10
97:2 136:11,18
137:11 140:4
179:9,16
**sort** 28:22 33:1
58:9 115:11
116:3 158:14
**sought** 40:20
44:21
**sound** 112:12
**sounds** 201:9
**source** 113:13
**sources** 102:22
**southwest** 6:14
**spaces** 205:5
**Spaght** 96:7,14
**Spaght's** 96:8
**span** 44:16
**speak** 45:3,17,19
64:11
**speaks** 139:14
154:9
**special** 9:20 30:17
**specialist** 13:10
13:11 14:18,19
15:11 30:12,16
33:17
**specialists** 33:11
56:14
**specific** 54:6
88:15 144:18
182:5
**specifically** 53:21
59:9 88:18,19
90:11 193:8
**specifics** 46:21
175:21
**speculate** 141:21
144:17,20
153:19 187:21
**speculation** 81:8
81:16 132:12
141:20 142:2
144:13 164:8
**spell** 96:8
**Spence** 48:13,14

48:17,22 49:3,9
49:12 50:2,7,8
203:16
**spending** 105:15
157:20 160:9
161:4 164:19
**spent** 19:3 85:5
**sphere** 167:12
**spike** 140:12
**spiking** 139:19
**spin** 163:3 199:21
200:3
**spokeswoman**
24:1
**spread** 183:10
189:2
**spring** 83:10
103:20,21 104:2
105:1,2,9,10
172:13 186:6
**springs** 137:22
**staff** 16:22 26:19
27:5,18,18 48:8
49:10 51:6,7,15
51:16,21 52:19
53:1,2 66:21
67:3,10,17 68:2
68:12 69:2
123:10 136:19
166:11 177:16
207:15,16
**stages** 97:16
**stairs** 91:4
**stakeholder**
137:21 167:17
**stakeholders**
121:3 167:12
**stalled** 117:13
**Stan** 96:7
**stand** 61:14
198:21
**standard** 174:12
189:18
**standards** 55:16
56:1 62:5,8 68:4
105:19,21 106:2
106:21
**standing** 115:11
116:3 138:4

**standpoint** 80:22
**stands** 7:13 54:4
122:16 159:14
191:9
**stand-alone** 54:17
**start** 201:6
**started** 75:6 97:18
**starting** 107:11
**startled** 100:18,20
**state** 5:14 6:10
8:19 10:18
44:17
**statement** 8:7
163:4 198:1
**States** 1:1 5:6
44:17
**stating** 164:20
**stations** 112:18
**station's** 90:4
**statistics** 113:16
**status** 145:21
**statutory** 37:3
**stay** 134:11
206:14
**stayed** 15:15
**staying** 66:6
**step** 62:11 129:13
134:8,9,16
161:15
**steps** 61:10 120:1
131:21 132:15
132:20 172:5
**Stewart** 7:14
48:10 56:12
57:22 58:15,22
69:10 150:3
151:8 180:19
**Stewart's** 149:8
149:12,16 203:1
**stick** 154:2
**sticky** 153:11,14
153:17,22
**stop** 173:3
**stories** 89:21
90:10 95:18
97:6 100:5,7
156:19,22
**story** 4:12,13,14
85:8 89:20 91:6

103:8,11 107:5
110:2 114:12
153:5,5,20
154:7,15,19,19
154:20 155:1,14
155:19,22
156:10,17 157:3
165:13,16 179:3
**straight** 165:6
**strategic** 15:21
22:4
**strategies** 106:18
117:1 132:4
133:13 140:1
**strategizing** 117:1
**strategy** 25:10
140:21
**streamline** 57:6
**streamlined** 21:2
**Street** 3:6,15 6:14
**stressful** 80:2
81:12,20
**strike** 31:22 34:7
46:2 91:16
132:6 158:4
179:9 183:18
188:19
**strong** 63:6 119:8
**structure** 30:14
**subject** 91:18
103:16 108:9
141:11 157:20
160:8,12 164:18
166:12 179:2
**subjects** 146:9
**subsequent**
198:19
**subsequently**
103:3 135:11
184:6
**substantive** 89:10
**success** 62:8
**sued** 24:6,11,14
24:21
**suggest** 17:20
163:16
**suggested** 115:3
125:12
**suggesting** 195:16

