DEPOSITION OF DEBORAH WILSON
CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

--------------------------------+

SHIRLEY TABB,                          +

              Plaintiff,    +

        v.                     + Case No.

DISTRICT OF COLUMBIA, BRENDA    + 1:06CV00789

DONALD WALKER, and MINDY GOOD,  +

            Defendants.    +

--------------------------------+


Deposition of DEBORAH WILSON

Washington, D.C.

Wednesday, January 9, 2008

10:09 A.M.



Job No.:  2-119438

Pages 1 - 178

Reported by:  Denice Z. Lombard, CSR

64c52d74-f5a3-4f2c-a0c0-46fed19b09da

DEPOSITION OF DEBORAH WILSON
CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

---

**Page 2**

1       Deposition of DEBORAH WILSON,
2   held at the offices of:
3
4       L.A.D. REPORTING COMPANY
5       1100 Connecticut Avenue, N.W., Suite 850
6       Washington, D.C. 20036
7       (202) 861-3410
8
9
10
11      Pursuant to agreement, before Denice Z.
12  Lombard, Certified Shorthand Reporter and Notary
13  Public in the District of Columbia.
14
15
16
17
18
19
20
21
22

---

**Page 4**

1           C O N T E N T S
2   EXAMINATION OF DEBORAH WILSON           PAGE
3       By Mr. Condit              6
4
5           E X H I B I T S
6       (Attached to the transcript.)
7   WILSON DEPOSITION EXHIBIT              PAGE

8   1   DC Personnel Regulations, Chapter 16,
9       Part 1                    95
10  2   E-mail chain August 15 & 17, 2005     103
11  3   D.C. Medical Certification by Health
12      Care Provider             107
13  4   Letter to Ms. Tabb dated March 29, 2005   109
14  5   E-mail chain dated August 2, 2005      115
15  6   Disability Certificated dated
16      August 18, 2005           116
17  7   CFSA Application for Family/Medical
18      Leave dated July 28, 2005      118
19  8   E-mail exchange between Stan Spaght
20      and the witness dated
21      September 22 & 23, 2005           120
22

---

**Page 3**

1       A P P E A R A N C E S
2
3   ON BEHALF OF PLAINTIFF:
4   RICHARD CONDIT, ESQUIRE
5   LAW OFFICES OF RICHARD CONDIT
6   1612 K Street, N.W., Suite 1100
7   Washington, D.C. 20006
8   (202) 408-0034
9
10
11
12   ON BEHALF OF DEFENDANTS:
13  MICHAEL P. BRUCKHEIM, ESQUIRE
14  OFFICE OF THE ATTORNEY GENERAL
15  GOVERNMENT OF THE DISTRICT OF COLUMBIA
16  One Judiciary Square
17  441 4th Street, N.W., 6th Floor - South
18  Washington, D.C. 20001
19  (202) 727-6295
20
21      ALSO PRESENT:  Shirley Tabb.
22

---

**Page 5**

1           E X H I B I T S, continued
2   WILSON DEPOSITION EXHIBIT              PAGE

3   9   E-mail to multiple addressees, from
4       Uma Ahluwalia dated September 20, 2005   127
5   10  E-mail to the witness and Heather Stowe,
6       from Mindy Good, dated September 30, 2005  128
7   11  Notification of Personnel Action dated
8       November 8, 2005          145
9   12  Letter to Ms. Tabb from Brenda Donald
10      Walker dated October 3, 2005       148
11  13  E-mail exchange dated October 2 & 4,
12      2005                  154
13  14  E-mail chain dated October 6, 2005      155
14  15  E-mail to CFSA - All Staff from Brenda
15      Donald, dated October 7, 2005      159
16  16  E-mail exchange between Derek Stewart
17      and the witness dated October 11, 2005   163
18  17  D.C. Whistleblower Protection law       174
19
20
21
22

---

2 (Pages 2 to 5)

DEPOSITION OF DEBORAH WILSON
CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 6

1           P R O C E E D I N G S
2              DEBORAH WILSON
3    having been duly sworn, testified as follows:
4         EXAMINATION BY COUNSEL FOR PLAINTIFF
5    BY MR. CONDIT:
6       Q   Good morning.  Could you please state your
7    full name for the record?
8       A   Yes, good morning.  Deborah Wilson.
9       Q   Ms. Wilson, where do you work?
10      A   At Child and Family Service with the
11   District of Columbia.
12      Q   And what is your position there?
13      A   Human resources manager, employee and labor
14   relations.
15      Q   Now, you gave deposition testimony in the
16   matter of Linda Ripley; is that correct?
17      A   Yes.
18      Q   And in that testimony you provided me with
19   your background, education, work history.
20          Do you recall that testimony?
21      A   Yes.
22      Q   As you sit here today, is there anything

Page 7

1    that you would need to correct about that testimony?
2       A   No, there isn't.
3       Q   So I wouldn't need to revisit that testimony
4    as far as you're concerned?
5       A   No, that's correct.
6       Q   Now, let me just remind you of a few ground
7    rules so that we are on the same page in this.
8          First of all, you need to do audible
9    responses.  Is that okay?
10      A   Yes.
11      Q   And you need to ask me for clarification if
12   there's any concern whatsoever about the phrasing of
13   my question, any of the terms in the question, so
14   that we make sure the record is clear what your
15   responses are to my question.  Is that okay?
16      A   Yes, that's okay.
17      Q   And then, of course, if you need a break,
18   given that it's so warm in here, or if you just need
19   a rest for a few minutes, you'll let me know.
20      A   Thank you.
21      Q   Now, I also need to remind you that you're
22   under oath, and having taken the oath, you understand

Page 8

1    that your responsibility in answering questions here
2    today, whether from myself or from District counsel,
3    is to provide a wholly truthful response.
4       A   Yes.
5       Q   Now, in terms of preparation for today, did
6    anyone tell you about any testimony provided in this
7    case thus far?
8          MR. BRUCKHEIM:  I'm going to object and ask
9    the witness not to testify insofar as to any
10   communication she may have had with counsel.
11         However, she can testify as to whether or
12   not she spoke with any other witnesses who were not
13   counsel.
14         MR. CONDIT:  Okay.  Well, my question is
15   "anyone," and it is not directed to counsel.  It's
16   not attempting to identify anybody.
17      Q   I just need to know what you may have heard
18   about any testimony in this case.
19      A   I have heard nothing.
20      Q   Have you discussed the fact that you would
21   testify today with anyone other than counsel?
22      A   I notified my employer.

Page 9

1       Q   And who is that?
2       A   Mr. Ronnie Charles.
3       Q   What position does Mr. Charles have?
4       A   Mr. Charles is senior deputy director.  That
5    was for accountability as to where I would be today.
6       Q   Okay.  Now, did you provide Mr. Charles with
7    any details, or just advise him of the general nature
8    of your visit today?
9       A   Just advised him where I would be today.
10      Q   Now, have you reviewed any documents
11   pertaining to this case or pertaining to Ms. Tabb?
12      A   I have not.
13         May I clarify that?
14      Q   Yes.
15      A   Except for the document that was sent
16   yesterday.
17         MR. BRUCKHEIM:  She's referring to the
18   notice of deposition and the appendix, which we
19   received yesterday afternoon about 3 o'clock, which I
20   promptly forwarded to her by e-mail.
21         MR. CONDIT:  So you reviewed the Notice of
22   Deposition.

3 (Pages 6 to 9)

64c52d74-f5a3-4f2c-a0c0-46fed19b09da

# DEPOSITION OF DEBORAH WILSON
## CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 10

1    Q    And in the Notice of Deposition did you
2  notice the appendix in the back of it which asked if
3  you have documents of certain categories?
4    A    I did briefly go through that, yes.
5    Q    Did you happen to know -- I know you may not
6  have had time to produce anything, obviously -- but
7  did you happen to know in reviewing that whether
8  there were any documents that you had personally in
9  your files that may have covered any of those?
10    A    I didn't have time to review it.
11    Q    Fair enough.
12       Now, have you reviewed any computer files or
13  e-mail files associated with Ms. Tabb or this case?
14    A    No, I haven't.
15    Q    Has anyone instructed or directed you
16  concerning how to answer any question that might be
17  raised in this deposition?
18    MR. BRUCKHEIM:  And, again, I'll ask
19  Ms. Wilson to testify only insofar as she's to non
20  attorneys.
21       As far as attorney prep goes, there was
22  discussion about the general nature of depositions.

Page 11

1       I'll ask her not to testify about any
2  conversations she had with counsel.
3  BY MR. CONDIT:
4    Q    And, again, I'm not asking you to identify
5  who you've had a conversation with.  I'm just wanting
6  to know for the record, so the record is clear, as to
7  whether or not you've gotten any instructions about
8  how you might answer certain questions in this
9  matter.
10    A    No, I haven't.
11    Q    Now, I know I indicated a few moments ago I
12  wouldn't go over background, but just so there's some
13  context for this deposition I just to ask you a
14  couple quick background questions so we have it in
15  this particular record.
16       And one is, what year did you start working
17  for CFSA?
18    A    September of '04.
19    Q    And what position did you initially take at
20  CFSA at that time?
21    A    Human resources manager.
22    Q    Same position you have now?

Page 12

1    A    Same position.
2    Q    Now, when did you first meet Shirley Tabb?
3    A    When did I first meet Ms. Shirley Tabb?  It
4  would have been early '05.
5    Q    Early 2005?
6    A    Yes.
7    Q    Do you remember why you met her at that
8  time, whether there was a particular occasion or
9  event or work that was being done?
10    A    To my recollection, we were working on
11  Rewards and Recognition Program.
12    Q    What is that?
13    A    That is an incentive -- well, not an
14  incentive.  It's a rewards program for employees for
15  different accomplishments, projects that they may
16  have worked on.
17       And I was working with Ms. Tabb as it
18  relates to developing the communication portion of
19  that.
20    Q    Tell me, please, what that means, to develop
21  the communication portion.
22       What was the communication portion?

Page 13

1    A    I don't recall all the details.  I just know
2  we met, and Shirley was providing some ideas of how
3  we could communicate all staff.  And I don't recall
4  all the details associated with that.
5    Q    Are there any documents that you know of
6  that would refresh your recollection on this
7  particular topic?
8    MR. BRUCKHEIM:  I'm going to object just as
9  to relevance.
10       But you can answer.
11    THE WITNESS:  I'm just trying to recall if
12  maybe there was a draft that was presented that
13  Shirley and I talked about.
14  BY MR. CONDIT:
15    Q    Would there be something possibly, for
16  example, on your computer or in your computer files
17  on this issue?
18    A    I don't know.
19    Q    Now, what type of rewards or recognition
20  were being given through the program that you were
21  just describing?
22    A    Well, at that point it was a start-up, so we

4 (Pages 10 to 13)

# DEPOSITION OF DEBORAH WILSON
## CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 14

1  were developing it.  So at that point nothing.
2    Q   And what was the intent of the program, if
3  you recall?
4    A   As I said earlier, it was to just
5  acknowledge people's accomplishments, be it special
6  projects or individual accomplishments or those type
7  of -- those types of recognitions.
8    Q   And who was going to give the awards, or
9  what person or persons would decide if rewards were
10  issued?
11    A   I don't recall.
12    Q   Is the program in place today?
13    A   No.
14    Q   Did the program ever get off the ground?
15    A   Yes.
16    Q   About how long did it stay in operation?
17    A   Two years.  I'm thinking two years.
18    Q   Okay.  Were you involved in any way in
19  issuing any awards under this program or helping
20  decide who would get awards under this program?
21    A   No.
22    Q   Do you know who was?

Page 15

1    A   No, I don't know all the details at this
2  point.
3    Q   Were the award recipients posted or publicly
4  notified in any way?
5    A   Yes.
6    Q   And how were they notified?
7    A   There would have been an all staff, an
8  all-staff communication.
9    Q   And typically an all-staff communication of
10  this nature, how would it be transmitted?
11    A   It could come from the Office of Public
12  Information, it could come from human resources.
13    Q   And who would issue an all-staff
14  communication regarding Rewards and Recognition
15  Program?
16    MR. BRUCKHEIM:  Objection as to form and
17  foundation.
18    But you can answer.
19    THE WITNESS:  It could be various people.
20  BY MR. CONDIT:
21    Q   At what level in the agency would those
22  all-staff communications on this program be issued?

Page 16

1    MR. BRUCKHEIM:  Same objection.
2    You can answer.
3    THE WITNESS:  I don't know.  When you say
4  "what level," I don't understand the question.
5  BY MR. CONDIT:
6    Q   For example, would an all-staff
7  communication about the Rewards and Recognition
8  Program be issued by the director of the agency, a
9  deputy director, your boss Mr. Charles?  What do you
10  know about that?
11    MR. BRUCKHEIM:  Same objection as to form
12  and foundation.
13    THE WITNESS:  I don't know.  I don't know.
14    MR. BRUCKHEIM:  If I can just say,
15  Ms. Wilson, if I need to place an objection on the
16  record, just wait a second before you give your
17  answer.  We can't both be talking at the same time.
18    THE WITNESS:  Okay.  Thank you.
19  BY MR. CONDIT:
20    Q   Now, in terms of your duties in your
21  position, how would you describe them in terms of the
22  scope and type of responsibilities you typically

Page 17

1  have?
2    A   Would you ask the question again, please?
3    Q   Sure.  What are your typical duties in your
4  job?
5    A   Typically my position duties entail employee
6  concerns, interpretation of the negotiated contract.
7    Q   Okay.  Anything else?
8    A   That covers the scope of it, of what I do.
9    Q   All right.  Let me unpack those two items a
10  little bit, please.
11    What do you mean when you say one of your
12  main duties is employee concerns?
13    A   That could be if an employee has a question
14  relative to scheduling, general employee concerns or
15  questions or clarifications, time, work hours, tour
16  of duty, those type of questions that employees may
17  have.
18    Q   If an employee has a question about personal
19  leave or Family and Medical Leave, is that a question
20  that you could answer?
21    A   No, that's not a question I can answer.
22    Q   Who would handle that question?

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410  (800)292-4789  (301)762-8282  (703)288-0026  (410)539-3664

DEPOSITION OF DEBORAH WILSON
CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 18

1    A    That would go to our benefits section in HR.
2    Q    And who within that section would answer
3 such a question?
4    A    I'm not sure who the particular person would
5 be.
6    Q    Do you know any of the people in the CFSA
7 human resources benefits section?
8    A    Yes.
9    Q    Who heads that section?
10   A    Stan Spaght.
11       MR. BRUCKHEIM:  Can you spell Spaght for the
12 record?
13       THE WITNESS:  Yes.  S-p-a-g-h-t.
14 BY MR. CONDIT:
15   Q    And what is Mr. Spaght's title?
16   A    He is the HR manager for comp and benefits.
17   Q    Do you know how long Mr. Spaght has been in
18 that position?
19       MR. BRUCKHEIM:  Objection as to foundation.
20       But you can answer.
21       THE WITNESS:  No.
22 BY MR. CONDIT:

Page 19

1    Q    Do you know if Mr. Spaght was in that
2 position in 2005?
3    A    He was in that position sometime in '05, but
4 I don't remember.
5    Q    Now, other than the HR manager for comp and
6 benefits in that section, are there any other
7 positions that you knew of and who are in those
8 positions?
9    A    Under Mr. Spaght you're speaking of?
10   Q    Yeah, um-hm.
11   A    There are two, three other positions.
12   Q    Do you know what the titles of those
13 positions might be?
14   A    I don't want to misquote, so I don't know
15 off the top of my head.
16   Q    Do you know any of the people, in terms of
17 their names, who work under Mr. Spaght at this time?
18   A    Yes.
19   Q    Who would that be?
20   A    One is Mr. Al Day.  The other is Ms. Tina
21 Smith.  And the other is Ms. Janice Stephens.
22   Q    Do you know whether or not Mr. Day,

Page 20

1 Ms. Smith and Ms. Stephens were in that office in
2 2005?
3    A    I know Mr. Day was.  Mr. Stephens was, but
4 again, I don't know exactly when, but some portion of
5 '05.
6    Q    Okay.  So if I'm understanding your
7 testimony correctly, you would not be the person, in
8 your position, to review any questions about leave,
9 any documentation about leave, whether it be personal
10 or family and medical; is that correct?
11   A    That's correct.
12   Q    Now, what about the area of employee
13 discipline or adverse action against employees?  Do
14 you have any involvement in that type of activity?
15   A    As far as interpretation of the contract,
16 that's my involvement.
17   Q    Now, explain that.  What contract are you
18 referring to?
19   A    The collective bargaining agreement with
20 AFSCME.
21   Q    Anything else in the area of adverse actions
22 or discipline involving employees?

Page 21

1    A    No.
2    Q    So the only task you have with respect to
3 that category is to help interpret the collective
4 bargaining agreement; is that right?
5    A    Help interpret the collective bargaining
6 agreement and whatever appropriate actions that comes
7 out of that agreement.
8    Q    Now, when Shirley Tabb was an employee of
9 CFSA, was she under the collective bargaining
10 agreement?
11   A    Yes.
12   Q    And can you explain why or how she was under
13 the agreement?
14   A    By virtue of her classification.
15   Q    And what classification was that?
16   A    I'm not sure if it's officially OPI
17 specialist.  I don't remember the actual title.  OPI
18 being Office of Public Information.  Right.
19   Q    All right.  So let me make sure I have clear
20 your duties.  You deal with employee concerns which
21 include questions about scheduling or work hours or
22 tours of duty, things of that nature; is that right?

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

64c52d74-f5a3-4f2c-a0c0-46fed19b09da

DEPOSITION OF DEBORAH WILSON
CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 22

1    A    That's correct.
2    Q    And you also deal with interpretation of the
3    collective bargaining agreement; is that correct?
4    A    That's correct.
5    Q    And then you have no other duties.  I'm not
6    saying that what you have to do isn't enough, but
7    there are no other categories, I guess I should say.
8    A    Right.
9    Q    Okay.  Cool.
10        Now, in your opinion -- and let's put the
11   framework here at 2005, so try to think back to 2005.
12   A    Okay.
13   Q    Your position in 2005, can you tell me what
14   your chain of command was?
15   A    In 2005 I reported directly to the human
16   resource administrator.
17   Q    Is that Mr. Charles?
18   A    No, that was Mr. Kleartis Jackson, spelled
19   K-l-e-a-r-t-i-s.
20   Q    Was Mr. Jackson in the position of human
21   resources administrator throughout 2005?
22   A    No.