**Suite** 2:6 3:7
**summer** 83:11
**supervises** 196:15
**supervisor** 10:2
11:1 53:12 54:7
55:16 135:14
175:1
**supervisory** 55:6
**support** 13:10,11
14:18,19 15:11
17:6 27:18,18
33:3 48:15 49:5
49:6,13,19,22
50:5,19 51:2,2,7
51:9 52:2 136:3
**supported** 13:15
**supporting** 14:21
**supposed** 192:10
193:20 195:20
**supposedly** 85:4
116:1
**suppressed**
160:21
**sure** 32:18 50:11
51:12 54:4
60:11 61:15
97:2 114:7
128:7 132:3
139:6 140:6
145:13 150:14
156:5 159:13
160:5 169:22
171:21 176:12
180:2 186:14
191:19 198:10
**surprise** 72:5 81:2
81:5
**surprised** 80:19
115:8,9
**surrounding**
90:20
**surveyed** 94:8
**swear** 5:22
**swearing** 8:16
**sworn** 6:6 210:5
**system** 27:2,7,20
28:14,20 29:5,7
30:9,18 31:8,10
31:11,13,18

35:10,12,19,21
36:5 54:8,14,20
54:21 55:10
56:5,6 62:1,10
70:14 91:20
101:1 143:11,14
144:3 169:4
176:19,19
180:12
**systems** 11:20
12:4 26:13 33:4
61:18 176:17
177:15 179:5
192:11 196:18
**S-p-a-g-h-t** 96:9

**T**

**T** 4:1,1
**Tabb** 1:6 3:20 5:5
5:16 7:18 41:4,7
48:10,12 54:9
55:21 56:11
58:15,22 59:5
60:5,8,14 62:19
69:10,18 70:21
71:1 72:2 74:18
75:2,11,15
76:14 78:5,12
79:2,7,20 81:1,6
81:21 83:13
84:9,13 85:12
100:4 110:5
111:14,18 115:2
126:12,19 127:1
127:6,10,11
128:2,17 129:3
130:2 131:17
134:14,22
135:12 137:7
151:20 152:6,10
168:3,13 169:19
170:21 171:2,12
172:6 174:1
175:3 176:3
177:21 178:11
181:10,21
183:15,20 184:8
185:6,15 186:3
195:17 205:13

211:1
**Tabb's** 7:19 56:16
57:15 64:19
81:11,14 82:22
169:5 170:11
172:1,21 176:13
182:4 185:21
190:3,10 201:20
202:3 206:1
**take** 12:14 16:6
18:3,16 22:12
31:22 33:10
36:16 38:17,21
42:16 58:12
67:18 68:8
72:10,22 73:2,4
75:5,18 76:21
77:11 78:20
79:3 83:21
97:12 99:3,7
104:11,15
105:20 120:19
126:15 127:10
129:10 131:22
134:9 142:14
147:7 150:16
157:21 160:2
166:13 169:7
176:21 181:2
189:7 199:12
201:11 203:8
**taken** 8:14 89:3
90:20 92:16,20
92:21 94:1,5,21
120:1 124:7
129:13 130:1
139:5,12 144:16
146:6 151:2
152:18 161:15
210:3,11 211:3
**takes** 14:13
132:21
**talk** 21:3 63:12
122:3 128:21
161:14 188:3
198:8
**talked** 45:6 75:7,8
104:15,16 106:5
129:2 177:4

198:10,11,12
**talking** 55:18
61:9 77:13
82:11,11,12
85:16,16 98:1,6
99:16 106:20
109:13 117:15
121:16 156:12
159:4 161:21
181:14 185:16
197:18 198:6
**tally** 102:11
**tap** 144:5
**tape** 5:3 99:8,9,13
173:14
**taped** 97:9
**tapes** 208:10
**tasks** 56:18 57:2
57:15 58:1 69:4
163:1,5
**teaching** 15:5,7
**team** 14:21 57:4
104:3,7 105:3
107:13 109:12
112:2 116:20
118:22 122:17
123:3,4,5,13,14
123:18 124:14
125:2,3
**teams** 13:15
**teamwork** 143:6
**tear** 142:15
**tech** 30:16
**technical** 30:12
**Telecommunic...**
13:2
**telephone** 13:13
128:18 129:8
130:2
**tell** 24:9 38:17
42:17 46:2
65:14 74:17
75:19 89:8
91:17 139:2,7
147:8 149:21
155:17 157:21
160:3 163:10
165:16 166:14
169:7