Page 23

1    Q    Do you know when he left that position in
2    2005?
3    A    Sometime in August '05.
4    Q    Did someone replace Mr. Jackson in August of
5    2005?
6    A    No.
7    Q    Do you know when, if at all, someone
8    replaced Mr. Jackson in that position?
9    A    December '05.
10   Q    Who filled the human resources administrator
11   position in December of 2005?
12   A    Darlene Mansfield.
13   Q    When Ms. Mansfield assumed that position,
14   did you then report directly to her?
15   A    Yes.
16   Q    Now, again focusing on 2005, your first-line
17   supervision was at the human-resources-administration
18   level, correct?
19   A    Yes.
20   Q    What was the next level of supervision above
21   that?
22   A    That would have been the senior deputy

Page 24

1    director position for administration.
2    Q    And who was in that position in 2005?
3    A    Mr. Ronnie Charles.
4    Q    Then following the chain up further, who was
5    above that position, Mr. Charles' position?
6    A    The director of the agency.
7    Q    In 2005 who was that?
8    A    That was still Brenda Donald Walker.
9    Q    Okay.  So let's review and make sure I've
10   got it right.  Your immediate supervisor during 2005
11   was the human resources administrator, correct?
12   A    Yes.
13   Q    Then your next-level supervisor was the
14   senior deputy director, correct?
15   A    Yes.
16   Q    And at that time, and I take it continuing
17   on, it was Mr. Charles.
18   A    Yes.
19   Q    And then your third-level supervisor was the
20   director of the agency.
21   A    Yes.
22   Q    So I take it, then, that you receive your

Page 25

1    performance evaluations from the human resources
2    administrator.
3    A    Yes.
4    Q    Now, during the 2005 time period, were you
5    involved in any management or supervisor-level
6    meetings that went beyond your department, let's say
7    that included other departments?
8        MR. BRUCKHEIM:  Objection; vague and
9    relevance.
10       But you can answer.
11       THE WITNESS:  Could you clarify that,
12   please?
13       MR. CONDIT:  Sure.  I have heard some folks
14   say that there were manager meetings or
15   executive-team meetings, meetings of that nature,
16   which would involve perhaps several departments.
17   Q    I'm wondering if you were involved in any
18   meetings of that nature in 2005.
19   A    In 2005.  Things are shifting, so I'm just
20   trying to recall.
21   Q    Sure.  And if the answer has different parts
22   because over 2005 there were different kinds of

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

# DEPOSITION OF DEBORAH WILSON
## CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 26

1 meetings going on, just feel free to elaborate on all
2 of that.
3    A   There were general meetings that I, as a
4 supervisor, would have been involved in or included.
5    Q   And what types of meetings would those be?
6    A   It would have been some of the management
7 meetings.
8    Q   In 2005 who would typically attend
9 management meetings?  And by "who" I mean types of
10 positions or department representation.
11   A   I can only answer for the portions that I
12 attended.  And at that time it would have been
13 supervisor level.
14   Q   Supervision from all departments across the
15 agency?
16   A   Not necessarily.  It would have been
17 management meetings.  So it could have been different
18 levels just depending upon their availability, what
19 other responsibilities they may have had, those type
20 of things.
21   Q   Were the management meetings that you are
22 thinking of in 2005 scheduled on some regular basis?

Page 27

1    A   Yes, yes.
2    Q   What was the schedule, if you recall?
3    A   It was a biweekly meeting.
4    Q   Who was the chairperson of the biweekly
5 management meetings?
6    A   The director.
7    Q   The director of the agency?
8    A   Yes.
9    Q   And in 2005 that would have been Brenda
10 Donald Walker?
11   A   That's correct.
12   Q   Would an agenda be issued in advance of
13 these meetings?
14   A   I don't recall during that time.  I don't
15 recall.  It's just, again, a lot of changes, so I
16 don't recall 2005 if an agenda was sent or just a
17 notification that the meeting was going to be held.
18   Q   If an agenda or notification was sent, how
19 would you receive it?  Through what means?
20   A   It would have been sent as an e-mail.
21   Q   And do you know who would typically send the
22 e-mail in 2005?

Page 28

1    A   Someone from the director's office.
2    Q   So it could have been the chief of staff or
3 the director's assistant, any of those positions?
4        MR. BRUCKHEIM:  Objection; calls for
5 speculation.
6        THE WITNESS:  I don't know.
7 BY MR. CONDIT:
8    Q   Would you have copies of any of these
9 notifications in an e-mail file or other file that
10 you maintain?
11   A   I doubt it.  I doubt it.
12   Q   How far back, to your knowledge, does your
13 e-mail storage go?
14   A   I'm smiling, because I had the misfortune of
15 losing files when we switched from GroupWise --
16 remember GroupWise, and we went to Outlook, and I've
17 had the misfortune of losing files.  And they haven't
18 been able to recover them.  So I don't have files.
19       So I'm just -- I was just thinking through
20 2005 I don't have.
21   Q   When did the agency switch from the
22 GroupWise e-mail application to the Outlook e-mail

Page 29

1 application?
2    A   It was sometime -- I don't recall.  I would
3 be speculating.
4    Q   Do you think the switch from GroupWise to
5 Outlook e-mail application took place sometime in
6 2005?
7    A   I would say yes.
8    Q   So assuming that it was sometime in 2005
9 that the switch took place, would that have been the
10 time that you lost the documents that you had in the
11 GroupWise application?
12   A   I don't know when I lost.  I know that I was
13 trying to find some documentation, and I could not
14 find '05's and '06's.  And I.T. has not been able to
15 recover it.
16   Q   Have you been dealing on this issue of lost
17 files with the folks within CFSA or with the folks
18 that are in OCTO?
19   A   I deal directly with CFSA I.T. people.
20   Q   Do you know if the OCTO people have been
21 involved?
22   A   To my understanding, they have been

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

DEPOSITION OF DEBORAH WILSON
CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

---

Page 30

1  involved.
2      Q   So as you sit here today, do you have a
3  sense of the earliest e-mail that you retain in your
4  e-mail files, what year that might be from?
5          MR. BRUCKHEIM:  Objection as to form and
6  speculation.
7          You can answer.
8          THE WITNESS:  I don't know.
9  BY MR. CONDIT:
10     Q   So do you think you have any e-mail from
11  2005, for example?
12         MR. BRUCKHEIM:  Same objection.
13         But you can answer.
14         THE WITNESS:  I don't want to say that I do
15  if I don't, and I don't want to say I don't if I do.
16  I don't know.  I really don't know.
17         MR. CONDIT:  Fair enough.
18     Q   I take it that if you went back to your
19  office after this deposition today you could sit down
20  at your computer and look at your email files and go
21  back as far as you could go, and that would tell you
22  the answer to my question, correct?

---

Page 31

1      A   Correct.
2      Q   Are your e-mail archived or stored or backed
3  up in any way that you're aware of?
4      A   I don't know.  That's an I.T. question
5  again.
6      Q   So you don't do anything specific to back up
7  or store or archive any e-mail.
8      A   No.
9      Q   Do you, as a practice, copy and save e-mail
10  of any kind if they're of particular importance or
11  interest to you in a file separate from e-mail?
12     A   No.
13     Q   Now, back to the management meetings, which
14  is where we got started on this --
15     A   Okay.
16     Q   -- you've indicated to me that the meetings
17  were biweekly in 2005 as you can recall, correct?
18     A   Correct.
19     Q   And that the director at the time,
20  Ms. Brenda Donald Walker, was the chairperson
21  typically of these meetings, correct?
22     A   Correct.

---

Page 32

1      Q   And about how many people would typically be
2  present for one of these biweekly meetings in 2005?
3      A   I don't recall.  I don't know.  I don't know
4  the numbers.
5      Q   Okay.  Would it be typically more than six?
6      A   Yes, yes.
7      Q   More than 12?
8      A   In some cases yes, yes.
9      Q   Occasionally more than 15?
10     A   Yes, um-hm.
11     Q   Where would these meetings be held?
12     A   Typically at 400 6th Street.
13     Q   And 400 6th Street is the CFSA headquarters
14  building; is that correct?
15     A   That's correct.
16     Q   And on what floor or conference room would
17  the meetings typically take place?
18     A   The ones that I attended was typically on
19  the fifth floor.
20     Q   And the fifth floor, as I understand it, is
21  where most of the higher-level management of CFSA has
22  offices; is that correct?

---

Page 33

1      A   There's some.
2      Q   Is the director's office on the fifth floor?
3      A   Yes.
4      Q   Deputy director?
5      A   Not all.
6      Q   Okay.  Is there a conference room or room
7  number on the fifth floor where these biweekly
8  management meetings would be held?
9      A   There is a conference number, but I don't
10  know what that number is.
11     Q   When the biweekly management meetings were
12  held that you attended in 2005, did anyone take notes
13  of the meetings and provide minutes after the
14  meetings?
15         MR. BRUCKHEIM:  Objection as to form.
16         You can answer.
17         THE WITNESS:  I don't recall.
18  BY MR. CONDIT:
19     Q   Do you ever recall, following a biweekly
20  meeting, receiving copies of notes or minutes of the
21  meeting?
22     A   Here again I don't recall for that period of

---

9 (Pages 30 to 33)

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410  (800)292-4789  (301)762-8282  (703)288-0026  (410)539-3664

64c52d74-f5a3-4f2c-a0c0-46fed19b09da

# DEPOSITION OF DEBORAH WILSON
## CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 34

1  time, because things have changed.  So I cannot put a
2  framework around that '05 time.  I don't know what
3  the process was.
4     Q    Does the current director, Sharlynn Bobo,
5  hold biweekly meetings of a similar nature to those
6  you attended in 2005?
7     A    Yes.
8     Q    And is it similar as to the size and type of
9  personnel that attend the meetings?
10    A    Yes.
11    Q    And are there minutes or notes kept of those
12 meetings, to your knowledge?
13    A    There are minutes.
14    Q    And are those distributed?
15    A    Yes.
16    Q    So you typically receive copies of the notes
17 or minutes of the current biweekly meetings?
18    A    Yes.
19    Q    Who on the staff presently takes the notes
20 or minutes of the biweekly meetings?
21    A    I don't know, because it's changed.  Staff
22 has changed, and assignments has changed, so I don't

Page 35

1  know at this point.
2     Q    Can you recall any person who has been in
3  that capacity of taking the notes and the minutes of
4  the biweekly staff meetings?
5     A    There have been several staff assistants.
6     Q    And these staff assistants would be staff
7  assistants to whom?
8     A    They may have been staff assistants to the
9  director or to one of the deputies.
10    Q    In 2005 do you recall who Ms. Brenda Donald
11 Walker had as a staff assistant or executive
12 assistant in her office?
13    A    Let me think.  The only person I recall
14 was -- she's no longer there, and I don't remember
15 her name, unfortunately.  I can see her face, but I
16 don't remember her name.
17    Q    Do you know if Angela Robinson served as a
18 staff or executive assistant?
19    A    That's the name, yes.
20    Q    Can you recall whether or not Ms. Robinson
21 was involved in the biweekly meetings that you're
22 thinking of in 2005?

Page 36

1     A    I can't really say for sure.  I don't
2  remember.
3     Q    In the 2005 biweekly staff meetings, was
4  there a sign-in sheet or attendance sheet of any kind
5  distributed?
6     A    I don't recall that.
7     Q    What type of topics were typically discussed
8  in the biweekly staff meetings in 2005?
9     A    I don't know what the topics may have been.
10 I was a newbie, and I was in the meetings.  I'm
11 not -- operational, administrative topics, but . . .
12    Q    Were issues regarding the LeShawn
13 class-action litigation discussed in these meetings?
14    A    Not that I'm aware of.  I don't recall that.
15    Q    Requirements that were instituted through
16 the LeShawn class-action litigation, were those
17 discussed in these biweekly meetings?
18    A    I don't recall specifically.
19    Q    Do you recall the issue of children sleeping
20 in the CFSA office building coming up in any of these
21 biweekly staff meetings?
22    A    No.

Page 37

1     Q    Is there any documentation, including any
2  computer files such as e-mail, that would refresh
3  your recollection on anything that was discussed or
4  any agendas or topics for any of the meetings in
5  2005?
6     A    Would you restate that question, please?
7     Q    Sure.  Is there any information that you may
8  have now or may have access to that would refresh
9  your memory on what was discussed in any of the
10 meetings in 2005?
11    A    No.
12    Q    Did you ever have occasion, through any
13 meetings that you attended or other information that
14 was distributed to agency staff, to learn that
15 children were sleeping in the CFSA office building?
16    A    No.
17    Q    You're not aware of that issue at all?
18    A    Not -- you said through agency staff?
19    Q    Right.
20    A    No.
21    Q    Any communications within the agency.
22    A    No.

10 (Pages 34 to 37)

DEPOSITION OF DEBORAH WILSON
CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 38

1    Q    Have you ever heard of that issue, children
2  sleeping in the office building?
3    A    I heard of it.
4    Q    How did you hear of it?
5    A    By the media that Ms. Tabb was a part of.
6    Q    So you saw media reports on the issue?
7    A    Yes, on television.
8    Q    When did you see those reports?
9    A    I don't recall what those dates were really.
10 Sometime -- sometime September, October?  I'm not
11 sure what the time frame -- in '05.
12   Q    And where were you when you saw these media
13 reports?
14   A    I don't even recall where I was.  I don't
15 know.
16   Q    Do you think there's any possibility that
17 you saw these media reports at the agency?
18   A    Oh, I know I didn't see them at the agency.
19   Q    So you would have been outside the agency
20 when you saw these reports.
21   A    Yes.
22   Q    Did you record any of these media reports,

Page 39

1  or do you know of any recordings of any of these
2  media reports?
3    A    No, I did not record them.
4    Q    Do you know of any recordings of the media
5  reports?
6    A    I am aware that there may have been some
7  recording of the documentation -- of the news and
8  television articles.
9    Q    And how are you aware that there may have
10 been recordings?
11   A    That was brought to -- that was brought to
12 the agency's attention, that it was recorded, that
13 the different stations continued to play, and that
14 they were being recorded.
15   Q    From whom did you learn that the media
16 reports that concerned Ms. Tabb and children sleeping
17 in the office building were recorded?
18   A    From OPI, Office of Public Information.
19   Q    Any particular person within OPI?
20   A    It would have been -- it would have been
21 Mindy, Mindy Good.
22   Q    Who is Ms. Good?

Page 40

1    A    She is the -- I'm trying to think what her
2  title is.  I'm not sure if she's their director or
3  public information.
4         At this moment could I take a break, please?
5         MR. CONDIT:  Certainly.
6         Let's go off the record.
7         (Recess taken.)
8         MR. CONDIT:  Let's go back on the record.
9         Ms. Wilson, before the break we were talking
10 about circumstances under which you became aware of
11 recordings of I guess news programs that involved
12 Ms. Tabb and the question of children sleeping in the
13 building.
14   Q    Do you recall that discussion?
15   A    Yes, I do.
16   Q    And before we broke you had indicated that
17 you had learned of these recordings from Mindy Good
18 who was the director of OPI, correct?
19   A    Yes.
20   Q    And about when did you learn of the
21 recordings?
22   A    It's hard to put a date on it.  I don't

Page 41

1  recall.  It was sometime in '05, but I don't know
2  when.
3    Q    And what was the occasion or reason for
4  Ms. Good sharing that information with you?
5         MR. BRUCKHEIM:  Objection; calls for
6  speculation.
7         But you can answer if she told you.
8         THE WITNESS:  I don't recall if she told me
9  or if she was just -- I don't recall if she gave me a
10 reason why.
11 BY MR. CONDIT:
12   Q    How did Ms. Good communicate the information
13 about recordings having been made?  Was it through
14 e-mail?  Was it in a face-to-face conversation?
15   A    It was in a face-to-face conversation in the
16 hallway.
17   Q    Was anyone else present?
18   A    I don't recall if anyone else was.
19   Q    So Ms. Good just came up to you and said,
20 "Ms. Wilson, we have these recordings."  Was it out
21 of the blue or was it part of some conversation?
22   A    I wouldn't say it was out of the blue.  It

11 (Pages 38 to 41)

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

64c52d74-f5a3-4f2c-a0c0-46fed19b09da

# DEPOSITION OF DEBORAH WILSON
## CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 42

1  was concerns because of the media, and I can't even
2  begin to speculate.  I just know I was at 400 6th
3  Street, and I can't even say where I was headed to,
4  if I was headed to a meeting or something.  But it
5  was in the area of her office, so . . .
6      Q   Okay.  Did you ever view the recorded
7  programs?
8      A   No.  No, I didn't.
9      Q   Do you know in what form the programs were
10 recorded?  In other words, was it on a VHS cassette
11 or DVD?  Do you have any knowledge of that?
12     A   I would -- I'm hesitating, because I would
13 be speculating.  But I would say it would be on a CD
14 just by nature of technology, but . . .
15     Q   But you didn't personally observe the media
16 that these recordings were on.
17     A   No.
18     Q   Do you know where the recordings or copies
19 of the recordings were kept in the office?
20     A   No.
21     Q   Other than yourself and Ms. Good, do you
22 know of anyone else who knew about these recordings?

Page 43

1      A   I'm not aware.
2      Q   Do you know if anyone else knew about these
3  recordings aside from you and Ms. Good?
4      MR. BRUCKHEIM:  Objection; calls for
5  speculation and asked and answered.
6      But if you know . . .
7      THE WITNESS:  It would be an assumption, but
8  I don't know particular.  But I would assume the
9  director or Mr. Charles.  That would be my
10 assumption.
11 BY MR. CONDIT:
12     Q   Was there any communication by e-mail or
13 otherwise that went to a variety of staff including
14 yourself that announced that this information had
15 been recorded?
16     MR. BRUCKHEIM:  Again, objection as to form
17 and speculation.
18     You can answer insofar as you personally saw
19 any e-mail addressed to you involving that subject
20 area.
21 BY MR. CONDIT:
22     Q   You can also personally answer any e-mail

Page 44

1  you may have seen from anyone else.  It doesn't have
2  to be your e-mail.  If you saw someone else's e-mail,
3  you can answer as well.
4      A   I know e-mails were exchanged, but as far as
5  recalling what they were, what their specific topics,
6  I don't remember that.
7      Q   Now, when you're saying e-mails were
8  exchanged, what type of information or content
9  generally, just generally, was in these messages?
10     MR. BRUCKHEIM:  Objection as to foundation
11 because she hasn't testified that she actually saw
12 it.  So if you want to ask that question first and
13 then --
14     MR. CONDIT:  She said she knew there were
15 e-mails, right?
16     MR. BRUCKHEIM:  She said she knew there were
17 e-mails, but we're now talking about how she knew.
18 BY MR. CONDIT:
19     Q   Did you see e-mails?
20     A   I knew there was e-mails -- there were
21 e-mails.
22     Q   About --

Page 45

1      A   About the television -- I want to say
2  "articles" all the time, but they're not articles,
3  but the media information.
4      Q   And this would be the media information
5  involving Ms. Tabb and the issue of children sleeping
6  in the building?
7      A   Yes, that's correct.
8      Q   And when you say "there were e-mails," were
9  these all staff kind of e-mails or to a certain
10 subset of staff if you're aware?
11     MR. BRUCKHEIM:  Objection as to form and
12 foundation.
13     You can answer.
14     THE WITNESS:  I just -- I really don't
15 remember.
16 BY MR. CONDIT:
17     Q   Are these e-mails that you would have copies
18 of?
19     A   I don't have copies because of my --
20 unfortunately because of my Outlook transition, the
21 e-mail information that I don't have.
22     Q   Well, let me get some clarification on that.

12 (Pages 42 to 45)

64c52d74-f5a3-4f2c-a0c0-46fed19b09da

DEPOSITION OF DEBORAH WILSON
CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 46

1    In answering as you just have, are you
2  meaning to imply that you know that for a fact that
3  you have no e-mail from 2005?
4    A   Rephrase that, please?
5    Q   Do you know that you have no e-mail -- that
6  you have retained no e-mail from 2005?
7    A   That I personally or as a representative of
8  the agency have no e-mails?
9    Q   Correct. In your position in human
10  resources, do you have -- can you say with certainty
11  that you have no e-mails from 2005?
12    A   No, I cannot. No, I cannot.
13    Q   Were the news programs that you testified a
14  little earlier that you saw involving Ms. Tabb, was
15  that the first time you had heard of children
16  sleeping in the building?
17    A   Yes, when I saw it on the television.
18    Q   What did you think about that issue when you
19  first heard of it in these news programs that you
20  saw?
21    MR. BRUCKHEIM: Objection as to relevance.
22    You can answer.