**telling** 31:5 89:3
98:10 108:14
111:21 112:8
162:9
**temp** 50:4
**ten** 31:7 89:14
**tenor** 69:1 116:5
**tenure** 33:16 35:4
44:22 55:13
84:10 104:14
**term** 7:21 80:19
**terminate** 134:15
172:2,6 183:14
**terminated**
127:15,16,17
128:20 135:12
183:18,21
185:15 190:5
**terminating**
134:21 205:13
**termination**
130:6 136:3
184:2 190:2,9
201:21 202:3
**terms** 21:5 33:21
41:1 45:20 61:2
62:1 67:1,13
75:17 108:22
131:18 132:15
137:9 179:17
202:5 206:5
**testified** 6:6 60:4
118:17 126:10
144:14,22 146:1
168:1 173:22
174:4 176:1,2,5
181:9,11,11
182:9 185:13
187:16,18 192:2
197:14 201:19
202:10 205:10
205:21
**testify** 30:13
46:11 101:11
**testifying** 104:21
160:19
**testimony** 7:5,6
8:13 37:4 46:17
49:8 51:13 68:1

85:18 93:21
95:6 100:8
112:1 114:13
120:14 121:14
122:4 173:19
174:15 180:18
183:17,19,22
185:14 186:10
186:18,19,22
187:20 190:16
192:5 194:20
201:22 206:3
209:4,6 210:4,7
**text** 153:9
**Thank** 43:4 60:10
155:7 191:20
192:1 195:4
204:10
**that's** 27:19 28:17
28:20 29:7 31:8
41:10 42:5,22
47:8,19 51:10
65:8 74:14 78:3
78:11 88:17
89:5 101:16
117:17 123:16
124:3,3 140:5,6
140:10 145:21
154:3 155:2
161:11,16
163:11 164:9
170:18 186:17
187:8 191:9
194:11 199:16
199:17 200:16
207:21
**thereabouts**
159:4
**thereunder** 51:22
**there's** 27:1 37:2
41:8 61:5,6 65:9
109:20 116:18
117:4 121:13
123:2,2 138:13
147:17 153:10
158:14 159:13
162:11 174:16
193:2 195:10
**they'd** 146:16,18

235

they're 22:14 41:2
60:17 66:4,13
70:16,18 96:15
102:10 146:11
thick 42:16
131:20
thin 189:2
thing 25:1,19
28:18,22 33:1
70:9 78:11
93:15 97:18
107:21 109:16
109:22 122:15
123:12 178:14
191:15 205:9
things 14:6 16:9
18:18 28:16
30:15 53:21
57:17,18,19,20
61:1 68:11
77:18 93:5
104:11,16
110:16 116:21
117:16,20,21
138:2 142:20
144:5 161:9
162:18 163:10
163:12 201:3,4
202:1
think 14:1 16:12
30:6 32:17
36:10,13 45:11
55:4 56:3,5 57:9
58:13 61:5,11
62:17 64:4,6
70:15 72:15
78:3 80:3,6,7
88:7 90:2 99:6
100:8 107:5
108:11 109:10
110:8,10 111:1
111:2 116:7,12
117:14 118:3
119:8 122:7,12
124:2 131:13,17
133:3,13 135:15
135:17 145:19
147:14 149:21
154:19 155:21

157:2,5 164:15
164:17 165:2
170:17 180:1,22
181:17 182:2
183:11 185:10
189:15,18,19
195:9 198:12,15
202:20 203:2
206:11 207:4,5
thinking 69:17
164:5
thinks 30:13
third 25:13
109:22 142:7
Thomas 11:4
Thompson
158:15,20
thought 46:17
75:4 157:4
195:3
threat 138:12
threaten 138:2
threatening
137:10,16
three 16:22 67:12
79:5,10 90:2
95:16 108:11
112:1 114:11
123:7 146:8
173:14 181:20
183:7 189:21
190:9 201:20
202:3 203:18
208:10
three-month
191:8
Thursday 141:9
time 5:10 9:21
10:12 11:5
16:22 17:14
18:3 19:2 25:5
29:22 31:17
34:9,9 37:9,11
46:15 48:3,5,11
48:16 49:9
52:10 54:12
56:3 57:16 58:4
58:11 60:19
61:9 62:11,18