Page 47

1    THE WITNESS: What did I think about it when
2  I saw the media?
3  BY MR. CONDIT:
4    Q   Yes.
5    A   Well, I was interested in hearing what was
6  going on since it was the first I had heard of it,
7  but I don't even remember what my reaction was at
8  that time.
9    Q   Do you know whether or not there was any
10  type of investigation by anyone within CFSA regarding
11  whether or not children were actually sleeping in the
12  CFSA office building?
13    A   I'm aware that there was some -- and I don't
14  know if it's called "investigation" -- but there was
15  some -- some information had to be formulated in
16  order to respond, which I think there was a
17  subsequent response from OPI. So I don't know if
18  that's considered investigation or what.
19    Q   How did you come to learn that some
20  information was being gathered in order to respond to
21  the media reports?
22    A   Maybe I should correct myself. I didn't say

Page 48

1  that I was aware. I was speculating -- I would
2  assume some information was gathered if there was a
3  response from OPI. So I don't know if it's
4  considered investigation or -- I don't know what the
5  terminology -- proper terminology would be for that.
6    I'm aware because of the results of Mindy
7  Good speaking on television in response to the
8  concerns. That's how I would have been aware.
9    Q   So you saw subsequent news programs with
10  Mindy Good speaking on this issue?
11    A   Yes.
12    Q   Where did you see those?
13    A   Again, it was outside of the agency.
14    Q   Aside from the news reports or shows that
15  you saw featuring, in part, Mindy Good, did you
16  become aware of any further information being
17  developed by the agency on the question of children
18  sleeping in the building?
19    A   No, I would not be aware of that.
20    Q   Were you involved in any meetings at the
21  time the media reports that you've been describing
22  came out that discussed this issue of children

Page 49

1  sleeping in the building or Ms. Tabb's appearance in
2  the media?
3    A   No, I wouldn't have been included in it.
4    Q   So you were not included.
5    A   No.
6    Q   Who is Michelle Lewis?
7    A   Michelle Lewis was part of human resources
8  staff and reported to me.
9    Q   Ms. Lewis reported to you?
10    A   Yes.
11    Q   What was Ms. Lewis's title or position when
12  she reported to you?
13    A   She was HR specialist.
14    Q   Were you Ms. Lewis's immediate supervisor?
15    A   Yes.
16    Q   Did Ms. Lewis work at the agency in the role
17  of HR specialist in 2005?
18    A   Yes.
19    Q   When did Ms. Lewis leave the agency?
20    A   March -- March or April of '07.
21    Q   During the period 2005 until Ms. Lewis left
22  the agency sometime in 2007, were you her immediate

13 (Pages 46 to 49)

64c52d74-f5a3-4f2c-a0c0-46fed19b09da

DEPOSITION OF DEBORAH WILSON
CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 50

1  supervisor?
2     A   Yes.
3     Q   So I take it, then, that you would have
4  performed her performance evaluations, for example?
5     A   Yes.
6     Q   Would you say that Ms. Lewis was a good
7  employee?
8     A   Yes.
9     Q   In your role as a human resources official
10  for CFSA, and other than in Ms. Tabb's situation,
11  have you been involved or informed of any other CFSA
12  employee being terminated?
13         MR. BRUCKHEIM:  Objection as to form and
14  relevance.
15         But you can answer.
16         THE WITNESS:  Would you repeat that, please?
17  BY MR. CONDIT:
18     Q   Sure.  In your role as a human resources
19  official have you ever been involved in the
20  termination of any employee?
21         MR. BRUCKHEIM:  Same objection.
22         THE WITNESS:  I've been aware of

Page 51

1  terminations.
2  BY MR. CONDIT:
3     Q   Okay.  Has your awareness included being
4  engaged in some way in the steps leading to
5  termination because of your role as a human resources
6  official?
7     A   Could you clarify what you mean steps?
8         MR. BRUCKHEIM:  I'll object just as to
9  foundation.
10  BY MR. CONDIT:
11     Q   Let me ask this.  Are you familiar with the
12  standards for -- that are used in disciplining or
13  terminating employees from CFSA?
14     A   Yes.
15     Q   I take it -- but you can correct me if I'm
16  wrong -- that there are steps that would have to be
17  followed in taking either an adverse action or a
18  termination action against a CFSA employee.
19         Is that correct generally?
20     A   Yes.
21     Q   So with respect to those steps or the
22  process that had to be followed, my question is, have

Page 52

1  you been involved in any of that process with respect
2  to the termination of any employee?
3         MR. BRUCKHEIM:  Again, objection as to form
4  and relevance.
5         You can answer.
6         THE WITNESS:  I'm just not clear what you're
7  speaking of, "involvement," if you could clarify
8  that.
9  BY MR. CONDIT:
10     Q   Sure.  Did you have a hand in any of the
11  paperwork, in any of the determinations, in any of
12  the advice given on whether or not someone should be
13  disciplined or terminated?
14     A   Okay.
15         MR. BRUCKHEIM:  Same objection.
16         You can answer.
17         THE WITNESS:  As it pertains to
18  interpretation of the contract, yes.
19  BY MR. CONDIT:
20     Q   What does that mean, "as it pertains to
21  interpretation of the contract"?
22     A   As it pertains to the articles within the

Page 53

1  contract that's applicable to any corrective action,
2  adverse action.
3     Q   With respect to Ms. Tabb, I believe you
4  testified earlier that she was an employee who came
5  under the collective bargaining agreement to which
6  you're referring; is that correct?
7     A   That's correct.
8     Q   Were you involved in any way in interpreting
9  the collective bargaining agreement as it applied to
10  Ms. Tabb and her situation when she was being either
11  disciplined or terminated from the agency?
12     A   Yes, when it came to disciplinary actions,
13  yes.
14     Q   And what disciplinary actions were you
15  involved in as it pertained to Ms. Tabb?
16     A   Corrective actions.
17     Q   What does that mean, corrective actions?
18     A   Corrective actions were -- are actions
19  that's reprimand or suspension less than 10 days.
20     Q   With respect to Ms. Tabb, what specific
21  corrective actions were you involved in?
22     A   Admonition -- well, really that's not a

14 (Pages 50 to 53)

64c52d74-f5a3-4f2c-a0c0-46fed19b09da

DEPOSITION OF DEBORAH WILSON
CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 54

1  corrective action.
2      A reprimand, which is a corrective action.
3    Q   What was the nature of the reprimand or the
4  issue involving the reprimand?
5    A   My recollection, it was pertaining to work
6  performance.  Work performance.  And then the
7  inappropriateness of correspondence directly to the
8  Mayor's Office.  I believe that's what it was.
9    Q   Do you retain any records, including e-mail
10  or other files, on this reprimand that you're
11  referring to?
12    A   Yes.
13    Q   And where are those kept?
14    A   They're kept at the agency.
15    Q   Are these in your office?
16    A   No, they're not in my office, but they're in
17  human resources.
18    Q   And what type of file or category of file
19  would these be kept in?
20    A   It would be corrective actions.
21    Q   So there would be a separate
22  corrective-actions folder?

Page 55

1    A   Actually it's part of the OPF in a section
2  with corrective action.
3    Q   And the OPF is what?
4    A   The official personnel file.
5    Q   Now, a minute ago you said in your testimony
6  that the reprimand that you were involved in that
7  pertained to Ms. Tabb concerned work performance and
8  I believe you said inappropriate correspondence to
9  the Mayor's Office; is that right?
10    A   Yes.
11    Q   What involvement did you have in the
12  reprimand?  Specifically what was your role?
13    A   My role was providing the template, the
14  letter template for use from Ms. Tabb's direct
15  supervisor.
16    Q   And who was that, the direct supervisor?
17    A   Mindy Good.
18    Q   And this template letter, what is that
19  exactly?
20    A   It's the letter that's -- that the District
21  agencies use for any corrective actions, adverse
22  actions.

Page 56

1    Q   Is this like a form letter?
2    A   They're standard form letters, yes.
3    Q   And what, if anything, did you add to the
4  standard form letter when you provided it to Mindy
5  Good?
6    A   Nothing.  Nothing.
7    Q   Were you -- strike that.
8        What information, if any, did you have that
9  indicated that the reprimand might be appropriate?
10    A   Here again I'm -- without seeing the files
11  or anything, I'm just -- standard information would
12  have been documentation, performance evaluation and
13  any -- any supporting documentation.
14    Q   In order to issue the template letter that
15  you were describing to Ms. Good, was it required for
16  you to verify Ms. Good's concern about Ms. Tabb's
17  performance and communications with the Mayor's
18  Office?
19        MR. BRUCKHEIM:  Objection as to form.
20        You can answer.
21        THE WITNESS:  No.
22  BY MR. CONDIT:

Page 57

1    Q   Do you know at the time whether you saw any
2  information, for example, on Ms. Tabb's
3  communications with the Mayor's Office?
4    A   I do recall seeing that, yes.
5    Q   What did you see?
6    A   I can't be specific, but I do remember an
7  e-mail -- and it may have been a hard copy of an
8  e-mail -- that was sent to the Mayor's Office
9  or . . .
10    Q   Who was sending the e-mail to the Mayor's
11  Office if you know?
12    A   It came from Ms. Tabb.
13    Q   So you saw an e-mail from Ms. Tabb to the
14  Mayor's Office.
15    A   Yes.
16    Q   What was the subject or information conveyed
17  in that e-mail, if you recall?
18    A   I don't recall the title or what the subject
19  matter was at this point.  I don't recall.
20    Q   Do you know with whom in the Mayor's Office
21  Ms. Tabb was communicating?
22    A   No, I don't remember.

15 (Pages 54 to 57)

64c52d74-f5a3-4f2c-a0c0-46fed19b09da

DEPOSITION OF DEBORAH WILSON
CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 58

1    Q    Would the evidence that supports the
2  reprimand that you've been speaking of be in any kind
3  of file?
4    A    It would be in the OPF.
5    Q    It would be in the official personnel
6  folder?
7    A    It should be in the official personnel file,
8  yes.
9    Q    Do you know about when you were dealing with
10 this reprimand issue?
11   A    It was in '05, but -- it had to have been in
12 '05, but I don't know the month, time, date.
13   Q    Do you know who Dr. Susan Newman is?
14   A    No, I don't.
15   Q    Do you know who Neil Albert is?
16   A    I've heard the name.  He's associated with
17 the District, and I'm not sure in what capacity.
18   Q    Okay.  Did anyone other than Mindy Good
19 communicate with you regarding the issuance of a
20 reprimand to Ms. Tabb?
21   A    I'm trying to recall if -- I can't say for
22 sure.

Page 59

1    Q    Okay.
2    A    I can't say for sure.
3    Q    Do you have an idea?  Do you have somebody
4  in mind?
5    A    I'm thinking it would have been the director
6  through -- but I don't know that for sure.
7    Q    Okay.  The director being Ms. Brenda Donald
8  Walker?
9    A    Yes.
10   Q    So she may have communicated with you on
11 that issue.
12   A    I'm not sure if she communicated with me or
13 communicated with Mindy.  I'm not sure.
14   Q    Now, what typically are the types of
15 documents contained an official personnel folder?
16   A    I don't really -- I can't really say all of
17 the documents, because I'm not the keeper of the OPF.
18 But generally we would have Form 50s,
19 Form 52s, A-1s, evaluations maybe be in there, any
20 letters of accommodations, things like that.
21 Recognitions, things such as this.
22   Q    And corrective actions, correct?

Page 60

1    A    Yes.
2    Q    Who is the keeper of the OPF?
3    A    Well, I really don't know who's the official
4  keeper -- who's designated of the OPF.
5    Q    Okay.  Who runs the office or file facility
6  that keeps the official personnel files or folders?
7    A    I don't know who actually officially holds
8  that function.  That would be something that -- I
9  know I'm not the responsible person.
10   Q    Is the keeping of the official personnel
11 file a function of the CFSA Human Resources Office?
12   A    Yes.
13   Q    Do you know anyone that works in that
14 capacity having to do with the keeping of the
15 official personnel folders?
16   A    No, I don't.
17   Q    No names come to mind?  No positions come to
18 mind?
19   A    No.  We don't have anyone classified as the
20 keeper of records.
21   Q    Okay.  So when you were saying before that
22 you're not the keeper of the official personnel

Page 61

1  file --
2    A    Yes.
3    Q    -- did you have someone in mind who has
4  something to do with the keeping of those records?
5    A    No, I don't.
6    Q    This is the -- I'm going to show you -- we
7  won't mark this as an exhibit, at least not yet.  I'm
8  going to show you what Ms. Tabb received in response
9  to her discovery request concerning her personnel
10 file, okay?
11   A    Okay.
12   Q    And I'll show it to Counsel first, but I'd
13 like you to thumb through it and tell me if the
14 reprimand information, corrective action information
15 that you've been testifying to is in here.  It may
16 be, but I may be missing it somehow.
17       So I'm going to present this to your counsel
18 or to District counsel and have him give it to you
19 and you can take a look.
20   A    Okay.
21       (Witness reviews document.)
22       THE WITNESS:  No, I don't see them in here.

16 (Pages 58 to 61)

64c52d74-f5a3-4f2c-a0c0-46fed19b09da

# DEPOSITION OF DEBORAH WILSON
## CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 62

1      MR. CONDIT:  Now, reflect for the record --
2  and I'll share with counsel to confirm, if he
3  wishes -- that the document that I just shared with
4  the witness through counsel is Bates marked with the
5  numbers 495 through 681 consecutively.
6      Counsel, would you like to confirm that?
7      (Counsel reviews document.)
8      MR. CONDIT:  Thank you.  So Counsel, do you
9  confirm --
10      MR. BRUCKHEIM:  Oh, yes.  Sorry.
11      MR. CONDIT:  Thank you.
12      Q   So if the corrective action information
13  pertaining to Ms. Tabb is not present in the document
14  I just showed you, that means -- but you understand
15  it to be in the official personnel folder, correct?
16      A   Yes.
17      Q   When was the last time you saw that
18  information?
19      A   I can't -- I can't begin to think when the
20  last time I saw it.
21      MR. BRUCKHEIM:  I will note for the record
22  that corrective action information, to my

Page 63

1  understanding, was provided in discovery and may have
2  been grouped with a different set of documents than
3  the documents contained in the official personnel
4  file.
5      MR. CONDIT:  Okay.
6      Q   You don't recall when you last saw that
7  information?
8      A   You're speaking of the reprimand and that
9  information?
10      Q   Yes.
11      A   It's been some while, some time ago.  I
12  haven't seen it probably or even looked at it or
13  anything like that in '05, '06 maybe?
14      Q   Okay.  Aside from the template letter that
15  you provided to Ms. Good, did you provide anyone with
16  any other information relating to the reprimand of
17  Ms. Tabb?
18      A   No.
19      Q   Now, the template letter, what information
20  did that contain in it?
21      A   It's a general template from DCHR that gives
22  a proposed notification time frame, a time that the

Page 64

1  employee has to -- opportunity to respond.  The
2  supervisor signs off, or the direct report signs off
3  on that, and it's presented to the employee.
4      Q   Now, other than the information that you
5  described, what was described, if anything, in the
6  template letter about the issues that were the
7  subject of the reprimand, that is, the communication
8  with the Mayor's Office and the performance issues?
9      A   I don't recall the detail to that.
10      Q   Do you recall if you provided any of that
11  information in the template letter?
12      A   No, I wouldn't have done that.
13      Q   So that would have been done by whom?
14      A   That would have been done by the proposing
15  official, who would have been the direct supervisor.
16      Q   Now, once an official proposes a reprimand,
17  what are the steps that it has to go through?
18      A   Once a reprimand is proposed, then that's
19  issued to the employee.  The employee has so many
20  days to respond.  And then they respond -- the
21  employee responds to a deciding official.
22      That deciding official then determines what

Page 65

1  the final outcome would be, either to uphold the
2  reprimand, reduce the reprimand, dismiss the
3  reprimand.
4      That information is then -- that decision is
5  made and issued back to the employee.
6      Q   In Ms. Tabb's case, who was the deciding
7  official on the reprimand?
8      A   I don't recall, because I don't know who --
9  at that time I don't recall.  I just haven't looked
10  at the documents.  Because -- and I'm hesitant
11  because the chain of command would have been whoever
12  typically would be through the chain of command.
13      And if there isn't a chain of command, then
14  it goes to an independent person, and I'm not sure
15  who that could have been at that time.  It would have
16  been another administrator, could have been another
17  deputy.  I just don't know who that is without
18  looking at the actual document.
19      Q   Who would have decided who the deciding
20  official is in Ms. Tabb's instance?
21      A   Who would have decided?
22      Q   Um-hm.

17 (Pages 62 to 65)

64c52d74-f5a3-4f2c-a0c0-46fed19b09da

# DEPOSITION OF DEBORAH WILSON
## CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 66

1    A   That would have been -- that would have come
2  from Mr. Charles as far as who could have been the
3  deciding official.
4    Q   And who would Mr. Charles communicate with
5  to establish the deciding official in Ms. Tabb's
6  case?
7        MR. BRUCKHEIM:  Objection as to form and
8  foundation.
9        You can answer.
10       THE WITNESS:  I don't know.
11 BY MR. CONDIT:
12   Q   So you didn't see any communication on the
13 deciding official?
14   A   I can't say for sure that I didn't see any
15 communication because, again, I'm not sure if -- I
16 don't know who the deciding official was, so . . .
17   Q   Was Michelle Lewis involved at all in the
18 reprimand issue concerning Ms. Tabb?
19   A   Yes.
20   Q   What role did Michelle Lewis have?
21   A   I'm not sure to what detail that she had
22 except that she was the first point -- may have been

Page 67

1  the first point of contact.  And the reason I say
2  that, because I wasn't -- I was out of the office for
3  a period of time on other agency matters, so . . .
4    Q   Okay.  Now, with respect to Michelle Lewis,
5  what were her duties as you can understand them or
6  describe them in 2005?
7    A   Michelle's duties were to -- really to --
8  again, kind of a duplicate to what I did to a lesser
9  degree but no less important.
10       If there were employee concerns, if there
11 were concerns from management as far as obtaining
12 templates, obtaining interpretation of the contract,
13 of the AFSCME contract, then she was the person that
14 would be available in my absence.
15   Q   What is the difference between a reprimand
16 and an admonition?
17   A   An admonition is actually a verbal warning
18 reduced to writing.  A reprimand is the first step in
19 a disciplinary action.  Not necessarily first step,
20 but it's a lesser step in the disciplinary action.
21   Q   So admonition is the write-up of a verbal
22 warning, correct?

Page 68

1    A   Yes.
2    Q   Is there any type of action -- corrective
3  action that's taken that might be in between an
4  admonition and a reprimand?
5    A   No.
6    Q   So then the next level of seriousness, if
7  you will, is a reprimand; is that right?
8    A   Yes.
9    Q   And that's a written warning.
10   A   That's a written -- more severe written
11 warning as far as progressive discipline.
12   Q   What would be the next step after a
13 reprimand?
14   A   You would have -- as far as the next step
15 could be suspension less than 10 days.
16   Q   And then what step after a less-than-10-day
17 suspension would there be?
18   A   You could have a suspension 10 days or
19 greater.
20   Q   Okay.  And what would be next?
21   A   And the next would be termination.
22   Q   Going back to the reasons for the reprimand

Page 69

1  of Ms. Tabb, what policy or standards were being
2  violated in the communication that Ms. Tabb allegedly
3  had with the Mayor's Office?
4        MR. BRUCKHEIM:  Objection as to form and
5  foundation.
6        THE WITNESS:  I don't recall what those
7  violations were.
8  BY MR. CONDIT:
9    Q   Is there some policy, written or unwritten,
10 that one does not communicate with the Mayor's
11 Office?
12       MR. BRUCKHEIM:  Same objection.
13       THE WITNESS:  I don't know.  I don't know if
14 there is or if there isn't.
15 BY MR. CONDIT:
16   Q   In your job, as you sit here today, would
17 you feel comfortable communicating with the Mayor's
18 Office if you thought something was important enough
19 to do so?
20       MR. BRUCKHEIM:  Objection as to form and
21 relevance.
22       You can answer.