64:1,3 66:5 67:5
69:4,5 70:12,12
70:20 72:14,21
73:15 74:1 75:9
76:20 81:21
82:9,11,22 83:5
83:5,6,8 84:12
84:20 89:19
91:11,12 96:11
96:14 97:21
99:11,14 102:20
107:4,8 109:4
110:7 116:14
118:9,18 120:13
120:15,20
121:21 123:10
123:17 125:19
126:1 132:14
133:4,14,17
135:3,6 136:9
137:3 138:5,14
144:16 146:14
152:14 154:15
158:5 159:3
165:20,22
167:20 168:12
169:16 172:8,19
173:4,12,15
174:5 176:6
178:1,7 181:2
184:22 188:10
188:12 190:2,5
191:2 192:11,16
193:7,9,9,10,14
196:11 198:7,9
199:10,11,18
201:7 202:6
203:2 208:3,11
times 4:17 36:22
45:7,19 60:13
88:20 114:20
133:8 165:15
189:21 206:10
206:12,14,16
timing 198:22
199:4,19 200:11
title 8:20 49:3
today 8:14 39:1
40:12 42:13

63:8 142:22
167:6 173:4
Today's 5:9
told 18:15 47:8
71:18 74:6
76:11 84:18
92:7 96:21
102:9 103:1
112:8,10 113:12
125:10 127:13
151:19 153:20
183:19 185:15
186:8 205:12
Tom 14:3
tools 15:8
top 65:15 89:6
99:2 104:4
121:17 141:8
142:7 154:20
155:14 158:14
160:2 169:5
170:11
topic 45:22
103:12 121:3
124:12,19,22
131:1 132:2
134:1
total 106:1 183:1
183:1,6
totally 138:3
140:8
touch 66:7
town 18:16
towns 17:8
TPR 139:20
140:16
track 97:13 103:2
107:20
tracked 107:17
tracking 156:6
train 61:17
training 19:18,18
19:19 21:18,20
22:3,4 23:5,8
43:6,10,16,19
43:22 44:4,5,9
44:13
trainings 23:2
transcript 8:10

38:12 138:19
147:1 153:1
155:10 157:13
159:18 165:10
166:6 168:21
170:6
transcription
209:6
transfer 22:17
33:6 71:2,4,10
71:15,19,21
74:18 75:2,7,8
75:10,11,15,18
76:7 77:8,10
78:12 79:3,4,18
80:4 81:1,13,15
84:8,9
transferred 33:18
73:21 79:21
transferring
32:21 72:2
trial 7:5
tried 109:17
115:16,17
troubling 207:18
true 67:13 162:5
201:16 203:2
209:5 210:6
truth 163:10
truthfully 39:3
try 106:18 109:7
145:2 163:1
trying 14:1 55:3
66:9 97:19
100:1 108:20
109:20 115:14
117:16 186:18
189:21 191:13
Tuesday 1:15
211:3
Tuesdays 67:8
turn 90:16 109:3
turned 42:6 85:3
90:15,21 148:13
184:4
turns 93:5
TV 84:22 85:1
87:16 88:5
153:6

236

**twice** 189:20
**two** 12:9 22:5
  39:14 61:10
  79:5,10 88:9,10
  90:2 91:19 92:2
  92:4 95:16
  99:13 104:5
  122:18 123:3,13
  142:11 183:4
  197:2 198:1
  206:12
**two-page** 147:5
  170:10
**two-part** 54:2
**type** 30:4 36:11
  44:5 66:2,12
**typed** 92:11
**types** 39:9 56:17
  121:2 123:7
  167:15
**typically** 67:10
  138:7 184:19
  188:14

——————
**U**
**Uh-huh** 12:7
  13:20 28:4
  112:4 115:21
  187:12 204:18
**ultimately** 94:16
**Uma** 53:14,16
  157:19 159:22
  164:4 165:5
  167:21
**umbrella** 17:4,7
**unable** 105:20
**unclear** 140:8
  176:11
**underperforming**
  174:16
**understand** 7:8
  7:20,22 8:15
  36:12,13 37:7
  37:16 40:13
  42:7 43:1 45:1
  45:12 47:4 51:4
  56:15 57:13,14
  58:1 78:16
  163:20 164:2