18 (Pages 66 to 69)

64c52d74-f5a3-4f2c-a0c0-46fed19b09da

# DEPOSITION OF DEBORAH WILSON
## CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 70

1      THE WITNESS:  If I felt it was something
2  personal that I should bring to the mayor's
3  attention, then I would do so.
4      If I thought it was something that was
5  related to internal functions or functions within my
6  place of business, I would direct that -- I would
7  send that directly to my director and my chain of
8  command.  I would not send it to the Mayor's Office.
9  BY MR. CONDIT:
10     Q    Now, let's assume that you've sent your
11  communications to the director and your chain of
12  command and they don't do anything.  What would you
13  do?
14     MR. BRUCKHEIM:  Again, the same objection as
15  to relevance.
16     But you can answer.
17     THE WITNESS:  I wouldn't do anything else.
18  I would continue to pursue it internally.
19  BY MR. CONDIT:
20     Q    And what if they wouldn't listen to you,
21  they didn't want to hear your concern?
22     MR. BRUCKHEIM:  Objection; asked and

Page 71

1  answered.
2      You can answer again.
3      THE WITNESS:  I would continue to pursue it
4  internally.
5  BY MR. CONDIT:
6      Q    So you would never go outside of CFSA with
7  any concern no matter how serious; is that true?
8      A    I would not.
9      Q    If the concern involved the safety of
10  children, would you go outside the agency to have
11  that matter addressed?
12     MR. BRUCKHEIM:  Again, objection as to
13  relevance, boarding on argumentative, but she can
14  answer.
15     THE WITNESS:  Would you rephrase that,
16  please, or restate that, please?
17  BY MR. CONDIT:
18     Q    Sure.  If your concern involved the safety
19  of children and you were not being heard within your
20  chain of command, they would not respond, would you
21  then feel like you could take the issue outside the
22  CFSA?

Page 72

1      A    No.  And let me, if I may --
2      Q    Sure.
3      A    I would use a method where I would involve
4  my director, my chain of command, and I would request
5  other methods for my concerns to be addressed.  But
6  they would be included.  I would not harm any child
7  or any family, but that would be my approach.
8      Q    Are you familiar at all with the District of
9  Columbia's whistleblower law?
10     A    I am now.
11     Q    And when you say you are now, what do you
12  mean?
13     A    Just know that there is a whistleblower.
14  That's what I'm aware of.
15     Q    Do you know what rights that law provides?
16     A    No, I don't.
17     Oh, I'm sorry.
18     MR. BRUCKHEIM:  Objection as to relevance
19  and calls for a legal conclusion.  She's not
20  testifying as a 30(b)(6) witness, she's not
21  testifying as an attorney.  I don't see why she
22  should talk about what her understanding is of a

Page 73

1  whistleblower law.
2      So, I mean, if you're asking just a couple
3  foundational questions, I'll let it go.  But, I mean,
4  if this is something we're going to get deep into,
5  then I'm not going to have her testify.
6      Because this has absolutely no basis as to
7  what she thinks the law may be about or what she
8  thinks her own rights may be about.  We're here about
9  Ms. Tabb and her situation.  And she can testify
10  about her knowledge as it relates to Ms. Tabb's
11  situation.
12     But apart from that, I'm not going to waste
13  our time having her testify to that.
14     MR. CONDIT:  Okay, I understand your
15  objection.
16     Q    Do you know whether or not there have been
17  any postings or trainings associated with
18  whistleblower rights within CFSA?
19     A    I'm not aware.
20     Q    So other than the reprimand involving
21  Ms. Tabb, were you involved in any other corrective
22  disciplinary or adverse actions concerning Ms. Tabb?

19 (Pages 70 to 73)

64c52d74-f5a3-4f2c-a0c0-46fed19b09da

DEPOSITION OF DEBORAH WILSON
CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 74

1    A   Corrective adverse or --
2    Q   Disciplinary.
3    A   Disciplinary actions?
4        MR. BRUCKHEIM:  Well, object as to form with
5    respect to the phrasing of "involved," but you can
6    answer.
7        THE WITNESS:  Again, as it deemed
8    involvement, I was present when Ms. -- when Mindy
9    Good informed Ms. Tabb of the termination.  I was
10   present there, so I was involved as a witness.
11   BY MR. CONDIT:
12   Q   When did that take place, the communication
13   that you're describing?
14   A   It would have been the first week of October
15   '05.
16   Q   How is it that you recall that this would
17   have been in the first week of October 2005?
18   A   That was the time of notification to
19   Ms. Tabb.
20   Q   Where did the communication that you
21   witnessed between Ms. Tabb and Mindy Good take place?
22   A   In Ms. Good's office.

Page 75

1    Q   And who was present besides yourself and
2    Mindy Good?
3    A   Nobody.
4    Q   I take it, then, that Ms. Tabb was on the
5    telephone?
6    A   Yes.
7    Q   And were you on a speaker-phone?
8    A   Yes.
9    Q   So you could hear what Ms. Tabb was saying?
10   A   Yes.
11   Q   What did Mindy Good communicate to Ms. Tabb
12   at that time?
13   A   Verbatim I don't recall.  General
14   information was that of notification of termination.
15   Q   About how long of a call was this?
16   A   I would say it was less than five minutes.
17   Q   And why was Ms. Tabb being terminated, if
18   you know?
19   A   To my recollection, because of the news
20   media, the allegations pertained in that -- in the
21   news media.
22   Q   Did Ms. Good indicate the reason for

Page 76

1    termination in this telephone call?
2    A   I believe she did.  If I recall, my
3    recollection, she started out reading the document of
4    termination from a document.  And if I recall also
5    then Ms. Tabb asked to call her back after she read
6    that information.  That's my recollection.
7    Q   What was Ms. Good reading?
8    A   She had a letter of notification.  I'm not
9    sure what the official title is on that.
10   Q   Did either you or Ms. Good take notes or in
11   any way record this conversation?
12   A   I did not, no.  And I did not see Ms. Good
13   take any notes.
14   Q   So aside from the letter that Ms. Good was
15   reading from, were there any other materials that
16   were being reviewed or referenced in this
17   conversation?
18   A   I don't recall.
19   Q   How did you come to be a participant in the
20   telephone call to Ms. Tabb regarding her termination?
21   A   They needed a witness.  I was selected as a
22   witness.

Page 77

1    Q   Who selected you?
2    A   Right now I don't really know who selected
3    me.  I don't know who selected me.
4    Q   Were you required to write up or memorialize
5    what transpired in the telephone call with Ms. Tabb
6    regarding her termination?
7    A   No.
8    Q   Did you take any notes after the telephone
9    call or do any write-up to the file after the
10   telephone call to record or remember what you saw or
11   observed or heard during that call?
12   A   I don't recall doing that.
13   Q   Other than being involved in the telephone
14   call that you're describing, did you have any other
15   involvement with respect to the termination of
16   Ms. Tabb?
17   A   I don't understand what you mean.
18   Q   Did you participate in any other way in any
19   other activity associated with the termination of
20   Ms. Tabb?
21   A   To the degree of previous records as far as
22   disciplinary actions, reprimand, that was my

20 (Pages 74 to 77)

64c52d74-f5a3-4f2c-a0c0-46fed19b09da

DEPOSITION OF DEBORAH WILSON
CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 78

1  involvement, yes.
2    Q    To your knowledge, did the reprimand play
3  some role in the termination of Ms. Tabb?
4    A    I don't know.  I don't know.
5    Q    So other than observing and listening in on
6  the phone call when Mindy Good advised Ms. Tabb of
7  her termination and participating in some aspect of
8  the reprimand to Ms. Tabb, did you have any other
9  involvement in any type of adverse action with
10  respect to Ms. Tabb?
11    A    Again, as I said, providing any previous
12  information, documents as far as the reprimand, any
13  previous disciplinary actions; providing that
14  information for the decision makers to make a
15  decision.
16    Q    What information were you providing and to
17  whom were you providing it?
18    A    Again, it would have been the reprimand,
19  previous disciplinary actions, that type of
20  information.
21    Q    Aside from the reprimand, what other
22  previous disciplinary actions are you referring to?

Page 79

1    A    Well, I shouldn't have lumped it in
2  together, but the admonition, but the reprimand, that
3  information.
4    Q    So to whom did you provide the reprimand?
5    A    I'm trying to recall if -- it can't be
6  speculation.
7        It would have been provided to Mr. Charles
8  and -- because he was my direct chain of command.
9    Q    Why would you have provided the reprimand
10  information to Mr. Charles when your immediate
11  supervisor was either Mr. Jackson or Ms. Mansfield?
12    A    They were not there during that time.
13    Q    Okay.  So Mr. Charles was serving --
14    A    Mr. Charles was my direct --
15    Q    So during October 2005 Mr. Charles was your
16  direct supervisor?
17    A    Correct.
18    Q    Did Mr. Charles ask you for the reprimand
19  information?
20    A    Yes.
21    Q    Did he ask you in any written form such as
22  e-mail or memo?

Page 80

1    A    I don't recall, but -- I don't recall if it
2  was in e-mail or anything like that.
3    Q    Did Mr. Charles indicate why he wanted the
4  reprimand information concerning Ms. Tabb?
5    A    It was related -- yes, as related to all of
6  the information that was going on with the media.
7    Q    Did you have occasion to meet with
8  Mr. Charles to discuss the reprimand information or
9  any other information concerning Ms. Tabb?
10    A    I don't recall having a meeting with him.  I
11  don't recall having a meeting with him on that.
12    Q    So if you didn't have a meeting, was it
13  likely that Mr. Charles was communicating by e-mail
14  with you on this subject?
15    A    No, just picking up a phone call, requesting
16  information.
17    Q    So he might have received a phone call about
18  it?
19    A    Yes.
20    Q    Would you have made any type of notation
21  about communications with Mr. Charles asking for
22  information about Ms. Tabb?

Page 81

1    A    No.
2    Q    Was Michelle Lewis involved at all in any
3  aspect of the information developed to support
4  Ms. Tabb's termination?
5    A    I'm not aware.  I don't recall that she was,
6  but . . . I don't recall that she was.
7    Q    Were there any meetings that you attended
8  that involved the issue of whether or not to
9  terminate Ms. Tabb?
10    A    No.
11    Q    Were there any meetings that you attended
12  that involved the issue of media programs or reports
13  that Ms. Tabb had been involved in in October -- or
14  excuse me, in September of 2005?
15    A    Would you repeat that, please?
16    Q    Sure.  Were there any meetings that you
17  attended that concerned or pertained in any way to
18  the media reports that Ms. Tabb was involved in?
19    A    No.
20    Q    Did Michelle Lewis ever discuss with you any
21  of the personnel issues concerning Ms. Tabb including
22  reprimand or admonition or termination, any of those

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

# DEPOSITION OF DEBORAH WILSON
## CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 82

1  things?
2  A   Reprimand, admonition you said and
3  termination?
4  Q   Right.
5  A   She did refer to me with the reprimand.
6  Q   So Ms. Lewis talked to you about that issue?
7  A   Yes.
8  Q   Did she talk to you -- Ms. Lewis that is --
9  about any other issue concerning Ms. Tabb?
10  A   She -- she did talk with me about Family
11  Medical Leave or -- I think it was medical leave.
12  Q   What was Ms. Lewis discussing with you about
13  Family Medical Leave for Ms. Tabb?
14  A   I'm not sure if it was Family Medical Leave.
15  I'm trying to get the time frame.  It wasn't -- I'm
16  not sure if it was on her medical leave or if it was
17  just strictly pertaining to the reprimand and the
18  disciplinary action.  I think it was more to the
19  disciplinary action.
20  Q   About how many times did you meet with
21  Ms. Lewis about that issue?
22  A   I don't know.  I mean, I don't keep a

Page 83

1  record, and it would be hard to say.
2  Q   Do you think you met with her more than once
3  about any disciplinary actions concerning Ms. Tabb?
4  A   I would say at least twice, but other than
5  that, it really would be difficult to say.
6  Q   Do you know if Ms. Lewis kept notes of any
7  of the meetings that she was involved in that
8  concerned Ms. Tabb?
9  A   I didn't see any notes.  She didn't present
10  any notes to me.  That's not to say that they aren't
11  there, but I don't have any notes.
12  Q   When Ms. Lewis left the agency, did she
13  provide any files or information that she had
14  accumulated as part of her job to you or anyone else?
15  A   No.  Any files that she had she did transfer
16  to me.  So I guess I answered my own question that
17  there aren't any, because there were no files
18  transferred.
19      When she left the agency, again, just
20  earlier '07, there was no information there.  So if
21  she kept files, then they weren't -- if she had
22  files, she didn't keep them or they weren't

Page 84

1  transferred.
2  Q   So just let me make sure I understand what
3  you just testified to.  I believe what you're telling
4  me is that when Michelle Lewis left her position at
5  CFSA she gave you files, but those files did not
6  contain any notes; is that right?
7  A   That's correct.  And those files were not
8  specific to Ms. Tabb.  They were just various files.
9  Q   Thank you for that clarification.
10  A   Okay.
11  Q   Now what, if any, requirements were there
12  under the collective bargaining agreement that had to
13  be satisfied before Ms. Tabb could be terminated?
14  A   Well, if you look at the collective
15  bargaining agreement, it depends upon the action
16  whether or not someone can be summarily removed.  And
17  so under those disciplinary actions, that would cover
18  the actions that occurred.  Under that language, that
19  would cover the actions that occurred as far as it
20  was decided.
21  Q   Okay.  Did you perform a review of the
22  collective bargaining agreement requirements and

Page 85

1  advise anybody about them before Ms. Tabb was
2  summarily removed?
3  A   I did review -- as is standard for my
4  position -- review the collective bargaining
5  agreement and/or -- and just provide interpretation
6  of that agreement, the contract language.
7  Q   What interpretation did you share and with
8  whom?
9  A   I just provided information of the contract
10  language as far as adverse actions in the CBA.  And
11  there's portions in there that you can also refer to
12  the DPM that legally legal would have to review to
13  determine whether an action is considered reason
14  enough for summarily -- for an employee to be
15  summarily removed.
16  Q   And to whom did you refer this information,
17  that is if contract language and the DPM.
18  A   That would have been to Mr. Charles.
19  Q   And why did you provide that information to
20  him?
21  A   He was my direct report.
22  Q   Did he ask you for it?

22 (Pages 82 to 85)

64c52d74-f5a3-4f2c-a0c0-46fed19b09da

# DEPOSITION OF DEBORAH WILSON
## CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 86

1    A    Yes.
2    Q    And how did he ask you for it?  In what way
3  did he communicate?
4    A    Again, as with the reprimand information, by
5  phone.
6    Q    And what is DPM?
7    A    It's the District Personnel Manual.
8    Q    Why were you providing guidance on the
9  District Personnel Manual?
10    A    Because that actually works in conjunction
11  with the contract as far as disciplinary adverse
12  actions.
13    Q    What was your understanding at the time of
14  what the requirements were for a summary removal
15  under the DPM?
16    A    Just by recollection, if actions threatened
17  the integrity of an agency or something to that
18  effect.  I don't have all of the details of that,
19  but . . .
20    Q    Was that the issue with respect to Ms. Tabb,
21  that she was threatening the integrity of the agency?
22    A    I believe that was one.  I believe that was

Page 87

1  an issue, yes.
2    Q    Were there any other issues?
3    A    I don't recall, but that sticks in my mind.
4    Q    What does that mean, in your understanding,
5  to threaten the integrity of the agency?
6        MR. BRUCKHEIM:  Objection as to relevance.
7        But you can answer.
8        THE WITNESS:  I don't think that would be to
9  me to interpret that.
10  BY MR. CONDIT:
11    Q    Why were you sharing it then with
12  Mr. Charles?
13    A    I was sharing that information because it
14  was the written information from the DPM, so I was
15  providing that information.
16    Q    Within the human resources office, do you
17  know whether or not there are any memos or other
18  information that interpret the DPM and, in
19  particular, the parts of the DPM that pertain to
20  summary removal?
21    A    No more than the DPM.  I'm not aware of
22  them.

Page 88

1    Q    Have you ever had occasion to be involved or
2  aware of a CFSA employee being summarily removed from
3  their position?
4        MR. BRUCKHEIM:  Objection as to relevance.
5        But you can answer.
6        THE WITNESS:  I don't remember.  I can't
7  honestly answer.  I just don't remember as far as
8  being aware or involved.
9  BY MR. CONDIT:
10    Q    So as you sit here today, do you think in
11  your career in the human resources office at CFSA
12  there have been other employees summarily removed?
13        MR. BRUCKHEIM:  Again, objection as to
14  relevance.  It may call for speculation.
15        But if you know, you can answer.
16        THE WITNESS:  I can't honestly say.
17  BY MR. CONDIT:
18    Q    So nothing sticks out in your mind?
19    A    No.  I just . . .
20    Q    Do you know whether or not the union was
21  notified about the decision to terminate Ms. Tabb?
22    A    To my understanding, yes, the union was

Page 89

1  aware.
2    Q    Were they specified informed?
3    A    I'm sorry?
4    Q    Was the union or the appropriate union
5  official specifically informed about the decision to
6  terminate Ms. Tabb?
7    A    They were provided information of her
8  termination.
9    Q    What information were they provided?
10    A    A copy of the termination letter.
11    Q    Were union officials informed of the intent
12  to terminate Ms. Tabb before that termination was
13  effected?
14    A    I'm not aware.  I don't recall that.
15    Q    When in time -- considering the event of
16  Ms. Tabb's summary removal and the phone call you
17  were involved in, when in time did the union then get
18  informed?  Was it before or after that phone call?
19    A    I don't recall.  I don't recall.
20    Q    Do you know what union official was informed
21  of Ms. Tabb's termination?
22    A    No.  No, I don't.

23  (Pages 86 to 89)

# DEPOSITION OF DEBORAH WILSON
## CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 90

1    Q   Did there ever come a time when Ms. Tabb met
2  with you to discuss any personnel issues or concerns
3  that she had?
4    A   Yes.
5    Q   And when did she meet with you?
6    A   It was earlier in '05.  Earlier '05.
7    Q   And what was the nature of the issue or
8  concern that Ms. Tabb was bring to your attention?
9    A   Two concerns.  One was her medical leave.
10 And the other was wanting to -- let me recall this
11 correctly -- wanting to propose a plan for a position
12 that she was -- Ms. Tabb was interested in, and I
13 can't remember which part of the agency it was.
14      She was interested in proposing an
15 opportunity that she could go into a position that
16 she felt that she would be very well suited for, and
17 she did have that discussion with me on those two
18 facts.
19    Q   Did she discuss both the items that you just
20 described in one meeting?
21    A   I know we met a couple times.  I don't know
22 if we talked about both in both of those meetings or

Page 91

1  not.
2    Q   Okay.  What was the nature of what Ms. Tabb
3  was relaying to you in the meetings that you recall
4  about medical leave?
5    A   She was completing a Family Medical Leave
6  certification and was -- if I recall correctly, was
7  going to have to extend it.  And that was early '05
8  or middle of '05.
9    Q   Did Ms. Tabb ask you for any particular
10 assistance in any respect with respect to the
11 medical-leave issue?
12    A   We discussed what the process was, and her
13 completing the forms and bringing -- making sure that
14 the forms were certified, that type of information,
15 bringing it in so that that certification could be
16 approved.
17    Q   Did you provide Ms. Tabb with the necessary
18 forms?
19    A   Either I did or someone from my staff --
20 from the HR staff gave it to me.  And we -- I can't
21 remember if I specifically gave Ms. Tabb those forms
22 or someone from our HR staff gave them to her.