175:11 193:11
  193:22 204:10
**understanding**
  8:2 31:1 40:18
  51:12 56:20
  59:5 75:9 95:1
  107:3,8 108:1
  130:5 132:10
  149:21 169:15
  184:7
**understood** 24:10
  44:19 46:17
  58:5 81:6
**underway** 25:3
**unfair** 179:21
**union** 78:17
**United** 1:1 5:6
  44:16
**University** 21:10
**unsatisfactory**
  62:14,16 64:22
  69:19 168:4
  170:21 171:3
  190:16 191:15
  191:17 192:4
  202:6
**unsure** 195:2
**unsurprised**
  129:5
**upper** 158:13
**upset** 100:18,21
  179:6,20
**upstairs** 86:11
**use** 27:2 30:1 34:8
  35:11,15 37:21
  65:10 178:1
  189:7,9,12
  202:11 203:9,17
  204:2
**usually** 55:19
  60:17 121:11

——————
**V**
**v** 211:1
**validity** 102:1
**various** 17:17
  58:8 90:21
  104:4
**vehicle** 25:7

**vehicles** 199:8
**venues** 184:16
**verbal** 8:6
**verbally** 8:11
**verify** 89:4 95:2,3
**version** 153:5
  156:10,11
**versus** 5:5 57:9
**video** 1:13 2:1
  5:10,11 112:17
**videographer**
  3:21 5:3,20 48:2
  48:4 63:18,22
  64:2 99:8,9,12
  173:11,13 208:9
**videos** 112:21
**view** 162:16
  183:13
**Vincent** 26:6
**Vincent's** 26:6
**violated** 134:17
  184:3 205:14,18
**voice** 5:13 98:1,6
  100:14,22 101:1
  101:6,7,11,12
  101:13,14,15
  102:2
**volume** 131:18
**volunteer** 51:6
**vs** 1:8
**V-drive** 29:12,13
  29:16

——————
**W**
**waiting** 86:15
**walked** 86:13
**want** 30:11 63:18
  71:7 83:19
  86:12 103:18
  116:17 117:21
  128:6 177:8
  186:14 188:3
  199:13 201:3
**wanted** 47:6
  73:20 74:7 82:9
  93:1 117:13
  189:9
**wants** 64:5 80:15
**Washington** 1:14

2:7 3:8,17 4:17
  6:14 11:10,11
  11:16,19 14:5
  17:18 165:15
**wasn't** 57:11,13
  66:18 67:2 80:2
  89:19 94:10
  109:7 114:14
  116:17 126:17
  160:20 177:3
  183:9 200:14,14
**way** 30:9,18 34:13
  55:1 61:7 68:18
  69:6 78:18
  80:18 89:4
  96:19 97:11
  99:5,5 111:1,2
  119:13 123:18
  148:19 149:3
  150:19 161:16
  163:7 188:9
  194:13 199:13
  201:4,6 203:8
  207:1
**ways** 68:19
**website** 90:4
  112:22 147:5,10
  147:16 148:18
  154:1 165:14
**web-based** 176:19
**week** 19:2 42:6
  66:22 67:4,5,14
  69:3 79:11
  82:13,13 142:11
  142:17 206:13
**weeks** 79:5 85:16
  104:5 122:18
  123:3,13 125:4
  132:18 192:18
**week's** 144:16
**welfare** 17:5,5,16
  17:17 26:13
  27:7 44:15 85:5
  117:5,10 138:1
  161:10,11,16
  162:20 167:12
**well-versed** 15:4
**went** 11:17 13:2
  14:16 15:16

16:4,5,8 25:1
  56:5 74:6 75:16
  76:5 78:16 92:6
  93:2,6,14 94:8
  97:13 103:1,2
  120:15 153:22
**weren't** 62:12
  178:2,5
**we'd** 68:8 99:17
**we'll** 7:18 120:20
  145:5
**we're** 6:15 12:6
  13:19 29:21
  36:16 37:1,8
  47:18 61:9
  85:15 97:15
  109:19,20
  115:15 116:20
  116:20 138:1,14
  164:13,21
**we've** 29:1 50:4
  133:3,9 161:15
  161:15 166:18
**whatsoever** 165:3
**what's** 42:21 85:1
  86:6 90:11
  117:6 133:5
  137:11 147:4
  153:4 159:21
  163:8 185:8
  201:7
**whichever** 63:1
  64:20
**Whistle** 43:13
**whited** 169:6
**Wiley** 11:20 12:3
**Williams** 3:12 4:5
  5:17,17 6:15
  7:12 22:17,20
  26:10 30:10
  36:10 37:5 39:2
  40:14 42:1 46:4
  46:7 47:18,21
  59:16 60:10
  63:14 64:4,8
  67:22 74:10,14
  81:8,16 101:10
  101:15,18
  132:12 133:1,6