Page 92

1    Q   Do you know what the nature of Ms. Tabb's
2  need was with respect to medical leave?
3    A   Am I allowed to say that?
4    Q   Sure.
5    A   She had diabetes and was concerned with
6  stabilizing her diabetes.
7    Q   Do you know whether or not medical leave --
8  Family Medical Leave was approved for Ms. Tabb
9  regarding the stabilization of her diabetes?
10    A   To my recollection it was.
11    Q   Do you know when -- during what period of
12 time in 2005 that family leave was supposed to take
13 place or be provided?
14    A   Somehow May '05 stays with me.  I'm not sure
15 if that's the time frame that I'm thinking of.
16    Q   Is May '05 the time period you're thinking
17 of for the conclusion of the leave?
18    A   I'm not sure about the conclusion of the
19 leave, because I wasn't involved in that portion.
20 Someone else within our department handled that.
21    Q   Now, what was Ms. Tabb proposing with
22 respect to a plan for a position that she was

Page 93

1  interested in?
2    A   I don't recall the details, but she was
3  really excited about some things that she saw could
4  go -- could enhance a department.  And here again, I
5  was still relatively new, so it was regarding social
6  work recruitment or -- not social work recruitment,
7  but adoptions and I think kinship care, something in
8  that area, and was very excited about being able to
9  propose an opportunity for her to go into a position
10 such as that; understanding there wasn't a position,
11 but being able to propose one.
12    Q   And what did you advise Ms. Tabb about the
13 issue of the proposed position that she wanted to
14 suggest?
15    A   I actually recall in our conversation saying
16 I would pursue it and go to the proper people to have
17 a discussion about it.  I knew in my capacity I
18 really didn't have the authority to make those
19 discussions, but it was something that she should
20 look into.
21    Q   Did you actually pursue possible
22 establishment of a position that Ms. Tabb was

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

DEPOSITION OF DEBORAH WILSON
CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 94

1  suggesting?
2      A    No, I didn't have authority or any capacity
3  in that role to do that.
4      Q    Did you advise Ms. Tabb in any way what
5  steps she should take to try to make that position a
6  reality?
7      A    No.  What I did advise Ms. Tabb was take her
8  plan and go to the proper people and have the
9  discussion with them.
10      Q    And who were the proper people at that time
11  if you recall?
12      A    At that time it would have been Brenda
13  Donald Walker and Mindy Good, or -- I'm trying to
14  think if it was one other person.  I don't think so.
15  Those were the two names I recall.
16      Q    And do you know if Ms. Tabb followed
17  through?
18      A    I don't know.  I don't know.
19      Q    Did either Mindy Good or Ms. Donald Walker
20  discuss Ms. Tabb's proposal with you?
21      A    No.
22          MR. CONDIT:  Let me show you what I'll mark

Page 95

1  as the first exhibit, please.
2          (Whereupon, Plaintiff's Exhibit 1 was marked
3  for identification and attached to the transcript.)
4          MR. CONDIT:  Let the record reflect that the
5  witness is being shown what's being marked as
6  Exhibit 1.  And this is the D.C. Personnel
7  Regulations, Chapter 16.
8      Q    And Ms. Wilson, what I'd like you to do, if
9  you don't mind, is to identify what section you may
10  have referred to in your earlier testimony regarding
11  summary removal.
12      A    It would be Section 1616, page 12 of 22.
13      Q    If you'd take just a moment, please, to
14  review Section 1616 and tell me after you've reviewed
15  it if this is substantially the same as what you
16  recall forwarding in October of 2005 or thereabouts
17  to Mr. Charles.
18      A    Yes.
19      Q    Yes, it is the same?
20      A    Yes.
21      Q    And just to make sure that I'm understanding
22  your testimony correctly, it is your testimony that

Page 96

1  you simply forwarded this information, not that you
2  sought to interpret it or suggest how it might apply
3  to Ms. Tabb; is that correct?
4      A    Correct.
5      Q    Do you know subsequently how this
6  Section 1616 was applied to Ms. Tabb's situation?
7      A    It's a summary removal, so her letter of
8  removal was a summary removal.  So my assumption
9  would be that it was applicable from this language to
10  the letter.
11      Q    But other than the fact that the summary
12  removal would be covered by this section, I take it
13  that you were not privy to any other interpretation
14  or application of facts of Ms. Tabb's case to that
15  standard; is that right?
16      A    That's correct.
17          MR. BRUCKHEIM:  Do you mind if we went off
18  the record very briefly?
19          MR. CONDIT:  Certainly.
20          (Lunch recess taken.)
21          MR. CONDIT:  Back on the record.
22      Q    Good afternoon, Ms. Wilson.

Page 97

1      A    Good afternoon.
2      Q    We left off discussing Ms. Tabb coming to
3  you to talk about a position and completing some
4  Family Medical Leave forms.  Do you recall that
5  discussion before the lunch break?
6      A    Yes.
7      Q    Other than that meeting or meetings that may
8  have occurred for those issues, did you ever have
9  occasion to have any other meetings with Ms. Tabb
10  regarding any personnel issues or concerns that she
11  wished to raise?
12      A    Those were the ones that were -- that we
13  spoke of, her concerns with wanting to present this
14  information, family -- her medical-leave situation,
15  the approval of that, the process of that.
16          I'm just thinking.
17      Q    Take your time.
18      A    She did mention -- we did have a
19  conversation sometime in '05, there was a
20  consideration for reorganization where the
21  communications position was going to open up in human
22  resources.

DEPOSITION OF DEBORAH WILSON
CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 98

1    And I'm not sure how in depth our
2 conversation was with that, but it was a position
3 that was going to be going -- transitioned from OPI
4 to human resources.
5    Q   And what was the discussion about that
6 issue?
7    A   I'm just trying to recall.  As far as my
8 involvement, it was I would say a relatively brief
9 discussion because the restructure or the
10 reorganization wasn't -- was actually under
11 Mr. Jackson, Kleartis Jackson.
12    But there were questions and concerns that
13 Ms. Tabb raised about coming from a position that she
14 held at that time in the Office of Public Information
15 and consideration of her being transitioned or
16 transferred into human resources in a communications
17 capacity.
18    Q   And what was the outcome of the discussion
19 of that possible transition?
20    A   There was no transition with Ms. Tabb.
21    Q   Do you know why?
22    A   No, I don't.

Page 99

1    Q   Aside from discussing the issue you just
2 described and what you testified to before lunch in
3 terms of meetings with Ms. Tabb, can you recall
4 having any other meetings with Ms. Tabb in 2005 that
5 pertained to any other personnel issues or concerns
6 that she might have?
7    A   We met about the proposed new position.  We
8 also met -- and I'm not sure if it was in the same
9 time that we were meeting about the other positions,
10 about the Family Medical Leave and the proposed new
11 position that she was interested in creating --
12 presenting, she voiced some concerns about where she
13 currently was -- her position, where she was
14 currently in the Office of Public Information, and
15 that was one of the reasons she was interested in
16 filling -- presenting a proposal for going into
17 another position that could utilize more so her
18 social-work background.
19    Q   What concerns did she voice at that time?
20    A   She actually voiced that she felt that this
21 new position that she felt that she could build would
22 be better suited for her, that she felt that she had

Page 100

1 a lot of background, experience.
2    I believe she mentioned about being in sales
3 and spoke of her accomplishments outside of the
4 agency.  I'm not sure what the time frame -- being in
5 sales, being able to be a great -- having great
6 results in sales, marketing, those type of things.
7    Q   Did Ms. Tabb voice any other concerns
8 regarding her position or status within OPI to you?
9    A   That was all inclusive in the few meetings
10 that we had.
11    Q   Did Ms. Tabb ever raise any concerns to you
12 where she expressed that she felt like she was being
13 harassed or otherwise not treated fairly?
14    A   We had a -- and again, it's within those --
15 the context of those meetings -- that Ms. Tabb
16 mentioned that she felt that she wasn't being
17 utilized, her skills weren't being utilized in the
18 area that she currently was holding.
19    Q   Aside from Ms. Tabb indicating that her
20 skills were not being utilized, did she ever discuss
21 with you any other time wherein she felt like she was
22 being harassed or otherwise unfairly treated?

Page 101

1    A   No.
2    Q   Do you know whether or not Ms. Tabb had
3 discussions about her concerns about being harassed
4 or unfairly treated with Michelle Lewis?
5    A   I don't know.
6    Q   So Michelle Lewis never reported to you that
7 Ms. Tabb had raised any concerns of that nature.
8    A   I don't recall that.
9    Q   Now, you indicated earlier in your testimony
10 that Kleartis Jackson left the agency; is that
11 correct?
12    A   Yes.
13    Q   Why did he leave the agency?
14    A   I don't know.
15    Q   Do you know under what circumstances he left
16 the agency?  In other words, did he resign?  Was he
17 fired?
18    A   I was informed he resigned.
19    Q   Do you have the contact information for
20 Michelle Lewis?
21    A   No, I don't.
22    Q   Do you know where she works?

26 (Pages 98 to 101)

64c52d74-f5a3-4f2c-a0c0-46fed19b09da

DEPOSITION OF DEBORAH WILSON
CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 102

1    A    Yes, she works for the feds, for the federal
2  government.
3    Q    Do you know where in the federal government?
4    A    She's with the Navy.  This is information
5  she gave me when she was going into her new position.
6  I understand at that time she was going to be located
7  at the Navy Yard, but I don't have any other
8  information.
9    Q    Do you know the nature of the position that
10  she was going to be taking?  Was it something in
11  human resources or something else?
12    A    I'm not sure what the official title was,
13  but it was something in human resources, but I don't
14  know what it actually was, or actually is.
15    Q    When was the last time you had any contact
16  with Michelle Lewis?
17    A    Sometime last -- middle of '07 right
18  after -- shortly after she left.
19    Q    And what was the occasion for that contact?
20    A    She just called to say hello.
21    Q    So you had a communication with her by
22  telephone?

Page 103

1    A    Yes.
2    Q    Have you had any e-mail communications with
3  Ms. Lewis since she left CFSA?
4    A    No.
5    Q    Do you know anyone who has?
6    A    I'm not aware of anyone.
7        MR. CONDIT:  Let me show you what I'll mark
8  as the next exhibit.
9        (Whereupon, Plaintiff's Exhibit 2 was marked
10  for identification and attached to the transcript.)
11        MR. CONDIT:  Ms. Wilson, you've been handed
12  what has been marked as Deposition Exhibit 2.  It is
13  an e-mail chain dating from the period of August 2005
14  -- looks like the range is from August 15 to 17,
15  2005.
16        The top e-mail is from Mindy Good, and it
17  involves Brenda Donald and Ronnie Charles.
18        And the lower e-mail on the first page of
19  the exhibit is an e-mail between Shirley Tabb and
20  Susan Newman.
21    Q    I'd just like you to take a look at this
22  e-mail and tell me if you've seen it before.

Page 104

1    A    Yes.
2    Q    When did you see this e-mail?
3    A    Sometime in -- I'm not sure if it was August
4  or September of '05, August of '05.
5    Q    And how did you come to see this e-mail,
6  Exhibit 2?
7    A    This e-mail was -- hard copy was given to
8  me -- was shared with me by Michelle Lewis.  I
9  believe that's who it was.
10    Q    Why did Ms. Lewis give you a copy of this
11  e-mail?
12        MR. BRUCKHEIM:  Objection; calls for
13  speculation.  I'm going to tell her not to answer
14  that, but if you restate it so she doesn't have to
15  speculate, I'll tell her to answer.
16  BY MR. CONDIT:
17    Q    Do you know why Ms. Lewis gave you a copy of
18  this e-mail?
19    A    I believe this was given to her from
20  Mr. Charles, and she shared this information with me.
21    Q    And what did you do, if anything, once this
22  information was shared with you?

Page 105

1    A    I believe I didn't do anything except this
2  was one of the documents that -- to my recollection,
3  supported the reprimand.
4    Q    Would that mean, then, that this document,
5  Exhibit 2, is a document that should be in the
6  official personnel file in the section involving
7  corrective action?
8    A    Yes, it should be.
9    Q    Do you know why this document was relevant
10  to the reprimand?
11    A    Again, as I stated earlier, it was a
12  decision by senior staff that this reprimand should
13  be presented.
14        MR. CONDIT:  I'm not sure that was
15  responsive to my question.  Could you read back my
16  question, please?
17        (Record was read by the reporter as follows:
18  "Question:  Do you know why this document
19        was relevant to the reprimand?")
20  BY MR. CONDIT:
21    Q    Can you answer that question, please?
22    A    Okay.  The document was relevant based upon

27 (Pages 102 to 105)

64c52d74-f5a3-4f2c-a0c0-46fed19b09da

DEPOSITION OF DEBORAH WILSON
CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 106

1 the senior management's decision for reprimand.
2   Q  Do you know whether or not anyone within the
3 Human Resources Department at CFSA evaluated
4 Exhibit 2 to determine whether or not it violated any
5 policy or standard of the agency or D.C. government?
6   A  No.
7   Q  Were you involved in any conversations or
8 communications with senior management regarding their
9 judgment or determination that Exhibit 2 was relevant
10 to the reprimand issue for Ms. Tabb?
11   A  No.
12   Q  Now, earlier you testified that the first
13 time you had learned about children sleeping in the
14 building was when the media reports came out sometime
15 in September of 2005; is that right?
16   A  Yes.
17   Q  Did you recognize that that issue was
18 reflected in Exhibit 2?
19   A  Now I do, yes.
20   Q  Did you recognize it at the time in August
21 of 2005?
22   A  Reading this I would have, yes.

Page 107

1   Q  The message at the very top of the exhibit,
2 first page of the exhibit, is from Brenda Donald to
3 Mindy Good and Ronnie Charles. Do you see that?
4   A  Yes.
5   Q  And Ms. Donald writes, "I am furious!"
6   Do you see that?
7   A  Yes.
8   Q  Did you come to learn why Ms. Donald was
9 furious about the issues or information in this
10 Exhibit 2?
11   A  No.
12   MR. CONDIT: Let me show you, please, what
13 I'll mark as the next deposition exhibit.
14   (Whereupon, Plaintiff's Exhibit 3 was marked
15 for identification and attached to the transcript.)
16   MR. CONDIT: Ms. Wilson, you've been handed
17 what has been marked as Exhibit 3. It's titled at
18 the top:
19   "Government of the District of Columbia,
20   Medical Certification by Health Care
21   Provider (D.C. Family and Medical Leave Act
22   of 1990)."

Page 108

1   It is four pages long. If you'd take a look
2 at it and tell me if you've seen it before.
3   (Witness reviews document.)
4   THE WITNESS: Yes.
5 BY MR. CONDIT:
6   Q  When would you have seen this document?
7   A  It would have been early '05.
8   Q  And do you recall why you would have had
9 occasion to see Exhibit 3?
10   A  This was about the time that Ms. Tabb was
11 requesting medical leave to care for her mother.
12   Q  Now, given your earlier explanation about
13 your duties versus the duties of other persons within
14 human resources, why is it that you would be seeing a
15 request for Family Medical Leave?
16   A  Because during the early part of -- late
17 '04, early '05 the HR department was going through
18 transitioning, and so I was the person that in some
19 cases handled or reviewed Family Medical Leave until
20 we had someone staffed to do that.
21   And so while that was being transitioned,
22 there were a few certification forms that did come to

Page 109

1 me -- or to someone on my staff I should say, not
2 directly to me.
3   Q  And do you know whether or not the request
4 for leave as we see in Exhibit 3 was approved?
5   A  I don't recall. During this time -- I don't
6 recall. I'm assuming it was.
7   MR. CONDIT: Let's mark the next exhibit,
8 please.
9   (Whereupon, Plaintiff's Exhibit 4 was marked
10 for identification and attached to the transcript.)
11   MR. CONDIT: Ms. Wilson, I've shown you
12 what's been marked Exhibit 4. It is a one-page
13 letter dated March 29, 2005 to Ms. Shirley Tabb.
14   Q  Please tell me if you've seen this before.
15   A  I can't say that I have.
16   Q  Have you seen a letter of this nature
17 before?
18   A  Yes.
19   Q  And what type of letter is this, or when is
20 it used?
21   A  This is a letter that is provided to
22 employees who have -- upon approval of their Family

28 (Pages 106 to 109)

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

# DEPOSITION OF DEBORAH WILSON
## CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 110

1  Medical Leave.
2      Q   Now, is there a reason why this letter is
3  not signed by anyone?
4      A   I don't know.  That's one reason why I
5  couldn't verify that I haven't seen it before.  I
6  don't know.
7      Q   Now, with respect to the second paragraph of
8  the letter, it reflects certification that Ms. Tabb
9  will be out from March 18, 2005 through July 11,
10  2005.  Do you see that?
11     A   Yes, I do.
12     Q   Does this letter indicate to you in any way
13  what the time period would be for approval of
14  Ms. Tabb's Family Medical Leave?
15     A   March 18th, '05 through July of '05, July
16  11th.
17     Q   So those dates would be the time frame for
18  the leave.
19     A   Based upon this letter, yes.
20     Q   Now, are there -- other than this letter
21  would there be any other communications that
22  typically would be issued, during this time period,

Page 111

1  pertaining to someone's application for Family
2  Medical Leave?
3      A   There would have been a follow-up letter
4  when the employee was scheduled to return, a
5  notification.  And to my knowledge -- I don't recall
6  all of the other, if there are others, all of the
7  other steps that may be involved, understanding I was
8  really kind of the catchall for that.
9      Q   Now, again, during this time period, which
10  for these documents is early part of 2005, what was
11  the standard for approving or denying Family Medical
12  Leave?
13     A   What do you mean standard?
14     Q   In other words, someone comes with an
15  application.  Are there standards that apply for when
16  the agency determines that this is a valid request
17  that we're going to honor, or how is that judged?
18     MR. BRUCKHEIM:  Objection as to form, but
19  you can answer.
20     THE WITNESS:  I'm not that familiar with the
21  time period, if it's a 30-day window of notification,
22  if it's a 10-day window of notification.  I really

Page 112

1  can't speak to that any longer.
2      MR. CONDIT:  Well, and again, I'm trying to
3  refer only to the time period when you were involved
4  in Family Medical Leave issues.
5      Q   During that time when you were involved,
6  what would you typically do if you received a request
7  for Family Medical Leave in order to evaluate it?
8      A   The evaluation didn't come to me.  It
9  actually came to someone else on the staff who took
10  the information, followed up with all of the required
11  documentation that's necessary from the doctor, from
12  the employee.
13     And I don't know what that window of process
14  time -- I don't know what that time was.  I didn't
15  actually handle -- work that process, so it would be
16  difficult for me to say what the time frame is.
17     Q   During the time period that you were
18  involved in some way in Family and Medical Leave
19  issues, were you the one that approved or disapproved
20  of such requests?
21     A   During this time it was subject to
22  availability.  Mr. Jackson would approve, or if, in

Page 113

1  his absence, I would sign off, or he may appoint
2  someone or give someone else the authority within the
3  department to sign off.
4      Q   Do you recall any occasion when you were
5  involved in signing off on or denying Family Medical
6  Leave?
7      A   For Ms. Tabb?
8      Q   For anyone.
9      A   I did sign off some of the letters.
10     Q   And those would be sign-offs to approve the
11  leave?
12     A   Those would be sign-offs to approve the
13  leave, and that was late '04, to my recollection.
14     Q   And when you were signing off to approve the
15  leave, how did you evaluate whether or not to approve
16  it?
17     A   Based upon the information provided to me by
18  staff, certified documentation from the physician,
19  and that information was then given to me stating all
20  the appropriate information was there.
21     Q   So if the appropriate information was there,
22  including the certifications from a doctor, right?