137:18 138:10
139:9 140:4
141:19 142:4
144:13,21 145:8
145:18 154:17
155:5 164:22
173:7,17 185:8
185:12 191:20
193:1 194:2,7
194:22 200:1
201:20 205:10
205:22 207:2,8
208:4,8
**willing** 6:21
**Wilson** 96:7,10
128:1,21 129:12
129:17,19 130:1
**winter** 103:21
105:2
**wish** 145:6
**wishes** 171:19
**witness** 4:2 5:22
6:4,19 7:6,9
28:4 46:6 63:16
64:4,8 74:12
101:13,17 140:6
145:4,6,9,10
155:3 192:22
200:4,6 208:3
210:4,7
**woman** 98:7
**wondering** 161:2
**won't** 30:20
**word** 152:4
161:22 164:5
**words** 25:10
53:21 54:14
60:16 95:22
191:13 206:21
**work** 8:22 9:8
10:15 11:5,19
12:11,18 13:2
14:9,9,11 15:22
18:14 19:7,9,10
19:11,13,16,17
23:6,14,20 25:1
26:7 30:2,4 32:1
32:4,7,10 33:11
33:12 34:9,12

34:15 35:5,8
36:6,19,21,22
38:9 48:17,19
49:18 59:5
68:19 77:20,21
79:7 83:4,5,5
98:21 110:17
111:10,12 116:1
176:8,8,14
190:3,6 206:14
206:15 207:19
**worked** 10:12
11:11,16,20
14:1,2 16:4
17:22 19:22
33:6 54:10
55:21 61:20
98:7,8,19
100:13 101:8
133:15 158:10
188:7
**worker** 100:2
154:9
**workers** 23:14,17
23:21 97:11
102:13 167:14
**working** 10:14
13:4 15:19 18:7
19:3,6 23:17
29:21 36:4
56:10 68:10
70:22 75:22
101:5 106:18
109:2 116:22
132:5 140:21
158:6 206:17
207:12
**works** 30:9
196:18
**work-related**
37:22
**worth** 31:7
**wouldn't** 95:22
118:7 160:6
171:14
**write** 15:5,6 99:4
161:18 163:19
163:22
**writer** 12:1,9,12

12:22
**writing** 14:8 73:8
153:14 180:1
**written** 57:20
143:20 155:15
179:21 181:12
**wrong** 46:16
50:12 71:8
100:9 149:22
**wrote** 17:1 153:21
178:13
**WUSA** 4:13,14
147:5 153:6
155:14

_____

**Y**

**Yamada** 155:15
**yeah** 13:20 27:18
132:13
**year** 12:3,5 13:4
13:17 15:15
20:17 48:19
49:20 50:4 54:7
55:17 58:11,19
58:22 59:2,6
62:22 64:20
65:18,21 68:4
69:1,7 70:12,18
83:11,11 103:20
136:6 168:7
183:10 189:20
189:21
**years** 11:17 12:10
14:12 16:1 21:6
25:2,3 39:14,15
66:10 142:19
162:19
**York** 9:10,13
**young** 85:4 88:13
88:16,18 90:19
92:16 93:1,8,10
93:14,18 94:22
111:17 113:2
147:18,18
149:10 150:17
**youngsters**
143:16
**youth** 150:1,17
**you'd** 145:3

**you're** 8:2,14
18:15 34:5
35:12 36:12
40:12 41:11
53:20,21 55:11
66:6 69:17 73:4
83:15 85:2 89:3
105:4 106:12
111:15 121:11
139:13 141:21
144:17 149:1,15
165:12 169:22
185:10 194:16
194:18,20
200:12 206:16
206:17
**you've** 33:6 36:6
38:18 41:2
101:21 112:15
146:4 147:8
153:6 155:12,18
157:21 165:16
166:1,14 169:1
169:7,10 170:8
181:10,10,11
194:1 199:4
206:20