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

64c52d74-f5a3-4f2c-a0c0-46fed19b09da

## DEPOSITION OF DEBORAH WILSON
## CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 114

1    A   Yes.
2    Q   And there was available time for the person
3  to take off -- I think that was what you said
4  earlier. Didn't you say something about it was
5  subject to availability?
6    A   No.
7    Q   No, you didn't say that? I'm sorry.
8        So if all the documentation was approved and
9  appropriate and in order, is that all that would be
10 necessary to approve the leave?
11   A   I don't want to say finality,
12 Because again, I just don't recall the overall
13 process and I don't want to say definitely when there
14 may be some steps that's missed.
15       But based upon my recollection, doctor's
16 certification, all appropriate documentation from the
17 doctor, signature by -- as this form states,
18 signature by the employee, identification of the
19 reason for the medical leave, and then based upon
20 that, the information would be available and -- not
21 available but would be presented for approval.
22       MR. CONDIT: Let me mark the next exhibit,

Page 115

1  please.
2        (Whereupon, Plaintiff's Exhibit 5 was marked
3  for identification and attached to the transcript.)
4        MR. CONDIT: Ms. Wilson, you've been shown
5  what's been marked deposition Exhibit 5. It is an
6  e-mail chain between Mindy Good and Michelle Lewis
7  during the period early August of 2005.
8    Q   I'd like you to take a look at it and tell
9  me if you've seen it before.
10   A   I can't say without a doubt that I've seen
11 this before.
12   Q   I notice from the first page of the exhibit
13 at the very top that this e-mail chain or the e-mail
14 chain reflected at the top of the first page shows
15 that a message from Michelle Lewis went to Brenda
16 Donald and to Mindy Good. Do you see that?
17   A   Yes.
18   Q   Would it be normal practice during this
19 time, August of 2005, for Michelle Lewis to have been
20 communicating directly with Brenda Donald or Mindy
21 Good?
22   A   Well, based upon the second page where it

Page 116

1  looks as if Brenda Donald e-mailed Mindy and
2  Michelle, in that content I would say yes, it would
3  have been appropriate for her to respond.
4        MR. CONDIT: Let me show you what I'll mark
5  as the next exhibit, please.
6        (Whereupon, Plaintiff's Exhibit 6 was marked
7  for identification and attached to the transcript.)
8        MR. CONDIT: Ms. Wilson, you're being shown
9  what has been marked Deposition Exhibit 6. It's a
10 one-page disability certificate from Theodore L.
11 Watkins, M.D.
12   Q   Take a look at it and tell me if you've seen
13 it before, please.
14   A   I can't say without a doubt that I have seen
15 it.
16   Q   Have you seen documents similar to this that
17 are somehow captioned or titled "Disability
18 Certificate"?
19   A   Yes.
20   Q   Is this a typical form for that type of
21 communication?
22   A   They vary from physician to physician.

Page 117

1    Q   And with respect to this particular
2  certificate and the information conveyed in it, would
3  it be sufficient to establish for the agency and for
4  the agency's human resources policy that a person was
5  disabled as reflected in the document?
6        MR. BRUCKHEIM: Objection. It calls for a
7  legal conclusion.
8        But she can answer insofar as whether or not
9  this particular type of notice is sufficient for the
10 agency to recognize the problems effective therein,
11 but I'm not going to have her testify as to whether
12 or not someone is disabled.
13       THE WITNESS: I wouldn't know whether
14 someone is disabled or not.
15 BY MR. CONDIT:
16   Q   I understand, but I'm asking more the
17 question that Counsel sort of clarified in his
18 objection, which is, is a certification document like
19 this sufficient from the agency-policy standpoint to
20 establish disability for the purposes of the agency's
21 personnel policies?
22   A   This form would be sufficient information to

30 (Pages 114 to 117)

DEPOSITION OF DEBORAH WILSON
CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 118

1  provide certification for Family Medical Leave.
2      MR. CONDIT: Okay. Let me show you what
3  I'll mark as the next deposition exhibit, please.
4      (Whereupon, Plaintiff's Exhibit 7 was marked
5  for identification and attached to the transcript.)
6      MR. CONDIT: Ms. Wilson, you've been handed
7  what has been marked deposition Exhibit 7. It is
8  entitled "Child and Family Services Agency,
9  Application for Family/Medical Leave." It's two
10 pages.
11     Q   I'd like you to take a look at it and tell
12 me if you've seen it before.
13     A   I've seen the form. I can't say for sure
14 I've seen this actual document, but . . .
15     Q   But you have seen this form before.
16     A   This type of form, yes.
17     Q   Now, let me ask you with respect to the
18 second page --
19     A   Yes.
20     Q   -- of the exhibit, down in the bottom
21 there's a box that says, "To be completed by the
22 office of human resources."  Do you see that?

Page 119

1      A   Yes, I do.
2      Q   Do you know whose signature is in there?
3      A   Yes.
4      Q   Who's that?
5      A   Jeriesha Ferguson.
6      Q   And who is Jeriesha Ferguson?
7      A   At that time she was the benefits assistant.
8  I believe that's her title.
9      Q   And would Ms. Ferguson's signature in the
10 box on page 2 of Exhibit 7 indicate that the leave
11 was approved?
12     A   According to this form, yes.
13     Q   You testified a little earlier today that
14 you had seen I guess on television, media stories
15 concerning Shirley Tabb and the issue of children
16 sleeping in the CFSA office building.
17     Do you recall that testimony?
18     A   Yes, I do.
19     Q   Do you recall seeing any print stories of
20 that issue?
21     A   What do you mean by print?
22     Q   Something in print as opposed to being in

Page 120

1  video.
2      MR. BRUCKHEIM: Like a newspaper?
3  BY MR. CONDIT:
4      Q   Like a newspaper or even on the Web, for
5  example.
6      A   No.
7      MR. CONDIT: Let's mark the next exhibit,
8  please.
9      (Whereupon, Plaintiff's Exhibit 8 was marked
10 for identification and attached to the transcript.)
11     MR. CONDIT: Ms. Wilson, you've been handed
12 what's been marked as Exhibit 8. It's a one-page
13 e-mail chain with a message from Stan Spaght on the
14 top to you dated September 23, 2005.
15     Q   I'd like you to take a look at it please and
16 tell me if you've seen this e-mail chain before.
17     A   Yes.
18     Q   You've seen this before?
19     A   Yes.
20     Q   Now, with respect to the lower part of the
21 exhibit, the last half of the exhibit, bottom half of
22 the exhibit I should say, there's a message from you

Page 121

1  to Sam Spaght dated September 22, 2005 at 406 p.m.
2      Do you see that?
3      A   Yes.
4      Q   And the message says:
5      "Please send Janet a confirmation that
6      Shirley Tabb's internet service temporarily
7      disconnected."
8      Do you see that message?
9      A   Yes, I do.
10     Q   Is that a message you sent to Mr. Spaght at
11 that time?
12     A   Yes.
13     Q   Now, what were you communicating with
14 respect to Shirley Tabb's Internet service.  What
15 does that mean I guess is what I'm asking.
16     A   Well, there's a process when -- there's a
17 process that has to go through our I.T. Department to
18 disconnect any Web services, Internet services.
19     Q   And what Web services or Internet services
20 are you referring to?
21     A   That would be all of the e-mails, all of the
22 Web services through it, which will be Outlook; I'm

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

64c52d74-f5a3-4f2c-a0c0-46fed19b09da

DEPOSITION OF DEBORAH WILSON
CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 122

1  not sure what all that's involved.
2      Q   So let me make sure that I understand.
3  Correct my characterization if it is incorrect in any
4  way.
5          What I hear you telling me is that around
6  this time period, September 22nd, 2005, the agency
7  was taking steps to disconnect Ms. Tabb from her CFSA
8  e-mail or any CFSA Internet service connections; is
9  that right?
10     A   Yes.
11     Q   Why was that step being taken on
12  September 22nd, 2005?
13     A   I'm trying to recall.  It seems as if there
14  was an e-mail that was sent from Ms. Tabb to all
15  staff while Ms. Tabb was out on Family Medical Leave.
16  And chief of staff wanted -- requested that the
17  services would be temporarily disconnected.
18     Q   What was the nature of the message that
19  Ms. Tabb sent?
20     A   I don't recall the detail, but it was
21  something to the point of going back to the media, to
22  the news media situation.  But I don't recall that.

Page 123

1  I don't recall the details of it.
2      Q   Who was the chief of staff at this time?
3      A   Janet Maher.
4      Q   Who did Ms. Maher report to directly?
5      A   The director, Brenda Donald Walker.
6      Q   Did you have any conversations with
7  Ms. Maher or communications other than what we see in
8  this exhibit regarding cutting off Shirley Tabb's
9  e-mail or Internet service?
10     A   I don't recall if that came directly from
11  her via e-mail or via a phone call, or if it came
12  from her through Mr. Charles.
13     Q   Did you have any meetings or communications
14  with anyone else other than those we see in this
15  exhibit on this subject of disconnecting Ms. Tabb's
16  e-mail or Internet service?
17     A   No.
18     Q   So you would have only spoken or
19  communicated with Mr. Spaght on this issue?
20     A   Correct.  Unless otherwise directed to
21  directly contact I.T.  But I don't remember how that
22  played out.  According to this e-mail, Mr. Charles

Page 124

1  was handling it.
2      Q   What communication from Ms. Maher or anyone
3  else prompted you to send the message to Mr. Spaght
4  that we see reflected in this exhibit?
5      A   As I stated, I don't recall if the message
6  came by phone call from Janet Maher or by phone call
7  or e-mail from Mr. Charles on behalf of Ms. Maher.  I
8  don't recall how that all occurred.
9      Q   During your time as a human resources
10  professional at CFSA, have you seen any other
11  situation where management had requested the
12  temporary disconnection of an employee from the
13  e-mail or Internet service?
14     A   Yes.
15     Q   What other occasions have you seen that?
16     A   Generally if someone is in a -- generally if
17  someone -- could be if someone is in a leave status,
18  they don't have need for access to the agency's Web
19  page.  If someone is in a disciplinary capacity.
20     Q   Are those the only two circumstances that
21  you're aware of?
22     A   Right, when you're looking at leaves, type

Page 125

1  of leaves, or disciplinary actions.
2      Q   So under what circumstance when someone is
3  on leave would the agency typically temporarily
4  disconnect their e-mail or Internet service?
5      A   That would be a decision determined by
6  senior staff, not by me, so I don't know what the
7  situation would be.
8      Q   Well, what circumstances have you seen in
9  your experience?
10     A   If someone has been on long-term leave.
11     Q   Do you know of any instance of a person on
12  long-term leave who had their e-mail and Internet
13  service at the agency cut off?
14     A   I couldn't name anyone right now, no.
15     Q   Are there any other documents that you're
16  aware of that are associated with this issue of
17  Ms. Tabb's disconnection from CFSA e-mail and
18  Internet service?
19     A   Not that I'm familiar with right now, no.
20     Q   But just so that I'm clear on your
21  testimony, it is your understanding that this action
22  of temporarily disconnecting Ms. Tabb's e-mail and

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

DEPOSITION OF DEBORAH WILSON
CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 126

1  Internet service had to do with Ms. Tabb's
2  interaction with the media?  Is that what you were
3  testifying to?
4      A   An interaction with all staff, sending all
5  staff -- all staff notice or something.  Again, I
6  don't recall the particular of the title or anything
7  like that.
8      Q   Is there an e-mail policy within the agency?
9      A   I'm not sure.  I.T. would be the people that
10  could address that.  I don't know.
11      Q   Well, I mean, from a human resources
12  standpoint, is there, for example, some kind of dos
13  and don'ts of utilizing agency e-mail?
14      A   I don't know.  We would refer to I.T.
15      Q   Now, other than the e-mail communications
16  that we see in this exhibit, did you have any
17  conversations or other communications with Mr. Spaght
18  on the issue of Ms. Tabb's Internet and e-mail
19  connections?
20      A   Not that I recall.
21      Q   Did you have any conversations or
22  communications with Mr. Ronnie Charles concerning the

Page 127

1  issue of Ms. Tabb's Internet or e-mail connections?
2      A   Not that I recall.
3      Q   Is there a written policy within the agency
4  indicating under what circumstance, when a person is
5  on leave, that they would be restricted or
6  temporarily cut off from their e-mail or Internet
7  service?
8          MR. BRUCKHEIM:  Objection as to form and
9  foundation.
10          You can answer.
11          THE WITNESS:  I'm not aware.
12  BY MR. CONDIT:
13      Q   Do you know who within the agency would be
14  the expert on application of the -- of a policy
15  having to do with cutting off or temporarily cutting
16  off e-mail or Internet service?
17      A   No.
18          MR. CONDIT:  Let me show you what's been
19  marked as the next exhibit.
20          (Whereupon, Plaintiff's Exhibit 9 was marked
21  for identification and attached to the transcript.)
22          MR. CONDIT:  Ms. Wilson, you've been handed

Page 128

1  what has been marked as Exhibit 9.  It's a one-page
2  e-mail from Mindy Good.  It's dated 9-20 or 9-21,
3  2005.
4      Q   Take a look at it, please, and tell me if
5  you've seen this document before.
6      A   No, I don't recall seeing this.
7      Q   Okay.  Do you recall the issue of management
8  within CFSA communicating to the city council about
9  the "children sleeping in the building" issue?
10      A   No more than what related back to that
11  earlier document, the August 17th, '05 document.  But
12  no.
13      Q   Okay.
14          (Recess taken.)
15          MR. CONDIT:  Let's go back on the record.
16          If we could mark the next exhibit, please.
17          (Whereupon, Plaintiff's Exhibit 10 was
18  marked for identification and attached to the
19  transcript.)
20          MR. CONDIT:  Ms. Wilson, you've have been
21  handed what has been marked as Exhibit 10.  This is
22  an e-mail chain between you and Mindy Good on

Page 129

1  September 29, September 30, 2005.
2      Q   Please take a look at it and tell me if
3  you've seen it before, including the note that seems
4  to be copied on the bottom of the document.
5      A   Yes.
6      Q   Now, I wonder in terms of this date, the
7  date of the first message on the lower part of the
8  document, September 29, 2005, why were you involved
9  in this issue of voicemail that was heard on
10  Channel 9?  Do you see the reference to that
11  information in the text of the message?
12      A   Yes.  This came as a result of -- this came
13  as a result of the -- there was a voice on a tape on
14  the -- it says "Channel 9."  And I believe it was
15  Mindy wanted to know if we could identify -- if
16  anyone in the agency could identify the person that
17  was on this tape.  And based upon Mindy's comment
18  about that, she informed us that Heather may be aware
19  of it.
20          So I did a follow up e-mail to Heather and a
21  copy to Mindy.  And that's where the response from
22  Heather -- from Mindy was that this person, Joann

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

DEPOSITION OF DEBORAH WILSON
CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 130

1  Vaughn, was the identified person on the voicemail --
2  on the voicemail of the -- on the tape.
3     Q   In terms of the handwritten message at the
4  bottom of the document, do you know whose handwriting
5  that is?
6     A   That's my handwriting.
7     Q   Thank you.
8        I know this is a little hard to read, but
9  can you read that message?
10    A   It's "Joann Vaughn" and "7-2901" and it's
11  "Room 1099."
12    Q   What does the 7-2901 refer to?
13    A   It's a telephone number.
14    Q   So that would be Ms. Vaughn's telephone
15  number within the agency?
16    A   Correct.
17    Q   And then Room 1099, what does that refer to?
18    A   That's where she physically is or was at
19  that time, physically located.
20    Q   And where in the building was Room 1099 at
21  that time?
22    A   That's building -- that room is located at

Page 131

1  400 6th Street.
2     Q   Do you know where in that building that room
3  is located?
4     A   It's on the first floor, but I don't know
5  where.
6     Q   Aside from this e-mail, which we see is
7  Exhibit 10, what other involvement, if any, did you
8  have in investigating or attempting to gather
9  information about anything to do with the news
10  reports that Shirley Tabb was involved in?
11    A   I spoke with Joann Vaughn.
12    Q   And when did you speak to Joann Vaughn?
13    A   I don't recall when I actually spoke with
14  her.
15    Q   Would it have been around this time, around
16  the end of September 2005 or later?
17    A   It wouldn't have been that time.  It would
18  have been -- I'm not sure.  I'm sure it wasn't on
19  that date, on September the 30th though.
20    Q   And why are you sure it wasn't on
21  September 30th?
22    A   Because at that point I was trying to find

Page 132

1  information where Ms. Vaughn was located and
2  telephone numbers.
3     Q   All right.  So about how long after this
4  September 30, 2005 e-mail do you think it was before
5  you spoke to Ms. Vaughn?
6     A   Within a matter of a week or two.
7     Q   And why did you seek to speak to Ms. Vaughn?
8     A   To confirm or deny whether or not she was
9  the person that was on a tape.
10    Q   Were you asked by anyone to pursue that line
11  of inquiry?
12    A   Yes.
13    Q   Who asked to you do that?
14    A   Mr. Charles.
15    Q   Did he explain why he wanted you to make
16  inquiry with Ms. Vaughn?
17    A   As associated with the Channel 9 tape, voice
18  on that tape.
19    Q   Did you hear the tape as it was played
20  through the Channel 9 program?
21    A   I did hear it after it was replayed over and
22  over again, so I did hear it.

Page 133

1     Q   Do you know or recall in any way what the
2  nature of the message was on the tape?
3     A   No, I don't recall.
4     Q   So sometime within a week or two after
5  September 30, 2005 you spoke to Ms. Vaughn, correct?
6     A   Correct.
7     Q   Where did you speak to her?
8     A   In human resources.
9     Q   In your office?
10    A   I'm trying to think.  Yes.
11    Q   And what did you ask her during this meeting
12  or encounter?
13    A   I don't recall what I asked her except in
14  general questions.  I don't know specifically what I
15  asked her, to be very detailed.  But just asking -- I
16  can't even speculate, so no need my trying to even
17  say what I asked her.  I don't know.
18    Q   Do you recall the reason why you had her
19  come in your office?
20    A   The reason, as I stated earlier, was really
21  to verify or deny whether she was the person on that
22  tape.

34 (Pages 130 to 133)

64c52d74-f5a3-4f2c-a0c0-46fed19b09da

DEPOSITION OF DEBORAH WILSON
CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 134

1    Q   Did you play the tape for her at the time
2  you met?
3    A   No, I don't -- no.
4    Q   What did Ms. Vaughn tell you during your
5  meeting?
6    A   Ms. Vaughn informed me that colleagues had
7  come to her, had recognized her voice on the tape,
8  and that she recalls receiving a phone call from
9  Ms. Tabb questioning something to do with blankets.
10       And she didn't realize that she was being
11 recorded, but it had nothing to do with -- it had to
12 do with having a supply of blankets when they went
13 out.  Apparently she works in the evening or
14 something.
15       So she needed to know, in case they needed
16 to have blankets when they go in the field, where a
17 supply of blankets was available, and that she had
18 spoken with Ms. Tabb about that.  Ms. Tabb was a
19 resource for those blankets.  And that's pretty much
20 what we discussed.
21   Q   What position did Ms. Vaughn occupy at the
22 time you met with her in 2005?