_____

**Z**

**Zuberi** 3:12 5:17

_____

**1**

**1** 1:21 4:9 38:11
38:15 92:7
158:16 169:13
170:12
**1:00** 67:8
**1:06CV00789P...**
5:8
**1:06CV00789(P...**
1:8
**1:30** 47:18 67:9
**1:31** 48:3
**10** 4:19 42:15
109:14 168:20
169:2
**10/7/05** 4:18
**11** 4:20 170:4,5,9
**1100** 2:5 3:7 5:12

**12** 24:17 193:14
193:15
**12:36** 1:16 5:10
**12:50:29** 155:17
**138** 4:11
**14** 109:14 210:22
**147** 4:12
**15** 19:5 42:15
92:8,10 182:16
182:21,21 183:9
**153** 4:13
**155** 4:14
**157** 4:15
**159** 4:16
**16** 139:22 140:19
**161** 2:3 6:
**165** 4:17
**166** 4:18
**168** 4:19
**170** 4:20
**173** 4:5
**192** 4:4
**1972** 11:15,18
**1973** 12:6 21:8
**1974** 13:6
**1975** 13:19
**1981** 14:13
**1989** 16:2
**1992** 11:16
**1993** 11:8

_____

**2**

**2** 4:11 138:18,22
141:3 143:3
144:9 145:13
147:17 148:16
154:21 186:17
204:11
**2-117463** 1:20
**2:15** 47:19
**2:30** 47:21 48:1
**2:36** 48:5
**2:56** 64:1
**2:57** 64:3
**20** 19:5 147:6
154:14 157:2,18
158:5 159:4
**2000** 169:14
**20001** 3:17

**20006** 3:8
**2001** 10:1 11:8
**2002** 9:5 10:1
  29:14,18 31:11
  34:10 48:8
  52:16 53:7
  56:11,16 58:2
  58:11,15 170:12
**2003** 58:21 59:6
  59:10 60:14
  61:9 62:11,18
  66:10 67:15
  69:5 70:11
  169:13,20
  170:12
**20036** 2:7
**2004** 59:6,10
  60:14 63:2 71:7
  169:15,20
  201:14
**2005** 39:15 50:5,8
  50:12 51:4
  52:14 59:7
  60:14 61:9
  62:11,18 63:2
  66:10 67:15
  69:6 70:12
  83:11 85:9 92:8
  105:1,10 107:6
  108:8 118:14
  123:6,17 125:19
  126:1,6 135:3
  137:3 147:6
  154:15 156:1,20
  157:2,18 158:5
  158:16 159:1,4
  165:16 166:13
  166:22 172:15
  172:16,19 175:9
  177:9 201:12,15
**2006** 39:15 201:17
**2007** 1:15 5:9
  211:3
**2008** 210:22
**202** 3:9,18
**21** 156:11 157:2
**21st** 155:22
**212** 1:21
**24-hour** 93:4

**26** 141:9,12

**3**

**3** 4:12 146:21,22
  147:4,17 148:6
  154:6 157:1
**3:41** 99:11
**3:49** 99:14
**30** 112:13
**30th** 70:19
**31** 169:13 170:12
**31st** 70:19
**38** 4:9

**4**

**4** 1:15 4:13 5:9
  152:22 153:4,10
  157:1 158:15
  211:3
**40** 112:13
**400** 6:13
**408-0034** 3:9
**441** 3:15

**5**

**5** 4:14 155:9,13,14
  155:22 157:1
**5:32** 173:12
**5:37** 173:15
**50** 112:13

**6**

**6** 4:4,15 157:12,16
  165:15
**6:15** 208:11

**7**

**7** 4:16 159:17,21
  159:21 164:13
  166:13,22
**727-6295** 3:18
**73** 11:15
**74** 12:6
**76** 13:19

**8**

**8** 4:17 165:9,13
**82** 14:13
**850** 2:6

**9**

**9** 4:12,14,18 84:22
  85:1,6,11,19
  86:3 89:8,16
  93:7 112:7
  114:3 147:5,16
  150:7,9 151:10
  151:21 153:6,21
  154:1,8 155:14
  166:5,9,18
**9-23-2005** 155:17
**9/20/05** 4:15,16