Page 135

1    A   Supervisory social worker.
2    Q   And did you say that Ms. Vaughn worked on
3  the night shift?
4    A   Yes, she's in the Child Protective Service
5  unit.  And I'm not sure what her actual schedule, but
6  it was after normal working hours, after the 8:15 to
7  4:45.
8    Q   Did you memorialize the conversation or
9  information you received in the conversation that you
10 were just describing with Ms. Vaughn?
11   A   I may have taken some handwritten notes on
12 that.
13   Q   And where would those notes be at this point
14 in time?
15   A   I would have to check back in my office to
16 see if I have them.  I'm just -- there may be
17 something in there.
18   Q   Had you been asked previously and during the
19 proceeding in this case to either search for or
20 provide documents that might be relevant to
21 Ms. Tabb's circumstances at CFSA.  Has anyone asked
22 you to produce any documents?

Page 136

1    A   No more than what I spoke of earlier, the
2  reprimand, the DPM, that type of information.
3    Q   And when were you asked to produce those
4  documents?
5    A   Sometime in September, October time frame.
6    Q   Of 2005?
7    A   Yes.
8    Q   So since that time you haven't been asked to
9  produce any documents associated with Ms. Tabb's
10 circumstances at CFSA?
11   A   No.
12   Q   Would you please check whatever files you
13 have access to and provide whatever you have that's
14 relevant to Ms. Tabb's circumstances to Mr. Bruckheim
15 at your earliest opportunity?
16   A   Okay.
17   Q   So you may have taken notes of this meeting.
18       Did you transmit what you learned in this
19 meeting to anyone within CFSA?
20   A   I may have had a conversation with
21 Mr. Charles.  But here again, I don't know for sure
22 if I memorialized that.  I'm sure I didn't -- I'm not

Page 137

1  sure about the conversation between Ms. Vaughn and I,
2  and I would have elevated that information, spoken
3  with Mr. Charles as to what those findings were.
4    Q   How long after you had the meeting with
5  Ms. Vaughn was it before you spoke with Mr. Charles?
6    A   It would have been shortly thereafter, but
7  specifically, if it was within 24 hours or the next
8  day, I don't know.
9    Q   And do you recall whether you met with him
10 personally or communicated by e-mail on this topic?
11   A   It would have been a phone call or stopping
12 by to see him or something like that.
13   Q   And when you communicated with Mr. Charles
14 about the information you had received from
15 Ms. Vaughn, what reaction did he have?
16   A   I don't recall his reaction.  It was just
17 passing information on.
18   Q   Did he say anything to you?
19   A   I don't recall him saying anything.
20   Q   Was anyone else present when you shared the
21 information about Ms. Vaughn's conversation with you
22 when you spoke to Mr. Charles?

35 (Pages 134 to 137)

64c52d74-f5a3-4f2c-a0c0-46fed19b09da

DEPOSITION OF DEBORAH WILSON
CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 138

1    A   I don't recall anyone.  Here again, I don't
2  remember if it was on the phone or if I saw him.
3    Q   Now, you said in your testimony that
4  Ms. Vaughn indicated to you that she, Ms. Vaughn,
5  didn't realize she was being recorded.
6        Do you recall giving that testimony?
7    A   Yes.
8    Q   What else did she say, if anything, about
9  that topic of being recorded?
10   A   That she didn't authorize anyone to record
11  her conversation or message.  I'm not sure what her
12  exact words were.
13   Q   Anything else?
14   A   No.
15   Q   Did she recall -- well, strike that.
16       Did you ask her whether or not she'd ever
17  left a voicemail message for Ms. Tabb regarding the
18  subject of blankets?
19   A   I'm trying to think.  She may have said that
20  there was a message -- she was responding to a phone
21  call and message.  I don't know for sure.  Seems as
22  if that was something that was mentioned.

Page 139

1    Q   Did you draw a conclusion based on your
2  conversations with Ms. Vaughn and any other
3  information you may have heard or reviewed as to
4  whether or not Ms. Vaughn had left a message for
5  Ms. Tabb or had been recorded in some other way by
6  Ms. Tabb?
7    A   Would you repeat that, please?
8    Q   Did you make a determination of any kind as
9  to how Ms. Vaughn's message or voice ended up being
10  recorded, whether it was by voicemail or some other
11  means?
12   A   No, I don't recall that.
13   Q   Did anyone else within the agency make that
14  determination to your knowledge?
15   A   Not that I'm aware of.  I don't know.
16   Q   Now, you said in your testimony that during
17  your conversation with Ms. Vaughn she indicated to
18  you that she was talking to Ms. Tabb because she
19  needed blankets when they went out in the field; is
20  that right?
21   A   That's my understanding, yes, of her needs.
22   Q   Did Ms. Vaughn indicate to you that they

Page 140

1  also needed blankets in circumstances where children
2  had to stay at the agency for a while?
3    A   No.
4    Q   She never said anything like that?
5    A   I don't recall her saying anything like
6  that.
7    Q   Is it possible she said anything like that?
8        MR. BRUCKHEIM:  Objection.
9        You can answer.
10       THE WITNESS:  I don't recall her saying
11  anything.
12       MR. CONDIT:  I'm not trying to be
13  argumentative, but I just need to get it clear for
14  the record.
15   Q   When you say you don't recall her saying
16  anything like that, is it possible she did?
17   A   I would say no.
18   Q   That's what I need to know.  Thank you.
19       Was Ms. Vaughn surprised or troubled in any
20  way about having her message become the subject of a
21  media story?
22       MR. BRUCKHEIM:  Objection.  That calls for

Page 141

1  speculation, and I'm going to tell her not to answer
2  it as phrased.  If you restate it where it's not
3  speculative, I'll have her answer.
4        MR. CONDIT:  She can answer what she knows,
5  and you can't instruct her not to answer a question
6  that doesn't involve privilege.
7        MR. BRUCKHEIM:  Well, I can instruct her not
8  to answer a question where she's blatantly required
9  to speculate.  You're asking her how somebody felt.
10  She can't possibly know how somebody felt unless that
11  person gave an indication of how they felt.  So if
12  the question is restated as to that, then I'll have
13  her answer
14  BY MR. CONDIT:
15   Q   Did Ms. Vaughn indicate to you in any way
16  her feelings about her voice being used in some media
17  story?
18   A   Yes.
19   Q   What did she indicate to you about that
20  topic?
21   A   She was upset.
22   Q   In some way?

36 (Pages 138 to 141)

64c52d74-f5a3-4f2c-a0c0-46fed19b09da

DEPOSITION OF DEBORAH WILSON
CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 142

1    A    That's all she said.  She was upset.
2    Q    So that was her total expression of concern
3 to you was simply, "I'm upset"?
4    A    Correct.  She said, "I'm upset."
5    Q    Did she say why she was upset?
6    A    Here again, I don't recall all the
7 particulars, so I would be speculating.
8    Q    Did you, in your conversation subsequent to
9 your meeting with Ms. Vaughn with Mr. Charles, did
10 you relay the fact that Ms. Vaughn was upset?
11    A    I don't recall.  I just reiterated the
12 facts.
13    Q    You indicated in your testimony about the
14 conversation you were having with Ms. Vaughn, that
15 Ms. Vaughn indicated something to the effect of
16 Ms. Tabb was a resource for blankets; is that right?
17    A    Yes.
18    Q    What did she say beyond that about Ms. Tabb
19 and the blankets?
20    A    I don't recall any more than what I stated
21 earlier about Ms. Tabb was a resource for blankets.
22    Q    Did she indicate in any way how Ms. Tabb got

Page 143

1 involved with Ms. Vaughn or any of her social workers
2 on the issue of blankets?
3    A    She referenced a contact, referenced Heather
4 Stowe.
5    Q    And who is Heather Stowe?
6    A    Heather Stowe was the CPS administrator.
7    Q    And CPS is --
8    A    Child Protective Services.
9    Q    Okay.  And what did she reference about
10 Heather Stowe?
11    A    Her reference was -- her reference was that
12 there was information that Shirley had sent, I'm
13 assuming to the CPS operational people, that she had
14 resources for blankets.
15    Q    When you say "CPS informational people,"
16 what do you mean?
17    A    The social workers, supervisors, the staff.
18    Q    Did you at any time come to see any
19 communications from Shirley Tabb to any of the staff
20 in the Child Protective Services Unit?
21    A    No.
22    Q    Do you know if anyone did?

Page 144

1    A    I don't know.
2    Q    How did you learn that Ms. Tabb sent
3 information to Child Protective Services staff?
4    A    Based upon this last exhibit, this
5 Exhibit 10.
6    Q    Point out please for me in the exhibit where
7 you learned that information.
8    A    Was it Exhibit 10?  Where it was speaking if
9 the social workers asked about blankets.  And that
10 conversation with Mindy was where I was informed,
11 according to this e-mail, that there was some e-mail
12 that Heather was attempting to retrieve that had been
13 sent to CPS by Shirley.  But I would not have
14 received that type of information, because I'm not in
15 that area, operations.
16    Q    Do you know whether or not Heather Stowe
17 ever retrieved any communications that Ms. Tabb
18 allegedly sent to the CPS Unit?
19    A    I don't know if she did.
20    Q    Now, to your knowledge, why would CPS Unit
21 social workers or supervisors need blankets in the
22 field?

Page 145

1    A    I wouldn't know.
2    Q    Did Ms. Vaughn indicate whether or not she
3 had ever received any blankets from Ms. Tabb?
4    A    I don't recall.
5    Q    Do you know from any other source whether or
6 not Ms. Tabb ever provided blankets to the CPS Unit?
7    A    I'm not aware.
8        MR. CONDIT:  Let me show you what I'll mark
9 as the next exhibit.
10        (Whereupon, Plaintiff's Exhibit 11 was
11 marked for identification and attached to the
12 transcript.)
13        MR. CONDIT:  Ms. Wilson, you've been handed
14 what has been marked Exhibit 11.  It is a
15 Notification of Personnel Action, Standard Form 50.
16 It is signed by someone down at the bottom, and it
17 appears to be dated 1-8-2005, or maybe 11-8-2005.
18 I'm not sure how to read that.
19    Q    Take a look at it and tell me if you
20 recognize this document.
21    A    I recognize the form, yes.
22    Q    Have you seen this particular document

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

64c52d74-f5a3-4f2c-a0c0-46fed19b09da

DEPOSITION OF DEBORAH WILSON
CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 146

1  before, in other words, with this information on it?
2      A   It would be in the OPF, so I would know that
3  it would be there, but I can't say that I've
4  specifically seen this, no.
5      Q   Interpret this document for us, please.
6  What does this document convey?
7          MR. BRUCKHEIM:  I'll just object since the
8  document speaks for itself.  But, I mean, if you have
9  any specific questions about parts that you want to
10  ask her about, then . . .
11  BY MR. CONDIT:
12     Q   To your knowledge, in looking at the
13  document, what is this document intended to do?
14     A   Looks as though this is a Standard Form 50,
15  that there's an action of removal with an effective
16  date of, and signature.
17     Q   Do you know whose signature that is at the
18  bottom of the document?
19     A   Yes.
20     Q   Who's that?
21     A   Stan Spaght.
22     Q   And do you know what Mr. Spaght has written

Page 147

1  to the right of his signature at the bottom of the
2  document?
3      A   Yes.
4      Q   What is that?
5      A   "Acting HR Administrator CFSA."
6      Q   And do you know what date he has placed on
7  this document?  Can you read that?
8      A   It appears to be 11.8.2005.
9      Q   Okay.  Now, drawing your attention to the
10  top of the document, it looks like Box 5-A says
11  "Code."  Do you see that?
12     A   Yes.
13     Q   Do you know what Code 330 means?
14     A   No, I don't.
15     Q   Is there some key or document that explains
16  what such codes would mean?
17     A   I don't know.
18     Q   Just below that is Box looks like 5-C.
19         Do you see that code there?
20     A   Yes.
21     Q   065?
22     A   Yes.

Page 148

1      Q   Do you know what that means?
2      A   No, I don't.
3      Q   Do you know why Mr. Spaght would have been
4  signing this document at this time, November 2005?
5      A   He was the acting HR administrator who would
6  have signed off on this type of action.
7          MR. CONDIT:  Let me show you what I'll have
8  marked as the next exhibit.
9          (Whereupon, Plaintiff's Exhibit 12 was
10  marked for identification and attached to the
11  transcript.)
12         MR. CONDIT:  Ms. Wilson, you've been shown
13  what has been marked as Deposition Exhibit 12.  It is
14  a two-page letter dated October 3, 2005 from Brenda
15  Donald Walker to Shirley Tabb and copied to several
16  individuals.
17     Q   Can you tell me, please, if you've seen this
18  document before?
19     A   Yes.
20     Q   When did you first see this document?
21     A   October 3rd, 2005.
22     Q   Were you involved at all in the preparation

Page 149

1  of this document?
2      A   I was involved in providing the basic
3  template.
4      Q   Okay.  So in terms of the language that we
5  see in this document, what of the language would have
6  come from you?
7      A   The first paragraph is the template.
8      Q   And that's the first paragraph on the first
9  page?
10     A   Only the first page.  And then the -- all
11  the paragraphs except for the -- on the second page,
12  everything except for the first two paragraphs would
13  be part of the template.
14     Q   Okay.  And why were you involved in
15  providing the template for this exhibit?
16     A   Because human resources has the standardized
17  templates for -- based upon the DPM or the contract
18  that we provide to management.
19     Q   Do you know whether or not, in terms of the
20  parts of this document that are not the template, do
21  you know whether or not Brenda Donald Walker drafted
22  those sections?

38 (Pages 146 to 149)

64c52d74-f5a3-4f2c-a0c0-46fed19b09da

DEPOSITION OF DEBORAH WILSON
CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 150

1    A    I don't know.
2    Q    Do you know who drafted those sections?
3    A    I don't know who all drafted those sections,
4    no.
5    Q    Were you asked in any way to articulate what
6    would be the appropriate reasons for taking the
7    action that we see reflected in this exhibit?
8    A    By virtue of providing the DPM information.
9    Q    But aside from the DPM information, the
10   facts that are relied upon to take the action, were
11   you involved in the development of those facts?
12   A    No.
13   Q    Do you know if anyone verified or checked
14   the facts that were used in this letter?
15   A    Senior staff.
16   Q    And how do you know that?
17   A    Because it was elevated to senior staff, and
18   Brenda Donald Walker as the director would have had
19   to have someone on her staff to validate that.
20   Q    But do you know for a fact that the facts
21   were validated by anyone?
22   A    No, I would have to refer to senior staff.

Page 151

1    Q    And at the time of this letter, October 3rd,
2    2005, who would be the senior staff that you're
3    referring to?
4    A    Mr. Charles, Mindy Good, Brenda Donald
5    Walker.
6    Q    Drawing your attention in Exhibit 12 to the
7    first page, and specifically to the second, third and
8    fourth paragraphs, do you see those?
9    A    Yes. On the first page you're saying.
10   Q    Yes.
11       Do you have any personal knowledge about the
12   information reflected in those paragraphs?
13       MR. BRUCKHEIM: Objection as to form.
14       You can answer.
15       THE WITNESS: I have knowledge based upon
16   the information that's been provided earlier, yes.
17   BY MR. CONDIT:
18   Q    What information are you referring to?
19   A    The exhibits where it talked about the
20   admonition, we talked about the reprimand. So I'm
21   aware of that.
22   Q    Okay. More specifically though, are you

Page 152

1    aware of any of the specific factual bases for the
2    action being taken that is reflected -- or excuse me,
3    that is reflected in paragraphs 2, 3 and 4 on the
4    first page of the exhibit?
5    A    Would you repeat that, please? I'm sorry.
6    Q    Sure. Referring your attention to page 1 of
7    the exhibit in paragraphs 2, 3 and 4, what I'd like
8    to know is do you have any firsthand personal
9    knowledge of the facts being reflected there?
10       And by firsthand personal knowledge I mean
11   are you aware of these events personally that are
12   being reflected in these paragraphs?
13       MR. BRUCKHEIM: Objection as to form. This
14   has been asked and answered.
15       But you can answer.
16       THE WITNESS: As it relates to the previous
17   information, I'm referring to the reprimand,
18   admonition and the other information that was sent to
19   the Mayor's Office. That's my knowledge.
20   BY MR. CONDIT:
21   Q    Okay. What role did you have in any
22   admonition that concerned Ms. Tabb?

Page 153

1        MR. BRUCKHEIM: Objection; asked and
2    answered.
3        You can answer again.
4        MR. CONDIT: She's discussed reprimand, not
5    the admonition.
6        THE WITNESS: The admonition?
7        MR. CONDIT: Yes.
8        THE WITNESS: I see in here it speaks of
9    August '05, but I just don't recall all of the
10   particulars of that.
11   BY MR. CONDIT:
12   Q    Do you recall whether you were involved as
13   the human resources person in anything to do with the
14   processing of an admonition involving Ms. Tabb?
15   A    I don't recall that in August '05.
16   Q    Other than your earlier response that senior
17   staff would have been involved in preparing the
18   factual basis for the removal action that we see
19   reflected in Exhibit 12, do you know who within
20   senior staff would have been engaged in that action?
21   A    No.
22       MR. CONDIT: I'll show you what we'll mark

39 (Pages 150 to 153)

# DEPOSITION OF DEBORAH WILSON
## CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 154

1  as the next exhibit, please.
2      (Whereupon, Plaintiff's Exhibit 13 was
3  marked for identification and attached to the
4  transcript.)
5      MR. CONDIT: Ms. Wilson, you've just been
6  shown what's been marked as Exhibit 13.
7      Q   Take a look at it, please, and tell me if
8  you've seen it before.
9      A   I can't say that I recall it, but it was
10  sent to me.  I have seen it then.
11     Q   Do you recall the issue of the extended sick
12  leave and what your involvement may have been in that
13  issue during this time period, which is early October
14  2005?
15     A   My involvement was distant from that.
16  During that time it was transitioned -- as far as
17  leave, was transitioned over to another entity within
18  human resources.
19     Q   So is it your understanding that the request
20  reflected by Ms. Tabb, which is the second message,
21  the lower message in this exhibit, dated October 2nd,
22  2005, that that request would have been referred to

Page 155

1  another part of human resources?
2      A   Correct.
3      Q   And what part of human resources would that
4  go to?
5      A   That was benefits.
6      Q   And do you know if, in fact, this issue as
7  reflected in this exhibit was referred to the
8  benefits section of HR?
9      A   Yes.
10     Q   And how do you know that?
11     A   Ms. Ferguson was the benefits assistant.
12     Q   And do you know anything about how the issue
13  was dealt with within that section?
14     A   No, I don't.
15     MR. CONDIT:  Let me show you the next
16  exhibit.
17     (Whereupon, Plaintiff's Exhibit 14 was
18  marked for identification and attached to the
19  transcript.)
20     MR. CONDIT:  Ms. Wilson, you've been handed
21  what has been marked as Exhibit 14.  It's an e-mail
22  chain, two pages, involving yourself and others.

Page 156

1      Q   If you'd take a look at it, please, and tell
2  me if you've seen it before.
3      A   I don't recall it, but it was addressed to
4  me, so . . .
5      Q   Do you think you received this e-mail
6  message?
7      A   Yes, yes.
8      Q   Do you recall the subjects being discussed
9  here during the October 6 time frame, which is the
10  investigation of the use of -- strike that.
11     Do you recall the information that's
12  reflected in this exhibit around the October 6 time
13  period about the investigation of Ms. Vaughn's voice
14  being recorded and the use of blankets in the
15  CPS Unit?
16     A   Well, it looks as if this document starts
17  off with an e-mail from Ms. Tabb to all staff, about
18  social workers' code of ethics; and then it proceeds
19  to response from the director at that time; and then
20  continues with information as it relates to blankets
21  and refers to an e-mail that Ms. Tabb sent to all CPS
22  staff and how the agency would be able to retrieve

Page 157

1  that information.
2      Q   Do you know why you were being copied with
3  this message?
4      A   No, I don't.
5      Q   Drawing your attention on the exhibit, first
6  page, to the second e-mail message from the top, it
7  starts with, "Ronnie: We know that the voice on the
8  tape was Joann Vaughn."  Do you see that?
9      A   Yes, I do.
10     Q   Then on the next line -- starting from the
11  first line but going over to the next line, it says:
12     "In our investigation did we find out
13     whether she knew that Shirley was taping
14     her and whether she did in fact have six
15     kids in her office that night."
16     Do you see that?
17     A   Yes, I do.
18     Q   Do you recall in your discussions with
19  Ms. Vaughn discussing whether or not she had six kids
20  in her office that night?
21     A   No, I don't.
22     Q   Were you asked to determine whether or not

40 (Pages 154 to 157)

# DEPOSITION OF DEBORAH WILSON
## CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 158

1  Ms. Vaughn had children in her office on the night in
2  question?
3      A   No.
4      Q   Now, drawing your attention to the second
5  page of the exhibit and the "All Staff" e-mail from
6  Ms. Tabb --
7      A   Yes.
8      Q   -- which refers to the -- as the subject,
9  the "Social Workers' Code of Ethics."
10         Do you see that?
11     A   Yes, I do.
12     Q   Do you know whether or not you received that
13 e-mail message?
14     A   I would have received it as an all staff.
15     Q   Do you recall whether or not you actually
16 received it?
17     A   Yes.
18     Q   And what did it communicate other than
19 "Subject: Social Workers' Code of Ethics"?
20     A   That's all that I recall.  Just looking at
21 this, I don't recall what that e-mail entailed.
22     Q   Did it have an attachment?

Page 159

1      A   I don't know.  I don't know.
2      Q   And do you think you might still have a copy
3  of that e-mail?
4      A   I doubt it, but -- I don't think so.  But
5  I'll be happy to look and see, but I don't think so.
6      Q   It would be a good idea to look and see.
7  Okay.
8      A   When I say "I doubt it," because we get lots
9  of all-staff e-mails and don't keep them.
10     Q   Do you recall any media stories following
11 Ms. Tabb's termination that discussed the fact that
12 she had been terminated?
13     A   No, I don't.
14         MR. CONDIT:  Let me show you the next
15 exhibit, please.
16         (Whereupon, Plaintiff's Exhibit 15 was
17 marked for identification and attached to the
18 transcript.)
19         MR. CONDIT:  Ms. Wilson, you've been handed
20 what has been marked as Exhibit 15.  It's a one-page
21 e-mail message from Brenda Donald to all CFSA staff
22 and copied to some other folks dated October 7, 2005,

Page 160

1  10:05 a.m.
2      Q   Have you seen this document before?
3      A   I would say yes.
4      Q   Do you recall it?
5      A   I don't recall it, but it's an "all staff,"
6  so . . .
7      Q   Do you think you might still have a copy of
8  this e-mail message?
9      A   No.
10     Q   Do you recall reviewing or looking at the
11 attachments which are labeled on this exhibit as
12 "Fenty response re replacement issues 10-6-5.doc" and
13 "10-5-05 CFSA Placement Strategies Councilmember
14 Fenty Attachment (2).doc"?  Do you see those?
15     A   I see that.
16     Q   Do you recall seeing those attachments?
17     A   No, I don't.
18     Q   Let me draw your attention, please, to the
19 second paragraph in this exhibit.  It says, starting
20 with the second sentence in that paragraph:
21     "As we emphasize the value that every child
22     deserves a family, we also place great

Page 161

1      premium on the value of maintaining the
2      confidentiality of our children and
3      families.  They do not need the added
4      stigma of having their photographs and
5      identifying information such as age and
6      presenting condition publicized."
7          Do you see that?
8      A   Yes.
9      Q   Do you know why that message was being
10 transmitted by the director at this time?
11         MR. BRUCKHEIM:  Objection.  Again, that
12 calls for blatant speculation.  I'm not going to have
13 her answer it as phrased, but if you restate it
14 appropriately, I'll have her answer the question.
15 BY MR. CONDIT:
16     Q   Do you know whether the issue of
17 confidentiality had anything to do with Ms. Tabb's
18 circumstances for termination?
19     A   No, I don't.
20     Q   Do you recall having any conversation or
21 meeting with anyone prior to Ms. Tabb's termination
22 that concerned the issue of confidentiality?

41 (Pages 158 to 161)

DEPOSITION OF DEBORAH WILSON
CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 162

1    A   No.
2    Q   Were you aware during this time period --
3  and I'll refer to the time period as September,
4  October 2005 -- that there was allegations that
5  Ms. Tabb had provided photographs of children that
6  were at CFSA to the media?
7    A   On the media, when there was a scene of a
8  child, teen-ager, a client.  That's what I was aware
9  of, yes.
10   Q   Did you ever become informed or aware that
11 it was alleged that Ms. Tabb had provided a
12 photograph of a child that was a CFSA client?
13   A   Through the media, through the media
14 information.  The media story.
15   Q   And how did you know from the media story
16 that Ms. Tabb had provided that information?
17   A   I can't say that I know.  It was all a part
18 of the story, so . . .
19   Q   Were you asked to look into the issue of any
20 photographs that may have been taken of children who
21 had spent any time at CFSA?
22   A   I wasn't, no.

Page 163

1    Q   Do you know of anyone that was?
2    A   Perhaps OPI, but I don't know for sure --
3  OPI, Office of Public Information.
4    Q   And why do you say that?
5    A   Just by the nature of what they do.
6    Q   Okay.
7        MR. CONDIT:  Let me show you the next
8  exhibit.
9        (Whereupon, Plaintiff's Exhibit 16 was
10 marked for identification and attached to the
11 transcript.)
12       MR. CONDIT:  Ms. Wilson, you've been handed
13 what I believe has been marked Exhibit 16.  And this
14 is an e-mail chain involving yourself and Derek
15 Stewart.
16   Q   Take a look at it and tell me if you recall
17 it, please.
18   A   Um-hm, yes, I recall.
19   Q   So you received and sent the e-mails
20 reflected in this exhibit?
21   A   Yes.
22   Q   Now, the first e-mail, down at the bottom of

Page 164

1  the exhibit, is from you to Derek Stewart.  The
2  subject is "Photos."  It says:
3       "Will you provide the dates of the photos
4    you sent, and the statement you were going
5    to put together about the day you saw her."
6       Do you see that sentence?
7    A   Yes.
8    Q   What are you referring to there?
9    A   This -- I'm referring to a conversation that
10 Derek and Mindy had as it pertained to the last time
11 that Derek saw Shirley, and that he was assisting her
12 with copying or downloading some photos, and he spoke
13 of that.  And so that's where the request was to
14 provide copies of that.  Or if he had that
15 information still available.
16   Q   Now, did Mr. Stewart tell you that he had
17 assisted Ms. Tabb in -- what did you say --
18 downloading photos?
19   A   No.  He had assisted her -- and may not be
20 the right terminology -- but assisted her surely in
21 doing something with some photos.
22   Q   And why were you inquiring of Mr. Stewart

Page 165

1  about the issue of his work with Ms. Tabb on photos?
2    A   Because it had been brought to my attention
3  by Mr. Stewart and Mindy Good.
4    Q   Why was the issue of photos of any
5  significance?
6    A   I don't know.  It was brought to my
7  attention by Mindy.
8    Q   So you don't know why you were inquiring
9  into the issue of photos?
10   A   I was following up with the statement and
11 comments that were made by OPI that there had been
12 some assistance as it related to some photos.  I
13 don't know what those photos were.
14   Q   Did you learn what the photos were in your
15 conversations with Mindy Good and Mr. Stewart?
16   A   I did learn later on in the conversation
17 with Mr. Stewart.
18   Q   So the e-mail chain that we see in
19 Exhibit 16 involves two communications dated
20 October 11th, 2005; is that correct?
21   A   That's correct.
22   Q   So are you saying that after October 11th

42 (Pages 162 to 165)

64c52d74-f5a3-4f2c-a0c0-46fed19b09da

# DEPOSITION OF DEBORAH WILSON
## CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 166

1  you spoke to Mr. Stewart about the photos?
2     A   It would have been after the 11th, yes, a
3  follow-up conversation with him.
4     Q   And where would you have spoken to
5  Mr. Stewart?
6     A   I don't recall.  I don't know if it was a
7  phone conversation or in the building.
8     Q   Did you memorialize your conversations or
9  communications with Mr. Stewart on the topic of
10  photos and when he last saw Ms. Tabb?
11     A   I'm not aware of this any more than this or
12  other e-mails.  I'm not aware of that.
13     Q   Is it possible you made some notes on that
14  topic?
15     A   No.
16     Q   Drawing your attention to the e-mail from
17  Mr. Stewart to you at the top of the page, he says,
18  in the second -- third line I guess it is, second
19  paragraph:
20     "As for my statement regarding the day
21     Shirley cleaned out her office, I am not
22     certain.  I can't remember and cannot

Page 167

1  recollect the day that occurred."
2     Do you see that?
3     A   Yes, I do.
4     Q   Why is he telling you, if you know, about
5  the day Shirley cleaned out her office?
6     A   That was based upon a statement from Mindy
7  that Derek was in his office the last day that
8  Shirley was seen in her office, and I'm not sure what
9  that date was, and -- because at that point he didn't
10  know that she was no longer at the agency.
11     Q   So is it your understanding that Mr. Stewart
12  was stating that he had seen Ms. Tabb in the agency
13  at some point after her official removal?
14     A   No, this was sometime in August.
15     Q   Okay.  Did Mr. Stewart indicate why Ms. Tabb
16  would have been cleaning out her office in August?
17     A   No, he didn't.
18     Q   Did someone ask you to -- excuse me, you may
19  have answered that generally -- someone
20  specifically -- and by that I mean do you have a
21  name -- direct you to collect this information about
22  photos and the last time Mr. Stewart saw Ms. Tabb?

Page 168

1     A   Yes, based on conversation with Derek
2  Stewart and Mindy Good, I followed up for information
3  as to when he -- "he" being Derek -- recalled when he
4  last saw Shirley.  And based upon his conversation or
5  mentioning about assisting with something with
6  photos, asked him to provide that information as far
7  as time frame.
8     Q   Right.  And I realize that you testified
9  earlier that there was some communication with Mindy
10  Good and OPI about this topic.
11     But my question is more specific, is were
12  you directed by someone to pursue this information?
13     A   By Mindy and Mr. Charles.
14     Q   And what did Mr. Charles tell you in his
15  direction to you about this information?
16     A   Generally speaking, just what secret
17  information is available.
18     Q   And did Mr. Charles tell you why he wanted
19  this information?
20     A   No.
21     Q   Now, from an earlier exhibit we know that --
22  and from your testimony about the telephone call --

Page 169

1  that you witnessed Mindy Good and Ms. Tabb --
2     A   Yes.
3     Q   -- we know that Ms. Tabb was removed from
4  her position earlier in October; is that correct?
5     A   That's correct.
6     Q   Why was this inquiry going forward on
7  October 11th, 2005, after the removal, if you know?
8     A   Let me refer to something.  I believe there
9  was a period of time that Ms. Tabb had to respond,
10  and she had, as the process of summarily removing or
11  any disciplinary action, it was information gathering
12  as far as opportunities.  And the next process were
13  final decision, that type of thing.
14     Q   So at this point in time, October 11, 2005,
15  who is directing the agency's development of
16  information with respect to Ms. Tabb?
17     A   I'm not sure who the keeper of all of this.
18  I don't know.
19     (Recess taken.)
20  BY MR. CONDIT:
21     Q   Ms. Wilson, with respect to the exhibit we
22  were discussing before the break, which is

43 (Pages 166 to 169)

64c52d74-f5a3-4f2c-a0c0-46fed19b09da

DEPOSITION OF DEBORAH WILSON
CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 170

1    Exhibit 16, do you know whether any photos were
2    recovered or obtained by you or anyone else within
3    CFSA that were allegedly used by Shirley Tabb?
4        A    I'm sorry.  Please repeat that.  I'm sorry.
5        Q    Sure.  Let me make it simpler.  With respect
6    to this Exhibit 16, the photos that are being
7    referred to --
8        A    Um-hm, yes.
9        Q    -- did you ever get any photos?
10       A    I did receive something.  I haven't looked
11   at them, so I don't know what they are.  But there
12   was information from OPI.
13       Q    Okay.  So you got photos?
14       A    Again, I haven't looked at it, so I -- it
15   was a disk.
16       Q    Like a CD?
17       A    Yes, um-hm.
18       Q    And do you know what the CD was supposed to
19   have on it?
20       A    To my knowledge, it was supposed to have a
21   picture of the child.
22       Q    A picture of what child?

Page 171

1        A    The child that was allegedly sleeping in the
2    agency.
3        Q    And once you received the CD, did you look
4    at it at all?
5        A    No.
6        Q    Did you give it to anyone else?
7        A    I passed it on to senior staff.
8        Q    Specifically to whom did you give it?
9        A    To Mr. Charles.
10       Q    Do you still have a copy of that CD?
11       A    No, I don't have a copy.
12       Q    Do you have the original?
13       A    No, I passed it on.
14       Q    Do you know if Mr. Charles still has it?
15       A    I don't know.
16       Q    Other than the CD provided by OPI, have you
17   seen any other either printed or electronically
18   provided photos relating to the Shirley Tabb
19   circumstances?
20       A    No.
21       Q    Do you know who Kenneth Bickerstaff is?
22       A    Yes.

Page 172

1        Q    Who's Mr. Bickerstaff?
2        A    He's a former employee of the agency.
3        Q    Was Mr. Bickerstaff allegedly involved in an
4    incident involving shooting a firearm into Heather
5    Stowe's office from outside the building?
6        A    I've been informed of that.
7        Q    Were you involved at all in any personnel
8    matters with respect to Mr. Bickerstaff and the
9    incident I just described?
10       A    No.
11       Q    Do you know who Beatrice Willar is?
12       A    Yes.
13       Q    Who is Ms. Willar?
14       A    She is the manager for volunteer services.
15       Q    Do you know how she came to have that
16   position?
17       A    No.
18       Q    Do you have any interaction with Ms. Willar?
19       A    On occasion just passing in the hallway.
20       Q    But other than that, you have no
21   professional interactions with her?
22       A    No.

Page 173

1        Q    We talked a little earlier about the
2    different categories of employees, those that were
3    under the collective bargaining agreement, for
4    example, and those that were not.
5            Is there an official name or a description
6    of people who work for CFSA who are not under the
7    collective bargaining agreement?
8        A    Generally if -- you have career service
9    employees who are in the bargaining unit, and then
10   you have MSS, management service -- I think it's
11   management service employees who are non bargaining
12   unit.  And then you have some small groups of
13   individuals or classifications that's career service,
14   but they're not bargaining unit.
15       Q    Okay.  And among those classifications that
16   you just described, which one of them fit Ms. Tabb at
17   the time she was working at the agency?
18       A    Career service, bargaining unit.
19       Q    And what category would you fall in?
20       A    MSS.
21       Q    Is an MSS employee essentially an employee
22   at will?

44  (Pages 170 to 173)

64c52d74-f5a3-4f2c-a0c0-46fed19b09da

# DEPOSITION OF DEBORAH WILSON
## CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 174

1     A    Yes.
2     Q    Which means what, to your understanding?
3     A    My understanding is that the agency can
4  terminate me 30-day notice, or I can give a
5  resignation within 30-day notice.
6     Q    Does the agency have to have cause to
7  terminate you if you're MSS?
8     A    According to the DPM, no.
9         MR. CONDIT:  Let me show you what we'll mark
10  as the last exhibit.
11         (Whereupon, Plaintiff's Exhibit 17 was
12  marked for identification and attached to the
13  transcript.)
14         MR. CONDIT:  Ms. Wilson, I'm going to show
15  you what's been marked as Exhibit 17.  It's a section
16  of the District of Columbia Code from the
17  Whistleblower Protection for Employees of
18  Contractors.
19     Q    Do you see that?
20     A    Yes, I do.
21     Q    It's a two-page document.
22     A    Um-hm.

Page 175

1     Q    Do you recall I asked you a little earlier
2  whether or not you knew what rights you or other
3  employees might have under the District of Columbia
4  Whistleblower Act?
5     A    Yes.
6     Q    Take a look at this, please, and tell me if
7  you've ever seen or heard of any of these rights or
8  responsibilities as reflected in the document.
9     A    I have not.
10     Q    Okay.  Do you know who Ms. Tabb -- excuse
11  me.
12         Do you know who was the deciding official
13  concerning Ms. Tabb's removal?
14     A    I didn't know until this exhibit was -- I
15  didn't recall until this exhibit was presented.  And
16  it was -- I don't remember.  Mr. Ronnie Charles.
17     Q    Mr. Charles was the deciding official on the
18  removal?
19     A    Yes.
20     Q    And what exhibit are you referring to?
21     A    Exhibit 12.
22     Q    May I see that for a moment, please?  Thank

Page 176

1  you.
2         And what is it in Exhibit 12, which is the
3  October 3, 2005 letter from Brenda Donald Walker to
4  Shirley Tabb, what is it that indicates that
5  Mr. Charles was the deciding official?
6     A    On the second page next to the last
7  paragraph it indicates -- identifies Mr. Charles as
8  the person who will issue a notice of final decision.
9     Q    Now, with respect to the removal action, the
10  summary removal, who was the deciding official on
11  that?
12     A    I'm sorry?
13     Q    Who was the deciding official in the removal
14  of Ms. Tabb from the agency?
15     A    The summary removal?
16     Q    The summary removal, yes.
17     A    It was Mr. Charles made the final decision.
18     Q    And so why isn't the letter that you're
19  referring to as Exhibit 12 signed by Mr. Charles?
20     A    Because the proposing would be from the
21  director, and then a final decision can be at the
22  director's designee.

Page 177

1     Q    So if I'm understanding your testimony
2  correctly, it is your understanding from looking at
3  the documentation that Brenda Donald Walker is the
4  proposing official for the termination; is that
5  correct?
6     A    Yes.
7     Q    And Mr. Charles is the deciding official?
8     A    Yes.
9         MR. CONDIT:  Ms. Wilson, thank you for your
10  time.  I don't have any other questions for you at
11  this time.  However District counsel may have some
12  questions for you.
13         MR. BRUCKHEIM:  I do not.
14         We can waive reading.
15         (Signature having been waived, the
16  deposition of DEBORAH WILSON was concluded at
17  3:29 p.m.)
18
19
20
21
22

45 (Pages 174 to 177)

64c52d74-f5a3-4f2c-a0c0-46fed19b09da

DEPOSITION OF DEBORAH WILSON
CONDUCTED ON WEDNESDAY, JANUARY 9, 2008

Page 178

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2        I, Denice Zelma Lombard, Certified Shorthand
3    Reporter, the officer before whom the foregoing
4    proceedings were taken, do hereby certify that the
5    foregoing transcript is a true and correct record of
6    the proceedings; that said proceedings were taken by
7    me stenographically and thereafter reduced to
8    typewriting under my supervision; and that I am
9    neither counsel for, related to, nor employed by any
10   of the parties to this case and have no interest,
11   financial or otherwise, in its outcome.
12       IN WITNESS WHEREOF, I have hereunto set my
13   hand and affixed my notarial seal this 14th day of
14   January 2008.
15   My commission expires April 30, 2008.
16
17
18   _____
19   NOTARY PUBLIC IN AND FOR
20   THE DISTRICT OF COLUMBIA
21
22

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664